# EXHIBIT 88

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE APPLE IPHONE

ANTITUST LITIGATION,        Case No. 4:11-cv-06714

YGR

_____

VIDEO DEPOSITION OF DANIEL L. McFADDEN, Ph.D.

San Francisco, California

Wednesday, May 14, 2025

STENOGRAPHICALLY REPORTED BY:

REBECCA L. ROMANO, RPR, CSR, CCR

California CSR No. 12546

Nevada CCR No. 827

Oregon CSR No. 20-0466

Washington CCR No. 3491

JOB NO. 7370734

PAGES 1 - 256

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE APPLE IPHONE

ANTITUST LITIGATION,        Case No. 4:11-cv-06714
                    YGR

_____

DEPOSITION OF DANIEL L. McFADDEN, Ph.D.,
taken on behalf of the Defendant, at Gibson Dunn &
Crutcher, LLP, One Embarcadero Center, Suite 2600,
San Francisco, California, commencing at 9:06 a.m.,
Wednesday, May 14, 2025, before REBECCA L. ROMANO,
a Registered Professional Reporter, Certified
Shorthand Reporter, Certified Court Reporter.

Page 2

APPEARANCES OF COUNSEL

For the Consumer Plaintiffs:
    WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
    BY:  MARK C. RIFKIN
    Attorney at Law
    270 Madison Avenue
    New York, New York 10016
    (212) 545-4600
    rifkin@whafh.com

For the Defendant:
    GIBSON, DUNN & CRUTCHER LLP
    BY:  DANIEL G. SWANSON
    Attorney at Law
    333 South Grand Avenue
    Los Angeles, California 90071-3197
    (213) 229-7430
    dswanson@gibsondunn.com

/////

Page 3

APPEARANCES OF COUNSEL(cont'd)

For the Defendant:
    GIBSON, DUNN & CRUTCHER LLP
    BY:  HARRY R. S. PHILLIPS
    Attorney at Law
    1050 Connecticut Avenue, N.W.
    Washington, DC 20036-5306
    (202) 887-3706
    hphillips2@gibsondunn.com

ALSO PRESENT:
    Conor Foley, Cornerstone Research(via Web
conference)
    David Grothouse, Senior Litigation Counsel at
Apple
    Shawna Hynes, Videographer
    Miguel Matamoros, Brattle Group
    E. Charlie Nusbaum, Brattle Group

/////

Page 4

I N D E X

DEPONENT                     EXAMINATION
DANIEL L. MCFADDEN, PH.D.              PAGE

BY MR. SWANSON                    10
BY MR. RIFKIN               248

E X H I B I T S
NUMBER                        PAGE
        DESCRIPTION
Exhibit DX61   Expert Report of Daniel L.      10
        McFadden, Ph.D. dated March 7,
        2025;

Exhibit DX62   Stipulation and Proposed Order    96
        for Leave to File Third Amended
        Consolidated Class Action
        Complaint;

Exhibit DX63   Paper - Choice  What Can Go      120
        Wrong?;

/////

Page 5

2 (Pages 2 - 5)

E X H I B I T S(cont'd)

NUMBER                    PAGE
        DESCRIPTION
Exhibit DX64   Draft Paper - The Economic       177
        Impact of a Market
        Intermediary's Sales
        Commission;

Exhibit DX65   Amicus Brief dated April 7,       232
        2025;


        PREVIOUSLY MARKED EXHIBITS
NUMBER                    PAGE
Exhibit DX37                    36

COURT REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

/////

Page 6

---

San Francisco, California;

Wednesday, May 14, 2025

9:06 a.m.

---o0o---

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:06 a.m. on May 14th, 2025.

Please note the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video-recorded deposition of Professor Daniel McFadden taken by counsel for defendant in the matter of In Re: Apple iPhone Antitrust Litigation, filed in the United States District Court, Northern District of California Oakland Division, Case No. 411-CV-06714YGR.

The location of this deposition is One Embarcadero Center, Suite 2600, San Francisco, California 94111.

My name is Shawna Hynes, representing Veritext Legal Solutions, and I am the

Page 7

---

videographer.  I am not related to any party in this action nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. SWANSON:  Dan Swanson for Apple Inc.

MR. RIFKIN:  Mark Rifkin for the plaintiffs.

MR. PHILLIPS:  Harry Phillips for Apple.

MR. GROTHOUSE:  David Grothouse for Apple.

MR. NUSBAUM:  Charlie Nusbaum with Brattle Group.

Mr. MATAMOROS:  Miguel Matamoros with Brattle Group.

THE VIDEOGRAPHER:  Thank you.

Will the court reporter please introduce yourself and administer the oath to the witness, and then counsel may proceed.

THE COURT REPORTER:  My name is Rebecca

Page 8

---

Romano.  I'm a California certified court reporter, license 12546.  I will be producing a transcript that is automatically admissible in court.

If you could raise your right hand for me, please.

THE DEPONENT:  (Complies.)

THE COURT REPORTER:  You do solemnly state, under penalty of perjury, that the testimony you are about to give in this deposition shall be the truth, the whole truth and nothing but the truth?

THE DEPONENT:  I do.

/////

Page 9

3 (Pages 6 - 9)

DANIEL MCFADDEN,                     09:08:04
having been administered an oath, was examined and
testified as follows:

EXAMINATION

BY MR. SWANSON:                     09:08:04

Q. Good morning, Professor McFadden.

A. Good morning.

Q. For the record, would you state your full name?

A. Daniel McFadden.                     09:08:34

Q. Okay. Now, we have premarked our first exhibit today --

(Exhibit DX 61 was marked for identification by the Court Reporter and is attached hereto.)                     09:08:41

Q. (By Mr. Swanson) -- which bears the number DX61. I think there's a copy that is within arm's length there.

That is, as I understand it, your most recent expert report.                     09:08:57

Could you confirm that for us?

A. Yes.

Q. And did you draft that report yourself?

A. I -- I prepared this in the same way that I have previous reports, which is I drafted it, but     09:09:12

Page 10

I have supporting staff as well.                     09:09:16

Q. And you therefore had assistance from some of the folks who worked at Brattle; is that correct?

A. That's correct.                     09:09:30

Q. And who at Brattle would that be?

A. That would be the two gentlemen at the table here, Mr. Nusbaum and Mr. Matamoros.

Q. Would that include Dr. Song?

A. No. I think at the point I was asked to     09:09:51
write this, there was a separation, which he went his way and I went mine.

Q. Do you know if Dr. Song saw a draft of your report?

A. I don't know directly, but my     09:10:09
understanding is that it would have been shared by the -- the staff.

Q. Are there any opinions that you intend to offer at trial that are not disclosed in your March 7 report?                     09:10:26

A. As of now, my understanding is that this is what I would be asked opinion about in court.

Q. Could you turn to page 4 of your report. I wanted to ask you a question about paragraph 11 at the top.                     09:10:45

Page 11

You state there, unless otherwise noted,     09:10:55
you reaffirm your opinions from your 2023 supplemental report and your other reports during the class certification stage.

Do you see that?                     09:11:04

A. Yes.

Q. When you're referring to your other reports during the class certification stage, is that all -- all of them?

A. I would say yes. I view -- in order     09:11:18
for -- to answer that in -- in -- with precision, I would need to know the specific opinion and whether there was clarifications and along the line. But the answer is generically yes.

Q. Okay. Are there any specific past     09:11:37
opinions that you can recall that you're not reaffirming?

A. No, I don't recall -- I don't -- I don't have any opinions now which were different from what I had then.                     09:11:59

Q. Are you reaffirming your opinion on relevant market definition as set forth in your opening report?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would say that -- one     09:12:15

Page 12

question is -- is whether I am now offering     09:12:18
opinions on some of the issues that I addressed before, and that was one area where -- where I am not offering an opinion in this report.

Q. (By Mr. Swanson) When you say it's an     09:12:36
area when you are not offering an opinion, are you indicating that you don't expect to be offering the opinion you previously rendered?

A. My understanding is that that subject is now the responsibility of Professor Stiglitz, and I     09:12:52
defer to him on those issues.

Q. All right. We'll come back to that.

Is it still your opinion that absent the alleged misconduct, all or nearly all consumers of iOS apps or in-app content would have paid lower     09:13:12
prices for their purchases?

A. As you stated. I -- I believe that was a general opinion in my previous work and I -- I stand by those opinions.

Q. Could you turn to paragraph 20 of your     09:13:43
report, please.

At the very bottom, I think it's the -- the last sentence that carries over from page 6 to page 7, you say there that you also testified why the tax incidence framework shows that     09:14:01

Page 13

4 (Pages 10 - 13)

super-competitive commissions charged by Apple 09:14:05 impacts all members of the class.

Do you see that?

A. Yes, I see that.

Q. By "all," do you mean 100 percent? 09:14:19

A. Yes, I -- I believe 100 percent of the people are impacted that are not necessarily encountered overcharge arm, but they -- they are impacted.

Q. How is a consumer impacted by Apple's 09:14:54 super-competitive commission if she would have paid more in the but-for world, according to your model?

A. Well, as I opined in my original report in 2021, and I think Professor Stiglitz has also opined, there can be harm to the consumers separate 09:15:16 from the issue of whether they incurred monetary damages from an overcharge, so...

Q. Well, monetary damage is all about the impact of the super-competitive commission, right?

MR. RIFKIN: Objection to form. 09:15:35

THE DEPONENT: Please repeat the question.

Q. (By Mr. Swanson) Monetary damage is all about the impact of the alleged super-competitive commission, right? 09:15:50

Page 14

MR. RIFKIN: Objection to form. 09:15:51

THE DEPONENT: Well, this -- this -- this sentence I don't think is restricted to monetary damage. Impact could be both monetary damages and nonmonetary arm. 09:16:07

Q. (By Mr. Swanson) I understand you have an opinion or Professor Stiglitz has an opinion that there may be other nonmonetary injuries, but this sentence is about the super-competitive commission, and that's a monetary issue, is it not? 09:16:21

A. Not necessarily, no. The super-competitive commission have impacts beyond the -- the direct monetary effect on the -- on the -- on the charge paid on current purchases.

Q. And what would those nonmonetary effects 09:16:40 be of the commission -- be from the commission allegedly being excessive?

A. Well, as I -- as I cited in my original report, there could be a suppressing effect on -- on entry into the developer marker so that fewer 09:17:00 apps were available. The -- the -- they could have a negative impact on innovation by developers.

These things are also enumerated by Dr. Stiglitz, and this is an area that I -- that I defer to him on in terms of the current litigation. 09:17:19

Page 15

(Discussion off the stenographic record.) 09:17:33

Q. (By Mr. Swanson) If a consumer would have paid more in the but-for world, according to your model, is that consumer benefited monetarily by the conduct in the super-competitive commission? 09:17:49

A. Please start over. I didn't get the whole sentence.

Q. If a consumer would have paid more in the but-for world, according to your model, is that consumer monetarily benefited by the 09:18:05 super-competitive commission?

MR. RIFKIN: Object to form.

THE DEPONENT: In terms of the overcharge, the answer is that -- that person is now -- has a negative overcharge. That's correct. 09:18:20

Q. (By Mr. Swanson) And a negative overcharge is good to consumers, is it not?

MR. RIFKIN: Object to form.

THE DEPONENT: This gets to the question of what's good for consumers. If you say have -- 09:18:36 have they benefited monetarily in terms of the overcharge, the answer is yes.

Have they benefited overall? That's a broader question, and I'm not offering an opinion on that. And as I say, Professor Stiglitz has 09:18:51

Page 16

opined on it, and I defer to his opinions on that. 09:18:55

Q. (By Mr. Swanson) When you speak of the class in your March 7 report, which class definition are you using?

A. In my original work, the class was 09:19:09 defined as all consumers who bought iOS apps in the aftermarket. That was subsequently not changed, but an alternative was offered of a $10 cutoff, which was defined in terms of Apple ID expenditures. 09:19:39

So in my original class certification stage reports, both of those cases were -- were considered, and that was the class considered at that time.

The -- the damage model and -- and design 09:19:52 is flexible with respect to the definition of the class because that simply determines what -- what accounts payors are considered and what transactions by them are considered, and that's adjustable in the implementation of the model. 09:20:15

Q. Are statements about the original class definition in your prior reports still valid when applied to the current class definition?

MR. RIFKIN: Objection to form.

THE DEPONENT: My understanding is that 09:20:37

Page 17

5 (Pages 14 - 17)

there are at least proposed modifications to the class definition, and that's not something that I have considered.

Q. (By Mr. Swanson) I did want to ask you that, but my question was a little bit different.

It is: When you in your prior reports made a statement or offered an opinion about the class as it was defined then, do those statements and opinions still apply in your current reports?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would say they do apply in my current report because my current report is essentially a description of the damage analysis and framework that I had established through 19 -- 1923 [sic].

Q. (By Mr. Swanson) Professor, how many hours have you spent on the case since your last deposition, which was in February of 2023?

A. I haven't added up current hours, but it's in the ballpark of one month.

Q. And do you have a sense of how many hours you've spent working on the case since you retired from Brattle in December of 2023?

A. That one month is -- is basically the -- the time spent on this report, and -- and I had

Page 18

no -- no work between my retirement and the preparation of this report.

Q. What was your assignment in connection with your March 7 report?

A. It's probably -- the best way to describe is tell you what I was asked to do. Go to paragraph -- no, I'm sorry.

Q. Paragraph 3? Does that help?

A. Yes, paragraph 3. So I was asked to explain for the merits litigation the -- the architecture of the damage analysis and -- and how it is designed and how it was designed to work.

Q. That description in paragraph 3, is that the full extent of your assignment for your trial testimony?

A. Yeah, for -- for -- for potential future trial testimony in the merits case? Is that what you're referring to?

Q. Well, as -- as you sit there expecting to deliver opinions that are in your report at trial, does that paragraph 3 essentially describe the full scope of -- of your testimony?

A. I -- I would say that's certainly what I was asked to do. I -- I -- I have no -- no instructions at this point to mutually explain

Page 19

that.

Q. If you move to paragraph 4 on that same page, you state that you were invited to work on this project by David Sunding, Ph.D., formerly president of The Brattle Group and now vice chairman of Berkeley Research Group, LLC.

Do you see that?

A. Yes.

Q. Are you still in contact with Dr. Sunding in connection with this case?

A. No.

Q. Do you have affiliation with the Berkeley Research Group?

A. No.

Q. What was Dr. Sunding's role in your work in this case aside from -- from being invited, as you described here?

A. He was a participant in the group discussions with me and -- and staff as to how to approach damage calculations in this litigation, and -- and I'm understanding from staff he was kept informed, although he did not remain in active day-to-day participation in the work.

Q. Did you -- you say in your report that you kept him informed of the theoretical work that

Page 20

you performed.

Did you keep him involved and informed with respect to the empirical work as well?

A. I did not personally, no.

Q. Did you rely on any feedback from Dr. Sunding about your work?

A. I don't know if you'd call it feedback, but there certainly was a work discussion among -- among Ph.D. economists about the nature of the economic model, what the market was here in -- and how to go about modeling prices, price changes.

Q. These were oral discussions with Dr. Sunding?

A. Yes.

Q. In paragraph 4 of your report, you also indicate that, during the class certification stage, you directed and worked closely with Minjae Song, Ph.D., another principal of The Brattle Group, in the creation, testing and implementation of your damages model.

Which of you was primarily responsible for the creation of the model?

A. I would say that if you describe building this damage analysis like you're building a house, I was the architect for the plan and he was the

Page 21

6 (Pages 18 - 21)

contractor who actually -- actually put the structure in place.

Q. Who was the inspector who did the testing?

A. Well, I would say -- say that -- that the judge was the planning department.

MR. SWANSON: I don't know what our role was.

Q. (By Mr. Swanson) And -- and then Dr. Song, as the contractor, would have been the implementer?

A. Well, I would say that that work was done under my direct supervision, so I was involved on a regular basis with -- with the implementation.

Q. You were a hands-on architect?

A. Well, I would say I was certainly a supervising architect, and so I was conferring regularly and being consulted regularly on how to proceed.

Q. Were there any errors in the implementation of the model in the class certification phase?

MR. RIFKIN: Objection to form.

THE DEPONENT: There -- there were -- there were certainly some errors, which were

Page 22

pointed out by your defense experts and -- and point -- requested -- the court required us to correct, yes.

Q. (By Mr. Swanson) And who was primarily responsible for those errors?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would think we'd have to look at specific issues, but certainly some of the errors were computational, and I think those would have been -- coding -- coding issues raised by the coders -- caused by the coders.

Q. (By Mr. Swanson) And the coders are people who work at Brattle?

A. As far as I know, that coding was all done internally, yes.

Q. And who was supervising the coders?

A. I would say Dr. Song.

Q. There was an implementation issue when your team created a model which relied on a fixed dollar method for calculating individual damages that you essentially rejected in favor of a percentage method.

Do you recall that?

MR. RIFKIN: Object to the form.

THE DEPONENT: I do recall that. That

Page 23

was a -- a misunderstanding on my part because I -- I failed to make the distinction between work that was done to respond to -- to your expert, Dr. Prince, and work that would be done as part of the affirmative damage analysis.

I was confused on that issue in your -- in my deposition, as I'm sure you recall.

Q. (By Mr. Swanson) Did Dr. Song supervise the implementation of the fixed dollar method in that episode?

A. I would say that -- that -- that work done for the preparation of -- of the reply was -- Dr. Prince -- was done under my supervision and I -- I was aware of it. Dr. Song was -- as I said, was the contractor. I was aware of it. I simply confused -- got myself confused in response to your questions.

Q. At one point there was a computational error which dropped apps whose minimum monthly average price was not precisely the same as its maximum monthly average price over a given year.

Do you recall that?

A. Yes. I recall an issue where -- where round-off cents could make a difference in the -- that was -- should have been caught in the coding.

Page 24

Q. And who was supervising the process?

A. I -- I actually don't know exactly. I mean, I -- Dr. Song and I were responsible for it, but I'm not sure. That's pretty far down the -- the chain in terms of -- of the work. I'm not sure who the direct supervisor of that coder was.

Q. You state in your current report that effective December 31, 2023, you retired as a principal of The Brattle Group.

Why did you retire?

A. Well, my hearing is not as good as it used to be, and I've been trying to get a little bit of research done and -- give my wife a little bit of benefit of retirement.

Q. Did your experience with Brattle in this case lead you to be dissatisfied with the support that they provided?

A. No.

Q. Have you formed any affiliation with a different consulting firm since then?

A. No.

Q. You indicate in paragraph 4 of your report that since the time that you retired, "Dr. Song has directly overseen the implementation of my methodology using the App Store transactions

Page 25

7 (Pages 22 - 25)

data for all genres in his expert report, including 09:33:12 preparing the underlying data for the modeling."

What do you mean in that sentence by "directly overseen"?

A. He is -- I'm no longer the -- the 09:33:30 operating architect, the supervising architect for that work. I have retired from that, so he's taken on that role.

Q. Have the blueprints changed at all since you retired? 09:33:44

A. I would say they have not. It's exactly the same blueprint. There are -- just as in building a house there may be construction issues in what materials are available and so forth, and I think some of those are present in Dr. Song's 09:33:58 current work, but I'm not involved in that.

Q. Have you had a role in directing any of Dr. Song's work from 2024 forward?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would say that I have 09:34:24 been kept apprised of that work, and occasionally I've been asked my opinion on -- implementation issues that have arisen, but I have not had any supervisory role.

Q. (By Mr. Swanson) You state that you and 09:34:42

Page 26

Dr. Song have conferred regularly as he has 09:34:45 implemented your methodology.

How regularly?

A. I would say quite regularly in 2025 and infrequently before 2025. 09:34:58

Q. Have these been oral or written communications or both?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, we have Zoom meetings, so oral and visual. 09:35:16

Q. (By Mr. Swanson) Any written communications?

A. Well, I've been shown documents and tables and such on Zoom, but I don't have copies.

Q. Do you know if Dr. Song has relied on 09:35:33 your feedback in these various conferences that you've had with him?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would have to look at -- at the specific issues, but I think by and large 09:35:56 the -- the -- the way this has gone is that various issues have come up and he's suggested how they would like to handle it and asked if that was -- what I thought was the best thing to do, and I can't think of any exceptions where I did not think 09:36:19

Page 27

it was the best thing to do. 09:36:22

Q. (By Mr. Swanson) Can you think of an example of one of those issues?

MR. RIFKIN: I'm going to object here. I think the protocol prohibits your inquiry into 09:36:32 communications between the experts, and I think this probably encroaches on that.

MR. SWANSON: I mean, I agree that there is an exclusion for communications among experts and their staff. The only question I have is 09:36:50 whether that has been waived by what's in the report.

MR. RIFKIN: I don't think so at all.

MR. SWANSON: Are you going to instruct him not to answer? 09:37:01

MR. RIFKIN: I think it's inconsistent with -- with the order. So if it requires an instruction, then yes.

MR. SWANSON: I mean, I think you have to tell us if this is -- you're taking the position 09:37:13 that this doesn't waive that because there is an exception for reliance.

MR. RIFKIN: I think if you want to ask Dr. Song if he relied upon any of those communications, you may want to do that to 09:37:28

Page 28

establish it as a threshold. But I don't know that 09:37:30 Professor McFadden can tell you what Dr. Song relied upon or didn't. I don't think you've established that.

MR. SWANSON: Yeah, I'm really talking 09:37:40 now about what Professor McFadden is relying on.

MR. RIFKIN: I'm sorry. Then maybe I misunderstood the question. Are you asking whether Professor McFadden relied upon any communications from Dr. Song in preparing his report? I thought 09:37:54 you were asking if -- if Dr. Song relied upon any of those communications in preparing Dr. Song's report. I could have misunderstood the question.

MR. SWANSON: Yeah. I mean, there's an extent to which it probably goes to both, but I 09:38:09 think it was more intended to be the former rather than the latter --

MR. RIFKIN: Okay.

MR. SWANSON: -- at this stage.

MR. RIFKIN: Well, then, why don't you 09:38:16 clarify the question, and then let's see if Professor McFadden can answer the predicate question first.

MR. SWANSON: Okay.

Q. (By Mr. Swanson) When you indicate here, 09:38:24

Page 29

8 (Pages 26 - 29)

Professor McFadden, that you and Dr. Song have conferred regularly as he has implemented your methodology, are you relying on those discussions in connection with offering up the opinions that are in this March 7 report?

A. No, I am not.

Q. And do those discussions have any bearing on your opinions in this case?

MR. RIFKIN: Objection to form.

THE DEPONENT: I suppose they do, because I -- my opinion is that -- to the extent that I have been apprised of what Dr. Song has done, he is implementing his work in conformity with the original architecture for the damage analysis.

Q. (By Mr. Swanson) Okay. And in reaching an opinion as to whether he has properly implemented your blueprints, have you relied upon your discussions with him about issues that have come up about how to implement the methodology?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would say in the -- in the end, it's -- it's Dr. Song's responsibility to explain to you whether or not and -- and how he is -- he has done his implementation. But at -- at the high level in which he and I had had

Page 30

discussions, my -- my understanding is that it -- he's following the original design.

Q. (By Mr. Swanson) Is the selection of instrumental variables for the genres that you did not address in your prior reports a topic that you considered to be one of implementation of your methodology?

A. Yes, I think that's an implementation issue which the -- the operating econometrician has the responsibility to sort out.

Q. And that would be Dr. Song?

A. That would be Dr. Song for his current work, yes.

Q. And do you have an opinion about whether or not his selection of instrumental variables for those new genres was a reliable selection?

A. Actually I have not even reviewed that work in detail. I just have a broad overview that he's carried on in a similar way to what was done earlier. So at this point, I don't have a basis for -- for offering any opinion.

Q. In Appendix B to your March 7 report, you list the materials that you relied upon in preparing that report?

A. Yes.

Page 31

Q. And I think that list is at pages 44 to 45 in this -- again, look at that.

Is this a list that supplements the lists of relied-upon materials from your prior reports?

A. I think the answer is yes in the sense that there were materials that went into my original opinions, and those -- to the extent that I'm holding those opinions indirectly, then I'm also relying on the support for that.

Q. So between all of those lists attached to all of your prior reports along with this list, have you identified all documents and information that you've relied on in connection with forming your opinions that you intend to provide at trial?

A. Yes.

Q. On page 44, you have a section of this appendix that is entitled "Expert Reports."

Do you see that?

A. Yes.

Q. One of the expert reports you list is the March 7, 2025, report of Dr. Minjae Song.

Do you see that?

A. Yes.

Q. Have you reviewed the entirety of Dr. Song's report?

Page 32

A. I have a copy of it and I have skimmed it at least, and in particular I -- I read more carefully the -- the section which was relevant which is mentioned in my report, which is the -- the introduction of data on payors, I suppose, to accounts.

Q. That report is, I believe, over 100 pages.

How many pages would you say you read carefully?

A. I -- I don't have a -- a count in my mind, so I don't think I can accurately answer that. But I would say that -- the -- the section that dealt with -- with payors is the section that I read carefully.

I also discussed with staff at various points the -- the general nature of -- of Dr. Song's findings.

Q. When you say you skimmed his report, was that a one-time skimming or did you skim it over several occasions?

A. I would say there were two -- two phases. One is before -- before the preparation of my report. I was primarily getting staff reports on his work, and that included details -- some details

Page 33

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

on payors, the new payor data as opposed to account ID data.

But beyond that, I -- I think I actually started to read the report only after my report was filed. I received a copy of it after his report was filed.

Q. So after March 7th?

A. Yes.

Q. Are you vouching for the accuracy of Dr. Song's estimates and opinions in his report?

A. I would say that what I -- what I -- my understanding from what I -- what I have been told about and have read about in his report that it follows the -- the design that I originally set out, the blueprint, and to -- and my -- my -- I guess you could say I could vouch for that.

For the implementation issues, that's mostly work done -- I think work done after -- after I retired. I'm not in a direct supervisory role for that, so I -- he -- he would be the person to ask about that work.

Q. To the best of your knowledge, are there any errors or inaccuracies in Dr. Song's report?

MR. RIFKIN: Objection to form.

THE DEPONENT: Not -- not to my

Page 34

knowledge.

Q. (By Mr. Swanson) Can you flip to page 1 of your report, please. I'm going to ask you a question keyed off of paragraph 1, where you describe the definition of the certified class. I think that's the second sentence in paragraph 1.

A. I have it in front of me.

Q. Okay. You understand that the class was certified to include all purchases for use on iPod Touch devices?

A. This -- this description is itself taken from, I think, court documents, and I think at the time those documents were written, the terminology was "all iOS devices," and I understand that that -- that that included the -- the iPod Touch.

Q. In your prior reports, you included iPod Touch transactions, didn't you?

A. That -- there were specific instructions of -- of what -- what Apple ID accounts were used, and that's detailed in -- in the previous work.

And as I sit here now, I believe that did include iPod Touch, but that's not something that I was paying attention to at the time, and the -- the instructions were -- at the time were look at all iOS device aftermarket purchases.

Page 35

Q. In a prior deposition, we had marked your June 1st, 2021, report as Exhibit DX37.

MR. SWANSON: I don't think we need to mark it again.

MR. RIFKIN: No.

MR. SWANSON: But we will give you a copy.

MR. RIFKIN: If you want us to look at it, sure.

Q. (By Mr. Swanson) Could you turn to page 6 of that -- it's a hefty document there -- to page 6, paragraph 16.

THE DEPONENT: 16, did you say?

MR. SWANSON: Paragraph 16.

MR. RIFKIN: Paragraph 16?

MR. SWANSON: On page 6.

THE DEPONENT: Yes.

Q. (By Mr. Swanson) And you state there that Apple mobile devices relevant for this matter are the iPhone, iPad and iPod Touch.

Do you see that?

A. Yes.

Q. And you defined the term "iOS mobile devices" as used in that report to include the iPod Touch, correct?

Page 36

A. That was my understanding at the time, yes.

Q. Okay. And then in paragraph 17 -- let's see. You state toward the bottom of that page:

"The iPod Touch's relative share of App Store transactions among the iOS mobile devices peaked in 2009, accounting for 36 percent of the App Store revenues at the time, and then decreased rapidly afterward."

Do you see that?

A. I do.

Q. And is that still your understanding?

A. Yes.

Q. Do you understand that Apple launched the App Store on July 10, 2008?

A. I don't recall the specific dates, but I believe that's right.

Q. If you look at paragraph 21 of that report, I think that will refresh your recollection.

A. Yes.

Q. And that indicates -- your report indicates that Apple launched the App Store on July 10, 2008, right?

A. Yes.

Page 37

10 (Pages 34 - 37)

Q. Okay. Could you turn to page 149 of this 2021 report and take a look at figure 23.

A. I have that in front of me now.

Q. All right. Thank you.

So figure 23 shows there were almost 7 billion iPod Touch transactions in the full transactional data that you had at that time, right?

A. Gee, I'm sorry. It's been some years now since I have looked at any of this, and I don't recall the -- the context or this table, so I don't know what these -- what this refers to.

Is it -- is it -- is this table reporting the -- the numbers of transactions up to 2019? Is that correct?

Q. Well, if you need to refresh yourself in looking at the report, I mean, I'm certainly happy to let you do so.

The figure 23 reports figures from above sample and the full data, right?

A. Yes. And again, I -- I simply don't recall this table now. And I have go back and know what that refers to, although the work in that report initially used a single 0.1 of 1 percent sample in the full transaction.

Page 38

Q. And that would be the sample referred to in figure 23, correct?

A. Presumably.

Q. Well, the notes say "calculations based on a 0.1 percent random sample," right?

A. Is that -- what was the question?

Q. I said the notes to figure 23 at the bottom there --

A. Yes.

Q. -- of that figure say "calculations based on 0.1 percent random sample," right?

A. Yes, that's what it says.

Q. And that's how you were doing estimation back at that time with a single 0.1 percent --

A. Yeah.

Q. -- random sample, right?

A. In the original report, yes.

Q. And you -- reporting in figure 23 the number of transactions for these various devices that were in the sample, right?

So, for example, for iPod, there were 6.6 million, roughly, transactions in the sample that you were using, right?

A. That's -- that sounds right.

Q. And on the right-hand side, the

Page 39

indication was that that's -- those iPod transactions were 10.4 percent of the sample, right?

A. That's -- that's what the table indicates.

Q. Okay. And then you have columns for full data where you indicate that there are 6.7 billion, roughly, iPod transactions accounting for 10.4 percent of the full transactional data that you had up to that point in time; is that not correct?

A. Yes.

Q. Now, you included those 6-plus billion iPod Touch transactions in the relevant aftermarket that you defined; is that not correct?

A. That's -- that's correct.

Q. And you included iPod Touch devices in the primary market that you defined?

A. I -- I would say that in the damage analysis, I was concerned with the aftermarket, and -- and so these tables have to deal with the aftermarket. I would say at that point I certainly -- my understanding was that iPod Touch was an iOS device that operated in that aftermarket. I don't recall ever offering any

Page 40

opinion on the -- the primary market, though, the device market.

Q. You don't recall in your report -- prior reports identifying the devices that constituted the primary market, sometimes called the fore market, F-O-R-E?

A. Yes. Well, I suppose I must have done. I would have go back and review, reread the report to -- to recall what -- what I said.

Q. You included iPod Touch transactions in your estimation of consumer demand in all of your prior reports, correct?

A. Yes, I would -- I do not recall that it was -- it was identified as any separate class of -- of transactions.

Q. You included iPod Touch transactions in calculating damages in all of your prior reports, correct?

A. As far as I can recall, yes.

Q. You can put the older report to one side now, and we can switch back to your March 7 report.

If you could turn to page 1 of your March 7 report, and in particular, footnote 2.

In footnote 2, you state that "For purposes of this report, I have been instructed by

Page 41

11 (Pages 38 - 41)

counsel to treat iPhones and iPads but not the iPod    09:59:15
Touch as iOS mobile devices."

Do you see that?

A.  Yes.

Q.  Who gave you that instruction?    09:59:24

A.  That -- reported to me by staff as coming
from the plaintiffs' counsel.

Q.  And were you given to understand why iPod
Touch devices were not to be treated as iOS
mobile devices?    09:59:44

MR. RIFKIN:  Objection.  Again, I think
we're getting to the point where your questions
encroach on areas that are excluded from discovery
by the -- by the order protocol.

Q.  (By Mr. Swanson)  Well, setting aside    10:00:05
what staff may have told you about counsel's
direction, do you have any understanding as you sit
here as to why iPod Touch devices are not treated
as iOS mobile devices in your report?

MR. RIFKIN:  Well, that -- that doesn't    10:00:24
quite cover the -- the exemptions because it's not
just staff.  Is also includes communications with
other experts as well as communications with
counsel.

So I think that the question still    10:00:36

Page 42

encroaches on areas that are exempt from discovery.    10:00:39

Q.  (By Mr. Swanson)  Are you relying on
instruction from counsel in your report?

A.  Yes.  My -- my understanding is that
counsel has asked the court to exclude iPod Touch,    10:00:52
and I'm -- I'm not -- I don't have an opinion on
why they are asking for that.

But the instructions here were to prepare
this report basically on the assumption the court
would accept their -- their modification of the    10:01:10
class definition.

Q.  As an economist, do you have an opinion
as to whether or not it's appropriate to exclude
iPod Touch transactions from the estimation of your
model?    10:01:26

MR. RIFKIN:  Objection to form.

THE DEPONENT:  Well, as an
econometrician, I would have the opinion that it
would have -- make virtually no difference to the
estimation of the damages, because while -- while    10:01:39
they accounted as quite a quite large number of
transactions, they account for a tiny fraction of
the total value of transactions.

Q.  (By Mr. Swanson)  Do you have an
understanding of what the consequences are of    10:01:57

Page 43

excluding iPod Touch transactions from the class    10:01:59
numerically?

A.  No, I have not studied the issue.

MR. RIFKIN:  Dan, we're getting close to
an hour.  I don't know if you were getting ready to    10:02:11
switch topics, but --

MR. SWANSON:  Yeah.

MR. RIFKIN:  -- is this a good time for a
break?

MR. SWANSON:  You want to take a break    10:02:17
now?

MR. RIFKIN:  That would be great.  Thank
you.

THE VIDEOGRAPHER:  This marks the end of
Media No. 1.  Off the record at 10:02.    10:02:24

(Recess taken.)

THE VIDEOGRAPHER:  This marks the
beginning of Media No. 2 in the deposition of
Professor Daniel McFadden.  We are back on the
record.  The time is 10:18 a.m.    10:17:56

Q.  (By Mr. Swanson)  Professor, could you
please turn to paragraph 5 of your March 7 report.

In the paragraph, at least the first part
of it, you state that you are "aware that counsel
for consumer plaintiffs has also asked    10:18:20

Page 44

Professor Stiglitz and Dr. Abrantes-Metz to submit    10:18:23
expert reports describing their opinions.  I rely
on several of their conclusions in forming some of
my own opinions."

Do you see that?    10:18:36

A.  Yes.

Q.  And then in footnote 6 there at the
bottom of the page, you list the March 7 report of
Professor Stiglitz and the March 7 report of
Dr. Abrantes-Metz, correct?    10:18:45

A.  Correct.

Q.  And you list them in your appendix on
relied-upon materials, right?

A.  I believe so, yes.

Q.  Okay.  Have you read the entirety of    10:18:53
Professor Stiglitz' March 7 report?

A.  I have -- at -- not -- not in great
detail with -- with extended consideration, but
yes, I have read it front to back.

Q.  And that report is close to 200 pages,    10:19:26
right?

A.  It's a long report, yes.

Q.  Do you remember how long you spent in
reviewing it?

A.  Well, I'm a fast reader, so I would say    10:19:42

Page 45

12 (Pages 42 - 45)

probably four -- four hours.    10:19:46

Q.  And was that in one sitting?

A.  Oh, I think the sequence is that I was receiving summaries from staff prior to -- as I prepared my report on what Professor Stiglitz'    10:20:04 opinions were going to be and so that -- and so you -- and my reading of my report was primarily done after I submitted my report.

Q.  Have you read Professor Stiglitz' March 7 report in more than one sitting?    10:20:30

A.  Certainly sections of it, yes.

Q.  And turning to Dr. Abrantes-Metz' March 7 report, have you read the entirety of that?

A.  I did read that, again, primarily after I submitted my report.    10:20:59

Q.  You are aware that she had submitted a prior report in the class certification phase, right?

A.  Yes.

Q.  And at least as of the time I asked you    10:21:11 in the prior deposition, you said you had not read that report.

Have you read it since then?

A.  I've read one -- one -- I believe the current report, I read -- I forget if it was the    10:21:25

Page 46

March 7 report or -- the March 7 report.    10:21:29

Q.  Okay.

A.  But in this case I was instructed by counsel to use her estimate of the but-for commissions, so that was essentially a wall --    10:21:44 given that number, I -- I read it out of interest, not because I wanted to form any opinions on it.

Q.  We'll come back to that.

When you say in paragraph 5 that you "rely on several of their conclusions in forming    10:22:06 some of your own opinions," are you indicating that your March 7 report sets forth opinions of yours that are newly formed?

A.  No, it -- in fact, the -- the bullet points that -- in paragraphs that follow this which    10:22:24 are drawn from their -- their opinions are essentially what I use.

Q.  When you formed the opinions set forth in your prior reports, you were not relying on any conclusions of Professor Stiglitz, correct?    10:22:47

A.  Correct.

Q.  And the same question for Dr. Abrantes-Metz, setting aside the but-for number?

A.  I was given the -- the 13.63 number and    10:23:01

Page 47

used in my supplemental report in 2023.    10:23:06

Q.  But there were no other conclusions of Dr. Abrantes-Metz that you were relying on in that or any other prior report, right?

A.  That's correct.    10:23:21

Q.  Have you changed any of your prior opinions in reliance on conclusions of Professor Stiglitz?

A.  It's a simple question, but could you repeat it?    10:23:40

Q.  Sure.

Have you changed any of your prior opinions in reliance on conclusions of Professor Stiglitz?

A.  I would -- I would say no.  I don't    10:23:51 recall any opinion that he offered that called into question my -- my earlier conclusions.

Q.  Have you changed any of your opinions from your prior reports in reliance on conclusions of Dr. Abrantes-Metz?    10:24:12

MR. RIFKIN:  Objection to form.

THE DEPONENT:  No, there -- the only -- the only conclusion from her report that plays a role is the but-for commission rate, and that's unchanged.    10:24:31

Page 48

Q.  (By Mr. Swanson) Okay.  And that's the    10:24:32 specific conclusion of Dr. Abrantes-Metz that you're relying on that you referred to here in paragraph 5?

A.  Correct.    10:24:42

Q.  Are -- well, in paragraph 5 you state that you've been instructed by counsel for consumer plaintiffs to assume that Apple would charge a 13.63 percent commission in the but-for world.

Do you see that?  That's in the second    10:25:13 bullet.

A.  I do.

Q.  I think -- I'm sorry.  The first bullet under paragraph 5.

A.  Yes, I see it.    10:25:23

Q.  So on the one hand you say you rely on Dr. Abrantes-Metz for the 13.63 percent number, but you also say counsel instructed you to assume that.

What is the role of Dr. Abrantes-Metz' conclusion given that instruction from counsel?    10:25:49

A.  Well, I think Abrantes-Metz would need to testify for the basis for -- for the 13.63 number, and so I'm -- I'm -- relying on counsel's instruction that that's going to be supported by her expert testimony.    10:26:15

Page 49

13 (Pages 46 - 49)

Q. Are you in any way vouching for the reliability of that number based on your review of her report?

A. No, I'm offering no opinion.

Q. How was the instruction provided by counsel?

A. This came back in 1922 or 1923 [sic], so I simply don't recall the -- the -- the mechanics of it.

Q. 2022, 2023?

A. It would have been late '22 or early '23 when I was asked to use this number instead of the range that appeared in my original report.

Q. Could you turn to paragraph 38 of your report.

You indicate there that in both your 2023 supplemental report and the present report, counsel provided you with the but-for commission rate which you understand is consistent with the opinions of Dr. Abrantes-Metz.

Are you saying anything here different from what you said in that first bullet of paragraph 5 that we just talked about?

A. No, I think that's the same statement.

Q. You also state in paragraph 38, "Hence, I do not discuss its estimation in this report."

Were you prepared to discuss the estimation of but-for commissions in your report had you not been instructed to assume the 13.63 percent figure?

MR. RIFKIN: Objection to form.

THE DEPONENT: No. I did not do the investigation.

Q. (By Mr. Swanson) Can your own methodology be used to estimate Apple's but-for commission?

MR. RIFKIN: Objection to form.

THE DEPONENT: No. I think that's -- there is a separate calculation that's required to do that. One has to look at comparable markets in which there is competition and one perhaps has to look at the Apple Store's own accounts and return on investment to make those judgments. That was -- that's not part of the damages analysis that I designed.

Q. (By Mr. Swanson) Well, couldn't you estimate the demand for App Store transactions and then infer the marginal cost for Apple by assuming profit maximization?

MR. RIFKIN: Objection to form.

THE DEPONENT: I haven't thought about it, and I would -- I would have to think about it in order to answer the question.

Q. (By Mr. Swanson) In your opinion, is Apple's marginal cost of an App Store transaction close to zero?

A. I -- I do not have an -- I do not have an opinion on that. I haven't studied it.

Q. Could you turn back to paragraph 5, please. I want to focus on the second bullet there. It goes from page 2 to page 3.

You state that you understand that "Professor Stiglitz has offered opinions related to the liability issues in this matter, including the relative antitrust markets in which the App Store operates and whether and how Apple's alleged misconduct has harmed consumers."

Do you see that?

A. Yes.

Q. Are these opinions of Professor Stiglitz that you're relying on?

A. I would say that what -- what I'm relying on is the -- the definition of the aftermarket that -- in which damages from overcharges have to be calculated, and so the -- the -- the damage -- architecture of the damage model is that it is -- is flexible and could be adapted to whatever the definition of that market is.

And so the extent to which I'm relying on Professor Stiglitz is essentially his -- his description of what that aftermarket is, and I think the -- the damage model is -- is -- has been implemented in terms of what was at that time the opinion on what the aftermarket was. And as far as my -- I have an understanding of the current work that it is also consistent with the definition -- his definition of the aftermarket.

Q. What do you understand Professor Stiglitz' opinion to be about the definition of the relevant market?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I would basically have to rely on the -- the description that's in my report, which is an attempt to summarize that and -- and I don't have an opinion on it beyond what's -- what appears in the report. That's in -- that's in paragraphs 12 through -- through 19 -- 12 through 18. 12 through -- yes, 12 through 18 or 19.

Q. (By Mr. Swanson) Do you have an

Page 50
Page 51
Page 52
Page 53

14 (Pages 50 - 53)

understanding as to whether Professor Stiglitz 10:33:09 concludes that the relevant market is single-sided or two-sided?

A.   Please repeat the question.

Q.   Yeah.   10:33:26

Do you have an understanding as to whether Professor Stiglitz concludes that the relevant market is single-sided or two-sided?

MR. RIFKIN:  Objection to form.

THE DEPONENT:  My -- my reading of his 10:33:40 report is that he concludes that it is two-sided, as do I, but that it does not exhibit strong platform externalities, which raise additional issues in the operation of two-sided markets.

But I'm not offering an opinion on these 10:34:02 issues, so I haven't studied it in further detail.

Q.   (By Mr. Swanson)  But it is your statement that the relevant market is two-sided at this point?

MR. RIFKIN:  Objection to form.   10:34:20

THE DEPONENT:  I'm not sure what the legal -- exact legal definition of "two-sided" is, but my view is that we have accounted for the fact that this is a market in which there are developers who have interests and are -- can be harmed by 10:34:35

Page 54

anticompetitive conduct and consumers that have 10:34:39 interests and also can be harmed by competitive -- anticompetitive conduct and the -- the tax incidence framework for the damage analysis is a position of allocation of the impact of the alleged 10:34:55 anticompetitive acts on both the consumers and developers.

Of course, the plaintiffs in this case are consumers, and I concentrate on the incidence of the -- of the commission of alleged 10:35:10 super-competitive commission rates on them.

Q.   (By Mr. Swanson)  Do you agree that the App Store is a two-sided transaction platform?

MR. RIFKIN:  Objection to form.

THE DEPONENT:  I -- I -- I'm not going to 10:35:27 agree to that because I think the -- the definition of "platform" has a specific legal meaning in terms of -- of -- of case law and so forth and -- and may not coincide with my understanding of the economic use of the term "platform."   10:35:44

So I don't know how to answer that question.

Q.   (By Mr. Swanson)  Well, you can answer the question as you used the term "platform" in your writings, and we'll come to that later.   10:35:53

Page 55

But in your economic understanding of the 10:35:57 term "platform" and "two-sided platform," is the -- I'm sorry.

Let's start with -- is the App Store a two-sided platform?   10:36:08

MR. RIFKIN:  Objection to form.

I think this exceeds the scope of Professor McFadden's opinion.

MR. SWANSON:  We're not doing those objections today, Mark.   10:36:17

MR. RIFKIN:  Well, I'm just --

MR. SWANSON:  That's a relevance objection.

MR. RIFKIN:  Well, I think it's an objection to form because it's an improper 10:36:22 question.

MR. SWANSON:  You made your objection.

MR. RIFKIN:  Be that as it may, I've made my objection.

MR. SWANSON:  Yeah.   10:36:30

THE DEPONENT:  I think every market in which there are multiple sellers and multiple buyers that -- with transactions that go through some intermediary have -- have a two-sided aspect to them.   10:36:44

Page 56

I would use the term "platform" to -- 10:36:45 to -- economically to apply any of those such markets.

But there is also a -- a specific concentration focused in economics on externalities 10:36:56 that may arise from the -- interchangeability or ubiquity or something like that in the operation of an intermediary, and I'm quite aware of that literature.  I even participated in it.

But Professor Stiglitz' opinion that I've 10:37:19 read is that his view is that -- these external effects that can occur for a market intermediary are not an issue in this case.

Q.   (By Mr. Swanson)  And these are so-called indirect network effects?   10:37:37

A.   I'm sorry?

Q.   You're referring to so-called indirect network effects?

A.   I -- I don't -- I, myself, don't use that term.  I'm not sure what the distinction between 10:37:50 direct and indirect network effects would be.

Q.   Do you understand Professor Stiglitz to be quantifying any harm to class members?

A.   I don't recall from my reading of his report that he has numbers.   10:38:22

Page 57

15 (Pages 54 - 57)

Q. You're the one quantifying harm, correct? 10:38:25

A. I'm the one who's quantifying the -- the overcharge harm to consumers, yes.

Q. At the top of page 3 of your report -- it's one of the bullets under paragraph 5 -- you 10:38:52 say --

I'll wait till you're there.

You say, "The methodology described in this report is consistent with these opinions" -- and you're referring there to the opinions of 10:39:07 Professor Stiglitz.

Do you see that?

A. Yes.

Q. Are there specific opinions of Professor Stiglitz' that you're referring to in 10:39:17 this paragraph that your model is consistent with?

A. I would say that the -- the opinion -- his opinions on what the -- the aftermarket is, is consistent with the damage model in the sense that it is flexible enough to deal with the original 10:39:39 definition of that market and any modifications that he's suggesting for.

Q. Are you also referring to his opinions about the identification of the anticompetitive conduct? 10:40:02

Page 58

A. I would say that I am not because the 10:40:11 damage model essentially starts from an instruction on what the but-for commission rate would have been absent anticompetitive conduct.

It does not depend on what the source of 10:40:25 that -- of that conduct was that would have made the difference between that claimed but-for rate and the actual rate.

Q. Well, when you refer to Professor Stiglitz offering opinions related to 10:40:45 liability issues, including whether and how Apple's alleged misconduct has harmed consumers, what are you referring to there?

A. I'm referring to the -- the overall opinion that he has that Apple did engage in 10:41:14 misconduct, specifically misconduct which allowed it to charge super-competitive commission in the iOS aftermarket.

Q. You have worked with Professor Stiglitz in litigation matters before, right? 10:41:44

A. I have.

Q. The Sabre case was one such instance?

A. Yes.

Q. Have there been others?

A. That's the one I recall, yes. 10:41:57

Page 59

Q. Are you familiar with Professor Stiglitz' 10:42:04 academic work in the area of antitrust economics?

A. I'm sure I'm not familiar with all of it. He's a prolific publisher. But I'm -- I'm aware of some of it. 10:42:23

Q. Would you say that Professor Stiglitz' work has shaped the field of antitrust law?

MR. RIFKIN: Objection to form.

THE DEPONENT: The answer is that's -- that's a question I've never asked myself, and -- 10:42:41 and I don't even know how you'd go about answering it. I would do citation counts, so how would you -- how do you determine what the criterion is?

Q. (By Mr. Swanson) Are you aware of any specific work of Professor Stiglitz that has shaped 10:43:01 the field of antitrust law?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, you're pressing me to remember articles that I may have read in the distant past. But I know that he's been one of 10:43:15 the -- of the major players in the issue of platform -- platform industry economics.

Q. (By Mr. Swanson) What makes you think that?

A. Well, somewhat from personal discussions 10:43:35

Page 60

with him. I mean, over the years we've talked a 10:43:38 number of times about these things.

Q. Excluding any work he's done in litigation, is it your understanding that he's written extensively on platform economics in an 10:43:56 economic context?

MR. RIFKIN: Objection to form.

THE DEPONENT: I think my -- my previous statement here was that -- is that I -- I think he's had an influence on that subject. I -- I 10:44:13 can't do it in terms of counts of articles and things like that. I don't know.

Q. (By Mr. Swanson) Are you familiar with any of the economics textbooks that Professor Stiglitz has authored? 10:44:30

A. Actually, I'm not -- the answer is no.

Q. Have you read any of his popular books?

MR. RIFKIN: Objection to form.

THE DEPONENT: Again, I'm not aware of -- I'm not aware of his popular books. 10:44:56

Q. (By Mr. Swanson) In your opinion, is Professor Stiglitz an expert on econometrics?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I think Professor Stiglitz is an expert on the entire -- 10:45:10

Page 61

16 (Pages 58 - 61)

entire field of economics. He's the -- he's probably the world's most respected economist, so -- but -- certainly in my special field, he's -- that's not an area he publishes in.

Q. (By Mr. Swanson) Are you aware of any contributions Professor Stiglitz has made to the field of econometrics?

A. No, I -- I would say that I'm not.

Q. In your opinion, who has greater expertise in econometrics, Professor Stiglitz or Dr. Song?

MR. RIFKIN: Objection to form.

THE DEPONENT: Please --

Q. (By Mr. Swanson) In your opinion?

A. -- repeat.

Q. In your opinion, who has greater expertise in econometrics, Professor Stiglitz or Dr. Song?

A. Well, I would say that -- as -- as I mentioned, I think Professor Stiglitz is qualified to testify as an expert on almost everything. But in terms of detailed econometrics, Dr. Song is himself a very skilled expert in econometrics.

Q. In the Weber case, you relied on Professor Stiglitz' opinions in calculating

Page 62

damages, correct?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would say generically, yes, but you're asking me to remember a -- a case that -- from many years ago, so I -- I -- I would have to go back to the case to remember any detail about it.

Q. (By Mr. Swanson) Even if you don't recall the exact details, do you still believe that Professor Stiglitz' opinions were correct in that case, the ones that you relied on?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I would say that Professor Stiglitz and I agreed on the nature of the platform in that case, and I'm aware that on -- on appeal, that case went against the -- the principals who we were working for. So the court -- the court made a different ruling on platforms than I think was -- was my opinion and I think also his opinion at the time of the case.

Q. (By Mr. Swanson) Did you read that opinion?

A. I don't recall reading -- reading the opinion. I should say in -- in context here, I went back and forth on platform questions because I

Page 63

worked on -- on a number of platform issues having to do with credit cards way -- way, way back, decades back, and it's always been an area that's a difficult one in economics and I think -- I think a difficult one for the courts to get the economics right.

Q. Do you have an opinion as to whether the Supreme Court has gotten the economics right on platform economics?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, my opinion is that if -- if they say it's this way, that's the way you -- you work for, that starting point.

Q. (By Mr. Swanson) Do you know if Professor Stiglitz has expressed disagreement with the way the Supreme Court has addressed platform economics issues?

MR. RIFKIN: Objection to form.

THE DEPONENT: He has not to me expressed anything about that.

Q. (By Mr. Swanson) Appendix A of your March 7 report is your CV, correct?

A. Yes.

Q. And pages 42 and 43 contain a list of your expert testimony and consulting from 2017 to

Page 64

the present; is that right?

A. Yes.

Q. Is it a complete list?

And I ask because, for example, it does not -- this list does not include any reports submitted or testimony given in this matter in 2022 or 2023.

A. Well, it's -- it's complete, but it does not include this case. You are correct.

Q. So there's no other expert testimony or consulting work for other cases --

A. That is correct.

Q. -- that hasn't been listed already?

A. That is correct. I retired from this business except for legacy litigation.

Q. So since you've retired from Brattle, you haven't engaged in any consulting or testimonial work other than this case?

A. That's correct.

Q. Would you please turn to paragraph 12 of your report.

In paragraph 12, you indicate that you understand "consumer plaintiffs allege that Apple lock consumers into buying apps only from Apple and paying Apple a 30 percent fee without their consent

Page 65

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

and lock consumers' iOS devices to prohibit them from using any app that was not approved or sold by Apple."

Q. Do you see that?

A. Yes.

Q. In footnote 7, you cite the plaintiffs' third amended consolidated complaint.

Do you see that?

A. Yes.

Q. You understand that's the current complaint?

A. Actually, I don't know.

Q. Well, if you'll turn to your relied-upon materials.

Page 44, under "Case Materials," the second item there that you rely upon is "Stipulation and proposed order for leave to file third amended consolidated class action complaint."

Do you see that?

A. Yes.

Q. Okay.

A. I see it as a reference.

Q. You're relying on that.

Can you tell me what -- what that is, then?

Page 66

A. I'm -- I'm citing -- I'm citing from the third amended complaint. Is this -- I don't actually know whether that's identical to what's listed here as -- as case materials.

Q. Okay. I'll represent to you -- Mr. Rifkin can jump in if he disagrees -- but that's the stipulation that contains the third amended complaint, which is the operative complaint in this case at this time.

A. Okay.

Q. And that's what you're relying on?

A. That's -- that's -- that's what I'm relying on in the sense -- in the sense that this paragraph is drafted from the statements in that document.

Q. Okay. And you reviewed that third amended complaint, correct?

A. I looked at these complaints. I -- I had help drafting this paragraph.

Q. Do you recall the last time you looked at the -- the third amended complaint?

A. No, I don't recall.

Q. But you have looked at it?

A. I have looked at it, yes.

Q. Does the conduct that you describe in

Page 67

paragraph 12 of your report, namely locking consumers into buying apps only from Apple and prohibiting them from using apps not approved or sold by Apple -- does that conduct reflect the conduct you understand plaintiffs to challenge in their complaint?

A. I'm sorry. Please repeat the question. I -- I didn't understand particularly the last sentence.

Q. Okay. I'll shorten it.

Does the conduct you describe in paragraph 12 of your report reflect the conduct you understand plaintiffs to challenge in their third amended complaint?

A. The sentence I heard that plaintiffs could challenge in their amended third complaint --

Q. I'll try it again.

A. Is that --

Q. You describe certain conduct by Apple here in paragraph 12 of your report, right?

A. Yes. My understanding is that these are listed as complaints in -- listed as terms in this third amended complaint.

Q. Okay. That -- that covers my question.

Do you understand plaintiffs to be

Page 68

challenging any conduct other than what you're listing here in your paragraph 12?

A. I have no understanding of that -- I don't -- its -- its relevance to the damage model is indirect in the sense that the damage model is designed to -- to -- to calculate the -- the overcharge to consumers from a commission rate that's super-competitive relative to some -- some benchmark, and it does not depend on the specifics of the -- the alleged anticompetitive conduct which led -- led to that difference between the -- the -- the competitive benchmark rate and -- and the actual rate.

So that I -- effect -- it's -- it is not relevant to -- to the architecture of the damage model, and so I do have an understanding. I didn't need to have an understanding of these details.

Q. Okay. We'll come back to that.

For now, could you turn to your paragraph 17, which is on page 5.

In that first sentence there, you indicate "Apple's conduct has allowed it to acquire monopoly power, the exercise of which has harmed consumers."

Do you see that?

Page 69

18 (Pages 66 - 69)

A. Yes.                                10:57:09

Q. Are you offering an opinion that Apple's conduct has allowed it to acquire monopoly power?

A. I am citing Professor Stiglitz.

Q. So are you relying on Professor Stiglitz     10:57:21 for that?

A. I would say the damage model is based on the difference between the actual commission charge and an analysis of what a competitive benchmark would have been, and it does not rely specifically     10:57:43 on the reason that those differ.

Q. Are you offering any opinion on when Apple acquired monopoly power?

A. I'm -- I'm relying on the -- Abrantes-Metz' estimation of the -- of the     10:58:27 competitive or but-for commission rate, and I have -- I have -- the damage model could accommodate a different benchmark reached through time, but he doesn't have to do that.

But that was not the instruction I was     10:59:01 given by counsel, and I have not investigated on my own.

Q. Do you apply the but-for commission rate provided by Dr. Abrantes-Metz to transactions in 2008 in your model?                          10:59:23

Page 70

A. In -- in the current implementation, that     10:59:26 rate is used throughout the alleged damage period.

Q. Okay. Are you assuming or opining that Apple had acquired monopoly power in 2008?

MR. RIFKIN: Objection to form.     10:59:44

THE DEPONENT: I'm using Dr. Abrantes-Metz' number and -- and if her number is the -- is different in 2008 from Apple's number, if Apple's number was -- commission rate was higher than 13.63, then it would be up to her to provide     11:00:03 you with justification for that.

Q. (By Mr. Swanson) I'm asking a specific question, though, about whether you are offering an opinion as to when Apple acquired monopoly power?

A. The answer is -- is no, I'm not myself     11:00:24 offering an opinion on that. I'm -- I have been instructed to use this particular commission rate, and that's -- implicit in that is an assumption that that rate would have -- would have applied throughout the entire damage period.     11:00:41

Q. And to the extent that that is implicit in the conclusions of Dr. Abrantes-Metz, have you read anything in her expert report that talks about why she thinks there was monopoly power in 2008?

A. I -- I don't recall reading anything     11:01:05

Page 71

about that.                               11:01:07

Q. Do you recall reading anything about that in -- in Professor Stiglitz' report?

A. I don't -- I might find something if I went back and read these reports more carefully.     11:01:24 In terms of what the -- I actually read, I don't recall either one opining on it -- the matter.

Q. Do you think it's credible to assume or conclude that Apple possessed monopoly power in the relevant market in 2008?                     11:01:41

MR. RIFKIN: Objection to form.

THE DEPONENT: I haven't studied the -- studied the issue, but my understanding is that from the -- from the very beginning, Apple had very tight control over the installation of apps on --     11:01:56 on the iOS devices. And in the intermediary years, only its own apps were allowed, and so that -- and -- and from the point that it began to allow third-party apps, it required them to go through the Apple Store.                          11:02:20

So I -- so I'm -- I have not opined on that in my report, but my impression is that they controlled that market from the very beginning.

Q. (By Mr. Swanson) In paragraph 12 of your report, back on page 4, you state that consumers --     11:02:44

Page 72

"Consumer plaintiffs allege that Apple     11:02:54 has monopolized or attempted to monopolize the market for the sale of iOS apps and in-app content."

Do you see that?                     11:03:03

A. Yes.

Q. Have you drawn any distinction in your modeling between those two legal theories in estimating harm?

MR. RIFKIN: Objection to form.     11:03:15

THE DEPONENT: The two terms being "monopolized" versus "attempted to monopolize"?

Q. (By Mr. Swanson) Yes.

A. No. I -- I don't even know what the distinction is legally.                      11:03:31

Q. Are you offering an opinion that Apple charges a super-competitive App Store commission?

A. I would say that I -- I am not. I think that my -- my use of -- of Abrantes-Metz' but-for commission rate implicitly assumes that the Apple     11:04:05 commission is super-competitive, so I'm -- I'm taking her -- her estimation as the basis for the damage calculations.

Q. Turn, please, to paragraph 17 of your report, which is on the next page, page 5, and I'm     11:04:40

Page 73

19 (Pages 70 - 73)

focusing on that last sentence in paragraph 17.    11:04:53

Are you offering any opinion that Apple's conduct has suppressed output in the variety and quality of available iOS apps and in-app content?

A. Well, I have repeatedly in my original    11:05:10 report and -- and subsequent reports pointed out that monetary harm from overcharges is one measurable harm to -- to consumers but that the alleged anticompetitive conduct could suppress entry by developers, suppress developer innovation    11:05:42 by reducing the return on investment and innovation.

Q. Have you conducted any independent study of the effect of Apple's conduct on output?

A. What output?    11:06:05

Q. Well, the output that is referred to in the last sentence of paragraph 17.

A. Well, the answer is -- is in -- in studying the effect of price on demand for apps and in-app content, yes, the damage model is doing a    11:06:28 quantitative calculation of the impact of -- of prices on these quantities.

Q. Well, the output is the same in the -- your but-for world as in the actual world, is it not?    11:06:49

Page 74

A. No, it's not. But the damage --    11:06:49 overcharge damage calculation is based on the difference in price as-is and but-for at -- at the quantities sold.

Q. But are the but-for quantities higher    11:07:04 than the as-is quantities or lower?

A. Well, the downward-sloping demand curve, the but-for quantities will be larger if the but-for price is lower.

Q. So do you calculate damages based on    11:07:29 those larger assumed but-for quantities?

A. Well, I -- I have not done that. And the answer is could -- could one do that as a matter of -- an economic calculation? Yes, one -- one could calculate the loss of consumer surplus.    11:07:52

But I have not done that, and I -- the reason is that the -- the accepted legal standard as I -- is -- seems to be that overcharges on existing purchases are -- are -- is a -- is a harm that is -- is -- is recognized as compensatable.    11:08:11

Q. Have you conducted any quantitative study of the effect of Apple's conduct on product quality?

A. I have not.

Q. Have you conducted any quantitative study    11:08:28

Page 75

of the effect of Apple's conduct on app variety?    11:08:31

A. No, I have not done anything currently on that issue.

Q. What econometric modeling approach would be appropriate to assess whether Apple's conduct    11:08:45 has affected the variety and quality of available iOS apps and in-app content?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, that's a broad question and I think an interesting one.    11:09:02

But I have not systematically gone about outlining how to do that. It's -- certainly, it's not part of my opinions in this case.

Q. (By Mr. Swanson) Turning to paragraph 18 of your report.    11:09:19

MR. RIFKIN: Dan, are you going to switch topics?

MR. SWANSON: Not really.

MR. RIFKIN: Okay.

MR. SWANSON: But you want to take a    11:09:26 break?

MR. RIFKIN: Well, if you wanted to ask a couple more questions on the same topic, go ahead, and then we'll take a break.

MR. SWANSON: Yeah, go a little bit    11:09:33

Page 76

further and then take a break.    11:09:35

MR. RIFKIN: Sure.

Is that okay with you, Professor McFadden?

MR. SWANSON: Why don't you just    11:09:40 intervene whenever --

MR. RIFKIN: Yeah, I just thought you were changing topics. That's fine.

MR. SWANSON: Yeah. I mean, probably not for a while, but I don't mind taking a break.    11:09:46

MR. RIFKIN: Well, why don't we take a break, then.

MR. SWANSON: Yeah, let's do it.

THE VIDEOGRAPHER: This marks the end of Media No. 2. Off the record. The time is 11:10.    11:09:54

(Recess taken.)

THE VIDEOGRAPHER: This marks the beginning of Media No. 3 in the deposition of Professor Daniel McFadden. We're back on the record. The time is 11:28.    11:28:43

Q. (By Mr. Swanson) Professor, can you turn to paragraph 18 of your report, please.

A. I have it.

Q. Okay. There you state that "as established by Professor Stiglitz, the relevant    11:28:56

Page 77

20 (Pages 74 - 77)

antitrust market in which Apple's App Store 11:28:58 operates is the market for the sale of iOS apps and in-app content in the United States."

Do you agree with that conclusion of Professor Stiglitz? 11:29:12

A. I -- I do. The subtext here is that the -- iPod Touch devices have come up, and I'm not sure what the relevant -- exactly how this sentence relates to how they are treated.

Q. That -- that was -- you're reading my 11:29:38 mind, because I wanted to ask that.

Based on your understanding, are paid app downloads and in-app transactions made by the iPod Touch in or outside the relevant market?

MR. RIFKIN: Objection to form. 11:30:00

THE DEPONENT: And my view is that the damage model can handle either case. My view as a person who's looking at the data is that it's going to make very little difference to -- in any -- any of the calculations. But it's not going to make 11:30:13 zero difference. So I think -- the calculations will have to be run whatever is decided on that issue.

Q. (By Mr. Swanson) The definition of the class doesn't affect the economic delineation of 11:30:31

Page 78

the relevant market, does it? 11:30:36

A. I think, as an overall statement, the answer is no, it should not.

Q. I wanted to ask you about paragraph 14 through 16 of your report. 11:31:14

Do you want to -- if you want to flip and take a quick look at those, although I'll take them one by one.

This is the part of your report where you summarize Professor Stiglitz' opinions about three 11:31:29 categories of Apple's conduct?

A. Yes.

Q. And you find these conclusions of Professor Stiglitz to be consistent with the opinions you have previously expressed; is that 11:31:46 right?

A. Yes.

Q. I'm going to start with paragraph 14.

You refer here to Professor Stiglitz' opinion that "Apple's policies prohibit developers 11:32:01 from distributing storelike apps, that is, apps that distribute other apps through the App Store."

Do you see that?

A. Yes.

Q. What is a storelike app? 11:32:15

Page 79

A. My understanding is that it would be -- 11:32:25 and -- an app which would allow you to acquire other apps or app content through some device other than through the Apple Store. That is, it would direct you to some -- some alternative. Or even 11:32:44 within this app, you would buy another app and pay for it outside the App Store. The Apple app.

Q. Would storelike apps compete with Apple's App Store?

A. Well, I think that the -- the 11:33:04 redirection -- the point redirection would be to outside the -- the rules of the Apple App Store.

Q. Would that make the developers of storelike apps competitors of Apple?

A. The answer is that I -- I have not 11:33:34 thought about this significantly. This is basically just my summary of what I understand is -- is Professor Stiglitz' opinion.

But I believe the answer is yes. That is to say, if -- and -- and within -- within an app 11:33:51 you could set up an account and buy in-app content through that app without ever having it go through the Apple payment system and subject to Apple commissions, yes, it could be a direct competitor.

Q. Also in paragraph 14, you summarize 11:34:17

Page 80

Professor Stiglitz' opining that "Apple imposes 11:34:23 contractual and technological restrictions that effectively prevent developers from selling apps to iOS device users throughout any channel other than the App Store." 11:34:35

Do you see that?

A. Yes.

Q. Do you understand that these restrictions that he's referring to effectively prevent developers from selling storelike apps to iOS 11:34:45 device users through channels other than the App Store?

A. Again, this is a -- a reference to Professor Stiglitz, so I have not investigated this personally myself. But my -- my understanding is 11:35:03 that a channel other than the App Store would be some -- some mechanism by which you could go to something on the Internet, say on your iPhone, and from that engage in a download which would end up with an app being installed on your iPhone and that 11:35:26 you would pay for through, say, perhaps putting in a credit card number directly to that site, and that would -- circumvent the -- the Apple sales commission.

Q. Have you heard the term "side loading" 11:35:47

Page 81

21 (Pages 78 - 81)

been used in reference to such an approach?

A. I'm -- I'm -- I encountered that term first in reading Professor Stiglitz' report.

Q. And do you understand him to be using the term "side loading" in the context that you just described?

A. I think that's right. I have not engaged in any separate independent investigation of that.

Q. Is your understanding that the restrictions that you're summarizing here from Professor Stiglitz' report apply equally to storelike apps and non-storelike apps?

A. Well, if -- I'm not sure even what the distinction is here. I think storelike apps are when you sell nondigital content, and if that's -- if that's the -- what that means, then I'm aware that Apple has a different system for -- for handling those than it does for digital content.

Q. Yeah. Fair enough.

I think Professor Stiglitz is just referring to apps with digital content or sales, right?

A. Well, certainly the -- the -- the issue here in this market are the apps which provide digital content.

Page 82

Q. Are there apps other than storelike digital -- storelike apps that would be in competition with Apple's App Store if stores were allowed on the App Store or if side loading was allowed?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I think that Amazon would very much like to be able to provide apps for the iOS system.

Q. (By Mr. Swanson) That would be a storelike app, right?

A. Well, again, the distinctions here are digital -- how it would be treated by Apple as digital content or nondigital content and whether they would impose on the Amazon store a commission for digital content.

And having said that, I would say we're getting into language and business operations here which I don't -- have not studied and I don't have any detailed opinions on.

Q. In your summary of Professor Stiglitz' opinions which you say are consistent with your own, he speaks and you summarize his opinion about "contractual and technological restrictions," right?

Page 83

A. Which paragraph is this in again?

Q. I believe we're still in 14.

A. Still in 14.

Q. At the bottom of page 4 where you say -- although you're summarizing his opinions, you say, "Additionally, Apple imposes contractual and technological restrictions that effectively prevent developers from selling apps for the iOS device users to any channel other than the App Store."

Do you see that?

A. Yes.

Q. Do you have any understanding of the difference between the contractual and technological restrictions referred to here?

A. Well, the technological restrictions I think primarily refer -- refer to jailbreaking, in which an app would be installed in violation of the -- of the Apple warranty on the devices.

And the contractual ones -- well, might -- might -- an example might be subscriptions and -- and the ability of -- of streaming services, for example, to bill their subscribers outside the Apple Store.

Q. What technological restriction are you referring to when you talk about jailbreaking?

Page 84

A. Well, I don't know much about jailbreaking, but I understand that basically a hacker can or at least used to be able to break into the operating system and override its -- some of its restrictions so that external apps could be installed. And I think I've just told you everything I know about jailbreaking.

Q. Is it your understanding that Professor Stiglitz opines that jail -- that prevention of jailbreaking is an anticompetitive act of Apple's?

A. I don't have any understanding of that. I don't recall anything in what I read in which he says has an opinion on that.

Q. Do you have an opinion on that?

A. No. That's -- that's a more complicated issue. I think that gets into the issue of the integrity of the operating -- the operating system.

Q. So you -- you don't have an opinion, right?

A. I do not have an opinion.

Q. Do you know if there are any other technological restrictions that are being referred to here in paragraph 14?

A. I don't have -- I made no independent

Page 85

22 (Pages 82 - 85)

study of this subject.                                    11:42:18

Q. Have you ever heard of "code signing restrictions"?

A. I -- I've heard the term, but I don't know what it means.                                    11:42:35

Q. Okay. Is it fair to say you therefore do not hold an opinion that code signing restrictions are anticompetitive conduct of Apple's?

A. Yes, I have no opinion on that.

Q. Turning to paragraph 15 of your report,                11:43:01 the second category of conduct on which Professor Stiglitz opines, as you indicate here, is "Apple's requirement that developers distributing their apps through the App Store use Apple's own payment processing system, iAP, when selling their        11:43:18 digital in-app content."

Do you see that?

A. Yes.

Q. Do you understand that to be a contractual or technological restriction?                11:43:26

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I would say it -- I'm not sure what the distinction is. I -- it seems like it would be mostly -- mostly a contractual prohibition, but it would be                11:43:52

Page 86

accompanied by, you know, basically whether the --       11:43:56 the -- did the Apple -- I don't know the word for it. You know, the windows into the operating system would -- would allow an app developer to request payment through a separately set up account    11:44:15 or not.

Q. (By Mr. Swanson) The references in Professor Stiglitz' report, the contractual restrictions, do you know who those contracts are with? Are they with consumers or developers or        11:44:37 both?

MR. RIFKIN: Objection to form.

THE DEPONENT: I don't know.

Q. (By Mr. Swanson) Looking at paragraph 16, this third category of conduct on          11:44:47 which Professor Stiglitz opines, the reference here is to anti-steering restrictions.

Do you see that?

A. Yes.

Q. We have, I think, spoken about these                  11:45:08 before in a prior deposition. Your damage methodology takes account of the anti-steering restrictions; is that still correct?

A. I would say that the damage methodology or architecture of the damage analysis works off        11:45:40

Page 87

the difference between the actual commission, sales      11:45:44 commission rate and the but-for sales commission rate, which has been put forward as publicly available in a competitive market.

And it -- it doesn't directly depend on                  11:46:03 what the nature of the offending conduct is, but certainly if -- if there were no anti-steering restrictions and consumers could readily pay for things through -- set up their own accounts with other people, that would certainly reduce Apple's       11:46:30 ability of monopolize -- monopolize through the control of the payment system.

Q. And that specific restriction, if it were assumed a way, would also logically reduce the but-for commission rate; is that right?                11:46:52

MR. RIFKIN: Objection to form.

THE DEPONENT: I don't know. I haven't thought about that, and I don't see a direct connection.

Q. (By Mr. Swanson) You submitted a                       11:47:09 declaration at some point years ago addressing what was plaintiffs' then attempt to add a state law claim that was directed at Apple's anti-steering provisions.

Do you remember that?                                    11:47:25

Page 88

A. I don't remember.                                      11:47:27

Q. Okay. If you look at paragraph 17, there you say at the beginning, "Together, Apple's conduct has allowed it to acquire monopoly power, the exercise of which has harmed consumers."             11:47:44

When you say "together," you're referring to the three categories of conduct that -- that are summarized in the three paragraphs above?

A. Yes.

Q. Do you have any opinion as to whether                  11:48:03 the -- any subset of those three categories of conduct inflict the same amount of harm on consumers?

A. I have not studied the issue. I have no opinion.                                              11:48:22

Q. Paragraph 18 of your report, you say, "My damages model estimates the effect of Apple's conduct on the prices paid by consumers for iOS apps and any content."

Which conduct of Apple are you referring                 11:48:48 to? Is it all three of those categories from Professor Stiglitz' report?

A. It's -- it's the summary of all conduct which would lead the Apple Store commission to be higher then a competitor rate.                        11:49:06

Page 89

23 (Pages 86 - 89)

Q. Does any element of conduct suffice to result in the but-for commission dropping to 13.6 percent?

A. That's a question for Professor -- for Dr. Abrantes-Metz.

Q. Is that a question for Professor Stiglitz as well?

A. I suppose, yes, it would be a fair question for him.

Q. There's nothing in your model other than level of the but-for commission that could account for different combinations of conduct being found to be unlawful short of the entire set of conduct, is there?

A. The answer is that the model works on the basis of a competitive rate, and so the -- it distinguishes only what the as-is actual rate established by Apple and what is projected to be -- is estimated to be the rate that would have prevailed absent the -- the alleged conduct.

And if some of that conduct were -- were questioned, then the issue would be what -- whether that would change the competitive.

I think the answer is that the competitive rate is based on comparables which

Page 90

are -- which have the -- the features of competition, so that should be relatively immune to the -- the question of what -- exactly how -- how Apple accomplished the rates it was able to charge.

Q. Could your model estimate the effect of the technological restrictions alone?

A. I think my -- my previous answer applies here, which would be the question -- the question is if you have only technological restrictions, would that change Dr. Abrantes-Metz' view on what the competitive market would have looked like, and I think -- I think the answer is probably no, that she would say that her basis for the competitive market is what goes on -- for her benchmark is what goes on in comparable markets.

Q. And that's your supposition? Is it -- is it your opinion -- do you have any opinion on that yourself?

A. I think that's basically the -- the -- the -- the economic substance of the matter.

Q. So if the jury were to find that the so-called anti-steering restrictions were not unlawful, that the iAP requirement was not unlawful, that the technological restrictions were not unlawful, your sense of the nub of the

Page 91

economics is the but-for commission rate would still be 13.6 percent?

MR. RIFKIN: Objection to form.

THE DEPONENT: The answer is I -- I haven't thought about that and -- and I don't know. But if -- if Apple is engaged in no -- no anticompetitive conduct, then -- then it presumably has a case that its rate is the competitive rate, and then there's an issue that Dr. Abrantes-Metz is -- I don't think I would agree with that.

Q. (By Mr. Swanson) I guess I'm getting at a situation where some but not all of the conduct is found to be unlawful, and I'm just trying to understand whether you've indicated that you think that isn't likely to matter to Dr. Abrantes-Metz' conclusion about the but-for commission rate.

A. Well, I would say that -- that -- that the question for her, then, would be if there's -- there's certain kinds of acts that are unlawful, then she needs to -- that are not found unlawful, then what would happen in comparable markets where those practices are present and what kinds of rates would prevail there.

Q. If some conduct is found to be lawful and some to be found unlawful, nothing in your model

Page 92

needs to be adjusted if anything other than the but-for commission rate; is that right?

A. That's right.

Q. Are you aware of Dr. Abrantes-Metz currently in her report offering any opinion about what the but-for commission rate would be if some of the challenged conduct was found to be lawful?

MR. RIFKIN: Objection to form.

THE DEPONENT: I didn't look for anything on that subject when I was reading the report. I don't recall reading anything about it.

Q. (By Mr. Swanson) Does your model offer any estimate of what download prices consumers would pay for storelike apps in the but-for world?

A. The model currently deals only with apps that have either paid download or iAP in the -- in the as-is world, so that to the extent that an App Store is selling nondigital content and is not subject to Apple commissions, it's -- it's outside my analysis.

Q. Well, if the but-for world reflects the removal of the alleged anticompetitive conduct, and one aspect of the anticompetitive conduct that's alleged is the refusal to allow storelike apps to sell digital content, don't you need to predict

Page 93

24 (Pages 90 - 93)

what the price of the storelike apps would be in   11:56:48
the but-for world?

A. I think the question -- the answer to the
question is that one has to think about what -- a
competitive alternative to the as-is world would be   11:57:15
with either rival app stores being available to
consumers or Apple engaging in limit pricing so
that they don't enter. And I believe that's the
nature of -- of Dr. Abrantes-Metz' analysis.

Q. Well, Dr. Abrantes-Metz assumes at least   11:57:49
one rival competitor enters the market, doesn't
she?

A. That's my recollection, yes.

Q. All right. Do you have any understanding
as to whether that rival is distributed through   11:58:00
Apple's App Store or outside of Apple's App Store
by side loading?

MR. RIFKIN: Objection to form.

THE DEPONENT: I actually haven't asked
the question. I would -- I would assume that it   11:58:16
would operate -- I'm not sure what the distinction
between side loading and -- and independent
operation would be, in fact.

Q. (By Mr. Swanson) Well, you understand
that one of the complaints plaintiffs raise is that   11:58:31

Page 94

Apple won't allow apps that sell digital content to   11:58:35
be distributed in the Apple App Store, right?

A. I understand that part.

Q. Right.
In a but-for world, it's at least   11:58:45
possible that there would be such applike --
storelike apps, correct?

A. Yes, there could be. And the issue is
would those apps charge for downloading? I don't
know.   11:59:03

Q. But doesn't your model need to predict
what those prices would be in the but-for world?

A. The model operates off the -- Apple's
but-for commission, and so the -- your question is
you need to have a great deal more detail on the   11:59:29
nature of -- of the but-for world to support that
but-for commission, and -- and the answer is that's
a question for -- for Dr. Abrantes-Metz.

Q. Okay. Is it a question for
Professor Stiglitz too?   11:59:49

A. Perhaps.

MR. SWANSON: Let's mark as what would be
DX62.

(Exhibit DX 62 was marked for
identification by the Court Reporter and is   12:00:07

Page 95

attached hereto.)   12:00:07

MR. SWANSON: Let's mark as DX62 the
stipulation that contains the operative complaint
in this case.

Q. (By Mr. Swanson) Go ahead and flip   12:00:29
through that and see if it refreshes your
recollection on having seen it before.

A. Very dimly. I don't --

Q. Okay.

A. I think I have seen it before, but I   12:00:55
don't remember when.

Q. Can you please turn to paragraph 51 of
the complaint. It's on page 12.
Let me know when you've had a chance to
look at that.   12:02:28

A. I'm reading it now. I read the
paragraph.

Q. Okay. Do you understand this to set
forth the conduct that plaintiffs allege has
enabled Apple to acquire and maintain a monopoly in   12:02:51
the iOS app aftermarket?

A. And I -- I have seen this before, but I
don't remember this -- this paragraph, and reading
it now, I'm not -- I'm not really prepared to make
comments on it.   12:03:25

Page 96

Q. Is there any conduct you understand   12:03:30
plaintiffs to be challenging that is not discussed
in this paragraph 51?

A. Paragraph 51 seems to refer specifically
to -- to the locking provisions on -- on the   12:03:52
devices, and as Professor Stiglitz has -- has
claimed in his report, there are other contractual
nonsteering provisions and -- and contractual
requirements to use the -- the Apple store payment
system and so forth, which he uses also be legs --   12:04:20
legs of the anticomparative score.

Q. Yet when you reviewed this, did you see
anything at all that challenges the anti-steering
provisions or the iAP provisions?

MR. RIFKIN: Objection to form.   12:04:39

THE DEPONENT: You're referring to
paragraph 51?

Q. (By Mr. Swanson) Well, or this entire
complaint.

A. Oh, well, I don't -- unfortunately it's   12:04:45
been so long that this is dim in my memory. I
don't recall this document content anymore.

Q. And you don't recall plaintiffs at one
point attempting to amend their complaint --
unsuccessfully attempting to amend their complaint   12:05:00

Page 97

25 (Pages 94 - 97)

to add a challenge to Apple's anti-steering provisions?

MR. RIFKIN: Objection to form.

THE DEPONENT: The answer is no, I don't remember.

Q. (By Mr. Swanson) And you don't remember submitting a declaration in support of that effort?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, as I sit here, I don't remember. I don't remember the declaration.

Q. (By Mr. Swanson) Paragraph 51 of the complaint discusses conduct that involves voiding the warranties of iOS device consumers who bought competing apps.

Do you see that?

A. Yes.

Q. Is that conduct that you understand is alleged to be anticompetitive in this case?

A. I don't recall, but I believe so, yes.

Q. Do you have any understanding or opinion as to whether Apple voids the warranties of iOS device consumers who buy competing apps?

A. Actually, I don't know whether it actually does. I understand that -- it does announce -- have the ability to do that.

Page 98

Q. And what do you base that understanding on?

A. Really, this goes back in history to the discussions prior to my filing my original report four -- four years ago, and I think staff at that point told -- told me that Apple was very opposed to jailbreaking and had engaged in -- a series of soft -- developed an operating system which made jailbreaking more difficult.

Q. Does your model estimate damages based on that conduct?

A. My model operates off the but-for commission rate estimated by Dr. Abrantes-Metz and does not go behind that to -- to Apple's conduct except that whatever Apple did, it was able to establish commissions in excess of what comparable markets with competitive rivals charge or are calculated to be able to charge.

Q. All right. You can put that aside for the moment. Thanks.

And we can turn back to your report. Paragraph 19 of your report, please, if you can turn to that.

You state in the first sentence there of paragraph 19 the model that you developed "is

Page 99

intended to estimate and quantify the monetary harm incurred by consumers as a result of overcharges for their app and in-app purchases relative to what they would have paid for these purchases absent Apple's alleged misconduct."

Do you see that?

A. Yes.

Q. By "monetary harm," you are referring to quantifying an overcharge on the commission and the impact of that on consumer prices, correct?

MR. RIFKIN: Objection to form.

THE DEPONENT: Yes, for -- for as-is purchases.

Q. (By Mr. Swanson) When you say that your model does not capture other forms of harm that consumers may have incurred as a result of Apple's alleged misconduct, are you referring to any other forms of monetary harm?

A. The -- the answer is -- let me step back, perhaps tell you about why this paragraph is here.

In my original report and supplementary report, I used "harm" as a synonym for an overcharge.

Professor Stiglitz talks about harm in -- in a broader sense, I think which involves

Page 100

consumer -- consumer satisfaction.

And so I want to draw a distinction between my use of the word "harm" and my earlier reports in the use -- his use of the word "harm," and -- and I -- the point is that there can be forms of impacts on consumers' satisfaction separate from the issue of its impact on their -- on their payment, their monetary payment.

And I am not offering opinions on -- on that or trying to quantify that.

Q. And my question was: Are those other forms of harm considered by you to be monetary harm?

A. Well, that's -- that's -- you ask a deep economic question, which is can changes in consumer satisfaction be monetized, and I think the -- the answer is they -- they can be, but not necessarily in conformity with legal precedents and standards.

Q. So those other forms of harm, to your mind as an economist, are also monetary harm, but they may not be legally recoverable monetary harm?

MR. RIFKIN: Objection to form.

MR. SWANSON: I'm trying to understand.

THE DEPONENT: Yeah, that's -- I think that's -- that's a -- a fair characterization, in

Page 101

26 (Pages 98 - 101)

fact, to that -- and economists can do consumer surplus measurements in the -- in the traditional economic use of that term, but monetary standards -- I'm sorry.

The legal standards for -- for the recovery are often based in terms of actual lost income rather than the deeper question of -- of trying to balance or -- or monetize consumer satisfaction.

Q. (By Mr. Swanson) With reference to the harms that Professor Stiglitz speaks of, the broader harms, those include loss in output or reduction in app variety; is that correct?

A. Yes.

Q. To your knowledge, has any expert in this matter proposed a model to calculate damages to class members from lost output or reduced app variety?

A. In the case? I'm not aware of this being done in the case, no.

Q. Do you know how Professor Stiglitz defines "output" in this context?

A. I -- I suppose he's using the common economic understanding of that term, but no, beyond that, I don't know his definition.

Page 102

Q. And the economic understanding of that term would be transactions or something else?

A. It would -- it -- we need to talk about what we're transacting for, yes, and for a measured product incoming units it would be the quantity of units, yes.

Q. You contend that the extent of harm that your model estimates is conservative, right?

A. I would say that it is -- it is in the sense that loss of variety, loss -- loss of quality are -- are things which are detrimental to consumer satisfaction.

Q. By describing your model as conservative in that sense, do you mean to opine that class members are owed more damages then your model calculates?

A. No. I think what they're owed can -- has to be -- conform to legal standards for recovery, and I -- and in this case, my damage model is based on what I understand to be a legal standard that -- that over -- overcharges our category that can be recovered.

I don't have an opinion on -- on the other matters or...

Q. Your model estimates that some class

Page 103

members paid lower prices as a result of Apple's conduct, correct?

MR. RIFKIN: Objection to form.

THE DEPONENT: The model damage calculation has a small percentage of consumers -- or a small percentage of app purchases where the model implications are that they would have paid -- paid more in the but-for world. That's correct.

Q. (By Mr. Swanson) What makes you say that there are a small number of transactions?

A. A small percentage.

Q. What makes you say there's a small percentage of transactions that would have been priced higher in the but-for world?

A. Oh, that's -- that's -- that's -- comes from the results of the model estimation as described in my supplemental report, for example.

Q. To the extent prices would be higher in the but-for world on account of Apple's conduct, the consumers who paid those particular prices obtained a monetary benefit, did they not?

A. They did, yes.

Q. Do you have any opinion as to whether some class members obtain nonmonetary benefits from Apple's conduct?

Page 104

A. I -- I have an opinion as an economist that -- that there was harm incurred by consumers and potential consumers as a result of conduct that would restrict innovation or entry of alternative products.

Q. Is the protection of consumer privacy a nonmonetary benefit to a consumer?

A. I would think so, yes.

Q. Is the protection of a consumer's security a nonmonetary benefit?

A. It -- it should be, yes.

Q. Does your model attempt to assess any of those benefits to the extent they arise from Apple's conduct in this case?

A. Well, they are issues in what the -- whether -- whether a competitive market could provide or would provide those same services. But the model -- my damage model itself does not attempt to monetize those.

Q. If your model does not account for nonmonetary effects of Apple's conduct, how do you know if any class member was harmed?

MR. RIFKIN: Objection to form.

THE DEPONENT: I think as a matter -- matter of economics in -- and consumer -- theory of

Page 105

27 (Pages 102 - 105)

consumers, innovations which lead to new -- new or higher-quality products or increased variety in the availability of products is something that increases consumer satisfaction.

So that -- they -- they would -- they would -- they have been harmed by not having access to those better products and more products.

Q. (By Mr. Swanson) So are you assuming that there are no benefits to Apple's conduct to consumers?

A. I think the issue is what -- what is -- what is the comparison of what Apple provides and what would be provided in a competitive market. I mean, if -- if the answer is that comparable products with comparable services are available in competitive markets, then the issue is simply what the price is for those.

Q. Well, your model shows that some prices are higher in the but-for world, right?

A. For some apps or in-app content, yes, they can be in the model.

Q. And is it possible in the but-for world that some consumers receive the benefit of -- in a nonmonetary sense from Apple's conduct?

MR. RIFKIN: Objection to form.

Page 106

THE DEPONENT: I think there's -- I cannot answer that question because I have not tried to quantify our -- consumer satisfaction and analyze it.

Q. (By Mr. Swanson) Okay. And you haven't tried to assess the potential nonmonetary benefits accruing in the form of increased consumer privacy protection and security as a result of Apple's conduct?

MR. RIFKIN: Objection to form.

THE DEPONENT: Please repeat the question.

Q. (By Mr. Swanson) You have not attempted to quantify any nonmonetary benefits flowing in to consumers from enhanced security or privacy on account of Apple's challenged conduct?

MR. RIFKIN: Same objection.

THE DEPONENT: The answer is I have not attempted to quantify that, nor if a competitive market provided comparable products, including comparable features like security and privacy, would -- would it be an issue.

Q. (By Mr. Swanson) Well, a comparable market would provide comparable prices, and yet you still find that there are prices in the but-for

Page 107

world that would be higher than they were in the real world, right?

MR. RIFKIN: Objection to form.

THE DEPONENT: I understood -- I may have misunderstood your question. I thought you were asking about privacy and security, and -- and my answer was that if you have a competitive market in which consumers can obtain products, the same apps at -- at lower prices with the same security and privacy provisions, then -- then there is no difference in -- in those dimensions --

Q. (By Mr. Swanson) That's what I'm trying to --

(Simultaneously speaking.)

THE DEPONENT: -- with that respect.

Q. (By Mr. Swanson) Sorry. Are you finished?

Yeah, that's what I'm trying to understand, because your model says there is a competitive market in the but-for world, and yet some consumers pay higher prices.

And my question is: Is it also possible in a competitive but-for world that some consumers will receive fewer privacy and security benefits?

MR. RIFKIN: Objection to form.

Page 108

THE DEPONENT: I think the answer to that is that -- that -- that's a legitimate question about the nature of the -- of the competition, and I would turn to Abrantes-Metz and ask in -- in comparable markets, what -- what, in fact, is the nature of these additional dimensions of product quality and are they, in fact, comparable markets in that respect. That -- that, I think -- is again the issue at hand.

Q. (By Mr. Swanson) Could you turn to paragraph 20 of your report, please.

Focusing for the moment on the beginning of that paragraph where you state that "The App Store commission functions like a sale tax whose impact could be apportioned between consumers and developers using a tax incidence framework."

Do you see that?

A. Yes.

Q. A tax incidence framework, generally speaking, seeks to estimate how a tax on a product affects the prices that consumers ultimately pay for that product; is that fair?

A. Yes, both -- both sellers and buyers.

Q. Could you move forward to paragraph 22. You state there that "Apple's App Store commission

Page 109

28 (Pages 106 - 109)

has the same economic effects as a sales or 12:25:16 ad valorem tax, a tax assessed as a fixed percentage of a sales price."

Do you see that? At the end of the paragraph? 12:25:31

A. Well, let -- let me just read -- read the paragraph.

Yes. What's the question?

Q. Okay. You're not claiming the commission is an actual tax, correct? 12:25:57

A. No. The claim is -- in terms of -- in terms of economics, transactions between principals, the effect of an intermediary has a similar -- similar instance on -- on the -- on the principals whether it's a -- an Apple or Amazon or 12:26:27 the U.S. government or -- or a state sales revenue tax.

Q. The relevant aspect of the commission is that it is charged as a fixed percentage of the sales price, right? 12:26:50

A. Yes. Well, that's -- whether the tax is charged as a fixed percentage, whether it's charged as an excess tax, or whether it's -- it's paid by a bill to the buyer or bill to the seller, it is economically secondary because with the adjustments 12:27:16

Page 110

of supply and demand, there's -- there's some final 12:27:21 incidence in which the buyers pay some portion and the sellers pay some portion.

Q. The tax incidence framework would apply to any fee that is charged as a fixed percentage of 12:27:33 the sale price of an app or of in-app content; is that right?

A. I'm not sure where this question is going, but -- but -- but the answer is that there's -- there's a question of -- of how buyers 12:28:01 of multiple products or sellers of multiple products might respond to -- to a tax, but the -- the -- the -- overall, the answer is yes.

Q. So, for example, a percentage royalty charged to a developer on the price of an app or an 12:28:23 in-app purchase would be analyzed using the tax incidence framework, correct?

MR. RIFKIN: Objection to form.

THE DEPONENT: Please repeat the question. 12:28:36

Q. (By Mr. Swanson) A percentage royalty, for example, charged to a developer on the price of an app or an in-app purchase would be analyzed using the tax incidence framework, correct?

A. Could you give me an -- an example? 12:28:49

Page 111

Q. Developer has to pay someone 10 percent 12:28:53 of the purchase price of the app as a royalty.

A. So, for example, a -- a music provider to charge a -- a royalty fee which is a percentage of the -- of the price of -- of a Spotify 12:29:09 subscription? Is that --

Q. For example. Or a provider of intellectual property might charge 5 percent of the price of an app.

You're aware that's a common phenomenon, 12:29:25 aren't you?

A. Actually, I don't know -- I don't know that much about how -- how things like music are -- entertainment royalties are charged or exactly what the basis of the -- of the -- how the royalty fee 12:29:43 is established.

Q. Okay. Well, then, we don't need to have specifics.

But my question to you is general. If a royalty is charged to a developer as a percentage 12:29:55 of the price of the app or the in-app purchase, that particular royalty could be analyzed using the tax incidence framework; is that not correct?

A. I think yes, in principle. Yes, there would be some incidence of the royalty on -- on 12:30:16

Page 112

the -- on the consumer and some on the supplier. 12:30:18

Q. Do you agree that in the but-for world, Apple would charge a commission for its services?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I'm -- I'm aware that 12:30:38 in general that intermediaries have costs, and they would -- at -- at -- certainly cover their costs on -- on a return on their investments, yes.

Q. (By Mr. Swanson) And what services do Apple's get -- I'm sorry. Strike that. 12:30:59

What services do developers get from Apple in exchange for paying the commission, in your opinion as an economist?

A. Well, I -- I would say that they get the -- the services comparable to what any whole -- 12:31:15 wholesaler or -- wholesaler or manufacturer gets from being able to distribute through a retailer to the customers.

Q. So distribution services?

A. Distribution services, information 12:31:33 services.

Q. Payment processing?

A. Perhaps -- perhaps -- perhaps other features. You mentioned privacy and security. That would be services, yes. 12:31:43

Page 113

29 (Pages 110 - 113)

Q. How about access to Apple's intellectual  12:31:45
property?

A. I'm not so sure about that. I haven't thought about it. But I'm not sure exactly what -- what Apple's intellectual property claims would be  12:32:05 here in -- in a competitive environment, for example.

MR. SWANSON: Should we talk about lunch?

MR. RIFKIN: Sure. Why don't we go off the record.  12:32:29

MR. SWANSON: Let's go off the record.

THE VIDEOGRAPHER: Off the record. This marks the end of Media No. 3. The time is 12:32.

(Recess taken.)

THE VIDEOGRAPHER: This marks the  12:32:49 beginning of Media No. 4 in the deposition of Professor Daniel McFadden. We are back on the record. The time is 1:46.

Q. (By Mr. Swanson) Professor, is it your opinion that Apple is a retailer that sells iOS  01:46:55 apps in an app content?

A. I think that -- that would be appropriate in a description. I think of it more as a consignment store, which -- which essentially implies a project -- a venue where sellers can come  01:47:19

Page 114

together and process things through to buyers.  01:47:23

Q. Is it your opinion that app developers are suppliers that manufacture apps in an app content and supply them through Apple?

MR. RIFKIN: Objection to form.  01:47:40

THE DEPONENT: My understanding -- of developers is that -- is that they are producing digital products and -- and digital content. Then they sell those through Apple for use on iOS devices and perhaps two other channels for -- often  01:47:59 for use on other types of devices.

Q. (By Mr. Swanson) Is it your opinion that Apple pays developers a wholesale price for their apps and in-app items?

A. I think that can be one way to label  01:48:17 the -- the payments to developers. The arrangement is that developers are charged on a commission on the price they set for their products.

Q. Is it your opinion in the but-for world, Apple would pay developers a higher wholesale  01:48:37 price?

MR. RIFKIN: Objection to form.

THE DEPONENT: I think the results for any particular developer would depend on their particular product and the -- and the prices that  01:48:56

Page 115

they -- they would set forth in their marginal  01:49:00 costs, but -- but with -- with a -- a lower commission rate in many cases the result would be a -- a lower -- a lower price to -- to the buyer and a higher price to the -- the developer.  01:49:23

Q. (By Mr. Swanson) Is it your opinion that the wholesale price that Apple pays to developers in the but-for world would be higher if there were no iAP requirement?

A. What -- what do you mean by an iAP  01:49:48 requirement?

Q. Well, the -- the one that you summarized from Professor Stiglitz' report that you said was consistent with your own opinions that Apple requires developers to use its payment solution,  01:50:02 iAP?

A. Okay. Thank you for that clarification, but could you the start the question over again, then, please?

Q. Okay. So in the but-for world, would  01:50:17 developers be paying Apple for payment solution services?

MR. RIFKIN: Objection to form.

THE DEPONENT: I think that -- in -- in a competitive market for app devices, there -- there  01:50:39

Page 116

would be potentially rivals to an Apple App Store  01:50:44 and there would be some competitive commission rate established in that market, and that would -- that would include -- that was -- there would be a positive commission. I think that's what  01:51:03 Dr. Abrantes-Metz had given as evidence, that in the competitive -- in the comparable competitives that she's analyzed that that would be the case.

Q. (By Mr. Swanson) Professor Stiglitz opines, and you say it's consistent with your  01:51:29 opinion, that Apple's iAP requirement has foreclosed alternative to Apple's iAP system that likely would have existed but for Apple's conduct.

Do you recall that?

A. I -- I recall statements like that. I --  01:51:50 I don't recall specifically the restriction to iAP.

Q. Take a look at paragraph 15 of your report.

Go ahead and look at that. We don't need to read it out loud.  01:52:13

A. Yes. Oh, yes.

Q. You are refreshed?

A. My memory is refreshed, yes.

Q. So that implies, does it not, that in the but-for world, some developers would likely have  01:52:39

Page 117

30 (Pages 114 - 117)

used alternative iOS in-app payment processing solutions?

A. I'm not sure that -- about the adjective "likely," but they would have that option, yes.

Q. Well, you say "Apple's iAP requirement has foreclosed alternatives to Apple's iAP system would likely would have existed but for Apple's conduct."

Do you not think that's likely anymore?

MR. RIFKIN: Objection to form.

THE DEPONENT: Oh, no, I think that -- there's two statements, and I would make the distinction. Are there some -- some developers who would like to use alternative payment systems? I think demonstrably, yes. Some have tried to answer to that.

Do I think that all developers or many developers would choose alternative systems? And the answer is I don't know. I haven't studied the issue.

Q. (By Mr. Swanson) Does your methodology take account of the likelihood that some developers would not be purchasing payment solutions from Apple?

A. My interpretation of -- of the

Page 118

Abrantes-Metz but-for commission rate is that it's -- is a commission rate which would prevail either if there were an active rival in the market or if Apple effectively adopted that rate so that rivals would be deferred from entering the market; that is to say they would engage in limit pricing.

I -- I have no opinion on what would actually occur, but that's my interpretation of the meaning of the but-for commission rate.

Q. Well, you do say in paragraph 15 that "alternatives likely would have existed," so that suggests that someone would not be foreclosed in the but-for world, does it not?

A. I think -- this is nitpicking, but I think the potential -- the potential rivals and actual rivals is -- really -- really a question to be determined as to whether injury would actually occur, and that would -- that would depend on Apple's but-for conduct and exactly what form it would take. It could -- it could, I think, legitimately discourage entry of rivals by pricing it in such a way that it's not profitable for them to come in.

(Exhibit DX63 was marked for identification by the Court Reporter and is

Page 119

attached hereto.)

MR. SWANSON: I'd like to mark as DX63 the document entitled "Choice: What can go wrong."

THE DEPONENT: I have it.

Q. (By Mr. Swanson) You have it now.

Is this a paper that you wrote, Professor McFadden?

A. It is.

Q. Can you turn to page 14, please. And I'd like to ask you about, I guess, what is the second paragraph where you say, "A common form of economic organization of a market for branded products are consignment stores that facilitate search among products by posting prices set by suppliers and/or processing transactions and charge suppliers commissions for their services."

Do you see that?

A. Yes.

Q. And you mentioned earlier that you think of the App Store more of a consignment store now; is that --

MR. RIFKIN: Objection.

I'm sorry. Objection to form.

I didn't mean to interrupt.

THE DEPONENT: Well, the term

Page 120

"consignment store," I use -- I don't think this is idiosyncratic to me, but I use "consignment store" as -- as my description of -- a source of anywhere from department stores and supermarkets to auction houses and -- and Amazon as stores that provide a -- a forum in which suppliers can bring their goods to sell and -- and put -- have them displayed in a way in which buyers can find that they can fulfill the transactions and accomplish what they need to accomplish.

Q. (By Mr. Swanson) So does this description of consignment store apply to the App Store?

A. I think it does.

Q. In the paper here, you give the example and you just gave the example in your testimony of the Amazon store.

Is the Amazon marketplace store a two-sided platform?

A. I earlier made the point that my use of the term "platform" is maybe different from the -- from the legal one.

But yes, consignment -- consignment store involves -- involves two-sided market, yes. I would call it a platform in economic terminology.

Page 121

31 (Pages 118 - 121)

Whether it would be called a platform in legal terminology where there's an -- added issues of network externalities is -- is -- I'm -- I'm unclear on -- what the final meaning in the legal parlance is of that.

Q. Okay. Well, I'm just asking you as an economist, so I don't think you need to worry too much about the legal terminology.

A. I would say in -- in the way -- the way I use the word "platform" in economic settings, yes, it's a two-sided platform.

Q. Do you have an understanding as to whether or not the Amazon store, as you referred to it here, benefits from any type of network effects?

MR. RIFKIN: Objection to form.

THE DEPONENT: I haven't studied that specifically. I think there is a -- a -- some distinction between platforms like credit cards and platforms like a -- like basically a supermarket or -- or a farmer's market. I think the networks or externalities for credit cards are qualitatively different than what -- whatever net -- kind of network effects there might be for -- for a -- a department store -- or -- or a farmer's market.

Q. (By Mr. Swanson) Well, the Amazon store

Page 122

you're referring to is the one where the suppliers set the prices, not Amazon, right?

A. Yes. In that sense, it's -- when I use the term "consignment store," I'm thinking of stores in which the seller is a posting a price.

Q. Like a supermarket, typically the supermarket sets the prices, not the suppliers of milk and cheese and peanut butter, right?

A. I think as -- as economists, we recognize that if these principles are rational, they respond to the price they actually pay, and it's -- really quite immaterial as to who actually names the price and whether you get the -- the wholesale or the retail version of that price. In the end, it worked out as the final prices paid by consumers and received by suppliers.

Q. So your opinion as an economist is it doesn't matter how the transaction is structured vertically?

MR. RIFKIN: Objection to form.

THE DEPONENT: I think that's -- that seems like a very broad statement. I suppose there might be situations in which -- how a structure would matter, and particularly if -- if either buyers or sellers are perhaps un- -- unaware or

Page 123

not -- not fully informed that it could matter.

But I think that -- certainly the economic fundamentals are that a rational economic agent is concerned with what they actually pay or to buy when they sell or a buy or sell.

Q. (By Mr. Swanson) Could you -- you can put that aside for a moment. We'll come back to it, that Exhibit 63.

But if you could pull your report from the pile again, I would like to ask you to turn to paragraph 38.

A. I have it in front of me.

Q. You say there in paragraph 38 that your "tax incidence model requires three components as an input."

Do you see that?

A. Yes.

Q. Your model depends on assumptions as well as these three inputs, correct?

A. Well, it's a framework that depends on a long-term economic understanding of how intermediaries in a market affect the principals on -- on both sides. And of course, it reflects my judgments on how to carry out the design and doing the analysis, given the kinds of data that are

Page 124

available.

Q. And that judgment is reflected in the making of certain assumptions, is it not?

A. I would say yes, that's true.

Q. And there is a difference between an input and an assumption, isn't there?

A. I'm not sure that I understand what -- what you're getting at there. For -- let's take, for example, the but-for rate. That's an input to the model. It's also -- I have been asked to make that as an assumption that that would be the -- but-for rate.

Q. Okay. Are either of the other two inputs assumptions?

A. Well, I would say estimation of consumer demand and the developers' costs which were inferred from the available data both involved inputs of data and -- and economic theory. I suppose all economic theory could be characterized by -- as an assumption, but it's an assumption informed by historical successes and failures.

Q. Could you turn to paragraph 30 of your report.

MR. RIFKIN: 3-0?

MR. SWANSON: 3-0.

Page 125

32 (Pages 122 - 125)

MR. RIFKIN: Yeah.

THE DEPONENT: I have that in front.

Q. (By Mr. Swanson) Okay. Second sentence of that paragraph says, "App developers set prices to maximize profits given their costs and the consumer demand they face rather than taking the market price as given."

Is that an assumption?

A. I would say that is a -- yes, that is a standard economic assumption in economics that firms -- app developers or firms seek to maximize profits.

Q. Is it a standard assumption in economics that all firms do not take the market prices given?

A. I'm sorry?

Q. Let me put it differently.

If you were assuming that developers set prices in a competitive market, wouldn't you assume that they would take market price as given?

A. I think the proposition -- the general economic proposition is that firms will -- firms seek to maximize prices in a -- in a perfectly competitive market, they will find that they have no ability to alter their price from the competitive low.

Page 126

Q. And that means they will take the market price as given --

A. That -- that their profit maximization choice will turn out to be the market price, yes.

Q. So you're not assuming a competitive market that developers are operating in here?

A. No, I am definitely not assuming, nor do I think there is evidence that it's a competitive market.

Q. In paragraph -- well, turn to paragraph 40, please.

A. 42, did you say?

Q. 40. 4-0.

A. I have that in front of me.

Q. Okay. The next to last sentence of paragraph 40 says, "In economic terms, the profit-maximizing firm sets price at a level where the marginal revenue equals the marginal cost."

Do you see that?

A. Yes.

Q. Would you agree that in economic theory, marginal revenue is equal to price in a competitive market?

A. No. Typically marginal revenue is not equal to price because --

Page 127

Q. In a competitive market?

A. I'm sorry. In a competitive market?

Q. In a competitive market.

A. Oh, sorry. I -- I misheard.

Yes, in a competitive market, any firm that tried to do this calculation would find that marginal revenue would equal price, yes.

Q. And in a competitive market, an economist would say that price is equal to marginal cost, correct?

A. I'm sorry. I'm losing track. Please repeat.

Q. Yeah. Sorry.

In a competitive market, an economist would assume that price and marginal cost are equal; isn't that true?

A. I wouldn't call that an assumption. That's a -- a consequence of a competitive market.

Q. You would agree that apps are not homogenous products, wouldn't you?

A. I think it's clear that they are branded products.

Q. They are branded and differentiated in other ways as well, right?

A. In many cases, yes.

Page 128

Q. You're assuming in your model that developers have some market power, correct?

A. Yes. It goes with the proposition that you have some ability to change your price that -- that gives you some limited local market power at -- at the least.

Q. You're assuming that developers have the power to set price above marginal cost, correct?

A. I don't know that I -- I wouldn't say that that's an assumption. That is -- that is a property of -- of a firm's operating in a market where there's branded -- differentiated products and -- and consumers place some value on the branding or heterogenous features in those products.

Q. Are you making any assumptions about the degree of market power held by developers?

A. I don't -- I don't believe so. I don't -- assuming that they have the ability to list different -- different prices in -- for their branded products, then they would see some -- variation and demand depending on the prices they set, and they would do the economical calculation to find the best price for them.

Q. Have you analyzed whether developers have

Page 129

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

increased their market power since the App Store opened in 2008?

A. No, I have not examined that question. I'm -- I think that I can understand how one might do that by looking at the number of apps that are available and so forth.

Q. Have you seen any evidence that developers on average have raised the price of their apps or in-app content since 2008?

A. I haven't -- I haven't looked for it, so I don't know.

Q. Would it surprise you if the average cost of an app on the App Store has increased significantly since 2008?

A. Well, I don't think we have direct observation on those costs. We have direct observation on the prices.

Q. Yeah. I'm sorry.

A. And of course you'd have to adjust those to real -- to real terms to make this a fair comparison. And the answer is I have not done that.

Q. And I'm sorry. I said cost. I meant to say the price of the apps.

Have you seen any evidence that the

Page 130

average price of apps on the App Store have increased significantly since 2008?

A. The answer is I have not looked.

Q. You would agree that Apple has not raised the commission at any time since the inception of the App Store, wouldn't you?

A. That's my understanding, yes.

Q. What economic factors would cause the developers to raise their prices after 2008?

A. First of all, I -- I don't know that they would. I could imagine that as the overall size of the market for -- aftermarket for iOS apps has -- has grown that there is -- has been entry, and -- and some of that entry would be probably for more -- for higher-cost apps would -- would enter and -- and so prices would be on average affected by that kind of entry.

Q. Could increasing developer market power be a factor that could cause developers to raise their prices subsequent to 2008?

A. Well, I would agree that the -- the ability of a developer to raise its prices would be a measure of its market power. Would historical developments in the market provide opportunities for additional market power to developers? The

Page 131

answer is I haven't studied it. I -- I don't know.

Q. If you turn back to paragraph 38, please. A few questions. A few more questions on that.

You indicate that your three inputs allow you to determine how developer pricing changes in response to commission rate changes.

Do you see that?

A. Please refer me to a sentence.

Q. This is on paragraph 38.

A. And -- and please ask the question again.

Q. It's at the end of the paragraph where you say that your "inputs together allow you to determine how developer pricing changes in response to commission rate changes."

A. Yes.

Q. Does your third input, the marginal cost estimate, depend on your second input, the estimate of consumer demand?

A. It does.

Q. Do you agree that marginal cost is the incremental or addition to cost that results from producing one more unit of output?

A. I -- I do, although your -- your statement leaves out a lot of qualifying conditions about short run and -- and long run and so forth.

Page 132

Q. Okay. Well, could you look at footnote 37 on page 12.

You say there are variable costs that are often used for proxies for the marginal cost of a firm, which is the "increment or addition to cost that results from producing one more unit of output."

Do you see that?

A. Yes.

Q. Do you stand by that?

A. I do.

Q. Okay. You refer there, higher up in that footnote, to "variable costs as firm expenses that change in proportion to production output."

Do you see that?

A. Yes.

Q. How do you measure production output?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, generically, the economic theory of -- of firm behavior is -- is based on simple firms that are producing one product in some physical units, and that's -- that's the case that's -- where this is rather simple to -- to define. A production output is simply the number of units they produce and sell.

Page 133

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q. (By Mr. Swanson) In the context of this case, does production output refer to something that is produced by the developer? 02:19:21

A. I guess the -- the question I have in -- in responding to your question is this is kind of -- this is a generic statement about -- about firms, and the question is what production output would mean in the context of an -- of an app developer. 02:19:43

And what I -- what I would assume in the context of an app developer, it's -- it's the number of -- number of apps you -- you supply and the number -- the -- the amount of content through iAP that you supply. 02:20:03

Q. So would app downloads be production output for a developer? 02:20:22

A. I think they would, although the -- the context for this is that the -- this -- this firm is engaging in some -- some account of activity which makes the -- the delivery of this particular digital product and everything that goes with it possible, and -- and including that it may include its own selling costs, for example. It may include some downstream maintenance of the product that's been delivered and so forth. 02:20:49 02:21:16

Page 134

Q. Yeah, I wasn't asking about cost. I was asking about production output. 02:21:18

Is app download production output for a developer. That's all I asked.

A. Yes. It's -- it's -- it's the -- it's the delivery of the -- of the app and the delivery of all the things that go with delivering the app. 02:21:31

Q. So our in-app transaction is production output for the developer?

A. The content that's provided through iAP, yes, I think it is. 02:21:46

Q. Is there any production output for a developer other than app downloads and in-app transactions?

A. Well, those are obviously the -- the headline production outputs of -- of an app developer. But there is -- there are -- there are dimensions to delivering these products, which -- which have to be considered as part of the correction process. For example, if you produce an app that requires you to host the -- the buyer, then you -- then that's part of -- part of the production process. 02:22:06 02:22:23

If you -- and that's an example of the -- of the kinds of auxiliary dimensions to this 02:22:39

Page 135

production. 02:22:44

Q. Well, does your model anywhere take account of that type of production output?

A. I think it -- I think it does in the sense that it's looking at what developers actually price their goods at, and, under the assumption of product monetization, that can be used to infer what their marginal cost is. 02:22:57

Q. What is the unit of output in your model?

A. Well, in -- in the damage analysis that I -- I designed, the output is either a download or it's a -- a unit of iAP content, which I treat iAP as a composite commodity at the app level. 02:23:30

Q. Does your model treat app users as a unit of output anywhere? 02:23:56

A. Please repeat the question.

Q. Does your model treat app users as a unit of output anywhere?

A. I'm not -- I don't think I understand the question. The model certainly is -- is a model which specifies a demand equation for iAP content as -- as -- and, again, that's implicitly but not explicitly a composite. 02:24:18

Q. Do costs in your model vary depending on the user? 02:24:48

Page 136

A. Do costs depend on the user? Well, the answer is -- as a question of in reality, I suppose they can, yes. 02:24:53

Q. In your model, if two users make the same in-app purchase at the same time, will your model treat the cost of those transactions as the same? 02:25:14

A. No, it definitely does not. The -- the -- those consumers pay -- pay the same price, and the marginal cost that's inferred from that price is -- is -- the app developers perceived a cost of providing that service to its -- to its spectrum of buyers. 02:25:36

Q. Let me make sure we're on the same wavelength.

If two users make the same in-app purchase at the same price at the same time, does your model treat the cost of each of those transactions as the same? 02:25:53

A. Yes, it is the same. It is -- it's the perceived marginal cost by the app developer of delivering that product to the -- all the consumers that have the ability to buy it. 02:26:12

Q. The primary data set your model uses to estimate consumer demand and marginal cost is the App Store transaction data, right? 02:26:38

Page 137

35 (Pages 134 - 137)

A. I -- I have two data sources. The 02:26:44 primary one is the App Store transaction data. I also draw on data from the developers. I should say in my previous reports, I had some direct evidence on that, and I believe an analysis has 02:27:01 taken place subsequent to my reports. There -- there's another expert that's providing such data.

Q. Yeah, and I'll come to that in a moment. Would you describe the App Store transaction data as real-world data? 02:27:18

A. Yes.

Q. The developer cost data that I think you alluded to a moment ago from your prior reports is another -- another source of real-world data for estimating your model; is that fair to say? 02:27:47

A. You're referring to information on -- on the margins --

Q. Yes.

A. -- gross margins, variable margins of developers? That's also real-world -- real-world 02:27:56 data, yes. Well, at least in -- in my previous reports where I -- I -- some direct involvement in -- in analyzing those data, it was definitely real-world data.

I -- I can't speak to the current data 02:28:17

Page 138

that's being used. I'm not -- I'm not familiar 02:28:22 with it in any detail.

Q. Okay. Your model's third input, the estimate of the but-for commission rate, is the only part of your model that reflects hypothetical 02:28:35 conditions, correct?

A. Well, I think I -- I would disagree that -- that's a hypothetical. I believe that that's substantially based on real-world data on comparable markets. 02:29:01

Q. You assume, don't you, in your methodology, that consumer demand is the same in the but-for world as the real world?

A. I -- I assume that the demand models that I fit are -- will -- will extrapolate from the 02:29:30 but-for prices -- I'm sorry -- from the as-is prices to the but-for prices that we determined.

Q. And you're assuming that marginal cost is the same in the but-for world as the real world?

A. Yes, I am, over -- again, over the range 02:29:59 of the -- of the analysis.

Q. The impact of the but-for world in your model occurs through the but-for commission estimate, right?

A. Please repeat the question. 02:30:18

Page 139

Q. The impact of the but-for world in your 02:30:18 model occurs through the but-for commission estimate; is that not right?

A. Yes.

Q. So based on your assumptions and 02:30:32 methodology, you built your model without knowing anything about the nature of competition in the but-for world; is that correct?

MR. RIFKIN: Objection to form.

THE DEPONENT: The damage model as it's 02:30:52 designed works off another expert's estimate of the rate that would prevail in a -- in a competitive but-for circumstance, and it does not depend on the nature -- the exact nature of the but-for market and that would -- that would lead to that rate. 02:31:18

Q. (By Mr. Swanson) Do you agree as a general matter that real-world evidence is informative for assessing any impact of Apple's commission rate on app and in-app purchase prices?

A. Again, please repeat the question. 02:31:33

Q. Yes. Do you agree as a general matter that real-world evidence is informative for assessing the impact of Apple's commission rate on app and in-app purchase prices? 02:31:43

Page 140

A. Yes, provided it's properly and carefully 02:31:48 analyzed.

Q. Could you take a look at footnote 36 in your report. It's on page 11. You state there that you understand 02:32:09 "Professor Stiglitz has analyzed real-world evidence that is consistent with the implications of the tax incidence framework." Do you see that?

A. Yes. 02:32:20

Q. Do you recall what you were referring to there?

A. I would have to go back to his report to pull out the specific examples, but I believe that they had to do with the prices charged by various 02:32:31 apps through the Apple store when they, in fact, have the option of -- of a charging mechanism outside the Apple store.

Q. Can you turn to paragraph 56 of your report, please, at least the part on page 20. 02:32:57 In the second sentence there, you state that "a class member who exclusively spent money on apps for which my model predicts price increases in the but-for world would incur no monetary damages." Do you see that? 02:33:22

Page 141

36 (Pages 138 - 141)

A. Yes.    02:33:23

Q. What kinds of apps does your model predict would have higher prices in the but-for world?

A. They typically would be low-price    02:33:31 downloads or in-app content typically often charged at Apple's minimum price of 99 cents.

Q. Are these apps ones that earn revenues from advertising?

A. I have not collected direct evidence on    02:34:13 that, but that's -- that's my inference. That is the -- let me say -- restate that.

That -- that's -- that's the inference from the model, that if they're profit-maximizing, then there must be -- that they have some other    02:34:30 source of revenue which is justifying their behavior.

Q. But your model only generally predicts that prices will be higher in the but-for world for low-priced apps, right?    02:34:46

MR. RIFKIN: Objection to form.

THE DEPONENT: It's -- it's in the nature of the -- of the profit-maximizing calculation that higher-priced apps will be -- will infer a higher positive marginal cost, yes.    02:35:16

Page 142

Q. (By Mr. Swanson) Is it your view that    02:35:19 apps with higher prices do not earn revenue through advertising?

A. No. It's simply a question of the -- I have no direct evidence on -- on advertising. I    02:35:35 haven't collected it.

The -- the logic of it is that if your price in the Apple store is sufficiently low, you -- the inference would be if you're profit-maximizing, you must have some other source    02:35:56 of revenue. There's no implication the other way that if you have -- a high -- a cost -- high-priced app that it could not also have other sources of revenue.

Q. Would you agree that your model predicts    02:36:13 prices for over a million apps?

A. Yes.

Q. Okay. Do you have an estimate of the proportion of those apps that your model predicts would have higher prices in the but-for world at    02:36:37 some point in time?

A. I had in my original report some number which would be relevant to that.

Q. Would you be surprised --

A. So yes, but I haven't done any    02:37:07

Page 143

calculations of that sort since that time.    02:37:09

Q. Would you be surprised if your model predicts that almost 1 million apps will have higher prices in the but-for world at some point in time?    02:37:20

A. The number that I had in my original report was -- that something like 5 or 6 percent of -- of apps had higher prices in the but-for world. That's the only number that I recall.

Q. 5 or 6 percent of apps or 5 or 6 percent    02:37:43 of accounts?

A. No, my original calculation was a calculation of the percent of apps with a property that if that was the only app purchased, the consumer would see a price increase rather than a    02:38:05 price decrease in the but-for world.

Q. Let me ask you to turn to paragraph 42 of your report. I just wanted to ask about the second sentence there in paragraph 42 which continues onto page 16.    02:38:46

You say, "If the commission rate is lower, app developers will lower their app and in-app content prices because the extra sales they make by cutting prices are more profitable than before."    02:38:59

Page 144

Do you see that?    02:38:59

A. Yes.

Q. Is that a prediction of your model?

A. I think I've tried throughout this report to qualify that the -- a lower commission rate will    02:39:08 lead to behavior only if marginal costs -- major or marginal cost is positive. I don't see that qualification here, so in that case this is a statement that would not apply to those particular sales.    02:39:33

Q. Your model can make predictions about but-for pricing for a commission rate of 15 percent in the but-for world, correct?

MR. RIFKIN: Objection to form.

THE DEPONENT: Please repeat the    02:39:51 question.

Q. (By Mr. Swanson) Your model can make predictions of but-for pricing for a commission rate in the but-for world of 15 percent, correct?

A. Are you asking me could it or -- or did    02:40:05 it? I mean, I -- I do -- the calculations I have done in my supplemental report were for the 13.62 percent. If you're asking me could it be done for different rates --

Q. Yeah --    02:40:22

Page 145

37 (Pages 142 - 145)

A. -- yes, it could be.                    02:40:22

Q. -- could be 15 percent instead of 13 --

A. Yes.

Q. -- .6?

A. Yes. Yes, that would be straightforward.   02:40:27

Q. And that would be the best prediction of your model if the but-for commission rate was 15 percent?

A. Yes.

MR. RIFKIN: Objection to form.        02:40:34

Q. (By Mr. Swanson) Have you tested your model to see if its predictions match reality when Apple dropped the commission for some developers to 15 percent?

MR. RIFKIN: Objection to form.        02:40:54

THE DEPONENT: I have not done that, and I would have to actually think about how you -- how would you even do it.

Q. (By Mr. Swanson) Do you think it's important for you to provide real-world evidence to   02:41:10 corroborate the predictions of your economic model?

A. As a general economic proposition, I think it is valuable and scientifically appropriate to test the predictions of your model against reality.                          02:41:34

Page 146

I'm not sure how that would work in the    02:41:35 hypothetical you just suggested. I mean, I think, for example, I would view looking at comparable markets for digital services that are competitive as the kind of real -- real-world evidence you   02:41:58 would look at.

Q. Well, you're aware that many developers pay 15 percent in the real world, right?

A. Well, what I'm aware of is that -- after a certain date, sequential renewals went to    02:42:20 16 percent, and there was a small developer program that provided that -- that incentive -- incentive. That's what I know about.

Q. Okay. That's real-world activity, right?

A. Well -- well, the answer is yes,       02:42:43 that's -- that's the real world. And, of course, the -- the question then would be can you do a careful analysis of those data and take care of the possible confounding effects, so like you've isolated the -- the evidence that would bear on the   02:43:04 question.

Q. Well, does your model take account of all confounding effects when it makes its predictions?

MR. RIFKIN: Objection to form.

THE DEPONENT: The -- the damage model     02:43:23

Page 147

assumes that in the presence of a but-for      02:43:25 commission rate, developers would price by maximizing profits and that consumers would respond in their demand to those decreased prices. That's -- those are the assumptions of the -- of    02:43:47 the -- the damage analysis model.

Q. (By Mr. Swanson) Your model incorporates to the best of your ability all of the economic factors that you think affect pricing either in the actual or but-for world, correct?           02:44:05

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I agree broadly. I mean, any -- any model is, of course, a simplification of -- of reality, so I -- so I have made judgments on what -- what was key in terms of   02:44:22 what could happen in the but-for world and what one could do with the available information.

Q. (By Mr. Swanson) Have you conducted any analysis at any point to test how your models' predictions compare to real-world evidence?       02:44:41

MR. RIFKIN: Objection to form.

THE DEPONENT: I myself have not done that, and I -- in terms of the kind of -- data you would need to do that, I -- I -- at the point at least up to my supplemental report, I did not have   02:45:03

Page 148

those -- any data like that.                 02:45:09

Q. (By Mr. Swanson) Can you think of any way to test your model's predictions against real-world evidence?

A. Well, I think the primary real-world    02:45:21 evidence would come from examination of comparable -- comparable digital markets that are -- are competitive.

I would -- I would say if Apple has -- essentially done experiments in which have changed   02:45:43 the commission rates, then -- then in principle that would provide evidence that could be analyzed, and if you can do it in such a way that you control for confounding effects, yes, that should be useful.                            02:46:00

Q. And you previously discussed Professor Stiglitz attempt to analyze such natural experiments, haven't you?

A. I have.

Q. Are those opinions that you continue to   02:46:15 hold and reaffirm?

A. I have not in this report considered those. I -- they're -- they're not part of this report. I'm not expecting to offer opinions on them.                             02:46:37

Page 149

38 (Pages 146 - 149)

Q. Have you identified any natural 02:46:41 experiments that could shed light on the reliability of your model?

A. No. I think that there are some examples such as those given by Professor Stiglitz which are 02:47:05 germane to this, but I'm -- I have not done it myself.

Q. Okay. And are you satisfied that Professor Stiglitz' examples account for confounding effects? 02:47:22

A. I'm aware that he has those examples, but I -- but I'm not prepared to offer any opinion myself on them.

MR. RIFKIN: Dan, good time for a break?

MR. SWANSON: Yeah. 02:47:37

MR. RIFKIN: Okay. Let's go off the record.

THE VIDEOGRAPHER: This marks the end of Media No. 4. Off the record. The time is 2:47 p.m. 02:47:43

(Recess taken.)

THE VIDEOGRAPHER: This marks the beginning of Media No. 5 in the deposition of Professor Daniel McFadden. We are back on the record. The time is 3:04. 03:04:47

Page 150

Q. (By Mr. Swanson) Professor McFadden, do 03:04:53 the App Store transaction data alone provide sufficient information to estimate consumer demand?

A. Yes.

Q. Would it be consistent with the 03:05:08 econometric methods widely used in the economic literature to use the App Store transactions data alone to estimate consumer demand for apps in an app content?

A. I think that the -- the good econometric 03:05:22 practice would be to use all the available data that -- that allows you to -- to sharpen those estimates, but it's certainly legitimate to have a starting point to use only the transactions data.

Q. And have you ever tried to use the 03:05:46 App Store transaction data alone as a starting point for your estimates?

A. I -- I don't recall the full history of the work from four years ago, but the -- that -- that started -- started from the idea that 03:06:08 developer gross margin data would be relevant and valuable for estimation, and so that was built into the architecture of the analysis.

I recall that there was some issue from your expert reports as to whether it could be done 03:06:36

Page 151

without the margin balance, and I just don't recall 03:06:38 now what we did in response to that.

Q. Okay. But it's perfectly possible to do it without margin bounds, is it not?

A. With -- certainly with less precision, 03:06:53 but if you're just asking me as an econometrician would that -- would that be a source, I think -- I think it would be a sufficient source to get estimates of at least some quality, but not necessarily good quality. 03:07:11

Q. Could you take a look at paragraph 43 of your report.

You say that there that "The key element of consumer demand needed for the purpose of quantifying the common economic impact of Apple's 03:07:26 anticompetitive conduct is consumers' sensitivity to price changes."

Do you see that?

A. Yes.

Q. Does your estimate of consumer demand 03:07:34 apply to both price increases as well as price decreases?

A. As -- as the demand models that we use are written down, they at least over the range in which they -- they are fitted and presumably 03:07:58

Page 152

reflect the reality, they -- they would handle -- 03:08:07 they should handle both price increases and decreases.

Q. Does your estimation of consumer demand rely on assumptions about the functional form of 03:08:17 the demand curve?

A. It does.

Q. You assume that price elasticity is equal to price multiplied by your estimated price sensitivity, correct? 03:08:35

A. Correct.

Q. And your model implies that demand elasticity increases proportionally with price, correct?

A. Yes. 03:08:47

Q. That's an assumption that you make about demand, correct?

A. Well, I would say that -- yes, that specification is an assumption. It's based on considerable experience in working with consumer 03:09:01 demand data, and I think it has some -- some theoretical merits.

But I would say that in -- in general, an econometrician confirming this would have some flexibility in trying out alternative forms to see 03:09:22

Page 153

39 (Pages 150 - 153)

which one fits the data best.    03:09:25

Q. Based on that assumption, the higher price for an app or in-app content, the higher the price elasticity, right?

A. That's a property of this, yes.    03:09:38

Q. And the higher the price elasticity, the higher the marginal cost that you infer, correct?

A. That's true.

Q. Do your modeling assumptions rule out low price elasticities for high-priced apps or in-app    03:09:53 content?

A. Please repeat the question.

Q. Do you your modeling assumptions rule out low price elasticities for high-priced apps or in-app content?    03:10:06

A. I wouldn't say they rule it out. I mean, I think these price sensitivity parameters in the demand model vary by genre. They vary between downloads and iAP. So -- some -- some of the -- some of the variations in price differ across those    03:10:33 categories, and that's -- that's not built into the -- the specification.

Q. For a given price sensitivity, though, your assumption does build into the modeling that higher-priced apps or in-app content will have    03:10:58

Page 154

higher rather than low price elasticities, correct?    03:11:02

A. Correct.

Q. Do you agree that your econometric model is based on the logit model?

A. What -- the statement is that it is    03:11:19 consistent with the logit model when -- the share of purchases among all consumers is a relatively small percentage of the total population. In that sense, it's consistent with the logit model. But -- but it's a widely used model for demand    03:11:50 quite independently of that property.

Q. Your model is consistent with the logit model when each product's market price is small; is that what you're trying to say?

A. It's -- it's approximately -- yes, it's    03:12:09 approximately consistent when there's a large number of products and the total market for the products -- the total number of consumers purchasing, say, in -- in a month is a small share of the total number of consumers who are potential    03:12:28 purchasers.

Q. And is it also consistent if consumers' disutility from price is linear?

A. I'm sorry? Say again.

Q. Is it also necessary for your model to be    03:12:44

Page 155

consistent with the logit model that a consumer's    03:12:50 disutility from price is linear?

A. No, I would say neither the logit model nor this model requires that kind of response. That -- that pattern response is typically for    03:13:15 products that are either purchased or not purchased, and their price is a small share of -- of people's incomes. So that's -- that's just a general economic proposition.

But I would say that the -- the use of    03:13:34 this model is -- is not hinged on that property.

Q. Do you agree that the relationship between price and marginal cost in your model stems from the logit demand model?

A. No. I think that -- the log linear model    03:13:52 is a widely used model for demand quite independently of -- of the logit model, and...

Q. So you --

A. The fact that the logit model -- that it can be derived from the logit model under limited    03:14:10 conditions is -- is not the reason it's used primarily.

Q. So if you've previously said that mathematical properties of my model, including the relationship between price and marginal costs, stem    03:14:27

Page 156

from that model, the logit model, you were in    03:14:29 error?

A. No. That -- that is a property of the logit model -- of the logit model under these specific conditions previously mentioned.    03:14:41

But this -- the log linear model is a freestanding demand model widely used without that -- that backstory.

Q. Are you familiar with more flexible random coefficients logit demand models?    03:15:03

A. Yes.

Q. You have estimated damages based on such an econometric model?

A. I have.

Q. In this case?    03:15:15

A. Oh, in this case? No. Well, I think the -- the -- again, as -- as a limiting property of -- of the -- what's called a mixed logit model. A limiting property of the mixed logit model is that you get the -- the log linear model with    03:15:34 variables in there that -- that are expectations of that mixing so that it doesn't actually change the -- the nature of the model, at least in particular, I'm -- I'm speaking of mixing with respect to features that the consumers care about,    03:15:55

Page 157

40 (Pages 154 - 157)

not -- not the price.    03:16:02

Q.  Can you turn -- well, take a look at paragraph 44. It's on the same page.

You state that you "designed your model to estimate demand for app downloads and demand for    03:16:17 in-app content separately while accounting for their interrelations."

Do you see that?

A.  Yes.

Q.  For apps in the same genre, are downloads    03:16:28 and in-app content economic substitutes, in your opinion?

A.  Please repeat the question.

Q.  Sure.

For apps in the same genre, are downloads    03:16:39 and in-app content economic substitutes, in your opinion?

MR. RIFKIN:  Objection to form.

THE DEPONENT:  No.  I would say they're -- they're not.  You know, the acquisition    03:16:51 of one is a precondition for the acquisition of the -- of the second.

Q.  (By Mr. Swanson)  Do you consider them to be in the same relevant market?

A.  I think I have to answer by going back to    03:17:18

Page 158

what the -- the demand specification actually is,    03:17:20 and it's -- it's -- it's one in which there is a -- an equation for downloads which does not include a -- a variable for IP, and there's an equation for IP demand which does depend on down -- downloads.    03:17:39 It's the presence of the downloads in the iAP equation which is -- is the interrelationship which I think is being referred to here.

Q.  And my question is:  Do you consider downloads and in-app purchases within the same    03:18:01 genre to be in the same relevant market?

A.  I would say they are all -- they are in the app -- iAP -- I'm sorry -- in the iOS aftermarket, yes.

Q.  And do products, to be in the same    03:18:19 relevant market, have to be economic substitutes?

A.  No, I don't think so necessarily.  You could have comparable -- what economists call complements also in the same market.

Q.  Like hot dogs and buns?    03:18:38

A.  Or left shoes and right shoes, yeah.

Q.  And is this an example, you believe, of left shoes and right shoes?

A.  Well, I think it's not quite the left shoe and the right shoe, but it's -- it would be    03:18:56

Page 159

unuseful, if not impossible, to do an iAP download    03:18:58 unless you have already acquired the app.

Q.  As a general matter, if demand for two products exhibits the same price sensitivity, are the two products likely economic substitutes?    03:19:19

A.  Please repeat the question.

Q.  As a general matter, if demand for two products exhibits the same price sensitivity, are the two products likely economic substitutes?

A.  I don't -- I don't think there's --    03:19:41 there's a general law one way or the other.  I -- that the -- the preconditions for that question are sufficiently ambiguous so that I think to actually answer it, you would need to know a lot more.

Q.  How can you tell if two products are    03:19:59 economic substitutes?

A.  Well, in general, if the price -- just as a matter of general economics, if the price of product A goes up and the -- the demand for product B goes up, that's an indication they are    03:20:18 substitutes.

Q.  Is it your opinion that price sensitivity for in-app content and for app downloads is different for the game genre?

MR. RIFKIN:  Objection to form.    03:20:45

Page 160

THE DEPONENT:  Between one and the other,    03:20:48 you mean?

MR. SWANSON:  Yes.  Yup.  Yup.

THE DEPONENT:  Well, I think it's an empirical question, and I -- I think the -- the    03:20:53 answer is, from my estimates in the supplementary report, is they are different.

Q.  (By Mr. Swanson)  By modeling demand for app downloads and demand for in-app content separately, are you allowing for marginal cost to    03:21:10 vary as between app download transactions and in-app content transactions?

A.  Yes.

Q.  And is it an empirical -- strike that.

As an empirical matter, is it your    03:21:31 conclusion that marginal cost varies as between app download transactions and in-app content transactions for the same genre?

A.  I haven't sat down to look at the data to answer that question exactly, but I believe that    03:21:52 the answer is they would be different -- they could easily be different.

Q.  Take a look at paragraph 45, also on the same page.  You say there, "Rather than letting all apps and in-app purchases have the same demand    03:22:15

Page 161

41 (Pages 158 - 161)

coefficients, my model allows apps that belong to    03:22:18
different app categories, hereafter referred to as
'genres,' to have different coefficients."

Do you see that?

A. Yes.    03:22:27

Q. Does your model permit you to assess
whether apps that belong to the same category are
economic substitutes?

A. I think the answer is that the -- the
model specification does not say anything about --    03:22:52
about patterns of substitution and complementarity.
It's essentially -- it's -- it's essentially a
property of competition among many products that
own -- own price comes to dominate the decisions of
an individual producer.    03:23:20

Q. Continuing on in paragraph 45, you say in
the last two sentences there, "The App Store
transactions data provides information on which
genre each app belongs to. This allows the
estimated model to reflect the demand and supply    03:23:42
conditions that are specific to each app genre."

Do you see that?

A. Yes.

Q. First, what do you mean by "demand
conditions"?    03:23:52

Page 162

A. Well, demand has both a price -- a price    03:23:58
and other factors in it which influence demand, and
essentially this is allowing for the possibility
that price sensitivities differ across genres and
also that other contributions to quantity at given    03:24:19
prices can also vary across genres.

Q. Do demand conditions include the
intensity of competition in app phases?

A. Well, they do in the sense that the price
sensitivity itself reflects the -- the degree to    03:24:48
which consumers have the ability to switch away
from a commodity or switch into not buying any
commodities in the market.

Q. That is an assessment made at the genre
level, right, not at the app level?    03:25:08

A. I'm sorry. I -- I -- I'm missing the
context for the question.

Q. Sure.

The demand conditions for an app within a
genre is the focus of what I was asking about.    03:25:25

Do those demand conditions include how
intensive the competition is for a particular app
within a given genre?

A. Oh. Well, then my previous answer was --
was what I intended to say, which is that the --    03:25:44

Page 163

the price sensitivity reflects whatever the    03:25:49
opportunities consumers see for buying substitutes
for this particular app or not buying in this genre
at all. And it -- I think it's not an unreasonable
specification that -- at least within -- within a    03:26:15
genre that that's -- that's -- that's a particular
estimate of -- of price sensitivity.

Q. Your model assumes, does it not, that all
apps and in-app purchases in the same genre face
the same demand conditions?    03:26:39

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I take it you mean
face the same price sensitivity parameter? Is that
what you mean by that?

Q. (By Mr. Swanson) Well, are there demand    03:26:51
conditions other than price sensitivity of
consumers?

A. The model, if you will recall from when
we've looked at this before, on the right-hand side
of the demand equation contains not only price, but    03:27:13
also a series of other variables, and so it depends
on those other variables as well.

Q. And those are fixed effects?

A. For example, those are -- are fixed
effects.    03:27:29

Page 164

Q. Okay, and what are those?    03:27:29

A. Well, there's an app fixed effects and
there's a -- a time fixed effect in the model.

Q. And in lay terms, how would you describe
what those variables are?    03:27:42

A. That for a particular app, we -- we are
not trying to explain the overall popularity of
that app. We're simply looking at variation in
popularity of that app with -- with -- with
measured changes in -- in its feature such as its    03:28:06
price.

Q. Do you -- does your model assume that
supply conditions differ as between app downloads
and in-app purchases?

A. It allows -- it allows the -- a marginal    03:28:26
cost that we impute to vary between the two, yes.

Q. And why would marginal cost differ as
between the two?

A. I would -- I'm not the right expert to
ask to enumerate all the things that go into    03:28:53
marginal cost, but there are clearly costs that go
into finding a customer and selling and getting
them to download an app than there are to
persuading them to buy iAP for -- for an app that's
already been downloaded. Like -- perhaps user    03:29:21

Page 165

42 (Pages 162 - 165)

acquisition costs would be higher for -- for 03:29:26 getting people to download it to begin with than it would be to persuade them to -- that you have content that they should buy.

Q. Should there be distinct margin 03:29:40 constraints for app downloads as opposed to in-app purchases as a result?

A. I think yes. It's reasonable that there are.

Q. How would you estimate damages if supply 03:29:56 conditions are the same for apps in a given genre but demand conditions differ among those apps?

A. Please repeat the question.

Q. How would you estimate damages if supply conditions are the same for apps in a given genre 03:30:12 but demand conditions differ as between apps in that genre?

A. Well, I think the practical answer is that one -- one can measure demand conditions at -- at some level of granularity and, you know, it's my 03:30:31 judgment in terms of the way this model was designed that we picked a granularity that balances the ability to get reliable statistical results and which allows some of the variation across apps to be captured. 03:30:55

Page 166

So I think the -- the answer is that -- 03:30:59 to the extent that there is variation in demand, we've tried to deal with it.

Q. Have you tested whether demand conditions differ for apps in a given genre? 03:31:15

A. I -- I personally have not done so. I'm -- I -- I'll leave it to Dr. Song as -- as to whether in the current round, he's done some of that. I'm -- I may remember having told that he has, but now I don't remember specifically. 03:31:46

Q. Is it important to the reliability of your model to test whether demand conditions differ for apps in a given genre?

A. Is it important to test? I would say that there -- there is a balance between how 03:32:12 detailed or granular a model can be and how accurately it can be estimated, and -- and there's -- there's a balance for -- point for that, and my -- in my judgment, that's the balance point we've picked. 03:32:33

If you do testing for, you know, uniformity or lack of heterogeneity, that's informative for whether you got that point right or not. So yes, I would -- I would say it's useful to have information like that. 03:32:51

Page 167

Q. Moving to paragraph 47. You indicate 03:32:54 there that -- this is at the bottom of paragraph 47 on page 17.

You state that your model "can incorporate information about developers' variable 03:33:09 margins as the constraints that the demand estimates should satisfy."

Do you see that?

A. Yes.

Q. Does your model require accurate 03:33:19 information about developers' margins?

A. In the way that I use it, the answer is no. In principle, if one had accurate information about individual developers' margins and you accept that they are profit maximizers, one -- one would 03:33:43 be able to precisely determine their price sensitivity or the demand for that app.

But that's not the way I use these. I use these as bounds based on observations about -- about developers. 03:34:07

And now I should say -- I should qualify this by saying that in my supplemental report, I had relatively few developers' data on which to base this analysis, and it was more a demonstration that you could use these data than it was a final 03:34:23

Page 168

result. My understanding is that there is now a -- 03:34:26 more -- quite a bit more data on developers available that's been used by Dr. Song.

Q. At least insofar as you used margin data from the developers and derived margin bounds, are 03:34:48 those margin bounds associated with statistical error?

A. They -- they are not treated as -- as statistical in my estimation. I recall -- I would have to go back and read the details, but I recall 03:35:19 doing some sensitivity tests of how things would change if the margin balance were changed, and so that's -- that's related to answering that question.

Q. Well, if, for example, the upper margin 03:35:41 bound for a genre is too low compared to reality, would that inject statistical error into your damage estimates?

A. I have to speak from recollection here because I haven't gone back and reviewed my work 03:36:07 from a few years back, but my -- my -- my memory of it is that the margin bounds are treated as fixed numbers in the estimation.

Q. Does that mean they're being treated as being measured without error? 03:36:32

Page 169

43 (Pages 166 - 169)

A. Yes.    03:36:48

Q. And so does your model take no account of measurement error with respect to margin bounds?

A. I think my recollection is that there is a separate calculation of the sensitivity of the    03:37:02 model outputs to the margin bounds, and that's the evidence that we have on their effect.

Q. Now, you indicated that in your prior reports you had used some developer information to derive margin bounds to show that your model could    03:37:33 accommodate such information, right?

A. Correct.

Q. Do you know whether the average margins implied by your unconstrained model are anywhere close to the average margins implied by your    03:37:56 constrained model?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would have to go back and look at the earlier reports. I don't at this point even recall whether we looked at that.    03:38:17

Q. (By Mr. Swanson) When you added margin constraints to your model, did it increase the amount of damages calculated?

A. I don't recall that damages were calculated with estimates without -- without the    03:38:32

Page 170

use of the margin bounds. We -- in the design of    03:38:38 the model, margin bounds were -- were sort of built into the strategy for doing demand estimation.

Q. Do you have an opinion as to whether the incorporation of margin bounds increased damages    03:38:50 compared to not including margin bounds?

A. I -- I do not know at this point which -- how it would go.

Q. Given the imposition of margin constraints, does your model necessarily estimate    03:39:09 positive aggregate damages?

A. No. I don't think that's a necessary consequence.

Q. Your list of relied-upon expert reports does not include the March 7 expert report of    03:39:36 Professor Allen McCormick, correct?

A. Correct.

Q. Are you aware of his report?

A. I've been told about it.

Q. Have you read it?    03:39:48

A. No, I have not.

Q. Do you plan to read it?

A. I received -- I think I received a copy of it. No, I may not even have received a copy of it.    03:39:59

Page 171

Q. Okay. You saw references to it in    03:39:59 Dr. Song's report, right?

A. I was told about it by staff. I -- I don't -- I don't recall reading Dr. Song's report to -- to -- paragraphs that involved that.    03:40:14

Q. So the paragraphs that you remember reading from Dr. Song's report were not paragraphs that said anything about Professor McCormick?

A. No. Parts of Dr. Song's report that I was concentrating on were the ones that involved    03:40:29 the new payor data that was available.

Q. Do you know Professor McCormick professionally?

A. No, I do not.

Q. Are you aware of what field or fields    03:40:44 he's an expert in?

A. My understanding is that he is an expert in -- that he's a business school professor that has expertise in digital production.

Q. If you were to provide guidance to such    03:41:05 an expert about how to estimate an accurate range of developer margins for use in your model, what instructions would you give him or her?

MR. RIFKIN: Object to the form.

THE DEPONENT: I think I would have to --    03:41:22

Page 172

the Court didn't like my analysis, or at least    03:41:23 didn't feel it was sufficient, and I -- I understand that. And I think the -- the fact that there's an another expert here is -- is justified. He's -- I am not an expert on the details of -- of    03:41:39 digital production.

Q. (By Mr. Swanson) But you're an expert on how the margin bounds fit in your model, right?

A. Well, yes.

Q. And conceptually, at least, you're an    03:41:54 expert on what should be measured in order to properly fit into your model, right?

A. Well, if -- if the question is do I understand what should go into a -- a margin bound so that it's commensurate with and on the same    03:42:16 scale as marginal costs, yes, I understand those elements.

Q. Would you guide a subject matter expert to calculate developer margins at the app level or the item level?    03:42:32

MR. RIFKIN: Object to the form.

THE DEPONENT: Oh, I think at the -- at the app month level, because I do -- I do not think that -- we understand that -- that we understand or there's really a possibility of understanding the    03:42:55

Page 173

44 (Pages 170 - 173)

detailed cost and the behavior of a developer at 03:42:57 the level of how -- how they handle iAP content.

Q. (By Mr. Swanson) What guidance would you give a subject matter expert in this area about how to choose the lower end of the margin range? 03:43:19

A. I believe that from -- from an economic perspective, what's -- what's relevant here are what the developers themselves view as their imputed marginal costs of providing product -- product, and that should be what drives their 03:43:49 pricing.

What they're doing is they're -- they're pricing -- if they're profit-maximizing in -- relative to what -- what their view of what their costs are. 03:44:06

And I would -- and I would myself turn to an industry expert and ask what -- what do these guys think they're doing. I don't know that -- that a general economist has great insight into that. 03:44:22

Q. Well, your model needs a range, so what does the lower and upper end of that range reflect from a statistical standpoint?

A. From a statistical standpoint, I would say the margin bounds are effectively bounds on the 03:44:50

Page 174

price sensitivity coefficients, and they -- they 03:44:54 are -- they then are based on the -- in the end on the judgment and evidence brought forward by industry experts on what -- what margin bounds prevail in -- in a particular class of developers 03:45:17 in a particular genre.

Q. But what is the guidance about where to locate those points? Are those two points intended to contain the cost experience of 60 percent of developers? Something else? 03:45:38

MR. RIFKIN: Objection to the form.

THE DEPONENT: The answer is I -- I don't know what the instructions of counsel were to -- or the requests from Dr. Song were to Dr. -- to Professor McCormick. 03:45:52

Q. (By Mr. Swanson) But you designed the model and you assigned a role for margin bounds, so what is the margin bounds supposed to measure?

What's supposed to be within those bounds, the average cost, the average cost for 03:46:06 40 percent of developers, 80 percent, 10 percent?

MR. RIFKIN: Objection to the form.

THE DEPONENT: It's not a -- that's not a question that I ever answered for myself, and I deferred originally to other people for examples of 03:46:30

Page 175

developers' financial records. 03:46:38

And whatever Professor McCormick has done, I'm not -- was not involved in designing that, nor would I feel that I am competent to design that. 03:46:52

Certainly when we were working with the financial records for a few firms, the idea was to look at -- look at the upper and lower limits of the -- of what we saw in reality.

Q. (By Mr. Swanson) That's what you were 03:47:05 doing when you --

A. Yes, when we were doing it.

Q. Would you guide a subject matter expert in this area to calculate developer margins for a particular year or set of years for purposes of 03:47:18 reliability of your model?

A. I don't think I would have -- have any foreknowledge on which would be better.

MR. SWANSON: I'm getting that look from you. Yet on timing -- 03:47:44

MR. RIFKIN: No. You want to take a break?

MR. SWANSON: I'm about to change.

MR. RIFKIN: Sure. Let's take a break.

THE VIDEOGRAPHER: This marks the end of 03:47:50

Page 176

Media No. 5. Off the record. The time is 3:48. 03:47:54

(Recess taken.)

(Exhibit DX64 was marked for identification by the Court Reporter and is attached hereto.) 03:48:34

THE VIDEOGRAPHER: This marks the beginning of Media No. 6 in the deposition of Professor Daniel McFadden. We are back on the record. The time is 4:04 p.m.

Q. (By Mr. Swanson) Professor, we've had 04:04:38 during a break an exhibit marked. This will be DX64. It's a paper that appears to be entitled "The economic impact of a market intermediary sales commission."

I think that -- 04:04:53

A. Yes.

Q. -- should be in front of you now.

A. Yes.

Q. Is that a paper that you have written?

A. Yes, that's a recent working paper in 04:05:02 progress.

Q. Okay. And is there any particular purpose for which you wrote this?

A. Yes. For some years I have been working on a treatise on the welfare economics of product 04:05:21

Page 177

45 (Pages 174 - 177)

liability, and I -- I made myself notes to add to that, and this is one of those notes. It got onto my CV by mistake because it was intended for sort of further treatise, not for this case.

But in any case, it's -- it -- it certainly deals with the issue of how to -- how to analyze the effects of intermediary sales.

Q. If you look at the bottom paragraph on the first page -- well, first of all, we talked about intermediaries earlier. Are you using the term here in the same sense that we discussed that term earlier?

A. Yes, I -- I -- I -- in the first paragraph, I describe some of the universe of intermediaries that can have various forms, but various kinds of agent -- agencies and consignment stores are examples that I have in mind.

Q. Is there some reason why you didn't include app stores in that set of examples?

A. Well, yes. I -- this was for my -- my -- my later treatise. I didn't deliver -- I didn't want to mention any active case, and so I have...

Q. So now back to the bottom paragraph on page 1.

Second sentence, you say, "For example,

Page 178

an intermediary like Amazon provides a virtual platform where principals can arrange transactions and provide checks on product safety and labeling and often provides transaction fulfillment services such as payment processing and provision for returns."

I just wanted to focus on the virtual platform language. What are you referring to by the term "virtual platform"?

A. Essentially a -- as an example of a two-sided -- a two-sided market, and the intermediary is facilitating the connection between sellers and buyers. So a -- a real estate agent is an intermediary that's helping buyers find houses and sellers of houses find buyers.

And I think the same thing is true for a consignment store.

Q. And you're using the term "platform" here in the economic sense, right, not in a legal sense?

A. In -- in the -- in the economic sense, very definitely.

Q. A little further in that bottom paragraph, you say, "Actual or potential competition for the provision of intermediary services establishes a benchmark limit on the

Page 179

commission that an intermediary can charge when coexisting with or forestalling rivals."

Do you see that?

A. Yes.

Q. First of all, what did you mean by "forestalling rivals"?

A. About -- about pricing in such a way that injury -- injury is discouraged. So in the -- in the antitrust analysis, I believe, and in damages from improper conduct, if -- if a firm basically is a monopolist but is pricing in such a way that no -- no potential rivals have an incentive to enter, then they're not causing any damage.

Q. Would allowing storelike apps in the App Store provide actual or potential competition for the provision of intermediary services?

A. I think I -- you'd have to look at the specifics of how that's structured, but I -- I think it's possible. I really don't have an opinion. It would -- that's a question of the specifics of the structuring.

Q. And when I say "storelike apps," I'm referring not to stores like Amazon that sell physical goods; I'm talking about digital in-app content.

Page 180

A. Yes, I understand it was in the Apple Store content.

Q. And would allowing side loading of such storelike apps on iOS devices provide actual or potential competition for the provision of intermediary services?

A. Again, I think that it's a question of the specifics of -- of -- of how it's set up and what the contractual arrangements are. I don't have an opinion ahead of time that it would or wouldn't forestall competition in a way that's consistent with the antitrust regulations.

Q. Well, my question was just if you had side loading of storelike apps, do you view that as providing actual or potential competition for the provision of intermediary services?

A. The answer is I don't know enough about what side loading involves to -- to answer the question and -- but I can imagine that potential rivalries could exist in a variety of forms and limit pricing that -- that discourages entry could also appear in a variety of forms. I...

Q. Still on the first page but a little higher up in that second paragraph, the one that starts -- well, the sentence that starts "For

Page 181

46 (Pages 178 - 181)

example."

You say, "If Amazon decreases its sales commission on books, this may result in a reduction in price of a particular book, a new edition with more durable binding, better editing, improved content, or reduction in advertising inserts and increase the variety of authors and books sold through Amazon."

Do you see that?

A. Yes.

Q. If Apple were to decrease the App Store commission, could that result in apps that have improved content?

A. As -- I think in -- generically, yes.

Q. Could it result in apps with less advertising?

A. I believe so.

Q. Okay. Have you analyzed whether any of this has occurred on the occasions when Apple reduced the App Store commission rate?

A. No, I have not myself investigated these issues per Apple.

Let me just remark -- this work was not -- it was done -- obviously memorializes my -- my experience which the Apple litigation is

Page 182

informing, but this is my own personal research work. It has nothing to do with this case. I don't -- I wasn't paid for or authorized to do this.

Q. Understood. Thank you for clarifying that.

On the second page, the first full paragraph, you indicate that "An economic analysis of sales commissions may want to consider welfare effects on the other economic agents, such as consumers who are not buyers or producers who are not sellers in the as-is market but might be active principals in a but-for market."

Do you see that?

A. Yes.

Q. Have you considered such effects in your damage model?

A. No, I have not, and deliberately, because my understanding is that the -- the legal standards here are that -- I can look at for overcharges as monetary damages, but that other forms of harm have a -- have a different legal standing and not necessarily immediately accepted by the courts.

Q. Well, in this particular sentence, are you assuming that there would be harm?

Page 183

A. Well, no. I'm just saying there may be welfare effects. So if you're doing this as an economist for the purposes of, say, public policy, perhaps for the design of litigation or for regulation, that these may be factors you would want to consider.

I think there are factors that could come in at that level which would not be appropriate to bring into a legal case.

Q. You are referring, though, on page 2 to welfare effects that could be positive or could be negative, right?

A. In general, yes.

Q. Okay. And in this case, you haven't looked at the effects of Apple's conduct on consumers who download apps but have never downloaded a paid app or made an in-app purchase, correct?

A. That's correct.

Q. And you're aware that there are tens of millions of those consumers, right?

A. Yes, I am.

Q. Do you think it's appropriate to ignore the effects of Apple's conduct on those consumers?

A. I think for an economist, it would be a

Page 184

concern if you're trying to do welfare economics for the entire economy, but I think that -- in a legal setting, you follow the rules set by the consumers.

Q. Are those consumers who downloads apps but don't make in-app purchases part of the relevant market in this case, as plaintiffs defined it?

MR. RIFKIN: Objection to form.

THE DEPONENT: I think the answer -- that question has a -- has a compound answer, which is that from a legal point of view, the -- the parties in -- the relevant parties in this case are the people who actually purchased products in -- in this market.

But from the standpoint of a general economic welfare analysis, you would -- you would also consider what's -- what's that mean to other agents in the economy.

Q. (By Mr. Swanson) I mean, economists certainly, and especially in the digital context, analyze markets where products are priced at zero, don't they?

A. Well, I think that -- the -- the answer to your question is I haven't done a literature

Page 185

47 (Pages 182 - 185)

search on zero-priced products, but it's certainly 04:16:29 the case that economists worry -- worry about provision of public goods and other goods that do not have market prices, do not have markets.

I'm not sure how you would classify 04:16:49 zero-priced digital goods in that I presume -- I presume the supplier offers a zero-priced digital good if they expect somehow to be able to monetize that downstream.

Q. Sometimes the developer monetizes through 04:17:07 advertising, right?

A. Through advertising or by getting -- giving a download to someone who will buy iAP, yes.

Q. And Apple would monetize it because the more users, if there are network effects, the more 04:17:22 developers will want to use the platform; is that logical?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I think what's true is that it -- if Apple is aware that there are 04:17:37 major network effects, it -- it should be seeking to get as many developers on this platform as possible, and presumably by charging as little price as they could, while -- while working even on it. 04:17:57

Page 186

Or so -- I'm -- I'm not sure. I think 04:17:57 Apple has incentives here, right? I'm not sure they work in the direction that you would like to claim.

Q. (By Mr. Swanson) Is it your opinion that 04:18:08 any time there are network effects with respect to a two-sided platform that the operator of the platform always has an incentive to charge a lower price to one side?

A. Oh, I think that -- at this point, I'm -- 04:18:23 I'm definitely not prepared to discuss platform -- platform economics. I'm -- it's a complicated area of economics. Tensions between what are so natural returns to scale and the negative effects of -- of concentration. 04:18:47

Q. Okay. Could you turn to page 4 of this article.

Here you're considering the case of a single product and seller but many potential buyers? 04:19:04

A. Yes.

Q. That's what you call a "monopolized market"?

A. Yes. The monopoly here refers to the seller side of the market. 04:19:12

Page 187

Q. You go on to say, "Suppose the product's 04:19:14 unique properties and/or branding give the seller the ability to set the retail price of the product and elicit positive demand over a range of prices."

Do you see that? 04:19:26

A. Yes.

Q. Does that description apply to developers in your model?

A. Developers in the Apple case?

Q. In your model. 04:19:32

A. In the demand model, yes, it does.

Q. Okay. And you also say here that "The market will clear when marginal revenue equals commission-adjusted marginal cost."

Do you see that? 04:19:45

A. Yes.

Q. Is that how you assume developers will set price in your model here in this case?

A. Yes, it is.

Q. Okay. And you also say here, "Assume 04:19:55 that in the relevant range, marginal cost is constant."

Do you see that?

A. Yes.

Q. That's what you assume in your model in 04:20:05

Page 188

this case, right? 04:20:06

A. Yes.

Q. Okay. And then if you'll to turn page 6.

In the first full paragraph, you say, "The assumption that marginal cost is constant over 04:20:22 the relevant range of quantities as in figure 2 corresponds to a seller whose technology is scalable, i.e., quantity can be doubled simply by doubling the rental of capital equipment and the workforce." 04:20:42

Do you see that?

A. Yes.

Q. Do you assume that to be true in your model in this case?

A. I haven't thought about it -- about it in 04:20:52 terms of the details of a developer's production technology, so I -- I'm not sure I can make that correspondence. But that's -- that's certainly the spirit of the assumption that -- that the digital production is scalable. 04:21:12

Q. On page 6 at heading 4, the upper half of the page, you refer here to a "monopolistically competitive market."

Do you see that?

A. Yes. 04:21:31

Page 189

48 (Pages 186 - 189)

Q. Would you characterize the competition between developers in a given genre as monopolistically competitive?

A. I think that's -- an old but -- but correct economist description of this market. I --

Q. And --

A. -- I imagine that the participants in the market would say we're not monopolists, we're -- we're workable competitors. But this is economist terminology for economists.

Q. The -- how do you distinguish, then, between the monopolized market and the monopolistically competitive market? What's the differing assumption or premise that distinguishes between those two?

A. Well, in the monopolistically competitive market -- well, as -- if you read through this section, you'll find this is where I make an argument that if choices are -- are discrete and these conditions that I've described for the market and the number of the buyers is small relative to the total of number of potential buyers that -- that you -- you get the result.

First of all, that -- that discrete choice demand will tend to take this log linear

Page 190

form approximately, and secondly, that Nash equilibrium with active price competition will tend -- tend to go in the limit to the more or less classic Chamberlinian monopolistic competition model.

Ef- -- effectively it's the -- it's the size of the active buyers compared with the size of the -- of the population of potential buyers that -- that determines whether the -- the Chamberlinian model is -- is an appropriate model. I believe it is -- I believe it is in this case.

Q. Do the potential buyers in that -- in that telling include those who never make a purchase?

A. It would, yes.

Q. All right. You can put that to one side and then find your expert report again.

And please turn to paragraph 32. Let's see.

A. I have.

Q. I'm sorry. I'm trying to find my place here.

The second sentence is where I wanted to start where you say, "At the time of writing my

Page 191

2023 supplemental report, that data set" -- referring to the App Store transactions data -- "recorded all transactions made through the App Store from July 2008 through April 2022."

Do you see that?

A. Yes.

Q. Would using additional transactional data after April 2022 result in more accurate estimates?

A. I would say that using more data which would reflect -- should lead to estimates which are more reflective of the behavior of this market through the entire damage period. I wouldn't say one way or the other as to whether they would be accurate.

Generally -- as a general statistical matter, you have more data drawn from the same population, you can get more accurate estimates. But here we have several things going on. One, it's a larger population, but also you have whatever has happened between '22 and '24.

Q. Well, if you assume that price sensitivity is uniform across the damage period, wouldn't you be drawing from the same population with more recent App Store transactional data?

A. Well, again, I think there are two things

Page 192

going on, which is that one is -- the answer is yes. To the extent that that price sensitivity parameter is, in fact, constant over time, is having more -- more data would allow you to estimate -- estimate it with more precision.

To the extent that there's any drift in it over time, this will allow you to more closely estimate the -- the -- the -- effectively the mean -- the mean value.

Q. Drift over time would mean that at some point the structural relationship is changing?

A. Oh, the structural relationship is -- words are rather vague. But the response is yes, if the -- if the market environment itself is changing over time, then the -- the price sensitivity parameter we measure is a measure of the sort of -- of the -- the average sensitivity over the -- the period being analyzed.

Q. Do you have any view as to whether or not the price sensitivity parameter that you're measuring was stable over the entire damage period to date?

A. I -- I don't -- if we examine that in the past, I don't recall the results. I simply don't remember. I don't remember asking the question.

Page 193

49 (Pages 190 - 193)

I'm not saying we didn't, but I don't remember it.    04:28:26

Q. Well, Dr. Song is now implementing your methodology with almost two years of additional App Store transactional data, correct?

A. Yes.    04:28:42

Q. Would you expect him at least for the music and entertainment and games genres, which you yourself estimated, to come up with estimates that are very similar to the ones that you previously reported?    04:28:58

A. I would expect him to be similar, but, again, to the extent that there is any drift over time, that would -- that would generate differences, and I think the updated sensitivity estimates would be more representative of the --    04:29:17 the overall behavior of consumers in the damage period.

Q. If Dr. Song, using more data, estimated a parameter that you had estimated and his estimate was significantly different than yours, what would    04:29:34 you conclude from that?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would say that there could be multiple reasons for that. One would be that one is working with -- a different set of data    04:29:57

Page 194

and it involves somewhat different market    04:30:01 conditions and -- and the parameters reflect the -- something about the average behavior over the period. That's the most likely source of -- of differences that are substantial.    04:30:21

Q. (By Mr. Swanson) Would there be any boundary point in terms of differences between your estimates and his where you would be led to question whether there was something wrong with the model itself?    04:30:40

MR. RIFKIN: Objection to form.

THE DEPONENT: I think the answer is that -- that an analysis based on the entire damage period would be the gold standard, and -- and if there's a question -- there's a question about what    04:31:07 was missing in the earlier model. For example, there's -- there's different developer data available, I understand, in Dr. Song's work than there was in -- in my work. When I say developer data, I mean the margin data.    04:31:26 He's -- he analyzed different -- a more complete set of genres than my initial example of genres. So those things would all contribute to differences.

Q. (By Mr. Swanson) Would the gold standard    04:31:46

Page 195

analysis including -- let me start over.    04:31:47

Would the gold standard be satisfied if Dr. Song included all of the iPod Touch transactions over the damage period?

MR. RIFKIN: Objection to form.    04:32:07

THE DEPONENT: My -- my view is that this was a -- a market -- aftermarket for iOS devices, and I -- I'd be -- I'd surprised if the -- the presence or absence of the iPod Touch would -- would have much difference primarily because it was    04:32:28 a -- an early and relatively small factor in the overall development of this market in terms of revenues and -- and numbers of transactions.

Q. (By Mr. Swanson) Well, we established earlier from your own report that at -- at an    04:32:47 earlier point iPod Touch transactions accounted for 10 percent of the entire universe over the class period up to that point.

Do you recall that?

A. I -- that was a table from my original    04:33:02 report, but since then, you have many more years of transactions, and you have inclusion of the under $10 people by -- as part of the class definition. And so I don't know -- I almost doubt that that 10 percent number has remained in place.    04:33:23

Page 196

Q. What does -- what does the class    04:33:28 definition have to do with what data you should use to estimate demand in your model?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I think there's a    04:33:44 question of implementation as to whether you -- you include payors or accounts in the -- in the demand estimation that are -- don't fit the -- fit the class definition.

Q. (By Mr. Swanson) Well, isn't everyone    04:34:02 who makes a purchase part of the demand in the market regardless of whether they spend more than $10 or not?

A. Well, I think -- I think that's right, and I think it's legitimate to -- use -- use them    04:34:14 all. But I think from an econometric view, you could also -- it's a legitimate argument that you should concentrate on the sensitivity of the people who matter for the -- for the case. So I don't think there was a clear econometric reason that    04:34:37 one -- one is to be excluded.

Q. Could you -- well, I'm going to ask you this question -- a little bit different topic.

But in your model, if a consumer makes one in-app purchase and the model calculates    04:35:02

Page 197

50 (Pages 194 - 197)

damages associated with that purchase, and then we compare that scenario with another one where the same consumer at the same time, same item, but instead of purchasing only one, the consumer purchases ten, would your model calculate ten times the damage in that second scenario?

MR. RIFKIN: Objection to form.

THE DEPONENT: I'm sorry. I have to stop and think -- think about it because I have to think about the steps in the -- in the damage calculation.

I -- I think the answer depends on whether those ten are bought as ten replications of the same item purchase or whether they're bought as -- as a package of ten. My model does not predict demand at the item level. You -- you narrowed it by saying they -- by only the one item, so that -- that helps.

But my model is not -- is not -- does not actually say that the way this would be sold in the but-for world would be one item -- the same item that you can buy ten times. I'm -- I think the model cannot -- cannot determine that.

Q. (By Mr. Swanson) Let me ask you to look at paragraph 51 in your report.

Page 198

A. I have that in front of me.

Q. Okay. In that paragraph you're talking about focal pricing?

A. Yes.

Q. The last sentence of that paragraph, you say, "I offer no opinions in this report regarding whether developers would display such pricing behavior in the absences of Apple's price tier restrictions."

Do you see that?

A. Yes.

Q. Now, in prior reports, you have offered some opinions on that topic, have you not?

A. I've offered the opinion that if focal prices are contained within Apple's price tiers, which in the case of -- of a 99-cent ending for a price, that's true, then an analysis of the impact of the tiers also tells you something about the -- about the impact of focal pricing.

Q. In this last sentence where you say you offer no opinions, are you withdrawing any prior opinions that you offered?

A. No. My opinion is -- is the same, which is that the framework, the architecture for this demand model can be applied with tier restrictions

Page 199

in place, and to the extent that focal pricing is on the -- on the tier grid with focal prices in place and that the -- that the demand -- damage model can accommodate that. That opinion is unchanged.

Q. Are you offering any opinion that Apple's price tiers are anticompetitive?

A. I am not. I've not been asked to do that. I'm not -- I understand that I will not be offering that opinion.

Q. Could you find Exhibit 63, the choice article.

A. Yes.

Q. And if you could turn to page 9 of that exhibit, please, I'd appreciate it.

Do you see the paragraph that says, "7. Focal pricing"?

A. Yes.

Q. You indicate there that there's an observation in marketing that consumer demands serve -- excuse me. "Consumer demands surge at specific monetary price trigger points, termed focal prices, with the implication that products should be designed to be sold at these prices."

Do you see that?

Page 200

A. Yes.

Q. First, what did you mean by "design"?

A. I'll give an example. If a maker of cereal or -- or a carbonated beverage finds that demand surges at 99 -- 99 cents, beyond 99 cents, and then they'll pick a size for their bottle or their box of cereal so that that's an attractive product at that price.

Q. Is it -- do you have an opinion as to whether app developers design their products in that way in connection with Apple's price tiers?

A. It -- I have no personal information on what designers consider, but I think as a general economic phenomenon, if -- if there -- there is a jump at 99 cents, yes, developers would -- would take that into account even if they were free to set any price they wish.

Q. And is it your -- well, is it your opinion that the products that are designed in that way to respect Apple's price tiers, so to speak, in the actual world will be designed the same way in the but-for world?

MR. RIFKIN: Objection to form.

THE DEPONENT: I don't know the answer to that. I -- certainly there's nothing in the damage

Page 201

51 (Pages 198 - 201)

modeling which is -- is intended to make any -- any 04:42:30 suggestions as to what that would be. I think I deliberately said I -- I do not think I can explain developer behavior at the granularity that would be required to predict decisions -- for example, the 04:42:55 size of cereal boxes or -- or the number of digital coins that go into an item, you know, in the iAP.

Q. (By Mr. Swanson) Are you assuming for purposes of your model that in the real world, the price tier points that the developers choose are 04:43:17 exactly profit-maximizing?

MR. RIFKIN: Objection to form.

THE DEPONENT: The calculation in the but-for situation assumes that developers choose among the available tier points and they choose the 04:43:44 maximum profit among the tier points and not -- not other points off -- off the tiers even if they were higher profit.

Q. (By Mr. Swanson) If developers are designing their products to correlate with the 04:43:59 price tier point that they choose, does that mean that that price tier point is the most profit-maximizing point?

MR. RIFKIN: Objection to form.

THE DEPONENT: That's -- that's -- that's 04:44:21

Page 202

a difficult question to answer, and I believe it -- 04:44:22 it depends on the -- the structure of production for developers and how -- what the -- what the nature of -- of quality changes are.

Q. (By Mr. Swanson) Have you studied that 04:44:44 empirically?

A. I have not studied it empirically. I've thought about it, and I think it's -- it's an under-explored area in economics.

Q. You know if Dr. Song has explored that 04:44:59 empirically?

A. As far as I know, he has not.

Q. Could you turn to page 13, please. And I wanted to focus on figure 3.

This figure in your article presents a 04:45:24 demand curve in red. I believe in the text you referred to it as "a partial attention demand curve."

Is that a fair --

A. Yes. 04:45:36

Q. -- statement?

Is it fair to say that this figure and that particular curve seeks to depict consumer demand in a world where prices ending in 99 are focal prices? 04:45:47

Page 203

A. Yes. This is a -- this is a constructed 04:45:53 example. It's not a -- not a general economic theory, but for this constructed example, this would be the nature of demand.

Q. Does your model of consumer demand in 04:46:08 this case rely on a partial attention demand curve like the one depicted in figure 3?

A. In this case, no. The assumption in this case is that consumers respond in a classic way to prices and products, that they are not inattentive. 04:46:28

Q. So does that mean that you're assuming that developers do not set prices to take account of what you call here "dollar-focused consumers"?

A. In the damage model for Apple, yes. The -- I have not made any special assumption on 04:46:50 the presence of -- of focal prices. I do not think, given the immaturity of the -- of that field, that it would be appropriate or -- or legally wise to introduce it.

Q. Please turn to page 14. 04:47:16

In your discussion of a consignment store that engages in anticompetitive conduct, you refer to "a tendency for suppliers to set prices at focal points being capable of influencing the distribution of the harm it causes consumers." 04:47:45

Page 204

Do you see that discussion? 04:47:49

A. Sorry. Refer to me to a line if you can.

Q. It is -- it's in the bottom paragraph, and you talked about -- when you start saying, "Suppose the conduct of a consignment store crosses 04:48:11 a traditional antitrust red line, say by refusing to deal with suppliers who attempt to sell through rival stores."

Do you see -- do you see that?

A. Yes. 04:48:25

Q. Then you say, "In the terminology of class action litigation, consignment store conduct is a common effect, but a tendency for suppliers to set prices at focal points can influence the distribution of the harm it causes consumers, as in 04:48:36 the figure 4 example."

Do you see that?

A. Yes.

Q. What are you referring to there?

A. Well, figure 4 was -- was an example 04:48:45 where I considered in -- in a -- a particular little constructed exercise, a small number of consumers that have a left inattention in the sense that they ignore the sense part of -- of a price.

And what -- what I find there is that a 04:49:14

Page 205

52 (Pages 202 - 205)

relatively small number of these kinds of consumers 04:49:21 can -- can, in fact, cause a fairly significant market effect.

Q. Can the tendency toward focal pricing mean in such a scenario that some consumers are not 04:49:33 harmed by the anticompetitive conduct?

A. What it means is that in terms of the price changes, yes, different -- different consumers would be affected differently. That is to say -- this would be -- this could have a 04:50:00 disruptive effect on the -- on the pattern of effects.

Q. Do you agree that the impacts of focal pricing effects on the distribution of harm may in some circumstances require individualized inquiry 04:50:20 on the pricing behavior of each supplier?

A. Well, I think that one of the issues in -- in class actions is that individualized inquiry is generally so costly as to essentially suppress that as -- as a remedy for misconduct, so 04:50:44 the question is if -- if, in fact, this phenomena is -- is important -- and one example doesn't establish that -- then it's -- then it's an issue that the -- the law in economics community should be thinking about. 04:51:06

Page 206

Q. Could you please turn to paragraph 54 of 04:51:10 your report.

In that paragraph, you state that you "modeled developer pricing decisions and therefore estimate but-for prices at the app level using the 04:51:32 average of item level prices in a given month as the app level in-app content price."

Do you see that?

A. Yes.

Q. And this is what you were earlier 04:51:45 referring to as "composite price"?

A. Yes.

Q. When you refer here to the average of item level prices, are you referring to a simple average or a weighted average? 04:51:59

A. It's a simple average in the calculations that I did to -- up to my supplementary report.

Q. Does it make a difference to your model whether you use a simple or a weighted average?

A. That's certainly an implementation issue. 04:52:16 I -- it doesn't change the architecture of the model. It -- it could have an impact on -- on the results, yes.

Q. Would your model yield unreliable results if you used weighted averages instead of simple 04:52:30

Page 207

averages? 04:52:34

A. I think that it's -- it's an econometrician's decision as to which of these price indices for a composite commodity is appropriate, and I don't think you can say either 04:52:50 one or the other is more or less reliable or more or less appropriate in any generic basis.

It's really a question of in the particular application whether a -- a level aggregation is the best one to use. 04:53:10

Q. Did you have a reason for using a simple average instead of a weighted average?

A. I don't have a strong reason. There is -- there is one reason, which is a simple average is -- avoids any -- any possible 04:53:25 econometric contamination from -- that would be introduced by changing the weights.

This is a problem which is not specific here. It arises every time you talk about price indices in the macro economy and otherwise. 04:53:43

Q. In your opinion, did developers decide what price they will charge for in-app purchases based on the average price of all in-app items rather than the price of those items individually?

A. My judgment is that -- app -- app 04:54:13

Page 208

developers have a marginal cost for -- for app 04:54:16 content, which is a relatively -- determined by production of that content and -- primarily and not by how it's packaged. And so that -- I think it's appropriate to do the analysis at the composite 04:54:39 content level, and I don't think that we have sufficient information on app developers' behavior to go at a finer granularity than that.

Q. Are you aware of any other businesses where sellers maximize profits based on the simple 04:55:01 average of all the prices they charge?

A. I think I have to answer by saying first of all, I don't follow and have information on most manufacturers' behavior at all, and in particular, I don't have any detailed information on how they 04:55:33 price multiple products.

I think that there are obviously issues on both the consumer demand side and the production side on how you manufacture and price products that are packaged in a variety of packages and formats. 04:55:54

Q. Does the approach of using a composite product as you described it result in your model calculating higher damages?

MR. RIFKIN: Objection to form.

THE DEPONENT: The answer is I don't 04:56:22

Page 209

53 (Pages 206 - 209)

know. I don't -- that's -- that's certainly not an intended part of the design. The design was motivated by what seemed reasonable in terms of the -- the data that was available and what we knew about developer behavior.

Q. (By Mr. Swanson) Well, composite pricing will tend to have higher prices than the -- than the sum of the individual in-app items for a given developer, correct?

A. Well, it is an average, so it will be roughly higher -- higher for half and lower for half. Of course, an average is not the same as the mode, but -- I'm sorry -- the median, but yes.

Q. Take a case where a developer has two in-app items and maximizes its profits at an average -- simple average price of $2.99.

Do you have that in mind?

A. Two items --

Q. Two items --

A. -- whose average price is 2.99?

Q. Yeah. Now, that would be consistent with the developer charging 99 cents for one of the items and $4.99 for the other item.

Do you agree?

A. Oh, you test me. It's simple arithmetic, but it's too late in the day for me to do it in my head.

Q. Well, I will represent to you that if you take the average of 99 cents and $4.99, you get 2.99.

MR. RIFKIN: Objection.

THE DEPONENT: Yes, I accept that.

Q. (By Mr. Swanson) Okay. So would the developer be equally profitable in the approach you take if it instead charges $1.99 for one of the items and $3.99 for the other item?

A. The answer is that that's -- that's not knowable without knowing something about the -- the quantities that are being transacted here, what -- what the demand response is and what the -- what the actual costs are of packaging in -- in the various sizes.

And it's -- that's a pretty complex problem, and certainly, I think -- a problem I think at a granularity where the outside econometrician has very little hope of answering it.

Q. Well, in your model, if you see one developer that has two items priced at 99 cents and 4.99 and another developer with two items priced at

1.99 and 3.99, your model will treat both of those as having the same composite price of $2.99; isn't that the case?

A. That sounds right.

Q. Okay. And your assumptions you use in your methodology will imply that both of those developers are maximizing their profits at a price -- average price of $2.99, correct?

A. That also sounds right.

Q. So when you say that developers set prices at the app level rather than the item level, do you mean that developers care only about the simple average price of all of the in-app items?

A. No. What I mean is that there are issues of how consumer demand responds to -- at the item level, and there are issues about -- about the -- the marginal costs at packaging at -- at the item level which -- are beyond the ability of -- the econo- -- outside econometrician to learn about from the kinds of data we have, and so we -- I've designed an analysis which does not try to speculate or infer what that level of -- of packaging and pricing behavior would be.

Q. When estimating demand for in-app purchases, does your model estimate demand for in-app purchases at the composite price or the individual item price?

A. Please ask the question again.

Q. When estimating demand for in-app purchases, does your model estimate that demand at the composite price or the individual item price?

MR. RIFKIN: Objection to form.

THE DEPONENT: The -- the -- a -- a record -- a record in that estimation is an item.

Q. (By Mr. Swanson) Which means that it's true that you estimate consumer demand for in-app purchases using the item prices, right?

A. Using the individual market demand and price by item, correct.

Q. And estimating consumer demand using the composite price would make no sense, would it? Consumer -- consumers don't purchase composites that are fictional, do they?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I think -- I think it would -- one could do that, and that's very commonly done in economics where demand is -- is studied at -- at -- at a granularity or composite of commodities with an appropriate commodity -- composite price, and so I think it would -- it

Page 210
Page 211
Page 212
Page 213

54 (Pages 210 - 213)

would certainly be possible to do that and appropriate to do that.

Q. (By Mr. Swanson) Why didn't you do that, then?

A. Well, I -- I think -- I -- as I recall, this goes back to -- four years, and I don't recall the details. But I think that was -- simply a judgment that -- at the time that -- those were -- those were the -- the data that were available for -- for estimation.

Q. Do you have any estimate of consumer price sensitivity at the so-called app or composite level?

MR. RIFKIN: Objection to form.

THE DEPONENT: Yeah. The answer I -- I have not seen results at that level, no.

Q. (By Mr. Swanson) Is it correct to say that in your model, the individual price of an in-app item is used for estimating demand, while the composite price is used for estimating damages?

A. That's correct.

Q. Is your model's assumption that developers set prices at the app level an empirical assumption?

A. I'm not sure what you mean by

Page 214

"empirical." I guess -- what do you mean by "empirical"? Perhaps you could explain.

Q. Have you surveyed any developers to ask whether they set prices at the app or the item level?

A. No, I -- I -- I think that -- that assumption is an assumption based on the -- the economic -- the econometrics of this at -- at a finer level of granularity, there's enough complexity so that -- the proper -- marginal cost is not easily measured. Prices are -- involve more complexities than simply a relationship to marginal cost at the item level. There's -- there's demand interactions and production interactions which make that a much more complicated relationship.

Q. You feel very comfortable estimating demand at the item level, right?

A. I'm -- I'm -- I'm aware that what that involves is that the distinction between the item level and the app month level go into the -- they basically end up in the residual, and so that the question as to whether you're getting a correct estimate of the app month level price coefficient is a question of whether the instruments are appropriately orthogonal to the -- to the residual

Page 215

in that -- to the disturbance in that case.

Q. You're referring to the instrumental variables?

A. Yes, the instrumental variables.

Q. And is it your -- do you have any evidence that the instruments are orthogonal?

A. The answer is I don't have over-identifying instruments, so I have not been able to make a test of that.

Q. Okay.

MR. RIFKIN: Good time for a break?

MR. SWANSON: Yeah.

MR. RIFKIN: Okay.

THE VIDEOGRAPHER: This marks the end of Media No. 6. Off the record. The time is 5:06.

(Recess taken.)

THE VIDEOGRAPHER: This marks the beginning of Media No. 7 in the deposition of Professor Daniel McFadden. We're back on the record. The time is 5:24.

Q. (By Mr. Swanson) Professor, take the example of a developer who sets a price for a paid download. Your model looks at that price and together with the assumption that that price is exactly profit-maximizing for the developer, you

Page 216

are able to infer a marginal cost; is that correct?

A. That's correct.

Q. Okay. And the accuracy of that marginal cost inference hinges on the assumption that the price the developer chooses is exactly profit-maximizing, correct?

A. Correct.

Q. Now, every app that has ever been sold at an App Store is set a price tier price point, correct?

A. Yes.

Q. So your model's accuracy in terms of inferring marginal cost hinges on assuming that all of those price tier price points are exactly profit-maximizing, correct?

A. Correct.

Q. And if they're not profit-maximizing exactly, then your inference of marginal cost is not accurate, is it?

A. If they're not exact, then the -- the marginal costs have the possibility of ranging within some bounds, and one could set out to do an analysis on that basis.

Q. One could calculate those bounds, correct?

Page 217

55 (Pages 214 - 217)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

A. Yes.                                    05:26:27

Q. And Professor Prince has actually done that in the past, has he not?

A. Yes. I -- I don't think he used them inappropriately, but yes. Once -- once you have them, you could do something appropriate.    05:26:35

Q. Well, you didn't have any issues with the mathematics of his calculation of those bounds, did you?

A. I'm sorry. You're testing me on something that I haven't read for -- for -- for four years, so I simply can't -- answer the question because I -- I haven't refreshed my knowledge of that.    05:26:57

Q. Okay. Fair enough.    05:27:12

When a consumer makes an in-app purchase in a free-to-download app, the free download of the app itself generates no cost to the developer in your model, correct?

A. No, I don't -- I don't agree with that. It -- it -- it's -- I think the model is silent on -- on how -- how the developer would -- covers his fixed cost in that case.    05:27:35

Q. Well, your model, by being silent, treats the cost as zero, right?    05:28:08

Page 218

A. Well, in terms of the pricing decision for iAP, that's based on the marginal cost of providing that composite iAP. And the -- the cost of delivering the app is not part of that calculation.    05:28:11    05:28:34

So presumably, somewhere in the background, they -- the app developer is making some business decision that's -- that that's the business model he wants to exercise, one with free downloads.    05:28:50

Q. Well, if free app downloads and associated in-app purchases are like left and right shoes, don't you need to look at the composite marginal cost of those two transactions?

A. I'm sorry. Just for my hearing, repeat that.    05:29:07

Q. Sure.

You had earlier said you viewed downloads as complements of in-app purchases in the apps which have been downloaded.    05:29:20

Did I get that right?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I'm not sure I understand the phrasing of the question, but I -- I think the answer would be that if I'm a developer.    05:29:35

Page 219

I -- I am making a business decision on whether I want to charge for the download of my app or not.    05:29:39

Q. (By Mr. Swanson) Well, if downloads and in-app purchases are complements instead of substitutes, wouldn't the developer want to optimize with respect to the cost of the download as well as with respect to the cost of the in-app purchase?    05:29:56

A. Well, the answer is -- is that if you -- went back further and asked for what -- what is the business decision of the developer as to what business model to adopt and whether to offer the download freely or not, presumably at that level, there -- if I'm a developer, I'm making some projection as to how much I can -- how much rev- -- profit I can gain from selling -- selling the app and selling advertising, and that would go into my decision as to whether to be in this business at all or whether to deliver the app freely or not. I agree with that.    05:30:17    05:30:37    05:30:58

Q. Well, do your -- the equations that define your model have any role for the cost of that free-to-download transaction?

A. The answer is -- is no. I -- I -- the -- the model effectively says that when -- when I    05:31:18

Page 220

price iAP, I'm -- I'm simply responding to -- to the market as exists with the people that have freely downloaded my app. That's just distinct from the business model in which they are making a joint decision as to how to price the app and how to price the iAP.    05:31:23    05:31:44

Q. If a user downloads an app for free and uses it but does not make any in-app transactions, is there any cost to the developer reflected in your model?    05:32:03

A. No. Those apps -- transactions do not appear in the analysis.

Q. Can I ask you to turn to paragraph 55 of your report.

You state in paragraph 55 that "There could be cases in which an app developer's cost structure or market conditions are such that your model estimates some consumer class members incurred no monetary harm as a result of Apple's alleged anticompetitive conduct."    05:32:33    05:32:51

Do you see that?

A. Yes.

Q. You write that there could be such cases.

Do you know whether there are such cases, in fact, where your model estimates class members    05:33:02

Page 221

56 (Pages 218 - 221)

incurred no monetary harm because of Apple's 05:33:05 alleged anticompetitive conduct?

A. Well, there certainly are such cases predicted by my analysis in the supplementary report in 2023. 05:33:23

Q. And as Dr. Song has implemented your model and reported about that in his March 7 expert report, does he find that there are more such class members who are not monetarily injured?

MR. RIFKIN: Objection to form. 05:33:52

THE DEPONENT: I don't -- I don't remember his exact results, but because he's working with payors rather than individual accounts and because he's working with more -- more time, I think there is a -- probably more of a chance that 05:34:08 any particular consumer would buy something which -- in which they would have benefited from the but-for case than -- than before.

Q. (By Mr. Swanson) Do you know how many class members Dr. Song finds incurred no monetary 05:34:27 harm because of Apple's alleged anticompetitive conduct?

A. I don't recall the number.

Q. You're aware that number is available in his report? 05:34:41

Page 222

A. Yes. I -- I -- I remember seeing in a 05:34:43 Zoom call the numbers, but I don't remember what the numbers were.

Q. Do you recall if it's more than 10 million class members? 05:34:53

A. Oh, no. What I remember are percentages. I don't remember numbers. I don't even remember the percentages, but I certainly -- I don't remember seeing numbers.

Q. Okay. Let me ask you to flip to 05:35:06 paragraph 58 of your report.

You write there that you understand that "Apple has now produced a supplemental data set that maps individual payor IDs which represent consumers who are billed for a transaction to the 05:35:46 transactions contained within the App Store transactional data."

Do you see that?

A. Yes.

Q. And do you base this understanding on the 05:35:55 part of the Song report that you reviewed?

A. Yes.

Q. Do you have any understanding about how individual payor IDs were mapped to transactions?

A. If it has been described to me, yes. 05:36:13

Page 223

Q. And do you know who did that mapping? 05:36:15

MR. RIFKIN: Objection to form.

THE DEPONENT: Ask the question again, please.

Q. (By Mr. Swanson) Let me start -- let me 05:36:27 start over again.

Let me ask you: Do you know who Darryl Thompson is?

A. No. I -- I've been told, but I can't repeat to you now the name of the outside firm, the 05:36:41 claims administrator firm that actually did this analysis, but I understand they played a major role in doing it.

Q. Does the JND Legal strike a chord?

A. I believe that's what I was told, yes. 05:36:58

Q. Okay. And do you understand that Mr. Thompson is with JND Legal and submitted a declaration about that activity?

A. I have no information on that. I have not heard the name before, and I haven't seen any 05:37:16 of their product myself.

Q. Did you -- when you read that part of Dr. Song's report, did you note that he, Dr. Song, referred to a declaration that was attached to his report? 05:37:31

Page 224

A. I'm sorry. I missed that. I didn't pick 05:37:32 up on it.

Q. Okay. Are you aware that JND Legal purports to have matched approximately 1.69 billion Apple IDs to approximately 246 million unique 05:37:48 individuals?

A. I was -- I was told, given ballpark estimates of those numbers, yes.

Q. Are you aware that Apple's data set matching transactions to payors relies on 05:38:05 JND Legal's list of unique individuals?

A. That's my understanding.

Q. And do you understand that JND Legal's list relies on a methodology for identifying and removing duplicate payor records? 05:38:21

A. I -- I have no direct and detailed knowledge of how -- how they work. I simply have a description that they -- they have done this analysis and that that's what they do, but I don't -- I don't know anything about the details of 05:38:45 it.

Q. You're not offering any opinion that JND Legal's methodology for matching Apple IDs to individuals is reliable?

A. Yes, I have no involvement in that work 05:38:58

Page 225

57 (Pages 222 - 225)

and I have no opinion.    05:39:00

Q. Your model, as a matter of logic, will only accurately identify which class members were harmed and unharmed to the extent that JND Legal has reliably identified the unique class members?    05:39:24

Would you agree with that?

A. I do not agree with -- with that in full, no. I mean, I think there are obvious things that one could do. If you knew more about what that company had done and had specific questions about    05:39:47 the way particular subclasses were processed, one could go through and track what implication that -- that had for the -- for the percent of harm.

Q. Your understanding is Dr. Song has implemented your methodology at the individual    05:40:07 class member level based on JND Legal's work; is that fair?

MR. RIFKIN: Objection to form.

THE DEPONENT: My -- my understanding is that he has used the identification of payors and    05:40:25 the transactions associated with those payors that Apple has -- has delivered. That's my understanding.

Q. (By Mr. Swanson) Okay. And how important is it to an accurate individualized    05:40:42

Page 226

assessment of damages under your model that    05:40:47 JND Legal's work is reliably accurate?

A. Well, my -- my view is that payor data is better than account ID level data for allocating damages and for determining in the claims    05:41:10 administration process what -- what's a damage account and what's not or what is a damage payor and what's not, but I -- actually, I think that doing it on an account basis would already have been an acceptable claims process from my -- from    05:41:27 my point of view. I think it would meet the standards that class action requires, as I understand them.

I would hope that the payor data is more accurate in identifying actual class members than    05:41:46 just sending money out to accounts, for example. But beyond that, I don't have an opinion on the matter.

Q. Well, data at the account level doesn't tell you anything about individual -- any given    05:42:03 individual class member, does it?

A. Well, I would say there are -- there are certainly interactions between Apple ID accounts which are omitted if you simply do things on an account-by-account basis, and if you have good    05:42:26

Page 227

payor data, that takes care of that issue.    05:42:33

Q. If you have good payor data and you're able to accurately figure out who the unique payors are from that data, then that takes care of that    05:42:49 issue, in your opinion?

A. Yes.

Q. So it is important that the methodology used to assess unique payors is a reliable methodology, correct?

A. Well, the question is essentially is    05:43:04 it -- is the error rate from using payors identified in this way more -- more or less than the error rate from assigning damage -- allocating damages by Apple ID and missing the interactions between Apple IDs.    05:43:27

My -- my own opinion, without detailed study, is that either of these methods is -- would be better than most of the class action cases where I have worked in the past in terms of getting the damages remediation to the people who actually    05:43:49 incurred the damages.

Q. You understand that in this case, the presiding judge has required that there be a matching process at this expert report time?

A. Actually, I -- I don't -- I -- I know    05:44:12

Page 228

that from my original time on my original report,    05:44:15 the -- it makes sense to do it on a payor basis, and the data was unavailable at the payor basis. I am not so aware that was a part of a -- the judge's order.    05:44:32

Q. Let me ask you to turn to paragraph -- well, 59, which is a sentence of your report.

You say there that "The process described above can handle any but-for commission rate the jury determines would prevail in the but-for    05:44:52 world."

Do you see that?

A. Yes.

Q. Your model assumes that iOS App Stores in the but-for world charge a single uniform    05:45:04 commission rate, correct?

A. Correct.

Q. If the jury determines that absent Apple's alleged anticompetitive conduct, multiple stores would charge different commission rates, can    05:45:18 your model calculate damages?

A. I would say there's -- there's nothing intrinsic in the architecture of the model that would prevent that. The architecture of the model is designed in such a way that it would be    05:45:36

Page 229

58 (Pages 226 - 229)

relatively -- relatively straightforward to introduce commission rates that varied over time or, say, varied between iAP and various genres.

But if it actually varied between rivals, my model does -- does not at this point work -- work from a description of what the actual topography in the but-for competition would be. It works simply from the Abrantes-Metz but -- but-for rate.

So in summary, my statement is that if I was -- if -- if she -- or if I was given rates from her that varied by time or varied by genre or varied by the nature of the product being delivered, the -- the model could accommodate that. But if the -- and she said that these rates would differ by rival, then I don't have a model of operation of rival stores.

Q. If the jury determines that developers maximized profits and set their prices not at the app level but at the item level, how would the jury reliably calculate damages based on the evidence from your model?

MR. RIFKIN: Objection to form.

THE DEPONENT: The answer is I don't -- I don't think I can do it and I don't think they can

Page 230

do it reliably.

Q. (By Mr. Swanson) If the jury determines that marginal costs are zero for in-app virtual currency transactions, how would the jury reliably calculate damages using your model?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, this is -- this is going to have to be a pretty smart jury if they can do those calculations, but I think the answer is if they -- if they can work at that level, then I don't know. I don't know -- I don't know how they would proceed.

Q. (By Mr. Swanson) If the jury determines that the margin constraints generally should be set at higher ranges, in other words, shifted up, how would the jury reliably calculate damages using your model?

A. The answer is that the model could be -- demand reestimated and damages recalculated with -- with different margin constraints. That -- that is an exercise that -- that takes quite a while and it would be -- I think beyond -- clearly beyond the capacity of a jury to do or ask for.

Q. (By Mr. Swanson) This is 65.

/////

Page 231

(Exhibit DX65 was marked for identification by the Court Reporter and is attached hereto.)

MR. SWANSON: Mark this as 65.

Q. (By Mr. Swanson) Professor McFadden, do you recognize Exhibit 65?

A. I do.

Q. Is this an amicus brief that was submitted to the U.S. Supreme Court on behalf of you and Professor Stiglitz?

A. Correct.

Q. And this was filed last month?

A. I believe so.

Q. Did you draft any part of this brief?

A. No.

Q. Did you review it?

A. I did. I reviewed it and made some suggestions.

Q. Now, this was submitted in a case called Laboratory Corporation of America versus Davis.

Do you have an understanding about what the issue is before the Supreme Court on which you decided to serve as a friend of the court?

A. I have limited understanding as to what the petitioner's proposal was, but beyond that, I

Page 232

don't know anything about the case.

Q. Do you understand that the Supreme Court granted review in that case to determine whether a class may be certified that contains unharmed class members?

A. I understand that that's -- that's the issue as to what the petitioner's proposal is, a particular proposal for making decisions on the basis of that.

Q. And you understand that the class as defined in this matter contains members that your model shows are monetarily unharmed, correct?

A. You're now referring to our Apple litigation?

Q. Yeah.

A. Yes, the model does show that.

Q. And do you understand that the question the Supreme Court is set to decide is quite relevant for whether this matter may continue as a class action?

MR. RIFKIN: Objection to form.

THE DEPONENT: Actually, I don't -- I -- I know very little about the circumstances here and how they relate to -- to this case. I suppose -- I suppose that these issues I thought were resolved

Page 233

59 (Pages 230 - 233)

at the class cert phase and -- and perhaps they will come up again on appeal, but I thought that was a -- a settled issue at this point.

Q. (By Mr. Swanson) Well, if the issue could come up again on appeal, it would be quite relevant if the Supreme Court decided an intervening case on that topic, would it not, as a matter of logic?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I imagine so, yes.

Q. (By Mr. Swanson) Now, on the front page of Exhibit 65, your counsel are listed -- your and Professor Stiglitz' counsel for purposes of the submission of this brief, right?

A. Actually, please -- please ask the question again.

Q. Sure.

This brief on the first page lists who your lawyers were who filed this brief on your behalf and on Professor Stiglitz' behalf, correct?

A. Yes, I believe that's the case.

Q. And that would be the Kellogg Hansen law firm?

A. Apparently.

Q. Yeah. And these -- and that firm is

Page 234

serving as your personal lawyers for purposes of filing this brief with the Supreme Court, correct?

A. Oh, I don't know what -- what the legalities of all this are. I mean, I -- I -- you're asking me about something that -- that I don't have any direct knowledge of.

Q. Well, are -- would -- do you understand that Kellogg Hansen was acting as your lawyer -- your lawyers for purposes of filing this brief with the Supreme Court?

A. Actually, I don't think I have -- I have an understanding of that. I have -- I -- I was asked if I agreed with the main points of this, and I -- I said that I did, and so they proceeded to -- to produce a draft in essentially this form.

I did not -- I did not instigate it, so I didn't have any personal involvement in deciding who was the lawyers representing this -- this opinion.

Q. You understand that Kellogg Hansen are also counsel to the plaintiff class in this litigation against Apple, don't you?

A. Actually, I -- I -- I don't know the specifics of that, no.

Q. You see David Frederick is listed as one

Page 235

of your lawyers here from Kellogg Hansen. Are you aware that he, along with Mr. Rifkin, is a lead counsel in this case?

A. Well, the answer is that -- yes, I must know that from the past. I've certainly talked to the lead counsels at times in the past, but I haven't remembered the name.

Q. And do you understand that this case can no longer proceed as a class action as a result of any decision by the Supreme Court in Laboratory Corporation that Mr. Frederick and his firm will likely lose a very large amount of attorneys' fees?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I -- I think I've tried to describe my involvement in this, which was that I was -- I was asked if I agreed with -- agreed with the point of view raised in this draft, and I -- and I said that I did, and so I was -- I was recorded as having approved its submission.

Beyond that, I -- I know nothing about the -- what you raise as kind of the legal side story here. I'm not involved in that.

Q. (By Mr. Swanson) Well, you agreed to submit this brief to the Supreme Court, and you're

Page 236

telling me you did not know that the law firm that represented it was -- your lawyer before the Supreme Court never informed you that they were also the lawyers in this case against Apple?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I didn't ask because I simply concentrated on the contents of the amicus brief. The issue here for me was whether the brief itself was -- was sound.

Q. (By Mr. Swanson) If you would please turn to page 1 of this brief and look at the second paragraph on that page, starting with the second sentence.

"To certify an antitrust class, Federal Rule of Civil Procedure 23 requires a reliable method to measure harm on a classwide basis and to later assign zero damages to any fortuitously uninjured class members."

Do you see that?

A. Yes.

Q. What do you understand to be meant by "fortuitously uninjured"?

A. Well, in point of fact, I did not try to interpret the -- the legal part of this document. I concentrated on its -- its economics, and so I --

Page 237

60 (Pages 234 - 237)

I -- I don't have an opinion at this point on what that means.

Q. Do you have any opinion about whether the class members that your model finds to be monetarily unharmed in this case are "fortuitously uninjured"?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I would assume that "fortuitously uninjured" means that -- that in the happy circumstance that they were not harmed, but otherwise I -- I -- I have not -- it's not a term that I've used, and I -- and I assume that it means simply that.

Q. (By Mr. Swanson) Can you turn to page 4, please. And I wanted to ask you about -- I think it's the fourth sentence in the first paragraph, the one that reads:

"Reliable models therefore may estimate zero damages for some consumers not because those individuals suffered no adverse effects, but because of noisy data, anomalous transactions, or the inherent limits of statistical modeling."

Do you see that?

A. Yes.

Q. As it's been implemented, does your model

Page 238

find over 10 million class members to be monetarily unharmed because of noisy data?

MR. RIFKIN: Objection to form.

THE DEPONENT: First of all, I'll refer back to the models that I'm familiar with from my supplementary report. I can't comment on -- on Dr. Song's work.

But there -- they do estimate zero damages for some consumers. That's a percentage, and, you know, the rules of arithmetic is that a small percentage of a very large number may still be a large number.

Beyond that, I don't recognize the -- the -- the 10 million figure. I know it is a percentage.

In my model, those people are there because the -- the model finds with some degree of precision that they are buying products for apps that -- that predictably would not have decreased prices in the -- in the but-for case.

Q. (By Mr. Swanson) And that's not because of noisy data or anomalous transactions or the limits of the statistical model, right?

MR. RIFKIN: Objection to form.

THE DEPONENT: There's two -- two

Page 239

different things possibly going on. One is that a -- a perfectly precise model and completely true model may identify unharmed or benefits -- beneficiary members of a -- of a class.

And the second is that in any econometric forecast of a but-for world, using statistical methods is never totally precise, so there will be some people who are probably misclassified. Either they were unharmed and then they -- uncorrectly classified as harmed or vice versa.

Those are two different phenomena.

Q. (By Mr. Swanson) Understood.

And the extent to which your model or your prior models as implemented in your prior reports have found uninjured Apple ID accounts, that has been because of the assumptions you've made that lead to the conclusion that negative marginal costs estimated and inferred by your model are associated with negative damage, right?

MR. RIFKIN: Objection to form.

THE DEPONENT: I would agree with that. I -- I -- I -- I would prefer instead of using the word "assumptions" to use "economic standard practices," "econometric practices," the data and -- and -- and what I think are appropriate

Page 240

assumptions. That would be the substitution I would make.

Q. (By Mr. Swanson) Let me ask you to turn to page 10 of your amicus brief.

THE VIDEOGRAPHER: Counsel, may we go off the record for a second for an audio adjustment?

MR. SWANSON: Sure.

THE VIDEOGRAPHER: Off the record. The time is 6:04.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record. The time is 6:09.

Q. (By Mr. Swanson) We were at page 10 of your amicus brief. Professor McFadden, could you look at the bottom paragraph.

I just wanted to ask about that or at least part of that paragraph on page 10.

You say, "Some variation and individual impact is inevitable. Even the most reliable models will assign zero damages to some class members whether because of data limitations or genuine differences in consumer behavior. Some consumers may have paid unusually low prices due to coupons, bundling or timing. Still others may fall within the model's margin of error where the harm,

Page 241

61 (Pages 238 - 241)

though real, is too small or idiosyncratic to be isolated with confidence."

Do you see that?

A. Yes.

Q. Are any of those explanations or reasons for why your model, as you implemented it in your prior reports, finds that millions of Apple ID accounts are uninjured?

A. Well, I think the answer is that my model is, I believe, reliably identifying unharmed in -- in the supplemental report accounts, perhaps later unharmed payors, and I think that's -- that's a genuine difference or at least given -- given the assumptions that set up the -- the architecture of -- of the demand model, which is to not try to deal with almost unanswerable questions about quality change.

Q. Could you turn back to page 6. I forget if we were already there. But anyway, turn to page 6. I wanted to ask you about the top paragraph.

You say there, "Price fixing is not the only way anticompetitive conduct undermines market integrity. Consider Apple's monopolization of the iPhone app marketplace. By prohibiting competing

Page 242

app stores, Apple has been able to force developers to pay a 30 percent commission on most paid apps and in-app purchases, generating years of super-competitive profits."

Do you see that?

A. Yes.

Q. Did you write that?

A. No.

Q. Has any court found Apple to be a monopolist of the iPhone app marketplace?

A. I can't answer that question. I don't know.

Q. Are you aware that the only court to address this issue in the Epic games case found that Apple was not a monopolist?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: The answer is I -- I did not suggest any edits to this paragraph because it seems to be a statement of -- of fact, and I -- I have no personal knowledge to -- to have an opinion on that. I treated it as a statement of fact.

Q. (By Mr. Swanson) And at the time you saw this and treated it as a statement of fact, you were not aware or had not recalled that the author

Page 243

of this statement was the lawyer for the class in this case suing Apple?

MR. RIFKIN: Objection to form.

THE DEPONENT: Well, I -- I was aware that -- that it was your inquiry via Brattle staff as to whether I would support such a brief, and so that was a connection I was aware of.

Q. (By Mr. Swanson) Did -- did you pay any lawyer for preparing this brief?

A. No.

Q. Do you know if anyone paid the lawyers who prepared this brief for you?

A. No, I have no knowledge of that.

Q. Now, you, in this top paragraph on page 6, cite the Supreme Court decision in Apple v. Pepper, this case, for your statement that "Apple has monopolized the iPhone app marketplace by prohibiting competing app stores."

Do you see that?

MR. RIFKIN: Objection to form.

THE DEPONENT: First of all, the term is "monopolization." I don't -- rather than "monopoly." I don't know if that matters.

Q. (By Mr. Swanson) Okay.

A. But the -- what exactly is your question

Page 244

for me?

Q. I was focusing on the citation here, Apple Inc. v. Pepper, citing this U.S. Supreme Court Reporter, 2019.

Do you see that?

A. Yes.

Q. That's a decision you've read before, right? You've relied on it in prior reports?

A. I relied -- I've relied on its implications. I don't recall reading it.

Q. Okay. Do you think the sentence right above that citation accurately describes the Pepper case?

A. The answer is I don't -- I don't know. I didn't -- I don't know the details of the -- of the legal claims here and citations, and I did not -- when reviewing this -- this draft of this amicus brief have any comments on this. I viewed that as something for the lawyers.

Q. This top paragraph on page 6 continues: "Professor McFadden's econometric analysis showed that this distortion led to systematically inflated prices, imposing a functional tax on all participants in the marketplace."

Page 245

62 (Pages 242 - 245)

Do you see that?                06:16:04

A.  Yes.

Q.  Did you edit that?

A.  No.

Q.  Is it correct that your model and        06:16:10 methodology show that all participants in the market paid inflated price -- prices?

MR. RIFKIN:  Objection to form.

THE DEPONENT:  I don't -- I don't have an independent analysis of the grammar in this        06:16:37 sentence.  If one is talking about systematically inflated prices, then I think conclusion -- conclusion would be correct, but I think that my model shows that there are cases showing where prices are not inflated.  That's -- those are the        06:16:57 exceptions when negative marginal cost is measured by my model.

Q.  (By Mr. Swanson) Did you consider editing this brief to disclose to the United States Supreme Court that your model and methodology        06:17:13 indicate that there are millions of uninjured Apple ID accounts?

A.  No.  My edits were entirely concerned with the question of the economic effect on the harm to people of rules which would either certify        06:17:36

Page 246

or not class actions, and there -- there -- that        06:17:45 was the point -- that was the area where I suggested edits, and it's based on my opinion that as an economist, there's a benefit-cost analysis that needs to be done on the large number of people        06:18:07 that potentially are harmed, the small number of people that are potentially unharmed, the cost to society and the court system of the -- of this kind of -- kind of litigation.

I mean, I'm -- I'm not even a -- a law        06:18:25 and economics professor, but I certainly see that, you know, there are issues that perhaps at the Supreme Court level there should be some discussion of this and not -- I don't think the petitioner's proposed rule is a good solution for this -- I        06:18:44 think a rather complex problem.

Q.  Have you submitted or signed on to amicus briefs before the Supreme Court in the past?

A.  On one occasion I did, and I've submitted briefs to other -- other court levels on a couple        06:19:03 of occasions.

MR. SWANSON:  Can we take a break? Because I think we're close.

MR. RIFKIN:  Let's go off the record.

THE VIDEOGRAPHER:  Off the record.  The        06:19:16

Page 247

time is 6:19.                06:19:17

(Recess taken.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 6:30.

Q.  (By Mr. Swanson) Professor McFadden, do        06:30:11 you hold any opinions which you intend to express at trial that were not set forth in your reports or discussed in this deposition?

A.  As of this point, I do not anticipate that.                06:30:24

Q.  Do you have any plans at present to submitted a rebuttal report?

A.  Actually I -- I have no plans, and I have not been asked to anticipate that.

Q.  Have you seen any economic evidence that        06:30:39 contradicts any of your opinions?

A.  That's -- that's a broad question.  But the -- the answer is not that come to mind.

MR. SWANSON:  All right.  No further questions.                06:30:56

MR. RIFKIN:  I have just two questions to clarify some prior testimony, so if you'll just indulge me for a moment.

EXAMINATION

/////

Page 248

BY MR. RIFKIN:                06:31:08

Q.  Professor McFadden, do you recall being asked earlier in the deposition some questions about unharmed Apple IDs or apps?

Do you recall that?                06:31:21

A.  Yes, I do.

Q.  Okay.  Do you have exhibit DX37 handy? This is your June 1, 2021 --

A.  It is available here, yes.

Q.  Okay.  I'd like you, if you would,        06:31:36 please, to turn to paragraph 241 of Exhibit DX37.

Let me know when you have that in front of you.

MR. SWANSON:  I'm sorry.  Which --

MR. RIFKIN:  241 on page 106.        06:31:56

Q.  (By Mr. Rifkin) Do you have that in front of you?

A.  Yes, I do.

Q.  And I'd like to direct your attention to the sentence that includes "I estimate that        06:32:06 approximately 5.8 percent of the consumer class members spent money on only those apps and in-app content whose but-for prices are higher at the 12 percent but-for commission rate."

Do you see that?                06:32:24

Page 249

63 (Pages 246 - 249)

A. Yes.    06:32:24

Q. Is that 5.8 percent number that appears in paragraph 241 of Exhibit DX37 -- is that the -- the number that you were recalling from before?

A. Yes, that is the number I was recalling.    06:32:39

Q. And is that the percentage of unharmed Apple IDs that you calculated when you prepared your reports based on the -- the data through 2019?

A. It's -- it's, in fact, a percentage of -- of Apple IDs that were unharmed and which did not,    06:33:02 in fact, make any purchases which would offset that.

And -- and it's not -- it's not a percent of -- of apps or app items that would by -- by tomorrow's calculation have caused a price decrease    06:33:30 rather than a price increase.

Q. Okay. Thank you.

And then switching now to a different area.

Do you -- do you recall some testimony    06:33:45 about margin bounds being applied at a particular level of transaction?

Do you recall that earlier in the deposition today?

A. If you could remind me a little more. I    06:34:07

Page 250

don't --    06:34:09

Q. Let me ask you this: In the demand estimations that you included in your supplemental reports, did you apply margin bounds at the app year level?    06:34:20

A. Yes, those bounds all apply at the app year level.

MR. RIFKIN: Thank you. I don't have any further questions.

MR. SWANSON: We're done.    06:34:29

MR. RIFKIN: Thank you.

MR. SWANSON: Thank you.

THE VIDEOGRAPHER: We are off the record at 6:34 p.m., and this concludes today's testimony given by Professor Daniel McFadden. The total    06:34:38 number of media was seven and will be retained by Veritext Legal Solutions.

(TIME NOTED: 6:34 P.M.)

06:38:28

---o0o---

06:38:28

Page 251

I, DANIEL L. McFADDEN, Ph.D., do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear notes; that my testimony as contained herein, as corrected, is true and correct.

Executed this _____ day of _____, 2025, at _____,_____.


_____
DANIEL L. McFadden, Ph.D.

Page 252

I, Rebecca L. Romano, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any deponents in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made stenographically by me and which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: May 16th, 2025

Rebecca L. Romano, RPR,
CSR. No 12546

Page 253

64 (Pages 250 - 253)

DANIEL G. SWANSON

dswanson@gibsondunn.com

May 15, 2025

RE: In Re Apple Iphone Antitrust Litigation  v.

5/14/2025, Daniel McFadden, (#7370734).

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 254

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 255

In Re Apple Iphone Antitrust Litigation  v.

Daniel McFadden (#7370734)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

(Daniel McFadden)          Date

Page 256

65 (Pages 254 - 256)

**[& - 232]**

| & | | | |
|---|---|---|---|

**&**  2:14 3:4,13 4:4 254:24 255:9

**0**

**0.1**  38:24 39:5 39:11,14
**06714**  1:6 2:6
**06714ygr**  7:20

**1**

**1**  1:25 7:14 35:2,4,6 38:24 41:22 44:15 144:3 178:24 237:11 249:8 255:1
**1.69**  225:4
**1.99**  211:10 212:1
**10**  5:5,12 17:8 37:15,24 112:1 175:21 196:17 196:23,25 197:13 223:5 239:1,14 241:4 241:13,17
**10.4**  40:2,9
**100**  14:5,6 33:7
**10016**  3:8
**1050**  4:7
**106**  249:15
**10:02**  44:15
**10:18**  44:20

**11**  11:24 141:4
**11:10**  77:15
**11:28**  77:20
**12**  53:22,22,23 53:23 65:20,22 68:1,12,20 69:2 72:24 96:13 133:2 249:24
**120**  5:21
**12546**  1:21 9:2 253:25
**12:32**  114:13
**13**  146:2 203:13
**13.6**  90:3 92:2
**13.62**  145:23
**13.63**  47:25 49:9,17,22 51:5 71:10
**14**  1:16 2:17 7:2 79:4,18 80:25 84:2,3 85:24 120:9 204:20
**149**  38:1
**14th**  7:7
**15**  86:10 117:17 119:10 145:12,19 146:2,8,14 147:8 254:3
**16**  36:12,13,14 36:15 79:5 87:15 144:20

147:11
**16th**  253:22
**17**  37:3 69:20 73:24 74:1,17 89:2 168:3
**177**  6:4
**18**  53:23,23 76:14 77:22 89:16
**19**  18:14 53:22 53:24 99:22,25
**1922**  50:7
**1923**  18:15 50:7
**1:46**  114:18
**1st**  36:2

**2**

**2**  41:23,24 44:18 52:11 77:15 184:10 189:6
**2.99**  210:20 212:2,8
**2.99.**  210:16 211:5
**20**  13:20 109:11 141:20
**20-0466**  1:22
**200**  45:20
**20036-5306**  4:8
**2008**  37:15,24 70:25 71:4,8 71:24 72:10 130:2,9,14 131:2,9,20

192:4
**2009**  37:7
**2017**  64:25
**2019**  38:14 245:4 250:8
**202**  4:9
**2021**  14:14 36:2 38:2 249:8
**2022**  50:10 65:6 192:4,8
**2023**  12:2 18:18,23 25:8 48:1 50:10,16 65:7 192:1 222:5
**2024**  26:18
**2025**  1:16 2:17 5:14 6:10 7:2,7 27:4,5 32:21 252:8 253:22 254:3
**2025.520**  254:9 254:12
**21**  37:18
**212**  3:9
**213**  3:18
**22**  50:11 109:24 192:20
**229-7430**  3:18
**23**  38:2,5,19 39:2,7,18 50:11 237:15
**232**  6:9

**[24 - 99]**

**24** 192:20
**241** 249:11,15
250:3
**246** 225:5
**248** 5:6
**256** 1:25
**2600** 2:15 7:22
**270** 3:7
**2:47** 150:20

### 3

**3** 19:8,9,13,21
52:11 58:4
77:18 114:13
203:14 204:7
**3-0** 125:24,25
**3.99** 211:11
212:1
**30** 65:25
125:22 243:2
255:1
**31** 25:8
**32** 191:19
**333** 3:16
**3491** 1:23
**36** 6:15 37:7
141:3
**37** 133:2
**38** 50:14,25
124:11,13
132:2,9
**3:04** 150:25
**3:48** 177:1

### 4

**4** 11:23 20:2
21:15 25:22
72:25 84:4
114:16 150:19
187:16 189:21
205:16,20
238:14
**4-0** 127:13
**4.99** 210:23
211:4,25
**40** 127:11,13,16
175:21
**411** 7:20
**42** 64:24
127:12 144:17
144:19
**43** 64:24
152:11
**44** 32:1,16
66:15 158:3
**45** 32:2 161:23
162:16
**47** 168:1,2
**4:04** 177:9
**4:11** 1:6 2:6

### 5

**5** 44:22 47:9
49:4,6,14
50:23 52:9
58:5 69:20
73:25 112:8
144:7,10,10
150:23 177:1

**5.8** 249:21
250:2
**5/14/2025**
254:5
**51** 96:12 97:3,4
97:17 98:11
198:25
**54** 207:1
**545-4600** 3:9
**55** 221:13,15
**56** 141:19
**58** 223:11
**59** 229:7
**5:06** 216:15
**5:24** 216:20

### 6

**6** 13:23 36:11
36:12,16 40:13
45:7 144:7,10
144:10 146:4
177:7 189:3,21
216:15 242:18
242:20 244:15
245:20
**6.6** 39:22
**6.7** 40:7
**60** 175:9
**61** 10:13
**62** 95:24
**63** 124:8
200:11
**65** 231:24
232:4,6 234:12
**6:04** 241:9

**6:09** 241:12
**6:19** 248:1
**6:30** 248:4
**6:34** 251:14,18

### 7

**7** 5:13 6:9
11:20 13:24
17:3 19:4 30:5
31:22 32:21
38:6 41:21,23
44:22 45:8,9
45:16 46:9,12
47:1,1,12
64:22 66:6
171:15 200:17
216:18 222:7
**7321** 253:24
**7370734** 1:24
254:5 256:2
**7th** 34:7

### 8

**80** 175:21
**827** 1:22
**887-3706** 4:9

### 9

**9** 200:14
**90071-3197**
3:17
**94111** 7:23
**96** 5:16
**99** 142:7
199:16 201:5,5
201:5,15
203:24 210:22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[99 - actually]**

211:4,24
**9:06**  2:16 7:3,7

**a**

**a.m.**  2:16 7:3,7
  44:20
**ability**  84:21
  88:11 98:25
  126:24 129:4
  129:19 131:22
  137:22 148:8
  163:11 166:23
  188:3 212:18
**able**  83:8 85:3
  91:4 99:15,18
  113:17 168:16
  186:8 216:9
  217:1 228:3
  243:1
**above**  38:19
  89:8 129:8
  229:9 245:12
  254:6
**abrantes**  45:1
  45:10 46:12
  47:23 48:3,20
  49:2,17,19,21
  50:20 70:15,24
  71:7,22 73:19
  90:5 91:10
  92:9,15 93:4
  94:9,10 95:18
  99:13 109:4
  117:6 119:1
  230:8

**absence**  196:9
**absences**  199:8
**absent**  13:13
  59:4 90:20
  100:4 229:18
**academic**  60:2
**accept**  43:10
  168:14 211:7
**acceptable**
  227:10
**accepted**  75:17
  183:23
**access**  106:6
  114:1
**accommodate**
  70:18 170:11
  200:4 230:14
**accompanied**
  87:1
**accomplish**
  121:9,10
**accomplished**
  91:4
**account**  34:1
  43:22 80:21
  87:5,22 90:11
  104:19 105:20
  107:16 118:22
  134:19 136:3
  147:22 150:9
  170:2 201:16
  204:12 227:4,7
  227:9,19,25,25
**accounted**
  43:21 54:23

  196:16
**accounting**
  37:7 40:8
  158:6
**accounts**  17:18
  33:6 35:19
  51:17 88:9
  144:11 197:7
  222:13 227:16
  227:23 240:15
  242:8,11
  246:22
**accruing**  107:7
**accuracy**  34:9
  217:3,12
**accurate**
  168:10,13
  172:21 192:8
  192:14,17
  217:19 226:25
  227:2,15
**accurately**
  33:12 167:17
  226:3 228:3
  245:12
**acquire**  69:22
  70:3 80:2 89:4
  96:20
**acquired**  70:13
  71:4,14 160:2
**acquisition**
  158:20,21
  166:1
**act**  85:11

**acting**  235:8
**action**  5:18 8:2
  66:18 205:12
  227:12 228:18
  233:20 236:9
  253:18,19
**actions**  206:18
  247:1
**active**  20:22
  119:3 178:22
  183:12 191:2,7
**activity**  134:19
  147:14 224:18
**acts**  55:6 92:19
**actual**  59:8
  69:13 70:8
  74:24 88:1
  90:17 102:6
  110:10 119:16
  148:10 179:23
  180:15 181:4
  181:15 201:21
  211:16 227:15
  230:6
**actually**  22:1,1
  25:2 31:17
  34:3 61:16
  66:12 67:3
  72:6 94:19
  98:23,24
  112:12 119:8
  119:17 123:11
  123:12 124:4
  136:5 146:17
  157:22 159:1

Page 3

**[actually - alter]**

| | | | |
|---|---|---|---|
| 160:13 185:14 198:20 218:2 224:11 227:8 228:20,25 230:4 233:22 234:15 235:11 235:23 248:13 | **adjustments** 110:25 | 59:18 96:21 131:12 159:14 196:7 | **allege** 65:23 73:1 96:19 |
| **ad** 110:2 | **adler** 3:4 | **afterward** 37:9 | **alleged** 13:14 14:24 52:16 55:5,10 59:12 69:10 71:2 74:9 90:20 93:22,24 98:18 100:5,17 221:20 222:2 222:21 229:19 |
| **adapted** 53:2 | **administer** 8:23 | **agencies** 178:16 | |
| **add** 88:22 98:1 178:1 | **administered** 10:2 253:8 | **agent** 124:4 178:16 179:13 | |
| **added** 18:19 122:2 170:21 | **administration** 227:6 | **agents** 183:10 185:19 | |
| **addition** 132:21 133:5 | **administrator** 224:11 | **aggregate** 171:11 | **allegedly** 15:17 |
| **additional** 54:13 109:6 131:25 192:7 194:3 | **admissible** 9:3 | **aggregation** 208:10 | **allen** 171:16 |
| | **adopt** 220:12 | | **allocating** 227:4 228:13 |
| | **adopted** 119:4 | **ago** 63:5 88:21 99:5 138:13 151:19 | **allocation** 55:5 |
| | **adverse** 238:20 | | **allow** 72:18 80:2 87:4 93:24 95:1 132:4,12 193:4 193:7 |
| **additionally** 84:6 | **advertising** 142:9 143:3,5 182:6,16 186:11,12 220:17 | **agree** 7:12 28:8 55:12,16 78:4 92:10 113:2 127:21 128:19 131:4,21 132:20 140:16 140:22 143:15 148:12 155:3 156:12 206:13 210:24 218:20 220:20 226:6,7 240:21 | |
| **address** 31:5 243:14 | | | |
| **addressed** 13:2 64:16 | **affect** 78:25 124:22 148:9 | | **allowed** 59:16 69:22 70:3 72:17 83:4,5 89:4 |
| **addressing** 88:21 | **affected** 76:6 131:16 206:9 | | |
| **adjective** 118:3 | **affects** 109:21 | | **allowing** 161:10 163:3 180:14 181:3 |
| **adjust** 130:19 | **affiliation** 20:12 25:19 | | |
| **adjustable** 17:20 | **affiliations** 8:9 | **agreed** 63:14 235:13 236:17 236:17,24 | **allows** 151:12 162:1,19 165:15,15 166:24 |
| **adjusted** 93:1 188:14 | **affirmative** 24:5 | | |
| | **aftermarket** 17:7 35:25 40:14,20,22,25 52:23 53:6,9 53:12 58:18 | **ahead** 76:23 96:5 117:19 181:10 | **alluded** 138:13 |
| **adjustment** 241:6 | | | **alter** 126:24 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[alternative - app]**

**alternative**
17:8 80:5 94:5
105:4 117:12
118:1,14,18
153:25
**alternatives**
118:6 119:11
**amazon** 83:7
83:15 110:15
121:5,17,18
122:13,25
123:2 179:1
180:23 182:2,8
**ambiguous**
160:13
**amend** 97:24
97:25
**amended** 5:17
66:7,18 67:2,8
67:17,21 68:14
68:16,23
**america** 232:20
**amicus** 6:9
232:8 237:7
241:4,14
245:17 247:17
**amount** 89:12
134:13 170:23
236:12
**analysis** 18:13
19:11 21:24
24:5 30:14
40:20 51:19
55:4 70:9
87:25 93:20

94:9 124:25
136:10 138:5
139:21 147:18
148:6,19
151:23 168:24
173:1 180:9
183:8 185:17
195:13 196:1
199:17 209:5
212:21 217:23
221:12 222:4
224:12 225:19
245:22 246:10
247:4
**analyze** 107:4
149:17 178:7
185:22
**analyzed**
111:16,23
112:22 117:8
129:25 141:2,6
149:12 182:18
193:18 195:21
**analyzing**
138:23
**angeles** 3:17
**announce**
98:25
**anomalous**
238:21 239:22
**answer** 12:11
12:14 16:14,22
28:15 29:22
32:5 33:12
52:3 55:21,23

60:9 61:16
71:15 74:18
75:13 79:3
80:15,19 90:15
90:24 91:7,12
92:4 94:3
95:17 98:4
100:19 101:17
106:14 107:2
107:18 108:7
109:1 111:9,13
118:15,19
130:21 131:3
132:1 137:2
147:15 158:25
160:14 161:6
161:20,21
162:9 163:24
166:18 167:1
168:12 175:12
181:17,18
185:10,11,24
193:1 195:12
198:12 201:24
203:1 209:12
209:25 211:12
214:15 216:7
218:12 219:25
220:9,24
230:24 231:9
231:18 236:4
242:9 243:11
243:18 245:14
248:18

**answered**
175:24
**answering**
60:11 169:13
211:21
**anti** 87:17,22
88:7,23 91:22
97:13 98:1
**anticipate**
248:9,14
**anticomparat...**
97:11
**anticompetitive**
55:1,3,6 58:24
59:4 69:10
74:9 85:10
86:8 92:7
93:22,23 98:18
152:16 200:7
204:22 206:6
221:20 222:2
222:21 229:19
242:23
**antitrust** 7:17
52:15 60:2,7
60:16 78:1
180:9 181:12
205:6 237:14
254:4 256:1
**antitust** 1:6 2:6
**anymore** 97:22
118:9
**anyway** 242:19
**app** 13:15
25:25 37:6,8

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[app - apple]**

37:15,23 51:22
52:5,15 55:13
56:4 66:2 73:3
73:17 74:4,20
76:1,7 78:1,3
78:12,13 79:22
79:25 80:2,3,6
80:6,7,7,9,12
80:20,21,22
81:5,12,16,20
83:3,4,11 84:9
84:17 86:14,16
87:4 93:18
94:6,16,16
95:2 96:21
100:3,3 102:13
102:17 104:6
106:20 109:14
109:25 111:6,6
111:15,16,23
111:23 112:2,9
112:21,21
114:21 115:2,3
115:14 116:25
117:1 118:1
120:20 121:13
126:4,11 130:1
130:9,13,13
131:1,6 134:8
134:11,15
135:3,6,7,8,13
135:13,16,21
136:13,14,17
137:5,10,15,20
137:25 138:2,9

140:19,19,24
140:25 142:6
143:13 144:14
144:22,22,23
151:2,7,9,16
154:3,3,10,15
154:25 158:5,6
158:11,16
159:10,13
160:2,23,23
161:9,9,11,12
161:16,17,25
162:2,17,19,21
163:8,15,19,22
164:3,9 165:2
165:6,8,9,13,14
165:23,24
166:6,6 168:17
173:19,23
178:19 180:15
180:24 182:11
182:20 184:17
184:17 185:6
192:2,4,24
194:4 197:25
201:10 207:5,7
207:7 208:22
208:23,25,25
209:1,7 210:8
210:15 212:11
212:13,24
213:1,4,11
214:12,19,23
215:4,20,23
217:8,9 218:16

218:17,18
219:4,7,11,12
219:19 220:2,4
220:7,16,19
221:3,5,7,8,16
223:16 229:14
230:20 231:3
242:25 243:1,3
243:10 244:17
244:18 249:22
250:14 251:4,6

**apparently**
234:24

**appeal**   63:16
234:2,5

**appear**   181:22
221:12 252:4

**appearance**   8:6

**appearances**
3:1 4:1 8:8

**appeared**   50:13

**appearing**
254:18 255:7

**appears**   53:21
177:12 250:2

**appendix**   31:22
32:17 45:12
64:21

**apple**   1:5 2:5
4:18 7:17 8:11
8:14,16 14:1
17:9 35:19
36:19 37:14,23
49:8 51:17,23
59:15 65:23,24

65:25 66:3
68:2,4,19
70:13 71:4,14
72:9,14,20
73:1,16,20
80:4,7,12,14,23
80:23 81:1,23
82:17 83:13
84:6,18,23
87:2 89:20,24
90:18 91:4
92:6 93:19
94:7 95:1,2
96:20 97:9
98:21 99:6,15
106:12 110:15
113:3,12
114:20 115:4,9
115:13,20
116:7,14,21
117:1 118:24
119:4 131:4
141:16,18
143:8 146:13
149:9 181:1
182:11,19,22
182:25 186:14
186:20 187:2
188:9 204:14
223:13 225:5
225:23 226:22
227:23 228:14
228:15 233:13
235:22 237:4
240:15 242:7

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[apple - arises]**

243:1,9,15
244:2,16,17
245:3 246:21
249:4 250:7,10
254:4 256:1
**apple's** 14:10
51:10 52:5,16
59:11 69:22
70:2 71:8,9
74:2,14 75:22
76:1,5 78:1
79:11,20 80:8
83:3 85:11
86:8,13,14
88:10,23 89:3
89:17 94:16,16
95:13 98:1
99:14 100:5,16
104:1,19,25
105:14,21
106:9,24 107:8
107:16 109:25
113:10 114:1,5
117:11,12,13
118:5,6,7
119:19 140:18
140:24 142:7
152:15 184:15
184:24 199:8
199:15 200:6
201:11,20
221:19 222:1
222:21 225:9
229:19 242:24

**application**
208:9
**applied** 17:23
71:19 199:25
250:21
**applies** 91:7
**applike** 95:6
**apply** 18:9,11
57:2 70:23
82:11 111:4
121:12 145:9
152:21 188:7
251:4,6
**apportioned**
109:15
**appreciate**
200:15
**apprised** 26:21
30:12
**approach**
20:20 76:4
82:1 209:21
211:9
**appropriate**
43:13 76:5
114:22 146:23
184:8,23
191:10 204:18
208:5,7 209:5
213:24 214:2
218:6 240:25
**appropriately**
215:25
**approved** 66:2
68:3 236:20

**approximately**
155:15,16
191:1 225:4,5
249:21
**apps** 13:15
15:21 17:6
24:19 65:24
68:2,3 72:15
72:17,19 73:3
74:4,19 76:7
78:2 79:21,21
79:22 80:3,8
80:14 81:3,10
82:12,12,14,21
82:24 83:1,2,8
84:8 85:5
86:14 89:19
93:14,15,24
94:1 95:1,7,9
98:14,22
106:20 108:8
114:21 115:3
115:14 128:19
130:5,9,24
131:1,12,15
134:12 141:16
141:23 142:2,8
142:20,24
143:2,16,19
144:3,8,10,13
151:8 154:10
154:14,25
158:10,15
161:25 162:1,7
164:9 166:11

166:12,15,16
166:24 167:5
167:13 180:14
180:22 181:4
181:14 182:12
182:15 184:16
185:5 219:19
221:11 239:18
243:2 249:4,22
250:14
**april** 6:9 192:4
192:8
**architect** 21:25
22:15,17 26:6
26:6
**architecture**
19:11 30:14
53:1 69:15
87:25 151:23
199:24 207:21
229:23,24
242:14
**area** 13:3,6
15:24 60:2
62:4 64:3
174:4 176:14
187:12 203:9
247:2 250:19
**areas** 42:13
43:1
**argument**
190:19 197:17
**arisen** 26:23
**arises** 208:19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[arithmetic - available]

**arithmetic**
210:25 239:10
**arm** 14:8 15:5
**arm's** 10:18
**arrange** 179:2
**arrangement**
115:16
**arrangements**
181:9
**article** 187:17
200:12 203:15
**articles** 60:19
61:11
**aside** 20:16
42:15 47:23
99:19 124:7
**asked** 11:10,22
19:6,9,24
26:22 27:23
43:5 44:25
46:20 50:12
60:10 94:19
125:10 135:4
200:8 220:10
235:13 236:17
248:14 249:3
**asking** 29:8,11
43:7 63:4
71:12 108:6
122:6 135:1,2
145:20,23
152:6 163:20
193:25 235:5
**aspect** 56:24
93:23 110:18

**assess** 76:5
105:12 107:6
162:6 228:8
**assessed** 110:2
**assessing**
140:18,23
**assessment**
163:14 227:1
**assign** 237:17
241:20
**assigned**
175:17
**assigning**
228:13
**assignment**
19:3,14
**assistance** 11:2
**associated**
169:6 198:1
219:12 226:21
240:19
**assume** 49:8,18
51:4 72:8
94:20 126:18
128:15 134:10
139:11,14
153:8 165:12
188:17,20,25
189:13 192:21
238:8,12
**assumed** 75:11
88:14
**assumes** 73:20
94:10 148:1
164:8 202:14

229:14
**assuming** 51:23
71:3 106:8
126:17 127:5,7
129:1,7,19
139:18 183:25
202:8 204:11
217:13
**assumption**
43:9 71:18
125:6,11,20,20
126:8,10,13
128:17 129:10
136:6 153:16
153:19 154:2
154:24 189:5
189:19 190:14
204:8,15
214:22,24
215:7,7 216:24
217:4
**assumptions**
124:18 125:3
125:14 129:16
140:5 148:5
153:5 154:9,13
212:5 240:16
240:23 241:1
242:14
**attached** 10:15
32:10 96:1
120:1 177:5
224:24 232:3
**attempt** 53:19
88:22 105:12

105:19 149:17
205:7
**attempted** 73:2
73:12 107:13
107:19
**attempting**
97:24,25
**attention** 35:23
203:17 204:6
249:19
**attorney** 3:6,15
4:6 8:10
253:19
**attorneys**
236:12
**attractive**
201:7
**auction** 121:4
**audio** 7:11
241:6
**author** 243:25
**authored** 61:15
**authorized**
183:3
**authors** 182:7
**automatically**
9:3
**auxiliary**
135:25
**availability**
106:3
**available** 15:21
26:14 74:4
76:6 88:4 94:6
106:15 125:1

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[available - believe]**

125:17 130:6 148:17 151:11 169:3 172:11 195:18 202:15 210:4 214:9 222:24 249:9

**avenue** 3:7,16 4:7

**average** 24:20 24:21 130:8,12 131:1,16 170:13,15 175:20,20 193:17 195:3 207:6,13,15,15 207:16,19 208:12,12,15 208:23 209:11 210:10,12,16 210:16,20 211:4 212:8,13

**averages** 207:25 208:1

**avoids** 208:15

**aware** 24:14,15 44:24 46:16 57:8 60:4,14 61:19,20 62:5 63:15 82:16 93:4 102:19 112:10 113:5 147:7,9 150:11 171:18 172:15 184:20 186:20 209:9 215:18

222:24 225:3,9 229:4 236:2 243:13,25 244:4,7

**b**

**b** 5:9 6:1 31:22 160:20 255:1

**back** 13:12 38:22 39:14 41:8,21 44:19 45:19 47:8 50:7 52:9 63:6 63:25 64:2,3 69:18 72:5,25 77:19 99:3,21 100:19 114:17 124:7 132:2 141:13 150:24 158:25 169:10 169:20,21 170:18 177:8 178:23 214:6 216:19 220:10 239:5 241:11 242:18 248:3

**background** 219:7

**backstory** 157:8

**balance** 102:8 152:1 167:15 167:18,19 169:12

**balances** 166:22

**ballpark** 18:20 225:7

**base** 99:1 168:24 223:20

**based** 39:4,10 50:2 70:7 75:2 75:10 78:12 90:25 99:10 102:6 103:19 133:21 139:9 140:5 153:19 154:2 155:4 157:12 168:19 175:2 195:13 208:23 209:10 215:7 219:2 226:16 230:21 247:3 250:8

**basically** 18:24 43:9 53:17 80:17 85:2 87:1 91:19 122:19 180:10 215:21

**basis** 22:14 31:20 49:22 73:22 90:16 91:13 112:15 208:7 217:23 227:9,25 229:2 229:3 233:9 237:16

**bear** 147:20

**bearing** 30:7

**bears** 10:16

**began** 72:18

**beginning** 8:9 44:18 72:14,23 77:18 89:3 109:12 114:16 150:23 177:7 216:18

**behalf** 2:14 232:9 234:20 234:20

**behavior** 133:20 142:17 145:6 174:1 192:11 194:16 195:3 199:8 202:4 206:16 209:7,14 210:5 212:23 241:22

**believe** 13:17 14:6 33:7 35:21 37:17 45:14 46:24 63:9 80:19 84:2 94:8 98:19 129:18 138:5 139:8 141:14 159:22 161:20 174:6 180:9 182:17 191:11,11 203:1,16 224:15 232:13 234:21 242:10

Page 9

[belong - buy]

**belong** 162:1,7
**belongs** 162:19
**benchmark** 69:9,12 70:9 70:18 91:14 179:25
**beneficiary** 240:4
**benefit** 25:14 104:21 105:7 105:10 106:23 247:4
**benefited** 16:4 16:10,21,23 222:17
**benefits** 104:24 105:13 106:9 107:6,14 108:24 122:14 240:3
**berkeley** 20:6 20:12
**best** 19:5 27:24 28:1 34:22 129:24 146:6 148:8 154:1 208:10
**better** 106:7 176:18 182:5 227:4 228:18
**beverage** 201:4
**beyond** 15:12 34:3 53:20 102:24 201:5 212:18 227:17

231:22,22 232:25 236:21 239:13
**bill** 84:22 110:24,24
**billed** 223:15
**billion** 38:6 40:7,13 225:4
**binding** 182:5
**bit** 18:5 25:13 25:14 76:25 169:2 197:23
**blueprint** 26:12 34:15
**blueprints** 26:9 30:17
**book** 182:4
**books** 61:17,20 182:3,7
**bottle** 201:6
**bottom** 13:22 37:4 39:8 45:8 84:4 168:2 178:8,23 179:22 205:3 241:15
**bought** 17:6 98:13 198:13 198:14
**bound** 169:16 173:14
**boundary** 195:7
**bounds** 152:4 168:19 169:5,6

169:22 170:3,6 170:10 171:1,2 171:5,6 173:8 174:25,25 175:4,17,18,20 217:22,24 218:8 250:21 251:4,6
**box** 201:7
**boxes** 202:6
**branded** 120:12 128:21 128:23 129:12 129:21
**branding** 129:14 188:2
**brattle** 4:20,21 8:18,20 11:3,6 18:23 20:5 21:19 23:13 25:9,15 65:16 244:5
**break** 44:9,10 76:21,24 77:1 77:10,12 85:3 150:14 176:22 176:24 177:11 216:11 247:22
**brief** 6:9 232:8 232:14 234:14 234:18,19 235:2,9 236:25 237:8,8,11 241:4,14 244:6 244:9,12

245:18 246:19
**briefs** 247:18 247:20
**bring** 121:6 184:9
**broad** 31:18 76:9 123:22 248:17
**broader** 16:24 100:25 102:12
**broadly** 148:12
**brought** 175:3
**build** 154:24
**building** 21:23 21:24 26:13
**built** 140:6 151:22 154:21 171:2
**bullet** 47:14 49:11,13 50:22 52:10
**bullets** 58:5
**bundling** 241:24
**buns** 159:20
**business** 65:15 83:18 172:18 219:8,9 220:1 220:11,12,18 221:4
**businesses** 209:9
**butter** 123:8
**buy** 80:6,21 98:22 124:5,5

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[buy - causes]**

137:22 165:24 166:4 186:13 198:22 222:16
**buyer** 110:24 116:4 135:21
**buyers** 56:23 109:23 111:2 111:10 115:1 121:8 123:25 137:12 179:13 179:14,15 183:11 187:20 190:21,22 191:7,8,13
**buying** 65:24 68:2 163:12 164:2,3 239:18

**c**

**c** 3:5
**ca** 254:9,12,21
**calculate** 69:6 75:10,15 102:16 173:19 176:14 198:5 217:24 229:21 230:21 231:5 231:16
**calculated** 52:25 99:18 170:23,25 250:7
**calculates** 103:16 197:25
**calculating** 23:20 41:17

62:25 209:23
**calculation** 51:14 74:21 75:2,14 104:5 128:6 129:23 142:23 144:12 144:13 170:5 198:11 202:13 218:8 219:5 250:15
**calculations** 20:20 39:4,10 73:23 78:20,21 144:1 145:21 207:16 231:9
**california** 1:2 1:15,21 2:2,16 3:17 7:1,19,23 9:1
**call** 21:7 121:25 128:17 159:18 187:22 204:13 223:2
**called** 41:5 48:16 57:14,17 91:22 122:1 157:18 214:12 232:19
**capable** 204:24
**capacity** 231:23
**capital** 189:9
**capture** 100:15
**captured** 166:25

**carbonated** 201:4
**card** 81:22
**cards** 64:2 122:18,21
**care** 147:18 157:25 212:12 228:1,4
**careful** 147:18
**carefully** 33:3 33:10,15 72:5 141:1
**carried** 31:19
**carries** 13:23
**carry** 124:24
**case** 1:6 2:6 7:20 18:17,22 19:17 20:10,16 25:16 30:8 47:3 55:8,18 57:13 59:22 62:24 63:4,6 63:11,15,16,20 65:9,18 66:15 67:4,9 76:13 78:17 92:8 96:4 98:18 102:19,20 103:19 105:14 117:8 133:23 134:2 145:8 157:15,16 178:4,5,22 183:2 184:9,14 185:7,13 186:2

187:18 188:9 188:18 189:1 189:14 191:12 197:19 199:16 204:6,8,9 210:14 212:3 216:1 218:23 222:18 228:22 232:19 233:1,3 233:24 234:7 234:21 236:3,8 237:4 238:5 239:20 243:14 244:2,16 245:13 253:15
**cases** 17:12 65:11 116:3 128:25 221:16 221:23,24 222:3 228:18 246:14
**categories** 79:11 89:7,11 89:21 154:21 162:2
**category** 86:11 87:15 103:21 162:7
**caught** 24:25
**cause** 131:8,19 206:2
**caused** 23:11 250:15
**causes** 204:25 205:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[causing - claiming]**

**causing** 180:13
**ccp** 254:9,12
**ccr** 1:21,22,23
**cent** 199:16
**center** 2:15
7:22
**cents** 24:24
142:7 201:5,5
201:15 210:22
211:4,24
**cereal** 201:4,7
202:6
**cert** 234:1
**certain** 68:19
92:19 125:3
147:10
**certainly** 19:23
21:8 22:16,25
23:8 38:17
40:23 46:11
62:3 76:12
82:23 88:7,10
113:7 124:2
136:20 151:13
152:5 176:6
178:6 185:21
186:1 189:18
201:25 207:20
210:1 211:19
214:1 222:3
223:8 227:23
236:5 247:11
**certification**
12:4,8 17:11
21:16 22:22

46:17
**certified** 2:18
2:19 9:1 35:5,9
233:4 253:2,3
**certify** 237:14
246:25 253:4
253:17
**chain** 25:5
**chairman** 20:6
**challenge** 68:5
68:13,16 98:1
**challenged**
93:7 107:16
**challenges**
97:13
**challenging**
69:1 97:2
**chamberlinian**
191:4,10
**chance** 96:14
222:15
**change** 90:23
91:10 129:4
133:14 157:22
169:12 176:23
207:21 242:17
256:4,7,10,13
256:16,19
**changed** 17:8
26:9 48:6,12
48:18 149:10
169:12
**changes** 21:11
101:15 132:5,6
132:13,14

152:17 165:10
203:4 206:8
**changing** 77:8
193:11,15
208:17
**channel** 81:4
81:16 84:9
**channels** 81:11
115:10
**characterizati...**
101:25
**characterize**
190:1
**characterized**
125:19
**charge** 15:14
49:8 59:17
70:8 91:4 95:9
99:17,18 112:4
112:8 113:3
120:15 180:1
187:8 208:22
209:11 220:2
229:15,20
**charged** 14:1
110:19,22,22
111:5,15,22
112:14,20
115:17 141:15
142:6
**charges** 73:17
211:10
**charging**
141:17 186:23
210:22

**charlie** 4:21
8:17
**checks** 179:3
**cheese** 123:8
**choice** 5:21
120:3 127:4
190:25 200:11
**choices** 190:19
**choose** 118:18
174:5 202:10
202:14,15,21
**chooses** 217:5
**chord** 224:14
**circumstance**
140:13 238:10
**circumstances**
206:15 233:23
**circumvent**
81:23
**citation** 60:12
245:2,12
**citations**
245:16
**cite** 66:6 244:15
**cited** 15:18
**citing** 67:1,1
70:4 245:3
**civil** 237:15
254:19,21
**claim** 88:23
110:11 187:4
**claimed** 59:7
97:7
**claiming** 110:9

[claims - commodity]

claims 114:5 224:11 227:5 227:10 245:16
clarification 116:17
clarifications 12:13
clarify 29:21 248:22
clarifying 183:5
class 5:18 12:4 12:8 14:2 17:3 17:3,5,11,13,17 17:21,23 18:2 18:8 21:16 22:21 35:5,8 41:14 43:11 44:1 46:17 57:23 66:18 78:25 102:17 103:14,25 104:24 105:22 141:22 175:5 196:17,23 197:1,9 205:12 206:18 221:18 221:25 222:8 222:20 223:5 226:3,5,16 227:12,15,21 228:18 233:4,4 233:10,20 234:1 235:21 236:9 237:14

237:18 238:4 239:1 240:4 241:20 244:1 247:1 249:21
classic 191:4 204:9
classified 240:10
classify 186:5
classwide 237:16
clear 128:21 188:13 197:20
clearly 165:21 231:22
close 44:4 45:20 52:6 170:15 247:23
closely 21:17 193:7
code 86:2,7 254:9,12,19,21
coder 25:6
coders 23:11,11 23:12,16
coding 23:10 23:10,14 24:25
coefficient 215:23
coefficients 157:10 162:1,3 175:1
coexisting 180:2

coincide 55:19
coins 202:7
collected 142:10 143:6
columns 40:6
combinations 90:12
come 13:12 27:22 30:19 47:8 55:25 69:18 78:7 114:25 119:23 124:7 138:8 149:6 184:7 194:8 234:2,5 248:18
comes 104:15 162:14
comfortable 215:16
coming 42:6
commencing 2:16
commensurate 173:15
comment 239:6
comments 96:25 245:18
commission 6:7 14:11,19,25 15:10,12,16,16 16:5,11 48:24 49:9 50:18 51:11 55:10,11 59:3,17 69:7

70:8,16,23 71:9,17 73:17 73:20,21 81:24 83:15 88:1,2,2 88:15 89:24 90:2,11 92:1 92:16 93:2,6 95:14,17 99:13 100:9 109:14 109:25 110:9 110:18 113:3 113:12 115:17 116:3 117:2,5 119:1,2,9 131:5 132:6,14 139:4,23 140:2 140:19,24 144:21 145:5 145:12,18 146:7,13 148:2 149:11 177:14 180:1 182:3,12 182:20 188:14 229:9,16,20 230:2 243:2 249:24
commissions 14:1 47:5 51:3 80:24 93:19 99:16 120:16 183:9
commodities 163:13 213:24
commodity 136:13 163:12

[commodity - conceptually]

208:4 213:24

**common**
102:23 112:10
120:11 152:15
205:13

**commonly**
213:22

**communicati...**
27:7,12 28:6,9
28:25 29:9,12
42:22,23

**community**
206:24

**company**
226:10

**comparable**
51:15 91:15
92:21 99:16
106:14,15
107:20,21,23
107:24 109:5,7
113:15 117:7
139:10 147:3
149:7,7 159:18

**comparables**
90:25

**compare**
148:20 198:2

**compared**
169:16 171:6
191:7

**comparison**
106:12 130:21

**compensatable**
75:20

**compete** 80:8

**competent**
176:4

**competing**
98:14,22
242:25 244:18

**competition**
51:16 83:3
91:2 109:3
140:7 162:13
163:8,22
179:24 180:15
181:5,11,15
190:1 191:2,4
230:7

**competitive**
14:1,11,19,24
15:9,12 16:5
16:11 55:2,11
59:17 69:8,12
70:9,16 73:17
73:21 88:4
90:16,23,25
91:11,13 92:8
94:5 99:17
105:16 106:13
106:16 107:19
108:7,20,23
114:6 116:25
117:2,7 126:18
126:23,25
127:5,8,22
128:1,2,3,5,8
128:14,18
140:12 147:4

149:8 189:23
190:3,13,16
243:4

**competitives**
117:7

**competitor**
80:24 89:25
94:11

**competitors**
80:14 190:9

**complaint** 5:19
66:7,11,18
67:2,8,8,17,21
68:6,14,16,23
96:3,13 97:19
97:24,25 98:12

**complaints**
67:18 68:22
94:25

**complementa...**
162:11

**complements**
159:19 219:19
220:4

**complete** 65:3
65:8 195:22

**completed**
254:7,17 255:6

**completely**
240:2

**completion**
253:15 255:10

**complex**
211:18 247:16

**complexities**
215:12

**complexity**
215:10

**complicated**
85:16 187:12
215:15

**complies** 9:6

**components**
124:14

**composite**
136:13,23
207:11 208:4
209:5,21 210:6
212:2 213:1,6
213:16,23,25
214:12,20
219:3,13

**composites**
213:17

**compound**
185:11

**computational**
23:9 24:18

**concentrate**
55:9 197:18

**concentrated**
237:7,25

**concentrating**
172:10

**concentration**
57:5 187:15

**conceptually**
173:10

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[concern - constraints]

concern   185:1
concerned
  40:20 124:4
  246:23
conclude   72:9
  194:21
concludes   54:2
  54:7,11 251:14
conclusion
  48:23 49:2,20
  78:4 92:16
  161:16 240:17
  246:12,13
conclusions
  45:3 47:10,20
  48:2,7,13,17,19
  71:22 79:13
conditions
  132:24 139:6
  156:21 157:5
  162:21,25
  163:7,19,21
  164:10,16
  165:13 166:11
  166:12,15,16
  166:19 167:4
  167:12 190:20
  195:2 221:17
conduct   16:5
  55:1,3 58:25
  59:4,6 67:25
  68:4,5,11,12,19
  69:1,10,22
  70:3 74:3,9,14
  75:22 76:1,5

79:11 86:8,11
87:15 88:6
89:4,7,12,18,20
89:23 90:1,12
90:13,20,21
92:7,12,24
93:7,22,23
96:19 97:1
98:12,17 99:11
99:14 104:2,19
104:25 105:3
105:14,21
106:9,24 107:9
107:16 117:13
118:8 119:19
152:16 180:10
184:15,24
204:22 205:5
205:12 206:6
221:20 222:2
222:22 229:19
242:23
conducted
  74:13 75:21,25
  148:18
conference
  4:16
conferences
  27:16
conferred   27:1
  30:2
conferring
  22:17
confidence
  242:2

confirm   10:21
confirming
  153:24
conform
  103:18
conformity
  30:13 101:18
confounding
  147:19,23
  149:14 150:10
confused   24:6
  24:16,16
connecticut   4:7
connection
  19:3 20:10
  30:4 32:13
  88:19 179:12
  201:11 244:7
conor   4:15
consent   65:25
consequence
  128:18 171:13
consequences
  43:25
conservative
  103:8,13
consider
  158:23 159:9
  183:9 184:6
  185:18 201:13
  242:24 246:18
considerable
  153:20
consideration
  45:18

considered
  17:13,13,18,19
  18:3 31:6
  101:12 135:19
  149:22 183:16
  205:21
considering
  187:18
consignment
  114:24 120:13
  120:20 121:1,2
  121:12,23,23
  123:4 178:16
  179:17 204:21
  205:5,12
consistent
  50:19 53:11
  58:9,16,19
  79:14 83:22
  116:14 117:10
  141:7 151:5
  155:6,9,12,16
  155:22 156:1
  181:12 210:21
consolidated
  5:18 66:7,18
constant
  188:22 189:5
  193:3
constituted
  41:4
constrained
  170:16
constraints
  166:6 168:6

Page 15

[constraints - conversations]

170:22 171:10 231:14,20
**constructed** 204:1,3 205:22
**construction** 26:13
**consulted** 22:18
**consulting** 25:20 64:25 65:11,17
**consumer** 3:3 14:10 16:2,4,8 16:10 41:11 44:25 49:7 65:23 73:1 75:15 100:10 101:1,1,15 102:1,8 103:11 105:6,7,25 106:4 107:3,7 113:1 125:15 126:6 132:18 137:24 139:12 144:15 151:3,8 152:14,20 153:4,20 197:24 198:3,4 200:20,21 203:23 204:5 209:18 212:15 213:11,15,17 214:11 218:16 221:18 222:16 241:22 249:21

**consumer's** 105:9 156:1
**consumers** 13:14 14:15 16:17,20 17:6 52:17 55:1,6,9 58:3 59:12 65:24 66:1 68:2 69:7,24 72:25 74:8 87:10 88:8 89:5,13,18 93:13 94:7 98:13,22 100:2 100:16 101:6 104:5,20 105:2 105:3 106:1,10 106:23 107:15 108:8,21,23 109:15,21 123:15 129:13 137:8,21 148:3 152:16 155:7 155:18,20,22 157:25 163:11 164:2,17 183:11 184:16 184:21,24 185:4,5 194:16 204:9,13,25 205:15,23 206:1,5,9 213:17 223:15 238:19 239:9 241:23

**cont'd** 4:1 6:1
**contact** 20:9 254:9,20
**contain** 64:24 175:9
**contained** 199:15 223:16 252:5
**contains** 67:7 96:3 164:20 233:4,11
**contamination** 208:16
**contend** 103:7
**content** 13:15 73:4 74:4,20 76:7 78:3 80:3 80:21 82:15,18 82:21,25 83:14 83:14,16 86:16 89:19 93:18,25 95:1 97:22 106:20 111:6 114:21 115:4,8 130:9 134:13 135:10 136:12 136:21 142:6 144:23 151:9 154:3,11,15,25 158:6,11,16 160:23 161:9 161:12,17 166:4 174:2 180:25 181:2 182:6,13 207:7

209:2,3,6 249:23
**contents** 237:7
**context** 38:11 61:6 63:24 82:5 102:22 134:1,8,11,18 163:17 185:21
**continue** 7:11 149:20 233:19
**continues** 144:19 245:20
**continuing** 162:16
**contractor** 22:1 22:10 24:15
**contracts** 87:9
**contractual** 81:2 83:24 84:6,13,19 86:20,25 87:8 97:7,8 181:9
**contradicts** 248:16
**contribute** 195:23
**contributions** 62:6 163:5
**control** 72:15 88:12 149:13
**controlled** 72:23
**conversations** 7:10

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[copies - courts]

copies 27:14

copy 10:17 33:1 34:5 36:7 171:23,24

cornerstone 4:15

corporation 232:20 236:11

correct 11:4,5 16:15 23:3 36:25 38:15 39:2 40:11,15 40:16 41:12,18 45:10,11 47:20 47:21 48:5 49:5 58:1 63:1 63:10 64:22 65:9,12,14,19 67:17 87:23 95:7 100:10 102:13 104:2,8 110:10 111:17 111:24 112:23 124:19 128:10 129:2,8 139:6 140:8 145:13 145:19 148:10 153:10,11,14 153:17 154:7 155:1,2 170:12 171:16,17 184:18,19 190:5 194:4 210:9 212:8 213:14 214:17

214:21 215:22 217:1,2,6,7,10 217:15,16,25 218:19 228:9 229:16,17 232:11 233:12 234:20 235:2 246:5,13 252:6

corrected 252:5

correction 135:20

corrections 252:4 254:14 254:15 255:3,4

correlate 202:20

corresponden... 189:18

corresponds 189:7

corroborate 146:21

cost 51:23 52:5 127:18 128:9 128:15 129:8 130:12,23 131:15 132:16 132:20,21 133:4,5 135:1 136:8 137:6,9 137:11,17,20 137:24 138:12 139:18 142:25 143:12 145:7 154:7 156:13

161:10,16 165:16,17,21 174:1 175:9,20 175:20 188:14 188:21 189:5 209:1 215:10 215:13 217:1,4 217:13,18 218:18,23,25 219:2,3,14 220:6,7,22 221:9,16 246:16 247:4,7

costly 206:19

costs 113:6,7 116:2 125:16 126:5 130:16 133:3,13 134:23 136:24 137:1 145:6 156:25 165:21 166:1 173:16 174:9,15 211:16 212:17 217:21 231:3 240:18

counsel 3:1 4:1 4:17 7:16 8:7 8:24 42:1,7,24 43:3,5 44:24 47:4 49:7,18 49:20 50:6,17 70:21 175:13 234:12,13 235:21 236:3

241:5 254:18 254:22 255:7

counsel's 42:16 49:23

counsels 236:6

count 33:11

counts 60:12 61:11

couple 76:23 247:20

coupons 241:24

course 55:8 124:23 130:19 147:16 148:13 210:12

court 1:1 2:1 2:19 6:19 7:18 8:22,25 9:1,3,7 10:14 11:22 23:2 35:12 43:5,9 63:18 63:18 64:8,16 95:25 119:25 173:1 177:4 232:2,9,22,23 233:2,18 234:6 235:2,10 236:10,25 237:3 243:9,13 244:15 245:4 246:20 247:8 247:13,18,20 253:3

courts 64:5 183:23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[cover - dates]

**cover** 42:21 113:7
**covers** 68:24 218:22
**created** 23:19
**creation** 21:19 21:22
**credible** 72:8
**credit** 64:2 81:22 122:18 122:21
**criterion** 60:13
**crosses** 205:5
**crutcher** 2:15 3:13 4:4
**csr** 1:21,21,22 253:25
**currency** 231:4
**current** 15:14 15:25 17:23 18:9,12,12,19 25:7 26:16 31:12 46:25 53:10 66:10 71:1 138:25 167:8
**currently** 76:2 93:5,15
**curve** 75:7 153:6 203:16 203:18,23 204:6
**customer** 165:22

**customers** 113:18
**cutoff** 17:9
**cutting** 144:24
**cv** 1:6 2:6 7:20 64:22 178:3

**d**

**d** 5:1
**damage** 14:18 14:23 15:4 17:15 18:13 19:11 20:20 21:24 24:5 30:14 40:19 52:25 53:1,7 55:4 58:19 59:2 69:4,5,15 70:7,17 71:2 71:20 73:23 74:20 75:1,2 78:17 87:21,24 87:25 103:19 104:4 105:18 136:10 140:10 147:25 148:6 169:18 180:13 183:17 192:12 192:22 193:21 194:16 195:13 196:4 198:6,10 200:3 201:25 204:14 227:6,7 228:13 240:19
**damages** 14:17 15:4 21:20

23:20 41:17 43:20 51:19 52:24 63:1 75:10 89:17 99:10 102:16 103:15 141:24 157:12 166:10 166:14 170:23 170:24 171:5 171:11 180:9 183:21 198:1 209:23 214:20 227:1,5 228:14 228:20,21 229:21 230:21 231:5,16,19 237:17 238:19 239:9 241:20
**dan** 8:11 44:4 76:16 150:14
**daniel** 1:14 2:13 3:14 5:3 5:12 7:15 10:1 10:10 44:19 77:19 114:17 150:24 177:8 216:19 251:15 252:1,12 254:1 254:5 256:2,24
**darryl** 224:8
**data** 26:1,2 33:5 34:1,2 38:7,20 40:7,9 78:18 124:25 125:17,18

137:23,25 138:1,2,3,7,10 138:10,12,14 138:21,23,24 138:25 139:9 147:18 148:23 149:1 151:2,7 151:11,14,16 151:21 153:21 154:1 161:19 162:18 168:23 168:25 169:2,4 172:11 192:1,2 192:7,9,16,24 193:4 194:4,18 194:25 195:17 195:20,20 197:2 210:4 212:20 214:9 223:13,17 225:9 227:3,4 227:14,19 228:1,2,4 229:3 238:21 239:2,22 240:24 241:21 250:8
**date** 147:10 193:22 253:20 254:16 255:5 256:24
**dated** 5:13 6:9 253:22
**dates** 37:16

## [david - depending]

**david** 4:17 8:15 20:4 235:25
**davis** 232:20
**day** 20:23,23 211:1 252:7
**dc** 4:8
**deal** 40:21 58:20 95:15 167:3 205:7 242:16
**deals** 93:15 178:6
**dealt** 33:14
**decades** 64:3
**december** 18:23 25:8
**decide** 208:21 233:18
**decided** 78:22 232:23 234:6
**deciding** 235:17
**decision** 208:3 219:1,8 220:1 220:11,18 221:5 236:10 244:15 245:7
**decisions** 162:14 202:5 207:4 233:8
**declaration** 88:21 98:7,10 224:18,24
**declare** 252:2

**decrease** 144:16 182:11 250:15
**decreased** 37:9 148:4 239:19
**decreases** 152:22 153:3 182:2
**deep** 101:14
**deeper** 102:7
**defendant** 2:14 3:12 4:3 7:16
**defense** 23:1
**defer** 13:11 15:25 17:1
**deferred** 119:5 175:25
**define** 133:24 220:22
**defined** 17:6,9 18:8 36:23 40:15,18 185:7 233:11
**defines** 102:22
**definitely** 127:7 137:7 138:23 179:21 187:11
**definition** 12:22 17:4,16 17:22,23 18:2 35:5 43:11 52:23 53:3,11 53:12,15 54:22 55:16 58:21 78:24 102:25

196:24 197:2,9
**degree** 129:17 163:10 239:17
**deliberately** 183:18 202:3
**delineation** 78:25
**deliver** 19:20 178:21 220:19
**delivered** 134:25 226:22 230:14
**delivering** 135:7,18 137:21 219:4
**delivery** 134:20 135:6,6
**demand** 41:11 51:22 74:19 75:7 111:1 125:16 126:6 129:22 132:18 136:21 137:24 139:12,14 148:4 151:3,8 152:14,20,23 153:4,6,12,17 153:21 154:18 155:10 156:14 156:16 157:7 157:10 158:5,5 159:1,5 160:3 160:7,19 161:8 161:9,25 162:20,24

163:1,2,7,19,21 164:10,15,20 166:12,16,19 167:2,4,12 168:6,17 171:3 188:4,11 190:25 197:3,7 197:11 198:16 199:25 200:3 201:5 203:16 203:17,24 204:4,5,6 209:18 211:15 212:15,24,25 213:4,5,11,13 213:15,22 214:19 215:13 215:17 231:19 242:15 251:2
**demands** 200:20,21
**demonstrably** 118:15
**demonstration** 168:24
**department** 22:6 121:4 122:24
**depend** 59:5 69:9 88:5 115:24 119:18 132:17 137:1 140:13 159:5
**depending** 129:22 136:24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [depends - determined]

**depends**  124:18 124:20 164:21 198:12 203:2
**depict**  203:23
**depicted**  204:7
**deponent**  5:2 9:6,12 12:25 14:21 15:2 16:13,19 17:25 18:11 22:24 23:7,25 26:20 27:9,19 30:10 30:21 34:25 36:13,17 43:17 48:22 51:7,13 52:1 53:17 54:10,21 55:15 56:21 60:9,18 61:8,19,24 62:13 63:3,13 64:11,19 71:6 72:12 73:11 76:9 78:16 83:7 86:22 87:13 88:17 92:4 93:9 94:19 97:16 98:4,9 100:12 101:24 104:4 105:24 107:1 107:11,18 108:4,15 109:1 111:19 113:5 115:6,23 116:24 118:11

120:4,25 122:16 123:21 126:2 133:19 140:10 142:22 145:15 146:16 147:25 148:12 148:22 158:19 161:1,4 164:12 170:18 172:25 173:22 175:12 175:23 185:10 186:19 194:23 195:12 196:6 197:5 198:8 201:24 202:13 202:25 209:25 211:7 213:8,20 214:15 219:23 222:11 224:3 226:19 230:24 231:7 233:22 234:10 236:15 237:6 238:8 239:4,25 240:21 243:18 244:4,21 246:9
**deponents** 253:7
**deposition**  1:14 2:13 7:15,21 9:9 18:18 24:7 36:1 44:18 46:21 77:18 87:21 114:16 150:23 177:7

216:18 248:8 249:3 250:24 253:14 254:19 254:23,25 255:8,10
**derive**  170:10
**derived**  156:20 169:5
**describe**  19:5 19:21 21:23 35:5 67:25 68:11,19 138:9 165:4 178:14 236:16
**described** 20:17 58:8 82:6 104:17 190:20 209:22 223:25 229:8
**describes** 245:12
**describing**  45:2 103:13
**description** 5:11 6:3 18:13 19:13 35:11 53:6,18 114:23 121:3,12 188:7 190:5 225:18 230:6
**design**  17:15 31:2 34:14 124:24 171:1 176:5 184:4 201:2,10 210:2

210:2
**designed**  19:12 19:12 51:20 69:6 136:11 140:11 158:4 166:22 175:16 200:24 201:19 201:21 212:21 229:25
**designers** 201:13
**designing** 176:3 202:20
**detail**  31:18 45:18 54:16 63:6 95:15 139:2
**detailed**  35:20 62:22 83:20 167:16 174:1 209:15 225:16 228:16
**details**  33:25 33:25 63:9 69:17 169:10 173:5 189:16 214:7 225:20 245:15
**determine** 60:13 132:5,13 168:16 198:23 233:3
**determined** 119:17 139:17 209:2 254:18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[determined - digital]**

| | | | |
|---|---|---|---|
| 254:23 255:7 | 221:9 | 208:21 209:1,7 | 207:18 242:13 |
| **determines** | **developer's** | 212:7,10,12 | **differences** |
| 17:17 191:9 | 189:16 221:16 | 214:23 215:3 | 194:14 195:5,7 |
| 229:10,18 | **developers** | 230:18 243:1 | 195:24 241:22 |
| 230:18 231:2 | 15:22 54:24 | **development** | **different**  12:19 |
| 231:13 | 55:7 74:10 | 196:12 | 18:5 25:20 |
| **determining** | 79:20 80:13 | **developments** | 50:21 63:18 |
| 227:5 | 81:3,10 84:8 | 131:24 | 70:18 71:8 |
| **detrimental** | 86:13 87:10 | **device**  35:25 | 82:17 90:12 |
| 103:11 | 109:16 113:11 | 40:24 41:2 | 121:21 122:22 |
| **developed**  99:8 | 115:2,7,13,16 | 80:3 81:4,11 | 129:20,20 |
| 99:25 | 115:17,20 | 84:8 98:13,22 | 145:24 160:24 |
| **developer** | 116:7,15,21 | **devices**  35:10 | 161:7,21,22 |
| 15:20 74:10 | 117:25 118:13 | 35:14 36:19,24 | 162:2,3 183:22 |
| 87:4 111:15,22 | 118:17,18,22 | 37:7 39:19 | 194:20,25 |
| 112:1,20 | 125:16 126:4 | 40:17 41:4 | 195:1,17,21 |
| 115:24 116:5 | 126:11,17 | 42:2,9,10,18,19 | 197:23 206:8,8 |
| 131:18,22 | 127:6 129:2,7 | 66:1 72:16 | 229:20 231:20 |
| 132:5,13 134:3 | 129:17,25 | 78:7 84:18 | 240:1,11 |
| 134:9,11,16 | 130:8 131:9,19 | 97:6 115:10,11 | 250:18 |
| 135:4,9,13,17 | 131:25 136:5 | 116:25 181:4 | **differentiated** |
| 137:20 138:12 | 137:10 138:3 | 196:7 | 128:23 129:12 |
| 147:11 151:21 | 138:20 144:22 | **differ**  70:11 | **differently** |
| 170:9 172:22 | 146:13 147:7 | 154:20 163:4 | 126:16 206:9 |
| 173:19 174:1 | 148:2 168:5,11 | 165:13,17 | **differing** |
| 176:14 186:10 | 168:14,20,23 | 166:12,16 | 190:14 |
| 195:17,19 | 169:2,5 174:8 | 167:5,12 | **difficult**  64:4,5 |
| 202:4 207:4 | 175:5,10,21 | 230:16 | 99:9 203:1 |
| 210:5,9,14,22 | 176:1 186:16 | **difference** | **digital**  82:18,21 |
| 211:9,24,25 | 186:22 188:7,9 | 24:24 43:19 | 82:25 83:2,13 |
| 216:22,25 | 188:17 190:2 | 59:7 69:11 | 83:14,16 86:16 |
| 217:5 218:18 | 199:7 201:10 | 70:8 75:3 | 93:25 95:1 |
| 218:22 219:7 | 201:15 202:10 | 78:19,21 84:13 | 115:8,8 134:21 |
| 219:25 220:5 | 202:14,19 | 88:1 108:11 | 147:4 149:7 |
| 220:11,14 | 203:3 204:12 | 125:5 196:10 | 172:19 173:6 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[digital - downloads]**

180:24 185:21 186:6,7 189:19 202:6
**dim** 97:21
**dimensions** 108:11 109:6 135:18,25
**dimly** 96:8
**direct** 15:13 22:13 25:6 34:19 57:21 80:5,24 88:18 130:15,16 138:4,22 142:10 143:5 225:16 235:6 249:19
**directed** 21:17 88:23
**directing** 26:17
**direction** 42:17 187:3 253:11
**directly** 11:15 25:24 26:4 81:22 88:5
**disagree** 139:7
**disagreement** 64:15
**disagrees** 67:6
**disclose** 246:19
**disclosed** 11:19
**discourage** 119:21
**discouraged** 180:8

**discourages** 181:21
**discovery** 42:13 43:1
**discrete** 190:19 190:24
**discuss** 51:1,2 187:11
**discussed** 33:16 97:2 149:16 178:11 248:8
**discusses** 98:12
**discussion** 16:1 21:8 204:21 205:1 247:13
**discussions** 20:19 21:12 30:3,7,18 31:1 60:25 99:4
**display** 199:7
**displayed** 121:7
**disruptive** 206:11
**dissatisfied** 25:16
**distant** 60:20
**distinct** 166:5 221:3
**distinction** 24:2 57:20 73:7,15 82:14 86:23 94:21 101:2 118:13 122:18 215:19

**distinctions** 83:12
**distinguish** 190:11
**distinguishes** 90:17 190:14
**distortion** 245:22
**distribute** 79:22 113:17
**distributed** 94:15 95:2
**distributing** 79:21 86:13
**distribution** 113:19,20 204:25 205:15 206:14
**district** 1:1,2 2:1,2 7:18,19
**disturbance** 216:1
**disutility** 155:23 156:2
**division** 1:3 2:3 7:19
**document** 6:23 36:11 67:15 97:22 120:3 237:24
**documents** 27:13 32:12 35:12,13
**dogs** 159:20

**doing** 39:13 56:9 74:20 124:24 169:11 171:3 174:12 174:18 176:11 176:12 184:2 224:13 227:9
**dollar** 23:20 24:9 204:13
**dominate** 162:14
**doubled** 189:8
**doubling** 189:9
**doubt** 196:24
**download** 81:19 93:13,16 135:3 136:11 160:1 161:11 161:17 165:23 166:2 184:16 186:13 216:23 218:17,17 220:2,6,13,23
**downloaded** 165:25 184:17 219:20 221:3
**downloading** 95:9
**downloads** 78:13 134:15 135:13 142:6 154:19 158:5 158:10,15 159:3,5,6,10 160:23 161:9

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [downloads - economic]

165:13 166:6
185:5 219:10
219:11,18
220:3 221:7

**downstream**
134:24 186:9

**downward**
75:7

**dr** 11:9,13
15:24 20:9,15
21:6,13 22:10
23:17 24:4,8
24:13,14 25:3
25:24 26:15,18
27:1,15 28:24
29:2,10,11,12
30:1,12,22
31:11,12 32:21
32:25 33:18
34:10,23 45:1
45:10 46:12
47:23 48:3,20
49:2,17,19
50:20 62:11,18
62:22 70:24
71:7,22 90:5
91:10 92:9,15
93:4 94:9,10
95:18 99:13
117:6 167:7
169:3 172:2,4
172:7,9 175:14
175:14 194:2
194:18 195:18
196:3 203:10

222:6,20
224:23,23
226:14 239:7

**draft** 6:4 10:23
11:13 232:14
235:15 236:18
245:17

**drafted** 10:25
67:14

**drafting** 67:19

**draw** 101:2
138:3

**drawing**
192:23

**drawn** 47:16
73:7 192:16

**drift** 193:6,10
194:12

**drives** 174:10

**dropped** 24:19
146:13

**dropping** 90:2

**dswanson** 3:19
254:2

**due** 241:23

**dunn** 2:14 3:13
4:4

**duplicate**
225:15

**durable** 182:5

**dx** 10:13 95:24

**dx37** 6:15 36:2
249:7,11 250:3

**dx61** 5:12
10:17

**dx62** 5:16
95:23 96:2

**dx63** 5:21
119:24 120:2

**dx64** 6:4 177:3
177:12

**dx65** 6:9 232:1

### e

**e** 4:21 5:1,9 6:1
41:6 254:9,12
255:1 256:3,3
256:3

**earlier** 31:20
48:17 101:3
120:19 121:20
170:19 178:10
178:12 195:16
196:15,16
207:10 219:18
249:3 250:23

**early** 50:11
196:11

**earn** 142:8
143:2

**easily** 161:22
215:11

**econo** 212:19

**econometric**
76:4 151:6,10
155:3 157:13
197:16,20
208:16 240:5
240:24 245:21

**econometrician**
31:9 43:18

152:6 153:24
211:21 212:19

**econometrici...**
208:3

**econometrics**
61:22 62:7,10
62:17,22,23
215:8

**economic** 6:4
21:10 55:19
56:1 61:6
75:14 78:25
91:20 101:15
102:3,24 103:1
110:1 120:11
121:25 122:10
124:3,3,21
125:18,19
126:10,21
127:16,21
131:8 133:20
146:21,22
148:8 151:6
152:15 156:9
158:11,16
159:16 160:5,9
160:16 162:8
174:6 177:13
179:19,20
183:8,10
185:17 201:14
204:2 215:8
240:23 246:24
248:15

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[economical - epic]

economical 129:23
economically 57:2 110:25
economics 57:5 60:2,22 61:5 61:14 62:1 64:4,5,8,9,17 92:1 105:25 110:12 126:10 126:13 160:18 177:25 185:1 187:12,13 203:9 206:24 213:22 237:25 247:11
economist 43:12 62:2 101:20 105:1 113:13 122:7 123:17 128:8 128:14 174:19 184:3,25 190:5 190:9 247:4
economists 21:9 102:1 123:9 159:18 185:20 186:2 190:10
economy 185:2 185:19 208:20
edit 246:3
editing 182:5 246:19

edition 182:4
edits 243:19 246:23 247:3
ef 191:6
effect 15:13,19 69:14 74:14,19 75:22 76:1 89:17 91:5 110:13 165:3 170:7 205:13 206:3,11 246:24
effective 25:8
effectively 81:3 81:9 84:7 119:4 174:25 191:6 193:8 220:25
effects 15:15 57:12,15,18,21 105:21 110:1 122:14,23 147:19,23 149:14 150:10 164:23,25 165:2 178:7 183:10,16 184:2,11,15,24 186:15,21 187:6,14 206:12,14 238:20
effort 98:7
either 72:7 78:17 93:16

94:6 119:3 123:24 125:13 136:11 148:9 156:6 208:5 228:17 240:8 246:25
elasticities 154:10,14 155:1
elasticity 153:8 153:13 154:4,6
element 90:1 152:13
elements 173:17
elicit 188:4
embarcadero 2:15 7:22
empirical 21:3 161:5,14,15 214:23 215:1,2
empirically 203:6,7,11
employee 253:18
enabled 96:20
encountered 14:8 82:2
encroach 42:13
encroaches 28:7 43:1
engage 59:15 81:19 119:6
engaged 65:17 82:7 92:6 99:7

engages 204:22
engaging 94:7 134:19
enhanced 107:15
enter 94:8 131:15 180:13
entering 119:5
enters 94:11
entertainment 112:14 194:7
entire 61:25 62:1 71:20 90:13 97:18 185:2 192:12 193:21 195:13 196:17
entirely 246:23
entirety 32:24 45:15 46:13
entitled 32:17 120:3 177:12
entry 15:20 74:10 105:4 119:21 131:13 131:14,17 181:21
enumerate 165:20
enumerated 15:23
environment 114:6 193:14
epic 243:14

**[episode - example]**

| | | | |
|---|---|---|---|
| **episode**  24:10 | 206:19 228:10 | 194:8,18,19 | 149:4,6,12 |
| **equal**  127:22 | 235:15 | 240:18 | 170:7 175:3 |
| 127:25 128:7,9 | **establish**  29:1 | **estimates**  34:10 | 216:6 230:21 |
| 128:16 153:8 | 99:16 206:23 | 89:17 103:8,25 | 248:15 |
| **equally**  82:11 | **established** | 151:13,17 | **exact**  6:22 |
| 211:9 | 18:14 29:4 | 152:9 161:6 | 54:22 63:9 |
| **equals**  127:18 | 77:25 90:18 | 168:7 169:18 | 140:14 217:20 |
| 188:13 | 112:16 117:3 | 170:25 192:8 | 222:12 |
| **equation** | 196:14 | 192:10,17 | **exactly**  25:2 |
| 136:21 159:3,4 | **establishes** | 194:8,15 195:8 | 26:11 78:8 |
| 159:7 164:20 | 179:25 | 221:18,25 | 91:3 112:14 |
| **equations** | **estate**  179:13 | 225:8 | 114:4 119:19 |
| 220:21 | **estimate**  47:4 | **estimating**  73:9 | 161:20 202:11 |
| **equilibrium** | 51:10,22 91:5 | 138:15 212:24 | 216:25 217:5 |
| 191:2 | 93:13 99:10 | 213:4,15 | 217:14,18 |
| **equipment** | 100:1 109:20 | 214:19,20 | 244:25 |
| 189:9 | 132:17,17 | 215:16 | **examination** |
| **errata**  254:14 | 137:24 139:4 | **estimation** | 5:2 10:4 149:6 |
| 254:16 255:3,5 | 139:24 140:3 | 39:13 41:11 | 248:24 |
| **error**  24:19 | 140:11 143:18 | 43:14,20 51:1 | **examine** |
| 157:2 169:7,17 | 151:3,8 152:20 | 51:3 70:15 | 193:23 |
| 169:25 170:3 | 158:5 164:7 | 73:22 104:16 | **examined**  10:2 |
| 228:11,13 | 166:10,14 | 125:15 151:22 | 130:3 |
| 241:25 | 171:10 172:21 | 153:4 169:9,23 | **example**  28:3 |
| **errors**  22:20,25 | 193:5,5,8 | 171:3 197:8 | 39:21 65:4 |
| 23:5,9 34:23 | 194:19 197:3 | 213:9 214:10 | 84:20,22 |
| **especially** | 207:5 212:25 | **estimations** | 104:17 111:14 |
| 185:21 | 213:5,11 | 251:3 | 111:22,25 |
| **essentially** | 214:11 215:23 | **evidence**  117:6 | 112:3,7 114:7 |
| 18:13 19:21 | 238:18 239:8 | 127:8 130:7,25 | 121:15,16 |
| 23:21 47:5,17 | 249:20 | 138:5 140:17 | 125:9 134:23 |
| 53:5 59:2 | **estimated** | 140:23 141:7 | 135:20,24 |
| 114:24 149:10 | 90:19 99:13 | 142:10 143:5 | 147:3 159:22 |
| 162:12,12 | 153:9 157:12 | 146:20 147:5 | 164:24 169:15 |
| 163:3 179:10 | 162:20 167:17 | 147:20 148:20 | 178:25 179:10 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[example - fact]**

182:1 195:16 195:22 201:3 202:5 204:2,3 205:16,20 206:22 216:22 227:16
**examples** 141:14 150:4,9 150:11 175:25 178:17,19
**exceeds** 56:7
**except** 65:15 99:15
**exception** 28:22
**exceptions** 27:25 246:16
**excess** 99:16 110:23
**excessive** 15:17
**exchange** 113:12
**exclude** 43:5,13
**excluded** 42:13 197:21
**excluding** 44:1 61:3
**exclusion** 28:9
**exclusively** 141:22
**excuse** 200:21
**executed** 252:7
**exempt** 43:1
**exemptions** 42:21

**exercise** 69:23 89:5 205:22 219:9 231:21
**exhibit** 5:12,16 5:21 6:4,9,15 10:12,13 36:2 54:12 95:24 119:24 124:8 177:3,11 200:11,15 232:1,6 234:12 249:7,11 250:3
**exhibits** 6:13 6:20 160:4,8
**exist** 181:20
**existed** 117:13 118:7 119:11
**existing** 75:19
**exists** 221:2
**expect** 13:7 186:8 194:6,11
**expectations** 157:21
**expecting** 19:19 149:24
**expenditures** 17:10
**expenses** 133:13
**experience** 25:15 153:20 175:9 182:25
**experiments** 149:10,18 150:2

**expert** 5:12 10:20 24:3 26:1 32:17,20 45:2 49:25 61:22,25 62:21 62:23 64:25 65:10 71:23 102:15 138:7 151:25 165:19 171:14,15 172:16,17,21 173:4,5,7,11,18 174:4,17 176:13 191:18 222:7 228:24
**expert's** 140:11
**expertise** 62:10 62:17 172:19
**experts** 23:1 28:6,9 42:23 175:4
**explain** 19:10 19:25 30:23 165:7 202:3 215:2
**explanations** 242:5
**explicitly** 136:23
**explored** 203:9 203:10
**express** 248:6
**expressed** 64:15,19 79:15

**extended** 45:18
**extensively** 61:5
**extent** 19:14 29:15 30:11 32:7 53:4 71:21 93:17 103:7 104:18 105:13 167:2 193:2,6 194:12 200:1 226:4 240:13
**external** 57:11 85:5
**externalities** 54:13 57:5 122:3,21
**extra** 144:23
**extrapolate** 139:15

**f**

**f** 41:6
**face** 126:6 164:9,13
**facilitate** 120:13
**facilitating** 179:12
**fact** 47:14 54:23 94:23 102:1 109:5,7 141:16 156:19 173:3 193:3 206:2,21 221:25 237:23

**[fact - focal]**

| | | | |
|---|---|---|---|
| 243:20,22,24 250:9,11 | **fee** 65:25 111:5 112:4,15 | **financially** 8:2 253:17 | 69:21 82:3 99:24 131:10 |
| **factor** 131:19 196:11 | **feedback** 21:5 21:7 27:16 | **find** 72:4 79:13 91:21 107:25 | 162:24 178:9,9 178:13 180:5 |
| **factors** 131:8 148:9 163:2 184:5,7 | **feel** 173:2 176:4 215:16 | 121:8 126:23 128:6 129:24 179:14,15 | 181:23 183:7 189:4 190:24 201:2 209:12 |
| **failed** 24:2 | **fees** 236:12 | 190:18 191:18 | 234:18 238:16 |
| **failures** 125:21 | **fewer** 15:20 108:24 | 191:22 200:11 205:25 222:8 | 239:4 244:21 |
| **fair** 82:19 86:6 90:8 101:25 | **fictional** 213:18 | 239:1 | **fit** 139:15 173:8 173:12 197:8,8 |
| 109:22 130:20 | **field** 60:7,16 62:1,3,7 | **finding** 165:22 | **fits** 154:1 |
| 138:15 203:19 | 172:15 204:18 | **findings** 33:18 | **fitted** 152:25 |
| 203:22 218:15 226:17 | **fields** 172:15 | **finds** 201:4 222:20 238:4 | **fixed** 23:19 24:9 110:2,19 |
| **fairly** 206:2 | **figure** 38:2,5 38:19 39:2,7 | 239:17 242:7 | 110:22 111:5 164:23,24 |
| **fall** 241:24 | 39:10,18 51:5 | **fine** 77:8 | 165:2,3 169:22 |
| **familiar** 60:1,3 61:13 139:1 | 189:6 203:14 203:15,22 | **finer** 209:8 215:9 | 218:23 |
| 157:9 239:5 | 204:7 205:16 | **finished** 108:17 | **fixing** 242:22 |
| **far** 23:14 25:4 41:19 53:9 | 205:20 228:3 239:14 | **firm** 25:20 127:17 128:5 | **flexibility** 153:25 |
| 203:12 | **figures** 38:19 | 133:5,13,20 | **flexible** 17:16 53:2 58:20 |
| **farmer's** 122:20,24 | **file** 5:17 66:17 | 134:18 180:10 224:10,11 | 157:9 |
| **fast** 45:25 | **filed** 7:18 34:5 34:6 232:12 | 234:23,25 | **flip** 35:2 79:6 96:5 223:10 |
| **favor** 23:21 | 234:19 | 236:11 237:1 | **flowing** 107:14 |
| **feature** 165:10 | **filing** 99:4 235:2,9 | **firm's** 129:11 | **focal** 199:3,14 |
| **features** 91:1 107:21 113:24 | **final** 111:1 122:4 123:15 | **firms** 126:11,11 126:14,21,21 | 199:19 200:1,2 200:17,23 |
| 129:14 157:25 | 168:25 | 133:21 134:7 176:7 | 203:25 204:16 204:23 205:14 |
| **february** 18:18 | **financial** 176:1 176:7 | **first** 10:11 29:23 44:23 | 206:4,13 |
| **federal** 237:14 253:14 255:1,8 255:9 | | 49:13 50:22 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [focus - frederick]

| | | | |
|---|---|---|---|
| **focus** 52:10 163:20 179:7 203:14 | **form** 12:24 14:20 15:1 16:12,18 17:24 | 148:11,21 153:5 158:18 160:25 164:11 | **forth** 12:22 26:14 47:12,18 55:18 63:25 |
| **focused** 57:5 204:13 | 18:10 22:23 23:6,24 26:19 | 170:17 172:24 173:21 175:11 | 96:19 97:10 116:1 130:6 |
| **focusing** 74:1 109:12 245:2 | 27:8,18 30:9 30:20 34:24 | 175:22 185:9 186:18 191:1 | 132:25 134:25 248:7 253:6 |
| **foley** 4:15 | 43:16 47:7 | 194:22 195:11 | **fortuitously** 237:17,22 |
| **folks** 11:3 | 48:21 51:6,12 | 196:5 197:4 | 238:5,9 |
| **follow** 47:15 185:3 209:13 | 51:25 53:16 54:9,20 55:14 | 198:7 201:23 202:12,24 | **forum** 121:6 **forward** 26:18 |
| **following** 31:2 | 56:6,15 60:8 | 209:24 213:7 | 88:3 109:24 |
| **follows** 10:3 34:14 254:8 | 60:17 61:7,18 61:23 62:12 | 213:19 214:14 219:22 222:10 | 175:3 **found** 90:12 |
| **footnote** 41:23 41:24 45:7 | 63:2,12 64:10 64:18 71:5 | 224:2 226:18 230:23 231:6 | 92:13,20,24,25 93:7 240:15 |
| 66:6 133:2,13 141:3 | 72:11 73:10 76:8 78:15 | 233:21 234:9 235:15 236:13 | 243:9,14 **four** 46:1,1 |
| **force** 243:1 | 83:6 86:21 | 237:5 238:7 | 99:5,5 151:19 |
| **fore** 41:5 | 87:12 88:16 | 239:3,24 | 214:6 218:12 |
| **forecast** 240:6 | 92:3 93:8 | 240:20 243:16 | **fourth** 238:16 |
| **foreclosed** 117:12 118:6 | 94:18 97:15 98:3,8 100:11 | 244:3,20 246:8 **formats** 209:20 | **fraction** 43:22 **framework** |
| 119:12 | 101:22 104:3 | **formed** 25:19 | 13:25 18:14 |
| **foregoing** 252:3 253:5,7 | 105:23 106:25 107:7,10 108:3 | 47:13,18 **former** 29:16 | 55:4 109:16,19 111:4,17,24 |
| 253:11,13 | 108:25 111:18 | **formerly** 20:4 | 112:23 124:20 |
| **foreknowledge** 176:18 | 113:4 115:5,22 116:23 118:10 | **forming** 32:13 45:3 47:10 | 141:8 199:24 **francisco** 1:15 |
| **forestall** 181:11 | 119:19 120:11 | **forms** 100:15 | 2:16 7:1,23 |
| **forestalling** 180:2,6 | 120:23 122:15 123:20 133:18 | 100:18 101:6 101:12,19 | **frcp** 255:1 **frederick** |
| **forget** 46:25 242:18 | 140:9 142:21 145:14 146:10 146:15 147:24 | 153:25 178:15 181:20,22 183:21 | 235:25 236:11 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[free - go]

**free**  201:16 218:17,17 219:10,11 220:23 221:7
**freely**  220:13 220:19 221:3
**freeman**  3:4
**freestanding** 157:7
**friend**  232:23
**front**  35:7 38:3 45:19 124:12 126:2 127:14 177:17 199:1 234:11 249:12 249:17
**fulfill**  121:9
**fulfillment** 179:4
**full**  10:8 19:14 19:21 38:6,20 38:25 40:6,9 151:18 183:7 189:4 226:7
**fully**  124:1
**functional** 153:5 245:24
**functions** 109:14
**fundamentals** 124:3
**further**  54:16 77:1 178:4 179:22 220:10 248:19 251:9

253:13,17
**future**  19:16

**g**

**g**  3:14 254:1
**gain**  220:16
**game**  160:24
**games**  194:7 243:14
**gee**  38:9
**general**  13:18 33:17 112:19 113:6 126:20 140:17,22 146:22 153:23 156:9 160:3,7 160:11,17,18 174:19 184:13 185:16 192:15 201:13 204:2
**generally** 109:19 142:18 192:15 206:19 231:14
**generate** 194:13
**generates** 218:18
**generating** 243:3
**generic**  134:6 208:7
**generically** 12:14 63:3 133:19 182:14

**genre**  154:18 158:10,15 159:11 160:24 161:18 162:19 162:21 163:14 163:20,23 164:3,6,9 166:11,15,17 167:5,13 169:16 175:6 190:2 230:12
**genres**  26:1 31:4,16 162:3 163:4,6 194:7 195:22,23 230:3
**gentlemen**  11:7
**genuine**  241:22 242:13
**germane**  150:6
**getting**  33:24 42:12 44:4,5 83:18 92:11 125:8 165:22 166:2 176:19 186:12 215:22 228:19
**gibson**  2:14 3:13 4:4
**gibsondunn.c...** 3:19 4:10 254:2
**give**  9:9 25:13 36:6 111:25 121:15 172:23

174:4 188:2 201:3
**given**  24:21 42:8 47:6,25 49:20 65:6 70:21 117:6 124:25 126:5,7 126:14,19 127:2 150:5 154:23 163:5 163:23 166:11 166:15 167:5 167:13 171:9 190:2 204:17 207:6 210:8 225:7 227:20 230:11 242:13 242:13 251:15 253:12
**gives**  129:5
**giving**  186:13
**go**  5:21 7:12 19:6 21:11 38:22 41:8 56:23 60:11 63:6 72:19 76:23,25 80:22 81:17 96:5 99:14 114:9,11 117:19 120:3 135:7 141:13 150:16 165:20 165:21 169:10 170:18 171:8 173:14 188:1

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[go - heterogeneity]

191:3 202:7 209:8 215:20 220:17 226:12 241:5 247:24
**goes** 29:15 52:11 91:14,15 99:3 129:3 134:21 160:19 160:20 214:6
**going** 7:7 28:4 28:14 35:3 46:6 49:24 55:15 76:16 78:18,20 79:18 111:9 158:25 192:18 193:1 197:22 231:8 240:1
**gold** 195:14,25 196:2
**good** 7:6 10:6,7 16:17,20 25:11 44:8 150:14 151:10 152:10 186:8 216:11 227:25 228:2 247:15
**goods** 121:7 136:6 180:24 186:3,3,6
**gotten** 64:8
**government** 110:16
**grammar** 246:10

**grand** 3:16
**granted** 233:3
**granular** 167:16
**granularity** 166:20,22 202:4 209:8 211:20 213:23 215:9
**great** 44:12 45:17 95:15 174:19
**greater** 62:9,16
**grid** 200:2
**gross** 138:19 151:21
**grothouse** 4:17 8:15,15
**group** 4:20,21 8:18,20 20:5,6 20:13,18 21:19 25:9
**grown** 131:13
**guess** 34:16 92:11 120:10 134:4 215:1
**guidance** 172:20 174:3 175:7
**guide** 173:18 176:13
**guys** 174:18

**h**

**h** 5:9 6:1 256:3
**hacker** 85:3
**haldenstein** 3:4
**half** 189:21 210:11,12
**hand** 9:4 39:25 49:16 109:9 164:19
**handle** 27:23 78:17 153:1,2 174:2 229:9
**handled** 254:8
**handling** 82:18
**hands** 22:15
**handy** 249:7
**hansen** 234:22 235:8,20 236:1
**happen** 92:21 148:16
**happened** 192:20
**happy** 38:17 238:10
**harm** 14:15 57:23 58:1,3 73:9 74:7,8 75:19 89:12 100:1,8,15,18 100:22,24 101:3,4,12,13 101:19,20,21 103:7 105:2 183:21,25 204:25 205:15

206:14 221:19 222:1,21 226:13 237:16 241:25 246:25
**harmed** 52:17 54:25 55:2 59:12 69:23 89:5 105:22 106:6 206:6 226:4 238:10 240:10 247:6
**harms** 102:11 102:12
**harry** 4:5 8:14
**head** 211:2
**heading** 189:21
**headline** 135:16
**heard** 68:15 81:25 86:2,4 224:20
**hearing** 25:11 219:15
**hefty** 36:11
**held** 129:17
**help** 19:8 67:19
**helping** 179:14
**helps** 198:18
**hereto** 10:15 96:1 120:1 177:5 232:3
**herz** 3:4
**heterogeneity** 167:22

[heterogenous - implications]

| | | | |
|---|---|---|---|
| **heterogenous** 129:14 | **host** 135:21 | 232:2 | 140:18,24 |
| **high** 30:25 143:12,12 154:10,14 | **hot** 159:20 **hour** 44:5 **hours** 18:17,19 18:21 46:1 | **identified** 32:12 41:14 150:1 226:5 228:12 | 152:15 177:13 199:17,19 207:22 241:19 |
| **higher** 71:9 75:5 89:25 104:14,18 106:2,19 108:1 108:21 115:20 116:5,8 131:15 133:12 142:3 142:19,24,24 143:2,20 144:4 144:8 154:2,3 154:6,7,25 155:1 166:1 181:24 202:18 209:23 210:7 210:11,11 231:15 249:23 | **house** 21:24 26:13 **houses** 121:5 179:14,15 **hphillips2** 4:10 **hynes** 4:19 7:24 **hypothetical** 139:5,8 147:2 | **identify** 226:3 240:3 **identifying** 41:4 216:8 225:14 227:15 242:10 **idiosyncratic** 121:2 242:1 **ids** 223:14,24 225:5,23 228:15 249:4 250:7,10 **ignore** 184:23 205:24 **imagine** 131:11 181:19 190:7 234:10 | **impacted** 14:7 14:9,10 **impacts** 14:2 15:12 101:6 206:13 **implement** 30:19 **implementati...** 17:20 21:20 22:14,21 23:18 24:9 25:24 26:22 30:24 31:6,8 34:17 71:1 197:6 207:20 |
| | **i** | | |
| **hinged** 156:11 **hinges** 217:4,13 **historical** 125:21 131:23 **history** 99:3 151:18 **hold** 86:7 149:21 248:6 **holding** 32:8 **homogenous** 128:20 **hope** 211:21 227:14 | **i.e.** 189:8 **iap** 86:15 91:23 93:16 97:14 116:9,10,16 117:11,12,16 118:5,6 134:14 135:10 136:12 136:12,21 154:19 159:6 159:13 160:1 165:24 174:2 186:13 202:7 219:2,3 221:1 221:6 230:3 **idea** 151:20 176:7 **identical** 67:3 **identification** 10:14 58:24 95:25 119:25 177:4 226:20 | **immaterial** 123:12 **immaturity** 204:17 **immediately** 183:23 **immune** 91:2 **impact** 6:5 14:19,24 15:4 15:22 55:5 74:21 100:10 101:7 109:15 139:22 140:1 | **implemented** 27:2 30:2,17 53:8 222:6 226:15 238:25 240:14 242:6 **implementer** 22:11 **implementing** 30:13 194:2 **implication** 143:11 200:23 226:12 **implications** 104:7 141:7 245:10 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [implicit - individual]

implicit 71:18 71:21
implicitly 73:20 136:22
implied 170:14 170:15
implies 114:25 117:24 153:12
imply 212:6
important 146:20 167:11 167:14 206:22 226:25 228:7
impose 83:15
imposes 81:1 84:6
imposing 245:23
imposition 171:9
impossible 160:1
impression 72:22
improper 56:15 180:10
improved 182:5,13
impute 165:16
imputed 174:9
inaccuracies 34:23
inappropriately 218:5

inattention 205:23
inattentive 204:10
incentive 147:12,12 180:12 187:8
incentives 187:2
inception 131:5
incidence 13:25 55:4,9 109:16 109:19 111:2,4 111:17,24 112:23,25 124:14 141:8
include 11:9 35:9,22 36:24 65:5,9 102:12 117:4 134:22 134:23 159:3 163:7,21 171:15 178:19 191:14 197:7
included 33:25 35:15,16 40:13 40:17 41:10,16 196:3 251:3 254:14 255:3
includes 42:22 249:20
including 8:7 26:1 52:14 59:11 107:20 134:22 156:24

171:6 196:1
inclusion 196:22
income 102:7
incomes 156:8
incoming 103:5
inconsistent 28:16
incorporate 168:5
incorporates 148:7
incorporation 171:5
increase 144:15 170:22 182:7 250:16
increased 106:2 107:7 130:1,13 131:2 171:5
increases 106:4 141:23 152:21 153:2,13
increasing 131:18
increment 133:5
incremental 132:21
incur 141:24
incurred 14:16 100:2,16 105:2 221:19 222:1 222:20 228:21

independent 74:13 82:8 85:25 94:22 246:10
independently 155:11 156:17
indicate 6:22 21:16 25:22 29:25 40:7 50:16 65:22 69:22 86:12 132:4 168:1 183:8 200:19 246:21
indicated 92:14 170:8
indicates 37:22 37:23 40:5
indicating 13:7 47:11
indication 40:1 160:20
indices 208:4 208:20
indirect 57:15 57:17,21 69:5
indirectly 32:8
individual 23:20 162:15 168:14 210:8 213:2,6,13 214:18 222:13 223:14,24 226:15 227:20 227:21 241:18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[individualized - intermediary]**

**individualized** 206:15,18 226:25

**individually** 208:24

**individuals** 225:6,11,24 238:20

**indulge** 248:23

**industry** 60:22 174:17 175:4

**inevitable** 241:19

**infer** 51:23 136:7 142:24 154:7 212:22 217:1

**inference** 142:11,13 143:9 217:4,18

**inferred** 125:17 137:9 240:18

**inferring** 217:13

**inflated** 245:23 246:7,12,15

**inflict** 89:12

**influence** 61:10 163:2 205:14

**influencing** 204:24

**information** 32:12 113:20 138:16 148:17 151:3 162:18

167:25 168:5 168:11,13 170:9,11 201:12 209:7 209:13,15 224:19

**informative** 140:18,23 167:23

**informed** 20:22 20:25 21:2 124:1 125:21 237:3

**informing** 183:1

**infrequently** 27:5

**inherent** 238:22

**initial** 195:22

**initially** 38:24

**inject** 169:17

**injured** 222:9

**injuries** 15:8

**injury** 119:17 180:8,8

**innovation** 15:22 74:10,12 105:4

**innovations** 106:1

**input** 124:15 125:6,9 132:16 132:17 139:3

**inputs** 124:19 125:13,18 132:4,12

**inquiry** 28:5 206:15,19 244:5

**inserts** 182:6

**insight** 174:19

**insofar** 169:4

**inspector** 22:3

**installation** 72:15

**installed** 81:20 84:17 85:6

**instance** 59:22 110:14

**instigate** 235:16

**instruct** 28:14

**instructed** 41:25 47:3 49:7,18 51:4 71:17

**instruction** 28:18 42:5 43:3 49:20,24 50:5 59:2 70:20

**instructions** 19:25 35:18,24 43:8 172:23 175:13

**instrumental** 31:4,15 216:2 216:4

**instruments** 215:24 216:6,8

**integrity** 85:18 242:24

**intellectual** 112:8 114:1,5

**intend** 11:18 32:14 248:6

**intended** 29:16 100:1 163:25 175:8 178:3 202:1 210:2

**intensity** 163:8

**intensive** 163:22

**interactions** 215:14,14 227:23 228:14

**interchangea...** 57:6

**interest** 47:6

**interested** 8:2 253:18

**interesting** 76:10

**interests** 54:25 55:2

**intermediaries** 113:6 124:22 178:10,15

**intermediary** 56:24 57:8,12 72:16 110:13 177:13 178:7 179:1,12,14,24

**[intermediary - jailbreaking]**

180:1,16 181:6 181:16

**intermediary's** 6:6

**internally** 23:15

**internet** 81:18

**interpret** 237:24

**interpretation** 118:25 119:8

**interrelations** 158:7

**interrelations...** 159:7

**interrupt** 120:24

**intervene** 77:6

**intervening** 234:7

**intrinsic** 229:23

**introduce** 8:22 204:19 230:2

**introduced** 208:17

**introduction** 33:5

**investigated** 70:21 81:14 182:21

**investigation** 51:8 82:8

**investment** 51:18 74:11

**investments** 113:8

**invited** 20:3,16

**involve** 215:11

**involved** 21:2 22:13 26:16 125:17 172:5 172:10 176:3 236:23

**involvement** 138:22 225:25 235:17 236:16

**involves** 98:12 100:25 121:24 121:24 181:18 195:1 215:19

**ios** 13:15 17:6 35:14,25 36:23 37:6 40:24 42:2,9,19 59:18 66:1 72:16 73:3 74:4 76:7 78:2 81:4,10 83:9 84:8 89:18 96:21 98:13,21 114:20 115:9 118:1 131:12 159:13 181:4 196:7 229:14

**ip** 159:4,5

**ipad** 36:20

**ipads** 42:1

**iphone** 1:5 2:5 7:17 36:20

81:18,20 242:25 243:10 244:17 254:4 256:1

**iphones** 42:1

**ipod** 35:9,15,16 35:22 36:20,24 37:5 38:6 39:21 40:1,8 40:14,17,23 41:10,16 42:1 42:8,18 43:5 43:14 44:1 78:7,13 196:3 196:9,16

**isolated** 147:20 242:2

**issue** 14:16 15:10 23:18 24:6,23 31:9 44:3 57:13 60:21 72:13 76:3 78:23 82:23 85:17,17 89:14 90:22 92:9 95:8 101:7 106:11 106:16 107:22 109:9 118:20 151:24 178:6 206:23 207:20 228:1,5 232:22 233:7 234:3,4 237:8 243:14

**issues** 13:2,11 23:8,10 26:13 26:23 27:20,22 28:3 30:18 34:17 52:14 54:14,16 59:11 64:1,17 105:15 122:2 182:22 206:17 209:17 212:14,16 218:7 233:25 247:12

**item** 66:16 173:20 198:3 198:14,16,17 198:21,21 202:7 207:6,14 210:23 211:11 212:11,15,17 213:2,6,9,12,14 214:19 215:4 215:13,17,19 230:20

**items** 115:14 208:23,24 210:8,15,18,19 210:23 211:11 211:24,25 212:13 250:14

**j**

**jail** 85:9

**jailbreaking** 84:16,25 85:2 85:7,10 99:7,9

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[jnd - lead]**

**jnd** 224:14,17 225:3,11,13,23 226:4,16 227:2
**job** 1:24
**joint** 221:5
**judge** 22:6 228:23
**judge's** 229:4
**judgment** 125:2 166:21 167:19 175:3 208:25 214:8
**judgments** 51:18 124:24 148:15
**july** 37:15,24 192:4
**jump** 67:6 201:15
**june** 36:2 249:8
**jury** 91:21 229:10,18 230:18,20 231:2,4,8,13,16 231:23
**justification** 71:11
**justified** 173:4
**justifying** 142:16

**k**

**keep** 21:2
**kellogg** 234:22 235:8,20 236:1

**kept** 20:21,25 26:21
**key** 148:15 152:13
**keyed** 35:4
**kind** 122:22 131:17 134:5 147:5 148:23 156:4 236:22 247:8,9
**kinds** 92:19,22 124:25 135:25 142:2 178:16 206:1 212:20
**knew** 210:5 226:9
**know** 11:13,15 12:12 21:7 22:7 23:14 25:2 27:15 29:1 38:12,22 44:5 55:21 60:11,20 61:12 64:14 66:12 67:3 73:14 85:1,7,22 86:5 87:1,2,3,9,13 88:17 92:5 95:10 96:14 98:23 102:21 102:25 105:22 112:12,12 118:19 129:9 130:11 131:10 132:1 147:13

158:20 160:14 166:20 167:21 170:13 171:7 172:12 174:18 175:13 181:17 196:24 201:24 202:7 203:10 203:12 210:1 221:24 222:19 224:1,7 225:20 228:25 231:11 231:11,11 233:1,23 235:3 235:23 236:5 236:21 237:1 239:10,14 243:12 244:11 244:23 245:14 245:15 247:12 249:12
**knowable** 211:13
**knowing** 140:6 211:13
**knowledge** 34:22 35:1 102:15 218:14 225:17 235:6 243:21 244:13

**l**

**l** 1:14,21 2:13 2:17 5:3,12 252:1,12 253:1 253:24

**label** 115:15
**labeling** 179:3
**laboratory** 232:20 236:10
**lack** 167:22
**language** 83:18 179:8
**large** 27:20 43:21 155:16 236:12 239:11 239:12 247:5
**larger** 75:8,11 192:19
**late** 50:11 211:1
**launched** 37:14 37:23
**law** 3:6,15 4:6 55:18 60:7,16 88:22 160:11 206:24 234:22 237:1 247:10
**lawful** 92:24 93:7
**lawyer** 235:8 237:2 244:1,9
**lawyers** 234:19 235:1,9,18 236:1 237:4 244:11 245:19
**lay** 165:4
**lead** 25:16 89:24 106:1 140:15 145:6 192:10 236:2,6

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[lead - log]**

240:17
**learn** 212:19
**leave** 5:17
  66:17 167:7
**leaves** 132:24
**led** 69:11,11
  195:8 245:22
**left** 159:21,23
  159:24 205:23
  219:12
**legacy** 65:15
**legal** 7:25
  54:22,22 55:17
  73:8 75:17
  101:18 102:5
  103:18,20
  121:22 122:1,4
  122:8 179:19
  183:19,22
  184:9 185:3,12
  224:14,17
  225:3 226:4
  236:22 237:24
  245:16 251:17
  254:7
**legal's** 225:11
  225:13,23
  226:16 227:2
**legalities** 235:4
**legally** 73:15
  101:21 204:19
**legitimate**
  109:2 151:13
  197:15,17

**legitimately**
  119:21
**legs** 97:10,11
**length** 10:18
**letting** 161:24
**level** 30:25
  90:11 127:17
  136:13 163:15
  163:15 166:20
  173:19,20,23
  174:2 184:8
  198:16 207:5,6
  207:7,14 208:9
  209:6 212:11
  212:11,16,18
  212:22 214:13
  214:16,23
  215:5,9,13,17
  215:20,20,23
  220:13 226:16
  227:4,19
  230:20,20
  231:10 247:13
  250:22 251:5,7
**levels** 247:20
**liability** 52:14
  59:11 178:1
**license** 9:2
**light** 150:2
**likelihood**
  118:22
**likely** 92:15
  117:13,25
  118:4,7,9
  119:11 160:5,9

195:4 236:12
**limit** 94:7 119:6
  179:25 181:21
  191:3
**limitations**
  241:21
**limited** 129:5
  156:20 232:24
**limiting** 157:17
  157:19
**limits** 176:8
  238:22 239:23
**line** 12:13
  205:2,6 254:15
  255:4 256:4,7
  256:10,13,16
  256:19
**linear** 155:23
  156:2,15 157:6
  157:20 190:25
**list** 31:23 32:1
  32:3,11,20
  45:8,12 64:24
  65:3,5 129:20
  171:14 225:11
  225:14
**listed** 65:13
  67:4 68:22,22
  234:12 235:25
**listing** 69:2
**lists** 32:3,10
  234:18
**literature** 57:9
  151:7 185:25

**litigation** 1:6
  2:6 4:17 7:17
  15:25 19:10
  20:20 59:20
  61:4 65:15
  182:25 184:4
  205:12 233:14
  235:22 247:9
  254:4 256:1
**little** 18:5 25:12
  25:13 76:25
  78:19 179:22
  181:23 186:23
  197:23 205:22
  211:21 233:23
  250:25
**llc** 20:6
**llp** 2:15 3:4,13
  4:4
**loading** 81:25
  82:5 83:4
  94:17,22 181:3
  181:14,18
**local** 129:5
**locate** 175:8
**location** 7:21
**lock** 65:24 66:1
**locked** 254:12
  255:1
**locking** 68:1
  97:5
**log** 156:15
  157:6,20
  190:25

**[logic - margin]**

**logic** 143:7 226:2 234:8
**logical** 186:17
**logically** 88:14
**logit** 155:4,6,9 155:12 156:1,3 156:14,17,19 156:20 157:1,4 157:4,10,18,19
**long** 45:22,23 97:21 124:21 132:25
**longer** 26:5 236:9
**look** 23:8 27:19 32:2 35:24 36:8 37:18 38:2 51:15,17 79:7 89:2 93:9 96:15 117:17 117:19 133:1 141:3 147:6 152:11 158:2 161:19,23 170:19 176:8,8 176:19 178:8 180:17 183:20 198:24 219:13 237:11 241:15
**looked** 38:10 67:18,20,23,24 91:11 130:10 131:3 164:19 170:20 184:15

**looking** 38:17 78:18 87:14 130:5 136:5 147:3 165:8
**looks** 216:23
**los** 3:17
**lose** 236:12
**losing** 128:11
**loss** 75:15 102:12 103:10 103:10,10
**lost** 102:6,17
**lot** 132:24 160:14
**loud** 117:20
**low** 126:25 142:5,20 143:8 154:9,14 155:1 169:16 241:23
**lower** 13:15 75:6,9 104:1 108:9 116:2,4 116:4 144:22 144:22 145:5 174:5,22 176:8 187:8 210:11
**lunch** 114:8

**m**

**macro** 208:20
**made** 18:7 56:17,18 59:6 62:6 63:18 78:13 85:25 99:8 121:20 148:15 163:14

178:1 184:17 192:3 204:15 232:17 240:17 252:3 253:9
**madison** 3:7
**main** 235:13
**maintain** 96:20
**maintenance** 134:24
**major** 60:21 145:6 186:21 224:12
**make** 24:2,24 43:19 51:18 78:19,20 80:13 96:24 118:12 125:10 130:20 137:4,13,15 144:24 145:11 145:17 153:16 185:6 189:17 190:18 191:14 202:1 207:18 213:16 215:14 216:9 221:8 241:2 250:11 254:14 255:3
**maker** 201:3
**makes** 60:23 104:9,12 134:20 147:23 197:11,24 218:16 229:2
**making** 125:3 129:16 219:7

220:1,14 221:4 233:8
**manner** 6:20
**manufacture** 115:3 209:19
**manufacturer** 113:16
**manufacturers** 209:14
**mapped** 223:24
**mapping** 224:1
**maps** 223:14
**march** 5:13 11:20 17:3 19:4 30:5 31:22 32:21 34:7 41:21,23 44:22 45:8,9 45:16 46:9,12 47:1,1,12 64:22 171:15 222:7
**margin** 151:21 152:1,4 166:5 169:4,5,6,12,15 169:22 170:3,6 170:10,21 171:1,2,5,6,9 173:8,14 174:5 174:25 175:4 175:17,18 195:20 231:14 231:20 241:25 250:21 251:4

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [marginal - maximize]

marginal  51:23
52:5 116:1
127:18,18,22
127:24 128:7,9
128:15 129:8
132:16,20
133:4 136:8
137:9,20,24
139:18 142:25
145:6,7 154:7
156:13,25
161:10,16
165:15,17,21
173:16 174:9
188:13,14,21
189:5 209:1
212:17 215:10
215:12 217:1,3
217:13,18,21
219:2,14 231:3
240:18 246:16
margins  138:17
138:19,19
168:6,11,14
170:13,15
172:22 173:19
176:14
mark  3:5 8:12
36:4 56:10
95:22 96:2
120:2 232:4
marked  6:13
10:13 36:1
95:24 119:24
177:3,11 232:1

marker  15:20
market  6:5
12:22 21:10
40:18 41:1,2,5
41:6 53:3,15
54:2,8,18,24
56:21 57:12
58:21 72:10,23
73:3 78:1,2,14
79:1 82:24
88:4 91:11,14
94:11 105:16
106:13 107:20
107:24 108:7
108:20 116:25
117:3 119:3,5
120:12 121:24
122:20,24
124:22 126:7
126:14,18,19
126:23 127:1,4
127:6,9,23
128:1,2,3,5,8
128:14,18
129:2,5,11,17
130:1 131:12
131:18,23,24
131:25 140:14
155:13,17
158:24 159:11
159:16,19
163:13 177:13
179:11 183:12
183:13 185:7
185:15 186:4

187:23,25
188:13 189:23
190:5,8,12,13
190:17,20
192:11 193:14
195:1 196:7,12
197:12 206:3
213:13 221:2
221:17 242:23
246:7
marketing
200:20
marketplace
121:18 242:25
243:10 244:17
245:25
markets  51:15
52:15 54:14
57:3 91:15
92:21 99:17
106:16 109:5,7
139:10 147:4
149:7 185:22
186:4
marks  44:14,17
77:14,17
114:13,15
150:18,22
176:25 177:6
216:14,17
matamoros
4:20 8:19,19
11:8
match  146:12

matched  225:4
matching
225:10,23
228:24
materials  26:14
31:23 32:4,6
45:13 66:14,15
67:4
mathematical
156:24
mathematics
218:8
matter  7:17
36:19 52:14
65:6 72:7
75:13 91:20
92:15 102:16
105:24,25
123:18,24
124:1 140:17
140:22 160:3,7
160:18 161:15
173:18 174:4
176:13 192:16
197:19 226:2
227:18 233:11
233:19 234:8
matters  59:20
103:24 244:23
maximization
51:24 127:3
maximize
126:5,11,22
209:10

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[maximized - metz]

| | | | |
|---|---|---|---|
| **maximized** 230:19 | **mean** 14:5 25:3 26:3 28:8,19 29:14 38:17 61:1 77:9 103:14 106:14 116:10 120:24 134:8 145:21 147:2 148:13 154:16 161:2 162:24 164:12 164:14 169:24 180:5 185:18 185:20 193:9,9 193:10 195:20 201:2 202:21 204:11 206:5 212:12,14 214:25 215:1 226:8 235:4 247:10 | **measured** 103:4 165:10 169:25 173:11 215:11 246:16 | 239:1 240:4 241:21 249:22 |
| **maximizers** 168:15 | | **measurement** 170:3 | **memorializes** 182:24 |
| **maximizes** 210:15 | | **measurements** 102:2 | **memory** 97:21 117:23 169:21 |
| **maximizing** 127:17 142:14 142:23 143:10 148:3 174:13 202:11,23 212:7 216:25 217:6,15,17 | | **measuring** 193:21 | **mention** 178:22 |
| | | **mechanics** 50:8 | **mentioned** 33:4 62:20 113:24 120:19 157:5 |
| | | **mechanism** 81:17 141:17 | **merits** 19:10,17 153:22 |
| **maximum** 24:21 202:16 | | **media** 7:14 44:15,18 77:15 77:18 114:13 114:16 150:19 150:23 177:1,7 216:15,18 251:16 | **method** 23:20 23:22 24:9 237:16 |
| **mccormick** 171:16 172:8 172:12 175:15 176:2 | **meaning** 55:17 119:9 122:4 | | **methodology** 25:25 27:2 30:3,19 31:7 51:10 58:8 87:22,24 118:21 139:12 140:6 194:3 212:6 225:14 225:23 226:15 228:7,9 246:6 246:20 |
| **mcfadden** 1:14 2:13 5:3,13 7:16 10:1,6,10 29:2,6,9,22 30:1 44:19 77:4,19 114:17 120:7 150:24 151:1 177:8 216:19 232:5 241:14 248:5 249:2 251:15 252:1,12 254:5 256:2,24 | **means** 82:16 86:5 127:1 206:7 213:10 238:2,9,12 | **median** 210:13 | |
| | | **meet** 227:11 | |
| | | **meetings** 27:10 | |
| | **meant** 130:23 237:21 | **member** 105:22 141:22 226:16 227:21 | |
| | **measurable** 74:8 | **members** 14:2 57:23 102:17 103:15 104:1 104:24 221:18 221:25 222:9 222:20 223:5 226:3,5 227:15 233:5,11 237:18 238:4 | **methods** 151:6 228:17 240:7 |
| **mcfadden's** 56:8 245:21 | **measure** 131:23 133:17 166:19 175:18 193:16,16 237:16 | | **metz** 45:1,10 46:12 47:23 48:3,20 49:2 49:17,19,21 50:20 70:15,24 71:7,22 73:19 90:5 91:10 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[metz - modeled]**

92:9,15 93:4
94:9,10 95:18
99:13 109:4
117:6 119:1
230:8
**microphones**
7:8
**miguel** 4:20
8:19
**milk** 123:8
**million** 39:22
143:16 144:3
223:5 225:5
239:1,14
**millions** 184:21
242:7 246:21
**mind** 33:12
77:10 78:11
101:20 178:17
210:17 248:18
**mine** 11:12
**minimum**
24:19 142:7
**minjae** 21:18
32:21
**misclassified**
240:8
**misconduct**
13:14 52:17
59:12,16,16
100:5,17
206:20
**misheard** 128:4
**missed** 225:1

**missing** 163:16
195:16 228:14
**mistake** 178:3
**misunderstan...**
24:1
**misunderstood**
29:8,13 108:5
**mixed** 157:18
157:19
**mixing** 157:22
157:24
**mobile** 36:19
36:23 37:6
42:2,10,19
**mode** 210:13
**model** 14:12
16:4,9 17:15
17:20 21:10,20
21:22 22:21
23:19 43:15
53:1,7 58:16
58:19 59:2
69:4,5,16 70:7
70:17,25 74:20
78:17 89:17
90:10,15 91:5
92:25 93:12,15
95:11,13 99:10
99:12,25
100:15 102:16
103:8,13,15,19
103:25 104:4,7
104:16 105:12
105:18,18,20
106:18,21

108:19 124:14
124:18 125:10
129:1 136:2,9
136:14,17,20
136:20,24
137:4,5,17,23
138:15 139:5
139:23 140:2,6
140:10 141:23
142:2,14,18
143:15,19
144:2 145:3,11
145:17 146:7
146:12,21,24
147:22,25
148:6,7,13
150:3 153:12
154:18 155:3,4
155:6,9,10,12
155:13,25
156:1,3,4,11,13
156:14,15,16
156:17,19,20
156:24 157:1,1
157:4,4,6,7,13
157:18,19,20
157:23 158:4
162:1,6,10,20
164:8,18 165:3
165:12 166:21
167:12,16
168:4,10 170:2
170:6,10,14,16
170:22 171:2
171:10 172:22

173:8,12
174:21 175:17
176:16 183:17
188:8,10,11,18
188:25 189:14
191:5,10,10
195:10,16
197:3,24,25
198:5,15,19,23
199:25 200:4
202:9 204:5,14
207:18,22,24
209:22 211:23
212:1,25 213:5
214:18 216:23
218:19,21,24
219:9 220:12
220:22,25
221:4,10,18,25
222:7 226:2
227:1 229:14
229:21,23,24
230:5,14,16,22
231:5,17,18
233:12,16
238:4,25
239:16,17,23
240:2,3,13,18
242:6,9,15
246:5,14,17,20
**model's** 139:3
149:3 214:22
217:12 241:25
**modeled** 207:4

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[modeling - neither]**

| | | | |
|---|---|---|---|
| **modeling** 21:11 26:2 73:8 76:4 154:9,13,24 161:8 202:1 238:22 | **monetize** 102:8 105:19 186:8 186:14 | 207:6 215:20 215:23 232:12 | 88:6 94:9 95:16 109:3,6 140:7,14,14 142:22 157:23 203:4 204:4 230:13 |
| **models** 139:14 148:19 152:23 157:10 238:18 239:5 240:14 241:20 | **monetized** 101:16 | **monthly** 24:19 24:21 | **nearly** 13:14 |
| | **monetizes** 186:10 | **morning** 7:6 10:6,7 | **necessarily** 6:22 14:7 15:11 101:17 152:10 159:17 171:10 183:23 |
| **modification** 43:10 | **money** 141:22 227:16 249:22 | **motivated** 210:3 | |
| **modifications** 18:1 58:21 | **monopolist** 180:11 243:10 243:15 | **move** 20:2 109:24 | **necessary** 155:25 171:12 254:14 255:3 |
| **moment** 99:20 109:12 124:7 138:8,13 248:23 | **monopolistic** 191:4 | **moving** 168:1 | |
| | **monopolistic...** 189:22 190:3 190:13,16 | **multiple** 56:22 56:22 111:11 111:11 194:24 209:16 229:19 | **need** 12:12 36:3 38:16 49:21 69:17 93:25 95:11,15 103:3 112:17 117:19 121:10 122:7 148:24 160:14 219:13 |
| **monetarily** 16:4,10,21 222:9 233:12 238:5 239:1 | **monopolists** 190:8 | **multiplied** 153:9 | |
| | **monopolizati...** 242:24 244:22 | **music** 112:3,13 194:7 | |
| **monetary** 14:16,18,23 15:3,4,10,13 74:7 100:1,8 100:18 101:8 101:12,20,21 102:3 104:21 141:24 183:21 200:22 221:19 222:1,20 | **monopolize** 73:2,12 88:11 88:11 | **mute** 7:10 | **needed** 152:14 |
| | | **mutually** 19:25 | **needs** 92:20 93:1 174:21 247:5 |
| | **monopolized** 73:2,12 187:22 190:12 244:17 | **n** | |
| | | **n** 5:1 | |
| | **monopoly** 69:23 70:3,13 71:4,14,24 72:9 89:4 96:20 187:24 244:23 | **n.w.** 4:7 | **negative** 15:22 16:15,16 184:12 187:14 240:17,19 246:16 |
| | | **name** 7:24 8:25 10:9 224:10,20 236:7 253:21 | |
| | | **names** 123:12 | |
| **monetization** 136:7 | | **narrowed** 198:17 | **neither** 156:3 253:17 |
| | **month** 18:20,24 155:19 173:23 | **nash** 191:1 | |
| | | **natural** 149:17 150:1 187:13 | |
| | | **nature** 21:9 33:17 63:14 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[net - objections]

**net** 122:22

**network** 57:15 57:18,21 122:3 122:14,23 186:15,21 187:6

**networks** 122:20

**nevada** 1:22

**never** 60:10 184:16 191:14 237:3 240:7

**new** 3:8,8 31:16 34:1 106:1,1 172:11 182:4

**newly** 47:13

**nitpicking** 119:14

**noisy** 238:21 239:2,22

**non** 82:12

**nondigital** 82:15 83:14 93:18

**nonmonetary** 15:5,8,15 104:24 105:7 105:10,21 106:24 107:6 107:14

**nonsteering** 97:8

**northern** 1:2 2:2 7:19

**notating** 254:15 255:4

**note** 6:19 7:8 224:23

**noted** 12:1 251:18

**notes** 39:4,7 178:1,2 252:4

**noticing** 8:10

**nub** 91:25

**number** 5:10 6:2,14 10:17 39:19 43:21 47:6,24,25 49:17,22 50:2 50:12 61:2 64:1 71:7,7,8,9 81:22 104:10 130:5 133:25 134:12,12,13 143:22 144:6,9 155:17,18,20 190:21,22 196:25 202:6 205:22 206:1 222:23,24 239:11,12 247:5,6 250:2 250:4,5 251:16 254:15 255:4

**numbers** 38:14 57:25 169:23 196:13 223:2,3 223:7,9 225:8

**numerically** 44:2

**nusbaum** 4:21 8:17,17 11:8

**o**

**o** 41:6

**o0o** 7:4 251:21

**oakland** 1:3 2:3 7:19

**oath** 8:23 10:2 253:8

**object** 16:12,18 23:24 28:4 172:24 173:21

**objection** 12:24 14:20 15:1 17:24 18:10 22:23 23:6 26:19 27:8,18 30:9,20 34:24 42:11 43:16 48:21 51:6,12 51:25 53:16 54:9,20 55:14 56:6,13,15,17 56:19 60:8,17 61:7,18,23 62:12 63:2,12 64:10,18 71:5 72:11 73:10 76:8 78:15 83:6 86:21 87:12 88:16 92:3 93:8 94:18 97:15

98:3,8 100:11 101:22 104:3 105:23 106:25 107:10,17 108:3,25 111:18 113:4 115:5,22 116:23 118:10 120:22,23 122:15 123:20 133:18 140:9 142:21 145:14 146:10,15 147:24 148:11 148:21 158:18 160:25 164:11 170:17 175:11 175:22 185:9 186:18 194:22 195:11 196:5 197:4 198:7 201:23 202:12 202:24 209:24 211:6 213:7,19 214:14 219:22 222:10 224:2 226:18 230:23 231:6 233:21 234:9 236:13 237:5 238:7 239:3,24 240:20 243:16 244:3,20 246:8

**objections** 8:4 56:10

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [observation - opinion]

| | | | |
|---|---|---|---|
| **observation** 130:16,17 200:20 | **offering** 13:1,4 13:6,7 16:24 30:4 31:21 40:25 50:4 54:15 59:10 70:2,12 71:13 71:16 73:16 74:2 93:5 101:9 200:6,10 225:22 | 126:3 127:15 133:1,12 139:3 143:18 147:14 150:8,16 152:3 165:1 172:1 177:22 182:18 184:14 187:16 188:12,20 189:3 199:2 211:8 212:5 216:10,13 217:3 218:15 223:10 224:16 225:3 226:24 244:24 245:11 249:7,10 250:17 | 129:11 |
| **observations** 168:19 | | | **operation** 54:14 57:7 94:23 230:17 |
| **obtain** 104:24 108:8 | | | **operations** 83:18 |
| **obtained** 104:21 | | | **operative** 67:8 96:3 |
| **obvious** 226:8 | | | **operator** 187:7 |
| **obviously** 135:15 182:24 209:17 | **offers** 186:7 | | **opine** 103:14 |
| | **office** 254:11 | | **opined** 14:13 14:15 17:1 72:21 |
| | **offset** 250:11 | | |
| **occasion** 247:19 | **oh** 46:3 97:20 104:15 117:21 118:11 128:4 157:16 163:24 173:22 187:10 193:12 210:25 223:6 235:3 | **old** 190:4 | **opines** 85:9 86:12 87:16 117:10 |
| **occasionally** 26:21 | | **older** 41:20 | |
| **occasions** 33:21 182:19 247:21 | | **omitted** 227:24 | **opining** 71:3 72:7 81:1 |
| **occur** 57:12 119:8,18 | **okay** 10:11 12:15 29:18,24 30:15 35:8 37:3 38:1 40:6 45:15 47:2 49:1 66:21 67:5,10,16 68:10,24 69:18 71:3 76:19 77:3,24 86:6 89:2 95:19 96:9,18 107:5 110:9 112:17 116:17,20 122:6 125:13 | **once** 218:5,5 | **opinion** 11:22 12:12,21 13:4 13:6,8,13,18 15:7,7 16:24 18:7 26:22 30:11,16 31:14 31:21 41:1 43:6,12,18 48:16 50:4 52:4,8 53:9,14 53:20 54:15 56:8 57:10 58:17 59:15 61:21 62:9,14 62:16 63:19,20 63:22,24 64:7 64:11 70:2,12 |
| **occurred** 182:19 | | **ones** 63:11 84:19 142:8 172:10 194:9 | |
| **occurs** 139:23 140:2 | | **opened** 130:2 | |
| **offending** 88:6 | | **opening** 12:23 | |
| **offer** 11:19 93:12 149:24 150:12 199:6 199:21 220:12 | | **operate** 94:21 | |
| | | **operated** 40:24 | |
| | | **operates** 52:16 78:2 95:13 99:12 | |
| **offered** 17:8 18:7 48:16 52:13 199:12 199:14,22 | | **operating** 26:6 31:9 85:4,18 85:18 87:3 99:8 127:6 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[opinion - page]**

71:14,16 73:16 74:2 79:20 80:18 83:23 85:14,15,19,21 86:7,9 89:10 89:15 91:17,17 93:5 98:20 103:23 104:23 105:1 113:13 114:20 115:2 115:12,19 116:6 117:11 119:7 123:17 150:12 158:12 158:17 160:22 171:4 180:20 181:10 187:5 199:14,23 200:4,6,10 201:9,19 208:21 225:22 226:1 227:17 228:5,16 235:19 238:1,3 243:21 247:3

**opinions** 11:18 12:2,16,19 13:2,19 17:1 18:9 19:20 30:4,8 32:7,8 32:14 34:10 45:2,4 46:6 47:7,11,12,16 47:18 48:7,13 48:18 50:19

52:13,20 58:9 58:10,14,18,23 59:10 62:25 63:10 76:13 79:10,15 83:20 83:22 84:5 101:9 116:14 149:20,24 199:6,13,21,22 248:6,16

**opportunities** 131:24 164:2

**opposed** 34:1 99:6 166:6

**optimize** 220:6

**option** 118:4 141:17

**oral** 21:12 27:6 27:10

**order** 5:16 12:10 28:17 42:14 52:3 66:17 173:11 229:5

**oregon** 1:22

**organization** 120:12

**original** 14:13 15:18 17:5,11 17:21 30:14 31:2 32:7 39:17 50:13 58:20 74:5 99:4 100:21 143:22 144:6

144:12 196:20 229:1,1 253:14 254:10,20,22

**originally** 34:14 175:25

**orthogonal** 215:25 216:6

**outcome** 8:3

**outlining** 76:12

**output** 74:3,14 74:15,16,23 102:12,17,22 132:22 133:7 133:14,17,24 134:2,7,16 135:2,3,9,12 136:3,9,11,15 136:18

**outputs** 135:16 170:6

**outside** 78:14 80:7,12 84:22 93:19 94:16 141:18 211:20 212:19 224:10

**overall** 16:23 59:14 79:2 111:13 131:11 165:7 194:16 196:12

**overcharge** 14:8,17 16:14 16:15,17,22 58:3 69:7 75:2 100:9,23

**overcharges** 52:24 74:7 75:18 100:2 103:21 183:20

**override** 85:4

**overseen** 25:24 26:4

**overview** 31:18

**owed** 103:15,17

**own** 45:4 47:11 51:9,17 70:22 72:17 83:23 86:14 88:9 116:14 134:23 162:14,14 183:1 196:15 228:16

**p**

**p.m.** 150:20 177:9 251:14 251:18

**package** 198:15

**packaged** 209:4,20

**packages** 209:20

**packaging** 211:16 212:17 212:23

**page** 5:3,10 6:2 6:14 11:23 13:23,24 20:3 32:16 35:2 36:11,12,16 37:4 38:1

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[page - particularly]**

| | | | |
|---|---|---|---|
| 41:22 45:8 | 110:23 123:15 | 124:11,13 | 135:22 139:5 |
| 52:11,11 58:4 | 183:3 184:17 | 125:22 126:4 | 141:20 149:23 |
| 66:15 69:20 | 216:22 241:23 | 127:10,11,16 | 185:6 196:23 |
| 72:25 73:25,25 | 243:2 244:11 | 132:2,9,11 | 197:11 205:24 |
| 84:4 96:13 | 246:7 | 141:19 144:17 | 210:2 219:4 |
| 120:9 133:2 | **paper** 5:21 6:4 | 144:19 152:11 | 223:21 224:22 |
| 141:4,20 | 120:6 121:15 | 158:3 161:23 | 229:4 232:14 |
| 144:20 158:3 | 177:12,19,20 | 162:16 168:1,2 | 237:24 241:17 |
| 161:24 168:3 | **paragraph** | 178:8,14,23 | **partial** 203:17 |
| 178:9,24 | 11:24 13:20 | 179:23 181:24 | 204:6 |
| 181:23 183:7 | 19:7,8,9,13,21 | 183:8 189:4 | **participant** |
| 184:10 187:16 | 20:2 21:15 | 191:19 198:25 | 20:18 |
| 189:3,21,22 | 25:22 35:4,6 | 199:2,5 200:16 | **participants** |
| 200:14 203:13 | 36:12,14,15 | 205:3 207:1,3 | 190:7 245:24 |
| 204:20 234:11 | 37:3,18 44:22 | 221:13,15 | 246:6 |
| 234:18 237:11 | 44:23 47:9 | 223:11 229:6 | **participated** |
| 237:12 238:14 | 49:4,6,14 | 237:12 238:16 | 57:9 |
| 241:4,13,17 | 50:14,23,25 | 241:15,17 | **participation** |
| 242:18,20 | 52:9 58:5,16 | 242:21 243:19 | 20:23 |
| 244:15 245:20 | 65:20,22 67:14 | 244:14 245:20 | **particular** 33:2 |
| 249:15 254:15 | 67:19 68:1,12 | 249:11 250:3 | 41:23 71:17 |
| 255:4 256:4,7 | 68:20 69:2,20 | **paragraphs** | 104:20 112:22 |
| 256:10,13,16 | 72:24 73:24 | 47:15 53:22 | 115:24,25 |
| 256:19 | 74:1,17 76:14 | 89:8 172:5,6,7 | 134:20 145:9 |
| **pages** 1:25 32:1 | 77:22 79:4,18 | **parameter** | 157:24 163:22 |
| 33:8,9 45:20 | 80:25 84:1 | 164:13 193:3 | 164:3,6 165:6 |
| 64:24 254:14 | 85:24 86:10 | 193:16,20 | 175:5,6 176:15 |
| 254:17,17 | 87:15 89:2,16 | 194:19 | 177:22 182:4 |
| 255:3,6,6 | 96:12,17,23 | **parameters** | 183:24 203:23 |
| **paid** 13:15 | 97:3,4,17 | 154:17 195:2 | 205:21 208:9 |
| 14:11 15:14 | 98:11 99:22,25 | **parlance** 122:5 | 209:14 222:16 |
| 16:3,8 78:12 | 100:20 109:11 | **part** 24:1,4 | 226:11 233:8 |
| 89:18 93:16 | 109:13,24 | 44:23 51:19 | 250:21 |
| 100:4 104:1,7 | 110:5,7 117:17 | 76:13 79:9 | **particularly** |
| 104:8,20 | 119:10 120:11 | 95:3 135:19,22 | 68:8 123:24 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[parties - phillips]**

| | | | |
|---|---|---|---|
| **parties** 7:12 185:12,13 | 223:24 225:15 227:3,7,14 | 40:2,9 49:9,17 51:5 65:25 | **perjury** 9:8 252:2 254:17 |
| **parts** 172:9 | 228:1,2 229:2 | 90:3 92:2 | 255:6 |
| **party** 8:1 72:19 253:19 | 229:3 | 112:1,8 144:7 144:10,10,13 | **permit** 162:6 **person** 16:14 |
| **past** 12:15 | **payors** 17:18 33:5,14 34:1 | 145:12,19,23 | 34:20 78:18 |
| 60:20 193:24 | 197:7 222:13 | 146:2,8,14 | **personal** 60:25 |
| 218:3 228:19 | 225:10 226:20 | 147:8,11 175:9 | 183:1 201:12 |
| 236:5,6 247:18 | 226:21 228:3,8 | 175:21,21,21 | 235:1,17 |
| **pattern** 156:5 | 228:11 242:12 | 196:17,25 | 243:21 |
| 206:11 | **pays** 115:13 | 226:13 243:2 | **personally** 21:4 |
| **patterns** | 116:7 | 249:21,24 | 81:15 167:6 |
| 162:11 | **pdf** 254:12 | 250:2,13 | **perspective** |
| **pay** 80:6 81:21 | 255:1 | **percentage** | 174:7 |
| 88:8 93:14 | **peaked** 37:7 | 23:22 104:5,6 | **persuade** 166:3 |
| 108:21 109:21 | **peanut** 123:8 | 104:11,13 | **persuading** |
| 111:2,3 112:1 | **penalty** 9:8 | 110:3,19,22 | 165:24 |
| 115:20 123:11 | 252:2 254:16 | 111:5,14,21 | **pertains** 253:13 |
| 124:4 137:8,8 | 255:5 | 112:4,20 155:8 | **petitioner's** |
| 147:8 243:2 | **people** 14:7 | 239:9,11,15 | 232:25 233:7 |
| 244:8 | 23:13 88:10 | 250:6,9 | 247:14 |
| **paying** 35:23 | 166:2 175:25 | **percentages** | **ph.d.** 1:14 2:13 |
| 65:25 113:12 | 185:14 196:23 | 223:6,8 | 5:3,13 20:4 |
| 116:21 | 197:18 221:2 | **perfectly** | 21:9,18 252:1 |
| **payment** 80:23 | 228:20 239:16 | 126:22 152:3 | 252:12 |
| 86:15 87:5 | 240:8 246:25 | 240:2 | **phase** 22:22 |
| 88:12 97:9 | 247:5,7 | **performed** 21:1 | 46:17 234:1 |
| 101:8,8 113:22 | **people's** 156:8 | **period** 71:2,20 | **phases** 33:22 |
| 116:15,21 | **pepper** 244:16 | 192:12,22 | 163:8 |
| 118:1,14,23 | 245:3,12 | 193:18,21 | **phenomena** |
| 179:5 | **perceived** | 194:17 195:4 | 206:21 240:11 |
| **payments** | 137:10,20 | 195:14 196:4 | **phenomenon** |
| 115:16 | **percent** 14:5,6 | 196:18 254:18 | 112:10 201:14 |
| **payor** 34:1 | 37:7 38:24 | 255:7 | **phillips** 4:5 |
| 172:11 223:14 | 39:5,11,14 | | 8:14,14 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[phones - potential]**

phones  7:10
phrasing
   219:24
physical   133:22
   180:24
pick   7:9 201:6
   225:1
picked   166:22
   167:20
pile   124:10
place   7:12 22:2
   129:13 138:6
   191:22 196:25
   200:1,3 253:6
plaintiff   235:21
plaintiffs   3:3
   8:13 42:7
   44:25 49:8
   55:8 65:23
   66:6 68:5,13
   68:15,25 73:1
   88:22 94:25
   96:19 97:2,23
   185:7
plan   21:25
   171:22
planning   22:6
plans   248:11
   248:13
platform   54:13
   55:13,17,20,24
   56:2,2,5 57:1
   60:22,22 61:5
   63:15,25 64:1
   64:9,16 121:19

121:21,25
122:1,10,11
179:2,8,9,18
186:16,22
187:7,8,11,12
platforms
   63:19 122:18
   122:19
played   224:12
players   60:21
plays   48:23
please   7:8,10
   8:5,22 9:5
   13:21 14:21
   16:6 35:3
   44:22 52:10
   54:4 62:13
   65:20 68:7
   73:24 77:22
   96:12 99:22
   107:11 109:11
   111:19 116:19
   120:9 127:11
   128:11 132:2,8
   132:10 136:16
   139:25 140:20
   141:20 145:15
   154:12 158:13
   160:6 166:13
   191:19 200:15
   203:13 204:20
   207:1 213:3
   224:4 234:15
   234:15 237:10
   238:15 249:11

plus   40:13
point   11:10
   19:25 23:2
   24:18 31:20
   40:10,22 42:12
   54:19 64:13
   72:18 80:11
   88:21 97:24
   99:6 101:5
   121:20 143:21
   144:4 148:19
   148:24 151:14
   151:17 167:18
   167:19,23
   170:20 171:7
   185:12 187:10
   193:11 195:7
   196:16,18
   202:21,22,23
   217:9 227:11
   230:5 234:3
   236:18 237:23
   238:1 247:2
   248:9
pointed   23:1
   74:6
points   33:17
   47:15 175:8,8
   200:22 202:10
   202:15,16,17
   204:24 205:14
   217:14 235:13
policies   79:20
policy   184:3

popular   61:17
   61:20
popularity
   165:7,9
population
   155:8 191:8
   192:17,19,23
portion   111:2,3
position   28:20
   55:5
positive   117:5
   142:25 145:7
   171:11 184:11
   188:4
possessed   72:9
possibility
   163:3 173:25
   217:21
possible   95:6
   106:22 108:22
   134:22 147:19
   152:3 180:19
   186:23 208:15
   214:1
possibly   240:1
posting   120:14
   123:5
potential   19:16
   105:3 107:6
   119:15,15
   155:20 179:23
   180:12,15
   181:5,15,19
   187:19 190:22
   191:8,13

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[potentially - price]

| | | | |
|---|---|---|---|
| **potentially** 117:1 247:6,7 | **predictions** 145:11,18 146:12,21,24 147:23 148:20 149:3 | **presiding** 228:23 | 115:13,18,21 116:4,5,7 |
| **power** 69:23 70:3,13 71:4 71:14,24 72:9 89:4 129:2,5,8 129:17 130:1 131:18,23,25 | | **pressing** 60:18 **presumably** 39:3 92:7 152:25 186:23 219:6 220:13 | 123:5,11,12,14 126:7,19,24 127:2,4,17,22 127:25 128:7,9 128:15 129:4,8 129:24 130:8 |
| **practical** 166:18 | **predicts** 141:23 142:18 143:15 143:19 144:3 | **presume** 186:6 186:7 | 130:24 131:1 136:6 137:8,10 |
| **practice** 151:11 | **prefer** 240:22 | **pretty** 25:4 211:18 231:8 | 137:16 141:23 |
| **practices** 92:22 240:24,24 | **premarked** 10:11 | **prevail** 92:23 119:2 140:12 | 142:5,7 143:8 144:15,16 |
| **precedents** 101:18 | **premise** 190:14 **preparation** 19:2 24:12 33:23 | 175:5 229:10 **prevailed** 90:20 | 148:2 152:17 152:21,21 |
| **precise** 240:2,7 | | **prevent** 81:3,9 84:7 229:24 | 153:2,8,9,9,13 |
| **precisely** 24:20 168:16 | **prepare** 43:8 **prepared** 10:24 46:5 51:2 | **prevention** 85:10 | 154:3,4,6,10,14 154:17,20,23 |
| **precision** 12:11 152:5 193:5 239:18 | 96:24 150:12 187:11 244:12 250:7 | **previous** 10:25 13:18 35:20 61:8 91:7 | 155:1,13,23 156:2,7,13,25 158:1 160:4,8 160:17,18,22 |
| **precondition** 158:21 | **preparing** 26:2 29:10,12 31:24 244:9 | 138:4,21 163:24 | 162:14 163:1,1 163:4,9 164:1 |
| **preconditions** 160:12 | **presence** 148:1 159:6 196:9 204:16 | **previously** 6:13 13:8 79:15 149:16 156:23 | 164:7,13,16,20 165:11 168:16 175:1 182:4 |
| **predicate** 29:22 **predict** 93:25 95:11 142:3 198:16 202:5 | **present** 4:14 8:7 26:15 50:17 65:1 92:22 248:11 | 157:5 194:9 **price** 21:11 24:20,21 74:19 75:3,9 94:1 | 186:24 187:9 188:3,18 191:2 192:21 193:2 193:15,20 |
| **predictably** 239:19 | **presents** 203:15 | 106:17 110:3 110:20 111:6 | 199:8,15,17 200:7,22 201:8 |
| **predicted** 222:4 | **president** 20:5 | 111:15,22 112:2,5,9,21 | 201:11,17,20 202:10,21,22 |
| **prediction** 145:3 146:6 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[price - processing]**

| | | | |
|---|---|---|---|
| 205:24 206:8 207:7,11 208:4 208:19,22,23 208:24 209:16 209:19 210:16 210:20 212:2,8 212:8,13 213:1 213:2,6,6,14,16 213:25 214:12 214:18,20 215:23 216:22 216:23,24 217:5,9,9,14,14 221:1,5,6 242:22 246:7 250:15,16 **priced** 104:14 142:20,24 143:12 154:10 154:14,25 185:22 186:1,6 186:7 211:24 211:25 **prices** 13:16 21:11 74:22 89:18 93:13 95:12 100:10 104:1,18,20 106:18 107:24 107:25 108:9 108:21 109:21 115:25 120:14 123:2,7,15 126:4,14,18,22 129:20,22 | 130:17 131:9 131:16,20,22 139:16,17,17 140:19,25 141:15 142:3 142:19 143:2 143:16,20 144:4,8,23,24 148:4 163:6 186:4 188:4 199:15 200:2 200:23,24 203:24,25 204:10,12,16 204:23 205:14 207:5,6,14 209:11 210:7 212:11 213:12 214:23 215:4 215:11 230:19 239:20 241:23 245:23 246:7 246:12,15 249:23 **pricing** 94:7 119:6,21 132:5 132:13 145:12 145:18 148:9 174:11,13 180:7,11 181:21 199:3,7 199:19 200:1 200:17 206:4 206:14,16 207:4 210:6 | 212:23 219:1 **primarily** 21:21 23:4 33:24 46:7,14 84:16 156:22 196:10 209:3 **primary** 40:18 41:1,5 137:23 138:2 149:5 **prince** 24:4,13 218:2 **principal** 21:18 25:9 **principals** 63:17 110:13 110:15 124:22 179:2 183:13 **principle** 112:24 149:11 168:13 **principles** 123:10 **prior** 17:22 18:6 31:5 32:4 32:11 35:16 36:1 41:3,12 41:17 46:4,17 46:21 47:19 48:4,6,12,19 87:21 99:4 138:13 170:8 199:12,21 240:14,14 242:7 245:8 248:22 253:8 | **privacy** 105:6 107:7,15,21 108:6,10,24 113:24 **private** 7:9 **probably** 19:5 28:7 29:15 46:1 62:2 77:9 91:12 131:14 222:15 240:8 **problem** 208:18 211:19 211:19 247:16 **procedure** 237:15 254:19 254:21 **proceed** 8:24 22:19 231:12 236:9 **proceeded** 235:14 **proceeding** 8:5 **proceedings** 253:5,7,9,15 **process** 25:1 115:1 135:20 135:23 227:6 227:10 228:24 229:8 **processed** 226:11 **processing** 86:15 113:22 118:1 120:15 179:5 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[produce - properly]

| | | | |
|---|---|---|---|
| **produce** 133:25 | **products** 105:5 | 60:1,6,15 | 202:16,18,23 |
| 135:20 235:15 | 106:2,3,7,7,15 | 61:15,22,25 | 216:25 217:6 |
| **produced** | 107:20 108:8 | 62:6,10,17,20 | 217:15,17 |
| 134:3 223:13 | 111:11,12 | 62:25 63:10,14 | 220:16 |
| **producer** | 115:8,18 | 64:15 70:4,5 | **profitable** |
| 162:15 | 120:12,14 | 72:3 77:4,19 | 119:22 144:24 |
| **producers** | 128:20,22 | 77:21,25 78:5 | 211:9 |
| 183:11 | 129:12,15,21 | 79:10,14,19 | **profits** 126:5 |
| **producing** 9:2 | 135:18 155:17 | 80:18 81:1,14 | 126:12 148:3 |
| 115:7 132:22 | 155:18 156:6 | 82:3,11,20 | 209:10 210:15 |
| 133:6,21 | 159:15 160:4,5 | 83:21 85:9 | 212:7 230:19 |
| **product** 75:22 | 160:8,9,15 | 86:12 87:8,16 | 243:4 |
| 103:5 109:6,20 | 162:13 185:14 | 89:22 90:4,6 | **program** |
| 109:22 115:25 | 185:22 186:1 | 95:20 97:6 | 147:11 |
| 133:22 134:21 | 200:23 201:10 | 100:24 102:11 | **progress** |
| 134:24 136:7 | 201:19 202:20 | 102:21 114:17 | 177:21 |
| 137:21 160:19 | 204:10 209:16 | 114:19 116:13 | **prohibit** 66:1 |
| 160:19 174:9 | 209:19 239:18 | 117:9 120:7 | 79:20 |
| 174:10 177:25 | **professional** | 141:6 149:16 | **prohibiting** |
| 179:3 187:19 | 2:18 253:2 | 150:5,9,24 | 68:3 242:25 |
| 188:3 201:8 | **professionally** | 151:1 171:16 | 244:18 |
| 209:22 224:21 | 172:13 | 172:8,12,18 | **prohibition** |
| 230:13 | **professor** 7:15 | 175:15 176:2 | 86:25 |
| **product's** | 10:6 13:10 | 177:8,10 | **prohibits** 28:5 |
| 155:13 188:1 | 14:14 15:7 | 216:19,21 | **project** 20:4 |
| **production** | 16:25 18:16 | 218:2 232:5,10 | 114:25 |
| 133:14,17,24 | 29:2,6,9,22 | 234:13,20 | **projected** |
| 134:2,7,15 | 30:1 44:19,21 | 241:14 245:21 | 90:18 |
| 135:2,3,8,12,16 | 45:1,9,16 46:5 | 247:11 248:5 | **projection** |
| 135:23 136:1,3 | 46:9 47:20 | 249:2 251:15 | 220:15 |
| 172:19 173:6 | 48:8,14 52:13 | **profit** 51:24 | **prolific** 60:4 |
| 189:16,20 | 52:20 53:5,14 | 127:3,17 | **proper** 215:10 |
| 203:2 209:3,18 | 54:1,7 56:8 | 142:14,23 | **properly** 30:16 |
| 215:14 | 57:10,22 58:11 | 143:10 168:15 | 141:1 173:12 |
| | 58:15 59:10,19 | 174:13 202:11 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[properties - question]**

| properties 156:24 188:2 **property** 112:8 114:2,5 129:11 144:13 154:5 155:11 156:11 157:3,17,19 162:13 **proportion** 133:14 143:19 **proportionally** 153:13 **proposal** 232:25 233:7,8 **proposed** 5:16 18:1 66:17 102:16 247:15 **proposition** 126:20,21 129:3 146:22 156:9 **protection** 105:6,9 107:8 **protocol** 28:5 42:14 **provide** 32:14 71:10 82:24 83:8 105:17,17 107:24 121:5 131:24 146:20 149:12 151:2 172:20 179:3 180:15 181:4 **provided** 25:17 50:5,18 70:24 | 106:13 107:20 135:10 141:1 147:12 254:19 255:8 **provider** 112:3 112:7 **provides** 106:12 162:18 179:1,4 **providing** 137:11 138:7 174:9 181:15 219:3 **provision** 179:5 179:24 180:16 181:5,16 186:3 **provisions** 88:24 97:5,8 97:14,14 98:2 108:10 **proxies** 133:4 **public** 184:3 186:3 **publicly** 88:3 **publisher** 60:4 **publishes** 62:4 **pull** 124:9 141:14 **purchase** 111:16,23 112:2,21 137:5 137:16 140:19 140:25 184:17 191:15 197:11 197:25 198:1 | 198:14 213:17 218:16 220:8 **purchased** 144:14 156:6,7 185:14 **purchasers** 155:21 **purchases** 13:16 15:14 35:9,25 75:19 100:3,4,13 104:6 155:7 159:10 161:25 164:9 165:14 166:7 185:6 198:5 208:22 212:25 213:1,5 213:12 219:12 219:19 220:4 243:3 250:11 **purchasing** 118:23 155:19 198:4 **purports** 225:4 **purpose** 152:14 177:23 **purposes** 41:25 176:15 184:3 202:9 234:13 235:1,9 **put** 22:1 41:20 88:3 99:19 121:7 124:7 126:16 191:17 | **putting** 81:21 |
| | | | **q** |
| | | | **qualification** 145:8 **qualified** 62:20 **qualify** 145:5 168:21 **qualifying** 132:24 **qualitatively** 122:21 **quality** 74:4 75:23 76:6 103:10 106:2 109:7 152:9,10 203:4 242:17 **quantify** 100:1 101:10 107:3 107:14,19 **quantifying** 57:23 58:1,2 100:9 152:15 **quantitative** 74:21 75:21,25 **quantities** 74:22 75:4,5,6 75:8,11 189:6 211:14 **quantity** 103:5 163:5 189:8 **question** 11:24 13:1 14:22 16:19,24 18:5 28:10 29:8,13 29:21,23 35:4 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[question - readily]**

39:6 42:25 47:22 48:9,17 52:3 54:4 55:22,24 56:16 60:10 68:7,24 71:13 76:10 90:4,6,9 91:3,8 91:8 92:18 94:3,4,20 95:14,18,19 101:11,15 102:7 107:2,12 108:5,22 109:2 110:8 111:8,10 111:20 112:19 116:18 119:16 130:3 132:10 134:4,5,7 136:16,20 137:2 139:25 140:20 143:4 145:16 147:17 147:21 154:12 158:13 159:9 160:6,12 161:5 161:20 163:17 166:13 169:14 173:13 175:24 180:20 181:7 181:13,19 185:11,25 193:25 195:9 195:15,15 197:6,23 203:1 206:21 208:8

213:3 215:22 215:24 218:13 219:24 224:3 228:10 233:17 234:16 236:14 243:11,17 244:25 246:24 248:17

**questioned** 90:22

**questions** 24:17 42:12 63:25 76:23 132:3,3 226:10 242:16 248:20,21 249:3 251:9

**quick** 79:7

**quite** 27:4 42:21 43:21,21 57:8 123:12 155:11 156:16 159:24 169:2 231:21 233:18 234:5

**quotations** 6:19

**quote** 6:22

**r**

**r** 4:5 41:6 256:3 256:3

**r&s** 255:1,9

**raise** 9:4 54:13 94:25 131:9,19 131:22 236:22

**raised** 23:10 130:8 131:4

236:18

**random** 39:5 39:11,16 157:10

**range** 50:13 139:20 152:24 172:21 174:5 174:21,22 188:4,21 189:6

**ranges** 231:15

**ranging** 217:21

**rapidly** 37:9

**rate** 48:24 50:18 59:3,7,8 69:7,12,13 70:16,23 71:2 71:9,17,19 73:20 88:2,3 88:15 89:25 90:16,17,19,25 92:1,8,8,16 93:2,6 99:13 116:3 117:2 119:1,2,4,9 125:9,12 132:6 132:14 139:4 140:12,15,19 140:24 144:21 145:5,12,19 146:7 148:2 182:20 228:11 228:13 229:9 229:16 230:9 249:24

**rates** 55:11 91:4 92:22 145:24 149:11 229:20 230:2 230:11,15

**rather** 29:16 102:7 126:6 133:23 144:15 155:1 161:24 193:13 208:24 212:11 222:13 244:22 247:16 250:16

**rational** 123:10 124:3

**reached** 70:18

**reaching** 30:15

**read** 6:21 33:2 33:9,15 34:4 34:13 45:15,19 46:9,13,14,21 46:23,24,25 47:6 57:11 60:19 61:17 63:21 71:23 72:5,6 85:13 96:16 110:6,6 117:20 169:10 171:20,22 190:17 218:11 224:22 245:7 252:2

**reader** 45:25

**readily** 88:8

**[reading - refer]**

| | | | |
|---|---|---|---|
| **reading** 46:7 54:10 57:24 63:23,23 71:25 72:2 78:10 82:3 93:10,11 96:16,23 172:4 172:7 245:10 254:24 255:9 | **reason** 70:11 75:17 156:21 178:18 197:20 208:11,13,14 256:6,9,12,15 256:18,21 | 196:19 214:5,6 222:23 223:4 245:10 249:2,5 250:20,23 | 150:19,25 177:1,9 213:9 213:9 216:15 216:20 241:6,8 241:11 247:24 247:25 248:4 251:13 253:9 253:12 |
| **reads** 238:17 | **reasonable** 166:8 210:3 | **recalled** 243:25 | |
| **ready** 44:5 | **reasons** 194:24 242:5 | **recalling** 250:4 250:5 | |
| **reaffirm** 12:2 149:21 | **rebecca** 1:21 2:17 8:25 253:1,24 | **receive** 106:23 108:24 | **recorded** 7:15 192:3 236:20 |
| **reaffirming** 12:17,21 | **rebuttal** 248:12 | **received** 34:5 123:16 171:23 171:23,24 | **recording** 7:11 **records** 176:1,7 225:15 |
| **real** 108:2 130:20,20 138:10,14,20 138:20,24 139:9,13,19 140:17,23 141:6 146:20 147:5,5,8,14,16 148:20 149:4,5 179:13 202:9 242:1 | **recalculated** 231:19 | **receiving** 46:4 | **recoverable** 101:21 |
| | **recall** 12:16,18 23:23,25 24:7 24:22,23 37:16 38:11,22 40:25 41:3,9,13,19 48:16 50:8 57:24 59:25 63:9,23 67:20 67:22 71:25 72:2,7 85:13 93:11 97:22,23 98:19 117:14 117:15,16 141:11 144:9 151:18,24 152:1 164:18 169:9,10 170:20,24 172:4 193:24 | **recent** 10:20 177:20 192:24 | **recovered** 103:22 |
| | | **recess** 44:16 77:16 114:14 150:21 177:2 216:16 241:10 248:2 | **recovery** 102:6 103:18 |
| | | **recognize** 123:9 232:6 239:13 | **red** 203:16 205:6 |
| **reality** 137:2 146:12,25 148:14 153:1 169:16 176:9 | | **recognized** 75:20 | **redirection** 80:11,11 |
| | | **recollection** 37:20 94:13 96:7 169:19 170:4 | **reduce** 88:10 88:14 |
| | | | **reduced** 102:17 182:20 |
| **really** 29:5 76:18 96:24 99:3 119:16,16 123:11 173:25 180:19 208:8 | | **record** 6:21 7:7 7:13 8:9 10:8 16:1 44:15,20 77:15,20 114:10,11,12 114:18 150:17 | **reducing** 74:11 **reduction** 102:13 182:3,6 |
| | | | **reestimated** 231:19 |
| | | | **refer** 59:9 79:19 84:16,16 97:4 132:8 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[refer - remediation]**

133:12 134:2 189:22 204:22 205:2 207:13 239:4
**reference** 66:22 81:13 82:1 87:16 102:10
**referenced** 254:6
**references** 87:7 172:1
**referred** 39:1 49:3 74:16 84:14 85:23 122:13 159:8 162:2 203:17 224:24
**referring** 12:7 19:18 57:17 58:10,15,23 59:13,14 81:9 82:21 84:25 89:6,20 97:16 100:8,17 123:1 138:16 141:11 179:8 180:23 184:10 192:2 205:19 207:11 207:14 216:2 233:13
**refers** 38:12,23 187:24
**reflect** 68:4,12 153:1 162:20 174:22 192:10

195:2
**reflected** 6:20 125:2 221:9
**reflective** 192:11
**reflects** 93:21 124:23 139:5 163:10 164:1
**refresh** 37:19 38:16
**refreshed** 117:22,23 218:13
**refreshes** 96:6
**refusal** 93:24
**refusing** 205:6
**regarding** 199:6
**regardless** 197:12
**registered** 2:18 253:1
**regular** 22:14
**regularly** 22:18 22:18 27:1,3,4 30:2
**regulation** 184:5
**regulations** 181:12
**rejected** 23:21
**relate** 233:24
**related** 8:1 52:13 59:10 169:13

**relates** 78:9
**relationship** 156:12,25 193:11,12 215:12,15
**relative** 37:5 52:15 69:8 100:3 174:14 190:21 253:18
**relatively** 91:2 155:7 168:23 196:11 206:1 209:2 230:1,1
**released** 254:22
**relevance** 56:12 69:4
**relevant** 12:22 33:3 36:19 40:14 53:15 54:2,8,18 69:15 72:10 77:25 78:8,14 79:1 110:18 143:23 151:21 158:24 159:11 159:16 174:7 185:7,13 188:21 189:6 233:19 234:6
**reliability** 50:2 150:3 167:11 176:16
**reliable** 31:16 166:23 208:6 225:24 228:8

237:15 238:18 241:19
**reliably** 226:5 227:2 230:21 231:1,4,16 242:10
**reliance** 28:22 48:7,13,19
**relied** 23:19 27:15 28:24 29:3,9,11 30:17 31:23 32:4,13 45:13 62:24 63:11 66:13 171:14 245:8,9,9
**relies** 225:10,14
**rely** 21:5 45:2 47:10 49:16 53:18 66:16 70:10 153:5 204:6
**relying** 29:6 30:3 32:9 43:2 47:19 48:3 49:3,23 52:21 52:22 53:4 66:23 67:11,13 70:5,14
**remain** 20:22
**remained** 196:25
**remark** 182:23
**remediation** 228:20

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[remedy - requested]**

| | | | |
|---|---|---|---|
| **remedy** 206:20 | **reply** 24:12 | 74:6 76:15 | 119:25 177:4 |
| **remember** | **report** 5:12 | 77:22 79:5,9 | 232:2 245:4 |
| 45:23 60:19 | 10:20,23 11:14 | 82:3,11 86:10 | 253:2,3,3 |
| 63:4,6 88:25 | 11:20,23 12:3 | 87:8 89:16,22 | **reporter's** 6:19 |
| 89:1 96:11,23 | 12:23 13:4,21 | 93:5,10 97:7 | **reporting** |
| 98:5,6,10,10 | 14:13 15:19 | 99:4,21,22 | 38:13 39:18 |
| 167:9,10 172:6 | 17:3 18:12,12 | 100:21,22 | **reports** 10:25 |
| 193:25,25 | 18:25 19:2,4 | 104:17 109:11 | 12:3,8 17:12 |
| 194:1 222:12 | 19:20 20:24 | 116:13 117:18 | 17:22 18:6,9 |
| 223:1,2,6,7,7,9 | 21:15 25:7,23 | 124:9 125:23 | 31:5 32:4,11 |
| **remembered** | 26:1 28:12 | 141:4,13,20 | 32:17,20 33:24 |
| 236:7 | 29:10,13 30:5 | 143:22 144:7 | 35:16 38:19 |
| **remind** 250:25 | 31:22,24 32:21 | 144:18 145:4 | 41:4,12,17 |
| **remotely** 8:8 | 32:25 33:4,7 | 145:22 148:25 | 45:2 47:19 |
| **removal** 93:22 | 33:19,24 34:4 | 149:22,24 | 48:19 65:5 |
| **removing** | 34:4,5,10,13,23 | 152:12 161:7 | 72:5 74:6 |
| 225:15 | 35:3 36:2,24 | 168:22 171:15 | 101:4 138:4,6 |
| **rendered** 13:8 | 37:19,22 38:2 | 171:18 172:2,4 | 138:13,22 |
| **renewals** | 38:17,24 39:17 | 172:7,9 191:18 | 151:25 170:9 |
| 147:10 | 41:3,8,20,21,23 | 192:1 196:15 | 170:19 171:14 |
| **rental** 189:9 | 41:25 42:19 | 196:21 198:25 | 199:12 240:15 |
| **repeat** 14:21 | 43:3,9 44:22 | 199:6 207:2,17 | 242:7 245:8 |
| 48:10 54:4 | 45:8,9,16,20,22 | 221:14 222:5,8 | 248:7 250:8 |
| 62:15 68:7 | 46:5,7,8,10,13 | 222:25 223:11 | 251:4 |
| 107:11 111:19 | 46:15,17,22,25 | 223:21 224:23 | **represent** 67:5 |
| 128:12 136:16 | 47:1,1,12 48:1 | 224:25 228:24 | 211:3 223:14 |
| 139:25 140:20 | 48:4,23 50:3 | 229:1,7 239:6 | **representative** |
| 145:15 154:12 | 50:13,15,17,17 | 242:11 248:12 | 194:15 |
| 158:13 160:6 | 51:1,3 53:19 | **reported** 1:20 | **represented** |
| 166:13 219:15 | 53:21 54:11 | 42:6 194:10 | 237:2 |
| 224:10 | 57:25 58:4,9 | 222:7 | **representing** |
| **repeatedly** 74:5 | 64:22 65:21 | **reporter** 2:18 | 7:24 235:18 |
| **replications** | 68:1,12,20 | 2:19,19 8:22 | **request** 87:5 |
| 198:13 | 71:23 72:3,22 | 8:25 9:1,7 | **requested** 23:2 |
| | 72:25 73:25 | 10:14 95:25 | 253:16 255:1,9 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [requested - rifkin]

255:10

**requests** 175:14

**require** 168:10 206:15

**required** 23:2 51:14 72:19 202:5 228:23 254:20

**requirement** 86:13 91:23 116:9,11 117:11 118:5

**requirements** 97:9

**requires** 28:17 116:15 124:14 135:21 156:4 227:12 237:15

**reread** 41:8

**research** 4:15 20:6,13 25:13 183:1

**residual** 215:21 215:25

**resolved** 233:25

**respect** 17:16 21:3 108:15 109:8 157:25 170:3 187:6 201:20 220:6,7

**respected** 62:2

**respond** 24:3 111:12 123:10

148:3 204:9

**responding** 134:5 221:1

**responds** 212:15

**response** 24:16 132:6,13 152:2 156:4,5 193:13 211:15

**responsibility** 13:10 30:22 31:10

**responsible** 21:21 23:5 25:3

**restate** 142:12

**restrict** 105:4

**restricted** 15:3

**restriction** 84:24 86:20 88:13 117:16

**restrictions** 81:2,8 82:10 83:24 84:7,14 84:15 85:5,23 86:3,7 87:9,17 87:23 88:8 91:6,9,22,24 199:9,25

**result** 90:2 100:2,16 104:1 105:3 107:8 116:3 166:7 169:1 182:3,12 182:15 190:23

192:8 209:22 221:19 236:9

**results** 104:16 115:23 132:21 133:6 166:23 193:24 207:23 207:24 214:16 222:12

**retail** 123:14 188:3

**retailer** 113:17 114:20

**retained** 251:16

**retire** 25:10

**retired** 18:22 25:8,23 26:7 26:10 34:19 65:14,16

**retirement** 19:1 25:14

**return** 51:17 74:11 113:8 254:17 255:6

**returns** 179:6 187:14

**rev** 220:15

**revenue** 110:16 127:18,22,24 128:7 142:16 143:2,11,14 188:13

**revenues** 37:8 142:8 196:13

**review** 41:8 50:2 232:16 233:3 253:15 254:8,10,13 255:2

**reviewed** 31:17 32:24 67:16 97:12 169:20 223:21 232:17

**reviewing** 45:24 245:17

**rifkin** 3:5,10 5:6 8:12,12 12:24 14:20 15:1 16:12,18 17:24 18:10 22:23 23:6,24 26:19 27:8,18 28:4,13,16,23 29:7,18,20 30:9,20 34:24 36:5,8,15 42:11,20 43:16 44:4,8,12 48:21 51:6,12 51:25 53:16 54:9,20 55:14 56:6,11,14,18 60:8,17 61:7 61:18,23 62:12 63:2,12 64:10 64:18 67:6 71:5 72:11 73:10 76:8,16 76:19,22 77:2

**[rifkin - san]**

| | | | |
|---|---|---|---|
| 77:7,11 78:15 | 222:10 224:2 | 170:11 172:2 | **royalties** |
| 83:6 86:21 | 226:18 230:23 | 173:8,12 | 112:14 |
| 87:12 88:16 | 231:6 233:21 | 179:19 184:12 | **royalty** 111:14 |
| 92:3 93:8 | 234:9 236:2,13 | 184:21 186:11 | 111:21 112:2,4 |
| 94:18 97:15 | 237:5 238:7 | 187:2 189:1 | 112:15,20,22 |
| 98:3,8 100:11 | 239:3,24 | 191:17 197:14 | 112:25 |
| 101:22 104:3 | 240:20 243:16 | 212:4,9 213:12 | **rpr** 1:21 253:24 |
| 105:23 106:25 | 244:3,20 246:8 | 215:17 218:25 | **rule** 154:9,13 |
| 107:10,17 | 247:24 248:21 | 219:12,21 | 154:16 237:15 |
| 108:3,25 | 249:1,15,16 | 234:14 239:23 | 247:15 |
| 111:18 113:4 | 251:8,11 | 240:19 245:8 | **rules** 80:12 |
| 114:9 115:5,22 | **right** 9:4 13:12 | 245:11 248:19 | 185:3 239:10 |
| 116:23 118:10 | 14:19,25 37:17 | **rival** 94:6,11,15 | 246:25 255:8 |
| 120:22 122:15 | 37:24 38:4,8 | 119:3 205:8 | **ruling** 63:18 |
| 123:20 125:24 | 38:20 39:5,11 | 230:16,17 | **run** 78:22 |
| 126:1 133:18 | 39:16,20,23,24 | **rivalries** | 132:25,25 |
| 140:9 142:21 | 39:25 40:3 | 181:20 | |
| 145:14 146:10 | 45:13,21 46:18 | **rivals** 99:17 | **s** |
| 146:15 147:24 | 48:4 59:20 | 117:1 119:5,15 | **s** 4:5 5:9 6:1 |
| 148:11,21 | 64:6,8 65:1 | 119:16,21 | 256:3 |
| 150:14,16 | 68:20 79:16 | 180:2,6,12 | **sabre** 59:22 |
| 158:18 160:25 | 82:7,22 83:11 | 230:4 | **safety** 179:3 |
| 164:11 170:17 | 83:25 85:20 | **role** 20:15 22:7 | **sale** 73:3 78:2 |
| 172:24 173:21 | 88:15 93:2,3 | 26:8,17,24 | 109:14 111:6 |
| 175:11,22 | 94:14 95:2,4 | 34:20 48:24 | **sales** 6:6 81:23 |
| 176:21,24 | 99:19 103:8 | 49:19 175:17 | 82:21 88:1,2 |
| 185:9 186:18 | 106:19 108:2 | 220:22 224:12 | 110:1,3,16,20 |
| 194:22 195:11 | 110:20 111:7 | **romano** 1:21 | 144:23 145:10 |
| 196:5 197:4 | 123:2,8 128:24 | 2:17 9:1 253:1 | 177:13 178:7 |
| 198:7 201:23 | 137:25 139:24 | 253:24 | 182:2 183:9 |
| 202:12,24 | 140:3 142:20 | **roughly** 39:22 | **sample** 38:20 |
| 209:24 211:6 | 147:8,14 154:4 | 40:8 210:11 | 38:25 39:1,5 |
| 213:7,19 | 159:21,23,25 | **round** 24:24 | 39:11,16,20,22 |
| 214:14 216:11 | 163:15 164:19 | 167:8 | 40:2 |
| 216:13 219:22 | 165:19 167:23 | | **san** 1:15 2:16 |
| | | | 7:1,23 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[sat - sense]

sat  161:19
satisfaction
  101:1,6,16
  102:9 103:12
  106:4 107:3
satisfied  150:8
  196:2
satisfy  168:7
saw  11:13
  172:1 176:9
  243:23
saying  50:21
  168:22 184:1
  194:1 198:17
  205:4 209:12
says  39:12
  85:14 108:19
  126:4 127:16
  200:16 220:25
scalable  189:8
  189:20
scale  173:16
  187:14
scenario  198:2
  198:6 206:5
schedule
  254:10
school  172:18
scientifically
  146:23
scope  19:22
  56:7
score  97:11
sealed  254:20

search  120:13
  186:1
second  35:6
  49:10 52:10
  66:16 86:11
  120:10 126:3
  132:17 141:21
  144:18 158:22
  178:25 181:24
  183:7 191:24
  198:6 237:11
  237:12 240:5
  241:6
secondary
  110:25
secondly  191:1
section  32:16
  33:3,13,14
  190:18
sections  46:11
security  105:10
  107:8,15,21
  108:6,9,24
  113:24
see  12:5 14:3,4
  20:7 29:21
  32:18,22 36:21
  37:4,10 42:3
  45:5 49:10,15
  52:18 58:12
  66:4,8,19,22
  69:25 73:5
  79:23 81:6
  84:10 86:17
  87:18 88:18

96:6 97:12
  98:15 100:6
  109:17 110:4
  120:17 124:16
  127:19 129:21
  132:7 133:8,15
  141:9,25
  144:15 145:1,7
  146:12 152:18
  153:25 158:8
  162:4,22 164:2
  168:8 180:3
  182:9 183:14
  188:5,15,23
  189:11,24
  191:20 192:5
  199:10 200:16
  200:25 205:1,9
  205:9,17 207:8
  211:23 221:21
  223:18 229:12
  235:25 237:19
  238:23 242:3
  243:5 244:19
  245:5 246:1
  247:11 249:25
seeing  223:1,9
seek  126:11,22
seeking  186:21
seeks  109:20
  203:23
seemed  210:3
seems  75:18
  86:24 97:4
  123:22 243:20

seen  96:7,10,22
  130:7,25
  214:16 224:20
  248:15
selection  31:3
  31:15,16
sell  82:15 93:25
  95:1 115:9
  121:7 124:5,5
  133:25 180:23
  205:7
seller  110:24
  123:5 187:19
  187:25 188:2
  189:7
sellers  56:22
  109:23 111:3
  111:11 114:25
  123:25 179:13
  179:15 183:12
  209:10
selling  81:3,10
  84:8 86:15
  93:18 134:23
  165:22 220:16
  220:16,17
sells  114:20
sending  227:16
senior  4:17
sense  18:21
  32:5 58:19
  67:13,13 69:5
  91:25 100:25
  103:10,14
  106:24 123:3

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[sense - sides]

136:5 155:9 163:9 178:11 179:19,19,20 205:23,24 213:16 229:2

**sensitive** 7:8

**sensitivities** 163:4

**sensitivity** 152:16 153:10 154:17,23 160:4,8,22 163:10 164:1,7 164:13,16 168:17 169:11 170:5 175:1 192:22 193:2 193:16,17,20 194:14 197:18 214:12

**sentence** 13:23 15:3,9 16:7 26:3 35:6 68:9 68:15 69:21 74:1,17 78:8 99:24 126:3 127:15 132:8 141:21 144:19 178:25 181:25 183:24 191:24 199:5,20 229:7 237:13 238:16 245:11 246:11 249:20

**sentences** 162:17

**separate** 14:15 41:14 51:14 82:8 101:7 170:5

**separately** 87:5 158:6 161:10

**separation** 11:11

**sequence** 46:3

**sequential** 147:10

**series** 99:7 164:21

**serve** 200:21 232:23

**service** 137:11

**services** 84:21 105:17 106:15 113:3,9,11,15 113:19,20,21 113:25 116:22 120:16 147:4 179:4,25 180:16 181:6 181:16

**serving** 235:1

**set** 12:22 34:14 47:18 80:21 87:5 88:9 90:13 96:18 115:18 116:1 120:14 123:2 126:4,17 129:8

129:23 137:23 176:15 178:19 181:8 185:3 188:3,18 192:1 194:25 195:22 201:17 204:12 204:23 205:14 212:10 214:23 215:4 217:9,22 223:13 225:9 230:19 231:14 233:18 242:14 248:7 253:6

**sets** 47:12 123:7 127:17 216:22

**setting** 42:15 47:23 185:3

**settings** 122:10

**settled** 234:3

**seven** 251:16

**several** 33:21 45:3 47:10 192:18

**shaped** 60:7,15

**share** 37:5 155:6,19 156:7

**shared** 11:16

**sharpen** 151:12

**shawna** 4:19 7:24

**shed** 150:2

**shifted** 231:15

**shoe** 159:25,25

**shoes** 159:21 159:21,23,23 219:13

**short** 90:13 132:25

**shorten** 68:10

**shorthand** 2:19 253:2

**show** 170:10 233:16 246:6

**showed** 245:22

**showing** 246:14

**shown** 27:13

**shows** 13:25 38:5 106:18 233:12 246:14

**sic** 18:15 50:7

**side** 39:25 41:20 81:25 82:5 83:4 94:17,22 164:19 181:3 181:14,18 187:9,25 191:17 209:18 209:19 236:22

**sided** 54:2,3,8,8 54:11,14,18,22 55:13 56:2,5 56:24 121:19 121:24 122:11 179:11,11 187:7

**sides** 124:23

Page 59

[sign - speaking]

sign 254:16 255:5

signature 253:24 254:22 254:24,24 255:9

signed 247:17

significant 206:2

significantly 80:16 130:14 131:2 194:20

signing 86:2,7

silent 218:21 218:24

similar 31:19 110:14,14 194:9,11

simple 48:9 133:21,24 207:14,16,19 207:25 208:11 208:14 209:10 210:16,25 212:13

simplification 148:14

simply 17:17 24:15 38:21 50:8 106:16 133:25 143:4 165:8 189:8 193:24 214:7 215:12 218:12 221:1 225:17

227:24 230:8 237:7 238:13

simultaneously 108:14

single 38:24 39:14 54:2,8 187:19 229:15

sit 19:19 35:21 42:17 98:9

site 81:22

sitting 46:2,10

situation 92:12 202:14

situations 123:23

size 131:11 191:7,7 201:6 202:6

sizes 211:17

skilled 62:23

skim 33:20

skimmed 33:1 33:19

skimming 33:20

sloping 75:7

small 104:5,6 104:10,11,12 147:11 155:8 155:13,19 156:7 190:21 196:11 205:22 206:1 239:11 242:1 247:6

smart 231:8

society 247:8

soft 99:8

sold 66:2 68:4 75:4 182:7 198:20 200:24 217:8

solemnly 9:7

solution 116:15 116:21 247:15

solutions 7:25 118:2,23 251:17 254:7

somewhat 60:25 195:1

song 11:9,13 21:18 22:10 23:17 24:8,14 25:3,24 27:1 27:15 28:24 29:2,10,11 30:1,12 31:11 31:12 32:21 62:11,18,22 167:7 169:3 175:14 194:2 194:18 196:3 203:10 222:6 222:20 223:21 224:23 226:14

song's 26:15,18 29:12 30:22 32:25 33:18 34:10,23 172:2 172:4,7,9

195:18 224:23 239:7

sorry 19:7 29:7 38:9 49:13 56:3 57:16 68:7 102:4 108:16 113:10 120:23 126:15 128:2,4,11,13 130:18,23 139:16 155:24 159:13 163:16 191:22 198:8 205:2 210:13 218:10 219:15 225:1 249:14

sort 31:10 144:1 171:2 178:3 193:17

sound 237:9

sounds 39:24 212:4,9

source 59:5 121:3 138:14 142:16 143:10 152:7,8 195:4

sources 138:1 143:13

south 3:16

speak 17:2 138:25 169:19 201:20

speaking 108:14 109:20 157:24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [speaks - stiglitz]

speaks 83:23 102:11

special 62:3 204:15

specific 12:12 12:15 23:8 27:20 35:18 37:16 49:2 55:17 57:4 58:14 60:15 71:12 88:13 141:14 157:5 162:21 200:22 208:18 226:10

specifically 59:16 70:10 97:4 117:16 122:17 167:10

specification 153:19 154:22 159:1 162:10 164:5

specifics 69:9 112:18 180:18 180:21 181:8 235:24

specifies 136:21

spectrum 137:12

speculate 212:22

spend 197:12

spent 18:17,22 18:25 45:23

141:22 249:22

spirit 189:19

spoken 87:20

spotify 112:5

stable 193:21

staff 11:1,17 20:19,21 28:10 33:16,24 42:6 42:16,22 46:4 99:5 172:3 244:5

stage 12:4,8 17:12 21:17 29:19

stand 13:19 133:10

standard 75:17 103:20 126:10 126:13 195:14 195:25 196:2 240:23

standards 101:18 102:4,5 103:18 183:19 227:12

standing 183:22

standpoint 174:23,24 185:16

start 16:6 56:4 79:18 116:18 191:25 196:1 205:4 224:5,6

started 34:4 151:20,20

starting 64:13 151:14,16 237:12

starts 59:2 181:25,25

state 8:5,8 9:8 10:8 12:1 20:3 25:7 26:25 36:18 37:4 41:24 44:24 49:6 50:25 52:12 72:25 77:24 88:22 99:24 109:13 109:25 110:16 141:5,21 158:4 168:4 207:3 221:15 254:9 254:12

stated 13:17

statement 18:7 50:24 54:18 61:9 79:2 123:22 132:24 134:6 145:9 155:5 203:21 230:10 243:20 243:22,24 244:1,16

statements 17:21 18:8 67:14 117:15 118:12

states 1:1 2:1 7:18 78:3 246:19

statistical 166:23 169:6,9 169:17 174:23 174:24 192:15 238:22 239:23 240:6

steering 87:17 87:22 88:7,23 91:22 97:13 98:1

stem 156:25

stems 156:13

stenographic 16:1

stenographic... 1:20 253:10

step 100:19

steps 198:10

stiglitz 13:10 14:14 15:7,24 16:25 45:1,9 45:16 46:5,9 47:20 48:8,14 52:13,20 53:5 53:14 54:1,7 57:10,22 58:11 58:15 59:10,19 60:1,6,15 61:15,22,25 62:6,10,17,20 62:25 63:10,14 64:15 70:4,5

**[stiglitz - substitutes]**

72:3 77:25
78:5 79:10,14
79:19 80:18
81:1,14 82:3
82:11,20 83:21
85:9 86:12
87:8,16 89:22
90:6 95:20
97:6 100:24
102:11,21
116:13 117:9
141:6 149:17
150:5,9 232:10
234:13,20
**stipulation**
5:16 66:17
67:7 96:3
254:21
**stop**  198:8
**store**  25:25
37:6,8,15,23
51:22 52:5,15
55:13 56:4
72:20 73:17
78:1 79:22
80:4,7,9,12
81:5,12,16
83:3,4,15 84:9
84:23 86:14
89:24 93:18
94:16,16 95:2
97:9 109:14,25
114:24 117:1
120:20,20
121:1,2,12,13

121:17,18,23
122:13,24,25
123:4 130:1,13
131:1,6 137:25
138:2,9 141:16
141:18 143:8
151:2,7,16
162:17 179:17
180:15 181:2
182:11,20
192:2,4,24
194:4 204:21
205:5,12 217:9
223:16
**store's**  51:17
**storelike**  79:21
79:25 80:8,14
81:10 82:12,12
82:14 83:1,2
83:11 93:14,24
94:1 95:7
180:14,22
181:4,14
**stores**  83:3 94:6
120:13 121:4,5
123:5 178:17
178:19 180:23
205:8 229:14
229:20 230:17
243:1 244:18
**story**  236:23
**straightforward**
146:5 230:1
**strategy**  171:3

**streaming**
84:21
**strike**  113:10
161:14 224:14
**strong**  54:12
208:13
**structural**
193:11,12
**structure**  22:2
123:23 203:2
221:17
**structured**
123:18 180:18
**structuring**
180:21
**studied**  44:3
52:8 54:16
72:12,13 83:19
89:14 118:19
122:16 132:1
203:5,7 213:23
**study**  74:13
75:21,25 86:1
228:17
**studying**  74:19
**subclasses**
226:11
**subject**  13:9
61:10 80:23
86:1 93:10,19
173:18 174:4
176:13
**submission**
234:14 236:20

**submit**  45:1
236:25
**submitted**  46:8
46:15,16 65:6
88:20 224:17
232:9,19
247:17,19
248:12
**submitting**
98:7
**subscribed**
253:21
**subscribers**
84:22
**subscription**
112:6
**subscriptions**
84:20
**subsequent**
74:6 131:20
138:6
**subsequently**
17:7
**subset**  89:11
**substance**
91:20
**substantial**
195:5
**substantially**
139:9
**substitutes**
158:11,16
159:16 160:5,9
160:16,21
162:8 164:2

**[substitutes - surprised]**

220:5
**substitution**
  162:11 241:1
**subtext** 78:6
**successes**
  125:21
**suffered** 238:20
**suffice** 90:1
**sufficient** 151:3
  152:8 173:2
  209:7
**sufficiently**
  143:8 160:13
**suggest** 243:19
**suggested**
  27:22 147:2
  247:3
**suggesting**
  58:22
**suggestions**
  202:2 232:18
**suggests** 119:12
**suing** 244:2
**suite** 2:15 7:22
**sum** 210:8
**summaries**
  46:4
**summarize**
  53:19 79:10
  80:25 83:23
**summarized**
  89:8 116:12
**summarizing**
  82:10 84:5

**summary** 80:17
  83:21 89:23
  230:10
**sunding** 20:4,9
  21:6,13
**sunding's**
  20:15
**super** 14:1,11
  14:19,24 15:9
  15:12 16:5,11
  55:11 59:17
  69:8 73:17,21
  243:4
**supermarket**
  122:19 123:6,7
**supermarkets**
  121:4
**supervise** 24:8
**supervising**
  22:17 23:16
  25:1 26:6
**supervision**
  22:13 24:13
**supervisor** 25:6
**supervisory**
  26:24 34:19
**supplemental**
  12:3 48:1
  50:17 104:17
  145:22 148:25
  168:22 192:1
  223:13 242:11
  251:3
**supplementary**
  100:21 161:6

207:17 222:4
  239:6
**supplements**
  32:3
**supplier** 113:1
  186:7 206:16
**suppliers** 115:3
  120:14,15
  121:6 123:1,7
  123:16 204:23
  205:7,13
**supply** 111:1
  115:4 134:12
  134:14 162:20
  165:13 166:10
  166:14
**support** 25:16
  32:9 95:16
  98:7 244:6
**supported**
  49:24
**supporting**
  11:1
**suppose** 30:10
  33:5 41:7 90:8
  102:23 123:22
  125:19 137:2
  188:1 205:5
  233:24,25
**supposed**
  175:18,19
**supposition**
  91:16
**suppress** 74:9
  74:10 206:20

**suppressed**
  74:3
**suppressing**
  15:19
**supreme** 64:8
  64:16 232:9,22
  233:2,18 234:6
  235:2,10
  236:10,25
  237:3 244:15
  245:3 246:20
  247:13,18
**sure** 24:7 25:4
  25:5 36:9
  48:11 54:21
  57:20 60:3
  77:2 78:8
  82:13 86:23
  94:21 111:8
  114:3,4,9
  118:3 125:7
  137:13 147:1
  158:14 163:18
  176:24 186:5
  187:1,2 189:17
  214:25 219:17
  219:23 234:17
  241:7
**surge** 200:21
**surges** 201:5
**surplus** 75:15
  102:2
**surprise** 130:12
**surprised**
  143:24 144:2

Page 63

**[surprised - talking]**

| | | | |
|---|---|---|---|
| 196:8 | 101:23 102:10 | 234:11 236:24 | **tables** 27:14 |
| **surveyed** 215:3 | 104:9 106:8 | 237:10 238:14 | 40:21 |
| **swanson** 3:14 | 107:5,13,23 | 239:21 240:12 | **take** 7:12 38:2 |
| 5:5 8:11,11 | 108:12,16 | 241:3,7,13 | 44:10 76:20,24 |
| 10:5,16 13:5 | 109:10 111:21 | 243:23 244:8 | 77:1,11 79:7,7 |
| 14:23 15:6 | 113:9 114:8,11 | 244:24 246:18 | 117:17 118:22 |
| 16:2,16 17:2 | 114:19 115:12 | 247:22 248:5 | 119:20 125:8 |
| 18:4,16 22:7,9 | 116:6 117:9 | 248:19 249:14 | 126:14,19 |
| 23:4,12 24:8 | 118:21 120:2,5 | 251:10,12 | 127:1 136:2 |
| 26:25 27:11 | 121:11 122:25 | 254:1 | 141:3 147:18 |
| 28:2,8,14,19 | 124:6 125:25 | **switch** 41:21 | 147:22 152:11 |
| 29:5,14,19,24 | 126:3 134:1 | 44:6 76:16 | 158:2 161:23 |
| 29:25 30:15 | 140:16 143:1 | 163:11,12 | 164:12 170:2 |
| 31:3 35:2 36:3 | 145:17 146:11 | **switching** | 176:21,24 |
| 36:6,10,14,16 | 146:19 148:7 | 250:18 | 190:25 201:16 |
| 36:18 42:15 | 148:18 149:2 | **synonym** | 204:12 210:14 |
| 43:2,24 44:7 | 150:15 151:1 | 100:22 | 211:4,10 |
| 44:10,21 49:1 | 158:23 161:3,8 | **system** 80:23 | 216:21 247:22 |
| 51:9,21 52:4 | 164:15 170:21 | 82:17 83:9 | **taken** 2:14 7:16 |
| 53:25 54:17 | 173:7 174:3 | 85:4,18 86:15 | 26:7 35:11 |
| 55:12,23 56:9 | 175:16 176:10 | 87:4 88:12 | 44:16 77:16 |
| 56:12,17,20 | 176:19,23 | 97:10 99:8 | 114:14 138:6 |
| 57:14 60:14,23 | 177:10 185:20 | 117:12 118:6 | 150:21 177:2 |
| 61:13,21 62:5 | 187:5 195:6,25 | 247:8 | 216:16 241:10 |
| 62:14 63:8,21 | 196:14 197:10 | **systematically** | 248:2 253:5 |
| 64:14,21 71:12 | 198:24 202:8 | 76:11 245:23 | **takes** 87:22 |
| 72:24 73:13 | 202:19 203:5 | 246:11 | 228:1,4 231:21 |
| 76:14,18,20,25 | 210:6 211:8 | **systems** 118:14 | **talk** 84:25 |
| 77:5,9,13,21 | 213:10 214:3 | 118:18 | 103:3 114:8 |
| 78:24 83:10 | 214:17 216:12 | **t** | 208:19 |
| 87:7,14 88:20 | 216:21 220:3 | | **talked** 50:23 |
| 92:11 93:12 | 222:19 224:5 | **t** 5:9 6:1 256:3 | 61:1 178:9 |
| 94:24 95:22 | 226:24 231:2 | 256:3 | 205:4 236:5 |
| 96:2,5 97:18 | 231:13,24 | **table** 11:8 | **talking** 29:5 |
| 98:6,11 100:14 | 232:4,5 234:4 | 38:11,13,22 | 180:24 199:2 |
| | | 40:4 196:20 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[talking - think]**

| | | | |
|---|---|---|---|
| 246:11 | **tensions** 187:13 | **tested** 146:11 | **thing** 27:24 |
| **talks** 71:23 | **term** 36:23 | 167:4 | 28:1 179:16 |
| 100:24 | 55:20,24 56:2 | **testified** 10:3 | **things** 15:23 |
| **tax** 13:25 55:3 | 57:1,20 81:25 | 13:24 | 61:2,12 88:9 |
| 109:14,16,19 | 82:2,5 86:4 | **testify** 49:22 | 103:11 112:13 |
| 109:20 110:2,2 | 102:3,24 103:2 | 62:21 | 115:1 135:7 |
| 110:10,17,21 | 120:25 121:21 | **testifying** 253:8 | 165:20 169:11 |
| 110:23 111:4 | 123:4 124:21 | **testimonial** | 192:18,25 |
| 111:12,16,24 | 178:11,12 | 65:17 | 195:23 226:8 |
| 112:23 124:14 | 179:9,18 | **testimony** 9:8 | 227:24 240:1 |
| 141:8 245:24 | 238:11 244:21 | 19:15,17,22 | **think** 10:17 |
| **team** 23:19 | **termed** 200:22 | 49:25 64:25 | 11:10 13:22 |
| **technological** | **terminology** | 65:6,10 121:16 | 14:14 15:3 |
| 81:2 83:24 | 35:13 121:25 | 248:22 250:20 | 23:7,9 26:15 |
| 84:7,14,15,24 | 122:2,8 190:10 | 251:14 252:4 | 27:20,25,25 |
| 85:23 86:20 | 205:11 | 253:12 | 28:2,5,6,13,16 |
| 91:6,9,24 | **terms** 15:25 | **testing** 21:19 | 28:19,23 29:3 |
| **technology** | 16:13,21 17:9 | 22:4 167:21 | 29:16 31:8 |
| 189:7,17 | 25:5 53:8 | 218:10 | 32:1,5 33:12 |
| **tell** 19:6 28:20 | 55:17 61:11 | **tests** 169:11 | 34:3,18 35:6 |
| 29:2 66:24 | 62:22 68:22 | **text** 203:16 | 35:12,12 36:3 |
| 100:20 160:15 | 72:6 73:11 | **textbooks** | 37:19 42:11,25 |
| 227:20 | 102:6 110:11 | 61:14 | 46:3 49:13,21 |
| **telling** 191:14 | 110:12 127:16 | **thank** 8:21 38:4 | 50:24 51:13 |
| 237:1 | 130:20 148:15 | 44:12 116:17 | 52:2 53:7 |
| **tells** 199:18 | 148:23 165:4 | 183:5 250:17 | 55:16 56:7,14 |
| **ten** 198:5,5,13 | 166:21 189:16 | 251:8,11,12 | 56:21 60:23 |
| 198:13,15,22 | 195:7 196:12 | **thanks** 99:20 | 61:8,9,24 |
| **tend** 190:25 | 206:7 210:3 | **theoretical** | 62:20 63:19,20 |
| 191:3,3 210:7 | 217:12 219:1 | 20:25 153:22 | 64:4,4 72:8 |
| **tendency** | 228:19 | **theories** 73:8 | 73:18 76:10 |
| 204:23 205:13 | **test** 146:24 | **theory** 105:25 | 78:21 79:2 |
| 206:4 | 148:19 149:3 | 125:18,19 | 80:10 82:7,14 |
| **tens** 184:20 | 167:12,14 | 127:21 133:20 | 82:20 83:7 |
| | 210:25 216:9 | 204:3 | 84:16 85:6,17 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[think - today]

87:20 90:24
91:7,12,12,19
92:10,14 94:3
94:4 96:10
99:5 100:25
101:16,24
103:17 105:8
105:24 106:11
107:1 109:1,8
112:24 114:22
114:23 115:15
115:23 116:24
117:5 118:9,11
118:15,17
119:14,15,20
120:19 121:1
121:14 122:7
122:17,20
123:9,21 124:2
126:20 127:8
128:21 130:4
130:15 134:17
135:11 136:4,4
136:19 138:12
139:7 145:4
146:17,19,23
147:2 148:9
149:2,5 150:4
151:10 152:7,8
153:21 154:17
156:15 157:16
158:25 159:8
159:17,24
160:10,13
161:4,5 162:9

164:4 166:8,18
167:1 170:4
171:12,23
172:25 173:3
173:22,23
174:18 176:17
177:15 179:16
180:17,19
181:7 182:14
184:7,23,25
185:2,10,24
186:19 187:1
187:10 190:4
192:25 194:14
195:12 197:5
197:14,14,15
197:16,20
198:9,9,9,12,22
201:13 202:2,3
203:8 204:17
206:17 208:2,5
209:4,6,12,17
211:19,20
213:20,20,25
214:5,7 215:6
218:4,21
219:25 222:15
226:8 227:8,11
230:25,25
231:9,22
235:11 236:15
238:15 240:25
242:9,12
245:11 246:12
246:13 247:14

247:16,23
**thinking**   123:4
  206:25
**thinks**   71:24
**third**   5:17 66:7
  66:18 67:2,7
  67:16,21 68:13
  68:16,23 72:19
  87:15 132:16
  139:3
**thompson**
  224:8,17
**thought**   27:24
  29:10 52:1
  77:7 80:16
  88:18 92:5
  108:5 114:4
  189:15 203:8
  233:25 234:2
**three**   79:10
  89:7,8,11,21
  124:14,19
  132:4
**threshold**   29:1
**tier**   199:8,25
  200:2 202:10
  202:15,16,21
  202:22 217:9
  217:14
**tiers**   199:15,18
  200:7 201:11
  201:20 202:17
**tight**   72:15
**till**   58:7

**time**   7:11 8:5
  17:14 18:25
  25:23 33:20
  35:13,23,24
  37:1,8 38:7
  39:14 40:10
  44:8,20 46:20
  53:8 63:20
  67:9,20 70:19
  77:15,20
  114:13,18
  131:5 137:5,16
  143:21 144:1,5
  150:14,19,25
  165:3 177:1,9
  181:10 187:6
  191:25 193:3,7
  193:10,15
  194:13 198:3
  208:19 214:8
  216:11,15,20
  222:14 228:24
  229:1 230:2,12
  241:9,12
  243:23 248:1,4
  251:18 253:6
  254:10,18,25
  255:7
**times**   61:2
  198:5,22 236:6
**timing**   176:20
  241:24
**tiny**   43:22
**today**   10:12
  56:10 250:24

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[today's - turn]**

today's 251:14
together 89:3,6
  115:1 132:12
  216:24
told 34:12
  42:16 85:6
  99:6,6 167:9
  171:19 172:3
  224:9,15 225:7
tomorrow's
  250:15
top 11:25 58:4
  242:20 244:14
  245:20
topic 31:5
  76:23 197:23
  199:13 234:7
topics 44:6
  76:17 77:8
topography
  230:7
total 43:23
  155:8,17,18,20
  190:22 251:15
totally 240:7
touch 35:10,15
  35:17,22 36:20
  36:25 38:6
  40:14,17,23
  41:10,16 42:2
  42:9,18 43:5
  43:14 44:1
  78:7,14 196:3
  196:9,16

touch's 37:5
toward 37:4
  206:4
track 128:11
  226:12
traditional
  102:2 205:6
transacted
  211:14
transacting
  103:4
transaction
  38:25 52:5
  55:13 123:18
  135:8 137:25
  138:2,10 151:2
  151:16 179:4
  220:23 223:15
  250:22
transactional
  38:7 40:9
  192:7,24 194:4
  223:17
transactions
  17:19 25:25
  35:17 37:6
  38:6,14 39:19
  39:22 40:2,8
  40:14 41:10,15
  41:16 43:14,22
  43:23 44:1
  51:22 56:23
  70:24 78:13
  103:2 104:10
  104:13 110:12

120:15 121:9
135:14 137:6
137:18 151:7
151:14 161:11
161:12,17,18
162:18 179:2
192:2,3 196:4
196:13,16,22
219:14 221:8
221:11 223:16
223:24 225:10
226:21 231:4
238:21 239:22
transcribed
  253:11
transcript 9:2
  252:3 253:12
  253:14,16
  254:6,8,10,13
  254:13,22
  255:2,2
treat 42:1
  136:12,14,17
  137:6,17 212:1
treated 42:9,18
  78:9 83:13
  169:8,22,24
  243:22,24
treatise 177:25
  178:4,21
treats 218:24
trial 11:19
  19:14,17,20
  32:14 248:7

tried 107:3,6
  118:15 128:6
  145:4 151:15
  167:3 236:15
trigger 200:22
true 125:4
  128:16 154:8
  179:16 186:19
  189:13 199:17
  213:11 240:2
  252:5 253:12
truth 9:10,10
  9:11
try 68:17
  212:21 237:23
  242:15
trying 25:12
  92:13 101:10
  101:23 102:8
  108:12,18
  153:25 155:14
  165:7 185:1
  191:22
turn 11:23
  13:20 36:10
  38:1 41:22
  44:22 50:14
  52:9 65:20
  66:13 69:19
  73:24 77:21
  96:12 99:21,23
  109:4,10 120:9
  124:10 125:22
  127:4,10 132:2
  141:19 144:17

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[turn - uninjured]**

158:2 174:16 187:16 189:3 191:19 200:14 203:13 204:20 207:1 221:13 229:6 237:11 238:14 241:3 242:18,19 249:11

**turning** 46:12 76:14 86:10

**two** 11:7 33:22 33:22 54:3,8 54:11,14,18,22 55:13 56:2,5 56:24 73:8,11 115:10 118:12 121:19,24 122:11 125:13 137:4,15 138:1 160:3,5,7,9,15 162:17 165:16 165:18 175:8 179:11,11 187:7 190:15 192:25 194:3 210:14,18,19 211:24,25 219:14 239:25 239:25 240:11 248:21

**type** 122:14 136:3

**types** 115:11

**typically** 123:6 127:24 142:5,6 156:5

**u**

**u.s.** 110:16 232:9 245:3

**ubiquity** 57:7

**ultimately** 109:21

**un** 123:25

**unanswerable** 242:16

**unavailable** 229:3

**unaware** 123:25

**unchanged** 48:25 200:5

**unclear** 122:4

**unconstrained** 170:14

**uncorrectly** 240:9

**under** 9:8 22:13 24:13 49:14 58:5 66:15 136:6 156:20 157:4 196:23 203:9 227:1 252:2 253:11

**underlying** 26:2

**undermines** 242:23

**understand** 10:19 15:6 35:8,14 37:14 42:8 50:19 52:12 53:13 57:22 65:23 66:10 68:5,8 68:13,25 80:17 81:8 82:4 85:2 86:19 92:14 94:24 95:3 96:18 97:1 98:17,24 101:23 103:20 108:19 125:7 130:4 136:19 141:5 173:3,14 173:16,24,24 181:1 195:18 200:9 219:24 223:12 224:12 224:16 225:13 227:13 228:22 233:2,6,10,17 235:7,20 236:8 237:21

**understanding** 11:16,21 13:9 17:25 20:21 31:1 34:12 37:1,12 40:23 42:17 43:4,25 53:10 54:1,6 55:19 56:1 61:4 68:21

69:3,16,17 72:13 78:12 80:1 81:15 82:9 84:12 85:8,12 94:14 98:20 99:1 102:24 103:1 115:6 122:12 124:21 131:7 169:1 172:17 173:25 183:19 223:20,23 225:12 226:14 226:19,23 232:21,24 235:12

**understood** 108:4 183:5 240:12

**unfortunately** 97:20

**unharmed** 226:4 233:4,12 238:5 239:2 240:3,9 242:10 242:12 247:7 249:4 250:6,10

**uniform** 192:22 229:15

**uniformity** 167:22

**uninjured** 237:18,22 238:6,9 240:15 242:8 246:21

Page 68

**[unique - vertically]**

| | | | |
|---|---|---|---|
| **unique** 188:2 225:5,11 226:5 228:3,8 | 102:3 115:9,11 116:15 118:14 121:1,2,20 | 186:15 | **variation** 129:22 165:8 166:24 167:2 |
| **unit** 7:14 132:22 133:6 136:9,12,14,17 | 122:10 123:3 151:7,11,14,15 152:23 156:10 | **uses** 97:10 137:23 221:8 **using** 17:4 25:25 39:23 | 241:18 **variations** 154:20 |
| **united** 1:1 2:1 7:18 78:3 246:19 | 168:12,18,19 168:25 171:1 172:22 186:16 | 66:2 68:3 71:6 82:4 102:23 109:16 111:16 | **varied** 230:2,3 230:4,12,12,13 **varies** 161:16 |
| **units** 103:5,6 133:22,25 | 197:2,15,15 207:19 208:10 212:5 240:23 | 111:24 112:22 178:10 179:18 192:7,9 194:18 | **variety** 74:3 76:1,6 102:13 102:18 103:10 |
| **universe** 178:14 196:17 **unlawful** 90:13 | **used** 25:12 35:19 36:24 38:24 48:1 | 207:5 208:11 209:21 213:12 213:13,15 | 106:2 181:20 181:22 182:7 209:20 |
| 91:23,24,25 92:13,19,20,25 **unreasonable** | 51:10 55:24 71:2 82:1 85:3 100:22 118:1 | 228:11 231:5 231:16 240:6 240:22 | **various** 27:16 27:21 33:16 39:19 141:15 |
| 164:4 **unreliable** 207:24 | 133:4 136:7 139:1 151:6 155:10 156:16 | **v** | 178:15,16 211:17 230:3 |
| **unsuccessfully** 97:25 | 156:21 157:7 169:3,4 170:9 | **v** 244:16 245:3 254:4 256:1 | **vary** 136:24 154:18,18 |
| **unuseful** 160:1 **unusually** 241:23 | 207:25 214:19 214:20 218:4 226:20 228:8 | **vague** 193:13 **valid** 17:22 **valorem** 110:2 | 161:11 163:6 165:16 **venue** 114:25 |
| **updated** 194:14 **upper** 169:15 174:22 176:8 | 238:12 **useful** 149:15 167:24 | **valuable** 146:23 151:22 **value** 43:23 | **veritext** 7:25 251:17 254:7,9 254:11,20 |
| 189:21 **use** 35:9 47:4 47:17 50:12 | **user** 136:25 137:1 165:25 221:7 | 129:13 193:9 **variable** 133:3 133:13 138:19 | **versa** 240:10 **version** 123:14 **versus** 73:12 |
| 55:20 57:1,19 71:17 73:19 86:14 97:9 101:3,4,4 | **users** 81:4,11 84:9 136:14,17 137:4,15 | 159:4 168:5 **variables** 31:4 31:15 157:21 164:21,22 165:5 216:3,4 | 232:20 **vertically** 123:19 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[vice - work]**

| | | | |
|---|---|---|---|
| **vice** 20:6 240:10 | **w** | 88:14 115:15 119:22 121:8 | **whereof** 253:20 |
| **video** 1:14 7:11 7:15 | **wait** 58:7 | 122:9,9 143:11 149:3,13 | **whispering** 7:9 |
| **videographer** 4:19 7:6 8:1,21 44:14,17 77:14 77:17 114:12 114:15 150:18 150:22 176:25 177:6 216:14 216:17 241:5,8 241:11 247:25 248:3 251:13 | **waive** 28:21 **waived** 28:11 254:24,24 **waiving** 254:21 **wall** 47:5 **want** 18:4 28:23,25 36:8 44:10 52:10 76:20 79:6,6 101:2 176:21 178:22 183:9 184:6 186:16 220:2,5 | 160:11 166:21 168:12,18 180:7,11 181:11 192:13 198:20 201:11 201:20,21 204:9 226:11 228:12 229:25 242:23 **ways** 128:24 **we've** 61:1 164:19 167:3 167:20 177:10 | **wholesale** 115:13,20 116:7 123:13 **wholesaler** 113:16,16 **widely** 151:6 155:10 156:16 157:7 **wife** 25:13 **windows** 87:3 **wise** 204:19 **wish** 201:17 **withdrawing** 199:21 |
| **view** 12:10 54:23 57:11 78:16,17 91:10 143:1 147:3 174:8,14 181:14 185:12 193:19 196:6 197:16 227:3 227:11 236:18 | **wanted** 11:24 47:7 76:22 78:11 79:4 144:18 179:7 191:24 203:14 238:15 241:16 242:20 | **web** 4:15 **weber** 62:24 **wednesday** 1:16 2:17 7:2 **weighted** 207:15,19,25 208:12 | **witness** 8:23 253:20 254:13 254:16 255:2,5 **wolf** 3:4 **word** 87:2 101:3,4 122:10 240:23 |
| **viewed** 219:18 245:18 **violation** 84:17 **virtual** 179:1,7 179:9 231:3 **virtually** 43:19 **visual** 27:10 **voiding** 98:12 **voids** 98:21 **vouch** 34:16 **vouching** 34:9 50:1 | **wants** 219:9 **warranties** 98:13,21 **warranty** 84:18 **washington** 1:23 4:8 **wavelength** 137:14 **way** 10:24 11:12 19:5 27:21 31:19 50:1 64:2,2,2 64:12,12,16 | **weights** 208:17 **welfare** 177:25 183:9 184:2,11 185:1,17 **went** 11:11,12 32:6 63:16,25 72:5 147:10 220:10 **whafh.com** 3:10 | **words** 193:13 231:15 **work** 13:18 17:5 19:1,12 20:3,15,23,25 21:3,6,8 22:12 23:13 24:2,4 24:11 25:5 26:7,16,18,21 30:13 31:13,18 33:25 34:18,18 34:21 35:20 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[work - zoom]**

38:23 53:10 60:2,7,15 61:3 64:13 65:11,18 147:1 151:19 169:20 182:23 183:2 187:3 195:18,19 225:17,25 226:16 227:2 230:5,6 231:10 239:7

**workable** 190:9

**worked** 11:3 21:17 59:19 64:1 123:15 228:19

**workforce** 189:10

**working** 18:22 63:17 153:20 176:6 177:20 177:24 186:24 194:25 222:13 222:14

**works** 87:25 90:15 140:11 230:8

**world** 14:12 16:3,9 49:9 74:24,24 93:14 93:17,21 94:2 94:5 95:5,12 95:16 104:8,14 104:19 106:19 106:22 108:1,2

108:20,23 113:2 115:19 116:8,20 117:25 119:13 138:10,14,20 138:20,24 139:9,13,13,19 139:19,22 140:1,8,17,23 141:6,24 142:4 142:19 143:20 144:4,9,16 145:13,19 146:20 147:5,8 147:14,16 148:10,16,20 149:4,5 198:21 201:21,22 202:9 203:24 229:11,15 240:6

**world's** 62:2

**worry** 122:7 186:2,2

**write** 11:11 221:23 223:12 243:7

**writing** 191:25

**writings** 55:25

**written** 27:6,11 35:13 61:5 152:24 177:19

**wrong** 5:22 120:3 195:9

**wrote** 120:6 177:23

**x**

**x** 5:1,9 6:1 253:16 255:9

**y**

**yeah** 19:16 29:5,14 39:15 44:7 54:5 56:20 76:25 77:7,9,13 82:19 101:24 108:18 126:1 128:13 130:18 135:1 138:8 145:25 150:15 159:21 210:21 214:15 216:12 233:15 234:25

**year** 24:21 176:15 251:5,7

**years** 38:9 61:1 63:5 72:16 88:21 99:5 151:19 169:21 176:15 177:24 194:3 196:21 214:6 218:12 243:3

**ygr** 1:6 2:6

**yield** 207:24

**york** 3:8,8

**yup** 161:3,3

**z**

**zero** 52:6 78:21 185:22 186:1,6 186:7 218:25 231:3 237:17 238:19 239:8 241:20

**zoom** 27:9,14 223:2

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.