# EXHIBIT 89

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE APPLE IPHONE

ANTITUST LITIGATION,          Case No. 4:11-cv-06714

YGR

_____

VIDEO DEPOSITION OF DANIEL L. McFADDEN, Ph.D.

San Francisco, California

Wednesday, May 14, 2025

STENOGRAPHICALLY REPORTED BY:

REBECCA L. ROMANO, RPR, CSR, CCR

California CSR No. 12546

Nevada CCR No. 827

Oregon CSR No. 20-0466

Washington CCR No. 3491

JOB NO. 7370734

PAGES 1 - 256

Page 1

consumers, innovations which lead to new -- new or higher-quality products or increased variety in the availability of products is something that increases consumer satisfaction.

So that -- they -- they would -- they would -- they have been harmed by not having access to those better products and more products.

Q. (By Mr. Swanson) So are you assuming that there are no benefits to Apple's conduct to consumers?

A. I think the issue is what -- what is -- what is the comparison of what Apple provides and what would be provided in a competitive market. I mean, if -- if the answer is that comparable products with comparable services are available in competitive markets, then the issue is simply what the price is for those.

Q. Well, your model shows that some prices are higher in the but-for world, right?

A. For some apps or in-app content, yes, they can be in the model.

Q. And is it possible in the but-for world that some consumers receive the benefit of -- in a nonmonetary sense from Apple's conduct?

MR. RIFKIN: Objection to form.

Page 106

THE DEPONENT: I think there's -- I cannot answer that question because I have not tried to quantify our -- consumer satisfaction and analyze it.

Q. (By Mr. Swanson) Okay. And you haven't tried to assess the potential nonmonetary benefits accruing in the form of increased consumer privacy protection and security as a result of Apple's conduct?

MR. RIFKIN: Objection to form.

THE DEPONENT: Please repeat the question.

Q. (By Mr. Swanson) You have not attempted to quantify any nonmonetary benefits flowing in to consumers from enhanced security or privacy on account of Apple's challenged conduct?

MR. RIFKIN: Same objection.

THE DEPONENT: The answer is I have not attempted to quantify that, nor if a competitive market provided comparable products, including comparable features like security and privacy, would -- would it be an issue.

Q. (By Mr. Swanson) Well, a comparable market would provide comparable prices, and yet you still find that there are prices in the but-for

Page 107

world that would be higher than they were in the real world, right?

MR. RIFKIN: Objection to form.

THE DEPONENT: I understood -- I may have misunderstood your question. I thought you were asking about privacy and security, and -- and my answer was that if you have a competitive market in which consumers can obtain products, the same apps at -- at lower prices with the same security and privacy provisions, then -- then there is no difference in -- in those dimensions --

Q. (By Mr. Swanson) That's what I'm trying to --

(Simultaneously speaking.)

THE DEPONENT: -- with that respect.

Q. (By Mr. Swanson) Sorry. Are you finished?

Yeah, that's what I'm trying to understand, because your model says there is a competitive market in the but-for world, and yet some consumers pay higher prices.

And my question is: Is it also possible in a competitive but-for world that some consumers will receive fewer privacy and security benefits?

MR. RIFKIN: Objection to form.

Page 108

THE DEPONENT: I think the answer to that is that -- that -- that's a legitimate question about the nature of the -- of the competition, and I would turn to Abrantes-Metz and ask in -- in comparable markets, what -- what, in fact, is the nature of these additional dimensions of product quality and are they, in fact, comparable markets in that respect. That -- that, I think -- is again the issue at hand.

Q. (By Mr. Swanson) Could you turn to paragraph 20 of your report, please.

Focusing for the moment on the beginning of that paragraph where you state that "The App Store commission functions like a sale tax whose impact could be apportioned between consumers and developers using a tax incidence framework."

Do you see that?

A. Yes.

Q. A tax incidence framework, generally speaking, seeks to estimate how a tax on a product affects the prices that consumers ultimately pay for that product; is that fair?

A. Yes, both -- both sellers and buyers.

Q. Could you move forward to paragraph 22. You state there that "Apple's App Store commission

Page 109

28 (Pages 106 - 109)

has the same economic effects as a sales or ad valorem tax, a tax assessed as a fixed percentage of a sales price."

Do you see that? At the end of the paragraph?

A. Well, let -- let me just read -- read the paragraph.

Yes. What's the question?

Q. Okay. You're not claiming the commission is an actual tax, correct?

A. No. The claim is -- in terms of -- in terms of economics, transactions between principals, the effect of an intermediary has a similar -- similar instance on -- on the -- on the principals whether it's a -- an Apple or Amazon or the U.S. government or -- or a state sales revenue tax.

Q. The relevant aspect of the commission is that it is charged as a fixed percentage of the sales price, right?

A. Yes. Well, that's -- whether the tax is charged as a fixed percentage, whether it's charged as an excess tax, or whether it's -- it's paid by a bill to the buyer or bill to the seller, it is economically secondary because with the adjustments

12:25:16
12:25:31
12:25:57
12:26:27
12:26:50
12:27:16

Page 110

of supply and demand, there's -- there's some final incidence in which the buyers pay some portion and the sellers pay some portion.

Q. The tax incidence framework would apply to any fee that is charged as a fixed percentage of the sale price of an app or of in-app content; is that right?

A. I'm not sure where this question is going, but -- but -- but the answer is that there's -- there's a question of -- of how buyers of multiple products or sellers of multiple products might respond to -- to a tax, but the -- the -- the -- overall, the answer is yes.

Q. So, for example, a percentage royalty charged to a developer on the price of an app or an in-app purchase would be analyzed using the tax incidence framework, correct?

MR. RIFKIN: Objection to form.

THE DEPONENT: Please repeat the question.

Q. (By Mr. Swanson) A percentage royalty, for example, charged to a developer on the price of an app or an in-app purchase would be analyzed using the tax incidence framework, correct?

A. Could you give me an -- an example?

12:27:21
12:27:33
12:28:01
12:28:23
12:28:36
12:28:49

Page 111

Q. Developer has to pay someone 10 percent of the purchase price of the app as a royalty.

A. So, for example, a -- a music provider to charge a -- a royalty fee which is a percentage of the -- of the price of -- of a Spotify subscription? Is that --

Q. For example. Or a provider of intellectual property might charge 5 percent of the price of an app.

You're aware that's a common phenomenon, aren't you?

A. Actually, I don't know -- I don't know that much about how -- how things like music are -- entertainment royalties are charged or exactly what the basis of the -- of the -- how the royalty fee is established.

Q. Okay. Well, then, we don't need to have specifics.

But my question to you is general. If a royalty is charged to a developer as a percentage of the price of the app or the in-app purchase, that particular royalty could be analyzed using the tax incidence framework; is that not correct?

A. I think yes, in principle. Yes, there would be some incidence of the royalty on -- on

12:28:53
12:29:09
12:29:25
12:29:43
12:29:55
12:30:16

Page 112

the -- on the consumer and some on the supplier.

Q. Do you agree that in the but-for world, Apple would charge a commission for its services?

MR. RIFKIN: Objection to form.

THE DEPONENT: I -- I'm -- I'm aware that in general that intermediaries have costs, and they would -- at -- at -- certainly cover their costs on -- on a return on their investments, yes.

Q. (By Mr. Swanson) And what services do Apple's get -- I'm sorry. Strike that.

What services do developers get from Apple in exchange for paying the commission, in your opinion as an economist?

A. Well, I -- I would say that they get the -- the services comparable to what any whole -- wholesaler or -- wholesaler or manufacturer gets from being able to distribute through a retailer to the customers.

Q. So distribution services?

A. Distribution services, information services.

Q. Payment processing?

A. Perhaps -- perhaps -- perhaps other features. You mentioned privacy and security. That would be services, yes.

12:30:18
12:30:38
12:30:59
12:31:15
12:31:33
12:31:43

Page 113

29 (Pages 110 - 113)

Q. How about access to Apple's intellectual   12:31:45
property?

A. I'm not so sure about that. I haven't thought about it. But I'm not sure exactly what -- what Apple's intellectual property claims would be   12:32:05 here in -- in a competitive environment, for example.

MR. SWANSON: Should we talk about lunch?

MR. RIFKIN: Sure. Why don't we go off the record.   12:32:29

MR. SWANSON: Let's go off the record.

THE VIDEOGRAPHER: Off the record. This marks the end of Media No. 3. The time is 12:32.

(Recess taken.)

THE VIDEOGRAPHER: This marks the   12:32:49 beginning of Media No. 4 in the deposition of Professor Daniel McFadden. We are back on the record. The time is 1:46.

Q. (By Mr. Swanson) Professor, is it your opinion that Apple is a retailer that sells iOS   01:46:55 apps in an app content?

A. I think that -- that would be appropriate in a description. I think of it more as a consignment store, which -- which essentially implies a project -- a venue where sellers can come   01:47:19

together and process things through to buyers.   01:47:23

Q. Is it your opinion that app developers are suppliers that manufacture apps in an app content and supply them through Apple?

MR. RIFKIN: Objection to form.   01:47:40

THE DEPONENT: My understanding -- of developers is that -- is that they are producing digital products and -- and digital content. Then they sell those through Apple for use on iOS devices and perhaps two other channels for -- often   01:47:59 for use on other types of devices.

Q. (By Mr. Swanson) Is it your opinion that Apple pays developers a wholesale price for their apps and in-app items?

A. I think that can be one way to label   01:48:17 the -- the payments to developers. The arrangement is that developers are charged on a commission on the price they set for their products.

Q. Is it your opinion in the but-for world, Apple would pay developers a higher wholesale   01:48:37 price?

MR. RIFKIN: Objection to form.

THE DEPONENT: I think the results for any particular developer would depend on their particular product and the -- and the prices that   01:48:56

they -- they would set forth in their marginal   01:49:00 costs, but -- but with -- with a -- a lower commission rate in many cases the result would be a -- a lower -- a lower price to -- to the buyer and a higher price to the -- the developer.   01:49:23

Q. (By Mr. Swanson) Is it your opinion that the wholesale price that Apple pays to developers in the but-for world would be higher if there were no iAP requirement?

A. What -- what do you mean by an iAP   01:49:48 requirement?

Q. Well, the -- the one that you summarized from Professor Stiglitz' report that you said was consistent with your own opinions that Apple requires developers to use its payment solution,   01:50:02 iAP?

A. Okay. Thank you for that clarification, but could you the start the question over again, then, please?

Q. Okay. So in the but-for world, would   01:50:17 developers be paying Apple for payment solution services?

MR. RIFKIN: Objection to form.

THE DEPONENT: I think that -- in -- in a competitive market for app devices, there -- there   01:50:39

would be potentially rivals to an Apple App Store   01:50:44 and there would be some competitive commission rate established in that market, and that would -- that would include -- that was -- there would be a positive commission. I think that's what   01:51:03 Dr. Abrantes-Metz had given as evidence, that in the competitive -- in the comparable competitives that she's analyzed that that would be the case.

Q. (By Mr. Swanson) Professor Stiglitz opines, and you say it's consistent with your   01:51:29 opinion, that Apple's iAP requirement has foreclosed alternative to Apple's iAP system that likely would have existed but for Apple's conduct.

Do you recall that?

A. I -- I recall statements like that. I --   01:51:50 I don't recall specifically the restriction to iAP.

Q. Take a look at paragraph 15 of your report.

Go ahead and look at that. We don't need to read it out loud.   01:52:13

A. Yes. Oh, yes.

Q. You are refreshed?

A. My memory is refreshed, yes.

Q. So that implies, does it not, that in the but-for world, some developers would likely have   01:52:39

used alternative iOS in-app payment processing solutions? 01:52:41

A. I'm not sure that -- about the adjective "likely," but they would have that option, yes.

Q. Well, you say "Apple's iAP requirement has foreclosed alternatives to Apple's iAP system would likely would have existed but for Apple's conduct." 01:52:58

Do you not think that's likely anymore?

MR. RIFKIN: Objection to form. 01:53:17

THE DEPONENT: Oh, no, I think that -- there's two statements, and I would make the distinction. Are there some -- some developers who would like to use alternative payment systems? I think demonstrably, yes. Some have tried to answer to that. 01:53:31

Do I think that all developers or many developers would choose alternative systems? And the answer is I don't know. I haven't studied the issue. 01:53:48

Q. (By Mr. Swanson) Does your methodology take account of the likelihood that some developers would not be purchasing payment solutions from Apple?

A. My interpretation of -- of the 01:54:06

Page 118

Abrantes-Metz but-for commission rate is that it's -- is a commission rate which would prevail either if there were an active rival in the market or if Apple effectively adopted that rate so that rivals would be deferred from entering the market; that is to say they would engage in limit pricing. 01:54:10 01:54:28

I -- I have no opinion on what would actually occur, but that's my interpretation of the meaning of the but-for commission rate.

Q. Well, you do say in paragraph 15 that "alternatives likely would have existed," so that suggests that someone would not be foreclosed in the but-for world, does it not? 01:54:47

A. I think -- this is nitpicking, but I think the potential -- the potential rivals and actual rivals is -- really -- really a question to be determined as to whether injury would actually occur, and that would -- that would depend on Apple's but-for conduct and exactly what form it would take. It could -- it could, I think, legitimately discourage entry of rivals by pricing it in such a way that it's not profitable for them to come in. 01:55:18 01:55:36

(Exhibit DX63 was marked for identification by the Court Reporter and is 01:55:46

Page 119

attached hereto.) 01:55:46

MR. SWANSON: I'd like to mark as DX63 the document entitled "Choice: What can go wrong."

THE DEPONENT: I have it.

Q. (By Mr. Swanson) You have it now. 01:56:28

Is this a paper that you wrote, Professor McFadden?

A. It is.

Q. Can you turn to page 14, please. And I'd like to ask you about, I guess, what is the second paragraph where you say, "A common form of economic organization of a market for branded products are consignment stores that facilitate search among products by posting prices set by suppliers and/or processing transactions and charge suppliers commissions for their services." 01:56:47 01:57:02

Do you see that?

A. Yes.

Q. And you mentioned earlier that you think of the App Store more of a consignment store now; is that -- 01:57:13

MR. RIFKIN: Objection.

I'm sorry. Objection to form.

I didn't mean to interrupt.

THE DEPONENT: Well, the term 01:57:22

Page 120

"consignment store," I use -- I don't think this is idiosyncratic to me, but I use "consignment store" as -- as my description of -- a source of anywhere from department stores and supermarkets to auction houses and -- and Amazon as stores that provide a -- a forum in which suppliers can bring their goods to sell and -- and put -- have them displayed in a way in which buyers can find that they can fulfill the transactions and accomplish what they need to accomplish. 01:57:23 01:57:40 01:58:03

Q. (By Mr. Swanson) So does this description of consignment store apply to the App Store?

A. I think it does.

Q. In the paper here, you give the example and you just gave the example in your testimony of the Amazon store. 01:58:22

Is the Amazon marketplace store a two-sided platform?

A. I earlier made the point that my use of the term "platform" is maybe different from the -- from the legal one. 01:58:43

But yes, consignment -- consignment store involves -- involves two-sided market, yes. I would call it a platform in economic terminology. 01:59:03

Page 121

31 (Pages 118 - 121)

A. Yes.                                06:32:24

Q. Is that 5.8 percent number that appears in paragraph 241 of Exhibit DX37 -- is that the -- the number that you were recalling from before?

A. Yes, that is the number I was recalling.    06:32:39

Q. And is that the percentage of unharmed Apple IDs that you calculated when you prepared your reports based on the -- the data through 2019?

A. It's -- it's, in fact, a percentage of -- of Apple IDs that were unharmed and which did not,   06:33:02 in fact, make any purchases which would offset that.

And -- and it's not -- it's not a percent of -- of apps or app items that would by -- by tomorrow's calculation have caused a price decrease   06:33:30 rather than a price increase.

Q. Okay. Thank you.

And then switching now to a different area.

Do you -- do you recall some testimony   06:33:45 about margin bounds being applied at a particular level of transaction?

Do you recall that earlier in the deposition today?

A. If you could remind me a little more. I   06:34:07

Page 250

don't --                               06:34:09

Q. Let me ask you this: In the demand estimations that you included in your supplemental reports, did you apply margin bounds at the app year level?                            06:34:20

A. Yes, those bounds all apply at the app year level.

MR. RIFKIN: Thank you. I don't have any further questions.

MR. SWANSON: We're done.           06:34:29

MR. RIFKIN: Thank you.

MR. SWANSON: Thank you.

THE VIDEOGRAPHER: We are off the record at 6:34 p.m., and this concludes today's testimony given by Professor Daniel McFadden. The total   06:34:38 number of media was seven and will be retained by Veritext Legal Solutions.

(TIME NOTED: 6:34 P.M.)

                              06:38:28

        ---o0o---

                              06:38:28

Page 251

I, DANIEL L. McFADDEN, Ph.D., do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear notes; that my testimony as contained herein, as corrected, is true and correct.

Executed this ____ day of _____, 2025, at _____,_____.


        _____
        DANIEL L. McFadden, Ph.D.

Page 252

I, Rebecca L. Romano, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any deponents in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made stenographically by me and which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: May 16th, 2025


        Rebecca L. Romano, RPR,
        CSR. No 12546

Page 253

64 (Pages 250 - 253)