# EXHIBIT 90

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE APPLE IPHONE

ANTITUST LITIGATION,          Case No. 4:11-cv-06714

YGR

_____

VIDEO DEPOSITION OF DANIEL L. McFADDEN, Ph.D.

San Francisco, California

Wednesday, May 14, 2025

STENOGRAPHICALLY REPORTED BY:

REBECCA L. ROMANO, RPR, CSR, CCR

California CSR No. 12546

Nevada CCR No. 827

Oregon CSR No. 20-0466

Washington CCR No. 3491

JOB NO. 7370734

PAGES 1 - 256

Page 1

You state there, unless otherwise noted, 09:10:55
you reaffirm your opinions from your 2023
supplemental report and your other reports during
the class certification stage.

Do you see that? 09:11:04

A.   Yes.

Q.   When you're referring to your other
reports during the class certification stage, is
that all -- all of them?

A.   I would say yes.  I view -- in order 09:11:18
for -- to answer that in -- in -- with precision, I
would need to know the specific opinion and whether
there was clarifications and along the line.  But
the answer is generically yes.

Q.   Okay.  Are there any specific past 09:11:37
opinions that you can recall that you're not
reaffirming?

A.   No, I don't recall -- I don't -- I don't
have any opinions now which were different from
what I had then. 09:11:59

Q.   Are you reaffirming your opinion on
relevant market definition as set forth in your
opening report?

MR. RIFKIN:  Objection to form.

THE DEPONENT:  I would say that -- one 09:12:15

Page 12

question is -- is whether I am now offering                    09:12:18

opinions on some of the issues that I addressed

before, and that was one area where -- where I am

not offering an opinion in this report.

Q.   (By Mr. Swanson)  When you say it's an            09:12:36

area when you are not offering an opinion, are you

indicating that you don't expect to be offering the

opinion you previously rendered?

A.   My understanding is that that subject is

now the responsibility of Professor Stiglitz, and I   09:12:52

defer to him on those issues.

Q.   All right.  We'll come back to that.

Is it still your opinion that absent the

alleged misconduct, all or nearly all consumers of

iOS apps or in-app content would have paid lower      09:13:12

prices for their purchases?

A.   As you stated.  I -- I believe that was a

general opinion in my previous work and I -- I

stand by those opinions.

Q.   Could you turn to paragraph 20 of your           09:13:43

report, please.

At the very bottom, I think it's the --

the last sentence that carries over from page 6 to

page 7, you say there that you also testified why

the tax incidence framework shows that              09:14:01

Page 13

super-competitive commissions charged by Apple          09:14:05

impacts all members of the class.

        Do you see that?

    A.    Yes, I see that.

    Q.    By "all," do you mean 100 percent?          09:14:19

    A.    Yes, I -- I believe 100 percent of the

people are impacted that are not necessarily

encountered overcharge arm, but they -- they are

impacted.

    Q.    How is a consumer impacted by Apple's          09:14:54

super-competitive commission if she would have paid

more in the but-for world, according to your model?

    A.    Well, as I opined in my original report

in 2021, and I think Professor Stiglitz has also

opined, there can be harm to the consumers separate          09:15:16

from the issue of whether they incurred monetary

damages from an overcharge, so...

    Q.    Well, monetary damage is all about the

impact of the super-competitive commission, right?

        MR. RIFKIN:  Objection to form.          09:15:35

        THE DEPONENT:  Please repeat the

question.

    Q.    (By Mr. Swanson)  Monetary damage is all

about the impact of the alleged super-competitive

commission, right?          09:15:50

                                                    Page 14

MR. RIFKIN:  Objection to form.                    09:15:51

THE DEPONENT:  Well, this -- this -- this sentence I don't think is restricted to monetary damage.  Impact could be both monetary damages and nonmonetary arm.                    09:16:07

Q.   (By Mr. Swanson)  I understand you have an opinion or Professor Stiglitz has an opinion that there may be other nonmonetary injuries, but this sentence is about the super-competitive commission, and that's a monetary issue, is it not?                    09:16:21

A.   Not necessarily, no.  The super-competitive commission have impacts beyond the -- the direct monetary effect on the -- on the -- on the charge paid on current purchases.

Q.   And what would those nonmonetary effects                    09:16:40
be of the commission -- be from the commission allegedly being excessive?

A.   Well, as I -- as I cited in my original report, there could be a suppressing effect on -- on entry into the developer marker so that fewer                    09:17:00
apps were available.  The -- the -- they could have a negative impact on innovation by developers.

These things are also enumerated by Dr. Stiglitz, and this is an area that I -- that I defer to him on in terms of the current litigation.                    09:17:19

Page 15

(Discussion off the stenographic record.)    09:17:33

Q.    (By Mr. Swanson)   If a consumer would have paid more in the but-for world, according to your model, is that consumer benefited monetarily by the conduct in the super-competitive commission?    09:17:49

A.    Please start over.  I didn't get the whole sentence.

Q.    If a consumer would have paid more in the but-for world, according to your model, is that consumer monetarily benefited by the    09:18:05 super-competitive commission?

MR. RIFKIN:  Object to form.

THE DEPONENT:  In terms of the overcharge, the answer is that -- that person is now -- has a negative overcharge.  That's correct.    09:18:20

Q.    (By Mr. Swanson)  And a negative overcharge is good to consumers, is it not?

MR. RIFKIN:  Object to form.

THE DEPONENT:  This gets to the question of what's good for consumers.  If you say have --    09:18:36 have they benefited monetarily in terms of the overcharge, the answer is yes.

Have they benefited overall?  That's a broader question, and I'm not offering an opinion on that.  And as I say, Professor Stiglitz has    09:18:51

Page 16

understanding as to whether Professor Stiglitz    10:33:09

concludes that the relevant market is single-sided

or two-sided?

A.   Please repeat the question.

Q.   Yeah.    10:33:26

Do you have an understanding as to

whether Professor Stiglitz concludes that the

relevant market is single-sided or two-sided?

MR. RIFKIN:  Objection to form.

THE DEPONENT:  My -- my reading of his    10:33:40

report is that he concludes that it is two-sided,

as do I, but that it does not exhibit strong

platform externalities, which raise additional

issues in the operation of two-sided markets.

But I'm not offering an opinion on these    10:34:02

issues, so I haven't studied it in further detail.

Q.   (By Mr. Swanson)  But it is your

statement that the relevant market is two-sided at

this point?

MR. RIFKIN:  Objection to form.    10:34:20

THE DEPONENT:  I'm not sure what the

legal -- exact legal definition of "two-sided" is,

but my view is that we have accounted for the fact

that this is a market in which there are developers

who have interests and are -- can be harmed by    10:34:35

Page 54

anticompetitive conduct and consumers that have   10:34:39

interests and also can be harmed by competitive --

anticompetitive conduct and the -- the tax

incidence framework for the damage analysis is a

position of allocation of the impact of the alleged   10:34:55

anticompetitive acts on both the consumers and

developers.

Of course, the plaintiffs in this case

are consumers, and I concentrate on the incidence

of the -- of the commission of alleged   10:35:10

super-competitive commission rates on them.

Q.   (By Mr. Swanson)  Do you agree that the

App Store is a two-sided transaction platform?

MR. RIFKIN:  Objection to form.

THE DEPONENT:  I -- I -- I'm not going to   10:35:27

agree to that because I think the -- the definition

of "platform" has a specific legal meaning in terms

of -- of -- of case law and so forth and -- and may

not coincide with my understanding of the economic

use of the term "platform."   10:35:44

So I don't know how to answer that

question.

Q.   (By Mr. Swanson)  Well, you can answer

the question as you used the term "platform" in

your writings, and we'll come to that later.   10:35:53

Page 55

But in your economic understanding of the          10:35:57
term "platform" and "two-sided platform," is the --
I'm sorry.

Let's start with -- is the App Store a
two-sided platform?                                10:36:08

MR. RIFKIN:  Objection to form.

I think this exceeds the scope of
Professor McFadden's opinion.

MR. SWANSON:  We're not doing those
objections today, Mark.                            10:36:17

MR. RIFKIN:  Well, I'm just --

MR. SWANSON:  That's a relevance
objection.

MR. RIFKIN:  Well, I think it's an
objection to form because it's an improper         10:36:22
question.

MR. SWANSON:  You made your objection.

MR. RIFKIN:  Be that as it may, I've made
my objection.

MR. SWANSON:  Yeah.                                10:36:30

THE DEPONENT:  I think every market in
which there are multiple sellers and multiple
buyers that -- with transactions that go through
some intermediary have -- have a two-sided aspect
to them.                                           10:36:44

Page 56

"Consumer plaintiffs allege that Apple      11:02:54

has monopolized or attempted to monopolize the

market for the sale of iOS apps and in-app

content."

          Do you see that?      11:03:03

     A.   Yes.

     Q.   Have you drawn any distinction in your

modeling between those two legal theories in

estimating harm?

          MR. RIFKIN:  Objection to form.      11:03:15

          THE DEPONENT:  The two terms being

"monopolized" versus "attempted to monopolize"?

     Q.   (By Mr. Swanson)  Yes.

     A.   No.  I -- I don't even know what the

distinction is legally.      11:03:31

     Q.   Are you offering an opinion that Apple

charges a super-competitive App Store commission?

     A.   I would say that I -- I am not.  I think

that my -- my use of -- of Abrantes-Metz' but-for

commission rate implicitly assumes that the Apple      11:04:05

commission is super-competitive, so I'm -- I'm

taking her -- her estimation as the basis for the

damage calculations.

     Q.   Turn, please, to paragraph 17 of your

report, which is on the next page, page 5, and I'm      11:04:40

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

focusing on that last sentence in paragraph 17.    11:04:53

Are you offering any opinion that Apple's conduct has suppressed output in the variety and quality of available iOS apps and in-app content?

A.    Well, I have repeatedly in my original    11:05:10 report and -- and subsequent reports pointed out that monetary harm from overcharges is one measurable harm to -- to consumers but that the alleged anticompetitive conduct could suppress entry by developers, suppress developer innovation    11:05:42 by reducing the return on investment and innovation.

Q.    Have you conducted any independent study of the effect of Apple's conduct on output?

A.    What output?    11:06:05

Q.    Well, the output that is referred to in the last sentence of paragraph 17.

A.    Well, the answer is -- is in -- in studying the effect of price on demand for apps and in-app content, yes, the damage model is doing a    11:06:28 quantitative calculation of the impact of -- of prices on these quantities.

Q.    Well, the output is the same in the -- your but-for world as in the actual world, is it not?    11:06:49

Page 74

A.   No, it's not.  But the damage --                11:06:49
overcharge damage calculation is based on the
difference in price as-is and but-for at -- at the
quantities sold.

Q.   But are the but-for quantities higher           11:07:04
than the as-is quantities or lower?

A.   Well, the downward-sloping demand curve,
the but-for quantities will be larger if the
but-for price is lower.

Q.   So do you calculate damages based on            11:07:29
those larger assumed but-for quantities?

A.   Well, I -- I have not done that.  And the
answer is could -- could one do that as a matter
of -- an economic calculation?  Yes, one -- one
could calculate the loss of consumer surplus.       11:07:52

But I have not done that, and I -- the
reason is that the -- the accepted legal standard
as I -- is -- seems to be that overcharges on
existing purchases are -- are -- is a -- is a harm
that is -- is -- is recognized as compensatable.    11:08:11

Q.   Have you conducted any quantitative study
of the effect of Apple's conduct on product
quality?

A.   I have not.

Q.   Have you conducted any quantitative study       11:08:28

Page 75

I, Rebecca L. Romano, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any deponents in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made stenographically by me and which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  May 16th, 2025

Rebecca L. Romano, RPR,

CSR. No 12546

Page 253