# EXHIBIT 91

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE APPLE IPHONE

ANTITUST LITIGATION,          Case No. 4:11-cv-06714

YGR

_____

ZOOM DEPOSITION OF DANIEL L. McFADDEN

(Reported Remotely via Video & Web Videoconference)

Berkeley, California (Deponent's location)

Friday, November 5, 2021

Volume I

STENOGRAPHICALLY REPORTED BY:

REBECCA L. ROMANO, RPR, CSR, CCR

California CSR No. 12546

Nevada CCR No. 827

Oregon CSR No. 20-0466

Washington CCR No. 3491

JOB NO. 4876250

PAGES 1 - 245

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IN RE APPLE IPHONE
ANTITUST LITIGATION,    Case No. 4:11-cv-06714 YGR

_____

DEPOSITION OF DANIEL L. McFADDEN, taken on behalf of the Defendant, with the deponent located in Berkeley, California, commencing at 9:02 a.m., Friday, November 5, 2021, remotely reported via Video & Web videoconference before REBECCA L. ROMANO, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter.

Page 2

APPEARANCES OF COUNSEL

(All parties appearing via Web videoconference)

For the Consumer Plaintiffs:

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

BY: THOMAS H. BURT

Attorney at Law

270 Madison Avenue

New York, New York 10016

(212) 545-4600

burt@whafh.com

For the Defendant:

GIBSON, DUNN & CRUTCHER LLP

BY: DANIEL G. SWANSON

Attorney at Law

333 South Grand Avenue

Los Angeles, California 90071-3197

(213) 229-7430

dswanson@gibsondunn.com

/////

Page 3

APPEARANCES OF COUNSEL(cont'd)

(All parties appearing via Web videoconference)

For the Defendant:

GIBSON, DUNN & CRUTCHER LLP

BY: HARRY R. S. PHILLIPS

Attorney at Law

1050 Connecticut Avenue, N.W.

Washington, DC 20036-5306

(202) 887-3706

hphillips2@gibsondunn.com

and

BY: CAELI A. HIGNEY

Attorney at Law

555 Mission Street

Suite 3000

San Francisco, California 94105-0921

(415) 393-8248

chigney@gibsondunn.com

/////

Page 4

APPEARANCES(cont'd)

(All parties appearing via Web videoconference)

ALSO PRESENT:

Nathaniel Hipsman, Cornerstone Research

Soseh Kevorkian, Videographer

Todd Kumler, Cornerstone Research

Thomas Munk, Concierge Technician

Scott B. Murray, Director, Commercial Litigation at Apple

Minjae Song, Brattle Group

Breno Vieira, Cornerstone Research

Dr. Kristof Zetenyi, Analysis Group

/////

Page 5

2 (Pages 2 - 5)

I N D E X

DEPONENT                    EXAMINATION

DANIEL L. MCFADDEN                    PAGE

VOLUME I

BY MR. SWANSON            11

E X H I B I T S

NUMBER                          PAGE

DESCRIPTION

Exhibit DX 0038 Reply Report of Daniel L.        12
    McFadden In Support of
    Plaintiffs' Motion For Class
    Certification dated October
    19, 2021;

Exhibit DX 0039 Expert Report of Daniel L.        12
    McFadden in Support of
    Plaintiffs' Motion for Class
    Certification dated June 1,
    2021;

Exhibit DX 0040 Errata to the Reply Report        15
    of Daniel L. McFadden dated
    October 19, 2021;

Page 6

E X H I B I T S(cont'd)

NUMBER                          PAGE

DESCRIPTION

Exhibit DX 0041 Declaration of Daniel L.        53
    McFadden in Support of
    Plaintiffs' Motion for Class
    Certification of UCL Claim;

Exhibit DX 0042 Handwritten Notes.        155

/////

Page 7

Berkeley, California; Friday, November 5, 2021

9:02 a.m.

---o0o---

THE VIDEOGRAPHER:  Good morning.  We are 09:02:52 going on the record at 9:02 a.m. on November 5th, 2021.

This is media unit 1 of the video-recorded deposition of Daniel McFadden taken by counsel for defendant in the matter of In Re: 09:03:13 Apple iPhone Antitrust Litigation filed in the United States District Court for the Northern District of California.  Case No. 411-CV-06714-YGR.

This deposition is being held by Veritext 09:03:36 virtual via Zoom Web conferencing.  My name is Soseh Kevorkian from the firm Veritext, and I'm the videographer, located in Topanga, California.  Our court reporter is Rebecca Romano, also from the firm Veritext.                    09:03:52

At this time, would counsel and all present please identify themselves for the record.

MR. SWANSON:  Sure.

Dan Swanson, Gibson Dunn, counsel for Apple Inc.                    09:04:05

Page 8

MS. HIGNEY:  Caeli Higney, Gibson Dunn, 09:04:10 counsel for Apple.

MR. PHILLIPS:  Harry Phillips, Gibson Dunn, counsel for Apple.

MR. MURRAY:  Scott Murray, Apple Inc. 09:04:23

MR. BURT:  Thomas Burt, Wolf Haldenstein, for the consumers.

THE VIDEOGRAPHER:  I think there's -- I don't think that's it.  Who else hasn't identified themselves?                    09:04:51

MR. VIEIRA:  Breno Vieira with Cornerstone Research for Apple.

MR. HIPSMAN:  Nathan Hipsman with Cornerstone Research for Apple.

MR. BURT:  And we have with us 09:05:04 Minjae Song from Brattle Group for consumers.

THE VIDEOGRAPHER:  Thank you so much.  I think that's it.

Rebecca, whenever you are ready.

THE COURT REPORTER:  Okay.  Sir, if you 09:05:16 could raise your right hand for me, please.

THE DEPONENT:  (Complies.)

THE COURT REPORTER:  You do solemnly state, under penalty of perjury, that the testimony you are about to give in this deposition shall be 09:05:17

Page 9

3 (Pages 6 - 9)

the truth, the whole truth and nothing but the truth? 09:05:17

THE DEPONENT: I do.

09:05:17

09:05:17

09:05:17

09:05:17

///// 09:05:32

Page 10

DANIEL L. McFADDEN 09:05:32 having been administered an oath, was examined and testified as follows:

MR. SWANSON: All right. Ready to go?

09:05:38

EXAMINATION

BY MR. SWANSON:

Q. All right. Good morning, Professor. We've met before, but for the record, my name is Dan Swanson, and I'll be taking your deposition today. 09:05:46

Could you please state your full name for the record.

A. Daniel McFadden.

Q. And is there any reason that we can't go forward today and -- and get your best testimony as best you can give it? 09:05:55

A. No.

Q. Okay. Thank you.

MR. SWANSON: I'd like to start -- maybe get some housekeeping out of the way and put up and mark as exhibits your reply report and your opening report. 09:06:17

My understanding is that the reply report would be DX38 and the opening report would be DX39, 09:06:32

Page 11

so if get those onto the Exhibit Share. 09:06:42

(Exhibit DX 0038 was marked for identification by the court reporter and is attached hereto.)

(Exhibit DX 0039 was marked for identification by the court reporter and is attached hereto.) 09:06:46

Q. (By Mr. Swanson) And, Professor, I'd appreciate it if you could take a look at those when they pop up to confirm they are what they appear to be, but I imagine you may have a paper copy that you should feel perfectly comfortable working with or an online copy. Whatever -- whatever suits you is fine. 09:06:49

MR. BURT: As long as we're housekeeping, didn't you mark his opening report last time? 09:07:02

MR. SWANSON: I did, and I thought about whether we use that number, but since we're not killing trees, I thought, you know, we could just give it a consecutive number. 09:07:16

MR. BURT: No objection.

MR. SWANSON: I'm happy to do it otherwise, but it seemed like it probably didn't matter.

MR. PHILLIPS: And those should both in 09:07:53

Page 12

the folder now. 09:07:54

MR. SWANSON: Okay. I see them.

Q. (By Mr. Swanson) Professor, if you'd look first at Exhibit 38. That appears to be true and correct copy of your reply report, which is dated October 19th, 2021. 09:08:14

If you could take a look at that and confirm that that is, indeed, what that is?

A. Yes.

Q. And then if you look at Exhibit 39, which is intended to be a true and correct copy of your opening report dated June 1st, 2021, and if you could also look and confirm that is what it appears to be? 09:08:42

A. Yes. 09:09:22

Q. Okay. Thank you.

We'll have other exhibits -- maybe not that many -- during the course of the day, but we'll probably spend most of our time with those two. 09:09:32

First, with respect to your reply report, Exhibit 38, did you draft that report yourself?

A. That report was prepared in the same way as my original report, in collaboration with a team of people working under me, and we drafted it 09:09:52

Page 13

4 (Pages 10 - 13)

together. 09:09:58

Q. Okay. And were there any different members of the team than you described in your last deposition?

A. I believe there are a few additions, 09:10:13 but -- to the team, but the person I worked with primarily is Dr. Minjae Song.

Q. Okay. And do you recall who the possible additions to the team were?

A. Not -- not as I'm sitting here, no. 09:10:43

Q. Okay. And those individuals didn't have a material role to play in -- in assisting you in drafting the reply report; is that correct?

A. The drafting process that I went through was done by me and in collaboration with Dr. Song, 09:10:59 and he may have had additional help.

Q. Okay. He may have additional help that wasn't evident to you?

A. That's correct.

Q. And were there any portions of the reply 09:11:23 report that were in -- entirely drafted by someone other than you?

A. I would say the entire report was processed by me and edited by me. It went back and forth with my support team, so in -- in that sense, 09:11:44

Page 14

I'm responsible for the entire report. 09:11:49

MR. SWANSON: And let's mark one more document, again, for sake of completeness. And that was a document that we received yesterday. It was an errata to your reply report, and that we 09:12:06 will mark as DX40. So let's just get that out of the way and put it up on Exhibit Share.

(Exhibit DX 0040 was marked for identification by the court reporter and is attached hereto.) 09:12:19

Q. (By Mr. Swanson) Okay. I see it has magically appeared. If you can take a look at that, Professor McFadden, and confirm for us that that is the errata to your reply report?

A. Yes. 09:13:21

Q. All right. Thank you for confirming that for the record.

Professor, do you have an estimate of how many hours you have spent on this case since your last deposition? 09:13:35

A. I don't.

Q. Okay. Can you give any rough minimum number of hours? For example, more than 100?

A. Please repeat. Was it since the last deposition? Is that the period you asked for? 09:14:03

Page 15

Q. Yes. Yes. 09:14:06

A. Yes, I would say more than 100.

Q. Since the last deposition, have you had any communications about Apple or about app stores in general with any governmental agency or 09:14:25 antitrust or competition regulator?

A. No.

Q. Now, let me ask you to look at your reply report, Exhibit 38, and I'd like to start with paragraph 1. Let me know when you're there. 09:14:52

A. Yes.

Q. Now, this paragraph appears under the heading "Assignment." And in paragraph 1, you state in the middle there toward the end that "counsel for consumer plaintiffs asked me to 09:15:31 prepare this reply report in response to points and critiques raised by Apple's experts," and then the sentence goes on to identify particular expert reports included in that.

Is that the assignment you were given in 09:15:49 connection with your reply report?

A. Yes.

Q. Did your assignment include responding to Apple's Daubert motion?

A. No. 09:16:09

Page 16

Q. Does your reply report reflect any change 09:16:14 in the assignment you described in your opening report?

MR. BURT: Objection. Form.

THE DEPONENT: Could you clarify what you 09:16:29 mean? There's a statement what the assignment is.

Q. (By Mr. Swanson) Okay. Why -- why don't we take a look at your opening report, which is Exhibit 39, and move to paragraph 10, which starts on page 3 of the opening report. 09:16:52

A. Yes.

Q. Okay. Now, on paragraph 10 at the beginning, you state that you have been asked by counsel for Consumer plaintiffs "to assess economic evidence relevant to the theory of the case 09:17:36 summarized above."

That's the first part of that sentence.

Is that an assignment that you are still carrying out through your reply report?

MR. BURT: Objection to form. 09:17:53

THE DEPONENT: The reply report assignment was specific as stated in the reply report, so I think it logically follows that it's also responsive to the original assignment, but I wasn't asked to renew the original assignment. 09:18:15

Page 17

5 (Pages 14 - 17)

Q. (By Mr. Swanson) Based on your 09:18:24 understanding, did the theory of the case change between the time of your opening report and the time you submitted your reply report?

A. As I understand it, there's been no 09:18:44 change in the theory of the case with the exception that I'm aware that counsel for the plaintiffs have filed an -- an amended complaint, and I recently submitted a disclosure affidavit to the effect that it did not raise new issues, so that the previous 09:19:09 report applied. So that's the only sense in which there's been any change that I'm aware of.

Q. Okay. And we'll definitely mark that as an exhibit, and we'll talk a bit about that. But at the moment I'm just focusing on the time between 09:19:26 your last -- opening report and then the time you submitted your reply report.

In paragraph 8 of your opening report, if you can focus on that, you state at the end of that paragraph, "Consumer plaintiffs allege that Apple 09:19:50 has engaged in an anticompetitive scheme to monopolize the aftermarket for iOS applications and in-app purchases throughout the class period."

Do you see that?

A. Yes. 09:20:16

Page 18

Q. And was that still your understanding 09:20:16 when you submitted your reply report?

A. The understanding -- understanding whether that's still the allegation of the consumer plaintiffs? Is that what you're asking? 09:20:37

Q. Yes, when you submitted your reply report. Is that still your understanding?

A. That is my understanding. Yes, my understanding is that the substance of their complaint remains the same. It may be that the 09:20:56 language that they used to describe that market is changed. I -- I don't have those details in front of me.

Q. Let me ask you to take a look at paragraph 9 of the original report, now Exhibit 39, 09:21:07 still on page 3. If you could just read that -- you don't have to read that out loud, but if you just take a look at that. Read that to yourself, and then I'll ask you a question about it.

A. Yes. 09:21:53

Q. Is this the summary of the theory of the case that you referred to in the first sentence of paragraph 10 of your opening report?

MR. BURT: Objection to form.

THE DEPONENT: Yes. 09:22:15

Page 19

Q. (By Mr. Swanson) Okay. As of the time 09:22:16 that you submitted your reply report, were you aware of any theory of the case that Apple attempted to attain or maintain a monopoly but did not succeed? 09:22:29

MR. BURT: Objection. Form.

THE DEPONENT: Could you repeat that. I'm not clear what you mean.

Q. (By Mr. Swanson) No problem.

As of the time you submitted your reply 09:22:40 report, were you aware of any theory of the case that Apple attempted to attain or maintain a monopoly but did not succeed in doing so?

A. When you say "aware of a theory," are you referring to specific propositions put forward by 09:23:00 your experts? I -- I need some context for this question.

Q. I'm asking a question where the term "theory of the case" means exactly what it means in paragraph 10 of your opening report. 09:23:19

So my question is directed at your understanding at the time you completed your reply report, were are you aware of any theory of the case that Apple attempted to attain or maintain a monopoly but did not succeed? 09:23:37

Page 20

A. I -- I simply don't understand the 09:23:46 question. Because, you know, it -- when you say -- you refer to some other theory of the case, I -- your -- your experts certainly have different views. I'm not sure what else you could be 09:23:58 referring to.

Q. Okay. Are you aware of any theory of the case that involves attempted monopolization?

MR. BURT: Objection. Calls for legal conclusion. 09:24:13

THE DEPONENT: I'm sorry. A theory advanced by -- by you? A theory advanced by your experts? What's the source and what -- and what is the theory? I don't understand.

Q. (By Mr. Swanson) Well, you read the 09:24:27 plaintiffs' complaint, correct?

A. Yes.

Q. And you have summarized the plaintiffs' theory of the case in paragraph 9 of your original report, correct? 09:24:38

A. Correct.

MR. BURT: Objection. Form.

THE DEPONENT: So have you seen any theory of the case on the part of the plaintiffs of -- of attempted monopolization? 09:24:46

Page 21

6 (Pages 18 - 21)

MR. BURT: Objection. Form.   09:24:54

THE DEPONENT: I'd have to say no. I don't -- I don't really understand the question, because I don't have any idea what you're referring to. But the answer is no, I -- I'm not aware of anything that I'm not aware of.   09:25:05

Q. (By Mr. Swanson) Okay. As of the time you submitted your reply report, were you aware of any theory of the case on the part of the plaintiffs that Apple engaged in unfair conduct that did not amount to monopolization of the aftermarket plaintiffs allege?   09:25:19

A. Please repeat it.

Q. As of the time you submitted your reply report, were you aware of any theory of the case by the plaintiffs that Apple engaged in unfair conduct that did not amount to monopolization of the aftermarket plaintiffs allege?   09:25:38

MR. BURT: So I -- I think that may run afoul of the stipulation.   09:25:59

MR. SWANSON: I'm not -- which stipulation?

MR. BURT: The -- the communications between the -- the expert and counsel. If you're -- I'll leave it there. That's my   09:26:12

Page 22

objection.   09:26:17

MR. SWANSON: I mean, if -- if you think it invades privilege, that's not my intent, so I'm -- I'm just asking him -- I'm trying to understand his concept of the theory of the case, which he seems to have put in issue here, so...   09:26:24

THE DEPONENT: As far as I'm aware, there have been some -- some court findings which may -- may affect how one interprets the relevant market here and whether it can be named an aftermarket or not. To the extent that that's an issue, I -- I'm -- I'm aware that some of the language of the allegations of the plaintiffs may change, but I'm not aware of any change in the substance of those allegations or any of -- of the substance of the theory of their -- the harm.   09:26:44   09:27:04

Q. (By Mr. Swanson) Okay. Thank you, Professor.

Still looking at the opening report, paragraph 10, in the second sentence there, you indicate that you have been also asked by counsel to address -- and this is item 1 -- "the availability of methods and evidence common to the consumer class to demonstrate whether Apple's misconduct relating to the Apple App Store caused   09:27:19   09:27:42

Page 23

harm to all or virtually all members of the   09:27:45 consumer class."

Do you see that?

A. I do.

Q. Is this an assignment that you are still   09:27:58 carrying out through your reply report?

MR. BURT: Objection to form.

THE DEPONENT: I addressed this in the rebuttal report, yes.

Q. (By Mr. Swanson) And where in your reply   09:28:19 report do you address the subject of whether Apple's misconduct related to the Apple App Store caused harm to all or virtually all members of the consumer class?

MR. BURT: Objection. Form.   09:28:35

THE DEPONENT: Give me one moment. I will give you the sources.

Q. (By Mr. Swanson) Okay. Thank you.

A. Paragraphs 10 through 17.

Q. Of your reply report?   09:29:43

A. Correct.

Q. Okay. And is there anyone in paragraphs 10 through 17 of your reply report where you expressly state that there is common evidence to show that Apple's alleged misconduct caused harm to   09:29:57

Page 24

all or virtually all members of the consumer class?   09:30:00

MR. BURT: Objection. Form.

THE DEPONENT: What I state in the reply report is that there is a practical mechanism for identifying which claimants are harmed and that that provides a clear path for appropriately compensating those harmed.   09:30:16

Q. (By Mr. Swanson) Yes, that, I understand. But is there anywhere in your reply report in those paragraphs where you make an express statement that there is common evidence to show that Apple's alleged misconduct caused harm to all or virtually all members of the consumer class?   09:30:41

MR. BURT: Objection to form.

THE DEPONENT: I consider that a question which is -- is moot when one has a specific and practical way of identifying those in the -- in the class -- named class of consumers who are harmed or who are not.   09:30:58

Q. (By Mr. Swanson) So in your view, the issue of whether all or all -- all or virtually all members of the consumer class have been harmed by the alleged conduct is moot?   09:31:27

A. From an economic point of view and I think from a real-life point of view in determining   09:31:43

Page 25

7 (Pages 22 - 25)

who is harmed and who should be compensated, if you have a practical rule for identifying who is actually harmed and for determining their compensation, then that -- that is the functional and should be what the court cares about in determining whether the class should go forward.

In terms of the language that's used to name the class or whether that's a broader group than those can be successful claimants, I think that's -- that's an issue that -- that the court should judge whether it -- it's practical and sensible.

Q.  Are you saying that you provided a fail-safe mechanism to redefine the class to include only those who are injured?

MR. BURT:  Objection to form.

THE DEPONENT:  I'm not sure what the term "fail-safe" means.  That's not a -- that's a legal -- perhaps a legal term.  That's not one that I use in this context.

Q.  (By Mr. Swanson)  But do you have, whatever you call it, in your opinion, a mechanism that redefines the class to identify only harmed individuals?

MR. BURT:  Objection to form.

Page 26

THE DEPONENT:  My understanding of the definition of the class currently is that it's all individuals who paid for Apple -- for app downloads or content through the Apple Store.  That's the definition of the class.  And some members of that class may have been harmed; others may not have been harmed.

But there is a practical mechanism for identifying claimants within that class who actually were harmed, and that's -- that's the germane and relevant determination for the purposes of actually determining the level of damage and assignment of damages.

Q.  (By Mr. Swanson)  Is that the germane and relevant determination for the purpose of actually determining liability?

MR. BURT:  Objection.

THE DEPONENT:  Liability is a -- is a common evidence issue which is substantially determined by the conduct of the defendant and the arena in which that conduct occurred, and that's primarily -- that's an issue which I think substantially can be addressed for a variety of potential class plaintiffs.

Q.  (By Mr. Swanson)  You understand, do you

Page 27

not, that Apple can't be held liable to any member of the class unless its conduct is shown to have had an adverse impact on that individual class member?

Do you understand that?

A.  Please repeat.

Q.  You understand, do you not, that Apple can't be held liable to any member of the class unless Apple's conduct is shown to have had an adverse impact on that individual class member?

A.  Your question involves, I think, legal technicalities, legal terminology and technicalities that I -- I'm not a lawyer -- I don't have a response to.

My understanding is that successful class certification depends on there being a -- a practical mechanisms for determining who -- which and whom among the class members are harmed and by how much and identifying them for distribution.

Q.  Let me ask you to look at paragraph 4 of your reply report, which is a short sentence.  And while you're finding it, I'll just read it, since it's short.

It says:  "Having reviewed Apple's experts' reports, I reaffirm the opinions offered

Page 28

in my opening report."

Do you see that now?

A.  Yes.

Q.  What do you mean by "reaffirm"?

A.  Continue to hold, not change.

Q.  Are you stating, then, that you have not changed any of your prior opinions?

A.  My position as an economist would be that as new facts come to light, I would adjust my opinions on this case in light of those new facts.

What I'm stating here is that having reviewed the Apple experts' reports, I do not find any -- any analysis there which leads me to change my opinions.

Q.  Have you identified any errors in your opening report?

A.  The answer is I -- I certainly made judgments on how to do analysis in my opening report, which reasonable economists could debate, and I'm open to suggestions as to alternative ways to do things which might -- might be better.

Q.  Were all of your prior opinions completely accurate?

MR. BURT:  Objection.  Form.

THE DEPONENT:  I would say that I don't

Page 29

8 (Pages 26 - 29)

think there is -- they were inaccurate, but there were some places where it could have been done differently and I would not -- I would not consider them -- those to be necessarily inferior alternatives. They could be equally -- equal alternatives.

Q. (By Mr. Swanson) Were there any numerical results that you reported in your opening report that you now regard as inaccurate?

A. I would say there are results where there are -- would have been alternative numerical calculations which would lead to slightly different results. It's not a question of inaccurate. It's simply that doing it in an equally acceptable way would lead to slightly different answers.

Q. Professor, are you reaffirming your opinion on relevant market definition as set forth in your opening report?

A. Yes. I have not changed my view of the market.

Q. Let me ask you to flip to your opening report at page 5, paragraph 13. Let me know when you're there.

A. I'm there.

Q. Okay. The first sentence of paragraph 13

Page 30

of your opening report states that "common economic evidence supports the conclusion that absent the allegation misconduct, all or nearly all consumers of iOS apps or in-app content would have paid lower prices for their purchases."

First, are you attempting to convey by that sentence that all or nearly all consumers of iOS apps or in-app content were harmed by Apple's alleged misconduct?

A. I would say that a more precise statement would be that nearly all consumers were harmed, but I would now add to that that one can identify consumers that actually were harmed so that the issue of whether it's all, nearly all, or not even nearly all is not relevant.

Q. Are you reaffirming that first sentence in paragraph 13 of your opening report?

A. I believe the response I gave -- just gave is a -- is a clarification. If you like, that's an update of that opinion.

Q. Okay. When you indicate in your reply report that you reaffirm the opinions in your opening report, are there other paragraphs in your opening report other than paragraph 13 where clarifications are required?

Page 31

MR. BURT: Objection to form.

THE DEPONENT: I don't know that I would call it a clarification. I would certainly call it an update in that I think the circumstances of the law on classification, as I understand it, are -- have shifted or are in the process of shifting and that the attention is, and I think properly, back on whether harmed members of the class can be identified and we -- there's a practical rule for doing that and for distributing damages to those that are actually harmed and that simplistic rules about the portion of the class that are harmed should be and -- and hopefully will be secondary.

Q. (By Mr. Swanson) I'd like to ask you a question about your testimony a moment ago that in more precise statement would be that nearly all consumers were harmed.

Are you abandoning the position that all consumers were harmed?

MR. BURT: Objection. Form.

THE DEPONENT: I do not believe this statement or statements I made elsewhere say that I believe that all consumers were harmed. The report and the methodology I use accounts for the fact that consumers in some cases are not harmed or

Page 32

might actually gain in some cases, and a methodology that I propose nets harm against gains.

Q. (By Mr. Swanson) So are you saying that when you use the term "all or virtually all" or the term "all or nearly all" in your opening report, you really never meant to convey all consumers as a realistic part of your opinion?

MR. BURT: Objection to form.

THE DEPONENT: I think as a matter of logic, "all or nearly all" means "nearly all." And that's what I mean.

Q. (By Mr. Swanson) So if we struck out the words "all or" in that phrase in your opening report, that is now the opinion that you would reaffirm?

MR. BURT: Objection to form.

THE DEPONENT: I think that is a correct interpretation of the original statement.

Q. (By Mr. Swanson) And does "nearly all" mean the same thing as "virtually all," as you've used those terms in one of the other of your reports?

A. Could you refer me to the place where I use "virtually all"?

Q. I think we just talked about that.

Page 33

9 (Pages 30 - 33)

Paragraph 10 of your opening report, the bottom of page 3.

So looking at that use of the term "virtually all" and then paragraph 13's use of the term "nearly all consumers," do you understand both of those terms to mean exactly the same thing?

A. I've used them here as synonyms.

Q. Okay.

A. Yes.

Q. And are they synonyms for the term "substantially all," in your opinion?

A. Excuse me. Where I do I use the term "substantially all"?

Q. I am asking you a stand-alone question.

A. I think in common English usage, "nearly" or "virtually" would be more -- would be more than substantially, but there are no numbers from common English that I believe go with these, so I'm not sure in the abstract what the functional distinction would be.

Q. As an economist, when you've used these terms "virtually all" or "nearly all" in your opening report, what number are you using? Is it 90 percent? 99 percent? 85 percent?

MR. BURT: Objection to form.

Page 34

THE DEPONENT: I don't think there was a specific quantitative number in mind. It simply means large.

Q. (By Mr. Swanson) If more than a de minimis number of class members are not injured, is it still your opinion as an economist that nearly all or virtually all class members are injured?

MR. BURT: Objection to form.

THE DEPONENT: I believe -- I believe that term is appropriate, and I -- I give that answer in the context that it is my opinion that Apple Store conduct caused harm to consumers at least but not limited to the measurable harm that I can measure by modeling.

Q. (By Mr. Swanson) If 40 percent of the members of the class were not injured, would you still hold the opinion as an economist that nearly all or virtually all class members were injured?

MR. BURT: Objection to form.

THE DEPONENT: I just made the distinction between being harmed and being harmed by the measure that can be used by me as an econometrician and -- and a claims process. And it's entirely possible that the -- nearly all the members of the consumer class were harmed and that

Page 35

a substantial but smaller proportion were harmed by the measures that can be quantified using my econometric methods.

Q. (By Mr. Swanson) In your opinion, if 30 million class members have been benefited overall by Apple's alleged misconduct, is it still your opinion that nearly all class members were injured?

MR. BURT: Objection to form.

THE DEPONENT: Are you asking that question using now my observation that there are unmeasured harm or may be? Or are you using the definition of harm that comes from the econometric analysis?

Q. (By Mr. Swanson) Either. You choose and answer the question.

A. Please, then, repeat the question.

Q. In your opinion, if 30 million class members have been benefited overall by Apple's alleged misconduct, is it still your opinion that nearly all class members were injured?

MR. BURT: Objection to form.

THE DEPONENT: My response is that in my view that there are a variety of things that Apple conduct did to cause harm to class members. If --

Page 36

if that view is correct, then many of those 30 million people that you mentioned may well have been harmed, even though they are not harmed by a specific measure that I can obtain quantitatively from my econometric analysis.

Q. (By Mr. Swanson) When you make a statement that "nearly all or virtually all members of the class were harmed by Apple's misconduct," what concept of harm are you using?

A. A concept of harm would be this: Compare the outcomes for consumers in the real world as is versus the outcomes that they would have had available in a but-for world where Apple had not engaged in the alleged misconduct. They may have paid lower prices. They may have had available -- available a larger variety of apps. They may have had available apps that were of higher quality. They may have had -- been driven by competition to provide better security or -- or privacy levels.

So those are some of the other areas where -- other dimensions or areas where consumers may have been harmed by Apple's misconduct.

Q. And are you offering an opinion that you have quantified that concept of harm in your reports?

Page 37

10 (Pages 34 - 37)

A.  To the contrary, I have said that I have    09:56:00
not quantified those harms.

Q.  Okay.  Are you saying that you can assert that nearly all consumers have suffered those harms, even if you can't quantify that concept of    09:56:16
harm?

MR. BURT:  Objection to form.

THE DEPONENT:  I would say that I -- I can assert that harms of that type are -- are classwide.  They are a common effect on all    09:56:42
consumers of iOS apps.

Q.  (By Mr. Swanson)  So now you're offering an opinion that all class members have been harmed?  Are you refining your clarification again?

MR. BURT:  Objection to form.    09:57:09

THE DEPONENT:  I don't think that this is a clarification.  It's actually a restatement of -- of the positions I took in the original report, which is that there are a variety of areas which I do not quantify in my econometric model where    09:57:22
consumers may have been adversely affected, and those involve some of the fruits of monopolization, such as lack of pressure on Apple to engage in enhanced security features, for example, of products that go through a store; a discouragement    09:57:49

Page 38

of developers from innovation and -- and bringing    09:57:52
forth new products.

And those are all harms to consumers in the sense that they either did not get to buy something that they might have wanted to if they    09:58:08
had been available, and in general that's an economic matter.  Consumers benefit from having more opportunities, even if they don't necessarily individually take advantage of them.  So in that sense, I would say economically these harms are    09:58:29
very broad.

Q.  (By Mr. Swanson)  Can you turn, please, to paragraph 227 of your opening report.  It starts on page 99.  Let me know when you're there.

A.  Which paragraph, please?    09:59:31

Q.  Paragraph 227.  Starts of the bottom of page 99 of your opening report.

A.  Yes.

Q.  The first sentence of paragraph 227 reads "common economic proof of the extent of damages for    10:00:30
each class member here is not difficult to establish, as it flows from the same methodology, described above, to demonstrate common impact."

Is this still your opinion?

A.  Yes.    10:00:46

Page 39

Q.  And the bottom sentence of paragraph 227    10:00:54
says:  "As I also describe, while there may be a small number of class members who show no damage under this methodology, they are easily identified and therefore do not undermine the common    10:01:09
methodology applicable to the consumer class for showing the extent of damages to class members."

Do you see that?

A.  Yes.

Q.  Is this still your opinion?    10:01:22

A.  Yes.

Q.  And what do you mean by "small number of class members"?

A.  Are you asking me to quantify "small"?

Q.  A small number.  A small number is a    10:01:43
number, correct?  Like 1, 10, 100?

MR. BURT:  Objection.  Form.

THE DEPONENT:  I think when I wrote that, I did not have a number in mind.  It's -- I could have said "a small proportion."    10:02:06

Q.  (By Mr. Swanson)  So are you now clarifying that that should read "a small proportion" rather than "a small number"?

MR. BURT:  Objection to form.

THE DEPONENT:  I don't think it's a    10:02:25

Page 40

question of clarification.  It's simply that    10:02:26
there's no number attached to "small" in this paragraph.

Q.  (By Mr. Swanson)  Well, you're a very distinguished economist, and a small number is a    10:02:37
pretty basic concept that economists deal with.

Were you trying to convey to the court something other than a small number, like 10, 20, 50, 100?

MR. BURT:  Objection to form.    10:02:51

THE DEPONENT:  I don't believe that I was trying to convey a -- a -- that to the court.  What I was -- I believe the interpretation of this and my intention was to convey that -- that there is a harm -- harm to a substantial number of members of    10:03:25
the class and that they can be identified.

Q.  (By Mr. Swanson)  Would you consider 30 million to be a small number within the context of this sentence?

MR. BURT:  Objection to form.    10:03:44

THE DEPONENT:  I don't think the intention of this paragraph was to -- was to suggest or establish a number.  I certainly did not -- did not have a number in mind when I wrote it.    10:04:04

Page 41

11 (Pages 38 - 41)

Q. (By Mr. Swanson) Well, you told the court under oath that there may be a small number of class members who show no damages.

So are you saying that you wrote that down and you had no intention of ruling out scenarios where 30 million class members had no damages?

MR. BURT: Objection to form.

THE DEPONENT: I think the paragraph as written does not rule that out.

Q. (By Mr. Swanson) Okay. Well, what -- what is your current estimate as you sit here of the number of class members who show no damages under your methodology?

A. In the reply report, there -- there are calculations which show that -- that the net -- the net harm is positive for all but about somewhere between 7.7 percent and 15 percent of the class.

Q. Well, what -- what numbers did those percentage correspond to? How many members of the class show no damage under your methodology?

MR. BURT: Objection to form.

THE DEPONENT: I don't -- I don't know, and I don't consider it relevant. That's -- that's -- that's -- that's simply not useful, as

Page 42

far as I'm concerned, in -- in the issues dealing -- dealing with the issues in this case.

Q. (By Mr. Swanson) Professor, in paragraph 6 of your reply report on page 2 -- I'm sorry. I don't think that's where I'm focusing.

Here we go. Paragraph 7. Sorry. Look at paragraph 7 on page 2 of your report.

You make an assertion about Professor Prince sometimes failing to meet the standards of scientific inquiry.

Do you see that?

A. I'm sorry. I have to go to the reply report?

Q. Yeah. The reply report, page 2, paragraph 7.

A. I have that paragraph, yes.

Q. Okay. What do you mean by "the standards of scientific inquiry"?

A. What I mean is that in each of the bullet points below that that is -- that is a failure to meet a standard scientific inquiry.

Q. Does an economist fail to meet the standards of scientific inquiry when he or she fails to report the results of analyses he or she claims to have done?

Page 43

MR. BURT: Objection to form.

THE DEPONENT: In a context where you have the responsibility to do that, yes.

Q. (By Mr. Swanson) Does an economist fail to meet the standards of scientific inquiry when he presents a different analysis from what he claims to have done due to an error in his computer code?

A. Yes.

Q. Okay.

MR. SWANSON: I think we're at a decent breaking point, since we've gone for about an hour.

Is that acceptable to everyone?

MR. BURT: Yes.

MR. SWANSON: Okay. Why don't we take ten now.

THE VIDEOGRAPHER: We're going off the record at 10:10 a.m. This is the end of media 1.

Or 10:27 [sic].

(Recess taken.)

THE VIDEOGRAPHER: We're on the record at 10:29 a.m. This is the beginning of media 2 in the deposition of Daniel McFadden.

Q. (By Mr. Swanson) Professor, I'd like to direct you to Appendix B of your reply report. That is an appendix that starts at page 143 of your

Page 44

reply report.

A. Yes.

Q. Okay. Is Appendix B a list that supplements the list of relied-on materials from your opening report?

A. It does. There may be some duplication.

Q. Okay. And does Appendix B identify all documents and information that you relied in connection with forming the opinions in your reply report?

A. Yes. Of course I follow current events, and there are some things I've learned about since this report was filed. But, yes, everything that I referred to there in the reply report should be in this list of documents considered.

Q. Okay. And then the first item on Exhibit -- or Appendix B is a stipulation and proposed order, Relief to File Third Amended Consolidated Class Action Complaint.

Do you see that?

A. Yes.

Q. Do you understand that that document contains the plaintiffs' currently operative third amended complaint?

MR. BURT: Objection to form.

Page 45

12 (Pages 42 - 45)

THE DEPONENT: You're asking me a legal question. I'm aware that there is a fourth amended complaint. I don't -- I'm not sure what you mean by "operative." This is a legal question.

Q. (By Mr. Swanson) Sure. Well, ultimately I'm trying to find out what you understand, and you put this on your list.

You understand there is a proposed fourth amended complaint, correct?

A. I've read a -- I read a document, and I don't know its legal status.

Q. Okay. Well, we'll -- we'll get to your declaration in a moment.

But you understand that there is a complaint in this case at the moment that sets forth the plaintiffs' claims?

A. You're referring to this document in Appendix B, first item?

Q. Yes. I represent to you that that contains the complaint that currently sets forth the plaintiffs' claims in this case.

So do you have that in mind?

A. I see the reference here, yes.

Q. I mean, you understand -- you represented in your report that you've looked at the

Page 46

plaintiffs' claims and have an understanding about their theories, correct?

A. The -- the list of materials relied upon is -- is intended to be an inclusive list of the things that were either cited or quotes were drawn from or were -- were considered for that purpose.

Q. Yeah. Okay.

I'm asking you about the plaintiffs' complaint. You understand there's a complaint in this case, right now, whatever its name is?

A. I would presume that's the case.

Q. Right. And you -- you read that in connection with forming your opinions in this case, correct?

A. I certainly read the plaintiffs' complaints. As I sit here, I don't remember the numbers associated with them. So if you're asking me did I personally read this particular version of the complaint, I don't recall.

Q. Okay. Have you taken any of the allegations of the plaintiffs' complaints to be true for purposes of your analysis?

A. That's a very broad question, and my generic -- general response is that I -- I have listed what I understand to be the plaintiffs'

Page 47

allegations, which I then used in -- in preparing my assignment.

But you'd have to be specific about the -- the point.

Q. Okay. Let me ask you a general question, then.

As an economist, would you consider it to be proper for you to base opinions about market definition based on factual allegations contained in the plaintiffs' complaint?

A. I certainly think it's appropriate in general for an expert to take instructions to use specific allegations which that expert himself is not responsible for approving. I've certainly done that in the past in other cases.

Q. And in this case, have you taken any instruction to use specific allegations about the relevant market for purposes of reaching your opinions about the relevant market definition in this case?

A. I do not recall doing that. If you want to ask me about specific things, you could help me with my recall.

Q. Okay. I will do that.

But first let me just ask you: Did

Page 48

counsel provide any assumptions that you relied on in forming your opinions in your -- in your reply report?

A. No.

Q. Okay. At page 145 of your reply report. We're still in Appendix B. At the very bottom, you'll see that you list Rule 52 order after trial on the merits.

Do you know what that is?

A. I do not.

Q. Well, I'll represent to you that that was the judge's opinion in the Epic case.

A. Yes. Then I do know what that refers to, yes.

Q. Okay. Are there factual findings in the judge's opinion that you agree with?

A. I did not read that finding with the intention of sorting that out, so I would have to go back to it to -- to answer the question.

Q. Do you recall reading any findings in the judge's opinion with which you disagreed?

A. I do not.

Q. Do you recall listing the Supreme Court's opinion in -- in this case, Apple v. Pepper, in your list of relied-upon materials in your opening

Page 49

13 (Pages 46 - 49)

report?                                    10:39:21

It's not a trick question. We can look at it, but I just --

A. I would -- I would assume that I did, because I recall referencing it, I believe.          10:39:28

Q. Yes, it is -- it's at page 130 of your -- I think it would be Exhibit B or Appendix B of your opening report.

In your reply report at paragraph -- well, take a look at paragraph 260 of your reply          10:39:49 report, which is at page 110. Let me know when you're there.

A. The paragraph again, please.

Q. 260 in the reply report.

A. Yes. I have that in front of me.          10:41:08

Q. Okay. In paragraph 260, you state that "the market definition analysis in my opening report is consistent with the Supreme Court's analysis of the Apple App Store in Apple Inc. v. Pepper, in which the Supreme Court held that to          10:41:27 consumers, Apple acts as a retailer."

Do you see that?

A. Yes.

Q. Do you know what the Supreme Court based its analysis of the Apple App Store on?          10:41:42

Page 50

A. No. I'm only familiar with the document.          10:41:59

Q. Is it your view or understanding that the Supreme Court made some type of factual analysis in its Apple v. Pepper decision?

MR. BURT: Objection. Form.          10:42:17

THE DEPONENT: I don't -- I don't know what "factual" means in this context, and I don't -- I do not understand or I'm not aware of exactly how the Supreme Court processes these things. I think that they generally are making          10:42:31 decisions on the basis of interpretation of the law and precedent, not on -- not on facts.

Q. (By Mr. Swanson) Well, do you know whether the Supreme Court based its analysis of the Apple App Store on anything other than the          10:42:46 allegations in the plaintiffs' complaint?

A. I don't know.

Q. Are you aware the Supreme Court in the Pepper case was required to assume that the allegations in plaintiffs' complaint were true?          10:43:03

MR. BURT: Objection. Form.

THE DEPONENT: As I say, I'm not aware of how -- how the Supreme Court works, except in very vague lay knowledge, so I don't know.

Q. (By Mr. Swanson) So how, if at all,          10:43:25

Page 51

then, are you relying on what you call the Supreme          10:43:26 Court's analysis of the Apple App Store?

MR. BURT: Objection. Form.

THE DEPONENT: My -- my understanding is that the Supreme Court made the ruling which I          10:43:43 refer to in this paragraph. They -- they held that the App Store acts as a retailer. That's -- that's what I'm using.

Q. (By Mr. Swanson) So you're relying on the Supreme Court for the factual proposition that          10:44:06 Apple acts as a retailer?

MR. BURT: Objection to form.

THE DEPONENT: I'm relying on -- on the Supreme Court decision for the legal decision that the plaintiffs have standing in this case on that          10:44:28 basis.

Q. (By Mr. Swanson) Did -- well, is it your understanding that the Supreme Court defined a relevant market in the Pepper case?

A. I don't know.                         10:44:48

Q. You're not assuming that they did, I take it?

A. What I'm using is the -- what I understand or read to be part of their finding, which is what's stated in paragraph 260, that          10:45:10

Page 52

consumers -- from the standpoint of consumers,          10:45:17 Apple acts as a retailer.

Q. Do -- do you -- changing gears a bit.

Do you rely on any documents produced by Google in reaching any of your opinions in your          10:45:39 reply report?

A. No.

Q. Do you rely on any documents produced by Amazon in reaching your reply report opinions?

A. No.                                  10:46:01

Q. Same question for Samsung documents?

A. No.

Q. Same question for Valve documents?

A. Sorry. What is the name again?

Q. Valve, V-A-L-V-E. It's the parent          10:46:14 company of Steam.

A. Not -- not as far as I am aware.

Q. Aside from the staff at Brattle and plaintiffs' counsel, have you discussed the opinions in your reports with anyone since your          10:46:43 last deposition?

A. No.

(Exhibit DX 0041 was marked for identification by the court reporter and is attached hereto.)                          10:46:47

Page 53

14 (Pages 50 - 53)

MR. SWANSON: I'd like to mark your 10:46:58 declaration from the other day as -- it would be Defendants' Exhibit 41. So we'll wait for the magic of electrons to accomplish that.

But it appears to be the declaration of 10:47:14 Daniel L. McFadden in support of plaintiffs' motion for class certification of UCL claim.

Q. (By Mr. Swanson) So let me know when that pops up on your screen.

A. I have it. 10:47:36

Q. Okay. And is that, indeed, a true copy of your declaration?

A. Yes.

Q. Okay. So when were you first approached about submitting this supplemental declaration? 10:47:56 I'm just looking for a date, a rough date.

A. I don't recall the exact day. I think early last week.

Q. Okay. It was after you submitted your reply report, which was October '19? 10:48:23

A. Correct.

Q. And when did you begin drafting this declaration?

A. The same -- the same day.

Q. Okay. And did you -- did you make the 10:48:40

Page 54

first draft of this document, or did you -- did you 10:48:48 edit the draft that you received?

A. The sequence is that I read the proposed amended complaint. I responded to -- to my support team at Brattle with -- with any questions that I 10:49:18 had, and most of those questions were resolved. I asked them to put it in the appropriate legal language, and then that's -- that's this document.

Q. In paragraph 3 of this declaration, you state you have reviewed the FAC. That is a 10:49:42 reference to the proposed fourth amended complaint, right?

A. Yes.

Q. Did -- did you -- did you see what we call a red line document as well that compared the 10:49:58 current complaint to the proposed fourth amended complaint?

MR. BURT: I'm going to object. I don't think you can ask him that.

MR. SWANSON: Well, there was a red line. 10:50:14 It was filed -- it was provided to us by you and the court, so I think I can if he saw a red line.

MR. BURT: Okay. I withdraw that.

MR. SWANSON: No, no, it wasn't a trick question. 10:50:29

Page 55

MR. BURT: Okay. So, then, I'm just 10:50:29 going to ask that you clarify. When you say was there a red line, you're asking only if he saw the red line subsequently filed with the court, not some other red line? 10:50:39

MR. SWANSON: Yes, that's fine. That's all I'm trying to get at.

MR. BURT: No objection.

Q. (By Mr. Swanson) Is that clear to you, Professor? 10:50:45

I'm sorry. I interrupted. Were you saying --

A. Yes, I think it's clear. And the answer is yes -- no, I did not see this -- this document you mentioned. 10:50:58

Q. Okay. So the only thing -- well, you've seen the full version of the proposed fourth amended complaint that you indicate here, and that's what you're relying on when you say you reviewed the FAC, right? 10:51:16

A. That's correct.

Q. Okay. And how long before you submitted this declaration did you review that proposed fourth amended complaint?

A. I received it one day, and I believe the 10:51:39

Page 56

declaration was -- prepared to be signed off by me 10:51:42 the following day.

Q. And before that first day when you received that proposed fourth amended complaint, had you been aware that such a proposal existed? 10:51:57

A. No.

Q. Sticking with paragraph 3, and you state there that you understand from your review of the FAC and from plaintiffs' counsel that the facts alleged in support of counts 1 and 2 were unlawful 10:52:28 monopolization and attempted monopolization respectively -- it says "respectfully" here. I'm sorry -- "both brought under Section 2 of the Sherman Act are the same facts alleged in support of the newly added count 3 for violation of the UCL 10:52:46 which prohibits any unlawful, unfair, or fraudulent business act or practice."

Do you see that?

A. Yes.

Q. Did you mean -- you meant "respectively" 10:52:57 there, right, not "respectfully"?

A. Yes. It should be "respectively."

Q. To what extent are you relying on plaintiffs' counsel for your understanding of what's alleged in the fourth amended complaint? 10:53:28

Page 57

15 (Pages 54 - 57)

MR. BURT: Objection to form.    10:53:35

THE DEPONENT: Plaintiffs' counsel communicated to me -- well, what -- what the California statutes are. I was actually familiar with those prior to that. And the question that    10:53:48    was put to me is whether new analysis would be needed to bring a complaint under those statutes.

Q. (By Mr. Swanson) And so that -- those are -- well, that's a question from plaintiffs' counsel.    10:54:08

Did plaintiffs' counsel tell you anything that you ended up relying on for purposes of this -- this paragraph 3 of your declaration?

A. Well, no. I say they did -- they did not. They -- they apprised me of what -- what the    10:54:27    requirements for filing under -- under the California statutes were. And I was going to say I was generally aware of those in advance. And the question put to me was that filing under those would not require any new common evidence or    10:54:48    different methodology I did not use before, and the answer is no.

Q. And are you relying on any other communications with plaintiffs' counsel for purposes of this declaration?    10:55:02

Page 58

A. No.    10:55:05

Q. What do you mean when you say that you understand the facts alleged in support of the UCL claim are the same facts as those alleged in support of the -- the two Sherman Act claims?    10:55:19

MR. BURT: Objection to form.

THE DEPONENT: I would say that refers to all the evidence that was introduced in my original report.

Q. (By Mr. Swanson) So you understand that    10:55:45    all the evidence that was in your original report has also been alleged by the plaintiffs in support of this proposed UCL claim? Is that what you're --

MR. BURT: Objection to form.

Q. (By Mr. Swanson) -- saying?    10:56:00

A. I'm -- I'm unaware of any aspect of it that would not be included.

Q. You refer in paragraph 3 to counts 1 and count 2 for unlawful monopolization and attempted monopolization.    10:56:27

Is it your understanding that the facts alleged in support of count 1 are the same facts as alleged -- or that are alleged in support of count 2?

MR. BURT: Objection to form.    10:56:45

Page 59

THE DEPONENT: I reread the paragraph 1,    10:57:22    which is a summary of -- of my expert report and my reply report.

Would you repeat the question.

Q. (By Mr. Swanson) Sure.    10:57:34

My question to you is: Is it your understanding that the facts alleged in support of count 1 are the same facts as alleged in support of count 2?

A. To clarify your question, when you say --    10:58:10    refer to count 1 versus count 2, is that the same as phrase 1 and phrase 2 in my first paragraph? I'm not clear where -- where you're at now.

Q. Well, in your paragraph 3, you state that based on your review of the FAC and your    10:58:35    communication with plaintiffs' counsel, the facts alleged in support of counts 1 and 2 for unlawful monopolization and attempted monopolization are the same facts alleged in support of the newly added count 3.    10:58:56

So my question for you is: Is it your understanding that the same facts alleged in count 1 are the same facts that are relied on in count 2?

MR. BURT: Objection. Form.    10:59:11

Page 60

THE DEPONENT: In terms of the common    10:59:18    evidence that I use in developing my methodology and model and damage analysis, the -- the same basis would be -- would be used and I think is appropriate to use for count 3 as was used for 1    10:59:36    and 2. The distinction here is that it's the same economic problem, even if the -- the legal statutes and what they require might differ in legal details that I'm not familiar with.

Q. (By Mr. Swanson) Well, what are the    10:59:57    facts alleged in support of count 2? Just your understanding, since you've sworn here that you have an understanding as to what they are.

MR. BURT: Objection. Form.

THE DEPONENT: I would say that is the    11:00:15    substance of the -- and the body of my opening report.

Q. (By Mr. Swanson) Okay. And are those the same -- is that the same substance in the body of your opening report that relates to count 1?    11:00:29

MR. BURT: Objection. Form.

THE DEPONENT: These count numbers, I believe, are -- are legal references to a particular legal code, and as an economist, I -- I can simply tell you what my assignment was and what    11:00:55

Page 61

16 (Pages 58 - 61)

I did. I have to leave it to the lawyers to 11:01:00 specify how -- how that's applied in -- in their arguments as -- as it affects various counts.

Q. (By Mr. Swanson) Well, do you know if there are any different facts alleged under the 11:01:20 unlawful monopolization count as compared to the attempted monopolization count?

A. I'm not aware of any differences that affected my conclusion in this declaration, which is that my methodology would apply to provide 11:01:49 what's needed.

Q. You indicated earlier today that you weren't aware of an attempted monopolization theory. Are you -- are you now telling us that you are aware of an attempted monopolization theory by 11:02:08 the plaintiffs?

A. Can you give me a reference? I have absolutely no idea where you're coming from.

Q. Okay. Are you aware that the plaintiffs have a theory of the case of attempted 11:02:25 monopolization?

A. Could you be specific as to -- are you suggesting this is a new theory that was not the theory under which I did my work in the original opening report? Is that what you're referring 11:02:51

Page 62

to -- asking about? 11:02:54

Q. Well, we talked about the use of your term "theory of the case" and your summary, your understanding of the plaintiffs' theory of the case in your opening report. 11:03:04

Do you now believe that there was a theory of attempted monopolization that you addressed in your opening report?

A. I'm not aware of any change in the plaintiffs' theory of the case which affected my 11:03:23 assignment or my conclusions.

Q. Yeah, I'm -- I'm not asking you about a change.

I'm asking when you wrote your opening report, were you aware of and did you address a 11:03:34 theory of attempted monopolization by the plaintiffs?

A. The answer is no. What I'm aware of was my assignment, which was specified what -- what they asked me to do, whether I could quantify the 11:04:05 common evidence relevant to their -- relevant to their claims as I read them in the -- in the complaint after -- after the time I wrote that original report.

Q. In paragraph 3 of your declaration -- 11:04:28

Page 63

this is at the bottom of -- I guess what's marked 11:04:33 or indicated as page 1 of the actual declaration, carries over to the top of page 2.

You state that "plaintiffs specifically alleged that Apple has engaged in and continues to 11:04:50 engage in acts that violate the unlawful and unfair prongs of the UCL."

Do you see that?

A. Yes.

Q. What -- what do you understand is the 11:05:01 unfair prong of the UCL?

A. I cannot answer that. I would -- I asked the staff to put this in the proper legal language. What I told them was that, as I understood the -- the amendment to the complaint, they had UCL, the 11:05:25 methodology that is laid out in my original report would also apply, and beyond that I left -- I left it to them to draft in the proper, appropriate legal language.

Q. Well, do you have any understanding of 11:05:42 what the difference is between the unlawful and unfair prongs of the UCL?

A. I'm going to answer that by saying that I'm -- dealt with the UCL in the past and I'm somewhat familiar with it, but I don't remember the 11:06:04

Page 64

details and I don't remember that language. So the 11:06:06 brief answer is no, I don't.

Q. Does unfair competition mean something to you than anticompetitive conduct?

A. Not in this case, because I don't know in 11:06:29 this case. But in previous cases, I have seen litigation using the ACL which involved conduct which I would classify as sharp business practices, but not unlawful business practices.

Q. And you -- I think maybe you misspoke for 11:06:54 a moment. You said ACL. Did you mean --

A. I'm sorry. UCL.

Q. Yeah. We can all do that.

So is it your understanding that all of the acts that are alleged to violate the unlawful 11:07:07 prong of the UCL are also alleged by plaintiffs to violate the unfair prong of the UCL?

A. The answer is that's -- that's a legal question. I do not know what the distinction would be. All I can say is that as an economist, I -- I 11:07:25 can marshal the same common evidence that I did in the original report, and I believe that it -- it provides counsel to the plaintiffs with what they need.

Q. Do -- do you understand there to be any 11:07:48

Page 65

17 (Pages 62 - 65)

alleged acts of Apple that violate the unfair prong 11:07:52 without also violating the unlawful prong?

A. I don't know.

Q. Is it your understanding that the plaintiffs do not allege any alleged acts by Apple 11:08:06 to be unfair that are not also alleged to be unlawful?

A. I don't know.

Q. What is your understanding in summary form of the acts that Apple has engaged in that 11:08:22 plaintiffs allege violate the UCL?

A. My understanding when I was given the forth amended report draft and asked if I would provide a declaration was that they are the same as in my original report. 11:08:57

Q. So insofar as you understand it, the acts that Apple has allegedly engaged in that violate the UCL are all listed in your original report?

A. That -- that is my understanding.

Q. And as you sit here, can you think of any 11:09:41 act of Apple that was alleged to be misconduct that was in your original report that is not contended to be a violation of the UCL?

A. It's not a question I -- I've examined, but as I sit here, I'm not aware of any. 11:10:05

Page 66

Q. Are you offering the opinion that 11:10:09 plaintiffs have lost money or property as a result of Apple's alleged UCL violation?

MR. BURT: Objection. Form.

THE DEPONENT: My understanding in 11:10:31 general of the -- of the plaintiffs' complaint is that they have suffered economic harm, they have lost money, and that -- my understanding is that those complaints carry over to the UC- -- UCL.

Q. (By Mr. Swanson) That latter part that 11:10:53 the complaints carry over to the UCL, is that your conclusion or your understanding?

A. That's my understanding.

Q. Now, in paragraph 4 of your declaration, you state that "because count 3 relies upon the 11:11:11 same facts and alleges the same conduct by Apple as counts 1 and 2, the opinions expressed in my opening and reply reports referenced above apply equally to count 3 brought under the UCL."

Do you see that? 11:11:30

A. Yes.

Q. Did you conduct any additional analysis before determining that your opinions apply equally to plaintiffs' proposed UCL claim?

A. Analysis? No. 11:11:51

Page 67

Q. In reaching the conclusion reflected in 11:11:54 paragraph 4 of this declaration, are you relying on anything other than the review of the proposed fourth amended complaint in your communications with plaintiffs' counsel? 11:12:12

MR. BURT: Objection. Form.

THE DEPONENT: My understanding from plaintiffs' counsel was that a -- common evidence that would be required for count 3 and what would be required from me would be the same; that is, the 11:12:38 charges would be the same. The alleged misconduct would be the same. And the question to me then was would I need to do additional analysis in order to handle a complaint brought under this particular statute as opposed to the previous ones. That was 11:13:02 what was put to me.

And that's -- my declaration is simply stating that I did not see any -- any impediment to that.

Q. (By Mr. Swanson) If plaintiffs' UCL 11:13:16 claim did not allege the same conduct by Apple as their Sherman Act claims, would the opinions in your reports still apply equally to the UCL claim?

MR. BURT: Objection. Form.

THE DEPONENT: One would have to ask what 11:13:43

Page 68

exactly the change in the complaint is and what the 11:13:45 charges are, and the -- the previous analysis might or might not be fully appropriate. It's possible that additional analysis would be need -- needed if you added a new dimension to the claim. 11:14:03

Q. (By Mr. Swanson) If plaintiffs' UCL claim were based on different conduct from the Sherman Act claims, would you have any opinion as to plaintiffs' ability to prove the elements of their UCL claim with common evidence? 11:14:19

MR. BURT: Objection to form.

THE DEPONENT: I think I would need to have a specific hypothetical to -- to answer, because it's -- the general answer is that it would depend. 11:14:39

Q. (By Mr. Swanson) You'd need to know what the different conduct would be before you could reach an opinion about the plaintiffs' ability to prove a UCL claim with common evidence, right?

A. Yes. 11:14:52

Q. Are there any opinions in your reports that do not apply to plaintiffs' UCL claim?

MR. BURT: Objection. Form.

THE DEPONENT: Not so far as I'm aware.

Q. (By Mr. Swanson) Do your opinions as to 11:15:23

Page 69

18 (Pages 66 - 69)

class members' injury and damages apply equally 11:15:26 with respect to the UCL claim?

MR. BURT: Objection. Form.

THE DEPONENT: My answer is that the methodology and its application, in my judgment, 11:15:53 would apply. Exactly what would have to be brought forward from that, what are the specifics of the claim, is not something I -- I've thought about, asked to be investigated, so I don't know -- if anything more would be needed. 11:16:18

Q. (By Mr. Swanson) Do you understand plaintiffs to seek the same type of monetary relief under the UCL as they do under the Sherman Act?

MR. BURT: Objection. Form.

THE DEPONENT: I don't know. 11:16:32

Q. (By Mr. Swanson) Do you understand plaintiffs to be seeking compensatory damages under the Sherman Act?

MR. BURT: Objection to form.

THE DEPONENT: I understand that the 11:16:51 plaintiffs are seeking damages. I do not know what legal statutes specifically are being -- being used. I'm aware in general that's it's an antitrust case, but beyond that, I don't know the legal details. 11:17:14

Page 70

Q. (By Mr. Swanson) You're aware from your 11:17:14 two reports that plaintiffs were already seeking antitrust damages, correct?

A. Correct.

Q. And you're opining here in this 11:17:23 declaration that those damages are the same as damages under the UCL; is that right?

MR. BURT: Objection.

THE DEPONENT: No, my understanding is that the plaintiffs are effectively filing a 11:17:38 complaint under the UCLL -- UCL which is parallel -- parallel to their existing complaint under the federal statutes.

Q. (By Mr. Swanson) What is your understanding as an economist of the purpose of the 11:18:01 UCL claim if it does not add any additional damages for any individual class member?

MR. BURT: Objection. Form.

THE DEPONENT: You're asking me for -- for a legal insight, I believe, and I have a very 11:18:23 limited legal insight. But -- but I understand that there are cases that have standing under the UCL -- the UCL which do not have standing or cannot succeed under the federal antitrust statutes.

Q. (By Mr. Swanson) Okay. So you're aware 11:18:47

Page 71

of cases or rules where certain conduct under the 11:18:48 antitrust laws would not be a violation, but that same conduct would be a violation under the UCL?

A. That goes beyond what I know. But my -- my memory of having dealt with this in this past is 11:19:09 I've dealt with law firms that were -- bringing actions under the UCL because it -- it had sort of different requirements than under the antitrust law.

Q. But here your basic understanding is 11:19:28 plaintiffs are suing regardless of the UCL or the antitrust laws about the same acts and the same conduct?

A. I would say that my understanding is that they are bringing a complaint for -- for the 11:19:51 conduct that -- that each particular statute allows a remedy for, and it's beyond my legal knowledge to know if that's exactly the same or whether there's some differences.

Q. And in that instance, I'm not asking for 11:20:12 you for your legal knowledge. I'm asking for your understanding on which you based your declaration here.

A. My understanding based on -- on which I base this declaration is that whatever complaints 11:20:28

Page 72

are being brought under the applicable law, my 11:20:33 methodology would be -- would be able to provide the common evidence that the plaintiffs require.

Q. But that's -- that's your conclusion and opinion, right? That's not your understanding? 11:20:46 You're not assuming your premise, are you?

A. You lost me on that question, please.

Q. Yeah.

A. Phrase it again.

Q. Sure. 11:21:03

You are concluding -- you are offering the opinion that the same methodologies can be applied to plaintiffs' UCL claim, correct?

A. I'm offering the opinion that as I understand the -- the allegations that are being 11:21:20 brought forward, those allegations can all be addressed by the methodology that I -- I've developed in my original report.

Beyond that, I have not examined the specifics of the legal requirements or 11:21:42 opportunities offered by the alternative statutes.

Q. Are you aware from reviewing the proposed fourth amended complaint that plaintiffs seek restitution as a remedy for the alleged UCL violation? 11:22:03

Page 73

19 (Pages 70 - 73)

MR. BURT: Objection. Form.

THE DEPONENT: I recall the language as an economist. I'm not aware of what this legal distinction is between the compensation, the restitution remedy.

Q. (By Mr. Swanson) Would you have any understanding of the term "restitution" in the context of plaintiffs' proposed UCL claim?

A. As an economist, I think of restitution, compensation as being synonyms, so I'm not aware of the legal distinctions.

Q. Are you aware that plaintiffs also seek disgorgement in their proposed fourth amended complaint as a remedy for their UCL claim?

A. As I sit here, I don't recall the word "disgorgement." If it was there, I missed it.

Q. Okay. Did you read very carefully the paragraph of the proposed fourth amended complaint that talked about restitution?

MR. BURT: Objection. Form.

THE DEPONENT: The answer is that in -- in the -- when I got a copy of the draft amended complaint, I concentrated on the claims that were -- were made and on whether my methodology would be able to address the -- the remedies for

Page 74

those claims. I did not dwell on the -- the more legal part of the complaint.

Q. (By Mr. Swanson) Do you have an understanding of what "disgorgement" is?

A. I know, yes, what the term typically means, yes.

Q. And what is your understanding?

A. That -- that if a firm earns what are viewed as excess profits or un- -- unlawfully gained profits, then there is a remedy that requires them to disgorge those profits.

Q. And do you understand that to be a remedy the plaintiffs are seeking under their Unfair Competition Law claim?

A. As I -- as I sit here, I don't recall reading it. When I went through the draft, I missed that, and so I have no -- no opinion on it and no memory of it.

Q. Is the methodology for determining restitution the same as the methodology for determining disgorgement, in your -- in your view?

MR. BURT: Objection. Form.

THE DEPONENT: In broad strokes, yes. I -- I have no -- no understanding of what the legal requirements are for -- for disgorgement.

Page 75

For example, who -- who -- who would receive the disgorged funds, how they would be distributed. Are those rules different than the -- the harms detailed in my methodology? I do not know the answer to that.

Q. (By Mr. Swanson) But -- but you know the answer to that question for the remedy of restitution; is that -- is that correct?

A. By "restitution," do you mean the damages that I calculate in my original report? Is that -- that the -- your use of that term?

Q. Whatever your understanding of the term "restitution" is when you read it in the plaintiffs' proposed fourth amended complaint?

MR. BURT: Objection. Form.

THE DEPONENT: My interpretation of restitution is the same as the damages I calculated in my original report.

Q. (By Mr. Swanson) Okay. Now let's take an example of a class member who downloaded only one paid app during the class period, and in the as-is world, it cost 99 cents. In the but-for world, your model would calculate that the individual class member in question, the hypothetical class member in question, would have

Page 76

been charged negative 84 cents for that download.

In other words, that class member would have been paid 84 cents instead of paying 99 cents in the as-is world.

Do you have that hypothetical clear?

A. Well, actually, there's -- there are a lot of numbers on it, so why -- why don't you go through it again, and maybe I'll try to take a note as you do so I can figure it out.

Q. Sure.

The class member makes one purchase and one purchase only during the class period. The as-is price is positive 99 cents. The but-for price is negative 84 cents.

Do you have that written down?

A. I have -- I have written that down. I'm -- I'm -- I don't understand where the minus 84 cents comes from, so do you want to explain that?

Q. Well, you're aware that your methodology can generate a negative but-for price, aren't you?

A. I'm aware that my methodology can certainly lead to situations in which the projected price changes. I -- I disagree that it produces negative prices, because the whole methodology is designed to deal with nonnegative prices.

Page 77

20 (Pages 74 - 77)

Q.  So let me ask you that, because I'd like 11:29:08 to have your very, very best answer.  I'd like to have an answer that doesn't have to be corrected later.

Is it your opinion that if -- let's 11:29:16 imagine the judge asked you directly, Professor McFadden, does your methodology ever generate a negative but-for price?

Your answer is absolutely not.  It doesn't do that.  It never does that? 11:29:32

MR. BURT:  Objection.  Form.

THE DEPONENT:  My methodology calculates a -- a net damage as a result of a changing commission rate for any -- for any given app.

And it can calculate the net harm over -- 11:30:10 overpayment plus or minus associated with -- with that change.

That's what the methodology does.

Q.  (By Mr. Swanson)  It's a very simple question, Professor. 11:30:27

Does your methodology generate any negative estimates of but-for prices?

A.  And the answer is I don't calculate but-for prices.  If I did so, the model constrains but-for prices to be nonnegative.  You -- you're 11:30:49

Page 78

asking me essentially a question which begins to 11:30:53 get into the -- the algebra and the mathematics of the -- of the model and -- and how -- how it's implemented.

Q.  Well, how does the model constrain the 11:31:08 but-for price not to be negative?  Does that mean if you get a negative but-for price, you just ignore it and write down zero?

MR. BURT:  Objection.  Form.

THE DEPONENT:  Let me answer that in two 11:31:36 sentences.

The first is that what the model does is precisely say that the profit maximum price is the -- is the -- is going by a formula which it requires it to be nonnegative.  Okay? 11:31:55

And the -- the second is that if -- if you're -- get into language where it talks about a negative price, you could talk about -- a virtual -- virtual negative price, which would be one element in the mathematical computation.  But 11:32:13 that's not what the -- the model as I designed it would do -- would produce, although it certainly can be an intermediate quantity in the mathematical calculation.

I -- I -- I am very reluctant to -- to 11:32:33

Page 79

take this on in verbal language going back and 11:32:38 forth, because it's simple, straightforward, and -- and direct mathematics, and it should be resolved that way, not -- not through legalese.

Q.  (By Mr. Swanson)  Well, I apologize that 11:32:56 this is a legal process.  The judge is going to need to understand it just like all the rest of us, so we do have to work with words.

How does the model constrain or require the but-for world not to be negative? 11:33:12

A.  Well, let's first talk about the mathematical model.  The mathematical model is one in which profits are written down as a function of price, reduced by the Apple Store commission, minus costs that differs multiplied by the -- by the 11:33:50 quantity.

And the model starts with the assumption that the developer is a profit maximizer and will maximize that subject to the constraint that price is nonnegative.  And that, in turn, produces a -- a 11:34:09 formula for the optimal price, which is the maximum of zero and a quantity, which if you want to have that in words, is one over -- one over alpha plus cost divided by one minus tao where tao is the commission rate, C is the marginal cost, alpha is 11:34:42

Page 80

the price sensitivity. 11:34:45

So that's the -- that's the formula for the optimal price in the mathematical model.

Q.  And with respect to the mathematical constraint that the price be not -- the but-for 11:34:57 price not be negative, how do you implement that constraint when absent the constraint, the but-for price would be negative?  What price do you assign in the but-for world to that item?

A.  Let me respond by -- by continuing to 11:35:20 describe the next step, which is you -- you start from this model -- mathematical model specification of what the price is at a given commission rate, and you now apply that at the as-is and the but-for commission rates, and that -- that will give you a 11:35:45 difference in the as-is and but-for prices.  And the harm to the -- net harm to the consumer is the difference between the as-is and the but-for price.

And that's taking into account that those two prices each are -- have to be nonnegative.  So 11:36:04 that's -- that's the model.  That's what -- that's what the model says next to do.

And that is -- is how it's implemented.

Q.  Well, we know all the prices in the real world are positive, don't we? 11:36:25

Page 81

21 (Pages 78 - 81)

A.  Let's take that as -- as an assumption, as a hypothesis.

Q.  Well, I'm asking you a factual question, Professor.  All the prices in the real world are positive.  That's what we're talking about here, right?

A.  Let me -- let me ask for some context. We -- we can talk about this in terms of the price of paid apps without IAP.  We talk about in the terms of the price of IAP.

Do you -- do you want to be specific?

Q.  Well, are you saying that a lot of prices are zero in the -- in the data that you worked with?

MR. BURT:  Objection.  Form.

Q.  (By Mr. Swanson)  What nonpositive prices have you dealt with in -- in your model?

A.  I didn't say that, but the answer is yes. There -- there are many apps which are free to download with paid IAP, so if you're talking about a download price, they have a download price of zero.

Q.  Uh-huh.

A.  If you're talking about paid downloads, they will have a positive price.  Paid downloads

Page 82

without IAP, they will have a positive price because they're not in the data unless they do have a positive price.

Q.  And apps that are free to download, your model constrains them not to have a negative price in the but-for world?

A.  Yes, it does.

Q.  So that but for that constraint, your model would allow some but-for prices for free downloads to be negative priced in the but-for world; is that correct?

MR. BURT:  Objection to form.

THE DEPONENT:  No, I would say the model doesn't allow that.  I believe that it would be inappropriate to do that simply because negative prices and Apple Store treatment of negative prices is qualitatively different.  The potential consumer audience for an app that carries a negative price is potentially quite different than the class that are interested in -- in apps paid for or free.

And so I think the model would be -- it would be inappropriate to apply the model and try to talk about negative prices in this model.

Q.  (By Mr. Swanson)  And does your model constrain the price of apps that are free to

Page 83

download in the as-is world not to be positive in the but-for world?

MR. BURT:  Objection.  Form.

THE DEPONENT:  The answer is yes.  Yes, it does.  I believe that free apps are by and large brought to the market under a different business model than -- than paid apps.

MR. SWANSON:  We're getting close to an hour.  Maybe we're beyond an hour.  Let me just wrap this up, to go back to my hypothetical.

Q.  (By Mr. Swanson)  So I understand you take issue with the hypothetical, which is fine. But it's my hypothetical to ask you about.

So, again, assume that the actual price is 99 cents.  The as-is world price for a download is 99 cents and the but-for price of that download is minus 84 cents.

How would you calculate damage based on those two prices, as-is and but-for?

MR. BURT:  Objection.

THE DEPONENT:  And my answer is that in the model that's -- your hypothetical is a logical impossibility.

Q.  (By Mr. Swanson)  I understand that you disagree, and you've said that.  It's on the record

Page 84

now.

But I'm asking you, Professor, a question that I'm entitled to ask, I believe, is how would you calculate the damage associated with those two prices?

MR. BURT:  Objection.  Asked and answered.

THE DEPONENT:  I believe the hypothetical is nonsensical, so I have no way to answer it.

Q.  (By Mr. Swanson)  You -- you can't do the math on that?

MR. BURT:  Objection.

THE DEPONENT:  My -- my position is that you've asked a logically inconsistent question and it does not have a logical answer.

Q.  (By Mr. Swanson)  Okay, Professor, but the terrific thing abut being a lawyer is I get to ask the question.

So you're telling me as an economist, you can't answer the question of what the damage would be if the actual world price is 99 cents and the but-for world price is minus 84 cents?

MR. BURT:  Objection.  Form.

THE DEPONENT:  The answer is I can tell you what the damage -- damages would be if the

Page 85

22 (Pages 82 - 85)

Apple commission rate changed and if the initial price was 99 cents, and my -- my model can produce that number. I'm telling you that the minus 84 cents -- but-for price that you're putting forward is a logical impossibility in my model, so that the damage -- the calculation -- it doesn't make sense to start from something completely illogical to reach the conclusion. The model has a logical path to follow to produce that damage, and that's the way I would do it. It's the way it's done.

Q. (By Mr. Swanson) I understand that's your opinion. I'm asking you a question completely independent of what you think of your model, whether my question is logical to you or not within the confines of your model.

I'm asking you a question: If you as an economist are told that the actual world price is 99 cents and the but-for price is minus 84 cents, how do you calculate the compensatory damage?

MR. BURT: Objection. Form.

THE DEPONENT: Yeah, in -- in the abstract -- in the abstract, not -- because it applies to my model. But in the abstract, the notion of an overcharge is it's the difference between the price actually paid and the price that

Page 86

would have been paid in the but-for world. So it's the difference between those two prices. It's 99 minus the quantity minus .84.

That's -- that seems to be the direct answer to what you are asking, but, again, I would emphasize that's in the abstract. That's not the calculation that my model does, and I -- I reject the implication that that's -- it needs to deal with that.

Q. (By Mr. Swanson) And in the abstract, with all the caveats you've just given, is that the same measure of monetary injury that you would use if the claim was for restitution?

MR. BURT: Objection. Form.

THE DEPONENT: I don't know what the context would be in which the term "restitution" would be any different than what we've just been discussing.

Q. (By Mr. Swanson) Well, restitution is restoring someone -- someone's money paid, right? And the money paid in this hypothetical is 99 cents, correct?

MR. BURT: Objection. Legal conclusion.

THE DEPONENT: This is a legal use of the term. I have no opinion as an economist.

Page 87

Q. (By Mr. Swanson) Okay.

A. And how it should be used.

Q. Okay.

MR. SWANSON: Shall we take a break?

THE VIDEOGRAPHER: We're going off the record at 11:44 a.m. This is end of media 2.

(Recess taken.)

THE VIDEOGRAPHER: We're on the record at 12:02 p.m. This is the beginning of the media 3 in the deposition of Daniel McFadden.

Q. (By Mr. Swanson) Professor, isn't it true that your model predicts that one-tenth of the class has individual damages that exceed the individual class member's spending in the actual as-is world?

A. I do not believe that's true. The model -- mathematical model does not allow that, and my -- and the implementation as I've followed it and understand it implements the mathematical model.

Q. So you're testifying that your model and methodology can never yield a damage estimate that exceeds the individual class member's spending in the real as-is world?

MR. BURT: Objection. Form.

Page 88

THE DEPONENT: That is my understanding, and I will qualify it by saying that there -- there is a procedure we follow in -- in handling IAP expenditures in the real world and in the but-for world, and the way we handle it is it does not allow overall IAP spending to go negative, if -- if you want to put it in those terms, so that the -- the difference between the as-is and the but-for price for IAP spending is never larger than the as-is price.

That's the way it's implemented, and that's inconsistent with the mathematical model.

Q. (By Mr. Swanson) Where -- where do you say that in your report?

Can you tell me where you disclose that particular implementation in your report?

A. It would be in the code in the backup for the original report.

Q. Okay. So the code for the backup for the original report will have some instruction in code that says make sure no matter what you do that in the but-for world, an in-app purchase price will never be negative?

MR. BURT: Objection. Form.

THE DEPONENT: Yes, with the explanation

Page 89

23 (Pages 86 - 89)

I just gave that the -- there is an issue of how 12:05:20 you handle individual IAP transactions, and the way -- the way that we implement it is we don't -- we do in terms of the portfolio of IAP purchased by an individual within a period, and so we do not 12:05:45 allow the but-for price of that portfolio to go below zero.

Beyond that, it is unnecessary to specify what's happening to the prices of individual items within the portfolio. 12:06:05

Q. (By Mr. Swanson) And did you write that code?

A. Did I personally write it? No. It was written under my instruction by team members.

Q. Okay. Did you verify that the code did 12:06:17 what you instructed?

A. If the question is did I go back and reread the code personally, no, I did not.

Q. Do you know the code does what you just said were your instructions? 12:06:38

A. I certainly queried the technical people that wrote it to -- as to what was done to make sure it was done satisfactorily and the -- I've been assured that it was.

Q. So, for example, you would have queried 12:06:56

Page 90

them to make sure that the code implements the 12:07:00 requirement that a but-for IAP price should never be negative?

MR. BURT: Objection to form.

THE DEPONENT: Again, the but-for IAP 12:07:16 price for the portfolio IAP purchase within -- within a time period, say within the month, cannot go negative.

In my judgment, it's not appropriate to do the analysis at the level of individual IAP 12:07:30 transactions. The -- the appropriate framework, in my view, for analyzing developer behavior is that -- is that they consider the portfolio of products you're offering under IAP and -- and their decisions are to maximize profits by pricing 12:07:57 that -- the overall level of their portfolios, and within the their portfolios they will make further decisions, but it's the overall pricing level of the portfolios -- portfolios that matter for the consumers and the model, which tricks those overall 12:08:19 prices to be nonnegative.

Q. (By Mr. Swanson) Well, let me ask you to turn to page 140 -- paragraph 140 of your reply report, which is on page 56.

Let me know when you get there. 12:09:39

Page 91

A. I'm on that page. 12:09:39

Q. Okay. Paragraph 140.

The first sentence of paragraph 140 reads "Professor Prince's Roblox analysis demonstrates why my modeling approach is reasonable and 12:09:49 consistent with market realities, while his alternative approach is improper."

What modeling approach of yours are you referring to here?

A. The approach of treating IAP pricing 12:10:10 decisions by developers as the pricing of a portfolio of different IAP items.

Q. And what do you mean by "portfolio"? Do you mean you aggregate them all together?

MR. BURT: Objection. Form. 12:10:27

THE DEPONENT: The answer is yes, by simply adding up the purchases of IAP for the developer, say for -- for a month.

Q. (By Mr. Swanson) So give me an example of how that works. I'm a developer; I have an app 12:10:42 and I have in-app purchases that cost 4.99, 9.99, and 20.99.

How does your model aggregate those different in-app purchases?

A. Let's -- let's for the sake of 12:11:05

Page 92

concreteness, take the -- the Robux example in 12:11:07 Figure 1. There would be some pattern of consumers buying 80, 160, 240, and -- and so forth, and the way to proceed is -- is under the assumption that in providing Robux to the Apple Store, what the -- 12:11:34 the developer does is look at the cost of providing whatever package or portfolio of these things is purchased in the market. You look at the cost of -- of that per additional purchase and look at the -- then at the marginal cost of that inferred 12:12:06 from the profit maximization equation.

And my view on that is that's economically appropriate because that is -- that's sort of the scale and -- and what I believe is a reasonable explanation of the -- of the focus 12:12:30 and target of -- of a developer. That is, they -- they will concentrate first on the -- the comparison of the price in the marginal cost of the portfolios they have, and behind that they may choose to optimize what are in those portfolios, 12:12:54 but -- but that's secondary and not necessary in terms of judging how their overall pricing affects consumers.

Q. Let's take a look at Figure 1 that you were talking about on page 57 of your rebuttal 12:13:13

Page 93

24 (Pages 90 - 93)

Veritext Legal Solutions
866 299-5127

report.                                           12:13:17
Suppose there's a consumer who's made only one purchase during the class period and it's for 80 Robux. You agree that here in Figure 1, 80 Robux in the real world cost 99 cents, correct?          12:13:27

A. Correct.

Q. What is the but-for price that your model calculates when you're looking at that individual consumer's injury and damages?

A. The answer is that -- that would be          12:13:58 attained by looking in the market at the purchases of Robux at various tranches and forming an average quantity and average price.

Q. Okay. But what's the but-for price for the individual consumer who only makes the purchase          12:14:22 of 99 cents for 80 Robux? You have to calculate damages for that person, right?

A. That's -- that's correct. And so what we do, what the code does is takes the average price as-is and but-for, takes the percentage change, and          12:14:43 applies that to the 99 cents.

Q. Are you sure of that?

A. Am I -- that is my understanding of what the software does. That was my instruction. And I think at some point there was a discussion as to          12:15:03

Page 94

whether it mattered whether this was done at this          12:15:06 stage or effectively at a later stage. Concluded it didn't matter.
But in any case, my instruction was to do it this way.          12:15:20

Q. So is this in the coding behind your original report?

A. That's my understanding, yes.

Q. And if your understanding is wrong, does that mean the coding was implemented incorrectly?          12:15:33

A. No, not necessarily. As I said, originally a -- a different method had been proposed, and I -- I question whether -- whether that mattered. I determined that I thought it was more sensible to do it on a percentage basis. I --          12:15:56
I did conclude, however, that it didn't really matter for the damage calculation which -- which way it was done, that in effect the damage harm is based on -- on the -- on a percentage, and it doesn't -- doesn't really matter if you          12:16:24 accumulate -- if you do the percentage first to the -- to the cumulative or you do the -- do the prices one at a time and then looked to get the same percentage, at least at the same answer.

Q. When you just testified that originally a          12:16:41

Page 95

different methodology had been proposed, what do          12:16:46 you mean? Did you propose a different method in your original report?

A. No. What I mean is that when the code was first written, it was -- it was written to          12:16:59 take -- take a -- a fixed dollar adjustment to each IAP item. And I -- on reviewing that, I said it would -- it would be more sensible to me from an economic point of view to apply a percentage, and as we worked it out, it turns out to not make any          12:17:27 difference or any discernible difference to the -- to the damage calculation.
But my preference for applying a percentage was implemented. At least I'm told it was implemented.          12:17:43

Q. So you're positive that the code was that turned over with the original report didn't calculate but-for prices for individual IAP items by subtracting a dollar amount associated with the portfolio of IAP items for that developer?          12:18:02

A. As I'm saying, at one point that was what the code did, and I had -- the code was changed at my request, and I believe that was changed before the original report was submitted. But since you asked the question, I can go back and -- and -- and          12:18:22

Page 96

check that.          12:18:26
But what I can tell you is that you get -- you get the -- you get the same number if you do it my way or you do it that way.

Q. Well, let's -- let's question that. Are          12:18:38 you saying that the but-for price for 80 Robux under the dollar as opposed to percentage method would not be minus 48 cents, according to your model?

A. What I'm saying is that the -- the          12:18:59 calculation of -- the calculation of the -- of the calculation of the harm for an individual consumer is, in my opinion, best represented through a percentage change, and in the -- in the implementation that I'm -- that I believe is -- is          12:19:23 in place, and I'm going -- I think it was in place in the original report, but -- but I'd have to go and check that -- that's done on a percentage basis, not on a fixed dollar adjustment basis as far as IAP item by item is -- is concerned.          12:19:44

Q. Well, is it your testimony that if a fixed dollar basis was used for this 80 Robux calculation that the but-for price would be positive instead of negative?

MR. BURT: Objection. Form.          12:20:04

Page 97

25 (Pages 94 - 97)

THE DEPONENT: I don't recall the -- the details of when I discussed that with the programmers and what was implemented exactly when. But my understanding was that originally it was programmed as a -- a fixed dollar adjustment and with a -- with a nonnegativity constraint and that I then asked that it be done on a percentage basis instead, and that was implemented.

Q. (By Mr. Swanson) Let me ask you to turn to paragraph 138 of your reply report. Let me know when you're there. It's on page 55.

A. Yes, I'm there.

Q. Okay. So in paragraph 138, you say, "Another criticism that Professor Prince makes regarding the 'mathematical assumptions' of the econometric model used in the second step of my methodology is that those properties have the implementation that 'developers change the price of all in-app purchase items by the same dollar amount in the but-for world.'"

Do you see that?

A. Yes.

Q. And Professor Prince is referring to the -- this dollar method that you talked about a moment ago, correct?

Page 98

A. That's correct.

Q. So are you saying here in your report that Professor Prince was wrong?

A. Yes. It's -- it's not a mathematical implementation of the model that IAP items would change in price in that way.

As the code was originally designed by -- by the programmers, it was written to do the calculation that way, but when I reviewed it, I concluded that it was more sensible to do it as -- on a percentage adjustment basis.

Q. So let me get this straight. Professor Prince was right about the original code, which he never saw, but he's wrong about the code that was actually turned over? Is that your testimony here?

MR. BURT: Objection to form.

THE DEPONENT: I would have to go back and review the -- the backup to my original report to determine what code was turned over with it.

Q. (By Mr. Swanson) Well, Professor, you understand you've made some very serious accusations against Professor Prince about not being scientific, not understanding econometrics.

Was it unimportant to you to determine whether or not your statement here taking issue

Page 99

with Professor Prince was correct?

MR. BURT: Objection. Form.

THE DEPONENT: First of all, let's understand exactly what paragraph 138 says. It's -- it's simply quoting him as to his claim. Okay?

Now, so what's the -- what's the question? So far we're -- we're not to my response.

Q. (By Mr. Swanson) Well, were you quoting his claim to say "good job, Professor Prince; you were right"?

A. Well, let's give me a few minutes to read on.

Q. Okay.

A. Yes. In paragraph 149 and 140, effectively what I'm saying is that Professor Prince has flagged this method of making us -- a fixed dollar adjustment per IAP item as -- as an issue, and he has proposed an alternative which, in my judgment, is itself not economically realistic, and that is the assumption that -- the -- the firm is -- is making a profit maximization decision on each individual IAP item, and the implication is it will have a very

Page 100

different marginal cost for different items within the IAP portfolio, as illustrated in -- in Figure 1 where, depending on how many Robux you buy, the -- the implication would be either a negative or a positive marginal cost. That, to me, is not -- is economically nonsensical.

Now, as to the -- as to the quote in paragraph 138, I have to go back and check as to whether the -- the way I did the calculation in the version of the software that I am familiar with was, in fact, what was turned over. I -- that's something I have to go back and check.

But I -- in my opinion, it's just -- the question of economic realism and -- and -- and having a sensible approach to this problem, a sensible approach is to think about the -- the selling of -- of a cluster of IAP detailed products by a -- by a developer. They would think about that in terms of the overall cost and revenue they can earn from selling that -- that portfolio.

It -- it does not make sense to talk about them doing it on -- on a piece-by-piece basis.

Q. Well, Professor, your paragraph 139 says: "As evidence to support this criticism" --

Page 101

26 (Pages 98 - 101)

referring to Professor Prince -- "Professor Prince modifies my model to estimate but-for prices for individual IAP items."

That's -- that's to support his criticism. His criticism was set forth in paragraph 138, correct?

A. Certainly the -- in the paragraph 138, which quotes him, quotes him as objecting -- claiming that the mathematical model requires a fixed dollar adjustment or actually implements a fixed dollar adjustment to each IAP item.

Q. And, Professor, under oath, swearing to the truth of what you say, is that what your code did?

MR. BURT: Objection. Form.

THE DEPONENT: As I've indicated, I have to go back and check what was -- the code in the background papers did. What I can tell you is that I instructed my team to do this in terms of a percentage adjustment on the -- on the average IAP price which, translated into an item-by-item basis, would be a percentage adjustment in each IAP item price. That was my instruction on how to do it. And the results of that is effectively the same damage calculation for -- by consumers before.

Page 102

Q. (By Mr. Swanson) Well, let's take that step by step.

First of all, if -- if that is correct, then you would agree with Professor Prince that the dollar method should not be used, correct?

MR. BURT: Objection.

THE DEPONENT: No. I would say that -- the -- the previous calculation was producing the same calculations of harm and who was harmed, as does the -- my preferred method of doing it, so that the -- the overall impact of using that previous method was -- was if not exactly approximately, be -- the same as using my preferred method.

Q. (By Mr. Swanson) Well, you keep it's the same. Are you talking about aggregate damages as opposed to whether individual class members are harmed?

A. I'm certainly talking about average -- average damages, but I also believe it would make -- make very little difference from the standpoint of -- of an individual as well.

But I -- I would -- I would agree that if an individual made a single purchase of a small IAP item for that individual, doing it by a percentage

Page 103

or doing it by a dollar amount would make a difference. That's true.

Q. Well, doesn't that method, when applied through your coding, show that one-tenth of the class has individual damages that are more than the amounts they spent individually in the actual world?

MR. BURT: Objection. Form.

THE DEPONENT: If I understand your question, you're asking me whether -- whether the first round of code before my percentage adjustment was introduced, did that -- and the answer is I don't -- I don't know. I haven't calculated or asked for those numbers.

But in the form in which I have asked and I understand has been implemented, that would not be the case.

Q. (By Mr. Swanson) So your testimony now is that absolutely it would be wrong to have a model where developers change the price of all in-app purchase items by the same dollar amount in the but-for world?

MR. BURT: Objection. Form.

THE DEPONENT: My testimony is that in terms of aggregate damages, it makes very little

Page 104

difference. In terms of the percentage of consumers who would be classified as harmed or unharmed, I don't recall -- I don't -- I don't recall doing that calculation or asking for that calculation. I -- I agree that it would make some difference.

Q. (By Mr. Swanson) And you agree that you signed off on paragraph 138 of your report without checking the code?

MR. BURT: Objection. Form.

THE DEPONENT: No, I don't agree to that. My -- my -- my understanding is the code, as I've described, was one in which the adjustments were made on a percentage basis, and if -- by -- by some sequencing that was not -- not the code that Mr. -- that Professor Prince received from us, that's regrettable.

Q. (By Mr. Swanson) But you checked the code before you signed off on paragraph 138? That is your testimony? I'm not asking what you assumed or what you thought. You checked the code before you signed off on paragraph 138?

A. I have -- I have explained the process here. I did not personally read this code. I gave instructions to and queried the programmers as to

Page 105

27 (Pages 102 - 105)

how it worked, and my understanding of that was as 12:35:01 I described, and that was -- that was something that was done well before the preparation of the prior -- prior report. In fact, I thought it was done in the original report. 12:35:16

Q. And if -- and if you're wrong, if the code actually did use a dollar method, would that be work that does not meet the standards of scientific inquiry?

MR. BURT: Objection to form. 12:35:37

THE DEPONENT: Well, I think the question is for what purposes, and I think for the question of overall damages, these calculations done either way are essentially equivalent. And in terms of, you know, whether individuals are affected or 12:36:07 unaffected, I believe the percentage adjustment is more economically sensible and the proper scientific protocol would be that I adopt the more sensible method, which I've done.

The question is simply at what point in 12:36:34 time. Was it done before or after the opening report? And I can't answer that without going back and looking at the background -- backup papers for the original report.

Q. (By Mr. Swanson) Could you turn to 12:36:49

Page 106

page 4 of your reply report, please. 12:36:51

A. Yes.

Q. So the title of this part of your report is "Methodology for Assessing Common Economic Proof of Impact," correct? 12:37:23

A. Correct.

Q. What is your definition of "common economic proof"?

A. It's the economic evidence which applies to impacts in this case phenomena are facts which 12:37:43 are classwide, that affect the entire class. They're not specific to individuals within the class.

Q. And what do you mean by the word "common"? 12:37:59

A. That it's -- that's it's economic evidence on -- on a marketwide basis, on evidence that affects all the consumers in the -- in the class is not -- it's not -- it's not individual to specific person -- people. 12:38:24

Q. What do you mean by "impact"?

A. The issue in this case is whether consumers were overcharged for their Apple Store purchases as a consequence of Apple Store conduct, and the issue, then, is what -- what those harms 12:38:54

Page 107

are and can they be measured in area and can they 12:39:08 be determined for the individual and could -- could compensation for those harms be distributed in the portion of the harm that -- that was actually incurred. 12:39:23

So that's -- those are the impacts that are of concern here.

Q. Do you agree that determining whether an individual class member has been harmed by the challenge conduct requires having that individual's 12:39:35 entire App Store transaction history?

MR. BURT: Objection. Form.

THE DEPONENT: I would say that the most precise determination of the net harm would be based on a given person's entire purchase history, 12:40:02 including across multiple Apple IDs, if they have multiple Apple IDs. Is it essential to have them all? And the answer is it -- it may not be essential in a sense that it's -- for example, perhaps there are old Apple IDs that an individual 12:40:32 has that terminated in the distant past that are -- where there was very little purchase activity, and ignoring them would have -- would have almost no effect on the total damage calculation.

So the -- the question is what the word 12:40:51

Page 108

"essential" means here, and I would say the best 12:40:54 solution would be to have them all, but it might be essential to have them all.

Q. (By Mr. Swanson) Did you determine whether any individual class member has been harmed 12:41:07 with the challenge conduct without having their entire transaction history for the whole class period?

MR. BURT: Objection. Form.

THE DEPONENT: Would you explain what you 12:41:24 mean by "any individual" as opposed to my previous answer?

Q. (By Mr. Swanson) Well, I'm not -- I'm not summarizing your previous answer. I'm asking you a new question. 12:41:38

A. Well, please ask it again, then, please.

Q. Okay. In order to determine whether any individual class member has been harmed by the challenge conduct, do you not need to have their entire transaction history for the whole class 12:41:58 period?

MR. BURT: Objection. Form.

THE DEPONENT: The answer is the most precise calculation that you could do would depend on their entire history, so that as a claimant, 12:42:16

Page 109

28 (Pages 106 - 109)

they would be asked to list all the Apple IDs that 12:42:19 they've had. The -- the Apple Store transactions records could then be used to verify those, fill in any that are omitted, eliminate those that shouldn't be there. That would be the -- that 12:42:41 would be the ideal procedure.

Are there shortcuts to that where you could say, if I don't -- if I don't do the complete and most complete and precise calculation, you could -- you could still bound the -- the impact or 12:42:57 dependably identify that they have been harmed? The answer is yes.

Q. (By Mr. Swanson) Well, how -- how in the world would you know a given individual had harm at all if you didn't know all their transactions? 12:43:13

MR. BURT: Objection. Form.

Q. (By Mr. Swanson) I'm not talking about precision. I'm talking about whether the number is positive at all. How do you know?

A. Well, I think the answer is -- is that 12:43:33 you can -- you can do the calculations for an individual based on all of the -- all of the Apple IDs that they -- they list and all of those that can be linked to the Apple's own records, and then the issue would simply be whether there are ghost 12:44:05

Page 110

accounts that no -- no one can find. 12:44:13

And I think the answer is that within -- within an acceptable degree of precision, you can make the determination of whether someone's net harm on the accounts you can identify is so large 12:44:39 that it's extremely unlikely that that could be offset by gains on the accounts that not have been identified.

Q. Well --

A. Because -- 12:44:54

Q. -- so you don't --

A. Statistically -- I'll finish.

Q. Okay.

A. Because statistically, there's -- there's a limit to how much there could be out there that 12:45:01 could be -- be a net gain.

Q. So if you've got someone's records from 2018 to 2021 and you look at all those and you don't have the records from 2008 to 2017, you can determine whether that individual is harmed? 12:45:29

MR. BURT: Objection.

THE DEPONENT: I think there is a -- a task for the processor of claims to -- to link all the existing records. But I see no -- I see no -- no insurmountable barrier to Apple finding all of 12:45:53

Page 111

the -- all the accounts used by a same individual 12:45:58 from the point that -- that they originally became clients of -- of the Apple Store.

Q. (By Mr. Swanson) Do you agree to merge all Apple IDs attached to a single individual would 12:46:14 be beyond the bounds of practicality?

MR. BURT: Objection.

THE DEPONENT: I'm -- you're quoting me, and I said in original report or in my deposition that I thought that that was impractical. And from 12:46:30 the standpoint of someone like myself sitting with the Apple Store records that I had, it -- it was an impracticality.

But I think as I thought further about what would be involved in a practical claims 12:46:46 process, I think that the burden would be on claimant to list all their Apple IDs and those -- those are verifiable or rejectable, and regional criteria -- criteria could be used for that.

So I -- I would say it's not as 12:47:07 insurmountable as I thought in the context of my original statement.

Q. (By Mr. Swanson) Well, do you agree that matching individual class members to Apple IDs is a hypothetical which has no practical possibility of 12:47:19

Page 112

implementation? 12:47:23

MR. BURT: Object to form.

THE DEPONENT: At this point, after thinking further about the claims process, no, I don't agree with that. I think my -- I will update 12:47:31 my opinion that I think that a properly designed claims process would make it practical to link the Apple IDs of any given individual.

Q. (By Mr. Swanson) Would you agree that it would be a Herculean task to match an individual 12:47:48 class member to all their Apple ID accounts?

MR. BURT: Objection. Form.

THE DEPONENT: As I thought about the design of a practical claims process, I have changed my opinion on that. My opinion is that 12:48:03 putting on -- putting the burden on claimants to list their Apple IDs and past credit card numbers or whatever you asked for, you can design a claimant process which would make this practical.

Q. (By Mr. Swanson) What is your 12:48:26 understanding of Apple's ability to link Apple IDs? What facts do you have about that?

A. My understanding was based on one of Apple's technical experts, and it is that Apple has a -- a great deal of -- of personal information 12:48:46

Page 113

29 (Pages 110 - 113)

about Apple customers, so that associated with each 12:48:51 active Apple ID account is -- is an email address, an active credit card, and addresses and phone numbers and all the things that are associated with use of current credit card charges, and that if you 12:49:15 combine that with a -- a carefully designed claimant process whereas the burden is on the claimant to provide all of their current and past Apple IDs that you could make -- you can make this a practical -- you can make this linking practical. 12:49:38

Q. So who has the information that -- that makes that linking practical? Are you asserting Apple has all the information?

MR. BURT: Objection. Form.

THE DEPONENT: That is my understanding 12:49:55 based on the -- Apple's technical expert on -- on Apple's store transactions.

Q. (By Mr. Swanson) So let's explore that.

So imagine a class member who has six Apple IDs. Do you find that to be an unlikely 12:50:14 hypothetical to start with?

A. The answer is that's certainly possible, yes.

Q. Okay. And is it your testimony under oath that Apple has all the information needed to 12:50:27

Page 114

say these six Apple IDs all belong to the same 12:50:31 person?

MR. BURT: Objection.

THE DEPONENT: My -- my testimony is that I -- I have -- based on the -- on an Apple 12:50:44 technical expert's report, the -- the assumption that Apple has names, addresses, credit card numbers, and other information for active Apple ID accounts and that presumably because all of these transactions are memorialized historically, as I 12:51:14 understand it, but if claimants provide their -- their past Apple ID accounts, then Apple would be able to make that linkage and potentially would have the ability to search further to verify that list of accounts to eliminate ones that are not 12:51:38 legitimate or add ones that have been forgotten.

Q. (By Mr. Swanson) So are you presuming that Apple has past credit card data?

MR. BURT: Objection.

THE DEPONENT: Certainly in the case that 12:51:59 any time an Apple account is active, there is -- there is credit card information associated with it and names, addresses, and all the things one needs to verify the credit card charges.

My general understanding from -- from 12:52:18

Page 115

your expert is that this expanded set of data on 12:52:20 Apple Store transactions is memorialized by Apple.

Q. (By Mr. Swanson) Which expansion -- what -- what expanded set of data are you referring to, and which expert are you talking about? 12:52:40

A. Excuse me. I will go look at my report for the name.

Q. Go ahead.

A. Okay. I'm referring to Exhibit 1 of the declaration of Mark Rollins. 12:53:13

Q. Okay. Do you understand Mr. Rollins to be an expert?

MR. BURT: Objection to form.

THE DEPONENT: I'm not sure what you'd call him, but I understand Mr. Rollins to be 12:53:28 knowledgeable about the Apple transactions database.

Q. (By Mr. Swanson) He is the one you referred to when you said "the expert"? You referred to "the expert" and "the expanded 12:53:37 database"?

A. He is the one I'm referring to, yes.

Q. Okay. So do you have any knowledge about this subject beyond what Mr. Rollins has in his declaration? 12:53:51

Page 116

A. The answer is basically no. Of course, 12:53:57 I -- I happen to know that with my own Apple Store accounts that they have my name, my address, my credit card information, and et cetera for the various accounts that I have. 12:54:10

Q. How many Apple IDs do you have?

A. Between myself and my wife, four.

Q. Well, just how about -- how about -- how many do you have?

A. I have two. 12:54:28

Q. And do you have an understanding of how many class members have multiple Apple IDs?

A. Only vaguely in the sense that I know how many customers roughly the Apple Store has and I know how many accounts it has, so I know that it's 12:54:49 on the -- on the -- certainly more than one account per person, but I don't know the number.

Q. You're aware, are you not, that there are more than 450 million total Apple IDs in the full App Store database produced in discovery? 12:55:09

A. Yes.

Q. And you're aware that there are a little over 200 million Apple IDs with paid transactions in the full database?

A. That's my recollection, yes. 12:55:25

Page 117

30 (Pages 114 - 117)

Q. In paragraph 16. Let's go to paragraph 16 of your reply report.

So in paragraph 16, at the end of that paragraph, you state that "no Apple ID should be excluded from the consumer class before the claims process described above is complete."

Do you see that?

A. Yes.

Q. So is it your view that the class could contain as many as 200 million Apple IDs?

A. Yes. I think the language should be that -- if the -- if the consumer class that's proposed is accepted, that's approximately how many Apple IDs would need to be processed.

Q. And how many individual members are there in the class?

A. I don't recall.

Q. Do you have any reliable estimate at all?

MR. BURT: Objection. Form.

THE DEPONENT: I don't recall asking, and so I have no idea.

Q. (By Mr. Swanson) Well, who would you ask? You're the expert, aren't you?

A. Well, I'm the expert on the economics of -- well, the economics -- of the common economic

Page 118

evidence, but I'm not necessarily the expert on the -- the legal definition or identification of the class.

Q. Well, as an economist, how would you go about -- knowing that there are little over 200 million Apple IDs with paid transactions, how would you go about determining how many members of the class there are?

MR. BURT: Objection. Form.

THE DEPONENT: Well, obviously a place to start would be to start with currently active Apple IDs. Use the name, address, and credit card information that Apple has, link -- link the ones that are the same, and then count how many linked people you have. That would be -- that would be a -- a very good first approximation.

Q. (By Mr. Swanson) And if you had to estimate, would you estimate that the class contains tens of millions of members or hundreds of millions of members?

MR. BURT: Objection. Form.

THE DEPONENT: I don't know that I would want to venture an estimate. I would simply say that it -- it might be reasonable to take the number of Apple ID accounts and divide it by the

Page 119

approximate number of accounts per person that you could obtain or estimate from a -- from a very quick consumer survey. That would be a -- one way to estimate it.

Q. (By Mr. Swanson) And have you looked into that at all?

A. No.

Q. Okay. Do you know how many average Apple IDs the named class representatives have?

A. I do not.

MR. SWANSON: Okay. It is about 1:00 o'clock West Coast time, so I think we agreed we'd do a lunch break.

At this point, why don't we go off the record and figure out how long that will be.

THE VIDEOGRAPHER: We're going off the record at 1:00 p.m. This is the end of media 3.

(Recess taken.)

THE VIDEOGRAPHER: We are on the record at 2:01 p.m. This is the beginning of media 4 in the deposition of Daniel McFadden.

THE DEPONENT: Okay. Before we begin, I need to correct a misstatement that I made -- several misstatements that I made this morning. I checked with Dr. Song as to whether my

Page 120

memory was correct about what was in the backup papers for the original report. He said go back and look at the original report and your deposition and your deposition corrections, which I did, and on the basis of that, I realize that what I said this morning was -- was incorrect.

So if you will permit, I will simply tell you what -- what the correct response should have been. Is that all right? Could I just put this in the record?

Q. (By Mr. Swanson) Well, first of all, do I understand you have been consulting other people about your deposition testimony during this deposition today?

A. No. As I mentioned this morning, I needed to check the backup, and all I did was ask him whether my memory was correct, and he simply said, look at -- look at your own past record. That was the conversation, and then I did so on my own.

Q. And you've not been talking to anyone, including counsel, about the substance of your deposition while this deposition is pending today, correct?

A. I did not.

Page 121

31 (Pages 118 - 121)

Q. Okay. Are you referring to the questions 02:03:03 I asked you about whether your original report calculated IAP prices using the -- what we call the dollar method?

A. Yes. 02:03:18

Q. And, in fact, your original report did use the dollar methodology, correct?

A. What's -- what's the case is in the original report, damages were calculated using IAP average cost and average price per app year. The 02:03:35 econometric model was estimated using IAP individual transactions. The app level -- app transaction level data or assumptions were never used in -- in any of the calculations actually reported in the original report, so the total 02:04:03 damage calculation and the percentage had never harmed in the original report, did not require that and did not use that.

In my first deposition, I already stated in error that it was a percentage adjustment, and 02:04:27 then I corrected that in the correction to my deposition and said it was -- it was indeed the -- a fixed dollar amount adjustment was the one that was implicit in the actual damage calculation done in the original report. 02:04:49

Page 122

Now, in the reply report, all the 02:04:52 calculations continue to use the dollar method, and that's because they were replies to -- to Professor Prince's calculations using the dollar method. And the statement I made this morning that 02:05:09 the percentage method had been implemented, that is correct. It has not been implemented in the code to this point.

Now, the percentage method is my proposal for the best way to do individual damage 02:05:26 calculations, because I believe it is a better description of what developers would do in the but-for world than the -- the fixed dollar method.

But at this point, the details of the design of the claims process and how that's set up 02:05:48 has -- has not yet been completely described, and, as I say, my current proposal is that that would be done a percentage method rather than a fixed dollar method.

So that's -- that's the -- the 02:06:09 correction. I -- I apologize, particularly since I already made this mistake once before in the -- in the previous deposition.

It's a -- clearly a difference between how I -- how I think about this and what's -- what 02:06:27

Page 123

was actually practical to implement at the time. 02:06:31

Q. Professor, you mentioned not using -- and I'm a little unclear which method you said you didn't use or that didn't effect your calculation of uninjured accounts in your original report. 02:06:50

But your calculation of individual uninjured accounts in the original report was based an improper measure? It wasn't a net harm measure, was it?

A. It was not a net harm measure. It was -- 02:07:11 it was properly described as -- as a measure of those who were never harmed, and in that sense it was completely proper. But both numbers, that number and -- and the net number, are, I think, useful. 02:07:31

Q. Let me ask you to look at paragraph 12 of your reply report.

A. I -- yes, I now have it. One moment.

Q. Sure.

A. Which -- which paragraph again? 02:08:15

Q. Paragraph 12. It starts at the bottom of page 4.

A. Yes, I have that now.

Q. So paragraph 12 involves what you call "a process for identifying and compensating harmed 02:08:38

Page 124

class members," correct? 02:08:41

A. Correct.

Q. And the process that you propose does not occur until after a judgment is entered against Apple, correct? 02:08:50

MR. BURT: Objection to form.

THE DEPONENT: That's -- that's a legal question. I don't know quote how class action works, but I -- I assume that that would be the natural sequence, that a judgment -- that there 02:09:04 were damages would be combined with approval of -- of a distribution process.

Q. (By Mr. Swanson) Well, your paragraph 12 says: "If a judgment is entered against Apple, here is a practical process for identifying and 02:09:22 compensating harmed class members."

So you're the one who's assuming a judgment is entered first, correct?

MR. BURT: Objection. Form.

THE DEPONENT: No, that's not the 02:09:34 intention. That simply says if -- if -- this would be -- I presume that a practical process that would be proposed to the -- to the court as part of class -- the class certification question as to whether there is a practical method for 02:09:52

Page 125

32 (Pages 122 - 125)

distributing compensation for harm. 02:09:55

Q. (By Mr. Swanson) But what do you mean by the words "if a judgment is entered against Apple"?

A. That if a judgment is -- is -- I simply mean that if -- if the consumers are entitled to 02:10:16 compensation, this is a practical process for how individual harmed claimants would be identified.

Q. So if a judgment is entered finding that Apple is liable to all the members of the class, then you proceed to this process? 02:10:36

MR. BURT: Objection. Form.

THE DEPONENT: You're asking me a question which I -- I think is a legal question, which is -- how are -- how are class-action rulings implemented. And my -- my general understanding -- 02:10:57 it's not a legal understanding -- is that for class certification, it's -- the plaintiffs need to show that there were -- there were damages, that those damages are identifiable to individual members of the class, and there's a practical method for 02:11:16 identifying them, measuring the aggregate harm or damages, and distributing it appropriately to the individuals in proportion to their harm, actual harm.

Q. (By Mr. Swanson) Now, if paragraph 12 is 02:11:43

Page 126

about a legal process, are you an expert on claims 02:11:44 processes for resolving legal matters?

A. No. I specifically said that I'm not a lawyer and that -- but -- what I just described is what -- what I have -- understand, have been told 02:12:01 as part of my assignment as to what -- what are the elements that need to go -- need to go into the analysis that I do on behalf of the plaintiffs.

Q. Do you agree that the process you described for identifying and compensating harmed 02:12:20 class members is necessary to identify which class members were actually injured by Apple's alleged conduct?

MR. BURT: Objection. Form.

THE DEPONENT: I think the question is 02:12:37 is -- does there exist a process, a practical process, to accomplish this. And this is simply one -- one proposed way one might go about it.

Q. (By Mr. Swanson) So this is not a necessary process to identify which class members 02:12:54 were actually injured by Apple's alleged conduct?

A. Well, think to the extent that it is important for individual claimants to accumulate all of their Apple IDs or -- and to combine them so that the net -- the net damage to them can be 02:13:19

Page 127

calculated at the individual level, that this or 02:13:23 something like this is a practical way and presumably one possible way to do it.

Q. Do you agree that this process or something like this process is necessary to 02:13:41 identify how many class members were actually injured by Apple's alleged conduct?

MR. BURT: Objection to form.

THE DEPONENT: I would say that it can be used for that purpose. I have not thought about 02:14:02 the question of whether there are -- are shortcuts that could be -- used to identify the number of injured class members.

Q. (By Mr. Swanson) This is the only process you thought of that would answer that 02:14:19 question?

A. Well, clearly, you can begin to bound that number. For example, this morning we talked about taking the total number of Apple IDs and using some information on the average number of IDs 02:14:33 per person to make an estimate of that number.

So I think that it's possible to get probably -- possibly quite good estimates without going through this entire process.

Q. Well, what we talked about earlier was 02:14:49

Page 128

estimating the size of the class. That wasn't the 02:14:51 process for estimating the number of harmed members of the class, was it?

A. Yes, that's -- that's correct.

Q. Now, Professor, suppose a consumer has 02:15:09 two Apple ID accounts, like you do. And hypothetically assume that one incurs an overcharge of $10 and the other account is better off in the but-for world by $20; so on net, the consumer gained $10 from Apple's challenged conduct. 02:15:31

Are you with me?

A. Yes.

Q. Okay. If the consumer only remembers the Apple ID which incurred an overcharge, your proposed method would determine that consumer's 02:15:47 eligible for $10 in damages, correct?

A. The potential feasible procedure I've described would ask the claimant to list all of their Apple IDs and would leave the opportunity for Apple or whoever processes these claims to link 02:16:13 Apple -- link Apple IDs, including the ones listed by the claimant and any others that are in Apple's records.

Q. So if the hypothetical class member only remembers the account that was damaged, then unless 02:16:37

Page 129

33 (Pages 126 - 129)

Apple somehow figures out how to link the two 02:16:42 accounts, Apple is going to be forced to pay that uninjured class member $10, correct?

MR. BURT: Objection. Form.

THE DEPONENT: The -- the answer is yes. 02:16:56 And of course this could go the other way. If the -- if the consumer fails to remember a past account on which they suffered harm, it could go in the other direction.

Q. (By Mr. Swanson) Right. 02:17:12

And -- and it's important that it go in the accurate direction. Wouldn't you agree that unharmed class members should not be compensated and harmed class members should be compensated?

A. I agree with that in -- in principle. I 02:17:31 could imagine that there are ways to set up a practical procedure which would approximate that, with not necessarily being perfect.

Q. Right.

Your idea of something that's not 02:17:49 necessarily perfect would involve how many unharmed class members being compensated?

MR. BURT: Objection. Form.

THE DEPONENT: I don't -- I don't have a number in mind. But I think that there's some -- 02:18:07

Page 130

as I understand it, legal precedent for what kinds 02:18:11 of class with a mix of injured and noninjured parties get certified or don't, so I would assume that the appropriate threshold here would -- should be consistent with the legal precedent. 02:18:30

Q. (By Mr. Swanson) Okay. And if the legal precedent says that only a de minimis number of uninjured class members should be compensated, what would you view, as an economist, a de minimis number to be in the context of this class action? 02:18:46

MR. BURT: Objection.

THE DEPONENT: I certainly don't have a fixed number in mind.

Q. (By Mr. Swanson) Is it more than 10 million? 02:19:10

MR. BURT: Objection. Form.

THE DEPONENT: I don't have a fixed number in mind.

Q. (By Mr. Swanson) Would you rule out 30 million uninjured class members? 02:19:18

MR. BURT: Objection to form.

THE DEPONENT: In my understanding of the legal precedents, the issue that the courts have offered opinions on are the percentage of purported class members who are injured. And so I think if I 02:19:37

Page 131

were to -- if I were to give you a number, it would 02:19:42 be a percentage of the class, and I have not done any systematic review of the legal precedents, nor am I qualified to do so, so I cannot myself produce that number. 02:20:01

Q. (By Mr. Swanson) If you could look at paragraph 12e, which is the bottom at page 5. Let me know when you're there.

A. Yes, I have that.

Q. You indicate here that your process for 02:20:32 identifying and compensating harmed class members involves for each claimant calculating the net overcharge explained in your reply report, Section IV.C, for each paid transaction and then summing these overcharges over all the claimants' 02:20:50 paid transactions.

Is that -- is that your opinion?

A. Yes. That's a correct summary of what that paragraph says.

Q. Okay. Does Section IV.C of your reply 02:21:02 report set forth a single method for calculating net overcharges?

A. I will take the time now to go back to IV.C.

Am I correct that you are referring to 02:21:41

Page 132

the reply report material beginning on page 82? 02:21:45

Q. Let's see. That appears to be Section IV.C.

But it's your reference, so you let me know. 02:22:04

A. That's fine. And I'll take a little time to go through that.

I have reviewed that. At least I've tried to. So please state your question.

Q. Okay. So my question was -- well, let me 02:24:23 amend it slightly.

Don't you identify alternative methods for calculating net overcharges in Section IV.C for games, music, and entertainment?

A. Could you explain what you mean by -- am 02:24:51 I proposing alternative methods? I don't -- can you be more specific?

Q. Sure.

Why don't we turn to your Figure 5 on page 86. 02:25:04

Are you there?

A. Yes.

Q. So you have two columns here, one for top 70 percent revenue apps and app-yearly and another column for all apps and app-monthly. 02:25:28

Page 133

34 (Pages 130 - 133)

Do those two columns correspond to 02:25:33 different ways to calculate net overcharges?

MR. BURT: Objection. Form.

THE DEPONENT: The columns correspond to simply bringing in -- into the calculation the -- 02:25:54 the remaining 30 percent of -- of the apps and basing the calculation on -- on a monthly analysis rather than a yearly analysis.

Q. (By Mr. Swanson) Right.

And these are -- in your review, are 02:26:18 these two alternative ways of doing the calculation, or are you -- or are you opining that one of them is the absolute best way?

A. I would say that the -- all apps and app monthly is a -- is a refinement. It should be -- I 02:26:41 believe it would be more precise.

Q. Are there other ways to refine your methodology other than this one?

MR. BURT: Objection. Form.

THE DEPONENT: I can't answer 02:27:21 categorically yes or no, but as I sit here, I can't think of obvious alternatives -- alternatives.

Q. (By Mr. Swanson) Okay. Now, this is your reply report. Why did you use a less precise method in your opening report? 02:27:39

Page 134

A. In the opening report, there was a -- 02:27:47 a -- a question of the size of the calculation that required -- that was required and the -- and the focus of the calculation on the primary sources of -- of harm. So the objective was to do a 02:28:07 calculation which reflected the -- as accurately as possible the overall harm to the -- to the class.

As you move from a determination of overall harm to the assignable harm to identify individuals, then it's desirable to scale -- scale 02:28:36 up to include all -- all of the apps that an individual might acquire.

Q. Does what you call the "all apps approach" actually include all apps in these genres that have paid transactions? 02:28:56

MR. BURT: Objection. Form.

THE DEPONENT: The calculations in this figure are still based on -- on my sample. But they're -- they are intended to indicate what -- what I expect, if it was done for the universe of 02:29:18 apps.

Q. (By Mr. Swanson) Well, you indicate in your report that this, quote/unquote, all-apps approach includes about 76 -- I think 76, somewhere around there -- thousand more apps than your 02:29:35

Page 135

original calculation from your first report. Is 02:29:39 that -- is that generally correct?

A. That's my recollection, yes.

Q. Okay. And the additional number of -- I'm just trying to see if I've got the number 02:29:53 written down somewhere. But the additional 70,000-plus apps that are involved in your all-apps calculation don't amount to all apps in the game, entertainment, and music genre that are paid, right? 02:30:16

A. Well, I think the only exclusion is that you don't capture all paid apps from the one-tenth to 1 percent sample.

Q. Okay. So would using all of those apps be even more precise than the method that you label 02:30:41 "all apps"?

A. I would say that adding them is -- is in the noise, because if -- if they're not purchased by -- by anyone in a sample this size, they are -- they are negligible prior to the market. They are 02:31:03 the last -- they -- they can and will be accounted for in -- in the final calculation.

Q. Well, okay. How do we -- how will we know how many uninjured class members there will be when you do that calculation -- or when someone 02:31:23

Page 136

does that calculation? 02:31:27

A. You would know it when you do the -- do the claims process.

Q. So you don't know now?

A. That's correct. I do not know now. 02:31:39

Q. Now, in your all-apps calculation, you indicate here in Figure 5 that the number of uninjured Apple ID accounts is 15.3 percent?

A. Correct, yes.

Q. And that's about a little more than 02:31:58 30 million Apple ID accounts?

A. I only think of this in percentage terms. I -- I see no point in -- in -- in making the scale of this class an issue. It's not an issue for the economic analysis, and if it's a legal issue, it's 02:32:23 beyond me. I have no economic opinion on whether that legally.

Q. Yeah. Well, I'm just asking you a numerical question, which is what does 15.3 percent of these Apple IDs for these genres correspond to 02:32:37 in terms of actual numbers?

A. I haven't done the calculation. And of course I will point out that this is percent of accounts, not percent of consolidated accounts for actual people. 02:33:01

Page 137

35 (Pages 134 - 137)

Q. Yeah. I didn't ask in terms of actual people. I asked how many Apple IDs it corresponded to. 02:33:02

A. Yes. As long as we are on the same understanding, I agree. 02:33:17

Q. So you don't know? You have no idea?

A. I have not done that calculation.

Q. You don't know if it's tens of millions of Apple IDs?

MR. BURT: Objection. Form. 02:33:26

THE DEPONENT: I don't think the calculation is relevant, and I haven't done it.

Q. (By Mr. Swanson) Now, in your opening report, with your top 70 percent approach, you calculated that 14.6 percent of Apple IDs were uninjured, correct? 02:33:43

A. Well, the precise statement is that I did not calculate that number in the original report. Professor Prince calculated and -- and I verified his calculation. 02:34:03

Q. Okay. You reported 5.8 percent in your opening report, right?

A. I believe that's the number, but understand that's a different number. That's the number of people who never had a purchase that -- 02:34:15

Page 138

in which a benefit has calculated. Sorry. Never -- never had a purchase in which a harm was calculated. 02:34:21

Q. And that's the number you reported in your opening report, correct? 02:34:33

A. Yes. I believe I stated that correctly, yes.

Q. Okay. And yet the real number of unharmed Apple IDs was 14.6 percent, correct? You don't dispute that? 02:34:47

A. The -- I'm not sure. I object to the use of "real number" versus the notion that somehow the other one was unreal. The other one was what it was. It was correct for describing what it described. 02:35:06

But I agree that if you -- if you net and use all apps and you do this on a monthly basis, then it's 15.3 percent.

Q. Okay. Now, does the 15.3 percent include every one of the Apple IDs that was included in the 14.6 percent? 02:35:25

A. I -- I believe so.

Q. And what do you base your belief on? Have you -- have you checked that calculation?

A. It's -- it's the same sample, and I see 02:35:53

Page 139

no reason why these two different calculations would eliminate any Apple IDs. 02:35:56

Q. Well, they're different overcharges, aren't they?

A. I thought the question was whether Apple IDs were being eliminated. Did I misunderstand your question? 02:36:14

Q. Yeah. I don't know.

My question was you had 14.6 percent uninjured corresponding with the approach reported in your opening report. Those are 14.6 percent specific -- very specific Apple ID accounts. Are all of those very specific Apple ID accounts included, every single one of them, among the 15.3 percent you report for your all-apps method? 02:36:27 02:36:44

A. Yes. That's what I understood to be your question previously, and the answer is as far -- as far as I know, they would be exactly the same. It's exactly the same sample, and I can't think of any reason that this method would have dropped apps. 02:37:03

Q. Well, would you have expected this method to come up with exactly the same calculated overcharge?

A. No, not -- not exactly the same. 02:37:21

Page 140

Q. Okay. But you think the uninjured Apple IDs should be exactly the same as in the earlier -- with a few extras? 02:37:23

A. I'm sorry. I'm having trouble -- I'm confused between what we're talking about. Are we talking about the -- the Apple -- the Apple ID records that go into the calculation, or are we talking about the Apple ID accounts that are -- that are -- show up as uninjured in the calculation? 02:37:41 02:38:01

Q. We're talking about the list of Apple IDs that would correspond with the 14.6 and the 15.3 percent.

A. Okay. Then I did misunderstand your previous question, because I -- I understand it to mean the -- the population of Apple IDs that were being -- that formed the denominator in these numbers, and my statement was I believe the denominator is the same for both numbers. 02:38:13

Now, I -- now I understand that you're asking me about the numerator, and the answer there is clearly not necessarily the same. But certainly a different number of -- of them in the right-hand column versus the left-hand column, and there may be some shuffling in and out as well. 02:38:32 02:38:53

Page 141

36 (Pages 138 - 141)

Q. Okay. Thank you. That was my question, and that is the answer.

In -- in your Section IV.C of your reply report, you have not laid out the means for calculating harm or damage for any of the two dozen app genres other than games, music, and entertainment, correct?

MR. BURT: Objection. Form.

THE DEPONENT: Please -- please state the question again.

Q. (By Mr. Swanson) Sure.

In your Section IV.C of your reply report, you have not laid out the means for calculating harm or damage for any of the dozen other app genres beyond games, music, and entertainment, correct?

A. No, I -- I disagree with that. I've -- I've set out a methodology, which I have applied to -- to two different categories. There are -- if you like one category and an aggregate of two other categories. That methodology would be applied to every other category. There are elements in that methodology that require that you use information specific to the genre, and that -- so it's not a completely mechanical process and should not be

Page 142

used mechanically. But it's -- it's a -- it's a road map. It's a program for doing it for all of the genre.

Q. Well, it's a road map that you've tested out on three but not tested out on 24 other genres, correct?

A. It's a road map which I've tested out a majority of the App Store revenues.

Q. And there are -- (indiscernible).

(Court Reporter asks for clarification.)

THE WITNESS: Sorry. Please repeat that. It was muddled.

MR. SWANSON: I will.

Q. (By Mr. Swanson) It is a road map with 24 more genres to go, correct?

A. There -- there a quite a few genres to go. Many of them -- as a side comment -- are relatively minus sources of Apple Store revenue are going to have a small effect on any damage award just in terms of the size of the -- of the damages requested.

Q. So you're saying a class member's interest can be disregarded if they happen to be purchasing only in a small genre?

A. I'm not proposing disregarding these

Page 143

genres, no. I think they properly belong in the calculation.

Q. Let me ask you to turn to paragraph 202 of the reply report. That starts on page 83.

A. I have it.

Q. Okay. You discuss in paragraph 202 a basic data processing error described in Professor Prince's report, correct?

A. It's -- it was a data processing procedure which he calls an error. I would -- I wouldn't label it an error. It was simply using the computer and closing point algorithms as they come, but I accept that it's probably -- as an econometrician, it's probably better to do this using -- using an agreed-on threshold rather than a closing point threshold.

Q. You chose in your original report to model but-for prices only for apps whose price did not change over a calendar year, correct?

A. Correct.

Q. And to identify those apps, you calculated the minimum and maximum -- or at least you had calculated the minimum and maximum monthly average prices of a given app and you dropped any app where those prices were not the same, right?

Page 144

A. That's correct, using the computer -- standard computer comparison to determine whether they're the same or not.

Q. And in doing this, your computer dropped apps whose minimum monthly average price was not precisely the same as its maximum monthly average price over a given year, right?

A. My understanding is that that did happen, yes.

Q. And in -- in paragraph 202, what do you mean when you say I that the average prices of the dropped apps were not "precisely the same"?

A. I'm sorry. What are you referring to and what's the question?

Q. My question is what do you mean when you say that the average prices of the dropped apps were not precisely the same?

A. What -- what I mean is that when -- when computers represent numbers including -- including point, they keep about 12 digits of accuracy or something like that, and depending on how data is processed, you could have a round up or round down in -- in the last digit, and that apparently was enough to trigger computer indications of a price change.

Page 145

37 (Pages 142 - 145)

Q. Do you agree with Professor Prince that your analysis excluded apps that have prices that are really the same?    02:45:48

A. Please repeat the question.

Q. Do you agree with Professor Prince that your approach excluded apps that have prices that are really the same?    02:45:59

A. I would -- I would agree that it -- it dropped apps where this -- including point round-up from -- occurred, and presumably that's -- that's because the round-up error was a misrepresentation of the -- of the actual price. I -- I -- I accept that is probably the case.    02:46:27

Q. And the approach omitted apps that should have properly been included, correct?    02:46:50

A. Omitted app years observations that would have been included had you used a somewhat more forgiving and robust method of asking whether two numbers are the same.

Q. Well, and it was Professor Prince who implemented a more forgiving and robust process for determining whether two numbers were actually the same, wasn't it?    02:47:11

A. He certainly did that, yes. And -- and I have reported numbers where I've -- where I've    02:47:28

Page 146

adopted what he did.    02:47:34

Q. And you could have done that yourself -- correct? -- in your opening report?

A. I was not aware of this problem in the -- my opening report.    02:47:44

Q. But you don't think it was an error? It was the computer's fault?

MR. BURT: Objection. Form.

THE DEPONENT: I don't -- I don't think the issue is -- is an error or a fault. It was --    02:47:58
it's simply doing it one way and the computer does that in a way which produced some unexpected results, and I think that Professor Prince's more forgiving way of doing this is more reliable.

Q. (By Mr. Swanson) Do you dispute that    02:48:25
when this issue was fixed, the number of unharmed Apple IDs increases?

A. My observation is that that number is quite sensitive, apparently, to this and -- and the overall damage numbers is not. And I do agree that    02:48:43
it -- I verified that it does make a difference in the number of -- of people that are tagged as uninjured.

Q. And so you agree that for your model to report accurate results, including an accurate    02:49:04

Page 147

accounting of the number of unharmed Apple IDs, it is necessary to fix the so-called machine precision issue?    02:49:07

MR. BURT: Objection to form.

THE DEPONENT: I -- I don't agree to that, actually. I think -- I think it is    02:49:21
reasonable to do that, but I would make the following comment: that these -- these cases, these people who are flipping from injured to uninjured here, involve tiny amounts of money    02:49:40
either way, and they -- they are going to have little or no effect on any kind of overall damage award. And, in fact, whether they are compensated or not by some very small amount of money is itself going to be -- inconsequential.    02:50:05

Now, it's -- but I think it's true that -- that the number of them that might get a dollar or not get a dollar demonstratively was affected by -- by this machine round-up problem.

Q. (By Mr. Swanson) Well, the issue of    02:50:26
unharmed class members isn't just an issue that relates to people who get a dollar or not a dollar, is it? You had 7 percent uninjured before you acknowledged that this was a reasonable correction to make, didn't you?    02:50:44

Page 148

A. Please repeat the number that you just gave me.    02:50:47

Q. Did you not acknowledge that a little bit more than 7 percent of accounts were uninjured before fixing this issue?    02:50:56

A. My correction is that the combination of fixing this issue and going to a month-by-month calculation, which is also a major source of -- of eliminating -- of changing the number of -- of app periods that come into play -- those two things    02:51:20
together make the difference, go from 7.7 to about 15 percent.

So, yes, I agree that that is substantial in terms of the actual count. I understand that the courts may or may not be consider that to be a    02:51:39
legal issue. But, again, I would just repeat what I -- my previous answer, which is that from a stand -- economic point of view and from the actual accounting dollar damage distribution of damage point of view, it does not make much difference.    02:52:00

Q. Let me ask to turn to paragraph 1 -- 117 of your reply report.

A. I have the paragraph.

Q. And this relates to a calculation that you made of but-for world results on the assumption    02:53:02

Page 149

38 (Pages 146 - 149)

that price tiers remained in effect; is that a fair    02:53:10 summary?

A. Give me one minute to get the context of this paragraph.

Yes, I have reviewed this -- the    02:53:22 preceding paragraphs. Now the question.

Q. Yeah. The question I wanted to focus on what you report on in that paragraph on page 48, the top of page 48. You indicate that your analysis as reported in that paragraph increases    02:54:42 the percentage of unharmed Apple IDs from 7.7 to 11.4 percent.

Do you see that?

A. Yes.

Q. In making that calculation, did you    02:54:56 correct for the computer floating digit issue?

A. I would to go back and check.

Q. Okay. Well, if I represent to you that it didn't, can you explain why you wouldn't have made that correction in reporting the results in    02:55:27 this paragraph?

A. Oh, I think the general rule that I'm following in -- in replying to your expert's critiques is to examine each one in turn, leaving in place everything else in my original report.    02:56:01

Page 150

And so this would be consistent with that.    02:56:08

Q. Well, do you know what the number is when you fix the computer problem?

A. I -- I'm -- I will accept your representation that this doesn't fix it, but, in    02:56:26 fact, I -- I don't know whether it does or not, and I don't know if it doesn't do it, what the answer would be if it did do it.

Q. Okay. Would you not expect that it would yield a higher percentage of unharmed Apple IDs    02:56:44 than 11.4 percent if it was fixed when it hadn't been fixed before?

A. I believe that if you did the steps that we just discussed in Figure 5, which is to use all -- all apps that appeared in the sample I    02:57:18 worked with and -- and replaced this floating point round-up criteria with a more robust one than it would be larger than 15.4 percent. There are, of course, almost certainly some overlaps, so I don't know how much larger it would be.    02:57:46

Q. Okay. Thank you.

Your analysis in paragraph 117 considers only the effect of price tiers on app download prices, correct?

A. Yes. That's my understanding.    02:58:39

Page 151

Q. Okay. So you didn't model how developers    02:58:41 might set in-app purchase prices if in the but-for world they were still required to price according to Apple's price tiers, correct?

A. I do not believe that is included in this    02:59:13 paragraph.

Q. Okay. If Apple removed its price tier policy or was made to remove its price tier policy, would you expect that app prices would still cluster at 99-cent price points?    02:59:33

A. I agree that focal point pricing is common, and I agree that I would expect to see it in -- in any world, including a but-for world.

But I would expect any -- any firm that's maximizing profit and their self-interest would --    03:00:04 would weigh what a using a focal point would do to demand versus using one which would maximize profits in the absence of a demand response to focal points. That's a -- that's a calculation that I presume every gas station makes every week.    03:00:26

Q. So the answer is yes or you're not sure?

A. The answer -- the answer is a qualified yes. I would expect to see it, but I would expect that the self-interest of firms would be to not -- do something different if it was in their interest.    03:00:52

Page 152

So if it was $1.99 and they find it in their    03:00:56 interest to go to $1.79, they would do that.

Q. Did you review the analysis of Professor Schmalensee where he found that of Google Play's top 100 paid apps, 83 percent had prices    03:01:10 ending in 99 cents?

A. I -- I recall that, but I don't recall the details.

Q. In your model, where there are no price tier constraints for the but-for world, what    03:01:29 percentage of but-for prices that you estimate actually end in 99 cents?

A. Well, I don't -- I don't know, but I would say one out of 100 would be a good guess.

Q. Because it would be random?    03:01:52

A. Yes.

Q. And none of your models account for the incentive of developers to choose 99 cent price points even absent Apple's price tiers, correct?

MR. BURT: Objection. Form.    03:02:08

THE DEPONENT: It is correct that in my model where I do calculations assuming that price tiers are not allowed that I assume they would pick the price that is the maximum profit to them without having to worry about demand being    03:02:35

Page 153

39 (Pages 150 - 153)

responsive to whether it's a focal point or not.    03:02:40
And if that's -- that's a phenomenon, I would
expect them to adjust their prices towards focal
points up or down.

MR. SWANSON: Okay. We've gone for an    03:03:00
hour, I think, so why don't we take a brief break
at this point.

THE VIDEOGRAPHER: We're going off the
record at 3:03 p.m. This is the end of media 4.

(Recess taken.)    03:03:26

THE VIDEOGRAPHER: We're on the record at
3:13 p.m. This is the beginning of media 5 in the
deposition of Daniel McFadden.

Q. (By Mr. Swanson) Professor, when we came
back from the last break and you offered up some    03:13:33
corrections, were you reading from anything?

A. I made myself notes, yes, and I referred
to those as I spoke to you.

Q. Okay.

MR. SWANSON: I'd like to have those    03:13:47
marked as a exhibit in the deposition, so can you
please preserve those.

THE DEPONENT: Very well.

MR. SWANSON: Okay.

Mr. Burt, will you undertake to have that    03:13:58

Page 154

added as Defense Exhibit -- I think that would be    03:14:01
41, Mr. Phillips?

MR. PHILLIPS: 42.

THE DEPONENT: I should just comment that
what I said was not a direct reading of that. I    03:14:18
used it as a reminder of points that I needed to
correct.

MR. SWANSON: I think that would be
Exhibit 41 -- or 42. I'm sorry. Mr. Phillips has
corrected me already.    03:14:33

(Exhibit DX 0042 was marked for
identification by the court reporter and is
attached hereto.)

Q. (By Mr. Swanson) All right. Professor,
do you agree with Professor Prince that if the    03:14:40
but-for commission rate were found to be the same
as the actual rate through October 2017 that more
than 50 percent of Apple ID accounts would be
uninjured using your model?

A. I'm sorry. I don't recall that exact    03:15:07
statement. Did I -- are you referring to a point
where I quote in my report or is that more general?

Q. No. I'm talking about the
Professor Prince's report. Do you recall that
aspect of his report?    03:15:25

Page 155

A. I don't recall those specific words.    03:15:26
Could you read it again.

Q. Well, I can read the question again.
Do you agree with Professor Prince that
if the but-for commission rate were found to be the    03:15:34
same as the actual rate through October 2017, more
than 50 percent of Apple ID accounts would be
uninjured using your model?

A. I don't know if the number, but what I
can say is that there would certainly be quite a    03:15:53
few accounts, including defunct accounts that would
not enter the damage calculation at that point.
I think the question as how -- how would
it affect overall damages is a different question,
and since a great deal of damages come post-2017,    03:16:16
it would have much less effect on -- on damages.
All that said, I don't know the numbers.

Q. That wasn't something in
Professor Prince's report that you choose to
critique, correct?    03:16:39

A. Correct.

Q. Do you agree with Professor Prince that
if the but-for commission rate were determined to
be 30 percent on the first $10 million in app sales
that more than 21 percent of Apple ID accounts    03:16:51

Page 156

would be uninjured using your model?    03:16:54

A. Again, that's not a calculation that I
have verified or -- or recall.

Q. It's not a calculation that you critiqued
either, is it?    03:17:10

A. Correct.

Q. Okay. Do you agree that calculating
damages involves comparing what the consumer paid
in the actual world versus what the consumer would
have paid in the but-for world?    03:17:26

A. I agree that's the definition of the
overcharge damage calculation.

Q. In your opinion, to calculate injury and
damages, is it necessary to estimate the commission
or commissions that would Apple actually have    03:17:41
charged in the but-for world?

A. I do not agree that that is necessary for
a calculation of overall damages. I think that
without spelling out chapter and verse of what
forms competitive pressure would take and what    03:18:06
Apple's response to those would be, one can make a
more general assessment of what -- what competitive
pressure would have impact on Apple Store in
general.
For example, I would expect that if the    03:18:28

Page 157

40 (Pages 154 - 157)

Apple Store ROI were comparable to the ROI available generally to investors that there would be no particular reason to invest in a competitor to the Apple Store. On the other hand, if it was -- if the ROI from the Apple Store were substantially higher than that available to comparison investors -- let's say, for example, Amazon -- the stakes to me would be quite tempting for a -- a large company like Amazon to pursue that opportunity.

That -- in itself, what form would that take in terms of what would it do to the -- the but-for structure, you know, would -- would the competitive stores be specialized -- all those are, of course, interesting questions. But I think the overall impact on the consumers is basically determined by what -- what kinds of commissions are equivalent to achieving an ROI that would -- would withstand active entry.

That's my answer.

Q. ROI is return on --

A. Return on investment.

Q. The questions that you say are interesting are not questions that you have answered in your reports, correct?

Page 158

A. Those questions are interesting from the standpoint of what happens in a -- in a market in -- in which an incumbent faces competition, but I don't think they are necessary for determining the overall level of damages and not critically important to determine who is damaged.

Q. What -- what is critically important to determine who is damaged?

A. I think the -- the key to determining who is damaged is to determine what the but-for prices would be for the purchases the consumers actually made as is. Certainly in the model that I use for this case, I -- I -- I have calculated those assuming a -- a uniform but-for commission rate.

If there were a credible proposal as to what Apple would have done other than change its -- as real-world practice of having a uniform commission rate, then my model -- the mechanics in my model allow that to go into the calculation, and that would -- would affect who suffers harm to what degree.

Q. Well, why are you under the impression that Apple has a real-world practice of having a uniform commission rate?

Page 159

A. Simply that their headline rate has been 30 percent since -- since the inception of the Apple Store that has not changed, and to the extent they have deviated from that headline rate, it seems to be primarily in response to the -- the threat of some very large subscription services. And I'm not sure what the incentives are to provide a reduced rate to small developers. I -- I don't have an economic answer to why Apple is doing that.

Q. When you use the phrase "uniform commission rate," do you mean single commission rate?

A. I do, yes, mean a single commission rate.

Q. So if a company has a headline rate and an alternative rate, is that, in your view, a company that has a single commission rate?

A. I haven't thought about that question. I -- I -- I think the -- the narrow definition of a uniform commission rate is -- is one commission rate, say like 30 percent for everything. If -- if exceptions are made, the question would be, well, whether that's -- whether that's a general phenomenon, whether that's responding in some way to different competitive pressures in -- in different submarkets. That would require my

Page 160

thinking.

Q. Well, you do concede, though, don't you, that Apple does not have a real-world practice of having a uniform commission rate?

MR. BURT: Objection. Form.

THE DEPONENT: This is -- this is -- it's just a question of fact. But my -- my -- remember -- memory of the fact is that they did have a uniform commission rate up until a certain date, and at that date they introduced a reduced rate for subscription renewals, and that was the result of some give-and-take between Apple and some large streaming services, and that further during or at the -- the pandemic that Apple introduced an additional reduced rate for small developers. That's 15 percent. That's my memory.

Q. (By Mr. Swanson) Okay. So that's not a uniform commission rate, is it?

MR. BURT: Objection.

THE DEPONENT: As of 2020, no, I would say it's not.

Q. (By Mr. Swanson) As of 2016, it's not, correct?

A. Well, if you're asking about the -- the large streaming services and that -- that

Page 161

41 (Pages 158 - 161)

reduction, I don't recall a specific date.   03:25:51

Q.  You've looked at the entertainment and the music genres.  Those are both genres that are very heavily affected by the subscription model, are they not?   03:26:09

A.  Yes, they are.

Q.  And have you calculated the average commission in those two genres and compared it to the game genre?

A.  I haven't specifically done that calculation.   03:26:31

Q.  You're aware that Professor Hitt did that in one of his reports in the Epic case, are you not?

A.  I don't recall it from his report in this case, and I did not read his report in any other case.   03:26:42

Q.  Okay.  Professor, could you turn to paragraph 53 in your reply report at page 21.

A.  I have that paragraph in front of me.   03:27:52

Q.  Okay.  Thank you.

The last sentence in that paragraph reads "consumers are entitled to the presumption that their welfare was reduced by the difference between the competitive (but-for) price and what they   03:28:03

Page 162

actually paid."   03:28:11

Do you see that?

A.  Yes.

Q.  What's the economic basis on which consumers, in your view, are entitled to such a presumption?   03:28:16

A.  The economic basis is the assumption that people act in their -- in their own self-interest, and the suggestion here is that they -- they do not.  So either they are failing to advance their own self-interest or they see some other reason to -- to not pursue the opportunity of getting a lower price.   03:28:37

Q.  Well, are you assuming that in the but-for world, all app stores offer the same quality-adjusted price as one another?   03:29:03

A.  I have made -- made no assumption on what the structure of the but-for competitive environment would be, whether that would consist of active liables, like, for example, Amazon; whether it would consist of Apple simply choosing to price that an ROI, that -- that's sufficiently low so that rivals like Amazon would not come in.  That is not -- I have not opined on which of those would occur, and I don't think in the end that it would   03:29:27   03:29:55

Page 163

matter to the consumer.   03:29:58

I -- I do have the opinion that there's no reason to believe that a competitive Apple Store would necessarily be lower quality or lower security.  I -- it's possible that some operations might not be as secure, but it's also possible that some entrants -- again, I use the example of Amazon -- might be able to come in with something that would be seriously competitive on all features of apps.   03:30:13   03:30:35

Q.  When you refer to "the competitive but-for price" in that last sentence in paragraph 53, are you assuming that there would be a single commission rate that would apply on every platform on which consumers could buy iOS apps in the but-for world?   03:30:55

A.  The only assumption that's really required for the statement that I make in this paragraph is that Apple itself would go to a competitive but-for prices calculated as I've laid out in my methodology.   03:31:31

Q.  So when you refer to the competitive but-for price, you're only calculating a price that Apple would charge in the but-for world, correct?

A.  Yes, I agree to that.  That's the   03:32:01

Page 164

relevant price for determining an overcharge, and there is an additional question of how that price would compare with the prices in rival stores if there were, in fact, actual entrants.   03:32:03

Q.  And do you -- do you not opine in your opening report that there will be entrants into the but-for world?   03:32:34

A.  I don't recall making such a statement.  My -- my view as an economist would be that what -- what could happen in the presence of potential entrants is that either -- either Apple will price at such a level that entrants -- entrants -- entry will occur and that competitive prices will then be determined in that market as a result of pricing competition between Apple and actual entrants or that Apple will engage in limit pricing which is sufficient to keep potential entrants from entering.   03:33:02   03:33:28

That's my economic view.  Either of those things could happen.   03:33:45

Q.  Could you please turn to paragraph 136 of your opening report.  It's at page 64.

A.  Yes, I have that open.

Q.  Okay.  Now, the second sentence of paragraph 136 reads --   03:35:03

Page 165

Veritext Legal Solutions
866 299-5127

A. I'm sorry. I've gone to the wrong place. 03:35:05 I thought you said page 136.

Q. No --

A. No?

Q. It's paragraph 136 on page 64. 03:35:12

A. I have that in front of me, yes.

Q. Okay. So the second sentence of paragraph 136 reads "But for Apple's anticompetitive conduct, there would have been non-Apple iOS app stores or in-app purchase 03:36:04 payment processing systems which Apple's App Store would have had to compete against to sell apps and in-app content to iOS device consumers, and as a result, Apple would have charged lower competitive commission rates." 03:36:25

Do you see that?

A. I do.

Q. Is that a part of your opening report that you have affirmed via paragraph 4 of your reply report? 03:36:33

A. Well, I will -- I will modify this statement by saying that as a matter of general industrial organization and microeconomics that whether you have actual entrants or potential entrants, those are both -- create competitive 03:36:52

Page 166

pressure on -- in common. So the statement is not 03:36:55 wrong. But it's perfectly reasonable to add that as a possible outcome.

Q. Well, there's a big difference between a but-for world that has no entrants and one that has 03:37:11 potential many entrance; don't you agree as an economist?

MR. BURT: Object to the form.

THE DEPONENT: No, I -- I -- I don't. I think that -- that's -- that's simply a -- a knife 03:37:27 edge or narrow determination that if a -- if a -- if an incumbent is successful in offering prices and product qualities that deter entry, then they are effectively responding to competitive pressure in the same way that they would if there was 03:37:55 actual -- actual entrant.

Q. (By Mr. Swanson) Well, how low would a price need to be compared to cost for it to prevent any rivals from entering the market?

A. I would say that it -- it's a price at 03:38:14 which the -- the ROI potentially available within the Apple Store rival's activity, with some allowance for risk, would be more attractive than the ROI available elsewhere in the world.

Q. Would that require a price below average 03:38:42

Page 167

variable cost? 03:38:44

A. Oh, I don't think so.

Q. So you think that price could be above average variable cost?

A. Yes, I do. 03:38:56

Q. Okay. And you think it would be above marginal cost?

A. Yes.

Q. And do you think it would be above long-run marginal cost? 03:39:07

A. Yes. I think it would be probably close to the -- a benchmark represented by comparable rival firms in a relatively competitive market similar to the one in question.

Q. And does this -- does this -- is this 03:39:32 theory reflected in, let's say, the basic undergraduate textbooks about how a company would price to exclude any entry?

A. I have not searched economic texts.

Q. But if I flip to an industrial 03:40:00 organizational textbook, I could find a section that would tell me definitively that this is how a company could deter all entry?

A. I think what I've just described is basic microeconomics of -- of the firm and of the firm 03:40:20

Page 168

operating in competitive but not necessarily 03:40:23 perfectly competitive markets. I -- I don't view this as -- as something that's controversial or particularly specific to this case. It's just a general proposition that -- that they -- I think 03:40:47 there's a general proposition in industrial organization that -- that potential rivals play the same role as actual rivals, substantially, in providing the incentives of competition. That's certainly the case in -- in game -- market game 03:41:09 models.

Q. Is it plausible that in your view that the app store might be the only iOS -- small -- small-letter app store -- in the but-for world?

A. I would say I really don't know what the 03:41:39 probability of that occurring is, but I think it's positive.

Q. Okay. Is a but-for world in which the app store is the only iOS app store more or less likely than one in which there is entry by 03:41:51 multiple iOS app stores?

A. I think that would depend entirely on what the potential conditions for entry are, and that would, in turn, be determined by what kinds of rules Apple would be operating under in this -- in 03:42:10

Page 169

43 (Pages 166 - 169)

this -- in this envisioned but-for alternative.    03:42:17

Q. When you talk about the entry in the but-for world potentially of -- of iOS app stores, this would be intra-brand competition -- I-N-T-R-A -- correct?    03:42:33

A. That, again, would depend a great deal on how these stores would be structured and how -- how their operators would -- would proceed to operate. If -- if the app stores signed up exclusive agreements with developers, you would have    03:43:04 differentiated stores and basically brand competition among them. If they do not sign on exclusive agreements, then you may have general-purpose app stores which would be, in effect, copies of the Apple Store, and you would    03:43:27 have competition among relatively homogeneous duopolists, oligopolists.

Q. Well, no matter what they do along those lines, these stores would all be selling iOS-brand apps, correct?    03:43:49

A. In terms of their relevance to this market, I think the answer is yes.

Q. Okay. And that is intra-brand competition, is it not?

MR. BURT: Objection. Form.    03:44:07

Page 170

THE DEPONENT: I'm sorry. Did you say    03:44:08 "intra" -- "inter" or "intra" in that question?

Q. (By Mr. Swanson) Intra. I-N-T-R-A.

A. What -- what are we talking about branding here? I was -- I was interpreting your    03:44:21 question as to being about the branding of the store -- store itself, either the Apple Store or rival stores. Are you using it that way or differently?

Q. I'm talking about the product itself.    03:44:34 The brand of the product is iOS app, is it not?

MR. BURT: Objection. Form.

THE DEPONENT: Yes, all -- it's my understanding all -- all the products that would be sold through these rival stores in this market    03:44:52 would be iOS apps, app content, yes.

Q. (By Mr. Swanson) When you refer to the competitive but-for price, again harkening back to that sentence in paragraph 53, is that competitive but-for price the same across the entire    03:45:19 ten-year-plus class period?

A. In all of the calculations that I have done to this point, I have not done any calculations other than for the entire class period, so the answer is yes. In terms of how the    03:45:43

Page 171

model has been exercised to this point, it's for --    03:45:49 it's for a uniform but-for rate. The model has the capacity to consider other damage periods, other rate structures, but that has not been done.

Q. Well, as an economist, do you think that    03:46:10 the competitive but-for price would change over time?

A. I think there's a question as to how the but-for world would have actually been implemented dynamically. Certainly the -- the model, as it    03:46:42 stands now, assumes that the Apple Store would have been open to competition from day one.

Q. Open to competition or potential competition?

A. Yeah, either -- either. As I said, I --    03:47:13 I -- my view is that the -- the competitive pressure on Apple would have been very similar from either actual entrant or a potential entrant.

Q. Professor, if it was necessary to determine what platform consumers would have chosen    03:47:37 to purchase on in the but-for world, how would go about doing that?

A. I believe you're asking me how would consumers choose among alternatives stores with alternative features, and that would require a    03:47:56

Page 172

study which I have not done.    03:48:02

Q. Could you turn to paragraph 43 in your reply report, please. That is on page 18.

A. Did you say 43?

Q. Yes.    03:49:05

A. Yes. Okay.

Q. In paragraph 43, you say that you select the competitive benchmark rates that you use in your analysis by examining recent competition in the PC gaming market.    03:49:21

Do you see that in your first sentence?

A. Yes.

Q. Is there a single competitive rate charged in the PC gaming market?

A. No.    03:49:40

Q. Is the PC gaming market the most analogous market for nongame iOS app transactions in the but-for world?

A. Please repeat the question.

Q. Is the PC gaming market the -- well, let    03:50:08 me -- let me withdraw that.

Let me rephrase it.

Is the PC gaming market the best benchmark for nongame iOS app transactions in the but-for world?    03:50:23

Page 173

44 (Pages 170 - 173)

MR. BURT: Objection. Form.    03:50:29

THE DEPONENT: I would say that it is the best available benchmark in the absence of identifiable markets that are competitive in other genres. I believe that for some other genres, such    03:50:57    as music and entertainment, that it may be possible to identify store -- stores or channels where -- where reasonably competitive rates prevail.

And for other genres, I have not at this point sat down to identify whether there are    03:51:34    potential benchmarks.

Q. (By Mr. Swanson) Are there other PC app markets in addition to the PC gaming market, in your view?

MR. BURT: Objection. Form.    03:51:57

THE DEPONENT: I'm -- I'm personally aware that they are, but I haven't -- not systematically studied it or asked my team to find information for me.

Q. (By Mr. Swanson) You discuss Steam in    03:52:17    your reports, correct?

A. Yes.

Q. And you understand that Steam has multiple tiers of commissions, starting with a headline 30 percent, correct?    03:52:27

Page 174

A. Yes. I understand that his -- that    03:52:33    certainly historically that was the case.

Q. Well, that's the case today, isn't it?

A. I understand that Steam still maintains a 30 -- at this moment still maintains the 30 percent    03:52:47    headline rate.

Q. Right.

Are you aware of any change in Steam's rate structure since 2018?

A. I actually haven't gone to collect data,    03:53:02    so the answer is I'm not aware.

Q. Okay. Are any of Steam's commission tiers at the level of the competitive but-for price?

A. My view is that they are not, and I    03:53:23    believe that in the current PC games market, they are under considerable competitive pressure.

Q. Steam is under considerable competitive pressure?

A. That -- that would be my -- my    03:53:45    expectation.

Q. And it's been under considerable competitive pressure since November of 2018?

A. I don't have exact dates in mind that I'm prepared to give you back. But the entry of the    03:54:04

Page 175

Epic store seems to have begun to generate    03:54:12    competitive responses from rivals, and that's the event that seems to have initiated a period in the PC gaming market that's pretty competitive.

Q. But you say Steam, which is the largest    03:54:31    incumbent, is not competitive; is that correct?

A. I -- I'm -- I -- I agree that my understanding is that they -- they have at this point held on to their -- at least their headline rate.    03:54:50

Q. They've held on to their 20 percent rate and their 25 percent rate too, have they not?

A. That's -- that's my understanding, without having very recently gone back to look at their rate structure.    03:55:08

Q. And in your opinion, none of those three rates is at the level of the competitive but-for price?

A. I base my opinion on what appears to be the rate to which the rival stores in this    03:55:32    particular market are gravitating, which seems to be around 10, 12, up to 15 percent. And I would think that that -- that puts a lot of pressure on Steam.

Q. What -- what stores have gravitated    03:55:57

Page 176

toward that rate aside from Epic, Discord, and    03:56:04    Microsoft?

A. Well, certainly those three are the ones that I -- I have in mind in particular. The -- did you include headline rate in your question? Or did    03:56:29    you talk about --

I'm sorry. Would you repeat the question.

Q. You had indicated that you based your opinion on what appears to be the rate to which    03:56:47    rival stores in this particular market are gravitating, which seems to be around 10, 12, up to 15 percent. And I was asking you when you were talking about rival stores that are gravitating, are you talking about anything other than Epic,    03:57:03    Microsoft, and Discord?

A. Not specifically, although I understand with the details yet to be determined that the Google Play Store is going to 15 percent.

Q. You have some inside information about    03:57:22    the Google Play Store reducing its headline rate from 30 percent to 15 percent?

A. I did not use the word "headline." I -- the only information I have is what's been posted on the Internet.    03:57:37

Page 177

45 (Pages 174 - 177)

Q. Okay. And what -- and what is your 03:57:38 understanding that the Google Play Store is going to do?

A. That they -- that they are going to 15 percent for some class of apps to be determined. 03:57:46

Q. And does it matter to you what class of apps?

A. Oh, I think that in the end that would -- that would certainly matter in terms of -- of whether that's a -- should be in the benchmark or 03:58:12 not.

Q. Is 15 percent a competitive but-for commission rate?

A. I think on the basis of the benchmarks that I have used that the -- the competitive rate 03:58:32 is closer to 12 percent.

Q. So are you relying on this Internet chatter about Google moving to 15 percent as evidence of a competitive rate, or is it your opinion that Google is maintaining a 03:58:53 super-competitive rate if it moves to 15 percent?

MR. BURT: Objection to form.

THE DEPONENT: The -- the announcement or the Internet report when announced by Google on this, it's -- it's not clear to me what going to 03:59:11

Page 178

amount to in any case. That's -- that's 03:59:17 information that came after the day I filed my reply report, so I have not relied on that in any way.

And -- and I think the -- the details of 03:59:26 what that amounts to would influence whether or not it would be appropriate to include in a benchmark. I -- as you are aware, in my original report -- report, I excluded the Google Play Store because they themselves are under some antitrust scrutiny. 03:59:48

Q. (By Mr. Swanson) But given this announcement, you are reserving the right to take them into account if they lower some commission down to 15 percent?

A. I think that the question is not so much 04:00:07 that as to what's -- what's happening in the -- in this market, and I think the market itself is evolving in response to competitive pressure. And we've seen responses with -- with the lowering of rates by some of these rivals already. We now see 04:00:27 a response from Google which could be interpreted as -- as a competitive response as well.

It not surprise me to see some of the satellite stores that provide Android apps to follow Google's pricing. 04:00:47

Page 179

Q. And Google is not a -- a PC competitor? 04:00:50 Google Play is not a PC competitor, is it?

A. Google Play is -- is an -- yes, it's a competitor in -- for that operating system, in the Android operating system. 04:01:19

Q. And your view is that the iOS App Store does not compete with Google Play or any of the Android app stores, correct?

A. My -- my view is that the -- the iOS App Store or Apple Store has -- has exclusive 04:01:45 distribution control of the app -- of the iOS app market after -- and I call it an aftermarket.

And -- and Google and its satellite rivals have control of the Android app market.

Q. Are you aware of the evidence showing 04:02:21 that the Epic Games store is operating at a substantial loss?

A. I'm -- I'm aware of -- some of the information about Epic that came out in their -- in their trial. And of course I have access to some 04:02:42 Apple cost data which I have used in my study. And my understanding from -- from the trial record and from the data I have is that Epic has engaged in paying developers to obtain the exclusive distribution rights and that they are not losing 04:03:05

Page 180

money on operating, but they are showing losses 04:03:12 in -- overall in terms of their long-run investment in -- in building their market share.

Q. And you have studied their operating margin. Can you tell me what it is? 04:03:30

A. I have information, I believe, in my original report, but I can't remember it now.

Q. In the but-for world, is it your opinion that no consumers would transact through the App Store if the App Store charged a higher 04:03:49 commission rate than other iOS stores?

A. I have not offered an opinion on that. I would say it's a matter of general economics. I would expect consumers to be somewhat heter- -- heterogenous in their tastes for what -- for what 04:04:16 they look for and how they would react -- in -- in a but-for market would depend a great deal on what the actual characteristics of -- of -- of rivals might be. And I think that the -- that the -- your hypothetical is speculative. If -- if consumers 04:04:45 are fairly responsive in moving to distribution channels, that gives them the best price, and they're satisfied that other dimensions are also satisfied, then that puts a lot of competitive pressure on Apple to adjust their prices to keep -- 04:05:05

Page 181

46 (Pages 178 - 181)

keep their presence in the market and vice versa.    04:05:09

Q.  Well, you understood that I wasn't asking or offering any premise; I was asking you a question about your opinion as to whether consumers would transact through the App Store if the    04:05:28 App Store in the but-for world charged a higher commission rate than other iOS stores?

A.  I believe my answer was responsive, which is that in -- in a circumstance in which rival app stores would come in that are comparable in terms    04:05:45 of dimensions other than price, then my presumption is -- certainly the presumption of my analysis is that consumers will respond in -- in their self-interest.  If there are features of the App Store that it can maintain uniquely that rivals    04:06:09 can't match, there may be some consumers that care about those and they're willing to pay for the difference.

Q.  Let me ask you, Professor, to turn to paragraph 49 of your reply report.    04:06:25

A.  Yes, I have that.

Q.  In paragraph 49, you state "that a literal application of the commission rates from the market chosen for the benchmark analysis is a nonsensical proposition."    04:06:58

Page 182

Do you see that?    04:07:01

A.  I do.

Q.  What do you mean by "literal application"?

A.  Professor Hitt suggests that I should    04:07:17 take my benchmark firms and -- and apply whatever their historical commissions were at each year in which they operated rather than taking the recent period where they are inactive competition.

And my view is that in -- in picking    04:07:43 economically sensible benchmarks, what you're looking for is a situation -- a situation comparable to -- to the market of interest in which there is active competition and you can see how it works out.    04:08:06

And that -- so that the history of these firms prior to the time of active competition is not relevant to determination of appropriate benchmark -- benchmark.

Q.  So your position is that there was no    04:08:22 active competition in the PC gaming market before November of 2018?

A.  My position is that this period since 2018, the last few years, have been an identifiable period of active competition in that market and    04:08:47

Page 183

there -- and that that market is sufficiently    04:08:50 comparable to the -- to the iOS aftermarket so that similar competitive rates are likely to apply. That is to say, it's an applicable -- applicable benchmark.    04:09:11

Q.  Let me switch gears a little bit.

Your report, Professor, make several references to so-called anti-steering provisions of Apple's.

Do you recall that?    04:09:27

A.  Are you talking about my original report?

Q.  I'm just talking about both reports.

A.  In both?  I -- I believe so.  You would have to steer -- steer me to the appropriate paragraph.    04:09:43

Q.  Oh, boy.  It's getting late in the day, isn't it?

I -- I will.  I will.  Just a preliminary question.  You do recall that you discussed that in your reports, correct?    04:09:58

A.  I believe so.  I would have to be reminded of what I actually said.

Q.  And I do that.  But before we get there, have you studied anti-steering provisions in the past as an economist?    04:10:12

Page 184

A.  The answer is I -- I do not -- I    04:10:36 certainly do not have a published paper on that topic, and in terms of work that I've done in the paths, I believe that I -- I've generally dealt with various antitrust issues where -- where there    04:10:52 may be several kinds of conduct at issue.  And I'm -- I can't recall as I sit here whether those would be classified as anti-steering or refusals to deal or -- or what.

Q.  Are you familiar with the use of    04:11:14 anti-steering provisions by American Express?

A.  I am.

Q.  Okay.  Do you have an understanding of the economic purpose or purposes for which American Express uses anti-steering provisions?    04:11:26

A.  The answer is that I knew a lot more about this in the past than I remember now, so I -- I'm nearly -- I haven't thought about it in years, and I -- I really am not prepared to say much about it.    04:11:57

Q.  Well, do you agree that the purpose of American Express's anti-steering provisions is to prevent merchants from steering business to American Express's competitors, Visa, Mastercard, Discover?    04:12:16

Page 185

47 (Pages 182 - 185)

A. Yes, that's my understanding.  04:12:19

Q. Okay. And you would agree as an economist that a company generally doesn't need to worry about losing business to noncompetitors?

A. Please say that again.  04:12:32

Q. Would you agree as an economist that a company generally doesn't need to worry about losing business to noncompetitors?

MR. BURT: Objection. Form.

THE DEPONENT: I -- I'm not quite --  04:12:49 quite sure what that means. I think if you are a -- any firm, you worry about what rivals will do and you worry about consumers will do. So consumers might go to a rival or they might go to the outside option; that is, to not buy products in  04:13:09 this market at all. Those are both concerns to a firm.

Perhaps you can put my answer together with your question and -- and rephrase the question.  04:13:25

Q. (By Mr. Swanson) Well, aren't economists -- don't economists focus on those companies which have the realistic possibility of taking business away from an incumbent? Isn't that how markets are defined?  04:13:46

Page 186

A. I agree that that's an element in a  04:13:56 definition of markets, and it is often used in -- in examining markets -- for example, examining the impact of mergers, for example.

I -- I would simply say that in general,  04:14:12 I would think that the -- the overall demand elasticity for products in the market is -- is also something that matters and would matter for market definition even if the outside option was not specifically identified.  04:14:39

Q. Professor, it's your opinion that Apple has no competitors to the App Store, correct?

A. It is my opinion that -- that once an individual buys an Apple mobile device that they are locked into acquiring any apps or app content  04:15:02 they want on that device from the -- from the Apple Store. They have no alternative to doing that.

And it's furthermore my opinion that the -- the ability to substitute away from that  04:15:19 involves very high switching costs, because you either have to forgo the mobile -- mobile feature or you have to acquire a -- a mobile device that's a different operating system, a learning process and so forth.  04:15:41

Page 187

Q. Your opinion that you've offered to the  04:15:43 court is that Apple has a 100 percent market share; is that not correct?

A. In the aftermarket for iOS devices, apps, and content, yes, that is my opinion.  04:15:56

Q. So 0 percent market share for competitors, correct?

A. Under current conditions, yes.

Q. And under current conditions, you have got no potential competitors either, correct?  04:16:11

MR. BURT: Objection. Form.

THE DEPONENT: I'm not sure what you mean by "potential competitors." I think that as long as Apple is able to continue to exercise their exclusive -- their exclusive rights to distribute  04:16:32 iOS, then there is no possibility of competition. If you ask me if that were dropped, are there potential competitors, I would say yes, there are.

Q. (By Mr. Swanson) If the App Store does not face any competitors, why is it concerned about  04:16:53 steering?

A. I don't believe I said that it was unconcerned about potential competitors. Anti-steering and exclusivity are pretty effective techniques for maintaining a monopoly.  04:17:24

Page 188

Q. Well, would you define the relevant  04:17:28 market differently if Apple had no anti-steering provisions?

MR. BURT: Objection. Form.

THE DEPONENT: I'm not sure how to answer  04:18:02 that. I -- I believe there -- there are areas, submarkets within the iOS market, where in the absence of anti-steering provisions there would be competition for indirect payment. That's a direct payment from developers to -- from consumers to  04:18:21 developers is -- actually happens. For example, with some of the streaming services.

Q. (By Mr. Swanson) What -- what submarkets are you talking about?

A. Services like -- like entertainment and  04:18:47 music streaming.

Q. In your opinion, is there a submarket for subscription apps?

MR. BURT: Objection. Form.

THE DEPONENT: I don't know if I would  04:19:16 call it -- I'm not sure what the usefulness is of identifying a submarket or not -- not a submarket. But some of these are -- I'd say are in a genre where there are substantial subscription costs and very strong incentives for the providers of those  04:19:33

Page 189

48 (Pages 186 - 189)

services to escape at least the headline rate of 04:19:39 Apple -- of the Apple Store.

MR. SWANSON: We've gone for over an hour at this point. Shall we take another break?

MR. BURT: Seems reasonable. 04:20:00

MR. SWANSON: Okay.

THE VIDEOGRAPHER: Going off the record at 4:20 p.m. This is the end of media 5.

(Recess taken.)

THE VIDEOGRAPHER: We're on the record at 04:32:15 4:32 p.m. This is the beginning of media 6 in the deposition of Daniel McFadden.

Q. (By Mr. Swanson) Professor, would you please turn to paragraph 92 of your opening report.

A. Yes, I have that. 04:33:36

Q. Professor, in paragraph 92 of your report, you discuss Section 3.1.1 of the App Store review guidelines.

Do you see that in your second sentence?

A. Are you -- are you referring to the 04:33:58 original report now or the reply report?

Q. The original report. The opening report.

A. Paragraph 92?

Q. Yes. Second sentence.

A. Yes. I've read the second sentence. 04:34:33

Page 190

Q. And you understand that this is a quote 04:34:36 from Section 3.1.1 of the App Store review guidelines?

A. Yes.

Q. Okay. Is it your understanding that this 04:34:48 provision represents conduct by Apple that the plaintiffs are challenging?

A. That is my understanding, yes.

Q. And -- and when did this conduct first start, in your understanding? 04:35:16

A. I don't know.

Q. Okay. Well, does -- after 2010? Do you know that?

A. No. I haven't been asked the question before and I haven't -- I haven't looked back at 04:35:43 the historical record.

Q. Okay. Is it important to your analysis when the conduct takes place the plaintiffs challenge?

A. As a general matter, yes. But in terms 04:36:04 of specific elements of the conduct, the question is what do -- what the overall conduct is with or without various elements that would -- would inhibit competitive pricing.

So it's not so much the dating of 04:36:29

Page 191

individual conduct actions, but the overall impact 04:36:32 of the list of actions that might be found to be anticompetitive.

Q. So does your model of impact and damages depend upon the overall impact of the whole list of 04:36:53 actions that the plaintiffs challenge?

A. My model depends on a benchmark for what competition would achieve in terms of competitive rates, and that's the basis for the calculations there. And I do not offer an opinion on what of 04:37:23 the various elements of anticompetitive conduct would or would not achieve that particular but-for commission rate.

Q. Do you have an opinion about whether Section 3.1.1 of the App Store review guidelines is 04:37:52 anticompetitive?

A. My understanding is that the plaintiffs allege that elements of these review guidelines are anticompetitive.

Q. Yes, I think you testified that you 04:38:59 believed that this particular provision is something that the plaintiffs challenge. My question for you is different.

My question was: Do you have an opinion about whether this provision is anticompetitive? 04:39:11

Page 192

A. And the answer is that at this point I've 04:39:23 been asked to assemble and present the evidence on common -- common evidence, common facts that are applicable to class certification and to provide a mechanism for quantifying damages and how they 04:39:40 would be distributed. I have not specifically been asked to opine on my ability, and so I have not done so. I -- I've taken my assignment as one of -- of simply assembling this evidence.

Q. Okay. Well, do you have an individual -- 04:40:04 let me strike that -- I'm sorry.

Do you have an opinion about whether this provision, Section 3.1.1, has had an independent impact on the consumer class?

MR. BURT: Form. 04:40:27

THE DEPONENT: At this point, I have not been asked to study this question. I have not studied this question. So at this point, I do not have an opinion.

Q. (By Mr. Swanson) Do you have an 04:40:42 understanding of what kinds of buttons or calls to action that Section 3.1.1 forbids?

A. I have a -- a general understanding that it forbids a developer from advertising or announcing to its users that they can pay by an 04:41:16

Page 193

49 (Pages 190 - 193)

alternative channel, but beyond that, I -- I would have to go back and review the details of the guidelines.

Q. Can your model show the effect of Apple's anti-steering provisions on app and in-app purchase prices independently from the effect of any of the other conduct the plaintiffs challenge?

MR. BURT: Objection. Form.

THE DEPONENT: I would say that my modeling framework and my mechanisms have the capacity to do that, but there are elements involving the extent to which consumers would follow leads or announcements within the -- within their app and actually use alternative mechanisms that could involve additional study of consumer choice. I have not been asked to do that. It -- I think it could be done, but I haven't done it.

Q. (By Mr. Swanson) Until you actually are asked to do it and try to do it, can you testify that it can be done?

MR. BURT: Objection. Form.

THE DEPONENT: Oh, I -- I would be prepared to say it can be done. It can be done by -- through -- through consumer experiments, for example.

Page 194

Q. (By Mr. Swanson) And that would involve some type of survey research?

MR. BURT: Objection. Form.

THE DEPONENT: It could involve survey research and it could involve survey research enhanced by actual experimental treatments in which consumers are asked to make meaningful choices in -- in a simulated market.

Q. (By Mr. Swanson) And none of that has been done to date, correct?

MR. BURT: Objection. Form.

THE DEPONENT: I have not been asked to do it. That's correct.

Q. (By Mr. Swanson) Are Apple's anti-steering provisions alone sufficient to cause the consumer damages that you have estimated in your reports?

A. I will refer you to my previous answer, which is that my model associates -- determines damages or calculates damages for a -- a but-for commission rate, so the question would be what -- what would the competitive pressure and the resulting commission rate be for Apple if steering -- added steering provisions were removed and otherwise they were not challenged, and -- and

Page 195

the answer is I have not done that.

Q. Professor, could you turn to paragraph 168 of your reply report -- actually, why don't you turn to 167. I'm sorry.

A. I have that paragraph.

Q. Now, this is where -- this starts a section a little higher up on page 69 that is entitled "The Criticism Regarding the Sample Size." Do you see that?

A. Yes.

Q. And this section of your reply report discusses an analysis conducted by Professor Prince in which he ran your model on 25 different 0.1 percent samples of Apple ID accounts, correct?

A. That's correct.

Q. Okay. Now, if you could turn the page to paragraph 169, please.

A. Yes, I have that.

Q. Okay. You state here that "Professor Prince's computer code contains errors that prevent people who do not have direct access to a supporting team's database engine from drawing the same Apple IDs included in his backup production."

Is that the import of that paragraph?

Page 196

A. Yes.

Q. Does your reply report describe any other perceived errors in Professor Prince's backup or code concerning this analysis?

MR. BURT: Objection. Form.

THE DEPONENT: Was the question -- could you repeat the question.

Q. (By Mr. Swanson) Sure. Does your reply report describe any other perceived error or errors in Professor Prince's backup or code concerning this analysis?

A. Are you referring specifically to computer -- errors in computer code or more generally? Because there are several problems with Professor Prince's analysis.

Q. Okay. Well, if there are other errors in the analysis that you discuss in this section about the criticism regarding the sample size, please let me know.

A. Yes, that's -- the whole section is detailing those errors.

Q. Okay. And are those errors other than the one that you describe here in paragraph 169?

A. Yes.

Q. Well, do you identify any error that

Page 197

50 (Pages 194 - 197)

affects anything other than whether someone can reproduce the actual drawings of the random samples that Professor Prince used?

MR. BURT: Objection to form.

THE DEPONENT: Well, you previously asked me about errors. I interpreted that as being errors in this -- in this portion of Professor Prince's analysis, which includes drawing the samples, how he -- how he worked with the samples, and the conclusion he draws from the samples. And those -- that's broader than just one computer coding problem.

So that was my answer -- interpretation that I used in my previous answer.

Q. (By Mr. Swanson) Okay. I appreciate that, and see if we are on the same wavelength.

Understanding that, does your report describe any other errors in his backup or code concerning his analysis of the random samples?

MR. BURT: Objection. Form.

THE DEPONENT: Well, yes. We can detail in the following paragraphs. I -- I criticize his failure to -- to report and respond appropriately to standard errors, and whether you classify that as something that's contained in his backup but not

Page 198

in his report, I -- I would say it's -- it's not in his report, and I believe in some cases it's -- this would potentially be available on his backup, but it is not reported.

Q. (By Mr. Swanson) Now, Professor Prince provided you and your team with the 25 samples that he used to conduct his analysis, correct?

A. He provided the -- the particular Apple ID reports, yes.

Q. Okay. And in paragraph 170 of your reply report, you state that you were able to assess his analysis using those 25 samples, correct?

A. It is -- it is possible to reproduce his analysis for those -- for those samples as given. The thing that's missing is the ability to coordinate the samples as given to this claim as to how they were generated.

Q. Okay. But did you find that your assessment using the actual 25 samples he provided generated the same results as he reported?

MR. BURT: Objection. Form.

THE DEPONENT: I will read you the last sentence of paragraph 170.

"In short, I cannot confirm that the computer code he used actually generated the

Page 199

samples he analyzes because of his coding error, but I find that the results he presents in his report exaggerate his claim compared to those obtained by running his code on my server."

Q. (By Mr. Swanson) Yes, but that's not the question I asked.

I asked about the actual samples he provided to you that you assessed. Did those not generate exactly the same results that he reported?

MR. BURT: Objection. Form.

THE DEPONENT: I will read the last sentence of paragraph 169, which is:

"I reran his code to draw the 25 samples to replicate his analysis, but, again, the results obtained in the 25 samples are different from what he describes in his report, although they are similar to the results obtained in the 25 -- in the 25 samples based on his unamended computer code."

That's another statement. I don't know if that's responsive to your question.

Q. (By Mr. Swanson) Well, I'm not sure it is. He gave you the exact samples he used.

Did you -- did you check what results flow from using those exact samples?

A. No -- I believe yes. That -- those

Page 200

calculations, there's -- those calculations are as he reports, yes.

Q. Okay. Thank you. That was my question.

Now, I understand that the -- the sentences you read, I want to ask you about.

So let's take paragraph 170. You found that "Professor Prince's results change when you use his computer code as it is (unamended) and fixed (amended) to draw the 25 0.1 percent samples."

Do you see that?

A. Yes.

Q. So to conduct your analysis, is it correct to say that you ran your model on 50 different samples different from the ones that Professor Prince used?

MR. BURT: Objection. Form.

THE DEPONENT: Yes.

Q. (By Mr. Swanson) So you drew 25 samples with Professor Prince unamended code and you drew 25 samples with his code as amended by your team, right?

A. Yes.

Q. So your analysis is based on running your model on different random samples from the ones

Page 201

51 (Pages 198 - 201)

that Professor Prince provided you in his backup, correct? 04:56:18

MR. BURT: Objection. Form.

THE DEPONENT: The answer is -- I -- I run -- rerun the analysis on the sample that he claims was produced by his code. I run it on the sample that is actually produced by his code and I run it on the -- the samples produced by his code with -- with an error corrected. 04:56:31

Q. (By Mr. Swanson) Let me ask you to turn to paragraph 183 of your reply report. 04:57:01

A. Paragraph 183, yes.

Q. Yeah. There, you indicate that you found that you got "qualitatively different results from Professor Prince's when you applied your model to the 25 random sample drawn by his code," correct? 04:57:56

A. Correct.

Q. What did you mean that the results were qualitatively different?

A. He draws a fairly strong conclusion about when -- when these samples produce results that he considers to be unacceptable, and when you use this code to generate data, you don't get exactly the same Apple IDs in the sample, and that changes the -- the number of -- of these samples where what 04:58:20

Page 202

he would classify as an unacceptable result changes. 04:58:51

Q. Let's -- let me ask you about those 50 samples that you ran using his amended and his unamended code. 04:59:07

Do you state in your report what percentage of Apple ID accounts were estimated to be uninjured in each of the 50 random samples you tested?

MR. BURT: Objection. Form. 04:59:25

THE DEPONENT: That is not a number that I asked for or reviewed.

Q. (By Mr. Swanson) So you don't know whether running your model on all 50 of those random samples produced the same percentage of uninjured class members? 04:59:47

A. The answer is I don't know, and -- and in my view, that -- that is a secondary issue. The primary issue is whether my original sample produces an accurate estimate of the price sensitivity within genres and business models, and that -- that's -- that's what -- what's important. And questions such as what other quotations do, what -- and what these percentages are for net uninjured, those are of secondary interest. 05:00:21 05:00:50

Page 203

Q. Well, I understand they're of secondary interest to you. They may be of interest to the court. 05:00:56

Why did you not report the results of those 50 random samples -- 05:01:06

MR. BURT: Objection. Form.

Q. (By Mr. Swanson) -- in terms of the number of uninjured Apple ID accounts?

MR. BURT: Objection to form.

THE DEPONENT: Well, as I indicated, I -- I do not think it's important myself to the use of -- use of my model and mechanism for determining whether there's a -- conditions for class certification or not. 05:01:20

Q. (By Mr. Swanson) Do you disagree that your model results in different numbers or identities of unharmed accounts when run on different random samples? 05:01:48

MR. BURT: Objection. Form.

THE DEPONENT: Yes, but I would like to make a statement about that, which is that using -- using a random sample here or using alternative random samples is -- for the purpose of that is to determine the price sensitivity of demand by genre and business model, and that is the sole feature of 05:02:06

Page 204

the econometric analysis that is carried forward into the determination of damages. 05:02:38

When damages are determined, all of that is done on the -- on the universe of Apple accounts and -- and the universe of apps and does not involve any of the remaining model quote -- coefficients. No random sampling is involved there. 05:02:56

So the -- the sole issue in sampling is whether it is determining price sensitivity with -- with adequate reliability and -- and whether there's anything about that setup which -- sample dependent feature of that setup which would cause any problem with that estimation. 05:03:18

Q. (By Mr. Swanson) I want to make sure that I understood your answer. 05:03:41

The question I asked was do you disagree that your model results in different numbers or identities of unharmed accounts when run on different random samples, and your first response was yes, you do disagree with that. 05:03:56

Is that your position?

MR. BURT: Objection. Form.

THE DEPONENT: My -- my position is that the number -- or the identity or the number of 05:04:10

Page 205

52 (Pages 202 - 205)

unharmed is determined at a -- at -- at a margin 05:04:15 where it's quite easy for individuals to flip from injured to uninjured depending on what -- what the parameters -- a price sensitivity parameter is and what apps are actually in the analysis, and so 05:04:40 that -- that is something that is -- is not necessarily very tightly determined by using a sample of this size.

But the single thing which really matters for the subsequent damage calculation, which is the 05:05:05 price sensitivity, is very well determined.

Q. (By Mr. Swanson) Are you saying that in your opinion, the price sensitivity is what's important to determining the aggregate of uninjured damages? 05:05:26

A. Yes.

Q. And the damages that you calculate here are quite high. They're in hundreds of millions or billions of dollars, correct?

A. Yes. 05:05:35

Q. So when you say that something doesn't matter for calculating aggregate damages, are you saying that you're perfectly comfortable with an aggregate damage estimate that varies by tens, scores, or hundreds of billions of dollars? 05:05:50

Page 206

MR. BURT: Objection. Form. 05:05:53

THE DEPONENT: I would say that I designed this model estimation and subsequent damage calculation so that it meets or exceeds the standards that I am familiar with for determination 05:06:15 of reliability, and I -- in my opinion, the estimates of price sensitivities in this analysis meet -- meet that standard.

Q. (By Mr. Swanson) And what are the standards that you're familiar with for 05:06:36 determination of reliability?

A. Well, in -- in my previous experience in -- in court cases, conventional significance levels are used -- 5 percent, 1 percent.

Q. How about 10 percent? 05:06:54

A. I think the -- the question of what would be appropriate here depends on the context. But I'm simply saying that it's certainly my experience that in many cases, the conventional 1 percent or 5 percent appear commonly. 05:07:13

Q. Is -- is the low download variable statistically significant, in your view, in your model?

MR. BURT: Objection. Form.

THE DEPONENT: For the entertainment and 05:07:28

Page 207

music genre, it is not. 05:07:33

Q. (By Mr. Swanson) And it is, in your opinion, for the game genre?

A. That's my recollection, yes.

Q. Do you know if it's statistically 05:07:47 significant for any other genre?

A. Not at this point, I don't know.

Q. Let me ask to turn to paragraph 197, please, in your reply report.

A. Yes. I have that paragraph in front of 05:08:45 me.

Q. Okay. You state here that "using the top 70 percent revenue apps in estimating demand for app downloads and in-app purchases is a reasonable economic approach." 05:08:58

I'm paraphrasing, I believe, on the IAP part.

A. Yes. The question?

Q. Did you not indicate earlier in the deposition that you thought there was a more 05:09:12 precise and accurate approach then the top 70 percent revenue approach?

A. I believe that was in reference to the -- the damage calculation as it would apply to individuals, not to the estimation. 05:09:35

Page 208

Q. Are you indicating here that your model 05:09:47 doesn't do very well when it comes to damage calculations for individuals?

MR. BURT: Objection to form.

THE DEPONENT: No, certainly not. What I 05:09:57 am saying is simply that for the purposes of estimating price sensitivity, it is econometrically reasonable to trim the sample as -- as I do. That concentrates the sensitivity analysis on the subset of apps that are responsible for the bulk of 05:10:21 Apple Store revenues and for the ones for which the price sensitivity is most critical for the damage calculation. The damage calculation relies on estimates of price sensitivity.

But beyond that, it's a straightforward 05:10:44 calculation, individual by individual and app by app.

Q. (By Mr. Swanson) Do you agree that it is important to rely on samples that are both random and representative? 05:10:59

A. Are you asking that as -- as a general matter or in respect to sampling from the Apple transaction store? I'm sorry. The Apple Store transactions.

Q. If it makes a difference, let's start 05:11:23

Page 209

53 (Pages 206 - 209)

with in general.    05:11:25

A. If a sample is random, it will be representative by the -- the nature of random sampling from the target population.

Q. Your actual sample that you work with is    05:11:54 filtered after you pull the sample, correct?

A. If you mean by "filtered" is the data then processed, the answer is yes. Those steps are outlined in Appendix E in my original report.

Q. Well, for example, one approach to    05:12:19 processing or filtering or whatever you want to call it is your use of the top 70 percent of revenue apps taken from that sample, correct?

A. Correct.

Q. That set of apps is not a random sample,    05:12:36 is it?

A. The answer to that is that it is a random sample of the apps that meet that criterion.

Q. Do you think that apps with high sales volume have the same characteristics as apps with    05:13:09 low sales volume?

MR. BURT: Objection. Form.

THE DEPONENT: They -- they don't necessarily, but they have the characteristics that matter for the -- the determination of the bulk of    05:13:23

Page 210

damages and harm in this case.    05:13:27

Q. (By Mr. Swanson) Do you think that apps with high sales volumes face the same demand elasticities as apps with low sales volumes?

MR. BURT: Objection. Form.    05:13:43

THE DEPONENT: I think that the price sensitivity that apps with high sales volume face is the one that matters in -- in this case, and the tail of a very large number of apps that have extremely low sales -- revenue sales volume are --    05:14:06 are incidental to the overall assessment of the level of damages in this case and, for that matter, the direction in which distribution of harm goes.

Q. (By Mr. Swanson) Well, you testified that the apps sample that you worked with is only a    05:14:36 random sample of the apps that meet your 70 percent criterion, right?

A. Correct.

Q. You don't have a random sample of all apps?    05:14:54

A. This is a sample that I think is econometrically appropriate. I think that given the -- given what's needed for this case and what's important to determine econometrically in this case, this was my econometric judgment that's the    05:15:07

Page 211

best way to go about determining that prices    05:15:15 sensitivity accurately, and that is, in my opinion, the accurate price sensitivity that matters for the large plurality of the apps that enter damages.

Q. I understand that you will defend your    05:15:38 judgment. I just want to understand the facts.

You have not drawn a random sample of all apps, have you?

A. As I've explained, the 70 percent of revenue threshold was -- was a deliberate sampling    05:16:03 of apps that are major contributors to Apple Store revenues and would be contributors to damages, so the intent of this was to sample in the places that mattered for the precision and accuracy with which damages could be calculated. That was -- that was    05:16:30 a deliberate, purposeful econometric decision on your part.

Q. Right. And you're comfortable with it.

So you are you hesitant to just say that you didn't take a random sample of all apps?    05:16:44

A. I have in this reply given you -- I believe it was Figure 5 -- the consequences of using -- using all apps that appeared in -- in the sample rather than the top 70 percent.

And the -- the -- the results of that    05:17:14

Page 212

there in plain view.    05:17:17

Q. And you indicated that your, quote/unquote, all-app analysis does not include all apps, right?

MR. BURT: Objection. Form.    05:17:34

THE DEPONENT: That is correct. It includes the apps that are popular enough to be acquired by one -- one -- one out of nearly 400,000 consumers. It excludes a very, very long tail of apps that are rare -- rarely downloaded or    05:17:53 purchased.

Q. (By Mr. Swanson) Now, Professor, your estimation method uses instrumental variables, correct?

A. Yes.    05:18:09

Q. What is -- what is an instrumental variable?

A. In fitting a demand relationship of quantity on price, there is an econometric issue that prices and quantities are jointly determined    05:18:28 in -- in the market and that if you simply run -- run a simple, ordinary squares regression of quantity on price, you will get a bias coefficient. So the solution that's broadly used in -- in econometrics is to use a technique in which    05:18:57

Page 213

54 (Pages 210 - 213)

variables that are reasonably well correlated with the right-hand side variables but uncorrelated with -- uncorrelated with the factors that may be causing simultaneity are -- are used in -- in the criterion.

And actually, in the estimation used in our case, that's called a -- a generalized method, a moments estimation method, but it's -- it's essentially a upscale version of what's often called a two-stage least squares.

Q. Do you -- do you agree that for an estimation method of this sort to be valid, the instruments should be strongly correlated with the right-hand side variables that they're controlling for?

MR. BURT: Objection to form.

THE DEPONENT: The answer is they do need to be correlated, but no, I don't think that strong correlation is -- I'm sure -- in fact, if the question is quantitatively what would you mean by "strong correlation," the answer is that if they're too strongly correlated, they themselves are suspect as -- as instruments.

Q. (By Mr. Swanson) Well, as an econometrician, are you familiar with the term

Page 214

"weak instrument"?

A. Yes.

Q. And do you agree that an instrument is weak if it is only weakly correlated with the right-hand side variable it's controlling for?

MR. BURT: Objection. Form.

THE DEPONENT: I'll answer in two sentences. The first is that, yes, that's the standard definition.

And the second statement is that what constitutes a weak instrument cannot be determined without a context, so that in the context of extremely large samples, you might have a different criterion for judging whether you have a weak instrument situation, and that would be different than in a smaller sample.

Q. (By Mr. Swanson) You agree that a regression that uses weak instruments is not a reliable regression?

MR. BURT: Objection. Form.

THE DEPONENT: I think that's the answer I just gave. The answer I just gave is that's absolutely a function of the sample size, the ability to obtain precise estimates from the instruments that one uses, and the -- the proof of

Page 215

the pudding in the final analysis is how precisely you are estimating the coefficients that matter.

Q. (By Mr. Swanson) Did you set forth anywhere in your opening or reply report the instruments that you used to estimate but-for prices for games or for music and entertainment apps?

A. I don't recall specifically where -- where they're named.

Q. Did you check whether the instrumental variables that you used for games are -- are weak?

A. As I indicated in my previous answer, the issue is whether the instruments are -- are sound instruments and are adequate to estimate the coefficients of interest with precision.

And what I can tell you is that I believe they are proper instruments and they do estimate the price sensitivity, which is the coefficient of interest, with precision.

Q. Well, isn't it a fact that the instruments you use for the games category are weak instruments?

A. Please repeat the question.

Q. Isn't it a fact that the instruments you use with respect to the games category are weak

Page 216

instruments?

MR. BURT: Objection. Form.

THE DEPONENT: As I've indicated in a previous answer, I don't think there is a definition of weak instruments, which is -- can be applied independent of context. And in my judgment, the context here, the sample size I use with -- I use, and the precision that I obtain with the coefficient of interest essentially establish that this instrumental technique -- instrumental variables technique is appropriate. I do not have a weak instruments prong.

Q. (By Mr. Swanson) Isn't there a fairly standard check that econometricians do when they use instrumental variables?

A. Well, there are many things that you can do with instrumental variables, but do you want to be specific?

Q. Well, to assess whether or not the instruments are weak?

A. Well, there certainly is -- is a literature on the use of -- the use of weak instruments. But as I've explained, in this sample with this sample size, I obtained results for which I do not -- in my opinion as an econometrician, I

Page 217

55 (Pages 214 - 217)

do not have a weak instruments problem.    05:25:31

Q. Okay. I understand you're saying that here in your deposition.

Where do you discuss that in your reports?    05:25:39

A. I don't think weak instruments are in this case. I didn't mention it because I -- I think they're a nonissue.

Q. Do you run any tests that support your testimony here today that the instruments are not    05:25:56 weak?

A. I've explained why I think it's not a relevant issue, which is the precision with which I estimate the coefficient of interest, which is the -- is the -- is the price sensitivity    05:26:08 coefficient.

The fact that I could estimate that with precision using the techniques I use is -- is the bottom line. That's what matters. And that's econometrically the basis on which I conclude that    05:26:25 this is an adequate analysis.

Q. Can you -- can you give me any examples from a literature of tests or checks that econometricians run to determine whether instruments are weak or not?    05:26:43

Page 218

A. I haven't prepared to do so. I would    05:26:52 have to go -- go back and look at the cases.

Q. Okay. You haven't run any of those tests or checks, I take it?

A. Yes, as I -- as I have explained, and I    05:27:01 will say it again, the bottom line, the proof of the pudding, is the precision with which you can estimate the coefficients of interest, and that -- and that supersedes any question about the instruments. The only -- the only question about    05:27:20 the instruments is are they good instruments. And if they are good instruments, that is to say not corrupted, and they provide precise estimates of the coefficient of interest, that's -- that's what you're looking for, period.    05:27:40

Q. If your instruments are weak, aren't you going to get different results if you use different random samples?

MR. BURT: Objection.

THE DEPONENT: No.    05:27:48

Q. (By Mr. Swanson) Let me ask you about paragraph 189 on page 79. Let's go to that page.

A. I have that in front of me.

Q. You indicate here you applied your methodology to the three largest F categories to    05:28:31

Page 219

illustrate by way of example how your methodology    05:28:35 can you used to quantify damages inflicted on the consumer class.

Have you indicated anywhere in your reports or your backups what the instruments are to    05:28:49 use for the other two dozen app categories?

A. I have -- I have not. I think the -- the methodology here gets into the details of the econometric analysis. The instruments that I -- that I do use in the genres which I have analyzed I    05:29:18 think were appropriate to those genres and could be adapted to -- to other genres. They would be -- they might have the same name. They would be -- have different definitions depending on the genre to which they are applied.    05:29:37

I also use, as you know, bounds on the -- on the estimation, and, again, I use bounds that are appropriate for the genres that I consider. And when one turns to other genres, it -- it is, I think, important to establish bounds that are    05:30:06 appropriate for those genres.

Q. So for 24 genres, you haven't specified the instruments and you haven't specified the bounds, correct?

A. What is correct is I have demonstrated    05:30:27

Page 220

for the genres, the games genre and the aggregated    05:30:30 music and entertainment genre, that this is a practical and feasible methodology.

And the answer is -- is it's correct that I have not done this analysis for any -- for any of    05:30:45 the other genres, nor have I done the preparatory work for that by laying out what instruments and what bounds would be used -- appropriate for each genre.

Q. Well, if you haven't done the work, you    05:31:03 don't know if your estimation for those other genres will be precise enough to be happy with the instruments you choose, correct?

MR. BURT: Objection. Form.

THE DEPONENT: I can't prejudge what the    05:31:31 results will be, but the job of -- of myself or another econometrician doing this would be to take and seek the -- the data that's necessary to -- to do that with sufficient reliability to proceed to the next phase.    05:31:54

MR. SWANSON: Okay. We've gone for another hour. We've got, I think, certainly less than an hour left to go.

Shall we take a short break?

MR. BURT: Okay.    05:32:10

Page 221

56 (Pages 218 - 221)

THE VIDEOGRAPHER: We're going off the record at 5:32 p.m. This is the end of media 6.

(Recess taken.)

THE VIDEOGRAPHER: On the record at 5:42 p.m. This is the beginning of media 7 in the deposition of Daniel McFadden.

Q. (By Mr. Swanson) Professor, you've repeatedly spoken about what you view as the precision of your estimate of aggregate damages.

Do you recall that testimony?

MR. BURT: Objection to form.

THE DEPONENT: Please repeat the question.

Q. (By Mr. Swanson) Yes.

I am -- I believe you've repeatedly testified that in your view you have measured aggregate damages with precision statistically.

Am I -- am I wrong?

MR. BURT: Objection.

THE DEPONENT: We've talked repeatedly about the estimation of -- of price sensitivity, of the price sensitivity parameter, and I -- my view is that that has been estimated with high precision, and the calculation of damages that -- that flows directly from that. And you can put a

Page 222

standard error on damages, say, with using the bootstrap method.

Q. (By Mr. Swanson) And that's not something you've done, is it?

A. The standard errors for the price sensitivity coefficients by -- by genre and business model that I report are -- are obtained by the bootstrap method. I don't recall carrying those forward to the damage calculation, although it's -- it's straightforward to do that.

Q. And so do you know if your point estimate of aggregate damages is statistically significant?

MR. BURT: Object to the form.

THE DEPONENT: It's not a calculation that -- if I've done it in the past, I don't recall doing it.

Q. (By Mr. Swanson) Well, if you wanted to have statistical confidence about your calculation of aggregate damages, is that something that you would do?

MR. BURT: Objection to form.

THE DEPONENT: I would say that -- yes. If I were asked -- asked about that question of how precisely they are, that would be the way I would do the calculation.

Page 223

Q. (By Mr. Swanson) Well, don't you understand that you've been asked to calculate damages precisely?

MR. BURT: Objection to form.

THE DEPONENT: I've been asked to establish whether common evidence and a methodology applicable to the class can be developed and presented which is -- sufficient to establish this class should be certified.

I have not been asked to produce a damages estimate which would be presented on its merits and could be challenged on its merits, but the methodology gives -- gives me the ability to do that readily.

Q. (By Mr. Swanson) Well, if your estimate of aggregate damages was not statistically precise, would that not cast some doubt on the reliability of your whole methodology?

MR. BURT: Objection to form.

THE DEPONENT: Well, the answer is yes, it would. And without having done the calculation, simply from the precision with which the price sensitivities are -- are established and -- and the -- their range of values, there's -- there's no question in my mind that -- had I done the

Page 224

calculation that these damages would be significantly different than zero.

Q. (By Mr. Swanson) Okay. Is -- is that the -- well, is that the question we're talking about, whether the damages are statistically significant from zero?

MR. BURT: Objection.

THE DEPONENT: I thought that's the question you asked me.

Q. (By Mr. Swanson) Well, is -- is that what you considered to be a reliable calculation of aggregate damages, a calculation that cannot be statistically distinguished from zero?

MR. BURT: Objection to form.

THE DEPONENT: What I'm familiar with and I explored in previous cases being litigated is that if damages are not significantly different than zero by some conventional standard of significance, that puts the plaintiffs' claim into question.

Q. (By Mr. Swanson) Well, the plaintiffs' claim could be put into question if the methodology for generating the damage estimate were to swing wildly and yet remain above zero; isn't that a fact?

Page 225

57 (Pages 222 - 225)

MR. BURT: Objection to form.

THE DEPONENT: I'm -- I'm not quite sure how to answer your question specifically, but I would say generally that one does want to establish a reliable number for damages. As to what the criterion should be for -- for what level of precision for which that should be estimated, I view that as primarily an issue for merits, not -- not -- and the issue for class certification is simply is there evidence that the -- that the plaintiffs may have a case and that they can meet the conditions for class certification.

Q. (By Mr. Swanson) The conditions for class certification require more than just the bare possibility that the plaintiffs may have a case, right?

MR. BURT: Objection to form.

THE DEPONENT: So -- so we've talked earlier about my understanding of what that requires, and -- and yes, no doubt there are other things that the court would look for.

Q. (By Mr. Swanson) Let me ask you to turn to paragraph 122 of your reply report.

A. Yes. I have that in front of me.

Q. You indicated here that your model does

Page 226

not capture the strategic interactions between apps in the but-for world.

Do you see that?

A. Yes, I -- I see the paragraph.

Q. Okay. And you are of the view that this failure to account for strategic interactions is conservative; is that -- is that right?

A. That's correct.

Q. Have you conducted any analysis to calculate the damages to the consumer class accounting for strategic competition between app developers?

A. Well, the answer is I have not reported that in my report and -- but, yes, on my own, I have -- I've calculated that. I've calculated the Nash equilibrium market solution among developers in that market game when demand is as described in my model.

Q. Is it your opinion that every app would charge an even lower but-for price if you accounted for the strategic competition between app developers?

MR. BURT: Objection to form.

THE DEPONENT: I answer in two stages.

The first stage is within the model and

Page 227

within the demand system that I now have in which you replace the -- the intercept term, the -- which determines the overall level of demand, with a -- with terms which are sensitive to the price of rivals, then -- and then go forward to compute the Nash equilibrium in that differentiated product Nash game, then the solution that I have in using my model is, in fact, the Nash equilibrium response of each product supplier. It's a dominant Nash strategy which is independent of what other firms do.

So the -- the answer -- the narrow question -- the narrow answer -- and I don't think it's that narrow -- is that within the model as it's set up, while I don't spend time developing a detailed model of rivalry between developers, in fact, my model is sufficiently robust so it can handle that kind of strategy interaction.

Q. (By Mr. Swanson) And --

A. I'm sorry. Then I think there was a second part to my response, which is that there are more general demand models, not the one that I use, in which there may be a greater degree of interaction among developer rivals, and by and large, the pattern of a demand model on which you

Page 228

have a more vigorous strategic interaction is that the -- the effects of intense rivalry will -- the effects of a uniform decrease in the cost of intense rivals will lead to price decreases that are stronger than the price decrease you would see if it affected only one firm's cost.

Q. Now, your existing model predicts that some apps become more expensive in the but-for world, correct?

MR. BURT: Objection. Form.

THE DEPONENT: Yes.

Q. (By Mr. Swanson) And is it your understanding or opinion that all of those apps that get more expensive in the but-for world have no competitors?

MR. BURT: Objection. Form.

THE DEPONENT: Let me see if -- if I can understand the context of your question.

You're -- you're asking me about competition among developers? I've indicated that the model as I have presented it in my report does not take competition into account explicitly, and as I say in paragraph 122 is that I view that as conservative, conservative from the point of view of the possibility that with active competition

Page 229

58 (Pages 226 - 229)

among rivals in what might be a demand model that's appropriate for describing rivalry, that the pressures of that rivalry might -- resulting from a common decrease in cost would -- would -- could lead to low or substantial price decreases or less -- less robust price increases than would occur by considering a single firm on its own.

Q. (By Mr. Swanson) And this is something that you have done since your reply report?

MR. BURT: Objection to form.

THE DEPONENT: This is something that -- that I have done since last spring, because my natural starting point was to consider developers as being in Nash equilibrium, but the models that we found appropriate econometrically for doing this analysis did not require that, and I do not believe that the determination of damages and the allocation of damages in this case requires that, so I have not -- I have not pursued that or presented that. I view it as unnecessary for the issue of class certification.

Q. (By Mr. Swanson) But in terms of the models you've spoken of that would result in deeper price increases in your view or less robust price increases in the but-for world, is that -- is that

Page 230

something you have discussed anywhere in your reports?

MR. BURT: Objection to form. I think you said "increased" twice when you meant to say "decreased" once.

MR. SWANSON: You're right. Deeper price decreases or less robust price increases.

Thank you, Mr. Burt.

THE DEPONENT: Yes, and the answer is in my report, I do not have any comment on competition except in my reply to your experts who say I don't consider this. The answer is that there -- that the model S written and presented does not consider strategic interactions, and my -- I believe that that is conservative.

Q. (By Mr. Swanson) Your price sensitivity variable is not estimated with respect to any potential competition from other app genres; is that correct?

A. My interpretation of the demand model is that in -- in the -- at specific parameters and in time parameters in that model, it will -- it will capture the -- the status quo, the as-is world circumstance in which these firms find themselves, the environment in which they find themselves. And

Page 231

that, in turn, is essentially a reflection of whatever equilibrium they attain in competition with rival -- rival developers.

So in that sense, whatever the effects of inter -- inter-developer competition are, Nash equilibrium or whatever -- they -- they are captured in the but-for world by other coefficients that are -- that are in these models.

And when I say that I believe this analysis is conservative, I do not take into account that those coefficients are the -- the values, the dummy variables, would change in the but-for world, although with active rivalry between developers, in reality they might. And if so, that would potentially increase damages relative to the ones that I calculate.

Q. Professor, changing gears for a moment.

Is it fair to say that you claim that Apple's expert's two-sided market criticisms are a matter of terminology rather than substance?

MR. BURT: Objection. Form.

THE DEPONENT: Yes. In the following sense: that the primary concern with a -- with a platform is what's happening on one side of the platform versus -- to the agents one side of the

Page 232

platform versus the agents on the other.

And that's -- I agree that that's something that needs to be taken into account.

In my analysis, although I adopt the terminology that the Apple Store is a retail -- retailer for the distribution of apps and app content, my analysis does take into account the impact of Apple commissions both upstream and downstream, that is, on both developers and consumers, so that my analysis does encompass the calculations which are, I believe, the leading reason that people emphasize the use of successful analysis.

Q. (By Mr. Swanson) Well, if your model takes account of two sides to the market and indirect network effects, why is that you say that your methodology for quantifying the common impact of Apple's misconduct would provide conservative estimates of damages in light of the two-sided market framework?

You say that in paragraph 263.

A. 263?

Q. Yeah.

MR. BURT: Page 111.

THE DEPONENT: The answer is that in

Page 233

59 (Pages 230 - 233)

paragraph 263, I point out that in addition to the question of who gains consumers or developers from a reduced Apple Store commission, I also note that in a -- in a platform analysis, there may be other things that happen in terms of impact on consumers and impact on developers, such as increased entry, more higher-quality apps or so forth that might come out of -- a two-sided analysis.

And I -- and I -- while -- while my retail store framework and the analogy to add more taxes and the two-sided analysis of the impacts of that is, I think, appropriate and germane and to the point in terms of overcharge calculations, I -- I recognize that while it may -- it may be less relevant to class certification and the overcharge harm to consumers here, it would -- it would be an issue if one were, in truth, considering both sides of this market and what could happen, say, to the developer side as well as the consumer side.

Q. (By Mr. Swanson) Well, if you were already, in truth, considering both sides of the market, it wouldn't be possible for damages to be amplified by adopting a two-sided market framework, would it?

MR. BURT: Objection. Form.

Page 234

THE DEPONENT: Well, I think that would depend entirely on the scope for damages, what types of damages could be claimed under the -- I know under the applicable law, and it's entirely possible, I believe, that developers might be entitled to damages of beyond -- what would you call it? An undercharge in terms of the -- their takeaway revenue from -- from the Apple store. They may -- they might have legitimate claims that other Apple conduct has impeded their businesses and harmed their businesses in -- in other ways.

Q. (By Mr. Swanson) So you're saying if the market definition was different, conduct that currently in the market you define that is not anticompetitive would be deemed to be anticompetitive?

MR. BURT: Objection. Form.

THE DEPONENT: The answer I just gave you did not mention market definition, and I -- and my response, I -- I was not considering market definition. I was simply considering, for example, the question of whether Apple Store conduct such as exclusions or anti- -- anti-steering would have impact on developers which might be above and beyond the harm they might be able to claim because

Page 235

they received revenue from Apple lower than they would have received in the but-for world.

Q. (By Mr. Swanson) Is it not a fact that in a two-sided market analysis, anti-steering can be a pro-competitive activity?

MR. BURT: Objection.

THE DEPONENT: Well, I didn't come here today prepared to discuss the economics of two-sided markets. But two-sided -- two-sided markets -- lots of things can happen in a two-sided market, and -- in particular, there are issues of how to two-sided markets affect the stability of -- of upstream versus downstream actors, and there can be issues of how they -- how they affect innovation and entry and competition.

Q. (By Mr. Swanson) Professor, are you aware that Professor Evans, whom you cite in your reply report, has written a number of articles on how market definition is different in the context of two-sided markets compared to single-sided markets?

A. I do not recall -- I don't recall reading -- reading those. No, I don't.

Q. Okay. Are you aware of any professional economic literature that emphasizes the importance

Page 236

of accounting for indirect network effects and market definition analysis in order to avoid defining markets that are too narrow?

MR. BURT: Objection.

THE DEPONENT: You asked me specifically about academic literature. My response is that my primary exposure to questions of platforms have come through previous litigation. I was involved in litigation in the American Airlines v. Sabre case where Sabre was represented as a platform industry. I was involved in some of the credit card cases in which credit card companies were treated as platform industries. I have a published paper on the browser market case dating back to the competition between Microsoft, Sun Microsystems, and AOL, which is concerned precisely with the issue of platform stability.

So I -- I have that experience. I suppose that last paper, which is very definitely an academic and rather forbidding paper, would be an example.

Q. (By Mr. Swanson) Do you have an understanding as to how to modify the hypothetical monopolist test in order to properly define relevant markets in the context of two-sided

Page 237

60 (Pages 234 - 237)

platform businesses?   06:11:22

MR. BURT: Objection. Form.

THE DEPONENT: I'm -- I'm familiar with the -- I'm familiar with the test, and I don't think that I to this day have clearance to discuss   06:11:31 some -- some of the opinions I've written on that in -- in the legal context and legal cases.

Q. (By Mr. Swanson) Yes, but my question was not to ask to disclose anything confidential, but just to ask you if you have an understanding as   06:11:53 an economist about how to modify the hypothetical monopolist test in order to properly define relevant markets in the context of two-sided platform businesses?

A. Oh, I'm sorry. You were talking about   06:12:08 SSNIP test, not -- not the -- not the credit card-type test?

Q. Correct.

A. Okay. Well, the answer is -- in general I'm generally familiar with those tests. I'm   06:12:21 familiar with the issue that they don't -- they don't work precisely exactly when you're essentially trying to judge whether a single firm has monopoly power as opposed to whether two firms merging would create monopoly power, the so-called   06:12:39

Page 238

"cellophane problem."   06:12:43

Q. Do you believe that Professor Evans properly applied the SSNIP test in the Epic case?

A. I have not -- I don't recall reading that, and so I can't -- I don't know.   06:12:57

Q. Is it still your opinion that the relevant market in this case is an aftermarket in which Apple has a 100 percent market share?

A. I would say yes. In -- in my view, the opportunities for substitution to alternative   06:13:20 devices is sufficiently steep. The -- the cost of switching is sufficiently cheap. You want a mobile device, you would have to replace your iPhone, iPad with a -- a non-Apple device. If you want to use a nonmobile device, you have to stay home rather than   06:13:50 doing it on the subway.

Those are, to me, very substantial switching costs for the bulk of consumers, and that's sufficient to define this as a -- quite a well-defined aftermarket.   06:14:06

Q. And do you feel you presented more evidence on this point than was presented to the court in the Epic case?

MR. BURT: Objection to form.

THE DEPONENT: I'm not familiar with what   06:14:23

Page 239

was presented in the Epic case, so I can't answer.   06:14:25

MR. SWANSON: Okay. I think we're up to the seven-hour mark. It's 6:14. So I would love to go through another couple dozen of pages of my outline, but I think -- I don't think Mr. Burt is   06:14:40 going to let me do that.

MR. BURT: It is -- it is awfully late here on the East Coast.

MR. SWANSON: Yes. I'm sorry about that.

MR. BURT: No, I understand. We -- we   06:14:53 worked off the witness's clock, but I'm -- I'm not inclined to give free range for more time on the second deposition of the same witness.

MR. SWANSON: I'm -- I'm sorry about the late time.   06:15:09

All right. Well, then, over to you.

MR. BURT: I have no questions for the witness.

MR. SWANSON: All right.

Well, thank you.   06:15:22

Thank you, Professor.

Thank you, everyone.

THE VIDEOGRAPHER: Okay. So we're going off the record. It's 6:15 p.m., and this concludes today's testimony given by Daniel McFadden.   06:15:31

Page 240

The total number of media units used was seven and will be retained by Veritext.

(TIME NOTED: 6:15 p.m.)

---o0o---

Page 241

61 (Pages 238 - 241)

I, DANIEL L. McFADDEN do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear notes; that my testimony as contained herein, as corrected, is true and correct.

Executed this _____ day of _____, 2021, at _____,_____.

_____
DANIEL L. McFADDEN

Page 242

MR. DANIEL G. SWANSON, ESQ.

dswanson@gibsondunn.com

November 8, 2021

RE: IN RE APPLE IPHONE ANTITUST LITIGATION

11/5/2021, DANIEL L. McFADDEN, JOB NO. 4876250

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived - Reading & Signature was waived at the time of the deposition.

Page 244

I, Rebecca L. Romano, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter, do hereby certify:

That the foregoing proceedings were taken before me remotely at the time and place herein set forth; that any deponents in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 11/8/2021

_Rebecca S. Romano_
Rebecca L. Romano, RPR, CCR
CSR. No 12546

Page 243

__ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_x_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 245

62 (Pages 242 - 245)

**[& - 30]**

| & |
| --- |
| **&** 1:14 2:16 3:5,14 4:5 244:23 245:9 |

| 0 |
| --- |
| **0** 188:6 |
| **0.1** 196:13 201:9 |
| **0038** 6:11 12:2 |
| **0039** 6:17 12:5 |
| **0040** 6:23 15:8 |
| **0041** 7:4 53:23 |
| **0042** 7:9 155:11 |
| **06714** 1:6 2:6 8:14 |

| 1 |
| --- |
| **1** 1:25 6:20 8:8 16:10,13 23:22 40:16 44:17 57:10 59:18,22 60:1,8,11 60:12,17,23 61:5 61:20 64:2 67:17 93:2,24 94:4 101:2 116:9 136:13 149:21 207:14,19 245:1 |
| **1.79** 153:2 |
| **1.99** 153:1 |
| **10** 17:9,12 19:23 20:20 23:20 24:19 24:23 34:1 40:16 41:8 129:8,10,16 130:3 131:15 156:24 176:22 177:12 207:15 |
| **100** 15:23 16:2 40:16 41:9 153:5 153:14 188:2 239:8 |
| **10016** 3:9 |
| **1050** 4:8 |
| **10:10** 44:17 |

**10:27** 44:18
**10:29** 44:21
**11** 6:5
**11.4** 150:12 151:11
**11/5/2021** 244:5
**11/8/2021** 243:22
**110** 50:11
**111** 233:24
**117** 149:21 151:22
**11:44** 88:6
**12** 6:11,17 124:16 124:21,24 125:13 126:25 145:20 176:22 177:12 178:16
**122** 226:23 229:23
**12546** 1:21 243:25
**12:02** 88:9
**12e** 132:7
**13** 30:22,25 31:17 31:24
**13's** 34:4
**130** 50:6
**136** 165:21,25 166:2,5,8
**138** 98:10,13 100:4 101:8 102:6,7 105:8,19,22
**139** 101:24
**14.6** 138:15 139:9 139:21 140:9,11 141:12
**140** 91:23,23 92:2 92:3 100:16
**143** 44:25
**145** 49:5
**149** 100:16
**15** 6:23 42:18 149:12 161:16 176:22 177:13,19 177:22 178:5,12

178:18,21 179:14
**15.3** 137:8,19 139:18,19 140:15 141:13
**15.4** 151:18
**155** 7:9
**16** 118:1,2,3
**160** 93:3
**167** 196:4
**168** 196:3
**169** 196:17 197:23 200:12
**17** 24:19,23
**170** 199:10,23 201:6
**18** 173:3
**183** 202:11,12
**189** 219:22
**19** 6:15,25 54:20
**197** 208:8
**19th** 13:6
**1:00** 120:12,17
**1st** 13:12

| 2 |
| --- |
| **2** 43:4,7,14 44:21 57:10,13 59:19,24 60:9,11,12,17,24 61:6,11 64:3 67:17 88:6 |
| **20** 41:8 129:9 176:11 |
| **20-0466** 1:22 |
| **20.99.** 92:22 |
| **200** 117:23 118:10 119:6 |
| **20036-5306** 4:9 |
| **2008** 111:19 |
| **2010** 191:12 |
| **2016** 161:22 |
| **2017** 111:19 155:17 156:6,15 |

**2018** 111:18 175:9 175:23 183:22,24
**202** 4:10 144:3,6 145:10
**2020** 161:20
**2021** 1:16 2:15 6:15,21,25 8:1,7 13:6,12 111:18 242:7 244:3
**2025.520** 244:9,12
**21** 156:25 162:19
**212** 3:10
**213** 3:19
**227** 39:13,16,19 40:1
**229-7430** 3:19
**24** 143:5,15 220:22
**240** 93:3
**245** 1:25
**25** 176:12 196:13 199:6,12,19 200:13,15,17,18 201:9,19,21 202:16
**260** 50:10,14,16 52:25
**263** 233:21,22 234:1
**270** 3:8
**2:01** 120:20

| 3 |
| --- |
| **3** 17:10 19:16 34:2 55:9 57:7,15 58:13 59:18 60:14 60:20 61:5 63:25 67:15,19 68:9 88:9 120:17 |
| **3.1.1** 190:17 191:2 192:15 193:13,22 |
| **30** 36:5,18 37:2 41:18 42:6 131:20 |

Veritext Legal Solutions
866 299-5127

**[30 - accounts]**

134:6 137:11
156:24 160:2,20
174:25 175:5,5
177:22 245:1
**3000**   4:16
**333**   3:17
**3491**   1:23
**38**   13:4,22 16:9
**39**   13:10 17:9
19:15
**393-8248**   4:18
**3:03**   154:9
**3:13**   154:12

**4**

**4**   28:20 67:14 68:2
107:1 120:20
124:22 154:9
166:19
**4.99**   92:21
**40**   35:15
**400,000**   213:8
**41**   54:3 155:2,9
**411**   8:14
**415**   4:18
**42**   155:3,9
**43**   173:2,4,7
**450**   117:19
**48**   97:8 150:8,9
**4876250**   1:24
244:5
**49**   182:20,22
**4:11**   1:6 2:6
**4:20**   190:8
**4:32**   190:11

**5**

**5**   1:16 2:15 8:1
30:22 132:7
133:19 137:7
151:14 154:12
190:8 207:14,20

212:22
**5.8**   138:21
**50**   41:9 155:18
156:7 201:14
203:3,8,14 204:5
**52**   49:7
**53**   7:4 162:19
164:13 171:19
**545-4600**   3:10
**55**   98:11
**555**   4:15
**56**   91:24
**57**   93:25
**5:32**   222:2
**5:42**   222:5
**5th**   8:6

**6**

**6**   43:4 190:11
222:2
**64**   165:22 166:5
**69**   196:7
**6:14**   240:3
**6:15**   240:24 241:3

**7**

**7**   43:6,7,15 148:23
149:4 222:5
**7.7**   42:18 149:11
150:11
**70**   133:24 138:14
208:13,22 210:12
211:16 212:9,24
**70,000**   136:7
**7321**   243:24
**76**   135:24,24
**79**   219:22

**8**

**8**   18:18 244:3
**80**   93:3 94:4,4,16
97:6,22

**82**   133:1
**827**   1:22
**83**   144:4 153:5
**84**   77:1,3,14,17
84:17 85:22 86:3
86:18 87:3
**85**   34:24
**86**   133:20
**887-3706**   4:10

**9**

**9**   19:15 21:19
**9.99**   92:21
**90**   34:24
**90071-3197**   3:18
**92**   190:14,16,23
**94105-0921**   4:17
**99**   34:24 39:14,17
76:22 77:3,13
84:15,16 85:21
86:2,18 87:2,21
94:5,16,21 152:10
153:6,12,18
**9:02**   2:15 8:2,6

**a**

**a.m.**   2:15 8:2,6
44:17,21 88:6
**abandoning**   32:18
**ability**   69:9,18
113:21 115:14
187:20 193:7
199:15 215:24
224:13
**able**   73:2 74:25
115:13 164:8
188:14 199:11
235:25
**absence**   152:18
174:3 189:8
**absent**   31:2 81:7
153:19

**absolute**   134:13
**absolutely**   62:18
78:9 104:19
215:23
**abstract**   34:19
86:22,22,23 87:6
87:10
**abut**   85:17
**academic**   237:6,20
**accept**   144:13
146:12 151:4
**acceptable**   30:14
44:12 111:3
**accepted**   118:13
**access**   180:20
196:21
**accomplish**   54:4
127:17
**account**   81:19
114:2 115:21
117:16 129:8,25
130:8 153:17
179:13 227:6
229:22 232:11
233:3,7,15
**accounted**   136:21
227:20
**accounting**   148:1
149:19 227:11
237:1
**accounts**   32:24
111:1,5,7 112:1
113:11 115:9,12
115:15 117:3,5,15
119:25 120:1
124:5,7 129:6
130:2 137:8,11,24
137:24 140:12,13
141:8 149:4
155:18 156:7,11
156:11,25 196:14

Veritext Legal Solutions
866 299-5127

**[accounts - allege]**

203:7 204:8,17 205:4,19

**accumulate** 95:21 127:23

**accuracy** 145:20 212:14

**accurate** 29:23 130:12 147:25,25 203:20 208:21 212:3

**accurately** 135:6 212:2

**accusations** 99:22

**achieve** 192:8,12

**achieving** 158:18

**acknowledge** 149:3

**acknowledged** 148:24

**acl** 65:7,11

**acquire** 135:12 187:23

**acquired** 213:8

**acquiring** 187:15

**act** 57:14,17 59:5 66:21 68:22 69:8 70:13,18 163:8

**action** 45:19 125:8 126:14 131:10 193:22 243:18,19

**actions** 72:7 192:1 192:2,6

**active** 114:2,3 115:8,21 119:11 158:19 163:20 183:14,17,21,25 229:25 232:13

**activity** 108:22 167:22 236:5

**actors** 236:13

**acts** 50:21 52:7,11 53:2 64:6 65:15 66:1,5,10,16 72:12

**actual** 64:2 84:14 85:21 86:17 88:14 104:6 122:24 126:23 137:21,25 138:1 146:12 149:14,18 155:17 156:6 157:9 165:4 165:15 166:24 167:16,16 169:8 172:18 181:18 195:6 198:2 199:19 200:7 210:5

**adapted** 220:12

**add** 31:12 71:16 115:16 167:2 234:10

**added** 57:15 60:19 69:5 155:1 195:24

**adding** 92:17 136:17

**addition** 174:13 234:1

**additional** 14:16 14:17 67:22 68:13 69:4 71:16 93:9 136:4,6 161:15 165:2 194:15

**additions** 14:5,9

**address** 23:22 24:11 63:15 74:25 114:2 117:3 119:12

**addressed** 24:8 27:23 63:8 73:17

**addresses** 114:3 115:7,23

**adequate** 205:11 216:14 218:21

**adjust** 29:9 154:3 181:25

**adjusted** 163:16

**adjustment** 96:6 97:19 98:5 99:11 100:19 102:10,11 102:20,22 104:11 106:16 122:20,23

**adjustments** 105:13

**adler** 3:5

**administered** 11:2 243:8

**adopt** 106:18 233:4

**adopted** 147:1

**adopting** 234:23

**advance** 58:18 163:10

**advanced** 21:12 21:12

**advantage** 39:9

**adverse** 28:3,10

**adversely** 38:21

**advertising** 193:24

**affect** 23:9 107:11 156:14 159:21 236:12,14

**affidavit** 18:9

**affirmed** 166:19

**afoul** 22:20

**aftermarket** 18:22 22:12,18 23:10 180:12 184:2 188:4 239:7,20

**agency** 16:5

**agents** 232:25 233:1

**aggregate** 92:14 92:23 103:16 104:25 126:21 142:20 206:14,22 206:24 222:9,17 223:12,19 224:16 225:12

**aggregated** 221:1

**ago** 32:15 98:25

**agree** 49:16 94:4 103:4,23 105:5,7 105:11 108:8 112:4,23 113:5,9 127:9 128:4 130:12,15 138:5 139:16 146:1,5,8 147:20,24 148:5 149:13 152:11,12 155:15 156:4,22 157:7,11,17 164:25 167:6 176:7 185:21 186:2,6 187:1 209:18 214:11 215:3,17 233:2

**agreed** 120:12 144:15

**agreements** 170:10,13

**ahead** 116:8

**airlines** 237:9

**algebra** 79:2

**algorithms** 144:12

**allegation** 19:4 31:3

**allegations** 23:13 23:15 47:21 48:1 48:9,13,17 51:16 51:20 73:15,16

**allege** 18:20 22:12 22:18 66:5,11

[allege - app]

68:21 192:18
**alleged** 24:25
25:12,23 31:9
36:6,20 37:14
57:10,14,25 59:3,4
59:12,22,23,23
60:7,8,17,19,22
61:11 62:5 64:5
65:15,16 66:1,5,6
66:21 67:3 68:11
73:24 127:12,21
128:7
**allegedly** 66:17
**alleges** 67:16
**allocation** 230:18
**allow** 83:9,14
88:17 89:6 90:6
159:20
**allowance** 167:23
**allowed** 153:23
**allows** 72:16
**alpha** 80:23,25
**alternative** 29:20
30:11 73:21 92:7
100:20 133:12,16
134:11 160:15
170:1 172:25
187:17 194:1,14
204:22 239:10
**alternatives** 30:5,6
134:22,22 172:24
**amazon** 53:9
158:8,9 163:20,23
164:8
**amend** 133:11
**amended** 18:8
45:18,24 46:2,9
55:4,11,16 56:18
56:24 57:4,25
66:13 68:4 73:23
74:13,18,22 76:14

201:9,21 203:4
**amendment** 64:15
**american** 185:11
185:15,22,24
237:9
**amount** 22:11,17
96:19 98:19 104:1
104:21 122:23
136:8 148:14
179:1
**amounts** 104:6
148:10 179:6
**amplified** 234:23
**analogous** 173:17
**analogy** 234:10
**analyses** 43:24
**analysis** 5:13
29:13,18 36:14
37:5 44:6 47:22
50:17,19,25 51:3
51:14 52:2 58:6
61:3 67:22,25
68:13 69:2,4
91:10 92:4 127:8
134:7,8 137:15
146:2 150:10
151:22 153:3
173:9 182:12,24
191:17 196:12
197:4,11,15,17
198:8,19 199:7,12
199:14 200:14
201:13,24 202:5
205:1 206:5 207:7
209:9 213:3 216:1
218:21 220:9
221:5 227:9
230:16 232:10
233:4,7,10,13
234:4,8,11 236:4
237:2

**analyzed** 220:10
**analyzes** 200:1
**analyzing** 91:12
**android** 179:24
180:5,8,14
**angeles** 3:18
**announced** 178:24
**announcement**
178:23 179:12
**announcements**
194:13
**announcing**
193:25
**answer** 22:5 29:17
35:11 36:16 49:19
56:13 58:22 63:18
64:12,23 65:2,18
69:13,14 70:4
74:21 76:5,7 78:2
78:3,9,23 79:10
82:18 84:4,21
85:9,15,20,24 87:5
92:16 94:10 95:24
104:12 106:22
108:18 109:12,14
109:23 110:12,20
111:2 114:22
117:1 128:15
130:5 134:20
140:17 141:21
142:2 149:17
151:7 152:21,22
152:22 158:20
160:9 170:22
171:25 175:11
182:8 185:1,16
186:18 189:5
193:1 195:18
196:1 198:13,14
202:4 203:17
205:16 210:8,17

214:17,21 215:7
215:21,22 216:12
217:4 221:4
224:20 226:3
227:13,24 228:12
228:13 231:9,12
233:25 235:18
238:19 240:1
**answered** 85:7
158:25
**answers** 30:15
**anti** 184:8,24
185:8,11,15,22
188:24 189:2,8
194:5 195:15
235:23,23 236:4
**anticompetitive**
18:21 65:4 166:9
192:3,11,16,19,25
235:15,16
**antitrust** 8:11 16:6
70:24 71:3,24
72:2,8,12 179:10
185:5
**antitust** 1:6 2:6
244:4
**aol** 237:16
**apologize** 80:5
123:21
**app** 16:4 18:23
23:25 24:12 27:3
31:4,8 50:19,25
51:15 52:2,7
76:21 78:14 83:18
89:22 92:20,21,24
98:19 104:21
108:11 117:20
122:10,12,12
133:24,25 134:14
142:6,15 143:8
144:24,25 146:16

Veritext Legal Solutions
866 299-5127

**[app - apps]**

149:9 151:23 152:2,9 156:24 163:15 166:10,10 166:11,13 169:13 169:14,19,19,21 170:3,9,14 171:11 171:16 173:17,24 174:12 180:6,8,10 180:11,11,14 181:10,10 182:5,6 182:9,15 187:12 187:15 188:19 190:17 191:2 192:15 194:5,5,14 208:14,14 209:16 209:17 213:3 220:6 227:11,19 227:21 231:18 233:6

**apparently** 145:23 147:19

**appear** 12:11 207:20 242:4

**appearances** 3:1 4:1 5:1

**appeared** 15:12 151:15 212:23

**appearing** 3:2 4:2 5:2 244:18 245:7

**appears** 13:4,13 16:12 54:5 133:2 176:19 177:10

**appendix** 44:24,25 45:3,7,17 46:18 49:6 50:7 210:9

**apple** 1:5 2:5 5:10 8:11,25 9:2,4,5,12 9:14 16:4 18:20 20:3,12,24 22:10 22:16 23:25 24:12 27:3,4 28:1,7

29:12 35:12 36:24 37:13 38:23 49:24 50:19,19,21,25 51:4,15 52:2,11 53:2 64:5 66:1,5 66:10,17,21 67:16 68:21 80:14 83:16 86:1 93:5 107:23 107:24 108:16,17 108:20 110:1,2,22 111:25 112:3,5,12 112:17,24 113:8 113:11,17,21,24 114:1,2,9,13,20,25 115:1,5,7,8,12,12 115:18,21 116:2,2 116:16 117:2,6,12 117:14,19,23 118:4,10,14 119:6 119:11,13,25 120:8 125:5,14 126:3,9 127:24 128:19 129:6,14 129:19,20,21,21 130:1,2 137:8,11 137:20 138:2,9,15 139:9,20 140:2,5 140:12,13 141:1,6 141:6,8,11,16 143:18 147:17 148:1 150:11 151:10 152:7 155:18 156:7,25 157:15,23 158:1,4 158:5 159:17,24 160:3,9 161:3,12 161:14 163:21 164:3,19,24 165:11,15,16 166:10,14 167:22 169:25 170:15

171:7 172:11,17 180:10,21 181:25 187:11,14,17 188:2,14 189:2 190:2,2 191:6 195:23 196:14,23 199:8 202:24 203:7 204:8 205:4 209:11,22,23 212:11 233:5,8 234:3 235:8,10,22 236:1 239:8,14 244:4

**apple's** 16:17,24 23:24 24:12,25 25:12 28:9,24 31:8 36:6,19 37:8 37:22 67:3 110:24 113:21,24 114:16 114:17 127:12,21 128:7 129:10,22 152:4 153:19 157:21 166:8,11 184:9 194:4 195:14 232:19 233:18

**applicable** 40:6 73:1 184:4,4 193:4 224:7 235:4

**application** 70:5 182:23 183:4

**applications** 18:22

**applied** 18:11 62:2 73:13 104:3 142:18,21 202:15 217:6 219:24 220:15 239:3

**applies** 86:23 94:21 107:9

**apply** 62:10 64:17 67:18,23 68:23

69:22 70:1,6 81:14 83:22 96:9 164:14 183:6 184:3 208:24

**applying** 96:13

**appreciate** 12:9 198:15

**apprised** 58:15

**approach** 92:5,7,8 92:10 101:15,16 135:14,24 138:14 140:10 146:6,14 208:15,21,22 210:10

**approached** 54:14

**appropriate** 35:10 48:11 55:7 61:5 64:18 69:3 91:9 91:11 93:13 131:4 179:7 183:18 184:14 207:17 211:22 217:11 220:11,18,21 221:8 230:2,15 234:12

**appropriately** 25:6 126:22 198:23

**approval** 125:11

**approving** 48:14

**approximate** 120:1 130:17

**approximately** 103:13 118:13

**approximation** 119:16

**apps** 31:4,8 37:16 37:17 38:11 82:9 82:19 83:4,20,25 84:5,7 133:24,25 134:6,14 135:11

Veritext Legal Solutions
866 299-5127

**[apps - back]**

135:13,14,21,23
135:25 136:7,7,8
136:12,14,16
137:6 139:17
140:15,21 144:18
144:21 145:5,12
145:16 146:2,6,9
146:14 151:15
153:5 164:10,15
166:12 170:20
171:16 178:5,7
179:24 187:15
188:5 189:18
205:5 206:5
208:13 209:10
210:13,15,18,19
210:20 211:2,4,7,9
211:15,16,20
212:4,8,11,20,23
213:4,7,10 216:7
227:1 229:8,13
233:6 234:7
**area** 108:1
**areas** 37:20,21
38:19 189:6
**arena** 27:21
**arguments** 62:3
**articles** 236:18
**aside** 53:18 177:1
**asked** 15:25 16:15
17:13,25 23:21
55:7 63:20 64:12
66:13 70:9 78:6
85:6,14 96:25
98:7 104:14,15
110:1 113:18
122:2 138:2
174:18 191:14
193:2,7,17 194:16
194:19 195:7,12
198:5 200:6,7

203:12 205:17
223:23,23 224:2,5
224:10 225:9
237:5
**asking** 19:5 20:18
23:4 34:14 36:10
40:14 46:1 47:8
47:17 56:3 63:1
63:12,14 71:19
72:20,21 79:1
82:3 85:2 86:12
86:16 87:5 104:10
105:4,20 109:14
118:20 126:12
137:18 141:21
146:18 161:24
172:23 177:13
182:2,3 209:21
229:19
**asks** 143:10
**aspect** 59:16
155:25
**assemble** 193:2
**assembling** 193:9
**assert** 38:3,9
**asserting** 114:12
**assertion** 43:8
**assess** 17:14
199:11 217:19
**assessed** 200:8
**assessing** 107:4
**assessment** 157:22
199:19 211:11
**assign** 81:8
**assignable** 135:9
**assignment** 16:13
16:20,23 17:2,6,18
17:22,24,25 24:5
27:13 48:2 61:25
63:11,19 127:6
193:8

**assisting** 14:12
**associated** 47:17
78:16 85:4 96:19
114:1,4 115:22
**associates** 195:19
**assume** 50:4 51:19
84:14 125:9 129:7
131:3 153:23
**assumed** 105:20
**assumes** 172:11
**assuming** 52:21
73:6 125:17
153:22 159:14
163:14 164:13
**assumption** 80:17
82:1 93:4 100:22
115:6 149:25
163:7,17 164:17
**assumptions** 49:1
98:15 122:13
**assured** 90:24
**attached** 12:4,7
15:10 41:2 53:25
112:5 155:13
**attain** 20:4,12,24
232:2
**attained** 94:11
**attempted** 20:4,12
20:24 21:8,25
57:11 59:19 60:18
62:7,13,15,20 63:7
63:16
**attempting** 31:6
**attention** 32:7
**attorney** 3:7,16
4:7,14 243:19
**attractive** 167:23
**audience** 83:18
**availability** 23:23
**available** 37:13,15
37:16,17 39:6

158:2,6 167:21,24
174:3 199:3
**avenue** 3:8,17 4:8
**average** 94:12,13
94:19 102:20
103:19,20 120:8
122:10,10 128:20
144:24 145:5,6,11
145:16 162:7
167:25 168:4
**avoid** 237:2
**award** 143:19
148:13
**aware** 18:7,12
20:3,11,14,23 21:7
22:5,6,8,15 23:7
23:12,14 46:2
51:8,18,22 53:17
57:5 58:18 62:8
62:13,15,19 63:9
63:15,18 66:25
69:24 70:23 71:1
71:25 73:22 74:3
74:10,12 77:19,21
117:18,22 147:4
162:12 174:17
175:8,11 179:8
180:15,18 236:17
236:24
**awfully** 240:7

**b**

**b** 5:9 6:8 7:1 44:24
45:3,7,17 46:18
49:6 50:7,7 245:1
**back** 14:24 32:7
49:19 80:1 84:10
90:17 96:25 99:17
101:8,12 102:17
106:22 121:2
132:23 150:17
154:15 171:18

Veritext Legal Solutions
866 299-5127

**[back - burt]**

175:25 176:14 191:15 194:2 219:2 237:14
**background** 102:18 106:23
**backup** 89:17,19 99:18 106:23 121:1,16 196:23 197:3,11 198:18 198:25 199:3 202:1
**backups** 220:5
**bare** 226:14
**barrier** 111:25
**base** 48:8 72:25 139:23 176:19
**based** 18:1 48:9 50:24 51:14 60:15 69:7 72:22,24 84:18 95:19 108:15 110:22 113:23 114:16 115:5 124:7 135:18 177:9 200:18 201:24
**basic** 41:6 72:10 144:7 168:16,24
**basically** 117:1 158:16 170:11
**basing** 134:7
**basis** 51:11 52:16 61:4 95:15 97:19 97:19,22 98:7 99:11 101:23 102:21 105:14 107:17 121:5 139:17 163:4,7 178:14 192:9 218:20
**beginning** 17:13 44:21 88:9 120:20

133:1 154:12 190:11 222:5
**begins** 79:1
**begun** 176:1
**behalf** 2:13 127:8
**behavior** 91:12
**belief** 139:23
**believe** 14:5 31:18 32:21,23 34:18 35:9,9 41:11,13 50:5 56:25 61:23 63:6 65:22 71:20 83:14 84:5 85:3,8 88:16 93:14 96:23 97:15 103:20 106:16 123:11 134:16 138:23 139:6,22 141:18 151:13 152:5 164:3 172:23 174:5 175:16 181:6 182:8 184:13,21 185:4 188:22 189:6 199:2 200:25 208:16,23 212:22 216:16 222:15 230:16 231:14 232:9 233:11 235:5 239:2
**believed** 192:21
**belong** 115:1 144:1
**benchmark** 168:12 173:8,24 174:3 178:10 179:7 182:24 183:6,19,19 184:5 192:7
**benchmarks** 174:11 178:14

183:11
**benefit** 39:7 139:1
**benefited** 36:5,19
**berkeley** 1:15 2:14 8:1
**best** 11:16,17 78:2 97:13 109:1 123:10 134:13 173:23 174:3 181:22 212:1
**better** 29:21 37:19 123:11 129:8 144:14
**beyond** 64:17 70:24 72:4,17 73:19 84:9 90:8 112:6 116:24 137:16 142:15 194:1 209:15 235:6,25
**bias** 213:23
**big** 167:4
**billions** 206:19,25
**bit** 18:14 53:3 149:3 184:6
**body** 61:16,19
**bootstrap** 223:2,8
**bottom** 34:1 39:16 40:1 49:6 64:1 124:21 132:7 218:19 219:6
**bound** 110:10 128:17
**bounds** 112:6 220:16,17,20,24 221:8
**boy** 184:16
**brand** 170:4,11,20 170:23 171:11
**branding** 171:5,6

**brattle** 5:11 9:16 53:18 55:5
**break** 88:4 120:13 154:6,15 190:4 221:24
**breaking** 44:11
**breno** 5:12 9:11
**brief** 65:2 154:6
**bring** 58:7
**bringing** 39:1 72:6 72:15 134:5
**broad** 39:11 47:23 75:23
**broader** 26:8 198:11
**broadly** 213:24
**brought** 57:13 67:19 68:14 70:6 73:1,16 84:6
**browser** 237:14
**building** 181:3
**bulk** 209:10 210:25 239:18
**bullet** 43:19
**burden** 112:16 113:16 114:7
**burt** 3:6,11 9:6,6 9:15 12:15,21 17:4,20 19:24 20:6 21:9,22 22:1 22:19,23 24:7,15 25:2,14 26:16,25 27:17 29:24 32:1 32:20 33:8,16 34:25 35:8,19 36:9,22 38:7,15 40:17,24 41:10,20 42:8,22 44:1,13 45:25 51:5,21 52:3,12 55:18,23 56:1,8 58:1 59:6

Veritext Legal Solutions
866 299-5127

**[burt - case]**

59:14,25 60:25 61:14,21 67:4 68:6,24 69:11,23 70:3,14,19 71:8,18 74:1,20 75:22 76:15 78:11 79:9 82:15 83:12 84:3 84:20 85:6,12,23 86:20 87:14,23 88:25 89:24 91:4 92:15 97:25 99:16 100:2 102:15 103:6 104:8,23 105:10 106:10 108:12 109:9,22 110:16 111:21 112:7 113:2,12 114:14 115:3,19 116:13 118:19 119:9,21 125:6,19 126:11 127:14 128:8 130:4,23 131:11,16,21 134:3,19 135:16 138:10 142:8 147:8 148:4 153:20 154:25 161:5,19 167:8 170:25 171:12 174:1,15 178:22 186:9 188:11 189:4,19 190:5 193:15 194:8,21 195:3,11 197:5 198:4,20 199:21 200:10 201:17 202:3 203:10 204:6,9,19 205:23 207:1,24 209:4 210:22 211:5 213:5 214:16

215:6,20 217:2 219:19 221:14,25 222:11,19 223:13 223:21 224:4,19 225:7,14 226:1,17 227:23 229:10,16 230:10 231:3,8 232:21 233:24 234:25 235:17 236:6 237:4 238:2 239:24 240:5,7,10 240:17

**business** 57:17 65:8,9 84:6 185:23 186:4,8,24 203:21 204:25 223:7

**businesses** 235:10 235:11 238:1,14

**buttons** 193:21

**buy** 39:4 101:3 164:15 186:15

**buying** 93:3

**buys** 187:14

**c**

**c** 80:25

**ca** 244:9,12,20

**caeli** 4:13 9:1

**calculate** 76:10,23 78:15,23 84:18 85:4 86:19 94:16 96:18 134:2 138:18 157:13 206:17 224:2 227:10 232:16

**calculated** 76:17 104:13 122:3,9 128:1 138:15,19 139:1,3 140:23 144:22,23 159:13 162:7 164:20

212:15 227:15,15

**calculates** 78:12 94:8 195:20

**calculating** 132:12 132:21 133:13 142:5,14 157:7 164:23 206:22

**calculation** 79:24 86:6 87:7 95:17 96:12 97:11,11,12 97:23 99:9 101:9 102:25 103:8 105:4,5 108:24 109:24 110:9 122:16,24 124:4,6 134:5,7,12 135:2,4 135:6 136:1,8,22 136:25 137:1,6,22 138:7,12,20 139:24 141:7,10 144:2 149:8,24 150:15 152:19 156:12 157:2,4,12 157:18 159:20 162:11 206:10 207:4 208:24 209:13,13,16 222:24 223:9,14 223:18,25 224:21 225:1,11,12

**calculations** 30:12 42:16 103:9 106:13 110:21 122:14 123:2,4,11 135:17 140:1 153:22 171:22,24 192:9 201:1,1 209:3 233:11 234:13

**calendar** 144:19

**california** 1:2,15 1:21 2:2,14 3:18 4:17 8:1,13,18 58:4,17

**call** 26:22 32:3,3 52:1 55:15 116:15 122:3 124:24 135:13 180:12 189:21 210:12 235:7

**called** 148:2 184:8 214:7,10 238:25

**calls** 21:9 144:10 193:21

**capacity** 172:3 194:11

**capture** 136:12 227:1 231:23

**captured** 232:7

**card** 113:17 114:3 114:5 115:7,18,22 115:24 117:4 119:12 237:12,12 238:17

**care** 182:16

**carefully** 74:17 114:6

**cares** 26:5

**carried** 205:1

**carries** 64:3 83:18

**carry** 67:9,11

**carrying** 17:19 24:6 223:8

**case** 1:6 2:6 8:14 15:19 17:15 18:2 18:6 19:22 20:3 20:11,19,24 21:3,8 21:19,24 22:9,15 23:5 29:10 43:2 46:15,21 47:10,11 47:13 48:16,20

[case - claimants]

49:12,24 51:19 52:15,19 62:20 63:3,4,10 65:5,6 70:24 95:4 104:17 107:10,22 115:20 122:8 146:13 159:13 162:13,16 162:17 169:4,10 175:2,3 179:1 211:1,8,12,23,25 214:7 218:7 226:11,15 230:18 237:10,14 239:3,7 239:23 240:1 243:15

**cases** 32:25 33:1 48:15 65:6 71:22 72:1 148:8 199:2 207:13,19 219:2 225:16 237:12 238:7

**cast** 224:17

**categorically** 134:21

**categories** 142:19 142:21 219:25 220:6

**category** 142:20 142:22 216:21,25

**cause** 36:25 195:15 205:13

**caused** 23:25 24:13,25 25:12 35:12

**causing** 214:4

**caveats** 87:11

**ccp** 244:9,12

**ccr** 1:21,22,23 243:24

**cellophane** 239:1

**cent** 152:10 153:18

**cents** 76:22 77:1,3 77:3,13,14,18 84:15,16,17 85:21 85:22 86:2,4,18,18 87:22 94:5,16,21 97:8 153:6,12

**certain** 72:1 161:9

**certainly** 21:4 29:17 32:3 41:23 47:15 48:11,14 77:22 79:22 90:21 102:7 103:19 114:22 115:20 117:16 131:12 141:22 146:24 151:19 156:10 159:12 169:10 172:10 175:2 177:3 178:9 182:12 185:2 207:18 209:5 217:21 221:22

**certification** 6:14 6:20 7:7 28:16 54:7 125:24 126:17 193:4 204:14 226:9,12 226:14 230:21 234:15

**certified** 2:18,18 131:3 224:9 243:2 243:3

**certify** 243:4,17

**cetera** 117:4

**challenge** 108:10 109:6,19 191:19 192:6,22 194:7

**challenged** 129:10 195:25 224:12

**challenging** 191:7

**change** 17:1 18:2,6 18:12 23:13,14 29:5,13 63:9,13 69:1 78:17 94:20 97:14 98:18 99:6 104:20 144:19 145:25 159:17 172:6 175:8 201:7 232:12

**changed** 19:12 29:7 30:19 86:1 96:22,23 113:15 160:3

**changes** 77:23 202:24 203:2

**changing** 53:3 78:13 149:9 232:17

**channel** 194:1

**channels** 174:7 181:22

**chapter** 157:19

**characteristics** 181:18 210:20,24

**charge** 164:24 227:20

**charged** 77:1 157:16 166:14 173:14 181:10 182:6

**charges** 68:11 69:2 114:5 115:24

**chatter** 178:18

**cheap** 239:12

**check** 97:1,18 101:8,12 102:17 121:16 150:17 200:23 216:10 217:14

**checked** 105:18,21 120:25 139:24

**checking** 105:9

**checks** 218:23 219:4

**chigney** 4:19

**choice** 194:16

**choices** 195:7

**choose** 36:15 93:20 153:18 156:19 172:24 221:13

**choosing** 163:21

**chose** 144:17

**chosen** 172:20 182:24

**circumstance** 182:9 231:24

**circumstances** 32:4

**cite** 236:17

**cited** 47:5

**civil** 244:19,20

**claim** 7:7 54:7 59:4,13 67:24 68:21,23 69:5,7,10 69:19,22 70:2,8 71:16 73:13 74:8 74:14 75:14 87:13 100:5,11 199:16 200:3 225:19,22 232:18 235:25

**claimant** 109:25 112:17 113:19 114:7,8 129:18,22 132:12

**claimants** 25:5 26:9 27:9 113:16 115:11 126:7 127:23 132:15

Veritext Legal Solutions
866 299-5127

[claimed - communicated]

claimed 235:3
claiming 102:9
claims 35:23 43:25
  44:6 46:16,21
  47:1 59:5 63:22
  68:22 69:8 74:23
  75:1 111:23
  112:15 113:4,7,14
  118:5 123:15
  127:1 129:20
  137:3 202:6 235:9
clarification 31:19
  32:3 38:14,17
  41:1 143:10
clarifications
  31:25
clarify 17:5 56:2
  60:10
clarifying 40:22
class 6:13,19 7:6
  18:23 23:24 24:2
  24:14 25:1,13,18
  25:18,22 26:6,8,14
  26:23 27:2,5,6,9
  27:24 28:2,3,8,10
  28:15,18 32:8,12
  35:5,7,16,18,25
  36:5,7,18,21,25
  37:8 38:13 39:21
  40:3,6,7,13 41:16
  42:3,6,13,18,21
  45:19 54:7 70:1
  71:17 76:20,21,24
  76:25 77:2,11,12
  83:19 88:13,14,23
  94:3 103:17 104:5
  107:11,13,19
  108:9 109:5,7,18
  109:20 112:24
  113:11 114:19
  117:12 118:5,9,12

118:16 119:3,8,18
120:9 125:1,8,16
125:24,24 126:9
126:14,16,20
127:11,11,20
128:6,13 129:1,3
129:24 130:3,13
130:14,22 131:2,8
131:10,20,25
132:2,11 135:7
136:24 137:14
143:22 148:21
171:21,24 178:5,6
193:4,14 203:16
204:13 220:3
224:7,9 226:9,12
226:14 227:10
230:21 234:15
classification 32:5
classified 105:2
  185:8
classify 65:8
  198:24 203:1
classwide 38:10
  107:11
clear 20:8 25:6
  56:9,13 60:13
  77:5 178:25
clearance 238:5
clearly 123:24
  128:17 141:22
clients 112:3
clock 240:11
close 84:8 168:11
closer 178:16
closing 144:12,16
cluster 101:17
  152:10
coast 120:12 240:8
code 44:7 61:24
  89:17,19,20 90:12

90:15,18,19 91:1
94:19 96:4,16,22
96:22 99:7,13,14
99:19 102:13,17
104:11 105:9,12
105:15,19,21,24
106:7 123:7
196:20 197:4,11
197:13 198:18
199:25 200:4,13
200:18 201:8,20
201:21 202:6,7,8
202:16,23 203:5
244:9,12,19,20
coding 95:6,10
  104:4 198:12
  200:1
coefficient 213:23
  216:18 217:9
  218:14,16 219:14
coefficients 205:7
  216:2,15 219:8
  223:6 232:7,11
collaboration
  13:24 14:15
collect 175:10
column 133:25
  141:24,24
columns 133:23
  134:1,4
combination
  149:6
combine 114:6
  127:24
combined 125:11
come 29:9 140:23
  144:13 149:10
  156:15 163:23
  164:8 182:10
  234:8 236:7 237:8

comes 36:13 77:18
  209:2
comfortable 12:12
  206:23 212:18
coming 62:18
commencing 2:14
comment 143:17
  148:8 155:4
  231:10
commercial 5:9
commission 78:14
  80:14,25 81:13,15
  86:1 155:16 156:5
  156:23 157:14
  159:14,19,25
  160:11,11,13,16
  160:19,19 161:4,9
  161:18 162:8
  164:14 166:15
  175:12 178:13
  179:13 181:11
  182:7,23 192:13
  195:21,23 234:3
commissions
  157:15 158:17
  174:24 183:7
  233:8
common 23:23
  24:24 25:11 27:19
  31:1 34:15,17
  38:10 39:20,23
  40:5 58:20 61:1
  63:21 65:21 68:8
  69:10,19 73:3
  107:4,7,15 118:25
  152:12 167:1
  193:3,3,3 224:6
  230:4 233:17
commonly 207:20
communicated
  58:3

Page 10

**[communication - confidential]**

communication
60:16
communications
16:4 22:23 58:24
68:4
companies 186:23
237:12
company 53:16
158:9 160:14,16
168:17,23 186:3,7
comparable 158:1
168:12 182:10
183:13 184:2
compare 37:10
165:3
compared 55:15
62:6 162:8 167:18
200:3 236:20
comparing 157:8
comparison 93:18
145:2 158:7
compensated 26:1
130:13,14,22
131:8 148:13
compensating
25:7 124:25
125:16 127:10
132:11
compensation
26:4 74:4,10
108:3 126:1,6
compensatory
70:17 86:19
compete 166:12
180:7
competition 16:6
37:18 65:3 75:14
159:3 165:15
169:9 170:4,12,16
170:24 172:12,13
172:14 173:9

183:9,14,17,21,25
188:16 189:9
192:8 227:11,21
229:20,22,25
231:10,18 232:2,5
236:15 237:15
competitive
157:20,22 158:14
160:24 162:25
163:18 164:3,9,11
164:20,22 165:13
166:14,25 167:14
168:13 169:1,2
171:18,19 172:6
172:16 173:8,13
174:4,8 175:13,17
175:18,23 176:2,4
176:6,17 178:12
178:15,19,21
179:18,22 181:24
184:3 191:24
192:8 195:22
236:5
competitor 158:3
180:1,2,4
competitors
185:24 187:12
188:7,10,13,18,20
188:23 229:15
complaint 18:8
19:10 21:16 45:19
45:24 46:3,9,15,20
47:9,9,19 48:10
51:16,20 55:4,11
55:16,17 56:18,24
57:4,25 58:7
63:23 64:15 67:6
68:4,14 69:1
71:11,12 72:15
73:23 74:14,18,23
75:2 76:14

complaints 47:16
47:21 67:9,11
72:25
complete 110:8,9
118:6
completed 20:22
244:7,17 245:6
completely 29:23
86:7,12 123:16
124:13 142:25
completeness 15:3
completion 243:15
245:10
complies 9:22
computation
79:20
compute 228:5
computer 44:7
144:12 145:1,2,4
145:24 147:11
150:16 151:3
196:20 197:13,13
198:12 199:25
200:18 201:8
computer's 147:7
computers 145:19
concede 161:2
concentrate 93:17
concentrated
74:23
concentrates
209:9
concept 23:5 37:9
37:10,24 38:5
41:6
concern 108:7
232:23
concerned 43:1
97:20 188:20
237:16

concerning 197:4
197:11 198:19
concerns 186:16
concierge 5:8
conclude 95:16
218:20
concluded 95:2
99:10
concludes 240:24
concluding 73:11
conclusion 21:10
31:2 62:9 67:12
68:1 73:4 86:8
87:23 198:10
202:20
conclusions 63:11
concreteness 93:1
conditions 169:23
188:8,9 204:13
226:12,13
conduct 22:10,16
25:23 27:20,21
28:2,9 35:12
36:25 65:4,7
67:16,22 68:21
69:7,17 72:1,3,13
72:16 107:24
108:10 109:6,19
127:13,21 128:7
129:10 166:9
185:6 191:6,9,18
191:21,22 192:1
192:11 194:7
199:7 201:13
235:10,13,22
conducted 196:12
227:9
conferencing 8:16
confidence 223:18
confidential 238:9

Veritext Legal Solutions
866 299-5127

[confines - correct]

| | | | |
|---|---|---|---|
| **confines** 86:15 | **constrains** 78:24 | **cont'd** 4:1 5:1 7:1 | **coordinate** 199:16 |
| **confirm** 12:10 | 83:5 | **contact** 244:9 | **copies** 170:15 |
| 13:8,13 15:13 | **constraint** 80:19 | **contain** 118:10 | **copy** 12:12,13 |
| 199:24 | 81:5,7,7 83:8 98:6 | **contained** 48:9 | 13:5,11 54:11 |
| **confirming** 15:16 | **constraints** 153:10 | 198:25 242:4 | 74:22 |
| **confused** 141:5 | **consulting** 121:12 | **contains** 45:23 | **cornerstone** 5:5,7 |
| **connecticut** 4:8 | **consumer** 3:4 | 46:20 119:19 | 5:12 9:12,14 |
| **connection** 16:21 | 16:15 17:14 18:20 | 196:20 | **correct** 13:5,11 |
| 45:9 47:13 | 19:4 23:24 24:2 | **contended** 66:22 | 14:13,19 21:16,20 |
| **consecutive** 12:20 | 24:14 25:1,13,22 | **content** 27:4 31:4 | 21:21 24:21 33:17 |
| **consequence** | 35:25 40:6 81:17 | 31:8 166:13 | 37:1 40:16 46:9 |
| 107:24 | 83:17 94:2,15 | 171:16 187:15 | 47:2,14 54:21 |
| **consequences** | 97:12 118:5,12 | 188:5 233:7 | 56:21 71:3,4 |
| 212:22 | 120:3 129:5,9,13 | **context** 20:16 | 73:13 76:8 83:11 |
| **conservative** | 130:7 157:8,9 | 26:20 35:11 41:18 | 87:22 94:5,6,18 |
| 227:7 229:24,24 | 164:1 193:14 | 44:2 51:7 74:8 | 98:25 99:1 100:1 |
| 231:15 232:10 | 194:15,24 195:16 | 82:7 87:16 112:21 | 102:6 103:3,5 |
| 233:18 | 220:3 227:10 | 131:10 150:3 | 107:5,6 120:23 |
| **consider** 25:15 | 234:19 | 207:17 215:12,12 | 121:1,8,17,24 |
| 30:3 41:17 42:24 | **consumer's** 94:9 | 217:6,7 229:18 | 122:7 123:7 125:1 |
| 48:7 91:13 149:15 | 129:15 | 236:19 237:25 | 125:2,5,18 129:4 |
| 172:3 220:18 | **consumers** 9:7,16 | 238:7,13 | 129:16 130:3 |
| 230:13 231:12,13 | 25:18 31:3,7,11,13 | **continue** 29:5 | 132:18,25 136:2 |
| **considerable** | 32:17,19,23,25 | 123:2 188:14 | 137:5,9 138:16 |
| 175:17,18,22 | 33:6 34:5 35:12 | **continues** 64:5 | 139:5,9,14 142:7 |
| **considered** 45:15 | 37:11,21 38:4,11 | **continuing** 81:10 | 142:16 143:6,15 |
| 47:6 225:11 | 38:21 39:3,7 | **contrary** 38:1 | 144:8,19,20 145:1 |
| **considering** 230:7 | 50:21 53:1,1 | **contributors** | 146:15 147:3 |
| 234:17,21 235:20 | 91:20 93:2,23 | 212:11,12 | 150:16 151:24 |
| 235:21 | 102:25 105:2 | **control** 180:11,14 | 152:4 153:19,21 |
| **considers** 151:22 | 107:18,23 126:5 | **controlling** 214:14 | 155:7 156:20,21 |
| 202:22 | 158:16 159:11 | 215:5 | 157:6 158:25 |
| **consist** 163:19,21 | 162:23 163:5 | **controversial** | 161:23 164:24 |
| **consistent** 50:18 | 164:15 166:13 | 169:3 | 170:5,20 174:21 |
| 92:6 131:5 151:1 | 172:20,24 181:9 | **conventional** | 174:25 176:6 |
| **consolidated** | 181:14,20 182:4 | 207:13,19 225:18 | 180:8 184:20 |
| 45:19 137:24 | 182:13,16 186:13 | **conversation** | 187:12 188:3,7,10 |
| **constitutes** 215:11 | 186:14 189:10 | 121:19 | 195:10,13 196:14 |
| **constrain** 79:5 | 194:12 195:7 | **convey** 31:6 33:6 | 196:15 199:7,12 |
| 80:9 83:25 | 213:9 233:10 | 41:7,12,14 | 201:14 202:2,16 |
| | 234:2,5,16 239:18 | | 202:17 206:19 |

Veritext Legal Solutions
866 299-5127

**[correct - damages]**

210:6,13,14
211:18 213:6,14
220:24,25 221:4
221:13 227:8
229:9 231:19
238:18 242:5
**corrected** 78:3
122:21 155:10
202:9 242:5
**correction** 122:21
123:21 148:24
149:6 150:20
**corrections** 121:4
154:16 242:3
244:14,15 245:3,4
**correctly** 139:6
**correlated** 214:1
214:13,18,22
215:4
**correlation** 214:19
214:21
**correspond** 42:20
134:1,4 137:20
141:12
**corresponded**
138:2
**corresponding**
140:10
**corrupted** 219:13
**cost** 76:22 80:24
80:25 92:21 93:6
93:8,10,18 94:5
101:1,5,19 122:10
167:18 168:1,4,7
168:10 180:21
229:3,6 230:4
239:11
**costs** 80:15 187:21
189:24 239:18
**counsel** 3:1 4:1
8:10,21,24 9:2,4

16:15 17:14 18:7
22:24 23:21 49:1
53:19 57:9,24
58:2,10,11,24
60:16 65:23 68:5
68:8 121:22
244:18,21 245:7
**count** 57:15 59:19
59:22,23 60:8,9,11
60:11,20,23,24
61:5,11,20,22 62:6
62:7 67:15,19
68:9 119:14
149:14
**counts** 57:10
59:18 60:17 62:3
67:17
**couple** 240:4
**course** 13:18
45:11 117:1 130:6
137:23 151:19
158:15 180:20
**court** 1:1 2:1,19
8:12,19 9:20,23
12:3,6 15:9 23:8
26:5,10 41:7,12
42:2 50:20,24
51:3,9,14,18,23
52:5,10,14,18
53:24 55:22 56:4
125:23 143:10
155:12 188:2
204:3 207:13
226:21 239:23
243:3
**court's** 49:23
50:18 52:2
**courts** 131:23
149:15
**create** 166:25
238:25

**credible** 159:16
**credit** 113:17
114:3,5 115:7,18
115:22,24 117:4
119:12 237:11,12
238:16
**criteria** 112:19,19
151:17
**criterion** 210:18
211:17 214:5
215:14 226:6
**critical** 209:12
**critically** 159:5,7
**criticism** 98:14
101:25 102:5,5
196:8 197:18
**criticisms** 232:19
**criticize** 198:22
**critique** 156:20
**critiqued** 157:4
**critiques** 16:17
150:24
**crutcher** 3:14 4:5
**csr** 1:21,21,22
243:25
**cumulative** 95:22
**current** 42:12
45:11 55:16 114:5
114:8 123:17
175:16 188:8,9
**currently** 27:2
45:23 46:20
119:11 235:14
**customers** 114:1
117:14
**cv** 1:6 2:6 8:14

|  d  |
| --- |

**d** 6:1
**damage** 27:12
40:3 42:21 61:3
78:13 84:18 85:4

85:20,25 86:6,9,19
88:22 95:17,18
96:12 102:25
108:24 122:16,24
123:10 127:25
142:5,14 143:19
147:20 148:12
149:19,19 156:12
157:12 172:3
206:10,24 207:4
208:24 209:2,12
209:13 223:9
225:23
**damaged** 129:25
159:6,8,10
**damages** 27:13
32:10 39:20 40:7
42:3,7,13 70:1,17
70:21 71:3,6,7,16
76:9,17 85:25
88:13 94:9,17
103:16,20 104:5
104:25 106:13
122:9 125:11
126:18,19,22
129:16 143:20
156:14,15,16
157:8,14,18 159:5
192:4 193:5
195:16,20,20
205:2,3 206:15,17
206:22 211:1,12
212:4,12,15 220:2
222:9,17,24 223:1
223:12,19 224:3
224:11,16 225:1,5
225:12,17 226:5
227:10 230:17,18
232:15 233:19
234:22 235:2,3,6

Page 13

[dan - deponent]

| | | | |
|---|---|---|---|
| **dan** 8:24 11:10 | **dealt** 64:24 72:5,6 | **definition** 27:2,5 | 220:14 |
| **daniel** 1:13 2:12 | 82:17 185:4 | 30:17 36:13 48:9 | **depends** 28:16 |
| 3:15 6:3,11,17,24 | **debate** 29:19 | 48:19 50:17 107:7 | 192:7 207:17 |
| 7:4 8:9 11:1,14 | **decent** 44:10 | 119:2 157:11 | **deponent** 2:13 6:2 |
| 44:22 54:6 88:10 | **decision** 51:4 | 160:18 187:2,9 | 9:22 10:3 17:5,21 |
| 120:21 154:13 | 52:14,14 100:24 | 215:9 217:5 | 19:25 20:7 21:11 |
| 190:12 222:6 | 212:16 | 235:13,19,21 | 21:23 22:2 23:7 |
| 240:25 242:1,11 | **decisions** 51:11 | 236:19 237:2 | 24:8,16 25:3,15 |
| 244:1,5 | 91:15,18 92:11 | **definitions** 220:14 | 26:17 27:1,18 |
| **data** 82:13 83:2 | **declaration** 7:4 | **definitively** | 29:25 32:2,21 |
| 115:18 116:1,4 | 46:13 54:2,5,12,15 | 168:22 | 33:9,17 35:1,9,20 |
| 122:13 144:7,9 | 54:23 55:9 56:23 | **defunct** 156:11 | 36:10,23 38:8,16 |
| 145:21 175:10 | 57:1 58:13,25 | **degree** 111:3 | 40:18,25 41:11,21 |
| 180:21,23 202:23 | 62:9 63:25 64:2 | 159:22 228:23 | 42:9,23 44:2 46:1 |
| 210:7 221:18 | 66:14 67:14 68:2 | **deliberate** 212:10 | 51:6,22 52:4,13 |
| **database** 116:17 | 68:17 71:6 72:22 | 212:16 | 58:2 59:7 60:1 |
| 116:21 117:20,24 | 72:25 116:10,25 | **demand** 152:17,18 | 61:1,15,22 67:5 |
| 196:22 | **declare** 242:1 | 153:25 187:6 | 68:7,25 69:12,24 |
| **date** 54:16,16 | **decrease** 229:3,5 | 204:24 208:13 | 70:4,15,20 71:9,19 |
| 161:10,10 162:1 | 230:4 | 211:3 213:18 | 74:2,21 75:23 |
| 195:10 243:20 | **decreased** 231:5 | 227:17 228:1,3,22 | 76:16 78:12 79:10 |
| 244:16 245:5 | **decreases** 229:4 | 228:25 230:1 | 83:13 84:4,21 |
| **dated** 6:14,20,24 | 230:5 231:7 | 231:20 | 85:8,13,24 86:21 |
| 13:6,12 243:22 | **deemed** 235:15 | **demonstrate** | 87:15,24 89:1,25 |
| **dates** 175:24 | **deeper** 230:23 | 23:24 39:23 | 91:5 92:16 98:1 |
| **dating** 191:25 | 231:6 | **demonstrated** | 99:17 100:3 |
| 237:14 | **defend** 212:5 | 220:25 | 102:16 103:7 |
| **daubert** 16:24 | **defendant** 2:13 | **demonstrates** 92:4 | 104:9,24 105:11 |
| **day** 13:18 54:2,17 | 3:13 4:4 8:10 | **demonstratively** | 106:11 108:13 |
| 54:24 56:25 57:2 | 27:20 | 148:18 | 109:10,23 111:22 |
| 57:3 172:12 179:2 | **defendants** 54:3 | **denominator** | 112:8 113:3,13 |
| 184:16 238:5 | **defense** 155:1 | 141:17,19 | 114:15 115:4,20 |
| 242:6 | **define** 189:1 | **depend** 69:15 | 116:14 118:20 |
| **dc** 4:9 | 235:14 237:24 | 109:24 169:22 | 119:10,22 120:22 |
| **de** 35:4 131:7,9 | 238:12 239:19 | 170:6 181:17 | 125:7,20 126:12 |
| **deal** 41:6 77:25 | **defined** 52:18 | 192:5 235:2 | 127:15 128:9 |
| 87:8 113:25 | 186:25 239:20 | **dependably** | 130:5,24 131:12 |
| 156:15 170:6 | **defining** 237:3 | 110:11 | 131:17,22 134:4 |
| 181:17 185:9 | **definitely** 18:13 | **dependent** 205:13 | 134:20 135:17 |
| **dealing** 43:2,2 | 237:19 | **depending** 101:3 | 138:11 142:9 |
| | | 145:21 206:3 | 147:9 148:5 |

Veritext Legal Solutions
866 299-5127

[deponent - different]

153:21 154:23 155:4 161:6,20 167:9 171:1,13 174:2,16 178:23 186:10 188:12 189:5,20 193:16 194:9,22 195:4,12 197:6 198:5,21 199:22 200:11 201:18 202:4 203:11 204:10,20 205:24 207:2,25 209:5 210:23 211:6 213:6 214:17 215:7,21 217:3 219:20 221:15 222:12,20 223:14,22 224:5 224:20 225:8,15 226:2,18 227:24 229:11,17 230:11 231:9 232:22 233:25 235:1,18 236:7 237:5 238:3 239:25

**deponent's** 1:15

**deponents** 243:7

**deposition** 1:13 2:12 8:9,15 9:25 11:10 14:4 15:20 15:25 16:3 44:22 53:21 88:10 112:9 120:21 121:3,4,13 121:14,23,23 122:19,22 123:23 154:13,21 190:12 208:20 218:3 222:6 240:13 243:14 244:19,22 244:24 245:8,10

**describe** 19:11 40:2 81:11 197:2 197:9,23 198:18

**described** 14:3 17:2 39:23 105:13 106:2 118:6 123:16 124:11 127:4,10 129:18 139:15 144:7 168:24 227:17

**describes** 200:16

**describing** 139:14 230:2

**description** 6:10 7:3 123:12

**design** 113:14,18 123:15

**designed** 77:25 79:21 99:7 113:6 114:6 207:3

**desirable** 135:10

**detail** 198:21

**detailed** 76:4 101:17 228:16

**detailing** 197:21

**details** 19:12 61:8 65:1 70:25 98:2 123:14 153:8 177:18 179:5 194:2 220:8

**deter** 167:13 168:23

**determination** 27:11,15 108:14 111:4 135:8 167:11 183:18 205:2 207:5,11 210:25 230:17

**determine** 99:19 99:24 109:4,17 111:20 129:15

145:2 159:6,8,10 172:20 204:24 211:24 218:24

**determined** 27:20 95:14 108:2 156:23 158:17 165:14 169:24 177:18 178:5 205:3 206:1,7,11 213:20 215:11 244:18,22 245:7

**determines** 195:19 228:3

**determining** 25:25 26:3,6 27:12,16 28:17 67:23 75:19 75:21 108:8 119:7 146:22 159:4,9 165:1 204:12 205:10 206:14 212:1

**developed** 73:18 224:7

**developer** 80:18 91:12 92:18,20 93:6,16 96:20 101:18 193:24 228:24 232:5 234:19

**developers** 39:1 92:11 98:18 104:20 123:12 152:1 153:18 160:8 161:15 170:10 180:24 189:10,11 227:12 227:16,22 228:16 229:20 230:13 232:3,14 233:9 234:2,6 235:5,24

**developing** 61:2 228:15

**deviated** 160:4

**device** 166:13 187:14,16,23 239:13,14,15

**devices** 188:4 239:11

**differ** 61:8

**difference** 64:21 81:16,18 86:24 87:2 89:8 96:11 96:11 103:21 104:2 105:1,6 123:24 147:21 149:11,20 162:24 167:4 182:18 209:25

**differences** 62:8 72:19

**different** 14:2 21:4 30:12,15 44:6 58:21 62:5 69:7 69:17 72:8 76:3 83:17,19 84:6 87:17 92:12,24 95:12 96:1,2 101:1,1 134:2 138:24 140:1,3 141:23 142:19 152:25 156:14 160:24,25 187:24 192:23 196:13 200:15 201:15,15 201:25 202:14,19 204:16,18 205:18 205:20 215:13,15 219:17,17 220:14 225:2,17 235:13 236:19

Veritext Legal Solutions
866 299-5127

[differentiated - earlier]

**differentiated** 170:11 228:6
**differently** 30:3 171:9 189:2
**differs** 80:15
**difficult** 39:21
**digit** 145:23 150:16
**digits** 145:20
**dimension** 69:5
**dimensions** 37:21 181:23 182:11
**direct** 44:24 80:3 87:4 155:5 189:9 196:21
**directed** 20:21
**direction** 130:9,12 211:13 243:11
**directly** 78:6 222:25
**director** 5:9
**disagree** 77:23 84:25 142:17 204:15 205:17,21
**disagreed** 49:21
**discernible** 96:11
**disclose** 89:15 238:9
**disclosure** 18:9
**discord** 177:1,16
**discouragement** 38:25
**discover** 185:25
**discovery** 117:20
**discuss** 144:6 174:20 190:17 197:17 218:4 236:8 238:5
**discussed** 53:19 98:2 151:14 184:19 231:1

**discusses** 196:12
**discussing** 87:18
**discussion** 94:25
**disgorge** 75:11
**disgorged** 76:2
**disgorgement** 74:13,16 75:4,21 75:25
**dispute** 139:10 147:15
**disregarded** 143:23
**disregarding** 143:25
**distant** 108:21
**distinction** 34:20 35:21 61:6 65:19 74:4
**distinctions** 74:11
**distinguished** 41:5 225:13
**distribute** 188:15
**distributed** 76:2 108:3 193:6
**distributing** 32:10 126:1,22
**distribution** 28:19 125:12 149:19 180:11,25 181:21 211:13 233:6
**district** 1:1,2 2:1,2 8:12,13
**divide** 119:25
**divided** 80:24
**division** 1:3 2:3
**document** 15:3,4 45:22 46:10,17 51:1 55:1,8,15 56:14
**documents** 45:8 45:15 53:4,8,11,13

**doing** 20:13 30:14 32:10 48:21 101:22 103:10,25 104:1 105:4 134:11 143:2 145:4 147:11,14 160:9 172:22 187:17 221:17 223:16 230:15 239:16
**dollar** 96:6,19 97:7,19,22 98:5,19 98:24 100:19 102:10,11 103:5 104:1,21 106:7 122:4,7,23 123:2,4 123:13,18 148:18 148:18,22,22 149:19
**dollars** 206:19,25
**dominant** 228:9
**doubt** 224:17 226:20
**download** 77:1 82:20,21,21 83:4 84:1,15,16 151:23 207:21
**downloaded** 76:20 213:10
**downloads** 27:3 82:24,25 83:10 208:14
**downstream** 233:9 236:13
**dozen** 142:5,14 220:6 240:4
**dr** 5:13 14:7,15 120:25
**draft** 13:22 55:1,2 64:18 66:13 74:22 75:16

**drafted** 13:25 14:21
**drafting** 14:13,14 54:22
**draw** 200:13 201:9
**drawing** 196:22 198:8
**drawings** 198:2
**drawn** 47:5 202:16 212:7
**draws** 198:10 202:20
**drew** 201:19,20
**driven** 37:18
**dropped** 140:20 144:24 145:4,12 145:16 146:9 188:17
**dswanson** 3:20 244:2
**due** 44:7
**dummy** 232:12
**dunn** 3:14 4:5 8:24 9:1,4
**duopolists** 170:17
**duplication** 45:6
**dwell** 75:1
**dx** 6:11,17,23 7:4 7:9 12:2,5 15:8 53:23 155:11
**dx38** 11:25
**dx39** 11:25
**dx40** 15:6
**dynamically** 172:10

**e**

**e** 6:1,8 7:1 53:15 210:9 244:9,12 245:1
**earlier** 62:12 128:25 141:2

Page 16

[earlier - errata]

208:19 226:19
**early** 54:18
**earn** 101:20
**earns** 75:8
**easily** 40:4
**east** 240:8
**easy** 206:2
**econometric** 36:3
36:13 37:5 38:20
98:16 122:11
205:1 211:25
212:16 213:19
220:9
**econometrically**
209:7 211:22,24
218:20 230:15
**econometrician**
35:23 144:14
214:25 217:25
221:17
**econometricians**
217:14 218:24
**econometrics**
99:23 213:25
**economic** 17:14
25:24 31:1 39:7
39:20 61:7 67:7
96:9 101:14 107:4
107:8,9,16 118:25
137:15,16 149:18
160:9 163:4,7
165:19 168:19
185:14 208:15
236:25
**economically**
39:10 93:13
100:21 101:6
106:17 183:11
**economics** 118:24
118:25 181:13
236:8

**economist** 29:8
34:21 35:6,17
41:5 43:22 44:4
48:7 61:24 65:20
71:15 74:3,9
85:19 86:17 87:25
119:4 131:9 165:9
167:7 172:5
184:25 186:3,6
238:11
**economists** 29:19
41:6 186:22,22
**edge** 167:11
**edit** 55:2
**edited** 14:24
**effect** 18:9 38:10
95:18 108:24
124:4 143:19
148:12 150:1
151:23 156:16
170:15 194:4,6
**effective** 188:24
**effectively** 71:10
95:2 100:17
102:24 167:14
**effects** 229:2,3
232:4 233:16
237:1
**either** 36:15 39:4
47:5 101:4 106:13
148:11 157:5
163:10 165:11,11
165:19 171:7
172:15,15,18
187:22 188:10
**elasticities** 211:4
**elasticity** 187:7
**electrons** 54:4
**element** 79:20
187:1

**elements** 69:9
127:7 142:22
191:21,23 192:11
192:18 194:11
**eligible** 129:16
**eliminate** 110:4
115:15 140:2
**eliminated** 140:6
**eliminating** 149:9
**email** 114:2
**emphasize** 87:6
233:12
**emphasizes**
236:25
**employee** 243:18
**encompass** 233:10
**ended** 58:12
**engage** 38:23 64:6
165:16
**engaged** 18:21
22:10,16 37:14
64:5 66:10,17
180:23
**engine** 196:22
**english** 34:15,18
**enhanced** 38:24
195:6
**enter** 156:12 212:4
**entered** 125:4,14
125:18 126:3,8
**entering** 165:18
167:19
**entertainment**
133:14 136:9
142:7,16 162:2
174:6 189:15
207:25 216:6
221:2
**entire** 14:23 15:1
107:11 108:11,15
109:7,20,25

128:24 171:20,24
**entirely** 14:21
35:24 169:22
235:2,4
**entitled** 85:3 126:5
162:23 163:5
196:8 235:6
**entrance** 167:6
**entrant** 167:16
172:18,18
**entrants** 164:7
165:4,6,11,12,12
165:15,17 166:24
166:25 167:5
**entry** 158:19
165:12 167:13
168:18,23 169:20
169:23 170:2
175:25 234:6
236:15
**environment**
163:19 231:25
**envisioned** 170:1
**epic** 49:12 162:13
176:1 177:1,15
180:16,19,23
239:3,23 240:1
**equal** 30:5
**equally** 30:5,14
67:19,23 68:23
70:1
**equation** 93:11
**equilibrium**
227:16 228:6,8
230:14 232:2,6
**equivalent** 106:14
158:18
**errata** 6:23 15:5
15:14 244:14,16
245:3,5

Page 17

[error - explain]

error   44:7 122:20 144:7,10,11 146:11 147:6,10 197:10,25 200:1 202:9 223:1
errors   29:15 196:20 197:3,10 197:13,16,21,22 198:6,7,18,24 223:5
escape   190:1
esq   244:1
essential   108:17 108:19 109:1,3
essentially   79:1 106:14 214:9 217:9 232:1 238:23
establish   39:22 41:23 217:9 220:20 224:6,8 226:4
established   224:23
estimate   15:18 42:12 88:22 102:2 118:18 119:18,18 119:23 120:2,4 128:21 153:11 157:14 203:20 206:24 216:5,14 216:17 218:14,17 219:8 222:9 223:11 224:11,15 225:23
estimated   122:11 195:16 203:7 222:23 226:7 231:17
estimates   78:22 128:23 207:7 209:14 215:24

219:13 233:19
estimating   129:1,2 208:13 209:7 216:2
estimation   205:14 207:3 208:25 213:13 214:6,8,12 220:17 221:11 222:21
et   117:4
evans   236:17 239:2
event   176:3
events   45:11
evidence   17:15 23:23 24:24 25:11 27:19 31:2 58:20 59:8,11 61:2 63:21 65:21 68:8 69:10,19 73:3 101:25 107:9,17 107:17 119:1 178:19 180:15 193:2,3,9 224:6 226:10 239:22
evident   14:18
evolving   179:18
exact   54:17 155:20 175:24 200:22,24
exactly   20:19 34:6 51:9 69:1 70:6 72:18 98:3 100:4 103:12 140:18,19 140:23,25 141:2 200:9 202:23 238:22
exaggerate   200:3
examination   6:2 11:6
examine   150:24

examined   11:2 66:24 73:19
examining   173:9 187:3,3
example   15:23 38:24 76:1,20 90:25 92:19 93:1 108:19 128:18 157:25 158:7 163:20 164:7 187:3,4 189:11 194:25 210:10 220:1 235:21 237:21
examples   218:22
exceed   88:13
exceeds   88:23 207:4
exception   18:6
exceptions   160:21
excess   75:9
exclude   168:18
excluded   118:5 146:2,6 179:9
excludes   213:9
exclusion   136:11
exclusions   235:23
exclusive   170:9,13 180:10,24 188:15 188:15
exclusivity   188:24
excuse   34:12 116:6
executed   242:6
exercise   188:14
exercised   172:1
exhibit   6:11,17,23 7:4,9 12:1,2,5 13:4,10,22 15:7,8 16:9 17:9 18:14 19:15 45:17 50:7

53:23 54:3 116:9 154:21 155:1,9,11
exhibits   11:22 13:17
exist   127:16
existed   57:5
existing   71:12 111:24 229:7
expanded   116:1,4 116:20
expansion   116:3
expect   135:20 151:9 152:9,12,14 152:23,23 154:3 157:25 181:14
expectation 175:21
expected   140:22
expenditures   89:4
expensive   229:8 229:14
experience   207:12 207:18 237:18
experimental 195:6
experiments 194:24
expert   6:17 16:18 22:24 48:12,13 60:2 114:16 116:1 116:5,12,19,20 118:23,24 119:1 127:1
expert's   115:6 150:23 232:19
experts   16:17 20:16 21:4,13 28:25 29:12 113:24 231:11
explain   77:18 109:10 133:15

[explain - following]

150:19
**explained** 105:23
132:13 212:9
217:23 218:12
219:5
**explanation** 89:25
93:15
**explicitly** 229:22
**explore** 114:18
**explored** 225:16
**exposure** 237:7
**express** 25:11
185:11,15
**express's** 185:22
185:24
**expressed** 67:17
**expressly** 24:24
**extent** 23:11 39:20
40:7 57:23 127:22
160:3 194:12
**extras** 141:3
**extremely** 111:6
211:10 215:13

**f**

**f** 219:25
**fac** 55:10 56:20
57:9 60:15
**face** 188:20 211:3
211:7
**faces** 159:3
**fact** 32:24 101:11
106:4 122:6
148:13 151:6
161:7,8 165:4
214:19 216:20,24
218:17 225:25
228:8,17 236:3
**factors** 214:3
**facts** 29:9,10 51:12
57:9,14 59:3,4,21
59:22 60:7,8,16,19

60:22,23 61:11
62:5 67:16 107:10
113:22 193:3
212:6
**factual** 48:9 49:15
51:3,7 52:10 82:3
**fail** 26:14,18 43:22
44:4
**failing** 43:9 163:10
**fails** 43:24 130:7
**failure** 43:20
198:23 227:6
**fair** 150:1 232:18
**fairly** 181:21
202:20 217:13
**familiar** 51:1 58:4
61:9 64:25 101:10
185:10 207:5,10
214:25 225:15
238:3,4,20,21
239:25
**far** 23:7 43:1
53:17 69:24 97:20
100:8 140:17,18
**fault** 147:7,10
**feasible** 129:17
221:3
**feature** 187:22
204:25 205:13
**features** 38:24
164:9 172:25
182:14
**federal** 71:13,24
243:14 245:1,8,9
**feel** 12:12 239:21
**figure** 77:9 93:2
93:24 94:4 101:2
120:15 133:19
135:18 137:7
151:14 212:22

**figures** 130:1
**file** 45:18
**filed** 8:11 18:8
45:13 55:21 56:4
179:2
**filing** 58:16,19
71:10
**fill** 110:3
**filtered** 210:6,7
**filtering** 210:11
**final** 136:22 216:1
**financially** 243:17
**find** 29:12 46:6
111:1 114:20
153:1 168:21
174:18 199:18
200:2 231:24,25
**finding** 28:22
49:17 52:24
111:25 126:8
**findings** 23:8
49:15,20
**fine** 12:14 56:6
84:12 133:6
**finish** 111:12
**firm** 8:17,20 75:8
100:23 152:14
168:25,25 186:12
186:17 230:7
238:23
**firm's** 229:6
**firms** 72:6 152:24
168:13 183:6,17
228:10 231:24
238:24
**first** 13:4,21 17:17
19:22 30:25 31:6
31:16 39:19 45:16
46:18 48:25 54:14
55:1 57:3 60:12
79:12 80:11 92:3

93:17 95:21 96:5
100:3 103:3
104:11 119:16
121:11 122:19
125:18 136:1
156:24 173:11
191:9 205:20
215:8 227:25
**fitting** 213:18
**fix** 148:2 151:3,5
**fixed** 96:6 97:19
97:22 98:5 100:19
102:10,11 122:23
123:13,18 131:13
131:17 147:16
151:11,12 201:9
**fixing** 149:5,7
**flagged** 100:18
**flip** 30:21 168:20
206:2
**flipping** 148:9
**floating** 150:16
151:16
**flow** 200:24
**flows** 39:22 222:25
**focal** 152:11,16,19
154:1,3
**focus** 18:19 93:15
135:4 150:7
186:22
**focusing** 18:15
43:5
**folder** 13:1
**follow** 45:11 86:9
89:3 179:25
194:13
**followed** 88:18
**following** 57:2
148:8 150:23
198:22 232:22

**[follows - generally]**

**follows** 11:3 17:23 244:8
**forbidding** 237:20
**forbids** 193:22,24
**forced** 130:2
**foregoing** 242:2 243:5,7,11,13
**forgiving** 146:18 146:21 147:14
**forgo** 187:22
**forgotten** 115:16
**form** 17:4,20 19:24 20:6 21:22 22:1 24:7,15 25:2 25:14 26:16,25 29:24 32:1,20 33:8,16 34:25 35:8,19 36:9,22 38:7,15 40:17,24 41:10,20 42:8,22 44:1 45:25 51:5 51:21 52:3,12 58:1 59:6,14,25 60:25 61:14,21 66:10 67:4 68:6 68:24 69:11,23 70:3,14,19 71:18 74:1,20 75:22 76:15 78:11 79:9 82:15 83:12 84:3 85:23 86:20 87:14 88:25 89:24 91:4 92:15 97:25 99:16 100:2 102:15 104:8,15,23 105:10 106:10 108:12 109:9,22 110:16 113:2,12 114:14 116:13 118:19 119:9,21 125:6,19 126:11

127:14 128:8 130:4,23 131:16 131:21 134:3,19 135:16 138:10 142:8 147:8 148:4 153:20 158:11 161:5 167:8 170:25 171:12 174:1,15 178:22 186:9 188:11 189:4,19 193:15 194:8,21 195:3,11 197:5 198:4,20 199:21 200:10 201:17 202:3 203:10 204:6,9,19 205:23 207:1,24 209:4 210:22 211:5 213:5 214:16 215:6,20 217:2 221:14 222:11 223:13,21 224:4,19 225:14 226:1,17 227:23 229:10,16 230:10 231:3 232:21 234:25 235:17 238:2 239:24
**formed** 141:17
**forming** 45:9 47:13 49:2 94:12
**forms** 157:20
**formula** 79:14 80:21 81:2
**forth** 14:25 30:17 39:2 46:16,20 66:13 80:2 93:3 102:5 132:21 187:25 216:3 234:7 243:7

**forward** 11:16 20:15 26:6 70:7 73:16 86:4 205:1 223:9 228:5
**found** 153:4 155:16 156:5 192:2 201:6 202:13 230:15
**four** 117:7
**fourth** 46:2,8 55:11,16 56:17,24 57:4,25 68:4 73:23 74:13,18 76:14
**framework** 91:11 194:10 233:20 234:10,23
**francisco** 4:17
**fraudulent** 57:16
**frcp** 245:1
**free** 82:19 83:4,9 83:20,25 84:5 240:12
**freeman** 3:5
**friday** 1:16 2:15 8:1
**front** 19:12 50:15 162:20 166:6 208:10 219:23 226:24
**fruits** 38:22
**full** 11:12 56:17 117:19,24
**fully** 69:3
**function** 80:13 215:23
**functional** 26:4 34:19
**funds** 76:2
**further** 91:17 112:14 113:4

115:14 161:13 243:13,17
**furthermore** 187:19

**g**

**g** 3:15 244:1
**gain** 33:1 111:16
**gained** 75:10 129:10
**gains** 33:2 111:7 234:2
**game** 136:8 162:9 169:10,10 208:3 227:17 228:7
**games** 133:14 142:6,15 175:16 180:16 216:6,11 216:21,25 221:1
**gaming** 173:10,14 173:16,20,23 174:13 176:4 183:21
**gas** 152:20
**gears** 53:3 184:6 232:17
**general** 16:5 39:6 47:24 48:5,12 67:6 69:14 70:23 115:25 126:15 150:22 155:22 157:22,24 160:22 166:22 169:5,6 170:14 181:13 187:5 191:20 193:23 209:21 210:1 228:22 238:19
**generalized** 214:7
**generally** 51:10 58:18 136:2 158:2 185:4 186:3,7

Page 20

[generally - harmed]

197:14 226:4 238:20

**generate** 77:20 78:8,21 176:1 200:9 202:23

**generated** 199:17 199:20,25

**generating** 225:23

**generic** 47:24

**genre** 136:9 142:24 143:3,24 162:9 189:23 204:24 208:1,3,6 220:14 221:1,2,9 223:6

**genres** 135:14 137:20 142:6,15 143:5,15,16 144:1 162:3,3,8 174:5,5 174:9 203:21 220:10,11,12,18 220:19,21,22 221:1,6,12 231:18

**germane** 27:11,14 234:12

**getting** 84:8 163:12 184:16

**ghost** 110:25

**gibson** 3:14 4:5 8:24 9:1,3

**gibsondunn.com** 3:20 4:11,19 244:2

**give** 9:25 11:17 12:20 15:22 24:16 24:17 35:10 62:17 81:15 92:19 100:13 132:1 150:3 161:12 175:25 218:22 240:12

**given** 16:20 66:12 78:14 81:13 87:11 108:15 110:14 113:8 144:24 145:7 179:11 199:14,16 211:22 211:23 212:21 240:25 243:12

**gives** 181:22 224:13,13

**go** 11:4,15 26:6 34:18 38:25 43:6 43:12 49:19 77:7 84:10 89:6 90:6 90:17 91:8 96:25 97:17 99:17 101:8 101:12 102:17 116:6,8 118:1 119:4,7 120:14 121:2 127:7,7,18 130:6,8,11 132:23 133:7 141:7 143:15,17 149:11 150:17 153:2 159:20 164:19 172:21 186:14,14 194:2 212:1 219:2 219:2,22 221:23 228:5 240:4

**goes** 16:18 72:4 211:13

**going** 8:6 44:16 55:18 56:2 58:17 64:23 79:14 80:1 80:6 88:5 97:16 106:22 120:16 128:24 130:2 143:19 148:11,15 149:7 154:8 177:19 178:2,4,25 190:7 219:17

222:1 240:6,23

**good** 8:5 11:8 100:11 119:16 128:23 153:14 219:11,12

**google** 53:5 153:4 177:19,21 178:2 178:18,20,24 179:9,21 180:1,2,3 180:7,13

**google's** 179:25

**governmental** 16:5

**grand** 3:17

**gravitated** 176:25

**gravitating** 176:21 177:12,14

**great** 113:25 156:15 170:6 181:17

**greater** 228:23

**group** 5:11,13 9:16 26:8

**guess** 64:1 153:14

**guidelines** 190:18 191:3 192:15,18 194:3

### h

**h** 3:6 6:8 7:1

**haldenstein** 3:5 9:6

**hand** 9:21 141:23 141:24 158:4 214:2,14 215:5

**handle** 68:14 89:5 90:2 228:18

**handled** 244:8

**handling** 89:3

**handwritten** 7:9

**happen** 117:2 143:23 145:8

165:10,20 234:5 234:18 236:10

**happening** 90:9 179:16 232:24

**happens** 159:2 189:11

**happy** 12:22 221:12

**harkening** 171:18

**harm** 23:16 24:1 24:13,25 25:12 33:2 35:12,13 36:12,13,25 37:9 37:10,24 38:6 41:15,15 42:17 67:7 78:15 81:17 81:17 95:19 97:12 103:9 108:4,14 110:14 111:5 124:8,10 126:1,21 126:23,24 130:8 135:5,7,9,9 139:2 142:5,14 159:21 211:1,13 234:16 235:25

**harmed** 25:5,7,18 25:22 26:1,3,23 27:6,7,10 28:18 31:8,11,13 32:8,11 32:12,17,19,23,25 35:21,21,25 36:1 37:3,3,8,22 38:13 103:9,18 105:2 108:9 109:5,18 110:11 111:20 122:17 124:12,25 125:16 126:7 127:10 129:2 130:14 132:11 235:11

Veritext Legal Solutions
866 299-5127

[harms - important]

harms  38:2,5,9
   39:3,10 76:3
   107:25 108:3
harry  4:6 9:3
heading  16:13
headline  160:1,4
   160:14 174:25
   175:6 176:9 177:5
   177:21,23 190:1
heavily  162:4
held  8:15 28:1,8
   50:20 52:6 176:9
   176:11
help  14:16,17
   48:22
herculean  113:10
hereto  12:4,7
   15:10 53:25
   155:13
herz  3:5
hesitant  212:19
heter  181:14
heterogenous
   181:15
high  187:21
   206:18 210:19
   211:3,7 222:23
higher  37:17
   151:10 158:6
   181:10 182:6
   196:7 234:7
higney  4:13 9:1,1
hipsman  5:5 9:13
   9:13
historical  183:7
   191:16
historically
   115:10 175:2
history  108:11,15
   109:7,20,25
   183:16

hitt  162:12 183:5
hold  29:5 35:17
home  239:15
homogeneous
   170:16
hopefully  32:13
hour  44:11 84:9,9
   154:6 190:3
   221:22,23 240:3
hours  15:19,23
housekeeping
   11:21 12:15
hphillips2  4:11
huh  82:23
hundreds  119:19
   206:18,25
hypothesis  82:2
hypothetical
   69:13 76:25 77:5
   84:10,12,13,22
   85:8 87:21 112:25
   114:21 129:24
   181:20 237:23
   238:11
hypothetically
   129:7

i

iap  82:9,10,20
   83:1 89:3,6,9 90:2
   90:4 91:2,5,6,10
   91:14 92:10,12,17
   96:7,18,20 97:20
   99:5 100:19,24
   101:2,17 102:3,11
   102:20,22 103:24
   122:3,9,11 208:16
idea  22:4 62:18
   118:21 130:20
   138:6
ideal  110:6

identifiable
   126:19 174:4
   183:24
identification  12:3
   12:6 15:9 53:24
   119:2 155:12
identified  9:9
   29:15 32:9 40:4
   41:16 111:8 126:7
   187:10
identify  8:22
   16:18 26:23 31:12
   45:7 110:11 111:5
   127:11,20 128:6
   128:12 133:12
   135:9 144:21
   174:7,10 197:25
identifying  25:5
   25:17 26:2 27:9
   28:19 124:25
   125:15 126:21
   127:10 132:11
   189:22
identities  204:17
   205:19
identity  205:25
ids  108:16,17,20
   110:1,23 112:5,17
   112:24 113:8,17
   113:21 114:9,20
   115:1 117:6,12,19
   117:23 118:10,14
   119:6,12 120:9
   127:24 128:19,20
   129:19,21 137:20
   138:2,9,15 139:9
   139:20 140:2,6
   141:2,11,16
   147:17 148:1
   150:11 151:10
   196:23 202:24

ignore  79:8
ignoring  108:23
illogical  86:7
illustrate  220:1
illustrated  101:2
imagine  12:11
   78:6 114:19
   130:16
impact  28:3,10
   39:23 103:11
   107:5,21 110:10
   157:23 158:16
   187:4 192:1,4,5
   193:14 233:8,17
   234:5,6 235:24
impacts  107:10
   108:6 234:11
impeded  235:10
impediment  68:18
implement  81:6
   90:3 124:1
implementation
   88:18 89:16 97:15
   98:18 99:5 113:1
implemented  79:4
   81:23 89:11 95:10
   96:14,15 98:3,8
   104:16 123:6,7
   126:15 146:21
   172:9
implements  88:19
   91:1 102:10
implication  87:8
   100:25 101:4
implicit  122:24
import  196:25
importance
   236:25
important  127:23
   130:11 159:6,7
   191:17 203:22

Veritext Legal Solutions
866 299-5127

[important - instruments]

| | | | |
|---|---|---|---|
| 204:11 206:14 209:19 211:24 220:20 | inconsequential 148:15 | individual 28:3,10 71:17 76:24 88:13 88:14,23 90:2,5,9 | 174:19 177:20,24 179:2 180:19 181:6 |
| **impossibility** 84:23 86:5 | **inconsistent** 85:14 89:12 | 91:10 94:8,15 96:18 97:12 | **inhibit** 191:24 |
| **impractical** 112:10 | **incorrect** 121:6 | 100:24 102:3 | **initial** 86:1 |
| **impracticality** 112:13 | **incorrectly** 95:10 | 103:17,22,24,25 | **initiated** 176:3 |
| | **increase** 232:15 | 104:5 107:19 | **injured** 26:15 35:5 |
| **impression** 159:23 | **increased** 231:4 234:6 | 108:2,9,20 109:5 109:11,18 110:14 | 35:7,16,18 36:8,21 127:12,21 128:7 |
| **improper** 92:7 124:8 | **increases** 147:17 150:10 230:6,24 | 110:22 111:20 112:1,5,24 113:8 | 128:13 131:2,25 148:9 206:3 |
| **inaccurate** 30:1,9 30:13 | 230:25 231:7 | 113:10 118:15 122:12 123:10 | **injury** 70:1 87:12 94:9 157:13 |
| **inactive** 183:9 | **incumbent** 159:3 167:12 176:6 186:24 | 124:6 126:7,19 127:23 128:1 | **innovation** 39:1 236:14 |
| **inappropriate** 83:15,22 | **incurred** 108:5 129:14 | 135:12 187:14 192:1 193:10 | **inquiry** 43:10,18 43:21,23 44:5 |
| **incentive** 153:18 | **incurs** 129:7 | 209:16,16 | 106:9 |
| **incentives** 160:7 169:9 189:25 | **independent** 86:13 193:13 217:6 | **individual's** 108:10 | **inside** 177:20 |
| **inception** 160:2 | 228:10 | **individually** 39:9 104:6 | **insight** 71:20,21 |
| **incidental** 211:11 | **independently** 194:6 | **individuals** 14:11 | **insofar** 66:16 |
| **inclined** 240:12 | **indicate** 23:21 | 26:24 27:3 106:15 | **instance** 72:20 |
| **include** 16:23 26:15 135:11,14 | 31:21 56:18 132:10 135:19,22 | 107:12 126:23 135:10 206:2 | **instructed** 90:16 102:19 |
| 139:19 177:5 179:7 213:3 | 137:7 150:9 202:13 208:19 | 208:25 209:3 | **instruction** 48:17 89:20 90:14 94:24 |
| **included** 16:19 59:17 139:20 | 219:24 | **industrial** 166:23 168:20 169:6 | 95:4 102:23 |
| 140:14 146:15,17 152:5 196:23 | **indicated** 62:12 64:2 102:16 177:9 | **industries** 237:13 | **instructions** 48:12 90:20 105:25 |
| 244:14 245:3 | 204:10 213:2 216:12 217:3 | **industry** 237:11 | **instrument** 215:1 215:3,11,15 |
| **includes** 135:24 198:8 213:7 | 220:4 226:25 229:20 | **inferior** 30:4 | **instrumental** 213:13,16 216:10 |
| **including** 108:16 121:22 129:21 | **indicating** 209:1 | **inferred** 93:10 | 217:10,10,15,17 |
| 145:19,19 146:9 147:25 152:13 | **indications** 145:24 | **inflicted** 220:2 | **instruments** |
| 156:11 | **indirect** 189:9 233:16 237:1 | **influence** 179:6 | 214:13,23 215:18 |
| **inclusive** 47:4 | **indiscernible** 143:9 | **information** 45:8 113:25 114:11,13 | 215:25 216:5,13 216:14,17,21,22 |
| | | 114:25 115:8,22 117:4 119:13 | 216:24 217:1,5,12 217:20,23 218:1,6 |
| | | 128:20 142:23 | 218:10,25 219:10 |

Veritext Legal Solutions
866 299-5127

**[instruments - know]**

219:11,11,12,16 220:5,9,23 221:7 221:13
**insurmountable** 111:25 112:21
**intended** 13:11 47:4 135:19
**intense** 229:2,4
**intent** 23:3 212:13
**intention** 41:14,22 42:5 49:18 125:21
**inter** 171:2 232:5 232:5
**interaction** 228:18 228:24 229:1
**interactions** 227:1 227:6 231:14
**intercept** 228:2
**interest** 143:23 152:15,24,25 153:2 163:8,11 182:14 183:13 203:25 204:2,2 216:15,19 217:9 218:14 219:8,14
**interested** 83:20 243:18
**interesting** 158:15 158:24 159:1
**intermediate** 79:23
**internet** 177:25 178:17,24
**interpretation** 33:18 41:13 51:11 76:16 198:13 231:20
**interpreted** 179:21 198:6
**interpreting** 171:5

**interprets** 23:9
**interrupted** 56:11
**intra** 170:4,23 171:2,2,3
**introduced** 59:8 104:12 161:10,14
**invades** 23:3
**invest** 158:3
**investigated** 70:9
**investment** 158:22 181:2
**investors** 158:2,7
**involve** 38:22 130:21 148:10 194:15 195:1,4,5 205:6
**involved** 65:7 112:15 136:7 205:7 237:8,11
**involves** 21:8 28:11 124:24 132:12 157:8 187:21
**involving** 194:12
**ios** 18:22 31:4,8 38:11 164:15 166:10,13 169:13 169:19,21 170:3 170:20 171:11,16 173:17,24 180:6,9 180:11 181:11 182:7 184:2 188:4 188:16 189:7
**ipad** 239:13
**iphone** 1:5 2:5 8:11 239:13 244:4
**issue** 23:6,11 25:21 26:10 27:19 27:22 31:14 84:12 90:1 99:25 100:20 107:22,25 110:25

131:23 137:14,14 137:15 147:10,16 148:3,20,21 149:5 149:7,16 150:16 185:6 203:18,19 205:9 213:19 216:13 218:13 226:8,9 230:21 234:17 237:17 238:21
**issues** 18:10 43:1,2 185:5 236:11,14
**item** 23:22 45:16 46:18 81:9 96:7 97:20,20 100:19 100:24 102:11,21 102:21,22 103:25
**items** 90:9 92:12 96:18,20 98:19 99:5 101:1 102:3 104:21
**iv.c** 132:14,20 133:13 142:3,12
**iv.c.** 132:24 133:3

**j**

**job** 1:24 100:11 221:16 244:5
**jointly** 213:20
**judge** 26:11 78:6 80:6 238:23
**judge's** 49:12,16 49:21
**judging** 93:22 215:14
**judgment** 70:5 91:9 100:21 125:4 125:10,14,18 126:3,4,8 211:25 212:6 217:7
**judgments** 29:18

**june** 6:20 13:12

**k**

**keep** 103:15 145:20 165:17 181:25 182:1
**kevorkian** 5:6 8:17
**key** 159:9
**killing** 12:19
**kind** 148:12 228:18
**kinds** 131:1 158:17 169:24 185:6 193:21
**knew** 185:16
**knife** 167:10
**know** 12:19 16:10 21:2 30:22 32:2 39:14 42:23 46:11 49:9,13 50:11,24 51:6,13,17,24 52:20 54:8 62:4 65:5,19 66:3,8 69:16 70:9,15,21 70:24 72:4,18 75:5 76:4,6 81:24 87:15 90:19 91:25 98:10 104:13 106:15 110:14,15 110:19 117:2,13 117:15,15,17 119:22 120:8 125:8 132:8 133:5 136:24 137:2,4,5 138:6,8 140:8,18 151:2,6,7,20 153:13 156:9,17 158:13 169:15 189:20 191:11,13 197:19 200:19 203:13,17 208:5,7

Page 24

[know - looking]

| | | | |
|---|---|---|---|
| 220:16 221:11 223:11 235:4 239:5 | **laws** 72:2,12 | 211:12 226:6 228:3 | **litigated** 225:16 |
| **knowing** 119:5 | **lawyer** 28:13 85:17 127:4 | **levels** 37:19 207:14 | **litigation** 1:6 2:6 5:10 8:11 65:7 237:8,9 244:4 |
| **knowledge** 51:24 72:17,21 116:23 | **lawyers** 62:1 | **liability** 27:16,18 | **little** 103:21 104:25 108:22 117:22 119:5 124:3 133:6 137:10 148:12 149:3 184:6 196:7 |
| **knowledgeable** 116:16 | **lay** 51:24 | **liable** 28:1,8 126:9 | |
| **kristof** 5:13 | **laying** 221:7 | **liables** 163:20 | |
| **kumler** 5:7 | **lead** 30:12,15 77:22 229:4 230:5 | **life** 25:25 | |
| **l** | **leading** 233:11 | **light** 29:9,10 233:19 | **llp** 3:5,14 4:5 |
| **l** 1:13,21 2:12,17 6:3,11,17,24 7:4 11:1 53:15 54:6 242:1,11 243:1,24 244:5 | **leads** 29:13 194:13 | **limit** 111:15 165:16 | **located** 2:14 8:18 |
| | **learned** 45:12 | | **location** 1:15 |
| | **learning** 187:24 | **limited** 35:13 71:21 | **locked** 187:15 244:12 245:1 |
| | **leave** 22:25 62:1 129:19 | **line** 55:15,20,22 56:3,4,5 218:19 219:6 244:15 245:4 | **logic** 33:10 |
| **label** 136:15 144:11 | **leaving** 150:24 | | **logical** 84:22 85:15 86:5,8,14 |
| **lack** 38:23 | **left** 64:17,17 141:24 221:23 | **lines** 170:19 | **logically** 17:23 85:14 |
| **laid** 64:16 142:4 142:13 164:20 | **legal** 21:9 26:19,19 28:11,12 46:1,4,11 52:14 55:7 61:7,8 61:23,24 64:13,19 65:18 70:22,25 71:20,21 72:17,21 73:20 74:3,11 75:2,25 80:6 87:23,24 119:2 125:7 126:13,16 127:1,2 131:1,5,6 131:23 132:3 137:15 149:16 238:7,7 244:7 | **link** 111:23 113:7 113:21 119:13,13 129:20,21 130:1 | **long** 12:15 56:22 120:15 138:4 168:10 181:2 188:13 213:9 |
| **language** 19:11 23:12 26:7 55:8 64:13,19 65:1 74:2 79:17 80:1 118:11 | | **linkage** 115:13 | |
| | | **linked** 110:24 119:14 | **look** 12:9 13:4,7 13:10,13 15:12 16:8 17:8 19:14 19:18 28:20 43:6 50:2,10 93:6,8,9 93:24 111:18 116:6 121:3,18,18 124:16 132:6 176:14 181:16 219:2 226:21 |
| **large** 35:3 84:5 111:5 158:9 160:6 161:13,25 211:9 212:4 215:13 228:25 | | **linking** 114:10,12 | |
| | | **list** 45:3,4,15 46:7 47:3,4 49:7,25 110:1,23 112:17 113:17 115:15 129:18 141:11 192:2,5 | |
| **larger** 37:16 89:9 151:18,20 | **legalese** 80:4 | | |
| | **legally** 137:17 | **listed** 47:25 66:18 129:21 | |
| **largest** 176:5 219:25 | **legitimate** 115:16 235:9 | **listing** 49:23 | **looked** 46:25 95:23 120:5 162:2 191:15 |
| **late** 184:16 240:7 240:15 | **letter** 169:14 | **literal** 182:23 183:3 | |
| | **level** 27:12 91:10 91:16,18 122:12 122:13 128:1 159:5 165:12 175:13 176:17 | | **looking** 23:19 34:3 54:16 94:8,11 106:23 183:12 219:15 |
| **law** 3:7,16 4:7,14 32:5 51:11 72:6,9 73:1 75:14 235:4 | | **literature** 217:22 218:23 236:25 237:6 | |

Veritext Legal Solutions
866 299-5127

[los - measuring]

los 3:18
losing 180:25
  186:4,8
loss 180:17
losses 181:1
lost 67:2,8 73:7
lot 77:7 82:12
  176:23 181:24
  185:16
lots 236:10
loud 19:17
love 240:3
low 163:22 167:17
  207:21 210:21
  211:4,10 230:5
lower 31:5 37:15
  163:13 164:4,4
  166:14 179:13
  227:20 236:1
lowering 179:19
lunch 120:13

**m**

machine 148:2,19
  243:10
madison 3:8
magic 54:4
magically 15:12
maintain 20:4,12
  20:24 182:15
maintaining
  178:20 188:25
maintains 175:4,5
major 149:8
  212:11
majority 143:8
making 51:10
  100:18,23 137:13
  150:15 165:8
map 143:2,4,7,14
margin 181:5
  206:1

marginal 80:25
  93:10,18 101:1,5
  168:7,10
mark 11:22 12:16
  15:2,6 18:13 54:1
  116:10 240:3
marked 12:2,5
  15:8 53:23 64:1
  154:21 155:11
market 19:11 23:9
  30:17,20 48:8,18
  48:19 50:17 52:19
  84:6 92:6 93:8
  94:11 136:20
  159:2 165:14
  167:19 168:13
  169:10 170:22
  171:15 173:10,14
  173:16,17,20,23
  174:13 175:16
  176:4,21 177:11
  179:17,17 180:12
  180:14 181:3,17
  182:1,24 183:13
  183:21,25 184:1
  186:16 187:7,8
  188:2,6 189:2,7
  195:8 213:21
  227:16,17 232:19
  233:15,20 234:18
  234:22,23 235:13
  235:14,19,20
  236:4,11,19 237:2
  237:14 239:7,8
markets 169:2
  174:4,13 186:25
  187:2,3 236:9,10
  236:12,20,21
  237:3,25 238:13
marketwide
  107:17

marshal 65:21
mastercard
  185:24
match 113:10
  182:16
matching 112:24
material 14:12
  133:1
materials 45:4
  47:3 49:25
math 85:11
mathematical
  79:20,23 80:12,12
  81:3,4,12 88:17,19
  89:12 98:15 99:4
  102:9
mathematics 79:2
  80:3
matter 8:10 12:24
  33:9 39:7 89:21
  91:19 95:3,17,20
  164:1 166:22
  170:18 178:6,9
  181:13 187:8
  191:20 206:22
  209:22 210:25
  211:12 216:2
  232:20
mattered 95:1,14
  212:14
matters 127:2
  187:8 206:9 211:8
  212:3 218:19
maximization
  93:11 100:24
maximize 80:19
  91:15 152:17
maximizer 80:18
maximizing
  152:15

maximum 79:13
  80:21 144:22,23
  145:6 153:24
mcfadden 1:13
  2:12 6:3,12,18,24
  7:5 8:9 11:1,14
  15:13 44:22 54:6
  78:7 88:10 120:21
  154:13 190:12
  222:6 240:25
  242:1,11 244:5
mean 17:6 20:8
  23:2 29:4 33:11
  33:20 34:6 40:12
  43:17,19 46:3,24
  57:20 59:2 65:3
  65:11 76:9 79:6
  92:13,14 95:10
  96:2,4 107:14,21
  109:11 126:2,5
  133:15 141:16
  145:11,15,18
  160:11,13 183:3
  188:12 202:18
  210:7 214:20
meaningful 195:7
means 20:19,19
  26:18 33:10 35:3
  51:7 75:6 109:1
  142:4,13 186:11
meant 33:6 57:20
  231:4
measurable 35:13
measure 35:14,22
  37:4 87:12 124:8
  124:8,10,11
measured 108:1
  222:16
measures 36:2
measuring 126:21

[mechanical - model]

| | | | |
|---|---|---|---|
| **mechanical** 142:25 | 126:9,19 127:11 127:12,20 128:6 | 40:4,6 42:14,21 58:21 61:2 62:10 | **minus** 77:17 78:16 80:14,24 84:17 |
| **mechanically** 143:1 | 128:13 129:2 130:13,14,22 | 64:16 70:5 73:2 73:17 74:24 75:19 | 85:22 86:3,18 87:3,3 97:8 |
| **mechanics** 159:19 | 131:8,20,25 | 75:20 76:4 77:19 | 143:18 |
| **mechanism** 25:4 | 132:11 136:24 | 77:21,24 78:7,12 | **minute** 150:3 |
| 26:14,22 27:8 | 148:21 203:16 | 78:18,21 88:22 | **minutes** 100:13 |
| 193:5 204:12 | **memorialized** | 96:1 98:17 107:4 | **misconduct** 23:25 |
| **mechanisms** 28:17 | 115:10 116:2 | 122:7 134:18 | 24:12,25 25:12 |
| 194:10,14 | **memory** 72:5 | 142:18,21,23 | 31:3,9 36:6,20 |
| **media** 8:8 44:17 | 75:18 121:1,17 | 164:21 219:25 | 37:8,14,22 66:21 |
| 44:21 88:6,9 | 161:8,16 | 220:1,8 221:3 | 68:11 233:18 |
| 120:17,20 154:9 | **mention** 218:7 | 224:6,13,18 | **misrepresentation** |
| 154:12 190:8,11 | 235:19 | 225:22 233:17 | 146:11 |
| 222:2,5 241:1 | **mentioned** 37:2 | **methods** 23:23 | **missed** 74:16 |
| **meet** 43:9,21,22 | 56:15 121:15 | 36:3 133:12,16 | 75:17 |
| 44:5 106:8 207:8 | 124:2 | **microeconomics** | **missing** 199:15 |
| 207:8 210:18 | **merchants** 185:23 | 166:23 168:25 | **mission** 4:15 |
| 211:16 226:11 | **merge** 112:4 | **microsoft** 177:2 | **misspoke** 65:10 |
| **meets** 207:4 | **mergers** 187:4 | 177:16 237:15 | **misstatement** |
| **member** 28:1,4,8 | **merging** 238:25 | **microsystems** | 120:23 |
| 28:10 39:21 71:17 | **merits** 49:8 224:12 | 237:15 | **misstatements** |
| 76:20,24,25 77:2 | 224:12 226:8 | **middle** 16:14 | 120:24 |
| 77:11 108:9 109:5 | **met** 11:9 | **million** 36:5,18 | **mistake** 123:22 |
| 109:18 113:11 | **method** 95:12 96:2 | 37:2 41:18 42:6 | **misunderstand** |
| 114:19 129:24 | 97:7 98:24 100:18 | 117:19,23 118:10 | 140:6 141:14 |
| 130:3 | 103:5,10,12,14 | 119:6 131:15,20 | **mix** 131:2 |
| **member's** 88:14 | 104:3 106:7,19 | 137:11 156:24 | **mobile** 187:14,22 |
| 88:23 143:22 | 122:4 123:2,5,6,9 | **millions** 119:19,20 | 187:22,23 239:12 |
| **members** 14:3 | 123:13,18,19 | 138:8 206:18 | **model** 38:20 61:3 |
| 24:1,13 25:1,13,22 | 124:3 125:25 | **mind** 35:2 40:19 | 76:23 78:24 79:3 |
| 27:5 28:18 32:8 | 126:20 129:15 | 41:24 46:22 | 79:5,12,21 80:9,12 |
| 35:5,7,16,18,25 | 132:21 134:25 | 130:25 131:13,18 | 80:12,17 81:3,12 |
| 36:5,7,19,21,25 | 136:15 140:15,20 | 175:24 177:4 | 81:12,21,22 82:17 |
| 37:7 38:13 40:3,7 | 140:22 146:18 | 224:25 | 83:5,9,13,21,22,23 |
| 40:13 41:15 42:3 | 213:13 214:7,8,12 | **minimis** 35:5 | 83:24 84:7,22 |
| 42:6,13,20 70:1 | 223:2,8 | 131:7,9 | 86:2,5,8,13,15,23 |
| 90:14 103:17 | **methodologies** | **minimum** 15:22 | 87:7 88:12,17,17 |
| 112:24 117:12 | 73:12 | 144:22,23 145:5 | 88:20,21 89:12 |
| 118:15 119:7,19 | **methodology** | **minjae** 5:11 9:16 | 91:20 92:23 94:7 |
| 119:20 125:1,16 | 32:24 33:2 39:22 | 14:7 | 97:9 98:16 99:5 |

Veritext Legal Solutions
866 299-5127

[model - newly]

102:2,9 104:20 122:11 144:18 147:24 152:1 153:9,22 155:19 156:8 157:1 159:12,19,20 162:4 172:1,2,10 192:4,7 194:4 195:19 196:13 201:14,25 202:15 203:14 204:12,16 204:25 205:6,18 207:3,23 209:1 223:7 226:25 227:18,25 228:8 228:14,16,17,25 229:7,21 230:1 231:13,20,22 233:14

**modeling** 35:14 92:5,8 194:10

**models** 153:17 169:11 203:21 228:22 230:14,23 232:8

**modifies** 102:2

**modify** 166:21 237:23 238:11

**moment** 18:15 24:16 32:15 46:13 46:15 65:11 98:25 124:18 175:5 232:17

**moments** 214:8

**monetary** 70:12 87:12

**money** 67:2,8 87:20,21 148:10 148:14 181:1

**monopolist** 237:24 238:12

**monopolization** 21:8,25 22:11,17 38:22 57:11,11 59:19,20 60:18,18 62:6,7,13,15,21 63:7,16

**monopolize** 18:22

**monopoly** 20:4,13 20:25 188:25 238:24,25

**month** 91:7 92:18 149:7,7

**monthly** 133:25 134:7,15 139:17 144:23 145:5,6

**moot** 25:16,23

**morning** 8:5 11:8 120:24 121:6,15 123:5 128:18

**motion** 6:13,19 7:6 16:24 54:6

**move** 17:9 135:8

**moves** 178:21

**moving** 178:18 181:21

**muddled** 143:12

**multiple** 108:16 108:17 117:12 169:21 174:24

**multiplied** 80:15

**munk** 5:8

**murray** 5:9 9:5,5

**music** 133:14 136:9 142:6,15 162:3 174:6 189:16 208:1 216:6 221:2

---

**n**

**n** 6:1 170:5 171:3

**n.w.** 4:8

**name** 8:16 11:9,12 26:8 47:10 53:14 116:7 117:3 119:12 220:13 243:21

**named** 23:10 25:18 120:9 216:9

**names** 115:7,23

**narrow** 160:18 167:11 228:12,13 228:14 237:3

**nash** 227:16 228:6 228:7,8,9 230:14 232:5

**nathan** 9:13

**nathaniel** 5:5

**natural** 125:10 230:13

**nature** 210:3

**nearly** 31:3,7,11 31:14,15 32:16 33:5,10,10,19 34:5 34:15,22 35:6,17 35:24 36:7,21 37:7 38:4 185:18 213:8

**necessarily** 30:4 39:8 95:11 119:1 130:18,21 141:22 164:4 169:1 206:7 210:24

**necessary** 93:21 127:11,20 128:5 148:2 157:14,17 159:4 172:19 221:18 244:14 245:3

**need** 20:16 65:24 68:13 69:4,12,16 80:7 109:19 118:14 120:23

126:17 127:7,7 167:18 186:3,7 214:17

**needed** 58:7 62:11 69:4 70:10 114:25 121:16 155:6 211:23

**needs** 87:8 115:23 233:3

**negative** 77:1,14 77:20,24 78:8,22 79:6,7,18,19 80:10 81:6,8 83:5,10,15 83:16,18,23 89:6 89:23 91:3,8 97:24 101:4

**negligible** 136:20

**neither** 243:17

**net** 42:16,17 78:13 78:15 81:17 108:14 111:4,16 124:8,10,14 127:25,25 129:9 132:12,22 133:13 134:2 139:16 203:24

**nets** 33:2

**network** 233:16 237:1

**nevada** 1:22

**never** 33:6 78:10 88:22 89:9,23 91:2 99:14 122:13 122:16 124:12 138:25 139:2,2

**new** 3:9,9 18:10 29:9,10 39:2 58:6 58:20 62:23 69:5 109:15

**newly** 57:15 60:19

[noise - october]

noise   136:18
non   166:10 239:14
noncompetitors
   186:4,8
nongame   173:17
   173:24
noninjured   131:2
nonissue   218:8
nonmobile   239:15
nonnegative   77:25
   78:25 79:15 80:20
   81:20 91:21
nonnegativity
   98:6
nonpositive   82:16
nonsensical   85:9
   101:6 182:25
northern   1:2 2:2
   8:13
notating   244:15
   245:4
note   77:8 234:3
noted   241:3
notes   7:9 154:17
   242:4
notion   86:24
   139:12
november   1:16
   2:15 8:1,6 175:23
   183:22 244:3
number   6:9 7:2
   12:18,20 15:23
   34:23 35:2,5 40:3
   40:12,15,15,16,19
   40:23 41:2,5,8,15
   41:18,23,24 42:2
   42:13 86:3 97:3
   110:18 117:17
   119:25 120:1
   124:14,14 128:12
   128:18,19,20,21

129:2 130:25
131:7,10,13,18
132:1,5 136:4,5
137:7 138:18,23
138:24,25 139:4,8
139:12 141:23
147:16,18,22
148:1,17 149:1,9
151:2 156:9
202:25 203:11
204:8 205:25,25
211:9 226:5
236:18 241:1
244:15 245:4
numbers   34:17
   42:19 47:17 61:22
   77:7 104:14
   113:17 114:4
   115:8 124:13
   137:21 141:18,19
   145:19 146:19,22
   146:25 147:20
   156:17 204:16
   205:18
numerator   141:21
numerical   30:8,11
   137:19

**o**

o'clock   120:12
o0o   8:3 241:7
oakland   1:3 2:3
oath   11:2 42:2
   102:12 114:25
   243:9
object   55:18 113:2
   139:11 167:8
   223:13
objecting   102:8
objection   12:21
   17:4,20 19:24
   20:6 21:9,22 22:1

23:1 24:7,15 25:2
25:14 26:16,25
27:17 29:24 32:1
32:20 33:8,16
34:25 35:8,19
36:9,22 38:7,15
40:17,24 41:10,20
42:8,22 44:1
45:25 51:5,21
52:3,12 56:8 58:1
59:6,14,25 60:25
61:14,21 67:4
68:6,24 69:11,23
70:3,14,19 71:8,18
74:1,20 75:22
76:15 78:11 79:9
82:15 83:12 84:3
84:20 85:6,12,23
86:20 87:14,23
88:25 89:24 91:4
92:15 97:25 99:16
100:2 102:15
103:6 104:8,23
105:10 106:10
108:12 109:9,22
110:16 111:21
112:7 113:12
114:14 115:3,19
116:13 118:19
119:9,21 125:6,19
126:11 127:14
128:8 130:4,23
131:11,16,21
134:3,19 135:16
138:10 142:8
147:8 148:4
153:20 161:5,19
170:25 171:12
174:1,15 178:22
186:9 188:11
189:4,19 194:8,21

195:3,11 197:5
198:4,20 199:21
200:10 201:17
202:3 203:10
204:6,9,19 205:23
207:1,24 209:4
210:22 211:5
213:5 214:16
215:6,20 217:2
219:19 221:14
222:11,19 223:21
224:4,19 225:7,14
226:1,17 227:23
229:10,16 230:10
231:3 232:21
234:25 235:17
236:6 237:4 238:2
239:24
objective   135:5
observation   36:11
   147:18
observations
   146:16
obtain   37:4 120:2
   180:24 215:24
   217:8
obtained   200:4,15
   200:17 217:24
   223:7
obvious   134:22
obviously   119:10
occur   125:4
   163:25 165:13
   230:7
occurred   27:21
   146:10
occurring   169:16
october   6:14,25
   13:6 54:20 155:17
   156:6

Veritext Legal Solutions
866 299-5127

[offer - original]

offer  163:15
192:10
offered  28:25
73:21 131:24
154:15 181:12
188:1
offering  37:23
38:12 67:1 73:11
73:14 91:14
167:12 182:3
office  244:11
offset  111:7
oh  150:22 168:2
178:8 184:16
194:22 238:15
okay  9:20 11:19
13:2,16 14:2,8,11
14:17 15:11,22
17:7,12 18:13
20:1 21:7 22:7
23:17 24:18,22
30:25 31:21 34:8
38:3 42:11 43:17
44:9,14 45:3,7,16
46:12 47:7,20
48:5,24 49:5,15
50:16 54:11,14,19
54:25 55:23 56:1
56:16,22 61:18
62:19 71:25 74:17
76:19 79:15 85:16
88:1,3 89:19
90:15 92:2 94:14
98:13 100:6,15
109:17 111:13
114:24 116:9,11
116:23 120:8,11
120:22 122:1
129:13 131:6
132:20 133:10
134:23 136:4,14

136:23 138:21
139:8,19 141:1,14
142:1 144:6
150:18 151:9,21
152:1,7 154:5,19
154:24 157:7
161:17 162:18,21
165:24 166:7
168:6 169:18
170:23 173:6
175:12 178:1
185:13 186:2
190:6 191:5,12,17
193:10 196:16,19
197:16,22 198:15
199:10,18 201:3
208:12 218:2
219:3 221:21,25
225:3 227:5
236:24 238:19
240:2,23
old  108:20
oligopolists  170:17
omitted  110:4
146:14,16
once  123:22
187:13 231:5
ones  68:15 115:15
115:16 119:13
129:21 177:3
201:15,25 209:11
232:16
online  12:13
open  29:20 165:23
172:12,13
opening  11:22,25
12:16 13:12 17:2
17:8,10 18:3,16,18
19:23 20:20 23:19
29:1,16,18 30:8,18
30:21 31:1,17,23

31:24 33:5,13
34:1,23 39:13,17
45:5 49:25 50:8
50:17 61:16,20
62:25 63:5,8,14
67:18 106:21
134:25 135:1
138:13,22 139:5
140:11 147:3,5
165:6,22 166:18
190:14,22 216:4
operate  170:8
operated  183:8
operating  169:1
169:25 180:4,5,16
181:1,4 187:24
operations  164:5
operative  45:23
46:4
operators  170:8
opine  165:5 193:7
opined  163:24
opining  71:5
134:12
opinion  26:22
30:17 31:20 33:7
33:14 34:11 35:6
35:11,17 36:4,7,18
36:20 37:23 38:13
39:24 40:10 49:12
49:16,21,24 67:1
69:8,18 73:5,12,14
75:17 78:5 86:12
87:25 97:13
101:13 113:6,15
113:15 132:17
137:16 157:13
164:2 176:16,19
177:10 178:20
181:8,12 182:4
187:11,13,19

188:1,5 189:17
192:10,14,24
193:12,19 206:13
207:6 208:3 212:2
217:25 227:19
229:13 239:6
opinions  28:25
29:7,10,14,22
31:22 45:9 47:13
48:8,19 49:2 53:5
53:9,20 67:17,23
68:22 69:21,25
131:24 238:6
opportunities  39:8
73:21 239:10
opportunity
129:19 158:10
163:12
opposed  68:15
97:7 103:17
109:11 238:24
optimal  80:21
81:3
optimize  93:20
option  186:15
187:9
order  45:18 49:7
68:13 109:17
237:2,24 238:12
ordinary  213:22
oregon  1:22
organization
166:23 169:7
organizational
168:21
original  13:24
17:24,25 19:15
21:19 33:18 38:18
59:8,11 62:24
63:24 64:16 65:22
66:15,18,22 73:18

Veritext Legal Solutions
866 299-5127

[original - pc]

76:10,18 89:18,20 95:7 96:3,17,24 97:17 99:13,18 106:5,24 112:9,22 121:2,3 122:2,6,9 122:15,17,25 124:5,7 136:1 138:18 144:17 150:25 179:8 181:7 184:11 190:21,22 203:19 210:9 243:14 244:10,21

**originally**  95:12 95:25 98:4 99:7 112:2

**outcome**  167:3

**outcomes**  37:11,12

**outline**  240:5

**outlined**  210:9

**outside**  186:15 187:9

**overall**  36:6,19 89:6 91:16,18,20 93:22 101:19 103:11 106:13 135:7,9 147:20 148:12 156:14 157:18 158:16 159:5 181:2 187:6 191:22 192:1,5 211:11 228:3

**overcharge**  86:24 129:7,14 132:13 140:24 157:12 165:1 234:13,15

**overcharged** 107:23

**overcharges** 132:15,22 133:13 134:2 140:3

**overlaps**  151:19

**overpayment** 78:16

**p**

**p.m.**  88:9 120:17 120:20 154:9,12 190:8,11 222:2,5 240:24 241:3

**package**  93:7

**page**  6:3,9 7:2 17:10 19:16 30:22 34:2 39:14,17 43:4,7,14 44:25 49:5 50:6,11 64:2 64:3 91:23,24 92:1 93:25 98:11 107:1 124:22 132:7 133:1,20 144:4 150:8,9 162:19 165:22 166:2,5 173:3 196:7,16 219:22 219:22 233:24 244:15 245:4

**pages**  1:25 240:4 244:14,17,17 245:3,6,6

**paid**  27:3 31:4 37:15 76:21 77:3 82:9,20,24,25 83:20 84:7 86:25 87:1,20,21 117:23 119:6 132:14,16 135:15 136:9,12 153:5 157:8,10 163:1

**pandemic**  161:14

**paper**  12:11 185:2 237:14,19,20

**papers**  102:18 106:23 121:2

**paragraph**  16:10 16:12,13 17:9,12 18:18,20 19:15,23 20:20 21:19 23:20 28:20 30:22,25 31:17,24 34:1,4 39:13,15,16,19 40:1 41:3,22 42:9 43:3,6,7,15,16 50:9,10,13,16 52:6 52:25 55:9 57:7 58:13 59:18 60:1 60:12,14 63:25 67:14 68:2 74:18 91:23 92:2,3 98:10,13 100:4,16 101:8,24 102:6,7 105:8,19,22 118:1 118:1,3,4 124:16 124:20,21,24 125:13 126:25 132:7,19 144:3,6 145:10 149:21,23 150:4,8,10,21 151:22 152:6 162:19,20,22 164:12,19 165:21 165:25 166:5,8,19 171:19 173:2,7 182:20,22 184:15 190:14,16,23 196:2,5,17,25 197:23 199:10,23 200:12 201:6 202:11,12 208:8 208:10 219:22 226:23 227:4 229:23 233:21 234:1

**paragraphs**  24:19 24:22 25:10 31:23

150:6 198:22

**parallel**  71:12,12

**parameter**  206:4 222:22

**parameters**  206:4 231:21,22

**paraphrasing** 208:16

**parent**  53:15

**part**  17:17 21:24 22:9 33:7 52:24 67:10 75:2 107:3 125:23 127:6 166:18 208:17 212:17 228:21

**particular**  16:18 47:18 61:24 68:14 72:16 89:16 158:3 176:21 177:4,11 192:12,21 199:8 236:11

**particularly** 123:21 169:4

**parties**  3:2 4:2 5:2 131:3

**party**  243:19

**path**  25:6 86:8

**paths**  185:4

**pattern**  93:2 228:25

**pay**  130:2 182:17 193:25

**paying**  77:3 180:24

**payment**  166:11 189:9,10

**pc**  173:10,14,16,20 173:23 174:12,13 175:16 176:4 180:1,2 183:21

Page 31

**[pdf - point]**

| | | | |
|---|---|---|---|
| **pdf** 244:12 245:1 | **percentage** 42:20 | **pertains** 243:13 | 76:14 126:17 |
| **penalty** 9:24 242:2 | 94:20 95:15,19,21 | **phase** 221:20 | 127:8 191:7,18 |
| 244:16 245:5 | 95:24 96:9,14 | **phenomena** | 192:6,17,22 194:7 |
| **pending** 121:23 | 97:7,14,18 98:7 | 107:10 | 225:19,21 226:11 |
| **people** 13:25 37:2 | 99:11 102:20,22 | **phenomenon** | 226:15 |
| 90:21 107:20 | 103:25 104:11 | 154:2 160:23 | **platform** 164:14 |
| 119:15 121:12 | 105:1,14 106:16 | **phillips** 4:6 9:3,3 | 172:20 232:24,25 |
| 137:25 138:2,25 | 122:16,20 123:6,9 | 12:25 155:2,3,9 | 233:1 234:4 |
| 147:22 148:9,22 | 123:18 131:24 | **phone** 114:3 | 237:10,13,17 |
| 163:8 196:21 | 132:2 137:12 | **phrase** 33:13 | 238:1,14 |
| 233:12 | 150:11 151:10 | 60:12,12 73:9 | **platforms** 237:7 |
| **pepper** 49:24 | 153:11 203:7,15 | 160:10 | **plausible** 169:12 |
| 50:20 51:4,19 | **percentages** | **pick** 153:23 | **play** 14:12 149:10 |
| 52:19 | 203:24 | **picking** 183:10 | 169:7 177:19,21 |
| **perceived** 197:3 | **perfect** 130:18,21 | **piece** 101:22,22 | 178:2 179:9 180:2 |
| 197:10 | **perfectly** 12:12 | **place** 33:23 97:16 | 180:3,7 |
| **percent** 34:24,24 | 167:2 169:2 | 97:16 119:10 | **play's** 153:5 |
| 34:24 35:15 42:18 | 206:23 | 150:25 166:1 | **please** 8:22 9:21 |
| 42:18 133:24 | **period** 15:25 | 191:18 243:6 | 11:12 15:24 22:13 |
| 134:6 136:13 | 18:23 76:21 77:12 | **places** 30:2 212:13 | 28:6 36:17 39:12 |
| 137:8,19,23,24 | 90:5 91:7 94:3 | **plain** 213:1 | 39:15 50:13 73:7 |
| 138:14,15,21 | 109:8,21 171:21 | **plaintiffs** 3:4 6:13 | 107:1 109:16,16 |
| 139:9,18,19,21 | 171:25 176:3 | 6:19 7:6 16:15 | 133:9 142:9,9 |
| 140:9,11,15 | 183:9,23,25 | 17:14 18:7,20 | 143:11 146:4 |
| 141:13 148:23 | 219:15 244:18 | 19:5 21:16,18,24 | 149:1 154:22 |
| 149:4,12 150:12 | 245:7 | 22:10,12,16,18 | 165:21 173:3,19 |
| 151:11,18 153:5 | **periods** 149:10 | 23:13 27:24 45:23 | 186:5 190:14 |
| 155:18 156:7,24 | 172:3 | 46:16,21 47:1,8,15 | 196:17 197:18 |
| 156:25 160:2,20 | **perjury** 9:24 | 47:21,25 48:10 | 208:9 216:23 |
| 161:16 174:25 | 242:2 244:17 | 51:16,20 52:15 | 222:12 |
| 175:5 176:11,12 | 245:6 | 53:19 54:6 57:9 | **plurality** 212:4 |
| 176:22 177:13,19 | **permit** 121:7 | 57:24 58:2,9,11,24 | **plus** 78:16 80:23 |
| 177:22,22 178:5 | **person** 14:6 94:17 | 59:12 60:16 62:16 | 136:7 171:21 |
| 178:12,16,18,21 | 107:20 115:2 | 62:19 63:4,10,17 | **point** 25:24,25 |
| 179:14 188:2,6 | 117:17 120:1 | 64:4 65:16,23 | 44:11 48:4 94:25 |
| 196:14 201:9 | 128:21 | 66:5,11 67:2,6,24 | 96:9,21 106:20 |
| 207:14,14,15,19 | **person's** 108:15 | 68:5,8,20 69:6,9 | 112:2 113:3 |
| 207:20 208:13,22 | **personal** 113:25 | 69:18,22 70:12,17 | 120:14 123:8,14 |
| 210:12 211:16 | **personally** 47:18 | 70:21 71:2,10 | 137:13,23 144:12 |
| 212:9,24 239:8 | 90:13,18 105:24 | 72:11 73:3,13,23 | 144:16 145:20 |
| | 174:16 | 74:8,12 75:13 | 146:9 149:18,20 |

Veritext Legal Solutions
866 299-5127

**[point - price]**

151:16 152:11,16 154:1,7 155:21 156:12 171:23 172:1 174:10 176:9 190:4 193:1 193:16,18 208:7 223:11 229:24 230:13 234:1,13 239:22
**points** 16:16 43:20 152:10,19 153:19 154:4 155:6
**policy** 152:8,8
**pop** 12:10
**pops** 54:9
**popular** 213:7
**population** 141:16 210:4
**portfolio** 90:4,6,10 91:6,13 92:12,13 93:7 96:20 101:2 101:20
**portfolios** 91:16 91:17,19,19 93:19 93:20
**portion** 32:12 108:4 198:7
**portions** 14:20
**position** 29:8 32:18 85:13 183:20,23 205:22 205:24
**positions** 38:18
**positive** 42:17 77:13 81:25 82:5 82:25 83:1,3 84:1 96:16 97:24 101:5 110:19 169:17
**possibility** 112:25 186:23 188:16 226:15 229:25

**possible** 14:8 35:24 69:3 114:22 128:3,22 135:7 164:5,6 167:3 174:6 199:13 234:22 235:5
**possibly** 128:23
**post** 156:15
**posted** 177:24
**potential** 27:24 83:17 129:17 165:10,17 166:24 167:6 169:7,23 172:13,18 174:11 188:10,13,18,23 231:18
**potentially** 83:19 115:13 167:21 170:3 199:3 232:15
**power** 238:24,25
**practical** 25:4,17 26:2,11 27:8 28:17 32:9 112:15 112:25 113:7,14 113:19 114:10,10 114:12 124:1 125:15,22,25 126:6,20 127:16 128:2 130:17 221:3
**practicality** 112:6
**practice** 57:17 159:18,24 161:3
**practices** 65:8,9
**precedent** 51:12 131:1,5,7
**precedents** 131:23 132:3
**preceding** 150:6

**precise** 31:10 32:16 108:14 109:24 110:9 134:16,24 136:15 138:17 208:21 215:24 219:13 221:12 224:16
**precisely** 79:13 145:6,12,17 216:1 223:24 224:3 237:16 238:22
**precision** 110:18 111:3 148:2 212:14 216:15,19 217:8 218:13,18 219:7 222:9,17,24 224:22 226:7
**predicts** 88:12 229:7
**preference** 96:13
**preferred** 103:10 103:13
**prejudge** 221:15
**preliminary** 184:18
**premise** 73:6 182:3
**preparation** 106:3
**preparatory** 221:6
**prepare** 16:16
**prepared** 13:23 57:1 175:25 185:19 194:23 219:1 236:8
**preparing** 48:1
**presence** 165:10 182:1
**present** 5:4 8:22 193:2
**presented** 224:8 224:11 229:21

230:20 231:13 239:21,22 240:1
**presents** 44:6 200:2
**preserve** 154:22
**pressure** 38:23 157:20,23 167:1 167:14 172:17 175:17,19,23 176:23 179:18 181:25 195:22
**pressures** 160:24 230:3
**presumably** 115:9 128:3 146:10
**presume** 47:11 125:22 152:20
**presuming** 115:17
**presumption** 162:23 163:6 182:11,12
**pretty** 41:6 176:4 188:24
**prevail** 174:8
**prevent** 167:18 185:23 196:21
**previous** 18:10 65:6 68:15 69:2 103:8,12 109:11 109:14 123:23 141:15 149:17 195:18 198:14 207:12 216:12 217:4 225:16 237:8
**previously** 140:17 198:5
**price** 77:13,14,20 77:23 78:8 79:6,7 79:13,18,19 80:14 80:19,21 81:1,3,5

Page 33

[price - professor]

| | | | |
|---|---|---|---|
| 81:6,8,8,13,18 | 85:5 87:2 90:9 | **privacy** 37:19 | **processes** 51:9 |
| 82:8,10,21,21,25 | 91:21 95:23 96:18 | **privilege** 23:3 | 127:2 129:20 |
| 83:1,3,5,18,25 | 102:2 122:3 | **pro** 236:5 | **processing** 144:7,9 |
| 84:14,15,16 85:21 | 144:18,24,25 | **probability** | 166:11 210:11 |
| 85:22 86:2,4,17,18 | 145:11,16 146:2,6 | 169:16 | **processor** 111:23 |
| 86:25,25 89:9,10 | 151:24 152:2,9 | **probably** 12:23 | **produce** 79:22 |
| 89:22 90:6 91:2,6 | 153:5,11 154:3 | 13:19 128:23 | 86:2,9 132:4 |
| 93:18 94:7,13,14 | 159:10 164:20 | 144:13,14 146:13 | 202:21 224:10 |
| 94:19 97:6,23 | 165:3,13 167:12 | 168:11 | **produced** 53:4,8 |
| 98:18 99:6 102:21 | 181:25 194:6 | **problem** 20:9 61:7 | 117:20 147:12 |
| 102:23 104:20 | 212:1 213:20 | 101:15 147:4 | 202:6,7,8 203:15 |
| 122:10 144:18 | 216:6 | 148:19 151:3 | **produces** 77:23 |
| 145:5,7,24 146:12 | **pricing** 91:15,18 | 198:12 205:14 | 80:20 203:20 |
| 150:1 151:23 | 92:10,11 93:22 | 218:1 239:1 | **producing** 103:8 |
| 152:3,4,7,8,10 | 152:11 165:14,16 | **problems** 197:14 | **product** 167:13 |
| 153:9,18,19,22,24 | 179:25 191:24 | **procedure** 89:3 | 171:10,11 228:6,9 |
| 162:25 163:13,16 | **primarily** 14:7 | 110:6 129:17 | **production** 196:24 |
| 163:21 164:12,23 | 27:22 160:5 226:8 | 130:17 144:10 | **products** 38:25 |
| 164:23 165:1,2,11 | **primary** 135:4 | 244:19,20 | 39:2 91:14 101:17 |
| 167:18,20,25 | 203:19 232:23 | **proceed** 93:4 | 171:14 186:15 |
| 168:3,18 171:18 | 237:7 | 126:10 170:8 | 187:7 |
| 171:20 172:6 | **prince** 43:9 98:14 | 221:19 | **professional** 2:17 |
| 175:14 176:18 | 98:23 99:3,13,22 | **proceedings** 243:5 | 236:24 243:2 |
| 181:22 182:11 | 100:1,11,18 102:1 | 243:8,9,15 | **professor** 11:8 |
| 203:20 204:24 | 102:1 103:4 | **process** 14:14 32:6 | 12:8 13:3 15:13 |
| 205:10 206:4,11 | 105:16 138:19 | 35:23 80:6 105:23 | 15:18 23:18 30:16 |
| 206:13 207:7 | 146:1,5,20 155:15 | 112:16 113:4,7,14 | 43:3,8 44:23 |
| 209:7,12,14 211:6 | 156:4,22 196:12 | 113:19 114:7 | 56:10 78:7,20 |
| 212:3 213:19,23 | 198:3 199:5 | 118:6 123:15 | 82:4 85:2,16 |
| 216:18 218:15 | 201:16,20 202:1 | 124:25 125:3,12 | 88:11 92:4 98:14 |
| 222:21,22 223:5 | **prince's** 92:4 | 125:15,22 126:6 | 98:23 99:3,12,20 |
| 224:22 227:20 | 123:4 144:8 | 126:10 127:1,9,16 | 99:22 100:1,11,18 |
| 228:4 229:4,5 | 147:13 155:24 | 127:17,20 128:4,5 | 101:24 102:1,1,12 |
| 230:5,6,24,24 | 156:19 196:20 | 128:15,24 129:2 | 103:4 105:16 |
| 231:6,7,16 | 197:3,10,15 198:8 | 132:10 137:3 | 123:4 124:2 129:5 |
| **priced** 83:10 | 201:7 202:15 | 142:25 146:21 | 138:19 144:8 |
| **prices** 31:5 37:15 | **principle** 130:15 | 187:24 | 146:1,5,20 147:13 |
| 77:24,25 78:22,24 | **prior** 29:7,22 58:5 | **processed** 14:24 | 153:4 154:14 |
| 78:25 81:16,20,24 | 106:4,4 136:20 | 118:14 145:22 | 155:14,15,24 |
| 82:4,12,16 83:9,16 | 183:17 243:8 | 210:8 | 156:4,19,22 |
| 83:16,23 84:19 | | | 162:12,18 172:19 |

**[professor - question]**

182:19 183:5 184:7 187:11 190:13,16 196:2 196:12,20 197:3 197:10,15 198:3,8 199:5 201:7,16,20 202:1,15 213:12 222:7 232:17 236:16,17 239:2 240:21

**profit** 79:13 80:18 93:11 100:23 152:15 153:24

**profits** 75:9,10,11 80:13 91:15 152:18

**program** 143:2

**programmed** 98:5

**programmers** 98:3 99:8 105:25

**prohibits** 57:16

**projected** 77:22

**prong** 64:11 65:16 65:17 66:1,2 217:12

**prongs** 64:7,22

**proof** 39:20 107:4 107:8 215:25 219:6

**proper** 48:8 64:13 64:18 106:17 124:13 216:17

**properly** 32:7 113:6 124:11 144:1 146:15 237:24 238:12 239:3

**properties** 98:17

**property** 67:2

**proportion** 36:1 40:20,23 126:23

**proposal** 57:5 123:9,17 159:16

**propose** 33:2 96:2 125:3

**proposed** 45:18 46:8 55:3,11,16 56:17,23 57:4 59:13 67:24 68:3 73:22 74:8,13,18 76:14 95:13 96:1 100:20 118:13 125:23 127:18 129:15

**proposing** 133:16 143:25

**proposition** 52:10 169:5,6 182:25

**propositions** 20:15

**protocol** 106:18

**prove** 69:9,19

**provide** 37:19 49:1 62:10 66:14 73:2 114:8 115:11 160:7 179:24 193:4 219:13 233:18

**provided** 26:13 55:21 199:6,8,19 200:8 202:1 244:19 245:8

**providers** 189:25

**provides** 25:6 65:23

**providing** 93:5,6 169:9

**provision** 191:6 192:21,25 193:13

**provisions** 184:8 184:24 185:11,15 185:22 189:3,8 194:5 195:15,24

**published** 185:2 237:13

**pudding** 216:1 219:7

**pull** 210:6

**purchase** 77:11,12 89:22 91:6 93:9 94:3,15 98:19 103:24 104:21 108:15,22 138:25 139:2 152:2 166:10 172:21 194:5

**purchased** 90:4 93:8 136:18 213:11

**purchases** 18:23 31:5 92:17,21,24 94:11 107:24 159:11 208:14

**purchasing** 143:24

**purported** 131:24

**purpose** 27:15 47:6 71:15 128:10 170:14 185:14,21 204:23

**purposeful** 212:16

**purposes** 27:11 47:22 48:18 58:12 58:25 106:12 185:14 209:6

**pursue** 158:9 163:12

**pursued** 230:19

**put** 11:21 15:7 20:15 23:6 46:7 55:7 58:6,19 64:13 68:16 89:7 121:9 186:18 222:25 225:22

**puts** 176:23 181:24 225:19

**putting** 86:4 113:16,16

### q

**qualified** 132:4 152:22

**qualify** 89:2

**qualitatively** 83:17 202:14,19

**qualities** 167:13

**quality** 37:17 163:16 164:4 234:7

**quantified** 36:2 37:24 38:2

**quantify** 38:5,20 40:14 63:20 220:2

**quantifying** 193:5 233:17

**quantitative** 35:2

**quantitatively** 37:4 214:20

**quantities** 213:20

**quantity** 79:23 80:16,22 87:3 94:13 213:19,23

**queried** 90:21,25 105:25

**question** 19:19 20:17,18,21 21:2 22:3 25:15 28:11 30:13 32:15 34:14 36:11,16,17 41:1 46:2,4 47:23 48:5 49:19 50:2 53:11 53:13 55:25 58:5 58:9,19 60:4,6,10 60:21 65:19 66:24 68:12 73:7 76:7 76:24,25 78:20

Page 35

**[question - recall]**

79:1 82:3 85:2,14 85:18,20 86:12,14 86:16 90:17 95:13 96:25 97:5 100:8 101:14 104:10 106:11,12,20 108:25 109:15 125:8,24 126:13 126:13 127:15 128:11,16 133:9 133:10 135:2 137:19 140:5,7,9 140:17 141:15 142:1,10 145:14 145:15 146:4 150:6,7 156:3,13 156:14 160:17,21 161:7 165:2 168:14 171:2,6 172:8 173:19 177:5,8 179:15 182:4 184:19 186:19,20 191:14 191:21 192:23,24 193:17,18 195:21 197:6,7 200:6,20 201:3 205:17 207:16 208:18 214:20 216:23 219:9,10 222:13 223:23 224:25 225:4,9,20,22 226:3 228:13 229:18 234:2 235:22 238:8

**questions** 55:5,6 122:1 158:15,23 158:24 159:1 203:23 237:7 240:17

**quick** 120:3
**quite** 83:19 128:23 143:16 147:19 156:10 158:8 186:10,11 206:2 206:18 226:2 239:19
**quo** 231:23
**quotations** 203:23
**quote** 101:7 125:8 135:23 155:22 191:1 205:6 213:3
**quotes** 47:5 102:8 102:8
**quoting** 100:5,10 112:8

**r**

**r** 4:6 170:5 171:3
**r&s** 245:1,9
**raise** 9:21 18:10
**raised** 16:17
**ran** 196:13 201:14 203:4
**random** 153:15 198:2,19 201:25 202:16 203:8,15 204:5,18,22,23 205:7,20 209:19 210:2,3,15,17 211:16,19 212:7 212:20 219:18
**range** 224:24 240:12
**rare** 213:10
**rarely** 213:10
**rate** 78:14 80:25 81:13 86:1 155:16 155:17 156:5,6,23 159:15,19,25 160:1,4,8,11,12,13 160:14,15,16,19

160:20 161:4,9,11 161:15,18 164:14 172:2,4 173:13 175:6,9 176:10,11 176:12,15,20 177:1,5,10,21 178:13,15,19,21 181:11 182:7 190:1 192:13 195:21,23
**rates** 81:15 166:15 173:8 174:8 176:17 179:20 182:23 184:3 192:9
**reach** 69:18 86:8
**reaching** 48:18 53:5,9 68:1
**react** 181:16
**read** 19:16,17,18 21:15 28:22 40:22 46:10,10 47:12,15 47:18 49:17 52:24 55:3 63:22 74:17 76:13 100:13 105:24 156:2,3 162:16 190:25 199:22 200:11 201:5 242:2
**readily** 224:14
**reading** 49:20 75:16 154:16 155:5 236:23,23 239:4 244:23 245:9
**reads** 39:19 92:3 162:22 165:25 166:8
**ready** 9:19 11:4
**reaffirm** 28:25 29:4 31:22 33:15

**reaffirming** 30:16 31:16
**real** 25:25 37:11 81:24 82:4 88:24 89:4 94:5 139:8 139:12 159:18,24 161:3
**realism** 101:14
**realistic** 33:7 100:22 186:23
**realities** 92:6
**reality** 232:14
**realize** 121:5
**really** 22:3 33:6 95:17,20 146:3,7 164:17 169:15 185:19 206:9
**reason** 11:15 140:1,20 158:3 163:11 164:3 233:12
**reasonable** 29:19 92:5 93:15 119:24 148:7,24 167:2 190:5 208:14 209:8
**reasonably** 174:8 214:1
**rebecca** 1:21 2:17 8:19 9:19 243:1 243:24
**rebuttal** 24:9 93:25
**recall** 14:8 47:19 48:21,23 49:20,23 50:5 54:17 74:2 74:15 75:15 98:1 105:3,4 118:17,20 153:7,7 155:20,24 156:1 157:3 162:1 162:15 165:8

Veritext Legal Solutions
866 299-5127

**[recall - reply]**

| | | | |
|---|---|---|---|
| 184:10,19 185:7 216:8 222:10 223:8,15 236:22 236:22 239:4 | 195:18 | **rejectable** 112:18 | **remained** 150:1 |
| **receive** 76:1 | **reference** 46:23 55:11 62:17 133:4 208:23 | **related** 24:12 | **remaining** 134:6 205:6 |
| **received** 15:4 55:2 56:25 57:4 105:16 236:1,2 | **referenced** 67:18 244:6 | **relates** 61:20 148:22 149:24 | **remains** 19:10 |
| **recess** 44:19 88:7 120:18 154:10 190:9 222:3 | **references** 61:23 184:8 | **relating** 23:25 | **remedies** 74:25 |
| **recognize** 234:14 | **referencing** 50:5 | **relationship** 213:18 | **remedy** 72:17 73:24 74:5,14 75:10,12 76:7 |
| **recollection** 117:25 136:3 208:4 | **referred** 19:22 45:14 116:19,20 154:17 | **relative** 232:15 243:18 | **remember** 47:16 64:25 65:1 130:7 161:8 181:7 185:17 |
| **record** 8:6,22 11:9 11:13 15:17 44:17 44:20 84:25 88:6 88:8 120:15,17,19 121:10,18 154:9 154:11 180:22 190:7,10 191:16 222:2,4 240:24 243:9,12 | **referring** 20:15 21:6 22:4 46:17 62:25 92:9 98:23 102:1 116:4,9,22 122:1 132:25 145:13 155:21 190:20 197:12 | **relatively** 143:18 168:13 170:16 | **remembers** 129:13,25 |
| | | **released** 244:21 | **reminded** 184:22 |
| | | **relevance** 170:21 | **reminder** 155:6 |
| | | **relevant** 17:15 23:9 27:11,15 30:17 31:15 42:24 48:18,19 52:19 63:21,21 138:12 165:1 183:18 189:1 218:13 234:15 237:25 238:13 239:7 | **remotely** 1:14 2:15 243:6 |
| **recorded** 8:9 | **refers** 49:13 59:7 | | **remove** 152:8 |
| **records** 110:3,24 111:17,19,24 112:12 129:23 141:7 | **refine** 134:17 | | **removed** 152:7 195:24 |
| | **refinement** 134:15 | **reliability** 205:11 207:6,11 221:19 224:17 | **renew** 17:25 |
| | **refining** 38:14 | | **renewals** 161:11 |
| | **reflect** 17:1 | | **repeat** 15:24 20:7 22:13 28:6 36:17 60:4 143:11 146:4 149:1,16 173:19 177:7 197:7 216:23 222:12 |
| **red** 55:15,20,22 56:3,4,5 | **reflected** 68:1 135:6 168:16 | **reliable** 118:18 147:14 215:19 225:11 226:5 | |
| | **reflection** 232:1 | | |
| | **refusals** 185:8 | **relied** 45:4,8 47:3 49:1,25 60:23 179:3 | |
| **redefine** 26:14 | **regard** 30:9 | | **repeatedly** 222:8 222:15,20 |
| **redefines** 26:23 | **regarding** 98:15 196:8 197:18 | **relief** 45:18 70:12 | **rephrase** 173:22 186:19 |
| **reduced** 80:14 160:8 161:10,15 162:24 234:3 | **regardless** 72:11 | **relies** 67:15 209:13 | |
| | **regional** 112:18 | | **replace** 228:2 239:13 |
| | **registered** 2:17 243:1 | **reluctant** 79:25 | |
| | **regression** 213:22 215:18,19 | **rely** 53:4,8 209:19 | **replaced** 151:16 |
| **reducing** 177:21 | | **relying** 52:1,9,13 56:19 57:23 58:12 58:23 68:2 178:17 | **replicate** 200:14 |
| **reduction** 162:1 | **regrettable** 105:17 | | **replies** 123:3 |
| **refer** 21:3 33:23 52:6 59:18 60:11 164:11,22 171:17 | **regulator** 16:6 | **remain** 225:24 | **reply** 6:11,23 11:22,24 13:5,21 14:13,20 15:5,14 |
| | **reject** 87:7 | | |

Veritext Legal Solutions
866 299-5127

[reply - respond]

16:8,16,21 17:1,19
17:21,22 18:4,17
19:2,6 20:2,10,22
22:8,14 24:6,10,20
24:23 25:3,9
28:21 31:21 42:15
43:4,12,14 44:24
45:1,9,14 49:2,5
50:9,10,14 53:6,9
54:20 60:3 67:18
91:23 98:10 107:1
118:2 123:1
124:17 132:13,20
133:1 134:24
142:3,12 144:4
149:22 162:19
166:20 173:3
179:3 182:20
190:21 196:3,11
197:2,9 199:10
202:11 208:9
212:21 216:4
226:23 230:9
231:11 236:18
**replying** 150:23
**report** 6:11,17,23
  11:22,23,24,25
  12:16 13:5,12,21
  13:22,23,24 14:13
  14:21,23 15:1,5,14
  16:9,16,21 17:1,3
  17:8,10,19,21,23
  18:3,4,11,16,17,18
  19:2,7,15,23 20:2
  20:11,20,23 21:20
  22:8,15 23:19
  24:6,9,11,20,23
  25:4,10 28:21
  29:1,16,19 30:9,18
  30:22 31:1,17,22
  31:23,24 32:23

33:5,14 34:1,23
38:18 39:13,17
42:15 43:4,7,13,14
43:24 44:24 45:1
45:5,10,13,14
46:25 49:3,5 50:1
50:8,9,11,14,18
53:6,9 54:20 59:9
59:11 60:2,3
61:17,20 62:25
63:5,8,15,24 64:16
65:22 66:13,15,18
66:22 73:18 76:10
76:18 89:14,16,18
89:20 91:24 94:1
95:7 96:3,17,24
97:17 98:10 99:2
99:18 105:8 106:4
106:5,22,24 107:1
107:3 112:9 115:6
116:6 118:2 121:2
121:3 122:2,6,9,15
122:17,25 123:1
124:5,7,17 132:13
132:21 133:1
134:24,25 135:1
135:23 136:1
138:14,18,22
139:5 140:11,15
142:4,13 144:4,8
144:17 147:3,5,25
149:22 150:8,25
155:22,24,25
156:19 162:15,16
162:19 165:6,22
166:18,20 173:3
178:24 179:3,8,9
181:7 182:20
184:7,11 190:14
190:17,21,21,22
190:22 196:3,11

197:2,9 198:17,23
199:1,2,11 200:3
200:16 202:11
203:6 204:4 208:9
210:9 216:4 223:7
226:23 227:14
229:21 230:9
231:10 236:18
**reported** 1:14,20
  2:16 30:8 122:15
  138:21 139:4
  140:10 146:25
  150:10 199:4,20
  200:9 227:13
**reporter** 2:18,18
  2:19 8:19 9:20,23
  12:3,6 15:9 53:24
  143:10 155:12
  243:2,3,3
**reporting** 150:20
**reports** 16:19
  28:25 29:12 33:22
  37:25 53:20 67:18
  68:23 69:21 71:2
  158:25 162:13
  174:21 184:12,20
  195:17 199:9
  201:2 218:5 220:5
  231:2
**represent** 46:19
  49:11 145:19
  150:18
**representation**
  151:5
**representative**
  209:20 210:3
**representatives**
  120:9
**represented** 46:24
  97:13 168:12
  237:10

**represents** 191:6
**reproduce** 198:2
  199:13
**request** 96:23
**requested** 143:21
  243:16 245:1,9,10
**require** 58:20 61:8
  73:3 80:9 122:17
  142:23 160:25
  167:25 172:25
  226:14 230:16
**required** 31:25
  51:19 68:9,10
  135:3,3 152:3
  164:18
**requirement** 91:2
**requirements**
  58:16 72:8 73:20
  75:25
**requires** 75:11
  79:15 102:9
  108:10 226:20
  230:18
**reran** 200:13
**reread** 60:1 90:18
**rerun** 202:5
**research** 5:5,7,12
  9:12,14 195:2,5,5
**reserving** 179:12
**resolved** 55:6 80:3
**resolving** 127:2
**respect** 13:21 70:2
  81:4 209:22
  216:25 231:17
**respectfully** 57:12
  57:21
**respectively** 57:12
  57:20,22
**respond** 81:10
  182:13 198:23

Page 38

[responded - sample]

**responded**  55:4
**responding**  16:23
  160:23 167:14
**response**  16:16
  28:14 31:18 36:23
  47:24 100:9 121:8
  152:18 157:21
  160:5 179:18,21
  179:22 205:20
  228:8,21 235:20
  237:6
**responses**  176:2
  179:19
**responsibility**
  44:3
**responsible**  15:1
  48:14 209:10
**responsive**  17:24
  154:1 181:21
  182:8 200:20
**rest**  80:7
**restatement**  38:17
**restitution**  73:24
  74:5,7,9,19 75:20
  76:8,9,13,17 87:13
  87:16,19
**restoring**  87:20
**result**  67:2 78:13
  161:12 165:14
  166:14 203:1
  230:23
**resulting**  195:23
  230:3
**results**  30:8,10,13
  43:24 102:24
  147:13,25 149:25
  150:20 199:20
  200:2,9,14,17,23
  201:7 202:14,18
  202:21 204:4,16
  205:18 212:25

217:24 219:17
  221:16
**retail**  233:5
  234:10
**retailer**  50:21 52:7
  52:11 53:2 233:6
**retained**  241:2
**return**  158:21,22
  244:17 245:6
**revenue**  101:19
  133:24 143:18
  208:13,22 210:13
  211:10 212:10
  235:8 236:1
**revenues**  143:8
  209:11 212:12
**review**  56:23 57:8
  60:15 68:3 99:18
  132:3 134:10
  153:3 190:18
  191:2 192:15,18
  194:2 243:15
  244:8,10,13 245:2
**reviewed**  28:24
  29:12 55:10 56:20
  99:9 133:8 150:5
  203:12
**reviewing**  73:22
  96:7
**right**  9:21 11:4,8
  15:16 47:10,12
  55:12 56:20 57:21
  69:19 71:7 73:5
  82:6 87:20 94:17
  99:13 100:12
  121:9 130:10,19
  134:9 136:10
  138:22 141:23
  144:25 145:7
  155:14 175:7
  179:12 201:22

211:17 212:18
  213:4 214:2,14
  215:5 226:16
  227:7 231:6
  240:16,19
**rights**  180:25
  188:15
**risk**  167:23
**rival**  165:3 168:13
  171:8,15 176:20
  177:11,14 182:9
  186:14 232:3,3
**rival's**  167:22
**rivalry**  228:16
  229:2 230:2,3
  232:13
**rivals**  163:23
  167:19 169:7,8
  176:2 179:20
  180:14 181:18
  182:15 186:12
  228:5,24 229:4
  230:1
**road**  143:2,4,7,14
**roblox**  92:4
**robust**  146:18,21
  151:17 228:17
  230:6,24 231:7
**robux**  93:1,5 94:4
  94:5,12,16 97:6,22
  101:3
**roi**  158:1,1,5,18,21
  163:22 167:21,24
**role**  14:12 169:8
**rollins**  116:10,11
  116:15,24
**romano**  1:21 2:17
  8:19 243:1,24
**rough**  15:22 54:16
**roughly**  117:14

**round**  104:11
  145:22,22 146:9
  146:11 148:19
  151:17
**rpr**  1:21 243:24
**rule**  26:2 32:9
  42:10 49:7 131:19
  150:22
**rules**  32:11 72:1
  76:3 169:25 245:8
**ruling**  42:5 52:5
**rulings**  126:14
**run**  22:19 168:10
  181:2 202:5,6,8
  204:17 205:19
  213:21,22 218:9
  218:24 219:3
**running**  200:4
  201:24 203:14

**s**

**s**  4:6 6:8 7:1
  231:13
**sabre**  237:9,10
**safe**  26:14,18
**sake**  15:3 92:25
**sales**  156:24
  210:19,21 211:3,4
  211:7,10,10
**sample**  135:18
  136:13,19 139:25
  140:19 151:15
  196:8 197:18
  202:5,7,16,24
  203:19 204:22
  205:12 206:8
  209:8 210:2,5,6,13
  210:15,18 211:15
  211:16,19,21
  212:7,13,20,24
  215:16,23 217:7
  217:23,24

Veritext Legal Solutions
866 299-5127

**[samples - short]**

samples 196:14 198:2,9,10,11,19 199:6,12,14,16,19 200:1,7,13,15,18 200:22,24 201:10 201:15,19,21,25 202:8,21,25 203:4 203:8,15 204:5,18 204:23 205:20 209:19 215:13 219:18
sampling 205:7,9 209:22 210:4 212:10
samsung 53:11
san 4:17
sat 174:10
satellite 179:24 180:13
satisfactorily 90:23
satisfied 181:23,24
saw 55:22 56:3 99:14
saying 26:13 33:3 38:3 42:4 56:12 59:15 64:23 82:12 89:2 96:21 97:6 97:10 99:2 100:17 143:22 166:22 206:12,23 207:18 209:6 218:2 235:12
says 28:24 40:2 57:12 81:22 89:21 100:4 101:24 125:14,21 131:7 132:19
scale 93:14 135:10 135:10 137:13

scenarios 42:6
schedule 244:10
scheme 18:21
schmalensee 153:4
scientific 43:10,18 43:21,23 44:5 99:23 106:9,18
scope 235:2
scores 206:25
scott 5:9 9:5
screen 54:9
scrutiny 179:10
search 115:14
searched 168:19
second 23:20 79:16 98:16 165:24 166:7 190:19,24,25 215:10 228:21 240:13
secondary 32:13 93:21 203:18,25 204:1
section 57:13 132:14,20 133:3 133:13 142:3,12 168:21 190:17 191:2 192:15 193:13,22 196:7 196:11 197:17,20
secure 164:6
security 37:19 38:24 164:5
see 13:2 15:11 18:24 24:3 29:2 40:8 43:11 45:20 46:23 49:7 50:22 55:14 56:14 57:18 64:8 67:20 68:18 98:21 111:24,24 118:7 133:2 136:5

137:13 139:25 150:13 152:12,23 163:2,11 166:16 173:11 179:20,23 183:1,14 190:19 196:9 198:16 201:11 227:3,4 229:5,17
seek 70:12 73:23 74:12 221:18
seeking 70:17,21 71:2 75:13
seen 21:23 56:17 65:6 179:19
select 173:7
self 152:15,24 163:8,11 182:14
sell 166:12
selling 101:17,20 170:19
sense 14:25 18:11 39:4,10 86:6 101:21 108:19 117:13 124:12 232:4,23
sensible 26:12 95:15 96:8 99:10 101:15,16 106:17 106:19 183:11
sensitive 147:19 228:4
sensitivities 207:7 224:23
sensitivity 81:1 203:21 204:24 205:10 206:4,11 206:13 209:7,9,12 209:14 211:7 212:2,3 216:18 218:15 222:21,22 223:6 231:16

sentence 16:18 17:17 19:22 23:20 28:21 30:25 31:7 31:16 39:19 40:1 41:19 92:3 162:22 164:12 165:24 166:7 171:19 173:11 190:19,24 190:25 199:23 200:12
sentences 79:11 201:5 215:8
sequence 55:3 125:10
sequencing 105:15
serious 99:21
seriously 164:9
server 200:4
services 160:6 161:13,25 189:12 189:15 190:1
set 30:17 102:5 116:1,4 123:15 130:16 132:21 142:18 152:2 210:15 216:3 228:15 243:6
sets 46:15,20
setup 205:12,13
seven 240:3 241:2
share 12:1 15:7 181:3 188:2,6 239:8
sharp 65:8
sherman 57:14 59:5 68:22 69:8 70:13,18
shifted 32:6
shifting 32:6
short 28:21,23 199:24 221:24

**[shortcuts - spoken]**

| | | | |
|---|---|---|---|
| **shortcuts** 110:7 128:11 | **simple** 78:19 80:2 213:22 | 206:8 215:23 217:7,24 | **sound** 216:13 |
| **shorthand** 2:18 243:2,10 | **simplistic** 32:11 | **slightly** 30:12,15 133:11 | **source** 21:13 149:8 |
| **show** 24:25 25:12 40:3 42:3,13,16,21 104:4 126:17 141:9 194:4 | **simply** 21:1 30:14 35:2 41:1 42:25 61:25 68:17 83:15 92:17 100:5 106:20 110:25 119:23 121:7,17 125:21 126:4 127:17 134:5 144:11 147:11 160:1 163:21 167:10 187:5 193:9 207:18 209:6 213:21 224:22 226:10 235:21 | **small** 40:3,12,14 40:15,15,20,22,23 41:2,5,8,18 42:2 103:24 143:19,24 148:14 160:8 161:15 169:13,14 | **sources** 24:17 135:4 143:18 |
| **showing** 40:7 180:15 181:1 | | | **south** 3:17 |
| **shown** 28:2,9 | | | **specialized** 158:14 |
| **shuffling** 141:25 | | **smaller** 36:1 215:16 | **specific** 17:22 20:15 25:16 35:2 37:4 48:3,13,17,22 62:22 69:13 82:11 107:12,20 133:17 140:12,12,13 142:24 156:1 162:1 169:4 191:21 217:18 231:21 |
| **sic** 44:18 | | **software** 94:24 101:10 | |
| **side** 143:17 214:2 214:14 215:5 232:24,25 234:19 234:19 | | **sold** 171:15 | |
| | | **sole** 204:25 205:9 | |
| | | **solemnly** 9:23 | |
| **sided** 232:19 233:19 234:8,11 234:23 236:4,9,9,9 236:10,12,20,20 237:25 238:13 | **simulated** 195:8 | **solution** 109:2 213:24 227:16 228:7 | **specifically** 64:4 70:22 127:3 162:10 177:17 187:10 193:6 197:12 216:8 226:3 237:5 |
| | **simultaneity** 214:4 | | |
| | **single** 103:24 112:5 132:21 140:14 160:11,13 160:16 164:13 173:13 206:9 230:7 236:20 238:23 | **solutions** 244:7 | |
| **sides** 233:15 234:17,21 | | **someone's** 87:20 111:4,17 | |
| | | **somewhat** 64:25 146:17 181:14 | **specification** 81:12 |
| **sign** 170:12 244:16 245:5 | | | **specifics** 70:7 73:20 |
| | **sir** 9:20 | **song** 5:11 9:16 14:7,15 120:25 | |
| **signature** 243:24 244:21,23,23 245:9 | **sit** 42:12 47:16 66:20,25 74:15 75:15 134:21 185:7 | **sorry** 21:11 43:4,6 43:12 53:14 56:11 57:13 65:12 139:1 141:4 143:11 145:13 155:9,20 166:1 171:1 177:7 193:11 196:4 209:23 228:20 238:15 240:9,14 | **specified** 63:19 220:22,23 |
| **signed** 57:1 105:8 105:19,22 170:9 | | | **specify** 62:2 90:8 |
| **significance** 207:13 225:19 | **sitting** 14:10 112:11 | | **speculative** 181:20 |
| | | | **spelling** 157:19 |
| | | | **spend** 13:19 228:15 |
| **significant** 207:22 208:6 223:12 225:6 | **situation** 183:12 183:12 215:15 | | |
| | | **sort** 72:7 93:14 214:12 | **spending** 88:14,23 89:6,9 |
| **significantly** 225:2 225:17 | **situations** 77:22 | **sorting** 49:18 | **spent** 15:19 104:6 |
| | **six** 114:19 115:1 | **soseh** 5:6 8:17 | **spoke** 154:18 |
| **similar** 168:14 172:17 184:3 200:17 | **size** 129:1 135:2 136:19 143:20 196:8 197:18 | | **spoken** 222:8 230:23 |

Veritext Legal Solutions
866 299-5127

[spring - study]

spring 230:12
squares 213:22
  214:10
ssnip 238:16 239:3
stability 236:12
  237:17
staff 53:18 64:13
stage 95:2,2
  214:10 227:25
stages 227:24
stakes 158:8
stand 34:14
  149:18
standard 43:21
  145:2 198:24
  207:8 215:9
  217:14 223:1,5
  225:18
standards 43:9,17
  43:23 44:5 106:8
  207:5,10
standing 52:15
  71:22,23
standpoint 53:1
  103:22 112:11
  159:2
stands 172:11
start 11:20 16:9
  81:11 86:7 114:21
  119:11,11 191:10
  209:25
starting 174:24
  230:13
starts 17:9 39:13
  39:16 44:25 80:17
  124:21 144:4
  196:6
state 9:24 11:12
  16:14 17:13 18:19
  24:24 25:3 50:16
  55:10 57:7 60:14

64:4 67:15 118:4
  133:9 142:9
  182:22 196:19
  199:11 203:6
  208:12 244:9,12
stated 17:22 52:25
  122:19 139:6
statement 17:6
  25:11 31:10 32:16
  32:22 33:18 37:7
  99:25 112:22
  123:5 138:17
  141:18 155:21
  164:18 165:8
  166:22 167:1
  200:19 204:21
  215:10
statements 32:22
states 1:1 2:1 8:12
  31:1
stating 29:6,11
  68:18
station 152:20
statistical 223:18
statistically
  111:12,14 207:22
  208:5 222:17
  223:12 224:16
  225:5,13
status 46:11
  231:23
statute 68:15
  72:16
statutes 58:4,7,17
  61:7 70:22 71:13
  71:24 73:21
stay 239:15
steam 53:16
  174:20,23 175:4
  175:18 176:5,24

steam's 175:8,12
steep 239:11
steer 184:14,14
steering 184:8,24
  185:8,11,15,22,23
  188:21,24 189:2,8
  194:5 195:15,24
  195:24 235:23
  236:4
stenographically
  1:20
step 81:11 98:16
  103:2,2
steps 151:13 210:8
sticking 57:7
stipulation 22:20
  22:22 45:17
  244:20
store 23:25 24:12
  27:4 35:12 38:25
  50:19,25 51:15
  52:2,7 80:14
  83:16 93:5 107:23
  107:24 108:11
  110:2 112:3,12
  114:17 116:2
  117:2,14,20 143:8
  143:18 157:23
  158:1,4,5 160:3
  164:3 166:11
  167:22 169:13,14
  169:19,19 170:15
  171:7,7,7 172:11
  174:7 176:1
  177:19,21 178:2
  179:9 180:6,10,10
  180:16 181:10,10
  182:5,6,15 187:12
  187:17 188:19
  190:2,17 191:2
  192:15 209:11,23

209:23 212:11
  233:5 234:3,10
  235:8,22
stores 16:4 158:14
  163:15 165:3
  166:10 169:21
  170:4,7,9,11,14,19
  171:8,15 172:24
  174:7 176:20,25
  177:11,14 179:24
  180:8 181:11
  182:7,10
straight 99:12
straightforward
  80:2 209:15
  223:10
strategic 227:1,6
  227:11,21 229:1
  231:14
strategy 228:10,18
streaming 161:13
  161:25 189:12,16
street 4:15
strike 193:11
strokes 75:23
strong 189:25
  202:20 214:18,21
stronger 229:5
strongly 214:13,22
struck 33:12
structure 158:13
  163:18 175:9
  176:15
structured 170:7
structures 172:4
studied 174:18
  181:4 184:24
  193:18
study 173:1
  180:21 193:17
  194:15

Veritext Legal Solutions
866 299-5127

[subject - swanson]

| | | | |
|---|---|---|---|
| **subject** 24:11 80:19 116:24 | **suffers** 159:21 | **supreme** 49:23 50:18,20,24 51:3,9 | 70:11,16 71:1,14 71:25 74:6 75:3 |
| **submarket** 189:17 189:22,22 | **sufficient** 165:17 195:15 221:19 224:8 239:19 | 51:14,18,23 52:1,5 52:10,14,18 | 76:6,19 78:19 80:5 82:16 83:24 |
| **submarkets** 160:25 189:7,13 | **sufficiently** 163:22 184:1 228:17 239:11,12 | **sure** 8:23 21:5 26:17 34:19 46:3 46:5 60:5 73:10 | 84:8,11,24 85:10 85:16 86:11 87:10 87:19 88:1,4,11 |
| **submitted** 18:4,9 18:17 19:2,6 20:2 20:10 22:8,14 54:19 56:22 96:24 | **suggest** 41:23 **suggesting** 62:23 **suggestion** 163:9 | 77:10 89:21 90:23 91:1 94:22 116:14 124:19 133:18 | 89:13 90:11 91:22 92:19 98:9 99:20 100:10 103:1,15 |
| **submitting** 54:15 | **suggestions** 29:20 | 139:11 142:11 152:21 160:7 | 104:18 105:7,18 106:25 109:4,13 |
| **subscribed** 243:21 | **suggests** 183:5 | 186:11 188:12 | 110:13,17 112:4 |
| **subscription** 160:6 161:11 162:4 189:18,24 | **suing** 72:11 **suite** 4:16 **suits** 12:14 | 189:5,21 197:8 200:21 205:15 214:19 226:2 | 112:23 113:9,20 114:18 115:17 116:3,18 118:22 |
| **subsequent** 206:10 207:3 | **summarized** 17:16 21:18 | **surprise** 179:23 **survey** 120:3 | 119:17 120:5,11 121:11 125:13 |
| **subsequently** 56:4 | **summarizing** 109:14 | 195:2,4,5 | 126:2,25 127:19 |
| **subset** 209:9 | **summary** 19:21 | **suspect** 214:23 | 128:14 130:10 |
| **substance** 19:9 23:14,15 61:16,19 121:22 232:20 | 60:2 63:3 66:9 132:18 150:2 | **swanson** 3:15 6:5 8:23,24 11:4,7,10 | 131:6,14,19 132:6 134:9,23 135:22 138:13 142:11 |
| **substantial** 36:1 41:15 149:13 180:17 189:24 230:5 239:17 | **summing** 132:15 **sun** 237:15 **super** 178:21 **supersedes** 219:9 | 11:20 12:8,17,22 13:2,3 15:2,11 17:7 18:1 20:1,9 21:15 22:7,21 | 143:13,14 147:15 148:20 154:5,14 154:20,24 155:8 155:14 161:17,22 |
| **substantially** 27:19,23 34:11,13 34:17 158:6 169:8 | **supplemental** 54:15 | 23:2,17 24:10,18 25:8,20 26:21 27:14,25 30:7 | 167:17 171:3,17 174:12,20 179:11 186:21 188:19 |
| **substitute** 187:20 **substitution** 239:10 | **supplements** 45:4 **supplier** 228:9 **support** 6:12,18 | 32:14 33:3,12,19 35:4,15 36:4,15 37:6 38:12 39:12 | 189:13 190:3,6,13 193:20 194:18 195:1,9,14 197:8 |
| **subtracting** 96:19 | 7:5 14:25 54:6 55:4 57:10,14 | 40:21 41:4,17 42:1,11 43:3 44:4 | 198:15 199:5 |
| **subway** 239:16 | 59:3,5,12,22,23 | 44:10,14,23 46:5 | 200:5,21 201:19 |
| **succeed** 20:5,13,25 71:24 | 60:7,8,17,19 61:11 101:25 102:4 218:9 | 51:13,25 52:9,17 54:1,8 55:20,24 56:6,9 58:8 59:10 | 202:10 203:13 204:7,15 205:15 206:12 207:9 |
| **successful** 26:9 28:15 167:12 233:12 | **supporting** 196:22 **supports** 31:2 | 59:15 60:5 61:10 61:18 62:4 67:10 | 208:2 209:18 211:2,14 213:12 |
| **suffered** 38:4 67:7 130:8 | **suppose** 94:2 129:5 237:19 | 68:20 69:6,16,25 | 214:24 215:17 |

Veritext Legal Solutions
866 299-5127

[swanson - thank]

216:3 217:13 219:21 221:21 222:7,14 223:3,17 224:1,15 225:3,10 225:21 226:13,22 228:19 229:12 230:8,22 231:6,16 233:14 234:20 235:12 236:3,16 237:22 238:8 240:2,9,14,19 244:1

**swearing** 102:12
**swing** 225:23
**switch** 184:6
**switching** 187:21 239:12,18
**sworn** 61:12
**synonyms** 34:7,10 74:10
**system** 180:4,5 187:24 228:1
**systematic** 132:3
**systematically** 174:18
**systems** 166:11

**t**

**t** 6:8 7:1 170:5 171:3
**tagged** 147:22
**tail** 211:9 213:9
**take** 12:9 13:7 15:12 17:8 19:14 19:18 39:9 44:14 48:12 50:10 52:21 76:19 77:8 80:1 82:1 84:12 88:4 93:1,24 96:6,6 103:1 119:24 132:23 133:6 154:6 157:20

158:12 161:12 179:12 183:6 190:4 201:6 212:20 219:4 221:17,24 229:22 232:10 233:7
**takeaway** 235:8
**taken** 2:12 8:9 44:19 47:20 48:16 88:7 120:18 154:10 190:9 193:8 210:13 222:3 233:3 243:5
**takes** 94:19,20 191:18 233:15
**talk** 18:14 79:18 80:11 82:8,9 83:23 101:21 170:2 177:6
**talked** 33:25 63:2 74:19 98:24 128:18,25 222:20 226:18
**talking** 82:5,20,24 93:25 103:16,19 110:17,18 116:5 121:21 141:5,6,8 141:11 155:23 171:4,10 177:14 177:15 184:11,12 189:14 225:4 238:15
**talks** 79:17
**tao** 80:24,24
**target** 93:16 210:4
**task** 111:23 113:10
**tastes** 181:15
**taxes** 234:11
**team** 13:24 14:3,6 14:9,25 55:5

90:14 102:19 174:18 199:6 201:21
**team's** 196:22
**technical** 90:21 113:24 114:16 115:6
**technicalities** 28:12,13
**technician** 5:8
**technique** 213:25 217:10,11
**techniques** 188:25 218:18
**tell** 58:11 61:25 85:24 89:15 97:2 102:18 121:7 168:22 181:5 216:16
**telling** 62:14 85:19 86:3
**tempting** 158:8
**ten** 44:15 171:21
**tens** 119:19 138:8 206:24
**tenth** 88:12 104:4 136:12
**term** 20:18 26:17 26:19 33:4,5 34:3 34:5,10,12 35:10 63:3 74:7 75:5 76:11,12 87:16,25 214:25 228:2
**terminated** 108:21
**terminology** 28:12 232:20 233:5
**terms** 26:7 33:21 34:6,22 61:1 82:8 82:10 89:7 90:4 93:22 101:19 102:19 104:25

105:1 106:14 137:12,21 138:1 143:20 149:14 158:12 170:21 171:25 178:9 181:2 182:10 185:3 191:20 192:8 204:7 228:4 230:22 234:5,13 235:7
**terrific** 85:17
**test** 237:24 238:4 238:12,16,17 239:3
**tested** 143:4,5,7 203:9
**testified** 11:3 95:25 192:20 211:14 222:16
**testify** 194:19
**testifying** 88:21 243:8
**testimony** 9:24 11:16 32:15 97:21 99:15 104:18,24 105:20 114:24 115:4 121:13 218:10 222:10 240:25 242:4 243:12
**tests** 218:9,23 219:3 238:20
**textbook** 168:21
**textbooks** 168:17
**texts** 168:19
**thank** 9:17 11:19 13:16 15:16 23:17 24:18 142:1 151:21 162:21 201:3 231:8 240:20,21,22

Page 44

[theories - truth]

theories  47:2
theory  17:15 18:2
  18:6 19:21 20:3
  20:11,14,19,23
  21:3,7,11,12,14,19
  21:24 22:9,15
  23:5,16 62:14,15
  62:20,23,24 63:3,4
  63:7,10,16 168:16
thing  33:20 34:6
  56:16 85:17
  199:15 206:9
things  29:21 36:24
  45:12 47:5 48:22
  51:10 93:7 114:4
  115:23 149:10
  165:20 217:16
  226:21 234:5
  236:10
think  9:8,9,18
  17:23 22:19 23:2
  25:25 26:9 27:22
  28:11 30:1 32:4,7
  33:9,17,25 34:15
  35:1 38:16 40:18
  40:25 41:21 42:9
  43:5 44:10 48:11
  50:7 51:10 54:17
  55:19,22 56:13
  61:4 65:10 66:20
  69:12 74:9 83:21
  86:13 94:25 97:16
  101:16,18 106:11
  106:12 110:20
  111:2,22 112:14
  112:16 113:5,6
  118:11 120:12
  123:25 124:14
  126:13 127:15,22
  128:22 130:25
  131:25 134:22

135:24 136:11
137:12 138:11
140:19 141:1
144:1 147:6,9,13
148:6,6,16 150:22
154:6 155:1,8
156:13 157:18
158:15 159:4,9
160:18 163:25
167:10 168:2,3,6,9
168:11,24 169:5
169:16,22 170:22
172:5,8 176:23
178:8,14 179:5,15
179:17 181:19
186:11 187:6
188:13 192:20
194:17 204:11
207:16 210:19
211:2,6,21,22
214:18 215:21
217:4 218:6,8,12
220:7,11,20
221:22 228:13,20
231:3 234:12
235:1 238:5 240:2
240:5,5
thinking  113:4
  161:1
third  45:18,23
thomas  3:6 5:8 9:6
thought  12:17,19
  70:8 95:14 105:21
  106:4 112:10,14
  112:21 113:13
  128:10,15 140:5
  160:17 166:2
  185:18 208:20
  225:8
thousand  135:25

threat  160:6
three  143:5 176:16
  177:3 219:25
threshold  131:4
  144:15,16 212:10
tier  152:7,8 153:10
tiers  150:1 151:23
  152:4 153:19,23
  174:24 175:13
tightly  206:7
time  8:21 12:16
  13:19 18:3,4,15,16
  20:1,10,22 22:7,14
  63:23 91:7 95:23
  106:21 115:21
  120:12 124:1
  132:23 133:6
  172:7 183:17
  228:15 231:22
  240:12,15 241:3
  243:6 244:10,18
  244:24 245:7
tiny  148:10
title  107:3
today  11:11,16
  62:12 121:14,23
  175:3 218:10
  236:8
today's  240:25
todd  5:7
told  42:1 64:14
  86:17 96:14 127:5
top  64:3 133:23
  138:14 150:9
  153:5 208:12,21
  210:12 212:24
topanga  8:18
topic  185:3
total  108:24
  117:19 122:15
  128:19 241:1

tranches  94:12
transact  181:9
  182:5
transaction
  108:11 109:7,20
  122:13 132:14
  209:23
transactions  90:2
  91:11 110:2,15
  114:17 115:10
  116:2,16 117:23
  119:6 122:12
  132:16 135:15
  173:17,24 209:24
transcribed
  243:11
transcript  242:3
  243:12,14,16
  244:6,8,10,13,13
  244:21 245:2,2
translated  102:21
treated  237:13
treating  92:10
treatment  83:16
treatments  195:6
trees  12:19
trial  49:7 180:20
  180:22
trick  50:2 55:24
tricks  91:20
tried  133:9
trigger  145:24
trim  209:8
trouble  141:4
true  13:4,11 47:22
  51:20 54:11 88:12
  88:16 104:2
  148:16 242:5
  243:12
truth  10:1,1,2
  102:13 234:17,21

Page 45

**[try - unlawful]**

| | | | |
|---|---|---|---|
| **try** 77:8 83:22 194:19 | **u** | 70:11,16,20 71:21 73:15 75:12 77:17 | 238:10 |
| **trying** 23:4 41:7 41:12 46:6 56:7 136:5 238:23 | **uc** 67:9 **ucl** 7:7 54:7 57:15 59:3,13 64:7,11,15 64:22,24 65:12,16 | 80:7 84:11,24 86:11 88:19 99:21 100:4 104:9,16 115:11 116:11,15 | **understood** 64:14 140:16 182:2 205:16 **undertake** 154:25 |
| **turn** 39:12 80:20 91:23 98:9 106:25 133:19 144:3 149:21 150:24 162:18 165:21 169:24 173:2 182:19 190:14 196:2,4,16 202:10 208:8 226:22 232:1 | 65:17 66:11,18,23 67:3,9,11,19,24 68:20,23 69:6,10 69:19,22 70:2,13 71:7,11,16,23,23 72:3,7,11 73:13,24 74:8,14 **ucll** 71:11 **uh** 82:23 **ultimately** 46:5 | 121:12 127:5 131:1 138:24 141:15,20 149:14 174:23 175:1,4 177:17 191:1 201:4 204:1 212:5 212:6 218:2 224:2 229:18 240:10 **understanding** | **unexpected** 147:12 **unfair** 22:10,16 57:16 64:6,11,22 65:3,17 66:1,6 75:13 **unharmed** 105:3 130:13,21 139:9 147:16 148:1,21 |
| **turned** 96:17 99:15,19 101:11 | **un** 75:9 **unacceptable** 202:22 203:1 | 11:24 18:2 19:1,3 19:3,7,8,9 20:22 27:1 28:15 47:1 | 150:11 151:10 204:17 205:19 206:1 |
| **turns** 96:10 220:19 | **unaffected** 106:16 **unamended** | 51:2 52:4,18 57:24 59:21 60:7 | **uniform** 159:14,18 159:25 160:10,19 161:4,9,18 172:2 |
| **twice** 231:4 | 200:18 201:8,20 203:5 | 60:22 61:12,13 63:4 64:20 65:14 | 229:3 |
| **two** 13:20 59:5 71:2 79:10 81:20 84:19 85:4 87:2 117:10 129:6 130:1 133:23 134:1,11 140:1 142:5,19,20 146:18,22 149:10 162:8 214:10 215:7 220:6 227:24 232:19 233:15,19 234:8 234:11,23 236:4,9 236:9,9,10,12,20 237:25 238:13,24 | **unaware** 59:16 **unclear** 124:3 **unconcerned** 188:23 **uncorrelated** 214:2,3 **undercharge** 235:7 **undergraduate** 168:17 **undermine** 40:5 **understand** 18:5 21:1,14 22:3 23:5 | 66:4,9,12,19 67:5 67:8,12,13 68:7 71:9,15 72:10,14 72:22,24 73:5 74:7 75:4,7,24 76:12 89:1 94:23 95:8,9 98:4 99:23 105:12 106:1 113:21,23 114:15 115:25 117:11 126:15,16 131:22 138:5 145:8 151:25 171:14 176:8,13 178:2 | **unimportant** 99:24 **uninjured** 124:5,7 130:3 131:8,20 136:24 137:8 138:16 140:10 141:1,9 147:23 148:10,23 149:4 155:19 156:8 157:1 203:8,16,25 204:8 206:3,14 **uniquely** 182:15 **unit** 8:8 **united** 1:1 2:1 8:12 |
| **type** 38:9 51:3 70:12 195:2 238:17 | 25:9 27:25 28:5,7 32:5 34:5 45:22 46:6,8,14,24 47:9 | 180:22 185:13 186:1 191:5,8,10 192:17 193:21,23 | **units** 241:1 **universe** 135:20 205:4,5 |
| **types** 235:3 **typically** 75:5 | 47:25 51:8 52:24 57:8 59:3,10 64:10 65:25 66:16 | 198:17 226:19 229:13 237:23 | **unlawful** 57:10,16 59:19 60:17 62:6 64:6,21 65:9,15 |

Veritext Legal Solutions
866 299-5127

**[unlawful - way]**

66:2,7
**unlawfully** 75:9
**unmeasured** 36:12
**unnecessary** 90:8
  230:20
**unquote** 135:23
  213:3
**unreal** 139:13
**update** 31:20 32:4
  113:5
**upscale** 214:9
**upstream** 233:8
  236:13
**usage** 34:15
**use** 12:18 26:20
  32:24 33:4,24
  34:3,4,12 48:12,17
  58:21 61:2,5 63:2
  76:11 87:12,24
  106:7 114:5
  119:12 122:7,18
  123:2 124:4
  134:24 139:11,17
  142:23 151:14
  159:12 160:10
  164:7 173:8
  177:23 185:10
  194:14 201:8
  202:22 204:11,12
  210:12 213:25
  216:21,25 217:7,8
  217:15,22,22
  218:18 219:17
  220:6,10,16,17
  228:22 233:12
  239:14
**useful** 42:25
  124:15
**usefulness** 189:21
**users** 193:25

**uses** 185:15
  213:13 215:18,25

**v**

**v** 49:24 50:19 51:4
  53:15,15 237:9
**vague** 51:24
**vaguely** 117:13
**valid** 214:12
**values** 224:24
  232:12
**valve** 53:13,15
**variable** 168:1,4
  207:21 213:17
  215:5 231:17
**variables** 213:13
  214:1,2,14 216:11
  217:11,15,17
  232:12
**varies** 206:24
**variety** 27:23
  36:24 37:16 38:19
**various** 62:3 94:12
  117:5 185:5
  191:23 192:11
**venture** 119:23
**verbal** 80:1
**verifiable** 112:18
**verified** 138:19
  147:21 157:3
**verify** 90:15 110:3
  115:14,24
**veritext** 8:15,17
  8:20 241:2 244:7
  244:9,11
**versa** 182:1
**verse** 157:19
**version** 47:18
  56:17 101:10
  214:9
**versus** 37:12 60:11
  139:12 141:24

152:17 157:9
  232:25 233:1
  236:13
**vice** 182:1
**video** 1:14 2:16
  8:9
**videoconference**
  1:14 2:16 3:2 4:2
  5:2
**videographer** 5:6
  8:5,18 9:8,17
  44:16,20 88:5,8
  120:16,19 154:8
  154:11 190:7,10
  222:1,4 240:23
**vieira** 5:12 9:11,11
**view** 25:20,24,25
  30:19 36:24 37:1
  51:2 75:21 91:12
  93:12 96:9 118:9
  131:9 149:18,20
  160:15 163:5
  165:9,19 169:2,12
  172:16 174:14
  175:15 180:6,9
  183:10 203:18
  207:22 213:1
  222:8,16,22 226:8
  227:5 229:23,24
  230:20,24 239:9
**viewed** 75:9
**views** 21:5
**vigorous** 229:1
**violate** 64:6 65:15
  65:17 66:1,11,17
**violating** 66:2
**violation** 57:15
  66:23 67:3 72:2,3
  73:25
**virtual** 8:16 79:19
  79:19

**virtually** 24:1,13
  25:1,13,21 33:4,20
  33:24 34:4,16,22
  35:7,18 37:7
**visa** 185:24
**volume** 1:17 6:3
  210:20,21 211:7
  211:10
**volumes** 211:3,4

**w**

**wait** 54:3
**waived** 244:23,23
**waiving** 244:20
**want** 48:21 77:18
  80:22 82:11 89:7
  119:23 187:16
  201:5 205:15
  210:11 212:6
  217:17 226:4
  239:12,14
**wanted** 39:5 150:7
  223:17
**washington** 1:23
  4:9
**wavelength**
  198:16
**way** 11:21 13:23
  15:7 25:17 30:14
  80:4 85:9 86:10
  86:10 89:5,11
  90:3,3 93:4 95:5
  95:18 97:4,4 99:6
  99:9 101:9 106:14
  120:3 123:10
  127:18 128:2,3
  130:6 134:13
  147:11,12,14
  148:11 160:23
  167:15 171:8
  179:4 212:1 220:1
  223:24

Page 47

**[ways - zoom]**

| | | |
|---|---|---|
| **ways** 29:20 130:16 134:2,11,17 235:11 | **work** 62:24 80:8 106:8 185:3 210:5 221:7,10 238:22 | 90:14 96:5,5 99:8 136:6 231:13 236:18 238:6 |
| **we've** 11:9 44:11 87:17 154:5 179:19 190:3 221:21,22 222:20 226:18 | **worked** 14:6 82:13 96:10 106:1 151:16 198:9 211:15 240:11 | **wrong** 95:9 99:3 99:14 104:19 106:6 166:1 167:2 222:18 |
| **weak** 215:1,4,11 215:14,18 216:11 216:21,25 217:5 217:12,20,22 218:1,6,11,25 219:16 | **working** 12:13 13:25 | **wrote** 40:18 41:24 42:4 63:14,23 90:22 |
| | **works** 51:23 92:20 125:9 183:15 | **x** |
| **weakly** 215:4 | **world** 37:11,13 76:22,23 77:4 80:10 81:9,25 82:4 83:6,11 84:1 84:2,15 85:21,22 86:17 87:1 88:15 88:24 89:4,5,22 94:5 98:20 104:7 104:22 110:14 123:13 129:9 149:25 152:3,13 152:13 153:10 157:9,10,16 159:18,24 161:3 163:15 164:16,24 165:7 167:5,24 169:14,18 170:3 172:9,21 173:18 173:25 181:8 182:6 227:2 229:9 229:14 230:25 231:23 232:7,13 236:2 | **x** 6:1,8 7:1 243:16 245:9 |
| **web** 1:14 2:16 3:2 4:2 5:2 8:16 | | **y** |
| **week** 54:18 152:20 | | **yeah** 43:14 47:7 63:12 65:13 73:8 86:21 137:18 138:1 140:8 150:7 172:15 202:13 233:23 |
| **weigh** 152:16 | | |
| **welfare** 162:24 | | |
| **went** 14:14,24 75:16 | | **year** 122:10 144:19 145:7 171:21 183:7 |
| **west** 120:12 | | |
| **whafh.com** 3:11 | | **yearly** 133:24 134:8 |
| **whereof** 243:20 | | |
| **wife** 117:7 | | **years** 146:16 183:24 185:18 |
| **wildly** 225:24 | | |
| **willing** 182:17 | | **yesterday** 15:4 |
| **withdraw** 55:23 173:21 | | **ygr** 1:6 2:6 8:14 |
| **withstand** 158:19 | | **yield** 88:22 151:10 |
| **witness** 143:11 240:13,18 243:20 244:13,16 245:2,5 | | **york** 3:9,9 |
| | | **z** |
| **witness's** 240:11 | **worry** 153:25 186:4,7,12,13 | **zero** 79:8 80:22 82:13,22 90:7 225:2,6,13,18,24 |
| **wolf** 3:5 9:6 | **wrap** 84:10 | |
| **word** 74:15 107:14 108:25 177:23 | **write** 79:8 90:11 90:13 | **zetenyi** 5:13 |
| **words** 33:13 77:2 80:8,23 126:3 156:1 | **written** 42:10 77:15,16 80:13 | **zoom** 1:13 8:16 |

Page 48

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.