# EXHIBIT 92

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

In re Apple iPhone

Antitrust Litigation          Case No. 4:11-cv-06714

_____          YGR

ZOOM DEPOSITION OF DANIEL L. McFADDEN

(Reported Remotely via Video & Web Videoconference)

Berkeley, California (Deponent's location)

Monday, December 5, 2022

Volume 1

STENOGRAPHICALLY REPORTED BY:

REBECCA L. ROMANO, RPR, CSR, CCR

California CSR No. 12546

Nevada CCR No. 827

Oregon CSR No. 20-0466

Washington CCR No. 3491

JOB NO. 5601935

PAGES 1 - 271

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

In re Apple iPhone
Antitrust Litigation      Case No. 4:11-cv-06714
_____   YGR

DEPOSITION OF DANIEL L. McFADDEN, taken on behalf of the Defendant, with the deponent located in Berkeley, California, commencing at 9:04 a.m., Monday, December 5, 2022, remotely reported via Video & Web videoconference before REBECCA L. ROMANO, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter.

Page 2

APPEARANCES OF COUNSEL

(All parties appearing via Web videoconference)

For the Plaintiffs:

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

BY:  MARK C. RIFKIN

Attorney at Law

270 Madison Avenue

New York, New York 1016

(212) 545-4600

rifkin@whafh.com

and

KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC

BY:  KYLE WOOD*(admitted only in Maryland,

practicing in the District of Columbia under

the supervision of member of the firm)

Attorney at Law

1615 M Street NW

#400

Washington, DC 20036

(202) 326-7900

kwood@kellogghansen.com

/////

Page 3

APPEARANCES OF COUNSEL(cont'd)

(All parties appearing via Web videoconference)

For the Defendant:

GIBSON DUNN & CRUTCHER LLP

BY:  DANIEL G. SWANSON

Attorney at Law

333 South Grand Avenue

Los Angeles, California 90071-3197

(213) 229-7430

dswanson@gibsondunn.com

and

BY:  HARRY R.S. PHILLIPS

BY:  CYNTHIA RICHMAN

Attorneys at Law

1050 Connecticut Avenue, N.W.

Washington, DC 20036-5306

(202) 955-8500

hphillips2@gibsondunn.com

crichman@gibsondunn.com

/////

Page 4

APPEARANCES OF COUNSEL(cont'd)

(All parties appearing via Web videoconference)

For the Defendant:

GIBSON DUNN & CRUTCHER LLP

BY:  CAELI A. HIGNEY

Attorney at Law

555 Mission Street

Suite 3000

San Francisco, California 94105-0921

(415) 393-8248

chigney@gibsondunn.com

ALSO PRESENT:

Chanont "Big" Banternghansa, Ph.D., Analysis Group

Jennifer Brown, Director, Commercial Litigation at Apple

Nikhil Gupta, Cornerstone Research

Nathaniel E. Hipsman, Cornerstone Research

Maria Laurito, Ph.D., Analysis Group

Matt Riesdorph, Concierge Technician

JoAnn Yager, Videographer

Kristof Zentenyi, Analysis Group

/////

Page 5

2 (Pages 2 - 5)

INDEX

DEPONENT                    EXAMINATION
DANIEL L. MCFADDEN                    PAGE
VOLUME 1

        BY MR. SWANSON        13
        BY MR. RIFKIN        255
        BY MR. SWANSON        262

EXHIBITS

NUMBER                    PAGE
        DESCRIPTION
Exhibit DX0043 Supplemental Expert Report
        of Daniel L. McFadden in
        Support of Plaintiffs' Motion
        for Class Certification dated
        September 26, 2022;

Exhibit DX 0044 Email String Subject:  Re:        25
        In re Apple iPhone Antitrust
        Litigation (No.
        4:11-cv-06714-YGR);

/////

Page 6

EXHIBITS(cont'd)

NUMBER                    PAGE
        DESCRIPTION
Exhibit DX 0045 Figure 1:  Summary of App        27
        Store Transactions Data and
        Estimation Results (Without
        Standard Errors);


        PREVIOUSLY MARKED EXHIBITS
NUMBER                    PAGE
Exhibit 37                179

/////

Page 7

Berkeley California; Monday, December 5, 2022

            9:04 a.m.

            ---o0o---

        THE VIDEOGRAPHER:  Good morning.  We are        11:49:56
on the record at 9:04 a.m. on December 5, 2022.

        Please note that this deposition is being
conduct virtually.  Quality of the recording
depends on the quality of camera and Internet
connection of participants.  What is seen from the        12:04:44
witness and heard on screen is what will be
recorded.

        Audio and video recording will continue
to take place unless all parties agree to go off
the record.                                12:04:56

        This is Media No. 1 of the recorded
deposition of Professor Daniel McFadden in the
matter of In Re:  Apple iPhone antitrust litigation
filed in the United States District Court,
Northern District of California, Oakland Division.        12:05:10
Case No 4:11-CV-06714-YGR.

        This deposition is being conducted
remotely using virtual technology.

        My name is JoAnn Yager, representing
Veritext Legal Solutions, and I'm the videographer.        12:05:34

Page 8

The court reporter is Rebecca Romano from the firm        12:05:36
Veritext Legal Solutions.

        I am not related to any party in this
action, nor am I financially interested in the
outcome.                                12:05:45

        If there are any objections to
proceeding, please state them at the time of your
appearance.

        Counsel and all present will now state
their appearances and affiliation for the record,        12:05:52
beginning with the noticing attorney.

        MR. SWANSON:  Dan Swanson for Apple Inc.

        MR. RIFKIN:  And this is Mark Rifkin of
Wolf Haldenstein on behalf of the plaintiffs.

        MR. PHILLIPS:  Harry Phillips for Apple.        12:06:12

        THE COURT REPORTER:  Do you want to just
make the rest of the appearances stenographically?

        MR. SWANSON:  That's acceptable to us.

        THE VIDEOGRAPHER:  The witness will be
sworn in.                                12:06:38

        THE COURT REPORTER:  Dr. McFadden, if you
could raise your right hand for me, please.

        THE DEPONENT:  (Complies.)

        THE COURT REPORTER:  You do solemnly
state, under penalty of perjury, that the testimony        12:06:39

Page 9

3 (Pages 6 - 9)

you are about to give in this deposition shall be the truth, the whole truth and nothing but the truth?

THE DEPONENT: I do.

/////

Page 10

DANIEL L. McFADDEN    12:06:58

having been administered an oath, was examined and testified as follows:

MR. SWANSON: All right. Thank you.    12:07:01

Good morning, Professor McFadden.

Before we commence, I just needed to put on the record some developments that took place in the last couple of days that we have corresponded about with Mr. Rifkin and his colleagues.    12:07:17

On Thursday we received word from Mr. Rifkin that there were issues with Professor McFadden's report that required certain revisions. On Friday we received certain revised materials, including updated figures for the    12:07:34 supplemental report of Professor McFadden. We're told that further information regarding standard error calculations remains to be provided.

We have not been able fully review the materials that were sent on Friday, and of course    12:07:50 we can't review at all materials we haven't even received yet.

We're reserving all of our rights today to pursue questions about the revisions and their bases and implications at a subsequent deposition    12:08:03

Page 11

of Professor McFadden. By proceeding with the    12:08:08 deposition today and asking any general questions about the revisions we received on Friday, we're not waiving the right to a further deposition.

So that's it by way of preliminary    12:08:21 statement.

I don't know, Mr. Rifkin, if you have anything to add.

MR. RIFKIN: Mr. Swanson, only that we -- we certainly understand the -- the circumstances    12:08:30 and -- and we've explained the circumstances, the discovery of the use of some inconsistent data for one purpose. We recognize that it -- it may require additional deposition time, and we indicated that we would work with you to coordinate    12:08:52 that.

The only thing that I would add is as new as it is to you, it is virtually as new as well to Professor McFadden, and so while you may have some general questions about the revised calculations    12:09:06 today, Professor McFadden's responses will likewise be general and in all likelihood will be subject to revision as the complete calculations are -- are done and as the work continues to be done.

But, you know, we -- we thought and we    12:09:24

Page 12

told you and I think you understood that it was    12:09:27 best to proceed and -- and see what needs to be done in a subsequent deposition.

MR. SWANSON: All right. Thank you -- thank you, Mr. Rifkin.    12:09:36

EXAMINATION

BY MR. SWANSON:

Q. Professor McFadden, aside from these matters we've ventilated, is there any reason the    12:09:42 deposition can't go forward today at your end?

A. No.

Q. And you're not taking any medication or otherwise subject to any conditions that would affect or impair your ability to give complete and    12:09:56 accurate testimony today; is that correct?

A. I am not.

Q. Okay. So that is correct?

A. Correct.

Q. Thank you.    12:10:12

Now, we are going to mark for the record your supplemental report. It's in Exhibit Share. I don't --

Professor, do you have a hard copy in front of you?    12:10:27

Page 13

4 (Pages 10 - 13)

A. I have a hard copy of most of the 12:10:29 supplemental report. I did not reprint the résumé or the materials replied upon.

Q. Okay. Well, we have a complete copy that is in Exhibit Share. I probably will ask you a few 12:10:41 questions about those portions, so we can always shift to the electronic version for those purposes.

(Exhibit DX0043 was marked for identification by the Court Reporter and is attached hereto.) 12:10:52

MR. SWANSON: We are having marked in Exhibit Share as DX -43. That will be the next exhibit in order, as we understand it.

MR. RIFKIN: Yeah. Mr. Swanson, is that going to appear in the marked folder? 12:11:08

MR. SWANSON: It -- it should.

MR. RIFKIN: I have it -- it has. As soon I asked it, popped up.

MR. SWANSON: All right. Well, I'm glad.

MR. RIFKIN: Yup. 12:11:20

Q. (By Mr. Swanson) Okay.

So, Professor McFadden, free feel to consult either your physical copy or the electronic copy as may be the case with respect to the question. 12:11:33

Page 14

Professor, did you draft Exhibit 43 12:11:34 yourself?

A. One moment. I'm trying to figure out how to open the report.

MR. RIFKIN: So if you go under your 12:11:56 name, there's marked exhibits. If you click on that folder, it should -- there it is. Excellent.

And then you can zoom in on that, Professor McFadden.

THE DEPONENT: How do I make this -- 12:12:18

MR. RIFKIN: Hang on a second. Let me see if I can help.

(Discussion off the stenographic record.)

MR. RIFKIN: Mr. Swanson, did you say Exhibit 37 or a different number? 12:12:56

MR. SWANSON: It is marked -- marked as Exhibit 43. I think Exhibit 37 --

MR. RIFKIN: Give us a moment.

Here we go.

MR. SWANSON: Okay. 12:13:05

MR. RIFKIN: Yeah, no problem.

(Discussion off the stenographic record.)

MR. RIFKIN: Okay. We have it.

MR. SWANSON: All right.

MR. RIFKIN: Thank you. 12:13:39

Page 15

MR. SWANSON: No problem. Thanks. 12:13:40

Q. (By Mr. Swanson) So to -- to restate my question, Professor, did you draft your supplemental report yourself?

A. As in my previous reports, this was 12:13:50 prepared in collaboration with my support team at the Brattle, and the process was similar to the ones I used for the previous reports.

Q. Has the composition of your support team at Brattle remained the same? 12:14:11

A. The project manager remains Minjae Song, and by and large, I believe it's the same, but I haven't -- I don't have a specific count of people.

Q. All right. Were there particular portions of the supplemental report that you 12:14:39 contributed the first draft of?

A. I think specifically Appendix E was -- was composed by myself directly with -- with -- and only edited and commented by others.

Q. And the -- the report is described as 12:15:08 supplemental. What -- what does that mean, as you understand it?

A. My understanding is that in the court order of March of this year, the court asked for clarification and comments on a series of issues, 12:15:29

Page 16

and this report is a response to those specific 12:15:33 requests from the court.

Q. And is this report intended to be a supplement to your prior reports?

A. I'm not sure what the word "supplement" 12:15:59 means in this context. It's -- it's intended to be a reply to issues that the court asked clarification on in its March order.

Q. Are there any new opinions in this case that you hold that are not disclosed in your 12:16:20 supplemental report?

A. I'm not quite sure how to interpret the question. The supplemental report contains the opinions that are relevant to the issues raised by the court. I don't know if you classify those as 12:16:49 new opinions or clarification, but -- but that's -- that is the account of this report. That's its content.

Q. Well, has it been your intention to disclose all of your new opinions in the 12:17:06 supplemental report?

A. Well, as I indicated, this report is a -- a response to specific issues that the order asked to be clarified, and it's -- it's -- the purpose of this report is to provide that clarification, 12:17:31

Page 17

5 (Pages 14 - 17)

not -- not to offer new opinions.   12:17:34

Q. How can we tell if you still hold an opinion that appears in one of your prior reports?

A. As a general matter, I -- I -- I stand by the opinions that I expressed in my previous   12:18:10 reports, and where the court has asked for clarification or I have taken issues with those opinions, I have provided -- tried to be responsive in this -- in this supplemental report to these requests from the court.   12:18:29

Q. Are there any opinions that were in your prior reports that you no longer hold?

A. I don't -- I don't know how --

MR. RIFKIN: Well, can I just -- before you answer that, I just want to object, because I   12:18:52 think, Mr. Swanson, you referred to a prior report. There were, in fact, two prior reports.

MR. SWANSON: I think, Mr. Rifkin, you can just object to the form.

MR. RIFKIN: I object to the form.   12:19:08

Q. (By Mr. Swanson) Can you answer the question, sir?

A. The -- the answer is that the -- the supplemental report is -- is -- deals specifically with issues raised in the court's order, and so I   12:19:28

Page 18

think any -- any of -- judgment on my three --   12:19:38 three reports should be made in the context of the purpose of this supplemental report, which is to respond to those specific issues.

Q. So can you identify any opinion in your   12:19:55 prior reports that you no longer hold?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: It's -- it's too broad a question for me to answer. If you ask me about   12:20:10 specific opinions previously expressed, I can tell you whether I feel the need to change them or modify them at this point.

Q. (By Mr. Swanson) So you can't think of a single opinion from your prior reports that you no   12:20:29 longer hold?

MR. RIFKIN: Objection. Misstates the testimony.

THE DEPONENT: I did not come prepared to -- to answer a question at that level. I came   12:20:39 prepared to answer questions about the -- what I've done in the supplemental report, and if you have questions about how that's related to the previous work, I will try to answer those specific questions.   12:20:54

Page 19

Q. (By Mr. Swanson) So you're saying that   12:20:57 we need to go through the hundred of pages of prior reports line by line to determine if you still hold those opinions, one by one?

A. I think if there are issues about whether   12:21:16 any conflict between what I say in the supplemental report and the prior reports that you -- that you would have to bring those up one by one, yes.

Q. Are you aware of any conflict between the opinions in your supplemental report and the   12:21:30 opinions set forth in your prior reports?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I believe the court order asked me to clarify what the court considered to be   12:21:42 inconsistencies or -- inconclusive opinions in my prior report in the sup- -- the purpose of the supplemental report is to do that, so I would say that the specific topics of the supplemental report are clarifications of -- of opinions in the prior   12:22:04 reports.

Q. (By Mr. Swanson) As you sit here today, are you aware of any errors in your prior reports?

A. Well, there were -- there were issues raised by Apple to my original report which were   12:22:31

Page 20

addressed in my reply report. There are further   12:22:36 issues that the court asked to be clarified from the first two reports, and those are the subject of the -- the supplemental report.

Q. So you're not aware of any errors in your   12:22:56 prior reports?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I -- I believe I answered the question, which was if there were -- there were   12:23:06 issues in the original report. For example. Dr. Prince pointed out a -- a computer machine round-off issue with -- with the way observations were used of the sample, and that was corrected in my reply report.   12:23:30

So if -- the technical answer to your question is that there -- there were -- if there was an issue in the original report, I think it did require correction and that's been corrected.

Q. (By Mr. Swanson) Were there any other   12:23:45 errors in your prior reports that were not corrected in your reply report?

A. I do not have a list in mind. I have not prepared a list. But if you bring up issues, I will try to deal with them one by one.   12:24:05

Page 21

6 (Pages 18 - 21)

Q. Professor, are you reaffirming your 12:24:10 opinion on relevant market definition as set forth in your opening report?

MR. RIFKIN: I will object to the form of the question as raising issues that the court has 12:24:21 directed Apple not to raise.

But nonetheless, Professor McFadden can answer the question.

THE DEPONENT: I have not reconsidered the question of market definition in my 12:24:34 supplemental report, and so my -- my opinion on this has not been updated.

Q. (By Mr. Swanson) Professor, is it still your opinion that common economic evidence supports the conclusion that absent the allegation 12:24:53 misconduct, all or nearly all consumers of iOS apps or in-app content would have paid lower prices for their purchases?

MR. RIFKIN: Same objection as before.

THE DEPONENT: Again, this issue has not 12:25:10 addressed in my supplemental report, and I have not re -- reconsidered that opinion.

Q. (By Mr. Swanson) Is it still your opinion that your methodology demonstrates common impact? 12:25:24

Page 22

MR. RIFKIN: Same objection. 12:25:26

THE DEPONENT: And -- and basically the same answer. I have not addressed that issue in the supplemental report. It was not asked for by the court order, and I have not -- not updated that 12:25:36 opinion.

Q. (By Mr. Swanson) Is it still your opinion that common economic evidence demonstrates a quantifiable pattern of impact on all class members? 12:25:50

MR. RIFKIN: Same objection as before.

THE DEPONENT: To the extent that the court order asked for clarification on the issue of preponderance and -- and that's addressed in the supplemental report, my opinion is what is offered 12:26:10 in the supplemental report.

Q. (By Mr. Swanson) Professor, when you speak of the class or the purported class in your supplemental report, are you referring to the class as originally defined or to some redefined class? 12:26:36

MR. RIFKIN: Objection to the form of the question. It's compound.

THE DEPONENT: The supplemental report responds to a court question on preponderance by considering an alternative or a clarification of 12:26:59

Page 23

the definition of the class, and I was -- on the 12:27:06 direction of counsel or at the request of counsel, I have done computations in the supplemental report that deal with a -- a restriction on the members of the class who would be eligible for receipt of 12:27:20 damage or damage award, and it's -- it's a legal question I -- on which I have no expertise as to whether that, in fact, amounts to a formal redefinition of the class or associate classification of what the distribution rules are 12:27:38 within the class.

Q. (By Mr. Swanson) Are statements about the original class in your prior reports still valid when applied to any other class definition?

MR. RIFKIN: Objection to the form of the 12:27:57 question. I'm not sure I understand it. I don't know if the witness does.

THE DEPONENT: I -- would ask if you are referring to the -- the general classification of whether it's a common market, whether there's 12:28:11 common impact and so forth.

But I -- I believe the answer is, as a broad matter -- and we'd have to go item by item to clarify it -- that the -- the restriction that counsel asked me to consider would not affect those 12:28:29

Page 24

conclusions. 12:28:33

Q. (By Mr. Swanson) Okay.

MR. SWANSON: I would like to mark as Exhibit DX -44 the letter that Mr. Rifkin sent us on Thursday. That -- that should be in the 12:28:47 Exhibit Share facility.

(Exhibit DX 0044 was marked for identification by the Court Reporter and is attached hereto.)

Q. (By Mr. Swanson) If you can find that. 12:29:05 I understand that might be at tab 14, if it helps.

MR. RIFKIN: It's there. If Professor McFadden refreshes his screen, it should be there.

THE DEPONENT: Which -- I'm sorry. Where 12:29:18 do I need to go?

MR. RIFKIN: So if you go back to Exhibit Share, Professor McFadden, and you go in the upper left-hand corner, if you use the back arrow, it will take you back to the screen listing 12:29:30 all the exhibits. There you go. And if you hit refresh and then marked exhibits, see -- there you go. That should populate a new exhibit. At the bottom it should be Exhibit 44. Is it there?

There you go. 12:29:48

Page 25

7 (Pages 22 - 25)

MR. SWANSON: Thank you, Mr. Rifkin.          12:29:53

MR. RIFKIN: Not a problem. Glad to help.

MR. SWANSON: Okay.

MR. RIFKIN: And, Professor McFadden, if          12:29:59
you need to, you know to zoom in using that magnifier?

THE DEPONENT: Yes.

MR. RIFKIN: Good.

THE DEPONENT: I have this in front of          12:30:06
me.

Q. (By Mr. Swanson) Okay. Professor, have you seen this email before?

A. Yes.

Q. And are you aware that on Friday,          12:30:18
December 2nd, plaintiffs produced various materials to us purporting to correct figures in your supplemental report?

A. I'm -- I'm -- of course I should read what was done. In this letter are the links that          12:30:52
were provided in this letter, and I -- in addition, I was informed by counsel and my support team that this letter -- this had been sent, yes.

Q. And you're aware that revised figures were sent on Friday; is that correct?          12:31:13

Page 26

A. I -- I don't know the -- the exact timing          12:31:19
but I -- I -- it became available to me I think probably Saturday morning, so I -- that's -- that's the time frame in which I'm aware of.

Q. Okay. Let me ask you to go back to          12:31:33
Exhibit Share and look at the document we've marked as DX -45.

(Exhibit DX 0045 was marked for identification by the Court Reporter and is attached hereto.)          12:31:42

MR. RIFKIN: It hasn't populated yet, Mr. Swanson, so just give us a moment.

MR. SWANSON: Yup.

MR. RIFKIN: Still not there.

Harry, you want to check to make sure          12:32:08
it's been posted? Oh, now it's shown up. We're good.

MR. SWANSON: Okay.

MR. RIFKIN: Thank you.

Q. (By Mr. Swanson) All right. Take a          12:32:19
moment, Professor, to familiarize yourself with that. It's only, I think, about eight or nine pages.

A. Yes, I have a hard copy of this. And if you don't mind, I will use the hard copy instead of          12:32:32

Page 27

trying to read the screen.          12:32:36

Q. No, I'm sure that's preferable.

And for the record, could you describe what -- what this is?

A. Are you asking for a description of          12:32:47
the -- so the details of the exhibits or -- or why these exhibits are here at all?

Q. Well, just -- just a foundational description so we can talk about it in more detail. Is -- is this the set of revised figures that you          12:33:00
understand the plaintiffs produced to us?

A. Yes. At least -- at least looking at the first one, it's -- it's the set that I received several days ago, yes.

Q. Okay. So this consists of partial or          12:33:29
wholly revised versions of your figures from your supplemental report, numbers 1, 2, 3, 4, 5, 6, 8, and 9, as well as a figure that's denominated paragraph 105.

Is that -- is that a fair statement?          12:33:55

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: That -- that is consistent with what I have, yes.

Q. (By Mr. Swanson) Okay. And there is no          12:34:10

Page 28

revised version of figure 7, 10, or 11 from your          12:34:13
supplemental report; is that correct?

A. That will take me a minute to -- to check.

MR. RIFKIN: While he does that, note my          12:34:30
objection to the form of the question.

THE DEPONENT: Yes, there is no revision to figure 7, and there -- there is no revision to figure 11, but the -- errors of revision to paragraph 105, and I believe that is a related          12:35:08
matter.

Q. (By Mr. Swanson) And there's no revision to figure 10 from your supplemental report; is that right?

A. That is correct.          12:35:24

Q. I'll come back to these revised figures in a bit, but I wanted to go through some other preliminary matters.

While we're -- while we're talking about revisions or errors, have -- have you identified          12:35:39
any other errors or omissions in your supplemental report that you or your counsel have not disclosed?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: My understanding is that          12:36:01

Page 29

8 (Pages 26 - 29)

these -- these calculations are -- are making these    12:36:06
calculations consistent has -- requires these --
these additional -- these additional table
revisions. And there will be places in the text
which have numbers that were taken from the tables,    12:36:23
and that -- those have not been updated yet.
So that they -- the -- there will be
revision of some of the text to reflect these --
these tables.
If the purpose of your question was to    12:36:40
ask whether there's -- some other area where there
are identified corrections or admissions, I'm
not -- no, I'm not aware of anything else.
Q. (By Mr. Swanson) Okay. Well, thank you
for clarifying that.    12:36:57
When do you plan to revise the text of
the report?
A. I haven't -- that -- that -- I have not a
schedule at this point. I understand that -- that
standard error calculations that are going on    12:37:15
that's a lengthy calculation and that it will take
some time to complete that, and I am -- counsel has
not given me instructions on how that will be
handled, whether there -- there would be a
supplemental to the supplement or how that -- form    12:37:35

Page 30

that would take. And I don't know on the schedule    12:37:39
that would be either. It depends pretty clearly
on -- on the point at which the -- the standard
error calculations are complete.
Q. All right. Well, thank you. We'll come    12:37:53
back to that as well.
But stepping -- stepping away from that
for a moment.
How many hours have you spent on this
case since your deposition, which I believe was    12:38:07
more than a year ago?
A. I don't have an exact number. I can only
give you a -- a rough ballpark number, but I would
say very roughly five weeks.
Q. Okay. Let me ask you to put your    12:38:26
supplemental report in front of you and flip to
page 2, paragraph 5.
A. I have that in front of me, yes.
Q. All right. Thank you.
Paragraph 5 starts with the statement    12:39:07
that "Counsel for consumer plaintiffs asked me to
prepare this report to address these issues."
You're referring there to the issues set
forth in paragraphs 1 to 4?
A. Correct.    12:39:25

Page 31

Q. And these are the issues that the court    12:39:25
had with your methodology and opinions, correct?
A. That's -- that's my -- was my reading,
but most importantly, that was -- that was the
instructions of counsel.    12:39:36
Q. How did you determine which issues the
court had with your work?
A. Counsel advised me on the -- what they
felt needed to be done, the assignment to respond
to the court.    12:39:59
Q. Would there any issues the court had that
you left out of paragraphs 1 through 4?
MR. RIFKIN: Objection to the form of the
question.
THE DEPONENT: Paragraphs 6 and 7 also    12:40:27
address issues shown for which I give responses in
this supplemental report.
Q. (By Mr. Swanson) Okay. Well, were there
any issues that -- that the court had that you left
out of paragraphs 1 through 4 or 6 and 7?    12:40:54
MR. RIFKIN: Objection to the form of the
question.
THE DEPONENT: The answer is that -- that
I'm -- I'm not a lawyer. I -- I -- I do not have
an independent legal opinion of what the court    12:41:14

Page 32

order required. But on -- on the assignment of    12:41:18
counsel, these are -- these are the issues that the
court raised.
Q. (By Mr. Swanson) Were there any issues
the court raised that -- that you couldn't    12:41:28
understand?
MR. RIFKIN: Objection to the form of the
question.
THE DEPONENT: I found -- I found the
court's requirements, thanks to which -- I could    12:41:45
respond, yes.
Q. (By Mr. Swanson) Were there any issues
the court raised that you disagreed with?
A. In my view, the court is the referee in
this process, and they the -- they get to respond    12:42:05
what they want, and I'm trying to respond to it.
Q. Is it your opinion that you have now
fixed all of the flaws that the court identified in
your past reports?
MR. RIFKIN: Objection to the form of the    12:42:19
question.
THE DEPONENT: Please repeat the
question.
Q. (By Mr. Swanson) Is it your opinion that
you have now fixed all of the flaws that the court    12:42:25

Page 33

9 (Pages 30 - 33)

identified in your past reports?    12:42:28

A. I'm sorry --

MR. RIFKIN: Same -- same objection.

Before -- before you answer.

THE DEPONENT: All right. I can't -- I'm    12:42:35 not understanding. It's garbling the words or something, so I'm not getting the sentence.

Q. (By Mr. Swanson) Okay. Let me try again.

Is it your opinion that you have now    12:42:43 fixed all of the flaws that the court identified in your past reports?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: My -- my opinion is that    12:42:57 the supplemental report addresses the clarifications asked for by the court.

Q. (By Mr. Swanson) Back to paragraph 5 of your supplemental report. You state that counsel also asked you to address the court's concern    12:43:25 regarding the percentage of uninjured class members discussed on pages 22 to 25 of the class certification order.

Do you see that?

A. Yes.    12:43:37

Page 34

Q. Did you review that portion of the order?    12:43:38

A. I read it, yes.

Q. What did you understand the court's concern to be, as expressed there?

MR. RIFKIN: Objection to the form of the    12:43:50 question.

Do you want to show him the -- the court's decision or do you want him to do this from memory?

MR. SWANSON: Mr. Rifkin, you are making    12:43:58 a lot of speaking objections, so let's see if we --

MR. RIFKIN: I disagree. I disagree with that.

MR. SWANSON: Well --

MR. RIFKIN: And I -- and I have tried    12:44:04 not to.

MR. SWANSON: Well, we're going to go to the magistrate judge if it keeps up.

So I'm going to ask the question again. You can state your objection to the form and then    12:44:13 we'll move on.

Q. (By Mr. Swanson) Professor, you state that counsel also asked you to address the court's concern regarding the percentage of uninjured class members discussed on pages 22 to 25 of the class    12:44:25

Page 35

certification order.    12:44:30

What did you understand the court's concern to be in those pages?

MR. RIFKIN: Same objection.

THE DEPONENT: I would have to review it    12:44:40 to -- to describe that in any detail, but broadly, it's the -- it's the issue of preponderance of harmed members in a class, and the rest of that's in class certification procedures on what the portion of a class has to show harm in order to    12:44:57 meet the criterion for preponderance.

Q. (By Mr. Swanson) Do you understand the court to have been concerned about the percentage or the absolute number of uninjured class members?

MR. RIFKIN: Objection to the form of the    12:45:17 question.

THE DEPONENT: I -- I do not know how the court does this, but in -- the -- the decisions that I've been -- read about, have been told about, it's normally discussed in terms of the percentage    12:45:39 of the class in terms of -- of whether the criterion for preponderance is met.

Q. (By Mr. Swanson) Do you have an opinion as the economist as to what the more relevant criterion is for assessing preponderance,    12:46:02

Page 36

percentage of the class that is unharmed or the    12:46:05 absolute number of class members that are unharmed?

A. I -- I don't have -- I don't have an opinion on -- on what -- what the legal standard would be. But just from -- from a point of common    12:46:27 sense, it seems to me that whatever the legal standard is, it would be applicable to and even-handedly to both large classes and small classes, and that would suggest a percentage.

Q. Professor, can you turn to paragraph 9 of    12:46:53 your supplemental report.

Are you there?

MR. RIFKIN: I think he asked if you were at paragraph 9 of your report.

THE DEPONENT: I am.    12:47:33

Q. (By Mr. Swanson) Okay. In paragraph 9, you indicate that Appendix B lists the materials that you rely on in preparing your supplemental report; is that -- is that correct?

A. That's correct.    12:47:46

Q. And that list is at pages 60 to 63 of your supplemental report?

A. In order to answer that question, I'll have to go to the -- to the exhibits, your exhibits.    12:48:06

Page 37

10 (Pages 34 - 37)

Q. Yeah, please do.    12:48:07

A. That was Exhibit 43; is that correct?

Q. Exhibit 43 is correct, and the first page of Exhibit E is page 60.

A. Yes, I have that, and it is indeed pages    12:49:16 60 through 63.

Q. All right. Thank you.

Is this a list that supplements the list of relied-on materials from your opening and your reply reports?    12:49:30

A. I believe so, but I would have to go back and compare it with the materials relied upon in the previous reports to confirm that.

Q. Well, between those three lists, has it been your intention to identify all documents and    12:49:52 information that you relied on in connection with forming the opinions in your reports?

A. Yes. As I've testified in the previous deposition, what I have asked my support team to do is to include all -- all documents that I relied    12:50:15 upon or had them collect for me for possibly relying upon. So it's -- it maybe a superset of the ones that I actually relied upon, but it should include all documents that I did actually rely upon.    12:50:37

Page 38

(Discussion off the stenographic record.)    12:50:38

Q. (By Mr. Swanson) I was asking Professor McFadden to look at the -- the heading "Expert Reports" on page 60.

Do you see that down the page?    12:51:22

A. I do, yes.

Q. You list the report in this case of Dr. Abrantes-Metz, correct?

A. I do.

Q. Are you relying on any draft of that    12:51:34 report created prior to the final version?

A. No, I am not.

Q. If you turn to page 61. You at the bottom of that page list three produced documents.

Do you see that?    12:51:59

A. I do.

Q. Do you know what those are?

A. They correspond, as I recall, to eight files of transactions, but I would have to go back and check with staff to verify that my memory is    12:52:21 correct.

Q. Okay. Well, that sounds about correct to me.

Do you rely on any other produced documents for purposes of this report?    12:52:33

Page 39

A. I don't -- not that I -- not that I'm    12:52:49 aware of, no.

Q. Okay. Are you aware that a consumer class has been certified against Google for alleged antitrust violations with respect to conduct in    12:53:01 connection with the Google Play Store?

A. I am.

Q. Have you reviewed the court's decision in that -- in that matter?

A. No. I was -- I was informed that there    12:53:18 was a decision, but I don't -- I have not reviewed it myself.

Q. Are you relying on any expert reports or other materials or information from that class certification proceeding?    12:53:30

A. No, I am not.

Q. Are you relying on any information or materials or document from that case in general?

A. Not insofar as I'm aware.

Q. You can turn to page 63 of your    12:53:57 supplemental report. I'm going to ask you a question about your list of textbooks.

Let me know when you're there.

A. Yes.

Q. Do you consider these to be authoritative    12:54:18

Page 40

texts in the area of statistics and/or    12:54:21 econometrics?

A. I would say some of them are -- are standard text within the central reach of econometrics and some of them are specialized to    12:54:43 specific issues.

Q. And the text by Timothy Sauer, is that "Numerical Analysis" with an L instead of an N?

A. I would have to go back and check. I -- I don't know.    12:55:09

Q. Are you aware of anything called "Numerican Analysis"?

A. No. It's a new word to me.

Q. Okay. You can --

MR. RIFKIN: Mr. Swanson, we've been --    12:55:20 we've been going about an hour, and I'd like to -- if you don't mind, I'd like to take a break at about that point. I don't know if you were at a place where it makes sense to stop or if you have a question or two more, but I'd like to try to take a    12:55:31 break roughly every hour.

MR. SWANSON: Yeah, I'm in favor of that. I don't think we've gone an hour yet, and I'm -- I've got a couple more questions on this before a break, but --    12:55:40

Page 41

11 (Pages 38 - 41)

MR. RIFKIN: Yeah. Go ahead. 12:55:42

MR. SWANSON: -- another couple minutes.

MR. RIFKIN: Okay. We can do that.

MR. SWANSON: Yeah. Okay.

Q. (By Mr. Swanson) And, 12:55:49 Professor McFadden, if you want to take a break at some point other than when counsel asked for one, please let us know.

Professor, did you interview anyone at all in connection with the case to date? 12:56:00

A. Could you clarify by -- by what you mean by -- by "interview"? Do you -- do you mean have I talked to other experts or -- or -- or to just my staff? Obviously I talked to my staff.

Q. Right. 12:56:28

Excluding counsel and your staff, have you interviewed anyone about factual issues in this case?

A. No.

Q. And aside from your staff and counsel, 12:56:45 have you discussed your opinions in this case with anyone since your last deposition?

A. No.

Q. And then just to wrap us up before the break, I wanted to ask you about Appendix A to your 12:57:03

Page 42

supplemental report. You can look to that. That 12:57:07 starts at page 40.

A. Yes, I have this in front of me.

Q. Okay. And this -- and this is your curriculum vitae, correct? 12:57:37

A. Correct.

Q. And it has been updated, I take it?

A. My recollection is that I updated it in the -- in the few weeks before this submission of the supplemental report. 12:57:53

Q. Okay. And is an up-to-date list of your expert testimony and consulting set forth starting on page 58?

A. I have that in front of me, yes.

Q. Okay. Is that an up-to-date list of your 12:58:39 expert testimony and consulting?

A. Yes.

Q. I gather you did not testify on the recent trial in the U.S. Airways versus Sabre case; is that correct? 12:58:55

A. I'm sorry. Again, please name the case.

Q. U.S. Airways versus Sabre.

A. You're asking is that -- I testified in the original trial. I have not been involved. I understand that that was remanded to the court, but 12:59:20

Page 43

I have not been involved in it. 12:59:25

Q. Do you know if another expert took your place in the second trial on the remand?

A. No. I have not followed the case at all.

Q. What was your role in the first trial? 12:59:40

A. It's been sufficiently long so I -- I don't remember any details about the case, but I -- I do remember calculating the -- the impact of changes in -- in the rules which might apply if -- if Sabre had not had restrictions in place on how 01:00:16 airlines could sell tickets.

Q. (By Mr. Swanson) Okay, Professor. Thank you.

MR. SWANSON: Why don't we take that break now, Mr. Rifkin. 01:00:33

MR. RIFKIN: Thank you very much. Appreciate it, Mr. Swanson.

And, Matt, if you can send us to a breakout room.

THE VIDEOGRAPHER: Going off the record. 01:00:42 The time is 10:00 a.m.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record. The time is 10:11 a.m.

Q. (By Mr. Swanson) All right. Professor, 01:00:45

Page 44

turning back to the exhibits we previously marked 01:00:46 as 44 and 45.

Mr. Rifkin indicated in the email that we marked as Exhibit 44 that there was an error in the way that apps were classified in genres for 01:00:49 purposes of your analyses.

Can you describe that error?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: My understanding is that 01:00:52 Apple classifies apps by genre such as games, music, entertainment, sports, and so forth and that in the successive data productions to the plaintiffs in this case, at least in the most recent production, some apps were reclassified from 01:00:57 one genre to another, and there is a question of how to handle apps that -- whose genre has changed.

I -- I do not have an opinion on how they should be done. It's -- in the -- in the -- first instance, it's basically Apple's decision, not 01:01:03 really described in any -- in any -- to us as to how they classify apps by genre. But we -- we take Apple's data as it comes and try to work with it.

The -- the letter that came with the last Apple production said to update data with the data 01:01:10

Page 45

12 (Pages 42 - 45)

in the last production if it conflicted in any way 01:01:11 with previous productions, and apparently that was intended to include genre classification, although -- although I must say it's not clear to me whether it actually should have been. That is 01:01:15 to say, on any given app that's been reclassified, I don't know if that's because the app itself changed its character substantially or Apple changed its rules for how it does classification. I don't any details about that. 01:01:20

Now, in terms of how that affected what we've done, we took the last production data. We were on a short timetable. We tried to update, but there was a consistency -- inconsistency which appeared recently in that not all of our code and 01:01:26 analysis updated to the latest genre classification for all apps, so that this letter is essentially a -- a statement that -- that we -- found this -- found this problem of reclassification or genre in exchanges with defendant's technical people, and we 01:01:32 agreed that it -- that it probably -- it's best to be consistent and use the latest classification consistently through all -- all our analysis. And the -- the letter states that that's what we were trying to do. 01:01:38

Page 46

Q. (By Mr. Swanson) Professor, when did you 01:01:38 personally first learn about the genre classification issue?

A. I would say that just before Thanksgiving, I learned from my staff that our 01:01:41 technical staff and I believe it was Cornerstone's technical staff working for the defendants were having difficulty getting the same code to produce the same results, so that there was some issue. And I took -- I understand as a -- not as a direct 01:01:46 participant in this that it took some time to figure out exactly what the source of that problem was.

And I would say it was sometime last week when -- perhaps Wednesday or Thursday that staff 01:01:50 reported that it was, in fact, due to this genre classification issue and -- and that we, in fact, had not done all our analysis using the updated genres. We did several pieces of it, but not -- not all of the pieces. 01:01:56

Q. And when you say "just before Thanksgiving," do you mean the Wednesday before Thanksgiving?

A. In terms of when I originally -- was originally told that -- that there was a -- a 01:01:59

Page 47

unresolved technical issue in the data production 01:02:00 and analysis, I would say it was sometime in mid-November, but I don't have a specific -- a specific date in -- that I recall.

Q. Okay. So it may have been a week or two 01:02:04 before Thanksgiving?

A. I simply don't -- I don't remember now.

Q. Why did you think it was just before Thanksgiving if you can't remember?

A. Well, because -- because it came fairly 01:02:09 recently. That is to say this -- the -- at -- at -- the first -- the first I was told about it, it seemed like a -- a machine incompatibility, possibly, so that -- my first reaction when I heard that -- that they were having -- my staff was 01:02:15 having trouble reconciling technical issues with Cornerstone's technical staff, my first question was are -- are they using similar computers and data processing software and are there some issues with that, and my team reported that they would 01:02:20 investigate that and they were delivering -- exchanging data with Cornerstone to try to determine the source of all this.

So that was where I stood. It was only -- it was only quite recently that -- it 01:02:25

Page 48

was -- appeared that the machines were not 01:02:26 responsible for it, that there was something else responsible for it.

Q. Do you have an understanding as to who chooses the classification of an app, the developer 01:02:29 or Apple?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: The answer is I -- I don't -- I actually don't know. I don't know who 01:02:32 does it.

Q. (By Mr. Swanson) Is it important to your opinions to know the answer to that -- that question?

A. I would say at a technical level, I'm 01:02:36 working with the assumption that the genre identification reflects the type of app and -- and the margin of cost of -- of operating that app, and that is something that varies by -- by genre.

So I would say that in that -- in that 01:02:41 sense, a classification -- a reclassification would have -- does -- could and -- and may have some effect on -- on -- on the results.

Q. Do you view it as important to resolve this classification issue in a -- a consistent way? 01:02:46

Page 49

13 (Pages 46 - 49)

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I don't know if I -- the -- the question is is it important. I'm not -- important for what for purposes? I think as a question of doing work soundly, one should work with the best data one can get with the best understanding one has of it, and if a gender -- sorry -- genre reclassification required modification, I think it's better to do it, yes.

Q. (By Mr. Swanson) Professor, in Exhibit 44, Mr. Rifkin states that "Brattle used the most recent genre of classifications with a single 0.1 percent sample used for the price tier analysis (Section VII and Appendix D) and for the full data to which the average coefficients are applied for damages calculations."

Is that statement correct?

A. That is consistent with what I understand to be the case in terms of -- of updating figures.

Q. Are you sure that you applied the most recent genre classifications for your price tier analysis?

A. The price tier analysis was not -- was done with the original -- one-tenth of 1 percent

Page 50

sample, so that the -- was there an impact of -- my understanding is that that -- my understanding is that that analysis used the -- the most recent genre classification.

Q. Professor, Exhibit 45 has the revised figures that were turned over. Do those figures correct only for the genre classification issue?

A. I believe this letter points -- points out that genre re- -- reclassification was an issue. It also pointed out that there was apparently some coding issue with the -- with the computation of standard errors. The tables that have been reproduced, in -- in my understanding, correct for the -- the genre reclassification. The standard error corrections have not been completed.

Q. Do you plan to make other corrections or revisions to the figures or analysis in your supplemental report other than the calculation of certain standard errors statistics?

A. No, not -- not at this point.

Q. To update the analyses in your report to reflect the most recent genre classifications, was it necessary for you or your Brattle team to process the -- the 75 .1 percent samples again?

A. Yes.

Page 51

Q. Do you know how long it took the Brattle team to process those samples again?

A. No, I don't have the number.

Q. Do you know if it was more than five days?

A. I -- I didn't ask, so I don't know when was this started.

Q. Well, do you have any understanding as an econometrician how long it should take Brattle to reprocess 75 of the samples?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: This is not an econometric issue. This is a -- a large-scale data processing issue, and I -- and I would yield to data processing and computer cloud experts as to how long these computations take.

Q. (By Mr. Swanson) So you don't hold yourself out as an expert in data processing?

A. I do not hold myself out as an expert in cloud computing and the technical operation of computers.

Q. So you have no idea how long it takes to process the 75 samples?

A. The answer is that -- that's something I

Page 52

can -- ask my staff, but I have not done that.

Q. So you have no understanding whatsoever about how long it takes?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Obviously, if this issue was -- was uncovered sometime in November, middle to late November, and today is the 5th of December, the revision happened within that time interval.

Q. (By Mr. Swanson) So it may have taken as long as two weeks to process the 75 samples?

A. What I'm aware is that the very extensive time required in -- in this analysis is to do the damage calculations on the full population of app IDs and the full population of -- of accounts.

The -- the demand model estimation is a much -- a considerably less -- not trivial, but considerably less insensitive computer calculation.

Clearly, it was done within a few weeks, I think probably less than two weeks.

Q. In his letter, Exhibit 44, Mr. Rifkin also wrote that "in some limited number of cases, the bootstrap analysis code used to calculate the standard errors of coefficients did not use all the

Page 53

14 (Pages 50 - 53)

150 bootstrap results, whereas Professor McFadden's supplemental states that all 150 results were used."

Is that correct?

A. That's correct. There is -- there was a coding error discovered after my report was submitted, I think, again, quite recently, and that's -- that's -- those calculations -- recalculations to correct that coding error are on the link.

Q. In those cases where you actually did not use all 150 bootstrapped results, do you know how many were actually used?

A. No, I don't know the details.

Q. That's not something you've inquired about?

A. I -- I'm -- I'm awaiting the -- the standard error calculations. There is -- there is, of course, other information available from the record of the 75 estimates, and I -- that's not subject to this coding problem, and I -- and I rely on those.

Q. Did you discover the coding problem?

A. Personally, no. I did not.

Q. Did you supervise the coding in any way?

Page 54

A. I would say that the -- the application of bootstrap was done under -- under my direction, and the technical details of this implementation were -- were left to technical programmers. And that's not -- that's not an area in which I have sufficient expertise to -- to supervise day-to-day coding.

Q. Mr. Rifkin also writes in Exhibit 44 that "because of the extraordinary amount of computer time necessary to complete the calculations, it is not possible to derive standard errors using a bootstrap analysis for all 75 .1 percent samples before Professor McFadden's deposition takes place."

As you sit here now, have you derived standard errors for all 75 .1 percent samples using data corrected for the genre classification issue?

A. No, I have not. My understanding is that these calculations are on point and that they take weeks.

Q. So you do have an understanding as to how long these calculations take to process, correct?

A. Well, I would say at -- at about the same granularity. I know that the estimation was -- the model is less than a week, and I know that the --

Page 55

the damage calculation is multiple weeks.

Q. Will you expect to be able to derive these standard error calculations before January 13th of next year?

A. I -- I do expect that. Obviously I need to consult the staff as to -- to its progress and their expected time of completion, but that's my understanding -- my expectation is that, yes, that will be completed before then.

Q. Okay.

Now, there are some quite substantial changes reflected in your revised figures in -- in Exhibit 45, are there not?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I would say that the -- we can discuss this figure by figure, but I -- I -- it's just surprisingly few changes, in my opinion.

Q. (By Mr. Swanson) You found surprisingly few substantial changes?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I found, for example, that for games, very -- very little change as a result of the genre misclassification. For music and

Page 56

entertainment, there's more -- larger changes. Apparently more reclassifications led to perhaps moving out of the music and entertainment genre into other genres.

Q. (By Mr. Swanson) In figure -- in your revised figure 3 in Exhibit 45, you have an IAP coefficient estimate for music and entertainment for the IAP price of negative .75.

Do you see that?

MR. RIFKIN: Can -- can we ask that you direct us to which figure you want us to look at? I'm sorry.

MR. SWANSON: Yes. Figure 3, revised figure 3.

MR. RIFKIN: Sure.

THE DEPONENT: Yes, I have that in front of me.

Q. (By Mr. Swanson) Okay. And in the original figure 3 for your supplemental report, you gave an estimate of negative 1.74 for that coefficient, correct?

A. Correct.

Q. So your revised estimate is less than half the magnitude of your original estimate, correct?

Page 57

15 (Pages 54 - 57)

A. It's definitely less.    01:05:44

Q. Didn't you conclude in your supplemental report that the standard error for your original estimate was not large?

A. I'm sorry. Please ask the question    01:05:46 again.

Q. Didn't you conclude in your supplemental report that the standard error for that original negative 1.74 estimate was "not large"?

A. Well, I -- it's true. It's not large    01:05:50 relative to the estimated coefficient.

Q. And did the standard error for that original estimate suggest that you would find a result that you now set forth as your opinion, namely, negative 0.75?    01:05:54

A. Please, again. Ask the question again.

Q. And did the standard error for that original estimate suggest that you would find a result like you have today that is set forth as your new opinion in revised figure 3, a new    01:05:58 coefficient estimate of negative 0.75?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Oh that's -- that's an apples-to-oranges comparison, because the original    01:06:02

Page 58

standard error was a figure which addressed the    01:06:03 statistical accuracy of the estimates for the -- the given data. With the genre revision, you're dealing with a completely new set of data, at least in terms -- in terms of there are clearly    01:06:08 differences in the data in -- in that genre classification. So it's -- it's simply not -- not relevant.

Q. (By Mr. Swanson) So do you take comfort from the fact that, as you testified earlier, your    01:06:12 game genre coefficients didn't change appreciably?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: It's not a question of comfort at all. It's simply a question of -- you    01:06:15 asked did -- did things change substantially, and I would say that for games, they did not change substantially as a result of the genre reclassification. But for music and entertainment there were some changes, yes.    01:06:21

Q. (By Mr. Swanson) Do you know how many apps had genres that changed either into or out of the music and entertainment genres in your corrected results?

MR. RIFKIN: Objection to the form of the    01:06:25

Page 59

question.    01:06:26

THE DEPONENT: I -- I do not have that number.

Q. (By Mr. Swanson) Do you have any rough estimate?    01:06:27

A. No, I don't. I -- I haven't -- have not -- I asked about it, but the staff, I haven't -- the computation has not yet been done.

Q. Okay. Is that an important figure in your analysis?    01:06:32

A. I would -- I would say that not -- not directly, no. I mean, obviously what's important for the analysis is that for whatever genre classification, you know, Apple -- Apple uses which is -- is deemed appropriate for this analysis,    01:06:36 one -- one just works with that.

Q. Professor, you now have full transactional data through April 2022, correct?

A. Correct.

Q. And that means you have now got data for    01:06:40 many billions of additional transactions, correct?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Correct.

Q. (By Mr. Swanson) In your review, are    01:06:43

Page 60

your econometric results more reliable because of    01:06:44 the additional transactional data that you have now?

MR. RIFKIN: Objection to the form of the question.    01:06:47

THE DEPONENT: I don't think it's a question of reliability. That is to say, the -- the econometric analysis should be based on the best available data, and with the updated transactions record that's clearly a more    01:06:51 comprehensive set of data. Whether it's appropriate to do the analysis with those data, I believe that's the case.

Q. (By Mr. Swanson) Have you tested the assumption that the demand is the same over time?    01:06:55

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I was not asked to do it. It was not raised by the court. I -- I have not done that in the supplemental report.    01:07:00

Q. (By Mr. Swanson) Do all the estimates that you now derive from your model using the bigger dataset fall within the confidence intervals for the corresponding estimates you generated using your prior smaller dataset?    01:07:04

Page 61

16 (Pages 58 - 61)

A. That's a very broad question. I would have to take it result by result.

And in any case, once again, estimates and standard errors on the -- on the previous dataset are -- are not relevant to the question of whether -- whether an expanded dataset there with an economist one -- as I said before, I think it's better to use the expanded dataset.

Q. I didn't follow what you said in your prior answer. You said that the estimates and standard errors on the previous dataset are not relevant to the question of whether -- and then you shifted to saying "an expanded dataset there with an economist one." It seems a bit garbled.

What -- what, in your view, are the previous estimates and standard errors in the previous dataset not relevant to?

A. The previous standard errors are relevant to the question of statistical reliability of the model fitted to that dataset.

And I do not think it's important to ask whether estimates from the new dataset are or are not within confidence balance established on the -- on the more limited dataset. That's -- that does not strike me as being a sensible statistical

Page 62

calculation.

Q. Can you turn to footnote 74 of your supplemental report. It's found at the bottom of page 24.

MR. RIFKIN: You said footnote 74?

MR. SWANSON: Correct.

MR. RIFKIN: Okay.

THE DEPONENT: Yes, I have that in front of me.

Q. (By Mr. Swanson) Okay. And -- and toward the end of that footnote, you indicate that the IAP price sensitivity coefficients for both games and music and entertainment apps are exceptions.

Do you see that?

A. Yes. I would preface my response here by saying that this footnote really has to be reexamined when I have new -- new estimates of standard errors, and I would hold in abeyance any prior conclusion on this footnote until I have that information.

Q. How many other paragraphs or footnotes in your supplemental report will you have to hold abeyance until you have the standard error calculations?

Page 63

A. I would say those -- those which use -- use statements about the standard errors with the corrected genre classifications and -- and the corrected coding error in the -- the bootstrap.

Q. And do you have a rough estimate as to how many footnotes or paragraphs that is? Is it more than a few dozen?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: That's -- that's not a count that I've made. I don't know.

Q. (By Mr. Swanson) Understanding that you preferred to hold it in abeyance awaiting the further results, I'd still like to know what you had in mind when you wrote that portion of footnote 74 and referred to the IAP price sensitivity coefficients as exceptions.

What did you mean then?

A. Yes, I think the point of this footnote is that if you compare the Appendix D estimates based on the original 0.1 percent sample with the ones that are -- being referred to here and using mean coefficients that you do see differences in -- in the IAP price sensitivity coefficients.

Q. Professor, if you used the 12 percent

Page 64

but-for commission rate from your prior reports, would you expect that the results in your supplemental report would be materially different from those you obtained in the past when you were using the smaller set of transactional data?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: So if I understand, you're asking me if I do the genre reclassification and the average and/or mean coefficients but use the 12 percent but-for discount rate, would I see different results than if I used the 13.6 discount rate -- not discount rate, commission rate?

Q. (By Mr. Swanson) Not quite.

If you used the 12 percent commission rate that you were using in your prior reports and you used that instead of the 13 percent rate that you're using now, would you get results that are materially different from those you obtained in the past when you were using that 12 percent but-for commission rate on a smaller dataset?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I think the -- it's -- a very broad question, and I think a broad answer is

Page 65

17 (Pages 62 - 65)

that my analysis is sensitive to the commission rate, so that the analysis -- the supplementary report analysis using a 12 percent commission rate would have given materially different results.

Q. (By Mr. Swanson) The -- the App Store transaction data include data now from almost 500 million individual Apple ID accounts; is that your understanding?

A. That's -- that's a -- that's a number that I -- doesn't appear in my supplemental report, so I don't -- I don't remember the exact number.

Q. Turn to paragraph 15 of your supplemental report, page 6.

A. Page 15?

Q. Paragraph 15, page 6.

A. Yes, I -- I you -- I stand corrected. I do have a number there. The numbers that appear in the figures are the -- are the accounts for which they -- they're paid purchases, so that's the number I concentrated on.

Q. Well, your report indicates that you have data on 498 million Apple ID accounts, correct?

A. Correct.

Q. How many of those accounts do you estimate damage for?

Page 66

A. If you go to figure 1, there are 176,964,271 accounts currently that enter my calculations, and those are the accounts that have -- payments to the Apple Store.

Q. Okay. And do you understand that there are about 223 million Apple ID accounts with paid transactions in the full database?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I don't have that number, but clearly there are payments for Apple app purchases and genres other than the -- the ones that I have analyzed.

Q. (By Mr. Swanson) Do you dispute this the number is approximately 223 million Apple IDs that have paid transactions in at least some genre?

A. I don't dispute it, but it's not a number that I have calculated or asked for.

Q. Okay. Do you have an understanding as to how many Apple ID accounts in the transactional database made no paid purchases?

A. The same answer. It's not -- it's not a number that I asked for, so I don't -- I don't know it.

Q. Do you have an understanding as to

Page 67

whether it's half of all Apple ID accounts?

A. I haven't done the calculation. If -- if your representation that, you know, about 248 million have purchases than the ones who don't, there's of course the difference between the total in that number.

Q. Okay. Well, my representation was 223 million Apple ID accounts did make paid transactions in some genre, just so the record is clear.

But you haven't calculated that number yet?

A. That's correct.

Q. Do you intend to at some point?

A. Well, that's -- that's a -- a future calculation, and I'm not sure what the -- counsel's instructions will be in terms of future work, but I would anticipate that for the purposes of damage estimation that the remaining genres will require analysis.

Q. Can you please turn to paragraph 29 of your supplemental. It's on page 12.

A. I have that in front of me.

Q. Okay. You indicated in paragraph 29 that you used the full App Store data to calculate

Page 68

damages rather than the sample.

Do you see that?

A. Please remind me the paragraph you're looking at.

Q. I'm sorry, Professor. I didn't hear that.

MR. RIFKIN: He asked which paragraph you're referring to.

MR. SWANSON: It's paragraph 29, second sentence.

MR. RIFKIN: And can you have the court reporter read back the question? Because I think I have an objection to it, but I want to hear it again.

MR. SWANSON: Uh-huh.

(Record read as follows:

"QUESTION: Okay. You indicated in paragraph 29 that you used the full App Store data to calculate damages rather than the sample.

"Do you see that?")

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I see it, yes.

Page 69

18 (Pages 66 - 69)

Q. (By Mr. Swanson) Okay. And is that 01:09:51 correct?

A. It's correct. If you need clarification on wording, I'll try to provide it.

Q. Did you estimate the demand parameters of 01:09:54 your model using data for all apps in the full dataset?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: As explained in my 01:09:57 original report and recapped here, there are two stages of this analysis. The first stage is demand estimation, and that's done on a simple or a series of samples. Those provide demand parameters which are then brought into the damage calculation. 01:10:02 That's the second stage.

It's the damage calculation which uses all apps and all accounts.

Q. (By Mr. Swanson) You estimated the demand parameters using data for apps in the games, 01:10:05 music, and entertainment genres only, correct?

A. In -- in my three reports to this point, I have considered only the games and the music and entertainment genres. I have not reported results on other genres. 01:10:11

Page 70

Q. And you only used data for the apps in 01:10:12 those genres, games, music, and entertainment, actually appearing in the .1 percent samples, correct?

A. If I understand the question, the 01:10:16 question is what accounts are brought into the analysis for a -- a particular genre and particular sample, and -- and the -- the answer is that it's the app within that -- within that genre, within a sample for the purposes of estimation, and it's all 01:10:21 apps in that genre and all accounts for the damage calculation stage.

Q. Right.

And I'm focused right now on your estimation of the demand parameters. So for those 01:10:24 you used only data for the music, entertainment, and games apps that appeared in your 75 .1 percent samples, correct?

A. In -- in the body of my supplemental report, I report on average demand parameter 01:10:29 estimates based on the 75 .1 percent samples.

Q. And you used only the games, entertainment, and music apps that appeared in those 75 samples for purposes of your estimation, correct? 01:10:34

Page 71

A. Correct. 01:10:35

Q. And, in fact, you used data only for the highest revenue apps collectively accounting for 70 percent of the spending in each of those samples, correct? 01:10:38

A. Correct.

Q. In any given .1 percent sample, what is the rough number of apps you're using to estimate the demand parameters?

A. As I sit here, I don't recall the exact 01:10:41 number. I recall it -- it was in my reply report and I think also came up in the previous deposition, so it's the same.

Q. It's fewer than a few thousand apps, is it not? 01:10:46

A. That's my recollection.

Q. Do you know how many unique game, music, and entertainment apps are in the transactional data in total?

A. That's -- that's a number that I don't 01:10:49 recall. I know it's quite large.

Q. It's more than 4.5 million as of 2021, is it not?

A. I don't recall the exact number, but I -- I -- I take your -- your estimate as probably -- 01:10:54

Page 72

probably correct. 01:10:55

Q. You're aware that it's a number in the millions, are you not?

A. Yes.

Q. Now, your sampling is done at the account 01:10:57 level, not at the app or transactional level, correct?

A. Could you clarify if -- for various stages and various purposes, I used the data in -- in -- in different ways. You are -- are you 01:11:02 referring to a particular stage?

Q. Well, your 75 random samples are samples of Apple ID accounts, are they not?

A. They are, yes.

Q. Are the apps that you use as data from 01:11:06 those 75 samples themselves randomly selected?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: The -- the procedure for selecting the apps to analyze was to select the 01:11:10 70 percent highest revenue apps in the Apple Store in that -- in that genre.

That -- that appeared in the particular 0.1 percent sample being analyzed.

Q. (By Mr. Swanson) Does your method of 01:11:15

Page 73

19 (Pages 70 - 73)

selecting top revenue apps make it more likely that apps are repeated across your 75 samples?

A. I don't know that I could answer whether it's more likely, but it is -- I would expect popular high-revenue apps to appear often and perhaps within repeated samples.

Q. You're not claiming, are you, that you're using 75 times more apps to estimate demand than you did in the single sample from your original report, are you?

A. Correct. I'm not claiming that.

Q. Are you aware that you're actually using fewer than 5,000 different apps in your 75 samples to estimate your demand coefficients?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: The -- the purpose of selecting the top 70 percent of apps as described in my original report was to provide the data which was most relevant to the determination of -- of damages and -- and substantial expenditure by class members. I have not changed my opinion on the purpose of that.

And to the extent that that implies a -- a substantial overlap in apps across samples,

Page 74

that's actually what I would expect to be the case. It's not -- it's not a flaw or a flaw in the analysis. I view it as a characteristic of the analysis.

Q. (By Mr. Swanson) Whether you view it as a flaw or not, my question was are you claiming that you are using more than 5,000 different apps in your 75 samples to estimate your coefficients?

A. No, I do not make that claim in my -- in my report, nor -- nor do I consider it relevant.

Q. Regardless of the number of apps you're using as data from your 75 samples, is it your opinion that the apps that you do use in your samples are representative of those in the full App Store data for the three genres?

A. I do not make that claim, nor do I think it's -- that's the best way to do the analysis. I think the best way to do the analysis where the issue is -- is a damages to members of the class is to concentrate on the primary sources of harm from overcharges, and that -- those part of the resources which will be apps which are themselves involved in substantial expenditures.

So I think the -- the focus here is on selecting apps which are important for calculation

Page 75

of harm, and that's -- that's -- that's not a random sample from all apps.

There's an immense tail of -- of apps that are -- are rarely purchased, and I don't think it would be appropriate -- rarely purchased and have very little consequence for damages -- potential damages, and I don't -- I don't think it would be appropriate to try to sweep them into the analysis. I think it would degrade the quality of the analysis.

Q. Your model assumes that consumers have the same price sensitivity for all apps in a given genre; is that correct?

A. If by "price sensitivity" you mean the -- the parameter coefficient on price within the demand model, the answer is yes, within each business model for either downloads and separately for IAP.

Q. Do you have an empirical basis for that model assumption or approach?

A. It is my econometric judgment that it is an appropriate level of analysis for this application.

Q. Did you conduct -- I'm sorry.

Did you conduct any analyses to determine

Page 76

if and how your assumption about the price sensitivity coefficient affects your empirical results?

A. Could you -- could you clarify the -- the -- your question? Are you -- are you asking essentially what the standard errors on these coefficients imply for damages?

Q. I am asking if you have an opinion as to the significance to your results of your assumption that the price sensitivity coefficient is the same for a given genre and business model.

A. The answer is I do -- do not at this point have an analysis contained in my supplemental report in which I examine that issue.

Q. Can your model estimate impact and damages if price sensitivity, in fact, varies among apps in a given genre in a given business model?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I didn't -- I didn't hear the question. Please repeat it.

Q. (By Mr. Swanson) Sure.

Can your model estimate impact and damages if the price sensitivity coefficient, in fact, varies among apps in a given genre and a

Page 77

20 (Pages 74 - 77)

given business model?                01:12:51

A.  I would say that my approach to model demand could, as -- as a matter of econometric design, consider the possibility -- consider that possibility, and if there are -- if there were specific hypotheses about variation within the genre, those -- those could be tested, and as an econometrician, I would evaluate alternatives on their merits.

Q.  Okay.  Professor, you assume that in some cases, consumers have the same price sensitivity coefficient across multiple genres, right?                01:12:58

MR. RIFKIN:  Objection to the form of the question.

THE DEPONENT:  I -- my understanding is that in the Apple data, music and entertainment are identified as separate genres, and our conclusion was that they are similar in their -- in the developer environment in -- in terms of what they involve in terms of developer cost.  So to that extent, we -- we combine those genres and estimate an -- an overall demand model for the two genres together.                01:13:02 01:13:07

MR. RIFKIN:  Mr. Swanson, are we at a point near a break?  We're -- we've been going at                01:13:11

Page 78

it for about another hour.                01:13:13

MR. SWANSON:  One more question and then we can take the break.

Q.  (By Mr. Swanson)  Is there any process or test that you apply to determine whether multiple genres are properly treated as exhibiting the same price sensitivity coefficient?                01:13:15

A.  I have not done a formal statistical test of that.

Q.  Your decision about music and entertainment was an application of your judgment?                01:13:19

A.  Please repeat the question.

Q.  Your decision to treat music and entertainment as having the same price sensitivity coefficient was a consequence of the application of your judgment?                01:13:23

MR. RIFKIN:  Objection to the form of the question.

THE DEPONENT:  I would say that it's a result of investigations by me and my supporting staff of what's involved in putting up an app that -- for various purposes, and my understanding is that in -- for both music and entertainment that royalties for content are a substantial component of costs, and -- whereas that's not the case for                01:13:26 01:13:32

Page 79

games.  So those two are distinct.                01:13:33

On the other hand, both music and entertainment involve a business model in which content is being provided to consumers and royalties are being paid to the producers of that content.                01:13:37

Q.  (By Mr. Swanson)  What does the fact that royalties are paying -- being paid by the developers have to do with consumer demand?

A.  The granularity of my model is designed to deal with developers who produce apps and are assumed to be profit maximizers, and -- so that the treatment of music and entertainment together is based on my -- my opinion that they -- they will have similar content costs.                01:13:41 01:13:47

MR. SWANSON:  All right.  Let's take our break.

MR. RIFKIN:  Okay.  Thanks.  We'll see in ten minutes or so.

THE VIDEOGRAPHER:  The time is 10:14 a.m.                01:13:49

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record.  The time is 11:25 a.m.

Q.  (By Mr. Swanson)  Professor, could you please turn to footnote 75 of your supplemental                01:13:52

Page 80

report.  It's on page 26.                01:13:53

A.  I have it in front of me.  Let me read it.

Yes, I've read it.

Q.  In that footnote, you say that you assign zero damages for app-months that experience a within-month As-Is download price change because you assume these price changes represent temporary price reductions or price fluctuations that are not explained by fluctuations in demand or marginal costs.                01:13:57 01:14:01

Do you see that?

A.  Yes.

Q.  Is your model in capable of dealing with temporary price reductions or price fluctuations?                01:14:04

A.  It's -- it's not designed to do that.  It's designed to reflect the -- the overall change in prices so, if you like, the appropriate changes in prices that might result from a decline in -- in commissions to -- to determine the full granularity of the dynamics of -- of temporary fluctuations would involve a -- a more -- a different and more complex model.  I have not -- I don't think it would be appropriate for this application.                01:14:10

Q.  What -- what kinds of price fluctuations                01:14:15

Page 81

21 (Pages 78 - 81)

might not be explained by changes in demand or marginal cost?

A. The types of fluctuations that are excluded, as noted in footnote 75, are situations where in a -- for a given app or for a given month there's a change in -- a down -- download price and -- and the response to that kind of a -- a sale or -- or come on presumably involves relatively short-term dynamics. You get some people that might be long-term buyers and they would rush to buy in the -- at the sale price, but that would not necessarily reflect a permanent increase in demand if that sale -- sale price were to be continued permanently. Let's just say you get a -- you get a dynamic there, and that dynamic involves a gran- -- granularity of demand which I do not attempt to model.

Q. Do in-app purchase prices experience within-month price reductions or price fluctuations?

A. At the level of analysis in my model, I -- I do not deal with item-specific prices. I only deal with IAP expenditure and average price per transaction.

So at -- in the -- in the model

Page 82

estimated, it -- it deals with whatever -- whatever is in the -- in the data in term of average price per transaction. So the answer is there, I do not -- I cannot distinguish or separate out within-month changes in, say, item prices.

Q. Well, you can distinguish within-month changes in the average bundle price of the bundle of IAPs, correct?

A. Please repeat the question. When you talk about the bundle of prices, I'm not sure what you were referring to exactly.

Q. Well, you calculated an average IAP price at the app level, correct?

A. Correct.

Q. And that average IAP price is an average of all of the IAP item prices for the app, correct?

A. That's correct.

Q. And that average IAP price can change or fluctuate within a given month, can it not?

A. I think given the way it's calculated, no, it could not, because it's calculated on the basis of a total number of -- of item transactions and total spend for that app for the month.

Q. You're saying that that calculation cannot change within the month, or are you saying

Page 83

that calculation is done for a given month?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: That calculation is done for a given month.

Q. (By Mr. Swanson) So my question was: Does that calculation fluctuate within a given month? It does, doesn't it?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: The calculation itself is done for the app month, so that's the granularity of the calculation.

Q. (By Mr. Swanson) Well, is your download price calculation done for a given month?

A. Yeah, it -- the answer is that in that case, there is a single price, and the data tell us whether that price has changed within the month.

Q. And if the price has changed within the month, you calculate zero damage, correct?

A. That's correct, for downloads.

Q. For downloads. And for in-app purchases, if there are changes in the individual in-app purchase items within the month, you go forward and calculate damages, correct?

Page 84

A. The answer is yes, subject to the -- the exceptions that are noted, if not here, elsewhere in -- in my supplementary.

Q. And what exceptions are you referring to?

A. Well, if you refer to -- I think it's -- the end of Appendix E. If -- if I can turn to that. Yes, paragraph 122 at Appendix E.

Q. Okay. So -- so that's another exception?

A. Yes.

Q. Okay. Professor, can you turn to paragraph 63 of your supplemental report.

I'm going to focus on the part at the top of page 25.

A. Yes, I've -- I've read the paragraph. Your question?

Q. Yeah. My question is you state here that the average value of the coefficients may change depending on which 75 random samples are used to estimate the model coefficient.

Do you see that?

A. Yes.

Q. Have you tested to see if the coefficients do change?

A. Well, I have the -- this -- this calculation produces 75 estimates, and yes, I have

Page 85

22 (Pages 82 - 85)

the distribution of those estimates.    01:15:47

Q. Have -- have you run different sets of 75 random samples to calculate the coefficients?

A. Yes. I'm sorry. The -- the language in this paragraph may be -- may be unclear.    01:15:51

This depends not -- not on resampling the 75, but whether comparing any one of them with any other of them.

Q. Okay. Well, let me -- let me ask the question again to make it clear.    01:15:56

If you took a new set of 75 random samples, would you expect the average coefficients to change?

A. The answer is yes, within the -- within the range of system precision that you -- that you    01:16:00 have when you average over 75 of these samples.

Q. Have you -- have you looked at different sets of 75 random samples?

A. No, I have not.

Q. If a different set of 75 random samples    01:16:04 would -- was used, will there be accounts that switch between harmed and unharmed status?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Any sample from the full    01:16:08

Page 86

population is a statistical sample when the -- the    01:16:09 estimates that come out of that and the damage calculation that come out of it, are -- are statistics, and they -- they reflect the composition of the sample.    01:16:14

So that if you -- if you draw more -- more samples, if you average over a different set of samples, you will -- you'll have some statistical variation. The -- the standard errors attached are -- are -- are in this case -- are due    01:16:19 to be updated. But the standard errors attached to the average coefficients of -- of -- provided a statistical benchmark for how -- how precise these are determined, what the -- what the degree of variation might be.    01:16:24

Q. (By Mr. Swanson) Do you agree that if you make any substantive change to your model, even using the same 75 random samples, that will result in some switching of accounts from harmed to unharmed and vice versa?    01:16:29

A. Could you give me an example of what you mean by "substantive change."

Q. Well, isn't it true that correcting for the genre classification issue yields different numbers of uninjured accounts and causes accounts    01:16:33

Page 87

to switch from harmed to unharmed?    01:16:34

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: The answer is that if you change the genre classification, that will have an    01:16:37 impact on coefficients, and somewhat different sets of coefficients will change the calculation of net harm account by account.

Q. (By Mr. Swanson) Instead of running the model for 75 samples and averaging the    01:16:41 coefficients, could have you pooled the 75 samples together and run the model once on the pool data?

A. Yes.

Q. Should it matter to the results if you do your estimation using 75 samples and take the    01:16:46 average or put the 75 samples together and estimate the coefficient once?

A. Both -- both procedures are statistically sound. They both are essentially drawing on large sample statistics, statistical theory, and to the    01:16:51 extent that these are, in fact, large samples, the -- they -- both -- both should be consistent, and they're statistically consistent for the true state of affairs.

Q. Should you get the same results either    01:16:56

Page 88

way?    01:16:57

A. Well, I think in any sample size short of the full population, there -- there would be differences that could be sampling -- sampling error.    01:17:00

Q. Instead of running the model on 75 one-tenth of a percent samples and averaging the coefficients, could you have run the model on a single 7.5 percent sample?

A. The answer is one -- one could do that,    01:17:04 yes.

Q. Would you expect to get the same results?

A. As I said, that is an alternative estimation which is statistically consistent, as is the procedure I -- I actually used in this report.    01:17:08 And in that sense, they should both give statistically sound results. In any finite sample that's short of the full population, there will be statistical noise with respect to some variation between the two results.    01:17:14

Q. Would it concern you if the estimates derived from those two approaches were materially different?

MR. RIFKIN: Objection to the form of the question.    01:17:17

Page 89

23 (Pages 86 - 89)

THE DEPONENT: I would say that's -- that's a very general question, and as an econometrician, I -- I would want to examine the results of both estimations, both types of estimation. And -- and if -- if they -- if they differed, there potentially a -- it would be -- it would be cause to examine each on -- each on their merits and -- and perhaps seek -- seek a -- a better estimation method for both.

Q. (By Mr. Swanson) We've spoken of three possible estimation methods. One is the one that you pursued, which was averaging the coefficients for 75 .1 percent random samples. The other two we talked about were pooling the 75 samples and running your model on the pooled sample, and the third was taking a 7.5 percent sample and running your model on that 7.5 percent sample.

Which of those three approaches, in your opinion as an econometrician, would be the best one to pursue from the standpoint --

MR. RIFKIN: Objection.

Q. (By Mr. Swanson) From the standpoint --

MR. RIFKIN: Objection to the form of the question.

I'm sorry. I didn't mean to interrupt,

Page 90

and I -- I just -- I thought you had finished your question, Mr. Swanson. I apologize.

THE DEPONENT: First can you explain -- can you explain what you -- how you distinguish the second and third of your alternatives? What would be the difference between pooling the 75 and just drawing a single 7.5 percent sample?

Q. (By Mr. Swanson) Well, does pooling your 75 random samples give you a sample of 7.5 percent in size?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Well, as -- as I -- let me tell you what I understand, which is that the 75 separate 0.15 percent samples do have some duplication as a count can appear in more than one of them. So if you draw a 7.5 percent sample, your third method, there would be a question as to whether you're doing that with or without replacement from -- from the full population.

Perhaps that's the distinction that you are trying to make between those methods.

Is that correct?

Q. (By Mr. Swanson) Yes. Why don't you assume it's without the replacement is the third

Page 91

method.

A. I think the answer is that all three of these methods are statistically consistent in -- in large-sample econometrics, and they should be all be -- should be perfectly satisfactory. And if -- if there were substantial differences between them, then I think they need to be evaluated on their merits.

Q. Professor, to calculate standard errors for your coefficients, you first calculate the variance of the coefficients according to a formula that you set forth in footnote 72 of your supplemental report; is that -- is that correct?

MR. RIFKIN: Did you say footnote 72 or paragraph 72? I just didn't hear. I'm sorry.

MR. SWANSON: Sure. Footnote 72.

MR. RIFKIN: Thank you.

MR. SWANSON: It's on page 24.

THE DEPONENT: Yes, I have that paragraph -- that footnote in front of me.

And that correctly describes the standard calculations that are -- are reported in the supplementary report. This is before the -- the recalculation with -- with corrected genre classification.

Page 92

Q. (By Mr. Swanson) But this is the formula you would apply, correct?

A. That was the formula that was used, correct.

Q. For this formula to be valid, would the 75 samples need to be independent?

A. The answer is yes, it is, that is a approximation which is -- which is only an approximation if there's any dependence between the different estimate.

Q. Do you know whether the 75 random samples you used are independent?

A. Well, in fact, there's about one -- one account out of a thousand is -- appears in -- in any pair of the 75 random samples.

So that's -- that's a source of nonindependence.

Q. In the nearly 16 months since you filed your opening report, you've still estimated your model for just three out of more than two dozen app genres, correct?

A. That's correct.

Q. Why have you not applied your model to other genres?

A. I'd say the answer to that goes to the

Page 93

24 (Pages 90 - 93)

purpose of these reports and the -- for what I was   01:18:46
retained to provide opinions on, and that is
whether there is a -- a methodology for determining
and distributing damages which meets the criteria
for class certification, and the two genres that I   01:18:50
analyzed, which represent a very substantial amount
of the total spending in the App Store, I -- I
believe are appropriate for that analysis.

If this proceeding boosts to the merit
stage, I would expect that in the merit stage, all   01:18:56
genres would need to be taken into account.

Q.   Is it still your opinion that your
description of the estimation procedure and your
backup are complete and detailed enough for any
well-trained economist to apply to other app   01:19:00
categories?

A.   I -- please repeat that again.

Q.   Sure.

Is it still your opinion that your
description of the estimation procedure and your   01:19:03
backup that you've turned over are complete and
detailed enough for any well-trained economist to
apply to other app categories?

MR. RIFKIN:   Objection to the form of the
question.   01:19:08

Page 94

THE DEPONENT:  Oh.  I -- I would say yes.   01:19:08
I mean, I will qualify by saying that my
instructions to my team on backup materials was
broad, to turn over all relevant materials, and
I -- I did not personally or directly verify what   01:19:12
was -- what's -- what's in the backups that were
provided.

I am incidentally aware that a technical
staff that's supporting me and the technical staff
at Cornerstone that's supporting you have still   01:19:17
unresolved differences in -- in data for which
there is -- still at this point no full
explanation.

Q.   (By Mr. Swanson)  I didn't want to
interrupt you if you're not finished.   01:19:21

A.   I'm sorry.  Again?

Q.   I said I didn't -- I didn't want to
interrupt if you were not finished.

A.   Sorry.  I am finished.

Q.   All right.  Thank you.   01:19:25

How long would it take a well-trained
economist to run your analysis on another app genre
other than the three you've already run?

MR. RIFKIN:   Objection to the form of the
question.   01:19:29

Page 95

THE DEPONENT:  Well, I can tell you that   01:19:29
the analysis that we did do started from the third
Apple data production in July and was -- was
completed, incidentally under great time pressure,
for the submission of my supplemental report, and I   01:19:33
believe that was in late September.

And I would anticipate that if you do
additional genres that comparable time would be
involved.

Q.   (By Mr. Swanson)  Comparable time would   01:19:37
be a number of months for doing three more genres?

A.   I would say that the calculations in --
in -- in that case took several months, and I would
expect that adding genres would -- be comparable.
I cannot, without actually doing it, tell you   01:19:42
whether it would be a little less or a little more.

Q.   Without actually doing it, can you say
what margin constraints a well-trained economist
should use for the other app categories?

A.   Well, I think the procedure that was used   01:19:47
for the -- the category -- the genres that I have
analyzed, which was to -- look -- look for firms
that were in the public domain or otherwise had
cost information in the record to provide
information on their margins, was -- was used, and   01:19:53

Page 96

I would anticipate that a similar exercise would be   01:19:54
carried out for other genres.  I would in
particular look for developers of apps in those
other genres that are -- in which cost information
is available, either because they're in the public   01:19:58
domain or because they have responded to requests
from counsel in this case.

Q.   How would a well-trained economist
determine which instrumental variable should be
used for the other app categories?   01:20:02

A.   Again, I think that -- the -- the method
that was used for determining instruments in the
categories that have been analyzed is -- is --
provides a good road map for how to do this for
other genres.   01:20:08

Q.   Well, you used -- well, strike that.

You say there's a good road map.  Do you
discuss instrumental variables in your supplemental
report?

A.   No.  The -- I should put this in the   01:20:11
context that the estimation that I do in the
supplemental report involves the -- the expanded
data, the -- including Apple's third production.

But the estimation methodology is what it
was in the original report.  The methodology has   01:20:17

Page 97

25 (Pages 94 - 97)

not changed, so the -- for example, the -- the instruments that are used has not changed.

Q. You never discussed the instruments that you selected for the three genres in your original report, did you?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: My -- my recollection is that there was a mention of -- of what instruments were used. I don't recall where in the report they -- they appeared.

Q. (By Mr. Swanson) Isn't it a fact that the instruments that you used could only be gleaned by looking at your backup?

A. It's possible.

Q. Is it important for an econometrician to discuss which instrumental variables he or she is using and the basis for using those instruments?

A. I would say in the overall methodology of estimation, yes, I would -- I would expect to see in the backup the -- the listed instruments that are used.

Q. In your academic writings, do you make use of instrumental variables?

A. I have done so, yes.

Page 98

Q. When you have done so, do you discuss in the text what your instruments are?

A. I don't think I can give a general answer to that. Some -- sometimes one is -- is writing comprehensively; sometimes one is writing for an audience for whom the technical details are not of great interest, and I would -- and sometimes these things are really designed for different audiences.

I think in -- in this case the text of my reports is designed to be understood by people in the legal community, so sometimes details are put off into backup.

Q. So is that a conscious decision that you made not to discuss your instrumental variables in the text of your reports?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I don't recall ever having a discussion about it. It was simply that there was -- there was a generic decision to try to keep the text of the report concentrated on the -- on the findings that would be of primary importance of the case and leaving technical details to appendices or backup.

Q. (By Mr. Swanson) And how would a

Page 99

well-trained economist determine which instrumental variables to use to estimate damages for the social media genre?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I have -- I have not sat -- sat down to look at what the possibilities are. I think clearly when one is looking for instruments, there are -- there are econometric statistical criteria that need to be met. They need to be correlated with the variables that require instrumentation. They to be uncorrelated with the disturbances in your model. And it is -- it is a matter of econometric judgment and, when possible, testing to determine what sets of variables will work, and one is often limited by what's available.

Q. (By Mr. Swanson) And has testing been possible for the instruments you've chosen for games and music and entertainment?

A. I would have to go back and -- and look -- look at -- look at the list and...

Q. Would it be your standard practice to apply statistical tests when possible to the selected instrumental variables?

Page 100

A. I would say it's not standard practice, but it's certainly something that I do, I certainly have done in the past in papers.

Q. And how do you decide when to test your instrumental variables and when not to test them?

A. As a general matter of econometrics, sometimes -- sometimes variables are obvious -- obviously potential instruments on the basis of, you know, economic reasoning or how they're constructed or where they come from, and sometimes they are problematic. And what's important is to if -- if instrument are problematic, one would like to be assured that they're not, in fact, a problem, and then the testing is appropriate.

Q. Were all of the instruments that you selected for your estimation with respect to the three genres obvious ones, in your terminology?

A. I -- I would say yes, they are.

Q. So you didn't feel the need to run any statistical test as a result of that?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Within -- within the constraints of my assignment and the time that I had, I did not run statistical tests of that sort.

Page 101

26 (Pages 98 - 101)

Q. (By Mr. Swanson) Professor, which genres out of all of the other genres can be combined for estimation purposes, like you did with music and entertainment?

A. That's not a question that I -- that I addressed in my supplemental report, and I have not sat down to -- to do that determination.

Q. Do you know if any of the other genres should be combined with the games genre for estimation purposes?

A. At this point, I don't know. I -- I simply don't know.

Q. Okay. Have you ruled out combining other genres with the game genre for estimation purposes?

A. I would say I haven't -- I haven't ruled it out. Games seem to be a -- a somewhat unique genre in terms of how it's used in the -- certainly in terms of the amount of spending.

Q. Are you able to determine whether a given account is harmed or unharmed, on net, without modeling but-for download and in-app purchase prices for apps in genres other than games, music, and entertainment?

A. You can determine net harm condition on the two genres -- the two genres analyzed to this

Page 102

point. That -- that could change as additional genres are considered, and in general I would expect that fewer people would be unharmed when you consider all the genres.

But that's my expectation. I don't know if that would, in fact, be the case.

Q. Is that an expectation or a speculation?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I -- I would say that -- I don't -- I don't know. I -- I -- I would be -- I would be surprised if it went the other way, but I don't know.

Q. (By Mr. Swanson) Could you please turn to paragraph 42 of your supplemental report.

A. I have that in front of me.

Q. Okay. I'm going to focus on the last sentence, which is on page 17, where you state that you don't need to estimate IAP item level but-for prices.

Do you see that?

A. Yes.

Q. Is that because you used the so-called percentage method to estimate the alleged changes to what consumers paid for IAP items for an app?

Page 103

A. That's correct.

Q. Okay. What is the more reliable way to determine but-for IAP item prices, the percentage method or direct estimation of item level IAP prices?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Again, I would emphasize that I don't -- I don't do that calculation, and that's a gran- -- granularity of calculation that I actually think is inappropriate for this application, because that requires a great deal of information on consumer substitution between items and -- and the developer's design of menus and -- of different items and -- and would amend their menus, and that's a degree of granularity that I think is unnecessary for this case and a distraction from its primary purpose.

Q. (By Mr. Swanson) Is it -- well, why is it unnecessary, in your opinion? Are you relying on some legal premise?

A. I'm relying on the -- the -- the assumption that underlies my analysis that developers are profit maximizers and that they seek to maximize the profits from their apps, and that

Page 104

includes the prices they set for various things that can be purchased.

Q. Do consumers -- do consumers make purchasing decisions for a specific item of in-app content based on the price of that item rather than the average price of all of the in-app content for the app?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I do not model what consumers are doing in terms of their trade-offs between items within an app, nor do I model the developer's decisions on how to organize and price their menus on different items. I don't believe that's a granularity that is required or useful for the determination of damages in this case.

I -- and I believe that for purposes of this -- a model which is grounded on product maximization by developers that the appropriate granularity is the -- the level of their average pricing for IAP and the total spending they -- they get on IAP as a result.

Q. (By Mr. Swanson) Do you agree that in-app purchase transactions make up the great bulk of paid transactions in the App Store transaction

Page 105

27 (Pages 102 - 105)

data?                              01:23:21

A.  I'm -- I'm aware that it is -- it is a substantial plurality.  I don't have an exact number in mind on the share.

Q.  What portion of your damages estimate is    01:23:24 accounted for by in-app purchase transactions?

A.  I don't have that number in -- in front of me.  Or I don't remember it.

Q.  Is it higher than 95 percent?

A.  Again, I don't have the number in front    01:23:29 of me.

Q.  Well, do you dispute that the enormous bulk of the damages you calculate are attributable to in-app purchase transactions?

MR. RIFKIN:  Objection to the form of the    01:23:33 question.

THE DEPONENT:  That may be true.

Q.  (By Mr. Swanson) Is it important to you to know?

A.  Is it important to me to know?  Is that    01:23:35 the question?

Q.  Is it important to you to know that fact?

MR. RIFKIN:  Objection to the form of the question.

THE DEPONENT:  I think the purpose of    01:23:39

Page 106

the -- of the modeling is to model demand for both    01:23:39 downloads and in-app purchases, and that's what the model does.  I -- I don't -- only if I -- if I were only modeling only a piece of the developer's decisions rather than -- than their entirety would    01:23:44 I have to worry about which piece to concentrate on.

Q.  (By Mr. Swanson) If you your model cannot reliably estimate but-for in-app purchase prices at the item level, are your impact and    01:23:49 damage calculations reliable?

A.  I believe my calculations are reliable because the granularity that I use is appropriate for the application.

Q.  So you believe that your calculations of    01:23:53 impacting damages are reliable regardless of whether or not you can calculate in-app purchases prices at the item level reliably?

MR. RIFKIN:  Objection to the form of the question.  But I may have misheard it.    01:23:58

Do you need to have that read back, Professor McFadden?

THE DEPONENT:  Well, go ahead.  Read it back.

MR. RIFKIN:  I apologize.  I -- may just    01:24:01

Page 107

have lost the train of thought here.    01:24:01

(Record read as follows:

"QUESTION:  So you believe that your calculations of impacting damages are reliable regardless of whether or not    01:24:02 you can calculate in-app purchases prices at the item level reliably?")

MR. RIFKIN:  Objection to the form of the question.

THE DEPONENT:  Yes, I believe it is    01:24:03 appropriate to use the granularity that I use, which is based on sort of this -- the scope what developers consider when they do product maximization.  That's what drives how -- how -- how I set up the demand, and -- my -- my economic    01:24:08 judgment is that's -- that's the appropriate level for this analysis.  I am not trying to model what developers do within -- within their operations in terms of how they set their menus, nor am I trying to model what consumers do if they choose between    01:24:14 different items in IAP purchases.

Q.  (By Mr. Swanson) Under the percentage method, you calculate the percentage by which the but-for average IAP price changes compared to the as-is average, and then you apply that percentage    01:24:19

Page 108

to all individual IAP items; is that correct?    01:24:20

A.  The answer is I apply that to the total IAP spending, percentage as applied to IAP spending.

Q.  So do you assume all but-for IAP item    01:24:24 prices all fall or rise by the same percentage?

A.  I make no assumption on what the menus are of the developers in terms of multiple IAP items, how those menus would change in the but-for world, and how -- how their prices in detail would    01:24:30 change in the but-for world and the analysis in my model is that the granularity of overall profit maximization by developers in terms of the average price they have for IAP and the -- the spending that results from that.    01:24:36

Q.  So --

MR. RIFKIN:  Mr. Swanson, I don't mean to interrupt, but I just wanted to point out that we're getting close to about another hour in, so whenever it's convenient for us to take a break.    01:24:39

But, again, I didn't mean to interrupt.

MR. SWANSON:  Yeah, I don't think we're close to an hour.  Maybe 50 minutes.  But we can -- we can break soon for lunch.

MR. RIFKIN:  Okay.  Okay.    01:24:44

Page 109

28 (Pages 106 - 109)

Q. (By Mr. Swanson) So is it your testimony 01:24:45 that your approach to calculating average IAP prices combined with your percentage method has no implications whatsoever for what the price of individual but-for IAP items prices will be? 01:24:49

A. I don't think that is -- that's an implication, no.

Q. You think it has no implications for individual IAP item prices?

MR. RIFKIN: Objection to the form of the 01:24:54 question.

THE DEPONENT: No. My -- my response is I don't think there is an implication that there is no --

I'm sorry. Perhaps you can start over. 01:24:56 Could you ask the question again.

Q. (By Mr. Swanson) Okay. Is it an implication of your approach to modeling average IAP prices and using the percentage method that individual IAP prices in the but-for world can take 01:25:01 any level up or down individually?

A. I don't believe there is an implication one way or the other. That is to say, the -- the granularity of my model considers product maximization by developers at the level of IAP 01:25:07

Page 110

spending and its response to average price for IAP 01:25:08 spending. That's -- that's the granularity of the analysis.

That is silent on the question of what developers do within their own walls to design 01:25:11 their menus of IAP items, and it's silent on what consumers do within their own homes to decide on one item versus another within a particular app.

Q. So you're making no assumption, empirical or otherwise, that individual IAP items move or 01:25:16 would move in the but-for world uniformly together?

A. That is correct. My -- my model at the granularity that I do the analysis is not -- does not speak to that issue.

Q. And if it were to be concluded by the 01:25:22 court that in the but-for world for a given app, some in-app purchase item would go up and some in-app purchase items go down, you would have no basis to contest that, I take it?

A. At -- at the current level of the 01:25:28 granularity of the model, it's -- it's -- it deals only -- only with IAP spending, and I believe beyond that, there are -- there are economic reasons that that's -- that that's a reasonable level to do the analysis. 01:25:33

Page 111

Q. Is IAP spending by an individual account 01:25:34 in the but-for world something that will change if the individual IAP item prices change in the but-for world?

MR. RIFKIN: Objection to the form of the 01:25:38 question.

THE DEPONENT: If I understand your question -- well, perhaps just repeat the question, please.

Q. (By Mr. Swanson) Well, are you assuming 01:25:40 that in the but-for world, the amount that an account spends on IAP purchases is the sum of the amounts that that account spends on the individual IAP items?

A. If I understand the question, the answer 01:25:45 is yes. The analysis takes the number of transactions, and the average price per transaction is the variables with which it deals, and of course the -- the product of those two is spending on IAP.

Is that -- is that the question? 01:25:50

Q. I will accept that as your answer.

If -- if a app has only one IAP item, your average price will be identical with the actual price of that IAP item, correct?

A. Correct. 01:25:55

Page 112

Q. And does your model accurately predict, 01:25:55 in your opinion, the individual item price in that case?

A. In -- in that case, the -- the granularity of the model is, again, at the level 01:25:59 of -- the developer's app profit maximization, and -- and -- and if the developer maintains a menu in a single item, then the answer is -- in the but-for world, then the answer is yes.

But I make no -- the model is silent as 01:26:04 to whether in the but-for world that's exactly what the developer would do.

Q. So am I correct to understand you to say that if an app has one in-app purchase item, your model can accurately and reliably predict it, but 01:26:09 if the app has two in-app purchase items, your model can only predict what the average IAP price will be reliably?

A. No. In fact, my answer that I just gave was -- was exactly the opposite. 01:26:14

I said that the -- I do not model what is going on inside the developer in terms of the menus they bring forward and the pricing in those menus of any individual items, and -- and the granularity of my model is at the overall level of IAP average 01:26:19

Page 113

29 (Pages 110 - 113)

pricing and IAP spending. And so the model is silent. I do not know what would happen.

Even if you -- even if a developer has a single IAP item in the as-in world, I do not model nor am I predicting what their menu would look like in the but-for world.

Q. You're not predicting a price for single IAP items when those are the only items for an app?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Sorry.

You -- you're making the -- the speculation that they would continue to have a single app in the but-for world. I -- the -- my model is silent on the -- the question as to whether they would have a single app in the but-for world.

Q. (By Mr. Swanson) I'm confused. My reference was to a -- an app that has one in-app purchase item.

Do you have that firmly in mind?

A. My understanding of your question is you're looking at a developer that in the as-is world has a single item.

Q. Correct.

Page 114

A. And my -- and my response was -- and I make no -- I make no assumption. The model makes no assumption what the configuration would be of the menu offer by that developer in the but-for world, whether it would be a single item, whether there would be multiple items, how they would be priced. The model deals only with IAP average price and IAP number of transactions and spending.

Q. So where do you say that in your report? Have you explained that your model makes no assumption about how many in-app purchase items a developer will offer in the but-for world?

A. I would refer you to Appendix E. Appendix E describes what -- what I do, and -- and the -- the point is that it's -- everything is done at the level of total -- total IAP -- IAP spending for the app. That's the granularity.

So there is no -- there is no assumption on what goes on within the item menu and pricing at the -- either the as-is or the but-for level.

Q. Now, if an app offers only one in-app purchase item, are you assuming in the but-for world that it will continue to offer an item that -- for which it charges?

MR. RIFKIN: Objection to the form of the

Page 115

question.

THE DEPONENT: It -- I -- I believe -- I believe you're asking whether for -- for IAP if the average price is positive in the as-is world, would it again be positive in the but-for world.

And the answer is yes, that's an implication of my model.

Q. (By Mr. Swanson) Right.

And is it your assumption that the developer maintains the exact same business model in the but-for world?

A. In terms of business model where I distinguish between paid app only, paid IAP only, and both paid app and paid IAP, yes, I assume that the developers maintain their as-is business model.

MR. RIFKIN: Are we at a good breaking point?

MR. SWANSON: No. Another question.

Q. (By Mr. Swanson) But -- but you are not assuming that the developer maintains its business model in terms of the number of in-app purchase items it offers in the but-for world; is that correct?

A. It is correct, but at the level of granularity of -- of -- in-app menus, my model is

Page 116

silent on how -- how those are organized by the developer. I deal only with profit maximization at the granularity -- granularity of average IAP price and total IAP transactions.

MR. SWANSON: Okay. Now we can take our break.

How long, Mr. Rifkin?

MR. RIFKIN: Why don't we plan to come back at 1:00 o'clock? Half an hour. Is that okay, or do you need a little more time?

MR. SWANSON: I'm being told 45 minutes is a little more reasonable, so why don't we say 1:15.

Is that all right for reporters and videographers?

THE VIDEOGRAPHER: Going off the record. The time is 12:28 p.m.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record. The time is 1:16 p.m.

Q. (By Mr. Swanson) Professor, you're aware, are you not, that the full App Store data contains a very large number of accounts where the account makes only a single 99-cent in-app purchase in the real world?

Page 117

30 (Pages 114 - 117)

You are aware of that, are you not?    01:16:46

A. I don't have the specific numbers in hand, but yes, I'm aware of that.

Q. Okay. How does your model determine what those accounts will pay in the but-for world, given 01:17:00 that they only purchase a single in-app purchase item and your account makes no assumption about how many in-app purchases they make in the but-for world?

MR. RIFKIN: Objection to the form of the 01:17:17 question.

THE DEPONENT: Please -- please repeat it.

Q. (By Mr. Swanson) How does your model predict but-for pricing for all those accounts that 01:17:29 make only a single in-app purchase of a 99-cent item in the real world?

A. The model establishes the -- the but-for price and from that -- a -- a percentage change in price for total IAP purchases and for downloads, 01:18:01 and it does not make any differentiation between what -- what's happening with a person who has multiple purchases versus a single purchase. A -- the only distinction would come -- in my supplemental report would be that if -- if the 01:18:31

Page 118

class members with less than $10 in total spending 01:18:38 are excluded for administrative or class redefinition reasons, then the group you've just mentioned would be included.

Q. Can your model reliably estimate the 01:18:55 but-for price paid by all of those accounts that make only a single 99-cent in-app purchase in the real world?

A. I don't think there is a distinction. Certainly the model does not make a distinction 01:19:19 between sources of overall demand in terms of size of -- of purchases or -- or levels of purchases.

So that reliability of the model is -- is determined overall but the statistical reliability. I don't -- I don't believe there is -- a 01:19:45 determination of that or that there's a reason for a determination of that by spending level.

Q. So you are confident in your predictions about the but-for pricing for those accounts that make only a single 99-cent in-app purchase 01:20:06 transaction?

A. I'm confident that this is an appropriate econometric model for determining damages, and I -- I don't -- I believe that's -- that's the primary -- its primary purpose.    01:20:28

Page 119

I don't -- I have not gone and looked at 01:20:30 its impact on people with different levels and spending except insofar as I've been asked to do the calculations excluding -- excluding those with $10 total spending or -- or less.    01:20:47

Q. Professor, I'd like to understand how you calculate the average price for all of the in-app purchase items offered by a given app in a given month.

Do you just add up the individual prices 01:21:04 and take a simple average, or do you weight them by the number of transactions, or do you do something else?

MR. RIFKIN: Objection to the form of the question.    01:21:15

THE DEPONENT: I -- I will -- I will refer you back to the -- to the earlier reports, but it's -- it's a simple average.

Q. (By Mr. Swanson) So if a given app in a given month has two items, two in-app purchase 01:21:31 items, one for 99 cents and one for 99.99, would the average price that you would calculate be $50.49?

A. Yes.

Q. And -- and it's your opinion that that's 01:21:48

Page 120

a reasonable way to calculate the average price? 01:21:50

A. Yes.

Q. If you assume in that example that there were a million purchases of the 99-cent item and only one purchase of the 99.99 item, would you 01:22:03 fill -- still think it's a reasonable way to calculate the average price?

A. I believe that overall, in analyzing the market demand and how developers would behave in this market with a different commission, that 01:22:28 that's an appropriate assumption to meet.

Q. Do well-trained economists used weighted averages to account for the popularity of different purchase items?

MR. RIFKIN: Objection to the form of the 01:22:41 question.

THE DEPONENT: I certainly -- I certainly don't think there is any uniform rule, and it would be highly context-dependent and problem-dependent.

Q. (By Mr. Swanson) Have you analyzed 01:22:59 whether simple average IAP price as you do rather than a weighted average IAP price affects your conclusions?

A. I have not.

Q. Do you know if that assumption, namely, 01:23:14

Page 121

31 (Pages 118 - 121)

using a simple average, affects your assessment of which accounts are harmed and which accounts are unharmed?

A. Please repeat the question.

Q. Have you analyzed whether using a simple average IAP price as you do rather than using a weighted average price affects your calculations about which accounts are harmed and which are unharmed?

A. I have not investigated that.

Q. Do you have an expectation as to what the impact of -- of using a simple average would be on your calculations of damages and impact?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I -- I haven't investigated that. At this point, I do not have an expectation.

Q. (By Mr. Swanson) As you calculated, the average price of an IAP bundle of item for an app can change from month to month if the developer adds one or more new IAP item at a different price, correct?

A. That is correct.

Q. And that's true even if the developer

Page 122

makes no change in the prices of the existing IAP items, right?

A. That can happen, yes.

Q. Suppose an app has one IAP item in January priced at 99 cents and then assume that the developer adds a second IAP item at 1.99 in February while keeping the January item at the same price.

Making those assumptions, your model will calculate a higher average IAP price in February than in January, wouldn't it?

A. That's correct.

Q. And you -- and you believe that's reasonable?

A. I believe that in the context of the overall analysis of IAP demand that that's reasonable, yes, in that context.

Q. Please turn to paragraph 80 of your supplemental report. That would be on page 32.

A. I have that in front of me.

Q. Okay. You note here in paragraph 80 that the court's class certification order stated that you "cite to no evidence or any other subject matter expert to justify your opinion that pricing tiers would not exist absent anticompetitive

Page 123

conduct."

Do you take issue with that?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: It is -- it is correct that I did not -- I -- as I recall, cite any literature on the prevalence of -- of prices at various price points in my previous reports. I do have several citations contained within this -- within this report here.

By the way, I would make a clear distinction between tier prices and local prices. Tier prices are imposed by a seller to -- to -- monopolistic seller, and focal prices are something that arise out of -- out of equilibrium and the -- the -- voluntary pricing by sellers, and those are not necessarily the same.

Q. (By Mr. Swanson) Just to follow up, because I'm not sure I follow.

Did you say that tier prices are imposed by a seller to monopolize?

A. No. I said that if -- if a -- if you have tier prices to impose, for example, by a monopolist, then that's distinct from focal prices.

Let me -- let me follow up that one with

Page 124

comment, which is that the existence of tier prices in general requires some kind of overall market control of pricing, and one way to get that is to have a monopoly supplier. Another way to get it is to have some outside regulatory agency setting up the tiers.

Tier prices are not necessarily stable or sustainable in a market in which there is competition with an absence of some kind of regulation.

Q. Are these views that you've disclosed in any of your expert reports?

A. No, I didn't disclose that in my -- in my expert reports but issued a response, I think, to your question -- or at least it's a response --

I'm sorry. It's not so much a response to your question as it -- it's a response to -- to the beginning -- to ask questions about tier and focal prices as if they were the same thing. They're not.

MR. SWANSON: All right. Well, that, I think, was a spontaneous offering of yours I'll move to strike as nonresponsive.

Q. (By Mr. Swanson) Do you continue to hold the opinion that pricing tiers would not exist

Page 125

32 (Pages 122 - 125)

absent anticompetitive conduct?    01:29:50

A. My view on that is it's -- it's an open question as to what the structure of the but-for market would be if there are rivals present to the Apple Store and that the ability of Apple to    01:30:09 maintain its -- its own tier pricing structure would be -- be at issue if -- if rivals came in and -- and did not adhere to the Apple pricing structure. And they're -- they may have an incentive to not do that -- or they do have an    01:30:35 incentive, possibly, to not do that.

Q. And do you discuss that in your supplemental report?

A. I don't.

Q. Do you still agree that focal point    01:30:50 pricing is common?

A. What do you mean by "focal point pricing"? By the way, could you tell me what -- what the focal prices are? Would you enumerate them for me, please.    01:31:07

Q. Well, you use the term "focal point pricing" in your report, do you not?

A. I -- I use it because Professors Smolinksi and Prince used it, but in -- in the discussion in which focal prices and tier prices    01:31:25

Page 126

are used as synonyms, the question naturally arises    01:31:28 what exactly are focal prices. I take it that your experts have some specific prices in mind as -- as focal points for seller behavior.

Q. Well, do you recall that the court in its    01:31:47 order stated that during your second deposition, you testified that focal point pricing is common?

A. Yes. I don't -- I don't disagree with that opinion. But then the question is what -- what is focal pricing, and I -- and I -- if you    01:32:02 want me to elaborate on my previous opinion, I think -- I think that is -- that's an open question. I think it's -- empirically you have to define what you mean by a focal price and you have to list them out, and then you can go and look at    01:32:17 -- look at actual pricing at Walmart's or Amazon and -- and -- or the Google store or wherever there are not tiers fixed in place and ask how prevalent are they. That's an empirical question.

Q. Well, do you still expect to see focal    01:32:37 point pricing in the but-for world absent Apple's price tiers?

A. Again, the answer is that if focal prices are defined as prices which end in .99, .89, .79, .69, .59, .49, .39, .29, .19, .09, .95, .9, .85 and    01:33:00

Page 127

so forth, if those are all focal prices, then I    01:33:15 would not at all be surprised that most prices fall in one of those categories.

Q. And would you expect in the but-for world that developers would choose to price their apps at    01:33:31 focal points ending in 99 cents most of the time?

A. I don't have a specific expectation with respect to what developers would do, but I think a general economic observation is that there -- there are price points which are more common than    01:33:57 others -- but you have to be careful that that's not a circular definition -- and -- and that -- that they exist for a variety of reasons.

For example, in the game theory literature, it's pointed out that focal prices can    01:34:16 be the result of tacit collusion among sellers.

Q. Can you take a look at footnote 86 on page 33 of your report.

A. I have that in front of me.

Q. You note in that footnote that "As part    01:34:51 of its settlement with developers, Apple has proposed to implement by March 2023 a price tier menu with 750 price points."

Is that your understanding?

A. That is my understanding, yes.    01:35:04

Page 128

Q. Is it your opinion that Apple would adopt    01:35:07 these 750 price points in the but-for world?

A. What I've done in the supplemental report is to go through and exercise to test what the impact of tier pricing would be if Apple had had    01:35:31 750 tier prices with a guess as to what those might be, since that -- Apple's plans haven't actually been announced yet.

Q. In your simulation, are you making any assumption about when Apple would first apply the    01:36:03 750 price tiers in the but-for world?

A. The calculation that I do assumes those -- those price tiers would be in place in the but-for world throughout the damage period.

Q. Is it your assumption that Apple would be    01:36:38 adopting those 750 price points in the but-for world as a result of a settlement with developers?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: What I would anticipate is    01:36:56 that the settlement with developers is -- is some reflection of the environment in which the Apple Store would have operated under competition.

Q. (By Mr. Swanson) By "some reflection," do you mean that the price points among the 750    01:37:15

Page 129

33 (Pages 126 - 129)

that end in .99 would be present in a world absent Apple's current price tiers?

A. Please repeat the question.

Q. You know what? I'll withdraw it.

Can you look at paragraph 82 in your supplemental report.

A. I have it in front of me.

Q. You refer in paragraph 82 to "left digit bias."

Do you see that?

A. Yes.

Q. Are you a subject matter expert on the subject of left digit bias?

A. I've cited a paper from who may be the only world expert on left digit bias.

Q. Have you done any academic work on the subject of left digit bias?

A. No. I've done work on the impact of tier pricing and the impact of tier pricing on -- on markets, but I have not investigated left digit bias.

Q. And you indicated, I think, that you believe there is only one subject matter expert on left digit bias in the world? Is that -- did I hear that right?

Page 130

A. No, I -- I -- I -- that was perhaps facetious. That's the only piece of literature that I'm aware of where that term is -- is even used, but I haven't searched that literature comprehensively.

Q. Okay. Have you searched that literature even less than comprehensively? Have you looked for any articles other than the one you cite?

A. I have not personally done a Google search on left digit bias.

Q. Have you done -- is -- is Google searching how you typically do academic research on subject matters where you don't have expertise?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Yes, I start with Google and JSTOR and Wikipedia and any other source of information that's available that's germane, and I try to evaluate it for what it's worth.

Q. (By Mr. Swanson) Okay. Turning to paragraph 83 of your supplemental report.

You state that "empirical evidence indicates that price setting with a final 9 or 99 digit is far from universal."

Do you see that?

Page 131

A. Yes.

Q. When you say it's far from universal, do you mean to say it's not common?

A. No. I mean far from universal.

Q. To be universal, would 100 percent of prices need to have a final digit of 9 or 99?

A. That's what universal would mean, yes.

Q. Okay. Would focal point pricing need to be universal to be important in assessing harm in this case?

A. Please repeat the question.

Q. Would focal point pricing need to be universal to be important in assessing harm in this case?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I -- I have difficulty with the question, because I think the -- the first question one should ask is what is the role of focal point pricing in any demand analysis and -- and market equilibrium analysis, particularly in the context of -- of litigation.

And what I can say is that certainly in the broad sweep of empirical economics, focal point pricing is -- is not -- does not figure

Page 132

significantly, and -- and whether it -- whether it should in specific applications is -- I think there's -- there's very little literature background on that.

Q. (By Mr. Swanson) Do economists who form opinions about predominantly common injury often omit focal pricing from their models?

A. Please repeat the question.

Q. Do economists who form opinions or who offer opinions about predominantly common injury often omit focal pricing from their models?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I -- I do not have a comprehensive view of what these -- this class of experts have opined.

Q. (By Mr. Swanson) Turning to paragraph 87, which is on page 35, you refer to a simulation that approximates a but-for world where Apple maintains its current price tier structure.

Do you see that?

A. I have the paragraph in front of me, yes.

Q. Okay. What do you mean by "simulation"?

A. I will try to describe what's -- what's done here, which is to -- in the but-for projection

Page 133

34 (Pages 130 - 133)

of demand and price setting to limit the pricing of IAP or of downloads to changes which correspond to the -- the grid sizes in -- in the Apple tier.

Q. Is a simulation different from an estimation?

A. I believe those are essentially synonyms, but the idea of a simulation is to -- of estimation is generally some statistical technique based on observations, and simulation is a projection, a forecast or an as-if analysis of what would happen under alternative conditions.

Q. In your simulation, do all individual IAP item prices conform to Apple's price tiers?

A. No. My model does not analyze and is silent on the pricing of individual items within IAP, and so in that sense this analysis is an analysis of what -- what would happen if average IAP prices were limited -- limited to changes that were on the scale of the Apple tier grid.

Q. How can you implement price tiers in your model if your model can't predict individual IAP item prices?

A. The technology -- the technology we -- we -- I've used for this, my team and I, is to adopt Professor Prince's methodology here, which

Page 134

is -- in -- in effect to -- introduce IAP average price changes that are -- well, one -- one or more tier distances away from the original average price.

So it's -- it's an -- an adaptation of his method.

Q. I see. And you accept his opinions about the proper way to account for price tiers in your model?

A. I believe that it is -- it provides an indication of the extent to which price tiers could -- could constrain competition with the intention of identifying situations in which it's -- it's likely that a firm offering IAP would not change its average IAP price.

Q. In paragraph 87, you state that you assume that "developers must choose but-for average in purchase prices by adjusting their as-is price in fixed increments consistent with the size of the increments on Apple's tier schedule."

Do you see that?

A. I see the sentence, yes.

Q. Okay. Okay. And when you refer to this, are you talking about fixed increments around the real-world average IAP bundle price for an app?

Page 135

A. Yes. The method starts with the as-is average IAP price. It -- it looks at the Apple tier where that price would fall in some interval between tiers and considers adjustments from that -- in that average IAP price at that same granularity, at the same distance between tiers as -- as would appear in the as-is world.

Q. And that real-world as-is average IAP price likely won't end in 99 cents, will it?

A. That's correct.

Q. Okay. To take an example, hypothetical example, if the average IAP bundle price is $3.25 in the real world, what fixed increments are you talking about that you look at?

A. At $3.25, it would be -- that's -- that's a region where the Apple tiers are one dollar apart, so it would be a plus or minus. $1 or $2 prices have to stay nonnegative, but plus or minus one, two, three, so forth.

Q. So you'd look at prices in this hypothetical that would start at 25 cents, move to $1.25, then to 2.25, then to 3.25, and so forth?

A. Correct.

Q. What if the IAP items in the app include both subscription and nonsubscription in-app

Page 136

purchase items? How do you -- how do you calculate the increments in that case?

A. I'm -- I'm aware that for subscriptions the Apple tiers are dense -- denser, but I would have to go back and -- and check my calculations to see whether I took that into account.

Q. Well, you're aware that currently subscription price tiers are somewhat different from non-subscription price tiers, correct?

A. Yes.

Q. So isn't it true that your method assumes that you will apply the subscription price tier increments if the average IAP price in the real world is the result of at least one subscription item?

A. I -- I would have to check how this was implemented at -- at a technical level.

Q. Well, is it important to you to make sure that your model is implemented properly at the technical level?

A. I think for the purposes of this section, the intent of the calculation is to provide a -- a sense of how many consumers might be unharmed as the result of confining IAP average price changes to -- to grid-level increments. And I think for

Page 137

35 (Pages 134 - 137)

that purpose, it -- it does what it's intended to do and says what it does.

Q. Going back to the hypothetical average bundle price of $3.25, is it correct that what your simulation does is look at the prices at fixed increments around that $3.25 and figures out which one is closest to the profit-maximizing price according to your model?

A. The principle here is that -- and it's a general principle -- is that a -- a firm will adjust prices to maximize profits, and if those prices are allowed to be continuous, it will do that what -- what I consider in all prices, and if prices are restricted to some -- some tier structure or grid, then it will maximize profits over the prices in the grid.

So the -- the application here of that general principle is that profits -- profits are compared for each of the possible increments.

Q. So if the hypothetical where the average real-world IAP bundle price is $3.25, your model says that the profit-maximizing price in a world with flexible pricing, a but-for world with flexible pricing, would be $2.60, does the model then look to see whether 2.25 or 3.25 or 4.25 is

Page 138

the relatively next most profitable price?

A. It is correct that the -- the -- this exercise looks for the -- a price at this level of change -- incremental changes that would maximize profits and would identify the app is not harming consumers if by this calculation the maximum profit remained at the original average IAP price.

MR. RIFKIN: Note my objection to the form of the question that Professor McFadden answered. I didn't get a chance to put my objection on the record, and I didn't want to interrupt his answer.

MR. SWANSON: Okay. Noted.

Q. (By Mr. Swanson) Professor, when you run your simulation using the roughly 750 price points, do you generate the price points in the but-for world in the same way, by looking at the increments around the as-is average IAP price?

A. That's correct.

Q. Okay. Please turn to paragraph 96 of your supplemental report. Let me know when you have that.

A. I have that.

Q. You state in there in that paragraph that your simulation shows that your model can

Page 139

accommodate any but-for price tier or focal pricing menu decided by the court and recalculate the results presented in figure 7 accordingly.

Do you see that?

A. Yes.

Q. Is it your understanding that the court will decide the proper price tiers or focal price points?

A. I'm not sure at what stage. Is this the point that the court, as I understand it, will decide on class certification, and -- and the court will weigh whether focal pricing is a very urgent certification? I suppose if the court certifies this class, then it's -- it may be a jury that decides this.

Q. So it's the jury that will decide which tiers or focal pricing menu to use and then recalculate the results?

A. No. I think my statement -- my statement should be that I -- I would say --

Let me start over.

In fact, the merits of alternative proposals for what would happen in the but-for world as regards tier pricing and/or focal pricing will -- would be aired in subsequent proceedings,

Page 140

and -- and the -- the judge or the jury can rule on their -- on the merits.

Q. Let me ask you to look at paragraph 90 of your supplemental report.

A. I have that.

Q. Okay. Thank you.

You state that the percentage of unharmed accounts in the tier pricing or focal pricing case is slightly larger than in the flexible pricing case.

Do you see that?

A. Yes.

Q. Now, these results are based on your use of a single .1 percent sample rather than the average of the 75 samples, right?

A. That's correct.

Q. Do you have an estimate of the percentage of accounts that are unharmed if each IAP item transaction took place precisely at one of Apple's price tiers in the but-for world?

A. No. My model is silent on -- on what menus would be offered in -- in the but-for world by a single developer with a single app.

Q. You indicate here in your report in paragraph 90 specifically that 20 percent of

Page 141

36 (Pages 138 - 141)

accounts are unharmed in the scenario where Apple maintains its current tier structure.

Is that right?

A. Yes.

Q. Now, that's almost 50 percent higher than the 14.3 percent figure you report for your model without tiers, right?

A. Let me -- let me pause in responding to that by referring you to the table with percentages unharmed.

And I believe this 20 percent number would be -- should be compared with the -- the percent unharmed.

And I'm not sure in my report whether that appears in Appendix C -- D or in the text.

Q. Well, you're talking about figure 7? That's on page 39.

A. Yes, that would be the -- that would be the comparable number without -- without tier pricing.

Q. And in column B, you report 20 percent of accounts unharmed in the class as defined in the complaint, right?

MR. RIFKIN: Objection to the form of the question.

Page 142

THE DEPONENT: Please remind me where we are in terms of what paragraph.

Q. (By Mr. Swanson) We're looking at figure 7, column D.

A. Yes, I see that now.

What's the question?

Q. Well, first the question is: Let's focus on what that -- what does that 20 percent mean?

A. That means that by the calculations that we have just discussed on the 0.1 percent sample and restrictions on what IAP average prices could be to various increments consistent with the -- the app tier at -- at 20 percent of people would be un- -- unharmed either -- either because they were originally unharmed or because in -- in addition they are buying the products for which the -- the -- the developer would not increase profits by changing IAP average price by one of those increments.

Q. So in your simulation, Apple's price tiers result in less harm than a scenario where there are no price tiers at all; is that correct?

A. I'm sorry. "Less harm"? I'm sorry. I missed -- I lost the train of the question.

Please repeat it.

Page 143

Q. Yes.

In your simulation, you calculate that Apple's price tiers result in less harm than in a world where pricing is perfectly flexible?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Yes, I think the implication of these numbers is that Apple's price tiers are anticompetitive. It prevents the fruits of competition from being -- being spread to consumers.

Q. (By Mr. Swanson) Well, how do you reach that conclusion when you calculate that the damages with price tiers are lower than the damages with flexible pricing?

MR. RIFKIN: Hold on a second. I want -- I want to object to the form of the question, but I'm not sure I heard the question correctly, so maybe you want to read it back.

MR. SWANSON: Go right ahead.

MR. RIFKIN: Thank you.

(Record read as follows:

"QUESTION: Well, how do you reach that conclusion when you calculate that the damages with price tiers are

Page 144

lower than the damages with flexible pricing?")

MR. RIFKIN: Okay. I'll object to the form of the question and stand on that objection.

THE DEPONENT: Well, what's happening here, you have a whole series of people that in the presence of flexible pricing would be damaged and would be accounted as being damaged, and then these are -- these are the price tiers. The conclusion is that this segment of people would no longer be recipients of -- of damages because they are calculated as not buying things as price would go down.

And the reason for that is that those prices are not going down because they're restricted to tiers.

Q. (By Mr. Swanson) So price tiers reduce the amount of damages and increase the number of unharmed accounts, but you're testifying that that shows that they are anticompetitive?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I would say that if price tiers have the impact of preventing competition from filtering down to consumers, then that's --

Page 145

37 (Pages 142 - 145)

that's a form of -- of anticompetitive conduct.    02:05:53
Whether it's -- it's legally anticompetitive is not an issue that I have an opinion on.

Q. (By Mr. Swanson) In your reply report, 02:06:09 you had indicated that when you analyzed Professor Prince's work, you found that overall damages are slightly larger with price tiers.
Is -- is it still your view that overall damages will be higher with price tiers than 02:06:25 without?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I don't recall what was in my report now. I would have to go back and -- and 02:06:35 read it and determine the context for that claim.

Q. (By Mr. Swanson) Well, do you currently hold the opinion that aggregate damages are higher if you account for Apple's price tiers in the but-for world?    02:06:53

A. I think that's an empirical question. It would depend on the data, and obviously now we are dealing with a new production of additional data.
So the answer is that it's -- it's data-dependent. It's an empirical question.    02:07:13

Page 146

Q. Well, and your simulation shows that 02:07:17 aggregate damages are less than 100 percent of the damage without price tiers, correct?

A. You're talking about in the supplemental report?    02:07:37

Q. I'm talking about figure 7.

A. As calculated by -- by a small amount, that's correct.

Q. Okay. Would you have some other calculation where price tiers make the aggregate 02:07:50 damages higher than with flexible pricing?

A. Not on these data.

Q. Do you have some other data that you're going to analyze from that standpoint?

A. In my earlier reports I was working with 02:08:09 data that excluded Apple's third production. That was different data.

Q. Do any of your models or simulations take account of the fact that the App Store transaction data reflected the pricing choices of developers 02:08:28 who are already constrained by Apple's price tiers in the real as-is world?

A. The answer is my -- my assumption as described in Appendix E is that developers are profit maximizers in the as-is world and that they 02:08:56

Page 147

have produced products and menus of products that 02:09:00 are appropriate to those prices.

Q. Well, your model assumes that if an app is priced at the $1.99 tier in the real world, that $1.99 is the true profit-maximizing price for that 02:09:28 developer and that app at that time, correct?

A. That -- that is correct.

Q. Isn't it a fact that when you observe that in the real world the developer selected a tier price of $1.99, all you know is that that 02:09:48 price was more profitable than the 99-cent or the 2.99 price tier?

A. You certainly know that, and you also know or at least as an economist assume that developers are profit maximizers, so that -- they 02:10:09 are missing products which maximize their products.

Q. But with price tiers in the real world, isn't it a fact that you can't know exactly what the developer's marginal cost is?

A. The answer is -- is yes, you can -- you 02:10:42 can determine that within -- within limits.

Q. And the limits are implicitly defined by the tiers, correct?

A. Yes.

Q. And those limits therefore will give you 02:11:09

Page 148

a range for the marginal cost, not a specific 02:11:12 point, correct?

A. As I say, my assumption is that -- the assumption underlying the analysis is that these firms are offering products that are 02:11:33 profit-maximizing at the prices they charge, and -- and those products have been -- have been designed and menus designed with price restrictions in mind.

Q. So are you saying now that it's your assumption that the precise price tier prices are 02:11:58 the respective profit-maximizing prices higher than any other price choice for the developer in the real world?

MR. RIFKIN: Objection to the form of the question.    02:12:14

THE DEPONENT: The answer is yes, that's the assumption that's made, as detailed in -- in Appendix E as consistently with all that's set out in my original report as well.

Q. (By Mr. Swanson) And if that's correct, 02:12:29 then those developers would choose those prices if there were no price tiers, correct, because they're the profit-maximizing prices?

A. I'm sorry. I lost -- please repeat the question slowly.    02:12:43

Page 149

38 (Pages 146 - 149)

Q. If -- if that assumption is correct, then 02:12:44 developers would choose those prices that end in 99 cents even if there were no price tiers, because you've just told me they're the profit-maximizing prices in the real world, right? 02:12:58

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: No, I don't -- I don't agree that that's a logical conclusion. It's entirely possible that if -- if they're in the 02:13:09 absence of tiers, they would design and price their products even more profitably.

Q. (By Mr. Swanson) Do you take that into account in your model?

A. The model as described in Appendix E 02:13:30 assumes that in the as-is world, firms are maximizing their profits at the prices they charge.

Q. And that's an assumption. Is there anywhere in your report where you marshal empirical evidence to show that's actually a description of 02:13:55 reality?

A. No.

Q. Let me ask you to turn to footnote 98 in your supplemental report, which is on page 35.

MR. RIFKIN: While Professor McFadden is 02:14:24

Page 150

doing that, if we're switching topics, we've been 02:14:25 going at it for about an another hour again. Is this a good time to take a break?

MR. SWANSON: With one or two more questions, yes, it is. 02:14:34

MR. RIFKIN: Okay.

THE DEPONENT: Did you say footnote 98?

Q. (By Mr. Swanson) Yes, footnote 98, page 35.

A. I have that in front of me. 02:14:47

Q. You indicate in that footnote that given the computational intensity of your price tier analysis, you did not have sufficient time to perform the tier and focal pricing analysis using the mean coefficients applied to the full App Store 02:15:08 transactions data within the time allotted by the court to incorporate Apple's revised data production.

Have you started performing that analysis? 02:15:21

A. Excuse me. I need one second to check which tables I have.

The answer is that -- I believe that is on the to-do list, but as of the -- as of the time this work was done, it had not been scheduled. 02:16:11

Page 151

Q. When do you estimate that you'll be 02:16:20 completed with that analysis?

A. I would have to check with -- with the team. I think the first priority of -- of the team at this point is compute standard errors, so I 02:16:35 don't know what the status of that is.

Q. But you do intend to undertake that analysis?

A. I -- I think it would be appropriate to do it, but I -- I believe that the essential points 02:16:55 that are made in this section are perfectly valid and sound using the 0.1 -- single 0.1 sample, so that is -- I wouldn't put as high a priority as some of the other computations we need to complete.

MR. SWANSON: All right. Well, thank 02:17:21 you.

We can take a break now.

MR. RIFKIN: Okay. Thank you.

THE VIDEOGRAPHER: Going off the record. The time is 2:17 p.m. 02:17:29

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:29 p.m.

Q. (By Mr. Swanson) Professor, is it correct that in order to estimate but-for prices in 02:29:29

Page 152

your model, you need to solve for the developer's 02:29:34 marginal cost?

A. Yes.

Q. And do you agree that marginal cost is the increment or addition to cost that results from 02:29:48 producing one more unit of output?

A. Yes.

Q. Now, can you help me understand the role of marginal cost in the process of estimating the but-for price. How -- how does -- how do you do 02:30:02 that using marginal cost?

A. This is all outlined precisely in Appendix E of the supplementary report. Would you like to -- for me to turn to that?

Q. Sure. 02:30:25

A. So now the question is -- please state your question again.

Q. Well, let me see if I can focus it in terms of the equations you've laid out in Appendix E. 02:30:53

In your equations, you use a little c, alphabet letter c, as a symbol for the developer's cost per unit; is that correct?

A. Yes, so one for -- one for downloads and one for IAP. 02:31:11

Page 153

39 (Pages 150 - 153)

Q. And each unit that's sold incurs a cost 02:31:13 equal to whatever value little c takes in -- in the respective cases of downloads and IAPs, correct?

A. Yes, under -- under product maximization, yes. 02:31:30

Q. And if little c is equal to one dollar and if there are five units sold, you assume that the incremental cost of the five units is $5, right?

A. Say -- say that again, please. 02:31:42

Q. Sure.

If little c is equal to one dollar and if you assume five units are sold, then your model assumes that the incremental cost of those five units are $5 in total. 02:31:58

Do you agree with that math?

A. Correct.

Q. Okay. Now, your cost variable, the little c, does not depend on the price of the transaction, does it? 02:32:11

A. Are we -- are you referring to a specific profit -- business model?

Q. I'm -- well, does it vary -- does c have a value that depends on the price of the transaction under any business model? 02:32:36

Page 154

A. It's not that c depends on the price of 02:32:43 the transaction but rather that under the assumption of profit maximization, one can recover from the observed price what c is.

Q. Well, in your modeling, do you model c as 02:32:57 depending on the price of the transaction?

I understand you solve c at a certain point in your estimation process using pricing data. But in your model, do you assume that c changes if the price of the transaction changes? 02:33:21

A. Make -- to make this specific, let me refer to paragraph 110, which is the case for a paid download only business model, and there the assumption is that the firm is choosing a download price given it -- giving it c, and giving -- given 02:33:48 demand response, which is sensitive to the download price, as -- as determined by question 8. And the firm then chooses to price it, maximizes that profit given c.

And then the -- then what we do -- what I 02:34:08 do is reverse that -- effectively reverse-engineer the product maximization of -- of the developer and say what -- what does c have to be in order to obtain the price that was actually charged.

Q. And if c happens to be a dollar per unit, 02:34:33

Page 155

that's regardless of whether the unit is priced at 02:34:40 99 cents or $99.99, correct?

A. That's correct.

Q. Can -- can c take the value of zero in 02:35:00 your model?

A. It did, yes.

Q. Can it be negative?

A. Yes, it can.

Q. Now, is -- is c what you're referring to when you speak in your report about the developer's 02:35:14 marginal cost?

A. Yes. It's -- it's the net incremental cost of delivery one unit, making note of both the direct cost of -- whether we -- we're required to service that to unit and netting indirect revenue 02:35:34 as unmeasured from other sources.

Q. Well, you're talking about how you estimate c, but I'm asking you now about your model posits what c is. And in your model, c is an amount, a fixed amount that varies by the number of 02:35:58 units that are sold, right?

A. Small c is a cost -- a net cost per unit.

Q. And it's also the marginal cost, correct?

A. And it's -- it's, yes, the marginal -- and it's the marginal cost. Does not depend on the 02:36:21

Page 156

number of units sold in this model. 02:36:24

Q. And it also happens to be equal to the average variable cost, the way you've made your assumptions here, correct?

A. Actually, no, because average variable 02:36:40 costs includes an allocation of fixed cost across all the units sold. This does not include an allocation of fixed cost.

Q. I've never done economics at a serious university, but average variable cost does not 02:36:58 include an allocation of total cost, does it?

A. I'm sorry. I missed -- I missed the -- the word "variable." Please go back and ask your question again.

Q. All right. You were scaring me there for 02:37:12 a moment.

Is it not the case that based on the way you assume costs are structured for your model that marginal cost is equal to average variable cost?

A. Yes, that is correct. When -- 02:37:29

Q. Okay.

A. -- marginal cost is constant, marginal cost equal average variable cost.

Q. Have -- have you undertaken any analysis empirically as to whether that is an appropriate 02:37:40

Page 157

40 (Pages 154 - 157)

and realistic assumption in this particular business?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I would say I'm not sure what you mean by "empirical." Certainly I tried to understand what the costs are of providing apps, what those cost components would be.

And I think part of that understanding is that the elements that I identify as specific elements of -- of costs are something that scales without changing the cost per unit.

Q. (By Mr. Swanson) Do you cite any evidence in your reports to establish the proposition that developer's marginal and average variable costs are the same?

A. I don't recall now whether that was part of the -- part of my original report or -- or not, but that is the assumption.

Q. Well, if marginal and average variable costs are different for developers generally, which one is relevant for determining a developer's profit-maximizing price?

MR. RIFKIN: Objection to the form of the question.

Page 158

THE DEPONENT: Well, I -- I -- I would say that true marginal cost and true net marginal cost would be the thing that developers would care about in terms of whether to -- to try to change their price to sell one more -- one more unit. But if they have a -- a variable cost structure, that is, marginal cost is actually changing, then one -- one would need -- I think it would be prudent to go further and investigate and tell you what the sources of costs are.

Q. (By Mr. Swanson) Do you have any basis to reject the premise that developers who sell digital content have marginal costs that are much lower than their average variable cost?

A. I -- I have no direct evidence on that.

Q. Do you assume that two apps in the same genre that have the same price and the same business model and face the same commission rate have the same marginal cost?

A. That is an implication of the calculations as outlined in Appendix E, yes.

Q. If two apps in the same genre have different prices in the same business model and face --

Well, strike that. Let -- let me try

Page 159

again.

If two apps in the same genre with the same business model have different prices, do you assume they have different marginal costs if they face the same commission rate?

A. Yes. The assumption is that firms are profit maximizers, and given what we observe on developers, they've got -- you know, their -- the prices they charge, we -- we have no way of distinguishing further.

Q. Do you think it is likely that marginal costs, as you estimate them, would change at the exact same time as a change in the commission rate?

A. Please repeat the question.

Q. Do you think it is likely that marginal costs, as you estimate them, would change at the exact same time as a change in the commission rate?

A. In the commission rate? Is that --

Q. Yeah.

A. -- your question?

Q. Yes.

A. I -- I have not -- I have not examined that issue. I -- I've -- I'm not sure that I have the -- have the data. I'd go back and look at the record in which -- to see if there are data in

Page 160

which commission rate changes and then worry about the dynamics of the response.

Q. But that's something you could do?

A. Oh, I don't know. I don't know if it's in the data, and I don't know if -- if -- given the purpose of this model is to determine long-run effects and not short-run dynamics, I'm not sure that the data would support a long -- long-run calculation.

Q. What is your definition of the "long run"?

A. Well, it's the usual economist definition. It's longer than the short run.

Q. Well, the usual lawyer's follow-up is how long is the short run?

A. I've -- I've encountered that question before, and I still don't have a numerical answer.

Q. Let me ask you to turn to paragraph 19 of your supplemental report. It's at page 8.

A. I have that in front of me.

Q. Okay. In the second sentence there, you say that you used the one -- one-tenth of 1 percent random sample and data on variable margins that were available from some app developers to estimate iOS aftermarket consumer demand and

Page 161

41 (Pages 158 - 161)

developers' variable costs.　02:44:09

When you say that you're estimating developers' variable costs in that sentence, do you mean that you're estimating marginal cost; in other words, that little c in your equation?　02:44:25

A. Yes.

Q. And then what do you mean by the term "variable margins" in that -- in that sentence?

A. The margin data comes from data from specific firms, either because they are public　02:45:00 firms and are publishing accounting information or because information is revealed through discovery. And there, the data come as accounts using standard accounting definitions.

And in -- in accounting, the distinction　02:45:25 is normally made between fixed costs and -- and variable costs. And so the -- the margins that -- that we use remove fixed costs and look at margins on -- on variable costs.

Q. In -- in terms of your mathematical　02:45:53 model, do you define the variable margin as being equal to price minus marginal cost divided by price?

A. Yes.

Q. So if the price hypothetically is $9.99　02:46:13

Page 162

and the marginal cost is a dollar, the variable　02:46:17 margin would be $9.99 minus a dollar, which is 8.99, divided by 9.99?

A. Yes.

Q. And that would be about 90 percent in　02:46:33 that hypothetical example?

A. Yes.

Q. Now, in paragraph 19 you had stated that your method uses data on variable margins that were available from some app developers.　02:46:48

Is -- are you referring there to the six app developers that have been spoken of in your prior reports?

A. I don't have my -- I have no reason to review my prior reports, but I don't remember the　02:47:06 exact number. But I take it that's -- from your description, that's what I did.

Q. Did you have -- well, I will represent to you that you -- that you mentioned the six in your prior report.　02:47:22

Did -- did you have data on those developers' marginal costs?

A. I believe in every case the data was on accounting-level data on firm operations in which there would be an accounting distinction between　02:47:46

Page 163

fixed costs and variable costs and -- and　02:47:50 calculations of variable margins.

Q. If you had had information on developers' marginal costs, would you have used that information in estimating your model rather than　02:48:11 the data that you actually used?

MR. RIFKIN: Can you repeat the question, please. I'm not sure I followed it.

Q. (By Mr. Swanson) If you had had information on developers' marginal costs, would　02:48:32 you have used that marginal cost information in estimating your model rather than the -- the accounting data that you actually made use of?

MR. RIFKIN: Objection to the form of the question.　02:48:47

THE DEPONENT: Well, I -- I did not have that, so the -- the option never came and I didn't consider it.

Q. (By Mr. Swanson) In using the accounted -- accounting data that was available to　02:49:04 you, did you include any costs that varied with the price of the download or the in-app purchase, like royalty cost?

A. I'm not sure I understand the question. Please -- please -- please just state it in terms　02:49:29

Page 164

of --　02:49:31

I understand you're asking about subscription prices? Is that -- or apps that have subscriptions?

Q. That's probably right. That's probably　02:49:43 fair.

So which -- did you have developers in -- in the cost data that you analyzed who had subscription apps?

A. Yes. In the music and entertainment　02:49:58 genre, I did.

Q. And -- and did they have royalty costs that you included in your estimates of variable margin?

A. Yes.　02:50:14

Q. And did you determine if those royalty costs were related to the price that the developer set for the download or the in-app purchase?

A. I -- I'm not sure how to answer your question. What -- what's -- what's the case is　02:50:36 that we -- we had accounting data for these firms, and the accounting data included their -- their accounting measures of variable costs and fixed costs, and we used -- we used the -- the -- the margin for those -- for those firms.　02:50:55

Page 165

42 (Pages 162 - 165)

Q. Do you know how their royalty payments 02:51:02 are structured, whether they're fixed fees or whether the royalties depend on the revenues charged to consumers or whether the royalties depend on the number of transactions alone? 02:51:14

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I don't know specifically. The -- the way we used the data was to treat the accounting distinctions between fixed costs and 02:51:29 variable costs as a -- as a reflection of their cost per customer.

Q. (By Mr. Swanson) Did you include so-called user acquisition costs when you were analyzing this cost data from the six developers? 02:51:46

A. In any case where that was distinguished as to the count -- category, yes, we did include those.

Q. Do you have an understanding if user acquisition costs are incurred with each additional 02:52:09 transaction?

A. I'm aware that there are -- are different models for user acquisition -- not models. There are different modes of charging user acquisition costs, and many -- many of those involve a charge 02:52:31

Page 166

per eyeball or produced subscriber, and I reviewed 02:52:38 those as being components of margin costs.

Q. Marginal cost of -- of what? Of in-app -- for each in-app purchase transaction?

A. I'm sorry. Please repeat the question. 02:53:00

Q. Oh, marginal cost of what? The cost of acquiring a new subscriber? Is that a marginal cost of making an additional in-app purchase?

MR. RIFKIN: Objection to the form of the question. 02:53:16

THE DEPONENT: It's certainly a component of the marginal cost of -- of a download.

Q. (By Mr. Swanson) Is it a part of the marginal cost of --

A. It -- it -- overall, it is, because 02:53:35 the -- the -- the model assumes that the app developer is maximizing profit over the -- over the app, and that includes all -- all the sources of revenue from that app. So the -- if the -- if the developer is offering both a paid download and IAP, 02:53:56 then the -- the calculation is -- is a -- a marginal cost per overall unit -- overall either downloaded or IAP as -- as the case may be.

Q. So do you -- does your model assume that for each additional in-app purchase transaction 02:54:27

Page 167

that user acquisition cost is repeated? 02:54:31

A. I do not believe so, but I would have to go back to the technical details of the -- of the margin constraints to -- to verify that.

Q. Did -- did you include advertising costs 02:54:56 when you were looking at the six developers' cost data to determine variable margins?

A. The -- the construction in principle was to separate insofar as possible average cost -- advertising costs that were not linked specifically 02:55:22 to individual subscriptions or purchases from those that were linked to individual subscriptions or -- I said subscriptions. Downloads or IAP purchases -- and -- and limit the analysis to those where there was a specific provision for the 02:55:45 advertising payment to be associated with the number of eyeballs or number of purchases.

Q. So if Epic Games paid $10 million for a billboard in Times Square, you would have excluded that advertising cost when you were looking at 02:56:11 the -- the margins for Epic Games?

A. That was certainly the intention of the -- of the analysis. I would have to go back and -- and check as to just exactly what the data was from Epic and how -- how it was accounted -- 02:56:36

Page 168

accounted for in their accounts. 02:56:41

Q. Now, your -- your estimation methodology imposes margin constraints, correct?

A. Please repeat the question.

Q. Your estimation methodology imposes 02:56:55 margin constraints; is that -- is that correct?

A. That is correct.

Q. Okay. Is it necessary to impose the margin constraints in order to conduct your analysis? 02:57:10

A. I would say that it's helpful, because the margin constraints are quite informative for the nature of the operations of the firms within -- within a genre. They're -- it's not -- it's not essential, but I think it improves the precision of 02:57:36 the -- of the estimation.

Q. In your opinion, can you reliably estimate the price sensitivity of demand for game in-app purchases based on -- on your model run without any margin constraints? 02:57:55

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I don't -- I don't recall doing that or seeing the -- seeing the results of that, so I -- I -- I don't know the answer. 02:58:09

Page 169

43 (Pages 166 - 169)

Q. (By Mr. Swanson) Do you know if the results of running your model with and without margin constraints differ?

A. No. I don't recall seeing an analysis without margin constraints.

Q. Now, going back to developers whose data that you used to calculate the variable margins and the margin constraints, you -- you indicated that you didn't remember the specific number, but has -- has that number changed since your earlier reports? In other words, have you added data from any additional developers beyond what you used before to set your margin constraints?

A. As of the supplemental report, no, I did not add additional firms for which I had margin data.

Q. Okay. And then just to get the names, let me see if I can refresh your recollection.

For game developers whose data you used, do you recall that those were Epic Games, Pocket Gems, and Playtika?

A. I would -- I -- I -- I accept your -- your list, but it's been more than a year since I reread my original report, so I would have go back and verify.

Page 170

Q. Okay. And let me just give it a try with respect to music streaming services whose data that you consulted for these purposes.

Do you recall that you used data from Spotify and Pandora?

A. Please -- please say it one more time. I didn't hear.

Q. Do you -- do you recall if you used data from Spotify and Pandora in looking at margin constraints for music services in the music genre?

A. That sounds right, but -- but I can't confirm without going back into my original report. It's been too long.

Q. Okay. Lastly, do you recall it was Netflix that you looked to in terms of cost and margin or variable margin data with respect to the entertainment genre?

A. I -- I do recall the work with Netflix data, yes.

Q. Okay. Let me ask you: Why have you not consulted the additional data from additional developers in formulating your margin constraints since your opening report?

A. I would say the short answer is that -- my reply report and, for that matter, the

Page 171

supplemental report, are all designed to respond to specific issues that have been raised, and -- and in particular, raised by Dr. Prince and raised by the court order. In other words, I have not set out to -- to refine the affirmative damage model that I -- that I developed for this case. I don't think it's needed, and my personal opinion is it's not needed for the class certification stage, and it would definitely be appropriate to bring in the additional margin -- companies and margin data if this moves on to the merit stage.

Q. Do you know if you have additional margin -- variable margin or cost data already available to you from discovery in this case beyond the six whose names I've already mentioned?

A. I understand generally from counsel that there -- there are -- there are developers who have been subpoenaed and -- and are asked for -- I'm not sure what the legal terminology is -- asked to provide information and -- and that is either in hand or anticipated, but that -- I don't know any details of that and I haven't seen those data myself.

Q. Do you rely on any industry expert for purposes of your margin constraints that you use in

Page 172

your modeling?

A. No, not personally. There are members of my team that are more knowledgeable about business accounting than I am, and I -- I can't tell you thirdhand whether or not they consult industry experts on -- on accounting issues.

Q. If they have, your -- you're not relying on that, I take it?

A. I -- I am relying on the -- the margin information that -- that my team has passed to me, yes.

Q. Well, that would be information that you turned over in discovery, correct?

A. Yes, I -- I presume so. I -- I didn't personally direct discovery or production, so that's my understanding, yes, it was turned over.

Q. As you sit here today, do you regard the six developers whose data you've used in the modeling for purposes of setting the margin constraints to be representative of all developers in the respective music, entertainment, and games genres?

A. I would say I regard them as -- the -- the universe of -- of developer margin information that I had at the time of my original report.

Page 173

44 (Pages 170 - 173)

I -- I don't -- I don't think I can 03:05:06 answer the question as to whether they are representative. They tend to be in some cases public companies and larger companies.

Q. Professor, have you performed any 03:05:26 analysis to confirm whether the variable margins and marginal costs to your model identifies for specific apps are actually correct?

A. Could you be more specific in -- in -- are you -- are you referring to the accounts -- 03:05:46 accounts of a particular firm in asking the question?

Q. It's a general question.

Have you done any analysis, any testing, to confirm whether the variable margins and 03:05:58 marginal costs that your modeling generates for all of the relevant developers and their apps are -- are actually correct and accurate?

A. The answer is no, I -- I've been able -- to only work with the data that I have. 03:06:23

Q. Now, your model generates marginal costs for every app in the games and music entertainment genres, right?

A. It is used that way, yes.

Q. And that would include the six 03:06:38

Page 174

developers' apps whose accounting data that you 03:06:41 have?

A. The answer is -- is yes.

Q. If you used your model to estimate the variable margins for the six developers for whom 03:07:00 you have real-world data, would you expect your estimates to match what you found based on the data?

A. No, not necessarily, no, because it's -- it's a picture of the entire genre, not -- not a 03:07:22 model of Epic or another specific gamer.

The -- the granularity of this analysis is to try to measure the -- the common impact across the genre of -- of the Apple commission.

Q. Well, you can use your model to -- to 03:07:52 generate estimates of the variable margins for the Netflix app, right?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: The model can be used to 03:08:13 infer the marginal cost of an -- an app in the music and entertainment genre from its -- from its price. That's -- that's -- that describes the -- the -- the general configuration or is an estimate of the general configuration of costs in 03:08:37

Page 175

that genre. It's not -- it's not a model of 03:08:40 Netflix, and it wouldn't necessarily reproduce actual numbers if you, in fact, had actual numbers from Netflix.

Q. (By Mr. Swanson) Well, let's make sure 03:08:55 we understand this. You're saying your model does not generate -- let's start with this.

Does your model generate a but-for price for the Netflix app, for downloads of the Netflix app? 03:09:06

A. It -- it would, yes.

Q. Okay. And would it also generate estimates of the marginal cost for downloads of the Netflix app?

A. It would. 03:09:25

Q. Well, have you ever compared those estimates to the data that you had and looked at from Netflix?

A. The answer is I -- I cannot do that in -- in a -- in a apples-to-apples way, because the 03:09:39 Netflix data is accounting data, and all I can deduce from that, those data, are -- is information on -- on margins that are, I think, typical firms in this genre.

And I used end balance, upper and lower 03:10:00

Page 176

balance on the observed margins, for the firms that 03:10:05 I do observe in this genre.

Q. Shouldn't you look to see whether what your model predicts for a specific app like Netflix is consistent with the data you're using to -- to 03:10:17 estimate the whole model?

A. The answer I just gave was that the Netflix data does not come in the form that allows that direct comparison.

Q. Well, let's step back. 03:10:36

You have a model that tells you an estimated marginal cost for the Netflix app, and you have cost data that allows you to calculate a variable margin for the Netflix app; isn't that the case? 03:10:51

A. I -- I have an accounting calculation of the -- of the variable margin from Netflix. That is not necessarily an economic measure or representative of Netflix, but I do use that information from them and other firms in that genre 03:11:15 to provide upper and lower bounds on the gross margins that firms in this genre have.

Q. Well, what's the point of using that data to impose restrictions on your model if you think it's not a particularly accurate portrayal of the 03:11:40

Page 177

45 (Pages 174 - 177)

relevant economic variable that you're looking at?    03:11:43

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I believe that the accounting data and the margins -- and gross    03:11:56 margins that come out of that are indicative of the nature of -- of the business within a genre and that upper and lower bounds on average margins within the genre is a -- a reasonable restriction on -- on the estimation, that it -- that it conveys    03:12:22 information that's helpful to -- to make -- to make the estimation more precise.

Q. (By Mr. Swanson) Do you -- do you think that your use of Netflix cost accounting data has improved your model's estimate of the marginal cost    03:12:38 of the Netflix app?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I believe that this form of constraints and the use of whatever the    03:12:53 available data is from actual suppliers in this genre is helpful. It's potentially confirmatory information on what can be inferred by reverse engineering profit maximization.

Q. (By Mr. Swanson) Do you recall what the    03:13:20

Page 178

margin bounds are that you're using for apps in the    03:13:21 game genre?

A. Not without going and looking back at my report.

Q. Do you have a copy of your opening    03:13:32 report?

A. I don't.

MR. SWANSON: We have one that we can access through Exhibit Share. It was previously marked as an exhibit in a prior deposition.    03:13:48

But if you go to Exhibit Share, I believe Mr. Rifkin can help you. I think you can pull up a copy.

MR. RIFKIN: I may need your help to find this. Do you think it's in another folder that we    03:14:14 don't have in Exhibit Share right now?

MR. SWANSON: I'm going to ask Mr. Phillips to help.

MR. PHILLIPS: It should be there. It's -- the PDF with 37 in the title.    03:14:26

MR. RIFKIN: It's -- it's Exhibit 37.

MR. SWANSON: Yeah.

MR. RIFKIN: Okay. We can give that a try.

I see expert report. Okay.    03:14:39

Page 179

Professor McFadden, do you have that in    03:14:45 front of you?

THE DEPONENT: I do.

MR. RIFKIN: Okay. Good. We're there.

Q. (By Mr. Swanson) I just ask you to -- to    03:14:52 look at paragraph 213 to see if that refreshes your recollection on the margin bounds for games.

MR. RIFKIN: Paragraph 213. Do you have a page, approximately?

MR. SWANSON: It's page 95.    03:15:10

MR. RIFKIN: Thanks. Just give us a moment to scroll down.

Okay. I don't know if Professor McFadden is there yet.

THE DEPONENT: I have the paragraph    03:15:49 there, 213, and I'm currently reading it.

MR. RIFKIN: And while he's doing that, Mr. Swanson, your question is does this refresh his recollection what these bounds were?

MR. SWANSON: Yes. I was focusing on the    03:16:06 games -- the games genre.

MR. RIFKIN: Okay.

THE DEPONENT: Yes. So I have it in front of me. I've read it.

Q. (By Mr. Swanson) All right. Now can you    03:16:19

Page 180

share with us what the margin bounds are for the    03:16:20 games genre?

A. Yes. Paragraph 213 says they range from 60 percent to 90 percent for games and 20 percent to 60 percent for music and entertainment.    03:16:35

Q. Okay. And for -- for games, the 90 percent margin constraint would correspond to a marginal cost equal to 10 percent of the -- the price; is that correct?

A. Yes.    03:16:59

Q. And the 60 percent margin constraint, the lower bound for games, would correspond to a marginal cost equal to 40 percent of the price?

A. Correct.

Q. What method did you use to choose the    03:17:15 60 percent lower margin bound for games?

A. It's more than a year since I read this, so I would -- I would have to go back to the -- apparently the appendix where this is discussed in further detail. I -- I simply don't remember it    03:17:51 after all this time.

Q. Well, setting aside, I guess, your specific memory, how as an econometrician would go about picking a lower bound from accounting data from several developers? Would you pick the lowest    03:18:09

Page 181

Veritext Legal Solutions
866 299-5127

number? Would you pick some average number? 03:18:13 What -- what do you think the right thing to do as an econometrician?

MR. RIFKIN: Objection to the form of the question. 03:18:22

THE DEPONENT: I don't have an answer. I would have to -- have to review the section which describes in detail what was done to determine how -- how that was determined.

Q. (By Mr. Swanson) Okay. Is there a 03:18:42 particular method to use in -- in determining bounds of this sort in statistical analysis?

A. I do not believe there's a formula or prescription for how it should be done.

Q. Is it an exercise that involves the 03:19:11 application of judgment?

A. Again, I would -- I would have to go back and review how it was actually done to -- to answer the question.

MR. RIFKIN: Not wanting to interrupt, 03:19:31 but we're getting close to about an hour in again.

MR. SWANSON: Yeah, I'm -- if you'll bear with me for another couple of minutes, I think we can take our break.

Q. (By Mr. Swanson) Professor, you don't 03:19:45

Page 182

allow for any uncertainty in the margin bounds that 03:19:45 you impose, correct?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: The margin bounds are 03:19:59 imposed on average margins in the genre, so that -- they are not bounds which are necessarily applied to every app. Apps can fall outside them.

Q. (By Mr. Swanson) But you assume that these bounds or constraints lie exactly at 60 and 03:20:23 90 percent respectively, right?

A. The -- the procedure is to constrain the -- average margin variable margin in -- among the apps analyzed in the genre, within those limits. 03:20:47

Q. Are you sure that the right margin constraints aren't 64 to 92 percent for games?

MR. RIFKIN: I'm sorry. Can you repeat that question.

Q. (By Mr. Swanson) Are you sure that the 03:21:01 right margin constraints aren't 64 to 92 percent?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: If -- if you're asking have I done -- would the -- is the estimation 03:21:20

Page 183

sensitive to margin bounds, the answer is it's -- 03:21:26 certainly to a -- a degree it is, yes.

Q. (By Mr. Swanson) What do you think is the degree of uncertainty associated with the two margin constraints you used for games? 03:21:39

A. It's not a calculation that I have considered or done.

Q. You haven't calculated the margin of error around those two numbers, those two constraints? 03:21:59

A. I have not.

Q. Do you agree that in the real world, different game apps charging the same price using the same business model may have different marginal cost? 03:22:18

A. The assumption of the model at the granularity in which it -- these things are analyzed assumes -- basically has the implication that for the same download price of one -- developers have the same margin plan. 03:22:52

Q. And do you agree or disagree that in the real world, different game apps charging the same price having the same business model, paying the same average commission rate may have different marginal costs? 03:23:12

Page 184

MR. RIFKIN: Objection to the form of the 03:23:16 question.

THE DEPONENT: The -- the purpose of the model and the way it's designed is to capture marginal cost -- marginal cost in this genre on 03:23:30 the -- as can be inferred from the data that we have, and at that granularity it has the implication that marginal cost is the same for two firms that are selling a download at the same price. That is -- that is a statement about the 03:23:54 granularity at which the model is analyzed and its intention, which is to capture a common effect.

I -- the model is -- does not have data and is silent on the question as to whether that is accurate or not accurate for any individual firm. 03:24:14

Q. (By Mr. Swanson) You've used the term "granular" or "granularity" a lot. By that, do you mean that your model is, in fact, not granular at the in-app purchase item level?

A. This -- the discussion here was dealing 03:24:38 with the question of one firm versus another, one developer versus another, one app versus another, and whether we can tell the difference between two different apps that are selling at the same price within a genre. And the answer is on -- with the 03:25:03

Page 185

47 (Pages 182 - 185)

data we have, we cannot tell a difference, but I believe that analyzing them together with -- with the assumption that they have the same marginal cost -- as a reverse implication of product maximization is a -- is appropriate granularity for purposes of this case.

MR. SWANSON:  All right.  Why don't we take our break now.

THE VIDEOGRAPHER:  Going off the record.  The time is 3:25 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  Back on the record.  The time is 3:35 p.m.

Q.  (By Mr. Swanson)  Professor, are you aware that in the real world, some developers sell in-app content through the Web?

A.  The answer is that I -- I understand that Apple --

(Discussion off the stenographic record.)

MR. RIFKIN:  That's my fault.  I apologize.  I had the wrong button pushed.  My apologies.

THE DEPONENT:  Please -- please repeat the question.

Q.  (By Mr. Swanson)  Are you aware that in

Page 186

the real world some developers sell in-app content through the Web?

A.  I'm aware that Apple has substantial restrictions on the ability for -- for developers to sell outside the Apple Store, that -- that there are in particular some -- some developers in the music and entertainment business as have -- have been able to obtain exceptions to that, perhaps because of grandfathering or perhaps because of their -- their market position.

Q.  Are you saying it's your understanding that Apple prohibits developers from selling in-app content through the Web?

A.  I'm saying that Apple has restrictions which prevent developers from let- -- letting consumers know that there are alternative channels that are available.

Q.  Well, my question was about the alternative channels that are available.  We can get to what developers can or can't say about those.

But you agree that there are alternative channels available, correct?

A.  In a few cases.  I think in -- in considering this question, you have to consider

Page 187

that the vast majority -- apparently the vast majority of developers do not have that option.

Q.  And have you done this factual or empirical study of how many developers, particularly among those who account for the 70 percent of revenues, how much they use alternative channels?

A.  I haven't done a systematic study of it, no.

Q.  Have you done any study of that?

A.  Well, I had reports from my team and from counsel, and in cases where developers have been able to develop alternative channels, then it's a unique enough event so it's newsworthy.  That's the state of my information.

Q.  Are you aware of the model that game developers have been known to use of selling virtual currency in-app?

A.  No.

Q.  Okay.  Are you -- well, strike that.

How --

A.  Let -- I'm sorry.  Let me -- let me respond to that.

I assume you meant by virtual currency cryptocurrency, but that -- that's a

Page 188

misunderstanding on my part, is it not?

Q.  That is misunderstanding.  I'm asking about virtual currencies like Robux or V-Bucks.  You're familiar with those?

A.  Yes.  Yes, those are certainly sold as IAP.

Q.  And you are -- are you aware if major game developers sell those virtual currencies through their Web?

A.  I'm -- I'm aware that there are a number of apps that are available both on iOS and -- and on the Web.  My -- my understanding is that except for a limited number of exceptions, consumers do not have the option of buying IAP on the Web to use on their iPhone.

Q.  And where did you get that understanding?

A.  From long ago.  More than a year ago.  At the time I was writing my original report, when -- when I was looking into the question of the -- of the -- of the definition of the market and whether Web sources for apps were in the same market as iOS apps.

Q.  How, as an economist, do you determine how a developer would optimize pricing over multiple channels, including website channels?

Page 189

48 (Pages 186 - 189)

A. You are asking for a re- -- a research 03:41:46 design. It's not something that I have done. But I can give an indication for the kind of information that you would need.

You would need to have a -- a sample of 03:41:55 consumers who are -- are active potentially in both markets or at least in one market or the other, and you would need to have a sample of apps that are operating in both markets, and you would have to observe prices and -- to do a demand analysis and a 03:42:20 product maximizing analysis. You would need to have enough variation, enough external events, so that you could identify the separate effects of -- of demand factors and supply factors.

Q. In the but-for world, Professor, will 03:42:49 developers use alternative channels beyond iOS app stores?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: My -- my position in the 03:43:07 past has been that -- in -- in the absence of Apple's alleged anticompetitive conduct that consumers would either have rival sources for iOS apps or that Apple would limit price so that entry by rivals would not occur. 03:43:34

Page 190

Q. (By Mr. Swanson) Is that still your 03:43:42 opinion, or your assumption, if it's not an opinion?

MR. RIFKIN: Objection to the form of the question. 03:43:49

THE DEPONENT: I would say that -- that it's -- it's a statement about the fact of operations of a market that's potentially open to competition.

Q. (By Mr. Swanson) Are you taking account 03:44:04 of competition in the but-for world from developer website sales of in-app content?

A. Please, I didn't hear the entire question. Can you please repeat it.

Q. Are you taking account of competition in 03:44:18 the but-for world from website sales of in-app content by developers?

A. The answer is that in my original report, in my analysis of -- of the market, I can -- I concluded that aftermarket sales of iOS apps is 03:44:41 a -- a distinctive market and that substitution between that and other sources of non-iOS apps on non-iOS equipment is -- is not in the same market.

Q. And that's true, in your opinion, in the but-for world as well as the actual world? 03:45:11

Page 191

A. This is not an issue that I thought 03:45:23 about, at least certainly not thought about for more than a year, but I -- my opinion in my original report was that once -- once you have a piece of iOS equipment that -- that Web -- 03:45:35 Web-based alternatives are -- are in most cases not a -- an attractive alternative to an iOS app that runs seamlessly with iOS and that that's a distinct submarket.

Q. Professor, if Apple dropped the 03:46:04 commission rate tomorrow to 13.63 percent across the board, what do you think would happen to developer prices?

A. I believe that in that circumstance, developers would see that it is advantageous to 03:46:24 them to reduce their prices, that is to say, given their marginal cost and given the additional revenue they would get from selling additional units, they now are in a situation where their profits would go up if they reduced prices and 03:46:49 induced more customers.

Q. In your opinion, would developers immediately set the prices that your model predicts?

A. The answer is the model is -- is does not 03:47:09

Page 192

speak to the timing, and because it's a -- it's a 03:47:13 model which is intended to capture the -- the long-run permanent effects, not the -- not the short-term dynamics. So the model is silent on whether it would be immediate or a month or two 03:47:32 months, so forth.

Q. Do you -- do you agree that if marginal cost in your model is zero, then a change in the commission rate will have no impact on but-for price? 03:47:50

A. That's correct.

Q. Do you agree that as marginal cost approaches zero, the change in the but-for price predicted by your model will became smaller and approach zero? 03:48:10

A. Yes.

Q. Let me ask you to flip to paragraph 7 on page 3 of your supplemental report.

A. I have it.

Q. You indicate in paragraph 7 that you 03:48:51 understand that counsel for consumer plaintiffs asked Dr. Rosa Abrantes-Metz to estimate the but-for commission rate.

Do you have an understanding as to why Dr. Abrantes-Metz was asked to do this? 03:49:01

Page 193

49 (Pages 190 - 193)

A. Yes. The -- the court order found my -- my termination list based on the benchmarks that I used to be inadequate, and this is a -- a calculation that's quite separate from my -- my model of demand and damages, that my model for demand and damages simply takes the but-for commission rate as an input.

So given that the court did not like my method, it seemed to be -- I actually recommended to counsel that they consider using another expert to do that separate calculation.

Q. Have you withdrawn your past opinions with respect to the but-for commission rate?

A. Please repeat the question.

Q. Have you withdrawn your past opinions with respect to the but-for commission rate?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I would say that my previous analysis, which was based on benchmark commission rates, is -- is moot, because the court asked for a commission rate with better support, and that was provided by Dr. Abrantes-Metz.

Q. (By Mr. Swanson) Do you recall testifying that 10 to 12 percent was the most

Page 194

likely range for Apple's but-for commission rate?

A. Based -- yes, based on my benchmark analysis.

Q. Okay. Have you changed your opinion about what the most likely range is for Apple's but-for commission?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: In my supplemental report, counsel asked me to take Dr. Abrantes-Metz's number as an input, and I have done that. So I have not had occasion to form a -- a new opinion on what the but-for commission rate would be, but I accept the number I was asked to assume.

Q. (By Mr. Swanson) Do you have any opinion as to whether Dr. Abrantes-Metz's 13.63 percent but-for commission rate is a reliable estimate?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: The answer is I have not read her report, so I have no opinion.

Q. (By Mr. Swanson) Isn't her report on your relied-upon list?

A. It is, because it's the source of the number that I used.

Page 195

Q. So you flipped open the report, found the number, and didn't read any further?

A. The number from -- from Dr. Abrantes-Metz was conveyed to me by counsel, and -- and I was asked to assume that but-for commission rate.

Q. Okay. So you actually never looked at her expert report?

A. That's correct.

Q. Can your model accommodate a but-for commission rate that changes over time?

A. It could, yes.

Q. And have you considered whether it would be appropriate to model a commission rate that changes over time?

A. Well, the answer is that the model has the capacity to do that, but I have not been asked to do that and I have not done it.

Q. Who, if anyone, is taking account of the impact of indirect network apps on Apple's but-for commission rate?

Is it you or Dr. Abrantes-Metz or neither of you or both of you?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Please restate the

Page 196

question. I -- it's a new terminology for me.

Q. (By Mr. Swanson) Okay. You're familiar with the term "indirect network effects"?

A. In the context of platform industries, yes.

Q. Okay. Who, if anyone, is taking account of the impact of indirect network effects on Apple's but-for commission rate?

MR. RIFKIN: Objection to the form of the question.

And -- and I will note this far afield from Professor McFadden's supplemental report or his two prior reports, for that matter.

THE DEPONENT: The answer is that counsel asked me to take the 13.63 percent commission rate as a -- a number for my analysis, and that's what I have done in my supplemental report work. I have not myself read her report or done -- done any further analysis on my part as to what the commission rate should be. But...

Q. (By Mr. Swanson) In -- in a but-for world with two iOS app stores, could your model predict whether different consumers would use the Apple App Store or the rival marketplace for their app and in-app purchase transactions?

Page 197

50 (Pages 194 - 197)

A. My model in its current form calculates the prices that developers would choose in order to maximize profits under a but-for commission rate. It does not specify the form in which competition absent Apple conduct would have occurred.

Q. If there are multiple iOS app stores in the but-for world, your model necessarily relies on assuming that they would all charge the same commission rate; isn't that correct?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I would say that the -- the intent and -- of the analysis is that the 13.63 percent commission rate reflects what competitive conditions would prevail, and under -- under a full, vigorous competition, you would expect a single price result for identical products.

Q. (By Mr. Swanson) Well, if the product were identical, would you assume in the but-for world that app stores that were competing in the marketplace would be equally sized?

A. Not necessarily, no.

Q. What would account for one app store having a larger market share than another if they

Page 198

sell an identical product at an identical price?

A. Okay. Primarily history, brand reputation, access to consumer -- consumers through possibly other channels.

Q. How do you know that 13.63 percent is a competitive commission rate if you haven't read Dr. Abrantes-Metz's expert report?

MR. RIFKIN: Objection to the form of the question.

And, again, I will say that this goes far afield of Professor McFadden's supplemental report or either of his two prior reports, for that matter.

MR. SWANSON: Mark, it's late in the day, but --

MR. RIFKIN: I know. That's why -- that's why I'm trying to suggest to you that you shouldn't be asking questions --

MR. SWANSON: Speaking --

MR. RIFKIN: -- that are impertinent to this witness.

MR. SWANSON: The speaking objections are not appropriate. You're wasting time.

MR. RIFKIN: Well, I -- I respectfully suggest that you're the one who's wasting time by

Page 199

asking Professor McFadden questions that he has not expressed an opinion on. And you know he's not expressed an opinion on it because you've obviously read his report thoroughly.

MR. SWANSON: Well, he's obviously not read any of the other reports, and I think that is something the judge will want to know about. But if you think that's not relevant, go with it, my friend. But I'm going to ask the questions, so --

MR. RIFKIN: Well --

MR. SWANSON: -- make your objections and we'll move right on.

THE DEPONENT: Would you please repeat.

Q. (By Mr. Swanson) There's no question pending.

Now, according to your supplemental report, classwide damages are the sum of account level damages; is that -- is that right?

A. In the supplemental report, that's the way the calculation is done. That's correct.

Q. And that's a change from the method you used in your original and reply reports, right?

A. Yes. Those -- those used a scale-up method from the -- from the sample that was analyzed, as -- as described in the -- in the recap

Page 200

section of the supplemental report.

Q. And -- and is it your opinion that the account aggregation method is a more reliable measure of aggregate damages than the scale-up method?

A. I would say yes.

Q. What is your current best estimate of classified damages?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: That's contained in, I believe, figure 4. And these are numbers only for the two genres that have currently been analyzed. There will be adjustments in these numbers and numbers for additional genres down the line at -- at the point where calculation for all genres is required.

Q. (By Mr. Swanson) And is your current best estimate of the aggregate damages subject to those caveats reflected in revised figure 4?

A. You're asking me about the -- the mean estimate? The mean estimate is determined. The standard errors remain to be fully calculated.

Q. Understood.

I'm asking for what your dollar best

Page 201

51 (Pages 198 - 201)

estimate is. And is that the number that appears 04:01:28 in revised figure 4?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: At this point, that's my 04:01:38 best estimate for damages when only the games and music and entertainment genres are analyzed.

Q. (By Mr. Swanson) Understood.

And that is $10,194,828,011?

A. Correct. 04:02:01

Q. And I take it it's your opinion that you obtain an exact measure of classified harm?

A. Please repeat the question.

Q. I take it is your opinion that your model gives you an exact measure of classwide harm? 04:02:16

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: There are two stages to my model analysis. One stage involves estimation of demand parameters, and the second stage involves 04:02:33 using those demand parameters to calculate out account-by-account level harm and aggregating it, a net harm and aggregating it.

There -- there -- there is statistical noise associated with the demand model estimation 04:02:55

Page 202

from a sample of the population. So there -- 04:02:59 that -- that statistical always remains, but from the point in which those demand parameters are used in the damage analysis, that -- that is a full population calculation. There's no further 04:03:17 statistical noise that are deduced.

Q. (By Mr. Swanson) And in your opinion, when you use the full App Store data, you obtain a exact measure of classwide harm, right?

MR. RIFKIN: Objection to the form of the 04:03:33 question.

THE DEPONENT: As I've -- as I've described, the -- this is a measure which will have statistical noise in it coming from the estimation stage. It will not have statistical noise in it 04:03:47 coming from the demand calculation stage.

Q. (By Mr. Swanson) If -- if you were to eliminate all undamaged accounts from the class calculations, would that have an effect on the aggregate classwide damages as you calculate them? 04:04:10

A. See if I understand the -- the operation you want me to consider.

You'd like me to go through and calculate account level net harm, then throw away all the people who are unharmed, and then add up damages 04:04:39

Page 203

for the remainder? 04:04:44

Q. Well, my question really is what you are proposing to do. Let -- let me ask it this way:

The -- the $10.1 billion figure that we talked about a moment ago, do you have that in mind 04:04:57 from revised figure 4?

A. Yes.

Q. Does that reflect adding up all of the accounts that have positive damage and subtracting all of the negative damages associated with the 04:05:11 remaining accounts?

A. Correct.

Q. Okay. And if you were to eliminate all of those unharmed accounts that may have zero or negative damage, what would that do to the damage 04:05:29 figure in revised figure 4? I assume it would increase it.

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: This -- this is a number 04:05:41 which is actually available in -- in another table. So -- but without going to that and giving you the precise number, it's -- it's about a half a percent.

Q. (By Mr. Swanson) All right. Let me ask 04:06:00

Page 204

you to take a look at your Appendix D. D in your 04:06:03 supplemental report.

MR. RIFKIN: D like David?

Q. (By Mr. Swanson) D like David or Daniel.

A. Yes, I have that in front of me. 04:06:30

Q. Okay. And in Appendix D, you present various alternative damage calculations; is that fair to say?

A. Yes. Appendix reports calculations based on the original 0.1 percent sample in order to 04:06:47 enable comparison to my original report.

Q. Okay. And you report two alternatives: one in paragraph 104 and one in paragraph 105.

Do you agree with that?

A. Please give me a minute to reread. 04:07:16

Yes, I have refreshed my memory.

What is the question?

Q. That you report two different alternative damage calculations in those two paragraphs respectively; is that -- is that correct? 04:07:47

A. Yes. Paragraph 104 corresponds to figure 11, and paragraph 105 corresponds to a -- an exhibit that was not included in the supplemental report and is reported in -- however, in a table that was sent to you in -- in this last round of 04:08:18

Page 205

52 (Pages 202 - 205)

revisions.    04:08:22

Q. Right. And that's the last page of Exhibit 45 that we looked at earlier today?

A. Correct.

Q. Can you turn to paragraph 105.    04:08:34

So you did not revise any calculations in paragraph 104 or figure 11, did you?

A. That's correct. Let's see. I'm sorry.

That's correct, but that's because these calculations were already done with -- with the    04:08:56 genre reclassification. It would -- the recalculation was unnecessary.

Q. Okay. The difference between the paragraph 104 and the paragraph 105 damage calculations is about $800 million.    04:09:19

Would you agree with that?

A. Yes. I need to flip between two.

Q. Uh-huh.

A. Yes, I see that.

Q. Okay. Why are -- why are these results    04:09:41 so different?

A. Well, this -- this comes entirely from the differences between the parameter estimate based on the 0-point -- the original 0.1 percent sample and those based in -- in paragraph 5 on the    04:10:06

Page 206

mean coefficients from the 75 samples.    04:10:12

Q. Are -- are those numbers different in any statistically significant way?

A. I don't have standard errors for these, so I can't answer the question at this point.    04:10:38

Q. Okay. Could you please turn to the original figure 6 in your supplemental report. That's on page 32.

A. Yes, I have that in front of me.

Q. Now, this original figure 6 shows that    04:11:09 17.2 percent of the accounts in the full class would be unharmed; is that correct?

A. Yes. So again, more analysis combined of the two genres that I've analyzed.

Q. Right. Games -- actually, three genres,    04:11:32 right? Games, music, and entertainment?

A. Yes.

Q. That 17.2 percent is a fraction of almost 177 million accounts with purchases in at least one of those three genres; is that right?    04:11:54

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Yes. As -- as noted in the notes to this table, column B is calculated as a magnitude of each statistic for unharmed IDs    04:12:11

Page 207

divided by the total in column A.    04:12:17

Q. (By Mr. Swanson) And the total in column A for the full class/three genres is almost 177 million accounts, right?

A. Correct.    04:12:34

Q. Okay. Now, because of the genre classification issue, you had to recalculate that 17.2 percent figure, right?

A. Correct.

Q. And your new figure 6 that is found in    04:12:47 deposition Exhibit 45 has a 17.6 percent figure for unharmed accounts; is that right?

A. Correct.

Q. So the genre classification issue created a lot of accounts that switched from harmed to    04:13:14 unharmed, did it not?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: It changed the percentage attributable from unharmed IDs to 17.2 percent to    04:13:25 17.6 percent.

Q. (By Mr. Swanson) And that reflects almost an additional million unharmed accounts, correct?

A. I have -- I haven't done the arithmetic.    04:13:40

Page 208

Q. Well, it's .0 -- I'm sorry. It's .4 of    04:13:46 176.9 million; would you agree?

A. Yes.

Q. And that is almost a million additional unharmed accounts, is it not?    04:14:11

A. Yes.

Q. And your revised figure 6 now indicates that 17.6 of 176.9 million accounts are unharmed, which would be over 31 million accounts; is that correct?    04:14:38

A. I will -- I will assume you've done your arithmetic correctly.

Q. Okay. Now, if we go back to your original figure 6 in your supplemental report, that shows that with a $10 spending cutoff applied,    04:15:01 7.6 percent of accounts were unharmed; is that -- is that correct?

A. Yes.

Q. And then you recalculated that percentage to account for the genre classification issue, and    04:15:21 that number increased to 7.8 percent; is that -- is that right?

A. Correct.

Q. And so your current estimate is that 7.8 percent of about 130.5 million accounts are    04:15:37

Page 209

53 (Pages 206 - 209)

uninjured?    04:15:42

A.   By -- by the criterion we are using for determining injury, yes.

Q.   With the caveats that you provided about genre and the like, correct?    04:15:57

A.   Correct.

Q.   And 7.8 of 138.5 million is over 10 million accounts; would you agree?

A.   I agree.  And, of course, as you can read, a much smaller percentage of -- of damages, 04:16:15 because these unharmed people are -- are -- tend to be people who spend very little.

Q.   We'll get to that.

Could you turn to figure 7 in your supplemental report, page 39.    04:16:43

A.   I have that in front of me.

Q.   Okay.  And -- and this is not a figure that you have needed to revise because of the genre issue, right?

A.   That's correct.  This was itself    04:17:12 estimated using the updated genre classification.

Q.   And in column A of figure 7, the -- the table here indicates that with flexible pricing, which I take it is no price tiers, 14.3 percent of accounts are unharmed without applying the $10    04:17:40

Page 210

cutoff; is that right?    04:17:43

A.   Correct, yes.

Q.   And then 5.3 percent are unharmed with the $10 cutoff, right?

A.   Correct.    04:17:55

Q.   What causes or accounts for the difference between the 14.3 percent estimate of unharmed accounts in figure 7 and the 17.6 percent number in revised figure 6?

A.   Figure 7 is calculated using the original    04:18:15 0.1 percent sample, and the other table you referred to was calculated using the mean parameter estimates from 75 samples.

Q.   Now, in column B of figure 7, you indicate that 20 percent of accounts are unharmed    04:18:39 in this sample?

A.   Correct.

Q.   And do you agree that 20 percent, if translated for the full data, would amount to over 35 million accounts for games, music, and    04:18:59 entertainment?

A.   I -- I'm not doing the arithmetic as we go, so I'll take your number.

Q.   Well, it would be 20 percent of the 177 million account figure, wouldn't it?    04:19:12

Page 211

A.   Sounds right.    04:19:22

Q.   If you used the mean demand coefficients of the 75 random samples and the full data to calculate but-for prices and damages with Apple's current price tiers, would you expect the    04:19:40 percentage of unharmed accounts in the full class to be higher or lower than 20 percent?

A.   Please restate the question.  It was so long, and I can't hear very well.

Q.   Yeah, no problem.    04:19:55

If you used the average demand coefficients from the 75 samples and the full data to calculate but-for prices and damage using Apple's current price tiers, would you expect the percentage of unharmed accounts in the full class    04:20:12 to be higher or lower than 20 percent?

MR. RIFKIN:  Objection to the form of the question.

THE DEPONENT:  The answer is I -- I don't know.  That's -- that's a calculation that would --    04:20:23 would have to be done.

Q.   (By Mr. Swanson)  In figure 7, in column A, the top -- the top figure there is 100 percent.  That -- that's in a row that is labeled "damages as share of flexible pricing damages."    04:20:48

Page 212

What -- what number does that 100 percent    04:20:51 figure correspond with?  What are the damages that you calculate?

A.   It corresponds to the numbers in -- in figure 4 of revised -- well, I'm sorry.  This is    04:21:08 for the .1 percent.  Did you want the number that goes with -- with that from the 0.1 percent sample?

For that, I have to go to Appendix C.

Q.   Okay.

A.   Do you want me to do that?    04:21:35

Q.   Yeah.  If you have a number, I would appreciate hearing it.

A.   I'm sorry.  Appendix D.

So this is a -- comes from the revision of figure 11, if I have not lost track of what your    04:22:24 question is.

Q.   Yeah.

A.   That is to say -- I'm sorry.  Please -- please start the question over, because now I'm losing track of whether you're asking --    04:22:49

Q.   Okay.

A.   -- overall of means, using means of 75, or using the -- the original sample.

Q.   I'm sorry.

It is, I think, straightforward, and that    04:23:01

Page 213

54 (Pages 210 - 213)

is what is the damage number that corresponds to the 100 percent entry in figure 7?

04:23:04

A. Okay. Figure 7, as -- as I read from the notes, uses the coefficients of estimation from the original 0.1 percent random sample, and figure 11, it does the same. So it's the figure 11 number for several damages the sum of the two columns in the last row of figure 11 that correspond to that 100 percent.

04:23:29

Q. And those two numbers are, roughly speaking, 10.648 billion and .947 billion; is that right?

04:24:05

A. Yes.

Q. So around 11.6 billion combined?

A. I'll -- I'll accept your arithmetic.

04:24:27

Q. I think it may be in your paragraph 104.

Do you see that?

A. You're right. It is in 104.

Q. Back to figure 7. You report in column C of figure 7 that 14.4 percent of accounts are unharmed in your simulation with approximately 750 price points.

04:24:56

Do you see that?

A. Yes.

Q. If you were to use the average demand

04:25:11

Page 214

coefficients of the 75 samples and the full data to calculate but-for prices and damages, like what you did in figure 6, do you expect the percent of unharmed accounts would be higher or lower than 14.9 percent?

04:25:14

04:25:33

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Please -- please read it back, the question.

Q. (By Mr. Swanson) Sure.

04:25:39

If you were to use the average demand coefficients of the 75 samples and the full data to calculate but-for prices and account level damages, do you expect that the percent of unharmed accounts would be higher or lower than 14.4 percent for your 750 price point scenario?

04:25:59

MR. RIFKIN: Same objection.

THE DEPONENT: The answer is I do not know without doing the calculation.

Q. (By Mr. Swanson) Okay. Let me ask you to flip to paragraph 77 of your supplemental report.

04:26:12

That's on page 30.

A. I have that in front of me.

Q. You indicate here that because unharmed

04:26:52

Page 215

accounts are correlated with low total spend, counsel has requested that you also calculate the share of unharmed accounts among only those accounts that spent more than $10 in total during the 14-year period from July 2008 to April 2022.

04:26:53

04:27:05

Do you see that?

A. Yes.

Q. Have you calculated any correlation statistics to back up this assertion?

A. To back up what? What's -- what's the question?

04:27:26

Q. The assertion that unharmed accounts are correlated with low total spend.

A. The -- the support for that is -- is in figure 5, that a -- a large share of the -- of the accounts with low spending.

04:27:44

Q. And you have revised figure 5; is that correct?

A. Yes. The revision is, to my eye, not detectable, but yes, it has been revised.

04:28:13

Q. Are you offering any opinion that the class should be truncated by a dollar spend to cutoff?

A. No. I -- I am simply responding to counsel's request.

04:28:33

Page 216

Q. Have you studied whether unharmed accounts are correlated with any factor other than low spend?

04:28:39

A. When you say "have I studied," do you mean have I done this -- an investigation that I've memorialized, or do you mean have I thought about it?

04:28:57

Q. Well, why don't we start with thinking about it. Have you -- have you thought about it?

A. Yes, I have thought about it.

04:29:11

Q. And have you reflected your thoughts in your supplemental report?

A. I don't -- I don't think I put in this a sentence that -- specifically with each thoughts. These thoughts are essentially statistical.

04:29:44

Q. Okay. Did you -- did you pick the $10 dividing line or did counsel?

A. Counsel.

Q. Do you have any opinion as to whether a $10 lifetime cutoff is superior to an $8 or an $18 cutoff?

04:30:02

A. No.

Q. Do you have an opinion about whether it's superior to a $61 cutoff?

A. I think the motivation in part is to

04:30:18

Page 217

55 (Pages 214 - 217)

consider the cost of administering distribution, and I believe that first came up -- came up to my attention as an -- an issue of -- of whether one would distributor benefits to consumers when the cost of the distribution was in excess of the -- of the award.

And it was -- it was -- it was a question then which was sort of left on the table, and then counsel asked to do this calculation.

Q. Uh-huh. Have you quantified the cost of distributing recovery for absent class members?

A. I haven't done a formal calculation, no.

Q. Have you disclosed any calculation in your report?

A. No.

Q. In your opinion, if you have one, is the cost of distributing recovery higher the higher the monetary amount of the claim made by a class member?

A. Please repeat the question.

Q. In your opinion, if you have one, is the cost of distributing recovery higher the higher the monetary amount of the claim made by a class member?

MR. RIFKIN: Objection to the form of the

Page 218

question.

THE DEPONENT: I -- my opinion is that it -- there is a cost of -- of fulfilling a damage award and that it's -- it's the cost of cutting a check in -- and mailing it, in most cases, and that -- that cost is essentially -- I would think would be relatively independent of the size of the damage award.

MR. RIFKIN: Mr. Swanson, we -- again, we've been going for another hour or so. Are you at a point where it makes sense to break?

MR. SWANSON: Yeah, I am.

MR. RIFKIN: Okay. Great. We'll do that.

MR. SWANSON: Okay.

MR. RIFKIN: Can we get total run time before we --

THE VIDEOGRAPHER: Going off the record. The time is 4:32 p.m.

(Recess taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 4:42 p.m.

Q. (By Mr. Swanson) All right. Professor, would you please turn to revised figure 5, which is in deposition Exhibit 45.

Page 219

A. I have that in front of me.

Q. All right. Would you agree that figure 5 shows that around 3 million unharmed accounts have spending of more than $18?

A. I -- I would have to do the arithmetic hopefully with a background for this figure rather than the -- than the chart probably. But I'll take your number as correct.

MR. RIFKIN: Well, I didn't get a chance to object, but I don't think that's what the chart says.

MR. SWANSON: And it may not, which is a good point, Mr. Rifkin.

Q. (By Mr. Swanson) Could you tell me how to figure out how many unharmed accounts have total spend of more than $18 by looking at this chart?

A. In principle, this is a area chart, so that the area should reflect accounts, so that as -- as you sum up these areas above -- above a certain number, you would get a portion relative to the area over the entire chart.

It's somewhat complicated by the fact that the -- the scale on the horizontal access is in logs, so that as you do that addition, you need -- you need to take that into account.

Page 220

Q. So can you by visual inspection give a rough estimate of how many unharmed accounts there are that had spending in the three genres of more than $18?

A. I cannot.

Q. Okay. Would you need to consult the -- the backup data?

A. I would see certainly -- to get a precise number, it -- it would be quickly available from -- from the actual account data by spending level, and I presume that's what the backup data is.

Q. Okay.

A. In fact, not presume. I actually know the backup data. I don't have it here.

Q. Right.

Does figure 5 show that there are unharmed accounts that spend hundreds or thousands of dollars on the three genres?

A. Is the question does the figure show that?

Q. Yes.

A. I -- I don't think you can read that from this figure.

Q. So this figure does not show, for example, that -- that there are unharmed accounts

Page 221

56 (Pages 218 - 221)

that spend $1185 in the three genres?    04:46:15

MR. RIFKIN: Objection to the form of the question. That's not what you asked before.

THE DEPONENT: I don't think you can, unfortunately, read from the -- the graphic of what    04:46:26 the -- what the numbers are at high levels.

Q. (By Mr. Swanson) Well, you can tell whether there is more than one, can you not?

A. I would say that I do not find this figure helpful for these questions. I -- I would    04:46:42 have to go to the background numbers that were used to construct the chart.

Q. So as you sit here looking at this chart, you cannot tell me whether there are unharmed accounts that have a spend of over hundreds of    04:46:59 dollars?

A. I cannot tell you how many. I'm aware that there are -- there are a small number with that characteristic.

Q. And there are a small number who spend    04:47:15 thousands of dollars and yet are unharmed?

A. The answer is that this -- if you look at spending among unharmed accounts, there are some very large numbers in the -- in the data, and that's true for harmed accounts as well, and that    04:47:44

Page 222

spending has -- has a long right tail.    04:47:48

Q. Okay. Fair -- fair enough.

Let me -- let me ask you to turn to paragraph 5 of your supplemental report, page 2.

A. I have that in front of me.    04:48:29

Q. Okay. In that paragraph, the second or third sentence, you -- you say, "In particular, counsel for consumer plaintiffs asked me to show how the percentage of unharmed accounts can be reduced by applying lifetime spending cutoffs,    04:48:45 i.e., limiting damage -- damages calculations to the accounts whose total spending on apps and IAP was above a certain dollar amount during the class period."

Do you see that?    04:49:02

A. Yes.

Q. Is that how you understand a $10 cutoff would be applied, by limiting damages calculations to the accounts whose total spending is $10 or more?    04:49:16

A. Yes.

Q. Okay. Can you turn to revised figure 6, please.

MR. RIFKIN: I'm sorry. I'm -- I'm just going to object to that last question, because I    04:49:40

Page 223

don't -- I think I heard it, but now I'm not sure I    04:49:43 did. So I just want to object to the form of that last question, just to be fair so that you know that I'm objecting to it.

I apologize for zoning out for a minute.    04:49:53

MR. SWANSON: It's okay. I read it from the report, so I think it will be clear. But --

MR. RIFKIN: Well, okay. I don't want to make a speaking objection, but I'm not sure that I agree with that.    04:50:07

Anyhow.

MR. SWANSON: Okay.

Q. (By Mr. Swanson) Revised figure 6.

Do you have that?

A. I do.    04:50:16

Q. Okay. Now, we -- we've established --

(Discussion off the stenographic record.)

Q. (By Mr. Swanson) So figure 6, we've already established, I believe, that the number of accounts for the three genres that are at issue at    04:51:04 this point in your calculations adds up to almost 177 million, right? 176.9 million, correct?

A. Those are the accounts that have paid -- paid purchases for apps in these genres, correct.

Q. And then with the $10 spending cutoff,    04:51:36

Page 224

the number of accounts that have more than $10 of    04:51:41 spending in one of these, in or across these three genres, is 130.5 million; am I reading that right?

A. Yes.

Q. Okay. So applying a $10 spending cutoff    04:51:59 would remove about 46.5 million accounts; is that right?

A. Yes.

Q. Okay. And those accounts would be omitted because in the actual world they spent $10    04:52:19 or less in the three genres, right?

A. The answer is yes, they spent less than $10 total for the period of the damage analysis, which in consequence would -- simply by doing back-of-the-envelope calculations would result in    04:52:43 at -- at most a -- a 16 percent recovery of their expenditures, and actually considerably less than that, and that's -- that's $1.60 or considerably less, probably the less in cost of provid- -- of cutting and mailing a check.    04:53:09

MR. SWANSON: All right. I'm going to move to strike everything after "The answer is yes" as nonresponsive.

Q. (By Mr. Swanson) How many of these 46 million accounts do you estimate have been    04:53:23

Page 225

57 (Pages 222 - 225)

harmed?                                    04:53:28

A. You're talking now about the difference between the spending and the nonspending cutoff? Those -- those accounts?

Q. Yes.                                    04:53:41

A. I -- I have not done that calculation, and I'm -- at this point I'm not sure that you could recover it from the numbers that are on -- on the table.

Q. Do you believe it would be roughly    04:54:03 60 percent or more?

A. I -- it would be speculation without -- without my actually sitting down and figuring out how to do the -- how to do the calculation.

Q. Okay. And that's not a number you've  04:54:19 calculated or reported; is that -- is that correct?

A. That's correct.

Q. Okay. If an account had $9 of spending in the as-is world with respect to the three genres, you would omit it from your analysis if the  04:54:38 cutoff were applied; is that correct?

A. I would admit it -- as I understand it, most people would be omitted from the possibility of recovery, and I have not been asked nor have I thought about whether they would also be excluded  04:55:03

Page 226

from the estimation and damages calculation.  04:55:08

Q. And if you haven't thought about it, I take it you have no opinion as to what the -- appropriate approach would be?

A. I -- two -- two responses. First, I    04:55:31 think you have to fast-forward in fact, redefine as those who were at least $10 spending. Then it would be appropriate to do the analysis of -- for the class as defined.

Secondly, I think in term of the numbers  04:55:49 we already have, it would have virtually no effect on total damages.

Q. Okay. And those are both your -- your estimates are instinct, but not based on any actual calculations?                             04:56:08

A. Please repeat the question.

Q. Your -- your -- the answer that you just gave is -- that's not based on your actually having done the calculations, correct?

A. Well, two parts to that. One is that in  04:56:23 figure 6 revised, we already see the difference in spending with and without the cutoff. It's -- it's -- it's quite a small number, and the impact of -- of -- of that would be quite small. The difference in net harm, the last -- lines 3 and 6,  04:56:52

Page 227

is -- is quite small.                       04:56:56

Now, if -- now if the balances were redone or be only the population of priors with -- with $10 spending cutoff limit, those may change estimated parameters, but I'd be -- I would be  04:57:17 surprised if it changed them much, simply because these -- these people play a very small role in -- in spending for apps.

Q. These -- you're referring to the 46 million accounts that would be omitted if -- if  04:57:39 a cutoff were applied?

A. Yes.

Q. Okay. If an account had $9 in total spending in the as-is world but your model predicted that the account would have spent $11 in  04:57:56 the but-for world, would that account be excluded under a lifetime spending cutoff?

A. If my model or analysis were applied to a new class defined as those who -- as the same as the current class except requiring at least a $10  04:58:30 total spending, I believe the app --

I'm sorry. I've lost my train, so please repeat the question.

Q. Sure.

My question was: If an account had $9 in  04:58:50

Page 228

total spending in the as-is world, but your model  04:58:54 would predict that the account would have spent $11 in the but-for world, would that account be excluded if there were a $10 lifetime spending cutoff?                                    04:59:11

A. And the answer is yes, it would. That is, with this spending cutoff, if it were a redefinition of the class and the analysis would -- was done for class members on the new definition then, these projects would not be part of the  04:59:29 classification or part of any award.

Q. And -- and in an account that spent $9 in the actual world and $11 in the but-for world would be an account that was uninjured, correct?

A. That's correct.                          04:59:50

Q. When a $10 cutoff is applied, it's being applied to accounts, not individuals, right?

A. Correct.

Q. So if a person has two accounts, one of which spent $10.99 in the three genres and the  05:00:09 other of which spent 99 cents, is that person in the class?

A. With a $10 cutoff, that -- that depends on how distribution or fulfillment of claims is handled, and I don't have an opinion on that. I --  05:00:32

Page 229

58 (Pages 226 - 229)

I -- I would presume that claimants would be asked 05:00:36 to list all their accounts. I just don't know the extent to which all of that would be factored into the calculations.

Q. Well, when is it your understanding that 05:00:53 the accounts with less than $10 would be excluded, before trial or after trial?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: My -- my understanding is 05:01:15 that if, in the class certificate stage, the ruling was that the predominant condition was not met without the $10 spending cutoff or that it was met with the $10 spending cutoff, that in the merits phase, the analysis would be done in its entirety 05:01:41 for the newly defined class.

Q. (By Mr. Swanson) Okay. So in that case, there will be no matching of accounts to individuals at the merits phase, correct?

A. Please repeat the question. 05:02:10

Q. In that case, there is no matching of accounts to individual class members at the merit stage, correct?

MR. RIFKIN: Objection to the form of the question. 05:02:20

Page 230

THE DEPONENT: My understanding at this 05:02:27 point is that the issue of how individuals with multiple accounts would be handled is something that would not be part of the merits phase. It would come at some later point. 05:02:42

Q. (By Mr. Swanson) And if a $10 cutoff is applied, that would be a process of linking all the accounts with more than $10 in lifetime spend?

A. I don't know. I was not asked to investigate that, nor, absent information 05:03:00 on linking, could I.

Q. Is your methodology more reliable with a lifetime spending cutoff?

MR. RIFKIN: Objection to the form of the question. 05:03:23

THE DEPONENT: I think my model is applicable to the class in its original definition and would be applicable to either a subclass, if that's how this is a result legally, or to a new reduced size class if that's the way it's resolved. 05:03:50 I believe the model could be used for each, and it's -- it would stand on its own bottom. Its reliability can be determined on its merits.

Q. (By Mr. Swanson) For your model to determine reliably whether a given account is 05:04:10

Page 231

harmed or unharmed, is it necessary for you to 05:04:13 remove all accounts with $10 or less in lifetime spending from your analysis?

A. Please elaborate on what you -- what your hypothesis is. For what purpose? 05:04:30

Q. Well, it's not a hypothesis. Let me ask it again.

For your model to reliably determine whether a given account is harmed or unharmed, is it necessary for you to remove all accounts with 05:04:43 $10 or less in lifetime spending from your model estimation?

A. In -- in order to analyze the case with -- with this cutoff? Is that the question?

Q. In order to reliably determine whether a 05:05:01 given account is harmed or unharmed.

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: The answer is whatever the definition of the class is and what accounts are in 05:05:14 the class, I think the model -- the model procedure, the methodology in terms of the data that's used, how it's estimated and how damages are calculated, is -- is applicable, can be -- can be done, and -- there's no -- I see no particular 05:05:37

Page 232

relationship between that and the reliability of 05:05:42 the analysis.

Q. (By Mr. Swanson) Is your model equally reliable, in your opinion, when used to assess damages for an account with $20 in lifetime 05:05:58 spending as it is when used to assess damages for an account with $10 in lifetime spending?

A. The -- the calculation that I can envision doing is -- establishing a confidence bound for the net harm for any individual account 05:06:28 based -- based on the system noise that comes from the estimation stage, and that -- that, in turn, would be responsive to this question.

Q. So are you saying that the confidence bound would differ as between accounts with $10 in 05:06:59 lifetime spending in $20 in lifetime spending?

A. It -- it could, because what we -- what we know is that the pattern of spending is related to whether an account is harmed or unharmed. That is to say we -- we know that unharmed accounts 05:07:37 are -- are higher than those with limited spending than those with high spending.

So that it -- it would make a difference.

Q. Okay. Do you know if it does make a difference as opposed to opining that it could make 05:07:59

Page 233

59 (Pages 230 - 233)

a difference?                                          05:08:02

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I do not have those calculations in front of me. I -- if -- if they        05:08:12 can be calculated from the numbers I already have, I would have to think about how to do it.

Q. (By Mr. Swanson) Okay. Do you agree that determining whether an individual class member has been harmed requires having that individual's       05:08:28 entire App Store transaction history?

A. Certainly the intention of the model and the way these damages are calculated in the supplementary report does precisely that.

Q. Do you agree that that is true whether or       05:09:02 not $10 lifetime spending cutoff was applied?

A. Well, I'll answer it by going back to -- to a previous response. Is it -- given the demand parameters, it would make no difference in the damage calculations for any given individual what       05:09:31 their spending level is.

But if you redefine the class as those with a $10 spending cutoff and restart the analysis from the very beginning, it's possible that that would have an effect on the estimated demand       05:09:49

Page 234

parameters.                                          05:09:52

Q. Do you -- do you have an understanding of how class members have multiple Apple IDs?

A. I have a -- a vague understanding, because we know how many accounts there are, and I       05:10:06 believe it's some point we had a -- a number on how many people -- some estimate of how many people had accounts. But I don't recall now from the days of writing the original report what that number was, but it was in the ballpark of three accounts per       05:10:27 person.

Q. So we established earlier that -- that in the current dataset, there are almost 500 million Apple ID accounts, correct?

A. The -- the raw -- raw count was -- is       05:10:51 about 500 million, and many of those made no purchase through the Apple Store. So a relevant population is at least only those that have made purchases.

Q. And when you say many have made no       05:11:12 purchases from the App Store, you're not suggesting that those accounts have not downloaded a great number of apps, are you?

A. Please repeat the question.

Q. The accounts out of the 500 million that       05:11:32

Page 235

made no dollar purchases have downloaded       05:11:36 collectively an enormous number of free apps, have they not?

A. The answer is clearly yes.

Q. Are you expressing any opinion in your       05:11:54 supplemental report regarding the number of Apple ID accounts each class member has on average?

A. No.

Q. Are you expressing any opinion in your supplemental report on whether the average       05:12:13 App Store customer has multiple accounts with unique Apple IDs?

A. No. There's no new revision of opinion I've given there.

Q. Do you express any opinion in your       05:12:30 supplemental report as to whether there are more unique Apple ID accounts than individual class members?

A. That is not an expression in my supplementary report.                                05:12:44

Q. Do you have an estimate of as to how many individuals as opposed to accounts are in the class?

A. No. I have only the knowledge of a number from some years ago as to how many       05:13:04

Page 236

individuals had Apple accounts.                      05:13:08

Q. And -- and is that number disclosed in one of your earlier reports?

A. Without going back, I don't recall.

Q. Have you done any study or investigation       05:13:30 that you disclose in your supplemental report regarding the extent to which class members may own so-called secondary or tertiary Apple ID accounts?

A. Could you explain the terms "secondary" or "tertiary"? I don't recall using those.       05:13:54

Q. I'm not saying that you have used them. Do you -- do you have any understanding of those terms?

A. Well, I would appreciate a definition.

Q. So would I. But I can only ask you the       05:14:11 questions today. So if those terms don't mean anything to you, then we can move on.

MR. RIFKIN: Objection to the form of the question.

Is there a place in the report you want       05:14:22 to refer him?

MR. SWANSON: I've asked my question, Mr. Rifkin. You can stop making speaking objections.

MR. RIFKIN: I haven't objected to       05:14:31

Page 237

60 (Pages 234 - 237)

anything other than the form, and I just asked him    05:14:32
if there was a place in his report to which you
wanted to refer him, and if the answer is no, then
we can move on.

MR. SWANSON: Well, we can move on once    05:14:41
he answers the question.

MR. RIFKIN: He has, multiple times.

MR. SWANSON: I don't think so.

Q. (By Mr. Swanson) Do you have --

MR. RIFKIN: The record -- fortunately,    05:14:48
the record is there for us.

MR. SWANSON: Yes, it is. We can all
agree on that.

Q. (By Mr. Swanson) Do you have an
understanding of the term "secondary" or "tertiary    05:14:54
account" as it relates to Apple ID accounts,
Professor?

A. I've never heard those -- those words
before, at least to describe accounts. Like I
don't know what the definition means, what the    05:15:10
source of those terms means.

Q. Okay.

A. Or what the applicability is.

Q. Okay. Fair enough.

In your reply report, you described a    05:15:27

Page 238

practical process that you would propose to    05:15:28
undertake for identifying and compensating harmed
class members.

Do you remember that?

MR. RIFKIN: Objection to the form of the    05:15:41
question.

THE DEPONENT: Yes. I have not reviewed
that for a year or so, but I -- I do remember
offering an opinion on that.

Q. (By Mr. Swanson) Do you -- do the    05:15:53
opinions in your supplemental report modify that
proposed process for identifying and compensating
harmed class members in any way?

A. No. I -- I have -- as far as I'm
concerned, that is -- that issue is moot, because I    05:16:15
have not been asked to offer an opinion further on
the distribution mechanism. My understanding
that -- that will be handled by other experts.

Q. Okay. Professor, do you agree that your
model assumes that developers set prices as if they    05:16:36
were monopolists?

A. My -- my model assumes that they maximize
profits by setting price, facing a demand for their
product, and that's within the context of a market
in which there may be Nash equilibrium, but I do    05:17:11

Page 239

not specifically model that. The model is    05:17:19
compatible with Nash equilibrium, but I have not
done or do I see a need to model rivalry among
developers beyond what I've done.

Q. Okay. And how does a monopolist set    05:17:41
prices?

A. Well, any -- any firm is going to
maximize its profits subject to the -- the demand
curve that it faces. The distinction between
monopoly and oligopoly and pure competition is all    05:18:03
encapsulated in -- in the demand curve that they
face and how -- how that responds to their price.
If they have rivals in the market, then you get a
different demand response than if they don't.

Q. How would you determine whether a given    05:18:26
developer had a monopoly with respect to an app or
a set of apps?

A. Well, in -- in general, you would -- you
would have to investigate -- investigate the
submarket in which they are located and apply DOJ    05:18:55
standards, I suppose, for whether that's a -- an
identifiable separate market. That's not an issue
that I have worked on, and I'm not prepared to go
beyond that offering an opinion.

Q. Is it your opinion that you estimate the    05:19:19

Page 240

degree of competitiveness through the price    05:19:22
sensitivity coefficient?

A. I would say that's function --
functionally correct.

Q. And is that an assessment of    05:19:36
competitiveness on average for a genre, or does it
apply to particular developers' apps within a
genre?

A. At the granularity of my model in terms
of how I describe and the assumptions I make on app    05:19:56
developers' behavior, I assume that they go about
setting a price given information on demand price
and sensitivity to their price, and the model is
silent on how that's affected by other prices.

Q. Other prices set by putatively competing    05:20:26
developers?

A. Yes.

Q. Does your model assume that all apps with
the same genre and business model have the same
price sensitivity?    05:20:43

A. The answer to that is if -- if provided
we understand that "price sensitivity," in my
terminology, is the coefficient on price in the --
in the log linear demand model, the answer is yes.

Q. Do you agree that some apps in a given    05:21:08

Page 241

61 (Pages 238 - 241)

genre might face more competition than other apps 05:21:11 in the same genre?

A. I -- I have -- I have no specific evidence one way or the other.

Q. Does your model allow for one app to 05:21:33 respond to a price change by a competing app by changing its own price?

A. The model does not explicitly consider the -- the market gain in which there is active rivalry. It is consistent with -- with -- Nash 05:21:53 equilibrium and oligopolistic sellers.

Q. In the real world, can Pandora's profit-maximizing price change when Spotify's price changes?

A. I -- I know very little specifically 05:22:18 about the -- the competition between those two firms in the real world. But I -- as a generic matter, I would expect that if two firms are offering very similar products and consumers can substitute easily between those products, then 05:22:38 that's a -- that's a -- that's a competitive force which would influence their behavior.

Q. Does your model allow for such reactions?

A. My view is that it's consistent with Nash equilibrium in an oligopolistic market. 05:22:59

Page 242

Q. So is that a yes? 05:23:13

A. Yes. The answer is that I -- I believe that the model as -- as estimated, estimates price sensitivity which -- which reflects the -- the patterns of -- of rivalry among developers. 05:23:34

Q. Do you agree that if some apps that were free in the real world charged a positive price in the but-for world, that could affect which class members are harmed?

A. I -- I -- I don't disagree with that, but 05:24:00 my understanding is that such individuals are not members of the class and that the analysis is based on those that are.

Q. Well, is it your understanding that members of the class by -- or acquire free apps as 05:24:19 well as apps for which they pay?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: Please repeat the question. 05:24:31

Q. (By Mr. Swanson) Is it your understanding that members of the class acquire free apps as well as apps for which they pay a positive amount?

A. I have not specifically looked at the 05:24:46

Page 243

data on that, but I would expect that's the case. 05:24:49

Q. I mean, you would assume -- assume with certainty that that is the case, would you not?

MR. RIFKIN: Objection to the form of the question. 05:25:04

THE DEPONENT: My -- my response was I expect that to be the case. I have not gone and done the actual data analysis to -- to say it always happens.

Q. (By Mr. Swanson) So you think it's 05:25:15 actually possible that all of the members of the class might never have acquired a free app?

A. That was not as I understood the question that was asked, nor my response. I think the question that was asked is whether you could ever 05:25:31 have a person in the class who never downloaded a free app, and the answer is that's an empirical question. I don't know the answer.

Q. Okay. And as sit here, you don't know if members of the class acquire free apps? 05:25:48

A. I've not done the data analysis required to tell me how many do and how many don't.

Q. Do you -- do you think members of the class are unrepresentative of the consumers who are -- who have Apple IDs? 05:26:12

Page 244

MR. RIFKIN: Objection to the form of the 05:26:19 question.

THE DEPONENT: Was the question are they representative or unrepresentative?

Q. (By Mr. Swanson) Unrepresentative. 05:26:24

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I -- I would say I -- I think manifestly the behavior of customers who buy apps may differ from behavior of those who don't, 05:26:44 but I would not say that they're two hermetically sealed groups. If the price of apps gone down -- goes down, perhaps some people who are previously nonbuyers might become buyers.

Q. (By Mr. Swanson) Do you agree that free 05:27:05 apps represent a large majority of apps on the App Store?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: I haven't done that 05:27:14 tabulation.

Q. (By Mr. Swanson) Do you agree that it is important to offer a prediction of how free apps would be priced in the but-for world in order to assess net harm to class members? 05:27:29

Page 245

62 (Pages 242 - 245)

A. Well, first of all, let me say that my -- that my understanding of the rulings -- the rulings -- the court order is that -- or perhaps at some other point in the legal proceedings, it was understood that the -- the membership in the class consisted -- the class membership consisted of those who have made monetary purchases.

Q. And is it your understanding that the members of the class who have made monetary purchases have not also acquired free apps?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: As I've indicated, it would not -- I have not done a -- a tabulation of how many do and how many don't.

Q. (By Mr. Swanson) If members of the class acquire free apps as well as having purchased apps and -- and having made in-app purchases, do you not need to account for the price of those free apps in the but-for world in order to accurately assess net harm to those class members?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: The answer is I -- I do not believe the model as currently constituted

Page 246

requires that.

Q. (By Mr. Swanson) Is that because you assume all apps that are free in the actual world are free in the but-for world?

MR. RIFKIN: Objection to the form of the question.

THE DEPONENT: The answer is yes, but my understanding is that -- is that's something that has been determined legally. That's not voluntary assumption on my part.

Q. (By Mr. Swanson) Do you agree that subscription apps face different market conditions than nonsubscription apps?

A. Yes, I would agree that -- the -- the nature of consumer demand for apps with a continuing delivery of content by subscription may end up on -- require different costs and different profit considerations than those apps that involve only a download or -- or a download followed by rather quick and one-off app purchases.

Q. Do you have an opinion as to why in 2016 Apple lowered its commission on subscription purchases to 15 percent after the first year of the subscription?

A. I -- I don't have an opinion. I -- I

Page 247

recall -- in -- in descriptions that the -- the large providers of services with subscriptions were -- were involved in serious negotiations with Apple, and -- and consumers of Apple devices were anxious to have those apps on their devices, so they -- those large providers had some market power to negotiate with Apple.

Q. Do you agree that Apple lowered its commission on subscriptions in that case in response to competitive pressure?

A. I -- I just gave you an answer as to what I recall, the -- the description of the market circumstances surrounding this -- this reduction in subscription renewal commissions. And I -- I presume that was the result of bargaining between Apple and large suppliers of subscription services.

MR. SWANSON: I would suggest taking a very short break, because I think we're almost up.

MR. RIFKIN: Sure. Let's take -- let's take five minutes.

MR. SWANSON: Yeah.

MR. RIFKIN: Okay.

MR. SWANSON: Great.

MR. RIFKIN: And that's welcome news.

THE VIDEOGRAPHER: Going off the record.

Page 248

The time is 5:32 p.m.

(Recess taken.)

THE VIDEOGRAPHER: Back on the record. The time is 5:43 p.m.

Q. (By Mr. Swanson) Professor, you are still in the process of calculating your standard errors for your estimates, correct?

A. Correct.

Q. Don't you need to know what the standard errors are before you can offer an opinion on the reliability of your estimates?

A. Please repeat the question.

Q. Don't you need to know what the standard errors are before you can offer an opinion on the reliability of your estimates?

A. I -- I have an alternative way to judge reliability, which is the distribution of the estimates over the 75 samples, and I can use those to establish confidence balance breach parameter, and those provide direct evidence on reliability.

Q. And have you disclosed those calculations in your supplemental report?

A. Yes.

Q. And where -- where have you done that?

A. Figure 2 and figure 8.

Page 249

63 (Pages 246 - 249)

Q. Are you referring to the revised figure 2?    05:45:19

A. In each case, these are available in revised form.

Q. And let's look at revised figure 2.    05:45:35

So what is it about figure 2 that allows you to opine on the reliability of your estimates without knowing or having yet calculated the standard errors?

A. If one looks, say, in the column A of figure 2 and the rows which are marked by percentiles, the difference between the 2.5 percentile price and the 97.5 percentile price is a 95 percent confidence bound. So that's a confidence bound that goes from minus 0.59 to minus 0.64.    05:45:58    05:46:23

Q. And -- and what does that tell you about how confident you are in your estimate?

A. That tells me there's a 95 percent probability that that coefficient is between minus .59 and minus .64.    05:46:46

Q. And for the IAP price per gains, your confidence bound is .13 to -- I'm sorry -- minus .13 to minus .27?

A. Correct.    05:47:07

Page 250

Q. That's a fairly broad bound, is it not?    05:47:08

A. Well, I'm not sure what you mean by -- by "broad."

Q. It varies by a factor of two, does it not?    05:47:26

A. It does not cross zero, so I would say that the IAP price coefficient is quite significant.

Q. Well, if the IAP price coefficient, instead of taking the mean value of minus .22 took the value of -- of minus .13, how much would -- impact would that have on your aggregate damage calculation?    05:47:41

A. That is a calculation that I have not done, but one in principle could do a damage calculation for each one of the 75 0.1 percent samples and produce a percentile distribution like this for damages, and that would be give a confidence bound for damages.    05:48:01

Q. Let's -- let's take a look at column E., the coefficient on the IAP price for music and entertainment.    05:48:29

Your 95 percent interval corresponds with a figure as low as minus .49 and as high as minus .284? I'm sorry -- 2.84?    05:48:50

Page 251

A. Correct.    05:48:53

Q. And that is a swing of almost five or six times?

A. Yes.

Q. And you -- and you find that to be very comforting with respect to your mean coefficient of minus 0.75?    05:49:08

A. This is -- this is a relatively wide confidence bound. It does not cross zero, but it is what it is, and if these -- if these -- if these 75 sets of estimates were carried forward into damages, one would have a distribution of estimated damages. And I haven't done that calculation.    05:49:29

Q. So that's not a calculation -- well, you've not done it, so you haven't disclosed it, right?    05:49:58

A. It's -- it's a calculation which is potentially feasible, and -- and I -- I believe that it's -- it would be feasible to do it within the time frame, although the highest priority is provide you with the standard errors and required to be correction from the genre of this reclassification.    05:50:20

Q. Now turn to revised figure 8.

THE VIDEOGRAPHER: Mr. Swanson, your    05:50:44

Page 252

video camera is off. Just letting you know.    05:50:46

MR. SWANSON: That was unintentional. Sorry.

Q. (By Mr. Swanson) Could you take a look at revised figure 8, Professor.    05:50:54

A. Yes.

Q. So what is it about figure 8 that gives you confidence about the reliability of your estimates in the absence of calculated standard errors?    05:51:05

A. By -- by the same procedure as to the previous figure, I can form 95 percent confidence bounds are -- or other confidence bounds and -- and those are -- those are a basis for -- for judging the -- the reliability of these coefficient estimates.    05:51:27

Q. And the confidence --

A. And I -- by the way, I would point out that these are confidence bounds for a -- a 01 percent sample -- estimate, not for the mean. And the mean itself would -- would require a -- a further calculation.    05:51:40

Q. All right. So figure 8 figures do not give you any basis for being confident in your mean coefficient calculations; is that correct?    05:52:03

Page 253

64 (Pages 250 - 253)

A. It's in the late in the day, so let me 05:52:10 review what I just said.

Q. Uh-huh.

A. This table gives the distribution of estimated demand coefficients, including of all 05:52:26 downloads. It is -- it is not giving the -- the -- as it appears in the table -- the distribution of -- of the mean.

For that, you would need to do a -- a bootstrap recalculation of the 75-sample average or 05:52:46 some -- some comparable procedure.

Q. And the 95 percent interval in figure 8 for IAP price coefficient in column B, ranges from 0.49 to zero -- I'm sorry -- to minus 4.67; is that right? 05:53:16

A. Correct.

Q. That's a factor of almost ten?

A. Correct.

Q. So the 95 percent of confidence interval encompasses like a 1,000 percent range? 05:53:31

A. It -- it encompasses minus 4.67 to minus 0.49.

MR. SWANSON: Okay.

All right. I think we're probably out of time. 05:53:51

Page 254

MR. RIFKIN: I -- just before we go, I 05:53:54 have a couple of questions just to clarify some testimony that was given, Professor McFadden, if you're okay to do this without a break. I will promise to keep it as short as possible. 05:54:06

EXAMINATION

BY MR. RIFKIN:

Q. So if -- if I can ask you to turn to paragraph -- I'm sorry -- to footnote 100 in your supplemental report. This is on page 35. And we 05:54:23 don't need to display it on the screen. I think you and I both have paper copies.

Tell me when you're there.

A. Page 35?

Q. It's page 35, footnote 100. 05:54:46

A. I have that in front of me.

Q. Okay. Do you remember earlier in the deposition Mr. Swanson asked you some questions about the tiered pricing structures that you used for your analysis? 05:55:01

A. I do.

Q. Okay. I'd like you to read through footnote 100 to yourself, and then I have just a couple of quick questions about it.

A. Yes, I -- I've now read it. 05:55:24

Page 255

Q. Okay. And is footnote 100, to your 05:55:26 understanding, an accurate description of the methodology that was used for determining an -- IAP price intervals on the assumption that was built into your price tier or focal pricing scenario? 05:55:45

A. Yes. Yes, it is.

Q. All right. If -- if during the examination today you gave a response to a question without having had a chance to sit and study it and write it out that was different in any respect from 05:56:06 footnote 100, which should we rely on, the -- the written description of the procedure and methodology or the one that you gave in answer to a question here today?

A. The answer is that the written 05:56:23 description is exact, and if I did not state -- say exact same thing, that's -- that was a lapse of memory.

Q. Okay. Or perhaps a misunderstanding of the question when it was asked? 05:56:37

A. Perhaps. I think I was asked about whether subscriptions were -- now that I review this, but I don't recall specifically that they were.

Q. Okay. And -- and let's turn to 05:56:53

Page 256

footnote 104 on page 37 of your supplemental 05:56:55 report. And -- and I'd ask that you read footnote No. 104 to yourself briefly.

A. Yes. I've read this again.

Q. And, again, is -- is footnote 104 an 05:57:21 accurate description of the methodology that you followed for purpose of the price tier or focal pricing scenario that -- that you described in supplemental -- in your supplemental report?

A. Yes, it is, for the case with -- with a 05:57:38 much finer project.

Q. And, again, if you answered a question today during your deposition --

By the way, were you shown footnote number 104 during your examination by Mr. Swanson? 05:57:55

A. No. I don't think I was asked this without exhibits.

Q. And did he -- when he asked you questions about your methodology, did he show you footnote No. 100? 05:58:10

A. No.

Q. Okay. So if -- if there's a difference between the testimony that you gave in response to any question Mr. Swanson asked without showing you footnote number 104 and the description that's 05:58:21

Page 257

65 (Pages 254 - 257)

written here in footnote number 104 in your report, which -- which is the accurate one that we should rely in terms of describing your methodology, please?

A. The description in the report. In the footnote.

Q. Okay. I'm going to hand you a printed copy of your reply report. And I don't believe we have a copy to display on the screen, but given my preference to paper, I don't think it's going to matter.

So let me hand that over to you and ask you first if you recognize had what I have just handed to you as your reply report which was signed in October of 2021?

A. Yes, I do recognize it.

Q. Okay. And when did you sign that reply report?

A. I believe -- I believe it was signed on that date, October 19, 2021.

Q. Okay. And you were asked some questions about -- a sensitivity analysis by Mr. Swanson earlier in the day.

Do you recall that?

A. Yes.

Page 258

Q. And -- and I'd like you to turn to pages 63 and 64 of the reply report that I put in front of you.

Do you see figure 2 on page 63 and figure 3 on page 64?

A. Yes, I have that.

Q. And would you tell us what figure 2 represents, please.

A. Figure 2 is a sensitivity analysis of games damages and how they would vary with variations in the margin bounds.

Q. All right. And if -- if you answered Mr. Swanson's question about whether you performed a sensitivity analysis, did he show you figure 2 on page 63 of your reply report when he asked you questions about whether you performed a sensitivity analysis?

A. He did not.

Q. Now, had he shown that to you, would you have said that you did a sensitivity analysis?

A. Yes. I -- clearly I -- I did it. I'd forgotten that it was in the reply report.

Q. Okay. And -- and the same question for figure 3 on page 64 of your reply report.

What is that?

Page 259

A. That's, again, a sensitivity analysis of variations in the margin bounds in music and entertainment genre.

Q. And earlier in the day when Mr. Swanson asked you questions about a sensitivity analysis for music and entertainment, did he show you figure 3 from your reply report?

A. He did not.

Q. And if -- if he had shown you figure 3 from your reply report when asked you if you had done a sensitivity analysis for the music and entertainment genres, what would you have said?

A. I would have said yes.

Q. Okay. And then one final question if -- if I can. This time I'd like to turn to figure 6 in your supplemental report.

And if you could hand me back my copy so that I have that. Thank you. I appreciate it.

Tell me when you have figure 6 in front of you.

A. Yes, I have it.

Q. Okay. In figure 6, there is a -- some text that describes what's shown in figure 6.

Do you see where I'm referring?

A. The notes to the figure?

Page 260

Q. Yes. Yes, sir. And there's -- there's a particular sentence there that says the following:

"The $10 spending cutoff removes accounts whose lifetime spending was less than $10."

Do you see where I'm reading?

A. Yes.

Q. Now, when Mr. Swanson asked you questions earlier during your deposition about whether the $10 cutoff was applied to as-is prices or but-for prices, did he show the text you wrote beneath figure 6 in your supplemental report?

A. I -- I -- at this point, I actually -- I was working -- looking at the revised version of figure 6 and it did not carry over the -- the text.

Q. Okay.

A. So I'm --

Q. The text refers to the spending cutoff removing accounts whose lifetime spending was less than $10.

That's an historical fact, correct?

A. That's correct.

Q. And that's a reference to the as-is prices that were historically charged to Apple ID accounts, correct?

A. Correct.

Page 261

66 (Pages 258 - 261)

Q.  Okay.                06:03:26

MR. RIFKIN:  I don't have anything else.

MR. SWANSON:  I am --

THE DEPONENT:  Thank you.

MR. SWANSON:  Well, thanks.                06:03:32

I have a follow-up on -- on your reply report.

FURTHER EXAMINATION

BY MR. SWANSON:

Q.  Professor, have you run any sensitivities                06:03:40 on the margin bounds for the games genre higher than 90 percent?

A.  What -- what -- what is -- is in my reply report is there --

MR. RIFKIN:  Would you like -- would you                06:04:01 like him to give reply report so that he can have it in front of?

MR. SWANSON:  Oh, yes, of course.  He's free to look at anything he wants to.

MR. RIFKIN:  Okay.                06:04:10

THE DEPONENT:  Remind me of the page.

Q.  (By Mr. Swanson)  It is page 63.

A.  I believe your question did I -- did I do a sensitivity calculation for a upper bound higher than .9?                06:04:40

Page 262

Q.  Yes.                06:04:43

A.  The answer is no.  It was only done for .7, .8, and .9.

Q.  And have you run a sensitivity for the margin bounds for music and entertainment higher                06:04:56 than .65?

A.  No.  The ones reported are for .3, .4, .45, .5, .6, and .65.

MR. SWANSON:  Okay.  Well, that's all I have for now.                06:05:14

Mr. Rifkin, as you know, we're not adjourning the deposition.  We're keeping it open as we --

MR. RIFKIN:  We understand, and we will do our best to work with you to make accommodations                06:05:20 for the -- for the supplemental information that we provided.

MR. SWANSON:  Yeah.  We will -- we will meet and confer about that.  Thank you.

MR. RIFKIN:  Okay.                06:05:31

And thank you all for your patience and the time.

THE VIDEOGRAPHER:  This completes today's deposition.  We are going off the record.  The time is 6:05 p.m.                06:05:39

Page 263

(TIME NOTED:  6:05 p.m.)


---O0O---


Page 264

I, DANIEL L. McFADDEN, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear notes; that my testimony as contained herein, as corrected, is true and correct.

Executed this _____ day of _____, 2022, at _____,_____.


_____
DANIEL L. McFADDEN

Page 265

67 (Pages 262 - 265)

I, Rebecca L. Romano, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter, do hereby certify:

That the foregoing proceedings were taken before me remotely at the time and place herein set forth; that any deponents in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name. Dated: December 6, 2022

Rebecca L. Romano, RPR, CCR
CSR. No 12546

Page 266

---

DANIEL G. SWANSON, ESQ.

dswanson@gibsondunn.com

DECEMBER 6, 2022

RE: IN RE: APPLE IPHONE ANTITRUST LITIGATION

DECEMBER 5, 2022, DANIEL McFADDEN, JOB NO. 5601935

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 267

---

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 268

---

IN RE: APPLE IPHONE ANTITRUST LITIGATION

DANIEL McFADDEN (#5601935)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

WITNESS                    Date

Page 269

68 (Pages 266 - 269)

**[& - 20]**

| & | | | |
|---|---|---|---|
| **&**  1:13 2:19 3:5 3:13 4:5 5:5 267:23 268:9 | **1.25**  136:22<br>**1.60**  225:18<br>**1.74**  57:20 58:9<br>**1.99**  123:6 148:4 148:5,10 | 206:14<br>**1050**  4:16<br>**10:00**  44:21<br>**10:11**  44:24<br>**10:14**  80:20 | **15**  66:12,14,15 247:23<br>**150**  54:1,2,12<br>**16**  93:18 225:16<br>**1615**  3:18 |

**0**

**0**  206:24 209:1
**0.1**  50:14 64:21 73:24 143:10 152:12,12 205:10 206:24 211:11 213:7 214:5 251:16
**0.15**  91:15
**0.49**  254:14
**0.49.**  254:22
**0.59**  250:15
**0.64.**  250:16
**0.75**  58:15,21 252:7
**0044**  6:19 25:7
**0045**  7:4 27:8
**01**  253:20
**06714**  1:6 2:6 6:22 8:21
**09**  127:25

**1**

**1**  1:16,25 6:3 7:4 8:16 28:17 31:24 32:12,20 50:25 51:24 55:12,16 67:1 71:3,17,21 72:7 90:13 136:17 141:14 161:22 213:6 268:1
**1,000**  254:20

**10**  29:1,13 119:1 120:5 168:18 181:8 194:25 209:15 210:8,25 211:4 216:4 217:16,20 223:17,19 224:25 225:1,5 225:10,13 227:7 228:4,20 229:4 229:16,23 230:6 230:13,14 231:6 231:8 232:2,11 233:7,15 234:16 234:23 261:3,4,9 261:19
**10,194,828,011** 202:9
**10.1**  204:4
**10.648**  214:11
**10.99**  229:20
**100**  132:5 147:2 212:23 213:1 214:2,9 255:9,15 255:23 256:1,11 257:20
**1016**  3:9
**104**  205:13,21 206:7,14 214:16 214:18 257:1,3,5 257:15,25 258:1
**105**  28:19 29:10 205:13,22 206:5

**11**  29:1,9 205:22 206:7 213:15 214:5,6,8 228:15 229:2,13
**11.6**  214:14
**110**  155:12
**1185**  222:1
**11:25**  80:23
**12**  64:25 65:11 65:15,20 66:3 68:22 194:25
**122**  85:7
**12546**  1:21 266:25
**12:28**  117:17
**13**  6:5 65:17 250:23,24 251:11
**13.6**  65:12
**13.63**  192:11 195:16 197:15 198:14 199:5
**130.5**  209:25 225:3
**138.5**  210:7
**13th**  56:4
**14**  25:11 216:5
**14.3**  142:6 210:24 211:7
**14.4**  214:20 215:15
**14.9**  215:5

**17**  103:18
**17.2**  207:11,18 208:8,20
**17.6**  208:11,21 209:8 211:8
**176,964,271**  67:2
**176.9**  209:2,8 224:22
**177**  207:19 208:4 211:25 224:22
**179**  7:12
**18**  217:20 220:4 220:16 221:4
**19**  127:25 161:18 163:8 258:20
**1:00**  117:9
**1:15**  117:13
**1:16**  117:20

**2**

**2**  28:17 31:17 136:17 223:4 249:25 250:2,5,6 250:11 259:4,7,9 259:14
**2.25**  136:22 138:25
**2.5**  250:13
**2.60**  138:24
**2.84**  251:25
**2.99**  148:12
**20**  141:25 142:11 142:21 143:8,13

**[20 - 64]**

181:4 211:15,18
211:24 212:7,16
233:5,16
**20-0466**  1:22
**20036**  3:20
**20036-5306**  4:17
**2008**  216:5
**2016**  247:21
**202**  3:21 4:18
**2021**  72:22
258:15,20
**2022**  1:15 2:18
6:17 8:1,6 60:18
216:5 265:7
266:21 267:3,5
**2023**  128:22
**2025.520**  267:9
267:12
**212**  3:10
**213**  4:10 180:6,8
180:16 181:3
**22**  34:22 35:25
251:10
**223**  67:6,15 68:8
**229-7430**  4:10
**24**  63:4 92:18
**248**  68:4
**25**  6:19 34:22
35:25 85:13
136:21
**255**  6:6
**26**  6:17 81:1
**262**  6:7
**27**  7:4 250:24
**270**  3:8
**271**  1:25
**284**  251:25

**29**  68:21,24 69:9
69:18 127:25
**2:17**  152:20
**2:29**  152:23
**2nd**  26:16

**3**

**3**  28:17 57:6,13
57:14,19 58:20
193:18 220:3
227:25 259:5,24
260:7,9 263:7
**3.25**  136:12,15
136:22 138:4,6
138:21,25
**30**  215:23 268:1
**3000**  5:9
**31**  209:9
**32**  123:19 207:8
**326-7900**  3:21
**33**  128:18
**333**  4:8
**3491**  1:23
**35**  133:18 150:24
151:9 211:20
255:10,14,15
**37**  7:12 15:15,17
179:20,21 257:1
**39**  127:25 142:17
210:15
**393-8248**  5:11
**3:25**  186:10
**3:35**  186:13

**4**

**4**  28:17 31:24
32:12,20 201:12
201:20 202:2
204:6,16 209:1

213:5 263:7
**4.25**  138:25
**4.5**  72:22
**4.67**  254:15,21
**40**  43:2 181:13
**400**  3:19
**415**  5:11
**42**  103:15
**43**  14:12 15:1,17
38:2,3
**44**  25:4,24 45:2,4
50:12 53:22
55:8
**45**  27:7 45:2
51:5 56:13 57:6
117:11 206:3
208:11 219:25
263:8
**46**  225:25 228:10
**46.5**  225:6
**49**  127:25 251:24
**498**  66:22
**4:11**  1:6 2:6 6:22
8:21
**4:32**  219:19
**4:42**  219:22

**5**

**5**  1:15 2:18 8:1,6
28:17 31:17,20
34:18 154:8,15
206:25 216:15
216:17 219:24
220:3 221:16
223:4 263:8
267:5
**5,000**  74:13 75:7

**5.3**  211:3
**50**  109:23 142:5
**50.49**  120:23
**500**  66:7 235:13
235:16,25
**545-4600**  3:10
**555**  5:8
**5601935**  1:24
267:5 269:2
**58**  43:13
**59**  127:25 250:21
**5:32**  249:1
**5:43**  249:4
**5th**  53:8

**6**

**6**  28:17 32:15,20
66:13,15 207:7
207:10 208:10
209:7,14 211:9
215:3 223:22
224:13,18
227:21,25
260:16,19,22,23
261:11,14 263:8
266:21 267:3
**60**  37:21 38:4,6
39:4 181:4,5,11
181:16 183:10
226:11
**61**  39:13 217:24
**63**  37:21 38:6
40:20 85:11
259:2,4,15
262:22
**64**  183:17,21
250:21 259:2,5
259:24

**[65 - account]**

| | | | |
|---|---|---|---|
| **65** 263:6,8 | 141:15 207:1 | **90** 141:3,25 | **able** 11:19 56:2 |
| **69** 127:25 | 211:13 212:3,12 | 163:5 181:4,7 | 102:19 174:19 |
| **6:05** 263:25 | 213:22 215:1,12 | 183:11 262:12 | 187:8 188:13 |
| 264:1 | 249:18 251:16 | **90071-3197** 4:9 | **abrantes** 39:8 |
| **7** | 252:11 254:10 | **92** 183:17,21 | 193:22,25 |
| | **750** 128:23 129:2 | **94105-0921** 5:10 | 194:23 195:10 |
| **7** 29:1,8 32:15,20 | 129:6,11,16,25 | **947** 214:11 | 195:16 196:3,21 |
| 140:3 142:16 | 139:15 214:21 | **95** 106:9 127:25 | 199:7 |
| 143:4 147:6 | 215:16 | 180:10 250:14 | **absence** 125:9 |
| 193:17,20 | **77** 215:21 | 250:19 251:23 | 150:11 190:21 |
| 210:14,22 211:8 | **79** 127:24 | 253:12 254:12 | 253:9 |
| 211:10,14 | **8** | 254:19 | **absent** 22:15 |
| 212:22 214:2,3 | | **955-8500** 4:18 | 123:25 126:1 |
| 214:19,20 263:3 | **8** 28:17 155:17 | **96** 139:20 | 127:21 130:1 |
| **7.5** 89:9 90:16,17 | 161:19 217:20 | **97.5** 250:13 | 198:5 218:11 |
| 91:7,9,17 | 249:25 252:24 | **98** 150:23 151:7 | 231:10 |
| **7.6** 209:16 | 253:5,7,23 | 151:8 | **absolute** 36:14 |
| **7.8** 209:21,25 | 254:13 263:3 | **99** 117:24 118:16 | 37:2 |
| 210:7 | **8.99** 163:3 | 119:7,20 120:21 | **academic** 98:23 |
| **70** 72:4 73:21 | **80** 123:18,21 | 121:4 123:5 | 130:16 131:12 |
| 74:18 188:6 | **800** 206:15 | 127:24 128:6 | **accept** 112:21 |
| **72** 92:12,14,15 | **82** 130:5,8 | 130:1 131:23 | 135:7 170:22 |
| 92:16 | **827** 1:22 | 132:6 136:9 | 195:13 214:15 |
| **7321** 266:24 | **83** 131:21 | 148:11 150:3 | **acceptable** 9:18 |
| **74** 63:2,5 64:16 | **85** 127:25 | 156:2 229:21 | **access** 179:9 |
| **75** 51:24 52:10 | **86** 128:17 | **99.99** 120:21 | 199:3 220:23 |
| 52:24 53:11 | **87** 133:18 135:16 | 121:5 156:2 | **accommodate** |
| 54:20 55:12,16 | **89** 127:24 | **9:04** 2:18 8:2,6 | 140:1 196:9 |
| 57:8 71:17,21,24 | **9** | **a** | **accommodatio...** |
| 73:12,16 74:2,8 | | | 263:15 |
| 74:13 75:8,12 | **9** 28:18 37:10,14 | **a.m.** 2:18 8:2,6 | **account** 17:17 |
| 80:25 82:4 | 37:16 127:25 | 44:21,24 80:20 | 73:5 88:8,8 |
| 85:18,25 86:2,7 | 131:23 132:6 | 80:23 | 93:14 94:11 |
| 86:11,16,18,20 | 226:18 228:13 | **abeyance** 63:19 | 102:20 112:1,12 |
| 87:18 88:10,11 | 228:25 229:12 | 63:24 64:13 | 112:13 117:24 |
| 88:15,16 89:6 | 262:25 263:3 | **ability** 13:15 | 118:7 121:13 |
| 90:13,14 91:6,9 | **9.99** 162:25 | 126:5 187:4 | 135:8 137:6 |
| 91:14 93:6,11,15 | 163:2,3 | | 146:19 147:19 |

**[account - affect]**

150:14 188:5 191:10,15 196:18 197:6 198:24 200:17 201:3 202:22,22 203:24 209:20 211:25 215:13 220:25 221:10 226:18 228:13 228:15,16,25 229:2,3,12,14 231:25 232:9,16 233:5,7,10,19 238:16 246:19
**accounted** 106:6 145:8 164:20 168:25 169:1
**accounting** 72:3 162:11,14,15 163:24,25 164:13,20 165:21,22,23 166:10 173:4,6 175:1 176:21 177:16 178:5,14 181:24
**accounts** 53:15 66:7,18,22,24 67:2,3,6,20 68:1 68:8 70:18 71:6 71:11 73:13 86:21 87:19,25 87:25 117:23 118:5,15 119:6 119:19 122:2,2,8 141:8,18 142:1 142:22 145:19 162:13 169:1

174:10,11 203:18 204:9,11 204:14 207:11 207:19 208:4,12 208:15,23 209:5 209:8,9,16,25 210:8,25 211:6,8 211:15,20 212:6 212:15 214:20 215:4,14 216:1,3 216:4,12,16 217:2 220:4,15 220:18 221:2,17 221:25 222:15 222:23,25 223:9 223:12,19 224:20,23 225:1 225:6,9,25 226:4 228:10 229:17 229:19 230:2,6 230:18,22 231:3 231:8 232:2,10 232:20 233:15 233:20 235:5,8 235:10,14,22,25 236:7,11,17,22 237:1,8 238:16 238:19 261:3,18 261:24
**accuracy** 59:2
**accurate** 13:16 174:18 177:25 185:15,15 256:2 257:6 258:2
**accurately** 113:1 113:15 246:20
**acquire** 243:15 243:22 244:20

246:17
**acquired** 244:12 246:10
**acquiring** 167:7
**acquisition** 166:14,20,23,24 168:1
**action** 9:4 266:18,19
**active** 190:6 242:9
**actual** 112:24 127:16 176:3,3 178:21 191:25 221:10 225:10 227:14 229:13 244:8 247:3
**adaptation** 135:5
**add** 12:8,17 120:10 170:15 203:25
**added** 170:11
**adding** 96:14 204:8
**addition** 26:21 143:15 153:5 220:24
**additional** 12:14 30:3,3 60:21 61:2 96:8 103:1 146:23 166:20 167:8,25 170:12 170:15 171:21 171:21 172:10 172:12 192:17 192:18 201:15 208:23 209:4

**address** 31:22 32:16 34:20 35:23
**addressed** 21:1 22:21 23:3,14 59:1 102:6
**addresses** 34:16
**adds** 122:22 123:6 224:21
**adhere** 126:8
**adjourning** 263:12
**adjust** 138:11
**adjusting** 135:18
**adjustments** 136:4 201:14
**adler** 3:5
**administered** 11:2 266:8
**administering** 218:1
**administrative** 119:2
**admissions** 30:12
**admit** 226:22
**admitted** 3:14
**adopt** 129:1 134:25
**adopting** 129:16
**advantageous** 192:15
**advertising** 168:5,10,16,20
**advised** 32:8
**affairs** 88:24
**affect** 13:15 24:25 243:8

Page 4

[affiliation - answer]

affiliation 9:10
affirmative
  172:5
afield 197:11
  199:11
aftermarket
  161:25 191:20
agency 125:5
aggregate
  146:18 147:2,10
  201:4,19 203:20
  251:12
aggregating
  202:22,23
aggregation
  201:3
ago 28:14 31:11
  189:17,17 204:5
  236:25
agree 8:14 87:16
  105:23 126:15
  150:9 153:4
  154:16 184:12
  184:21 187:22
  193:7,12 205:14
  206:16 209:2
  210:8,9 211:18
  220:2 224:10
  234:8,15 238:13
  239:19 241:25
  243:6 245:15,22
  247:11,14 248:8
agreed 46:21
ahead 42:1
  107:23 144:20
aired 140:25
airlines 44:11

airways 43:19
  43:22
allegation 22:15
alleged 40:4
  103:24 190:22
allocation 157:6
  157:8,11
allotted 151:16
allow 183:1
  242:5,23
allowed 138:12
allows 177:8,13
  250:6
alphabet 153:22
alternative
  23:25 89:13
  134:11 140:22
  187:16,19,22
  188:7,13 190:16
  192:7 205:7,18
  249:16
alternatives 78:8
  91:5 192:6
  205:12
amazon 127:16
amend 104:15
amount 55:9
  94:6 102:18
  112:11 145:18
  147:7 156:20,20
  211:19 218:18
  218:23 223:13
  243:24
amounts 24:8
  112:13
analyses 45:6
  51:21 76:25

analysis 5:15,21
  5:24 41:8,12
  46:16,23 47:18
  48:2 50:15,23,24
  51:3,17 53:13,24
  55:12 60:10,13
  60:15 61:8,12
  66:1,2,3 68:20
  70:12 71:7 75:3
  75:4,17,18 76:9
  76:10,22 77:13
  82:21 94:8
  95:22 96:2
  104:23 108:17
  109:11 111:3,13
  111:25 112:16
  123:16 132:20
  132:21 134:10
  134:16,17 149:4
  151:13,14,20
  152:2,8 157:24
  168:14,23
  169:10 170:4
  174:6,14 175:12
  182:12 190:10
  190:11 191:19
  194:20 195:3
  197:16,19
  198:13 202:19
  203:4 207:13
  225:13 226:20
  227:8 228:18
  229:8 230:15
  232:3 233:2
  234:23 243:12
  244:8,21 255:20
  258:22 259:9,14
  259:17,20 260:1

  260:5,11
analyze 73:20
  134:14 147:14
  232:13
analyzed 67:13
  73:24 94:6
  96:22 97:13
  102:25 121:20
  122:5 146:6
  165:8 183:14
  184:18 185:11
  200:25 201:13
  202:7 207:14
analyzing 121:8
  166:15 186:2
angeles 4:9
announced
  129:8
answer 18:15,21
  18:23 19:10,20
  19:21,24 21:16
  22:8 23:3 24:22
  32:23 34:4
  37:23 49:9,13
  52:25 62:10
  65:25 67:22
  71:8 74:3 76:16
  77:12 83:3
  84:16 85:1
  86:14 88:4
  89:10 92:2 93:7
  93:25 99:3
  109:2 112:15,21
  113:8,9,19 116:6
  127:23 139:12
  146:24 147:23
  148:20 149:16
  151:23 161:17

Veritext Legal Solutions
866 299-5127

[answer - apple]

165:19 169:25 171:24 174:2,19 175:3 176:19 177:7 182:6,18 184:1 185:25 186:17 191:18 192:25 195:20 196:15 197:14 207:5 212:19 215:18 222:22 225:12,22 227:17 229:6 232:19 234:17 236:4 238:3 241:21,24 243:2 244:17,18 246:24 247:7 248:11 256:13 256:15 263:2

**answered** 21:9 139:10 257:12 259:12

**answers** 238:6

**anticipate** 68:18 96:7 97:1 129:20

**anticipated** 172:21

**anticompetitive** 123:25 126:1 144:9 145:20 146:1,3 190:22

**antitrust** 1:6 2:6 6:20 8:18 40:5 267:4 269:1

**anxious** 248:5

**apart** 136:17

**apologies** 186:22

**apologize** 91:2 107:25 186:21 224:5

**app** 7:4 22:17 46:6,7 49:5,17 49:18 53:14 66:5 67:11 68:25 69:19 71:9 73:6 75:15 79:21 81:6 82:5 82:18 83:13,16 83:23 84:12,22 84:23 93:20 94:7,15,23 95:22 96:19 97:10 102:21 103:25 105:4,6,7,12,24 105:25 106:6,14 107:2,9,17 108:6 111:8,16,17,18 112:22 113:6,14 113:14,16,16 114:8,14,16,19 114:19 115:11 115:17,21,21 116:13,14,21,25 117:22,24 118:6 118:8,16 119:7 119:20 120:7,8 120:19,20 122:20 123:4 135:25 136:24 136:25 139:5 141:23 143:13 147:19 148:3,6 151:15 161:24 163:10,12

164:22 165:18 167:4,4,8,16,18 167:19,25 169:19 174:22 175:17,21 176:9 176:10,14 177:4 177:12,14 178:16 183:8 185:19,22 186:16 187:1,12 188:18 190:17 191:12,16 192:7 197:22,24,25,25 198:6,21,24 203:8 228:21 234:11 235:21 236:11 240:16 241:10 242:5,6 244:12,17 245:17 246:18 247:20

**apparently** 46:2 51:11 57:2 181:19 188:1

**appear** 14:15 66:10,17 74:5 91:16 136:7 265:4

**appearance** 9:8

**appearances** 3:1 4:1 5:1 9:10,17

**appeared** 46:15 49:1 71:17,23 73:23 98:11

**appearing** 3:2 4:2 5:2 71:3 267:18 268:7

**appears** 18:3 93:14 142:15 202:1 254:7

**appendices** 99:24

**appendix** 16:17 37:17 42:25 50:15 64:20 85:6,7 115:13,14 142:15 147:24 149:18 150:15 153:13,20 159:21 181:19 205:1,6,9 213:8 213:13

**apple** 1:6 2:6 5:18 6:20 8:18 9:12,15 20:25 22:6 45:11,25 46:8 49:6 60:14 60:14 66:7,22 67:4,6,11,15,20 68:1,8 73:13,21 78:16 96:3 126:5,5,8 128:21 129:1,5,10,15,23 133:19 134:3,19 136:2,16 137:4 142:1 175:14 186:18 187:3,5 187:12,14 190:24 192:10 197:24 198:5 235:3,14,17 236:6,12,17 237:1,8 238:16 244:25 247:22 248:4,4,7,8,16

Veritext Legal Solutions
866 299-5127

[apple - asking]

261:23 267:4 269:1

apple's 45:20,23 97:23 127:21 129:7 130:2 134:13 135:20 141:19 143:20 144:3,8 146:19 147:16,21 151:17 190:22 195:1,5 196:19 197:8 212:4,14

apples 58:25 176:20,20

applicability 238:23

applicable 37:7 231:17,18 232:24

application 55:1 76:23 79:11,15 81:24 104:12 107:14 138:17 182:16

applications 133:2

applied 24:14 50:17,21 93:23 109:3 151:15 183:7 209:15 223:18 226:21 228:11,18 229:16,17 231:7 234:16 261:9

apply 44:9 79:5 93:2 94:15,23 100:24 108:25 109:2 129:10

137:12 240:20 241:7

applying 210:25 223:10 225:5

appreciably 59:11

appreciate 44:17 213:12 237:14 260:18

approach 76:20 78:2 110:2,18 193:15 227:4

approaches 89:22 90:18 193:13

appropriate 60:15 61:12 76:5,8,22 81:18 81:24 94:8 101:14 105:19 107:13 108:11 108:16 119:22 121:11 148:2 152:9 157:25 172:9 186:5 196:13 199:23 227:4,8

approximately 67:15 180:9 214:21

approximates 133:19

approximation 93:8,9

apps 22:17 45:5 45:11,15,17,22 46:17 59:22 63:13 70:6,18,20

71:1,11,17,23 72:3,8,14,18 73:15,20,21 74:1 74:2,5,8,13,18 74:25 75:7,11,13 75:22,25 76:2,3 76:12 77:17,25 80:11 97:3 102:22 104:25 128:5 158:7 159:16,22 160:2 165:3,9 174:8,17 175:1 179:1 183:8,14 184:13 184:22 185:24 189:11,21,22 190:8,24 191:20 191:22 196:19 223:12 224:24 228:8 235:23 236:2 240:17 241:7,18,25 242:1 243:6,15 243:16,23,23 244:20 245:10 245:12,16,16,23 246:10,17,17,19 247:3,12,13,15 247:18 248:5

april 60:18 216:5

area 30:11 41:1 55:5 220:17,18 220:21

areas 220:19

arises 127:1

arithmetic 208:25 209:12

211:22 214:15 220:5

arrow 25:20

articles 131:8

aside 13:9 42:20 181:22

asked 14:18 16:24 17:7,23 18:6 20:15 21:2 23:4,13 24:25 31:21 34:17,20 35:23 37:13 38:19 42:7 59:16 60:7 61:18 67:18,23 69:7 120:3 172:18,19 193:22,25 194:22 195:10 195:14 196:5,16 197:15 218:9 222:3 223:8 226:24 230:1 231:9 237:22 238:1 239:16 244:14,15 255:18 256:20 256:21 257:16 257:18,24 258:21 259:15 260:5,10 261:7

asking 12:2 28:5 39:2 43:23 65:9 77:5,8 116:3 156:18 165:2 174:11 183:24 189:2 190:1 199:18 200:1

Veritext Legal Solutions
866 299-5127

**[asking - back]**

| | | | |
|---|---|---|---|
| 201:21,25 213:20 | assuming 112:10 115:22 116:20 198:8 | authoritative 40:25 | 178:8 182:1 183:6,13 184:24 212:11 214:25 |
| assertion 216:9 216:12 | assumption 49:16 61:15 | available 27:2 54:19 61:9 97:5 100:17 131:18 | 215:11 236:7,10 241:6 254:10 |
| assess 233:4,6 245:25 246:20 | 76:20 77:1,9 104:23 109:7 | 161:24 163:10 164:20 172:14 | averages 121:13 averaging 88:10 |
| assessing 36:25 132:9,13 | 111:9 115:2,3,11 115:18 116:9 | 178:21 187:17 187:19,23 | 89:7 90:12 awaiting 54:17 |
| assessment 122:1 241:5 | 118:7 121:11,25 129:10,15 | 189:11 204:21 221:9 250:3 | 64:13 award 24:6 |
| assign 81:5 | 147:23 149:3,4 | avenue 3:8 4:8 | 218:6 219:4,8 |
| assignment 32:9 33:1 101:24 | 149:10,17 150:1 150:18 155:3,14 | 4:16 average 50:16 | 229:11 aware 20:9,23 |
| associate 24:9 | 158:1,19 160:6 | 65:10 71:20 | 21:5 26:15,24 |
| associated 168:16 184:4 | 184:16 186:3 191:2 247:10 | 82:23 83:2,7,12 83:15,15,18 | 27:4 30:13 40:2 40:3,19 41:11 |
| 202:25 204:10 | 256:4 | 85:17 86:12,16 | 53:12 73:2 |
| assume 78:10 81:8 91:25 | assumptions 123:9 157:4 | 87:7,12 88:16 105:6,20 108:24 | 74:12 95:8 106:2 117:22 |
| 109:5 116:14 | 241:10 | 108:25 109:13 | 118:1,3 131:3 |
| 121:3 123:5 135:17 148:14 | assured 101:13 attached 14:10 | 110:2,18 111:1 112:17,23 | 137:3,7 166:22 186:15,25 187:3 |
| 154:7,13 155:9 | 25:9 27:10 | 113:17,25 115:7 | 188:16 189:7,10 |
| 157:18 159:16 160:4 167:24 | 87:10,11 attempt 82:16 | 116:4 117:3 120:7,11,18,22 | 222:17 |
| 183:9 188:24 195:14 196:5 | attention 218:3 attorney 3:7,17 | 121:1,7,21,22 122:1,6,7,12,20 | **b** |
| 198:20 204:16 209:11 241:11 | 4:7 5:7 9:11 266:19 | 123:10 134:17 135:1,3,15,17,25 | **b** 6:10 7:1 37:17 142:21 207:24 |
| 241:18 244:2,2 247:3 | attorneys 4:15 attractive 192:7 | 136:2,5,8,12 137:13,24 138:3 | 211:14 254:13 268:1 |
| assumed 80:12 | attributable | 138:20 139:7,18 | **back** 25:17,19,20 |
| assumes 76:11 129:12 137:11 | 106:13 208:20 audience 99:6 | 141:15 143:11 143:18 157:3,5 | 27:5 29:16 31:6 34:18 38:11 |
| 148:3 150:16 | audiences 99:8 | 157:10,19,23 | 39:19 41:9 |
| 154:14 167:16 184:18 239:20 | audio 8:13 | 158:15,20 159:14 168:9 | 44:23 45:1 69:12 80:22 |
| 239:22 | | | 100:21 107:21 |

Veritext Legal Solutions
866 299-5127

**[back - break]**

| | | | |
|---|---|---|---|
| 107:24 117:9,19 | 175:7 192:6 | 178:4,19 179:11 | **billions** 60:21 |
| 120:17 137:5 | 194:2,20 195:2,2 | 182:13 186:2 | **bit** 29:17 62:14 |
| 138:3 144:19 | 205:9 206:24,25 | 192:14 201:12 | **board** 192:12 |
| 146:15 152:22 | 227:14,18 | 218:2 224:19 | **body** 71:19 |
| 157:13 160:24 | 233:11,11 | 226:10 228:21 | **boosts** 94:9 |
| 168:3,23 170:6 | 243:12 | 231:21 235:6 | **bootstrap** 53:24 |
| 170:24 171:12 | **bases** 11:25 | 243:2 246:25 | 54:1 55:2,12 |
| 177:10 179:3 | **basically** 23:2 | 252:18 258:8,19 | 64:4 254:10 |
| 181:18 182:17 | 45:20 184:18 | 258:19 262:23 | **bootstrapped** |
| 186:12 209:13 | **basis** 76:19 | **benchmark** | 54:12 |
| 214:19 215:9 | 83:22 98:18 | 87:13 194:20 | **bottom** 25:24 |
| 216:9,10 219:21 | 101:8 111:19 | 195:2 | 39:14 63:3 |
| 225:15 234:17 | 159:11 253:14 | **benchmarks** | 231:22 |
| 237:4 249:3 | 253:24 | 194:2 | **bound** 181:12,16 |
| 260:17 | **bear** 182:22 | **beneath** 261:10 | 181:24 233:10 |
| **background** | **beginning** 9:11 | **benefits** 218:4 | 233:15 250:14 |
| 133:4 220:6 | 125:18 234:24 | **berkeley** 1:14 | 250:15,23 251:1 |
| 222:11 | **behalf** 2:16 9:14 | 2:17 8:1 | 251:19 252:9 |
| **backup** 94:14,21 | **behave** 121:9 | **best** 13:2 46:21 | 262:24 |
| 95:3 98:14,21 | **behavior** 127:4 | 50:7,7 61:9 | **bounds** 177:21 |
| 99:12,24 221:7 | 241:11 242:22 | 75:17,18 90:19 | 178:8 179:1 |
| 221:11,14 | 245:9,10 | 201:7,19,25 | 180:7,19 181:1 |
| **backups** 95:6 | **believe** 16:12 | 202:6 263:15 | 182:12 183:1,5,7 |
| **balance** 62:23 | 20:14 21:9 | **better** 50:10 | 183:10 184:1 |
| 176:25 177:1 | 24:22 29:10 | 62:8 90:9 | 253:13,13,19 |
| 249:19 | 31:10 38:11 | 194:22 | 259:11 260:2 |
| **balances** 228:2 | 47:6 51:8 61:13 | **beyond** 111:23 | 262:11 263:5 |
| **ballpark** 31:13 | 94:8 96:6 | 170:12 172:14 | **brand** 199:2 |
| 235:10 | 105:14,17 | 190:16 240:4,24 | **brattle** 16:7,10 |
| **banternghansa** | 107:12,15 108:3 | **bias** 130:9,13,15 | 50:12 51:23 |
| 5:15 | 108:10 110:22 | 130:17,21,24 | 52:1,9 |
| **bargaining** | 111:22 116:2,3 | 131:10 | **breach** 249:19 |
| 248:15 | 119:15,24 121:8 | **big** 5:15 | **break** 41:17,21 |
| **based** 61:8 64:21 | 123:13,15 | **bigger** 61:23 | 41:25 42:6,25 |
| 71:21 80:14 | 130:23 134:6 | **billboard** 168:19 | 44:15 78:25 |
| 105:5 108:12 | 135:10 142:11 | **billion** 204:4 | 79:3 80:17 |
| 134:8 141:13 | 151:23 152:10 | 214:11,11,14 | 109:20,24 117:6 |
| 157:17 169:19 | 163:23 168:2 | | 151:3 152:17 |

Veritext Legal Solutions
866 299-5127

[break - case]

182:24 186:8 219:11 248:18 255:4

**breaking** 116:16

**breakout** 44:19

**briefly** 257:3

**bring** 20:8 21:24 113:23 172:9

**broad** 19:9 24:23 62:1 65:25,25 95:4 132:24 251:1,3

**broadly** 36:6

**brought** 70:15 71:6

**brown** 5:17

**bucks** 189:3

**built** 256:4

**bulk** 105:24 106:13

**bundle** 83:7,7,10 122:20 135:25 136:12 138:4,21

**business** 76:17 77:11,17 78:1 80:3 116:10,12 116:15,20 154:22,25 155:13 158:2 159:18,23 160:3 173:3 178:7 184:14,23 187:7 241:19

**button** 186:21

**buy** 82:11 245:9

**buyers** 82:10 245:14

**buying** 143:16 145:12 189:14

**c**

**c** 3:6 142:15 153:21,22 154:2 154:6,12,19,23 155:1,4,5,7,9,15 155:19,23,25 156:4,9,18,19,19 156:22 162:5 213:8 214:19

**ca** 267:9,12,20

**caeli** 5:6

**calculate** 53:24 68:25 69:20 84:20,25 86:3 92:9,10 106:13 107:17 108:6,23 120:7,22 121:1,7 123:10 137:1 144:2,13,24 170:7 177:13 202:21 203:20 203:23 212:4,13 213:3 215:2,13 216:2

**calculated** 67:18 68:11 83:12,20 83:21 122:19 145:12 147:7 184:8 201:23 207:24 211:10 211:12 216:8 226:16 232:24 234:6,13 250:8 253:9

**calculates** 198:1

**calculating** 44:8 110:2 249:6

**calculation** 30:21 51:18 53:19 56:1 63:1 68:2,16 70:15,17 71:12 75:25 83:24 84:1,4,7 84:11,13,15 85:25 87:3 88:7 104:9,10 129:12 137:22 139:6 147:10 161:9 167:21 177:16 184:6 194:4,11 200:20 201:16 203:5,16 212:20 215:19 218:9,12 218:13 226:6,14 227:1 233:8 251:13,14,16 252:13,14,17 253:22 262:24

**calculations** 11:18 12:20,23 30:1,2,20 31:4 50:17 53:14 54:8,18 55:10,19 55:22 56:3 63:25 67:3 92:22 96:12 107:11,12,15 108:4 120:4 122:7,13 137:5 143:9 159:21 164:2 203:19 205:7,9,19 206:6

206:10,15 223:11,18 224:21 225:15 227:15,19 230:4 234:5,20 249:21 253:25

**california** 1:2,14 1:21 2:2,17 4:9 5:10 8:1,20

**called** 41:11 103:23 166:14 237:8

**camera** 8:9 253:1

**capable** 81:14

**capacity** 196:16

**capture** 185:4,12 193:2

**care** 159:3

**careful** 128:11

**carried** 97:2 252:11

**carry** 261:14

**case** 1:6 2:6 8:21 14:24 17:9 31:10 39:7 40:18 42:10,18 42:21 43:19,21 44:4,7 45:14 50:20 61:13 62:3 75:1 79:25 84:17 87:10 96:13 97:7 99:9 99:23 103:6 104:17 105:16 113:3,4 132:10 132:14 137:2 141:8,10 155:12

[case - clarification]

157:17 163:23
165:20 166:16
167:23 172:6,14
177:15 186:6
230:17,21
232:13 244:1,3,7
248:9 250:3
257:10 266:15
**cases** 53:23
54:11 78:11
154:3 174:3
187:24 188:12
192:6 219:5
**categories** 94:16
94:23 96:19
97:10,13 128:3
**category** 96:21
166:17
**cause** 90:7
**causes** 87:25
211:6
**caveats** 201:20
210:4
**ccp** 267:9,12
**ccr** 1:21,22,23
266:24
**cent** 117:24
118:16 119:7,20
121:4 148:11
**central** 41:4
**cents** 120:21
123:5 128:6
136:9,21 150:3
156:2 229:21
**certain** 11:13,14
51:19 155:7
220:20 223:13

**certainly** 12:10
101:2,2 102:17
119:10 121:17
121:17 132:23
148:13 158:6
167:11 168:22
184:2 189:5
192:2 221:8
234:12
**certainty** 244:3
**certificate**
230:11
**certification**
6:16 34:23 36:1
36:9 40:15 94:5
123:22 140:11
140:13 172:8
**certified** 2:21,21
40:4 266:2,3
**certifies** 140:13
**certify** 266:4,17
**chance** 139:10
220:9 256:9
**change** 19:12
56:24 59:11,16
59:17 81:7,17
82:6 83:18,25
85:17,23 86:13
87:17,22 88:5,7
103:1 109:9,11
112:2,3 118:19
122:21 123:1
135:15 139:4
159:4 160:12,13
160:16,17 193:8
193:13 200:21
228:4 242:6,13
269:4,7,10,13,16

269:19
**changed** 45:17
46:8,9 59:22
74:22 84:18,19
98:1,2 170:10
195:4 208:19
228:6
**changes** 44:9
56:12,18,20 57:1
59:20 81:8,18
82:1 83:5,7
84:23 103:24
108:24 134:2,18
135:2 137:24
139:4 155:10,10
161:1 196:10,14
242:14
**changing** 143:18
158:12 159:7
242:7
**channels** 187:16
187:19,23 188:7
188:13 189:25
189:25 190:16
199:4
**chanont** 5:15
**character** 46:8
**characteristic**
75:3 222:19
**charge** 149:6
150:17 160:9
166:25 198:8
**charged** 155:24
166:4 243:7
261:23
**charges** 115:24
**charging** 166:24
184:13,22

**chart** 220:7,10
220:16,17,21
222:12,13
**check** 27:15 29:4
39:20 41:9
137:5,16 151:21
152:3 168:24
219:5 225:20
**chigney** 5:12
**choice** 149:12
**choices** 147:20
**choose** 108:20
128:5 135:17
149:21 150:2
181:15 198:2
**chooses** 49:5
155:18
**choosing** 155:14
**chosen** 100:19
**circular** 128:12
**circumstance**
192:14
**circumstances**
12:10,11 248:13
**citations** 124:9
**cite** 123:23 124:6
131:8 158:13
**cited** 130:14
**civil** 267:19,20
**claim** 75:9,16
146:16 218:18
218:23
**claimants** 230:1
**claiming** 74:7,11
75:6
**claims** 229:24
**clarification**
16:25 17:8,16,25

Page 11

**[clarification - commission]**

18:7 23:13,25 70:3
**clarifications** 20:20 34:17
**clarified** 17:24 21:2
**clarify** 20:15 24:24 42:11 73:8 77:4 255:2
**clarifying** 30:15
**class** 6:16 23:9 23:18,18,19,20 24:1,5,9,11,13 24:14 34:21,22 35:24,25 36:8,9 36:10,14,21 37:1 37:2 40:4,14 74:21 75:19 94:5 119:1,2 123:22 133:15 140:11,14 142:22 172:8 203:18 207:11 208:3 212:6,15 216:22 218:11 218:18,23 223:13 227:9 228:19,20 229:8 229:9,22 230:11 230:16,22 231:17,20 232:20,21 234:9 234:22 235:3 236:7,17,23 237:7 239:3,13 243:8,12,15,22 244:12,16,20,24 245:25 246:5,6,9

246:16,21
**classes** 37:8,9
**classification** 24:10,19 46:3,9 46:16,22 47:3,17 49:5,21,25 51:4 51:7 55:17 59:7 60:14 87:24 88:5 92:25 208:7,14 209:20 210:21 229:11
**classifications** 50:13,22 51:22 64:3
**classified** 45:5 201:8 202:12
**classifies** 45:11
**classify** 17:15 45:22
**classwide** 200:17 202:15 203:9,20
**clear** 46:4 68:10 86:10 124:11 224:7
**clearly** 31:2 53:20 59:5 61:10 67:11 100:8 236:4 259:21
**click** 15:6
**close** 109:19,23 182:21
**closest** 138:7
**cloud** 52:16,21
**code** 46:15 47:8 53:24 267:9,12 267:19,20

**coding** 51:11 54:6,9,21,23,25 55:7 64:4
**coefficient** 57:7 57:21 58:11,21 76:15 77:2,10,24 78:12 79:7,15 85:19 88:17 241:2,23 250:20 251:7,9,21 252:6 253:15,25 254:13
**coefficients** 50:16 53:25 59:11 63:12 64:17,23,24 65:10 74:14 75:8 77:7 85:17 85:23 86:3,12 87:12 88:6,7,11 89:8 90:12 92:10,11 151:15 207:1 212:2,12 214:4 215:1,12 254:5
**collaboration** 16:6
**colleagues** 11:10
**collect** 38:21
**collectively** 72:3 236:2
**collusion** 128:16
**columbia** 3:15
**column** 142:21 143:4 207:24 208:1,3 210:22 211:14 212:22 214:19 250:10

251:20 254:13
**columns** 214:7
**combine** 78:21
**combined** 102:2 102:9 110:3 207:13 214:14
**combining** 102:13
**come** 19:19 29:16 31:5 82:8 87:2,3 101:10 117:8 118:24 162:13 177:8 178:6 231:5
**comes** 45:23 162:9 206:22 213:14 233:11
**comfort** 59:9,15
**comforting** 252:6
**coming** 203:14 203:16
**commence** 11:7
**commencing** 2:17
**comment** 125:1
**commented** 16:19
**comments** 16:25
**commercial** 5:17
**commission** 65:1 65:13,15,21 66:1 66:3 121:10 159:18 160:5,13 160:17,18 161:1 175:14 184:24 192:11 193:9,23 194:7,13,16,21

**[commission - connection]**

194:22 195:1,6 195:13,17 196:5 196:10,13,20 197:8,15,20 198:3,9,14 199:6 247:22 248:9
**commissions** 81:20 248:14
**common** 22:14 22:24 23:8 24:20,21 37:5 126:16 127:7 128:10 132:3 133:6,10 175:13 185:12
**community** 99:11
**companies** 172:10 174:4,4
**comparable** 96:8 96:10,14 142:19 254:11
**compare** 38:12 64:20
**compared** 108:24 138:19 142:12 176:16
**comparing** 86:7
**comparison** 58:25 177:9 205:11
**compatible** 240:2
**compensating** 239:2,12
**competing** 198:21 241:15 242:6

**competition** 125:9 129:23 135:12 144:10 145:24 191:9,11 191:15 198:4,16 240:10 242:1,16
**competitive** 198:15 199:6 242:21 248:10
**competitiveness** 241:1,6
**complaint** 142:23
**complete** 12:23 13:15 14:4 30:22 31:4 55:10 94:14,21 152:14
**completed** 51:15 56:9 96:4 152:2 267:7,17 268:6
**completely** 59:4
**completes** 263:23
**completion** 56:7 266:15 268:10
**complex** 81:23
**complicated** 220:22
**complies** 9:23
**component** 79:24 167:11
**components** 158:8 167:2
**composed** 16:18
**composition** 16:9 87:5

**compound** 23:22
**comprehensive** 61:11 133:15
**comprehensiv...** 99:5 131:5,7
**computation** 51:12 60:8
**computational** 151:12
**computations** 24:3 52:17 152:14
**compute** 152:5
**computer** 21:12 52:16 53:18 55:9
**computers** 48:18 52:22
**computing** 52:21
**concentrate** 75:20 107:6
**concentrated** 66:20 99:21
**concern** 34:20 35:4,24 36:3 89:21
**concerned** 36:13 239:15
**concierge** 5:22
**conclude** 58:2,7
**concluded** 111:15 191:20
**conclusion** 22:15 63:20 78:17 144:13,24 145:9 150:9
**conclusions** 25:1 121:23

**condition** 102:24 230:12
**conditions** 13:14 134:11 198:15 247:12
**conduct** 8:8 40:5 76:24,25 124:1 126:1 146:1 169:9 190:22 198:5
**conducted** 8:22
**confer** 263:19
**confidence** 61:23 62:23 233:9,14 249:19 250:14 250:15,23 251:19 252:9 253:8,12,13,17 253:19 254:19
**confident** 119:18 119:22 250:18 253:24
**configuration** 115:3 175:24,25
**confining** 137:24
**confirm** 38:13 171:12 174:6,15
**confirmatory** 178:22
**conflict** 20:6,9
**conflicted** 46:1
**conform** 134:13
**confused** 114:18
**connecticut** 4:16
**connection** 8:10 38:16 40:6 42:10

Veritext Legal Solutions
866 299-5127

[conscious - correct]

conscious 99:13
consequence
  76:6 79:15
  225:14
consider 24:25
  40:25 75:10
  78:4,4 103:4
  108:13 138:13
  164:18 187:25
  194:10 203:22
  218:1 242:8
considerably
  53:17 225:17,18
considerately
  53:18
considerations
  247:18
considered
  20:15 70:23
  103:2 184:7
  196:12
considering
  23:25 187:25
considers 110:24
  136:4
consisted 246:6
  246:6
consistency
  46:14
consistent 28:23
  30:2 46:22
  49:25 50:19
  88:22,23 89:14
  92:3 135:19
  143:12 177:5
  242:10,24
consistently
  46:23 149:18

consists 28:15
constant 157:22
constituted
  246:25
constrain 135:12
  183:12
constrained
  147:21
constraint 181:7
  181:11
constraints
  96:18 101:24
  168:4 169:3,6,9
  169:12,20 170:3
  170:5,8,13
  171:10,22
  172:25 173:20
  178:20 183:10
  183:17,21 184:5
  184:10
construct 222:12
constructed
  101:10
construction
  168:8
consult 14:23
  56:6 173:5
  221:6
consulted 171:3
  171:21
consulting 43:12
  43:16
consumer 31:21
  40:3 80:9
  104:13 161:25
  193:21 199:3
  223:8 247:15

consumers 22:16
  76:11 78:11
  80:4 103:25
  105:3,3,11
  108:20 111:7
  137:23 139:6
  144:11 145:25
  166:4 187:16
  189:13 190:6,23
  197:23 199:3
  218:4 242:19
  244:24 248:4
cont'd 4:1 5:1
  7:1
contact 267:9
contained 77:13
  124:9 201:11
  265:4
contains 17:13
  117:23
content 17:18
  22:17 79:24
  80:4,6,15 105:5
  105:6 159:13
  186:16 187:1,13
  191:12,17
  247:16
contest 111:19
context 17:6
  19:2 97:21
  121:19 123:15
  123:17 132:22
  146:16 197:4
  239:24
continue 8:13
  114:13 115:23
  125:24

continued 82:13
continues 12:24
continuing
  247:16
continuous
  138:12
contributed
  16:16
control 125:3
convenient
  109:20
conveyed 196:4
conveys 178:10
coordinate 12:15
copies 255:12
copy 13:24 14:1
  14:4,23,24 27:24
  27:25 179:5,13
  258:8,9 260:17
corner 25:19
cornerstone 5:19
  5:20 48:22
  95:10
cornerstone's
  47:6 48:17
correct 13:16,18
  13:19 26:17,25
  29:2,15 31:25
  32:2 37:19,20
  38:2,3 39:8,21
  39:22 43:5,6,20
  50:18 51:7,14
  54:4,5,9 55:22
  57:21,22,25
  60:18,19,21,24
  63:6 66:22,23
  68:13 70:2,3,21
  71:4,18,25 72:1

Veritext Legal Solutions
866 299-5127

**[correct - court]**

| | | | |
|---|---|---|---|
| 72:5,6 73:1,7 | 235:14 241:4 | 148:19 149:1 | 174:16,21 |
| 74:11 76:13 | 249:7,8 250:25 | 153:2,4,5,9,11 | 175:25 184:25 |
| 83:8,13,14,16,17 | 252:1 253:25 | 153:23 154:1,8 | 247:17 |
| 84:20,21,25 | 254:16,18 | 154:14,18 | **counsel** 3:1 4:1 |
| 91:23 92:13 | 261:20,21,24,25 | 156:11,13,14,22 | 5:1 9:9 24:2,2 |
| 93:2,4,21,22 | 265:5 | 156:22,23,25 | 24:25 26:22 |
| 104:1 109:1 | **corrected** 21:14 | 157:3,6,8,10,11 | 29:22 30:22 |
| 111:12 112:24 | 21:19,22 55:17 | 157:19,19,22,23 | 31:21 32:5,8 |
| 112:25 113:13 | 59:24 64:3,4 | 157:23 158:8,12 | 33:2 34:19 |
| 114:25 116:23 | 66:16 92:24 | 159:2,3,6,7,14 | 35:23 42:7,16,20 |
| 116:24 122:23 | 265:5 | 159:19 162:4,22 | 97:7 172:16 |
| 122:24 123:12 | **correcting** 87:23 | 163:1 164:11,23 | 188:12 193:21 |
| 124:5 136:10,23 | **correction** 21:19 | 165:8 166:12,15 | 194:10 195:10 |
| 137:9 138:4 | 252:22 | 167:3,6,6,8,12 | 196:4 197:14 |
| 139:2,19 141:16 | **corrections** | 167:14,22 168:1 | 216:2 217:17,18 |
| 143:22 147:3,8 | 30:12 51:15,16 | 168:6,9,20 | 218:9 223:8 |
| 148:6,7,23 149:2 | 265:3 267:14,15 | 171:15 172:13 | 267:18,21 268:7 |
| 149:20,22 150:1 | 268:3,4 | 175:21 176:13 | **counsel's** 68:16 |
| 152:25 153:23 | **correctly** 92:21 | 177:12,13 | 216:25 |
| 154:3,17 156:2,3 | 144:18 209:12 | 178:14,15 181:8 | **count** 16:13 |
| 156:23 157:4,20 | **correlated** | 181:13 184:15 | 64:11 91:16 |
| 169:3,6,7 173:13 | 100:11 216:1,13 | 185:5,5,8 186:4 | 166:17 235:15 |
| 174:8,18 181:9 | 217:2 | 192:17 193:8,12 | **couple** 11:9 |
| 181:14 183:2 | **correlation** | 218:1,5,10,17,22 | 41:24 42:2 |
| 187:23 193:11 | 216:8 | 219:3,4,6 225:19 | 182:23 255:2,24 |
| 196:8 198:9 | **correspond** | **costs** 79:25 | **course** 11:20 |
| 200:20 202:10 | 39:18 134:2 | 80:15 81:11 | 26:19 54:19 |
| 204:12 205:20 | 181:7,12 213:2 | 157:6,18 158:7 | 68:5 112:18 |
| 206:4,8,9 207:12 | 214:8 | 158:11,16,21 | 210:9 262:18 |
| 208:5,9,13,24 | **corresponded** | 159:10,13 160:4 | **court** 1:1 2:1,22 |
| 209:10,17,23 | 11:9 | 160:12,16 162:1 | 8:19 9:1,16,21 |
| 210:5,6,20 211:2 | **corresponding** | 162:3,16,17,18 | 9:24 14:9 16:23 |
| 211:5,17 216:18 | 61:24 | 162:19 163:22 | 16:24 17:2,7,15 |
| 220:8 224:22,24 | **corresponds** | 164:1,1,4,10,21 | 18:6,10 20:14,15 |
| 226:16,17,21 | 205:21,22 213:4 | 165:12,17,23,24 | 21:2 22:5 23:5 |
| 227:19 229:14 | 214:1 251:23 | 166:10,11,14,20 | 23:13,24 25:8 |
| 229:15,18 | **cost** 49:18 78:20 | 166:25 167:2 | 27:9 32:1,7,10 |
| 230:19,23 | 82:2 96:24 97:4 | 168:5,10 174:7 | 32:11,19,25 33:3 |

**[court - data]**

33:5,13,14,18,25
34:11,17 36:13
36:18 43:25
61:19 69:12
111:16 127:5
140:2,6,10,11,13
151:17 172:4
194:1,8,21 246:3
266:3
**court's** 18:25
33:10 34:20
35:3,8,23 36:2
40:8 123:22
**created** 39:11
208:14
**crichman** 4:20
**criteria** 94:4
100:10
**criterion** 36:11
36:22,25 210:2
**cross** 251:6
252:9
**crutcher** 4:5 5:5
**cryptocurrency**
188:25
**csr** 1:21,21,22
266:25
**currencies** 189:3
189:8
**currency** 188:18
188:24
**current** 111:20
130:2 133:20
142:2 198:1
201:7,18 209:24
212:5,14 228:20
235:13

**currently** 67:2
137:7 146:17
180:16 201:13
246:25
**curriculum** 43:5
**curve** 240:9,11
**customer** 166:12
236:11
**customers**
192:21 245:9
**cutoff** 209:15
211:1,4 216:23
217:20,21,24
223:17 224:25
225:5 226:3,21
227:22 228:4,11
228:17 229:5,7
229:16,23
230:13,14 231:6
231:13 232:14
234:16,23 261:3
261:9,17
**cutoffs** 223:10
**cutting** 219:4
225:20
**cv** 1:6 2:6 6:22
8:21
**cynthia** 4:14

**d**

**d** 6:1 50:15
64:20 142:15
143:4 205:1,1,3
205:4,6 213:13
**damage** 24:6,6
53:14 56:1
66:25 68:18
70:15,17 71:11

84:20 87:2
107:11 129:14
147:3 172:5
203:4 204:9,15
204:15 205:7,19
206:14 212:13
214:1 219:3,8
223:11 225:13
234:20 251:12
251:15
**damaged** 145:7
145:8
**damages** 50:17
69:1,20 74:21
75:19 76:6,7
77:7,16,24 81:6
84:25 94:4
100:2 105:16
106:5,13 107:16
108:4 119:23
122:13 144:13
144:14,25 145:1
145:11,18 146:8
146:10,18 147:2
147:11 194:5,6
200:17,18 201:4
201:8,19 202:6
203:20,25
204:10 210:10
212:4,24,25
213:2 214:7
215:2,13 223:11
223:18 227:1,12
232:23 233:5,6
234:13 251:18
251:19 252:12
252:13 259:10

**dan** 9:12
**daniel** 1:12 2:15
4:6 6:3,14 8:17
11:1 205:4
265:1,11 267:1,5
269:2
**data** 7:5 12:12
45:13,23,25,25
46:12 48:1,19,22
50:7,16 52:14,15
52:19 55:17
59:3,4,6 60:18
60:20 61:2,9,11
61:12 65:5 66:6
66:6,22 68:25
69:19 70:6,20
71:1,16 72:2,19
73:9,15 74:19
75:12,15 78:16
83:2 84:17
88:12 95:11
96:3 97:23
106:1 117:22
146:22,23,25
147:12,13,16,17
147:20 151:16
151:17 155:9
160:24,25 161:5
161:8,23 162:9,9
162:13 163:9,21
163:23,24 164:6
164:13,20 165:8
165:21,22 166:9
166:15 168:7,24
170:6,11,16,19
171:2,4,8,16,19
171:21 172:10
172:13,22

Veritext Legal Solutions
866 299-5127

[data - deponent]

173:18 174:20 175:1,6,8 176:17 176:21,21,22 177:5,8,13,23 178:5,14,21 181:24 185:6,13 186:1 203:8 211:19 212:3,12 215:1,12 221:7 221:10,11,14 222:24 232:22 244:1,8,21

**database** 67:7,21

**dataset** 61:23,25 62:5,6,8,11,13 62:17,20,22,24 65:21 70:7 235:13

**date** 42:10 43:11 43:15 48:4 258:20 266:20 267:16 268:5 269:24

**dated** 6:16 266:21

**david** 205:3,4

**day** 55:6,6 199:14 254:1 258:23 260:4 265:6

**days** 11:9 28:14 52:5 235:8

**dc** 3:20 4:17

**deal** 21:25 24:4 80:11 82:22,23 104:12 117:2

**dealing** 59:4 81:14 146:23

185:20

**deals** 18:24 83:1 111:21 112:18 115:7

**december** 1:15 2:18 8:1,6 26:16 53:8 266:21 267:3,5

**decide** 101:4 111:7 140:7,11 140:16

**decided** 140:2

**decides** 140:15

**decision** 35:8 40:8,11 45:20 79:10,13 99:13 99:20

**decisions** 36:18 105:4,13 107:5

**declare** 265:1

**decline** 81:19

**deduce** 176:22

**deduced** 203:6

**deemed** 60:15

**defendant** 2:16 4:4 5:4

**defendant's** 46:20

**defendants** 47:7

**define** 127:14 162:21

**defined** 23:20 127:24 142:22 148:22 227:9 228:19 230:16

**definitely** 58:1 172:9

**definition** 22:2 22:10 24:1,14 128:12 161:10 161:13 189:20 229:9 231:17 232:20 237:14 238:20

**definitions** 162:14

**degrade** 76:9

**degree** 87:14 104:16 184:2,4 241:1

**delivering** 48:21

**delivery** 156:13 247:16

**demand** 53:16 61:15 70:5,12,14 70:20 71:15,20 72:9 74:8,14 76:16 78:3,22 80:9 81:10 82:1 82:12,16 107:1 108:15 119:11 121:9 123:16 132:20 134:1 155:16 161:25 169:18 190:10 190:14 194:5,6 202:20,21,25 203:3,16 212:2 212:11 214:25 215:11 234:18 234:25 239:23 240:8,11,14 241:12,24 247:15 254:5

**demonstrates** 22:24 23:8

**denominated** 28:18

**dense** 137:4

**denser** 137:4

**depend** 146:22 154:19 156:25 166:3,5

**dependence** 93:9

**dependent** 121:19,19 146:25

**depending** 85:18 155:6

**depends** 8:9 31:2 86:6 154:24 155:1 229:23

**deponent** 2:16 6:2 9:23 10:4 15:10 19:9,19 20:14 21:9 22:9 22:20 23:2,12,23 24:18 25:15 26:8,10 28:23 29:7,25 32:15,23 33:9,22 34:5,15 36:5,17 37:15 45:10 49:9 50:3 52:13 53:6 56:16,23 57:16 58:24 59:14 60:2,24 61:6,18 63:8 64:10 65:8 65:24 67:10 69:25 70:10 73:19 74:17 77:20 78:15

Veritext Legal Solutions
866 299-5127

[deponent - developers]

| | | | |
|---|---|---|---|
| 79:19 84:4,11 | 244:6 245:3,8,20 | 94:20 150:20 | 231:25 232:8,15 |
| 86:25 88:4 90:1 | 246:13,24 247:7 | 163:17 248:12 | 240:15 |
| 91:3,13 92:19 | 262:4,21 | 256:2,12,16 | **determined** |
| 95:1 96:1 98:8 | **deponent's**  1:14 | 257:6,25 258:5 | 87:14 119:14 |
| 99:18 100:6 | **deponents**  266:7 | **descriptions** | 155:17 182:9 |
| 101:23 103:10 | **deposition**  1:12 | 248:1 | 201:22 231:23 |
| 104:8 105:10 | 2:15 8:7,17,22 | **design**  78:4 | 247:9 267:18,22 |
| 106:17,25 | 10:1 11:25 12:2 | 104:14 111:5 | 268:7 |
| 107:23 108:10 | 12:4,14 13:3,11 | 150:11 190:2 | **determining** |
| 110:12 112:7 | 31:10 38:19 | **designed**  80:10 | 94:3 97:12 |
| 114:11 116:2 | 42:22 55:13 | 81:16,17 99:8,10 | 119:23 158:22 |
| 118:12 120:16 | 72:13 127:6 | 149:7,8 172:1 | 182:11 210:3 |
| 121:17 122:16 | 179:10 208:11 | 185:4 | 234:9 256:3 |
| 124:5 129:20 | 219:25 255:18 | **detail**  28:9 36:6 | **develop**  188:13 |
| 131:16 132:17 | 257:13 261:8 | 109:10 181:20 | **developed**  172:6 |
| 133:14 143:1 | 263:12,24 | 182:8 | **developer**  49:5 |
| 144:7 145:5,23 | 266:14 267:19 | **detailed**  94:14 | 78:19,20 113:7 |
| 146:14 149:16 | 267:22,24 268:8 | 94:22 149:17 | 113:12,22 114:3 |
| 150:8 151:7 | 268:10 | **details**  28:6 44:7 | 114:23 115:4,12 |
| 158:5 159:1 | **derive**  55:11 | 46:10 54:14 | 116:10,20 117:2 |
| 164:16 166:8 | 56:2 61:22 | 55:3 99:6,11,23 | 122:21,25 123:6 |
| 167:11 169:23 | **derived**  55:15 | 168:3 172:22 | 141:23 143:17 |
| 175:20 178:4,19 | 89:22 | **detectable** | 148:6,9 149:12 |
| 180:3,15,23 | **describe**  28:3 | 216:20 | 155:22 165:17 |
| 182:6 183:5,24 | 36:6 45:7 | **determination** | 167:17,20 |
| 185:3 186:23 | 133:24 238:19 | 74:20 102:7 | 173:24 185:22 |
| 190:20 191:6 | 241:10 | 105:16 119:16 | 189:24 191:11 |
| 194:19 195:9,20 | **described**  16:20 | 119:17 | 192:13 240:16 |
| 196:25 197:14 | 45:21 74:18 | **determine**  20:3 | **developer's** |
| 198:12 200:13 | 147:24 150:15 | 32:6 48:23 | 104:14 105:13 |
| 201:11 202:5,18 | 200:25 203:13 | 76:25 79:5 | 107:4 113:6 |
| 203:12 204:20 | 238:25 257:8 | 81:20 97:9 | 148:19 153:1,22 |
| 207:23 208:19 | **describes**  92:21 | 100:1,15 102:19 | 156:10 158:15 |
| 212:19 215:8,18 | 115:14 175:23 | 102:24 104:3 | 158:22 |
| 219:2 222:4 | 182:8 260:23 | 118:4 146:16 | **developers**  80:9 |
| 230:10 231:1,16 | **describing**  258:3 | 148:21 161:6 | 80:11 97:3 |
| 232:19 234:4 | **description**  6:12 | 165:16 168:7 | 104:24 105:19 |
| 239:7 243:19 | 7:3 28:5,9 94:13 | 182:8 189:23 | 108:13,18 109:8 |

Veritext Legal Solutions
866 299-5127

[developers - district]

| | | | |
|---|---|---|---|
| 109:13 110:25 111:5 116:15 121:9 128:5,8,21 129:17,21 135:17 147:20 147:24 148:15 149:21 150:2 158:21 159:3,12 160:8 161:24 162:1,3 163:10 163:12,22 164:3 164:10 165:7 166:15 168:6 170:6,12,19 171:22 172:17 173:18,20 174:17 175:1,5 181:25 184:20 186:15 187:1,4,6 187:12,15,20 188:2,4,12,17 189:8 190:16 191:17 192:15 192:22 198:2 239:20 240:4 241:7,11,16 243:5 **developments** 11:8 **devices** 248:4,5 **differ** 170:3 233:15 245:10 **differed** 90:6 **difference** 68:5 91:6 185:23 186:1 206:13 211:7 226:2 227:21,25 | 233:23,25 234:1 234:19 250:12 257:22 **differences** 59:6 64:23 89:4 92:6 95:11 206:23 **different** 15:15 65:3,12,19 66:4 73:10 74:13 75:7 81:22 86:2 86:17,20 87:7,24 88:6 89:23 93:10 99:8 104:15 105:14 108:21 120:2 121:10,13 122:22 134:4 137:8 147:17 158:21 159:23 160:3,4 166:22 166:24 184:13 184:14,22,24 185:24 197:23 205:18 206:21 207:2 240:14 247:12,17,17 256:10 **differentiation** 118:21 **difficulty** 47:8 132:17 **digit** 130:8,13,15 130:17,20,24 131:10,24 132:6 **digital** 159:13 **direct** 47:10 57:11 104:4 156:14 159:15 | 173:15 177:9 249:20 **directed** 22:6 **direction** 24:2 55:2 266:11 **directly** 16:18 60:12 95:5 **director** 5:17 **disagree** 35:12 35:12 127:8 184:21 243:10 **disagreed** 33:13 **disclose** 17:20 125:13 237:6 **disclosed** 17:10 29:22 125:11 218:13 237:2 249:21 252:15 **discount** 65:11 65:12,13 **discover** 54:23 **discovered** 54:6 **discovery** 12:12 162:12 172:14 173:13,15 **discuss** 56:17 97:18 98:17 99:1,14 126:12 **discussed** 34:22 35:25 36:20 42:21 98:3 143:10 181:19 **discussion** 15:13 15:22 39:1 99:19 126:25 185:20 186:19 224:17 | **display** 255:11 258:9 **dispute** 67:14,17 106:12 **distance** 136:6 **distances** 135:3 **distinct** 80:1 124:24 192:9 **distinction** 91:21 118:24 119:9,10 124:12 162:15 163:25 240:9 **distinctions** 166:10 **distinctive** 191:21 **distinguish** 83:4 83:6 91:4 116:13 **distinguished** 166:16 **distinguishing** 160:10 **distraction** 104:18 **distributing** 94:4 218:11,17,22 **distribution** 24:10 86:1 218:1,5 229:24 239:17 249:17 251:17 252:12 254:4,7 **distributor** 218:4 **district** 1:1,2 2:1 2:2 3:15 8:19,20 |

Veritext Legal Solutions
866 299-5127

[disturbances - empirical]

disturbances 100:13
divided 162:22 163:3 208:1
dividing 217:17
division 1:3 2:3 8:20
document 27:6 40:18
documents 38:15,20,24 39:14,25
doing 50:6 91:19 96:11,15,17 105:11 151:1 169:24 180:17 211:22 215:19 225:14 233:9
doj 240:20
dollar 136:16 154:6,12 155:25 163:1,2 201:25 216:22 223:13 236:1
dollars 221:18 222:16,21
domain 96:23 97:6
download 81:7 82:6 84:14 102:21 155:13 155:14,16 164:22 165:18 167:12,20 184:19 185:9 247:19,19
downloaded 167:23 235:22

236:1 244:16
downloads 76:17 84:21,22 107:2 118:20 134:2 153:24 154:3 168:13 176:9,13 254:6
dozen 64:7 93:20
dr 9:21 21:12 39:8 172:3 193:22,25 194:23 195:10 195:16 196:3,21 199:7
draft 15:1 16:3 16:16 39:10
draw 87:6 91:17
drawing 88:19 91:7
drives 108:14
dropped 192:10
dswanson 4:11 267:2
due 47:16 87:10
dunn 4:5 5:5
duplication 91:16
dx 6:19 7:4 14:12 25:4,7 27:7,8
dx0043 6:13 14:8
dynamic 82:15 82:15
dynamics 81:21 82:9 161:2,7 193:4

e

e 5:20 6:1,10 7:1 16:17 38:4 85:6 85:7 115:13,14 147:24 149:18 150:15 153:13 153:20 159:21 251:20 267:9,12 268:1 269:3,3,3
earlier 59:10 120:17 147:15 170:10 206:3 235:12 237:3 255:17 258:23 260:4 261:8
easily 242:20
econometric 52:13 61:1,8 76:21 78:3 100:9,14 119:23
econometrician 52:9 78:8 90:3 90:19 98:16 181:23 182:3
econometrics 41:2,5 92:4 101:6
economic 22:14 23:8 101:9 108:15 111:23 128:9 177:18 178:1
economics 132:24 157:9
economist 36:24 62:7,14 94:15,22 95:22 96:18 97:8 100:1

148:14 161:12 189:23
economists 121:12 133:5,9
edited 16:19
effect 49:23 135:1 185:12 203:19 227:11 234:25
effectively 155:21
effects 161:7 190:13 193:3 197:3,7
eight 27:22 39:18
either 14:23 31:2 59:22 76:17 88:25 97:5 115:20 143:14 143:14 162:10 167:22 172:20 190:23 199:12 231:18
elaborate 127:11 232:4
electronic 14:7 14:23
elements 158:10 158:11
eligible 24:5
eliminate 203:18 204:13
email 6:19 26:13 45:3
emphasize 104:8
empirical 76:19 77:2 111:9

Veritext Legal Solutions
866 299-5127

[empirical - estimation]

127:19 131:22
132:24 146:21
146:25 150:19
158:6 188:4
244:17
**empirically**
127:13 157:25
**employee** 266:18
**enable** 205:11
**encapsulated**
240:11
**encompasses**
254:20,21
**encountered**
161:16
**engineer** 155:21
**engineering**
178:24
**enormous**
106:12 236:2
**enter** 67:2
**entertainment**
45:12 57:1,3,7
59:19,23 63:13
70:21,24 71:2,16
71:23 72:18
78:16 79:11,14
79:23 80:3,13
100:20 102:4,23
165:10 171:17
173:21 174:22
175:22 181:5
187:7 202:7
207:16 211:21
251:22 260:3,6
260:12 263:5
**entire** 175:10
191:13 220:21

234:11
**entirely** 150:10
206:22
**entirety** 107:5
230:15
**entry** 190:24
214:2
**enumerate**
126:19
**envelope** 225:15
**environment**
78:19 129:22
**envision** 233:9
**epic** 168:18,21
168:25 170:20
175:11
**equal** 154:2,6,12
157:2,19,23
162:22 181:8,13
**equally** 198:22
233:3
**equation** 162:5
**equations**
153:19,21
**equilibrium**
124:15 132:21
239:25 240:2
242:11,25
**equipment**
191:23 192:5
**errata** 267:14,16
268:3,5
**error** 11:18
30:20 31:4 45:4
45:7 51:15 54:6
54:9,18 56:3
58:3,8,12,17
59:1 63:24 64:4

89:5 184:9
**errors** 7:7 20:23
21:5,21 29:9,20
29:21 51:12,19
53:25 55:11,16
62:4,11,16,18
63:19 64:2 77:6
87:9,11 92:9
152:5 201:23
207:4 249:7,10
249:14 250:9
252:21 253:10
**esq** 267:1
**essential** 152:10
169:15
**essentially** 46:17
77:6 88:19
134:6 217:15
219:6
**establish** 158:14
249:19
**established**
62:23 224:16,19
235:12
**establishes**
118:18
**establishing**
233:9
**estimate** 57:7,20
57:23,24 58:4,9
58:13,18,21 60:5
64:5 66:25 70:5
72:8,25 74:8,14
75:8 77:15,23
78:21 85:19
88:16 93:10
100:2 103:19,24
106:5 107:9

119:5 141:17
152:1,25 156:18
160:12,16
161:25 169:18
175:4,25 177:6
178:15 193:22
195:17 201:7,19
201:22,22 202:1
202:6 206:23
209:24 211:7
221:2 225:25
235:7 236:21
240:25 250:18
253:20
**estimated** 58:11
70:19 83:1
93:19 177:12
210:21 228:5
232:23 234:25
243:3 252:12
254:5
**estimates** 54:20
59:2 61:21,24
62:3,10,16,22
63:18 64:20
71:21 85:25
86:1 87:2 89:21
165:13 175:7,16
176:13,17
211:13 227:14
243:3 249:7,11
249:15,18 250:7
252:11 253:9,16
**estimating** 153:9
162:2,4 164:5,12
**estimation** 7:6
53:16 55:24
68:19 70:13

Page 21

[estimation - extent]

71:10,15,24
88:15 89:14
90:5,9,11 94:13
94:20 97:21,24
98:20 101:16
102:3,10,14
104:4 134:5,7
155:8 169:2,5,16
178:10,12
183:25 202:19
202:25 203:14
214:4 227:1
232:12 233:12
**estimations** 90:4
**evaluate** 78:8
131:19
**evaluated** 92:7
**event** 188:14
**events** 190:12
**evidence** 22:14
23:8 123:23
131:22 150:20
158:14 159:15
242:4 249:20
**exact** 27:1 31:12
66:11 72:10,24
106:3 116:10
160:13,17
163:16 202:12
202:15 203:9
256:16,17
**exactly** 47:12
83:11 113:11,20
127:2 148:18
168:24 183:10
**examination** 6:2
13:7 255:6
256:8 257:15

262:8
**examine** 77:14
90:3,7
**examined** 11:2
160:22
**example** 21:11
56:23 87:21
98:1 121:3
124:23 128:14
136:11,12 163:6
221:25
**excellent** 15:7
**exception** 85:8
**exceptions** 63:14
64:17 85:2,4
187:8 189:13
**excess** 218:5
**exchanges** 46:20
**exchanging**
48:22
**excluded** 82:4
119:2 147:16
168:19 226:25
228:16 229:4
230:6
**excluding** 42:16
120:4,4
**excuse** 151:21
**executed** 265:6
**exercise** 97:1
129:4 139:3
182:15
**exhibit** 6:13,19
7:4,12 13:22
14:5,8,12,13
15:1,15,17,17
25:4,6,7,18,23
25:24 27:6,8

38:2,3,4 45:4
50:12 51:5
53:22 55:8
56:13 57:6
179:9,10,11,16
179:21 205:23
206:3 208:11
219:25
**exhibiting** 79:6
**exhibits** 7:10
15:6 25:21,22
28:6,7 37:24,25
45:1 257:17
**exist** 123:25
125:25 128:13
**existence** 125:1
**existing** 123:1
**expanded** 62:6,8
62:13 97:22
**expect** 56:2,5
65:2 74:4 75:1
86:12 89:12
94:10 96:14
98:20 103:3
127:20 128:4
175:6 198:17
212:5,14 215:3
215:14 242:18
244:1,7
**expectation** 56:8
103:5,7 122:11
122:18 128:7
**expected** 56:7
**expenditure**
74:21 82:23
**expenditures**
75:23 225:17

**experience** 81:6
82:18
**expert** 6:13 39:4
40:13 43:12,16
44:2 52:19,20
123:24 125:12
125:14 130:12
130:15,23
172:24 179:25
194:10 196:7
199:7
**expertise** 24:7
55:6 131:13
**experts** 42:13
52:16 127:3
133:16 173:6
239:18
**explain** 91:3,4
237:9
**explained** 12:11
70:10 81:10
82:1 115:10
**explanation**
95:13
**explicitly** 242:8
**express** 236:15
**expressed** 18:5
19:11 35:4
200:2,3
**expressing** 236:5
236:9
**expression**
236:19
**extensive** 53:12
**extent** 23:12
74:24 78:21
88:21 135:11
230:3 237:7

Page 22

**[external - first]**

external  190:12
extraordinary
  55:9
eye  216:19
eyeball  167:1
eyeballs  168:17

**f**

face  159:18,24
  160:5 240:12
  242:1 247:12
faces  240:9
facetious  131:2
facility  25:6
facing  239:23
fact  18:17 24:8
  47:16,17 59:10
  72:2 77:16,25
  80:7 88:21
  93:13 98:12
  101:13 103:6
  106:22 113:19
  140:22 147:19
  148:8,18 176:3
  185:18 191:7
  220:22 221:13
  227:6 261:20
factor  217:2
  251:4 254:17
factored  230:3
factors  190:14
  190:14
factual  42:17
  188:3
fair  28:20 165:6
  205:8 223:2,2
  224:3 238:24

fairly  48:10
  251:1
fall  61:23 109:6
  128:2 136:3
  183:8
familiar  189:4
  197:2
familiarize
  27:21
far  131:24 132:2
  132:4 197:11
  199:10 239:14
fast  227:6
fault  186:20
favor  41:22
feasible  252:18
  252:19
february  123:7
  123:10
federal  266:14
  268:1,8,9
feel  14:22 19:12
  101:19
fees  166:2
felt  32:9
fewer  72:14
  74:13 103:3
figel  3:13
figure  7:4 15:3
  28:18 29:1,8,9
  29:13 47:12
  56:17,17 57:5,6
  57:11,13,14,19
  58:20 59:1 60:9
  67:1 132:25
  140:3 142:6,16
  143:3 147:6
  201:12,20 202:2

204:4,6,16,16
205:22 206:7
207:7,10 208:8
208:10,11 209:7
209:14 210:14
210:17,22 211:8
211:9,10,14,25
212:22,23 213:2
213:5,15 214:2,3
214:5,6,8,19,20
215:3 216:15,17
219:24 220:3,6
220:15 221:16
221:19,23,24
222:10 223:22
224:13,18
227:21 249:25
249:25 250:2,5,6
250:11 251:24
252:24 253:5,7
253:12,23
254:13 259:4,5,7
259:9,14,24
260:7,9,16,19,22
260:23,25
261:11,14
figures  11:15
  26:17,24 28:10
  28:16 29:16
  50:20 51:6,6,17
  56:12 66:18
  138:6 253:23
figuring  226:13
filed  8:19 93:18
files  39:19
fill  121:6
filtering  145:25

final  39:11
  131:23 132:6
  260:14
financially  9:4
  266:17
find  25:10 58:13
  58:18 179:14
  222:9 252:5
findings  99:22
finer  257:11
finished  91:1
  95:15,18,19
finite  89:17
firm  3:16 9:1
  135:14 138:10
  155:14,18
  163:24 174:11
  185:15,21 240:7
firmly  114:21
firms  96:22
  149:5 150:16
  160:6 162:10,11
  165:21,25
  169:13 170:15
  176:23 177:1,20
  177:22 185:9
  242:17,18
first  16:16 21:3
  28:13 38:3 44:5
  45:19 47:2
  48:12,12,14,17
  70:12 91:3
  92:10 129:10
  132:18 143:7
  152:4 218:2
  227:5 246:1
  247:23 258:13

Page 23

[fitted - forward]

| | | | |
|---|---|---|---|
| **fitted** 62:20 | **focus** 75:24 | 24:15 28:21 | 182:4 183:3,22 |
| **five** 31:14 52:4 | 85:12 103:17 | 29:6,23 30:25 | 185:1 190:18 |
| 154:7,8,13,14 | 143:7 153:18 | 32:13,21 33:7,20 | 191:4 194:17 |
| 248:20 252:2 | **focused** 71:14 | 34:13 35:5,20 | 195:7,12,18 |
| **fixed** 33:18,25 | **focusing** 180:20 | 36:15 45:8 49:7 | 196:23 197:9 |
| 34:11 127:18 | **folder** 14:15 | 50:1 52:11 53:4 | 198:1,4,10 199:8 |
| 135:19,24 | 15:7 179:15 | 56:14,21 58:22 | 201:9 202:3,16 |
| 136:13 138:5 | **follow** 62:9 | 59:12,25 60:22 | 203:10 204:18 |
| 156:20 157:6,8 | 124:18,19,25 | 61:4,16 64:8 | 207:21 208:17 |
| 162:16,18 164:1 | 161:14 262:6 | 65:6,22 67:8 | 212:17 215:6 |
| 165:23 166:2,10 | **followed** 44:4 | 69:23 70:8 | 218:25 222:2 |
| **flaw** 75:2,2,6 | 164:8 247:19 | 73:17 74:15 | 224:2 230:8,24 |
| **flaws** 33:18,25 | 257:7 | 77:18 78:13 | 231:14 232:17 |
| 34:11 | **following** 261:2 | 79:17 84:2,9 | 234:2 237:18 |
| **flexible** 138:23 | **follows** 11:3 | 86:23 88:2 | 238:1 239:5 |
| 138:24 141:9 | 69:16 108:2 | 89:24 90:23 | 243:17 244:4 |
| 144:4,15 145:1,7 | 144:22 267:8 | 91:11 94:24 | 245:1,6,18 |
| 147:11 210:23 | **footnote** 63:2,5 | 95:24 98:6 | 246:11,22 247:5 |
| 212:25 | 63:11,17,20 | 99:16 100:4 | 250:4 253:12 |
| **flip** 31:16 193:17 | 64:15,19 80:25 | 101:21 103:8 | **formal** 24:8 79:8 |
| 206:17 215:21 | 81:5 82:4 92:12 | 104:6 105:8 | 218:12 |
| **flipped** 196:1 | 92:14,16,20 | 106:15,23 | **forming** 38:17 |
| **fluctuate** 83:19 | 128:17,20 | 107:19 108:8 | **formula** 92:11 |
| 84:7 | 150:23 151:7,8 | 110:10 112:5 | 93:1,3,5 182:13 |
| **fluctuations** 81:9 | 151:11 255:9,15 | 114:9 115:25 | **formulating** |
| 81:10,15,21,25 | 255:23 256:1,11 | 118:10 120:14 | 171:22 |
| 82:3,20 | 257:1,2,5,14,19 | 121:15 122:14 | **forth** 20:11 22:2 |
| **focal** 124:14,24 | 257:25 258:1,6 | 124:3 129:18 | 24:21 31:24 |
| 125:19 126:15 | **footnotes** 63:22 | 131:14 132:15 | 43:12 45:12 |
| 126:17,19,21,25 | 64:6 | 133:5,9,12 139:9 | 58:14,19 92:12 |
| 127:2,4,7,10,14 | **force** 242:21 | 142:24 144:5,17 | 128:1 136:19,22 |
| 127:20,23 128:1 | **forecast** 134:10 | 145:4,21 146:1 | 193:6 266:7 |
| 128:6,15 132:8 | **foregoing** 265:2 | 146:12 149:14 | **fortunately** |
| 132:12,20,24 | 266:5,7,11,13 | 150:6 158:3,24 | 238:10 |
| 133:7,11 140:1,7 | **forgotten** 259:22 | 164:14 166:6 | **forward** 13:11 |
| 140:12,17,24 | **form** 18:19,20 | 167:9 169:21 | 84:24 113:23 |
| 141:8 151:14 | 19:7 20:12 21:7 | 175:18 177:8 | 227:6 252:11 |
| 256:5 257:7 | 22:4 23:21 | 178:2,17,19 | |

Veritext Legal Solutions
866 299-5127

**[found - genres]**

**found** 33:9,9 46:18,19 56:19 56:23 63:3 146:7 175:7 194:1 196:1 208:10
**foundational** 28:8
**fraction** 207:18
**frame** 27:4 252:20
**francisco** 5:10
**frcp** 268:1
**frederick** 3:13
**free** 14:22 236:2 243:7,15,23 244:12,17,20 245:15,23 246:10,17,19 247:3,4 262:19
**freeman** 3:5
**friday** 11:14,20 12:3 26:15,25
**friend** 200:9
**front** 13:25 26:10 31:16,18 43:3,14 57:16 63:8 68:23 81:2 92:20 103:16 106:7,10 123:20 128:19 130:7 133:22 151:10 161:20 180:2,24 205:5 207:9 210:16 215:24 220:1 223:5 234:5 255:16 259:2 260:19

262:17
**fruits** 144:9
**fulfilling** 219:3
**fulfillment** 229:24
**full** 50:16 53:14 53:15 60:17 67:7 68:25 69:19 70:6 75:14 81:20 86:25 89:3,18 91:20 95:12 117:22 151:15 198:16 203:4,8 207:11 208:3 211:19 212:3,6 212:12,15 215:1 215:12
**fully** 11:19 201:23
**function** 241:3
**functionally** 241:4
**further** 11:17 12:4 21:1 64:14 159:9 160:10 181:20 196:2 197:19 203:5 239:16 253:22 262:8 266:13,17
**future** 68:15,17

**g**

**g** 4:6 267:1
**gain** 242:9
**gains** 250:22
**game** 59:11 72:17 102:14

128:14 169:18 170:19 179:2 184:13,22 188:16 189:8
**gamer** 175:11
**games** 45:11 56:24 59:17 63:13 70:20,23 71:2,17,22 80:1 100:20 102:9,16 102:22 168:18 168:21 170:20 173:21 174:22 180:7,21,21 181:2,4,6,12,16 183:17 184:5 202:6 207:15,16 211:20 259:10 262:11
**garbled** 62:14
**garbling** 34:6
**gather** 43:18
**gems** 170:21
**gender** 50:8
**general** 12:2,20 12:22 18:4 24:19 40:18 90:2 99:3 101:6 103:2 125:2 128:9 138:10,18 174:13 175:24 175:25 240:18
**generally** 134:8 158:21 172:16
**generate** 139:16 175:16 176:7,8 176:12

**generated** 61:24
**generates** 174:16 174:21
**generic** 99:20 242:17
**genre** 45:11,16 45:17,22 46:3,16 46:19 47:2,16 49:16,19 50:9,13 50:22 51:4,7,9 51:14,22 55:17 56:25 57:3 59:3 59:6,11,18 60:13 64:3 65:9 67:16 68:9 71:7,9,11 73:22 76:13 77:11,17,25 78:7 87:24 88:5 92:24 95:22 100:3 102:9,14 102:17 159:17 159:22 160:2 165:11 169:14 171:10,17 175:10,14,22 176:1,24 177:2 177:20,22 178:7 178:9,22 179:2 180:21 181:2 183:6,14 185:5 185:25 206:11 208:6,14 209:20 210:5,18,21 241:6,8,19 242:1 242:2 252:22 260:3 262:11
**genres** 45:5 47:19 57:4

[genres - gupta]

59:22,23 67:12
68:19 70:21,24
70:25 71:2
75:15 78:12,17
78:21,22 79:6
93:21,24 94:5,11
96:8,11,14,21
97:2,4,15 98:4
101:17 102:1,2,8
102:14,22,25,25
103:2,4 173:22
174:23 201:13
201:15,16 202:7
207:14,15,20
208:3 221:3,18
222:1 224:20,24
225:3,11 226:20
229:20 260:12
**germane**  131:18
**getting**  34:7 47:8
109:19 182:21
**gibson**  4:5 5:5
**gibsondunn.com**
4:11,19,20 5:12
267:2
**give**  10:1 13:15
15:18 27:12
31:13 32:16
87:21 89:16
91:9 99:3
148:25 171:1
179:23 180:11
190:3 205:15
221:1 251:18
253:24 262:16
**given**  30:23 46:6
59:3 66:4 72:7
76:12 77:11,17

77:17,25 78:1
82:5,5 83:19,20
84:1,5,7,15
102:19 111:16
118:5 120:8,8,19
120:20 151:11
155:15,15,19
160:7 161:5
192:16,17 194:8
231:25 232:9,16
234:18,20
236:14 240:15
241:12,25 255:3
258:9 266:12
**gives**  202:15
253:7 254:4
**giving**  155:15,15
204:22 254:6
**glad**  14:19 26:2
**gleaned**  98:13
**go**  8:14 13:11
15:5,19 20:2
24:23 25:16,17
25:18,21,23,25
27:5 29:17
35:17 37:24
38:11 39:19
41:9 42:1 67:1
84:24 100:21
107:23 111:17
111:18 127:15
129:4 137:5
144:20 145:12
146:15 157:13
159:8 160:24
168:3,23 170:24
179:11 181:18
181:23 182:17

192:20 200:8
203:23 209:13
211:23 213:8
222:11 240:23
241:11 255:1
**goes**  93:25
115:19 199:10
213:7 245:13
250:15
**going**  13:21
14:15 30:20
35:17,19 40:21
41:16 44:20
78:25 85:12
103:17 113:22
117:16 138:3
145:15 147:14
151:2 152:19
170:6 171:12
179:3,17 186:9
200:9 204:22
219:10,18
223:25 225:21
234:17 237:4
240:7 248:25
258:7,10 263:24
**good**  8:5 11:6
26:9 27:17
97:14,17 116:16
151:3 180:4
220:13
**google**  40:4,6
127:17 131:10
131:11,16
**gran**  82:15
104:10
**grand**  4:8

**grandfathering**
187:9
**granular**  185:17
185:18
**granularity**
55:24 80:10
81:20 82:16
84:12 104:10,16
105:15,20
107:13 108:11
109:12 110:24
111:2,13,21
113:5,24 115:17
116:25 117:3,3
136:6 175:12
184:17 185:7,11
185:17 186:5
241:9
**graphic**  222:5
**great**  96:4 99:7
104:12 105:24
219:13 235:22
248:23
**grid**  134:3,19
137:25 138:15
138:16
**gross**  177:21
178:5
**grounded**
105:18
**group**  5:16,21,24
119:3
**groups**  245:12
**guess**  129:6
181:22
**gupta**  5:19

**[h - iap]**

| h | | | |
|---|---|---|---|
| **h** 6:10 7:1 269:3 | 88:1 102:20 | 215:15 218:17 | **hypotheses** 78:6 |
| **haldenstein** 3:5 9:14 | 122:2,8 208:15 | 218:17,22,22 | **hypothesis** 232:5 232:6 |
| **half** 57:24 68:1 117:9 204:23 | 222:25 226:1 | 233:21 262:11 | **hypothetical** |
| **hand** 9:22 25:19 80:2 118:3 | 232:1,9,16 | 262:24 263:5 | 136:11,21 138:3 |
| | 233:19 234:10 | **highest** 72:3 | 138:20 163:6 |
| | 239:2,13 243:9 | 73:21 252:20 | **hypothetically** |
| 172:21 258:7,12 | **harming** 139:5 | **highly** 121:19 | 162:25 |
| 260:17 | **harry** 4:13 9:15 | **higney** 5:6 | |

| | | | i |
|---|---|---|---|
| **handed** 258:14 | 27:15 | **hipsman** 5:20 | |
| **handedly** 37:8 | **heading** 39:3 | **historical** 261:20 | **i.e.** 223:11 |
| **handle** 45:17 | **hear** 69:5,13 | **historically** | **iap** 57:6,8 63:12 |
| **handled** 30:24 | 77:20 92:15 | 261:23 | 64:16,24 76:18 |
| 229:25 231:3 | 130:25 171:7 | **history** 199:2 | 82:23 83:12,15 |
| 239:18 267:8 | 191:13 212:9 | 234:11 | 83:16,18 103:19 |
| **hang** 15:11 | **heard** 8:11 48:14 | **hit** 25:21 | 103:25 104:3,4 |
| **hansen** 3:13 | 144:18 224:1 | **hold** 17:10 18:2 | 105:21,22 |
| **happen** 114:2 | 238:18 | 18:12 19:6,16 | 108:21,24 109:1 |
| 123:3 134:10,17 | **hearing** 213:12 | 20:3 52:18,20 | 109:3,3,5,8,14 |
| 140:23 192:12 | **help** 15:12 26:3 | 63:19,23 64:13 | 110:2,5,9,19,20 |
| **happened** 53:9 | 153:8 179:12,14 | 125:24 144:16 | 110:25 111:1,6 |
| **happening** | 179:18 | 146:18 | 111:10,22 112:1 |
| 118:22 145:5 | **helpful** 169:11 | **homes** 111:7 | 112:3,12,14,19 |
| **happens** 155:25 | 178:11,22 | **hopefully** 220:6 | 112:22,24 |
| 157:2 244:9 | 222:10 | **horizontal** | 113:17,25 114:1 |
| **hard** 13:24 14:1 | **helps** 25:11 | 220:23 | 114:4,8 115:7,8 |
| 27:24,25 | **hereto** 14:10 | **hour** 41:16,21,23 | 115:16,16 116:3 |
| **harm** 36:10 | 25:9 27:10 | 79:1 109:19,23 | 116:13,14 117:3 |
| 75:20 76:1 88:8 | **hermetically** | 117:9 151:2 | 117:4 118:20 |
| 102:24 132:9,13 | 245:11 | 182:21 219:10 | 121:21,22 122:6 |
| 143:21,23 144:3 | **herz** 3:5 | **hours** 31:9 | 122:20,22 123:1 |
| 202:12,15,22,23 | **high** 74:5 152:13 | **hphillips2** 4:19 | 123:4,6,10,16 |
| 203:9,24 227:25 | 222:6 233:22 | **huh** 69:15 | 134:2,12,16,18 |
| 233:10 245:25 | 251:24 | 206:18 218:10 | 134:21 135:1,14 |
| 246:21 | **higher** 106:9 | 254:3 | 135:15,25 136:2 |
| **harmed** 36:8 | 123:10 142:5 | **hundred** 20:2 | 136:5,8,12,24 |
| 86:22 87:19 | 146:10,18 | **hundreds** 221:17 | 137:13,24 |
| | 147:11 149:11 | 222:15 | 138:21 139:7,18 |
| | 212:7,16 215:4 | | |

Veritext Legal Solutions
866 299-5127

[iap - indicates]

141:18 143:11 143:18 153:25 167:20,23 168:13 189:6,14 223:12 250:22 251:7,9,21 254:13 256:3
**iaps** 83:8 154:3
**idea** 52:23 134:7
**identical** 112:23 198:17,20 199:1 199:1
**identifiable** 240:22
**identification** 14:9 25:8 27:9 49:17
**identified** 29:20 30:12 33:18 34:1,11 78:17
**identifies** 174:7
**identify** 19:5 38:15 139:5 158:10 190:13
**identifying** 135:13 239:2,12
**ids** 53:15 67:15 207:25 208:20 235:3 236:12 244:25
**immediate** 193:5
**immediately** 192:23
**immense** 76:3
**impact** 22:25 23:9 24:21 44:8 51:1 77:15,23 88:6 107:10

120:2 122:12,13 129:5 130:18,19 145:24 175:13 193:9 196:19 197:7 227:23 251:12
**impacting** 107:16 108:4
**impair** 13:15
**impertinent** 199:20
**implement** 128:22 134:20
**implementation** 55:3
**implemented** 137:17,19
**implication** 110:7,13,18,22 116:7 144:8 159:20 184:18 185:8 186:4
**implications** 11:25 110:4,8
**implicitly** 148:22
**implies** 74:24
**imply** 77:7
**importance** 99:22
**important** 49:12 49:24 50:4,5 60:9,12 62:21 75:25 98:16 101:11 106:18 106:20,22 132:9 132:13 137:18 245:23

**importantly** 32:4
**impose** 124:23 169:8 177:24 183:2
**imposed** 124:13 124:20 183:6
**imposes** 169:3,5
**improved** 178:15
**improves** 169:15
**inadequate** 194:3
**inappropriate** 104:11
**incentive** 126:10 126:11
**incidentally** 95:8 96:4
**include** 38:20,24 46:3 66:6 136:24 157:7,11 164:21 166:13 166:17 168:5 174:25
**included** 119:4 165:13,22 205:23 267:14 268:3
**includes** 105:1 157:6 167:18
**including** 11:15 97:23 189:25 254:5
**incompatibility** 48:13
**inconclusive** 20:16

**inconsistencies** 20:16
**inconsistency** 46:14
**inconsistent** 12:12
**incorporate** 151:17
**increase** 82:12 143:17 145:18 204:17
**increased** 209:21
**increment** 153:5
**incremental** 139:4 154:8,14 156:12
**increments** 135:19,20,24 136:13 137:2,13 137:25 138:6,19 139:17 143:12 143:19
**incurred** 166:20
**incurs** 154:1
**independent** 32:25 93:6,12 219:7
**indicate** 37:17 63:11 141:24 151:11 193:20 211:15 215:25
**indicated** 12:15 17:22 45:3 68:24 69:17 130:22 146:6 170:8 246:13
**indicates** 66:21 131:23 209:7

Page 28

**[indicates - issue]**

210:23
**indication**
135:11 190:3
**indicative** 178:6
**indirect** 156:15
196:19 197:3,7
**individual** 66:7
84:23 109:1
110:5,9,20
111:10 112:1,3
112:13 113:2,24
120:10 134:12
134:15,21
168:11,12
185:15 230:22
233:10 234:9,20
236:17
**individual's**
234:10
**individually**
110:21
**individuals**
229:17 230:19
231:2 236:22
237:1 243:11
**induced** 192:21
**industries** 197:4
**industry** 172:24
173:5
**infer** 175:21
**inferred** 178:23
185:6
**influence** 242:22
**information**
11:17 38:16
40:14,17 54:19
63:21 96:24,25
97:4 104:13

131:18 162:11
162:12 164:3,5
164:10,11
172:20 173:10
173:12,24
176:22 177:20
178:11,23
188:15 190:4
231:10 241:12
263:16
**informative**
169:12
**informed** 26:22
40:10
**injury** 133:6,10
210:3
**input** 194:7
195:11
**inquired** 54:15
**insensitive** 53:18
**inside** 113:22
**insofar** 40:19
120:3 168:9
**inspection** 221:1
**instance** 45:20
**instinct** 227:14
**instructions**
30:23 32:5
68:17 95:3
**instrument**
101:12
**instrumental**
97:9,18 98:17,24
99:14 100:1,25
101:5
**instrumentation**
100:12

**instruments**
97:12 98:2,3,9
98:13,18,21 99:2
100:9,19 101:8
101:15
**intend** 68:14
152:7
**intended** 17:3,6
46:3 138:1
193:2
**intensity** 151:12
**intent** 137:22
198:13
**intention** 17:19
38:15 135:13
168:22 185:12
234:12
**interest** 99:7
**interested** 9:4
266:18
**internet** 8:9
**interpret** 17:12
**interrupt** 90:25
95:15,18 109:18
109:21 139:12
182:20
**interval** 53:9
136:3 251:23
254:12,19
**intervals** 61:23
256:4
**interview** 42:9
42:12
**interviewed**
42:17
**introduce** 135:1
**investigate**
48:21 159:9

231:10 240:19
240:19
**investigated**
122:10,17
130:20
**investigation**
217:5 237:5
**investigations**
79:20
**involve** 78:20
80:3 81:22
166:25 247:18
**involved** 43:24
44:1 75:23
79:21 96:9
248:3
**involves** 82:8,15
97:22 182:15
202:19,20
**ios** 22:16 161:25
189:11,22
190:16,23
191:20,22,23
192:5,7,8 197:22
198:6
**iphone** 1:6 2:6
6:20 8:18
189:15 267:4
269:1
**issue** 21:13,18
22:20 23:3,13
36:7 47:3,9,17
48:1 49:25 51:7
51:10,11 52:14
52:15 53:6
55:17 75:19
77:14 87:24
111:14 124:2

[issue - lawyer's]

126:7 146:3 160:23 192:1 208:7,14 209:20 210:19 218:3 224:20 231:2 239:15 240:22
**issued** 125:14
**issues** 11:12 16:25 17:7,14,23 18:7,25 19:4 20:5,24 21:2,11 21:24 22:5 31:22,23 32:1,6 32:11,16,19 33:2 33:4,12 41:6 42:17 48:16,19 172:2 173:6
**item** 24:23,23 82:22 83:5,16,22 103:19 104:3,4 105:4,5 107:10 107:18 108:7 109:5 110:9 111:8,17 112:3 112:22,24 113:2 113:8,14 114:4 114:20,24 115:5 115:19,22,23 118:7,17 121:4,5 122:20,22 123:4 123:6,7 134:13 134:22 137:15 141:18 185:19
**items** 84:24 103:25 104:13 104:15 105:12 105:14 108:21 109:1,9 110:5

111:6,10,18 112:14 113:16 113:24 114:8,8 115:6,11 116:22 120:8,20,21 121:14 123:2 134:15 136:24 137:1

**j**

**january** 56:4 123:5,7,11
**jennifer** 5:17
**joann** 5:23 8:24
**job** 1:24 267:5
**jstor** 131:17
**judge** 35:18 141:1 200:7 249:16
**judging** 253:14
**judgment** 19:1 76:21 79:11,16 100:14 108:16 182:16
**july** 96:3 216:5
**jury** 140:14,16 141:1
**justify** 123:24

**k**

**keep** 99:20 255:5
**keeping** 123:7 263:12
**keeps** 35:18
**kellogg** 3:13
**kellogghansen...** 3:22
**kind** 82:7 125:2 125:9 190:3

**kinds** 81:25
**know** 12:7,25 17:15 18:13 24:17 26:6 27:1 31:1 36:17 39:17 40:23 41:10,18 42:8 44:2 46:7 49:10 49:10,13 50:3 52:1,4,6 54:12 54:14 55:24,25 59:21 60:14 64:11,14 67:23 68:3 72:17,21 74:3 93:11 101:9 102:8,11 102:12 103:5,11 103:13 106:19 106:20,22 114:2 121:25 130:4 139:21 148:10 148:13,14,18 152:6 160:8 161:4,4,5 166:1 166:8 169:25 170:1 172:12,21 180:13 187:16 199:5,16 200:2,7 212:20 215:19 221:13 224:3 230:2 231:9 233:18,20,24 235:5 238:20 242:15 244:18 244:19 249:9,13 253:1 263:11
**knowing** 250:8

**knowledge** 236:24
**knowledgeable** 173:3
**known** 188:17
**kristof** 5:24
**kwood** 3:22
**kyle** 3:14

**l**

**l** 1:12,21 2:15,20 6:3,14 11:1 41:8 265:1,11 266:1 266:24
**labeled** 212:24
**laid** 153:19
**language** 86:4
**lapse** 256:17
**large** 16:12 37:8 52:14 58:4,9,10 72:21 88:19,21 92:4 117:23 216:15 222:24 245:16 248:2,6 248:16
**larger** 57:1 141:9 146:8 174:4 198:25
**lastly** 171:14
**late** 53:8 96:6 199:14 254:1
**latest** 46:16,22
**laurito** 5:21
**law** 3:7,17 4:7,15 5:7
**lawyer** 32:24
**lawyer's** 161:14

Veritext Legal Solutions
866 299-5127

[learn - lot]

learn  47:2
learned  47:5
leaving  99:23
led  57:2
left  25:19 32:12
  32:19 55:4
  130:8,13,15,17
  130:20,24
  131:10 218:8
legal  8:25 9:2
  24:6 32:25 37:4
  37:6 99:11
  104:21 172:19
  246:4 267:7
legally  146:2
  231:19 247:9
lengthy  30:21
letter  25:4 26:20
  26:21,23 45:24
  46:17,24 51:8
  53:22 153:22
letting  187:15
  253:1
level  19:20 49:15
  73:6,6 76:22
  82:21 83:13
  103:19 104:4
  105:20 107:10
  107:18 108:7,16
  110:21,25
  111:20,25 113:5
  113:25 115:16
  115:20 116:24
  119:17 137:17
  137:20,25 139:3
  163:24 185:19
  200:18 202:22
  203:24 215:13

221:10 234:21
levels  119:12
  120:2 222:6
lie  183:10
lifetime  217:20
  223:10 228:17
  229:4 231:8,13
  232:2,11 233:5,7
  233:16,16
  234:16 261:4,18
likelihood  12:22
likewise  12:21
limit  134:1
  168:14 190:24
  228:4
limited  53:23
  62:24 100:16
  134:18,18
  189:13 233:21
limiting  223:11
  223:18
limits  148:21,22
  148:25 183:15
line  20:3,3
  201:15 217:17
  267:15 268:4
  269:4,7,10,13,16
  269:19
linear  241:24
lines  227:25
link  54:10
linked  168:10,12
linking  231:7,11
links  26:20
list  21:23,24
  37:21 38:8,8
  39:7,14 40:22
  43:11,15 100:22

127:15 151:24
  170:23 194:2
  195:23 230:2
listed  98:21
listing  25:20
lists  37:17 38:14
literature  124:7
  128:15 131:2,4,6
  133:3
litigation  1:6 2:6
  5:18 6:21 8:18
  132:22 267:4
  269:1
little  56:24 76:6
  96:16,16 117:10
  117:12 133:3
  153:21 154:2,6
  154:12,19 162:5
  210:12 242:15
llp  3:5 4:5 5:5
local  124:12
located  2:17
  240:20
location  1:14
locked  267:12
  268:1
log  241:24
logical  150:9
logs  220:24
long  44:6 52:1,9
  52:17,23 53:3,11
  55:22 82:10
  95:21 117:7
  161:6,8,8,10,15
  171:13 189:17
  193:3 212:9
  223:1

longer  18:12
  19:6,16 145:10
  161:13
look  27:6 39:3
  43:1 57:11
  96:22,22 97:3
  100:7,22,22,22
  114:5 127:15,16
  128:17 130:5
  136:14,20 138:5
  138:25 141:3
  160:24 162:18
  177:3 180:6
  205:1 222:22
  250:5 251:20
  253:4 262:19
looked  86:17
  120:1 131:7
  171:15 176:17
  196:6 206:3
  243:25
looking  28:12
  69:4 98:14
  100:8 114:23
  139:17 143:3
  168:6,20 171:9
  178:1 179:3
  189:19 220:16
  222:13 261:13
looks  136:2
  139:3 250:10
los  4:9
losing  213:20
lost  108:1 143:24
  149:24 213:15
  228:22
lot  35:11 185:17
  208:15

Veritext Legal Solutions
866 299-5127

**[low - maximize]**

low   216:1,13,16
  217:3 251:24
lower   22:17
  144:14 145:1
  159:14 176:25
  177:21 178:8
  181:12,16,24
  212:7,16 215:4
  215:15
lowered   247:22
  248:8
lowest   181:25
lunch   109:24

**m**

m   3:18
machine   21:12
  48:13 266:10
machines   49:1
madison   3:8
magistrate   35:18
magnifier   26:7
magnitude   57:24
  207:25
mailing   219:5
  225:20
maintain   116:15
  126:6
maintains   113:7
  116:10,20
  133:20 142:2
major   189:7
majority   188:1,2
  245:16
making   30:1
  35:10 111:9
  114:12 123:9
  129:9 156:13

167:8 237:23
manager   16:11
manifestly   245:9
map   97:14,17
march   16:24
  17:8 128:22
margin   49:18
  96:18 162:9,21
  163:2 165:14,25
  167:2 168:4
  169:3,6,9,12,20
  170:3,5,8,13,15
  171:9,16,16,22
  172:10,10,13,13
  172:25 173:9,19
  173:24 177:14
  177:17 179:1
  180:7 181:1,7,11
  181:16 183:1,5
  183:13,13,16,21
  184:1,5,8,20
  259:11 260:2
  262:11 263:5
marginal   81:10
  82:2 148:19
  149:1 153:2,4,9
  153:11 156:11
  156:23,24,25
  157:19,22,22
  158:15,20 159:2
  159:2,7,13,19
  160:4,11,15
  162:4,22 163:1
  163:22 164:4,10
  164:11 167:3,6,7
  167:12,14,22
  174:7,16,21
  175:21 176:13

177:12 178:15
  181:8,13 184:14
  184:25 185:5,5,8
  186:3 192:17
  193:7,12
margins   96:25
  161:23 162:8,17
  162:18 163:9
  164:2 168:7,21
  170:7 174:6,15
  175:5,16 176:23
  177:1,22 178:5,6
  178:8 183:6
maria   5:21
mark   3:6 9:13
  13:21 25:3
  199:14
marked   7:10
  14:8,11,15 15:6
  15:16,16 25:7,22
  27:6,8 45:1,4
  179:10 250:11
market   22:2,10
  24:20 121:9,10
  125:2,8 126:4
  132:21 187:10
  189:20,21 190:7
  191:8,19,21,23
  198:25 239:24
  240:13,22 242:9
  242:25 247:12
  248:6,12
marketplace
  197:24 198:22
markets   130:20
  190:7,9
marshal   150:19

maryland   3:14
match   175:7
matching   230:18
  230:21
materially   65:3
  65:19 66:4
  89:22
materials   11:15
  11:20,21 14:3
  26:16 37:17
  38:9,12 40:14,18
  95:3,4
math   154:16
mathematical
  162:20
matt   5:22 44:18
matter   8:18 18:4
  24:23 29:11
  40:9 78:3 88:14
  100:14 101:6
  123:24 130:12
  130:23 171:25
  197:13 199:13
  242:18 258:11
matters   13:10
  29:18 131:13
maximization
  105:19 108:14
  109:13 110:25
  113:6 117:2
  154:4 155:3,22
  178:24 186:5
maximize
  104:25 138:11
  138:15 139:4
  148:16 198:3
  239:22 240:8

Page 32

**[maximizers - mind]**

**maximizers**
80:12 104:24
147:25 148:15
160:7
**maximizes**
155:18
**maximizing**
138:7,22 148:5
149:6,11,23
150:4,17 158:23
167:17 190:11
242:13
**maximum** 139:6
**mcfadden** 1:12
2:15 6:3,14 8:17
9:21 11:1,6,16
12:1,19 13:9
14:22 15:9 22:7
25:13,18 26:5
39:3 42:6
107:22 139:9
150:25 180:1,13
200:1 255:3
265:1,11 267:5
269:2
**mcfadden's**
11:13 12:21
54:1 55:13
197:12 199:11
**mean** 16:21
42:11,12 47:22
60:12 64:18,23
65:10 76:14
87:22 90:25
95:2 109:17,21
126:17 127:14
129:25 132:3,4,7
133:23 143:8

151:15 158:6
162:4,7 185:18
201:21,22 207:1
211:12 212:2
217:5,6 237:16
244:2 251:2,10
252:6 253:20,21
253:24 254:8
**means** 17:6
60:20 143:9
213:22,22
238:20,21
**meant** 188:24
**measure** 175:13
177:18 201:4
202:12,15 203:9
203:13
**measures** 165:23
**mechanism**
239:17
**media** 8:16
100:3
**medication**
13:13
**meet** 36:11
121:11 263:19
**meets** 94:4
**member** 3:16
218:19,24 234:9
236:7
**members** 23:10
24:4 34:21
35:25 36:8,14
37:2 74:22
75:19 119:1
173:2 218:11
229:9 230:22
235:3 236:18

237:7 239:3,13
243:9,12,15,22
244:11,20,23
245:25 246:9,16
246:21
**membership**
246:5,6
**memorialized**
217:6
**memory** 35:9
39:20 181:23
205:16 256:18
**mention** 98:9
**mentioned** 119:4
163:19 172:15
**menu** 113:7
114:5 115:4,19
128:23 140:2,17
**menus** 104:14,16
105:14 108:19
109:7,9 111:6
113:22,23
116:25 141:22
148:1 149:8
**merit** 94:9,10
172:11 230:22
**merits** 78:9 90:8
92:8 140:22
141:2 230:14,19
231:4,23
**met** 36:22
100:10 230:12
230:13
**method** 73:25
90:9 91:18 92:1
97:11 103:24
104:4 108:23
110:3,19 135:6

136:1 137:11
163:9 181:15
182:11 194:9
200:21,24 201:3
201:5
**methodology**
22:24 32:2 94:3
97:24,25 98:19
134:25 169:2,5
231:12 232:22
256:3,13 257:6
257:19 258:3
**methods** 90:11
91:22 92:3
**metz** 39:8
193:22,25
194:23 196:3,21
**metz's** 195:10,16
199:7
**mid** 48:3
**middle** 53:7
**million** 66:7,22
67:6,15 68:4,8
72:22 121:4
168:18 206:15
207:19 208:4,23
209:2,4,8,9,25
210:7,8 211:20
211:25 220:3
224:22,22 225:3
225:6,25 228:10
235:13,16,25
**millions** 73:3
**mind** 21:23
27:25 41:17
64:15 106:4
114:21 127:3
149:8 204:5

Page 33

**[minjae - music]**

| | | | |
|---|---|---|---|
| **minjae** 16:11 | 105:10,12,18 | 202:14,19,25 | **monopolize** |
| **minus** 136:17,18 | 107:1,3,8 108:17 | 228:14,18 229:1 | 124:21 |
| 162:22 163:2 | 108:20 109:12 | 231:16,21,24 | **monopoly** 125:4 |
| 250:15,15,20,21 | 110:24 111:12 | 232:8,11,21,21 | 240:10,16 |
| 250:23,24 | 111:21 113:1,5 | 233:3 234:12 | **month** 81:7 82:5 |
| 251:10,11,24,24 | 113:10,15,17,21 | 239:20,22 240:1 | 82:19 83:5,6,19 |
| 252:7 254:14,21 | 113:25 114:1,4 | 240:1,3 241:9,13 | 83:23,25 84:1,5 |
| 254:21 | 114:15 115:2,7 | 241:18,19,24 | 84:8,12,15,18,20 |
| **minute** 29:3 | 115:10 116:7,10 | 242:5,8,23 243:3 | 84:24 120:9,20 |
| 205:15 224:5 | 116:12,15,21,25 | 246:25 | 122:21,21 193:5 |
| **minutes** 42:2 | 118:4,14,18 | **model's** 178:15 | **months** 81:6 |
| 80:19 109:23 | 119:5,10,13,23 | **modeling** 102:21 | 93:18 96:11,13 |
| 117:11 182:23 | 123:9 134:14,21 | 107:1,4 110:18 | 193:6 |
| 248:20 | 134:21 135:9 | 155:5 173:1,19 | **moot** 194:21 |
| **misclassification** | 137:19 138:8,21 | 174:16 | 239:15 |
| 56:25 | 138:24 139:25 | **models** 133:7,11 | **morning** 8:5 |
| **misconduct** | 141:21 142:6 | 147:18 166:23 | 11:6 27:3 |
| 22:16 | 148:3 150:14,15 | 166:23 | **motion** 6:15 |
| **misheard** 107:20 | 153:1 154:13,22 | **modes** 166:24 | **motivation** |
| **missed** 143:24 | 154:25 155:5,9 | **modification** | 217:25 |
| 157:12,12 | 155:13 156:5,18 | 50:10 | **move** 35:21 |
| **missing** 148:16 | 156:19 157:1,18 | **modify** 19:13 | 111:10,11 |
| **mission** 5:8 | 159:18,23 160:3 | 239:11 | 125:23 136:21 |
| **misstates** 19:17 | 161:6 162:21 | **moment** 15:3,18 | 200:12 225:22 |
| **misunderstand...** | 164:5,12 167:16 | 27:12,21 31:8 | 237:17 238:4,5 |
| 189:1,2 256:19 | 167:24 169:19 | 157:16 180:12 | **moves** 172:11 |
| **model** 53:16 | 170:2 172:5 | 204:5 | **moving** 57:3 |
| 55:25 61:22 | 174:7,21 175:4 | **monday** 1:15 | **multiple** 56:1 |
| 62:20 70:6 | 175:11,15,20 | 2:18 8:1 | 78:12 79:5 |
| 76:11,16,17,20 | 176:1,6,8 177:4 | **monetary** | 109:8 115:6 |
| 77:11,15,17,23 | 177:6,11,24 | 218:18,23 246:7 | 118:23 189:25 |
| 78:1,2,22 80:3 | 184:14,16,23 | 246:9 | 198:6 231:3 |
| 80:10 81:14,23 | 185:4,11,13,18 | **monopolist** | 235:3 236:11 |
| 82:17,21,25 | 188:16 192:23 | 124:24 240:5 | 238:7 |
| 85:19 87:17 | 192:25 193:2,4,8 | **monopolistic** | **music** 45:12 |
| 88:10,12 89:6,8 | 193:14 194:5,5 | 124:14 | 56:25 57:3,7 |
| 90:15,17 93:20 | 196:9,13,15 | **monopolists** | 59:19,23 63:13 |
| 93:23 100:13 | 197:22 198:1,7 | 239:21 | 70:21,23 71:2,16 |

Veritext Legal Solutions
866 299-5127

[music - number]

71:23 72:17 78:16 79:10,13 79:23 80:2,13 100:20 102:3,22 165:10 171:2,10 171:10 173:21 174:22 175:22 181:5 187:7 202:7 207:16 211:20 251:21 260:2,6,11 263:5

**n**

**n** 6:1 41:8
**n.w.** 4:16
**name** 8:24 15:6 43:21 266:21
**names** 170:17 172:15
**nash** 239:25 240:2 242:10,24
**nathaniel** 5:20
**naturally** 127:1
**nature** 169:13 178:7 247:15
**near** 78:25
**nearly** 22:16 93:18
**necessarily** 82:12 124:17 125:7 175:9 176:2 177:18 183:7 198:7,23
**necessary** 51:23 55:10 169:8 232:1,10 267:14 268:3

**need** 19:12 20:2 25:16 26:6 56:5 70:3 92:7 93:6 94:11 100:10,11 101:19 103:19 107:21 117:10 132:6,8,12 151:21 152:14 153:1 159:8 179:14 190:4,5,8 190:11 206:17 220:25,25 221:6 240:3 246:19 249:9,13 254:9 255:11
**needed** 11:7 32:9 172:7,8 210:18
**needs** 13:2
**negative** 57:8,20 58:9,15,21 156:7 204:10,15
**negotiate** 248:7
**negotiations** 248:3
**neither** 196:21 266:17
**net** 88:7 102:20 102:24 156:12 156:22 159:2 202:23 203:24 227:25 233:10 245:25 246:20
**netflix** 171:15,18 175:17 176:2,4,9 176:9,14,18,21 177:4,8,12,14,17 177:19 178:14 178:16

**netting** 156:15
**network** 196:19 197:3,7
**nevada** 1:22
**never** 98:3 157:9 164:17 196:6 238:18 244:12 244:16
**new** 3:9,9 12:17 12:18 17:9,16,20 18:1 25:23 41:13 58:20,20 59:4 62:22 63:18,18 86:11 122:22 146:23 167:7 195:12 197:1 208:10 228:19 229:9 231:19 236:13
**newly** 230:16
**news** 248:24
**newsworthy** 188:14
**nikhil** 5:19
**nine** 27:22
**noise** 89:19 202:25 203:6,14 203:15 233:11
**non** 137:9 191:22,23
**nonbuyers** 245:14
**nonindepende...** 93:17
**nonnegative** 136:18
**nonresponsive** 125:23 225:23

**nonspending** 226:3
**nonsubscription** 136:25 247:13
**normally** 36:20 162:16
**northern** 1:2 2:2 8:20
**notating** 267:15 268:4
**note** 8:7 29:5 123:21 128:20 139:8 156:13 197:11
**noted** 82:4 85:2 139:13 207:23 264:1
**notes** 207:24 214:4 260:25 265:4
**noticing** 9:11
**november** 48:3 53:7,8
**number** 6:11 7:2 7:11 15:15 31:12,13 36:14 37:2 52:3 53:23 60:3 66:9,11,17 66:20 67:10,15 67:17,23 68:6,11 72:8,11,20,24 73:2 75:11 83:22 96:11 106:4,7,10 112:16 115:8 116:21 117:23 120:12 142:11 142:19 145:18

**[number - okay]**

| | | | |
|---|---|---|---|
| 156:20 157:1 163:16 166:5 168:17,17 170:9 170:10 182:1,1 189:10,13 195:10,14,25 196:2,3 197:16 202:1 204:20,23 209:21 211:9,23 213:1,6,11 214:1 214:6 220:8,20 221:9 222:18,20 224:19 225:1 226:15 227:23 235:6,9,23 236:2 236:6,25 237:2 257:15,25 258:1 267:15 268:4 | **oakland**  1:3 2:3   8:20 **oath**  11:2 266:9 **object**  18:15,19   18:20 22:4   144:17 145:3   220:10 223:25   224:2 **objected**  237:25 **objecting**  224:4 **objection**  19:7   19:17 20:12   21:7 22:19 23:1   23:11,21 24:15   28:21 29:6,23 | 118:10 120:14 121:15 122:14 124:3 129:18 131:14 132:15 133:12 139:8,11 142:24 144:5 145:4,21 146:12 149:14 150:6 158:3,24 164:14 166:6 167:9 169:21 175:18 178:2,17 182:4 183:3,22 185:1 190:18 191:4 | **observed**  155:4   177:1 **obtain**  155:24   187:8 202:12   203:8 **obtained**  65:4,19 **obvious**  101:7,17 **obviously**  42:14   53:6 56:5 60:12   101:8 146:22   200:3,5 **occasion**  195:12 **occur**  190:25 |
| **numbers**  28:17   30:5 66:17   87:25 118:2   144:8 176:3,3   184:9 201:12,14   201:15 207:2   213:4 214:10   222:6,11,24   226:8 227:10   234:6 | 32:13,21 33:7,20   34:3,13 35:5,20   36:4,15 45:8   49:7 50:1 52:11   53:4 56:14,21   58:22 59:12,25   60:22 61:4,16   64:8 65:6,22   67:8 69:13,23   70:8 73:17   74:15 77:18   78:13 79:17 | 194:17 195:7,18 196:23 197:9 198:10 199:8 201:9 202:3,16 203:10 204:18 207:21 208:17 212:17 215:6,17 218:25 222:2 224:9 230:8,24 231:14 232:17 234:2 237:18 239:5 243:17 | **occurred**  198:5 **october**  258:15   258:20 **offer**  18:1 115:4   115:12,23   133:10 239:16   245:23 249:10   249:14 **offered**  23:15   120:8 141:22 **offering**  125:22 |
| **numerical**  41:8   161:17 **numerican**   41:12 **nw**  3:18 | 84:2,9 86:23   88:2 89:24   90:21,23 91:11   94:24 95:24   98:6 99:16   100:4 101:21 | 244:4 245:1,6,18 246:11,22 247:5 **objections**  9:6   35:11 199:22   200:11 237:24 **observation**   128:9 | 135:14 149:5   167:20 216:21   239:9 240:24   242:19 **offers**  115:21   116:22 |
| **o** | 103:8 104:6 105:8 106:15,23 | **observations**   21:13 134:9 | **office**  267:11 **offs**  105:11 |
| **o'clock**  117:9 **o0o**  8:3 264:6 | 107:19 108:8 110:10 112:5 114:9 115:25 | **observe**  148:8   160:7 177:2   190:10 | **oh**  27:16 58:24   95:1 161:4   167:6 262:18 **okay**  13:18 14:4   14:21 15:20,23   25:2 26:4,12 |

Page 36

[okay - original]

| | | | |
|---|---|---|---|
| 27:5,18 28:15,25 | 219:15 221:6,12 | 171:23 179:5 | 236:15 239:9,16 |
| 30:14 31:15 | 223:2,6,22 224:6 | **operated**  129:23 | 240:24,25 |
| 32:18 34:8 | 224:8,12,16 | **operating**  49:18 | 247:21,25 |
| 37:16 39:22 | 225:5,9 226:15 | 190:9 | 249:10,14 |
| 40:3 41:14 42:3 | 226:18 227:13 | **operation**  52:21 | **opinions**  17:9,14 |
| 42:4 43:4,11,15 | 228:13 230:17 | 203:21 | 17:16,20 18:1,5 |
| 44:12 48:5 | 233:24 234:8 | **operations** | 18:8,11 19:11 |
| 56:10 57:18 | 238:22,24 | 108:18 163:24 | 20:4,10,11,16,20 |
| 60:9 63:7,10 | 239:19 240:5 | 169:13 191:8 | 32:2 38:17 |
| 67:5,19 68:7,24 | 244:19 248:22 | **opine**  250:7 | 42:21 49:13 |
| 69:17 70:1 | 254:23 255:4,17 | **opined**  133:16 | 94:2 133:6,9,10 |
| 78:10 80:18 | 255:22 256:1,19 | **opining**  233:25 | 135:7 194:12,15 |
| 85:8,10 86:9 | 256:25 257:22 | **opinion**  18:3 | 239:11 |
| 102:13 103:17 | 258:7,17,21 | 19:5,15 22:2,11 | **opposed**  233:25 |
| 104:2 109:25,25 | 259:23 260:14 | 22:14,22,24 23:6 | 236:22 |
| 110:17 117:5,9 | 260:22 261:15 | 23:8,15 32:25 | **opposite**  113:20 |
| 118:4 123:21 | 262:1,20 263:9 | 33:17,24 34:10 | **optimize**  189:24 |
| 131:6,20 132:8 | 263:20 | 34:15 36:23 | **option**  164:17 |
| 133:23 135:23 | **oligopolistic** | 37:4 45:18 | 188:2 189:14 |
| 135:23 136:11 | 242:11,25 | 56:18 58:14,20 | **oranges**  58:25 |
| 139:13,20 141:6 | **oligopoly**  240:10 | 74:22 75:13 | **order**  14:13 |
| 145:3 147:9 | **omissions**  29:21 | 77:8 80:14 | 16:24 17:8,23 |
| 151:6 152:18 | **omit**  133:7,11 | 90:19 94:12,19 | 18:25 20:14 |
| 154:18 157:21 | 226:20 | 104:20 113:2 | 23:5,13 33:1 |
| 161:21 169:8 | **omitted**  225:10 | 120:25 123:24 | 34:23 35:1 36:1 |
| 170:17 171:1,14 | 226:23 228:10 | 125:25 127:9,11 | 36:10 37:23 |
| 171:20 176:12 | **once**  62:3 88:12 | 129:1 146:4,18 | 123:22 127:6 |
| 179:23,25 180:4 | 88:17 192:4,4 | 169:17 172:7 | 152:25 155:23 |
| 180:13,22 181:6 | 238:5 | 191:2,3,24 192:3 | 169:9 172:4 |
| 182:10 188:20 | **ones**  16:8 38:23 | 192:22 195:4,12 | 194:1 198:2 |
| 195:4 196:6 | 64:22 67:12 | 195:15,21 200:2 | 205:10 232:13 |
| 197:2,6 199:2 | 68:4 101:17 | 200:3 201:2 | 232:15 245:24 |
| 204:13 205:6,12 | 263:7 | 202:11,14 203:7 | 246:3,20 |
| 206:13,20 207:6 | **open**  15:4 126:2 | 216:21 217:19 | **oregon**  1:22 |
| 208:6 209:13 | 127:12 191:8 | 217:23 218:16 | **organize**  105:13 |
| 210:17 213:9,21 | 196:1 263:12 | 218:21 219:2 | **organized**  117:1 |
| 214:3 215:20 | **opening**  22:3 | 227:3 229:25 | **original**  20:25 |
| 217:16 219:13 | 38:9 93:19 | 233:4 236:5,9,13 | 21:11,18 24:13 |

Veritext Legal Solutions
866 299-5127

[original - patience]

| | | | |
|---|---|---|---|
| 43:24 50:25 57:19,24 58:3,8 58:13,18,25 64:21 70:11 74:9,19 97:25 98:4 135:3 139:7 149:19 158:18 170:24 171:12 173:25 189:18 191:18 192:4 200:22 205:10,11 206:24 207:7,10 209:14 211:10 213:23 214:5 231:17 235:9 266:14 267:10 267:21 **originally** 23:20 47:24,25 143:15 **outcome** 9:5 **outlined** 153:12 159:21 **output** 153:6 **outside** 125:5 183:8 187:5 **overall** 78:22 81:17 98:19 109:12 113:25 119:11,14 121:8 123:16 125:2 146:7,9 167:15 167:22,22 213:22 **overcharges** 75:21 **overlap** 74:25 | **p** **p.m.** 117:17,20 152:20,23 186:10,13 219:19,22 249:1 249:4 263:25 264:1 **page** 6:3,11 7:2 7:11 31:17 38:3 38:4 39:4,5,13 39:14 40:20 43:2,13 63:4 66:13,14,15 68:22 81:1 85:13 92:18 103:18 123:19 128:18 133:18 142:17 150:24 151:8 161:19 180:9,10 193:18 206:2 207:8 210:15 215:23 223:4 255:10,14 255:15 257:1 259:4,5,15,24 262:21,22 267:15 268:4 269:4,7,10,13,16 269:19 **pages** 1:25 20:2 27:23 34:22 35:25 36:3 37:21 38:5 259:1 267:14,17 267:17 268:3,6,6 **paid** 22:17 66:19 67:6,16,21 68:8 80:5,8 103:25 | 105:25 116:13 116:13,14,14 119:6 155:13 167:20 168:18 224:23,24 **pair** 93:15 **pandora** 171:5,9 **pandora's** 242:12 **paper** 130:14 255:12 258:10 **papers** 101:3 **paragraph** 28:19 29:10 31:17,20 34:18 37:10,14 37:16 66:12,15 68:21,24 69:3,7 69:9,18 85:7,11 85:14 86:5 92:15,20 103:15 123:18,21 130:5 130:8 131:21 133:17,22 135:16 139:20 139:24 141:3,25 143:2 155:12 161:18 163:8 180:6,8,15 181:3 193:17,20 205:13,13,21,22 206:5,7,14,14,25 214:16 215:21 223:4,6 255:9 **paragraphs** 31:24 32:12,15 32:20 63:22 64:6 205:19 | **parameter** 71:20 76:15 206:23 211:12 249:19 **parameters** 70:5 70:14,20 71:15 72:9 202:20,21 203:3 228:5 234:19 235:1 **part** 75:21 85:12 128:20 158:9,17 158:18 167:13 189:1 197:19 217:25 229:10 229:11 231:4 247:10 **partial** 28:15 **participant** 47:11 **participants** 8:10 **particular** 16:14 71:7,7 73:11,23 97:3 111:8 158:1 172:3 174:11 182:11 187:6 223:7 232:25 241:7 261:2 **particularly** 132:21 177:25 188:5 **parties** 3:2 4:2 5:2 8:14 **parts** 227:20 **party** 9:3 266:19 **passed** 173:10 **patience** 263:21 |

Veritext Legal Solutions
866 299-5127

[pattern - please]

**pattern**  23:9
  233:18
**patterns**  243:5
**pause**  142:8
**pay**  118:5
  243:16,23
**paying**  80:8
  184:23
**payment**  168:16
**payments**  67:4
  67:11 166:1
**pdf**  179:20
  267:12 268:1
**penalty**  9:25
  265:2 267:16
  268:5
**pending**  200:15
**people**  16:13
  46:20 82:9
  99:10 103:3
  120:2 143:13
  145:6,10 203:25
  210:11,12
  226:23 228:7
  235:7,7 245:13
**percent**  50:14,25
  51:24 55:12,16
  64:21,25 65:11
  65:15,17,20 66:3
  71:3,17,21 72:4
  72:7 73:21,24
  74:18 89:7,9
  90:13,16,17 91:7
  91:9,15,17 106:9
  132:5 141:14,25
  142:5,6,11,13,21
  143:8,10,13
  147:2 161:22

163:5 181:4,4,4
181:5,7,8,11,13
181:16 183:11
183:17,21 188:6
192:11 194:25
195:16 197:15
198:14 199:5
204:24 205:10
206:24 207:11
207:18 208:8,11
208:20,21
209:16,21,25
210:24 211:3,7,8
211:11,15,18,24
212:7,16,23
213:1,6,7 214:2
214:5,9,20 215:3
215:5,14,15
225:16 226:11
247:23 250:14
250:19 251:16
251:23 253:12
253:20 254:12
254:19,20
262:12
**percentage**
  34:21 35:24
  36:13,20 37:1,9
  103:24 104:3
  108:22,23,25
  109:3,6 110:3,19
  118:19 141:7,17
  208:19 209:19
  210:10 212:6,15
  223:9
**percentages**
  142:9

**percentile**
  250:13,13
  251:17
**percentiles**
  250:12
**perfectly**  92:5
  144:4 152:11
**perform**  151:14
**performed**  174:5
  259:13,16
**performing**
  151:19
**period**  129:14
  216:5 223:14
  225:13 267:18
  268:7
**perjury**  9:25
  265:2 267:17
  268:6
**permanent**
  82:12 193:3
**permanently**
  82:14
**person**  118:22
  229:19,21
  235:11 244:16
**personal**  172:7
**personally**  47:2
  54:24 95:5
  131:9 173:2,15
**pertains**  266:13
**ph.d.**  5:15,21
**phase**  230:15,19
  231:4
**phillips**  4:13
  9:15,15 179:18
  179:19

**physical**  14:23
**pick**  181:25
  182:1 217:16
**picking**  181:24
**picture**  175:10
**piece**  107:4,6
  131:2 192:5
**pieces**  47:19,20
**place**  8:14 11:8
  41:19 44:3,10
  55:14 127:18
  129:13 141:19
  237:20 238:2
  266:6
**places**  30:4
**plaintiffs**  3:4
  6:15 9:14 26:16
  28:11 31:21
  45:14 193:21
  223:8
**plan**  30:16 51:16
  117:8 184:20
**plans**  129:7
**platform**  197:4
**play**  40:6 228:7
**playtika**  170:21
**please**  8:7 9:7,22
  33:22 38:1 42:8
  43:21 58:5,16
  68:21 69:3
  77:21 79:12
  80:25 83:9
  94:17 103:14
  112:9 118:12,12
  122:4 123:18
  126:20 130:3
  132:11 133:8
  139:20 143:1,25

[please - present]

149:24 153:16 154:10 157:13 160:14 164:8,25 164:25,25 167:5 169:4 171:6,6 186:23,23 191:13,14 194:14 196:25 200:13 202:13 205:15 207:6 212:8 213:18,19 215:8,8 218:20 219:24 223:23 227:16 228:22 230:20 232:4 235:24 243:19 249:12 258:4 259:8

**pllc** 3:13
**plurality** 106:3
**plus** 136:17,18
**pocket** 170:20
**point** 19:13 30:19 31:3 37:5 41:18 42:7 51:20 55:19 64:19 68:14 70:22 77:13 78:25 95:12 102:11 103:1 109:18 115:15 116:17 122:17 126:15,17,21 127:7,21 132:8 132:12,20,24 140:10 149:2 152:5 155:8 177:23 201:16

202:5 203:3 206:24 207:5 215:16 219:11 220:13 224:21 226:7 231:2,5 235:6 246:4 253:18 261:12
**pointed** 21:12 51:10 128:15
**points** 51:8,8 124:8 127:4 128:6,10,23 129:2,16,25 139:15,16 140:8 152:10 214:22
**pool** 88:12
**pooled** 88:11 90:15
**pooling** 90:14 91:6,8
**popped** 14:18
**popular** 74:5
**popularity** 121:13
**populate** 25:23
**populated** 27:11
**population** 53:14,15 87:1 89:3,18 91:20 203:1,5 228:3 235:18
**portion** 35:1 36:10 64:15 106:5 220:20
**portions** 14:6 16:15
**portrayal** 177:25

**position** 187:10 190:20
**positive** 116:4,5 204:9 243:7,24
**posits** 156:19
**possibilities** 100:7
**possibility** 78:4 78:5 226:23
**possible** 55:11 90:11 98:15 100:15,19,24 138:19 150:10 168:9 234:24 244:11 255:5
**possibly** 38:21 48:14 126:11 199:4
**posted** 27:16
**potential** 76:7 101:8
**potentially** 90:6 178:22 190:6 191:8 252:18
**power** 248:6
**practical** 239:1
**practice** 100:23 101:1
**practicing** 3:15
**precise** 87:13 149:10 178:12 204:23 221:8
**precisely** 141:19 153:12 234:14
**precision** 86:15 169:15
**predict** 113:1,15 113:17 118:15

134:21 197:23 229:2
**predicted** 193:14 228:15
**predicting** 114:5 114:7
**prediction** 245:23
**predictions** 119:18
**predicts** 177:4 192:24
**predominant** 230:12
**predominantly** 133:6,10
**preface** 63:16
**preferable** 28:2
**preference** 258:10
**preferred** 64:13
**preliminary** 12:5 29:18
**premise** 104:21 159:12
**prepare** 31:22
**prepared** 16:6 19:19,21 21:24 240:23
**preparing** 37:18
**preponderance** 23:14,24 36:7,11 36:22,25
**prescription** 182:14
**presence** 145:7
**present** 5:14 9:9 126:4 130:1

Page 40

**[present - pricing]**

| | | | |
|---|---|---|---|
| 205:6 | 105:5,6,13 | 159:5,17 162:22 | 127:3,23,24 |
| **presented** 140:3 | 108:24 109:14 | 162:23,25 | 128:1,2,15 129:6 |
| **pressure** 96:4 | 110:4 111:1 | 164:22 165:17 | 132:6 134:13,18 |
| 248:10 | 112:17,23,24 | 169:18 175:23 | 134:22 135:18 |
| **presumably** 82:8 | 113:2,17 114:7 | 176:8 181:9,13 | 136:18,20 138:5 |
| **presume** 173:14 | 115:8 116:4 | 184:13,19,23 | 138:11,12,13,14 |
| 221:11,13 230:1 | 117:3 118:19,20 | 185:10,24 | 138:16 143:11 |
| 248:15 | 119:6 120:7,22 | 190:24 193:10 | 145:15 148:2 |
| **pretty** 31:2 | 121:1,7,21,22 | 193:13 198:17 | 149:6,10,11,21 |
| **prevail** 198:15 | 122:6,7,20,22 | 199:1 210:24 | 149:23 150:2,5 |
| **prevalence** | 123:8,10 124:8 | 212:5,14 214:22 | 150:17 152:25 |
| 124:7 | 127:14,22 128:5 | 215:16 239:23 | 159:23 160:3,9 |
| **prevalent** 127:18 | 128:10,22,23 | 240:12 241:1,12 | 165:3 190:10 |
| **prevent** 187:15 | 129:2,11,13,16 | 241:12,13,20,22 | 192:13,16,20,23 |
| **preventing** | 129:25 130:2 | 241:23 242:6,7 | 198:2 212:4,13 |
| 145:24 | 131:23 133:20 | 242:13,13 243:3 | 215:2,13 239:20 |
| **prevents** 144:9 | 134:1,13,20 | 243:7 245:12 | 240:6 241:14,15 |
| **previous** 16:5,8 | 135:2,4,8,11,15 | 246:19 250:13 | 261:9,10,23 |
| 18:5 19:23 | 135:18,25 136:2 | 250:13,22 251:7 | **pricing** 105:21 |
| 38:13,18 46:2 | 136:3,5,9,12 | 251:9,21 254:13 | 113:23 114:1 |
| 62:4,11,16,17,18 | 137:8,9,12,13,24 | 256:4,5 257:7 | 115:19 118:15 |
| 72:12 124:8 | 138:4,7,21,22 | **priced** 115:7 | 119:19 123:24 |
| 127:11 194:20 | 139:1,3,7,15,16 | 123:5 148:4 | 124:16 125:3,25 |
| 234:18 253:12 | 139:18 140:1,7,7 | 156:1 245:24 | 126:6,8,16,18,22 |
| **previously** 7:10 | 141:20 143:18 | **prices** 22:17 | 127:7,10,16,21 |
| 19:11 45:1 | 143:20,22 144:3 | 81:18,19 82:18 | 129:5 130:19,19 |
| 179:9 245:13 | 144:8,14,25 | 82:22 83:5,10,16 | 132:8,12,20,25 |
| **price** 50:14,22 | 145:9,12,17,23 | 102:22 103:20 | 133:7,11 134:1 |
| 50:24 57:8 | 146:8,10,19 | 104:3,5 105:1 | 134:15 138:23 |
| 63:12 64:16,24 | 147:3,10,21 | 107:10,18 108:7 | 138:24 140:1,12 |
| 76:12,14,15 77:1 | 148:5,10,11,12 | 109:6,10 110:3,5 | 140:17,24,24 |
| 77:10,16,24 | 148:17 149:8,10 | 110:9,19,20 | 141:8,8,9 142:20 |
| 78:11 79:7,14 | 149:12,22 150:3 | 112:3 120:10 | 144:4,15 145:2,7 |
| 81:7,8,9,9,15,15 | 150:11 151:12 | 123:1 124:7,12 | 147:11,20 |
| 81:25 82:6,11,13 | 153:10 154:19 | 124:12,13,14,20 | 151:14 155:8 |
| 82:19,19,23 83:2 | 154:24 155:1,4,6 | 124:23,24 125:1 | 189:24 210:23 |
| 83:7,12,15,18 | 155:10,15,17,18 | 125:7,19 126:19 | 212:25 255:19 |
| 84:15,17,18,19 | 155:24 158:23 | 126:25,25 127:2 | 256:5 257:8 |

Veritext Legal Solutions
866 299-5127

**[primarily - projection]**

| | | | |
|---|---|---|---|
| **primarily** 199:2 | 212:10 | 190:11 198:19 | 192:10 197:12 |
| **primary** 75:20 | **problematic** | 199:1 239:24 | 199:11 200:1 |
| 99:22 104:18 | 101:11,12 | **production** | 219:23 238:17 |
| 119:25,25 | **procedure** 73:19 | 45:15,25 46:1,12 | 239:19 249:5 |
| **prince** 21:12 | 89:15 94:13,20 | 48:1 96:3 97:23 | 253:5 255:3 |
| 126:24 172:3 | 96:20 183:12 | 146:23 147:16 | 262:10 |
| **prince's** 134:25 | 232:22 253:11 | 151:18 173:15 | **professors** |
| 146:7 | 254:11 256:12 | **productions** | 126:23 |
| **principle** 138:9 | 267:19,20 | 45:13 46:2 | **profit** 80:12 |
| 138:10,18 168:8 | **procedures** 36:9 | **products** 143:16 | 104:24 109:12 |
| 220:17 251:15 | 88:18 | 148:1,1,16,16 | 113:6 117:2 |
| **printed** 258:7 | **proceed** 13:2 | 149:5,7 150:12 | 138:7,22 139:6 |
| **prior** 17:4 18:3 | **proceeding** 9:7 | 198:18 242:19 | 147:25 148:5,15 |
| 18:12,16,17 19:6 | 12:1 40:15 94:9 | 242:20 | 149:6,11,23 |
| 19:15 20:2,7,11 | **proceedings** | **professional** | 150:4 154:22 |
| 20:17,20,23 21:6 | 140:25 246:4 | 2:20 266:2 | 155:3,19 158:23 |
| 21:21 24:13 | 266:5,8,9,15 | **professor** 8:17 | 160:7 167:17 |
| 39:11 61:25 | **process** 16:7 | 11:6,13,16 12:1 | 178:24 242:13 |
| 62:10 63:20 | 33:15 51:24 | 12:19,21 13:9,24 | 247:18 |
| 65:1,16 163:13 | 52:2,24 53:11 | 14:22 15:1,9 | **profitable** 139:1 |
| 163:15,20 | 55:22 79:4 | 16:3 22:1,7,13 | 148:11 |
| 179:10 197:13 | 153:9 155:8 | 23:17 25:13,18 | **profitably** |
| 199:12 266:8 | 231:7 239:1,12 | 26:5,12 27:21 | 150:12 |
| **priority** 152:4 | 249:6 | 35:22 37:10 | **profits** 104:25 |
| 152:13 252:20 | **processing** 48:19 | 39:3 42:6,9 | 138:11,15,18,18 |
| **priors** 228:3 | 52:14,16,19 | 44:12,25 47:1 | 139:5 143:17 |
| **probability** | **produce** 47:8 | 50:11 51:5 54:1 | 150:17 192:20 |
| 250:20 | 80:11 251:17 | 55:13 60:17 | 198:3 239:23 |
| **probably** 14:5 | **produced** 26:16 | 64:25 69:5 | 240:8 |
| 27:3 46:21 | 28:11 39:14,24 | 78:10 80:24 | **programmers** |
| 53:21 72:25 | 148:1 167:1 | 85:10 92:9 | 55:4 |
| 73:1 165:5,5 | **producers** 80:5 | 102:1 107:22 | **progress** 56:6 |
| 220:7 225:19 | **produces** 85:25 | 117:21 120:6 | **prohibits** 187:12 |
| 254:24 | **producing** 153:6 | 134:25 139:9,14 | **project** 16:11 |
| **problem** 15:21 | **product** 105:18 | 146:7 150:25 | 257:11 |
| 16:1 26:2 46:19 | 108:13 110:24 | 152:24 174:5 | **projection** |
| 47:12 54:21,23 | 112:19 154:4 | 180:1,13 182:25 | 133:25 134:9 |
| 101:13 121:19 | 155:22 186:4 | 186:14 190:15 | |

Veritext Legal Solutions
866 299-5127

**[projects - question]**

**projects** 229:10
**promise** 255:5
**proper** 135:8
  140:7
**properly** 79:6
  137:19
**proposals**
  140:23
**propose** 239:1
**proposed** 128:22
  239:12
**proposing** 204:3
**proposition**
  158:15
**provid** 225:19
**provide** 17:25
  70:4,14 74:19
  94:2 96:24
  137:22 172:20
  177:21 249:20
  252:21
**provided** 11:18
  18:8 26:21 80:4
  87:12 95:7
  194:23 210:4
  241:21 263:17
  267:19 268:8
**providers** 248:2
  248:6
**provides** 97:14
  135:10
**providing** 158:7
**provision** 168:15
**prudent** 159:8
**public** 96:23
  97:5 162:10
  174:4

**publishing**
  162:11
**pull** 179:12
**purchase** 82:18
  84:24 102:21
  105:24 106:6,14
  107:9 111:17,18
  113:14,16
  114:20 115:11
  115:22 116:21
  117:24 118:6,6
  118:16,23 119:7
  119:20 120:8,20
  121:5,14 135:18
  137:1 164:22
  165:18 167:4,8
  167:25 185:19
  197:25 235:17
**purchased** 76:4
  76:5 105:2
  246:17
**purchases** 22:18
  66:19 67:12,21
  68:4 84:22
  107:2,17 108:6
  108:21 112:12
  118:8,20,23
  119:12,12 121:4
  168:11,14,17
  169:19 207:19
  224:24 235:19
  235:21 236:1
  246:7,10,18
  247:20,23
**purchasing**
  105:4
**pure** 240:10

**purported** 23:18
**purporting**
  26:17
**purpose** 12:13
  17:24 19:3
  20:17 30:10
  74:17,23 94:1
  104:18 106:25
  119:25 138:1
  161:6 185:3
  232:5 257:7
**purposes** 14:7
  39:25 45:6 50:5
  68:18 71:10,24
  73:9 79:22
  102:3,10,14
  105:17 137:21
  171:3 172:25
  173:19 186:6
**pursue** 11:24
  90:20
**pursued** 90:12
**pushed** 186:21
**put** 11:7 31:15
  88:16 97:20
  99:11 139:10
  152:13 217:13
  259:2
**putatively**
  241:15
**putting** 79:21

**q**

**qualify** 95:2
**quality** 8:8,9
  76:9
**quantifiable**
  23:9

**quantified**
  218:10
**question** 14:25
  16:3 17:13
  18:22 19:8,10,20
  20:13 21:8,10,17
  22:5,8,10 23:22
  23:24 24:7,16
  28:22 29:6,24
  30:10 32:14,22
  33:8,21,23 34:14
  35:6,19 36:16
  37:23 40:22
  41:20 45:9,16
  48:17 49:8,14
  50:2,4,6 52:12
  53:5 56:15,22
  58:5,16,23 59:13
  59:14,15 60:1,23
  61:5,7,17 62:1,5
  62:12,19 64:9
  65:7,23,25 67:9
  69:12,17,24 70:9
  71:5,6 73:18
  74:16 75:6 77:5
  77:19,21 78:14
  79:2,12,18 83:9
  84:3,6,10 85:15
  85:16 86:10,24
  88:3 89:25 90:2
  90:24 91:2,12,18
  94:25 95:25
  98:7 99:17
  100:5 101:22
  102:5 103:9
  104:7 105:9
  106:16,21,24
  107:20 108:3,9

Page 43

**[question - real]**

110:11,16 111:4
112:6,8,8,15,20
114:10,15,22
116:1,18 118:11
120:15 121:16
122:4,15 124:4
125:15,17 126:3
127:1,9,13,19
129:19 130:3
131:15 132:11
132:16,18,19
133:8,13 139:9
142:25 143:6,7
143:24 144:6,17
144:18,23 145:4
145:22 146:13
146:21,25
149:15,25 150:7
153:16,17
155:17 157:14
158:4,25 160:14
160:20 161:16
164:7,15,24
165:20 166:7
167:5,10 169:4
169:22 174:2,12
174:13 175:19
178:3,18 180:18
182:5,19 183:4
183:19,23 185:2
185:14,21
186:24 187:18
187:25 189:19
190:19 191:5,14
194:14,18 195:8
195:19 196:24
197:1,10 198:11
199:9 200:14

201:10 202:4,13
202:17 203:11
204:2,19 205:17
207:5,22 208:18
212:8,18 213:16
213:19 215:7,9
216:11 218:7,20
219:1 221:19
222:3 223:25
224:3 227:16
228:23,25 230:9
230:20,25
231:15 232:14
232:18 233:13
234:3 235:24
237:19,22 238:6
239:6 243:18,20
244:5,13,15,18
245:2,3,7,19
246:12,23 247:6
249:12 256:8,14
256:20 257:12
257:24 259:13
259:23 260:14
262:23
**questions**   11:24
12:2,20 14:6
19:21,23,25
41:24 125:18
151:5 199:18
200:1,9 222:10
237:16 255:2,18
255:24 257:18
258:21 259:16
260:5 261:7
**quick**   247:20
255:24

**quickly**   221:9
**quite**   17:12
48:25 54:7
56:11 65:14
72:21 169:12
194:4 227:23,24
228:1 251:7

**r**

**r**   269:3,3
**r&s**   268:1,9
**r.s.**   4:13
**raise**   9:22 22:6
**raised**   17:14
18:25 20:25
33:3,5,13 61:19
172:2,3,3
**raising**   22:5
**random**   73:12
76:2 85:18 86:3
86:11,18,20
87:18 90:13
91:9 93:11,15
161:23 212:3
214:5
**randomly**   73:16
**range**   86:15
149:1 181:3
195:1,5 254:20
**ranges**   254:14
**rarely**   76:4,5
**rate**   65:1,11,13
65:13,13,16,17
65:21 66:2,3
159:18 160:5,13
160:17,18 161:1
184:24 192:11
193:9,23 194:7

194:13,16,22
195:1,13,17
196:5,10,13,20
197:8,15,20
198:3,9,14 199:6
**rates**   194:21
**raw**   235:15,15
**reach**   41:4
144:12,23
**reaction**   48:14
**reactions**   242:23
**read**   26:19 28:1
35:2 36:19
69:12,16 81:2,4
85:14 107:21,23
108:2 144:19,22
146:16 180:24
181:17 195:21
196:2 197:18
199:6 200:4,6
210:10 214:3
215:8 221:22
222:5 224:6
255:22,25 257:2
257:4 265:2
**reading**   32:3
180:16 225:3
261:5 267:23
268:9
**reaffirming**   22:1
**real**   117:25
118:17 119:8
135:25 136:8,13
137:13 138:21
147:22 148:4,9
148:17 149:13
150:5 175:6
184:12,22

Page 44

**[real - refreshes]**

| | | | |
|---|---|---|---|
| 186:15 187:1 242:12,17 243:7 | 235:8 237:4,10 248:1,12 256:23 258:24 | 39:1 44:20,23 54:20 61:10 68:9 69:16 | **refer** 85:5 115:13 120:17 130:8 133:18 |
| **realistic** 158:1 | **recap** 200:25 | 80:22 96:24 | 135:23 155:12 |
| **reality** 150:21 | **recapped** 70:11 | 108:2 117:16,19 | 237:21 238:3 |
| **really** 45:21 | **receipt** 24:5 | 139:11 144:22 | **referee** 33:14 |
| 63:17 99:8 | **received** 11:11 | 152:19,23 | **reference** 114:19 |
| 204:2 | 11:14,22 12:3 | 160:25 186:9,12 | 261:22 |
| **reason** 13:10 | 28:13 | 186:19 219:18 | **referenced** 267:6 |
| 119:16 145:14 | **recess** 44:22 | 219:22 224:17 | **referred** 18:16 |
| 163:14 269:6,9 | 80:21 117:18 | 238:10,11 | 64:16,22 211:12 |
| 269:12,15,18,21 | 152:21 186:11 | 248:25 249:3 | **referring** 23:19 |
| **reasonable** | 219:20 249:2 | 263:24 266:9,12 | 24:19 31:23 |
| 111:24 117:12 | **recipients** | **recorded** 8:12 | 69:8 73:11 |
| 121:1,6 123:14 | 145:11 | 8:16 | 83:11 85:4 |
| 123:17 178:9 | **reclassification** | **recording** 8:8,13 | 142:9 154:21 |
| **reasoning** 101:9 | 46:19 49:21 | **recover** 155:3 | 156:9 163:11 |
| **reasons** 111:24 | 50:9 51:9,14 | 226:8 | 174:10 228:9 |
| 119:3 128:13 | 59:19 65:9 | **recovery** 218:11 | 250:1 260:24 |
| **rebecca** 1:21 | 206:11 252:23 | 218:17,22 | **refers** 261:17 |
| 2:20 9:1 266:1 | **reclassifications** | 225:16 226:24 | **refine** 172:5 |
| 266:24 | 57:2 | **redefine** 227:6 | **reflect** 30:8 |
| **recalculate** | **reclassified** | 234:22 | 51:22 81:17 |
| 140:2,18 208:7 | 45:15 46:6 | **redefined** 23:20 | 82:12 87:4 |
| **recalculated** | **recognize** 12:13 | **redefinition** 24:9 | 204:8 220:18 |
| 209:19 | 258:13,16 | 119:3 229:8 | **reflected** 56:12 |
| **recalculation** | **recollection** 43:8 | **redone** 228:3 | 147:20 201:20 |
| 92:24 206:12 | 72:16 98:8 | **reduce** 145:17 | 217:11 |
| 254:10 | 170:18 180:7,19 | 192:16 | **reflection** 129:22 |
| **recalculations** | **recommended** | **reduced** 192:20 | 129:24 166:11 |
| 54:9 | 194:9 | 223:10 231:20 | **reflects** 49:17 |
| **recall** 39:18 48:4 | **reconciling** | **reduction** | 198:14 208:22 |
| 72:10,11,21,24 | 48:16 | 248:13 | 243:4 |
| 98:10 99:18 | **reconsidered** | **reductions** 81:9 | **refresh** 25:22 |
| 124:6 127:5 | 22:9,22 | 81:15 82:19 | 170:18 180:18 |
| 146:14 158:17 | **record** 8:6,15 | **reexamined** | **refreshed** 205:16 |
| 169:23 170:4,20 | 9:10 11:8 13:21 | 63:18 | **refreshes** 25:13 |
| 171:4,8,14,18 | 15:13,22 28:3 | | 180:6 |
| 178:25 194:24 | | | |

Page 45

**[regard - report]**

| | | | |
|---|---|---|---|
| **regard** 173:17 173:23 | 249:11,15,17,20 250:7 253:8,15 | **remind** 69:3 143:1 262:21 | 262:16 |
| **regarding** 11:17 34:21 35:24 236:6 237:7 | **reliable** 61:1 104:2 107:11,12 107:16 108:5 195:17 201:3 231:12 233:4 | **remotely** 1:13 2:18 8:23 266:6 | **report** 6:13 11:13,16 13:22 14:2 15:4 16:4 16:15,20 17:1,3 17:11,13,17,21 17:22,25 18:9,16 18:24 19:3,22 20:7,10,17,18,19 20:25 21:1,4,11 21:15,18,22 22:3 22:11,21 23:4,15 23:16,19,23 24:3 26:18 28:17 29:2,13,22 30:17 31:16,22 32:17 34:16,19 37:11 37:14,19,22 39:7 39:11,25 40:21 43:1,10 51:18,21 54:6 57:19 58:3 58:8 61:20 63:3 63:23 65:3 66:3 66:10,13,21 70:11 71:20,20 72:11 74:10,19 75:10 77:14 81:1 85:11 89:15 92:13,23 93:19 96:5 97:19,22,25 98:5 98:10 99:21 102:6 103:15 115:9 118:25 123:19 124:10 126:13,22 128:18 129:3 130:6 131:21 |
| **regardless** 75:11 107:16 108:5 156:1 | | **remove** 162:18 225:6 232:2,10 | |
| **regards** 140:24 | **reliably** 107:9,18 108:7 113:15,18 119:5 169:17 231:25 232:8,15 | **removes** 261:3 | |
| **region** 136:16 | | **removing** 261:18 | |
| **registered** 2:20 266:1 | | **renewal** 248:14 | |
| **regulation** 125:10 | **relied** 38:9,12,16 38:20,23 195:23 | **repeat** 33:22 77:21 79:12 83:9 94:17 112:8 118:12 122:4 130:3 132:11 133:8 143:25 149:24 160:14 164:7 167:5 169:4 183:18 186:23 191:14 194:14 200:13 202:13 218:20 227:16 228:23 230:20 235:24 243:19 249:12 | |
| **regulatory** 125:5 | **relies** 198:7 | | |
| **reject** 159:12 | **rely** 37:18 38:24 39:24 54:21 172:24 256:11 258:3 | | |
| **related** 9:3 19:23 29:10 165:17 233:18 | | | |
| **relates** 238:16 | **relying** 38:22 39:10 40:13,17 104:20,22 173:7 173:9 | | |
| **relationship** 233:1 | | **repeated** 74:2,6 168:1 | |
| **relative** 58:11 220:20 266:18 | **remain** 201:23 | **replacement** 91:20,25 | |
| **relatively** 82:8 139:1 219:7 252:8 | **remainder** 204:1 | **replied** 14:3 | |
| | **remained** 16:10 139:7 | **reply** 17:7 21:1 21:15,22 38:10 72:11 146:5 171:25 200:22 238:25 258:8,14 258:17 259:2,15 259:22,24 260:7 260:10 262:6,13 | |
| **released** 267:21 | **remaining** 68:19 204:11 | | |
| **relevant** 17:14 22:2 36:24 59:8 62:5,12,17,18 74:20 75:10 95:4 158:22 174:17 178:1 200:8 235:17 | **remains** 11:18 16:11 203:2 | | |
| | **remand** 44:3 | | |
| | **remanded** 43:25 | | |
| | **remember** 44:7 44:8 48:7,9 66:11 106:8 163:15 170:9 181:20 239:4,8 255:17 | | |
| **reliability** 61:7 62:19 119:13,14 231:23 233:1 | | | |

Veritext Legal Solutions
866 299-5127

**[report - responsive]**

| | | | |
|---|---|---|---|
| 139:21 141:4,24 142:6,14,21 146:5,15 147:5 149:19 150:19 150:24 153:13 156:10 158:18 161:19 163:20 170:14,24 171:12,23,25 172:1 173:25 179:4,6,25 189:18 191:18 192:4 193:18 195:9,21,22 196:1,7 197:12 197:17,18 199:7 199:11 200:4,17 200:19 201:1 205:2,11,12,18 205:24 207:7 209:14 210:15 214:19 215:22 217:12 218:14 223:4 224:7 234:14 235:9 236:6,10,16,20 237:6,20 238:2 238:25 239:11 249:22 255:10 257:2,9 258:1,5 258:8,14,18 259:2,15,22,24 260:7,10,16 261:11 262:7,14 262:16 **reported** 1:13,20 2:19 47:16 48:20 70:24 | 92:22 205:24 226:16 263:7 **reporter** 2:21,21 2:22 9:1,16,21 9:24 14:9 25:8 27:9 69:12 266:2,3,3 **reporters** 117:14 **reports** 16:5,8 17:4 18:3,6,12 18:17 19:2,6,15 20:3,7,11,21,23 21:3,6,21 24:13 33:19 34:1,12 38:10,13,17 39:4 40:13 65:1,16 70:22 94:1 99:10,15 120:17 124:8 125:12,14 147:15 158:14 163:13,15 170:10 188:11 197:13 199:12 200:6,22 205:9 237:3 **represent** 81:8 94:6 163:18 245:16 **representation** 68:3,7 **representative** 75:14 173:20 174:3 177:19 245:4 **representing** 8:24 **represents** 259:8 | **reprint** 14:2 **reprocess** 52:10 **reproduce** 176:2 **reproduced** 51:13 **reputation** 199:3 **request** 24:2 216:25 **requested** 216:2 266:16 268:1,9 268:10 **requests** 17:2 18:10 97:6 **require** 12:14 21:19 68:19 100:12 247:17 253:21 **required** 11:13 33:1 50:9 53:13 105:15 156:14 201:17 244:21 252:21 **requirements** 33:10 **requires** 30:2 104:12 125:2 234:10 247:1 **requiring** 228:20 **reread** 170:24 205:15 **resampling** 86:6 **research** 5:19,20 131:12 190:1 **reserving** 11:23 **resolve** 49:24 **resolved** 231:20 **resources** 75:22 | **respect** 14:24 40:5 89:19 101:16 128:8 171:2,16 194:13 194:16 226:19 240:16 252:6 256:10 **respectfully** 199:24 **respective** 149:11 154:3 173:21 **respectively** 183:11 205:20 **respond** 19:4 32:9 33:11,15,16 172:1 188:23 242:6 **responded** 97:6 **responding** 142:8 216:24 **responds** 23:24 240:12 **response** 17:1,23 63:16 82:7 110:12 111:1 115:1 125:14,15 125:16,17 155:16 161:2 234:18 240:14 244:6,14 248:10 256:8 257:23 **responses** 12:21 32:16 227:5 **responsible** 49:2 49:3 **responsive** 18:8 233:13 |

Veritext Legal Solutions
866 299-5127

[rest - rifkin]

rest   9:17 36:8
restart   234:23
restate   16:2
   196:25 212:8
restricted
   138:14 145:16
restriction   24:4
   24:24 178:9
restrictions
   44:10 143:11
   149:8 177:24
   187:4,14
result   56:24
   58:14,19 59:18
   62:2,2 79:20
   81:19 87:18
   101:20 105:22
   128:16 129:17
   137:14,24
   143:21 144:3
   198:17 225:15
   231:19 248:15
results   7:6 47:9
   49:23 54:1,2,12
   59:24 61:1
   64:14 65:2,12,18
   66:4 70:24 77:3
   77:9 88:14,25
   89:12,17,20 90:4
   109:15 140:3,18
   141:13 153:5
   169:24 170:2
   206:20
retained   94:2
return   267:17
   268:6
revealed   162:12

revenue   72:3
   73:21 74:1,5
   156:15 167:19
   192:18
revenues   166:3
   188:6
reverse   155:21
   155:21 178:23
   186:4
review   11:19,21
   35:1 36:5 60:25
   163:15 182:7,18
   254:2 256:22
   266:15 267:8,10
   267:13 268:2
reviewed   40:8
   40:11 167:1
   239:7
revise   30:16
   206:6 210:18
revised   11:14
   12:20 26:24
   28:10,16 29:1,16
   51:5 56:12 57:6
   57:13,23 58:20
   151:17 201:20
   202:2 204:6,16
   209:7 211:9
   213:5 216:17,20
   219:24 223:22
   224:13 227:21
   250:1,4,5 252:24
   253:5 261:13
revision   12:23
   29:7,8,9,12 30:8
   53:9 59:3
   213:14 216:19
   236:13

revisions   11:14
   11:24 12:3
   29:20 30:4
   51:17 206:1
richman   4:14
riesdorph   5:22
rifkin   3:6,11 6:6
   9:13,13 11:10,12
   12:7,9 13:5
   14:14,17,20 15:5
   15:11,14,18,21
   15:23,25 18:14
   18:18,20 19:7,17
   20:12 21:7 22:4
   22:19 23:1,11,21
   24:15 25:4,12,17
   26:1,2,5,9 27:11
   27:14,19 28:21
   29:5,23 32:13,21
   33:7,20 34:3,13
   35:5,10,12,15
   36:4,15 37:13
   41:15 42:1,3
   44:15,16 45:3,8
   49:7 50:1,12
   52:11 53:4,22
   55:8 56:14,21
   57:10,15 58:22
   59:12,25 60:22
   61:4,16 63:5,7
   64:8 65:6,22
   67:8 69:7,11,23
   70:8 73:17
   74:15 77:18
   78:13,24 79:17
   80:18 84:2,9
   86:23 88:2
   89:24 90:21,23

91:11 92:14,17
94:24 95:24
98:6 99:16
100:4 101:21
103:8 104:6
105:8 106:15,23
107:19,25 108:8
109:17,25
110:10 112:5
114:9 115:25
116:16 117:7,8
118:10 120:14
121:15 122:14
124:3 129:18
131:14 132:15
133:12 139:8
142:24 144:5,16
144:21 145:3,21
146:12 149:14
150:6,25 151:6
152:18 158:3,24
164:7,14 166:6
167:9 169:21
175:18 178:2,17
179:12,14,21,23
180:4,8,11,17,22
182:4,20 183:3
183:18,22 185:1
186:20 190:18
191:4 194:17
195:7,18 196:23
197:9 198:10
199:8,16,20,24
200:10 201:9
202:3,16 203:10
204:18 205:3
207:21 208:17
212:17 215:6,17

Page 48

[rifkin - san]

218:25 219:9,13
219:16 220:9,13
222:2 223:24
224:8 230:8,24
231:14 232:17
234:2 237:18,23
237:25 238:7,10
239:5 243:17
244:4 245:1,6,18
246:11,22 247:5
248:19,22,24
255:1,7 262:2,15
262:20 263:11
263:14,20
**right** 9:22 11:5
12:4 13:4 14:19
15:24 16:14
27:20 29:14
31:5,19 34:5
38:7 42:15
44:25 71:13,14
78:12 80:16
95:20 116:8
117:14 123:2
125:21 130:25
141:15 142:3,7
142:23 144:20
150:5 152:15
154:9 156:21
157:15 165:5
171:11 174:23
175:17 179:16
180:25 182:2
183:11,16,21
186:7 200:12,18
200:22 203:9
204:25 206:2
207:15,16,20

208:4,8,12
209:22 210:19
211:1,4 212:1
214:12,18
219:23 220:2
221:15 223:1
224:22 225:3,7
225:11,21
229:17 252:16
253:23 254:15
254:24 256:7
259:12
**rights** 11:23
**rise** 109:6
**rival** 190:23
197:24
**rivalry** 240:3
242:10 243:5
**rivals** 126:4,7
190:25 240:13
**road** 97:14,17
**robux** 189:3
**role** 44:5 132:19
153:8 228:7
**romano** 1:21
2:20 9:1 266:1
266:24
**room** 44:19
**rosa** 193:22
**rough** 31:13
60:4 64:5 72:8
221:2
**roughly** 31:14
41:21 139:15
214:10 226:10
**round** 21:13
205:25

**row** 212:24
214:8
**rows** 250:11
**royalties** 79:24
80:5,8 166:3,4
**royalty** 164:23
165:12,16 166:1
**rpr** 1:21 266:24
**rule** 121:18
141:1
**ruled** 102:13,15
**rules** 24:10 44:9
46:9 268:8
**ruling** 230:11
**rulings** 246:2,3
**run** 86:2 88:12
89:8 95:22,23
101:19,25
139:14 161:6,7,8
161:11,13,15
169:19 193:3
219:16 262:10
263:4
**running** 88:9
89:6 90:15,16
170:2
**runs** 192:8
**rush** 82:10
**résumé** 14:2

**s**

**s** 6:10 7:1 269:3
**sabre** 43:19,22
44:10
**sale** 82:7,11,13
82:13
**sales** 191:12,16
191:20

**sample** 21:14
50:14 51:1
64:21 69:1,21
71:8,10 72:7
73:24 74:9 76:2
86:25 87:1,5
88:20 89:2,9,17
90:15,16,17 91:7
91:9,17 92:4
141:14 143:10
152:12 161:23
190:5,8 200:24
203:1 205:10
206:25 211:11
211:16 213:7,23
214:5 253:20
254:10
**samples** 51:24
52:2,10,24 53:11
55:12,16 70:14
71:3,18,21,24
72:5 73:12,12,16
74:2,6,13,25
75:8,12,14 85:18
86:3,12,16,18,20
87:7,8,18 88:10
88:11,15,16,21
89:7 90:13,14
91:9,15 93:6,11
93:15 141:15
207:1 211:13
212:3,12 215:1
215:12 249:18
251:17
**sampling** 73:5
89:4,4
**san** 5:10

[sat - set]

sat  100:7,7 102:7
satisfactory  92:5
saturday  27:3
sauer  41:7
saying  20:1
  62:13 63:17
  83:24,25 95:2
  149:9 176:6
  187:11,14
  233:14 237:11
says  138:2,22
  181:3 220:11
  261:2
scale  52:14
  134:19 200:23
  201:4 220:23
scales  158:11
scaring  157:15
scenario  142:1
  143:21 215:16
  256:5 257:8
schedule  30:19
  31:1 135:20
  267:10
scheduled
  151:25
scope  108:12
screen  8:11
  25:13,20 28:1
  255:11 258:9
scroll  180:12
sealed  245:12
seamlessly  192:8
search  131:10
searched  131:4,6
searching
  131:12

second  15:11
  44:3 69:9 70:16
  91:5 123:6
  127:6 144:16
  151:21 161:21
  202:20 223:6
secondary  237:8
  237:9 238:15
secondly  227:10
section  50:15
  137:21 152:11
  182:7 201:1
see  13:2 15:12
  25:22 34:24
  35:11 39:5,15
  57:9 63:15
  64:23 65:11
  69:2,22,25 80:18
  81:12 85:20,22
  98:20 103:21
  127:20 130:10
  131:25 133:21
  135:7,21,22
  137:6 138:25
  140:4 141:11
  143:5 153:18
  160:25 170:18
  177:3 179:25
  180:6 192:15
  203:21 206:8,19
  214:17,23 216:6
  221:8 223:15
  227:21 232:25
  240:3 259:4
  260:24 261:5
seeing  169:24,24
  170:4

seek  90:8,8
  104:24
seen  8:10 26:13
  172:22
segment  145:10
select  73:20
selected  73:16
  98:4 100:25
  101:16 148:9
selecting  73:20
  74:1,18 75:25
sell  44:11 159:5
  159:12 186:15
  187:1,5 189:8
  199:1
seller  124:13,14
  124:21 127:4
sellers  124:16
  128:16 242:11
selling  185:9,24
  187:12 188:17
  192:18
send  44:18
sense  37:6 41:19
  49:21 89:16
  134:16 137:23
  219:11
sensible  62:25
sensitive  66:1
  155:16 184:1
sensitivities
  262:10
sensitivity  63:12
  64:16,24 76:12
  76:14 77:2,10,16
  77:24 78:11
  79:7,14 169:18
  241:2,13,20,22

243:4 258:22
  259:9,14,16,20
  260:1,5,11
  262:24 263:4
sent  11:20 25:4
  26:23,25 205:25
sentence  34:7
  69:10 103:18
  135:22 161:21
  162:3,8 217:14
  223:7 261:2
separate  78:17
  83:4 91:15
  168:9 190:13
  194:4,11 240:22
separately  76:17
september  6:17
  96:6
series  16:25
  70:13 145:6
serious  157:9
  248:3
service  156:15
services  171:2
  171:10 248:2,16
set  20:11 22:2
  28:10,13 31:23
  43:12 58:14,19
  59:4 61:11 65:5
  86:11,20 87:7
  92:12 105:1
  108:15,19
  149:18 165:18
  170:13 172:4
  192:23 239:20
  240:5,17 241:15
  266:6

Veritext Legal Solutions
866 299-5127

[sets - sort]

**sets** 86:2,18 88:6
  100:15 252:11
**setting** 125:5
  131:23 134:1
  173:19 181:22
  239:23 241:12
**settlement**
  128:21 129:17
  129:21
**share** 13:22 14:5
  14:12 25:6,18
  27:6 106:4
  179:9,11,16
  181:1 198:25
  212:25 216:3,15
**shift** 14:7
**shifted** 62:13
**short** 46:13 82:9
  89:2,18 161:7,13
  161:15 171:24
  193:4 248:18
  255:5
**shorthand** 2:21
  266:2,10
**show** 35:7 36:10
  150:20 221:16
  221:19,24 223:8
  257:19 259:14
  260:6 261:10
**showing** 257:24
**shown** 27:16
  32:16 257:14
  259:19 260:9,23
**shows** 139:25
  145:20 147:1
  207:10 209:15
  220:3

**sign** 258:17
  267:16 268:5
**signature** 266:24
  267:21,23,23
  268:9
**signed** 258:14,19
**significance** 77:9
**significant** 207:3
  251:8
**significantly**
  133:1
**silent** 111:4,6
  113:10 114:2,15
  117:1 134:15
  141:21 185:14
  193:4 241:14
**similar** 16:7
  48:18 78:18
  80:15 97:1
  242:19
**simple** 70:13
  120:11,18
  121:21 122:1,5
  122:12
**simply** 48:7 59:7
  59:15 99:19
  102:12 181:20
  194:6 216:24
  225:14 228:6
**simulation** 129:9
  133:18,23 134:4
  134:7,9,12 138:5
  139:15,25
  143:20 144:2
  147:1 214:21
**simulations**
  147:18

**single** 19:15
  50:14 74:9
  84:17 89:9 91:7
  113:8 114:4,7,14
  114:16,24 115:5
  117:24 118:6,16
  118:23 119:7,20
  141:14,23,23
  152:12 198:17
**sir** 18:22 261:1
**sit** 20:22 55:15
  72:10 173:17
  222:13 244:19
  256:9
**sitting** 226:13
**situation** 192:19
**situations** 82:4
  135:13
**six** 163:11,19
  166:15 168:6
  172:15 173:18
  174:25 175:5
  252:2
**size** 89:2 91:10
  119:11 135:19
  219:7 231:20
**sized** 198:22
**sizes** 134:3
**slightly** 141:9
  146:8
**slowly** 149:25
**small** 37:8 147:7
  156:22 222:18
  222:20 227:23
  227:24 228:1,7
**smaller** 61:25
  65:5,21 193:14
  210:10

**smolinksi** 126:24
**social** 100:2
**software** 48:19
**sold** 154:1,7,13
  156:21 157:1,7
  189:5
**solemnly** 9:24
**solutions** 8:25
  9:2 267:7
**solve** 153:1
  155:7
**somewhat** 88:6
  102:16 137:8
  220:22
**song** 16:11
**soon** 14:18
  109:24
**sorry** 25:15 34:2
  43:21 50:9
  57:12 58:5 69:5
  76:24 86:4
  90:25 92:15
  95:16,19 110:15
  114:11 125:16
  143:23,23
  149:24 157:12
  167:5 183:18
  188:22 206:8
  209:1 213:5,13
  213:18,24
  223:24 228:22
  250:23 251:25
  253:3 254:14
  255:9
**sort** 101:25
  108:12 182:12
  218:8

Page 51

[sound - statement]

| | | | |
|---|---|---|---|
| **sound** 88:19 | **specifically** | **spends** 112:12 | 55:11,16 56:3 |
| 89:17 152:12 | 16:17 18:24 | 112:13 | 58:3,8,12,17 |
| **soundly** 50:6 | 141:25 166:8 | **spent** 31:9 216:4 | 59:1 62:4,11,16 |
| **sounds** 39:22 | 168:10 217:14 | 225:10,12 | 62:18 63:19,24 |
| 171:11 212:1 | 240:1 242:15 | 228:15 229:2,12 | 64:2 77:6 87:9 |
| **source** 47:12 | 243:25 256:23 | 229:20,21 | 87:11 92:9,21 |
| 48:23 93:16 | **specify** 198:4 | **spoken** 90:10 | 100:23 101:1 |
| 131:17 195:24 | **speculation** | 163:12 | 152:5 162:13 |
| 238:21 | 103:7 114:13 | **spontaneous** | 201:23 207:4 |
| **sources** 75:20 | 226:12 | 125:22 | 249:6,9,13 250:9 |
| 119:11 156:16 | **spend** 83:23 | **sports** 45:12 | 252:21 253:9 |
| 159:10 167:18 | 210:12 216:1,13 | **spotify** 171:5,9 | **standards** |
| 189:21 190:23 | 216:22 217:3 | **spotify's** 242:13 | 240:21 |
| 191:22 | 220:16 221:17 | **spread** 144:10 | **standpoint** 90:20 |
| **south** 4:8 | 222:1,15,20 | **square** 168:19 | 90:22 147:14 |
| **speak** 23:18 | 231:8 | **stable** 125:7 | **start** 110:15 |
| 111:14 156:10 | **spending** 72:4 | **staff** 39:20 42:14 | 131:16 136:21 |
| 193:1 | 94:7 102:18 | 42:14,16,20 47:5 | 140:21 176:7 |
| **speaking** 35:11 | 105:21 109:3,4 | 47:6,7,15 48:15 | 213:19 217:8 |
| 199:19,22 | 109:14 111:1,2 | 48:17 53:1 56:6 | **started** 52:7 96:2 |
| 214:11 224:9 | 111:22 112:1,19 | 60:7 79:21 95:9 | 151:19 |
| 237:23 | 114:1 115:8,16 | 95:9 | **starting** 43:12 |
| **specialized** 41:5 | 119:1,17 120:3,5 | **stage** 70:12,16 | **starts** 31:20 43:2 |
| **specific** 16:13 | 209:15 216:16 | 71:12 73:11 | 136:1 |
| 17:1,23 19:4,11 | 220:4 221:3,10 | 94:10,10 140:9 | **state** 9:7,9,25 |
| 19:24 20:19 | 222:23 223:1,10 | 172:8,11 202:19 | 34:19 35:20,22 |
| 41:6 48:3,4 78:6 | 223:12,19 | 202:20 203:15 | 85:16 88:24 |
| 82:22 105:4 | 224:25 225:2,5 | 203:16 230:11 | 103:18 131:22 |
| 118:2 127:3 | 226:3,18 227:7 | 230:23 233:12 | 135:16 139:24 |
| 128:7 133:2 | 227:22 228:4,8 | **stages** 70:12 | 141:7 153:16 |
| 149:1 154:21 | 228:14,17,21 | 73:9 202:18 | 164:25 188:15 |
| 155:11 158:10 | 229:1,4,7 230:13 | **stand** 18:4 66:16 | 256:16 267:9,12 |
| 162:10 168:15 | 230:14 231:13 | 145:4 231:22 | **stated** 123:22 |
| 170:9 172:2 | 232:3,11 233:6,7 | **standard** 7:7 | 127:6 163:8 |
| 174:8,9 175:11 | 233:16,16,18,21 | 11:17 30:20 | **statement** 12:6 |
| 177:4 181:23 | 233:22 234:16 | 31:3 37:4,7 41:4 | 28:20 31:20 |
| 242:3 | 234:21,23 261:3 | 51:12,15,19 | 46:18 50:18 |
| | 261:4,17,18 | 53:25 54:18 | 140:19,19 |

Veritext Legal Solutions
866 299-5127

**[statement - supplemental]**

| | | | |
|---|---|---|---|
| 185:10 191:7 | **store**  7:5 40:6 | 123:23 130:12 | **substitute** |
| **statements**  24:12 | 66:5 67:4 68:25 | 130:13,17,23 | 242:20 |
| 64:2 | 69:19 73:21 | 131:13 201:19 | **substitution** |
| **states**  1:1 2:1 | 75:15 94:7 | 240:8 | 104:13 191:21 |
| 8:19 46:24 | 105:25 117:22 | **submarket** | **subtracting** |
| 50:12 54:2 | 126:5 127:17 | 192:9 240:20 | 204:9 |
| **statistic**  207:25 | 129:23 147:19 | **submission**  43:9 | **successive**  45:13 |
| **statistical**  59:2 | 151:15 187:5 | 96:5 | **sufficient**  55:6 |
| 62:19,25 79:8 | 197:24 198:24 | **submitted**  54:7 | 151:13 |
| 87:1,9,13 88:20 | 203:8 234:11 | **subpoenaed** | **sufficiently**  44:6 |
| 89:19 100:10,24 | 235:17,21 | 172:18 | **suggest**  37:9 |
| 101:20,25 | 236:11 245:17 | **subscribed** | 58:13,18 199:17 |
| 119:14 134:8 | **stores**  190:17 | 266:21 | 199:25 248:17 |
| 182:12 202:24 | 197:22 198:6,21 | **subscriber**  167:1 | **suggesting** |
| 203:2,6,14,15 | **straightforward** | 167:7 | 235:21 |
| 217:15 | 213:25 | **subscription** | **suite**  5:9 |
| **statistically** | **streaming**  171:2 | 136:25 137:8,9 | **sum**  112:12 |
| 88:18,23 89:14 | **street**  3:18 5:8 | 137:12,14 165:3 | 200:17 214:7 |
| 89:17 92:3 | **strike**  62:25 | 165:9 247:12,16 | 220:19 |
| 207:3 | 97:16 125:23 | 247:22,24 | **summary**  7:4 |
| **statistics**  41:1 | 159:25 188:20 | 248:14,16 | **sup**  20:17 |
| 51:19 87:4 | 225:22 | **subscriptions** | **superior**  217:20 |
| 88:20 216:9 | **string**  6:19 | 137:3 165:4 | 217:24 |
| **status**  86:22 | **structure**  126:3 | 168:11,12,13 | **superset**  38:22 |
| 152:6 | 126:6,9 133:20 | 248:2,9 256:22 | **supervise**  54:25 |
| **stay**  136:18 | 138:15 142:2 | **subsequent** | 55:6 |
| **stenographic** | 159:6 | 11:25 13:3 | **supervision**  3:16 |
| 15:13,22 39:1 | **structured** | 140:25 | **supplement**  17:4 |
| 186:19 224:17 | 157:18 166:2 | **substantial** | 17:5 30:25 |
| **stenographically** | **structures** | 56:11,20 74:21 | **supplemental** |
| 1:20 9:17 | 255:19 | 74:25 75:23 | 6:13 11:16 |
| **step**  177:10 | **studied**  217:1,4 | 79:24 92:6 94:6 | 13:22 14:2 16:4 |
| **stepping**  31:7,7 | **study**  188:4,8,10 | 106:3 187:3 | 16:15,21 17:11 |
| **stipulation** | 237:5 256:9 | **substantially** | 17:13,21 18:9,24 |
| 267:20 | **subclass**  231:18 | 46:8 59:16,18 | 19:3,22 20:6,10 |
| **stood**  48:24 | **subject**  6:19 | **substantive** | 20:18,19 21:4 |
| **stop**  41:19 | 12:22 13:14 | 87:17,22 | 22:11,21 23:4,15 |
| 237:23 | 21:3 54:21 85:1 | | 23:16,19,23 24:3 |

[supplemental - swanson]

26:18 28:17 29:2,13,21 30:25 31:16 32:17 34:16,19 37:11 37:18,22 40:21 43:1,10 51:18 54:2 57:19 58:2 58:7 61:20 63:3 63:23 65:3 66:10,12 68:22 71:19 77:13 80:25 85:11 92:13 96:5 97:18,22 102:6 103:15 118:25 123:19 126:13 129:3 130:6 131:21 139:21 141:4 147:4 150:24 161:19 170:14 172:1 193:18 195:9 197:12,17 199:11 200:16 200:19 201:1 205:2,23 207:7 209:14 210:15 215:21 217:12 223:4 236:6,10 236:16 237:6 239:11 249:22 255:10 257:1,9,9 260:16 261:11 263:16

**supplementary** 66:2 85:3 92:23 153:13 234:14 236:20

**supplements** 38:8

**supplier** 125:4

**suppliers** 178:21 248:16

**supply** 190:14

**support** 6:15 16:6,9 26:22 38:19 161:8 194:22 216:14

**supporting** 79:20 95:9,10

**supports** 22:14

**suppose** 123:4 140:13 240:21

**sure** 17:5,12 24:16 27:15 28:2 50:21 57:15 68:16 77:22 83:10 92:16 94:18 124:19 137:18 140:9 142:14 144:18 153:15 154:11 158:5 160:23 161:7 164:8,24 165:19 172:19 176:5 183:16,20 215:10 224:1,9 226:7 228:24 248:19 251:2

**surprised** 103:12 128:2 228:6

**surprisingly** 56:18,19

**surrounding** 248:13

**sustainable** 125:8

**swanson** 4:6 6:5 6:7 9:12,12,18 11:5 12:9 13:4,8 14:11,14,16,19 14:21 15:14,16 15:20,24 16:1,2 18:16,18,21 19:14 20:1,22 21:20 22:13,23 23:7,17 24:12 25:2,3,10 26:1,4 26:12 27:12,13 27:18,20 28:25 29:12 30:14 32:18 33:4,12,24 34:8,18 35:10,14 35:17,22 36:12 36:23 37:16 39:2 41:15,22 42:2,4,5 44:12 44:14,17,25 47:1 49:12 50:11 52:18 53:10 56:19 57:5,13,18 59:9,21 60:4,25 61:14,21 63:6,10 64:12 65:14 66:5 67:14 69:9 69:15 70:1,19 73:25 75:5 77:22 78:24 79:2,4 80:7,16 80:24 84:6,14 87:16 88:9 90:10,22 91:2,8 91:24 92:16,18

93:1 95:14 96:10 98:12 99:25 100:18 102:1 103:14 104:19 105:23 106:18 107:8 108:22 109:17 109:22 110:1,17 112:10 114:18 116:8,18,19 117:5,11,21 118:14 120:19 121:20 122:19 124:18 125:21 125:24 129:24 131:20 133:5,17 139:13,14 143:3 144:12,20 145:17 146:5,17 149:20 150:13 151:4,8 152:15 152:24 158:13 159:11 164:9,19 166:13 167:13 170:1 176:5 178:13,25 179:8 179:17,22 180:5 180:10,18,20,25 182:10,22,25 183:9,20 184:3 185:16 186:7,14 186:25 191:1,10 194:24 195:15 195:22 197:2,21 198:19 199:14 199:19,22 200:5 200:11,14 201:18 202:8

Page 54

[swanson - terms]

203:7,17 204:25 205:4 208:2,22 212:22 215:10 215:20 219:9,12 219:15,23 220:12,14 222:7 224:6,12,13,18 225:21,24 230:17 231:6,24 233:3 234:8 237:22 238:5,8,9 238:12,14 239:10 243:21 244:10 245:5,15 245:22 246:16 247:2,11 248:17 248:21,23 249:5 252:25 253:2,4 254:23 255:18 257:15,24 258:22 260:4 261:7 262:3,5,9 262:18,22 263:9 263:18 267:1

**swanson's** 259:13

**sweep** 76:8 132:24

**swing** 252:2

**switch** 86:22 88:1

**switched** 208:15

**switching** 87:19 151:1

**sworn** 9:20

**symbol** 153:22

**synonyms** 127:1 134:6

**system** 86:15 233:11

**systematic** 188:8

**t**

**t** 6:10 7:1 269:3 269:3

**tab** 25:11

**table** 30:3 142:9 204:21 205:24 207:24 210:23 211:11 218:8 226:9 254:4,7

**tables** 30:5,9 51:12 151:22

**tabulation** 245:21 246:14

**tacit** 128:16

**tail** 76:3 223:1

**take** 8:14 25:20 27:20 29:3 30:21 31:1 41:17,20 42:6 43:7 44:14 45:22 52:9,17 55:19,22 59:9 62:2 72:25 79:3 80:16 88:15 95:21 109:20 110:20 111:19 117:5 120:11 124:2 127:2 128:17 136:11 147:18 150:13 151:3 152:17 156:4 163:16 173:8 182:24 186:8 195:10

197:15 202:11 202:14 205:1 210:24 211:23 220:7,25 227:3 248:19,20 251:20 253:4

**taken** 2:15 18:7 30:5 44:22 53:10 80:21 94:11 117:18 152:21 186:11 219:20 249:2 266:5

**takes** 52:23 53:3 55:13 112:16 154:2 194:6

**talk** 28:9 83:10

**talked** 42:13,14 90:14 204:5

**talking** 29:19 135:24 136:14 142:16 147:4,6 156:17 226:2

**team** 16:6,9 26:22 38:19 48:20 51:23 52:2 95:3 134:24 152:4,4 173:3,10 188:11

**technical** 21:16 46:20 47:6,7 48:1,16,17 49:15 52:21 55:3,4 95:8,9 99:6,23 137:17,20 168:3

**technician** 5:22

**technique** 134:8

**technology** 8:23 134:23,23

**tell** 18:2 19:11 84:17 91:14 96:1,15 126:18 159:9 173:4 185:23 186:1 220:14 222:7,14 222:17 244:22 250:17 255:13 259:7 260:19

**tells** 177:11 250:19

**temporary** 81:8 81:15,21

**ten** 80:19 254:17

**tend** 174:3 210:11

**tenth** 50:25 89:7 161:22

**term** 82:9,10 83:2 126:21 131:3 162:7 185:16 193:4 197:3 227:10 238:15

**termination** 194:2

**terminology** 101:17 172:19 197:1 241:23

**terms** 36:20,21 46:11 47:24 50:20 59:5,5 68:17 78:19,20 102:17,18 105:11 108:19 109:8,13 113:22

Veritext Legal Solutions
866 299-5127

[terms - tier]

116:12,21
119:11 143:2
153:19 159:4
162:20 164:25
171:15 232:22
237:9,13,16
238:21 241:9
258:3
**tertiary**   237:8,10
238:15
**test**   79:5,8 101:4
101:5,20 129:4
**tested**   61:14 78:7
85:22
**testified**   11:3
38:18 43:23
59:10 127:7
**testify**   43:18
**testifying**   145:19
194:25 266:8
**testimony**   9:25
13:16 19:18
43:12,16 110:1
255:3 257:23
265:4 266:12
**testing**   100:15
100:18 101:14
174:14
**tests**   100:24
101:25
**text**   30:4,8,16
41:4,7 99:2,9,15
99:21 142:15
260:23 261:10
261:14,17
**textbooks**   40:22
**texts**   41:1

**thank**   11:5 13:4
13:5,20 15:25
26:1 27:19
30:14 31:5,19
38:7 44:12,16
92:17 95:20
141:6 144:21
152:15,18
260:18 262:4
263:19,21
**thanks**   16:1
33:10 80:18
180:11 262:5
**thanksgiving**
47:5,22,23 48:6
48:9
**theory**   88:20
128:14
**thing**   12:17
125:19 159:3
182:2 256:17
**things**   59:16
99:8 105:1
145:12 184:17
**think**   13:1 15:17
16:17 18:16,18
19:1,14 20:5
21:18 27:2,22
37:13 41:23
48:8 50:5,10
53:21 54:7 61:6
62:7,21 64:19
65:24,25 69:13
72:12 75:16,18
75:24 76:4,7,9
81:23 83:20
85:5 89:2 92:2,7
96:20 97:11

99:3,9 100:8
104:11,17
106:25 109:22
110:6,8,13 119:9
121:6,18 125:14
125:22 127:12
127:12,13 128:8
130:22 132:18
133:2 137:21,25
140:19 144:7
146:21 152:4,9
158:9 159:8
160:11,15
169:15 172:7
174:1 176:23
177:24 178:13
179:12,15 182:2
182:23 184:3
187:24 192:12
200:6,8 213:25
214:16 217:13
217:25 219:6
220:10 221:22
222:4 224:1,7
227:6,10 231:16
232:21 234:7
238:8 244:10,14
244:23 245:9
248:18 254:24
255:11 256:21
257:16 258:10
**thinking**   217:8
**third**   90:16 91:5
91:18,25 96:2
97:23 147:16
223:7
**thirdhand**   173:5

**thoroughly**
200:4
**thought**   12:25
91:1 108:1
192:1,2 217:6,9
217:10 226:25
227:2
**thoughts**   217:11
217:14,15
**thousand**   72:14
93:14
**thousands**
221:17 222:21
**three**   19:1,2
38:14 39:14
70:22 75:15
90:10,18 92:2
93:20 95:23
96:11 98:4
101:17 136:19
207:15,20 208:3
221:3,18 222:1
224:20 225:2,11
226:19 229:20
235:10
**throw**   203:24
**thursday**   11:11
25:5 47:15
**tickets**   44:11
**tier**   50:14,22,24
124:12,13,20,23
125:1,7,18 126:6
126:25 128:22
129:5,6 130:18
130:19 133:20
134:3,19 135:3
135:20 136:3
137:12 138:14

Page 56

[tier - trying]

140:1,24 141:8
142:2,19 143:13
148:4,10,12
149:10 151:12
151:14 256:5
257:7
**tiered**  255:19
**tiers**  123:25
125:6,25 127:18
127:22 129:11
129:13 130:2
134:13,20 135:8
135:11 136:4,6
136:16 137:4,8,9
140:7,17 141:20
142:7 143:21,22
144:3,9,14,25
145:9,16,17,24
146:8,10,19
147:3,10,21
148:17,23
149:22 150:3,11
210:24 212:5,14
**time**  9:7 12:14
27:4 30:22
44:21,24 47:11
53:9,13 55:10
56:7 61:15
80:20,23 96:4,8
96:10 101:24
117:10,17,20
128:6 148:6
151:3,13,16,24
152:20,23
160:13,17 171:6
173:25 181:21
186:10,13
189:18 196:10

196:14 199:23
199:25 219:16
219:19,22 249:1
249:4 252:20
254:25 260:15
263:22,24 264:1
266:6 267:10,18
267:24 268:7
**times**  74:8
168:19 238:7
252:3
**timetable**  46:13
**timing**  27:1
193:1
**timothy**  41:7
**title**  179:20
**today**  11:23 12:2
12:21 13:11,16
20:22 53:8
58:19 173:17
206:3 237:16
256:8,14 257:13
**today's**  263:23
**todd**  3:13
**told**  11:17 13:1
36:19 47:25
48:12 117:11
150:4
**tomorrow**
192:11
**top**  74:1,18
85:12 212:23,23
**topics**  20:19
151:1
**total**  68:5 72:19
83:22,23 94:7
105:21 109:2
115:16,16 117:4

118:20 119:1
120:5 154:15
157:11 208:1,2
216:1,4,13
219:16 220:15
223:12,19
225:13 227:12
228:13,21 229:1
**track**  213:15,20
**trade**  105:11
**train**  108:1
143:24 228:22
**trained**  94:15,22
95:21 96:18
97:8 100:1
121:12
**transaction**  66:6
82:24 83:3
105:25 112:17
119:21 141:19
147:19 154:20
154:25 155:2,6
155:10 166:21
167:4,25 234:11
**transactional**
60:18 61:2 65:5
67:20 72:18
73:6
**transactions**  7:5
39:19 60:21
61:10 67:7,16
68:9 83:22
105:24,25 106:6
106:14 112:17
115:8 117:4
120:12 151:16
166:5 197:25

**transcribed**
266:11
**transcript**  265:3
266:12,14,16
267:6,8,10,13,13
267:21 268:2,2
**translated**
211:19
**treat**  79:13
166:9
**treated**  79:6
**treatment**  80:13
**trial**  43:19,24
44:3,5 230:7,7
**tried**  18:8 35:15
46:13 158:6
**trivial**  53:17
**trouble**  48:16
**true**  58:10 87:23
88:23 106:17
122:25 137:11
148:5 159:2,2
191:24 222:25
234:15 265:5
266:12
**truncated**
216:22
**truth**  10:2,2,3
**try**  19:24 21:25
34:8 41:20
45:23 48:22
70:4 76:8 99:20
131:19 133:24
159:4,25 171:1
175:13 179:24
**trying**  15:3 28:1
33:16 46:25
91:22 108:17,19

Page 57

**[trying - united]**

199:17
turn   37:10 39:13
  40:20 63:2
  66:12 68:21
  80:25 85:6,10
  95:4 103:14
  123:18 139:20
  150:23 153:14
  161:18 206:5
  207:6 210:14
  219:24 223:3,22
  233:12 252:24
  255:8 256:25
  259:1 260:15
turned   51:6
  94:21 173:13,16
turning   45:1
  131:20 133:17
two   18:17 21:3
  41:20 48:5
  53:11,21 70:11
  78:22 80:1
  89:20,22 90:13
  93:20 94:5
  102:25,25
  112:19 113:16
  120:20,20
  136:19 151:4
  159:16,22 160:2
  184:4,9,9 185:8
  185:23 193:5
  197:13,22
  199:12 201:13
  202:18 205:12
  205:18,19
  206:17 207:14
  214:7,10 227:5,5
  227:20 229:19

242:16,18
  245:11 251:4
type   49:17
types   82:3 90:4
typical   176:23
typically   131:12

**u**

u.s.   43:19,22
uh   69:15 206:18
  218:10 254:3
un   143:14
uncertainty
  183:1 184:4
unclear   86:5
uncorrelated
  100:12
uncovered   53:7
undamaged
  203:18
underlies   104:23
underlying
  149:4
understand
  12:10 14:13
  16:22 24:16
  25:11 28:11
  30:19 33:6 35:3
  36:2,12 43:25
  47:10 50:19
  65:8 67:5 71:5
  91:14 112:7,15
  113:13 120:6
  140:10 153:8
  155:7 158:7
  164:24 165:2
  172:16 176:6
  186:17 193:21

203:21 223:17
  226:22 241:22
  263:14
understanding
  16:23 29:25
  34:6 45:10 49:4
  50:8 51:2,2,13
  52:8 53:2 55:18
  55:21 56:8
  64:12 66:8
  67:19,25 78:15
  79:22 114:22
  128:24,25 140:6
  158:9 166:19
  173:16 187:11
  189:12,16
  193:24 230:5,10
  231:1 235:2,4
  237:12 238:15
  239:17 243:11
  243:14,22 246:2
  246:8 247:8
  256:2
understood   13:1
  99:10 201:24
  202:8 244:13
  246:5
undertake   152:7
  239:2
undertaken
  157:24
unfortunately
  222:5
unharmed   37:1
  37:2 86:22
  87:20 88:1
  102:20 103:3
  122:3,9 137:23

141:7,18 142:1
  142:10,13,22
  143:14,15
  145:19 203:25
  204:14 207:12
  207:25 208:12
  208:16,20,23
  209:5,8,16
  210:11,25 211:3
  211:8,15 212:6
  212:15 214:21
  215:4,14,25
  216:3,12 217:1
  220:3,15 221:2
  221:17,25
  222:14,21,23
  223:9 232:1,9,16
  233:19,20
uniform   121:18
uniformly
  111:11
uninjured   34:21
  35:24 36:14
  87:25 210:1
  229:14
unintentional
  253:2
unique   72:17
  102:16 188:14
  236:12,17
unit   153:6,23
  154:1 155:25
  156:1,13,15,22
  158:12 159:5
  167:22
united   1:1 2:1
  8:19

Veritext Legal Solutions
866 299-5127

**[units - voluntary]**

| | | | |
|---|---|---|---|
| **units**  154:7,8,13 | 126:23 140:17 | 175:16 177:14 | **vice**  87:20 |
| 154:15 156:21 | 141:13 153:21 | 177:17 178:1 | **video**  1:13 2:19 |
| 157:1,7 192:19 | 162:18 164:13 | 183:13 | 8:13 253:1 |
| **universal**  131:24 | 172:25 175:15 | **variables**  97:18 | **videoconference** |
| 132:2,4,5,7,9,13 | 177:19 178:14 | 98:17,24 99:14 | 1:13 2:19 3:2 |
| **universe**  173:24 | 178:20 181:15 | 100:2,11,16,25 | 4:2 5:2 |
| **university** | 182:11 188:6,17 | 101:5,7 112:18 | **videographer** |
| 157:10 | 189:14 190:16 | **variance**  92:11 | 5:23 8:5,25 9:19 |
| **unmeasured** | 197:23 203:8 | **variation**  78:6 | 44:20,23 80:20 |
| 156:16 | 214:25 215:11 | 87:9,15 89:19 | 80:22 117:16,19 |
| **unnecessary** | 249:18 | 190:12 | 152:19,22 186:9 |
| 104:17,20 | **useful**  105:15 | **variations** | 186:12 219:18 |
| 206:12 | **user**  166:14,19 | 259:11 260:2 | 219:21 248:25 |
| **unrepresentative** | 166:23,24 168:1 | **varied**  164:21 | 249:3 252:25 |
| 244:24 245:4,5 | **uses**  60:14 70:17 | **varies**  49:19 | 263:23 |
| **unresolved**  48:1 | 163:9 214:4 | 77:16,25 156:20 | **videographers** |
| 95:11 | **usual**  161:12,14 | 251:4 | 117:15 |
| **update**  45:25 | **v** | **variety**  128:13 | **view**  33:14 49:24 |
| 46:13 51:21 | | **various**  26:16 | 62:15 75:3,5 |
| **updated**  11:15 | **v**  189:3 | 73:8,9 79:22 | 126:2 133:15 |
| 22:12 23:5 30:6 | **vague**  235:4 | 105:1 124:8 | 146:9 242:24 |
| 43:7,8 46:16 | **valid**  24:14 93:5 | 143:12 205:7 | **views**  125:11 |
| 47:18 61:9 | 152:11 | **vary**  154:23 | **vigorous**  198:16 |
| 87:11 210:21 | **value**  85:17 | 259:10 | **vii**  50:15 |
| **updating**  50:20 | 154:2,24 156:4 | **vast**  188:1,1 | **violations**  40:5 |
| **upper**  25:19 | 251:10,11 | **ventilated**  13:10 | **virtual**  8:23 |
| 176:25 177:21 | **variable**  97:9 | **verify**  39:20 95:5 | 188:18,24 189:3 |
| 178:8 262:24 | 154:18 157:3,5 | 168:4 170:25 | 189:8 |
| **urgent**  140:12 | 157:10,13,19,23 | **veritext**  8:25 9:2 | **virtually**  8:8 |
| **use**  12:12 25:19 | 158:16,20 159:6 | 267:7,9,11 | 12:18 227:11 |
| 27:25 46:22 | 159:14 161:23 | **versa**  87:20 | **visual**  221:1 |
| 53:25 54:12 | 162:1,3,8,17,19 | **version**  14:7 | **vitae**  43:5 |
| 62:8 64:1,2 | 162:21 163:1,9 | 29:1 39:11 | **volume**  1:16 6:3 |
| 65:10 73:15 | 164:1,2 165:13 | 261:13 | **voluntary** |
| 75:13 96:19 | 165:23 166:11 | **versions**  28:16 | 124:16 247:9 |
| 98:24 100:2 | 168:7 170:7 | **versus**  43:19,22 | |
| 107:13 108:11 | 171:16 172:13 | 111:8 118:23 | |
| 108:11 126:21 | 174:6,15 175:5 | 185:21,22,22 | |

Veritext Legal Solutions
866 299-5127

**[waived - writing]**

| w | | | |
|---|---|---|---|
| **waived** 267:23 267:23 | 185:4 200:20 204:3 207:3 231:20 234:13 239:13 242:4 249:16 253:18 257:14 | **whereof** 266:20 | 114:4,6,14,17,24 115:5,12,23 |
| **waiving** 12:4 267:20 | | **wholly** 28:16 | 116:4,5,11,22 |
| **walls** 111:5 | | **wide** 252:8 | 117:25 118:5,9 |
| **walmart's** 127:16 | **ways** 73:10 | **wikipedia** 131:17 | 118:17 119:8 127:21 128:4 |
| **want** 9:16 18:15 27:15 33:16 35:7,8 42:6 57:11 69:13 90:3 95:14,17 127:11 139:11 144:16,17,19 200:7 203:22 213:6,10 224:2,8 237:20 | **we've** 12:11 13:10 27:6 41:15,16,23 46:12 78:25 90:10 151:1 219:10 224:16 224:18 | **withdraw** 130:4 | 129:2,11,14,17 130:1,15,24 |
| | | **withdrawn** 194:12,15 | 133:19 135:25 |
| | | **witness** 8:11 9:19 24:17 199:21 266:20 267:13,16 268:2 268:5 269:24 | 136:7,8,13 137:14 138:21 138:22,23 139:17 140:24 141:20,22 144:4 |
| | **web** 1:13 2:19 3:2 4:2 5:2 186:16 187:2,13 189:9,12,14,21 192:5,6 | | 146:20 147:22 147:25 148:4,9 148:17 149:13 |
| | | **wolf** 3:5 9:14 | 150:5,16 175:6 |
| | | **wood** 3:14 | 184:12,22 |
| | | **word** 11:11 17:5 41:13 157:13 | 186:15 187:1 190:15 191:11 191:16,25,25 |
| **wanted** 29:17 42:25 109:18 238:3 | **website** 189:25 191:12,16 | | |
| | **wednesday** 47:15,22 | **wording** 70:4 | 197:22 198:7,21 |
| **wanting** 182:20 | | **words** 34:6 162:5 170:11 172:4 238:18 | 225:10 226:19 228:14,16 229:1 229:3,13,13 |
| **wants** 262:19 | **week** 47:14 48:5 55:25 | | |
| **washington** 1:23 3:20 4:17 | **weeks** 31:14 43:9 53:11,20,21 55:20 56:1 | **work** 12:15,24 19:24 32:7 45:23 50:6,6 68:17 100:16 130:16,18 146:7 151:25 171:18 174:20 197:17 263:15 | 242:12,17 243:7 243:8 245:24 246:20 247:3,4 |
| **wasting** 199:23 199:25 | | | **worry** 107:6 161:1 |
| **way** 12:5 21:13 45:5 46:1 49:25 54:25 75:17,18 83:20 89:1 103:12 104:2 110:23 121:1,6 124:11 125:3,4 126:18 135:8 139:17 157:3,17 160:9 166:9 174:24 176:20 | **weigh** 140:12 | | |
| | **weight** 120:11 | **worked** 240:23 | **worth** 131:19 |
| | **weighted** 121:12 121:22 122:7 | **working** 47:7 49:16 147:15 261:13 | **wrap** 42:24 |
| | **welcome** 248:24 | | **write** 256:10 |
| | **went** 103:12 | **works** 60:16 | **writes** 55:8 |
| | **whafh.com** 3:11 | **world** 109:10,11 110:20 111:11 111:16 112:2,4 112:11 113:9,11 | **writing** 99:4,5 189:18 235:9 |
| | **whatsoever** 53:2 110:4 | | |

Veritext Legal Solutions
866 299-5127

**[writings - zoom]**

| | |
|---|---|
| **writings** 98:23 | 251:6 252:9 |
| **written** 256:12 | 254:14 |
| 256:15 258:1 | **zoning** 224:5 |
| **wrong** 186:21 | **zoom** 1:12 15:8 |
| **wrote** 53:23 | 26:6 |
| 64:15 261:10 | |

**x**

**x** 6:1,10 7:1
266:16 268:9

**y**

**yager** 5:23 8:24
**yeah** 14:14 15:21
38:1 41:22 42:1
42:4 84:16
85:16 109:22
160:19 179:22
182:22 212:10
213:11,17
219:12 248:21
263:18
**year** 16:24 31:11
56:4 170:23
181:17 189:17
192:3 216:5
239:8 247:23
**years** 236:25
**ygr** 1:7 2:7 6:22
8:21
**yield** 52:15
**yields** 87:24
**york** 3:9,9
**yup** 14:20 27:13

**z**

**zentenyi** 5:24
**zero** 81:6 84:20
156:4 193:8,13
193:15 204:14

Page 61

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.