# EXHIBIT 94

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION


IN RE APPLE IPHONE

ANTITUST LITIGATION,        Case No.  4:11-cv-06714

YGR

_____


ZOOM DEPOSITION OF DANIEL L. McFADDEN

(Reported Remotely via Video & Web Videoconference)

Berkeley, California (Deponent's location)

Friday, November 5, 2021

Volume I


STENOGRAPHICALLY REPORTED BY:

REBECCA L. ROMANO, RPR, CSR, CCR

California CSR No. 12546

Nevada CCR No. 827

Oregon CSR No. 20-0466

Washington CCR No. 3491

JOB NO. 4876250

PAGES 1 - 245

Page 1

Q.   Does your reply report reflect any change    09:16:14
in the assignment you described in your opening
report?

MR. BURT:  Objection.  Form.

THE DEPONENT:  Could you clarify what you    09:16:29
mean?  There's a statement what the assignment is.

Q.   (By Mr. Swanson)  Okay.  Why -- why don't
we take a look at your opening report, which is
Exhibit 39, and move to paragraph 10, which starts
on page 3 of the opening report.    09:16:52

A.   Yes.

Q.   Okay.  Now, on paragraph 10 at the
beginning, you state that you have been asked by
counsel for Consumer plaintiffs "to assess economic
evidence relevant to the theory of the case    09:17:36
summarized above."

That's the first part of that sentence.

Is that an assignment that you are still
carrying out through your reply report?

MR. BURT:  Objection to form.    09:17:53

THE DEPONENT:  The reply report
assignment was specific as stated in the reply
report, so I think it logically follows that it's
also responsive to the original assignment, but I
wasn't asked to renew the original assignment.    09:18:15

Page 17

Q.   (By Mr. Swanson)  Based on your     09:18:24
understanding, did the theory of the case change
between the time of your opening report and the
time you submitted your reply report?

A.   As I understand it, there's been no     09:18:44
change in the theory of the case with the exception
that I'm aware that counsel for the plaintiffs have
filed an -- an amended complaint, and I recently
submitted a disclosure affidavit to the effect that
it did not raise new issues, so that the previous     09:19:09
report applied.  So that's the only sense in which
there's been any change that I'm aware of.

Q.   Okay.  And we'll definitely mark that as
an exhibit, and we'll talk a bit about that.  But
at the moment I'm just focusing on the time between     09:19:26
your last -- opening report and then the time you
submitted your reply report.

In paragraph 8 of your opening report, if
you can focus on that, you state at the end of that
paragraph, "Consumer plaintiffs allege that Apple     09:19:50
has engaged in an anticompetitive scheme to
monopolize the aftermarket for iOS applications
and in-app purchases throughout the class period."

Do you see that?

A.   Yes.     09:20:16

Page 18

Q.   And was that still your understanding    09:20:16
when you submitted your reply report?

A.   The understanding -- understanding
whether that's still the allegation of the consumer
plaintiffs?  Is that what you're asking?    09:20:37

Q.   Yes, when you submitted your reply
report.  Is that still your understanding?

A.   That is my understanding.  Yes, my
understanding is that the substance of their
complaint remains the same.  It may be that the    09:20:56
language that they used to describe that market is
changed.  I -- I don't have those details in front
of me.

Q.   Let me ask you to take a look at
paragraph 9 of the original report, now Exhibit 39,    09:21:07
still on page 3.  If you could just read that --
you don't have to read that out loud, but if you
just take a look at that.  Read that to yourself,
and then I'll ask you a question about it.

A.   Yes.    09:21:53

Q.   Is this the summary of the theory of the
case that you referred to in the first sentence of
paragraph 10 of your opening report?

     MR. BURT:  Objection to form.

     THE DEPONENT:  Yes.    09:22:15

Veritext Legal Solutions
866 299-5127

Q.   (By Mr. Swanson)  Okay.  As of the time     09:22:16
that you submitted your reply report, were you
aware of any theory of the case that Apple
attempted to attain or maintain a monopoly but did
not succeed?                                      09:22:29

MR. BURT:  Objection.  Form.

THE DEPONENT:  Could you repeat that.
I'm not clear what you mean.

Q.   (By Mr. Swanson)  No problem.

As of the time you submitted your reply     09:22:40
report, were you aware of any theory of the case
that Apple attempted to attain or maintain a
monopoly but did not succeed in doing so?

A.   When you say "aware of a theory," are you
referring to specific propositions put forward by     09:23:00
your experts?  I -- I need some context for this
question.

Q.   I'm asking a question where the term
"theory of the case" means exactly what it means in
paragraph 10 of your opening report.              09:23:19

So my question is directed at your
understanding at the time you completed your reply
report, were are you aware of any theory of the
case that Apple attempted to attain or maintain a
monopoly but did not succeed?                     09:23:37

Page 20

if that view is correct, then many of those                09:53:59

30 million people that you mentioned may well have

been harmed, even though they are not harmed by a

specific measure that I can obtain quantitatively

from my econometric analysis.                              09:54:14

Q.   (By Mr. Swanson)  When you make a

statement that "nearly all or virtually all members

of the class were harmed by Apple's misconduct,"

what concept of harm are you using?

A.   A concept of harm would be this:  Compare     09:54:42

the outcomes for consumers in the real world as is

versus the outcomes that they would have had

available in a but-for world where Apple had not

engaged in the alleged misconduct.  They may have

paid lower prices.  They may have had available --    09:55:07

available a larger variety of apps.  They may have

had available apps that were of higher quality.

They may have had -- been driven by competition to

provide better security or -- or privacy levels.

So those are some of the other areas          09:55:34

where -- other dimensions or areas where consumers

may have been harmed by Apple's misconduct.

Q.   And are you offering an opinion that you

have quantified that concept of harm in your

reports?                                                   09:55:56

Page 37

A.    To the contrary, I have said that I have    09:56:00

not quantified those harms.

Q.    Okay.  Are you saying that you can assert

that nearly all consumers have suffered those

harms, even if you can't quantify that concept of    09:56:16

harm?

MR. BURT:  Objection to form.

THE DEPONENT:  I would say that I -- I

can assert that harms of that type are -- are

classwide.  They are a common effect on all    09:56:42

consumers of iOS apps.

Q.    (By Mr. Swanson)  So now you're offering

an opinion that all class members have been harmed?

Are you refining your clarification again?

MR. BURT:  Objection to form.    09:57:09

THE DEPONENT:  I don't think that this is

a clarification.  It's actually a restatement of --

of the positions I took in the original report,

which is that there are a variety of areas which I

do not quantify in my econometric model where    09:57:22

consumers may have been adversely affected, and

those involve some of the fruits of monopolization,

such as lack of pressure on Apple to engage in

enhanced security features, for example, of

products that go through a store; a discouragement    09:57:49

Page 38

of developers from innovation and -- and bringing    09:57:52

forth new products.

And those are all harms to consumers in

the sense that they either did not get to buy

something that they might have wanted to if they    09:58:08

had been available, and in general that's an

economic matter.  Consumers benefit from having

more opportunities, even if they don't necessarily

individually take advantage of them.  So in that

sense, I would say economically these harms are    09:58:29

very broad.

Q.  (By Mr. Swanson)  Can you turn, please,

to paragraph 227 of your opening report.  It starts

on page 99.  Let me know when you're there.

A.  Which paragraph, please?    09:59:31

Q.  Paragraph 227.  Starts of the bottom of

page 99 of your opening report.

A.  Yes.

Q.  The first sentence of paragraph 227 reads

"common economic proof of the extent of damages for    10:00:30

each class member here is not difficult to

establish, as it flows from the same methodology,

described above, to demonstrate common impact."

Is this still your opinion?

A.  Yes.    10:00:46

Page 39

Q.    And the bottom sentence of paragraph 227    10:00:54
says:  "As I also describe, while there may be a
small number of class members who show no damage
under this methodology, they are easily identified
and therefore do not undermine the common    10:01:09
methodology applicable to the consumer class for
showing the extent of damages to class members."

Do you see that?

A.    Yes.

Q.    Is this still your opinion?    10:01:22

A.    Yes.

Q.    And what do you mean by "small number of
class members"?

A.    Are you asking me to quantify "small"?

Q.    A small number.  A small number is a    10:01:43
number, correct?  Like 1, 10, 100?

MR. BURT:  Objection.  Form.

THE DEPONENT:  I think when I wrote that,
I did not have a number in mind.  It's -- I could
have said "a small proportion."    10:02:06

Q.    (By Mr. Swanson)  So are you now
clarifying that that should read "a small
proportion" rather than "a small number"?

MR. BURT:  Objection to form.

THE DEPONENT:  I don't think it's a    10:02:25

Page 40

that, in turn, is essentially a reflection of                    06:00:25

whatever equilibrium they attain in competition

with rival -- rival developers.

So in that sense, whatever the effects of

inter -- inter-developer competition are, Nash                   06:00:41

equilibrium or whatever -- they -- they are

captured in the but-for world by other coefficients

that are -- that are in these models.

And when I say that I believe this

analysis is conservative, I do not take into                     06:01:01

account that those coefficients are the -- the

values, the dummy variables, would change in the

but-for world, although with active rivalry between

developers, in reality they might.  And if so, that

would potentially increase damages relative to the               06:01:27

ones that I calculate.

Q.   Professor, changing gears for a moment.

Is it fair to say that you claim that

Apple's expert's two-sided market criticisms are a

matter of terminology rather than substance?                     06:01:45

MR. BURT:  Objection.  Form.

THE DEPONENT:  Yes.  In the following

sense:  that the primary concern with a -- with a

platform is what's happening on one side of the

platform versus -- to the agents one side of the                 06:02:05

Page 232

platform versus the agents on the other.

06:02:09

And that's -- I agree that that's

something that needs to be taken into account.

In my analysis, although I adopt the

terminology that the Apple Store is a retail --

06:02:23

retailer for the distribution of apps and app

content, my analysis does take into account the

impact of Apple commissions both upstream and

downstream, that is, on both developers and

consumers, so that my analysis does encompass the

06:02:39

calculations which are, I believe, the leading

reason that people emphasize the use of successful

analysis.

Q.    (By Mr. Swanson)  Well, if your model

takes account of two sides to the market and

06:03:01

indirect network effects, why is that you say that

your methodology for quantifying the common impact

of Apple's misconduct would provide conservative

estimates of damages in light of the two-sided

market framework?

06:03:21

You say that in paragraph 263.

A.    263?

Q.    Yeah.

MR. BURT:  Page 111.

THE DEPONENT:  The answer is that in

06:04:13

Page 233

paragraph 263, I point out that in addition to the    06:04:14

question of who gains consumers or developers from

a reduced Apple Store commission, I also note that

in a -- in a platform analysis, there may be other

things that happen in terms of impact on consumers    06:04:38

and impact on developers, such as increased entry,

more higher-quality apps or so forth that might

come out of -- a two-sided analysis.

And I -- and I -- while -- while my

retail store framework and the analogy to add more    06:05:06

taxes and the two-sided analysis of the impacts of

that is, I think, appropriate and germane and to

the point in terms of overcharge calculations, I --

I recognize that while it may -- it may be less

relevant to class certification and the overcharge    06:05:32

harm to consumers here, it would -- it would be an

issue if one were, in truth, considering both sides

of this market and what could happen, say, to the

developer side as well as the consumer side.

Q.    (By Mr. Swanson)  Well, if you were    06:05:51

already, in truth, considering both sides of the

market, it wouldn't be possible for damages to be

amplified by adopting a two-sided market framework,

would it?

MR. BURT:  Objection.  Form.    06:06:04

Veritext Legal Solutions
866 299-5127

I, Rebecca L. Romano, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Court Reporter, do hereby certify:

That the foregoing proceedings were taken before me remotely at the time and place herein set forth; that any deponents in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 11/8/2021

Rebecca L. Romano, RPR, CCR

CSR. No 12546

Page 243