# EXHIBIT 95

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| **IN RE APPLE IPHONE ANTITRUST LITIGATION** | **No. 4:11-cv-06714-YGR** |
| | **Hon. Yvonne Gonzalez Rogers** |

EXPERT REPORT OF

## DANIEL L. MCFADDEN, PH.D.

**MARCH 7, 2025**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## CONTENTS

**I. Introduction** ...............................................................................................................1

    I.A. Assignment ................................................................................................1

    I.B. Summary of Opinions................................................................................3

**II. Apple's Alleged Anticompetitive Conduct** ..........................................................4

**III. Economic Principles of the App Store Commission**...........................................6

    III.A. The App Store Commission Functions as a Sales Tax ...................................7

    III.B. The Impact of the App Store Commission is Common to the Class ...........................13

**IV. Econometric Model for Estimating Damages** ...................................................14

    IV.A. App Developer Pricing and Profit Maximization................................................15

    IV.B. Estimating Consumer Demand for iOS Apps and In-App Content..............................16

        IV.B.1. Model of Consumer Demand .................................................................16

        IV.B.2. App Developer Costs and Gross Margin Bounds................................................17

    IV.C. Estimating Class-wide Damages ......................................................................18

        IV.C.1. The Percentage Method for Calculating Damages ................................................18

        IV.C.2. Identification of Harmed and Unharmed Class Members ....................................20

**V. Conclusion**...............................................................................................................21

**Appendix A Curriculum Vitae** ................................................................................23

**Appendix B Materials Relied Upon** ........................................................................44

**Appendix C Technical Details of Damages Model**...................................................46

Figure 1: Effects of Tax on Consumers and Suppliers ........................................... 9

Figure 2: Effects of Commission on Consumers and App Developers ....................................... 11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

and how Apple's alleged misconduct has harmed consumers. The methodology described in this report is consistent with these opinions.

6. Unless otherwise noted, I use the terminology from my prior reports. For example, throughout my report I use the terms "As-Is" and "But-For" worlds in the same manner as I have in my previous testimony. The same is true for the terms "app downloads", "in-app purchases", and "IAPs." Moreover, I refer to the anonymized Apple accounts associated with each transaction contained in Apple's prior App Store transactions data productions as "Apple IDs" throughout this report. Finally, I refer to three business models for paid apps—"Paid Download Only", "Paid Download with IAP", and "Free Download with IAP"—in the same manner as my prior reports.

7. I disclosed my qualifications, compensation, and documents I relied on in my prior reports. Appendix A details my up-to-date CV and Appendix B lists the materials I relied upon in preparing this report.

## I.B. Summary of Opinions

8. Section II summarizes Apple's alleged misconduct and the resulting consumer harm analyzed by Prof. Stiglitz. I find his opinions consistent with the opinions I offered in my prior reports. I designed my methodology to estimate the monetary harm caused by Apple's allegedly supracompetitive App Store commission rate. The extent of consumer harm my model estimates is conservative if consumers are harmed in other ways as a result of Apple's alleged misconduct.

9. Section III explains the tax incidence framework that forms that basis of my damages methodology and the degree of common impact of Apple's alleged misconduct. Apple's App Store commission has the same economic effects as sales or ad valorem taxes, both of which are well-studied in economics. The impact of Apple's conduct is common and the tax incidence framework can be used to estimate consumers' monetary damages.

10. Section IV outlines the econometric model I demonstrated to the Court in my prior reports. My model can be used to estimate Class-wide damages and identify those consumers who did not incur monetary damages. Moreover, my model can be used to estimate damages both with and without Apple's price tier restrictions in the But-For world, and can accommodate any But-For commission rate the Court or a jury finds on the merits.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

11. Unless otherwise noted, I reaffirm my opinions from my 2023 Supplemental Report and my other reports during the class certification stage.

## II. Apple's Alleged Anticompetitive Conduct

12. Consumer Plaintiffs allege that Apple has monopolized or attempted to monopolize the market for the sale of iOS apps and in-app content.[7] Specifically, Consumer Plaintiffs allege that Apple "lock[ed] consumers into buying apps only from Apple and paying Apple a 30% fee" without their consent.[8] They further allege that Apple locked consumers' iOS devices "to prohibit them from using any app that was not approved or sold by Apple."[9] In so doing, Consumer Plaintiffs allege that Apple "violated Section 2 of the Sherman Act…in a manner that harmed competition and injured iOS apps[sic] consumers by reducing output and consumer choice, and by increasing prices for iOS apps to supracompetitive levels."[10]

13. I understand that Counsel for Consumer Plaintiffs have asked Prof. Stiglitz to, among other things, analyze whether Apple's alleged conduct enabled it to acquire and maintain market power (or monopoly power); and, to analyze whether Apple's alleged misconduct harmed consumers.[11] I have reviewed Prof. Stiglitz's Initial Report and summarize several of Prof. Stiglitz's opinions below.[12] I find these opinions consistent with the opinions I offered in my class certification reports.

14. First, Apple, through its Developer Program License Agreement and App Review Guidelines, sets the requirements developers must meet to distribute their products via the App Store.[13] These policies prohibit iOS app developers from distributing store-like apps—that is, apps that distribute other apps—through the App Store. Additionally, Apple imposes contractual and technological restrictions that effectively prevent developers from selling apps to iOS device

---

[7]  I understand that Consumer Plaintiffs allege that this market constitutes an aftermarket derived from the purchase of an iOS mobile device. *See, e.g.,* Third Amended Consolidated Complaint, ¶ 19.

[8]  Third Amended Consolidated Complaint, ¶ 18.

[9]  Third Amended Consolidated Complaint, ¶ 18.

[10]  Third Amended Consolidated Complaint, ¶ 19.

[11]  Stiglitz Initial Report, Section I.B.

[12]  Stiglitz Initial Report, Section I.C. *See also,* Stiglitz Initial Report, Section III and Stiglitz Initial Report, Section IV.

[13]  *See, generally,* Stiglitz Initial Report, Section III.A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

users through any channel other than the App Store. These barriers have eliminated potential alternative distribution channels for iOS apps and in-app content that might have emerged absent Apple's restrictive practices. With no major alternatives for reaching iOS users, developers have no choice but to comply with Apple's requirements.

15. Second, Apple requires that developers distributing their apps through the App Store use Apple's own payment processing system (IAP) when selling their digital in-app content.[14] Aside from limited exceptions (e.g., for transactions of non-digital goods and services), developers cannot use alternative iOS in-app payment processing solutions when selling their in-app content. Apple's IAP requirement has foreclosed alternatives to Apple's IAP system that likely would have existed but for Apple's conduct.

16. Third, Apple has enacted a series of anti-steering provisions that insulate its App Store from competition, at least until January 2024.[15] These anti-steering restrictions prevent developers from including external links within their app or otherwise directing consumers to purchase mechanisms other than Apple's IAP system. These restrictions further discourage multiplatform developers from using contact information obtained within their iOS apps to encourage users to purchase their content outside of the app. By enforcing these anti-steering provisions, Apple can further prohibit any meaningful competition from outside the App Store.

17. Together, Apple's conduct has allowed it to acquire monopoly power, the exercise of which has harmed consumers.[16] By foreclosing competition, Apple deprived consumers of alternative purchase channels from which they could buy iOS apps and in-app content. Thus, Apple is able to charge a supracompetitive App Store commission, which in turn has increased the prices consumers pay for iOS apps and in-app content. Further, Apple's conduct has allowed it to impose restrictions on the prices developers can charge for their apps and in-app content. Finally, Apple's conduct has suppressed output, and the variety and quality of available iOS apps and in-app content.

---

[14] *See, generally,* Stiglitz Initial Report, Section III.B.
[15] *See, generally,* Stiglitz Initial Report, Section III.C.
[16] *See, generally,* Stiglitz Initial Report, Section IV.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

18. It is important to highlight two aspects of my damages model before proceeding. First, as established by Prof. Stiglitz, the relevant antitrust market in which Apple's App Store operates is the market for the sale of iOS apps and in-app content in the United States. My damages model estimates the effect of Apple's conduct on the prices paid by consumers for iOS apps and in-app content. Hence, my damages model estimates the effect of the Apple App Store's supracompetitive commission on the prices for App Store apps and in-app purchases.[17]

19. Second, the damages model I developed is intended to estimate and quantify the monetary harm incurred by consumers as a result of overcharges for their app and in-app purchases relative to what they would have paid for these purchases absent Apple's alleged misconduct.[18] It does not capture other forms of harm that consumers may have incurred as a result of Apple's alleged misconduct. For example, it does not quantify harm related to the loss in output or reduction in app variety described by Prof. Stiglitz. In that sense, the extent of consumer harm my model estimates is conservative. If my model finds a Consumer Class member did not incur monetary damages from overcharges, that does not imply they were unharmed by Apple's conduct. The references I made in my prior reports to "unharmed" Consumer Class members was only intended to convey that they did not incur monetary damages attributable to Apple's supracompetitive App Store commission.

## III. Economic Principles of the App Store Commission

20. In this section, I explain the economic principles of the App Store commission. Specifically, I have previously testified how the App Store commission functions like a sales tax whose impact can be apportioned between consumers and developers using a tax incidence framework.[19] The economic principle of tax incidence clarifies how the App Store commission levied on app developers results in higher app and in-app content prices for the Consumer Class. The econometric methodology I summarize in Section IV and Appendix C is based on the tax incidence principle. I also testified why the tax incidence framework shows the supracompetitive

---

[17]    *See, e.g.,* McFadden 2021 Opening Report, ¶¶ 149-150.

[18]    McFadden 2021 Opening Report, ¶¶ 243-244. *See also,* McFadden 2023 Supplemental Report, ¶ 11.

[19]    *See, e.g.,* McFadden 2021 Opening Report, Section VI.B. *See also*, Reply Report of Daniel L. McFadden in Support of Plaintiff's Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), Oct. 19, 2021 (hereafter referred to as the "McFadden 2021 Reply Report"), Section II.B.1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

commission charged by Apple impacts all members of the Class.[20] I reaffirm those opinions in this section. Consequently, I base this section on related sections in my prior reports.[21]

## III.A. The App Store Commission Functions as a Sales Tax

21. The underlying economic principles of the App Store's commission are straightforward.[22] Apple charges developers a percentage of the sales price for their apps and digital in-app content in the form of a commission. The commissions Apple collects is therefore a component of app developers' effective operating costs, which are a key determinant of prices offered by profit-maximizing developers. When marginal operating costs, including the App Store commissions, increase, developers will increase their price to offset a portion of those costs.

22. This phenomenon is not unique to the Apple App Store. When firms pay a certain percentage of their revenue to a retailer or distributor, they offset an increase in this component of marginal costs by raising prices.[23] How much they increase prices depends on the impact of the commission on their marginal costs and on the price sensitivity of their consumers, but the economic impact is that consumers pay higher prices as a result of an increased commission. Importantly, Apple's App Store commission has the same economic effects as a sales or *ad valorem* tax, a tax assessed as a fixed percentage of a sales price.

23. Economists have analyzed how a tax levied on sellers of goods and services impacts buyers of those goods and services since at least the 18th century when Adam Smith extensively discussed the subject of taxation in the *Wealth of Nations*.[24] The tax incidence is one of the most fundamental principles in economics, such that I have not seen any undergraduate introductory economics textbook that does not cover this topic. Whether the tax is levied on suppliers (app developers) or consumers (the Consumer Class), the principles of tax incidence teach us that

---

[20]  McFadden 2021 Opening Report, ¶ 149.

[21]  McFadden 2021 Opening Report, Section VI.A and VI.B. *See also* McFadden 2021 Reply Report, Section II.B. *See also*, Reply Report of Daniel L. McFadden in Support of Plaintiff's Renewed Motion for Class Certification, *In re Apple iPhone Antitrust Litigation* No. 4:11-cv-06714-YGR, (N.D. Cal.), April 28, 2023 (hereafter referred to as the "McFadden 2023 Reply Report"), Section II.

[22]  McFadden 2021 Opening Report, ¶ 132.

[23]  McFadden 2021 Opening Report, ¶ 132. *See also*, McFadden 2021 Opening Report, ¶ 148.

[24]  McFadden 2023 Reply Report, ¶ 18. *See also*, McFadden 2021 Opening Report, ¶ 144. *See also*, Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations*, (1776) Chapter II of Book V.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

both consumers and suppliers share the burden of a tax. In other words, consumers pay more and suppliers receive less after the tax is introduced.

24. Figure 1, copied from an undergraduate economics textbook, illustrates how consumers and suppliers share the burden of a tax using a hypothetical gasoline market as an example.[25] The downward sloping line represents the demand curve and the upward sloping lines represent the supply curve(s). The left panel of Figure 1 illustrates the market equilibrium, represented by the intersection of supply and demand at point "A", in the absence of a tax. In that equilibrium, consumers pay $1.50 to buy a gallon of gasoline and suppliers receive the entire $1.50 from selling it.

25. The graph on the right panel of Figure 1 instead shows the impact of imposing 50¢ per gallon tax on suppliers.[26] When a 50¢ per gallon tax is imposed on suppliers, the supply curve shifts upward from $S_1$ to $S_2$. The 50¢ per gallon tax is "equivalent to a 50¢ per gallon increase in marginal cost…Because the tax acts like an increase in marginal cost, the entire supply curve shifts upward by 50¢ from $S_1$ to $S_2$ and the supply of gas falls."[27] As a result, the market equilibrium, i.e., the point at which the supply and demand curves intersect, also shifts from point "A" to point "D".

26. In the new equilibrium, gasoline consumers pay $1.80 per gallon.[28] However, gasoline sellers do not receive the full $1.80 paid by consumers. Instead, they receive only $1.30 per gallon. Notably, both gasoline consumers and gasoline suppliers pay a portion of the tax despite the tax having been levied on suppliers. In this example, "[t]he real burden of the tax is borne primarily by consumers, who pay 30¢ of the tax through higher prices, leaving producers to bear only 20¢ of the tax."[29]

---

[25]  Jonathan Gruber, *Public Finance and Public Policy*, 5th ed., (New York: Worth Publishers, 2016), p. 588. *See also*, McFadden 2021 Opening Report, ¶ 145 and Figure 11.

[26]  McFadden 2021 Opening Report, ¶ 146.

[27]  Jonathan Gruber, *Public Finance and Public Policy*, 5th ed., (New York: Worth Publishers, 2016), p. 588. *See also,* McFadden 2021 Opening Report, ¶ 145.

[28]  McFadden 2021 Opening Report, ¶ 146.

[29]  Jonathan Gruber, *Public Finance and Public Policy*, 5th ed., (New York: Worth Publishers, 2016), p. 588.

**FIGURE 1: EFFECTS OF TAX ON CONSUMERS AND SUPPLIERS**



Source: Jonathan Gruber, *Public Finance and Public Policy*, 5th ed., (New York: Worth Publishers, 2016), p. 588.

27. This textbook example is based on an excise tax, a tax of a fixed amount per unit sold, but the same principle can be applied to sales or *ad valorem* taxes.[30] Indeed, "[a]ll of the lessons [about tax incidence] drawn here apply equally to both types of taxes; the major difference with ad valorem incidence analysis is that taxes shift the … supply curve proportionally … rather than by fixed amounts…"[31]

28. Figure 2 below applies the principles of tax incidence to the Apple App Store commission.[32] In this figure, suppose app developers have a supply curve S absent Apple's App Store commission, or, equivalently, the supply curve at the "wholesale" price received net of Apple's commission. D represents the consumer demand curve at the "retail" price that he or she pays including

---

30 McFadden 2021 Opening Report, ¶ 147.
31 Jonathan Gruber, *Public Finance and Public Policy*, 5th ed., (New York: Worth Publishers, 2016), p. 587.
32 McFadden 2021 Opening Report, ¶ 148 and Figure 12.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Apple's commission. In the "As-Is" world, Apple sets a commission rate $\tau_{AI} > 0$, which shifts the supply curve upwards proportionally. The shifted As-Is supply curve is represented by $S_1$. The equilibrium in the As-Is world is represented by the point $E_{AI}$, where the price consumers pay is $P_{AI}$, the price developers receive is $P_{AI}(1 - \tau_{AI})$, and the quantity purchased is $Q_{AI}$.

29. As described in Section II, Apple would have charged a lower App Store commission rate, $\tau_{BF}$, but for its alleged monopolization of the sale of iOS apps and in-app content. Graphically, the app developer supply curve would shift upwards by less than in the As-Is world, from $S$ to $S_2$.[33] The equilibrium in the But-For world is represented by the point $E_{BF}$, where the price consumers pay is $P_{BF}$, the price developers receive is $P_{BF}(1 - \tau_{BF})$, and quantity purchased is $Q_{BF}$.[34] The amount by which consumers are overcharged on their As-Is purchases as a result of Apple's supracompetitive App Store commission rate is represented by the top-most shaded rectangular area, which is calculated as $Q_{AI}$ times the As-Is and But-For price difference $(P_{AI} - P_{BF})$. Similarly, the amount by which app developers are overcharged on their As-Is sales is calculated as $Q_{AI}$ times $P_{BF}(1 - \tau_{BF}) - P_{AI}(1 - \tau_{AI})$. The bottom-most shaded rectangular region represents App developers' overcharge amount. The excess commission, the sum of consumers' and developers' overcharge, is $Q_{AI}$ times $(P_{AI}\tau_{AI} - P_{BF}\tau_{BF})$, and the share of the excess commission that is an overcharge to consumers is $\frac{(P_{AI} - P_{BF})}{(P_{AI}\tau_{AI} - P_{BF}\tau_{BF})}$.

---

[33]   McFadden 2021 Opening Report, ¶ 148.

[34]   In the As-Is world, app developers pay Apple $\tau_{AI}P_{AI}$ and keep $(1 - \tau_{AI})P_{AI}$, where $\tau_{AI}$ is the App Store commission. In the But-For world, app developers would have paid Apple $\tau_{BF}P_{BF}$, and kept $(1 - \tau_{BF})P_{BF}$, where $\tau_{BF}$ is lower than $\tau_{AI}$.

**FIGURE 2: EFFECTS OF COMMISSION ON CONSUMERS AND APP DEVELOPERS**

Source: Reproduced from McFadden 2021 Opening Report, Figure 12.

30. The real world is more complicated than Figure 2.[35] App developers set prices to maximize profits, given their costs and the consumer demand they face, rather than taking the market price as given as in the treatment of supply shown in Figure 2. The fundamental economic principles are the same as the textbook tax incidence framework despite this complication: The App Store's excess commission is an *ad valorem* tax levied on app developers in the aftermarket for iOS apps and IAP, and both the Consumer Class members and app developers share its burden.[36]

31. While I summarize my econometric model in detail in Section IV and Appendix C, it is instructive to explain how my econometric model is based on the tax incidence framework. In the framework of Figure 2, I used real-world data to estimate consumer demand ($D$) and the app

---

[35]  McFadden 2021 Opening Report, ¶ 149.

[36]  I understand Prof. Stiglitz has analyzed real-world evidence that is consistent with the implications of the tax incidence framework. *See* Stiglitz Initial Report, Section IV.B.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

developer marginal costs, assuming that developers set their prices to maximize profits.[37] The estimated marginal costs and developers' profit maximization conditions together take the place of $S_1$ and $S_2$ in Figure 2. In other words, I used the developers' marginal costs and profit maximization conditions to find $E_{AI}$ and $E_{BF}$ on the consumer demand curve. I adjusted the App Store commission rate from $\tau_{AI}$ to $\tau_{BF}$ in developers' profit maximization conditions holding fixed the non-commission portion of their marginal costs to determine developers' prices in $E_{BF}$. The consumer overcharge is the difference between $P_{AI}$ and $P_{BF}$ and the Consumer Class damages are the overcharge multiplied by $Q_{AI}$, i.e., the upper shaded area.

32. The primary dataset I used to estimate consumer demand and developers' marginal costs, and calculate the consumer overcharge is the App Store transactions data. At the time of writing my 2023 Supplemental Report, that dataset recorded all transactions made through the App Store from July 2008 through April 2022.[38] The level of detail of the App Store transactions data allowed me to identify the Apple IDs of iOS device consumers who spent money on apps and in-app content through the App Store during the Class Period. It also allowed me to identify the apps and in-app content purchased with each transaction, and how much commission Apple retained.[39]

33. I also used data on developers' variable costs. Developer data is supplemental because my model employs econometric methods widely used in the economic literature to estimate app developers'

---

[37] McFadden 2021 Opening Report, ¶ 150. As I explained in my prior reports, the relevant app developer costs to estimating common economic impact are developers' variable costs. Variable costs are firm expenses that change in proportion to production output. An example of a variable cost is royalty payments paid by music streaming service providers. These royalty payments, which are paid to the rights-holders of music offered by the music streaming service, are variable costs because the royalty payments increase as the more consumers download and use their app to stream music. Variable costs are often used as proxies for the marginal cost of a firm, which is the "*increment*, or addition, to cost that results from producing one more unit of output." Moreover, "[b]ecause fixed cost does not change as output increases, the increase in total cost when output increases is identical to the corresponding increase in variable cost." *See* McFadden 2021 Opening Report, ¶ 185; and footnotes 249 and 250. *See also* Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization, 4th ed.* (Pearson, 2015): 53-54.

[38] *See* McFadden 2023 Supplemental Report, ¶ 6. *See also*, McFadden 2021 Opening Report, ¶¶ 138-139. I understand that Apple has since produced additional data so that its App Store transactions now records all transactions made through the App Store from the start of the Class Period until February 2, 2024. *See* Expert Report of Minjae Song, Ph.D., *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025 (hereafter referred to as the "Song 2025 Report"), Section II.

[39] In fact, because I can calculate the commission for each transaction, I do not need to know which app developers are qualified for the discounted rates. *See* McFadden 2021 Opening Report, ¶¶ 31-32. *See also*, McFadden 2021 Opening Report, ¶ 139.

---

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

cost functions jointly with consumer demand and app developers' profit maximization conditions.[40] These methods are based on the basic economic principle that the profit-maximizing firm's variable margin is the inverse of the price elasticity of demand. In other words, the profit-maximizing firm sets a higher markup when consumer demand is less elastic. In situations where firms' cost data are not available, but there is sufficient information to estimate consumer demand, economists can use this principle and observed market equilibrium prices to impute firms' variable margins.

34. Nevertheless, information on firms' costs and variable margin is helpful in estimating demand and costs.[41] By reversing the mechanism of imputing firms' variable margins, firms' cost data can be used to estimate consumer demand more accurately. Still, it is important to emphasize that my model does not require information for every app developer's cost. I can use consumer demand and app developers' profit maximization conditions to estimate app developers' costs without cost data from each of these app developers.[42]

## III.B. The Impact of the App Store Commission is Common to the Class

35. Any consumer who spent money on apps and in-app content has been impacted by Apple's App Store commission in excess of competitive levels if it resulted in app developers changing the retail price of apps and in-app content.[43] If consumers paid to subscribe to music streaming services or purchased 100 virtual tokens in a game app, their transactions were subject to Apple's App Store commissions. If as a result of anti-competitive acts by Apple, commissions exceeded competitive levels, and the price consumers paid was inflated, consumers were overcharged for these digital products.

36. The economic principles described in the previous subsection can be applied to all iOS device consumers who spent money on the App Store, or only those who satisfy the Class definition, and all app developers who are subject to the App Store commission.[44] While consumers may

---

[40] McFadden 2021 Opening Report, ¶ 140.
[41] McFadden 2021 Opening Report, ¶¶ 141-142.
[42] McFadden Opening Report, ¶ 142.
[43] McFadden 2021 Opening Report, ¶ 131.
[44] McFadden 2021 Opening Report, ¶ 133.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

have spent money on a variety of apps, app variety does not negate the commonality of economic impact because all app developers selling apps and in-app content through the App Store were bound by Apple's alleged anticompetitive restrictions in the iOS aftermarket during the Class Period.[45]

37.  Of course, the degree of the common economic impact, and thus the amount of damages, differs depending on which apps and in-app content the Consumer Class members spent money on.[46] However, the econometric model for assessing common economic impact that I summarize in Section IV and Appendix C can be used to quantify the amount of damages that individual Class members incurred through their particular choice of apps and in-app content purchased during the Class Period. As I have explained in my prior reports, my methodology would not change whether consumers sue Apple individually or as a class.[47]

## IV. Econometric Model for Estimating Damages

38.  The tax incidence framework described in Section III requires three components as an input. First, it requires an estimate of the App Store commission rate that would prevail absent its alleged conduct. In both my 2023 Supplemental Report and the present report, Counsel provided me with the But-For commission rate, which I understand is consistent with the opinions of Dr. Abrantes-Metz. Hence, I do not discuss its estimation in this report.[48] Second, the tax incidence framework requires an estimate of consumer demand, which was represented by the curve labeled $D$ in Figure 2. Third, I must estimate developers' costs, which, together with estimates for consumer demand and developers' profit maximization conditions, allow me to determine how developer pricing changes in response to commission rate changes.

39.  In this section, I summarize the econometric model I developed in my prior reports to estimate damages using the tax incidence framework. Consequently, I base this section on related sections

---

[45]  *See, generally,* Stiglitz Initial Report, Section III for a discussion of Apple's restrictions.

[46]  In some cases, the amount of damages may differ depending on when the Consumer Class members spent money if app developers offer temporary price discounts. *See* McFadden 2021 Opening Report, ¶ 135 and footnote 201.

[47]  McFadden 2023 Reply Report, ¶ 69.

[48]  McFadden 2023 Supplemental Report, ¶ 7.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

in my prior reports.[49] Broadly, given an estimate for the But-For commission rate, consumer demand, and developers' costs, I can estimate the app and in-app content prices consumers would have paid absent Apple's alleged misconduct. I understand that, in the class certification process, the Court concluded that "[my] model can show the impact of Apple's allegedly anticompetitive conduct across all class members."[50]

## IV.A. App Developer Pricing and Profit Maximization

40.  I model app developers' price setting strategies as profit-maximizing firms' pricing decision, which is a standard way to model firms' strategies in economics.[51] When a firm increases its price, it will lose some consumers who are more price sensitive than others, but it can make more money from consumers who continue to buy its product. But the firm does not want to continue to raise its price indefinitely because the extra money earned from consumers who stay with it at some point becomes smaller than the money it loses from reduced demand. In economic terms, the profit-maximizing firm sets price at a level where the marginal revenue equals the marginal cost. The marginal revenue is determined by consumer demand, while the marginal cost is determined by the cost function.

41.  Estimating app developers' price setting behavior is equivalent to estimating their profit functions and applying the profit maximizing conditions to them.[52] The consumer demand and app developer cost functions are part of this pricing model because they dictate how the marginal revenue and margin cost change as app developers change prices.

42.  Once I estimate app developers' costs and consumer demand, which together dictate their pricing decisions, I can use them to estimate app and in-app content prices at lower, competitive But-For commission rates.[53] If the commission rate is lower, app developers will lower their app and in-

---

[49]  McFadden 2021 Opening Report, Sections VI.D-VI.E. *See also,* McFadden 2021 Reply Report, Section II.A and IV.B; McFadden 2023 Reply Report, Section III.C and IV.C. *See also, generally,* McFadden 2023 Supplemental Report.

[50]  Second Class Certification Order, 26:4-5.

[51]  App developers do not price discriminate, meaning that they set a single price for a given product. *See* McFadden 2021 Opening Report, ¶ 167. Moreover, I model developers' pricing decisions at the app-level. *See* McFadden 2021 Reply Report, ¶ 142. *See also,* McFadden 2023 Reply Report, ¶ 103.

[52]  McFadden 2021 Opening Report, ¶ 168.

[53]  McFadden 2021 Opening Report, ¶ 169.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

app content prices because the extra sales they make by cutting prices are more profitable than before. But app developers will stop lowering the prices at some point because they have to sell *every* unit at lower prices, and it is not worth selling more units when the prices are below some threshold. The pricing model estimates the level at which app developers stop lowering their app and in-app content prices for a given But-For commission rate. I explain the mathematics of developers' profit maximization and how I use the profit maximization principle to estimate developers' profit functions in Appendix C.

## IV.B. Estimating Consumer Demand for iOS Apps and In-App Content

### IV.B.1. Model of Consumer Demand

43. The key element of consumer demand needed for the purpose of quantifying the common economic impact of Apple's anticompetitive conduct is consumers' sensitivity to price changes.[54] Whether an app developer sets the download price for a dictionary app or the in-app content price for a music streaming app, its pricing decision will depend on how price sensitive the iOS device consumers are.

44. I designed my model to estimate demand for app downloads and demand for in-app content separately while accounting for their interrelations.[55] It includes two demand equations: The first is an equation representing the demand for app downloads, which I can use to estimate consumers' price sensitivity for app downloads. The second is an equation representing demand for in-app purchases, which I can use to estimate consumers' price sensitivity for in-app purchases. I also included a variable in the in-app purchase demand equation to capture how Paid Download IAP apps, for which consumers pay for both app downloads and in-app content, may account for the impact their download price has on the amount of in-app content they ultimately sell. I describe these demand equations in more detail in Appendix C.

45. Rather than letting all apps and in-app purchases have the same demand coefficients, my model allows apps that belong to different app categories (hereafter referred to as "genres") to have

---

54    McFadden 2021 Opening Report, ¶ 177.
55    McFadden 2021 Opening Report, ¶¶ 179-184.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

different coefficients.[56] The app genres are used by iOS device users to find apps to fit their needs, and Apple advises app developers to choose the most accurate and effective genres for listing their apps. The App Store transactions data provides information on which genre each app belongs to. This allows the estimated model to reflect the demand and supply conditions that are specific to each app genre.

46. I explained in my prior reports how my demand model can be estimated using random samples of the full App Store transactions data. For example, I demonstrated in my 2021 reports that estimating my model with a single random sample produces statistically valid demand estimates.[57] I subsequently explained in my 2023 Supplemental Report a statistically sound way to account for and minimize sampling error by estimating the demand model with many random samples from the full App Store transactions data.[58]

### IV.B.2. App Developer Costs and Gross Margin Bounds

47. As I explained in Section III, some app developers produced cost data at the time of writing my prior reports. My model incorporates these app developers' variable margins when estimating consumer demand.[59] A basic economic principle shows that a profit-maximizing firm's variable margin is the inverse of the price elasticity of demand it faces. This relationship means that the variable margin can be estimated using only demand estimates if the variable margin is unknown. Conversely, if information on the variable margin is available, it can help improve demand estimation.[60] Thus, my model can incorporate information about developers' variable margins as the constraints that the demand estimates should satisfy.[61] I demonstrated this aspect

---

[56]  McFadden 2021 Opening Report, ¶¶ 210-211.

[57]  I estimated demand using the transactions associated with a 0.1 percent random sample of Apple IDs. *See* McFadden 2021 Opening Report, ¶ 218. *See also*, McFadden 2021 Opening Report, Figures 20-26. *See also,* McFadden 2021 Reply Report, ¶¶ 171-173.

[58]  Specifically, I estimated consumer demand with many 0.1 percent samples and used the average value of the estimated coefficients obtained from those samples to estimate damages. This demand estimation process took the following steps: (1) Draw 75 0.1 percent samples. (2) Estimate consumer demand with each of these samples. (3) Take the average of the 75 sets of estimated demand coefficients obtained from these samples. (4) Use the average value of the coefficients to estimate damages. *See* McFadden 2023 Supplemental Report, ¶¶ 53-54, and footnote 67.

[59]  McFadden 2021 Opening Report, ¶ 212. *See also,* McFadden 2023 Reply Report, ¶¶ 141-142.

[60]  McFadden 2023 Reply Report, ¶ 150.

[61]  McFadden 2021 Opening Report, ¶ 213.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

of my model in my prior reports by imposing bounds on the genre average variable margins implied by my model for the Games and Music & Entertainment genres.[62]

48. Because my model uses only genre average margin bounds as constraints, the estimated variable margins for individual apps can be different from the estimated average margin and can vary widely.[63] Also, my model does not impose the margin constraints on the app developers or apps for which cost information is available. Instead, my model uses the app developers' cost information only to learn about a range of variable margins for each app genre. Thus, the estimated variable margins for these app developers can lie outside the range specified in the constraints if their margins are not close to the app genre average margin.

## IV.C. Estimating Class-wide Damages

### IV.C.1. The Percentage Method for Calculating Damages

49. My econometric model uses the "percentage method", as described in my 2023 Supplemental Report and summarized below, to calculate damages for all paid transactions in the App Store transactions data.[64] This method calculates damages at the transaction level, allowing me to distinguish between harmed and unharmed Class members. I estimate Class-wide damage by aggregating these transaction-level damages across all transactions associated with Class members.

50. I explained in my 2023 Supplemental Report that my model can be used to estimate But-For prices both in the absence of Apple's price tier restrictions and assuming Apple's price tiers

---

62  For example, I imposed the constraint that the average variable margin implied by the demand estimates in the Games genre and the profit maximization conditions for those apps should range from 60 percent to 90 percent. In estimating demand for Entertainment and Music apps and in-app content, I imposed the constraint that the average variable margin implied by the demand estimates in the Music and Entertainment genres and the profit maximization conditions for those apps range from 20 percent to 60 percent. *See* McFadden 2021 Opening Report, ¶ 213.

63  McFadden 2021 Opening Report, ¶ 215. *See also,* McFadden 2023 Reply Report, ¶ 141.

64  McFadden 2023 Supplemental Report, Section III.B and III.C. *See also,* McFadden 2023 Reply Report, ¶ 46. My methodology can use demand coefficients estimated using random samples of the full data to calculate damages for the full App Store transactions data. That is possible because once consumer demand is estimated using a sample, developers' variable costs and their But-For prices can be estimated for apps that are not included in the sample used in demand estimation. *See* McFadden 2023 Supplemental Report, ¶ 31. The mathematical formula for estimating the But-For price for apps not included in any one 0.1 percent sample is presented in Appendix C. The formula is reproduced from my 2023 Supplemental Report. *See,* McFadden 2023 Supplemental Report, Appendix E.1.

---

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

_Daniel McFadde_

Daniel L. McFadden, Ph.D.

March 7, 2025