# EXHIBIT 96

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**

# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

|  |  |
|---|---|
| **IN RE APPLE IPHONE ANTITRUST LITIGATION** | **No. 4:11-cv-06714-YGR**<br><br><br>**Hon. Yvonne Gonzalez Rogers** |

EXPERT REPORT OF
## DANIEL L. MCFADDEN, PH.D.

**MARCH 7, 2025**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## CONTENTS

**I. Introduction** ...........................................................................................................1

    I.A. Assignment ...................................................................................................1

    I.B. Summary of Opinions.................................................................................3

**II. Apple's Alleged Anticompetitive Conduct** ..........................................................4

**III. Economic Principles of the App Store Commission**...................................................6

    III.A. The App Store Commission Functions as a Sales Tax .....................................7

    III.B. The Impact of the App Store Commission is Common to the Class .............................13

**IV. Econometric Model for Estimating Damages** .........................................................**14**

    IV.A. App Developer Pricing and Profit Maximization.............................................15

    IV.B. Estimating Consumer Demand for iOS Apps and In-App Content..............................16

        IV.B.1. Model of Consumer Demand ...................................................................16

        IV.B.2. App Developer Costs and Gross Margin Bounds.................................................17

    IV.C. Estimating Class-wide Damages ...........................................................................18

        IV.C.1. The Percentage Method for Calculating Damages ...........................................18

        IV.C.2. Identification of Harmed and Unharmed Class Members ...................................20

**V. Conclusion**...............................................................................................................**21**

**Appendix A Curriculum Vitae** ...................................................................................**23**

**Appendix B Materials Relied Upon** ..........................................................................**44**

**Appendix C Technical Details of Damages Model**....................................................**46**

Figure 1: Effects of Tax on Consumers and Suppliers ..........................................................9

Figure 2: Effects of Commission on Consumers and App Developers ...................................11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

# I. Introduction

## I.A. Assignment

1. In the Class Certification Order issued on February 2, 2024, the Court certified a proposed Consumer Class that Consumer Plaintiffs allege are harmed by Apple's anticompetitive practices in the aftermarket for the sale of iOS applications ("apps") and in-app content.[1] The certified Consumer Class (the "Class") is defined as all persons in the United States who purchased one or more iOS apps from Apple, or who paid Apple for one or more in-app purchases, including, but not limited to, any subscription purchase, for use on an iOS mobile device (an "iOS device" hereafter) at any time since July 10, 2008 (the "Class Period").[2] The Class is limited to those persons who paid more than $10 in total to Apple during the Class Period for iOS apps and in-app purchases from any one Apple ID.[3]

2. In prior testimony, I explained how the Apple App Store's allegedly supracompetitive commission fee functions like a tax in the aftermarket for iOS apps and in-app purchases, thereby harming both the Consumer Class and developers.[4] I also demonstrated how the econometric model described therein can be used to estimate the monetary harm incurred by the Consumer Class as a result of Apple's allegedly supracompetitive App Store commission fee and price tier restrictions.[5]

---

[1] Order Denying Apple's Daubert Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), February 02, 2024 (hereafter referred to as the "Second Class Certification Order"). *See also,* Stipulation and [Proposed] Order for Leave to File Third Amended Consolidated Class Action Complaint, *In re Apple iPhone Antitrust Litigation*, No. C 11-06714-YGR (N.D. Cal.), September 11, 2020, ECF No. 228 (hereafter referred to as the "Third Amended Consolidated Complaint").

[2] Second Class Certification Order, 2:9-13. For the purposes of this report, I have been instructed by Counsel to treat iPhones and iPads, but not the iPod Touch, as iOS mobile devices.

[3] Second Class Certification Order, 2:9-13.

[4] Expert Report of Daniel L. McFadden in Support of Plaintiff's Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), June 1, 2021 (hereafter referred to as the "McFadden 2021 Opening Report"); and Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiff's Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), January 19, 2023 (hereafter referred to as the "McFadden 2023 Supplemental Report").

[5] *See, generally,* McFadden 2023 Supplemental Report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

3. Counsel for Consumer Plaintiffs has asked me to explain my methodology for estimating damages for purchases of iOS apps and in-app content in the Apple App Store. I demonstrated to the Court in my prior testimony how my methodology can be used to estimate damages on a Class-wide basis and for each Class member.

4. I was invited to work on this project by David Sunding, Ph.D., formerly President of The Brattle Group and now Vice Chairman of Berkeley Research Group, LLC. During the class certification stage of this litigation, I developed the tax incidence approach as the theoretical framework for the econometric modeling I performed to assess the impact, if any, and to estimate the damages, if any, to the Consumer Class from Apple's alleged misconduct. I directed and worked closely with Minjae Song, Ph.D., another Principal of The Brattle Group, in the creation, testing, and implementation of my damages model. Dr. Song and I kept Dr. Sunding informed of the theoretical work I performed. Effective December 31, 2023, I retired as a Principal of The Brattle Group. Since that date, Dr. Song has directly overseen the implementation of my methodology using the App Store transactions data for all genres in his expert report, including preparing the underlying data for the modeling. Dr. Song and I have conferred regularly as he has implemented my methodology.

5. I am aware that Counsel for Consumer Plaintiffs has also asked Prof. Stiglitz and Dr. Abrantes-Metz to submit expert reports describing their opinions. I rely on several of their conclusions in forming some of my own opinions.[6] Counsel has instructed me to rely on the following list of conclusions from these experts when explaining my methodology.

- I have been instructed by Counsel for Consumer Plaintiffs to assume that Apple would charge a 13.63 percent commission on app downloads and in-app purchases made through the App Store absent Apple's alleged anticompetitive conduct. I understand that this commission is consistent with the opinions offered by Dr. Abrantes-Metz.

- I understand that Prof. Stiglitz has offered opinions related to the liability issues in this matter, including the relevant antitrust markets in which the App Store operates and whether

---

[6]   Expert Report of Joseph E. Stiglitz, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025 (hereafter referred to as the "Stiglitz Initial Report"); and Expert Report of Rosa M. Abrantes-Metz, Ph.D., *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

and how Apple's alleged misconduct has harmed consumers. The methodology described in this report is consistent with these opinions.

6. Unless otherwise noted, I use the terminology from my prior reports. For example, throughout my report I use the terms "As-Is" and "But-For" worlds in the same manner as I have in my previous testimony. The same is true for the terms "app downloads", "in-app purchases", and "IAPs." Moreover, I refer to the anonymized Apple accounts associated with each transaction contained in Apple's prior App Store transactions data productions as "Apple IDs" throughout this report. Finally, I refer to three business models for paid apps—"Paid Download Only", "Paid Download with IAP", and "Free Download with IAP"—in the same manner as my prior reports.

7. I disclosed my qualifications, compensation, and documents I relied on in my prior reports. Appendix A details my up-to-date CV and Appendix B lists the materials I relied upon in preparing this report.

## I.B. Summary of Opinions

8. Section II summarizes Apple's alleged misconduct and the resulting consumer harm analyzed by Prof. Stiglitz. I find his opinions consistent with the opinions I offered in my prior reports. I designed my methodology to estimate the monetary harm caused by Apple's allegedly supracompetitive App Store commission rate. The extent of consumer harm my model estimates is conservative if consumers are harmed in other ways as a result of Apple's alleged misconduct.

9. Section III explains the tax incidence framework that forms that basis of my damages methodology and the degree of common impact of Apple's alleged misconduct. Apple's App Store commission has the same economic effects as sales or ad valorem taxes, both of which are well-studied in economics. The impact of Apple's conduct is common and the tax incidence framework can be used to estimate consumers' monetary damages.

10. Section IV outlines the econometric model I demonstrated to the Court in my prior reports. My model can be used to estimate Class-wide damages and identify those consumers who did not incur monetary damages. Moreover, my model can be used to estimate damages both with and without Apple's price tier restrictions in the But-For world, and can accommodate any But-For commission rate the Court or a jury finds on the merits.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

11. Unless otherwise noted, I reaffirm my opinions from my 2023 Supplemental Report and my other reports during the class certification stage.

## II. Apple's Alleged Anticompetitive Conduct

12. Consumer Plaintiffs allege that Apple has monopolized or attempted to monopolize the market for the sale of iOS apps and in-app content.[7] Specifically, Consumer Plaintiffs allege that Apple "lock[ed] consumers into buying apps only from Apple and paying Apple a 30% fee" without their consent.[8] They further allege that Apple locked consumers' iOS devices "to prohibit them from using any app that was not approved or sold by Apple."[9] In so doing, Consumer Plaintiffs allege that Apple "violated Section 2 of the Sherman Act…in a manner that harmed competition and injured iOS apps[sic] consumers by reducing output and consumer choice, and by increasing prices for iOS apps to supracompetitive levels."[10]

13. I understand that Counsel for Consumer Plaintiffs have asked Prof. Stiglitz to, among other things, analyze whether Apple's alleged conduct enabled it to acquire and maintain market power (or monopoly power); and, to analyze whether Apple's alleged misconduct harmed consumers.[11] I have reviewed Prof. Stiglitz's Initial Report and summarize several of Prof. Stiglitz's opinions below.[12] I find these opinions consistent with the opinions I offered in my class certification reports.

14. First, Apple, through its Developer Program License Agreement and App Review Guidelines, sets the requirements developers must meet to distribute their products via the App Store.[13] These policies prohibit iOS app developers from distributing store-like apps—that is, apps that distribute other apps—through the App Store. Additionally, Apple imposes contractual and technological restrictions that effectively prevent developers from selling apps to iOS device

---

[7]   I understand that Consumer Plaintiffs allege that this market constitutes an aftermarket derived from the purchase of an iOS mobile device. *See, e.g.,* Third Amended Consolidated Complaint, ¶ 19.

[8]   Third Amended Consolidated Complaint, ¶ 18.

[9]   Third Amended Consolidated Complaint, ¶ 18.

[10]   Third Amended Consolidated Complaint, ¶ 19.

[11]   Stiglitz Initial Report, Section I.B.

[12]   Stiglitz Initial Report, Section I.C. *See also,* Stiglitz Initial Report, Section III and Stiglitz Initial Report, Section IV.

[13]   *See, generally,* Stiglitz Initial Report, Section III.A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

users through any channel other than the App Store. These barriers have eliminated potential alternative distribution channels for iOS apps and in-app content that might have emerged absent Apple's restrictive practices. With no major alternatives for reaching iOS users, developers have no choice but to comply with Apple's requirements.

15. Second, Apple requires that developers distributing their apps through the App Store use Apple's own payment processing system (IAP) when selling their digital in-app content.[14] Aside from limited exceptions (e.g., for transactions of non-digital goods and services), developers cannot use alternative iOS in-app payment processing solutions when selling their in-app content. Apple's IAP requirement has foreclosed alternatives to Apple's IAP system that likely would have existed but for Apple's conduct.

16. Third, Apple has enacted a series of anti-steering provisions that insulate its App Store from competition, at least until January 2024.[15] These anti-steering restrictions prevent developers from including external links within their app or otherwise directing consumers to purchase mechanisms other than Apple's IAP system. These restrictions further discourage multiplatform developers from using contact information obtained within their iOS apps to encourage users to purchase their content outside of the app. By enforcing these anti-steering provisions, Apple can further prohibit any meaningful competition from outside the App Store.

17. Together, Apple's conduct has allowed it to acquire monopoly power, the exercise of which has harmed consumers.[16] By foreclosing competition, Apple deprived consumers of alternative purchase channels from which they could buy iOS apps and in-app content. Thus, Apple is able to charge a supracompetitive App Store commission, which in turn has increased the prices consumers pay for iOS apps and in-app content. Further, Apple's conduct has allowed it to impose restrictions on the prices developers can charge for their apps and in-app content. Finally, Apple's conduct has suppressed output, and the variety and quality of available iOS apps and in-app content.

---

[14]    *See, generally,* Stiglitz Initial Report, Section III.B.

[15]    *See, generally,* Stiglitz Initial Report, Section III.C.

[16]    *See, generally,* Stiglitz Initial Report, Section IV.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

18. It is important to highlight two aspects of my damages model before proceeding. First, as established by Prof. Stiglitz, the relevant antitrust market in which Apple's App Store operates is the market for the sale of iOS apps and in-app content in the United States. My damages model estimates the effect of Apple's conduct on the prices paid by consumers for iOS apps and in-app content. Hence, my damages model estimates the effect of the Apple App Store's supracompetitive commission on the prices for App Store apps and in-app purchases.[17]

19. Second, the damages model I developed is intended to estimate and quantify the monetary harm incurred by consumers as a result of overcharges for their app and in-app purchases relative to what they would have paid for these purchases absent Apple's alleged misconduct.[18] It does not capture other forms of harm that consumers may have incurred as a result of Apple's alleged misconduct. For example, it does not quantify harm related to the loss in output or reduction in app variety described by Prof. Stiglitz. In that sense, the extent of consumer harm my model estimates is conservative. If my model finds a Consumer Class member did not incur monetary damages from overcharges, that does not imply they were unharmed by Apple's conduct. The references I made in my prior reports to "unharmed" Consumer Class members was only intended to convey that they did not incur monetary damages attributable to Apple's supracompetitive App Store commission.

## III. Economic Principles of the App Store Commission

20. In this section, I explain the economic principles of the App Store commission. Specifically, I have previously testified how the App Store commission functions like a sales tax whose impact can be apportioned between consumers and developers using a tax incidence framework.[19] The economic principle of tax incidence clarifies how the App Store commission levied on app developers results in higher app and in-app content prices for the Consumer Class. The econometric methodology I summarize in Section IV and Appendix C is based on the tax incidence principle. I also testified why the tax incidence framework shows the supracompetitive

---

[17] *See, e.g.,* McFadden 2021 Opening Report, ¶¶ 149-150.

[18] McFadden 2021 Opening Report, ¶¶ 243-244. *See also,* McFadden 2023 Supplemental Report, ¶ 11.

[19] *See, e.g.,* McFadden 2021 Opening Report, Section VI.B. *See also*, Reply Report of Daniel L. McFadden in Support of Plaintiff's Motion for Class Certification*, In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), Oct. 19, 2021 (hereafter referred to as the "McFadden 2021 Reply Report"), Section II.B.1.

commission charged by Apple impacts all members of the Class.[20] I reaffirm those opinions in this section. Consequently, I base this section on related sections in my prior reports.[21]

## III.A. The App Store Commission Functions as a Sales Tax

21. The underlying economic principles of the App Store's commission are straightforward.[22] Apple charges developers a percentage of the sales price for their apps and digital in-app content in the form of a commission. The commissions Apple collects is therefore a component of app developers' effective operating costs, which are a key determinant of prices offered by profit-maximizing developers. When marginal operating costs, including the App Store commissions, increase, developers will increase their price to offset a portion of those costs.

22. This phenomenon is not unique to the Apple App Store. When firms pay a certain percentage of their revenue to a retailer or distributor, they offset an increase in this component of marginal costs by raising prices.[23] How much they increase prices depends on the impact of the commission on their marginal costs and on the price sensitivity of their consumers, but the economic impact is that consumers pay higher prices as a result of an increased commission. Importantly, Apple's App Store commission has the same economic effects as a sales or *ad valorem* tax, a tax assessed as a fixed percentage of a sales price.

23. Economists have analyzed how a tax levied on sellers of goods and services impacts buyers of those goods and services since at least the 18th century when Adam Smith extensively discussed the subject of taxation in the *Wealth of Nations*.[24] The tax incidence is one of the most fundamental principles in economics, such that I have not seen any undergraduate introductory economics textbook that does not cover this topic. Whether the tax is levied on suppliers (app developers) or consumers (the Consumer Class), the principles of tax incidence teach us that

---

[20]    McFadden 2021 Opening Report, ¶ 149.

[21]    McFadden 2021 Opening Report, Section VI.A and VI.B. *See also* McFadden 2021 Reply Report, Section II.B. *See also*, Reply Report of Daniel L. McFadden in Support of Plaintiff's Renewed Motion for Class Certification, *In re Apple iPhone Antitrust Litigation* No. 4:11-cv-06714-YGR, (N.D. Cal.), April 28, 2023 (hereafter referred to as the "McFadden 2023 Reply Report"), Section II.

[22]    McFadden 2021 Opening Report, ¶ 132.

[23]    McFadden 2021 Opening Report, ¶ 132. *See also*, McFadden 2021 Opening Report, ¶ 148.

[24]    McFadden 2023 Reply Report, ¶ 18. *See also*, McFadden 2021 Opening Report, ¶ 144. *See also*, Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations*, (1776) Chapter II of Book V.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

both consumers and suppliers share the burden of a tax. In other words, consumers pay more and suppliers receive less after the tax is introduced.

24. Figure 1, copied from an undergraduate economics textbook, illustrates how consumers and suppliers share the burden of a tax using a hypothetical gasoline market as an example.[25] The downward sloping line represents the demand curve and the upward sloping lines represent the supply curve(s). The left panel of Figure 1 illustrates the market equilibrium, represented by the intersection of supply and demand at point "A", in the absence of a tax. In that equilibrium, consumers pay $1.50 to buy a gallon of gasoline and suppliers receive the entire $1.50 from selling it.

25. The graph on the right panel of Figure 1 instead shows the impact of imposing 50¢ per gallon tax on suppliers.[26] When a 50¢ per gallon tax is imposed on suppliers, the supply curve shifts upward from $S_1$ to $S_2$. The 50¢ per gallon tax is "equivalent to a 50¢ per gallon increase in marginal cost…Because the tax acts like an increase in marginal cost, the entire supply curve shifts upward by 50¢ from $S_1$ to $S_2$ and the supply of gas falls."[27] As a result, the market equilibrium, i.e., the point at which the supply and demand curves intersect, also shifts from point "A" to point "D".

26. In the new equilibrium, gasoline consumers pay $1.80 per gallon.[28] However, gasoline sellers do not receive the full $1.80 paid by consumers. Instead, they receive only $1.30 per gallon. Notably, both gasoline consumers and gasoline suppliers pay a portion of the tax despite the tax having been levied on suppliers. In this example, "[t]he real burden of the tax is borne primarily by consumers, who pay 30¢ of the tax through higher prices, leaving producers to bear only 20¢ of the tax."[29]

---

[25]  Jonathan Gruber, *Public Finance and Public Policy*, 5th ed., (New York: Worth Publishers, 2016), p. 588. *See also*, McFadden 2021 Opening Report, ¶ 145 and Figure 11.

[26]  McFadden 2021 Opening Report, ¶ 146.

[27]  Jonathan Gruber, *Public Finance and Public Policy*, 5th ed., (New York: Worth Publishers, 2016), p. 588. *See also,* McFadden 2021 Opening Report, ¶ 145.

[28]  McFadden 2021 Opening Report, ¶ 146.

[29]  Jonathan Gruber, *Public Finance and Public Policy*, 5th ed., (New York: Worth Publishers, 2016), p. 588.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**FIGURE 1: EFFECTS OF TAX ON CONSUMERS AND SUPPLIERS**



Source: Jonathan Gruber, *Public Finance and Public Policy*, 5th ed., (New York: Worth Publishers, 2016), p. 588.

27. This textbook example is based on an excise tax, a tax of a fixed amount per unit sold, but the same principle can be applied to sales or *ad valorem* taxes.[30] Indeed, "[a]ll of the lessons [about tax incidence] drawn here apply equally to both types of taxes; the major difference with ad valorem incidence analysis is that taxes shift the … supply curve proportionally … rather than by fixed amounts…"[31]

28. Figure 2 below applies the principles of tax incidence to the Apple App Store commission.[32] In this figure, suppose app developers have a supply curve *S* absent Apple's App Store commission, or, equivalently, the supply curve at the "wholesale" price received net of Apple's commission. *D* represents the consumer demand curve at the "retail" price that he or she pays including

---

30    McFadden 2021 Opening Report, ¶ 147.
31    Jonathan Gruber, *Public Finance and Public Policy*, 5th ed., (New York: Worth Publishers, 2016), p. 587.
32    McFadden 2021 Opening Report, ¶ 148 and Figure 12.

Expert Report of Daniel L. McFadden, Ph.D.        No. 4:11-cv-06714-YGR | Page 9 of 49

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Apple's commission. In the "As-Is" world, Apple sets a commission rate $\tau_{AI} > 0$, which shifts the supply curve upwards proportionally. The shifted As-Is supply curve is represented by $S_1$. The equilibrium in the As-Is world is represented by the point $E_{AI}$, where the price consumers pay is $P_{AI}$, the price developers receive is $P_{AI}(1 - \tau_{AI})$, and the quantity purchased is $Q_{AI}$.

29. As described in Section II, Apple would have charged a lower App Store commission rate, $\tau_{BF}$, but for its alleged monopolization of the sale of iOS apps and in-app content. Graphically, the app developer supply curve would shift upwards by less than in the As-Is world, from $S$ to $S_2$.[33] The equilibrium in the But-For world is represented by the point $E_{BF}$, where the price consumers pay is $P_{BF}$, the price developers receive is $P_{BF}(1 - \tau_{BF})$, and quantity purchased is $Q_{BF}$.[34] The amount by which consumers are overcharged on their As-Is purchases as a result of Apple's supracompetitive App Store commission rate is represented by the top-most shaded rectangular area, which is calculated as $Q_{AI}$ times the As-Is and But-For price difference $(P_{AI} - P_{BF})$. Similarly, the amount by which app developers are overcharged on their As-Is sales is calculated as $Q_{AI}$ times $P_{BF}(1 - \tau_{BF}) - P_{AI}(1 - \tau_{AI})$. The bottom-most shaded rectangular region represents App developers' overcharge amount. The excess commission, the sum of consumers' and developers' overcharge, is $Q_{AI}$ times $(P_{AI}\tau_{AI} - P_{BF}\tau_{BF})$, and the share of the excess commission that is an overcharge to consumers is $\frac{(P_{AI} - P_{BF})}{(P_{AI}\tau_{AI} - P_{BF}\tau_{BF})}$.

---

[33] McFadden 2021 Opening Report, ¶ 148.

[34] In the As-Is world, app developers pay Apple $\tau_{AI}P_{AI}$ and keep $(1 - \tau_{AI})P_{AI}$, where $\tau_{AI}$ is the App Store commission. In the But-For world, app developers would have paid Apple $\tau_{BF}P_{BF}$, and kept $(1 - \tau_{BF})P_{BF}$, where $\tau_{BF}$ is lower than $\tau_{AI}$.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**FIGURE 2: EFFECTS OF COMMISSION ON CONSUMERS AND APP DEVELOPERS**



Source: Reproduced from McFadden 2021 Opening Report, Figure 12.

30. The real world is more complicated than Figure 2.[35] App developers set prices to maximize profits, given their costs and the consumer demand they face, rather than taking the market price as given as in the treatment of supply shown in Figure 2. The fundamental economic principles are the same as the textbook tax incidence framework despite this complication: The App Store's excess commission is an *ad valorem* tax levied on app developers in the aftermarket for iOS apps and IAP, and both the Consumer Class members and app developers share its burden.[36]

31. While I summarize my econometric model in detail in Section IV and Appendix C, it is instructive to explain how my econometric model is based on the tax incidence framework. In the framework of Figure 2, I used real-world data to estimate consumer demand ($D$) and the app

---

[35] McFadden 2021 Opening Report, ¶ 149.

[36] I understand Prof. Stiglitz has analyzed real-world evidence that is consistent with the implications of the tax incidence framework. *See* Stiglitz Initial Report, Section IV.B.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

developer marginal costs, assuming that developers set their prices to maximize profits.[37] The estimated marginal costs and developers' profit maximization conditions together take the place of $S_1$ and $S_2$ in Figure 2. In other words, I used the developers' marginal costs and profit maximization conditions to find $E_{AI}$ and $E_{BF}$ on the consumer demand curve. I adjusted the App Store commission rate from $\tau_{AI}$ to $\tau_{BF}$ in developers' profit maximization conditions holding fixed the non-commission portion of their marginal costs to determine developers' prices in $E_{BF}$. The consumer overcharge is the difference between $P_{AI}$ and $P_{BF}$ and the Consumer Class damages are the overcharge multiplied by $Q_{AI}$, i.e., the upper shaded area.

32. The primary dataset I used to estimate consumer demand and developers' marginal costs, and calculate the consumer overcharge is the App Store transactions data. At the time of writing my 2023 Supplemental Report, that dataset recorded all transactions made through the App Store from July 2008 through April 2022.[38] The level of detail of the App Store transactions data allowed me to identify the Apple IDs of iOS device consumers who spent money on apps and in-app content through the App Store during the Class Period. It also allowed me to identify the apps and in-app content purchased with each transaction, and how much commission Apple retained.[39]

33. I also used data on developers' variable costs. Developer data is supplemental because my model employs econometric methods widely used in the economic literature to estimate app developers'

---

[37] McFadden 2021 Opening Report, ¶ 150. As I explained in my prior reports, the relevant app developer costs to estimating common economic impact are developers' variable costs. Variable costs are firm expenses that change in proportion to production output. An example of a variable cost is royalty payments paid by music streaming service providers. These royalty payments, which are paid to the rights-holders of music offered by the music streaming service, are variable costs because the royalty payments increase as the more consumers download and use their app to stream music. Variable costs are often used as proxies for the marginal cost of a firm, which is the "*increment*, or addition, to cost that results from producing one more unit of output." Moreover, "[b]ecause fixed cost does not change as output increases, the increase in total cost when output increases is identical to the corresponding increase in variable cost." *See* McFadden 2021 Opening Report, ¶ 185; and footnotes 249 and 250. *See also* Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization, 4th ed.* (Pearson, 2015): 53-54.

[38] *See* McFadden 2023 Supplemental Report, ¶ 6. *See also*, McFadden 2021 Opening Report, ¶¶ 138-139. I understand that Apple has since produced additional data so that its App Store transactions now records all transactions made through the App Store from the start of the Class Period until February 2, 2024. *See* Expert Report of Minjae Song, Ph.D., *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025 (hereafter referred to as the "Song 2025 Report"), Section II.

[39] In fact, because I can calculate the commission for each transaction, I do not need to know which app developers are qualified for the discounted rates. *See* McFadden 2021 Opening Report, ¶¶ 31-32. *See also*, McFadden 2021 Opening Report, ¶ 139.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

cost functions jointly with consumer demand and app developers' profit maximization conditions.[40] These methods are based on the basic economic principle that the profit-maximizing firm's variable margin is the inverse of the price elasticity of demand. In other words, the profit-maximizing firm sets a higher markup when consumer demand is less elastic. In situations where firms' cost data are not available, but there is sufficient information to estimate consumer demand, economists can use this principle and observed market equilibrium prices to impute firms' variable margins.

34. Nevertheless, information on firms' costs and variable margin is helpful in estimating demand and costs.[41] By reversing the mechanism of imputing firms' variable margins, firms' cost data can be used to estimate consumer demand more accurately. Still, it is important to emphasize that my model does not require information for every app developer's cost. I can use consumer demand and app developers' profit maximization conditions to estimate app developers' costs without cost data from each of these app developers.[42]

## III.B. The Impact of the App Store Commission is Common to the Class

35. Any consumer who spent money on apps and in-app content has been impacted by Apple's App Store commission in excess of competitive levels if it resulted in app developers changing the retail price of apps and in-app content.[43] If consumers paid to subscribe to music streaming services or purchased 100 virtual tokens in a game app, their transactions were subject to Apple's App Store commissions. If as a result of anti-competitive acts by Apple, commissions exceeded competitive levels, and the price consumers paid was inflated, consumers were overcharged for these digital products.

36. The economic principles described in the previous subsection can be applied to all iOS device consumers who spent money on the App Store, or only those who satisfy the Class definition, and all app developers who are subject to the App Store commission.[44] While consumers may

---

[40]   McFadden 2021 Opening Report, ¶ 140.

[41]   McFadden 2021 Opening Report, ¶¶ 141-142.

[42]   McFadden Opening Report, ¶ 142.

[43]   McFadden 2021 Opening Report, ¶ 131.

[44]   McFadden 2021 Opening Report, ¶ 133.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

have spent money on a variety of apps, app variety does not negate the commonality of economic impact because all app developers selling apps and in-app content through the App Store were bound by Apple's alleged anticompetitive restrictions in the iOS aftermarket during the Class Period.[45]

37. Of course, the degree of the common economic impact, and thus the amount of damages, differs depending on which apps and in-app content the Consumer Class members spent money on.[46] However, the econometric model for assessing common economic impact that I summarize in Section IV and Appendix C can be used to quantify the amount of damages that individual Class members incurred through their particular choice of apps and in-app content purchased during the Class Period. As I have explained in my prior reports, my methodology would not change whether consumers sue Apple individually or as a class.[47]

## IV. Econometric Model for Estimating Damages

38. The tax incidence framework described in Section III requires three components as an input. First, it requires an estimate of the App Store commission rate that would prevail absent its alleged conduct. In both my 2023 Supplemental Report and the present report, Counsel provided me with the But-For commission rate, which I understand is consistent with the opinions of Dr. Abrantes-Metz. Hence, I do not discuss its estimation in this report.[48] Second, the tax incidence framework requires an estimate of consumer demand, which was represented by the curve labeled $D$ in Figure 2. Third, I must estimate developers' costs, which, together with estimates for consumer demand and developers' profit maximization conditions, allow me to determine how developer pricing changes in response to commission rate changes.

39. In this section, I summarize the econometric model I developed in my prior reports to estimate damages using the tax incidence framework. Consequently, I base this section on related sections

---

[45]   *See, generally,* Stiglitz Initial Report, Section III for a discussion of Apple's restrictions.

[46]   In some cases, the amount of damages may differ depending on when the Consumer Class members spent money if app developers offer temporary price discounts. *See* McFadden 2021 Opening Report, ¶ 135 and footnote 201.

[47]   McFadden 2023 Reply Report, ¶ 69.

[48]   McFadden 2023 Supplemental Report, ¶ 7.

in my prior reports.[49] Broadly, given an estimate for the But-For commission rate, consumer demand, and developers' costs, I can estimate the app and in-app content prices consumers would have paid absent Apple's alleged misconduct. I understand that, in the class certification process, the Court concluded that "[my] model can show the impact of Apple's allegedly anticompetitive conduct across all class members."[50]

## IV.A. App Developer Pricing and Profit Maximization

40. I model app developers' price setting strategies as profit-maximizing firms' pricing decision, which is a standard way to model firms' strategies in economics.[51] When a firm increases its price, it will lose some consumers who are more price sensitive than others, but it can make more money from consumers who continue to buy its product. But the firm does not want to continue to raise its price indefinitely because the extra money earned from consumers who stay with it at some point becomes smaller than the money it loses from reduced demand. In economic terms, the profit-maximizing firm sets price at a level where the marginal revenue equals the marginal cost. The marginal revenue is determined by consumer demand, while the marginal cost is determined by the cost function.

41. Estimating app developers' price setting behavior is equivalent to estimating their profit functions and applying the profit maximizing conditions to them.[52] The consumer demand and app developer cost functions are part of this pricing model because they dictate how the marginal revenue and margin cost change as app developers change prices.

42. Once I estimate app developers' costs and consumer demand, which together dictate their pricing decisions, I can use them to estimate app and in-app content prices at lower, competitive But-For commission rates.[53] If the commission rate is lower, app developers will lower their app and in-

---

49  McFadden 2021 Opening Report, Sections VI.D-VI.E. *See also,* McFadden 2021 Reply Report, Section II.A and IV.B; McFadden 2023 Reply Report, Section III.C and IV.C. *See also, generally,* McFadden 2023 Supplemental Report.

50  Second Class Certification Order, 26:4-5.

51  App developers do not price discriminate, meaning that they set a single price for a given product. *See* McFadden 2021 Opening Report, ¶ 167. Moreover, I model developers' pricing decisions at the app-level. *See* McFadden 2021 Reply Report, ¶ 142. *See also,* McFadden 2023 Reply Report, ¶ 103.

52  McFadden 2021 Opening Report, ¶ 168.

53  McFadden 2021 Opening Report, ¶ 169.

app content prices because the extra sales they make by cutting prices are more profitable than before. But app developers will stop lowering the prices at some point because they have to sell *every* unit at lower prices, and it is not worth selling more units when the prices are below some threshold. The pricing model estimates the level at which app developers stop lowering their app and in-app content prices for a given But-For commission rate. I explain the mathematics of developers' profit maximization and how I use the profit maximization principle to estimate developers' profit functions in Appendix C.

## IV.B. Estimating Consumer Demand for iOS Apps and In-App Content

### IV.B.1. Model of Consumer Demand

43. The key element of consumer demand needed for the purpose of quantifying the common economic impact of Apple's anticompetitive conduct is consumers' sensitivity to price changes.[54] Whether an app developer sets the download price for a dictionary app or the in-app content price for a music streaming app, its pricing decision will depend on how price sensitive the iOS device consumers are.

44. I designed my model to estimate demand for app downloads and demand for in-app content separately while accounting for their interrelations.[55] It includes two demand equations: The first is an equation representing the demand for app downloads, which I can use to estimate consumers' price sensitivity for app downloads. The second is an equation representing demand for in-app purchases, which I can use to estimate consumers' price sensitivity for in-app purchases. I also included a variable in the in-app purchase demand equation to capture how Paid Download IAP apps, for which consumers pay for both app downloads and in-app content, may account for the impact their download price has on the amount of in-app content they ultimately sell. I describe these demand equations in more detail in Appendix C.

45. Rather than letting all apps and in-app purchases have the same demand coefficients, my model allows apps that belong to different app categories (hereafter referred to as "genres") to have

---

[54]    McFadden 2021 Opening Report, ¶ 177.
[55]    McFadden 2021 Opening Report, ¶¶ 179-184.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

different coefficients.[56] The app genres are used by iOS device users to find apps to fit their needs, and Apple advises app developers to choose the most accurate and effective genres for listing their apps. The App Store transactions data provides information on which genre each app belongs to. This allows the estimated model to reflect the demand and supply conditions that are specific to each app genre.

46. I explained in my prior reports how my demand model can be estimated using random samples of the full App Store transactions data. For example, I demonstrated in my 2021 reports that estimating my model with a single random sample produces statistically valid demand estimates.[57] I subsequently explained in my 2023 Supplemental Report a statistically sound way to account for and minimize sampling error by estimating the demand model with many random samples from the full App Store transactions data.[58]

## IV.B.2. App Developer Costs and Gross Margin Bounds

47. As I explained in Section III, some app developers produced cost data at the time of writing my prior reports. My model incorporates these app developers' variable margins when estimating consumer demand.[59] A basic economic principle shows that a profit-maximizing firm's variable margin is the inverse of the price elasticity of demand it faces. This relationship means that the variable margin can be estimated using only demand estimates if the variable margin is unknown. Conversely, if information on the variable margin is available, it can help improve demand estimation.[60] Thus, my model can incorporate information about developers' variable margins as the constraints that the demand estimates should satisfy.[61] I demonstrated this aspect

---

[56]   McFadden 2021 Opening Report, ¶¶ 210-211.

[57]   I estimated demand using the transactions associated with a 0.1 percent random sample of Apple IDs. *See* McFadden 2021 Opening Report, ¶ 218. *See also*, McFadden 2021 Opening Report, Figures 20-26. *See also,* McFadden 2021 Reply Report, ¶¶ 171-173.

[58]   Specifically, I estimated consumer demand with many 0.1 percent samples and used the average value of the estimated coefficients obtained from those samples to estimate damages. This demand estimation process took the following steps: (1) Draw 75 0.1 percent samples. (2) Estimate consumer demand with each of these samples. (3) Take the average of the 75 sets of estimated demand coefficients obtained from these samples. (4) Use the average value of the coefficients to estimate damages. *See* McFadden 2023 Supplemental Report, ¶¶ 53-54, and footnote 67.

[59]   McFadden 2021 Opening Report, ¶ 212. *See also,* McFadden 2023 Reply Report, ¶¶ 141-142.

[60]   McFadden 2023 Reply Report, ¶ 150.

[61]   McFadden 2021 Opening Report, ¶ 213.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

of my model in my prior reports by imposing bounds on the genre average variable margins implied by my model for the Games and Music & Entertainment genres.[62]

48. Because my model uses only genre average margin bounds as constraints, the estimated variable margins for individual apps can be different from the estimated average margin and can vary widely.[63] Also, my model does not impose the margin constraints on the app developers or apps for which cost information is available. Instead, my model uses the app developers' cost information only to learn about a range of variable margins for each app genre. Thus, the estimated variable margins for these app developers can lie outside the range specified in the constraints if their margins are not close to the app genre average margin.

## IV.C. Estimating Class-wide Damages

### IV.C.1. The Percentage Method for Calculating Damages

49. My econometric model uses the "percentage method", as described in my 2023 Supplemental Report and summarized below, to calculate damages for all paid transactions in the App Store transactions data.[64] This method calculates damages at the transaction level, allowing me to distinguish between harmed and unharmed Class members. I estimate Class-wide damage by aggregating these transaction-level damages across all transactions associated with Class members.

50. I explained in my 2023 Supplemental Report that my model can be used to estimate But-For prices both in the absence of Apple's price tier restrictions and assuming Apple's price tiers

---

[62]  For example, I imposed the constraint that the average variable margin implied by the demand estimates in the Games genre and the profit maximization conditions for those apps should range from 60 percent to 90 percent. In estimating demand for Entertainment and Music apps and in-app content, I imposed the constraint that the average variable margin implied by the demand estimates in the Music and Entertainment genres and the profit maximization conditions for those apps range from 20 percent to 60 percent. *See* McFadden 2021 Opening Report, ¶ 213.

[63]  McFadden 2021 Opening Report, ¶ 215. *See also,* McFadden 2023 Reply Report, ¶ 141.

[64]  McFadden 2023 Supplemental Report, Section III.B and III.C. *See also,* McFadden 2023 Reply Report, ¶ 46. My methodology can use demand coefficients estimated using random samples of the full data to calculate damages for the full App Store transactions data. That is possible because once consumer demand is estimated using a sample, developers' variable costs and their But-For prices can be estimated for apps that are not included in the sample used in demand estimation. *See* McFadden 2023 Supplemental Report, ¶ 31. The mathematical formula for estimating the But-For price for apps not included in any one 0.1 percent sample is presented in Appendix C. The formula is reproduced from my 2023 Supplemental Report. *See,* McFadden 2023 Supplemental Report, Appendix E.1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

persist in the But-For world. Specifically, I conducted a simulation that approximates a But-For world where Apple maintains its current tier pricing structure.[65] In that simulation, I assumed that developers chose But-For download prices from Apple's price tier schedule that existed at that time, and chose But-For average in-app content prices by adjusting their As-Is price in fixed increments consistent with the size of the increments on Apple's tier schedule. From that restricted set of prices, developers in my model selected the prices that earned them the highest profits.

51. That analysis also demonstrated that my model can accommodate focal pricing, should the Court or the jury find on the merits that Apple's price tier restrictions would not exist in a But-For world but that app developers would continue to set focal prices consistent with Apple's price tiers.[66] I offer no opinions in this report regarding whether developers would display such pricing behavior in the absences of Apple's price tier restrictions.

52. In the framework of Figure 2, the estimated But-For prices—whether they be from my model that removes Apple's price tiers in the But-For world or the version of the model that maintains them in the But-For world—represent the prices that would prevail at the But-For equilibrium $E_{BF}$.

53. Given But-For prices, I can calculate transaction-level damages in two steps. First, I can calculate overall consumer overcharge for any given app-month as a fraction of the total commission paid for that app-month. I denoted this fraction as $r_{j,t}$ for app $j$ in month $t$ in my prior reports.[67] I can then calculate the damages for a transaction associated with app $j$ in month $t$ as $r_{j,t}$ percent of the App Store commission revenues attributable to the spend for that transaction.[68] I refer to this approach as the "percentage method."

---

[65]    McFadden 2023 Supplemental Report, Section VII.

[66]    McFadden 2023 Supplemental Report, ¶ 88.

[67]    *See* McFadden 2023 Supplemental Report, ¶ 41. *See also,* McFadden 2023 Reply Report, ¶ 39.

[68]    For example, at the 13.63 percent But-For commission rate, the consumer overcharge percentage I estimated in my 2023 Supplemental Report for Roblox in January 2018 was 35.5 percent of the App Store's commission revenues earned from Roblox that month (and that percentage would vary from app-month to app-month). Suppose consumer spending for one transaction is $0.99 and consumer spending for another transaction is $9.99 on Roblox in January 2018. Apple's App Store commission revenues from the first transaction is $0.297 (30 percent of $0.99) and $2.997 (30 percent of $9.99) from the second transaction. Thus, the consumer who made

Continued on next page

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

54. It is important to highlight that I model developer pricing decisions, and therefore estimate But-For prices, at the app level using the average of item-level prices (in a given month) as the app-level in-app content price.[69] Because I use spending (or commissions) as a basis of damages, I do not need to estimate in-app item-level But-For prices when implementing the "percentage method" described above.

## IV.C.2. Identification of Harmed and Unharmed Class Members

55. There could be cases in which an app developer's cost structure or market conditions are such that my model estimates some Consumer Class members incurred no monetary harm as a result of Apple's alleged anticompetitive conduct.[70] For example, some app developers may not account for the App Store commission in their pricing decision because they incur no variable costs.[71] If an app developer selling a Free Download IAP app relies on other revenue sources such as advertising in addition to selling in-app content, this app developer may increase its in-app content price at a lower commission rate. In my model, such cases would be identified by zero or negative cost estimates.

56. Thus, whether a Class member incurs monetary damages depends on which apps and in-app content they spent money on and how much they spent on each.[72] For example, a Class member who exclusively spent money on apps for which my model predicts price increases in the But-For world would incur no monetary damages. However, even if a Class member spent money on an app that my model predicts would not have set lower prices in the But-For world, that Class member could be harmed if it spent enough money on another app for which my model predicts

---

the first transaction was injured by $0.105 (35.5 percent of $0.297) and the consumer who made the second transaction was injured by $1.064 (35.5 percent of $2.997) for their Roblox spending in January 2018. *See* McFadden 2023 Supplemental Report, ¶ 41. If both transactions are associated with the same Apple ID (or payor ID as described in Section IV.C.2), that Apple ID's (or payor ID's) total monetary harm from its January 2018 spending on Roblox is $0.105 + $1.064 = $1.169.

69    *See also,* McFadden 2023 Supplemental Report, ¶ 42.

70    McFadden 2021 Opening Report, ¶ 225.

71    As shown in Appendix C, the in-app content price of Free Download IAP apps always decreases when the App Store commission decreases as long as the demand curve has a negative slope, and the marginal cost is positive. (Note that my model includes ancillary revenues such as advertising revenue as negative components of the marginal cost.)  That means the in-app content price would not change when the App Store commission changes if the marginal cost is zero. *See also,* McFadden 2021 Opening Report, ¶ 176. *See also*, McFadden 2023 Reply Report ¶ 81.

72    McFadden 2023 Reply Report, ¶¶ 68-69.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

lower prices in the But-For world. What matters is that because the App Store transactions data provides information on all app and in-app content transactions made through the App Store, I can quantify the effects of Apple's alleged misconduct on any combination of transactions.

57. At the time of writing my 2023 Supplemental Report, I was not provided with the data necessary to identify which App Store transactions or Apple IDs were associated with any given consumer. However, I demonstrated quantitatively how my model can be used to determine the damages associated with all paid transactions made by an Apple ID. That is, I showed that my model can determine which Apple IDs incurred monetary harm and which did not, and how one can apply a $10 spending cutoff to limit those included in the Class.[73]

58. I understand that Apple has now produced a supplemental dataset that maps individual payor IDs, which represent consumers who were billed for a transaction, to the transactions contained within the App Store transactions data.[74] I further understand that, using this supplemental dataset, one can identify the transactions associated with each individual payor ID and determine which payor IDs meet the $10 spending cutoff described in the Class definition.[75] Thereafter, the transaction-level damages calculated using my model can be aggregated across the transactions associated with any payor ID that meets this spending threshold. This process can be used to identify which Class members were harmed and which were unharmed, and there is no risk of compensating Class members who did not incur monetary harm.

59. The process describe above can handle any But-For commission rate the jury determines would prevail in a But-For world.

## V. Conclusion

I reserve the right to supplement, update, or revise my opinions and analyses based on any information, documents, or data that are made available to me.

---

[73]   *See* McFadden 2023 Supplemental Report, Figure 6.
[74]   *See* Song 2025 Report, Section IV.B.
[75]   *See* Song 2025 Report, Section IV.B.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

*Daniel McFadde*

Daniel L. McFadden, Ph.D.

March 7, 2025

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## Appendix A Curriculum Vitae

**Professor Daniel McFadden**, recipient of the 2000 Nobel Prize in Economics, is the E. Morris Cox Professor Emeritus of Economics at the University of California at Berkeley and the founding director of its Econometrics Laboratory. He is also the Presidential Professor Emeritus of Health Economics at the University of Southern California, where he had joint appointments at the USC Sol Price School of Public Policy and the Department of Economics at USC Dornsife College. He is currently a Presidential scholar in residence at the Schaeffer Center for Health Economics and Policy at USC, and director of a research program on health-related choice behavior. From 2000 through 2023, he was a Principal with The Brattle Group, which provides consulting services and expert testimony on economic, finance, regulatory and strategic issues to corporations, law firms and public agencies worldwide. Previously, he was a Ford Research Professor at the University of Chicago, the James R. Killian Professor of Economics at MIT, the Irving Fisher Research Professor at Yale University, and a Fairchild Distinguished Scholar at the California Institute of Technology. He was awarded the Nobel Prize for his numerous contributions to quantitative economic science and, in particular, his pioneering theoretical, methodological, and empirical work in the analyses of discrete choices. Dr. McFadden has received numerous other awards including the John Bates Clark Medal given every two years to the American economist under the age of forty who has made the most outstanding contribution to the field of economic science, the Frisch medal for the best paper in Econometrica, the Laffont prize for contributions to econometrics, the Nemmers Prize for fundamental contributions to economics, the American Agricultural Association for the best paper in the American Journal of Agricultural Economics, and the German Health Economics Association prize for the best paper in health economics. He is the recipient of an honorary LLD degree from the University of Chicago, honorary DSc degrees from the University of Minnesota and North Carolina State University, an Honoris Causa degree from the University of Paris, and honorary PhD degrees from the University of London, the University of Montreal, and other institutions. Dr. McFadden received his Ph.D. in Behavioral Science with specialization in Economics from the University of Minnesota in 1962. There he also earned his B.S. in Physics, with high distinction, in 1957.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Dr. McFadden has held the following academic appointments:

| | |
|---|---|
| 2022- | Presidential Scholar in Residence, University of Southern California |
| 2014-2019 | Presidential Professor of Health Economics, University of Southern California |
| 1996- | Director, Econometrics Laboratory, University of California, Berkeley |
| 1995-1996 | Chair, Department of Economics, University of California, Berkeley |
| 1991-1995 | Director, Econometrics Laboratory, University of California, Berkeley |
| 1990- | E. Morris Cox Chair, University of California, Berkeley |
| 1990- | Professor of Economics, University of California, Berkeley |
| 1990 | Sherman Fairchild Distinguished Scholar, California Institute of Technology |
| 1986-1991 | Director, Statistics Center, Massachusetts Institute of Technology |
| 1984-1991 | James R. Killian Chair, Massachusetts Institute of Technology |
| 1978-1991 | Professor of Economics, Massachusetts Institute of Technology |
| 1977-1978 | Irving Fisher Research Professor, Yale University |
| 1968-1979 | Professor of Economics, University of California, Berkeley |
| 1966-1967 | Visiting Associate Professor, University of Chicago |
| 1966-1968 | Associate Professor of Economics, University of California, Berkeley |
| 1963-1966 | Assistant Professor of Economics, University of California, Berkeley |
| 1962-1963 | Assistant Professor of Economics, University of Pittsburgh |
| 1961-1962 | Instructor, Economics, University of Minnesota |
| 1959-1960 | Research Assistant, Social Psychology, University of Minnesota |
| 1957-1958 | Instructor, Physics, University of Minnesota |

## Experience

Dr. McFadden has had a varied background in professional and public service. Among his achievements are:

President, Western Economics Association International (2019)

President, American Economic Association (AEA) (2005)

Chair, National Academy of Science (NAS) Section 54 Economic Sciences (2003- )

Chair, NAS Committee on Methods of Forecasting Demand and Supply of Doctoral Scientists and Engineers (1997-2000)

Advisory Committee, Journal of Applied Economics (1996- )

NAS Commission on Science, Engineering, and Public Policy (1995- )

Chair, AEA Committee on Electronic Publication (1994- )

Vice President, American Economics Association (1994)

NAS Committee on Behavioral and Social Sciences and Education (1989-1994)

Panel Study of Income Dynamics, Advisory Board (1988-1991)

Executive Committee, American Economics Association (1985-1987)

President, Econometric Society (1985)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Executive Committee, Econometric Society (1983-1986)

Council of the Econometric Society (1983-1986)

Vice President, Econometric Society (1983-1984)

NAS Committee on Energy Demand Modeling (1983-1984)

NAS Committee, Basic Research in the Social Sciences (1982-1987)

Chair, AEA Awards Committee (1981-1984)

Board of Directors, National Bureau of Economic Research (1980-1983)

Editor, Econometric Society Monographs (1980-1983)

Review Committee, California Energy Commission (1979)

Sloan Foundation Book Committee (1977-1979)

Executive Committee, Econometric Society (1978-1980)

Board of Editors, Transportation Research (1978-1980)

Associate Editor, Journal of Econometrics (1977-1978)

Board of Directors, National Bureau of Economic Research (1976-1977)

Executive Committee, Transportation Research Board (1975-1978)

City of Berkeley, Coordinated Transit Project (1975-1976)

Advisory Committee on Transportation Models, Metropolitan Transportation Commission (1975)

Council of the Econometric Society (1974-1980)

Elected Member, Universities National Bureau (1974-1977)

Board of Editors, Journal of Mathematical Economics (1973-1977)

Board of Editors, American Economic Review (1971-1974)

Chair, NSF-NBER Conference, Economics of Uncertainty (1970- )

Economics Advisory Panel, National Science Foundation (1969-1971)

Editor, Journal of Statistical Physics (1968-1970)

MIT Center for Energy Policy Research, Program Board, 1983-84

MIT Engineering Dean Search Committee, 1980-81

MIT Provost's Committee on Statistics, 1979-80

UC Berkeley Chair, Department of Economics, 2009-2010

UC Berkeley Director of Graduate Studies, 1994-95

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

**Professional Affiliations**

    American Economics Association

    The Econometric Society

    American Statistical Association

    Mathematical Association of America

    Transportation Research Board

**Fellowships, Scholarships, Honors, and Awards**

    Honorary Degree, University of Montreal (2004)

    Honorary Degree, University College London (2003)

    Richard Stone Prize in Applied Econometrics (2000-2001)

    Nobel Prize in Economics (Joint Recipient) (2000)

    Nemmers Prize in Economics, Northwestern University (2000)

    American Agricultural Economics Association, Best Paper Prize (1994)

    University of Chicago, LLD (1992)

    Frisch Medal, Econometric Society (1986)

    Elected to National Academy of Science (1981)

    Outstanding Teacher Award, MIT (1981)

    Fisher-Schultz Lecture, Econometrics Society (1979)

    Elected to American Academy of Arts and Sciences (1977)

    John Bates Clark Medal, American Economics Association (1975)

    Elected Fellow, Econometrics Society (1969)

    Ford Faculty Research Fellow (1966-1967)

    Mellon Post-Doctoral Fellow (1962-1963)

    Earhart Fellow (1960-1961)

    Ford Foundation Behavioral Science Fellow (1958-1962)

**Publications**

**Books and Monographs**

Essays on Economic Behavior Under Uncertainty, with M. Balch and S. Wu (eds.), North Holland: Amsterdam, 1974.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

Urban Travel Demand: A Behavioral Analysis, with T. Domencich, North Holland: Amsterdam, 1975. Reprinted by The Blackstone Company: Mount Pleasant, MI, 1996.

Production Economics: A Dual Approach to Theory and Applications, with M. Fuss (eds.), North Holland: Amsterdam, Vol. 1 and 2, 1978.

Structural Analysis of Discrete Data with Econometric Applications, with C.F. Manski (eds.), MIT Press: Cambridge, MA, 1981.

Microeconomic Modeling and Policy Analysis: Studies in Residential Energy Demand, with T. Cowing, Academic Press: New York, 1984.

Preferences, Uncertainty, and Optimality: Essays in Honor of Leonid Hurwicz, with J. Chipman and M.K. Richter (eds.), Westview Press: Boulder, CO, 1990.

Handbook of Econometrics Vol IV, with R. Engle (eds.), North Holland: Amsterdam, 1994.

Statistical Tools, manuscript in preparation.

Rationality and equilibrium, a symposium in honor of Marcel K. Richter, series: Studies in Economic Theory, vol. 26, with C.D Aliprantis, R.L. Matzkin, J.C. Moore,  N.C. Yannelis, (Eds.), Springer-Verlag: Berlin Heidelberg 2006.

"Contingent Valuation of Environmental Goods," with Kenneth Train, Elgar, 2017.

"Foundations of Stated Preference Elicitation," with M. Ben-Akiva and K. Train, NOW Press, April 2019.

**Articles**
**Production Theory**
"Constant Elasticity of Substitution Production Functions," Review of Economic Studies, 1963.
"A Review of 'Manufacturing Production Functions in the U.S., 1957: An Interindustry and Interstate Comparison of Productivity'," Journal of the American Statistical Association, March 1967.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"Cost, Revenue, and Profit Functions," in M. Fuss and D. McFadden (eds.), Production Economics: a Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

" A Survey of Functional Forms in the Economic Analysis of Production," with M. Fuss and Y. Mundlak, in M. Fuss and D. McFadden (eds.), Production Economics: a Dual Approach to Theory and Applications, Vol. I, 219-268, North Holland: Amsterdam, 1978.

"The General Linear Profit Function," in M. Fuss and D. McFadden (eds.), Production Economics: a Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Flexibility Versus Efficiency in Ex Ante Plant Design," with M. Fuss, in M. Fuss and D. McFadden (eds.), Production Economics: a Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Estimation Techniques for the Elasticity of Substitution and Other Production Parameters," in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Measurement of the Elasticity of Factor Substitution and Bias of Technical Change," with P. Diamond and M. Rodriguez, in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Joint Estimation of Freight Transportation Decisions Under Nonrandom Sampling," with C. Winston and A. Boersch-Supan, in A. Daugherty (ed.), Analytical Studies in Transport Economics, 137-157, Cambridge University Press: Cambridge, 1985.

**Econometrics**

"Conditional Logit Analysis of Qualitative Choice Behavior," in P. Zarembka (ed.), Frontiers in Econometrics, 105-142, Academic Press: New York, 1973.

"Comments on 'Estimation of a Stochastic Model of Reproduction: An Econometric Approach'," in N. Terleckyj (ed.), Household Production and Consumption, 139-145, National Bureau of Economic Research: New York, 1975.

"The Revealed Preferences of a Government Bureaucracy: Theory," The Bell Journal of Economics and Management Science, Autumn 1975.

"The Revealed Preferences of a Government Bureaucracy: Empirical Evidence," The Bell Journal of Economics and Management Science, No. 1, 55-72, Spring 1976.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"A Comment on Discriminant Analysis 'Versus 'Logit Analysis," Annals of Economic and Social Measurement, 1976.

"Quantal Choice Analysis: A Survey," Annals of Economic and Social Measurement, 1976.

" Econometric Models for Probabilistic Choice Among Products," The Journal of Business, 1980.

"Econometric Models of Probabilistic Choice," in C.F. Manski and D. McFadden (eds.), Structural Analysis of Discrete Data with Econometric Applications, 198-272, MIT Press: Cambridge, MA, 1981.

"Alternative Estimators and Sample Designs for Discrete Choice Analysis," with C.F. Manski, in C.F. Manski and D. McFadden (eds.), Structural Analysis of Discrete Data with Econometric Applications. 2-50, MIT Press: Cambridge, MA, 1981.

"Qualitative Response Models," in W. Hildenbrand (ed.), Advances in Econometrics: Invited Papers for the Fourth World Congress of the Econometric Society, Econometric Society Monograph, 1-37, Cambridge University Press: Cambridge, 1982.

"Specification Tests for the Multinomial Logit Model," with J. Hausman, Econometrica, September 1984.

"Econometric Analysis of Qualitative Response Models," in Z. Griliches and M. Intrilligator (eds.), Handbook of Econometrics, Elsevier: Amsterdam, 1984.

"Comment on Technical Problems in Social Experimentation: Cost versus Ease of Analysis," in J.A. Hausman and D.A. Wise (eds.), Social Experimentation, 214-219, National Bureau of Economic Research: Chicago, 1985.

"The Choice Theory Approach to Market Research," Marketing Science, Fall 1986.

"The Demand for Local Telephone Service: A Fully Discrete Model of Residential Calling Patterns and Service Choices," with K. Train and M. Ben-Akiva, The Rand Journal of Economics, Spring 1987.

"Regression-Based Specification Tests for the Multinomial Logit Model," Journal of Econometrics, 1987.

"What do Microeconometricians Really Do?" Proceedings of the American Statistical Association, 402-405, Business Statistics Section, 1987.

"Comment on Joel Horowitz and George Neumann, Semiparametric Estimation of Employment Duration Models," with A. Han, Econometric Reviews, 1987/1988.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"Econometric Modeling of Locational Behavior," Annals of Operations Research: Facility Location Analysis: Theory and Applications, 1989.

"A Method of Simulated Moments for Estimation of Discrete Response Models Without Numerical Integration," Econometrica, September 1989.

"Testing for Stochastic Dominance," in T. Formby and T.K. Seo (eds.), Studies in the Economics of Uncertainty, 113-134, Springer: New York, 1989.

"Micro-simulation of Local Residential Telephone Demand Under Alternative Service Options and Rate Structures," with T. Atherton, M. Ben-Akiva, and K. Train, in A. de Fontenay, M. Shugard, and D. Sibley (eds.), Telecommunications Demand Modelling, 137-163, Elsevier: Amsterdam, 1990.

"Advances in Computation, Statistical Methods, and Testing of Discrete Choice Models," Marketing Letters, 1991.

"Efficient Estimation by Multinomial Approximation and Sequential Simulation," with W. Beckert and A. Eymann, Working Paper, July 1994.

"Large Sample Estimation and Hypothesis Testing," with W. Newey, in R. Engle and D. McFadden, (eds.) Handbook of Econometrics, North Holland: Amsterdam, 1994.

"Estimation by Simulation," with P. Ruud, The Review of Economics and Statistics, November 1994.

"Simulation of Multivariate Normal Rectangle Probabilities and Their Derivatives: Theoretical and Computational Results," with V. Hajivassiliou and P. Ruud, Journal of Econometrics, May-June 1996.

"Lectures on Simulation-Assisted Statistical Inference," presented at the EC-squared Conference, Florence, Italy, December 12, 1996.

"Estimation of Some Partially Specified Nonlinear Models," with C. Ai, Journal of Econometrics, January-February 1997.

"Modeling Methods for Discrete Choice Analysis," with M. Ben-Akiva, et al., Marketing Letters, July 1997.

"The Method of Simulated Scores with Application to Models of External Debt Crises," with V. Hajivassiliou, Econometrica, July 1998.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"Mixed MNL Models for Discrete Response," with K. Train, Journal of Applied Econometrics, 2000.09, Vol. 15, 447-470.

"On Selecting Regression Variables to Maximize Their Significance," with C. Hsiao, K. Morimune, J. Powell, Nonlinear Statistical Modelling, 2001, Vol 13, 259-280.

"Economic Choices," Nobel Lecture, December 2000.  American Economic Review, June 2001.

"Observational Studies: Choice-based sampling," forthcoming in International Encyclopedia of Social and Behavior Sciences, Vol. 2.1, Article 92, Elsevier Science: Amsterdam, 2001.

"Discrete Choice Models Incorporating Revealed Preferences and Psychometric Data," with T. Morikawa and M. Ben-Akiva, Econometric Models In Marketing, Vol. 16, 27-53, Elsevier Science: Oxford, 2002.

"Characteristics of Generalized Extreme Value Distributions," with M. Bielaire and D. Bolduc, Working Paper, April, 2003.

"Structural Simulation of Facility Sharing: Unbundling Policies and Investment Strategy in Local Exchange Markets," by Nauman Ilias, Paul C. Liu, Daniel L. McFadden, Lisa Wood, Glenn A. Woroch & William P. Zarakas, 2005.

"Statistical Analysis of Choice Experiments and Surveys," with A. Bemmaor, F. Caro, J. Dominitz, B. Jun, A. Lewbel, R. Matzkin, F. Molinari, N. Schwarz, R. Willis and J. Winter, Marketing Letters, 16:3/4, 183-196, December 2005.

"The estimation of generalized extreme value models from choice-based samples," Transportation Research Part B: Methodological, Vol. 42, 4, 381-394, May 2008.

"Risk, Uncertainty and Discrete Choice Models," with A. de Palma, M. Ben-Akiva, D. Brownstone, C. Holt, T. Magnac, P. Moffatt, N. Picard, K. Train, P. Wakker, J. Walker, Marketing Letters, 19:3/4, 269-285, July 2008.

"Semiparametric Analysis," Quantile, no. 5, pp. 29-40, September 2008.

"Conditional Logit Analysis of Qualitative Choice Behavior," Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics, Vol. 3, pp. 337-374, 2009.

"Maximal Uniform Convergence Rates in Parametric Estimation Problems," with Walter Beckert, Econometric Theory, Vol. 26, Issue 2, 469-500, April 2010.

"Choice Probability Generating Functions," with Bierlaire, M., Fogerau, M., Journal of Choice Modelling, 2013.09, Vol. 8, 1-18.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"Estimating Features of a Distribution from Binomial Data,"  with Lewbel, A., Linton, O., Journal of Econometrics, Vol. 162, No. 2, pp. 170-88, June 2, 2011.

"Economic Juries and Public Project Provision," Journal of Econometrics, Vol. 166, No. 1, pp. 116-126, January 2012.

"The Browser War--Analysis of Markov Perfect Equilibrium in Markets with Dynamic Demand Effects," with Jenkins, Mark; Liu, Paul; Matzkin, Rosa L,  Journal of Econometrics  Vol. 222.1,  (May 2021): 244-260.

"Instability in Mixed Logit Demand Models," Journal of Choice Modelling, Vol. 43, June 2022.


**Transportation**

"The Measurement of Urban Travel Demand," Journal of Public Economics, 303-328, 1974.

"Aggregate Travel Demand Forecasting from Disaggregated Behavioral Models," with F. Reid, Transportation Research Record: Travel Behavior and Values, No. 534, 24-37, 1975.

"The Mathematical Theory of Demand Models," in P. Stopher and A. Meyburg (eds.), Behavioral Travel-demand Models, 305-314, D.C. Heath and Co.: Lexington, MA, 1976.

"Demand Model Estimation and Validation," with A.P. Talvitie and Associates, Urban Travel Demand Forecasting Project, Final Report, Volume V, Institute of Transportation Studies, University of California, Berkeley, June 1977.

"Demographic Data and Policy Analysis," with S. Cosslett, G. Duguay, and W. Jung, Urban Travel Demand Forecasting Project, Final Report, Institute of Transportation Studies, University of California, Berkeley, June 1977.

"Quantitative Methods for Analyzing Travel Behaviour of Individuals: Some Recent Developments," in D. Hensher and P. Stopher (eds.), Behavioural Travel Modelling, 279-318, Croom Helm London: London, 1978.

"An Application of Diagnostic Tests for the Independence from Irrelevant Alternatives Property of the Multinomial Logit Model," with W. Tye and K. Train, Transportation Research Record: Forecasting Passenger and Freight Travel, No. 637, 39-46, Transportation Research Board, 1978.

"Modelling the Choice of Residential Location," in A. Karlqvist, L. Lundqvist, F. Snickars, and J. Weibull (eds.), Spatial Interaction Theory and Planning Models, 75-96, North Holland: Amsterdam, 1978. Reprinted in J. Quigley (ed.), The Economics of Housing, Edward Elgar: London, 1997.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"The Goods/Leisure Tradeoff and Disaggregate Work Trip Mode Choice Models," with K. Train, Transportation Research, February 1978.

"The Theory and Practice of Disaggregate Demand Forecasting for Various Modes of Urban Transportation," in Emerging Transportation Planning Methods, U.S. Department of Transportation DOT-RSPA-DPB-50-78-2, August 1978. Reprinted in T.H. Oum, et al. (eds.), Transport Economics: Selected Readings, 51-80, Seoul Press: Seoul, 1995.

"Overview and Summary: Urban Travel Demand Forecasting Project," with F. Reid, A. Talvitie, M. Johnson, and Associates, The Urban Travel Demand Forecasting Project, Final Report, Volume I, Institute of Transportation Studies, University of California, Berkeley, June 1979.

"Measuring Willingness-to-Pay for Transportation Improvements," in T. Gärling, T. Laitila, and K. Westin (eds.) Theoretical Foundations of Travel Choice Modeling, 339-364, Elsevier Science: Amsterdam, 1998.

"Disaggregate Behavioural Travel Demand's RUM Side: A 30-Year Retrospective," in The Leading Edge of Travel Behavior Research, Davide Heshner and J. King (eds.) Pergamon Press: Oxford, 2002.

"Interstate Wine Shipments and E-Commerce," Journal of Wine Economics, Vol. 1, No. 1, May 2006, pp. 3-6.

"Aggregate Travel Demand Forecasting from Disaggregated Behavioral Models," with F. Reid, Elgar Reference Collection. Classics in Planning Series, Vol. 2, pp. 191-204, 2006.

"The behavioral science of transportation," Transport Policy Volume 14, Issue 4, 269274, July 2007.

"The Measurement of Urban Travel," Classics in Planning, Vol. 7, pp. 69-94, 2007.

"Modelling the Choice of Residential Location," Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics, Vol. 3, pp. 409-430, 2009.

"Is Vehicle Depreciation a Component of Marginal Travel Cost?," with D. Hang and K. Train, Journal of Transportation Economics and Policy, April 2016.

**Economic Growth and Development**

"Comment on 'An Optimum Fiscal Policy in an Aggregate Model of Economic Growth'," in I. Adelman and E. Thorbecke (eds.), The Theory and Design of Economic Development, 140-146, Johns Hopkins Press: Baltimore, MD, 1966.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"The Evaluation of Development Programmes," The Review of Economic Studies, 1967.

"On the Existence of Optimal Development Plans," in H. Kuhn (ed.) Proceedings of the Sixth Princeton Symposium on Mathematical Programming, 403-427, Princeton University Press: Princeton, NJ, 1970.

"Criteria for Public Investment: Comment," The Journal of Political Economy, November/December 1972.

"On the Existence of Optimal Development Programmes in Infinite-Horizon Economies," in J. Mirrlees and N.H. Stern (eds.), Models of Economic Growth, 260-282, Macmillan: Great Britain, 1973.

"Is There Life After Debt? An Econometric Analysis of the Creditworthiness of Developing Countries," with R. Eckaus, G. Feder, V. Hajivassiliou, and S. O'Connell, in J. Cuddington and G. Smith, International Debt and the Developing Countries, 179-209, International Bank for Reconstruction and Development/The World Bank: Washington, D.C., 1985.

"Hot Money and Cold Comfort: Global Capital Movement and Financial Crises in Emerging Economies," Lecture, Latin American and Caribbean Economics Association ANEC Conference on Globalization and Development, 2004.

**Economic Theory and Mathematical Economics**

"On Hicksian Stability," in J.N. Wolfe (ed.), Value, Capital, and Growth, 329-351, University Press: Edinburgh, 1969.

"On the Controllability of Decentralized Macroeconomic Systems: The Assignment Problem," in H.E. Kuhn and P. Szego (eds.), Mathematical Systems Theory and Economics 1, 221-239, Springer-Verlag: New York, 1969.

"A Simple Remark on the Second Best Pareto Optimality of Market Equilibria," Journal of Economic Theory, June 1969.

"A Technical Note on Classical Gains from Trade," with J.M. Grandmont, Journal of International Economics, 1972.

"On Some Facets of Betting: Comments," in M.S. Balch, D. McFadden, and S.Y. Wu (eds.), Essays on Economic Behavior Under Uncertainty, 126-137, North-Holland: Amsterdam, 1974.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"Some Uses of the Expenditure Function in Public Finance," with P.A. Diamond, Journal of Public Economics, 1974.  Reprinted in J. Creedy (ed.), Measuring Welfare Changes and Tax Burdens, Edward Elgar: London, September 1998.

"A Characterization of Community Excess Demand Functions," with R. Mantel, A. Mas-Colell, and M.K. Richter, Journal of Economic Theory, 1974.

"An Example of the Non-Existence of Malinvaud Prices in a Tight Economy," Journal of Mathematical Economics, 1975.

"Tchebyscheff Bounds for the Space of Agent Characteristics," Journal of Mathematical Economics, 1975.

"On Efficiency and Pareto Optimality of Competitive Programs in Closed Multisector Models," with M. Majumdar and T. Mitra, Journal of Economic Theory, August 1976.

"Definite Quadratic Forms Subject to Constraint," in M. Fuss and D. McFadden (eds.), Production Economics:  A Dual Approach to Theory and Applications, North-Holland: Amsterdam, 1978.

"Necessary and Sufficient Conditions for the Classical Programming Problem," in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"Convex Analysis," in M. Fuss and D. McFadden (eds.), Production Economics: A Dual Approach to Theory and Applications, North Holland: Amsterdam, 1978.

"A Note on the Computability of Tests of the Strong Axiom of Revealed Preference," Journal of Mathematical Economics, 1979.

"Pareto Optimality and Competitive Equilibrium in Infinite Horizon Economies," with M. Majumdar and T. Mitra, Journal of Mathematical Economics, 1980.

"Welfare Analysis of Incomplete Adjustment to Climatic Change," in V.K. Smith and A. White (eds.), Advances in Applied Micro-economics, JAI Press: Greenwich, CT, 1984.

"Stochastic Rationality and Revealed Stochastic Preference," with M.K. Richter, in J. Chipman, D. McFadden, and M.K. Richter (eds.), Preferences, Uncertainty, and Optimality, Essays in Honor of Leo Hurwicz, 161-186, Westview Press: Boulder, CO, 1990.

"Consumers 'Evaluation of New Products: Learning from Self and Others," with K. Train, Journal of Political Economy, 1996.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"Economic Choice Behavior: Psychological Foundations and the Contributions of Amos Tversky," Working Paper, August 1996.

"Rationality for Economists," Working Paper presented at the NSF Symposium on Eliciting Preferences, July 1997.  Forthcoming in Journal of Risk and Uncertainty, December 1999.

"Extended Framework for Modeling Choice Behavior," with M. Ben-Akiva, et al.  Marketing Letters, Vol. 10, Issue 3, Kluwer, 187-203, August 1999.

"Pricing in a Competitive Market with a Common Network Resource," Working Paper, April 2003.

"Hybrid Choice Models: Progress and Challenges," with M. Ben-Akiva et. Al., Marketing Letters, Vol. 13, Issue 3, 163-175, August 2002.

"Epilogue," Marketing Letters, Vol. 13, Issue 3, 163-175, August 2002.

"Revealed Stochastic Preference:  A Synthesis," Economic Theory, Springer, vol. 26(2), pages 245264, August 2005.

"Welfare Economics at the Extensive Margin Giving Gorman Polar Consumers Some Latitude," Working Paper, June 2004.

"The Misuse of Econometrics in Litigation," by Susan J. Guthrie, Paul C. Liu, Daniel L. McFadden and Kenneth T. Wise, ABA Monograph on Econometrics, Forthcoming, 2005.

"The Misuse of Econometrics in Estimating Damages," with Kenneth T. Wise, et. al.  ABA monograph on Econometrics, 2005.

"The Browser War - Econometric Analysis of Markov Perfect Equilibrium in Markets with Network Effects," with Mark Jenkins et. al.  Presented at the American Economic Association Annual Meeting.  7-9 January 2005.  Philadelphia, PA.

"The Science of Pleasure: The Measurement of Consumer Welfare,"" Frisch Memorial Lecture, Plenary Session at the Econometric Society World Congress, upcoming, 19-24 August 2005, University College London.

"Free Markets and Fettered Consumers," American Economic Review, Vol. 96, pp. 5-29, March 2006.

"Rationality and Equilibrium: A Symposium in Honor of Marcel K. Richter," with C. Aliprantis, R. Matzkin, J. Moore, N. Yannelis, Studies in Economic Theory, No. 26, pp. viii, 252, April 2006

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"Revealed Stochastic Preference: A Synthesis," Studies in Economic Theory, No. 26, pp. 1-20, 2006.

Foreword to '"Rationality and Equilibrium – 'A Symposium in Honor of Marcel K. Richter," with C. Aliprantis, R. Matzin, J. Moore, N. Yannelis, Studies in Economic Theory, No. 26, pp. v-vi, 2006.

"Human Capital Accumulation and Depreciation", Review of Agricultural Economics, vol. 30, no. 3, 379-85, Fall 2008.

"The Revealed Preferences of a Government Bureaucracy: Theory," Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics, Vol. 3, pp. 375-390, 2009.

"The Revealed Preferences of a Government Bureaucracy: Empirical Evidence," Elgar Reference Collection. Pioneering Papers of the Nobel Memorial Laureates in Economics, Vol. 3, pp. 391-408, 2009.

"100 Years of the American Economic Review: The Top 20 Articles," with Arrow, K.J., Bernheim, B.D., Feldstein, M.S., Poterba, J. M., Solow, R.M., American Economic Review, Vol. 101, No. 1, pp. 1-8, February 2011.

"A theory of the perturbed consumer with general budgets," with M. Fogeraru, NBER Working Paper Series, No. 17953, 2012.

"The New Science of Pleasure:  Consumer Choice Behavior and the Measurement of Well-Being," in S. Hess and A. Daly (ed) Handbook of Choice Modelling, 2nd ed., Elgar Press, 2024.

"Choice:  What Can Go Wrong?," working paper, 2024.

"The Economic Impact of a Market Intermediary's Sales Commission," working paper, 2025.


**Energy**

"Forecasting the Impacts of Alternative Electricity Rate Structures: A Feasibility Study," Final Report, California Energy Commission, 1976.

"Determinants of the Long-Run Demand for Electricity," with C. Puig and D. Kirshner, Proceedings of the American Statistical Association, 1978.

"A Two-Level Electricity Demand Model," with J. Hausman and M. Kinnucan, Journal of Econometrics, 1979.

"Residential Energy Demand Modeling and the NIECS Data Base: An Evaluation," with T. Cowing and J. Dubin, Report No. MIT-EL-82-009, MIT Energy Laboratory, January 1982.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"An Analysis of the Distributional Impacts of Energy Policies Affecting Residential Energy Demand: The ORNL Model," with J. Berkovec, T. Cowing, and J. Rust, Discussion Paper No. MIT-EL-82-032WP, MIT Energy Laboratory, April 1982.

"An Analysis of the Distributional Impacts of Energy Policies Affecting Residential Energy Demand: The REEPS Model," with T. Cowing, Discussion Paper No. MIT-EL 82-057WP, MIT Energy Laboratory, April 1982.

"An Evaluation of the ORNL Residential Energy Use Model," EPRI Report EA-2442, Electronic Research Institute: Palo Alto, June 1982.

"The NIECS Data Base and Its Use in Residential Energy Demand Modeling," with T. Cowing and J. Dubin, Discussion Paper No. MIT-EL-82-041WP, MIT Energy Laboratory, June 1982.

"A Thermal Model for Single-Family Owner-Occupied Detached Dwellings in NIECS," with J. Dubin, Discussion Paper No. MIT-EL-040WP, MIT Energy Laboratory, June 1982.

"A Comparative Evaluation of the ORNL and REEPS Models of Residential Energy Demand for Forecasting Residential Energy Policy Impacts," with J. Berkovec, T. Cowing, and J. Rust, Discussion Paper No. MIT-EL-82-061WP, MIT Energy Laboratory, July 1982.

"Residential End-Use Energy Planning System (REEPS)," with A. Goett, EPRI Report EA-2512, Electronic Power Research Institute: Palo Alto, July 1982.

"An Econometric Analysis of Residential Electric Appliance Holdings and Consumption," with J. Dubin, Econometrica, March 1984.

"The Residential End-Use Energy Planning System: Simulation Model Structure and Empirical Analysis," with A. Goett, in J. Moroney (ed.), Advances in the Economics of Energy and Resources, JAI Press: Greenwich, CT, 1984.

"Consumer Attitudes and Voluntary Rate Schedules for Public Utilities," with K. Train and A. Goett, the Review of Economics and Statistics, August 1987.

"Estimating Household Value of Electric Service Reliability with Market Research Data," with A. Goett and C-K. Woo, Energy Journal: Special Electricity Reliability Issue, 1988.

**Health Economics**

"Estimation of Response Probabilities from Augmented Retrospective Observations," with D. Hsieh and C. Manski, Journal of the American Statistical Association, No. 391, 651-662, September 1985.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"The Dynamics of Housing Demand by the Elderly: Wealth, Cash Flow, and Demographic Effects," with J. Feinstein, in D. Wise (ed), The Economics of Aging, 55-91, University of Chicago Press: Chicago, 1989.

"The Dynamics of Housing Demand by the Elderly: User Cost Effects," with C. Ai, J. Feinstein, and H. Pollakowski, in D. Wise (ed.), Issues in the Economics of Aging, 33-87, University of Chicago Press: Chicago, 1990.

"Problems of Housing the Elderly in the United States and Japan," in Y. Noguchi and D. Wise (eds.), Aging in the United States and Japan, 109-137, University of Chicago Press: Chicago, 1994.

"Demographics, the Housing Market, and the Welfare of the Elderly," in D. Wise (ed.), Studies in the Economics of Aging, 225-285, University of Chicago Press: Chicago, 1994.

"Living Arrangements: Health and Wealth Effects," with A. Boersh-Supan and R. Schnabel, in D. Wise (ed.), Advances in the Economics of Aging, 193-216, University of Chicago Press: Chicago, 1996.

"Comment on 'Elderly Health, Housing, and Mobility'," in D. Wise (ed.), Advances in the Economics of Aging, 317-320, University of Chicago Press: Chicago, 1996.

"The Impact of Demographics on Housing and Nonhousing Wealth in the United States," with H. Hoynes, in M. Hurd and N. Yashiro (Eds.), The Economic Effects of Aging in the United States and Japan, 153-194, University of Chicago Press: Chicago, 1997.

"Subjective Survival Curves and Life Cycle Behavior," with M. Hurd and L. Gan, in D. Wise (ed.), Inquiries in the Economics of Aging, 259-305, University of Chicago Press: Chicago, 1998.

"Consumption and Savings Balances of the Elderly: Experimental Evidence on Survey Response Bias," with M. Hurd, et al., in D. Wise (ed.), Frontiers in the Economics of Aging, 353-387, University of Chicago Press: Chicago, 1998.

"Healthy, Wealthy, and Wise? Socioeconomic Status, Morbidity, and Mortality among the Elderly," with M. Hurd and A. Merrill, Working Paper, April 1998.

"Predictors of Mortality Among the Elderly," with M. Hurd and A. Merill, working paper, December 1999.  Forthcoming in D. Wise (ed.) Themes in the Economics of Aging, University of Chicago Press: Chicago, 2001.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"Comment on Incentive Effects of Social Security Under an Uncertain Disability Option," in D. Wise (ed.) Themes in the Economics of Aging, University of Chicago Press: Chicago, 2001.

"Response Behavior in Surveys of the Elderly: Experimental Evidence from Internet Surveys," with Joachim Winter, Conference Draft, March 2001.

"Healthy, Wealthy, and Wise? Tests for Direct Causal Paths between Health and Socioeconomic Status," with P. Adams, M. Hurd, A. Merrill, and T. Ribeiro, Journal of Econometrics, Vol 112, Issue 1, 3-56, 2003.

"Response," with P. Adams, M. Hurd, A. Merrill, and T. Ribeiro, Journal Of Econometrics, Vol 112, Issue 1, 129-133, 2003.

"Individual Subjective Survival Curves," with L. Gan and M. Hurd, NBER Working Paper No. 9480, January 2003.

"Subjective Mortality Risk and Bequests," with L. Gan, G. Gong and M. Hurd, NBER Working Paper No. 10789, September 2004.

"Broken Down by Work and Sex: How Our Health Declines: Comment, Analyses in the Economics of Aging," pp. 205-12, 2005.

"Medicare prescription drug coverage: Consumer information and preferences," with  J. Winter, R. Balza, F. Caro, F. Heiss, B. Jun and R. Matzkin, Proceedings of the National Academy of Sciences, May 2006.

"Who Failed to Enroll in Medicare Part D, and Why? Early Results," with J. Winter and F. Heiss. Health Affairs, doi: 10.1377/hlthaff.25.w344, August 2006.

"Mind the Gap! Consumer Perceptions and Choices of Medicare Part D Prescription Drug Plans," with J. Winter and F. Heiss, Working Paper, November, 2007.

"ConsumerDirected Health Care: Can Consumers Look After Themselves?,"  with J. Winter and F. Heiss, Swiss Journal of Economics and Statistics, 144(3), 285307 July, 2008.

"Human Capital Accumulation and Depreciation," Review of Agricultural Economics, Vol. 30, Issue 3, pp. 379-385, October 2008.

"Want to Monitor Medicare's New Drug Benefit Program? Start by Sending a Check for $120,000," Economists 'Voices, vol. 5, no. 4, 2008.

"The Human Side of Mechanism Design, A Tribute to Leo Hurwicz and JeanJacques Laffont," Review of Economic Design, 13, (1), 77-100 & 377, 2009.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"Regulation of private health insurance markets: Lessons from enrollment, plan type choice, and adverse selection in Medicare Part D," with J. Winter and F. Heiss, NBER Working Paper 15392, October 2009.

"The Impact of Employer Matching on Savings Plan Participation under Automatic Enrollment: Comment, Research Findings," in The Economics of Aging, pp. 327-35, 2010.

"Mind the Gap! Consumer Perceptions and Choices of Medicare Part D Prescription Drug Plans," with F. Heiss, J. Winter, Research Findings in the Economics on Aging, pp. 413-481, 2010.

"Healthy, Wealthy and Wise?" Revisited: An Analysis of the Causal Pathways from Socio-economic Status to Health," with Stowasser, T., Heiss, F., Winter, J., National Bureau of Economic Research, Inc, NBER Working Papers: 17273, 2011.

"Remedies for Sick Insurance," with C. Noton, P. Olivella, **SERIEs** Vol. 6, Iss. 3, (August 2015): 247-278.

"Plan Selection in Medicare Part D: Evidence from Administrative Data," with F. Heiss, A, Leive, J. Winter, NBER Working Paper Series, No. 18166, 2012.

"The New Science of Pleasure," NBER Working Paper Series, No. 18687, 2013.

"Inattention and Switching Costs as Sources of Inertia in Medicare Part D," with Heiss, Florian; Winter, Joachim; Wuppermann, Amelie; Zhou, Bo, American Economic Review, Vol. 111.9,  (September 2021): 2737-2781.


**Environmental Economics**

"Assessing Use Value Losses Caused by Natural Resource Injury," with J.A. Hausman and G. Leonard, in J. Hausman (ed.), Contingent Valuation: a Critical Assessment, 341-363, North Holland: Amsterdam, 1993.

"Issues in the Contingent Valuation of Environmental Goods: Methodologies for Data Collection and Analysis," with G. Leonard, in J. Hausman (ed.), Contingent Valuation: a Critical Assessment, 165-208, North Holland: Amsterdam, 1993.

"Contingent Valuation and Social Choice," American Journal of Agricultural Economics, November 1994.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

"A Utility-consistent, Combined Discrete Choice and Count Data Model Assessing Recreational Use Losses Due to Natural Resource Damage," with J. Hausman and G. Leonard, Journal of Political Economics, 1995.

"Estimating Natural Resource Damages with and without Contingent Valuation, " by Susan J. Guthrie, Daniel L. McFadden and Kenneth T. Wise, at the 88th Annual Meeting of the Air and Waste Management Association, 1995.

"Why is Natural Resource Damage Assessment So Hard?," Hibbard Lecture, Agricultural and Resource Economics, University of Wisconsin, Madison, May, 1996.

"Measuring Environmental Injury in the Presence of Confounding Risks," Working Paper, May 1996.

"On the Analysis of Endogenously Recruited Panels," Working Paper, February 1997.

"Can Meta-analyses of CV Studies Determine Their Reliability?" Working Paper, October 1997.

"Referendum Contingent Valuation, Anchoring, and Willingness to Pay for Public Goods," with D. Green, K. Jacowitz, and D. Kahneman, Resource and Energy Economics, 1998.

"Computing Willingness-to-Pay in Random Utility Models," in J. Moore, R. Riezman, and J. Melvin (eds.), Trade, Theory and Econometrics: Essays in Honour of John S. Chipman, Routledge, forthcoming January 1999.

"Comment on Discussion of Morey and Waldman's 'Measurement Error in Recreation Demand Models,'" with K. Train and R. Johnson, Journal of Environmental Economics and Management, Vol. 40, pp. 76-81 (2000).


**Expert Testimony and Consulting (2017-Present)**

I submitted an expert report (August 14, 2017), and a supplemental report (September 22, 2017) on behalf of plaintiffs in the matter of United States v. Novartis Pharmaceuticals Corp., United States District Court, Southern District of New York, No. 11 Civ. 0071 (PGG).

I was deposed (March 1, 2018) on behalf of plaintiffs in the matter of United States v. Novartis Pharmaceuticals Corp., United States District Court, Southern District of New York, No. 11 Civ. 0071 (PGG).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

I was deposed (April 10, 2018) on behalf of General Motors, Inc., In Re: General Motors LLC, Ignition Switch Litigation, United States District Court for the Southern District of New York, Case No. 14-MD-2543 (JMF).

I was retained for a class of insurance subscribers who allege an antitrust injury by a consortium of insurers who maintain horizontal agreements that allocate markets and limit competition.

I submitted expert reports on behalf of defendant Polaris Industries Inc. in the matter of Riley Johanssohn et al. v. Polaris Industries No. 0:16-cv-03348-PJS-LIB on January 31, 2019, April 25, 2019 and August 1, 2019.

I was deposed (February 25, 2019 and May 22, 2019) on behalf of Polaris.

I submitted an expert reports on behalf of the Consumer Financial Protection Bureau in the matter of Consumer Financial Protection Bureau v. Ocwen Financial Corporation et al. No. 9:17-CV-80495-MARRA-MATTHEWMAN on August 15, 2019, and November 14, 2019.

I was deposed on behalf of Consumer Financial Protection Bureau v. Ocwen Financial Corporation et al. No. 9:17-CV-80495-MARRA-MATTHEWMAN on February 4, 2020.

I submitted an expert report and testified on behalf of a class of European air freight shippers in an anti-trust matter involving overcharges by airlines serving European markets, June 2020.

I submitted an expert report on behalf of Mondelez and was deposed in a matter involving deceptive labeling, in the case of McMorrow v. Mondelez, July 2020.

I submitted an expert report on behalf of Ford in a matter involving an allegedly defective vehicle component a in the case of Eric Stevens et.al. v. Ford Motor Company on May 17, 2021, was deposed in this matter on June 3, 2021, and submitted an affidavit on July 13, 2021.

I submitted an expert report on behalf of the Consumer Plaintiffs in the Apple iPhone antitrust litigation on June 1, 2021, and was deposed in this matter on August 3, 2021.

I submitted an expert report on behalf of Mondelez in a matter involving deceptive labeling, in the case of McMorrow v. Mondelez, July 2, 2021.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

# Appendix B Materials Relied Upon

## CASE MATERIALS

Order Denying Apple's Daubert Motion to Exclude the Testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz; and Granting Plaintiffs' Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), February 02, 2024.

Stipulation and [Proposed] Order for Leave to File Third Amended Consolidated Class Action Complaint, *In re Apple iPhone Antitrust Litigation*, No. C 11-06714-YGR (N.D. Cal.), September 11, 2020, ECF No. 228.

## EXPERT REPORTS

Expert Report of Daniel L. McFadden in Support of Plaintiff's Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), June 1, 2021.

Expert Report of Joseph E. Stiglitz, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025.

Expert Report of Minjae Song, Ph.D., *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025.

Expert Report of Rosa M. Abrantes-Metz, PhD, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), March 7, 2025.

Reply Report of Daniel L. McFadden in Support of Plaintiff's Motion for Class Certification*, In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), Oct. 19, 2021.

Reply Report of Daniel L. McFadden, PH.D., in Support of Plaintiff's Renewed Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.) April 28, 2023.

Revised Supplemental Expert Report of Daniel L. McFadden in Support of Plaintiff's Motion for Class Certification, *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR, (N.D. Cal.), January 19, 2023.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

ACADEMIC ARTICLES AND BOOKS

Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations*, (1776).

Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th ed., (Pearson, 2015): 53-54.

Jonathan Gruber, *Public Finance and Public Policy*, 5th ed., (New York: Worth Publishers, 2016).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

## Appendix C Technical Details of Damages Model

60. This appendix recaps my demand and profit maximization model and is taken from 2023 Supplemental Report.[76] I present the mathematical equations for consumer demand for app downloads and IAP, and equations for app developer profits. Assuming that app developers set prices to maximize their profits, I solve for the developers' marginal costs and profit maximizing prices as functions of the demand parameters and Apple's commission. I then solve for the prices developers would have set in the But-For world, and the net monetary loss to consumers per transaction due to supra-competitive prices.

61. In the notation of my Original Report, demands for an app download, and for IAP within that app, are:

$$(8) \quad \log(Q_{jt}) = \alpha^d p_{jt}^d + X_{jt}^d \gamma^d + u_{jt}^d$$

$$(9) \quad \log(\omega_{jkt}) = \alpha^{IAP} p_{jkt}^{IAP} + \beta^Q \log(Q_{jt}) + X_{jkt}^{IAP} \gamma^{IAP} + u_{jkt}^{IAP}$$

62. The equation numbering is that of my Original Report. In these equations, $j$ indexes the app, $t$ the time period (year and month), $k$ an IAP item, $Q$ the number of download transactions, $\omega$ the number of IAP transactions, $p$ a price per transaction, $X$ a vector of controls including app and time fixed effects, and $u$ a residual. These demands are estimated and analyzed separately for two genres, Games and consolidated Music & Entertainment.

63. Price sensitivity parameters $\alpha^d$ and $\alpha^{IAP}$ are negative, and developers are assumed to maximize profit. For the purpose of the developer profit model, all IAP items in an app-period are aggregated into a composite IAP sale, with price determined by taking the average price across the distinct IAP items observed in the app-period. With this implementation, the IAP item index $k$ is redundant and is dropped in the formulas below. Three business models are considered: (1) paid download only with no paid IAP, (2) paid IAP with free download, and (3) paid download and paid IAP. For clarity, consider each in turn.

---

[76]    McFadden 2023 Supplemental Report, Appendix E.1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

64. (1) For paid download only with no paid IAP, only equation (8) enters, the operating profit of the developer is $\pi = \left((1-\tau)p_{jt}^d - c_{jt}^d\right)Q_{jt}$, and profit is maximized at $\hat{p}_{jt}^d = max\{0, -\frac{1}{\alpha^d} + \frac{c_{jt}^d}{1-\tau}\}$. Observed As-Is price $p_{jt}^{d,AS} > 0$ is used to estimate $\hat{c}_{jt}^d = (1-\tau^{AS})(-\frac{1}{\alpha^d} + p_{jt}^{d,AS})$, and a predicted But-For price is calculated as

$$\hat{p}_{jt}^{d,BF} = max\{0, -\frac{1}{\alpha^d} + \frac{\hat{c}_{jt}^d}{1-\tau^{BF}}\} = max\{0, \frac{1-\tau^{AS}}{1-\tau^{BF}} p_{jt}^{d,AS} - \frac{1}{\alpha^d}\frac{\tau^{AS} - \tau^{BF}}{1-\tau^{BF}}\}$$

65. The right-hand-side of the max in this equation is always positive in my simulation, so that the constraint that $\hat{p}_{jt}^{d,BF}$ be non-negative is never binding, and therefore the constraint is not necessary in my implementation. The estimated net monetary loss to a buyer per As-Is transaction is

$$p_{jt}^{d,AS} - \hat{p}_{jt}^{d,BF} = \frac{\tau^{AS} - \tau^{BF}}{1-\tau^{BF}}\left(p_{jt}^{d,AS} + \frac{1}{\alpha^d}\right)$$

66. This estimated net loss depends only on the As-Is and But-For commission, the As-Is price, and the price sensitivity parameter $\alpha^d$.

67. (2) For paid IAP only with no download, only equation (9) enters, the operating profit of the developer is $\pi = \left((1-\tau)p_{jt}^{IAP} - c_{jt}^{IAP}\right)\omega_{jt}$, and profit is maximized at $\hat{p}_{jt}^{IAP} = max\{0, -\frac{1}{\alpha^{IAP}} + \frac{c_{jt}^{IAP}}{1-\tau}\}$. Observed As-Is price $p_{jt}^{IAP,AS} > 0$ is used to estimate $\hat{c}_{jt}^{IAP} = (1-\tau^{AS})(-\frac{1}{\alpha^{IAP}} + p_{jt}^{IAP,AS})$, and a predicted But-For price is calculated

$$\hat{p}_{jt}^{IAP,BF} = max\{0, -\frac{1}{\alpha^{IAP}} + \frac{\hat{c}_{jt}^{IAP}}{1-\tau^{BF}}\} = max\{0, \frac{1-\tau^{AS}}{1-\tau^{BF}} p_{jt}^{IAP,AS} - \frac{1}{\alpha^{IAP}}\frac{\tau^{AS} - \tau^{BF}}{1-\tau^{BF}}\}$$

68. As in case (1), $\hat{p}_{jt}^{IAP,BF}$ is always positive in my simulation and the constraint that it be non-negative is never binding. The estimated monetary loss to a buyer per As-Is transaction is

$$p_{jt}^{IAP,AS} - \hat{p}_{jt}^{IAP,BF} = \frac{\tau^{AS} - \tau^{BF}}{1-\tau^{BF}}\left(p_{jt}^{IAP,AS} + \frac{1}{\alpha^{IAP}}\right)$$

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

69. This net loss depends only on the As-Is and But-For commission, the As-Is price, and the price sensitivity parameter $\alpha^{IAP}$.

70. (3) For paid download and paid IAP, both equations (8) and (9) enter, and the operating profit of the developer is $\pi = \left((1-\tau)p_{jt}^d - c_{jt}^d\right)Q_{jt} + \left((1-\tau)p_{jt}^{IAP} - c_{jt}^{IAP}\right)\omega_{jt}$. The first-order conditions for profit-maximization are

(a) $\frac{\partial \pi}{\partial p_{jt}^{IAP}} = \left\{1 - \tau + \alpha^{IAP}\left((1-\tau)p_{jt}^{IAP} - c_{jt}^{IAP}\right)\right\}\omega_{jt} \leq 0 \text{ and } p_{jt}^{IAP}\frac{\partial \pi}{\partial p_{jt}^{IAP}} = 0$

(b) $\frac{\partial \pi}{\partial p_{jt}^d} = \left\{1 - \tau + \alpha^d\left((1-\tau)p_{jt}^d - c_{jt}^d\right)\right\}Q_{jt} + \left((1-\tau)p_{jt}^{IAP} - c_{jt}^{IAP}\right)\omega_{jt}\beta^Q\alpha^d \leq 0$

$$\text{and } p_{jt}^d\frac{\partial \pi}{\partial p_{jt}^d} = 0 \, .$$

71. Equation $(a)$ implies profit-maximizing price $\hat{p}_{jt}^{IAP} = max\{0, -\frac{1}{\alpha^{IAP}} + \frac{c_{jt}^{IAP}}{1-\tau}\}$. As in case (2), observed As-Is price $p_{jt}^{IAP,AS} > 0$ is used to estimate $\hat{c}_{jt}^{IAP} = (1 - \tau^{AS})(-\frac{1}{\alpha^{IAP}} + p_{jt}^{IAP,AS})$, and the predicted But-For IAP price is always positive in my simulation:

$$\hat{p}_{jt}^{IAP,BF} = max\{0, -\frac{1}{\alpha^{IAP}} + \frac{\hat{c}_{jt}^{IAP}}{1 - \tau^{BF}}\} = max\{0, \frac{1 - \tau^{AS}}{1 - \tau^{BF}}p_{jt}^{IAP,AS} - \frac{1}{\alpha^{IAP}}\frac{\tau^{AS} - \tau^{BF}}{1 - \tau^{BF}}\}$$

72. Equation (b), evaluated at observed $p_{jt}^{d,AS} > 0$, $p_{jt}^{IAP,AS} > 0$, $Q_{jt}^{AS} > 0$, $\omega_{jt}^{AS} > 0$, and the estimated $\hat{c}_{jt}^{IAP}$, is solved to give

$$\hat{c}_{jt}^d = (1 - \tau^{AS})(p_{jt}^{d,AS} + \frac{1}{\alpha^d}) + \left((1-\tau^{AS})p_{jt}^{IAP,AS} - \hat{c}_{jt}^{IAP}\right)\frac{\omega_{jt}^{AS}\beta^Q}{Q_{jt}^{AS}}$$

$$= (1 - \tau^{AS})\left(p_{jt}^{d,AS} + \frac{1}{\alpha^d} - \frac{\omega_{jt}^{AS}\beta^Q}{\alpha^{IAP}Q_{jt}^{AS}}\right)$$

73. Equation (b) evaluated at $\tau^{BF}$, $\hat{c}_{jt}^{IAP}$, $\hat{c}_{jt}^d$, and $\hat{p}_{jt}^{IAP,BF}$ yields a nonlinear equation in $\hat{p}_{jt}^{d,BF}$ that must be solved numerically.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY – SUBJECT TO PROTECTIVE ORDER

$$p_{j,t}^{d,BF} = max\left(0, -\frac{1}{\hat{\alpha}^d} + \frac{\hat{\beta}^Q \omega_{j,t}^{BF}}{\hat{\alpha}^{IAP} Q_{j,t}^{BF}} + \frac{(1-\tau^{AS})}{(1-\tau^{BF})}\left[\frac{1}{\hat{\alpha}^d} - \frac{\hat{\beta}^Q \omega_{j,t}^{AS}}{\hat{\alpha}^{IAP} Q_{j,t}^{AS}} + p_{j,t}^{AS}\right]\right)$$

74. The estimated net monetary loss to a buyer per As-Is IAP transaction is

$$p_{jt}^{IAP,AS} - \hat{p}_{jt}^{IAP,BF} = \frac{\tau^{AS} - \tau^{BF}}{1-\tau^{BF}}\left(\frac{1}{\alpha^{IAP}} + p_{jt}^{IAP,AS}\right).$$

The But-For download price does not have an explicit solution formula in this case, so it must be solved numerically and hence there is no explicit formulas for the estimated net monetary loss to a buyer per As-Is app download transaction. However, from the first order condition used to obtain $\hat{p}_{jt}^{IAP,BF}$, this net loss can be calculated as a function of As-Is prices and quantities of both downloads and IAP sales as well as the As-Is and But-For commission.

Expert Report of Daniel L. McFadden, Ph.D.