# EXHIBIT 6

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

_____

IN RE APPLE IPHONE          ) Case No.

ANTITRUST LITIGATION,        ) 4:11-cv-06714 YGR

_____


**HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY**


VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

DARRYL THOMPSON

9:05 A.M.

JUNE 5, 2025

1200 SIXTH AVENUE, SUITE 610

SEATTLE, WASHINGTON


REPORTED BY:

CARLA R. WALLAT, CRR, RPR

WA CCR 2578, OR CSR 16-0443, CA CSR 14423

JOB No. 7376385


PAGES 1 - 218

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

APPEARANCES

FOR THE CERTIFIED CLASS:
THOMAS H. BURT
Wolf Haldenstein Adler Freeman & Herz LLP
270 Madison Avenue
New York, New York 10016
212.545.4600
burt@whafh.com

KYLE M. WOOD
ANNA K. LINK - via Zoom
Kellogg, Hansen, Todd, Figel & Frederick, PLLC
1615 M Street NW, Suite 400
Washington, DC 20036
202.326.7900
kwood@kellogghansen.com
alink@kellogghansen.com

FOR THE DEFENDANT:
ELI M. LAZARUS
CAELI A. HIGNEY - via Zoom
Gibson, Dunn & Crutcher LLP
One Embarcadero Center, Suite 2600
San Francisco, California 94111
415.393.8200
elazarus@gibsondunn.com
chigney@gibsondunn.com

RAMONA LIN
HARRY R. S. PHILLIPS - via Zoom
Gibson, Dunn & Crutcher LLP
1700 M Street, N.W.
Washington, D.C. 20036
202.955.8500
rlin@gibsondunn.com
hphillips@gibsondunn.com

ALSO PRESENT:
LORI TALBOTT, Videographer
JEREMIAH RONDEAU, Cornerstone Research
CHRIS BRUEGGE, Cornerstone Research - via Zoom

Page 2

I N D E X

EXAMINATION BY:                              PAGE(S)
MR. LAZARUS                                      9
MR. BURT                                       209

EXHIBITS FOR IDENTIFICATION                    PAGE
Exhibit DX 112   Supplemental Expert Report of      14
         Darryl Thompson, April 16,
         2025
Exhibit DX 113   README file                   18
Exhibit DX 114   Exhibit 1, In Re:  Blue Cross      33
         Blue Shield Antitrust
         Litigation, Declaration of
         Jennifer M. Keough
Exhibit DX 115   Exhibit A, In Re Blue Cross        47
         Blue Shield Antitrust
         Litigation, Declaration of
         Megan E. Jones
Exhibit DX 116   Declaration of Darryl Thompson     72
Exhibit DX 117   7/10/2024 email from Ramona        80
         Lin to Rachele Byrd and Kyle
         Wood

Page 3

EXHIBITS FOR IDENTIFICATION                    PAGE
Exhibit DX 118   7/10/2024 letter to Rachele        84
         Byrd and Kyle Wood from Eli
         Lazarus
Exhibit DX 119   Kim B                        148
         Excerpts from Apple Payor Data
         Produced as
         APL-APPSTORE_10767813,
         APL-APPSTORE_10809581,
         APL-APPSTORE_10857484, and
         APL-APPSTORE_10864885
Exhibit DX 120   Kim J                        149
         Excerpts from Apple Payor Data
         Produced as
         APL-APPSTORE_10767813,
         APL-APPSTORE_10809581,
         APL-APPSTORE_10857484, and
         APL-APPSTORE_10864885
Exhibit DX 121   Kim H                        150
         Excerpts from Apple Payor Data
         Produced as
         APL-APPSTORE_10767813,
         APL-APPSTORE_10809581,
         APL-APPSTORE_10857484, and
         APL-APPSTORE_10864885

Page 4

EXHIBITS FOR IDENTIFICATION                    PAGE
Exhibit DX 122   Debra                        153
         Excerpts from Apple Payor Data
         Produced as
         APL-APPSTORE_10767813,
         APL-APPSTORE_10809581,
         APL-APPSTORE_10857484, and
         APL-APPSTORE_10864885
Exhibit DX 123   Deb                          154
         Excerpts from Apple Payor Data
         Produced as
         APL-APPSTORE_10767813,
         APL-APPSTORE_10809581,
         APL-APPSTORE_10857484, and
         APL-APPSTORE_10864885
Exhibit DX 124   Cindy - Jason                156
         Excerpts from Apple Payor Data
         Produced as
         APL-APPSTORE_10767813,
         APL-APPSTORE_10809581,
         APL-APPSTORE_10857484, and
         APL-APPSTORE_10864885

Page 5

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

EXHIBITS FOR IDENTIFICATION                PAGE

Exhibit DX 125  Cindy                      156
          Excerpts from Apple Payor Data
          Produced as
          APL-APPSTORE_10767813,
          APL-APPSTORE_10809581,
          APL-APPSTORE_10857484, and
          APL-APPSTORE_10864885
Exhibit DX 126  Cindy - Ellie              158
          Excerpts from Apple Payor Data
          Produced as
          APL-APPSTORE_10767813,
          APL-APPSTORE_10809581,
          APL-APPSTORE_10857484, and
          APL-APPSTORE_10864885
Exhibit DX 127  1/15/2025 letter to Eli    196
          Lazarus from Kyle Wood
Exhibit DX 128  Declaration of Darryl      199
          Thompson, March 7, 2025

REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

Page 6

please state them at the time of your appearance.

Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. LAZARUS:  I'm Eli Lazarus of Gibson, Dunn & Crutcher for Apple, Inc., the defendant.  I'm joined here by Ramona Lin, who is a colleague at Gibson Dunn, and Jeremiah Rondeau from Cornerstone Research.  And joining on the Zoom line we have Caeli Higney from Gibson Dunn and Chris Bruegge from Cornerstone Research.

MR. BURT:  I am Thomas Burt from Wolf, Haldenstein, Adler, Freeman & Herz LLP for the certified class.

BY MR. WOOD:  Kyle Wood from Kellogg, Hansen, Todd, Figel & Frederick, also for the certified class.

THE VIDEOGRAPHER:  Thank you.

Would the court reporter please swear in the witness.

DARRYL THOMPSON, sworn as a witness by the Certified Court Reporter, testified as follows:

Page 8

SEATTLE, WASHINGTON; JUNE 5, 2025
9:05 A.M.
--oOo--

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:05 a.m. on June 5th, 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.  Audio and video recording will continue to take place unless both parties agree to go off the record.

This is Media Unit 1 in the video-recorded deposition of Darryl Thompson taken by counsel for defendant in regards to Apple iPhone Antitrust Litigation filed in the United States District Court, Northern District of California, Oakland Division.  Case number 4:11-cv-06714-YGR.  The location of the deposition is 1200 Sixth Avenue, Suite 610, Seattle, Washington.

My name is Lori Talbott representing Veritext and I am the videographer.  The court reporter is Carla Wallat from the firm Veritext.

I'm not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding,

Page 7

EXAMINATION

BY MR. LAZARUS:

Q.  Please state your full name for the record.

A.  Darryl Wayne Thompson.

Q.  All right.  We have met a few times, Mr. Thompson.  And I think you know from our prior meetings that I am not a data expert or computer scientist, so I think I'm going to have to ask you to explain a lot of things to me today.  So thank you for your patience with that.

But first I have a few preliminary questions.

Have you been deposed before?

A.  Yes.

Q.  Okay.  How many times?

A.  Once.

Q.  Okay.  And what case was that?

A.  I actually don't recall the case.

Q.  Okay.  When was that?

A.  Approximately seven -- six to seven years ago.

Q.  Okay.  What was the general topic of your testimony?

A.  I was providing information with regards to a class action administration my company was administering.

Q.  Did it -- did your testimony deal with

Page 9

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

deduplication of data?

A. It did not.

Q. Have you ever testified in a trial?

A. I have not.

Q. Okay. Have you ever been retained as a testifying expert in another case?

A. I have not.

Q. And has a court -- has a court ever expressed disagreement with any of your opinions in a case?

A. Not that I am aware of.

Q. Have you ever submitted a declaration in a court case prior to this case?

A. Yes, I have.

Q. Okay. What cases?

A. I could not name any of them I -- but I have.

Q. Okay. About how many?

A. Maybe a dozen.

Q. Okay. Did those declarations deal with deduplication of data?

MR. BURT: Objection. Form.

A. The declaration -- some -- some of the declarations I believe contained information regarding the total population received and the ultimate size of the class after going through deduplication without specifically referencing deduplication.

Page 10

Q. (BY MR. LAZARUS) And when you say the population received, that's the population receiving notice in the case?

A. The population received is the -- in that -- what I was referencing is the population we received from third party, usually the defendant, and then we would perform analysis and deduplication and then the final outcome. So those numbers may have been included in -- in one or more of my declarations.

Q. Thank you.

Just some more preliminaries.

If I ask a question and you don't understand it, please tell me that. If you answer a question, I will assume that you understood the question and have answered it to the fullest extent of your recollection; is that fair?

A. Yes.

Q. Okay. And you may request breaks during the deposition. I just ask that if when you request a break if I have asked a question, I ask that you answer the question before we take a break.

Does that make sense?

A. Yes.

Q. And do you understand that you are under oath today?

Page 11

A. I do.

Q. Is there any reason that you would be unable to give your honest and best testimony today?

A. Not -- no.

Q. We are being helped today by a court reporter. And for her sake, and the sake of the transcript, I'd ask that you wait until I have finished asking a question before you answer. It can be difficult to take down what we're saying if we're talking over each other.

MR. LAZARUS: And finally for the preliminaries, given the topics we will discuss today, I will designate the transcript as "highly confidential - attorneys' only" for Apple.

Q. (BY MR. LAZARUS) All right. What did you do to prepare for today's -- sorry?

MR. BURT: I note that you said, "for Apple." I just want to join in the "highly confidential" designation because we expect to be discussing matters that have source code protection.

Q. (BY MR. LAZARUS) All right. What did you do to prepare for today's deposition?

A. I met with counsel. I did some high-level review of deduplication code that I wrote. I read some sections of my declaration and my expert documentation.

Page 12

Q. Okay. When you -- when did you meet with counsel?

A. I met last Friday, last Monday, last Tuesday, which I guess would have been the day before yesterday.

Q. All right.

A. And yesterday. Additionally, we had met three weeks ago in preparation for when my declaration was previously scheduled.

Q. Your deposition was previously scheduled?

A. Or my deposition, apologies.

Q. And how long were those meetings with counsel?

A. They varied from two hours to four hours.

Q. And you mentioned some code and documents that you looked at.

Did you look at any documents other than the ones that you just named in preparation for this deposition?

A. There was a letter that I also scanned that pertained to -- or at least had a section that pertained to NCOA data.

Q. Who was that letter from?

A. I believe it was from Mark Rifkin.

Q. Okay. Counsel for the plaintiffs?

A. Yes.

Q. Okay. Any other documents?

Page 13

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

A. None that jump out at me right at the moment.

Q. Okay.

MR. LAZARUS: And can we now mark document -- the supplemental expert report, Tab 1, as DX 112.

(Deposition Exhibit DX 112 was marked.)

Q. (BY MR. LAZARUS) And I think that will come up on the screen here.

MR. LAZARUS: And can we also get the paper copies, please.

Q. (BY MR. LAZARUS) All right. This document is labeled "Supplemental Expert Report of Darryl Thompson," correct?

A. That is correct.

Q. Is this a copy of your final report in this case?

A. It appears to be, yes.

Q. Okay. On page 7 of this report, is that your electronic signature?

A. It is.

Q. Okay. And is it okay if I call this document "your report" so that when I say "your report," you'll understand I'm referring to this document and not any prior declaration or other document?

A. I'm fine with that.

Page 14

Q. Okay. Did you write this report yourself?

A. I -- I wrote the significant components of it. Portions of it came out of my original declaration and were provided to me by counsel in a template. And so they filled in certain sections that came out of my declaration and then I -- they provided sections that said, all right, this is sections that you need to provide what you did.

Q. Understood.

What portions did counsel write?

MR. BURT: Objection to characterization.

Q. (BY MR. LAZARUS) You can answer.

A. I'm not sure I can point to any section that I know counsel wrote. As I said, the -- from my recollection, the -- the expert -- the report came over with sections filled out from my declaration, so I don't believe that qualifies that they wrote it. They copied it from my declaration and then they identified sections that I need to fill in.

Q. Okay. But you adopted all of the language in this document as your final report?

A. I did.

Q. Okay. Let's see. Okay.

When did you start drafting this document?

Page 15

A. Oh, I could not give you a date. I've --

Q. Roughly?

A. I want to say March of this year, but I -- again, I can't -- I could not give you with high confidence when I started writing this.

Q. Understood.

Were any portions of this report or the declaration -- well, scratch that.

Were any portions of this report taken from prior declarations that you had given in any other matter?

MR. BURT: Object to form.

A. Possibly bio information would have been brought forward, but -- but nothing with regards to work on this -- on this matter. But possibly bio information.

Q. (BY MR. LAZARUS) Okay. Bio information meaning your own biography --

A. That is correct.

Q. -- background information?

Okay. Have you been asked to prepare any reports to be submitted in this case after this document?

MR. BURT: Objection. I -- I don't think I need to let him answer that.

Page 16

MR. LAZARUS: Your -- what -- what's the basis for the objection?

MR. BURT: You're asking whether he's going to file a report in the future. I don't -- I think that's objectionable.

MR. LAZARUS: And you're --

MR. BURT: Because it goes to attorney work product.

MR. LAZARUS: And you're instructing him not to answer?

MR. BURT: I'm instructing him not to answer.

MR. LAZARUS: All right. I'll withdraw that question for now.

I hear there's a request on the Zoom for all of us to speak up, so --

MR. BURT: I'm a quiet objector so as not to interfere with your examination.

MR. LAZARUS: Much appreciated.

MR. BURT: I'll move my mic up.

MR. LAZARUS: That probably does it.

Q. (BY MR. LAZARUS) Okay. Do you intend to offer any opinions in rebuttal to any of Apple's experts in this case?

MR. BURT: I think that's still attorney

Page 17

5 (Pages 14 - 17)

work product.

MR. LAZARUS: Okay. I'll withdraw that question for the moment also.

Q. (BY MR. LAZARUS) All right. Are all of the opinions that you are offering in this case contained in your report?

A. Yes.

Q. Okay. And are all of the bases for those opinions described in your report?

A. I believe so.

Q. Okay. You also provided a README file on May 28, 2025; is that correct?

A. I provided a README file. I don't know the exact date, but I will accept that it's that date.

Q. Okay.

MR. LAZARUS: Can we go ahead and mark -- it's Tab 17 -- as an exhibit?

MR. BURT: Is this 113?

MR. LAZARUS: I'm sorry?

MR. BURT: Is this 113?

MR. LAZARUS: It should be 113, right.

(Deposition Exhibit DX 113 was marked.)

Q. (BY MR. LAZARUS) Okay. Is this the README file that you produced?

A. Yes.

Page 18

Q. All right. And your report and this README file both describe the methods you used to form your opinions in this case, correct?

MR. BURT: Objection to form.

A. The README file simply lists a -- a -- a set of steps to executing code that I believe represents the -- a -- substantially all of the code I ran in order to achieve the outcome.

Q. (BY MR. LAZARUS) Okay. And just the -- so the question I asked is, your report and the README file both describe the methods you used to form your opinions in this case; is that -- is that correct?

MR. BURT: Same objection.

A. The README file gives a list of -- of code to execute and -- and some additional instruction. I don't know that it -- it actually direct -- provides detail on, you know, the actual activity. Simply the code being run.

Q. (BY MR. LAZARUS) Okay. But to understand the methods that you used in this case in your analysis, we should look at the report and this README file?

MR. BURT: Objection. Asked and answered.

A. Yes. The -- the README file did provide information on how -- which scripts I ran, yes.

Page 19

Q. (BY MR. LAZARUS) Okay. And we'll come back to talk more about your background, but your current employer is JND Legal Administration; is that correct?

A. That is correct.

Q. All right. And you maintain that parts of the methods and the code described in your report and the README file are proprietary to JND, correct?

A. That is correct.

Q. Do you have knowledge of anyone outside of JND using those methods?

MR. BURT: Objection to form.

A. Not -- not that I'm aware of.

Q. (BY MR. LAZARUS) In forming your opinions in this case, did you review any peer-reviewed publications related to the methods you relied upon?

A. I did not.

Q. Are there any analyses that you relied upon for the opinions in your report that are not included in the -- well, scratch that. Let me back up.

In addition to the report and this README file, you also provided backup materials of computer files that you relied on in your analysis in this case; is that right?

MR. BURT: Objection to form.

A. Yes. I provided the code, yes.

Page 20

Q. (BY MR. LAZARUS) Okay. Are there any analyses that you relied upon for the opinions in your report that are not included in the computer files that you provided to Apple?

A. I'm not sure I understand the -- the question.

Q. Okay. So you provided computer files to Apple, more specifically, to Apple's consultants at Cornerstone Research, correct?

A. That is correct.

Q. Are there any -- scratch that.

Did you conduct any analysis that you rely upon in your report other than those that are reflected in the computer files that you produced?

A. I do not believe I relied on any -- anything other than what's -- what was provided in -- in -- I did not rely on anything -- or I do not believe I relied on anything other than what I provided in the outcome and what I -- what I determined in the report.

Q. Okay. So tell me if I have this right.

You do not believe that you relied upon any -- you do not believe you relied upon anything other than what is in your report, what is in your README file and what is in the computer files and code that you produced to Cornerstone Research.

Is that right?

Page 21

6 (Pages 18 - 21)

A. If I understand the question, I believe that is correct.

Q. Okay. Are there any questions that you have that -- to help clarify the question?

A. I'm trying to -- I'm trying to determine if there was something that -- that it's -- that is -- would qualify as -- as meeting the -- the criteria you speak of. I -- and I can't think of anything.

Q. Okay. Understood.

Have you identified any errors or omissions in your report since you submitted it?

A. Not to my -- no, not to my knowledge.

Q. Okay. You hold yourself out as a data specialist, correct?

A. I -- I have extensive experience in utilizing and working with data.

Q. Okay. If you look at page 1 of the report, there's a line that says, "I have worked as a data -- data specialist for over 25 years."

Is that right?

A. Line 1, Section 3?

Q. Correct. In paragraph 3.

A. That is correct.

Q. Okay. And that's -- you stand by that assertion?

Page 22

A. I do.

Q. Okay.

A. I've worked as a data specialist for over 25 years.

Q. All right. And you graduated from Washington State University in 1996 with a bachelor of arts in management information systems; is that correct?

A. That's correct.

Q. Have you resided outside of the state of Washington since you graduated in 1996?

A. No.

Q. Okay. Do you have any formal education beyond the bachelor's degree in management information systems that we just referred to?

A. No.

Q. Okay. You don't have any advanced degrees like a master's or a Ph.D., right?

A. I do not.

Q. And you don't have any degree in statistics, correct?

A. I do not.

Q. You're not a professor of management information systems, statistics or any other subject, correct?

A. I am not.

Page 23

Q. You have not authored any peer-reviewed published research on subjects relating to statistical methodology, correct?

A. I have not.

Q. You do not have any professional certifications or accreditations in management information systems, statistics or any other fields, correct?

A. That is correct.

Q. All right. So we mentioned that your current employer is JND Legal Administration. Okay if we refer to the company as JND?

A. Certainly.

Q. All right. And what is JND?

A. JND is a legal administration firm. We provide legal administration -- or for -- administration services for class action lawsuits, securities cases. We also have a e-discovery division.

Q. All right. And what is your job title?

A. I am chief information officer and chief operating officer.

Q. And what are your main responsibilities?

A. I -- I oversee the entire IT organization. I oversee the operations organization. So the -- the IT organization includes the infrastructure,

Page 24

networking, data administration. Operations includes the -- the teams that do project management and administration of our -- administration of our projects.

Q. Understood.

And what are your responsibilities on the legal cases that JND handles claims administration for?

A. What are my responsibilities?

Q. Yes.

A. It can -- it varies widely, from performing oversight of actual and managing the delivery of a project, from -- from noticing to distribution. I also, for our most complex cases, I am involved in the data management and processing and prep and deduplication of data.

Q. Okay. And when you say "noticing," and "distribution," what do those terms refer to?

A. Noticing is sending either mail or email or some other information to class members about the administration.

Distribution refers to once the administration has completed the -- it's -- it's process and determined who received payment, distribution is sending some sort of payment.

Q. Understood.

Page 25

7 (Pages 22 - 25)

And you say at paragraph 6 of your report, which is on page 2, that there is an Exhibit B -- excuse me, Appendix B to the report, correct?

A. Paragraph -- yes.

Q. And in that paragraph 6, you state that Appendix B is a non-exhaustive list of class action settlement administrations for which I reviewed or oversaw the review of data in the last four years, correct?

A. Yes.

Q. And Appendix B contains 11 page -- an 11-page list of cases, correct?

A. Yes.

Q. And did you personally conduct deduplication of individual persons based on personally identifiable information in all of these cases?

A. No.

MR. BURT: Objection to form.

Q. (BY MR. LAZARUS) For what percentage of those cases would you estimate that you did personally conduct deduplication work?

A. I -- I don't believe I could give a -- a realistic answer to that. I -- I do not know.

Q. Is it fair to say it is neither zero percent nor 100 percent?

Page 26

A. It is absolutely not zero and it is not 100. That is correct.

Q. Would you say it's closer to 25 or 75 percent?

A. I believe it'd be closer to 25 percent that I actually did the hands on deduplication.

Q. Okay. And in the cases where you did do hands-on deduplication, what types of data did you deduplicate?

MR. BURT: Objection to form.

A. In general? In general, it would have been contact data for individual -- or for individuals, name, address, situationally phone, situationally email, situationally some sort of other identifier.

Q. (BY MR. LAZARUS) Okay. In all of those cases, was it always personal information that you were deduplicating as opposed to some other kind of data? Does that make sense?

MR. BURT: Objection to form.

A. I would need an example of "some other kind of data." That's too broad for me, I think, to answer.

Q. (BY MR. LAZARUS) Was it always contact information for people that you were deduplicating?

A. No.

Q. Okay. What was an example of when it was not that?

Page 27

A. Business data.

Q. Okay. What do you mean by "business data"?

A. Names of businesses, addresses of businesses.

Q. Understood.

Okay. So other than contact information for persons and business information, is there other data that you can think of that you have deduplicated in any of those cases in Exhibit -- in Appendix B?

A. Yes.

Q. Okay. What other kinds of information?

A. Vehicle data could be involved, but an association with people or businesses.

Q. Okay. Understood.

Okay. And then from September 1998 to July 2010 you were employed by a company called Adaptis, correct?

A. That is correct.

Q. And what is Adaptis?

A. Adaptis was a health care claims administration company.

Q. Okay. And you say "was."

Does the company no longer exist?

A. The company no longer exists.

Q. Okay. Were your responsibilities at Adaptis similar to your current responsibilities at JND?

Page 28

MR. BURT: Objection to form.

Q. (BY MR. LAZARUS) You can answer.

A. I -- I had overlapping responsibilities at Adaptis as what I do at JND, yes.

Q. Okay. What's different between your responsibilities at Adaptis and your responsibilities at JND?

A. Currently, I'm -- oversee operations. I did not do that at Adaptis. Currently, I'm CIO in the IT arena and at Adaptis I held various roles as I became more and more senior, from data analyst to managing director of IT.

Q. Understood.

Did you do what you describe as hands-on data deduplication work at Adaptis?

A. I did hands-on data analysis work at Adaptis. I did hands-on data matching work at Adaptis, which is matching to, you know, to contact records to determine they're the same. The purpose and outcome was in deduplication, but roll up in that situation. But the function was the same and similar.

Q. What's the difference between matching and deduplication?

A. For -- so deduplication is to identify a -- a primary record and all of its related records.

Page 29

8 (Pages 26 - 29)

Matching is to take records and merge details about them to determine a final.

Q. Okay. That sounds very similar to me.

A. It is very similar.

Q. Okay. All right. Let's go to -- from October 2010 to June 2016 you were employed by Garden City Group, correct?

A. That is correct.

Q. And what is Garden City Group?

A. Garden City Group was a legal claims administration company.

Q. And it no longer exists?

A. It no longer exists.

Q. And was it -- how did it cease to exist?

A. It was acquired by a competitor.

Q. Okay. What competitor was that?

A. Epiq.

Q. Okay. Spelled E-P-I-Q; is that correct?

A. No clue.

Q. Okay. Were your responsibilities at Garden City Group similar to your responsibilities at JND?

A. Yes.

Q. Are there differences?

A. Yes.

Q. And what are those?

Page 30

A. At Garden City Group, again, I was not the -- I was not COO or head of operations. So I was not responsible for the operations organization.

Other than that, as my role grew, I -- I filled the similar role as a CIO for Garden City Group.

Q. All right. Did you do data deduplication or data matching at Garden City Group?

A. I did.

Q. Okay. Did you do both of those, matching and deduplication?

A. At Garden City Group primarily it was deduplication, similar to JND.

Q. Okay. Were the methods that you used at Garden City Group similar to the methods that you use at JND for deduplication?

MR. BURT: Objection. Form.

A. I believe so.

Q. (BY MR. LAZARUS) Can you think of any differences between them?

A. Only that as I have gained more and more and more and more experience over the years, I've evolved and improved my methods. And so I believe they've gotten better.

Q. Can you give examples of how they've gotten better?

Page 31

Q. Okay. Can you define "claims administration"?

A. Claims administration in general?

Q. Claims administration as the field that you work in?

A. So legal claims administration?

Q. Yes.

A. It is a -- the service of taking a -- well, a class action administration as an example, and providing a life cycle of steps. And it is very dependent on the case which of those pieces of the life cycle actually are required in order to frequently effectuate notice, effectuate, you know, claims receipt, processing claims, claims determination and

Page 32

ultimately some sort of benefit distribution to harmed parties.

Q. All right.

MR. LAZARUS: Could we pull up the document Tab 18C, please?

MR. BURT: And is this going to be a source code protected document?

MR. LAZARUS: No. This is a public filing. Okay.

(Deposition Exhibit DX 114 was marked.)

MR. LAZARUS: And is this Exhibit 114?

Q. (BY MR. LAZARUS) All right. This is a public filing dated September 3, 2001.

Do you recognize this as a declaration of a Jennifer Keough -- and I don't know if I'm pronouncing that --

A. Keough.

Q. Keough.

So do you recognize this as a declaration of a Jennifer Keough submitted in In Re: Blue Cross Blue Shield Antitrust Litigation concerning a class settlement in that litigation?

A. I have no reason to believe that's not what this is.

Q. Okay. And you referred to this litigation in

Page 33

9 (Pages 30 - 33)

your report, correct?

A. I did.

Q. All right. And do you see that in paragraph 99, which is on the last page of that declaration of Ms. Keough, it refers to due process and Rule 23 requirements?

A. I do.

Q. Based on your work in claims administration, are you aware that for a damages class action Rule 23 requires the best notice that is practicable under the circumstances including individual notice to all members who can be identified through reasonable effort?

MR. BURT: Objection to the extent it calls for a legal conclusion.

But you can answer to the extent you understand.

A. Okay.

Can you repeat the question?

Q. (BY MR. LAZARUS) Sure.

Based on your work in claims administration, are you aware that for a damages class Rule 23 requires, quote, "The best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable

Page 34

effort"?

A. I am aware of Rule 23. I've not read it.

Q. Okay.

A. But I am aware of it and its purpose.

Q. All right. When deduplicating records within the claims administration process, the goal is to get the best notice practicable under the circumstances to members of the class identified through reasonable efforts, correct?

A. It is -- it is a goal. It's -- as I've mentioned, it is situational, what -- what is required for -- for any particular administration. Notice may not be one of the deliverables. But where administration -- or where noticing is and we have class data, then I believe that is a reasonable statement.

Q. And what are other -- you mentioned -- you said that the deduplication with the goal of getting the best notice practicable under the circumstances to members of the class identified through reasonable effort, you said that is one goal -- or that is a goal.

What are other goals?

MR. BURT: Objection to form.

A. We have situations -- administrations that we've administered where there is no noticing. We were

Page 35

just doing distribution.

Q. (BY MR. LAZARUS) Okay. And so what -- okay.

If you look at paragraph 24 of Ms. Keough's declaration, it states, quote, "Based on JND's experience in handling class action mailings, JND was trusted by the parties to institute deduplication measures based on and in accord with industry best practices to combine records so that we could reduce duplicate mailings," correct?

Do you see that?

A. This is paragraph 25?

Q. 24.

A. 24. I don't believe that is paragraph 24.

Q. Is it not?

A. Oh, hold on. Second part of paragraph 24. Got it.

Q. Yes.

Do you see that language?

A. Yes.

Q. Okay. Do you understand the practice that Ms. Keough is describing in that paragraph?

MR. BURT: Objection to form.

A. I -- I believe I know what she is referring to.

Q. (BY MR. LAZARUS) Okay. Why does the claims

Page 36

administration process require or benefit from deduplicating records as -- as Ms. Keough is describing it?

MR. BURT: Objection. Form.

A. Why does the claim administration industry benefit?

Q. (BY MR. LAZARUS) Yes, from deduplication of data?

A. I don't know that the -- that the claims administrator benefits from deduplication.

Q. Why does the claims administrator do deduplication?

A. The -- the intent would be to -- I -- I believe it would be several fold. The -- the intent would be to combine records that represent the same entity, so that whatever future action needs to be taken, that can be done for a -- an individual once. People are not a big fan of receiving 78 postcards of -- about a notice. And also, 78 postcards are -- carry a cost.

So I think they're -- they're a benefit to the -- the class and -- but I don't believe it is -- there's a benefit to the administrator.

Q. Understood. Fair enough.

How do you know how effective the

Page 37

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

deduplication process was in achieving intended goals in class administration?

A. I missed a word. Can you repeat that one more time for me?

Q. Let me rephrase it.

When you are involved in deduplication for class administration, how do you know that the deduplication process is achieving the intended goals?

A. So we -- I mean, we spend extensive time, both performing deduplication and reviewing and -- and kind of quality reviewing the outcome to -- to ensure accuracy.

And then we do -- you know, for most administrations, we have paths for class members to contact us. And if there are issues, they have the ability to contact us and let us know that there was an issue with whatever they received, and that can provide feedback.

Q. And when you refer to quality reviewing of the outcome, what does that involve?

A. It involves a -- additional resources with extensive experience in doing deduplication, experience utilizing JND methods and methodologies for deduplication to review how -- how deduplication was performed and evaluating both code and the data outcome

Page 38

to see if there's anything identifiable that would suggest an issue.

Q. And when you say "additional resources," are you referring to people?

A. I'm referring to people.

Q. So the -- the quality review process at JND involves additional people, human resources with extensive experience in doing deduplication reviewing the process that has been undertaken in a given case; is that right?

A. I think I missed -- again, I missed a word. Can you please repeat that question?

Q. So I'm saying the -- I'm trying to recap what you have said.

The quality review process for deduplication at JND involves additional people, human resources with extensive experience in deduplication reviewing the process that has been undertaken in a particular case?

MR. BURT: Objection to form.

Q. (BY MR. LAZARUS) Is that right?

A. Yes.

Q. Okay. JND was or has been the claims administrator in two cases involving Apple, Inc., Lerman versus Apple and the MacBook Keyboard Litigation.

Page 39

Is that right?

A. Yes, I believe that's correct.

Q. And you refer to those cases in paragraph 5 of your report, correct?

A. Yes, that is correct.

Q. All right. Let's start with the Lerman versus Apple case.

Were you personally involved in that case?

A. Can -- can you give me a little -- well, what scope is personally involved mean?

Q. What does it mean to you?

A. I had -- I -- communications with the people running the case about the case. I had knowledge about the case. I had -- so if that is personally involved, then, yes, I was personally involved in that case.

Q. Did you do what you have described as hands-on deduplication of data in that case?

A. I don't recall. I don't believe so.

Q. Okay. Do you know what data, if any, JND used to deduplicate in that case?

A. I don't in that particular case. I don't recall.

Q. Okay.

A. I do know at one point I looked at the data.

Q. Okay. Do you know what -- do you recall what

Page 40

kind of data that was?

A. I do not.

Q. Was it personally identifying -- personally identifiable information about customers?

A. I apologize, I do not recall.

Q. Okay. How large was the class in Lerman versus Apple?

A. I do not recall.

Q. Would -- does it sound right to you that it was 1.5 million customers?

A. I -- I can't either confirm or deny.

Q. Understood.

Okay. And then for the MacBook Keyboard Litigation, were you personally involved in that case?

A. Yes, I was.

Q. Okay. What were your responsibilities with respect to that case?

A. I both worked closely with the VP of operations on the administration, as well as I did extensive data analysis on the case.

Q. Okay. Did you do hands-on deduplication of data in that case?

A. I -- it -- it appears I did. I don't recall doing it, but, yes, I did.

Q. Okay. Understood.

Page 41

11 (Pages 38 - 41)

What data did JND use to deduplicate in that case?

A. It was a number of years ago. I don't recall the exact data.

Q. Okay. But would it have been personally identifiable information for customers?

A. I do know there were -- was information about customers in the data.

Q. Okay. Do you recall that Apple did not -- well, do you recall that data used for deduplication in that case came from Apple?

A. Yes.

Q. Is it correct that Apple did not provide credit card information in that case?

A. I do not recall.

Q. Okay. Do you recall how large the class was in that litigation?

A. I -- I don't remember a count.

Q. Okay. Does 15 million sound right to you?

A. I -- I do not remember a count.

Q. Okay. And you write in paragraph 5 of your report that in the MacBook Keyboard Settlement, JND analyzed data, quote, "using an agreed upon data hierarchy," correct?

A. Yes, I did write that.

Q. What does "data hierarchy" mean there?

A. As I recall, the data contained information with regards to MacBook ownership and dates and time -- of when they were owned, and we had to apply a hierarchical ownership of when somebody may have been the owner to determine whether they were the valid -- a valid class member to receive payment. I believe that's the case.

Q. Okay. And I guess just backing up for me because, again, I am not an expert in these areas.

But -- so data hierarchy, what does that mean, generally?

A. I -- I think that could vary massively depending on the -- the situation. But in -- in the most generic terms I think it would be a way to apply, for lack of a better term, priority to -- to data amongst itself.

Q. Okay. And why was there an agreed hierarchy in the MacBook Keyboard Settlement?

A. I -- I don't recall the -- where the hierarchical definition came from.

Q. In that case, in that data, were there multiple possible hierarchies?

A. I'm not sure I understand the question.

Q. So there was an agreed upon hierarchy, right?

Q. Does that imply that there were alternative hierarchies that could have been used?

MR. BURT: Objection. Form.

A. I -- I don't know that I can answer that question. I...

Q. (BY MR. LAZARUS) Does the choice of a data hierarchy affect the results of the deduplication process?

MR. BURT: Objection. Form. Incomplete hypothetical.

A. I -- I suppose it could.

Q. (BY MR. LAZARUS) So looking at the MacBook Keyboard Settlement, there was an agreed hierarchy, as you write in your report.

If a different hierarchy had been used, would you agree it is possible that a different deduplication result would have obtained?

MR. BURT: Same objection.

A. I do not believe -- if I recall correctly, I do not believe the hierarchy relevant to MacBook was deduplication based. I believe it was ownership based, which would not be relevant to deduplication.

Q. (BY MR. LAZARUS) Understood. Okay.

You personally have never been an employee of Apple; is that right?

A. I have not.



12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY



Q. Okay. But do you agree that when an individual enrolls in an employer-sponsored health plan, the employer may provide some information like name and address for the employee?

MR. BURT: Objection. Form.

A. Yes.

Q. (BY MR. LAZARUS) Okay. Did that data also -- I'll scratch that.

The ███████████████████████ does not appear in your Appendix B of your report.

Why is that?

A. I believe because it was referenced in my -- in the content of the report.

Q. Okay.

MR. LAZARUS: Can we mark Tab 2 as the next exhibit, which will be -- this should be 115; is that right?

*Page 46*

---

fees and expenses for administering claims in that case at that point?

A. I -- I could not confirm or deny a -- a total of JND's fees for Blue Cross Blue Shield.

Q. Okay. But do you have any reason to doubt that number in this declaration?

A. No.

Q. Okay. Why would -- that seems like a large number to me.

Why would JND's fees and expenses be so high for administering claims in that litigation?

MR. BURT: Objection. Form.

A. The -- the scope of services requested and provided.

Q. (BY MR. LAZARUS) Was this -- is that a large number -- compared to other cases that JND is involved in, is that amount of fees and expenses typical of cases or would that be on the high side?

A. That -- that is a -- a significant -- that's not -- JND received significant revenue from Blue Cross Blue Shield.

Q. Okay. If I'm understanding correctly that the revenue received from this case is larger than other cases, why would that be? Why is that?

MR. BURT: Objection. Form. "This

*Page 48*

---

(Deposition Exhibit DX 115 was marked.)

Q. (BY MR. LAZARUS) All right. This is a public filing dated March 6, 2024, although the signature at the bottom is dated March 5.

Do you recognize this as a declaration of a Megan Jones submitted in In Re: Blue Cross Blue Shield Antitrust Litigation?

A. I -- yes, I -- that's what it looks to be.

Q. Okay. And do you know Megan Jones?

A. I believe I have been on a conference call that Megan Jones attended at some point.

Q. Okay. And Megan Jones appears to be affiliated with the Hausfeld LLP firm; is that correct?

A. I assume so.

Q. Okay ███████████████████████████
███████████████████████████
███████████
███████████████

Q. Okay. But you have no reason to doubt it?

A. I have no reason to doubt it.

Q. If you look at paragraph 6 of this declaration, do you see that the middle sentence refers to JND's fees and expenses as more than $76.5 million?

A. I do.

Q. And is that correct, that those were JND's

*Page 47*

---

case."

A. Again, scope -- scope of services provided, size of -- of case, size of class, size of notice, volume of claims, volume of, you know, activity with the class, the contact -- our contact center. You know, it is a -- a very, very large complex administration.

Q. (BY MR. LAZARUS) And there was an objection on -- that my question referred to "this case."

You understood I was referring to the Blue Cross Blue Shield litigation in that question; is that right?

A. I did.

Q. Okay. So looking at your answer to that question, are you saying that -- or would you agree that, as a general matter, the -- the more class members there are, the more -- the higher the fees and expenses would be to administer claims; is that fair to say?

MR. BURT: Objection. Form.

A. I would say there is a relationship, but, again, it also is heavily dependent on services provided.

Q. (BY MR. LAZARUS) Right.

A. And requested.

*Page 49*

13 (Pages 46 - 49)

Q. Understood.

But, I guess, holding those services provided constant, there is a positive correlation between the number of class members and the fees that will be required for class administration?

MR. BURT: Objection. Form. Foundation.

A. If you're doing the same type of work for more people, yes, that would cost more.

Q. (BY MR. LAZARUS) Okay. When you say, "if you're doing the same type of work for more people," does that mean if you're doing the same type of work in class administration for a class with more members, that would cost more?

A. It could cost more.

Q. As a general -- as a general rule, you would expect it to cost more, right?

MR. BURT: Objection. Form.

A. As a general rule. I've seen exceptions where very small classes are very, very costly to administer because of the nature of the class, the nature of the individuals involved.

Q. (BY MR. LAZARUS) But that would be the exception to the rule; is that right?

A. I believe so.

Page 50

Q. Generally, a larger class will mean larger class administration fees; is that right?

A. It would mean more work to administer the class, so that would result in higher fees.

Q. All right. Why did you write about JND's experience in the ▮▮▮▮▮ in your report in the case that we are talking about today -- the Apple case that we're talking about today?

A. The work I performed in the ▮▮▮▮ settlement with regards to data deduplication was on a large dataset and it, to me, represented a -- a logical example of my experience working with large datasets doing complex deduplication.

MR. BURT: Objection. Form.

Page 51

A. There was different data to -- to utilize. There was different quality issues to address.

Q. Okay. When you say, "different data quality issues to address," if I heard that right, can you give us example -- an example of data -- a data quality issue that applied to one of those cases but not the other, the Blue Cross Blue Shield litigation versus the Apple case that we are talking about today?

A. I don't recall not -- a -- a smiley face emoji in the Blue Cross Blue Shield data, and there was a -- a small portion of the Apple data that had some -- some -- some things like that.

Q. Okay. Are you saying that you do recall a

Page 52

smiley face emoji in Blue Cross Blue Shield or --

A. I -- I -- I was saying that I didn't recall seeing that in the Blue Cross Blue Shield data, but I do recall, you know, emoji type data in the Apple data in some -- some instances.

Q. Understood. Okay.

A. As an example.

Q. All right. And for the Equifax data breach, you write in your report, again, at paragraph 4, that you also personally worked on the data analysis and deduplication, correct?

A. That is correct.

Q. And am I correct that that Equifax litigation was about a class of consumers whose personal information was held by Equifax and may have been impacted by a data breach of the Equifax computer systems?

A. That is correct.

Q. So in the deduplication in the Equifax case, am I correct that you were deduplicating records representing individual consumers?

A. Can -- can you restate that question?

Q. Sure.

So in the deduplication work in the Equifax case, am I correct that you were deduplicating records

Page 53

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

representing individual consumers?

A. The -- yeah, the data that we had was -- or were provided was for individuals. I don't know how to respond to the statement "consumers" other than it's individuals.

Q. Understood.

And those records that you were deduplicating contained personally identifiable information like name and address; is that right?

A. That is correct.

Q. Were addresses in that case cross-checked against any external datasets?

A. Yes.

Q. What external datasets?



Q. Okay. The National Change of Address database, is that administered by the US Postal Service?

A. Yes. As far as I'm aware.

Q. And do you use a third-party vendor in order to access that dataset?

Page 54

Q. Okay. And is it possible that banks would validate that sort of information before issuing a loan or providing credit to an individual?

MR. BURT: Objection. Form. Foundation.

A. I -- I assume a competent bank would, yes.

Q. (BY MR. LAZARUS) Okay. And why -- why -- again, why did you write about the Equifax work in your report in this case that we're talking about today?

A. Similarly, it represented a large, complex deduplication effort that I personally performed.

Q. Okay. And you say in paragraph 4 of your report that the deduplication work for the Equifax case took months.

Do you recall how many months that was?

A. That was -- I -- I do not know exactly. That also was several years ago, though, pre-COVID years.

Q. Understood. Time has lost meaning since then.

A. It really has.

Q. Is -- do you recall whether you spent more time on the deduplication work in the Equifax case than the Apple payor data in this case?

A. I don't recall.

Q. Okay. Did you use the same methods for data evaluation, cleaning, deduplicating and validating in

Page 56

A. Yes, I do.

Q. Okay. And who is that vendor?

A. The current vendor is Melissa Data.

Q. Was Melissa Data used as a vendor in the Equifax data breach litigation for your deduplication work?

A. I don't know if that was the vendor we were using at the time. We've been using Melissa Data for a number of years, but I don't remember exactly.

Q. Okay. And the information that you were deduplicating, was that information that had been provided by individuals to banks or credit card companies in applying for loans or credit, do you know?

A. I have no visibility into how Equi- -- yeah, Equifax collects their data.

Q. Okay. But you would agree that when individuals submit documents -- let me retract that.

You would agree that when individuals apply for loans or credit, they might submit documents such as pay stubs or other documentation to verify the information they are providing?

MR. BURT: Objection. Form. Foundation.

Q. (BY MR. LAZARUS) Would you agree with that?

A. I think that is a reasonable statement.

Page 55

the Equifax case as you used in the Apple case we are talking about today?



Q. All right. For purposes of this case, the Apple case we're talking about today, in what field do you purport to be an expert?

A. Data deduplication.

Q. Okay. Any other fields or is that --

A. That I am purporting to be an expert today?

Q. Right.

A. No.

Q. Okay. Do you purport to have expertise in data analysis?

A. I purport to have decades of experience in data analysis.

Q. Okay. Is there a difference in your mind between decades of experience and having expertise in data analysis?

MR. BURT: Objection. Form. Calls for

Page 57

15 (Pages 54 - 57)

a legal conclusion.

A. Decades of experience is a -- is a quantifiable effort. Expertise, you know, requires me to make a determination compared to others that I don't know.

Q. (BY MR. LAZARUS) All right. Do you purport to have expertise in natural language processing?

A. I do not.

Q. Do you purport to have expertise in statistical modeling?

A. I do not.

Q. Do you purport to have expertise in statistics?

A. I do not.

Q. And we have discussed that you produced to Apple or Apple's consultants code that you used in your analysis in this case, correct?

A. We did discuss that, yes.

Q. And when you perform deduplication work, do you normally produce your proprietary methodology to an opposing party?

A. We do not.

MR. BURT: Eli, we've been going about an hour and a half.

MR. LAZARUS: Yes.

Page 58

MR. BURT: And if the witness doesn't need a break and if you don't need a break, eventually I'm going to, so if you got a stopping point.

MR. LAZARUS: Understand.

Would you like a break at this point? We can take one.

THE WITNESS: I -- I'm fine until someone else needs a break.

MR. LAZARUS: Okay.

MR. BURT: We can keep going.

MR. LAZARUS: Okay.

Q. (BY MR. LAZARUS) Have you ever produced your proprietary methodology for deduplication to an opposing party?

A. I have not.

Q. And let me see. Okay. I'm going backwards a little bit here, but if we could go back to Ms. Keough's declaration, which was Exhibit 114.

I did not ask, who is Ms. Keough?

A. Jennifer Keough is the CEO of JND Legal Administration and the J in JND.

Q. It stands for Jennifer. Understood.

Paragraph 26 of Ms. Keough's declaration starting on the second line of that paragraph states, quote, "JND again analyzed the data to determine the

Page 59

most effective rules in order to achieve the highest quantity of deduplication while not deduplicating individuals that were not conclusively the same person."

Do you see that language?

A. I do.

Q. Okay. Do you understand what practice Ms. Keough is describing there?

A. I do.

Q. Can you explain in your own words what the practice is with respect to achieving the highest quality of deduplication while not deduplicating -- I'm sorry, the highest quantity of deduplication while not deduplicating individuals that were not conclusively the same person?

MR. BURT: Objection to form.

A. My understanding of what she was communicating there was a validated review deduping process where we utilized the data points available to identify the same individuals and where we would have high confidence that those matches would, in fact, be the same individual.

Q. (BY MR. LAZARUS) And the part about not deduplicating individuals that were not conclusively the same person, what does that refer to?

Page 60

A. That refers to not including logic within a deduplication process that we did not have high confidence that those -- the data points utilized would result in a -- a positive match.

Q. And why is that an appropriate practice, if it is?

MR. BURT: Objection. Form.

Q. (BY MR. LAZARUS) Let me withdraw that question.

Is that an appropriate practice in deduplication for claims administration?

A. I believe it to be, yes.

Q. Okay. And why is that appropriate?

A. If you are able to deduplicate with high confidence but don't deduplicate the records that you do not have confidence in the deduplication, you may slightly overnotice, but you are still notifying the class in the most efficient way possible.

Q. Okay. Has any employee or executive of JND served as a testifying expert witness in another case, to your knowledge?

A. In -- I believe so, but I couldn't -- I couldn't point to a specific situation.

Q. Okay. Okay. And I guess in the -- the language we were just talking about from Ms. Keough's

Page 61

16 (Pages 58 - 61)

declaration where she says that JND analyzed the data to determine the most effective rules in order to achieve the highest quantity of deduplication while not deduplicating individuals that were not conclusively the same person, is that something that you did in this case that we're talking about today?

A. My -- my goal was to deduplicate where I had high confidence in the match and not deduplicate where the -- I did not believe the -- it was reasonable to believe that the records were -- represented the same entity or individual.

██  ████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
███████████

MR. BURT: Objection. Form.

██  ████████████████████████
████████████████████████████
████████████████████████.

Q. (BY MR. LAZARUS) All right. And we will get more obviously into your assignment in this case.

On -- on the question about other JND employees or executives serving as testifying expert witnesses in other cases, did that happen in any of the

cases listed in Appendix B in your report?

A. Actually, can you restate that question?

Q. Sure.

So initially I asked or intended to ask, has any employee or executive of JND served as a testifying expert witness in another case other than the case we're talking about here today?

A. And I don't know off the top of my head.

Q. Okay. And you don't know off the top of your head if that is true of any case listed in Appendix B of your report, right?

A. I do not know that off the top of my head, no.

Q. Okay. When was JND first retained in this case?

A. Actually, I don't -- I don't know a specific date when -- when counsel reached out to my senior management.

Q. How did you first hear about JND's retention?

A. I spoke to one of the founders and discussed what -- the assignment.

Q. And one of the founders of JND?

A. Yes.

Q. Do you remember which one?

A. It was either Jennifer Keough or Neil Zola.

Q. And do you remember ballpark when that was?

A. I would say, approximately, a year ago.

Q. Okay. So, approximately, June of 2024?

A. I'd probably say, approximately, May of 2024.

Q. Okay. Why was JND first retained in this case?

MR. BURT: Objection. Form.

A. I -- all I can tell you is what I was requested to do.

Q. (BY MR. LAZARUS) Okay. Okay. We will move on to that.

But, I guess, first, do you understand that you may need to testify in front of a jury in this case?

A. I do.

Q. When did you learn that?

A. Earlier this year.

MR. LAZARUS: This might be a good time for a break if that's --

THE WITNESS: I'm fine with that.

MR. LAZARUS: -- good for you all.

Okay. Why don't we go off the record.

THE VIDEOGRAPHER: We are going off the record at 10:42.

(Break from 10:42 a.m. to 10:58 a.m.)

THE VIDEOGRAPHER: We are back on the

record. The time is 10:58. Please proceed.

MR. WOOD: Noting for the record that Anna Link of Kellogg Hansen has also joined, also counsel of record for the certified class.

Q. (BY MR. LAZARUS) All right. We'll jump back into the questions.

████████████████████████
██████████
████████████████
████████████████████████████
████████████████████████████
█████████
████████████████████████
████████████████████████████████
████████████████████████
████████████████

MR. BURT: Objection to form.

A. No, not that I'm aware of.

Q. (BY MR. LAZARUS) Okay. Are you -- so you're not aware that JND's compensation would change at all if the plaintiffs' class is decertified or remains certified?

A. Not that I'm aware of, no.

Q. Okay. And you're not aware that JND's compensation would change at all if the plaintiffs

17 (Pages 62 - 65)

prevail at trial or do not prevail at trial?

A. That is correct.

Q. Is JND being paid any compensation other than for your services in this case?

MR. BURT: Objection to form.

Q. (BY MR. LAZARUS) I should -- let me rephrase that.

Is JND being paid any other compensation in this case other than for your services?

A. I -- I do not know if, for example, the -- Jennifer or Neil may be billing time. It would be time in relation to this effort.

Q. Okay. So to your knowledge, JND is not being paid for anything in this case other than your deduplication work or other people's work in connection with your deduplication work; is that right?

MR. BURT: Objection to form.

If I -- if I understand the question, you can answer only to the extent that you know.

A. From what I know, that is correct, we are only being compensated for -- for work related to deduplication and our retention for that -- for that service.

Q. (BY MR. LAZARUS) Okay. Do you know if JND has had any discussions with plaintiffs' counsel about

Page 66

the possibility that JND would have a role in claims administration for this case?

A. Repeat the question. I think I --

Q. Are you aware of whether JND has had any discussions with plaintiffs' counsel about the possibility that JND would have a role in claims administration for this case?

A. I believe conversations have occurred. I'm not privy to any details.

Q. Okay. Do you know whether JND expects to have a role in claims administration in this case?

MR. BURT: Objection. Asked and answered.

A. I -- I don't know that I can say expects. I -- I believe I can say interested in.

Q. (BY MR. LAZARUS) Okay. Interested in meaning, if you can perform a role in claims administration in this case, JND would like to do so? Let me rephrase that.

If JND can play a role in claims administration, JND would like to do that; is that right?

A. That is correct. We provide claims administration, and if there is claims administration here, we would be interested in providing the service.

Page 67

Q. Okay. Do you know -- do you know when discussions on that topic have taken place between plaintiffs' counsel and JND?

A. I -- I do not.

Q. Okay. Even ballpark?

A. I -- I don't know. Again, I was not privy to -- to -- I was not involved in the conversation, nor privy to any details about a conversation.

Q. Okay. And how are you personally being compensated for your work in this case?

A. I get a salary from JND for all of the work I do. The work I'm doing on this has no impact except increasing my work.

Q. Okay. About how many hours have you spent on this case to date?

A. I would estimate several hundred.

Q. Okay. And am I correct that, in broad strokes, what you did in this case was to evaluate data produced by Apple, cleanse the data and deduplicate the data by matching records that appear to you to represent the same person. Is that --

MR. BURT: Objection to form.

Q. (BY MR. LAZARUS) Is that a fair characterization of what you have done?

A. I think that is a reasonable summary.

Page 68

Q. Okay. Did you personally perform all of the data evaluation, cleaning and matching for this project?

A. Yes.

Q. Has anyone assisted you in this matter?

A. Yes.

Q. Okay. Who -- who was that?

A. Cameron Karlin.

Q. Can you spell that, please?

A. I don't think I can.

Q. Okay.

A. C-A-M-E-R-O-N, K-A-R-L-I-N.

Q. Who is that?

A. Cameron is a manager of data analysis at JND.

Q. Okay. And what did Cameron do in connection with this work that we are talking about today?

A. Cameron performed quality review of my efforts to -- yeah, he performed quality review.

Q. Did anyone else assist you on your work in this matter?

A. No.

Q. Okay. How much time did Cameron spend on this assignment?

A. I -- I don't have a number. I would -- I could provide an estimate.

Page 69

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

Q. Okay. What estimate would you provide?

A. A hundred hours or less.

Q. Okay. And in your Summary of Results at paragraph 10 in your report, you state that, "JND determined that Apple payor data could be reliably deduplicated."

Do you see that, paragraph 10?

MR. BURT: Page 3.

A. "JND determined that Apple payor data could be reliably deduplicated to remove the vast majority of duplicate entities"?

Q. (BY MR. LAZARUS) Yes.

A. Yes.

Q. Okay. Who does "JND" refer to in that paragraph?

MR. BURT: Objection. Form.

A. That refers to my company, JND Legal Administration.

Q. (BY MR. LAZARUS) So who at JND determined that Apple payor data could be reliably deduplicated, etcetera, as stated in that paragraph?

A. I did.

Q. And if you look at paragraphs 16 and 17 of your report, you'll see that it uses the word "we." So, "We first needed to review the data submission," in

paragraph 16, and then, "We commenced our process of deduplicating the data," in paragraph 17.

Do you see that?

A. I do.

Q. Okay. Who does "we" refer to there?

MR. BURT: Objection. Form.

Q. (BY MR. LAZARUS) In those paragraphs?

A. That refers to me.

Q. Does it refer to you and Cameron Karlin or should it be just you?

MR. BURT: Objection. Form.

A. This refers to me.

Q. (BY MR. LAZARUS) Okay. Have you had any communications about Apple with any governmental agency or regulator, whether foreign or domestic?

A. Not -- not that I recall.

Q. The same question for, have you had any communications about the app store or any app marketplace with any governmental agency or regulator, whether foreign or domestic?

A. Also not that I recall, no.

Q. Okay. In your work on this case, did you review plaintiffs' Third Amended Complaint in this case?

A. Do you have a copy of that?

Q. I don't know that we actually do. So -- but if you recall, do you -- did you review --

A. I don't recall.

Q. -- plaintiffs' Third Amended Complaint? Okay.

A. Apologies for not letting you complete your sentence.

Q. Right. No problem. No worries.

So you --

MS. LIN: I can upload it, too. I just need a second.

MR. LAZARUS: May as well do that and we'll just come back to those.

But in the meantime, can we go -- can we do Tab 10B first?

(Deposition Exhibit DX 116 was marked.)

Q. (BY MR. LAZARUS) All right. Mr. Thompson, do you -- well, first of all, this document is being marked as Exhibit 116.

MR. LAZARUS: Thank you.

Q. (BY MR. LAZARUS) Do you recognize this document as a declaration dated August 1, 2024, that you signed in connection with this litigation?

A. I do.

Q. All right. I'll ask you to look at paragraph 4, please. You state in that paragraph,

quote, "In this case, JND was requested to evaluate a sample dataset of Apple payor data in order to design an algorithm to deduplicate/roll-up payor records."

Do you see that?

A. I do see that.

Q. And a little later in that paragraph it says, "In order to accurately determine a total transaction value for a payor, all instances of the payor need to be linked as they represent the same individual/entity."

Did I read that correctly?

A. You did.

Q. Okay. Does that paragraph accurately describe what plaintiffs' counsel asked you to do in this case?

MR. BURT: Objection. Form.

A. The -- all but the last sentence accurately defines what the -- what plaintiffs' counsel requested us to do on the sample data. And I believe the last sentence represents why.

Q. (BY MR. LAZARUS) You say, "All but the last sentence accurately defines what plaintiffs' counsel requested us to do on the sample data"?

A. That is correct.

Q. Okay. And then what are you saying about the last sentence?

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

A. And -- the last sentence is -- represents the why. They didn't ask us to -- there's no action with regards to us and actually the transaction value.

Q. Understood. Okay. Thank you.

Okay. Now, let's turn back to Exhibit 112, which is your report.

If you look at paragraphs 8 and 9 of your report, do those paragraphs state the questions you were asked to investigate as your assignment in this case?

A. I believe that represents a fair summary of the assignment.

Q. Okay. And did plaintiffs' counsel ask you those questions at the start of your engagement on this matter?

MR. BURT: I'm going to object to the extent that you're calling for the substance of communication that's attorney work product.

MR. LAZARUS: I think it's -- I think the question is fair because it is asking -- and I'll preface it this way to say, I'm only asking for information from plaintiffs' counsel that you relied on in drafting your report.

MR. BURT: I just want to make sure I understand. You're saying you're asking for the

Page 74

instruction about the assignment upon which he relied in reaching his conclusions?

MR. LAZARUS: Correct.

MR. BURT: Yeah, I have no problem with him answering what he understood his assignment to be.

Q. (BY MR. LAZARUS) And I think my question here is the timing of when did you receive these questions that are what you said was a fair summary of your assignment in this case.

MR. BURT: To the extent that you're asking him about communications with counsel, those are work product, but I have no problem with him answering when he understood his assignment.

MR. LAZARUS: Okay. Let's go with that.

A. I -- the best I can do is a ballpark of, approximately, a year ago I understood the overall assignment. Maybe several months later, when we received the full dataset, clarity on the work product and desired outcome of the -- or desired output of the -- of my work.

Q. (BY MR. LAZARUS) Okay. Did the assignment change after you first started working on the case?

MR. BURT: Objection. Objection to form. I can explain it if you need me to.

A. Please repeat the question.

Page 75

Q. (BY MR. LAZARUS) Did your assignment change after you first started working on this case?

MR. BURT: Objection. Form.

MR. LAZARUS: Okay.

Q. (BY MR. LAZARUS) Excuse me. Let me -- let me rephrase it slightly this way.

Did your assignment in this case change after you first started working on this case?

MR. BURT: Objection to form. I -- I can help you out by explaining why I'm objecting.

MR. LAZARUS: Okay. Please.

MR. BURT: He's -- what he's described is that he started working, and the declaration shows, he started working during the period when we had an active disagreement with Apple about the data, for example, the contemplation of a sample process that's described in the declaration.

I -- I don't want to say more words, but that's the basis of the objection.

MR. LAZARUS: Okay. Understood. Thank you.

Q. (BY MR. LAZARUS) Okay. Well, I will still ask the question.

Did your assignment change after you had started work in this case?

Page 76

MR. BURT: Same objection.

To the extent you understand it, go ahead and answer.

A. Okay.

So from -- from -- my question, from -- from the moment I started working to some later point, did the -- did the assignment change?

Q. (BY MR. LAZARUS) Yes.

A. The initial assignment involved a sample dataset and a determination of whether deduplication could be applied based on the sample set. When a full dataset was provided, the addition of producing a deduplicated set was added.

Q. Okay. And I guess I want to ask about the August 1 declaration that we were looking at as Exhibit 116.

So the description there appears to request -- the description there appears to describe a request to design an algorithm to deduplicate/roll-up payor records, which is different from what's described in paragraph 8 of the final report of determining whether a reliable means exists for deduplicating.

Is that -- is that indeed a difference?

A. Can you specify in the expert report exactly where -- what you're referencing?

Page 77

20 (Pages 74 - 77)

Q. Paragraph 8 of the expert report. I'm sorry, paragraph 9.

So my question is, in paragraph 9 of your expert report, you state, "Counsel requested that I determine whether there exists a reliable means by which to consolidate duplicative payor records that all relate to the same person and associate those names to a unique person."

And the "determine whether there exists a reliable means," language does not appear in paragraph 4 of the August 1 declaration.

Is there a reason for that?

A. No, not that I'm aware of, there's no reason that the -- the words are slightly different.

Q. Okay. But they are describing the same assignment that you received?

A. I -- I believe, yes, that -- that I had overlapping assignments in -- in concept and direction for -- for both a sample set of determining whether a deduplication can occur and for the full dataset of performing a deduplication providing an outcome.

Q. And in -- so now the final report, in paragraph 8, you state that, quote, "JND was requested to evaluate a large dataset produced by Apple containing information that it collects from 'payors' -

Page 78

individuals that purchase apps and in-app content on Apple iPhones and iPads," correct?

A. Correct.

Q. All right. You use the term "unique payor" in paragraph 9. And then in paragraph 18 you use the term "unique individual."

Do those mean the same thing in this context?

A. Where's the reference on the second one, please?

Q. Paragraph 18.

A. Yeah, I think if -- the entire sentence read in context would suggest, that, yeah, individuals represents Apple payor.

Q. Okay. And Apple did, in fact, produce a dataset to your office in Seattle in a few installments, correct?

A. Yeah, Apple payor data was delivered to -- to our Seattle office.

Q. And in your report you refer to that dataset as the Apple payor data, correct?

A. That is correct.

MR. LAZARUS: Can we please mark Tab 3 as the next exhibit which will be 117?

And this is a three-page document that is not stapled at this moment.

Page 79

(Deposition Exhibit DX 117 was marked.)

Q. (BY MR. LAZARUS) This is a copy of an email from my colleague, Ramona Lin, to plaintiffs' counsel dated July 10, 2024.

Do you recognize this document?

A. Yes. It looks familiar to me.

Q. Okay. So this document was previously shared with you; is that right?

A. The contents are familiar to me.

Q. Okay.

A. I don't remember if it came to me originated from Ramona Lin, but the contents look familiar to me.

Q. Okay. This email was sent just after production to your office of the sample dataset, the sample of the Apple payor data, correct?

A. Oh, I don't know the -- the dates. I have no reason to believe that's incorrect.

Q. Okay. And this email lists 17 fields, including first_name, last_name, city, state, postal code, etcetera.

Do you recognize those as the fields included in the Apple payor data?

A. Yes.

Q. And for the sake of the transcript, I'll try to list out the field names -- list out field names

Page 80

when they come up, including the underscores, just the first time. And then after that, we can just refer to them with -- without the underscore, like "first name," "last name," if that's okay with you?

A. That's fine with me.

Q. Okay. So one of the fields listed in this Exhibit 117 is billing_info_id_hashed.

Did you understand that that variable refers to unique -- unique identifiers for each payor record?

A. For each payor record in the dataset provided?

Q. Yes.

A. So it was the -- essentially, the unique ID for each of the 1.69 billion records?

Q. Right.

A. I understood that as the intent.

Q. Okay. You understood that as the intent, but is that different from what you saw in the data?

A. There was some small -- very small portion of those -- those hashed values that were not unique in the data.

Q. Okay. And another --

A. As I recall.

Q. Okay. Did you do anything to try to correct the -- sorry.

And so you said that you saw some small

Page 81

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

portion of the hashed values that were not unique in the data.

Is that a problem in the data?

A. Not for the purpose of deduplication.

Q. Okay. So you did not do anything to try to correct that non-uniqueness of those particular hashed values?

A. I -- I evaluated them to determine if there was a -- a issue with how the data was produced to me. But it appeared for -- for all records that I recall, that they -- the billing_info_id when duplicated also represented duplicate information about the individual and, therefore, didn't impact the deduplication.

I also, when I produced the ultimate outcome to -- back to Apple, I provided a -- an ID indicator so that they understood that I was not providing duplicate records. They provided duplicate records to me and I was just providing an outcome for what they gave me.

Q. And another field in this Exhibit 117 is person_id_hashed.

Do you understand that variable to indicate the account associated with the payor record?

A. Yes, I understood person_id_hashed was intended to represent a -- a payor entity in -- in the Apple data.

Page 82

Q. Okay. And do you understand that an account with Apple is sometimes referred to as an Apple ID or an Apple ID account? This is just for ease of talking about it.

A. Can you please repeat the question?

Q. Do you understand that an account with Apple -- I'll say, do you understand that a customer account with Apple is sometimes referred to as an Apple ID or an Apple ID account?

A. And this would be for a Apple accountholder as opposed to a payor? You're distinguishing those two things?

Q. Correct.

A. Okay. Unrelated to person_id_hashed?

Q. I'm asking about in everyday parlance when people talk about having an account -- a customer account with Apple, they might use the term "Apple ID" or "Apple ID account."

And I'm just asking if you're aware of that terminology.

A. I'm aware of and understand that terminology, yes.

Q. Okay. And the fields that are listed in this email were the fields in the sample dataset and also the full Apple payor dataset; is that correct?

Page 83

MR. BURT: Objection to foundation.

Q. (BY MR. LAZARUS) You can answer the question.

A. Okay.

These look to be the fields. I would have to do an actual compare to the actual to say with 100 percent certainty, yes, these represent every field and there's no extras we're missing.

Q. Okay. And this email states that, quote, "This sample production," -- I'm looking at -- okay.

So bottom of the first page as you're looking at it, "This sample production includes user-generated data that is received by Apple during its ordinary course of business but is not verified by Apple."

Do you see that?

A. I do.

MR. LAZARUS: All right. Can we please mark Tab 4 as the next exhibit?

This will be a copy of a letter from me to plaintiffs' counsel. This is a two-page letter printed two sided.

(Deposition Exhibit DX 118 was marked.)

Q. (BY MR. LAZARUS) Do you recognize this letter?

A. I'm not sure I've ever seen this letter.

Q. Okay. If you look at in your report

Page 84

footnote 2, I believe you are referencing this letter; is that right?

A. Okay.

Q. Does that indicate that you -- does that refresh your recollection that you have seen this letter?

A. Yeah, it -- it is vaguely familiar.

Q. Okay.

A. Pieces of it are vaguely familiar.

Q. On page 2 of this letter, beginning on the third line, it says, "Apple further provides notice that this sample production includes user-generated data that is received by Apple during its ordinary course of business but is not verified by Apple. For example, Apple device users supply data concerning their street addresses, phone numbers and similar information, or users may on occasion omit such data in submissions to Apple, or submit fictitious values. As a result, not all data fields are populated for all payor data records and those that are populated may contain data that is not reliable."

Do you see that?

A. I do.

Q. So did you understand when you began your assignment in this case that these limitations

Page 85

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

described in my letter applied to the sample Apple payor data?

A. I did.

Q. And did you understand that these limitations applied to the full Apple payor dataset when you began to analyze it?

A. I did.

Q. And you understood that these limitations applied to the full Apple payor dataset when you finalized your opinions about the data, correct?

A. I'm sorry, please repeat that.

Q. You understood that these limitations described in my letter applied to the full Apple payor dataset when you finalized your opinions about the data?

A. I did.

Q. And you mentioned before that you saw, for example, smiley face emojis in the Apple payor data, correct?

A. I did.

Q. And did you see entries in the Apple payor data that appeared to not be legitimate names and addresses?

A. I did.

Q. Did you see names or addresses that included

Page 86

profanity?

A. Yes.

Q. For example, addresses that contained the letters F-U-C and K?

A. I don't remember specifically, but profanity in -- existed, yeah.

Q. Okay. How did you handle entries in the data like that, data that included profanity or otherwise appeared to be not legitimate names and addresses?

A. In situations where I could identify data that -- such as profanity, emojis, I would cleanse or remove the data and then use other available data points to attempt to match and deduplicate the records.

Q. When you say "cleanse the records," does that mean cleanse them to remove the emojis and the profanity?

A. It means, yeah, removing profanity if I could identify it and removing emojis, or in nonstandard ASCII characters, potentially translating them if possible.

Q. Did you -- with respect to profanity, did you conduct that cleansing by way of code or manually cleansing the values?

A. By "manually" you mean actually by hand one by one records? What does "manual" mean?

Page 87

Q. So -- well, let me ask what it means to you in the question.

So would you draw a distinction between cleansing by way of code versus manually cleansing? Would you use those terms in talking about this concept?

A. I don't think I would use the term "manually" per se. I -- I would say that I would write a -- write a piece of code that would perform an update to -- to records to remove particular data --

Q. Okay.

A. -- if I were able to identify them.

Q. And with respect to profanity, did you write a piece of code to cleanse data of profanity?

A. I -- I believe I -- there was some -- some code that removed some -- some amount of profanity at some point.

Q. Okay. Can you -- if we look at your README file, which we have marked as Exhibit --

MR. BURT: 113.

MR. LAZARUS: 113. Thank you.

Q. (BY MR. LAZARUS) Do you have your README file --

A. I do.

Q. -- in front of you?

Page 88

Does the README file name any file or code that was used for cleaning profanity?

A. I do not know off the top of my head.

Q. Okay. Why don't we -- we'll put a pin in that and maybe come back to it.

Did you see addresses that were illegitimate like in the street1 field values like "your mom" or other things like that?

A. I'm -- I -- I don't recall. I know there was data -- data -- data issues that -- but in some portion, but I don't recall "your mom."

Q. But when you say, "data issues," are you referring to other values that did not appear to represent legitimate addresses?

A. I believe that is -- is reasonable in some -- some small portion, yeah.

Q. Okay. Did you see instances of famous addresses like The White House in the data?

A. I don't recall off the top of my head.

Q. Okay. Or another example, Apple's headquarters at 1 Infinite Loop, did you see that address entered into the payor -- Apple payor data here?

A. I do recall a small portion of Apple's address as the address, yeah.

Page 89

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

Q. And how did you deal with addresses like those that were -- well, let me ask the initial question.

Do you believe in your expert opinion that those are legitimate addresses representing the addresses of Apple payors?

MR. BURT: Objection to form.

A. No. In my opinion, that -- Apple's address as an Apple payor address is not a valid address.

Q. (BY MR. LAZARUS) And what did you do in your deduplication work with respect to addresses like Apple's headquarters that do not, in your opinion, represent valid addresses for Apple payors?

A. Part of the cleansing analysis I identified that. I believe I would attempt to remove it and not utilize it as a matching criteria --

Q. Okay.

A. -- at some point.

Q. And looking again at your README file, Exhibit 113, can you point to a file listed there that does the work you just described of removing invalid address entries so that they would not be utilized as matching criteria?

A. Not off the top of my head, no.

Q. Okay. Would it help if we looked at the individual files?

Page 90

A. It -- yeah, possibly. If we want to go through all of them and review them, I could -- I could search.

Q. Is there one file, looking at your README file, that you think is more likely to contain the cleaning code that you are thinking of?

A. Not one particular, no. I -- not at the moment.

Q. Okay. We talked before about the Blue Cross Blue Shield data and Equifax data.

Would I be correct that there appear to be more illegitimate addresses in the Apple payor data ███████████████████████████████ ██████████████

MR. BURT: Objection to form.

█ ████████████████████████████
███████████████████████████████
███████████████████████████
███████████████████████████
█ ██████████████████████████
█████████████████████████████
███████████████████████████████
█ ██████████████████████████
███████████████████████████████

Page 91

███████████████████████████████████████
█████████████████████████████████
█ ████████████████████████████████
███████████████████████████████████████
██████████████████████
█ ████████████████████████████████
██████████████████████████████████
███████████████████████████████████████
█████████████

Q. So returning to your report at paragraph 8, I want to focus on your reference to payors as, "individuals that purchased apps and in-app content on Apple iPhones and iPads."

Do you see that language in paragraph 8?

A. I do.

Q. Okay. What was the basis for your understanding that payors are individuals making purchases on iPhones and iPads and not other devices?

A. I believe that was communicated to me, but I couldn't -- I couldn't confirm who communicated that to me, that defined the class.

Q. Okay. Are you aware that the payor dataset produced by Apple included information collected from payors who made purchases on iPod Touch devices?

A. Did not.

Page 92

Q. Do you know whether the Apple payor data included entries for consumers who only downloaded free apps and never paid for apps or in-app content?

A. That is not information I would have had.

Q. So you do not know that sitting here today?

A. (Shaking head.)

Q. And for the court reporter --

A. No.

Q. -- say an audible. Yeah, thank you.

Do you know whether the Apple payor data included entries for consumers who paid for transactions using gift cards?

A. I do not.

Q. Okay. Do you know whether the Apple payor data included entries for consumers who paid for transactions using credit card points?

A. I do not.

Q. Do you know whether the Apple payor data included entries for consumers who only made purchases that were refunded, charged back or reversed?

A. I do not.

Q. In paragraph 9 of your report, you stated that, quote, "Counsel requested that I determine whether there exists a reliable means by which to consolidate duplicative payor records that all relate

Page 93

24 (Pages 90 - 93)

to the same person and associate those names to a unique person," correct?

A. That is paragraph 9 of the expert -- supplemental expert report?

Q. Yes.

A. Okay.

Q. Okay. And let's see.

And then the next part of paragraph 9 states, "If such a means exists, counsel further requested that I proceed with deduplicating those records and create an anonymized identifier for each unique payor, and then match those payor identifiers to create a primary person ID," correct?

A. That is correct.

Q. Okay. In that first question in paragraph 9, were plaintiffs' counsel asking you -- I'll rephrase.

In that first question in paragraph 9 of your report, is that part of your assignment asking you whether there was a means to fully consolidate duplicative payor records or partially consolidate them?

MR. BURT: Objection. Form.

A. I -- I don't believe I understand the -- the difference between those statements.

Q. (BY MR. LAZARUS) So in -- in paragraph 9,

Page 94

"Counsel requested that I determine whether there exists a reliable means by which to consolidate duplicative payor records that all relate to the same person."

My question is, in this assignment, were you asked to consolidate all records that relate to the same person or, as we were discussing before, those about which you had high confidence or any different metric?

MR. BURT: Objection. Form.

A. I -- I do not believe there was any conversation about a -- a partial versus complete. It was a deduplication to the best of my ability based on my experience doing deduplication, which would go back to my applying the methodologies I've used and have confidence in the outcome of.

Q. (BY MR. LAZARUS) But you did not conclude that there was a means to fully deduplicate all records in the payor data, did you?

MR. BURT: Objection. Form.

Q. (BY MR. LAZARUS) And let me -- well, I'll refer you to paragraph 15 of your report that states that you, quote, "determined and communicated to plaintiffs' counsel that JND could reliably reduce duplication in the Apple data," correct?

Page 95

A. Yes, that is what it says.

Q. And that is reduce but not eliminate, correct?

A. I don't -- I don't believe it references a -- a -- to degree reduced to zero would be eliminate. So I don't believe it's referenced there.

Q. Okay. And as you understood your assignment, was that assignment asking you to reduce duplication to zero or reduce duplication to some other level?

A. As I understood my assignment, it was to reduce duplication to the best of my ability where I had confidence that I had matched records that were of the same entity. I -- I cannot point to -- well, that's -- that's it.

Q. And your report states at paragraph 10 that, quote, "JND determined that the Apple payor data could be reliably deduplicated to remove the vast majority of duplicate entities," correct?

A. That is correct.

Q. Okay. And that's -- you're stating there that you could deduplicate to remove the vast majority of duplicate entities but not all duplicate entities, correct?

A. I cannot rule out the possibility that additional -- that records as this that are of the same entity that did not have adequate information for me to

Page 96

reliably determine they're the same.

Q. How do you know you -- or do you know that you did not fully deduplicate the data?

A. Can you restate that? I think that's a double negative.

Q. Yes, there's -- yeah, a lot of "not's" in there.

My question is, you refer to having identified that there -- you communicated to plaintiffs' counsel that JND could reliably reduce duplication in the Apple data. And then you state that, "JND determined that the Apple payor data could be reliably deduplicated to remove the vast majority of duplicate entities."

And my question is whether you are certain that you removed the vast majority of duplicate entities but not all?

A. I have high confidence that I -- that a vast majority of duplicates were removed. When you achieve over 80 percent reduction, my experience is that is an exceptional deduplication effort.

I -- I cannot rule out the possibility that additional -- or that records exist that are the same entity still in the data.

THE VIDEOGRAPHER: Counsel, I'm so sorry to interrupt, but we lost the remote people. Do you

Page 97

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

want to go off the record or not?

THE WITNESS: And it's noon.

MR. LAZARUS: It is noon. Sure, why don't we go off the record. Thank you.

THE VIDEOGRAPHER: We are going off the record at 12:01.

(Deposition recessed at 12:01 p.m. to be reconvened at 12:45 p.m.)

Page 98

AFTERNOON SESSION

12:49 P.M.

--oOo--

THE VIDEOGRAPHER: We are back on the record. The time is 12:49. Please proceed.

EXAMINATION RESUMED

BY MR. LAZARUS:

Q. All right. Before we went off the record, I was inarticulately trying to ask a question with a bunch of double negatives. So I will try that again.

In your analysis of the Apple payor data, is it possible that you eliminated 100 percent of the duplication?

A. I can't rule it out.

Q. Okay. How likely do you think it is that you eliminated 100 percent of the duplication?

A. I -- I don't know how to quantify -- quantify that. I -- I -- yeah, I don't know how to quantify that.

Q. Okay. Have you tried to quantify it at all?

A. I have not.

Q. And why -- if you didn't deduplicate 100 percent, why not?

MR. BURT: Objection. Form. Incomplete

Page 99

hypothetical.

Q. (BY MR. LAZARUS) If -- if in your analysis in this case you did not eliminate 100 percent of the duplication in the Apple payor data, why is that?

A. Records would not be matched and deduplicated if they did not have the data points available to match records together to a level that I had confidence that they could be considered the same record.

Q. To a level that you would have confidence?

A. That is correct.

Q. Okay. And how did you determine whether you had sufficient confidence or not?

MR. BURT: Objection. Form.

Q. (BY MR. LAZARUS) I'll rephrase again.

How did you determine whether you had sufficient confidence in deduplicating particular records or not?

MR. BURT: Objection. Form.

A. So I -- in evaluating the data and determining what data was available, I -- I build -- built a set of deduplication scripts that I -- that align with deduplication methodologies I've used for -- for years, if not decades.

And in applying those and utilizing them over this time, in my experience, I have assembled an

Page 100

understanding of the outcomes and -- and based on adequate matching points, have built a experience -- confidence in various data matches.

Q. (BY MR. LAZARUS) And I'll point to paragraph 17F of your report where you refer to an iterative process that you repeat until, in your words, "the marginal returns are outweighed by the time and effort required to continue."

In that language, when you say, "marginal returns," does that refer to additional duplicates that could be potentially identified with additional iterations of your process?

A. I think you're going to have to re- -- restate that, please.

Q. Yeah.

So you refer in paragraph 17F to marginal returns.

And I'll just ask, what do marginal returns -- what does "marginal returns" mean there?

A. Okay. I understand the question.

So if -- in -- in analyzing records that still are identified as unique or primary, and I'm not able to find ways to code and generate a match based on the data available, that then I -- then that is a time where I -- I determine that I have -- I have

Page 101

26 (Pages 98 - 101)

effectively matched as -- as many as I can identify with -- with the information available.

Q. But the 17F language refers to the marginal returns being outweighed by the time and effort required to continue.

Does that mean that if you took the time and effort to run additional iterations of your method, you might identify additional matches, but so few that it would be outweighed by spending any additional time and effort; is that right?

A. I -- I can't rule out that, you know, additional -- you know, unlimited time and unlimited money could -- could result in some additional matching.

Q. But that's what marginal returns refers to, right?

A. Yeah.

Q. The returns is additional matches, right?

A. The -- the -- yeah, marginal returns would be, in this context, additional matches.

Q. Okay. And the point you refer to when the marginal costs are outweighed by the time and effort required to continue, that means the point when you determined that the additional duplicates you might be able to find would not be worth the time and effort

Page 102

required to identify them, correct?

A. Actually, can you -- can you re- -- restate that question because I think you missed -- misused a word.

Q. Okay.

A. I believe you said "marginal cost."

Q. I'm sorry. Well, and I have it -- I have it written down as marginal cost, too. But thank you for catching that.

The point you refer to when the marginal returns are outweighed by the time and effort required to continue, that means the point when you determine that the additional duplicates you might be able to find would not be worth the time and effort required to identify them; is that correct?

A. That is correct.

Q. And how did you estimate the marginal returns?

MR. BURT: Objection. Form.

A. I was -- I don't believe there's an estimation of marginal returns. I believe it is more accurate to say I was not finding additional matches that I could effectuate in a -- in a both coded and confident manner, which is the -- the point we try to determine my returns here for the effort I'm putting in, I'm not -- I'm not finding additional things that I could

Page 103

match.

Q. And did you -- are you saying that you did -- you got the marginal returns down to zero?

A. I -- I'm saying that I -- I did not see things I could match but decided not to. I -- it required additional work for me to find add- -- additional possible matches.

Q. Okay. And that's based on your -- your experience that you've described in your work in legal administration, claims administration?

A. Correct. And my -- and my years of experience performing data match and data duplication -- deduplication, that's correct.

Q. So since we're talking about marginal returns that could be generated if additional time and effort was spent, am I right, to take this to the extreme, it would be possible to identify additional matches by examining every single possible match, but you would say the benefit of doing that would be outweighed by the amount of time and effort it would require to do that; is that right?

MR. BURT: Objection to form.

A. I'm sorry, please restate because I think a piece of that is -- I have -- I have a question about how you framed it. So please restate.

Page 104

Q. (BY MR. LAZARUS) Okay. So I guess to take a step back.

You referred to marginal returns being outweighed by time and effort required to identify any additional matches?

A. That is correct.

Q. Excuse me.

And I'm trying to understand -- I think what I have heard you say is that it would -- in order to find additional matches, it would require -- and to back up.

In order to identify additional potential matches, it would require the expenditure of more time and more effort than you thought in your judgment worthwhile in the analysis; is that correct?

A. I -- I was -- yeah, I was no longer seeing a benefit and additional matches from the work continuing, so I stopped.

Q. But would you agree that -- that you did not examine every possible match, you personally sitting down and examining every possible match?

A. If you're asking if I looked at all 1.7 billion records individually and tried to match them individually, I did not do that.

Q. And why not?

A. It would have been ineffective and time

Page 105

27 (Pages 102 - 105)

consuming beyond measure.

Q. But if the time were available to examine every single possible match, do you agree that an individualized analysis of every possible match could yield additional matches?

A. I can't rule it out.

Q. Okay. All right. Let's go back to your report at paragraph 10. You know what? Well, hold on, let me see. Let's see.

So you ran your iterative process for deduplication, right?

A. That is correct.

Q. And at some point you determined that the marginal returns in matches from continuing to iterate were so low that they were outweighed by the additional time and effort required to continue iterating?

MR. BURT: Objection to form. Asked and answered.

A. I did.

Q. (BY MR. LAZARUS) And I understand you say that your experience has informed your decision on when to stop iterating that process.

Can you describe the criteria that you used to make that decision?

A. To make the decision that the marginal return

Page 106

was no longer justifying the -- the means, so to speak -- or --

Q. Right.

A. Okay.

So as I -- as I recall, I reached a point of deduplication and analysis where I could no longer apply either cleansing or additional deduplication rules which would either produce a match result in one of the rules that I had already built or, with a new rule, that I would have high confidence that the records that matched were, in fact, the same entity.

Q. Okay. And if I'm understanding right, that -- does that mean that at the end -- the last round of iteration that you did run, you got zero matches?

MR. BURT: Objection. Form. Foundation.

Q. (BY MR. LAZARUS) And I'll say my question is, that sounds different from marginal returns being outweighed, you know, marginal returns being low enough that outweighed by the additional time and effort, versus marginal returns got down to zero, the last iteration produced zero matches and, therefore, you stopped.

Do you understand the difference that I'm asking about?

Page 107

A. I do.

Q. And which one accurately describes your approach, your method on -- on determining when to stop iterating on your method?

A. I do not believe they're mutually exclusive.

Q. Okay. Can you explain more?

A. So the last iteration run produced a result. Additional analysis to determine if additional iterations would benefit I didn't identify, I'll say, meaningful results to justify continuing.

Q. How do you determine whether the next round iteration would yield results before you've run it, if that makes sense?

A. The analysis of the data is the determination of whether there is something there to -- to either cleanse or apply new rules to that -- so that's -- that's how you determine whether there's something there to -- to actually iterate on.

Q. So the -- the last iteration produced some level of matching --

A. Uh-huh.

Q. -- some number of matches?

A. Uh-huh.

Q. And you did analysis and determined that the next round of iteration, which you did not run, likely

Page 108

would -- would not produce matches or would produce very few; is that right?

MR. BURT: Objection. Form.

A. Give me a second.

Q. (BY MR. LAZARUS) No problem.

A. I -- I -- as I recall, I do -- reached a point where I was not identifying any matches that I could apply a -- a process to deduplicate further.

Q. Okay. Are you aware of any literature or studies that support the decision-making process that you've just described?

A. I am not.

Q. And your algorithm for deduplication groups records if they match exactly on some combination of the cleaned variables in the payor data; is that correct?

A. That is correct.

Q. Why did you use that approach?

A. Why did I use the approach of matching on the data available to determine if somebody's the same person?

Q. Let's start there.

A. That is -- the information in the data is what I had available to define what each individual, you know, data points were, their contact information. And

Page 109

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

so in -- as far as data based contact information goes, those are the data points that define an individual.

Q. And in many -- you describe tiers of your matching process, correct?

A. Could you point out to where I did?

Q. I believe in your report you refer to tiers of matching.

But you agree, sitting here today, that you used different tiers of matching in your process; is that right?

A. I did use different tiers in my deduplication matching process, yes.

Q. Okay. And in many tiers, you include address as part of the match, correct?

A. I do.

Q. Are you aware of literature, studies or publications that suggest that using -- that suggest using exact address matching?

A. Can -- can you restate it?

Q. Sure.

So are you aware of literature, studies or publications that suggest or recommend using exact address matching for deduplication purposes?

A. No.

Q. Are you aware of other methods commonly used

Page 110

to deduplicate and/or determine association between records that include address?

A. To -- to clarify, you said, "other methods." Address by itself is not a method of matching individuals to -- so I want to make sure that that's not what you're suggesting when you say "other methods."

Q. What I'm suggesting is, your -- your method uses, as we just discussed, as one part of your method, you use exact matching between the cleaned addresses of different entries.

A. Addresses utilized as a -- as a one piece in a collection of data points and matching, yes, I agree with that.

Q. And so as opposed to using exact matching of cleaned address values, are you aware of other methods commonly used in deduplication that involves address matching?

A. I was with you until your last word.

Q. Okay.

A. Because you ended with "in address matching," and I don't believe that's what your intent was. Because you're saying what -- what I believe your question was, what else other than address do you use in address matching?

Page 111

Q. So I think I'm trying to focus in on exact matching --

A. Okay.

Q. -- of cleaned address.

A. Okay.

Q. Are there other -- are you aware of other ways to, as part of a deduplication process, use address data other than exact matching of --

A. Yes.

Q. -- a cleaned address? Okay.

What -- what other methods are you familiar with?

A. I am familiar with processes of using, as an example, a -- an address combined with city and state and not using postal code because postal code sometimes can -- can be inaccurate, or using address along with postal code and not city and state. And to -- because sometimes the postal code is more accurate than the -- than the city.

Q. Are you aware of any publication criticizing as outdated or unreliable processes of deduplication that rely on coding by hand depending on the results of the previous step -- previous step?

MR. BURT: Objection. Form.

A. Coding by hand?

Page 112

Q. (BY MR. LAZARUS) Coding by hand.

A. Versus?

Q. Any alternatives you can think of.

MR. BURT: Objection. Form.

A. I am not aware of any publications like that.

Q. (BY MR. LAZARUS) Okay. Are you aware of the concept of geocoding in address matching?

A. I am aware of the concept.

Q. Okay. And what is that?

A. It is -- from -- from my memory, I believe geocoding is a method of assigning essentially a coordinate to a location.

Q. Okay. And you did not use that concept in your analysis in this case, correct?

A. No, I did not.

Q. Okay. Why not?

A. It -- it is not a method or practice that I have commonly used. I have used geocoding infrequently and didn't find it to be overly valuable.

Q. Okay. When -- when have you used geocoding? Do you remember particular instances when you did?

A. Not specifics. I have used geocoding on a number, and I cannot give you a specific number, a number of administrations in order to apply geocoding to -- to addresses.

Page 113

29 (Pages 110 - 113)

Q. Okay. Do you remember when the last time you used it was?

A. I do not.

Q. Ballpark?

A. I -- no, I do not.

Q. Okay. Are you aware of using distance metrics such as the Levenshtein or Hamming distance to determine whether names or addresses match?

A. No.

Q. Are you aware of the concept of thresholding to determine matches by using distance metrics in address matching?

A. No.

Q. Are you aware of the concept of a longest common subsequence in address matching?

A. No.

Q. Are you aware of the concept of an N-gram in address matching?

A. No.

Q. Are you aware of the concept of user defined parameters in address matching?

A. Can you provide clarity on what you mean by "user defined parameters"?

Q. I think let's -- let's move on.

Oh, are you aware of the concept of SOUNDEX

Page 114

what SOUNDEX properties are?

A. I believe it's a -- a -- essentially, phonetic matching.

Q. Are you aware of the concept of predictive modeling such as logistic regression in address matching?

A. No.

Q. I did want to -- so on paragraph 9 of your report, it states that if a reliable means for deduplication exists, I'm paraphrasing there, quote, "Counsel further requested that I proceed with deduplicating those records and create an anonymized identifier for each unique payor, and then match those payor identities to create a primary person ID."

I'd like to suggest one thing that might be a typographical error there.

Page 116

properties in addressing matching -- in address matching?

A. What is that? Repeat that.

Q. SOUNDEX properties?

A. In address matching? No, not in address matching.

Q. Are you familiar with SOUNDEX properties in other contexts?

A. Aware of them, yes.

Q. What's your understanding of what SOUNDEX properties are?

A. My understanding would be a -- I believe I've experienced it with regards to more in the -- I'm trying to think of a situation where it's actually -- I've actually been involved in it. I don't know that I can --

Q. Well --

A. Yeah, I don't --

MR. BURT: Let the witness finish.

THE WITNESS: Huh?

MR. BURT: Let the witness finish.

A. I can't think of a context or a situation where I've been involved with it.

Q. (BY MR. LAZARUS) Whether or not you've been involved with it, do you have a -- an understanding of

Page 115

Q. Okay. Okay. Your report states that in formulating your opinions in this case, you relied on well-accepted methods of consolidating contact data in the claims administration field including proprietary

Page 117

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

methods that JND has developed over the past nine years, correct?

A. What section?

Q. Let's see.

Paragraph 10. Thank you.

A. Okay.

Q. You see the language that I'm referring to in paragraph 10?

A. I do.

Q. All right. And the methods that you are describing in paragraph 10, they attempt to clean, deduplicate and match records, correct?

A. Cleanse and deduplication, yes.

Q. Outside of claims administration, are you aware of any other fields that have developed methods to clean and deduplicate records in a dataset?

A. I am not -- I've personally not worked in other fields that -- other than health care claims administration where we did clean and match data. So I -- I can't speak to fields I've not -- not worked in or with.

Q. And you're not aware of other fields that do -- that have developed methods to clean and deduplicate data?

MR. BURT: Objection. Asked and

Page 118

answered.

A. No.

Q. (BY MR. LAZARUS) Would you be surprised to learn that other disciplines use data cleaning?

A. It -- I -- I'm not sure if you're asking my emotional response -- response to the statement. But I -- I -- I would expect other industries to utilize these process -- or similar processes and methodologies based on how much data exists in the world today.

Q. And is that true for both cleansing data and deduplicating data?

A. Cleansing data, yes. Matching data, yes. Deduplication may be a -- a function of the various industries.

Q. Okay. Maybe related to that point that you were just making, is identifying unique individuals distinct from deduplicating records?

A. Can -- can you repeat that question? I thought there was something --

Q. Sure.

A. -- something didn't make sense to me.

Q. Is identifying unique individuals distinct from deduplicating records?

A. I'm trying to determine what the outcome of -- of -- of both efforts are in my head. I believe the

Page 119

outcome is essentially the same.

Q. Okay. And in the process that you undertook in this case, were there any different steps that you took to identify unique individuals different from the deduplicating records or are those essentially the same effort?

A. The effort of deduplication's goal essentially is to produce a list of unique individuals.

Q. In addition to the Apple payor data in this case, you used a National Change of Address search in your analysis in this case, correct?

A. I ran a subset of the data through the National Change of Address, a process in order to get updated current addresses for a portion of the population, correct.

Q. And that was through Melissa Data, if I -- is that the right name of the vendor?

A. That is correct.

Q. Okay. And other than your -- other than the Apple payor data itself, the data or results that you received from Melissa Data and your own JND methods, did you rely on anything else in reaching your opinions in this case?

A. Other than my experience and the data available?

Page 120

Q. That's correct.

A. No, that's what I relied on.

Q. Okay.

A. And I believe that's complete.

Q. There was no other external data source that was used other than the Melissa Data data?

A. No, due to the limitations of the protection orders of very limited what could be done with the data.

Q. Would additional data have been helpful in conducting this analysis?

MR. BURT: Objection. Form.

Q. (BY MR. LAZARUS) Would additional data have been helpful in your deduplication effort in this case?

MR. BURT: Objection. Form.

A. It is possible.

Q. (BY MR. LAZARUS) Is there any particular data that you think of that would have been helpful?

A. It is possible that running a subset of the data through a -- one of the big three credit bureaus for advanced address search could have produced additional updated addresses that would have benefitted the matching.

Q. Did you request the ability to do that additional running of data through one of the big

Page 121

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

credit bureau's data?

A. It was -- I believe there was discussion, but due to the aggressive nature of the protective order surrounding the Apple data, it was -- I don't believe that running this -- that there was much appetite for -- for sending the data out to a second vendor for that additional search.

Q. Okay. Did plaintiffs' counsel provide any assumptions that you relied on in forming your opinions?

A. Did plaintiffs' counsel -- I'm going to repeat your question to make sure I understand.

Did plaintiffs' counsel provide any assumptions that I used to form my conclusion, was that your question?

Q. Yes.

A. Not that I can think of.

Q. Other than asking you the questions that formed your assignment, did counsel give you instructions on how you should conduct your analysis?

MR. BURT: Objection. Form.

A. Not -- not that I can think of. Counsel are not versed in data deduplication.

Q. (BY MR. LAZARUS) Did plaintiffs' counsel advise you to be aggressive or conservative in

Page 122

assigning matches?

A. They were -- they provided neither direction on either of those things.

Q. Okay. Did they identify a target number for your end result of identified unique payors?

A. They did not.

Q. Did they identify a range of numbers to target for the end result?

A. They did not.

Q. Okay.

MR. BURT: I should object to the form of those questions to the extent that they go beyond what he relied on. But I let him answer.

Q. (BY MR. LAZARUS) Before submitting your report, did you know whether any of plaintiffs' other experts intended to rely on your opinions?

A. No. I'm -- was, and for the most part, still unaware of any other experts that exist.

Q. Okay. Experts that exist in this case, is that --

A. That's correct.

Q. Other than staff at JND and plaintiffs' counsel, did you discuss the opinions in your report with anyone else?

A. Not that I can think of. I don't know if it

Page 123

came up over dinner.

Q. Okay. And if it came up over dinner -- well, I'll withdraw that.

You don't have a memory of it coming up over dinner?

A. I do not.

Q. Okay. And you're not remembering any other conversations at dinner or otherwise about your work in this case?

A. Outside of counsel or JND staff?

Q. Outside of counsel or JND staff.

A. I -- not that I can think of.

Q. Okay. Are you familiar with someone named Minjae Song?

A. I -- I am.

Q. Okay. Who is that?

A. I believe that he works for Brattle.

Q. And have you discussed with him your work in this case?

A. I was on a conference call with Minjae prior to work starting. So I don't believe I've ever -- I don't recall talking to him since this work commenced.

Q. Okay.

A. So I don't think I could talk to him about the work occurring, at least that I recall.

Page 124

Q. Okay. Did -- did Dr. Song say anything in that conversation that you relied upon in doing the work on your assignment in this case?

A. Not that I recall.

Q. Okay. Am I correct that in your work on this case you performed some cleansing and then some deduplication and then some cleansing again and went back and forth between cleansing and deduplication a number of times; is that accurate?

A. That is accurate.

Q. Okay. How many times did you cleanse and deduplicate?

A. I -- many.

Q. Okay. But you don't know an exact number?

A. I do not know an exact number.

Q. Is an exact number recorded in your materials that you've produced to Apple's consultants?

A. No.

MR. BURT: Objection. Form.

Q. (BY MR. LAZARUS) All right. Looking back at the -- at Tab 10B -- sorry. That's -- let's -- what's our exhibit number? 116. Thank you. Exhibit 116.

This is your August 1st, 2024, declaration.

A. Yep.

Q. Do you see at paragraph 7D, you state, "I do

Page 125

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

not know how to mechanically duplicate the skill of recognizing how successful each iteration has been at resolving issues with incomplete personally identifying data. JND has developed unique expertise to do so over the course of many years and many engagements."

Q. Do you see that?

A. I do.

Q. How many people outside of JND have the skill and expertise that you refer to in that paragraph 7D, to the extent you know?

A. I -- I can't imagine a way I would know that.

Q. Okay. All right. Will you get -- so the next one I want to refer to is your README file, which has already been marked as Exhibit 113.

The purpose of that README file was to explain the order in which code files should be run to produce the final output from your analysis with sufficient information to allow Apple's expert to replicate JND's analysis with no changes to the code other than updates to file paths; is that right?

A. I'm unclear where that -- you determined that was the -- what I -- my marching order for producing this.

Q. Okay. I -- I can represent to you that that is the request that our team made for the README file.

Page 126

█████████████████████████
███████████████
█ ███████████████████
██████
█ ████████████████████
████ .

Q. Okay. Can you confirm -- actually, let me take that back.

MR. LAZARUS: Okay. It's been another hour. I think it might be good to take a break. So why don't we go off the record.

THE VIDEOGRAPHER: We are going off the record at 1:48.

(Break from 1:48 p.m. to 2:06 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:06. Please proceed.

MR. LAZARUS: Thank you.

Q. (BY MR. LAZARUS) Okay. Now I want to ask a series of questions looking at paragraph 17 of your report. And also looking at the README file which is --

MR. BURT: 113.

MR. LAZARUS: 113. Thank you.

Q. (BY MR. LAZARUS) So let me know when you have paragraph 17.

Page 128

A. Okay.

Q. Is that consistent with your goal in creating the README file?

A. My goal in producing the README file was, to the best of my ability and limited time, provide the -- the approximate order of running the -- the files that I used to produce results in order for a third party to try to replicate the effort and come up with similar outcomes, recognizing that the code I provided was not a deliverable of this effort and, therefore, is not a situation where you would not have to change any code in order to achieve the goal.

Q. The README file lists dot SQL scripts, correct?

A. That is correct.

Q. Besides SQL, which I'm -- I understand would be spelled S-Q-L?

A. Of course.

Q. Did you use any other software or computer programs for your work in this case?

A. The NCOA process.

█ ████████████████████
█ ██████████████████████
████████████████████████
███████████████████████

Page 127

█ ██████████████████████
███████████████████
█ ████████████████████████
████████████████████████████
██████████████████████████
█████████████
█ ████████████
█ ██████████████
█ ████████████
█ █████████████████████████
██████████████████████████
█ ████████████████████████
███████████████████████████
█ ████████████████████████
██████████████
█ ███████████████████████
█ ██████████████████████████
████████████████████████████
███████████████████████████
█ █████████████

A. Yes, I do.

████████████████████████████
████████████████████████████████
█████████████████████████████
█████████████

Page 129

33 (Pages 126 - 129)



Q. Okay. And your report refers to tiers and rounds.

Can you say what you mean by "tiers" and "rounds"?

A. Can you point out to me where I refer to

Page 130

---

"tiers" and I refer to "rounds"?

Q. I will in just a moment.

Do you -- 17E.

A. Okay. I see "tiers" in E. I don't see "rounds." Where do I refer to "rounds"?

Q. In F, 17F.

A. Okay. All right.

Q. What do you mean by "tiers" and "rounds"?

A. In this context, I referred to tiers as the -- the tiers of the deduplication matching logic within the various deduplication algorithms that, based on the hierarchy of the -- of the tier within the overall file, I apply to have a -- a confidence level in the matching based on the data points utilized for each tier.

With regards to round, I -- that is the iterative process of applying and then making changes and applying and making changes as necessary to improve and enhance and evolve the -- the matching.

Q. Okay. So within a round, am I correct that you would apply various tiers of your process; is that right?

A. That is a fair characterization, yes.

Q. Okay. And can you identify what is described in paragraph 17E of your report as the first round of

Page 131

---

your deduplication algorithm, can you identify the scripts listed in your README file that correspond to that round?

MR. BURT: I'm sorry. Did you mean F?

MR. LAZARUS: I believe I mean E. Yeah, I mean -- I mean in paragraph 17E where there is a description of the top tier and then in 17F, yes, it refers to the first round. So thank you.

Q. (BY MR. LAZARUS) Paragraph 17E and F.

In your README file, can you point to the files that correspond to the first round of deduplication?

Q. Okay. All right. In paragraph 17A of your report, you state that you, quote, "evaluated the entire dataset to determine what data quality issues exist."

Do you see that?

A. I do.

Q. What data quality issues did you identify?

MR. BURT: Object to form.

Page 132

---

A. I don't remember a list off the top of my head. In -- I -- I can give you some examples. There were records that had missing fields, missing address or a missing name or states that weren't a US state as a value.

But overall, as I recall, this was a -- a small subset of the overall data.

Q. (BY MR. LAZARUS) Okay. And did you analyze the frequency of missing values for each variable?

A. At the time I did.

Q. Okay. And did you review the most common values for each variable to determine whether they were plausible?

A. I did.

Q. And what did you -- how many of the most common values did you review, like, the top ten or -- in terms of the most common values, which ones did you review?

A. For each data point how many did I review?

Q. Right. For each variable.

A. Okay.

Page 133

34 (Pages 130 - 133)



Q. And did you determine that action was required based on common values in the data?

A. There were -- there were some scenarios where action was required.

Q. What action did you take?



Q. Okay. And is that exclusion of a value for matching purposes recorded in code?

A. So the -- it's not a -- well, yes.

Q. Where is that recorded?

A. So if a field is blank, it would be excluded

Page 136

I have no way to know based on a hashed value that it wasn't already there.

Q. Okay. Did you ask that question of anyone?

A. I did not.

Q. And if you look back at the email from my colleague Ramona, which is Exhibit 117.

A. Yep.

Q. There is a list of 16 phone numbers hashed that are included in that email, correct?

A. It looks like about 16, yeah.

Q. And am I correct that you replaced those phone numbers with missing values?

A. I replaced these hashed values with blanks in the sample data for these particular values.

Q. Okay. Did you also do so in the full dataset?

A. With a different set of hashed values because these weren't -- were not consistently carried over to the full dataset. But, yes, I followed a similar process.

Q. Did you investigate whether there were any other values for phone_number_hashed that appeared very frequently and, therefore, could be not legitimate phone numbers?

A. I did.

Q. Okay. And what did you find in that

from matching.



Q. Okay. When you matched on a phone number and the field is phone_number_hashed, did you include the area code in that matching?

A. I did not. But I -- I do not know that I had clarity whether the area code was included in the hashed value and also provided separately, therefore,

Page 135

investigation?

A. I don't recall specifically. I believe there were some -- some additional phone numbers that the -- the volumes seemed unduly high. But because I had no visibility into the actual phone number since I had a hashed value, it was difficult to make a determination.

Q. So you did not then replace those phone numbers that you identified with blank values?

A. I don't recall if I -- I added to the list of approximately 16 off the top of my head.

Q. Okay. And do you think it is plausible that a single phone number, including area code, would be associated with over 1,000 unique payors?

MR. BURT: Objection. Form. Foundation.

Q. (BY MR. LAZARUS) You can answer.

A. Okay. Please -- please repeat, then.

Q. Do you think it is plausible that a single phone number, including area code, would be associated with over 1,000 unique payors?

A. It seems unlikely. I certainly couldn't rule it out.

Q. Okay. What if it was more than 100,000 unique payors?

A. It seems unlikely. Again, I cannot rule it

Page 137

35 (Pages 134 - 137)

out.

Q. Okay. The hash_hashed field represents payment -- payment method information, correct?

A. My understanding of the hash_hashed was a hashed of the last four digits of the payor's credit card number for that -- for that record is what I understood it to be.

Q. Did you investigate whether there were any -- well, let me scratch that.

Okay. Let's look at paragraph 10 of your report.

In paragraph 10 you write about, quote, "well-accepted methods of consolidating contact data in the claims administration field, including proprietary methods that JND has developed over the past nine years," correct?

A. That is correct.

Q. All right. When you describe your methods as "well accepted," who specifically are you claiming to have accepted these methods?

A. Well, these are methods that have evolved over the last 14 years of me working in the legal claims administration industry across two of the largest legal claims administration organizations that have existed, and utilized against thousands of, you know,

administration services and datasets without, you know, having situations where these were not found to produce valid and useful results.

So I would say, myself, for extensive experience doing this and working with, you know, individuals in the industry that -- that work at companies I work with, or work at.

Q. Have any of those well-accepted methods that you describe been published in any publications, periodicals, journals, to your knowledge?

A. No. As stated, we've -- we feel that the -- the methods that we utilize are -- are proprietary and a competitive advantage for our organization. And I can't see a situation where we would -- would publish those.

Q. And you write also in paragraph 10 of your report that you applied your deduplication methods to, quote, "a random sample of approximately 13 million payor records."

Do you see that?

A. I do.

Q. Did you make any changes to your methods after you applied them to this sample and before you applied them to the full payor dataset?

MR. BURT: Objection. Form.

A. Let me reread the sentence, please.

Got it. Yes.

Q. (BY MR. LAZARUS) What changes did you make?

A. I added multiple tiers to the deduplication logic. I added additional data cleansing because the full dataset represented additional, you know, opportunities for both cleansing and deduplication based on shear volume.

Q. Okay. In paragraph 17E, you write that, "Each tier of the deduplication algorithm utilizes different available data points in combination, or alone, to produce a match, and each match requires a different level of review and validation based on the data points used in the match," correct?

A. Correct.

Q. And in the statement that, "each match requires a different level of review and validation," do you mean to say that you or someone at JND reviewed and validated some matches or all matches for each tier of the algorithm?

MR. BURT: Objection. Form and foundation.

A. Some matches. It would be -- I don't see a situation where, again, one point -- a total of 1.44 billion records that were -- were identified as

duplicates could realistically be reviewed.

Q. (BY MR. LAZARUS) How was the review carried out? You mentioned Cameron assisted with that.

What review was done by you and Cameron?

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

Or -- and additionally, we would do the same analysis, see if there's matches that didn't occur that if, with additional either cleansing or deduplication we could apply to, you know, create the match.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

MR. BURT: Objection. Form.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓



Q. Okay. The code that was used in review and validation, was that code produced to Apple?

A. I -- I don't know off the top of my head. It was certainly coded on the air-gapped machine.

Q. In paragraph 17F, you say that you, "ran the deduplication algorithm against the data and reviewed the outcome, evaluated records that are potential matches that did not match in version 1."

What is version 1 there?

Page 142

A. So in any particular round, I'm -- I may run a -- a code set, evaluate whether the outcome -- if there's additional matching opportunities or cleansing and matching opportunities that occur, make a -- a modification to the -- that -- the code for that round and then rerun it as that round before I determine that I've -- I've completed the -- the efforts of that round and move on to the next one for -- for additional, you know, types of matching.

Q. Okay. What assumptions did you make, if any, in conducting your deduplication work?

A. Let's see. I assumed that the person_id_hashed provided by Apple was as they defined it that represented, for the most part, a payor individual and that it could reliably be treated as such.

Q. Can I ask where you saw a representation from Apple that person_id_hashed represented, for the most part, a payor individual?

A. I believe I read that in the data dictionary provided, but I do not -- I cannot be certain that that is where I received that information.

Q. Okay. Any other assumptions that you made in conducting your deduplication work?

A. That's the -- that's the most -- that's the

Page 143

one I can think of off the top of my head.

Q. Okay. For each tier of the deduplication method that you used, you required values of the relevant variables to match exactly and without using, quote-unquote, "fuzzy matching"; is that right?

MR. BURT: Objection. Form. Foundation.

Q. (BY MR. LAZARUS) Okay. I can -- I'll break it up.

For each tier of the deduplication method that you used, you required values of the relevant variables to match exactly across records, correct?

A. Can you -- you're going to have to restate that or give an example or -- or something of that nature.

Q. Sure.

So to -- my basic question is, you used exact matching rather than fuzzy matching; is that correct?

A. Fuzzy matching isn't a real thing.

Q. Okay. I'm interested to hear about that.

A. But I believe your question is, for example, did I only match a record when using the name if the full name matched completely to the other full name? The answer to that is no.

Q. What did you do instead?

Page 144

A. As an example, along with additional data points, if a partial address matched, say, the first ten digits of the address line 1, along with the full name, along with the person ID, along with the city and state, that would be considered a match in one of the tiers of the -- of the deduplication, which in -- in some realms would -- I think people might use the phrase "fuzzy matching" on that. I would refer to it as logical partial data points.

Q. Did you do any analysis that matched, for example, first name that would match -- let me restart.

So did you do any analysis that would match in the first name field for the values of William and Bill?

A. No.

Q. And why not?

A. There -- there -- there are tools, you know, available that would allow for, you know, the variable names representations to be matched, but I don't believe it's something that I could easily access from an air-gapped computer.

Q. Did you request the ability to access tools to do that?

A. I did not.

Q. Do you agree that requiring exact matching for

Page 145

37 (Pages 142 - 145)

a variable for two records to be a match could result in some records not being matched due to slight differences in the values entered by a single payor?

A. As -- as -- I mean, I don't know how to answer that because it -- it feels like you're asking me to agree to that when, in fact, that is not the situation -- I did not in every situation require a full match of the data.

So I will say, with the caveat that I -- I coded to deal with not full matches of every field necessarily, that, yes, requiring full matches could potentially repress matching.

Q. Okay. Do you agree that there could be different people with the same first name and same last name at the same address?

A. I can't rule that out.

Q. For example, Bob Smith, Senior and Bob Smith, Junior, those could both show up as Bob Smith in the data, but they could actually be different people, right?

A. I -- I cannot rule out that Junior and Senior still living at home don't use their Junior and Senior, even though they know if they don't, they're going to get each other's mail.

Q. And your algorithm would not differentiate

Page 146

between those two payors with the same first name and last name based on their name if they didn't use some other indicator like a suffix Junior and Senior; is that right?

A. If -- if they lived in the same household and had the same name and did not use their Junior and Senior, I would not distinguish them.

Q. Okay. Do you agree that there could be records that have the same last name but different first names that could still correspond to the same payor?

A. I certainly can't rule that out.

Q. Okay. And your algorithm would not be able to match those records based on the name, correct?

A. Because the names are different.

Q. Right.

A. That is correct.

Q. You did not use some variables in your matching algorithm, correct?

A. Can you be more specific with variables?

Q. Variables available in the Apple payor data.

A. So data fields?

Q. Okay.

A. There were some data fields, as mentioned previously. I did not use county. I did not use area

Page 147

code. I did not -- so, yes, those -- those as examples I did not use.

Q. Why -- why was county not used?

A. I -- I'm -- I do not see a situation that county benefits in an address match where a street address and a city/state or a street address and a postal code would not create the match. I do not see what data point I would replace county with to give me confidence in a match.

Q. Okay. Let's look at an example.

MR. LAZARUS: 19A, please.

(Deposition Exhibit DX 119 was marked.)

MR. LAZARUS: And I will represent that this is a record from the Apple payor data.

Q. (BY MR. LAZARUS) Do you see the field names listed at the left here?

A. I do.

Q. And those match the fields in the raw Apple payor data that you received?

A. They appear to be, yes.

Q. And in this record, the last name listed is ▮▮▮ correct?

A. That is correct.

Q. And the first name listed is ▮▮▮ correct?

A. Correct.

Page 148

Q. So this is a ▮▮▮▮ living at -- or let me take that back.

This is -- this record lists ▮▮▮▮ together with the address -- an address in ▮▮▮▮ ▮▮▮▮, correct?

A. That is correct.

MR. LAZARUS: Okay. If we could get 19B and then C after that.

(Deposition Exhibit DX 120 was marked.)

MR. LAZARUS: And I'm sorry, what was the exhibit number on that last one?

MS. LIN: 119.

MR. LAZARUS: 119. Okay. So this one will be 120.

Q. (BY MR. LAZARUS) All right. This is Exhibit 120, which I will represent is another record from the Apple payor data.

And if you see the first name here is ▮▮▮ and the last name is ▮▮▮, correct?

A. Correct.

Q. And the address listed is in ▮▮▮▮ ▮▮▮▮, correct?

A. Correct.

Q. Okay. And then I will show you another Exhibit.

Page 149

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

MR. LAZARUS:  So this should be Exhibit 121.

(Deposition Exhibit DX 121 was marked.)

MR. LAZARUS:  I should be saying DX 121.

Q.  (BY MR. LAZARUS)  In DX 121, the name -- the first name listed is ███ correct?

A.  Correct.

Q.  And the last name listed is ███ correct?

A.  Correct.

Q.  And the address listed is Apple's headquarters at 1 Infinite Loop in Cupertino, California, correct?

A.  Correct.

Q.  All right.  Do you agree that all three of these exhibits at DX 119, DX 120 and DX 121 have different person_id_hashed values?

A.  Looks to, yes.

Q.  And they all have different last names, correct?

A.  They do.

Q.  And they have a different payment credential in the hash_hashed column, correct?

A.  Okay.  Correct.

Q.  And they have different phone numbers in the phone number field, correct?

A.  Appears to, yes.

Page 150

Q.  And they have different city, state, postal code and street 1 values, correct?

A.  Correct.

Q.  Would you agree, then, that the only identifying information shared by all three of these records is the first name '███

MR. BURT:  Objection.

Withdrawn.

A.  In -- in the data provided as it exists, yes, I -- the only -- the only common data point I see is '███ correct.

Q.  (BY MR. LAZARUS)  And sitting here today, is it your opinion that these three records correspond to three unique individuals or one payor or two -- let me rephrase that.

Sitting here today, is it your opinion that these three records correspond to one, two or three unique individuals?

MR. BURT:  Objection.  Form.

A.  I -- I don't -- I do not know that I have enough information to actually render an opinion on that.  If you are -- in its static state where -- without any -- any additional information or evolution of the data, I -- I currently don't see them as a -- as a -- as a match, but...

Page 151

Q.  (BY MR. LAZARUS)  And you would agree that it is not -- it would not be appropriate to group these three records together as a unique individual based solely on the first name, correct?

A.  As a -- as a general statement, I agree that matching on first name alone is not a -- a valid match criteria.

Q.  And that is, again -- that is the -- well, withdrawn.

Did you review matches to see if records like these that only share one data point in the first name field were matched together?

A.  I -- I reviewed matches based on a broad spectrum of criteria and in looking for situations where matches occurred where not all fields matched to determine if there -- there was a -- a concern or issue with the match.

And so, in general, I can't say that I specifically analyzed that as you described it.  But, yes, on -- at the field by field level I did look for and review matches and where data points did and didn't match.

Q.  Would you be surprised to learn that your method did group these three records together?

A.  Again, if you're looking for me to gauge my

Page 152

emotional opinion to it, I have no comment.  To -- is it possible that these three records matched for a variety of reasons?  It is possible, but I can't speak to it in isolation.

Q.  Understood.

So I will represent to you that I understand that these three records were grouped together in a collection of 42,555 records from 17,683 accounts as identified by person ID.

Do you consider it plausible that all 42,555 records in that grouping represent a single unique payor?

A.  Again, I would need to examine in detail the data, the criteria, the match, how it occurred before I could render an opinion.  Is it -- and determine whether a -- a viable valid match could exist and why.

MR. LAZARUS:  Can I have 19G, please?  And I'll do H after that.

(Deposition Exhibit DX 122 was marked.)

MR. LAZARUS:  So this will be DX 122.

Q.  (BY MR. LAZARUS)  I will again represent that this exhibit is a record from the Apple payor data.

And this record lists first name ███ correct?

A.  Correct.

Page 153

39 (Pages 150 - 153)

Q. Last name listed is ███████ correct?

A. Correct.

Q. And the address listed is ███████████ ████████████████████████████, correct?

A. Correct.

Q. Okay.

MR. LAZARUS: I'll now mark DX 123.

(Deposition Exhibit DX 123 was marked.)

Q. (BY MR. LAZARUS) DX 123 is another record from the Apple payor data.

And do you see that the first name listed here is ████████

A. Yes.

Q. And the last name listed here is ███████ correct?

A. Correct.

Q. And the address listed is ███████ ████████████████████, correct?

A. Correct.

Q. So these two records have the same last name, the same -- the same last name, correct?

A. Correct.

Q. On the address -- the street address, the two values are the same except for a period at the end of the address in one of them, correct?

Page 154

A. Correct.

Q. But the records have different values for person_id_hashed, correct?

A. Correct.

Q. And they have different values for phone number, correct?

A. Correct.

Q. Based on the information that you can see in these two records, do you believe, in your opinion, that these are two distinct individuals, ███████████, at the same address or a single individual?

A. Seems to be, with the information in front of me, plausible that they're the same individual.

Q. I will represent that in the output data that we received from your production, that these two records were not matched.

Why would that be, or why is that, I should say?

A. So the -- the al- -- matching algorithm does do a partial first name along with last name and address. But I believe because partial first name does, you know, present a -- a increased risk of overmatching, I believe the algorithm includes a -- the phone_number_hashed as a -- as a validator to compensate for the increased risk of a partial name.

Page 155

Q. I see.

MR. LAZARUS: I will mark another document. This one will be DX 124.

(Deposition Exhibit DX 124 was marked.)

Q. (BY MR. LAZARUS) Looking at DX 124, the first name listed is ██████ correct?

A. Correct.

Q. The last name listed is ██████ correct?

A. Correct.

Q. And the address listed is ████████████ -- excuse me -- ████████████████████████ written out completely, correct?

A. Correct.

Q. And that address is in ██████████████, as identified here, correct?

A. Correct.

MR. LAZARUS: We'll mark the next document as DX 125, correct?

(Deposition Exhibit DX 125 was marked.)

Q. (BY MR. LAZARUS) This document identifies the -- this document is another record from the Apple payor data.

The first name listed is ██████████ correct?

A. Not on mine.

Q. Oh, what do you have?

Page 156

A. I have another ██████

Q. Well, let's -- I do have an extra ██████ here.

MR. LAZARUS: This -- yes, this one with ██████ should be DX 125. Is that correct on the Exhibit Share?

Q. (BY MR. LAZARUS) Okay. So in DX 125, the first name listed is ████████ correct?

A. Correct.

Q. And the last name listed is ████████ correct?

A. Correct.

Q. And the address listed is ██████████████ ██████ period, correct?

A. Correct.

Q. And that address is listed as being in ████████████████ correct?

A. Correct.

Q. And so looking at DX 124 and DX 125, these list, would you agree, the same address?

A. It does, yes.

Q. And DX 124 and DX 125 identify the same payment method in the hash_hashed field, correct?

A. Looks to, yes.

Q. So looking at these two records, do ██████████ and ████████████████, in your

Page 157

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

opinion, to be different payors?

A. In -- in isolation, they do not.

Q. They do not look to be different payors?

A. They -- they do not -- they -- they look to be different payors.

Q. Okay.  Thank you.

And do you agree that it would be plausible that ██████████ and ██████████████ are a married couple that share a credit card and live at the same address?

A. Do I agree it's plausible?  I agree it's plausible.

Q. Okay.

MR. LAZARUS:  We'll mark this as DX 126.

(Deposition Exhibit DX 126 was marked.)

Q. (BY MR. LAZARUS)  DX 126 I will represent is another record from the Apple payor data.

The first name listed in this record is ██████ ████████ correct?

A. Correct.

Q. And the last name listed is ███████ correct?

A. Correct.

Q. And the address listed is ████████ ██████████████████ fully spelled out, correct?

A. Correct.

Page 158

Q. And that address is listed as being in ████████████████, correct?

A. Correct.

Q. Looking at these three exhibits, DX 124, DX 125 and DX 126, do you see that they all three have the same address except that ███████ is fully spelled out in two of them and abbreviated in one of them?

A. I do.

Q. And do you see that all three of them use the same payment method in the hash_hashed field?

A. I do.

Q. Would it be -- well, in your opinion sitting here today, do you believe that these are one, two or three unique payors?

A. With the data available in front of me, in isolation, it looks to be three different people.

MR. BURT:  I'm going to object that Apple's counsel is marking as exhibits paper copies of data removed from the system which, of course, since it's Apple's data, they have the right to do, but that the expert on plaintiffs' side could not similarly remove for the purpose of examination preparation.

MR. LAZARUS:  Understood.  The objection is noted.

Q. (BY MR. LAZARUS)  Would it be consistent with

Page 159

the information you see in these three records that ██████ and ████████ are a married couple and have a daughter named ██████

A. There is nothing in the information I have in front of me that I -- I can draw that conclusion definitively.  I can't rule it out.

Q. Okay.  If we assume that that is the case, then would you agree that it is also plausible that the daughter, █████ was using her parents' credit card?

A. I certainly couldn't rule it out.

Q. But in that case, █████ would not be a unique payor, would she?

MR. BURT:  Objection.  Form.

A. What -- what's your definition of "payor," then?

Q. (BY MR. LAZARUS)  This is an important question.

What is your definition of "payor"?

A. A -- a individual that paid for something.  And I'm not aware of anything that suggests that it has to be their own credit card, just that they have to make a payment.  And, therefore, they have a transact -- a record in the transaction data with their personal information on it.

Q. But would you agree that in a hypothetical in

Page 160

which a parent has a credit card and pays the credit card bills from the parents' bank account and let's a child use that credit card, but pays, again, for the bill on that credit card out of the parents' bank account, would you agree that in that situation the parent is the payor?

MR. BURT:  Objection.  Form and scope.

Q. (BY MR. LAZARUS)  I will -- if you followed that hypothetical that I described, then you can answer.  If not, I can break it down into the individual pieces.

A. I -- I followed it.  I -- and I -- it is -- I think my -- the hypothetical, sure, the hypothetical is possible.  It is unclear to me while -- within the data how any of those hypotheticals could be definitively determined.

Q. So your last statement was:  It was unclear to me within the data how any of those hypotheticals could definitely be determined.

Why not?

A. So, based on the data available, it's equally as possible that █████ and █████ are a married couple and ████████ is the live-in nanny that uses their credit card.

Q. Did you seek to -- well, I'm trying to decide

Page 161

41 (Pages 158 - 161)

the order of the questions here.

But did you attempt to resolve uncertainties like that?

MR. BURT: Objection. Form.

A. And, again, I -- I think this goes back to the definition of "payor." And I am unaware of any document or documentation that suggests that a -- assuming your hypothetical is correct, there's -- I am unaware of any definition of -- of a class member that suggests that it's the -- the cardholder as opposed to the information available, which is an individual associated to a record that has transactions and made payments.

Q. (BY MR. LAZARUS) Do you not agree that the -- the payor is the person who -- whose money was used to pay for a transaction?

MR. BURT: Objection. Form. Foundation.

A. Again, you are -- that -- that's a class definition that I'm certain I am not the person to define.

Q. (BY MR. LAZARUS) And in -- on the question of, did you attempt to resolve any uncertainties like the ones we're discussing right now, did you ask for any additional data in order to resolve these sorts of

Page 162

uncertainties?

MR. BURT: Objection. Form.

A. You're -- you're -- I didn't have an uncertainty about this so, therefore, there would be no reason for me to request data to resolve something I did not see as an uncertainty.

Q. (BY MR. LAZARUS) Okay. And I apologize if I've missed it, but can you explain why you don't see an uncertainty as to -- let's stick with the ███ ███████████ situation in DX 124, DX 125 and DX 126.

Am I correctly understanding that you are saying you do not see uncertainty in who the unique payors were among those three?

A. I do not.

Q. Okay. And can you explain why you don't see uncertainty there?

A. My understanding of the Apple payor data is that each line represents a -- a billing event associated with transactions that I did not have and -- but represented billing events or purchases.

And the -- each -- each individual that made a purchase represented a potential class member if they fulfilled all additional requirements for being -- being part of the class.

It -- I am unaware if it exists, but I am not

Page 163

privy to it, but I am unaware of anything within the class definition that suggests that a payor had to use their own credit card or -- and I don't -- I am unaware of how, on an individual basis, one could determine that regardless of the data. Because ███ could have used her -- whoever's credit card and gave him 20 bucks for it, and so she did actually pay.

So the -- I don't see how the hypotheticals in this situation could ever be resolved.

Q. Did you make an attempt to determine if two -- You know what? I'll withdraw that.

All right. Let's see.

This relates to a topic that we discussed earlier, but I have some slightly different questions.

Did you estimate a false positive rate, by which I mean the rate at which you identified two records as being the same payor even though they are not in reality?

A. Did I estimate a false positive rate?

Q. Yes.

A. I did not.

Q. Okay. And similar question, did you estimate a false negative rate?

A. Can you expound by -- provide the full definition, please?

Page 164

Q. I will.

So did you estimate a false negative rate, by which I mean the rate at which you identified two records as being different payors even though in reality they are the same payor?

A. I did not.

Q. If there are mistakes in your matching, what do you believe would be the -- what do you believe are the sources of those mistakes?

MR. BURT: Objection to form. Compound.

Q. (BY MR. LAZARUS) I'll stick with the question if you understand it.

A. I do. Repeat it for me, but I -- I believe I understand your question.

Q. If there are mistakes in your matching, what are the sources of those mistakes? And I will revise it to say, if there are mistakes in the matching that you conducted in this case, what do you believe are likely to be the sources of those mistakes?

A. I don't know how to answer that because I -- I looked for mistakes. I tried to identify mistakes and then fix mistakes. So if I had a -- a area where I thought, oh, there's mistakes, I would have attempted to identify and resolve.

It's not to say there are no mistakes as much

Page 165

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

as I can't give you an example because I attempted to identify and resolve them.

Q. So, for example, if there were mistakes in cleaning the data versus cleaning -- excuse me. Let me ask it this way.

Is it possible that there were mistakes in cleaning the data?

A. I certainly can't rule it out.

Q. Is it possible that there were mistakes in matching the data?

A. Also certainly cannot rule that out.

Q. In the review that you conducted in looking for mistakes to correct, did you see mistakes in cleaning?

A. I -- I cannot say -- I could not give examples, but it is certainly likely that I identified areas where cleansing was -- was inaccurate and I fixed or resolved the -- the issue that I identified. I have confidence that that occurred.

Q. And to make sure we're using -- we're understanding each other, is cleaning the same as cleansing? Are those two synonyms?

A. I -- I would use those -- those terms interchangeably in this situation.

Q. Okay. And in the review searching for

Page 166

mistakes, did you identify mistakes in matching as opposed to cleaning?

A. I -- I'm confident I identified issues where there -- I needed to add additional matching logic. I don't recall off the top of my head identifying situations where a match occurred where it shouldn't have, but I can't categorically say that that didn't happen also.

Q. Did you take steps to determine whether any mistakes had been made in coding the analysis?

A. I -- as previously mentioned, I had a additional person review both code and results attempting to identify errors.

Q. Does the code used in this case to clean the data contain any software tests?

A. Such as?

Q. I'll turn the question back to you.

What does "software tests" mean to you?

A. And that's why I'm asking. It's -- they're -- software tests can -- can, in theory, mean a -- a wide ranging set of things. So I'm -- I'm -- as stated, I'm not sure how to answer.

Q. Okay. I -- my understanding is that, for example, when a coder is submitting code to an open source software project, that code would typically

Page 167

contain tests to show that the code does what the author says it does.

Is that a familiar concept to you?

A. It is.

Q. Okay. Does the code that you used to clean data in this case contain software tests of that kind?

A. It does not. I've never seen those sort of tests applied in this application.

Q. Are you familiar with the concept of a gold standard validation set?

A. Theoretically, but I would love to hear the definition in this context.

Q. I don't know that I have a -- a definition.

But what's -- what's your understanding of the concept?

A. Well, a -- a gold standard from -- from what I could -- and, again, without looking at a definition, I believe that is a -- a -- sort of a perfect sample. But -- and, again, I don't know how that applies in this -- is applicable in this situation. But that's how I would understand the term here.

Q. And do you mean that you don't see how that concept is applicable in this situation because there is no gold standard validation set available?

A. Well, and I -- again, what -- what is the

Page 168

validation? Part of this is, gold standard, okay. But validation set, what does that mean? I don't -- I don't understand the -- what the -- is being referenced. That I cannot give you an example of because I do not know what it's attempting to reference.

Q. Okay.

MR. BURT: We've been going about 90 minutes, Eli.

MR. LAZARUS: Okay. Shall we take a break?

THE VIDEOGRAPHER: We are going off the record at 3:31.

(Break from 3:31 p.m. to 3:51 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 3:51. Please proceed.

MR. LAZARUS: Thank you.

Q. (BY MR. LAZARUS) I'd like to go back to your README file, which is Exhibit DX 113. And that file -- at the point that you're describing the nonstandard ASCII files, there's a statement, "I would comment and uncomment sections as needed."

Do you see that?

A. I do.

Q. Do you remember that?

Page 169

43 (Pages 166 - 169)

Can you explain to me, and this is where not being a computer person, what "comment" and "uncomment" means?

A. Certainly.

So the -- the -- those particular files are a -- a set of executables. And I would -- and commenting is simply flagging particular sections as, don't run -- when this file is executed, don't run these -- this section. So that would be commenting it out. Or uncommenting it would be, make this particular section of code available for execution.

Q. I see.

Okay. So it's more or less turning on and off different parts of the code.

Is that a fair description?

A. I think that's a -- a fair laymen's determination of it, yes. Absolutely.

Q. Okay. And why -- why did you do that in this case in -- in those files?

A. Certainly.



Page 170

And other sections I would continue to run until I cleansed to the best of my ability the -- the nonstandard ASCII and either, again, remove it or -- or translate it to something that is more logical in order to do matching on.

Q. Okay. In the situation that you just described, it sounds like commenting or uncommenting that portion of the code might affect the time that's required to -- to run code but would not affect the results of -- of running the code; is that right?

A. That is correct.

Q. Okay. Is that always the case in all of the

Page 171

times that you commented and uncommented portions of the code in those files that you're talking about at this point in your README file?

A. For these -- these two particular files?

Q. Right.

A. Yeah, the primary driver was I wasn't getting any additional results, meaningful results. And so I commented out so that it would -- yeah, it'd speed up.

Q. Okay. Are there -- were there instances in those particular files when you commented a portion of code in a way that did affect the output?

A. I don't believe so.

Q. Okay. Do you remember which lines of code you commented or uncommented in running those files?

A. I'm sure the -- I'm sure the file is hundreds of lines long, and I certainly do not recall which or when.

Q. And the commenting and uncommenting is not recorded in a file that you produced to Apple, correct?

A. It is not.

Q. Okay. And at the bottom of the README file there's a statement, "There may be additional places that require code to be commented for a script to fully execute."

Do you remember which lines of code are

Page 172

referenced there that need to be commented or uncommented -- uncommented to make all of the scripts fully execute?

A. I -- I do not remember which -- which scripts or which line in scripts. It should be relatively obvious to an individual experienced in -- in SQL code.

Just wanted to make it clear that some analysis and -- and evaluation was required in order for certain scripts to run without -- all it really would do is, generally speaking, without kicking off the SQL statement that ran a query.

Q. Is it recorded somewhere what portions would need to be commented or uncommented in order to make all of the scripts fully execute?

A. It is not.

Q. And would -- am I correct that commenting or uncommenting some portions of the code would affect the output of the code?

A. Oh, certainly commenting out certain portions of code would change the outcome.

Q. And so as produced, without commenting or uncommenting certain portions of the code, the scripts that you provided to Apple's consultants will not replicate your final output again --

MR. BURT: Objection. Form.

Page 173

44 (Pages 170 - 173)

Foundation.

Q. (BY MR. LAZARUS) Let me repeat that.

Am I correct that without commenting or uncommenting certain portions of code, the scripts that you provided to Apple's consultants as produced will not replicate your final output?

MR. BURT: Objection. Form. Foundation.

A. I believe that the -- that the code that I produced is substantially in the form that I ran it with, and -- and if run as is, should substantially produce the -- should produce similar outcomes.

It would -- I think the majority of things that would be commented are not items that produce a change to the data outcome as much as queries that would be used to analyze a step.

So I believe that the -- run as is, they would -- should produce similar -- very similar results.

Q. (BY MR. LAZARUS) Okay. Similar but not exactly the same?

A. I -- I certainly can't say exactly. I can't -- I can't rule out that -- that there would be some -- some level of a discrepancy.

Q. Okay. Excuse me.

Page 174

We talked earlier about paragraph 15 of your report -- excuse me -- which states that, "JND communicated to plaintiffs' counsel that it could reliably reduce duplication in the Apple data."

How do you define "reliably" in that sentence? "Reliably" or "reliability," how do you define those terms?

A. Okay. I'm sorry, I was reading the section. Can you repeat the question?

Q. I want to ask how you define "reliably" as used in that sentence or to define the noun form of it, "reliability"?

A. Okay.

So I would define that as being able to apply a set of methods that I have used extensively and have confidence in a -- a outcome based on both the methods used and the data available to apply it against.

Q. And is that the same definition of "reliably" or "reliability" that you have used in other deduplication work in the past?

A. I -- I don't know that I can say I've used the term "reliably" or "reliability" in reference to a previous deduplication. I can say that applying methods and based on the data available is the process by which I determine a confidence level in an outcome.

Page 175

Q. Okay. And that again -- that understanding of reliability is based on your years of experience in the field?

A. That is correct.

Q. All right. Sticking with your report, the paragraph 17E states that, "the top tier of the matching algorithm is the most stringent and matched on Person_ID_Hashed, first name, last name, full address, city, state and postal code."

Do you see where I'm reading that from?

A. I do.

Q. And when you say, "top tier," does that mean that this tier was run first before other matching tiers?

A. I -- yes, I believe that is correct.

Q. Okay. And why were these variables chosen for matching in this top tier?

A. I -- I tier the -- the deduplication based on a confidence level that the amount -- the data being matched is most likely to represent the -- the same individual.

And so in this situation, if exact first name, exact last name, exact full address, exact cities, exact state, exact postal code, along with the person ID that bundles people in -- within the Apple data all

Page 176

match, I have an extremely high confidence level that that should be the same person.

Q. And what is that understanding based on?

A. Experience.

Q. And, now, in this example, you did not match based on payment information. Let me -- well, let me -- let me ask about phone number.

You did not match based on phone number in this example -- in this top tier, correct?

A. I didn't.

Q. Why not?

A. I -- I can't tell you specifically my thought process at the time, other than I -- I assess matching and it -- I can only assume that I made a determination that phone number did not meaningfully change the outcomes and, therefore, I was confident as this is the top tier.

Q. And paragraph 17E also states that this tier "required minimal validation as it matched on virtually every available and relevant personal identifying data point."

What validation did you perform for this top tier?

A. Similar to all tiers. I did queries. I looked for, you know, matches that -- for, you know,

Page 177

45 (Pages 174 - 177)

any reason I could identify, any analysis seemed anomalous, to see if I needed to adjust any -- any sort of matching logic.

But as -- as stated, when -- when you have the same full name, you have the same full address and you have the same person_id_hashed, there -- there's limited data to -- that -- that could definitively say that this is not a match. You know, things like phone number or, you know, a -- the last four digits of his credit card, people have multiple credit cards, people have multiple phone numbers. It's not a -- not a definitive that it -- it could change the outcome of that.

Q. Did you identify matches that you thought may not be true matches in that first tier?

A. I -- I don't recall specifically as -- as I analyzed. I'm sure I did analyze and evaluate.

Q. Okay. How was the validation for that first tier different from validation for other tiers?

A. Primarily, it would have been based on the types of queries run, the -- the what -- what matching or no matching to compare in -- in the records that were rolled up, and quantity of time spent performing the analysis. The -- the fewer the data points, the greater the analysis performed to try to determine

Page 178

erroneous matches.

Q. And was the validation performed by both you and the Cameron person that you mentioned before?

A. Yes.

Q. Is the validation work documented in your materials that you produced to Apple?

A. There could be validation code in -- in the scripts provided.

Q. All right. In your second example in paragraph 17E, you state that you ████████ ████████████████████████████████████████ ████████████████

Did I read that correctly?

A. That is correct.

Q. Okay. Why was the variable last name no longer included -- or why was the variable last name not included in this second -- in this second example?

A. So, in my experience, there is a -- a meaningful population of individuals where they have changed their last name, the most common being somebody getting married, that this produces a significant positive match for.

So we -- we look at these and -- and attempt to match. But -- and, again, combining that not just with address, but person ID, which is purported to be

Page 179

a -- a somewhat bundling of -- of a record, it gave me confidence that that was a logical match.

THE COURT REPORTER: Logical?

THE WITNESS: Logical match. Apologies.

MR. LAZARUS: I was just going to check the transcript and tell you, but that -- that wouldn't work.

Q. (BY MR. LAZARUS) On address, you agree that there are 50 and more than 51 different values for state in the data?

A. I haven't looked at in a long time, but that sounds right.

Q. There are -- my understanding is that there are over 200 different values.

Am I correct that you did not make adjustments to values for state that do not correspond to an actual state abbreviation?

A. I don't recall off the top of my head what I did with state.

Q. Okay. Am I correct that fractions sometimes appear in street addresses?

A. I -- I'm not disputing it. I -- I don't know the answer to that.

Q. Okay. In the Apple payor data, you don't recall whether there were fractions in street

Page 180

addresses?

A. I don't.

Q. Okay. And you don't recall how you coded or matched based on those?

A. I do not.

Q. Okay. The example that I'm thinking of is ████████████████████████, Pennsylvania.

You would agree that that could be written in various ways, in unicode with ██ ██ ████████ ████████.

A. I don't dispute that.

Q. Okay. And it could be written other ways, like ████████.

Do you agree with that?

A. I do. It could be, I suppose.

Q. All right. Okay. Do you agree that the same street numbers and street names can appear in different cities?

A. Yes. Street -- street numbers and street names do appear in different cities.

Q. Okay. And do you agree that a ZIP Code can cover multiple cities?

A. I don't know that I -- I can't -- I can't -- I can neither confirm or deny that.

Q. Okay.

Page 181

46 (Pages 178 - 181)

A. That would be somewhat unusual, I think. But I suppose it's possible.

Q. Okay. All right. For the address 123 West Main Street, you can imagine a number of different permutations of the spelling with West abbreviated as W and Street abbreviated as ST, right?

A. Yes.

Q. Would all combinations of those be treated as a match in your process?

A. The -- if they are -- if they are spelled out differently, and so they're West and W, may -- they would not match. However, various other processes throughout the matching or cleansing could ultimately produce a match, such as running them through the NCOA standarized as the address for an ultimate match.

Q. And is it also true that an address -- well, let me scratch that.

If you had a tier that matched on every available and relevant personal identifying data point, in other words, if records were exact duplicates on every available relevant piece of personal identifying information in the data, would any validation be required to evaluate resulting matches?

A. Every single data point available? Well, that I think in some situations did exist because

Page 182

billing ID was duplicate, in which case I was looking -- I was trying to figure out why billing ID was there multiple times.

But other than that, if every single data point for -- was the same, then I -- I'm unaware of how to dispute that those -- those two records are the same.

Q. And so that's -- am I understanding correctly that that's true if you included every data field including billing_info_id and also true if you excluded billing_info_id and ran the match -- ran -- excuse me, the tier based on all personal identifiable data points not including billing_info_id_hashed?

MR. BURT: Objection to form.

MR. LAZARUS: Yeah, that was a long question.

Q. (BY MR. LAZARUS) Let me break that down into two parts.

The first one is, do I understand correctly that if there were records that matched on every single data field including billing_info_id_hashed, you would not view any validation as required in that situation?

A. It's a hypothetical as I did not do that match. If I did, I -- I would have -- I would have -- pure -- process I would still probably run queries to

Page 183

validate that there was nothing anomalous. It's just that there's -- I'm not sure what would be identifiable to determine that something isn't since all data points are -- are the same. There's nothing that can be identified that would cause them to not be the same entity.

So out of -- out of process, I would. But, yes, it would -- it wouldn't -- it would bear no fruit.

Q. And if you had matched on every available personal identifying data point, excluding billing_info_id because it's the record identifier and not personally identifiable information, in that case, would you view any validation as necessary?

A. Same answer. I would -- I would perform validation, but I -- it would -- I do not see how it would bear fruit. But out of process I would follow my process.

Q. Next I want to ask some questions about the NCOA check that is described in paragraph 17G of your report.

You write that you, quote, "cross-checked the address information against publicly available data obtained through an NCOA (National Change of Address) search from the United States Postal Service."

Do you see where I'm reading that?

Page 184

A. I do.

Q. And we discussed earlier that this search was run through a third-party vendor, Melissa Data Solutions, correct?

A. That is correct.

Q. And you mentioned at one point earlier that you may have used a different vendor at another time.

Is that -- is that true, that you have used other -- another vendor or multiple other vendors for NCOA searches?

MR. BURT: Objection to characterization of prior testimony.

A. Over -- over -- over the many years I've done this, I, myself and my organization, have used more than one vendor to provide NCOA services.

Q. (BY MR. LAZARUS) Why change vendors for NCOA search services?

A. Melissa Data provided a better solution at a competitive price.

Q. What was the name of the Melissa Data Solutions product that you used in this case?

A. I don't know that I -- I know it is Melissa Data.

Q. Are you aware that they have different -- Melissa Data Solutions has different product offerings?

Page 185

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

A. I do know they have multiple offerings. I believe we just use their NCOA product or their -- their solution.

Q. Does that solution that you used only run the data through the NCOA database or does it do additional work on the data?

A. The process does do -- perform some level of standardization of addresses as -- as an output.

Q. Okay. And what's your understanding of that standardization? What does it do?

A. It attempts to take the address input and standardize it to the -- basically, the postal -- the USPS form of an address, from -- from my understanding.

Q. Does it do anything else, to your understanding?

A. Standardization and looking for a change of address is -- is my understanding of its -- its function.

Q. And does -- my understanding is that you uploaded a portion of the Apple payor data to Melissa Data Solutions; is that correct?

A. That is correct.

Q. And then does Melissa Data -- did Melissa Data Solutions automatically conduct all of the standardization and NCOA checks on all of those

Page 186

uploaded records or did you need to request steps to be taken on particular records or portions of the uploaded data?

A. The process as I understand it on the Melissa Data side, as they've communicated, is we upload the -- I upload the file. Their system automatically picks it up. There is no request. There is no person interaction.

Q. Do you know whether Melissa Data Solutions offers a product that does NCOA lookup only and not the additional standardization steps that you described?

A. I -- I don't know.

Q. Okay. Did you perform any validation to confirm that the address cleaning steps being outsourced to Melissa Data Solutions were done correctly?

A. No. I'm -- I'm unclear on how that would be done, so, no.

Q. Do you know how Melissa Data Solutions matches addresses?

MR. BURT: Objection to form. Foundation.

Q. (BY MR. LAZARUS) Well, let me back up. Does Melissa Data Solutions match addresses?

A. I'm -- I am unaware of Melissa Data's internal

Page 187

processes for -- for how they connect a uploaded record to a record so they could produce a -- a NCOA output. Everything I -- everything I would say with regard to that would be speculation of a third party's internal workings.

Q. So am I correct that you're not aware whether they use exact matching or what we were referring to earlier as fuzzy matching?

A. I'm -- yeah, I am not aware of their -- their internal processes.

Q. Okay. How many name and address combinations did you cross-check against the NCOA data through Melissa Data Solutions?

A. 290 million. I'm -- I'm trying to pull from my memory, but I -- I couldn't -- couldn't swear to an exact number.

Q. Okay. Why does 290 million come to mind?

A. Other than that's what comes to mind. I -- it's somewhere -- I think it's somewhere in the ballpark, but -- but I don't know exactly the number. Somewhere between -- yeah, I -- I don't know exact number. But it's -- it's about that. Somewhere in the neighborhood.

Q. And is that 290 million, is that all of the name and address combinations in the Apple payor data?

Page 188

A. That represented the subset of the total population that at that point had -- was still identified as a primary record based on all of the deduplication and cleansing that occurred up until that point.

The -- the intent of sending that small subpopulation instead of sending the entire 1.69 billion records was in complying with the protective order and protecting the data to best of our ability.

Q. For how many records did you verify a change in address using the NCOA data search?

A. I don't have that number in -- on top of my head.

Q. Okay. Is that number available in the materials that you've made available to Apple?

A. It is available in the data I made available.

Q. Okay. And once you got any change of address associated with a name, did you then add the new address information back to your computer at JND and merge it onto the Apple payor data?

A. You're going to have to say that one more time for me.

Q. Let me -- I'll break it up into two. Once you got any change of address associated

Page 189

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

with a name, did you then add the new address information back to your computer at JND?

A. Got it.

We -- I -- I took the results of the NCOA process and I uploaded back to the air-gapped PC, that is correct.

Q. And you merged it onto the Apple payor dataset that you had on that computer?

A. That is correct.

Q. Did you record anywhere the full list of names checked against the NCOA data?

A. There is -- are -- there is a table within the data provided made available to Apple that contains a list of records that I uploaded to -- or that I -- yeah, that I downloaded and then uploaded for the NCOA process.

Q. Okay. And do I understand correctly that that table shows the results from the NCOA data search for each name checked?

A. I do not recall if the results are in a table. They are, however, in text files that were provided and made available to Apple's consultants. So the -- all of the data is there in some form. It may -- they may not be in tables simply because they take up a lot of space in the database.

Page 190

Q. Okay. And when you say that the NCOA search results data are in the materials provided to Apple in some form, does that include if there was no change to the address?

A. It would have in the -- in the data it would have the information -- I'm speaking from memory, but I'm pretty certain that the result file had the data uploaded for processing, as well as the output of the process.

Q. In your opinion, did checking against the NCOA data resolve most of the address changes in the data?

MR. BURT: Objection to form.

A. Did it resolve -- I'm -- I don't believe I understand the question with regards to "Did it resolve most of the changes to the address -- addresses." Can you -- can you clarify what you mean by that?

Q. (BY MR. LAZARUS) I will try.

So the NCOA data is intended to identify individuals who have changed their address; is that correct?

A. That is correct.

Q. And so within the Apple payor data there are records representing some number of individuals who have changed addresses, correct?

Page 191

A. Almost certainly, yes.

Q. And is it your opinion that most of those people represented in the Apple payor data who had changed their address were identified through the NCOA search?

A. I -- I can't -- I don't believe I could classify it as "most." I can say the -- the NCOA look-back period is four years. So if an individual moved within the last four years, then the process is likely to have been successful in identifying and updating that address.

Q. All right. What is the file Apple_final_deduplication_ouput? And in the file name the last part is spelled O-U-P-U-T, but I imagine, is that a typo that it should have an extra T so it should be "output"?

A. Seems reasonable, yes.

Q. So to read it that way, what is the file named Apple_final_deduplication_output?

A. I think that that is the piece of code that spools out the -- essentially, the -- the three columns mentioned earlier. Again, I'm working from memory and I don't have the code in front of me. But I believe that is the code that spools out a -- the billing_info_id, the primary_billing_info_id, and the

Page 192

JND sequence number.

THE COURT REPORTER: Was it JD?

A. JND sequence number.

MR. LAZARUS: And is that a file that we have a printout of?

Q. (BY MR. LAZARUS) Your report references that you reduced duplication down to approximately 246 million payors, correct?

A. That is correct.

Q. The number that we see in Apple_final_deduplication_output is 243,646,638.

Do you know why that is different from approximately 246 million?

A. Not off the top of my head.

Q. Okay. Don't hold me to it, but I think we're winding down.

All right. Apple's consultants visited your office at JND in Seattle on May 5 to 6, 2025, correct?

A. I'll take your word for it. I won't dispute that.

Q. And they were given access to inspect files on an air-gapped computer at JND, correct?

A. That sounds correct.

Q. And let's see.

After that, you brought a hard drive

Page 193

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

containing computer files to the office of Apple's consultants in San Francisco, correct?

A. That is correct.

Q. And is it okay if I refer to those files on the hard drive that you brought to San Francisco as your backup files?

A. I -- I have no issue with you referring to them that way.

Q. Okay. And you -- you delivered that hard drive with your backup files to San Francisco initially on May 21st, 2025, correct?

A. I'll take your word for it. I don't --

Q. Okay.

A. -- I don't have a phone or a calendar in front of me, but, sure.

Q. Right.

Did you make any modifications to your backup files after Apple's consultants were given access to JND's computer on May 5 to 6, 2025 and before you transported your backup files to the office of Apple's consultants on May 21, 2025?

A. Not that I recall, no.

Q. In the final Apple -- the file Apple_final_deduplication_output, you referenced there were three fields generated by that code; is that -- is

Page 194

that correct?

A. If it does what I recall it doing, I think the better way -- it -- it spools them out to -- to flat files.

Q. Okay.

A. I think.

Q. Thank you.

So in the final output, those three fields that you produced were billing_info_id_hashed, second field primary_billing_info_id_hashed and JND_assigned_ID, correct?

A. That is correct.

Q. And can you explain what that additional field JND_assigned_id was?

A. Certainly.

So I added a numeric sequence to every record I received from Apple as a external or internal identifier, however you want to phrase it, but a JND specific identifier that had no -- contained no meaning other than it's a numeric.

And the purpose of providing it back to Apple -- or to -- in that file was, as I mentioned previously, billing_info_id was not unique in the file I received. And, therefore, the only way to provide clarity that I wasn't providing duplicate billing info

Page 195

records back, I needed to show they existed multiple times in the data I received.

Q. All right.

MR. LAZARUS: I'll ask that we mark for identification a letter here and this will be Exhibit DX 127.

(Deposition Exhibit DX 127 was marked.)

Q. (BY MR. LAZARUS) And the letter is dated January 15, 2025, and it is from plaintiffs' counsel to myself.

I apologize, I may be looking at the wrong document.

MR. LAZARUS: Could we go off the record for a moment?

THE WITNESS: I'd love the use the restroom if we take five.

THE VIDEOGRAPHER: We are going off the record at 4:48.

(Break from 4:48 p.m. to 4:52 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 4:52. Please proceed.

MR. LAZARUS: Thank you.

Q. (BY MR. LAZARUS) As I was just saying, the document that we have marked as Exhibit 127 is, in fact, the document that I intended to mark as Exhibit

Page 196

DX 127. So I'll proceed to ask a couple of questions about it.

On the first page here, at the bottom of the paragraph that starts with the word "First," the last sentence refers to a solution that plaintiffs and their claims administrator have created.

And I'll give you a moment to look at the paragraph, but claims administrator there refers to JND, correct?

A. Well, I -- I did not author the letter. I think -- I assume claims administrator means JND.

Q. Understood.

A. But, yeah, I need a minute to read the whole paragraph, please.

Q. Okay. Go ahead.

A. Okay.

Q. All right. And understanding that you did not write the letter, do you understand the reference to claims administrator here to be a reference to JND?

A. That's what I would understand it to be.

Q. Okay. And on the second page in the paragraph beginning "Second," do you see -- I'll read -- this is in the middle of the paragraph, there's a sentence that says, "Specifically, with a double-hashed billing info id field, plaintiffs would have to provide their

Page 197

50 (Pages 194 - 197)

damages calculations back to Apple to remove a layer of hashing from the double-hashed billing info ID field before JND could begin administering damages to class members."

Do you see that?

A. Okay.

Q. Before -- earlier in the deposition we discussed the possibility that JND would serve a role in claims administration in this case.

Does this -- reading this sentence change your recollection at all about whether JND is expected to have a role in claims administration in this case?

MR. BURT: Objection to form.

A. I don't know that it changes my -- my position on that. It -- I -- as sort of discussed previously, JND's not been hired to be the claims administrator for this, as there's nothing to be the administrator of at this time.

Q. (BY MR. LAZARUS) Okay. Was one of the purposes of the JND_assigned_id field to assist with claims administration in the event that JND was assisting with claims administration?

A. That is not why I assigned it. I assigned it so that it was clear that I was returning a record for every record provided to me.

Page 198

MR. LAZARUS: Let's see. Can we get Tab 9, please? This will be marked as DX 128.

(Deposition Exhibit DX 128 was marked.)

Q. (BY MR. LAZARUS) And this is a document titled "Declaration of Darryl Thompson" dated March 7, 2025.

This is a declaration from you; is that correct?

A. It looks to be, yes.

Q. Okay. And this is your electronic signature on page 8, correct?

A. It is.

Q. Okay. Did you author this declaration?

MR. BURT: Objection to form.

MR. LAZARUS: Withdrawn.

Q. (BY MR. LAZARUS) Did you write this declaration?

A. I -- I wrote the majority of it. Some of it was taken from previous declarations, but I was the primary author.

Q. Okay. When you say "previous declarations," what declarations are you referring to?

A. I couldn't point to -- I don't recall. But things like my bio information as an example would have -- would have come from -- likely come from

Page 199

previous -- a previous declaration. No reason to rewrite it.

Q. And the previous declarations from which material was drawn for this declaration, were those previous declarations all declarations from you or from other people?

A. Certainly that piece would have been from a declaration where I was the signatory.

Q. Right. Any other -- any -- any declarations from other people that you drew from in writing this declaration?

A. It is -- I think it's likely that I -- there may be some information out of the Blue Cross Blue Shield declaration Exhibit 114 that may have contributed to some information in here with regards to Blue Cross Blue Shield. But other than that, I can't think of where -- any others.

Q. Understood.

And did -- did counsel write any portions of this declaration?

A. I -- counsel reviewed and provided markups that I would review and determine if they were accurate and accept or reject, depending on accuracy.

Q. Okay. And you decided what language was ultimately included in the declaration?

Page 200

A. I did.

Q. Okay. Does this declaration reflect the same analysis as the report that we've been discussing today?

A. I believe so, yes.

Q. Why did you decide to title this a declaration instead of an expert report?

A. I believe at the time of its -- that it was delivered, it was not being delivered as an expert report, but a -- a declaration.

Q. And the footers on pages 1 and 3 through 8 do refer to "Expert Report of Darryl Thompson."

Why didn't you change them to say "declaration"?

MR. BURT: Objection. Form.

A. I do not -- I don't know why it is stated that way. An error.

Q. (BY MR. LAZARUS) Are you aware that plaintiffs' counsel were obligated to disclose their expert witnesses to Apple on March 7, 2025?

MR. BURT: Objection. Calls for a legal conclusion.

A. Restate -- can you repeat?

Q. (BY MR. LAZARUS) Just if you're aware.

Are you aware that plaintiffs' counsel was

Page 201

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

obligated to disclose their expert witnesses to Apple on March 7, 2025?

A. I was not.

Q. Okay. Are you aware that Apple requested access to inspect your code at JND's office in Seattle on May 1 and 2, 2025?

A. I -- I don't know if I'm -- if I was included in -- in that information, but I may have.

Q. Okay. Do you -- do you know where you were on May 1 and 2, 2025?

A. No.

Q. All right. Do you think it is likely that some number of payors in the Apple payor data have provided fictitious contact information in order to protect their own privacy?

MR. BURT: Objection. Form.

A. I -- I don't know how I would be able to speculate on that with any accuracy at all.

Q. (BY MR. LAZARUS) Do you think it's likely that some number of payors in the Apple payor data have engaged in fraud?

MR. BURT: Same objection.

A. I'm -- I also would have no way to speculate with any accuracy on that question.

Q. (BY MR. LAZARUS) Okay. And I'll ask a

Page 202

follow-up question to that.

Do you think it is likely that some number of payors represented in the Apple payor data have entered fictitious contact information as part of committing fraud?

MR. BURT: Objection to form. Foundation.

A. And, again, I don't -- I don't know how -- how I could possibly accurately speculate on -- on that situation.

Q. (BY MR. LAZARUS) Okay. Do you think it is likely that some number of payor records in the Apple payor data were set up by bots and not directly by human operators?

MR. BURT: Objection. Form. Foundation.

A. Similarly, I -- it is -- without deeper access to Apple's systems I would have no way to assess that accurately.

Q. (BY MR. LAZARUS) And when I say, "bots," do you understand I mean computer programs designed to perform automated tasks?

A. I -- I take bots as a term of art in my -- in my industry.

Q. And am I correct that you did not request any

Page 203

additional data in order to identify payor records that might have been created by bots?

MR. BURT: Objection. Form. Foundation.

A. I -- sorry, but -- but based on what it took to get the data I got, I don't see how that was a conceivable thing.

Q. (BY MR. LAZARUS) And not a conceivable thing --

A. To receive additional data from Apple.

Q. And so you did not request any --

A. I requested --

MR. BURT: Object to form. Foundation.

A. I requested no additional data from Apple.

Q. (BY MR. LAZARUS) Do you agree that fraudulent activity, whether by a human operator or by a bot, is more likely to be found where the payor spends money through multiple accounts rather than just one?

MR. BURT: Objection. Form. Foundation.

A. Please -- please restate your question.

Q. (BY MR. LAZARUS) Do you agree that fraudulent activity, whether by a human operator or by a bot, is more likely to be found where the payor spends money through multiple accounts rather than just one account?

Page 204

A. Not my -- not my field of expertise. So I -- I can't speak to fraudulent purchasing.

Q. Okay. Just to ask one follow-up there.

Do you suspect that it is true that fraudsters would tend to set up one account and run all of their frauds out of that one account or set up many accounts?

MR. BURT: Objection. Form. Foundation.

A. Again, I -- other than speculation, I have no -- I have no experience with fraud -- fraudulent purchasing accounts. So I have no -- I have no way to give you a -- a answer that I can have confidence in.

MR. LAZARUS: Okay. So -- okay. Well, I think -- why don't we go off the record and take a break and then come back and we'll see if we have anything else.

THE VIDEOGRAPHER: We are going off the record at 5:11.

(Break from 5:11 p.m. to 5:24 p.m.)

THE VIDEOGRAPHER: We are back on the record. The time is 5:24. Please proceed.

MR. LAZARUS: Thank you.

Q. (BY MR. LAZARUS) Mr. Thompson, you mentioned that in your review and validation of the data that both you and the person, Cameron, who I apologize, the

Page 205

52 (Pages 202 - 205)



last name is --

A. Karlin.

Q. Karlin.

You mentioned that both you and Karlin -- I'm sorry, I'll start over.

You mentioned that both you and Cameron Karlin conducted review and validation of your deduplication results; is that right?

A. That is correct.

Q. And did you and Cameron have any disagreements over any particular finding in that review?

MR. BURT: I'm going to object. And I think that's a discussion within an expert shop and I --

MR. LAZARUS: You're right. You're right. Withdrawn.

Q. (BY MR. LAZARUS) All right. Let me ask this.

Page 206

MR. BURT: Object to form.

Go ahead.

Page 207

MR. BURT: Objection. Form. Foundation.

Page 208

Q. (BY MR. LAZARUS) All right. And then one other point. So I asked earlier where you were on May 1 and 2, and you said you don't have a calendar in front of you.

Do you have your phone with you that -- would you be able to look at your calendar and refresh your memory as to where you --

A. My phone is not on me right this second, no.

Q. All right. We will let that go.

MR. LAZARUS: Okay. Those are all the questions I have. Thank you.

MR. BURT: I think I don't need to take a break to ask what I need to ask. And this will not take very long. Thank you for your patience, Mr. Thompson.

EXAMINATION

BY MR. BURT:

Q. You know who I am, but just so the record's clear, Thomas Burt from Wolf Haldenstein. You know me.

Is this the first engagement you've worked on deduplication for where there were user-generated data

Page 209

53 (Pages 206 - 209)

fields that were some measure of populated with inaccurate, noninformative or nonstandard entries?

MR. LAZARUS: Object to form.

A. This is not the first engagement that I've had to deal with similar data, no.

Q. (BY MR. BURT) In the past, has that happened once or more than once?

A. It has happened more than once.

Q. So early this morning, Mr. Lazarus asked you about your hands-on involvement in the list of engagements that is attached as Appendix B to your report.

Do you generally remember discussing that subject?

A. I do.

Q. And taking not just -- withdrawn. Let me ask you first.

What period's covered by that list?

A. I believe the list is the last four years.

Q. Okay. Taking not just that period, but your entire experience at Garden City and at JND together, can you quantify for me how often you've been the supervisor of the folks doing hand -- hands on deduplication work?

A. Over the entire period, probably well over

Page 210

50 percent of the time. Possibly 60 to 70 percent of the time.

Q. Have you ever taught other people how to do deduplication?

A. I have.

Q. Are the people that you've taught how to do deduplication people who worked on assignments that you've supervised?

A. They were.

Q. And have you ever taught anyone to teach other people the skill set of deduplicating?

A. People that I have taught have become managers that then taught others, yes.

Q. Okay. Are there any of the engagements that are listed in your Exhibit B to your report engagements where the people doing the hands-on deduplication were taught to do it by the people that you taught how to teach it?

A. Most certainly, yes.

MR. BURT: Unless Mr. Lazarus has more questions, I do not.

MR. LAZARUS: I do not either.

MR. BURT: We're off the record.

THE VIDEOGRAPHER: Before we conclude, can we please get orders on the record?

Page 211

MR. LAZARUS: What does that mean?

THE VIDEOGRAPHER: Transcript order -- transcript orders and video orders.

MR. LAZARUS: So we would like the rough transcript as soon as it can be delivered today. And the -- an expedited transcript tomorrow, if that's -- and then in terms of video --

THE VIDEOGRAPHER: Copy or sync?

MR. LAZARUS: I think we want a copy. Is that what we have done for other depositions?

THE VIDEOGRAPHER: Yeah, I don't know what your standing order is -- or if there is a standing order, what it is.

MR. LAZARUS: Do you know, Ramona?

MS. LIN: No idea. It's a standing order.

THE VIDEOGRAPHER: Okay. I will have them check. All right.

MR. LAZARUS: Okay. Thank you.

MR. BURT: Rough and regular on the transcript. Video, we'll circle back.

THE VIDEOGRAPHER: Okay. All right. Thank you, everyone.

This concludes today's testimony of Darryl Thompson. The total number of media units used

Page 212

was five and will be retained by Veritext. We're going off the record at 5:35.

(Deposition concluded at 5:35 p.m.)

(Signature was reserved.)

Page 213

54 (Pages 210 - 213)

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

REPORTER'S CERTIFICATE

I, CARLA R. WALLAT, CCR, CSR, RPR, CRR, the undersigned Certified Court Reporter, authorized to administer oaths and affirmations in and for the states of Washington (2578), Oregon (16-0443), and California (14423) do hereby certify:

That the sworn testimony and/or proceedings, a transcript of which is attached, was given before me at the time and place stated therein; that any and/or all witness(es) were duly sworn to testify to the truth; that the sworn testimony and/or proceedings were by me stenographically recorded and transcribed under my supervision. That the foregoing transcript contains a full, true, and accurate record of all the sworn testimony and/or proceedings given and occurring at the time and place stated in the transcript; that a review of which was requested; that I am in no way related to any party to the matter, nor to any counsel, nor do I have any financial interest in the event of the cause.

WITNESS MY HAND AND DIGITAL SIGNATURE this 6th day of June, 2025.

*Carla R. Wallat*

CARLA R. WALLAT, RPR, CRR

Washington CCR #2578, Expires 1/5/2026

Oregon CSR #16-0443, Expires 9/30/2027

California CSR #14423, Expires 1/31/2026

Page 214

---

THOMAS H. BURT

burt@whafh.com

June 6, 2025

RE: In Re Apple Iphone Antitrust Litigation

6/5/2025, Darryl Thompson, (#7376385).

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, noting the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 215

---

xx Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, noting the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 216

---

I declare under penalty of perjury under the laws that the foregoing is true and correct.

Executed on _____ , 20___,

at _____, _____.

_____

Darryl Thompson

Page 217

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

In Re Apple Iphone Antitrust Litigation

Darryl Thompson (#7376385)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

(Darryl Thompson)          Date

Page 218

56 (Page 218)

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

**[& - 17,683]**

| **&** |
|---|
| **&**  2:4,8,14,18 8:6,13,16 129:13 215:24 216:10 |

| **0** |
|---|
| **0**  132:14 |
| **06714**  1:5 7:17 |

| **1** |
|---|
| **1**  1:25 3:14 7:12 14:4 22:17,21 72:21 77:15 78:11 89:21 142:24 142:25 145:3 150:11 151:2 201:11 202:6 202:10 209:6 216:1 |
| **1,000**  137:13,20 |
| **1.44**  140:25 |
| **1.5**  41:10 |
| **1.69**  81:13 189:8 |
| **1.7**  105:22 |
| **1/15/2025**  6:16 |
| **1/2**  181:10 |
| **1/31/2026** 214:25 |
| **1/5/2026** 214:23 |
| **10**  70:4,7 80:4 96:14 106:8 118:5,8,11 |

138:10,12 139:16
**100**  26:25 27:1 84:6 99:13,17 99:24 100:3
**100,000**  133:25 137:23
**10016**  2:5
**10767813**  4:8 4:15,22 5:5,12 5:19 6:5,12
**10809581**  4:9 4:16,23 5:6,13 5:20 6:6,13
**10857484**  4:10 4:17,24 5:7,14 5:21 6:7,14
**10864885**  4:11 4:18,25 5:8,15 5:22 6:8,15
**10:42**  64:23,24
**10:58**  64:24 65:1
**10b**  72:14 125:21
**11**  26:11,11
**112**  3:10 14:5,6 74:5 129:1
**113**  3:13 18:18 18:20,21,22 88:20,21 90:19 126:14 128:22 128:23 129:2 129:23 169:19

**114**  3:14 33:10 33:11 59:18 200:14
**115**  3:18 46:24 47:1
**116**  3:22 72:15 72:18 77:16 125:22,22
**117**  3:23 79:23 80:1 81:7 82:19 136:6
**118**  4:2 84:21
**119**  4:5 148:12 149:12,13 150:14
**120**  4:12 149:9 149:14,16 150:14
**1200**  1:13 7:18 132:17
**1201**  132:17
**121**  4:19 150:2 150:3,4,5,14
**122**  5:2 153:19 153:20
**123**  5:9 154:7,8 154:9 182:3
**124**  5:16 156:3 156:4,5 157:18 157:21 159:4 163:10
**125**  6:2 156:18 156:19 157:5,7 157:18,21 159:5 163:10

**126**  6:9 158:14 158:15,16 159:5 163:10
**127**  6:16 196:6 196:7,24 197:1
**128**  6:18 199:2 199:3
**12:01**  98:6,7
**12:45**  98:8
**12:49**  99:2,6
**13**  139:18
**14**  3:10 138:22
**14423**  1:22 214:5,25
**148**  4:5
**149**  4:12
**15**  42:19 95:22 175:1 196:9
**150**  4:19
**153**  5:2
**154**  5:9
**156**  5:16 6:2
**158**  6:9
**16**  3:11 70:23 71:1 136:8,10 137:10
**16-0443**  1:22 214:5,24
**1615**  2:9
**17**  18:17 70:23 71:2 80:18 128:19,25 129:1,3
**17,683**  153:8

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[1700 - 7376385]**

**1700** 2:19
**17a** 132:18
**17b** 129:17,24
**17e** 131:3,25
  132:6,9 140:9
  176:6 177:18
  179:10
**17f** 101:5,16
  102:3 131:6
  132:7 142:21
**17g** 184:19
**18** 3:13 79:5,10
**18c** 33:5
**196** 6:16
**19863** 214:21
**199** 6:18
**1996** 23:6,10
**1998** 28:14
**19a** 148:11
**19b** 149:7
**19g** 153:17
**1:48** 128:13,14
**1st** 125:23

**2**

**2** 26:2 46:23
  85:1,10 202:6
  202:10 209:6
**20** 116:17
  164:6 217:5
**200** 180:14
**2001** 33:13
**20036** 2:9,19
**2010** 28:15
  30:6

**2016** 30:6
**202.326.7900**
  2:10
**202.955.8500**
  2:20
**2024** 47:3 64:2
  64:3 72:21
  80:4 125:23
**2025** 1:12 3:12
  6:19 7:1,6
  18:12 193:18
  194:11,19,21
  196:9 199:6
  201:20 202:2,6
  202:10 214:19
  215:3
**2025.520** 215:9
  215:12
**209** 3:5
**21** 194:21
**212.545.4600**
  2:6
**218** 1:25
**21st** 194:11
**23** 34:6,9,22
  35:2
**24** 36:3,12,13
  36:13,15
**243,646,638**
  193:11
**246** 193:8,13
**249** 154:3,17
**25** 22:19 23:4
  27:3,4 36:11

**2578** 1:22
  214:4,23
**26** 59:23
**2600** 2:14
**270** 2:5
**28** 18:12
**290** 188:14,17
  188:24
**2:06** 128:14,16

**3**

**3** 22:21,22
  33:13 70:8
  79:22 201:11
**30** 216:1
**33** 3:14
**35** 45:21
**395** 65:7,10
**3:31** 169:13,14
**3:51** 169:14,16

**4**

**4** 51:14 53:9
  56:12 72:25
  78:11 84:17
**400** 2:9 132:14
**401** 132:16
**415.393.8200**
  2:15
**42,555** 153:8,10
**43.5** 181:13
**43rd** 181:7,9
**47** 3:18
**4:11** 1:5 7:17
**4:48** 196:18,19

**4:52** 196:19,21

**5**

**5** 1:12 7:1 40:3
  42:21 47:4
  130:7 193:18
  194:19
**5.sql** 130:8
**50** 180:9 211:1
**51** 180:9
**5315** 156:10,11
  157:12 158:23
**5:11** 205:18,19
**5:24** 205:19,21
**5:35** 213:2,3
**5th** 7:6

**6**

**6** 26:1,5 47:3
  47:21 193:18
  194:19 215:3
**6/5/2025** 215:5
**60** 211:1
**610** 1:13 7:18
**6th** 214:18

**7**

**7** 6:19 14:18
  199:5 201:20
  202:2
**7/10/2024** 3:23
  4:2
**70** 211:1
**72** 3:22
**7376385** 1:23
  215:5 218:2

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

**[75 - additional]**

**75** 27:3
**76.5** 47:23
**78** 37:18,19
**7d** 125:25
126:9

**8**

**8** 74:7 77:21
78:1,23 92:10
92:14 199:11
201:11
**80** 3:23 97:19
**800** 132:16
**801** 132:16
**84** 4:2

**9**

**9** 3:4 74:7 78:2
78:3 79:5
93:22 94:3,8
94:15,17,25
116:8 117:1,5
199:2
**9/30/2027**
214:24
**90** 169:9
**94111** 2:15
**99** 34:4
**9:05** 1:11 7:2,6

**a**

**a.m.** 1:11 7:2,6
64:24,24
**abbreviated**
159:7 182:5,6
**abbreviation**
180:17

**ability** 38:16
95:13 96:10
121:24 127:5
145:22 171:15
189:10 208:11
**able** 61:14
88:12 101:22
102:25 103:13
147:13 175:14
202:17 209:9
**above** 215:6
**absolutely** 27:1
170:17
**accept** 18:14
200:23
**accepted**
117:24 138:13
138:19,20
139:8
**access** 54:25
145:20,22
193:21 194:18
202:5 203:17
**accomplished**
130:17
**accomplishes**
129:23
**accord** 36:7
**account** 82:22
83:1,3,6,8,9,16
83:17,18 117:8
117:15 161:2,5
204:25 205:5,6
**accountholder**
83:10

**accounts** 153:8
204:18,25
205:6,11
**accreditations**
24:6
**accuracy** 38:12
200:23 202:18
202:24
**accurate**
103:20 112:18
125:9,10
200:22 206:24
209:2 214:12
**accurately** 73:7
73:13,16,21
108:2 203:9,19
**achieve** 19:8
60:1 62:3
97:18 127:12
**achieving** 38:1
38:8 60:11
**acquired** 30:15
**action** 7:23
9:23 24:17
26:6 32:20
34:9 36:5
37:16 74:2
134:2,10,13,14
**active** 76:15
**activity** 19:17
49:4 204:16,23
**actual** 19:17
25:11 84:5,5
137:5 180:16

**actually** 9:17
19:16 27:5
32:23 63:2,15
72:1 74:3
87:24 103:2
108:18 115:14
115:15 128:7
146:19 151:21
164:7
**adaptis** 28:16
28:18,19,24
29:4,6,9,10,15
29:16,17
**add** 104:6
135:18 167:4
189:19 190:1
**added** 77:13
137:9 140:4,5
195:16
**addition** 20:20
77:12 120:9
**additional**
19:15 38:21
39:3,7,16
96:24 97:22
101:10,11
102:7,8,9,12,13
102:18,20,24
103:13,21,25
104:6,6,15,17
105:5,10,11,16
106:5,15 107:7
107:20 108:8,8
121:10,13,22
121:25 122:7

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

**[additional - agree]**

137:3 140:5,6
141:13 143:3,8
145:1 151:23
162:25 163:23
167:4,12 172:7
172:22 186:5
187:11 195:13
204:1,10,14
**additionally**
13:6 141:11
142:11
**address** 27:12
32:2,5 45:15
45:17 46:11
52:12,16 54:9
54:17,20 89:22
89:24,25 90:7
90:8,8,21
91:22 92:2
110:13,18,23
111:2,4,16,17
111:21,24,25
112:4,7,10,14
112:16 113:7
114:12,15,18
114:21 115:1,5
115:5 116:5
120:10,13
121:21 129:4
129:18 130:10
133:3 134:16
134:18,19
142:14 145:2,3
146:15 148:5,6
148:6 149:4,4

149:21 150:10
154:3,17,23,23
154:25 155:11
155:21 156:10
156:14 157:12
157:15,19
158:10,23
159:1,6 176:8
176:23 178:5
179:11,25
180:8 182:3,15
182:16 184:22
184:23 186:11
186:13,17
187:14 188:11
188:25 189:12
189:18,20,25
190:1 191:4,11
191:15,20
192:4,11 207:4
**addresses** 28:3
54:11 85:16
86:23,25 87:3
87:9 89:6,14
89:18 90:1,4,5
90:10,12 91:12
111:10,12
113:25 114:8
120:14 121:22
180:21 181:1
186:8 187:20
187:24 191:16
191:25
**addressing**
115:1

**adequate** 96:25
101:2
**adjust** 178:2
**adjustment**
209:3
**adjustments**
180:15
**adler** 2:4 8:13
**administer**
49:18 50:20
51:3 214:3
**administered**
35:25 54:21
**administering**
9:24 48:1,11
198:3
**administration**
9:23 20:3
24:11,15,16,17
25:1,3,3,7,20
25:21 28:20
30:11 32:13,14
32:15,17,20
34:8,21 35:6
35:12,14 37:1
37:5 38:2,7
41:19 49:7
50:5,13 51:2
59:21 61:11
67:2,7,11,18,21
67:24,24 70:18
104:10,10
117:25 118:14
118:19 138:14
138:23,24

139:1 198:9,12
198:21,22
**administrations**
26:7 35:24
38:14 113:24
**administrator**
37:10,11,23
39:23 197:6,8
197:11,19
198:16,17
**adopted** 15:21
**advanced**
23:16 121:21
**advantage**
139:13
**advise** 122:25
**affect** 44:7
171:21,22
172:11 173:17
**affiliated** 47:13
**affiliations** 8:3
**affirmations**
214:4
**afternoon** 99:1
**agency** 71:14
71:19
**aggressive**
122:3,25
**ago** 9:19 13:7
42:3 51:18
56:17 64:1
75:16 92:1,2
**agree** 7:11
44:16 46:8
49:15 55:16,18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[agree - appearing]**

55:24 105:18 106:3 110:8 111:13 145:25 146:6,13 147:8 150:13 151:4 152:1,5 157:19 158:7,11,11 160:8,25 161:5 162:14 180:8 181:8,14,16,21 204:15,22

**agreed** 42:23 43:18,25 44:13

**ahead** 18:16 77:2 197:15 207:2

**aip** 130:2

**air** 127:23 128:1 142:18 145:21 190:5 193:22

**al** 155:19

**algorithm** 73:3 77:19 109:13 129:4,18 132:1 140:10,20 141:23 142:22 146:25 147:13 147:19 155:19 155:23 176:7

**algorithmically** 141:19,22

**algorithms** 131:11 142:3,7

**align** 100:21

**alink** 2:11

**allow** 126:18 145:18

**alternative** 44:1

**alternatives** 113:3

**amended** 71:23 72:4

**amount** 48:17 88:16 104:20 176:19 208:9

**analyses** 20:17 21:2 208:20

**analysis** 11:7 19:20 20:22 21:11 29:16 41:20 53:10 57:19,21,24 58:17 69:14 90:13 99:12 100:2 105:14 106:4 107:6 108:8,14,24 113:14 120:11 121:11 122:20 126:17,19 135:15 141:12 145:10,12 167:10 173:8 178:1,24,25 201:3 206:20 207:17,22 208:3,4

**analyst** 29:11

**analyze** 86:6 133:8 174:16 178:17

**analyzed** 42:23 59:25 62:1 91:13 152:19 178:17

**analyzing** 101:21 207:14

**anna** 2:8 65:3

**anomalous** 178:2 184:1

**anonymized** 94:11 116:12

**answer** 11:13 11:20 12:8 15:13 16:25 17:10,12 26:23 27:20 29:2 34:16 44:4 49:14 66:19 77:3 84:2 123:13 137:16 141:25 144:24 146:4 161:10 165:20 167:22 180:23 184:14 205:12

**answered** 11:15 19:23 67:13 106:18 119:1

**answering** 75:5 75:12

**antitrust** 1:5 3:15,19 7:14 33:21 46:16 47:7 215:4 218:1

**apl** 4:8,9,10,11 4:15,16,17,18 4:22,23,24,25 5:5,6,7,8,12,13 5:14,15,19,20 5:21,22 6:5,6,7 6:8,12,13,14,15

**apologies** 13:10 72:5 180:4

**apologize** 41:5 163:7 196:11 205:25

**app** 71:18,18 79:1 92:12 93:3

**appear** 46:17 68:20 78:10 89:13 91:11 148:20 157:25 180:21 181:17 181:20

**appearance** 8:1

**appearances** 8:3

**appeared** 82:10 86:22 87:9 91:23 136:21

**appearing** 215:18 216:7

[appears - asked]

appears  14:17
41:23 47:12
77:17,18
150:25
appendix  26:3
26:6,11 28:8
46:17 63:1,10
210:11
appetite  122:5
apple  1:4 4:6
4:13,20 5:3,10
5:17 6:3,10
7:14 8:6 12:14
12:18 21:4,7
39:23,24 40:7
41:7 42:9,11
42:13 44:25
51:8,21 52:9
52:20,23 53:4
56:22 57:1,11
58:16 68:19
70:5,9,20
71:14 73:2
76:15 78:24
79:2,13,14,17
79:20 80:15,22
82:15,25 83:2
83:2,3,7,8,9,9
83:10,17,17,18
83:25 84:12,13
85:11,13,14,15
85:18 86:1,5,9
86:13,18,21
89:22 90:5,8
90:12 91:12

92:4,13,23
93:1,10,14,18
95:25 96:15
97:10,12 99:12
100:4 117:20
120:9,20 122:4
130:3,7,8,9
134:6 142:16
143:13,18
147:21 148:14
148:18 149:17
153:22 154:10
156:21 158:17
163:17 172:19
175:4 176:25
179:6 180:24
186:20 188:25
189:16,21
190:7,13 191:2
191:23 192:3
192:13,19
193:11 194:23
194:24 195:17
195:22 198:1
201:20 202:1,4
202:13,20
203:3,12
204:10,14
215:4 218:1
apple's  17:23
21:7 58:16
89:20,24 90:7
90:11 125:17
126:18 134:16
150:10 159:18

159:20 173:23
174:5 190:22
193:17 194:1
194:18,20
203:18
applicable
168:20,23
application
168:8
applied  52:18
77:11 86:1,5,9
86:13 139:17
139:23,23
168:8
applies  168:19
apply  43:4,15
55:18 107:7
108:16 109:8
113:24 131:13
131:21 141:14
175:14,17
applying  55:13
95:15 100:24
131:17,18
175:23
appreciated
17:19
approach
108:3 109:18
109:19
appropriate
61:5,10,13
152:2
approximate
127:6

approximately
9:19 64:1,2,3
75:16 137:10
139:18 193:7
193:13
apps  79:1
92:12 93:3,3
appstore  4:8,9
4:10,11,15,16
4:17,18,22,23
4:24,25 5:5,6,7
5:8,12,13,14,15
5:19,20,21,22
6:5,6,7,8,12,13
6:14,15
april  3:11
area  135:12,22
135:24 137:12
137:19 147:25
165:22
areas  43:10
166:17
arena  29:10
art  203:23
arts  23:6
ascii  87:19 92:6
130:5 169:21
170:23 171:1
171:16
ascii.sql  130:4
asked  11:20
16:21 19:10,22
63:4 67:12
73:14 74:9
95:6 106:17

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

**[asked - b]**

118:25 209:5
210:9

**asking** 12:7
17:3 74:20,21
74:25 75:11
83:15,19 94:16
94:18 96:7
105:21 107:25
119:5 122:18
146:5 167:19

**assembled**
100:25

**assertion** 22:25

**assess** 177:13
203:18

**assigned**
116:22 195:11
195:14 198:20
198:23,23

**assigning**
113:11 123:1

**assignment**
62:22 63:20
69:23 74:9,12
75:1,5,9,13,17
75:21 76:1,7
76:24 77:7,9
78:16 85:25
94:18 95:5
96:6,7,9
122:19 125:3
135:10 208:18

**assignments**
78:18 211:7

**assist** 69:19
198:20

**assisted** 69:5
141:3

**assisting**
198:22

**associate** 78:7
94:1

**associated**
82:22 137:13
137:19 162:12
163:19 189:19
189:25

**association**
28:12 111:1

**assume** 11:14
47:14,18 56:6
160:7 177:14
197:11

**assumed**
143:12

**assuming** 162:8

**assumptions**
122:9,14
143:10,23

**attached**
210:11 214:7

**attempt** 87:13
90:14 118:11
129:5,19 162:2
162:23 164:10
179:23 208:9

**attempted**
165:23 166:1
208:18

**attempting**
134:20 167:13
169:5

**attempts**
186:11

**attended** 47:11

**attorney** 8:4
17:7,25 74:18

**attorneys** 1:7
12:14

**audible** 93:9

**audio** 7:9

**august** 72:21
77:15 78:11
125:23

**austin** 149:4

**author** 168:2
197:10 199:13
199:20

**authored** 24:1

**authorized**
214:3

**automated**
203:22

**automatically**
186:24 187:6

**available** 60:19
87:12 100:6,20
101:24 102:2
106:2 109:20
109:24 120:25
140:11 145:18
147:21 159:15
161:21 162:11
168:24 170:11

175:17,24
177:20 182:19
182:21,24
184:9,22
189:15,16,17
189:17 190:13
190:22

**ave** 154:3,17
157:12

**avenue** 1:13 2:5
7:18 156:11,11
158:24,24
159:6

**aware** 10:10
20:12 34:9,22
35:2,4 54:23
65:18,20,23,24
67:4 78:13
83:19,21 92:22
109:9 110:16
110:21,25
111:16 112:6
112:20 113:5,6
113:8 114:6,10
114:14,17,20
114:25 115:9
116:4 118:15
118:22 160:20
185:24 188:6,9
201:18,24,25
202:4

**b**

**b** 4:5 26:2,3,6
26:11 28:8
46:17 63:1,10

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[b - billed]**

129:9 154:12
210:11 211:15
216:1
**bachelor**  23:6
**bachelor's**
23:13
**back**  20:1,19
59:17 64:25
65:5 72:12
74:5 82:15
89:5 91:24
93:20 95:14
99:5 105:2,10
106:7 125:8,20
128:8,15 136:5
141:17 149:2
162:5 167:17
169:15,18
187:23 189:20
190:2,5 192:8
195:21 196:1
196:20 198:1
205:15,20
212:21
**backfill**  130:10
**background**
16:20 20:2
**backing**  43:9
**backup**  20:21
134:5 194:6,10
194:17,20
**backwards**
59:16
**ballpark**  63:25
68:5 75:15

114:4 188:20
**bank**  56:6
161:2,4
**banks**  55:12
56:1
**based**  26:15
34:8,21 36:4,7
44:21,21 77:11
95:13 101:1,23
104:8 110:1
119:9 131:11
131:14 134:11
136:1 140:8,13
141:25 147:2
147:14 152:3
152:13 155:8
161:21 175:16
175:24 176:2
176:18 177:3,6
177:8 178:20
181:4 183:12
189:3 204:5
**bases**  18:8
**basic**  144:17
**basically**  171:7
186:12
**basis**  17:2
76:19 92:16
164:4
**bcbs**  45:8
**bear**  184:8,16
**beaver**  154:4
154:18
**began**  85:24
86:5

**beginning**  8:4
85:10 197:22
**believe**  10:22
13:22 15:18
18:10 19:6
21:14,16,20,21
22:1 26:22
27:4 31:17,22
33:23 35:15
36:13,23 37:14
37:22 40:2,18
43:7 44:19,20
44:21 46:20
47:10 50:25
61:12,22 62:9
62:10,19 65:9
67:8,15 73:18
74:11 78:17
80:17 85:1
88:15 89:15
90:3,14 91:18
92:19 94:23
95:11 96:3,5
103:6,19,20
108:5 110:6
111:22,23
113:10 115:12
116:2 119:25
121:4 122:2,4
124:17,21
130:7 132:5
137:2 143:20
144:21 145:20
155:9,21,23
159:13 165:8,8

165:13,18
168:18 172:12
174:9,17
176:15 186:2
191:13 192:6
192:23 201:5,8
206:18,21
207:4 210:19
**benefit**  33:1
37:1,6,21,23
104:19 105:16
108:9
**benefits**  37:10
148:5
**benefitted**
121:22
**best**  12:3 34:10
34:23 35:7,19
36:7 75:15
95:13 96:10
127:5 171:15
189:9 207:15
207:19 208:10
**better**  31:23,25
43:16 185:18
195:3
**beyond**  23:12
106:1 123:12
**big**  37:18 54:18
121:20,25
127:25
**bill**  145:14
161:4
**billed**  65:13

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

**[billing - burt]**

**billing** 65:7 66:11 81:7 82:11 116:19 116:20,21 117:3,19 163:18,20 183:1,2,10,11 183:13,21 184:11 192:25 192:25 195:9 195:10,23,25 197:24 198:2

**billion** 81:13 105:22 140:25 189:8

**bills** 161:2

**bio** 16:13,15,17 199:24

**biography** 16:18

**bit** 59:17

**blank** 134:25 135:8 137:8

**blanks** 136:13

**bleed** 32:10

**blue** 3:14,15,18 3:19 33:20,20 45:3,3,6,11,12 45:21,22,23,24 45:25,25 46:2 46:2,3,3,6,6,16 46:16 47:6,6 47:15,16 48:4 48:4,20,21 49:10,11 51:6

51:6,9,9,15,15 52:8,8,19,19,22 52:22 53:1,1,3 53:3 62:12,13 91:9,10,13 92:1,1,5,7 200:13,13,16 200:16

**bob** 146:17,17 146:18

**bot** 204:16,23

**bots** 203:13,20 203:23 204:2

**bottom** 47:4 84:10 172:21 197:3

**brattle** 124:17

**breach** 45:4 53:8,16 55:5

**break** 11:20,21 59:2,2,5,8 64:18,24 128:10,14 144:8 161:10 169:11,14 183:17 189:24 196:19 205:15 205:19 209:16

**breaks** 11:18

**brian** 148:22 149:1,3

**broad** 27:20 68:17 152:13

**brought** 16:14 193:25 194:5

**bruegge** 2:25 8:10

**bucks** 164:6

**build** 100:20

**built** 100:20 101:2 107:9

**bunch** 99:11

**bundles** 176:25

**bundling** 180:1

**bureau's** 122:1

**bureaus** 54:19 121:20

**burt** 2:4,6 3:5 8:12,12 10:20 12:17 15:11 16:12,24 17:3 17:7,11,17,20 17:25 18:18,20 19:4,13,22 20:11,24 26:18 27:9,18 29:1 31:16 33:6 34:14 35:23 36:22 37:4 39:19 44:3,9 44:18 46:12 48:12,25 49:20 50:6,18 51:22 55:22 56:4 57:25 58:23 59:1,10 60:16 61:7 62:17 64:6 65:17 66:5,17 67:12 68:22 70:8,16

71:6,11 73:15 74:16,24 75:4 75:10,23 76:3 76:9,12 77:1 84:1 88:20 90:6 91:15 94:22 95:10,20 99:25 100:13 100:18 103:18 104:22 106:17 107:15 109:3 112:24 113:4 115:19,21 117:4,12 118:25 121:12 121:15 122:21 123:11 125:19 128:22 132:4 132:25 137:14 139:25 140:21 141:20 144:6 151:7,19 159:17 160:13 161:7 162:4,17 163:2 165:10 169:8 173:25 174:7 183:14 185:11 187:21 191:12 198:13 199:14 201:15 201:21 202:16 202:22 203:6 203:15 204:3 204:13,19 205:7 206:12

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[burt - certainly]**

207:1 208:21 209:15,21,23 210:6 211:20 211:23 212:20 215:1,2

**business** 28:1,2 28:6 84:13 85:14

**businesses** 28:3 28:3,12

**byrd** 3:24 4:3

**c**

**c** 2:1 69:12 87:4 129:9,17,24 149:8

**ca** 1:22 215:9 215:12,21

**caeli** 2:13 8:9

**calculations** 198:1

**calendar** 194:14 209:6,9

**california** 1:2 2:15 7:16 150:11 214:5 214:25

**call** 14:21 47:10 124:20 207:9

**called** 28:15

**calling** 74:17

**calls** 34:15 57:25 201:21

**cameron** 69:8 69:14,15,17,22

71:9 141:3,4 141:16 179:3 205:25 206:6 206:10

**capture** 170:25

**card** 42:14 55:12 93:16 138:6 158:9 160:9,21 161:1 161:2,3,4,24 164:3,6 178:10

**cardholder** 162:10

**cards** 93:12 178:10

**care** 28:19 118:18

**carla** 1:21 7:22 214:2,22

**carried** 136:17 141:2 142:3

**carry** 37:20

**case** 1:4 7:17 9:16,17 10:6,9 10:12,12 11:3 14:16 16:22 17:24 18:5 19:3,12,20 20:14,22 32:22 39:9,18 40:7,8 40:13,13,14,15 40:17,20,21 41:14,17,20,22 42:2,11,14 43:8,22 48:1

48:23 49:1,3,9 51:7,8,21 52:1 52:2,9,9,20 53:19,25 54:11 56:9,13,21,22 57:1,1,6,7,10 57:11 58:17 61:20 62:6,13 62:22 63:6,6 63:10,14 64:5 64:13 66:4,9 66:14 67:2,7 67:11,18 68:10 68:15,18 71:22 71:24 73:1,14 74:10 75:9,22 76:2,7,8,25 85:25 100:3 113:14 117:23 120:3,10,11,23 121:14 123:19 124:9,19 125:3 125:6 127:20 160:7,11 165:18 167:14 168:6 170:19 171:25 183:1 184:12 185:21 198:9,12

**cases** 10:14 24:18 25:7,13 26:12,16,20 27:6,15 28:8 39:23 40:3 48:16,18,24

52:18 62:25 63:1 92:9 206:22 208:16

**catching** 103:9

**categorically** 167:7

**cause** 184:5 214:17

**cautious** 208:10

**caveat** 146:9

**ccp** 215:9,12

**ccr** 1:22 214:2 214:23

**cease** 30:14

**center** 2:14 49:5

**ceo** 59:20

**certain** 15:5 97:14 143:21 162:20 173:9 173:19,22 174:4 191:7 206:20

**certainly** 24:13 57:3 130:1 134:8 137:21 142:18 147:12 160:10 166:8 166:11,16 170:4,20 172:16 173:19 174:22 192:1 195:15 200:7 211:19

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[certainty - cleanse]**

| | | | |
|---|---|---|---|
| **certainty** 84:6 | **characterizati...** | **city** 30:7,9,10 | 25:19 26:6 |
| **certificate** | 15:12 68:24 | 30:21 31:1,5,7 | 32:20 33:21 |
| 214:1 | 131:23 185:11 | 31:11,14 80:19 | 34:9,22 35:8 |
| **certifications** | **characters** | 112:14,17,19 | 35:15,20 36:5 |
| 24:6 | 87:19 | 145:4 148:6 | 37:22 38:2,7 |
| **certified** 2:3 | **charged** 93:20 | 151:1 176:9 | 38:14 41:6 |
| 8:14,16,23 | **chase** 156:14 | 179:11 210:21 | 42:16 43:7 |
| 65:4,22 214:3 | 157:16 159:2 | **civil** 215:19,21 | 49:3,5,16 50:4 |
| **certify** 214:5 | **check** 180:5 | **claim** 37:5 | 50:5,13,13,21 |
| **change** 54:17 | 184:19 188:12 | **claiming** | 51:1,2,4 53:14 |
| 54:20 65:20,25 | 206:22 212:18 | 138:19 | 61:18 65:4,21 |
| 75:22 76:1,7 | **checked** 54:11 | **claims** 25:7 | 92:21 162:9,19 |
| 76:24 77:7 | 184:21 190:11 | 28:19 30:10 | 163:22,24 |
| 120:10,13 | 190:19 | 32:13,14,15,17 | 164:2 198:3 |
| 127:11 173:20 | **checking** | 32:24,25,25 | **classes** 50:20 |
| 174:15 177:15 | 191:10 | 34:8,21 35:6 | **classify** 192:7 |
| 178:12 184:23 | **checks** 186:25 | 36:25 37:9,11 | **clean** 118:11,16 |
| 185:16 186:16 | **chevy** 156:14 | 39:22 48:1,11 | 118:19,23 |
| 189:11,18,25 | 157:16 159:2 | 49:4,18 61:11 | 135:12,16 |
| 191:3 198:10 | **chief** 24:20,20 | 67:1,6,11,17,20 | 167:14 168:5 |
| 201:13 218:4,7 | **chigney** 2:16 | 67:23,24 | **cleaned** 109:15 |
| 218:10,13,16 | **child** 161:3 | 104:10 117:25 | 111:10,16 |
| 218:19 | **choice** 44:6 | 118:14,18 | 112:4,10 130:3 |
| **changed** | **chosen** 176:16 | 138:14,22,24 | 130:7,8,9 |
| 179:20 191:20 | **chris** 2:25 8:10 | 197:6,8,11,19 | **cleaning** 51:25 |
| 191:25 192:4 | **cindy** 5:16 6:2 | 198:9,12,16,21 | 56:25 69:2 |
| **changes** 126:19 | 6:9 | 198:22 | 89:2 91:6 |
| 131:17,18 | **cio** 29:9 31:5 | **clarify** 22:4 | 119:4 166:4,4 |
| 139:22 140:3 | **circle** 212:21 | 111:3 191:16 | 166:7,14,21 |
| 191:11,15 | **circumstances** | **clarity** 75:18 | 167:2 187:14 |
| 198:14 | 34:11,24 35:7 | 114:22 135:24 | **cleanse** 32:2 |
| **character** | 35:19 | 141:21 195:25 | 68:19 87:11,14 |
| 170:23 171:1,8 | **cities** 176:23 | **class** 2:3 8:14 | 87:15 88:14 |
| 171:8 | 181:18,20,22 | 8:17 9:23 | 108:16 118:13 |
| | | 10:24 24:17 | 125:11 171:4 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[cleansed - compare]**

| | | | |
|---|---|---|---|
| **cleansed** | 126:19 127:9 | **collects** 55:15 | **commenting** |
| 132:14 171:15 | 127:11 129:22 | 78:25 | 170:7,9 171:20 |
| **cleansing** 32:5 | 130:19 134:3 | **college** 154:3 | 172:18 173:16 |
| 87:22,23 88:4 | 134:22 135:12 | 154:17 | 173:19,21 |
| 88:4 90:13 | 135:13,22,24 | **column** 150:21 | 174:3 |
| 107:7 119:10 | 137:12,19 | **columns** | **committing** |
| 119:12 125:6,7 | 142:4,5,8,15,16 | 192:21 | 203:4 |
| 125:8 129:4,18 | 143:2,5 148:1 | **combination** | **common** |
| 129:24 130:1,2 | 148:7 151:2 | 109:14 140:11 | 114:15 133:11 |
| 130:4,11,15,17 | 167:12,14,24 | **combinations** | 133:16,17 |
| 130:18 140:5,7 | 167:25 168:1,5 | 182:8 188:11 | 134:11 151:10 |
| 141:13 143:3 | 170:11,14,21 | 188:25 | 179:20 |
| 166:17,22 | 171:3,21,22,23 | **combine** 36:8 | **commonly** |
| 182:13 189:4 | 172:2,11,13,23 | 37:15 | 110:25 111:17 |
| **cleansing.sql.** | 172:25 173:6 | **combined** 32:9 | 113:18 |
| 130:2 | 173:17,18,20 | 112:14 | **communicated** |
| **cleanup.sql.** | 173:22 174:4,9 | **combining** | 92:19,20 95:23 |
| 130:5 | 176:9,24 179:7 | 179:24 | 97:9 175:3 |
| **clear** 45:10 | 179:12 181:21 | **come** 14:7 20:1 | 187:5 |
| 173:7 198:24 | 192:20,23,24 | 72:12 81:1 | **communicating** |
| 209:23 | 194:25 202:5 | 89:5 127:8 | 60:17 |
| **closely** 41:18 | 215:9,12,19,21 | 188:17 199:25 | **communication** |
| **closer** 27:3,4 | **coded** 103:22 | 199:25 205:15 | 74:18 |
| **clue** 30:19 | 142:18 146:10 | **comes** 128:5 | **communicati...** |
| **code** 12:20,24 | 181:3 | 188:18 | 40:12 71:14,18 |
| 13:13 19:6,7 | **coder** 167:24 | **coming** 124:4 | 75:11 |
| 19:14,18 20:6 | **coding** 112:22 | **commenced** | **companies** |
| 20:25 21:23 | 112:25 113:1 | 71:1 124:22 | 55:13 139:7 |
| 33:7 38:25 | 167:10 | **comment** 153:1 | **company** 9:23 |
| 58:16 80:20 | **colleague** 8:7 | 169:21 170:2 | 24:12 28:15,20 |
| 87:22 88:4,9 | 80:3 136:6 | **commented** | 28:22,23 30:11 |
| 88:14,16 89:1 | **collected** 92:23 | 172:1,8,10,14 | 70:17 |
| 91:6 101:23 | **collection** | 172:23 173:1 | **compare** 84:5 |
| 112:15,15,17 | 111:13 142:7 | 173:13 174:14 | 178:22 208:2 |
| 112:18 126:16 | 153:8 | | 208:24 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

**[compared - consumers]**

| | | | |
|---|---|---|---|
| **compared** 48:16 58:4 | **computer** 9:7 20:21 21:3,6 21:13,23 53:16 127:19 145:21 170:2 189:20 190:2,8 193:22 194:1,19 203:21 | **conduct** 21:11 26:14,21 87:22 122:20 186:24 207:22 | **connect** 188:1 |
| **compensate** 155:25 | | | **connection** 66:15 69:15 72:22 |
| **compensated** 66:21 68:10 | | **conducted** 165:18 166:12 206:7 | **conservative** 122:25 |
| **compensation** 65:14,20,25 66:3,8 | | **conducting** 121:11 143:11 143:24 | **consider** 153:10 |
| **competent** 56:6 | **conceivable** 204:7,8 | **conference** 47:10 124:20 | **considered** 100:8 145:5 |
| **competitive** 139:13 185:19 | **concept** 78:18 88:6 113:7,8 113:13 114:10 114:14,17,20 114:25 116:4 168:3,9,15,23 | **confidence** 16:5 60:20 61:3,15,16 62:8,19 95:8 95:16 96:11 97:17 100:7,9 100:12,16 101:3 107:10 131:13 135:18 148:9 166:19 175:16,25 176:19 177:1 180:2 205:12 | **consistent** 127:2 159:25 |
| **competitor** 30:15,16 | | | **consistently** 136:17 |
| **complaint** 71:23 72:4 | | | **consolidate** 78:6 93:25 94:19,20 95:2 95:6 |
| **complete** 72:5 95:12 121:4 | **concern** 152:16 | | |
| **completed** 25:22 143:7 215:7,17 216:6 | **concerning** 33:21 85:15 | | **consolidating** 117:24 138:13 |
| | **conclude** 95:17 211:24 | | **constant** 50:3 |
| **completely** 144:23 156:12 | **concluded** 213:3 | | **constitute** 130:11 |
| **completion** 216:11 | **concludes** 212:24 | **confident** 103:22 167:3 177:16 | **consultants** 21:7 58:16 125:17 173:23 174:5 190:22 193:17 194:2 194:18,21 |
| **complex** 25:13 49:6 51:13 56:10 | **conclusion** 34:15 58:1 122:14 160:5 201:22 | | |
| | | **confidential** 1:7 12:13,19 | |
| **complying** 189:8 | **conclusions** 75:2 | **confirm** 41:11 48:3 92:20 128:7 181:24 187:14 | **consumed** 207:13 |
| **components** 15:2 | **conclusively** 60:3,14,24 62:4,15 | | **consumers** 53:14,21 54:1 54:4 93:2,11 93:15,19 |
| **compound** 165:10 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

## [consuming - correct]

| | | | |
|---|---|---|---|
| **consuming** 106:1 | 103:12 106:16 171:14 | 35:9 36:9 40:2 40:4,5 42:13 | 144:12,18 147:14,17,19 |
| **contact** 27:11 27:21 28:5 29:18 38:15,16 49:5,5 109:25 110:1 117:24 138:13 202:14 203:4 215:9,20 | **continuing** 105:17 106:14 108:10 | 42:24 45:4,5,8 45:9,10,13 47:13,25 53:11 53:12,13,18,20 53:25 54:10 | 148:22,23,24 148:25 149:5,6 149:19,20,22 149:23 150:6,7 150:8,9,11,12 |
| | **contributed** 200:15 | | 150:18,21,22 |
| | **conversation** 68:7,8 95:12 125:2 | 58:17 65:9 66:2,20 67:23 68:17 73:23 | 150:24 151:2,3 151:11 152:4 153:24,25 |
| **contain** 85:21 91:5 167:15 168:1,6 | **conversations** 7:8 67:8 124:8 | 75:3 79:2,3,16 79:20,21 80:15 | 154:1,2,4,5,15 154:16,18,19 |
| **contained** 10:22 18:5 43:2 45:14,17 45:18 54:8 87:3 116:19 195:19 | **coo** 31:2 | 81:23 82:6 | 154:21,22,25 |
| | **coordinate** 113:12 | 83:13,25 86:10 86:19 91:11 | 155:1,3,4,6,7 156:6,7,8,9,12 |
| | **copied** 15:19 | 94:2,13,14 | 156:13,15,16 |
| | **copies** 14:10 159:18 | 95:25 96:2,17 96:18,22 | 156:18,23 157:5,8,9,10,11 |
| **containing** 78:25 194:1 | **copy** 14:15 71:25 80:2 84:18 212:8,9 | 100:10 103:1 103:15,16 104:11,13 105:6,14 | 157:13,14,16 157:17,22 158:19,20,21 |
| **contains** 26:11 190:13 214:12 | **cornerstone** 2:24,25 8:8,10 21:8,24 | 106:12 109:16 109:17 110:4 110:14 113:14 | 158:22,24,25 159:2,3 162:8 166:13 171:24 |
| **contemplation** 76:16 | **correct** 14:13 14:14 16:19 18:12 19:3,12 20:3,4,7,8 21:8 21:9 22:2,14 22:22,23 23:7 23:8,20,24 24:3,8,9 26:3,9 26:12 27:2 28:16,17 30:7 30:8,18 34:1 | 117:3,15 118:2 118:12 120:11 120:15,18 121:1 123:21 125:5 127:14 127:15 131:20 135:12 136:9 136:11 138:3 138:16,17 140:14,15 | 172:19 173:16 174:3 176:4,15 177:9 179:14 180:15,20 185:4,5 186:21 186:22 188:6 190:6,9 191:21 191:22,25 193:8,9,18,22 193:23 194:2,3 |
| **content** 46:21 79:1 92:12 93:3 | | | |
| **contents** 80:9 80:12 | | | |
| **context** 79:7,12 102:20 115:22 131:9 168:12 | | | |
| **contexts** 115:8 | | | |
| **continue** 7:10 101:8 102:5,23 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[correct - darryl]

194:11 195:1
195:11,12
197:9 199:8,11
203:25 206:9
217:3
**corrections**
215:14,15
216:3,4
**correctly**  44:19
48:22 73:11
163:11 179:13
183:8,19
187:16 190:17
**correlation**
50:3
**correspond**
132:2,11
147:10 151:13
151:17 180:16
**cost**  37:20 50:9
50:14,15,17
103:6,8
**costly**  50:20
**costs**  102:22
**counsel**  7:13
8:2 12:23 13:2
13:11,23 15:4
15:10,15 63:16
65:4 66:25
67:5 68:3
73:14,17,21
74:13,22 75:11
78:4 80:3
84:19 93:23
94:9,16 95:1

95:24 97:9,24
116:11 122:8
122:11,13,19
122:22,24
123:23 124:10
124:11 159:18
175:3 196:9
200:19,21
201:19,25
214:16 215:18
215:22 216:7
**count**  42:18,20
133:24 134:17
**country**  135:13
**county**  147:25
148:3,5,8
**couple**  158:9
160:2 161:22
197:1
**course**  84:13
85:14 126:5
127:18 159:19
**court**  1:1 7:15
7:21 8:19,23
10:8,8,12 12:5
93:7 180:3
193:2 214:3
**cover**  181:22
**covered**  210:18
**covid**  56:17
**create**  94:10,12
116:12,14
130:3,7,8,9
141:14 148:7

**created**  116:18
197:6 204:2
**creating**  117:1
127:2
**credential**
150:20
**credit**  42:14
54:18 55:12,13
55:19 56:3
93:16 121:20
122:1 138:5
158:9 160:9,21
161:1,1,3,4,23
164:3,6 178:10
178:10
**criteria**  22:7
90:15,22
106:23 152:7
152:14 153:14
207:5,10,11
**criticizing**
112:20
**cross**  3:14,18
33:20 45:3,6
45:12,21,24,25
46:2,3,6,16
47:6,15 48:4
48:20 49:11
51:6,9,15 52:8
52:19,22 53:1
53:3 54:11
62:13 91:9,13
92:1,5,7
184:21 188:12
200:13,16

**crr**  1:21 214:2
214:22
**crutcher**  2:14
2:18 8:6
129:13
**csr**  1:22,22
214:2,24,25
**cupertino**
150:11
**current**  20:2
24:10 28:25
55:3 120:14
**currently**  29:8
29:9 151:24
**customer**  83:7
83:16
**customers**  41:4
41:10 42:6,8
45:12,22 46:3
**cutoff**  207:15
**cv**  1:5 7:17
**cycle**  32:21,23
**cyndi**  163:10
**cynthia**  156:23
157:2,5,8,25
158:8 160:2
161:23

**d**

**d**  3:1 154:12
**d.c.**  2:19
**damages**  34:9
34:22 198:1,3
**darryl**  1:10
3:11,22 6:18
7:13 8:22 9:4

Page 15

**[darryl - dataset]**

| | | | |
|---|---|---|---|
| 14:12 199:5 | 69:2,14 70:5,9 | 121:25 122:1,4 | 178:24 180:10 |
| 201:12 212:25 | 70:20,25 71:2 | 122:6,23 126:4 | 180:24 182:19 |
| 215:5 217:12 | 73:2,18,22 | 127:24 129:4,4 | 182:22,24 |
| 218:2,24 | 76:15 79:17,20 | 129:5,18,18,19 | 183:4,9,12,21 |
| **data**   4:6,13,20 | 80:15,22 81:17 | 129:24 130:1,2 | 184:3,10,22 |
| 5:3,10,17 6:3 | 81:20 82:2,3,9 | 130:2,10 | 185:3,18,20,23 |
| 6:10 9:7 10:1 | 82:25 84:12 | 131:14 132:14 | 185:25 186:5,6 |
| 10:19 13:20 | 85:13,15,17,19 | 132:20,24 | 186:20,21,23 |
| 22:13,16,18,19 | 85:20,21 86:2 | 133:7,19,23 | 186:23 187:3,5 |
| 23:3 25:1,14 | 86:10,15,18,22 | 134:11 135:5 | 187:9,15,19,24 |
| 25:15 26:8 | 87:7,8,10,12,12 | 136:14 138:13 | 188:12,13,25 |
| 27:7,11,16,20 | 88:10,14 89:10 | 140:5,11,13 | 189:9,12,17,21 |
| 28:1,2,6,11 | 89:10,10,12,18 | 141:16 142:5 | 190:11,13,18 |
| 29:11,14,16,17 | 89:22 91:10,10 | 142:22 143:20 | 190:23 191:2,5 |
| 31:6,7 32:10 | 91:12,13,16,17 | 145:1,9 146:8 | 191:7,11,11,19 |
| 35:15 37:8 | 92:4,5,7 93:1 | 146:19 147:21 | 191:23 192:3 |
| 38:25 40:17,19 | 93:10,15,18 | 147:22,24 | 196:2 202:13 |
| 40:24 41:1,20 | 95:19,25 96:15 | 148:8,14,19 | 202:20 203:3 |
| 41:22 42:1,4,8 | 97:3,11,12,23 | 149:17 151:9 | 203:13 204:1,6 |
| 42:10,23,23 | 99:12 100:4,6 | 151:10,24 | 204:10,14 |
| 43:1,2,11,16,22 | 100:19,20 | 152:11,21 | 205:24 209:25 |
| 44:6 45:4,11 | 101:3,24 | 153:14,22 | 210:5 |
| 45:14,23 46:2 | 104:12,12 | 154:10 155:14 | **data's**   187:25 |
| 46:7,14 51:10 | 108:14 109:15 | 156:22 158:17 | **database**   54:17 |
| 51:21,25 52:11 | 109:20,23,25 | 159:15,19,20 | 54:21 116:18 |
| 52:15,17,17,22 | 110:1,2 111:13 | 160:23 161:15 | 186:5 190:25 |
| 52:23 53:3,4,4 | 112:8 117:6,11 | 161:18,21 | **dataset**   51:11 |
| 53:8,10,16 | 117:20,24 | 162:25 163:5 | 54:25 73:2 |
| 54:2,15,18 | 118:19,24 | 163:17 164:5 | 75:18 77:10,12 |
| 55:3,4,5,8,15 | 119:4,9,10,11 | 166:4,7,10 | 78:20,24 79:15 |
| 56:22,24 57:13 | 119:12,12 | 167:15 168:6 | 79:19 80:14 |
| 57:19,21,24 | 120:9,12,16,20 | 171:2,4 174:15 | 81:10 83:24,25 |
| 59:25 60:19 | 120:20,21,24 | 175:4,17,24 | 86:5,9,14 |
| 61:3 62:1 | 121:5,6,6,9,10 | 176:19,25 | 92:22 118:16 |
| 68:18,19,20 | 121:13,17,20 | 177:20 178:7 | 132:20 136:15 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[dataset - deduplication]**

136:18 139:24
140:6 190:7
**datasets**  51:13
54:12,14 91:14
91:16 139:1
208:1,24
**date**  16:1 18:14
18:14 63:16
68:15 215:16
216:5 218:24
**dated**  33:13
47:3,4 72:21
80:4 196:8
199:5
**dates**  43:3
80:16
**daughter**  160:3
160:9
**day**  13:4
214:18
**dc**  2:9
**deal**  9:25 10:18
90:1 91:25
92:6,8 146:10
210:5
**deb**  5:9 154:12
155:10
**debra**  5:2
153:23 155:10
**decades**  57:20
57:23 58:2
100:23
**decertified**
65:21

**decide**  161:25
201:6 207:7
**decided**  104:5
200:24
**decision**  106:21
106:24,25
109:10
**declaration**
3:16,20,22
6:18 10:11,21
12:25 13:7
14:24 15:3,6
15:17,19 16:8
33:14,19 34:5
36:4 47:5,22
48:6 59:18,23
62:1 72:21
76:13,17 77:15
78:11 125:23
199:5,7,13,17
200:1,4,8,11,14
200:20,25
201:2,6,10,14
**declarations**
10:18,22 11:9
16:10 199:19
199:21,22
200:3,5,5,9
**declare**  217:1
**deduping**  60:18
**deduplicate**
27:8 40:20
42:1 61:14,15
62:7,8,14,18
68:19 73:3

77:19 87:13
95:18 96:20
97:3 99:23
109:8 111:1
118:12,16,24
125:12
**deduplicated**
28:7 70:6,10
70:20 77:13
96:16 97:12
100:5
**deduplicating**
27:16,22 35:5
37:2 45:11
52:1 53:20,25
54:7 55:11
56:25 60:2,12
60:14,24 62:4
71:2 77:22
94:10 100:16
116:12 119:11
119:17,23
120:5 211:11
**deduplication**
10:1,19,24,25
11:7 12:24
25:15 26:14,21
27:5,7 29:15
29:20,23,24
31:6,10,12,15
35:18 36:6
37:7,10,12
38:1,6,8,10,22
38:24,24 39:8
39:15,17 40:17

41:21 42:10
44:7,16,21,22
45:8 51:10,13
51:15 53:11,19
53:24 55:5
56:11,13,21
57:13 58:19
59:13 60:2,12
60:13 61:2,11
61:16 62:3
66:15,16,22
77:10 78:20,21
82:4,13 90:10
95:13,14 97:20
100:21,22
104:13 106:11
107:6,7 109:13
110:11,23
111:17 112:7
112:21 116:10
118:13 119:13
121:14 122:23
125:7,8 131:10
131:11 132:1
132:12,13
139:17 140:4,7
140:10 141:13
142:22 143:11
143:24 144:2
144:10 145:6
175:20,23
176:18 189:4
192:13,19
193:11 194:24
206:7 208:17

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[deduplication - determined]**

209:25 210:24
211:4,7,16
**deduplication's**
120:7
**deeper** 203:17
**defendant** 2:12
7:14 8:6 11:6
**define** 32:13
109:24 110:2
162:21 175:5,6
175:10,11,14
**defined** 92:21
114:20,23
143:13
**defines** 73:17
73:21
**definitely**
161:19
**definition**
43:21 142:8
160:14,18
162:6,9,20
164:2,25
168:12,13,17
175:18
**definitive**
178:12
**definitively**
160:6 161:16
178:7
**degree** 23:13
23:19 96:4
**degrees** 23:16
**deliverable**
127:10

**deliverables**
35:13
**delivered** 79:17
194:9 201:9,9
212:5
**delivery** 25:11
**deltas** 208:25
**deny** 41:11
48:3 181:24
**depend** 65:14
**dependent**
32:22 49:22
**depending**
43:14 112:22
200:23
**depends** 142:8
**deposed** 9:12
**deposition** 1:9
7:13,18 11:19
12:22 13:9,10
13:17 14:6
18:22 33:10
47:1 72:15
80:1 84:21
98:7 148:12
149:9 150:3
153:19 154:8
156:4,19
158:15 196:7
198:7 199:3
213:3 215:19
215:23,25
216:8,11
**depositions**
212:10

**describe** 19:2
19:11 29:14
73:13 77:18
106:23 110:3
116:17 138:18
139:9 142:2
**described** 18:9
20:6 40:16
76:12,17 77:20
86:1,13 90:20
104:9 109:11
131:24 152:19
161:9 171:20
184:19 187:11
**describes** 108:2
**describing**
36:21 37:2
60:8 78:15
118:11 169:20
**description**
77:17,18 132:7
170:15
**design** 73:2
77:19
**designate** 12:13
**designation**
12:19
**designed**
203:21
**desired** 75:19
75:19 207:24
**detail** 19:17
153:13
**details** 30:1
67:9 68:8

**determination**
32:25 58:4
77:10 108:14
137:6 170:17
177:14
**determine** 22:5
29:18 30:2
43:6 59:25
62:2 73:7 78:5
78:9 82:8
93:23 95:1
97:1 100:11,15
101:25 103:12
103:23 108:8
108:11,17
109:20 111:1
114:8,11
119:24 132:20
133:12 134:10
142:12 143:6
152:16 153:15
164:4,10 167:9
175:25 178:25
184:3 200:22
207:18,21,22
208:25
**determined**
21:18 25:23
70:5,9,19
95:23 96:15
97:11 102:24
106:13 108:24
126:21 135:17
161:16,19
215:18,23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[determined - doing]

| | | | |
|---|---|---|---|
| 216:7 | 158:3,5 159:16 | **discovery** | **distribution** |
| **determining** | 164:14 165:4 | 24:18 | 25:12,17,21,23 |
| 77:21 78:19 | 170:14 178:19 | **discrepancy** | 33:1 36:1 |
| 100:19 108:3 | 180:9,14 | 174:24 | **district** 1:1,2 |
| **developed** | 181:17,20 | **discuss** 12:12 | 7:15,16 |
| 118:1,15,23 | 182:4 185:7,24 | 58:18 123:23 | **divider** 32:9 |
| 126:4 138:15 | 185:25 193:12 | **discussed** 58:15 | **division** 1:3 |
| **device** 85:15 | 208:16,19 | 63:19 111:9 | 7:16 24:18 |
| **devices** 92:18 | **differentiate** | 117:7 124:18 | **document** 6:24 |
| 92:24 | 146:25 | 164:13 185:2 | 14:4,11,21,23 |
| **dial** 135:13 | **differently** | 198:8,15 | 14:24 15:22,25 |
| **dictionary** | 182:11 | **discussing** | 16:23 33:5,7 |
| 143:20 | **difficult** 12:8 | 12:20 95:7 | 72:17,21 79:24 |
| **difference** | 137:6 | 162:24 201:3 | 80:5,7 156:3 |
| 29:22 57:5,22 | **digital** 214:18 | 210:13 | 156:18,20,21 |
| 77:23 94:24 | **digits** 138:5 | **discussion** | 162:7 171:2 |
| 107:24 | 145:3 178:9 | 122:2 206:13 | 196:12,24,25 |
| **differences** | 206:20 207:8 | **discussions** | 199:4 |
| 30:23 31:19 | **dinner** 124:1,2 | 66:25 67:5 | **documentation** |
| 52:5,7 146:3 | 124:5,8 | 68:2 | 12:25 55:20 |
| 208:20 | **direct** 19:16 | **dispute** 181:11 | 162:7 |
| **different** 29:5 | **direction** 78:18 | 183:6 193:19 | **documented** |
| 44:15,16 45:21 | 123:2 208:7 | **disputing** | 179:5 |
| 52:11,12,15 | **directly** 65:11 | 180:22 | **documents** |
| 77:20 78:14 | 203:13 | **distance** 114:6 | 13:13,15,25 |
| 81:17 95:8 | **director** 29:12 | 114:7,11 | 55:17,19 |
| 107:18 110:9 | **disagreement** | **distinct** 119:17 | **doing** 36:1 |
| 110:11 111:11 | 10:9 76:15 | 119:22 155:10 | 38:22 39:8 |
| 120:3,4 136:16 | **disagreements** | **distinction** 88:3 | 41:24 50:8,11 |
| 140:10,12,17 | 206:10 | **distinguish** | 50:12 51:13 |
| 146:14,19 | **disciplines** | 147:7 | 68:12 95:14 |
| 147:9,15 | 119:4 | **distinguishing** | 104:19 125:2 |
| 150:15,17,20 | **disclose** 201:19 | 83:11 | 139:5 195:2 |
| 150:23 151:1 | 202:1 | **distracted** | 210:23 211:16 |
| 155:2,5 158:1 | | 129:15 | |

Page 19

[domestic - email]

**domestic** 71:15 71:20
**dot** 127:13
**double** 97:4 99:11 197:24 198:2
**doubt** 47:19,20 48:5
**downloaded** 93:2 190:15
**dozen** 10:17
**dozens** 207:13 208:1
**dr** 125:1
**drafting** 15:25 74:23
**draw** 88:3 160:5
**drawn** 200:4
**drew** 200:10
**drive** 193:25 194:5,10
**driver** 172:6
**due** 34:5 121:7 122:3 146:2
**duly** 214:9
**dunn** 2:14,18 8:6,8,10 129:13
**duplicate** 36:9 70:11 82:12,16 82:17 96:17,21 96:21 97:13,15 126:1 132:14 183:1 195:25

**duplicated** 82:11
**duplicates** 97:18 101:10 102:24 103:13 141:1 182:20
**duplication** 95:25 96:7,8 96:10 97:10 99:14,17 100:4 104:12 175:4 193:7
**duplicative** 78:6 93:25 94:20 95:3
**dx** 3:10,13,14 3:18,22,23 4:2 4:5,12,19 5:2,9 5:16 6:2,9,16 6:18 14:5,6 18:22 33:10 47:1 72:15 80:1 84:21 148:12 149:9 150:3,4,5,14,14 150:14 153:19 153:20 154:7,8 154:9 156:3,4 156:5,18,19 157:5,7,18,18 157:21,21 158:14,15,16 159:4,5,5 163:10,10,10 169:19 196:6,7

197:1 199:2,3

**e**

**e** 2:1,1 3:1,21 24:18 30:18 69:12 131:4 132:5 154:4,12 154:18 157:13 158:19,19 215:9,12 216:1 218:3,3,3
**earlier** 64:16 117:7 164:14 175:1 185:2,6 188:8 192:22 198:7 209:5
**early** 210:9
**ease** 83:3
**easily** 145:20
**education** 23:12
**effective** 37:25 60:1 62:2
**effectively** 102:1
**effectuate** 32:24,24 103:22
**efficient** 61:18
**effort** 34:13 35:1,21 52:3,4 56:11 58:3 62:13 66:12 97:20 101:8 102:4,7,10,22 102:25 103:11

103:14,24 104:15,20 105:4,13 106:16 107:20 120:6,7 121:14 127:8,10
**efforts** 35:9 69:17 119:25 143:7
**either** 25:18 41:11 63:24 107:7,8 108:15 123:3 141:13 171:16 211:22
**elazarus** 2:16
**electronic** 14:19 199:10
**eli** 2:13 4:3 6:16 8:5 58:23 169:9
**eliminate** 96:2 96:4 100:3
**eliminated** 99:13,17
**ellie** 6:9 158:18 160:3,9,11 161:22 163:10 164:5
**elmwood** 149:21
**email** 3:23 25:18 27:13 80:2,13,18 83:24 84:8 136:5,9

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

## [embarcadero - example]

**embarcadero** 2:14

**emoji** 52:21 53:1,4

**emojis** 86:18 87:11,15,18 92:4

**emotional** 119:6 153:1

**employed** 28:15 30:6

**employee** 44:24 46:11 61:19 63:5

**employees** 62:24

**employer** 20:3 24:11 46:9,10

**employers** 46:4

**ended** 111:21

**engaged** 202:21

**engagement** 74:14 209:24 210:4

**engagements** 126:5 210:11 211:14,15

**enhance** 131:19

**enrolls** 46:9

**ensure** 32:9 38:11

**entered** 89:22 146:3 203:3

**entire** 24:23 79:11 132:20

189:7 210:21 210:25

**entities** 70:11 96:17,21,21 97:13,16

**entity** 37:16 62:11 73:10 82:24 96:12,25 97:23 107:11 117:18 184:6

**entries** 86:21 87:7 90:21 93:2,11,15,19 111:11 210:2

**epiq** 30:17

**equally** 161:21

**equi** 55:14

**equifax** 45:3 53:8,13,15,16 53:19,24 55:5 55:15 56:8,13 56:21 57:1,6 91:10,14 92:2

**errata** 215:14 215:16 216:3,5

**erroneous** 179:1

**error** 116:16 201:17

**errors** 22:10 167:13

**es** 214:8

**essentially** 81:12 113:11 116:2 120:1,5

120:7 192:21

**estimate** 26:20 51:19 68:16 69:25 70:1 103:17 164:15 164:19,22 165:2

**estimation** 103:19

**etcetera** 70:21 80:20

**evaluate** 68:18 73:1 78:24 141:6 143:2 178:17 182:23 209:1

**evaluated** 82:8 132:19 142:23

**evaluating** 38:25 100:19

**evaluation** 51:25 56:25 69:2 173:8

**event** 163:18 198:21 214:17

**events** 163:20

**eventually** 59:2

**everyday** 83:15

**evolution** 151:23

**evolve** 131:19

**evolved** 31:21 138:21

**exact** 6:24 18:14 42:4

51:19 110:18 110:22 111:10 111:15 112:1,8 125:14,15,16 144:17 145:25 176:22,23,23 176:23,24,24 182:20 188:7 188:16,21

**exactly** 55:9 56:16 77:24 109:14 144:4 144:12 174:21 174:22 188:20

**examination** 1:9 3:3 9:1 17:18 99:7 159:22 209:20

**examine** 105:19 106:2 153:13

**examining** 104:18 105:20

**example** 27:19 27:24 32:1,3,8 32:20 51:12 52:17,17 53:7 66:10 76:16 85:15 86:18 87:3 89:20 112:14 127:25 134:15 141:24 144:14,21 145:1,11 146:17 148:10

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

**[example - expertise]**

166:1,3 167:24
169:4 177:5,9
179:9,17 181:6
199:24
**examples** 31:24
133:2 148:1
166:16
**excel** 127:25
128:1
**except** 68:12
132:16 154:24
159:6
**exception**
50:24
**exceptional**
97:20
**exceptions**
50:19
**excerpts** 4:6,13
4:20 5:3,10,17
6:3,10
**excluded**
134:25 135:6
183:10
**excluding**
184:10
**exclusion**
134:21 135:3
**exclusive** 108:5
**excuse** 26:3
76:5 105:7
156:11 166:4
174:25 175:2
183:11

**executables**
170:6
**execute** 19:15
172:24 173:3
173:14
**executed** 170:8
217:5
**executing** 19:6
**execution**
170:11
**executive** 61:19
63:5
**executives**
62:24
**exercise** 208:17
**exhaustive** 26:6
**exhibit** 3:10,13
3:14,14,18,18
3:22,23 4:2,5
4:12,19 5:2,9
5:16 6:2,9,16
6:18 14:6
18:17,22 26:2
28:8 33:10,11
46:24 47:1
59:18 72:15,18
74:5 77:16
79:23 80:1
81:7 82:19
84:17,21 88:19
90:19 125:22
125:22 126:14
129:23 136:6
148:12 149:9
149:11,16,25

150:2,3 153:19
153:22 154:8
156:4,19 157:6
158:15 169:19
196:5,7,24,25
199:3 200:14
211:15
**exhibits** 3:9 4:1
5:1 6:1,23
150:14 159:4
159:18
**exist** 28:22
30:14 32:12
97:22 123:18
123:19 132:21
153:16 182:25
**existed** 87:6
138:24 196:1
**exists** 28:23
30:12,13 77:22
78:5,9 93:24
94:9 95:2
116:10 119:9
151:9 163:25
**expect** 12:19
50:17 119:7
134:17
**expected**
198:11
**expects** 67:10
67:14
**expedited**
212:6
**expenditure**
105:12

**expenses** 47:23
48:1,10,17
49:18
**experience**
22:15 31:21
36:5 38:22,22
39:8,17 45:3
51:6,12 57:20
57:23 58:2
95:14 97:19
100:25 101:2
104:9,11
106:21 120:24
139:5 176:2
177:4 179:18
205:10 208:15
208:16 210:21
**experienced**
115:13 173:6
**expert** 3:10 9:7
10:6 12:25
14:4,12 15:16
43:10 57:12,15
61:20 62:24
63:6 77:24
78:1,4 90:3
94:3,4 126:18
159:21 201:7,9
201:12,20
202:1 206:13
**expertise** 57:18
57:23 58:3,7,9
58:12 126:4,9
205:1

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[experts - files]**

| | | | |
|---|---|---|---|
| **experts** 17:24 123:16,18,19 | **f** | **fewer** 178:24 | **figel** 2:8 8:16 |
| **expires** 214:23 214:24,25 | **f** 87:4 131:6 132:4,9 | **fictitious** 85:18 202:14 203:4 | **figure** 183:2 |
| **explain** 9:9 60:10 75:24 108:6 126:15 163:8,15 170:1 195:13 | **face** 52:21 53:1 86:18 | **field** 32:2,5,10 32:11,15 57:11 80:25,25 82:19 84:6 89:7 116:20,21 117:25 133:22 134:25 135:21 138:2,14 145:13 146:10 148:15 150:24 152:12,20,20 157:22 159:10 170:22,23 171:2,4,7 176:3 183:9,21 195:10,13 197:25 198:2 198:20 205:1 206:19 | **file** 3:13 17:4 18:11,13,24 19:2,5,11,14,21 19:24 20:7,21 21:22 88:19,23 89:1,1 90:18 90:19 91:4,5 126:13,15,20 126:25 127:3,4 127:13,24 128:20 129:23 130:17 131:13 132:2,10 169:19,19 170:8 172:3,15 172:19,21 187:6 191:7 192:12,13,18 193:4 194:23 195:22,23 |
| **explaining** 76:10 | **fact** 60:21 79:14 107:11 146:6 196:25 | | |
| **expound** 164:24 | **fair** 11:16 26:24 37:24 49:18 68:23 74:11,20 75:8 131:23 170:15 170:16 | | |
| **expressed** 10:8 | | | |
| **extensive** 22:15 38:9,22 39:8 39:17 41:20 139:4 207:17 | **false** 164:15,19 164:23 165:2 207:16 208:8 | | |
| **extensively** 175:15 | **familiar** 80:6,9 80:12 85:7,9 112:11,13 115:7 124:13 168:3,9 | | |
| **extent** 11:15 34:14,16 66:19 74:17 75:10 77:2 123:12 126:10 | **famous** 89:17 | **fields** 24:7 32:9 57:14 80:18,21 81:6 83:23,24 84:4 85:19 116:19,23 118:15,18,20 118:22 130:3 133:3 147:22 147:24 148:18 152:15 171:10 194:25 195:8 210:1 | **filed** 7:15 |
| | **fan** 37:18 | | **files** 20:22 21:3 21:6,13,23 45:21 90:25 126:16 127:6 130:16 132:11 132:15 169:21 170:5,19 172:2 172:4,10,14 190:21 193:21 194:1,4,6,10,18 194:20 195:4 |
| **external** 54:12 54:14 121:5 195:17 | **far** 54:23 110:1 208:8 | | |
| **extra** 157:2 192:15 | **federal** 216:1,8 216:10 | | |
| **extras** 84:7 | **feedback** 38:18 | | |
| **extreme** 104:16 | **feel** 139:11 | | |
| **extremely** 177:1 | **feels** 146:5 | | |
| | **fees** 47:23 48:1 48:4,10,17 49:17 50:4 51:2,4 | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[filing - found]**

| | | | |
|---|---|---|---|
| **filing** 33:9,13 47:3 | 70:25 72:14,17 75:22 76:2,8 80:19 81:2,3 84:10 94:15,17 131:25 132:8 132:11,13 145:2,11,13 146:14 147:1 147:10 148:24 149:18 150:6 151:6 152:4,6 152:11 153:23 154:11 155:20 155:21 156:5 156:23 157:8 158:18 170:25 176:8,13,22 178:15,18 179:11 183:19 197:3,4 206:19 206:20,23 207:3,3,7 209:24 210:4 210:17 | **folks** 210:23 | 103:18 104:22 |
| **fill** 15:20 | | **follow** 184:16 203:1 205:3 | 106:17 107:15 |
| **filled** 15:5,17 31:5 | | **followed** 136:18 161:8 161:12 | 109:3 112:24 |
| **final** 11:8 14:15 15:22 30:2 77:21 78:22 116:18,24 126:17 173:24 174:6 192:13 192:19 193:11 194:23,24 195:8 | | | 113:4 117:4,12 |
| | | **follows** 8:24 215:8 | 121:12,15 |
| | | **footers** 201:11 | 122:14,21 |
| | | **footnote** 85:1 | 123:11 125:19 |
| | | **foregoing** 214:12 217:2 | 132:25 137:14 |
| | | **foreign** 71:15 71:20 | 139:25 140:21 |
| | | **form** 10:20 16:12 19:2,4 19:11 20:11,24 26:18 27:9,18 29:1 31:16 35:23 36:22 37:4 39:19 44:3,9 46:12 48:12,25 49:20 50:6,18 51:22 55:22 56:4 57:25 60:16 61:7 62:17 64:6 65:17 66:5,17 68:22 70:16 71:6,11 73:15 75:24 76:3,9 90:6 91:15 94:22 95:10,20 99:25 100:13,18 | 141:9,20 144:6 |
| **finalized** 86:10 86:14 | | | 151:19 160:13 |
| **finally** 12:11 | | | 161:7 162:4,17 |
| **financial** 214:17 | | | 163:2 165:10 |
| **financially** 7:24 | | | 173:25 174:7 |
| **find** 101:23 102:25 103:14 104:6 105:9 113:19 136:25 | | | 174:10 175:11 |
| | | | 183:14 186:13 |
| | | | 187:21 190:23 |
| | | | 191:3,12 |
| | | | 198:13 199:14 |
| | | | 201:15 202:16 |
| | | | 203:6,15 204:3 |
| | | | 204:13,19 |
| | | | 205:7 207:1 |
| | | | 208:21 210:3 |
| **finding** 103:21 103:25 206:11 | **five** 92:1 196:16 213:1 | | **formal** 23:12 |
| **fine** 14:25 59:7 64:19 81:5 | **fix** 165:22 | | **formed** 122:19 |
| | **fixed** 166:17 | | **forming** 20:13 122:9 |
| **finish** 115:19 115:21 | **flagging** 170:7 | | |
| | **flat** 195:3 | | **formulating** 117:23 |
| **finished** 12:7 | **focus** 92:11 112:1 | | **forth** 125:8 |
| **firm** 7:22 24:15 47:13 | | | **forward** 16:14 |
| | **focusing** 207:6 | | **found** 139:2 204:17,24 |
| **first** 9:11 63:13 63:18 64:4,11 | **fold** 37:14 | | |

## [foundation - go]

**foundation**
50:7 55:23
56:5 84:1
107:16 137:15
140:22 144:7
162:18 174:1,8
187:22 203:7
203:16 204:4
204:13,20
205:8 208:22
**founders** 63:19
63:21
**four** 13:12 26:8
138:5 178:9
192:8,9 210:19
**fractions**
180:20,25
**framed** 104:25
**francisco** 2:15
194:2,5,10
**fraud** 202:21
203:5 205:10
**frauds** 205:6
**fraudsters**
205:4
**fraudulent**
204:15,22
205:2,10
**frcp** 216:1
**frederick** 2:8
8:16
**free** 93:2
**freeman** 2:4
8:13

**frequency**
133:9
**frequently**
32:23 136:22
**friday** 13:3
**front** 64:12
88:25 129:1,2
155:12 159:15
160:5 192:23
194:14 209:7
**fruit** 184:8,16
**fulfill** 208:18
**fulfilled** 163:23
**full** 9:3 75:18
77:11 78:20
83:25 86:5,9
86:13 136:15
136:18 139:24
140:6 144:23
144:23 145:3
146:8,10,11
164:24 176:8
176:23 178:5,5
179:11 190:10
207:4 214:12
**fullest** 11:15
**fully** 94:19
95:18 97:3
158:24 159:6
172:23 173:3
173:14
**function** 29:21
119:13 186:18
**fundamentally**
52:13

**further** 85:11
94:9 109:8
116:11
**future** 17:4
37:16 129:5,19
**fuzzy** 144:5,18
144:19 145:8
188:8

### g

**gained** 31:20
**gapped** 127:23
128:1 142:18
145:21 190:5
193:22
**garden** 30:6,9
30:10,20 31:1
31:5,7,11,14
210:21
**gauge** 152:25
**general** 9:20
27:10,10 32:14
49:16 50:16,16
50:19 152:5,18
**generally** 43:12
51:1 142:7
173:10 206:24
210:13
**generate**
101:23
**generated**
84:11 85:12
104:15 194:25
209:25
**generic** 43:15

**geocoding**
113:7,11,18,20
113:22,24
**getting** 35:18
172:6 179:21
**gibson** 2:14,18
8:5,7,10
129:13
**gibsondunn.c...**
2:16,16,20,21
**gift** 93:12
**give** 12:3 16:1,4
26:22 31:24
40:9 51:18
52:16 91:18,20
109:4 113:23
122:19 133:2
134:16 141:21
141:24 144:14
148:8 166:1,15
169:4 197:7
205:12 207:19
**given** 12:12
16:10 39:9
193:21 194:18
214:7,13
**gives** 19:14
**go** 7:11 18:16
30:5 59:17
64:21 72:13
75:14 77:2
91:1,24 95:14
98:1,4 106:7
123:12 128:11
169:18 196:13

Page 25

**[go - hierarchical]**

197:15 205:14 207:2 209:12

**goal** 35:6,10,18 35:21,21 62:7 120:7 127:2,4 127:12

**goals** 35:22 38:1,8

**goes** 17:7 110:1 162:5

**going** 7:6 9:8 10:24 17:4 33:6 58:23 59:3,10,16 64:22 74:16 98:5 101:13 122:11 128:12 144:13 146:23 159:17 169:8 169:12 180:5 189:22 196:17 205:17 206:12 213:1

**gold** 168:9,16 168:24 169:1

**good** 7:5 64:17 64:20 117:21 128:10

**gotten** 31:23,24

**governmental** 71:14,19

**graduated** 23:5 23:10

**gram** 114:17

**great** 129:12

**greater** 178:25

**grew** 31:4

**group** 30:7,9 30:10,21 31:1 31:5,7,11,14 133:23 152:2 152:24

**grouped** 153:7

**grouping** 153:11

**groups** 109:13

**guess** 13:4 43:9 46:6 50:2 61:24 64:11 77:14 105:1

**h**

**h** 2:4 4:19 153:18 215:1 218:3

**haldenstein** 2:4 8:13 209:23

**half** 58:24 181:7

**hamming** 114:7

**hand** 87:24 112:22,25 113:1 210:23 214:18

**handle** 87:7

**handled** 215:8

**handles** 25:7

**handling** 36:5

**hands** 27:5,7 29:14,16,17

40:16 41:21 210:10,23 211:16

**hansen** 2:8 8:16 65:3

**happen** 62:25 167:8

**happened** 210:6,8

**happens** 65:15

**hard** 193:25 194:5,9

**harmed** 33:1

**harry** 2:18 129:11,12

**hash** 138:2,4 150:21 157:22 159:10

**hashed** 81:7,19 82:1,6,20,23 83:14 116:20 116:21 117:3 117:10,14,17 117:19 135:21 135:25 136:1,8 136:13,16,21 137:6 138:2,4 138:5 143:13 143:18 150:15 150:21 155:3 155:24 157:22 159:10 176:8 178:6 179:11 183:13,21 195:9,10

197:24 198:2

**hashing** 198:2

**hausfeld** 47:13

**head** 31:2 45:18 63:8,10 63:12 89:3,19 90:23 93:6 119:25 130:13 130:20 133:2 137:10 142:17 144:1 167:5 180:18 189:14 193:14

**headquarters** 89:21 90:11 150:10

**health** 28:19 46:9 118:18

**hear** 17:15 63:18 144:20 168:11

**heard** 52:16 105:9

**heavily** 49:22

**held** 29:10 53:15

**help** 22:4 76:10 90:24

**helped** 12:5

**helpful** 121:10 121:14,18

**herz** 2:4 8:13

**hierarchical** 43:5,21

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

**[hierarchies - included]**

**hierarchies** 43:23 44:2

**hierarchy** 42:24 43:1,11 43:18,25 44:7 44:13,15,20 131:12

**high** 12:23 16:4 48:10,18 60:20 61:2,14 62:8 95:8 97:17 107:10 137:4 177:1

**higher** 49:17 51:4

**highest** 60:1,11 60:13 62:3

**highly** 1:7 12:13,18

**higney** 2:13 8:9

**hired** 198:16

**hit** 171:8

**hitting** 171:11

**hold** 22:13 36:15 106:8 193:15

**holding** 50:2

**home** 146:22

**honest** 12:3

**hour** 58:24 65:8 128:10

**hours** 13:12,12 65:16 68:14 70:2 207:14

**house** 89:18

**household** 147:5

**hphillips** 2:21

**huh** 108:21,23 115:20

**human** 39:7,16 203:14 204:16 204:23

**hundred** 68:16 70:2

**hundreds** 172:15 207:14 208:1

**hyojin** 150:8

**hypothetical** 44:10 100:1 160:25 161:9 161:13,13 162:8 183:23 208:12,23

**hypotheticals** 161:15,18 164:8

**i**

**idea** 212:15

**identifiable** 26:15 39:1 41:4 42:6 45:15 54:8 183:12 184:2 184:12

**identification** 3:9 4:1 5:1 6:1 196:5

**identified** 15:19 22:10 34:12,25 35:8 35:20 90:13 97:8 101:11,22 123:5 137:8 140:25 153:9 156:15 164:16 165:3 166:16 166:18 167:3 171:1 184:5 189:3 192:4

**identifier** 27:13 94:11 116:13 184:11 195:18 195:19

**identifiers** 81:9 94:12

**identifies** 156:20

**identify** 29:24 60:19 87:10,18 88:12 102:1,8 103:1,15 104:17 105:4 105:11 108:9 120:4 123:4,7 129:22 131:24 132:1,24 157:21 165:21 165:24 166:2 167:1,13 170:23,25 178:1,14 191:19 204:1

**identifying** 32:1 41:3 109:7 119:16 119:22 126:3 151:5 167:5 177:20 182:19 182:21 184:10 192:10

**identities** 116:14

**illegitimate** 89:6 91:12,22

**imagine** 126:11 182:4 192:14

**impact** 68:12 82:13 170:24

**impacted** 53:16

**imply** 44:1

**important** 160:16

**improve** 131:18

**improved** 31:22 32:3

**inaccurate** 112:16 166:17 210:2

**inarticulately** 99:10

**include** 110:13 111:2 135:21 191:3

**included** 11:8 20:18 21:3 80:21 86:25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[included - intend]**

87:8 92:23
93:2,11,15,19
116:24 135:24
136:9 179:16
179:17 183:9
200:25 202:7
215:14 216:3
**includes**  24:25
25:1 84:11
85:12 155:23
**including**  8:2
34:11,24 61:1
80:19 81:1
117:25 137:12
137:19 138:14
183:10,13,21
**incomplete**
44:9 99:25
126:3
**incorrect**  80:17
**increased**
155:22,25
**increasing**
68:13
**independently**
141:6
**indicate**  6:24
82:21 85:4
**indicator**  82:15
147:3
**individual**
26:15 27:11
34:11,24 37:17
46:9 53:21
54:1 56:3

60:22 62:11,20
73:10 79:6
82:12 90:25
109:24 110:2
117:15 143:15
143:19 152:3
155:11,13
160:19 161:11
162:11 163:21
164:4 173:6
176:21 192:8
**individualized**
106:4
**individually**
65:12 105:22
105:23
**individuals**
27:11 50:22
54:3,5 55:12
55:17,18 60:3
60:14,20,24
62:4,15 79:1
79:12 92:12,17
111:5 119:16
119:22 120:4,8
139:6 151:14
151:18 155:10
179:19 191:20
191:24
**industries**
119:7,14
**industry**  36:7
37:5 138:23
139:6 203:24

**ineffective**
105:25
**infinite**  89:21
150:11
**info**  81:7 82:11
116:20,21
117:3,19
183:10,11,13
183:21 184:11
192:25,25
195:9,10,23,25
197:24 198:2
**information**
9:22 10:22
16:13,16,17,20
19:25 23:7,13
23:23 24:7,20
25:19 26:16
27:15,22 28:5
28:6,10 41:4
42:6,7,14 43:2
45:15,20 46:10
53:15 54:8
55:10,11,21
56:2 74:22
78:25 82:12
85:17 92:23
93:4 96:25
102:2 109:23
109:25 110:1
126:18 138:3
143:22 151:5
151:21,23
155:8,12 160:1
160:4,24

162:11 177:6
182:22 184:12
184:22 189:20
190:2 191:6
199:24 200:13
200:15 202:8
202:14 203:4
**informed**  52:3
106:21
**infrastructure**
24:25
**infrequently**
113:18
**initial**  77:9
90:2
**initially**  63:4
194:10
**input**  186:11
**inspect**  193:21
202:5
**installments**
79:16
**instance**  171:1
**instances**  53:5
73:8 89:17
113:21 172:9
**institute**  36:6
**instructing**
17:9,11
**instruction**
19:15 75:1
**instructions**
122:20
**intend**  17:22

**[intended - jnd's]**

**intended** 38:1,8
63:4 82:24
123:16 191:19
196:25
**intent** 37:13,14
81:15,16
111:22 189:6
**interaction**
187:8
**interchangea...**
166:24
**interest** 214:17
**interested** 7:24
67:15,16,25
144:20
**interfere** 17:18
**intermittent**
130:18
**internal** 187:25
188:4,10
195:17
**interrupt** 97:25
**introducing**
32:8
**invalid** 90:20
135:3
**investigate**
74:9 136:20
138:8
**investigation**
137:1
**involve** 38:20
**involved** 25:13
28:11 38:6
40:8,10,14,15

41:14 48:16
50:22 68:7
77:9 115:15,23
115:25
**involvement**
210:10
**involves** 38:21
39:7,16 111:17
**involving** 39:23
**ipads** 79:2
92:13,18
**iphone** 1:4 7:14
215:4 218:1
**iphones** 79:2
92:13,18
**ipod** 92:24
**isolation** 153:4
158:2 159:16
**issue** 38:17
39:2 52:18
82:9 91:17
152:16 166:18
194:7
**issues** 38:15
52:12,16 89:10
89:12 92:2
126:3 129:5,18
132:20,24
142:13 167:3
**issuing** 56:2
**it'd** 27:4 172:8
**items** 174:14
**iterate** 106:14
108:18

**iterating**
106:16,22
108:4
**iteration**
107:14,22
108:7,12,19,25
126:2
**iterations**
101:12 102:7
108:9
**iterative** 101:6
106:10 131:17
**ivanchan** 154:1
154:14

**j**

**j** 4:12 59:21
**january** 196:9
**jason** 5:16
156:6 157:1,25
158:8 160:2
161:22 163:9
**jay** 149:19
**jd** 193:2
**jennifer** 3:17
33:15,20 59:20
59:22 63:24
66:11
**jeremiah** 2:24
8:8
**jersey** 149:22
**jnd** 20:3,7,9
24:11,12,14,15
25:7 28:25
29:4,7 30:21
31:12,15 36:5

38:23 39:6,16
39:22 40:19
42:1,22 46:1
48:16,20 59:20
59:21,25 61:19
62:1,23 63:5
63:13,21 64:4
65:11,13 66:3
66:8,13,24
67:1,4,6,10,18
67:20,21 68:3
68:11 69:14
70:4,9,14,17,19
73:1 78:23
91:13 95:24
96:15 97:10,11
116:22 118:1
120:21 123:22
124:10,11
126:4,8 138:15
140:18 175:2
189:20 190:2
193:1,3,18,22
195:11,14,18
197:9,11,19
198:3,8,11,20
198:21 208:14
210:21
**jnd's** 36:4
47:23,25 48:4
48:10 51:5
63:18 65:14,20
65:24 126:18
194:19 198:16
202:5

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[job - lazarus]**

| | | | |
|---|---|---|---|
| **job** 1:23 24:19 | **keough** 3:17 | 66:19,20,24 | 209:22,23 |
| **join** 12:18 | 33:15,17,18,20 | 67:10,14 68:1 | 212:11,14 |
| **joined** 8:7 65:3 | 34:5 36:21 | 68:1,6 72:1 | **knowledge** |
| **joining** 8:9 | 37:2 59:19,20 | 80:16 89:3,9 | 20:9 22:12 |
| 129:11 | 60:8 62:12 | 93:1,5,10,14,18 | 40:13 61:21 |
| **jones** 3:21 47:6 | 63:24 | 97:2,2 99:18 | 66:13 139:10 |
| 47:9,11,12 | **keough's** 36:3 | 99:19 102:11 | **kwood** 2:10 |
| **journals** | 59:18,23 61:25 | 102:12 106:8 | **kyle** 2:7 3:24 |
| 139:10 | **keyboard** | 107:19 109:25 | 4:3 6:17 8:15 |
| **judgment** | 39:24 41:13 | 115:15 123:15 | |
| 105:13 | 42:22 43:19 | 123:25 125:14 | **l** |
| **july** 28:15 80:4 | 44:13 | 125:15 126:1 | **l** 69:12 127:17 |
| **jump** 14:1 65:5 | **kicking** 173:10 | 126:10,11 | 158:19,19 |
| **june** 1:12 7:1,6 | **kim** 4:5,12,19 | 128:24 133:25 | **labeled** 14:12 |
| 30:6 64:2 | 148:24 149:1,3 | 134:7 135:23 | **lack** 43:16 |
| 214:19 215:3 | 149:18 150:6 | 136:1 138:25 | **language** 15:21 |
| **junior** 146:18 | 151:6,11 | 139:1,5 140:6 | 36:18 58:7 |
| 146:21,22 | **kind** 27:16,19 | 141:9,14 142:6 | 60:5 61:25 |
| 147:3,6 | 38:10 41:1 | 142:7,12,17 | 78:10 92:14 |
| **jury** 64:12 | 168:6 | 143:9 145:17 | 101:9 102:3 |
| **justify** 108:10 | **kinds** 28:10 | 145:18 146:4 | 118:7 200:24 |
| **justifying** | **know** 9:6 15:15 | 146:23 151:20 | **large** 41:6 |
| 107:1 | 18:13 19:16,17 | 155:22 164:11 | 42:16 48:8,15 |
| | 26:23 29:18 | 165:20 168:13 | 49:6 51:11,12 |
| **k** | 32:7,24 33:15 | 168:19 169:5 | 56:10 78:24 |
| **k** 2:8 69:12 | 36:23 37:9,25 | 175:21 177:25 | **larger** 48:23 |
| 87:4 | 38:7,13,16 | 177:25 178:8,9 | 51:1,1 |
| **karlin** 69:8 | 40:19,24,25 | 180:22 181:23 | **largest** 138:23 |
| 71:9 206:2,3,4 | 42:7 44:4 | 185:22,22 | **laws** 217:2 |
| 206:6 | 45:20 46:4,6 | 186:1 187:9,12 | **lawsuits** 24:17 |
| **keep** 59:10 | 47:9 49:4,6 | 187:19 188:20 | **layer** 198:1 |
| **kellogg** 2:8 | 53:4 54:3 55:7 | 188:21 193:12 | **laymen's** |
| 8:15 65:3 | 55:13 56:16 | 198:14 201:16 | 170:16 |
| **kellogghanse...** | 58:3,5 63:8,9 | 202:7,9,17 | **lazarus** 2:13 |
| 2:10,11 | 63:12,15 66:10 | 203:8 207:8 | 3:4 4:4 6:17 |
| | | | 8:5,5 9:2 11:1 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[lazarus - line]**

12:11,15,21
14:3,7,9,11
15:13 16:17
17:1,6,9,13,19
17:21,22 18:2
18:4,16,19,21
18:23 19:9,19
20:1,13 21:1
26:19 27:14,21
29:2 31:18
33:4,8,11,12
34:20 36:2,25
37:7 39:20
44:6,12,23
46:14,23 47:2
48:15 49:8,24
50:10,23 51:24
55:24 56:7
58:6,25 59:4,9
59:11,12 60:23
61:8 62:21
64:9,17,20
65:5,19 66:6
66:24 67:16
68:23 70:12,19
71:7,13 72:11
72:16,19,20
73:20 74:19
75:3,6,14,21
76:1,4,5,11,20
76:22 77:8
79:22 80:2
84:2,16,22
88:21,22 90:9
91:20 94:25

95:17,21 98:3
99:8 100:2,14
101:4 105:1
106:20 107:17
109:5 113:1,6
115:24 117:7
117:14 119:3
121:13,17
122:24 123:14
125:20 128:9
128:17,18,23
128:24 129:12
129:16 132:5,9
133:8 137:16
140:3 141:2,23
144:8 148:11
148:13,15
149:7,10,13,15
150:1,4,5
151:12 152:1
153:17,20,21
154:7,9 156:2
156:5,17,20
157:4,7 158:14
158:16 159:23
159:25 160:16
161:8 162:14
162:22 163:7
165:11 169:10
169:17,18
174:2,20 180:5
180:8 183:15
183:17 185:16
187:23 191:18
193:4,6 196:4

196:8,13,22,23
198:19 199:1,4
199:15,16
201:18,24
202:19,25
203:11,20
204:8,15,22
205:13,22,23
206:15,17
207:6 209:4,13
210:3,9 211:20
211:22 212:1,4
212:9,14,19
**lead** 207:23
**learn** 64:15
   119:4 152:23
**leave** 129:5,19
**left** 148:16
**legal** 20:3
   24:11,15,16
   25:7 30:10
   32:17 34:15
   58:1 59:20
   70:17 104:9
   138:22,23
   201:21 215:7
**legitimate**
   86:22 87:9
   89:14 90:4
   136:22
**lerman** 39:24
   40:6 41:6
**letter** 4:2 6:16
   13:18,21 84:18
   84:19,23,24

85:1,6,10 86:1
86:13 196:5,8
197:10,18
**letters** 87:4
**letting** 72:5
**level** 12:23
   91:17 96:8
   100:7,9 108:20
   131:13 140:13
   140:17 152:20
   174:24 175:25
   176:19 177:1
   186:7
**levenshtein**
   114:7
**life** 32:21,22
**likely** 91:5
   99:16 108:25
   165:19 166:16
   176:20 192:10
   199:25 200:12
   202:12,19
   203:2,12
   204:17,24
**limitations**
   85:25 86:4,8
   86:12 121:7
**limited** 121:8
   127:5 178:7
**lin** 2:17 3:24
   8:7 72:9 80:3
   80:12 149:12
   212:15
**line** 8:9 22:18
   22:21 59:24

Page 31

**[line - made]**

85:11 130:18
145:3 163:18
173:5 215:15
216:4 218:4,7
218:10,13,16
218:19
**lines** 172:13,16
172:25
**link** 2:8 65:3
**linked** 73:9
**list** 19:14 26:6
26:12 32:7
80:25,25 120:8
133:1 136:8
137:9 157:19
190:10,14
210:10,18,19
**listed** 63:1,10
81:6 83:23
90:19 130:16
132:2 148:16
148:21,24
149:21 150:6,8
150:10 154:1,3
154:11,14,17
156:6,8,10,23
157:8,10,12,15
158:18,21,23
159:1 211:15
**lists** 19:5 80:18
127:13 149:3
153:23
**literature**
109:9 110:16
110:21

**litigation** 1:5
3:16,20 7:15
33:21,22,25
39:25 41:14
42:17 46:17
47:7,16 48:11
49:11 51:6,16
52:19 53:13
55:5 65:15
72:22 215:4
218:1
**little** 40:9 59:17
73:6
**live** 158:9
161:23
**lived** 147:5
**living** 146:22
149:1
**llp** 2:4,14,18
8:13 47:13
**load** 130:12
**loan** 56:2
**loans** 55:13,19
**local** 128:2
**location** 7:17
113:12
**locked** 215:12
216:1
**logic** 61:1
131:10 140:5
167:4 178:3
**logical** 51:12
145:9 171:17
180:2,3,4

**logistic** 116:5
**long** 13:11
172:16 180:11
183:15 209:17
**longer** 28:22,23
30:12,13
105:15 107:1,6
171:11 179:16
207:23 208:2
**longest** 114:14
**look** 13:15
19:21 22:17
36:3 47:21
70:23 72:24
74:7 80:12
84:4,25 88:18
136:5 138:10
141:7 148:10
152:20 158:3,4
170:22 179:23
192:8 197:7
209:9
**looked** 13:14
40:24 90:24
105:21 165:21
177:25 180:11
**looking** 44:12
49:14 77:15
84:9,10 90:18
91:4 125:20
128:19,20
141:16 152:14
152:25 156:5
157:18,24
159:4 166:12

168:17 183:2
186:16 196:11
208:4
**looks** 47:8 80:6
136:10 150:16
157:23 159:16
199:9
**lookup** 187:10
**loop** 89:21
150:11
**lori** 2:23 7:20
**lost** 56:18
97:25
**lot** 9:9 97:6
190:24
**love** 168:11
196:15
**low** 106:15
107:19

**m**

**m** 2:7,9,13,19
3:17 69:12
**macbook** 39:24
41:13 42:22
43:3,19 44:12
44:20
**machine**
127:23 128:2
142:18
**made** 92:24
93:19 126:25
143:23 162:12
163:21 167:10
177:14 189:16
189:17 190:13

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[made - matches]**

190:22
**madison** 2:5
**mail** 25:18
146:24
**mailings** 36:5,9
**main** 24:22
182:4
**maintain** 20:5
**majority** 70:10
96:16,20 97:13
97:15,18
174:13 199:18
**make** 11:22
27:17 58:4
74:24 106:24
106:25 111:5
119:21 122:12
137:6 139:22
140:3 143:4,10
160:22 164:10
166:20 170:10
173:2,7,13
180:15 194:17
215:14 216:3
**makes** 108:13
207:18
**making** 92:17
109:10 119:16
131:17,18
**management**
23:7,13,22
24:6 25:2,14
63:17
**manager** 69:14

**managers**
211:12
**managing**
25:11 29:11
**manner** 6:23
103:23
**manual** 87:25
142:11
**manually** 87:22
87:24 88:4,7
141:16,19
**march** 6:19
16:3 47:3,4
199:5 201:20
202:2
**marching**
126:22
**marginal** 101:7
101:9,16,18,19
102:3,15,19,22
103:6,8,10,17
103:20 104:3
104:14 105:3
106:14,25
107:18,19,21
**mark** 13:22
14:3 18:17
46:23 79:22
84:17 154:7
156:2,17
158:14 196:4
196:25
**marked** 14:6
18:22 33:10
47:1 72:15,18

80:1 84:21
88:19 126:14
148:12 149:9
150:3 153:19
154:8 156:4,19
158:15 196:7
196:24 199:2,3
**marketplace**
71:19
**marking**
159:18
**markups**
200:21
**married** 158:8
160:2 161:22
179:21
**maryland**
156:14 157:16
159:2
**massively**
43:13
**master's** 23:17
**match** 32:11
61:4 62:8
87:13 94:12
100:6 101:23
104:1,5,12,18
105:19,20,22
106:3,4 107:8
109:14 110:14
114:8 116:13
118:12,19
134:20 140:12
140:12,14,16
141:9,14,18

142:24 144:4
144:12,22
145:5,11,12
146:1,8 147:14
148:5,7,9,18
151:25 152:6
152:17,22
153:14,16
167:6 177:1,5
177:8 178:8
179:22,24
180:2,4 182:9
182:12,14,15
183:11,24
187:24 207:5
207:15,19
**matched** 96:11
100:5 102:1
107:11 135:20
144:23 145:2
145:10,19
146:2 152:12
152:15 153:2
155:16 176:7
176:20 177:19
179:10 181:4
182:18 183:20
184:9
**matches** 60:21
101:3 102:8,18
102:20 103:21
104:7,17 105:5
105:10,12,16
106:5,14
107:14,22

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[matches - method]**

108:22 109:1,7
114:11 123:1
140:19,19,23
141:12 142:11
142:14,24
146:10,11
152:10,13,15
152:21 177:25
178:14,15
179:1 182:23
187:19 207:16
207:19 208:7,8
208:9
**matching** 29:17
29:18,22 30:1
31:7,9 32:2
68:20 69:2
90:15,22 101:2
102:14 108:20
109:19 110:4,7
110:9,12,18,23
111:4,10,13,15
111:18,21,25
112:2,8 113:7
114:12,15,18
114:21 115:1,2
115:5,6 116:3
116:6 119:12
121:23 129:6
129:19 131:10
131:14,19
134:22 135:1
135:19,22
141:7 143:3,4
143:9 144:5,18

144:18,19
145:8,25
146:12 147:19
152:6 155:19
165:7,15,17
166:10 167:1,4
170:24 171:5
171:18 176:7
176:13,17
177:13 178:3
178:21,22
182:13 188:7,8
206:21
**material** 200:4
**materials** 20:21
125:16 134:6
179:6 189:16
191:2
**matter** 16:11
16:15 49:16
65:7 69:5,20
74:15 214:16
**matters** 12:20
**maximize** 32:2
**mean** 28:2 38:9
40:10,11 43:1
43:11 50:12
51:1,3 79:7
87:15,24,25
101:19 102:6
107:13 114:22
130:23 131:8
132:4,5,6,6
140:18 141:22
141:25 146:4

164:16 165:3
167:18,20
168:22 169:2
176:12 191:16
203:21 212:1
**meaning** 16:18
56:18 67:17
141:16 195:19
**meaningful**
108:10 135:18
172:7 179:19
**meaningfully**
177:15
**means** 77:22
78:5,10 87:17
88:1 93:24
94:9,19 95:2
95:18 102:23
103:12 107:1
116:9 170:3
197:11
**measure** 106:1
209:3 210:1
**measures** 36:7
**mechanically**
126:1
**media** 7:12
212:25
**meet** 13:1
**meeting** 22:7
**meetings** 9:7
13:11
**megan** 3:21
47:6,9,11,12

**melissa** 55:3,4
55:8 120:16,21
121:6 185:3,18
185:20,22,25
186:20,23,23
187:4,9,15,19
187:24,25
188:13
**member** 43:7
162:9 163:22
**members** 25:19
34:12,25 35:8
35:20 38:14
49:17 50:4,13
198:4
**memory** 113:10
124:4 188:15
191:6 192:22
209:10
**mention** 92:3
**mentioned**
13:13 24:10
35:11,17 86:17
134:15 141:3
147:24 167:11
179:3 185:6
192:22 195:22
205:23 206:4,6
**merge** 30:1
189:21
**merged** 190:7
**met** 9:5 12:23
13:3,6
**method** 102:7
108:3,4 111:4

Page 34

**[method - names]**

111:8,9 113:11
113:17 138:3
144:3,10
152:24 157:22
159:10
**methodologies**
38:23 52:13
57:4,6 95:15
100:22 119:8
**methodology**
24:3 58:20
59:13
**methods** 19:2
19:11,20 20:6
20:10,15 31:13
31:14,22 38:23
51:25 52:8,13
56:24 57:3,5
110:25 111:3,7
111:16 112:11
117:24 118:1
118:10,15,23
120:21 138:13
138:15,18,20
138:21 139:8
139:12,17,22
175:15,16,24
**metric** 95:9
**metrics** 114:6
114:11
**mic** 17:20
**microphones**
7:7
**middle** 47:22
197:23

**million** 41:10
42:19 47:23
132:15,16,16
132:16,17,17
139:18 188:14
188:17,24
193:8,13
**mind** 57:22
128:6 188:17
188:18
**mine** 156:24
**minimal** 177:19
**minjae** 124:14
124:20
**minute** 197:13
**minutes** 169:9
**missed** 38:3
39:11,11 103:3
163:8
**missing** 84:7
133:3,3,4,9
136:12
**mistakes** 165:7
165:9,15,16,17
165:19,21,21
165:22,23,25
166:3,6,9,13,13
167:1,1,10
**misused** 103:3
**modeling** 58:10
116:5
**modification**
143:5
**modifications**
194:17

**mom** 89:7,11
**moment** 14:1
18:3 77:6
79:25 91:8
131:2 196:14
197:7
**monday** 13:3
**money** 102:13
162:15 204:17
204:24
**months** 51:16
51:17 56:14,15
75:17
**morning** 7:5
210:9
**move** 17:20
64:9 114:24
143:8
**moved** 192:9
208:1,6,8
**multiple** 43:23
140:4 178:10
178:11 181:22
183:3 185:9
186:1 196:1
204:18,25
**mute** 7:9
**mutually** 108:5

**n**

**n** 2:1 3:1 69:12
69:12 114:17
**n.w.** 2:19
**name** 7:20 9:3
10:15 27:12
45:15,17 46:11

54:8 80:19,19
81:3,4 89:1
120:17 133:4
144:22,23,23
145:4,11,13
146:14,15
147:1,2,2,6,9
147:14 148:21
148:24 149:18
149:19 150:5,6
150:8 151:6
152:4,6,11
153:23 154:1
154:11,14,20
154:21 155:20
155:20,21,25
156:6,8,23
157:8,10
158:18,21
176:8,8,22,23
178:5 179:11
179:15,16,20
185:20 188:11
188:25 189:19
190:1,19
192:13 206:1
206:19,21,23
207:3,3,4,7
**named** 13:16
124:13 132:15
160:3 192:18
**names** 28:3
78:7 80:25,25
86:22,25 87:9
94:1 114:8

[names - object]

145:19 147:10
147:15 148:15
150:17 181:17
181:20 190:10
**nanny** 161:23
**national** 54:16
54:20 120:10
120:13 184:23
**natural** 58:7
**nature** 50:21
50:21 122:3
144:15
**ncoa** 13:20
127:21,22
130:6,10,12
182:14 184:19
184:23 185:10
185:15,16
186:2,5,25
187:10 188:2
188:12 189:12
190:4,11,15,18
191:1,10,19
192:4,7
**ncoa.sql** 130:9
**necessarily**
6:24 146:11
**necessary**
131:18 184:13
215:14 216:3
**need** 15:7,20
16:25 27:19
59:2,2 64:12
72:10 73:8
75:24 135:6

153:13 173:1
173:13 187:1
197:13 209:15
209:16
**needed** 70:25
134:2 135:7
142:13 167:4
169:22 178:2
196:1 209:3
**needle** 208:7
**needs** 37:16
59:8
**negative** 97:5
164:23 165:2
**negatives** 99:11
**neighborhood**
188:23
**neil** 63:24
66:11
**neither** 26:24
123:2 181:24
**networking**
25:1
**never** 44:24
93:3 168:7
**new** 2:5,5 107:9
108:16 149:22
189:19 190:1
**nine** 118:1
138:15
**non** 26:6 82:6
92:6 130:4,5
170:23 171:1
**noninformative**
210:2

**nonstandard**
87:18 169:20
171:16 210:2
**noon** 98:2,3
**normally** 58:20
**northern** 1:2
7:16
**not's** 97:6
**notating**
215:15 216:4
**note** 6:23 7:7
12:17
**noted** 159:24
**notepad** 127:23
**notice** 11:3
32:24 34:10,11
34:23,24 35:7
35:12,19 37:19
49:3 85:11
**noticing** 8:4
25:12,16,18
35:14,25
**notifying** 61:17
**noting** 65:2
**noun** 175:11
**number** 7:17
42:3 45:16,18
48:6,9,16 50:4
55:9 69:24
108:22 113:23
113:23,24
123:4 125:9,14
125:15,16,22
135:20,21
136:21 137:5

137:12,19
138:6 149:11
150:24 155:6
155:24 177:7,8
177:15 178:9
182:4 188:16
188:20,22
189:13,15
191:24 193:1,3
193:10 202:13
202:20 203:2
203:12 206:20
207:5,8 208:15
212:25 215:15
216:4
**numbers** 11:8
85:16 123:7
136:8,12,23
137:3,8 150:23
178:11 181:17
181:19 206:22
**numeric** 195:16
195:20
**nw** 2:9

**o**

**o** 69:12 192:14
**oakland** 1:3
7:16
**oath** 11:24
**oaths** 214:3
**object** 16:12
74:16 123:11
132:25 159:17
204:13 206:12
207:1 210:3

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [objecting - okay]

| | | | |
|---|---|---|---|
| **objecting** 76:10 | 151:7,19 | **occurring** | 30:3,5,16,18,20 |
| **objection** 10:20 | 159:23 160:13 | 124:25 214:14 | 31:9,13 32:13 |
| 15:11 16:24 | 161:7 162:4,17 | **occurs** 130:2,4 | 33:9,25 34:18 |
| 17:2 19:4,13 | 163:2 165:10 | **october** 30:6 | 35:3 36:2,2,20 |
| 19:22 20:11,24 | 173:25 174:7 | **offer** 17:23 | 36:25 39:22 |
| 26:18 27:9,18 | 183:14 185:11 | **offering** 18:5 | 40:19,23,25 |
| 29:1 31:16 | 187:21 191:12 | **offerings** | 41:6,13,16,21 |
| 34:14 35:23 | 198:13 199:14 | 185:25 186:1 | 41:25 42:5,9 |
| 36:22 37:4 | 201:15,21 | **offers** 187:10 | 42:16,19,21 |
| 39:19 44:3,9 | 202:16,22 | **office** 79:15,18 | 43:9,18 44:23 |
| 44:18 46:12 | 203:6,15 204:3 | 80:14 193:18 | 45:19,23 46:8 |
| 48:12,25 49:8 | 204:19 205:7 | 194:1,20 202:5 | 46:14,22 47:9 |
| 49:20 50:6,18 | 208:21 | 215:11 | 47:12,15,19 |
| 51:22 55:22 | **objectionable** | **officer** 24:20,21 | 48:5,8,22 |
| 56:4 57:25 | 17:5 | **oh** 16:1 36:15 | 49:14 50:10 |
| 60:16 61:7 | **objections** 7:25 | 80:16 114:25 | 51:20,24 52:5 |
| 62:17 64:6 | **objector** 17:17 | 156:25 165:23 | 52:7,15,25 |
| 65:17 66:5,17 | **obligated** | 173:19 | 53:6 54:20 |
| 67:12 68:22 | 201:19 202:1 | **okay** 9:14,16 | 55:2,10,16 |
| 70:16 71:6,11 | **observe** 208:2 | 9:18,20 10:5 | 56:1,7,12,24 |
| 73:15 75:23,23 | **obtained** 44:17 | 10:14,16,18 | 57:14,18,22 |
| 76:3,9,19 77:1 | 184:23 | 11:18 13:1,23 | 59:9,11,16 |
| 84:1 90:6 | **obvious** 173:6 | 13:25 14:2,18 | 60:7 61:13,19 |
| 91:15 94:22 | **obviously** | 14:21,21 15:1 | 61:24,24 63:9 |
| 95:10,20 99:25 | 62:22 | 15:21,24,24 | 63:13 64:2,4,9 |
| 100:13,18 | **occasion** 85:17 | 16:17,21 17:22 | 64:9,21 65:14 |
| 103:18 104:22 | **occur** 78:20 | 18:2,8,11,15,23 | 65:19,24 66:13 |
| 106:17 107:15 | 141:12 143:4 | 19:9,19 20:1 | 66:24 67:10,16 |
| 109:3 112:24 | 171:5 | 21:1,6,19 22:3 | 68:1,5,9,14,17 |
| 113:4 117:4,12 | **occurred** 67:8 | 22:9,13,17,24 | 69:1,7,11,15,22 |
| 118:25 121:12 | 130:15 142:12 | 23:2,12,16 | 70:1,3,14 71:5 |
| 121:15 122:21 | 142:14 152:15 | 24:11 25:16 | 71:13,22 72:4 |
| 125:19 137:14 | 153:14 166:19 | 27:6,14,24 | 73:13,24 74:4 |
| 139:25 140:21 | 167:6 189:4 | 28:2,5,10,13,14 | 74:5,13 75:14 |
| 141:20 144:6 | 209:1 | 28:21,24 29:5 | 75:21 76:4,11 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[okay - orders]**

| | | | |
|---|---|---|---|
| 76:20,22 77:4 | 132:18 133:8 | 197:15,16,21 | 153:1,15 155:9 |
| 77:14 78:15 | 133:11,21 | 198:6,19 | 158:1 159:12 |
| 79:14 80:7,10 | 134:21 135:2 | 199:10,13,21 | 191:10 192:2 |
| 80:13,18 81:4 | 135:20 136:3 | 200:24 201:2 | **opinions**  10:9 |
| 81:6,16,21,23 | 136:15,25 | 202:4,9,25 | 17:23 18:5,9 |
| 82:5 83:1,14 | 137:11,17,23 | 203:11 205:3 | 19:3,12 20:13 |
| 83:23 84:3,8,9 | 138:2,10 140:9 | 205:13,13 | 20:18 21:2 |
| 84:25 85:3,8 | 142:15 143:10 | 209:13 210:20 | 86:10,14 |
| 87:7 88:11,18 | 143:23 144:2,8 | 211:14 212:17 | 117:23 120:22 |
| 89:4,17,20 | 144:20 146:13 | 212:19,22 | 122:10 123:16 |
| 90:16,24 91:9 | 147:8,13,23 | **omissions** | 123:23 |
| 92:16,22 93:14 | 148:10 149:7 | 22:10 | **opportunities** |
| 94:6,7,15 96:6 | 149:13,24 | **omit**  85:17 | 140:7 143:3,4 |
| 96:19 99:16,21 | 150:22 154:6 | **once**  9:15 25:21 | **opposed**  27:16 |
| 100:11 101:20 | 157:7 158:6,13 | 37:17 189:18 | 65:11 83:11 |
| 102:21 103:5 | 160:7 163:7,15 | 189:25 210:7,7 | 111:15 162:10 |
| 104:8 105:1 | 164:22 166:25 | 210:8 | 167:2 |
| 106:7 107:4,12 | 167:23 168:5 | **ones**  13:16 | **opposing**  58:21 |
| 108:6 109:9 | 169:1,7,10 | 133:17 162:24 | 59:14 |
| 110:13 111:20 | 170:13,18 | **ooo**  7:3 99:3 | **oral**  1:9 |
| 112:3,5,10 | 171:19,25 | **open**  127:25 | **order**  19:8 |
| 113:6,9,13,16 | 172:9,13,21 | 167:24 | 32:23 54:24 |
| 113:20 114:1,6 | 174:20,25 | **operating** | 60:1 62:2 73:2 |
| 117:22,22 | 175:8,13 176:1 | 24:21 | 73:7 105:9,11 |
| 118:6 119:15 | 176:16 178:18 | **operations** | 113:24 120:13 |
| 120:2,19 121:3 | 179:15 180:20 | 24:24 25:1 | 122:3 126:16 |
| 122:8 123:4,10 | 180:24 181:3,6 | 29:8 31:2,3 | 126:22 127:6,7 |
| 123:19 124:2,7 | 181:12,16,21 | 41:19 | 127:12 135:7 |
| 124:13,16,23 | 181:25 182:3 | **operator** | 162:1,25 |
| 125:1,5,11,14 | 186:9 187:13 | 204:16,23 | 171:17 173:8 |
| 126:12,24 | 188:11,17 | **operators** | 173:13 189:9 |
| 127:1,22 128:3 | 189:15,18 | 203:14 | 202:14 204:1 |
| 128:7,9,18 | 190:17 191:1 | **opinion**  90:3,7 | 212:2,12,13,16 |
| 129:3 130:21 | 193:15 194:4,9 | 90:11 151:13 | **orders**  121:8 |
| 131:4,7,20,24 | 194:13 195:5 | 151:16,21 | 211:25 212:3,3 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[ordinary - paragraph]

**ordinary** 84:12
85:13
**oregon** 214:5
214:24
**organization**
24:23,24,25
31:3 139:13
185:14
**organizations**
138:24 207:17
**original** 15:3
215:10,20,22
**originated**
80:11
**ouput** 192:13
**outcome** 7:24
11:8 19:8
21:18 29:19
38:11,20,25
75:19 78:21
82:14,18 95:16
119:24 120:1
142:19,23
143:2 173:20
174:15 175:16
175:25 178:12
**outcomes** 101:1
127:9 141:7
174:12 177:16
208:24 209:1
**outdated**
112:21
**outliers** 134:1
**output** 75:19
116:24 126:17

155:14 172:11
173:18,24
174:6 186:8
188:2 191:8
192:16,19
193:11 194:24
195:8
**outside** 20:9
23:9 118:14
124:10,11
126:8
**outsourced**
187:15
**outweighed**
101:7 102:4,9
102:22 103:11
104:19 105:4
106:15 107:19
107:20
**overall** 75:16
131:12 133:6,7
**overlapping**
29:3 78:18
**overly** 113:19
**overmatching**
155:23 207:20
208:10
**overnotice**
61:17
**oversaw** 26:8
45:7
**oversee** 24:23
24:24 29:8
**oversight** 25:11

**own** 16:18
60:10 120:21
160:21 164:3
202:15
**owned** 43:4
**owner** 43:6
**ownership** 43:3
43:5 44:21

**p**

**p** 2:1,1 30:18
192:14
**p.m.** 98:7,8
99:2 128:14,14
169:14,14
196:19,19
205:19,19
213:3
**page** 3:3,9 4:1
5:1 6:1 14:18
22:17 26:2,11
26:11 34:4
70:8 79:24
84:10,19 85:10
197:3,21
199:11 215:15
216:4 218:4,7
218:10,13,16
218:19
**pages** 1:25
201:11 215:14
215:17,17
216:3,6,6
**paid** 65:11,13
66:3,8,14 93:3
93:11,15

160:19
**paper** 14:10
159:18
**paragraph**
22:22 26:1,4,5
34:4 36:3,11
36:13,15,21
40:3 42:21
47:21 51:14
53:9 56:12
59:23,24 70:4
70:7,15,21
71:1,2 72:25
72:25 73:6,13
77:21 78:1,2,3
78:11,23 79:5
79:5,10 92:10
92:14 93:22
94:3,8,15,17,25
95:22 96:14
101:5,16 106:8
116:8,17 117:1
117:5 118:5,8
118:11 125:25
126:9 128:19
128:25 129:3
129:17 131:25
132:6,9,18
138:10,12
139:16 140:9
142:21 175:1
176:6 177:18
179:10 184:19
197:4,8,14,21
197:23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

**[paragraphs - people]**

**paragraphs** 70:23 71:7 74:7,8
**parameters** 114:21,23
**paraphrasing** 116:10
**parent** 161:1,6
**parents** 160:9 161:2,4
**park** 149:21
**parlance** 83:15
**part** 36:15 60:23 90:13 94:8,18 110:14 111:9 112:7 123:17 143:14 143:19 163:24 169:1 192:14 203:4
**partial** 95:12 145:2,9 155:20 155:21,25 207:3
**partially** 94:20
**particular** 32:10 35:12 39:18 40:21 82:6 88:10 91:7 100:16 113:21 117:10 121:17 136:14 143:1 170:5,7 170:10,21,22 171:2 172:4,10

187:2 206:11 207:12,13
**parties** 7:11 33:2 36:6
**parts** 20:5 170:14 183:18
**party** 7:23 11:6 46:1 54:24 58:21 59:14 127:7 185:3 214:16
**party's** 188:4
**past** 118:1 138:15 175:20 210:6
**paths** 38:14 126:20
**patience** 9:10 209:17
**pay** 55:20 162:16 164:7
**payment** 25:23 25:24 43:7 138:3,3 150:20 157:22 159:10 160:22 177:6
**payments** 162:13
**payor** 4:6,13,20 5:3,10,17 6:3 6:10 51:21 56:22 70:5,9 70:20 73:2,3,8 73:8 77:19 78:6 79:4,13

79:17,20 80:15 80:22 81:9,10 82:22,24 83:11 83:25 85:20 86:2,5,9,13,18 86:21 89:22,22 90:8 91:12 92:22 93:1,10 93:14,18,25 94:11,12,20 95:3,19 96:15 97:12 99:12 100:4 109:15 116:13,14,18 117:8,8,15,15 117:16,18,20 120:9,20 130:3 130:7,8,9 139:19,24 143:14,19 146:3 147:11 147:21 148:14 148:19 149:17 151:14 153:12 153:22 154:10 156:22 158:17 160:12,14,18 161:6 162:6,15 163:17 164:2 164:17 165:5 180:24 186:20 188:25 189:21 190:7 191:23 192:3 202:13 202:20 203:3

203:12,13 204:1,17,24
**payor's** 138:5
**payors** 78:25 90:5,12 92:11 92:17,24 123:5 137:13,20,24 147:1 158:1,3 158:5 159:14 163:13 165:4 193:8 202:13 202:20 203:3
**pays** 161:1,3
**pc** 190:5
**pdf** 215:12 216:1
**peer** 20:14 24:1
**penalty** 215:16 216:5 217:1
**pennsylvania** 154:4,18 181:7
**people** 27:22 28:12 37:18 39:4,5,7,16 40:12 50:9,11 62:19 83:16 97:25 126:8 145:7 146:14 146:19 159:16 176:25 178:10 178:10 192:3 200:6,10 211:3 211:6,7,11,12 211:16,17

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[people's - please]

**people's** 66:15
**percent** 26:24
  26:25 27:3,4
  84:6 97:19
  99:13,17,24
  100:3 211:1,1
**percentage**
  26:19
**perfect** 168:18
**perform** 11:7
  58:19 67:17
  69:1 88:9
  177:22 184:14
  186:7 187:13
  203:22
**performed**
  38:25 51:9
  56:11 69:17,18
  125:6 141:15
  141:19 178:25
  179:2
**performing**
  25:10 38:10
  78:21 104:12
  178:23
**period** 76:14
  154:4,24
  157:13 192:8
  210:20,25
  215:18 216:7
**period's** 210:18
**periodicals**
  139:10
**perjury** 215:17
  216:6 217:1

**permutations**
  182:5
**person** 60:4,15
  60:25 62:5,15
  68:21 78:7,8
  82:20,23 83:14
  94:1,2,13 95:4
  95:7 109:21
  116:14 117:2,8
  117:10,14,17
  143:13,18
  145:4 150:15
  153:9 155:3
  162:15,20
  167:12 170:2
  176:8,24 177:2
  178:6 179:3,11
  179:25 187:7
  205:25 207:4
  208:14,17
**personal** 27:15
  53:14 160:24
  177:20 182:19
  182:21 183:12
  184:10
**personally**
  26:14,15,20
  40:8,10,14,15
  41:3,3,14 42:5
  44:24 45:7,14
  53:10 54:8
  56:11 68:9
  69:1 105:19
  118:17 126:3
  184:12

**persons** 26:15
  28:6
**pertained**
  13:19,20
**ph.d.** 23:17
**phillips** 2:18
  129:11,12
**phone** 27:12
  45:15,18 85:16
  135:20,21
  136:8,11,21,23
  137:3,5,7,12,19
  150:23,24
  155:5,24 177:7
  177:8,15 178:8
  178:11 194:14
  206:22 207:4
  209:8,11
**phones** 7:9
**phonetic** 116:2
**phrase** 145:8
  195:18
**pick** 7:8
**picks** 187:6
**piece** 88:9,14
  104:24 111:12
  182:21 192:20
  200:7
**pieces** 32:22
  85:9 161:11
  170:21
**pin** 89:4
**pittsburgh**
  181:7

**place** 7:10 68:2
  214:8,14
**places** 172:22
**plaintiffs** 13:23
  65:21,25 66:25
  67:5 68:3
  71:23 72:4
  73:14,17,21
  74:13,22 80:3
  84:19 94:16
  95:24 97:9
  122:8,11,13,24
  123:15,22
  159:21 175:3
  196:9 197:5,25
  201:19,25
**plan** 46:10
**plans** 45:22
**plausible**
  133:13 137:11
  137:18 153:10
  155:13 158:7
  158:11,12
  160:8
**play** 67:20
**please** 7:7,9 8:1
  8:19 9:3 11:13
  14:10 33:5
  39:12 65:1
  69:9 72:25
  75:25 76:11
  79:9,22 83:5
  84:16 86:11
  99:6 101:14
  104:23,25

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[please - primary]**

| | | | |
|---|---|---|---|
| 128:16 129:14 | **points** 54:16 | **possible** 43:23 | **practices** 36:8 |
| 129:14,22 | 60:19 61:3 | 44:16 56:1 | **pre** 56:17 |
| 137:17,17 | 87:13 93:16 | 61:18 87:20 | **predictive** |
| 140:1 142:2 | 100:6 101:2 | 99:13 104:7,17 | 116:4 |
| 148:11 153:17 | 109:25 110:2 | 104:18 105:19 | **preface** 74:21 |
| 164:25 169:16 | 111:13 131:14 | 105:20 106:3,4 | **preliminaries** |
| 196:21 197:14 | 140:11,13 | 121:16,19 | 11:11 12:12 |
| 199:2 204:21 | 145:2,9 152:21 | 153:2,3 161:14 | **preliminary** |
| 204:21 205:21 | 178:24 183:12 | 161:22 166:6,9 | 9:11 |
| 211:25 | 184:3 208:2 | 182:2 | **prep** 25:14 32:1 |
| **pllc** 2:8 | **populated** | **possibly** 16:13 | **preparation** |
| **plus** 132:17 | 85:19,20 210:1 | 16:15 91:1 | 13:7,16 159:22 |
| **point** 15:14 | **population** | 203:9 211:1 | **prepare** 12:16 |
| 32:7 40:24 | 10:23 11:2,2,4 | **postal** 54:21 | 12:22 16:21 |
| 47:11 48:2 | 11:5 120:15 | 80:19 112:15 | **present** 2:22 |
| 54:15 59:3,5 | 179:19 189:2 | 112:15,17,18 | 8:2 155:22 |
| 61:23 77:6 | **portion** 52:23 | 148:7 151:1 | **pretty** 191:7 |
| 88:17 90:17,19 | 81:18 82:1 | 176:9,24 | **prevail** 66:1,1 |
| 96:12 101:4 | 89:11,16,24 | 179:12 184:24 | **previous** |
| 102:21,23 | 120:14 130:14 | 186:12 | 112:23,23 |
| 103:10,12,23 | 171:21 172:10 | **postcards** | 175:23 199:19 |
| 106:13 107:5 | 186:20 | 37:18,19 | 199:21 200:1,1 |
| 109:6 110:5 | **portions** 15:3 | **potential** 32:11 | 200:3,5 |
| 117:6,11 | 15:10 16:7,9 | 105:11 142:23 | **previously** 13:8 |
| 119:15 128:1 | 172:1 173:12 | 163:22 | 13:9 32:6 80:7 |
| 130:25 132:10 | 173:17,19,22 | **potentially** | 134:15 147:25 |
| 133:19 135:5 | 174:4 187:2 | 87:19 101:11 | 167:11 195:23 |
| 140:24 148:8 | 200:19 | 146:12 170:24 | 198:15 |
| 151:10 152:11 | **position** 198:14 | **pour** 65:10 | **price** 185:19 |
| 169:20 172:3 | **positive** 50:3 | **practicable** | **primarily** |
| 177:21 182:19 | 61:4 164:15,19 | 34:10,23 35:7 | 31:11 178:20 |
| 182:24 183:5 | 179:22 207:19 | 35:19 | **primary** 29:25 |
| 184:10 185:6 | **possibility** 67:1 | **practice** 36:20 | 94:12 101:22 |
| 189:2,5 199:23 | 67:6 96:23 | 60:7,11 61:5 | 116:14,21 |
| 206:19 209:5 | 97:21 198:8 | 61:10 113:17 | 117:2,3 172:6 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[primary - provided]**

| | | | |
|---|---|---|---|
| 189:3 192:25 195:10 199:20 | 76:16 101:6,12 106:10,22 | 18:24 21:13,24 58:15 59:12 | **project** 25:2,12 69:3 167:25 |
| **printed** 84:19 | 109:8,10 110:4 | 68:19 78:24 | **projects** 25:4 |
| **printout** 193:5 | 110:9,12 112:7 | 82:9,14 92:23 | **pronouncing** 33:15 |
| **prior** 9:6 10:12 14:24 16:10 124:20 185:12 | 119:8 120:2,13 127:21,22 131:17,21 134:3 135:9 | 107:22 108:7 108:19 121:21 125:17 134:6 142:16 172:19 | **properties** 115:1,4,7,11 116:1 |
| **priority** 43:16 | 136:19 175:24 | 173:21 174:5 | **proprietary** |
| **privacy** 202:15 | 177:13 182:9 | 174:10 179:6 | 20:7 58:20 |
| **private** 7:8 | 183:25 184:7 | 195:9 207:15 | 59:13 117:25 |
| **privy** 67:9 68:6 68:8 164:1 | 184:16,17 186:7 187:4 | 209:2 **produces** | 138:14 139:12 **protect** 202:15 |
| **probably** 17:21 64:3 133:25 183:25 210:25 | 190:5,16 191:9 192:9 **processes** | 179:21 **producing** 77:12 126:22 | **protected** 33:7 **protecting** 189:9 |
| **problem** 72:7 75:4,12 82:3 109:5 129:16 | 112:13,21 119:8 182:12 188:1,10 | 127:4 **product** 17:8 18:1 74:18 | **protection** 12:20 121:7 **protective** |
| **procedure** 215:19,21 | **processing** 25:14 32:25 | 75:12,18 185:21,25 | 122:3 189:9 **provide** 15:8 |
| **proceed** 65:1 94:10 99:6 116:11 128:16 169:16 196:21 197:1 205:21 | 58:7 191:8 **produce** 32:11 58:20 79:14 107:8 109:1,1 120:8 126:16 | 186:2 187:10 **production** 80:14 84:9,11 85:12 155:15 **profanity** 87:1 | 19:24 24:16 38:17 42:13 46:10 67:23 69:25 70:1 114:22 122:8 |
| **proceeding** 7:25 | 127:7 139:2 140:12 142:6 | 87:5,8,11,16,17 87:21 88:13,14 | 122:13 127:5 141:21 164:24 |
| **proceedings** 214:6,10,13 | 142:19 171:13 174:12,12,14 | 88:16 89:2 **professional** | 185:15 195:24 197:25 |
| **process** 25:22 34:5 35:6 37:1 38:1,8 39:6,9 39:15,18 44:8 45:8,10 60:18 61:2 71:1 | 174:18 182:14 188:2 207:16 **produced** 4:7 4:14,21 5:4,11 5:18 6:4,11 | 24:5 **professor** 23:22 **programs** 127:20 203:21 | **provided** 15:4 15:6 18:11,13 20:21,25 21:4 21:6,15,17 46:1,3 48:14 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

**[provided - quote]**

49:2,23 50:2 54:3 55:12 77:12 81:10 82:15,17 123:2 127:9 135:25 143:13,21 151:9 173:23 174:5 179:8 185:18 190:13 190:21 191:2 198:25 200:21 202:14 215:19 216:8

**provides** 19:16 85:11

**providing** 9:22 32:21 55:21 56:3 67:25 78:21 82:16,18 195:21,25

**public** 33:8,12 47:2

**publication** 112:20

**publications** 20:15 110:17 110:22 113:5 139:9

**publicly** 184:22

**publish** 139:14

**published** 24:2 139:9

**pull** 33:4 188:14

**purchase** 79:1 163:22

**purchased** 92:12

**purchases** 92:18,24 93:19 163:20

**purchasing** 205:2,11

**pure** 183:25

**purport** 57:12 57:18,20 58:6 58:9,12

**purported** 179:25

**purporting** 57:15

**purports** 117:19

**purpose** 29:19 35:4 82:4 126:15 159:22 195:21

**purposes** 57:10 110:23 134:22 198:20 206:21

**put** 89:4

**putting** 103:24

**q**

**qualifies** 15:18

**qualify** 22:7

**quality** 38:11 38:19 39:6,15 52:12,15,17 60:12 69:17,18

91:17 132:20 132:24

**quantifiable** 58:3

**quantification** 91:19,21

**quantify** 99:18 99:18,19,21 210:22

**quantity** 60:2 60:13 62:3 178:23

**queries** 134:4,5 134:7 141:6 174:15 177:24 178:21 183:25

**query** 133:23 135:6 142:5 173:11

**question** 11:12 11:13,14,20,21 12:8 17:14 18:3 19:10 21:5 22:1,4 34:19 39:12 43:24 44:5 49:9,11,15 53:22 61:9 62:23 63:2 66:18 67:3 71:17 74:20 75:6,25 76:23 77:5 78:3 83:5 84:2 88:2 90:2 94:15,17 95:5

97:8,14 99:10 101:20 103:3 104:24 107:17 111:24 119:18 122:12,15 136:3 142:1 144:17,21 160:17 162:22 164:22 165:11 165:14 167:17 175:9 183:16 191:14 202:24 203:1 204:21 207:13

**questions** 9:11 22:3 65:6 74:8 74:14 75:7 122:18 123:12 128:19 162:1 164:14 184:18 197:1 209:14 211:21

**quiet** 17:17

**quotations** 6:23

**quote** 6:24 34:23 36:4 42:23 45:7 59:25 73:1 78:23 84:8 93:23 95:23 96:15 116:10 129:4 132:19 138:12 139:18 144:5 184:21

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[r - record]**

| r | | | |
|---|---|---|---|
| **r**  1:21 2:1,18 69:12,12 214:2 214:22 218:3,3 | **reading**  175:8 176:10 184:25 198:10 215:24 216:10 | 35:15,20 55:25 62:9 68:25 89:15 91:18 192:17 | 78:16 84:12 85:13 120:21 143:22 148:19 155:15 195:17 195:24 196:2 |
| **r&s**  216:1,10 | **readme**  3:13 | **reasons**  153:3 | **receives**  46:6 |
| **rachele**  3:24 4:2 | 18:11,13,23 19:1,5,10,14,21 | **rebuttal**  17:23 | **receiving**  11:2 37:18 |
| **ramona**  2:17 3:23 8:7 80:3 80:12 136:6 212:14 | 19:24 20:7,20 21:22 88:18,22 89:1 90:18 91:4 126:13,15 126:25 127:3,4 | **recall**  9:17 40:18,22,25 41:5,8,23 42:3 42:9,10,15,16 43:2,20 44:19 | **recessed**  98:7 **recognize** 33:14,19 47:5 72:20 80:5,21 84:22 135:2 |
| **ran**  19:7,25 106:10 120:12 135:9 142:21 171:6 173:11 174:10 183:11 183:11 208:17 | 127:13 128:20 129:23 130:17 132:2,10 169:19 172:3 172:21 | 45:17 52:21,25 53:2,4 56:15 56:20,23 57:5 71:16,21 72:2 72:3 81:22 82:10 89:9,11 89:19,24 92:7 | **recognizing** 126:2 127:9 135:5 **recollection** 11:15 15:16 85:5 198:11 |
| **random**  139:18 | **real**  144:19 | 107:5 109:6 | **recommend** |
| **range**  123:7 | **realistic**  26:23 | 116:23 124:22 | 110:22 |
| **ranging**  167:21 | **realistically** | 124:25 125:4 | **reconvened** |
| **rate**  65:7 164:15,16,19 164:23 165:2,3 | 141:1 **reality**  164:18 165:5 | 133:6 137:2,9 167:5 172:16 178:16 180:18 180:25 181:3 | 98:8 **record**  6:24 7:6 7:11 8:4 9:3 |
| **rather**  144:18 204:18,25 | **really**  56:19 173:9 | 190:20 194:22 195:2 199:23 | 29:25 64:21,23 65:1,2,4 81:9 |
| **raw**  148:18 | **realms**  145:7 | **recap**  39:13 | 81:10 82:22 |
| **reached**  63:16 107:5 109:6 | **reason**  12:2 33:23 47:19,20 | **receipt**  32:25 **receive**  43:7 | 98:1,4,6 99:6,9 100:8 117:9,16 |
| **reaching**  75:2 120:22 | 48:5 78:12,13 80:17 163:5 | 75:7 204:10 **received**  10:23 | 117:19 128:11 128:13,16 |
| **read**  6:23 12:24 35:2 73:11 79:11 143:20 179:13 192:18 197:13,22 | 178:1 200:1 218:6,9,12,15 218:18,21 **reasonable** 34:12,25 35:8 | 11:2,4,5 25:23 38:17 45:21 48:20,23 75:18 | 129:11 132:14 134:20 138:6 144:22 148:14 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [record - reject]

148:21 149:3
149:16 153:22
153:23 154:9
156:21 158:17
158:18 160:23
162:12 169:13
169:16 180:1
184:11 188:1,2
189:3 190:10
195:16 196:13
196:18,21
198:24,25
205:14,18,21
211:23,25
213:2 214:13
**record's** 209:22
**recorded** 1:9
7:12 125:16
134:22,24
172:19 173:12
214:11
**recording** 7:10
**records** 29:18
29:25 30:1
35:5 36:8 37:2
37:15 53:20,25
54:7 61:15
62:10 68:20
73:3 77:20
78:6 81:13
82:10,17,17
85:20 87:13,14
87:25 88:10
91:25 93:25
94:10,20 95:3

95:6,18 96:11
96:24 97:22
100:5,7,17
101:21 105:22
107:11 109:14
111:2 116:12
118:12,16
119:17,23
120:5 133:3
135:8 139:19
140:25 142:23
144:12 146:1,2
147:9,14 151:6
151:13,17
152:3,10,24
153:2,7,8,11
154:20 155:2,9
155:16 157:24
160:1 164:17
165:4 178:22
182:20 183:6
183:20 187:1,2
189:8,11
190:14 191:24
196:1 203:12
204:1
**reduce** 36:8
95:24 96:2,7,8
96:10 97:10
175:4
**reduced** 96:4
193:7
**reduction**
97:19

**refer** 24:11
25:17 38:19
40:3 47:16
60:25 70:14
71:5,9 79:19
81:2 95:22
97:8 101:5,10
101:16 102:21
103:10 110:6
126:9,13
129:17 130:25
131:1,5 145:8
194:4 201:12
**reference** 79:8
92:11 169:6
175:22 197:18
197:19
**referenced**
46:20 96:5
169:4 173:1
194:24 215:6
**references** 96:3
193:6
**referencing**
10:25 11:5
77:25 85:1
**referred** 23:14
33:25 49:9
83:2,8 105:3
129:24 131:9
**referring** 14:23
36:23 39:4,5
49:10 89:13
117:6 118:7
188:7 194:7

199:22
**refers** 25:21
34:5 47:22
61:1 70:17
71:8,12 81:8
102:3,15 117:1
117:8,10,14,17
130:21 132:8
197:5,8
**reflect** 201:2
**reflected** 6:23
21:12
**refresh** 85:5
209:9
**refunded** 93:20
**regard** 62:12
188:3
**regarding**
10:22 45:22
**regardless**
164:5
**regards** 7:14
9:22 16:14
43:3 51:10
74:3 92:1
115:13 117:5
131:16 142:14
191:14 200:15
**regression**
116:5
**regular** 212:20
**regulator** 71:15
71:19
**reject** 200:23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[relate - represent]**

| | | | |
|---|---|---|---|
| **relate** 78:7 93:25 95:3,6 | 122:9 123:13 125:2 | 67:3 75:25 83:5 86:11 | 74:23 77:21,24 78:1,4,22 |
| **related** 7:23 20:15 29:25 66:21 119:15 214:15 | **rely** 21:11,16 112:22 120:22 123:16 | 101:6 115:3 119:18 122:11 137:17 165:13 174:2 175:9 | 79:19 84:25 92:10 93:22 94:4,18 95:22 96:14 101:5 |
| **relates** 164:13 | **remains** 65:21 | 201:23 | 106:8 110:6 |
| **relating** 24:2 | **remember** | **rephrase** 38:5 | 116:9,17 |
| **relation** 66:12 | 42:18,20 55:9 | 66:6 67:19 | 117:22 123:15 |
| **relationship** 49:21 | 57:9 63:23,25 80:11 87:5 | 76:6 94:16 100:14 151:15 | 123:23 128:20 129:25 130:21 |
| **relatively** 173:5 | 91:22 113:21 | **replace** 137:7 | 131:25 132:19 |
| **released** 215:22 | 114:1 133:1 | 148:8 | 138:11 139:17 |
| **relevant** 44:20 44:22 144:4,11 177:20 182:19 182:21 | 169:25 172:13 172:25 173:4 210:13 | **replaced** 136:11,13 **replicate** | 175:2 176:5 184:20 193:6 201:3,7,10,12 |
| **reliability** 175:6,12,19,22 | **remembering** 124:7 | 126:18 127:8 173:24 174:6 | 210:12 211:15 **reported** 1:20 |
| 176:2 | **remote** 97:25 | **report** 3:10 | **reporter** 7:21 |
| **reliable** 77:22 78:5,10 85:21 93:24 95:2 | **remotely** 8:2 129:11 **remove** 70:10 | 14:4,12,15,18 14:22,22 15:1 15:16,22 16:7 | 8:19,23 12:5 93:7 180:3 193:2 214:3 |
| 116:9 | 87:12,15 88:10 | 16:9 17:4 18:6 | **reporter's** 6:23 |
| **reliably** 70:5,10 70:20 95:24 | 90:14 96:16,20 97:13 134:19 | 18:9 19:1,10 19:21 20:6,18 | 214:1 **reports** 16:22 |
| 96:16 97:1,10 97:12 143:15 | 159:22 171:16 198:1 | 20:20 21:3,12 21:18,22 22:11 | **represent** 37:15 68:21 |
| 175:4,5,6,10,18 175:22 | **removed** 88:16 97:15,18 | 22:17 26:1,3 34:1 40:4 | 73:9 82:24 84:6 89:14 |
| **relied** 20:15,17 20:22 21:2,14 | 159:19 **removing** | 42:22 44:14 45:2 46:18,21 | 90:12 117:19 126:24 130:14 |
| 21:17,20,21 74:22 75:1 | 87:17,18 90:20 **render** 151:21 | 47:17 51:7,14 53:9 56:9,13 | 148:13 149:16 153:6,11,21 |
| 117:23 121:2 | 153:15 **repeat** 34:19 38:3 39:12 | 63:1,11 70:4 70:24 74:6,8 | 155:14 158:16 176:20 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [representation - returns]

| | | | |
|---|---|---|---|
| **representation** 143:17 | 216:1,10,11 | 191:13,15 | 123:5,8 142:20 |
| **representations** 145:19 | **require** 37:1 104:20 105:10 | 208:20 | 146:1 191:7 |
| **represented** | 105:12 146:7 | **resolved** 164:9 | **resulting** |
| 51:11 56:10 | 172:23 | 166:18 | 182:23 208:24 |
| 62:10,20 82:12 | **required** 32:23 | **resolving** 126:3 | **results** 44:7 |
| 140:6 143:14 | 35:11 50:5 | **resources** | 70:3 108:10,12 |
| 143:18 163:20 | 101:8 102:5,23 | 38:21 39:3,7 | 112:22 120:20 |
| 163:22 189:1 | 103:1,11,14 | 39:16 | 127:7 130:6 |
| 192:3 203:3 | 104:5 105:4 | **respect** 41:17 | 139:3 142:6 |
| **representing** | 106:16 134:2 | 60:11 87:21 | 167:12 171:13 |
| 7:20 45:11 | 134:10,13 | 88:13 90:10 | 171:23 172:7,7 |
| 53:21 54:1 | 144:3,11 | **respond** 54:4 | 174:19 190:4 |
| 90:4 191:24 | 171:22 173:8 | **response** 119:6 | 190:18,20 |
| **represents** 19:6 | 177:19 182:23 | 119:6 | 191:2 206:8 |
| 73:19 74:1,11 | 183:22 215:20 | **responsibilities** | 207:24 208:3,3 |
| 79:13 138:2 | **requirements** | 24:22 25:6,8 | 208:4,19 209:2 |
| 163:18 | 34:6 163:23 | 28:24,25 29:3 | **resumed** 99:7 |
| **repress** 146:12 | **requires** 34:10 | 29:6,6 30:20 | **retained** 10:5 |
| **request** 11:18 | 34:23 58:3 | 30:21 41:16 | 63:13 64:4 |
| 11:19 17:15 | 140:12,17 | **responsible** | 213:1 |
| 77:17,18 | **requiring** | 31:3 | **retention** 63:18 |
| 121:24 126:25 | 145:25 146:11 | **restart** 145:11 | 66:22 |
| 145:22 163:5 | **reread** 140:1 | **restate** 53:22 | **retract** 55:17 |
| 187:1,7 203:25 | **rerun** 143:6 | 63:2 97:4 | **return** 106:25 |
| 204:11 | **research** 2:24 | 101:13 103:2 | 215:17 216:6 |
| **requested** | 2:25 8:8,11 | 104:23,25 | **returning** |
| 48:13 49:25 | 21:8,24 24:2 | 110:19 129:14 | 92:10 198:24 |
| 64:8 73:1,17 | 134:7 | 144:13 201:23 | **returns** 101:7 |
| 73:22 78:4,23 | **reserved** 213:4 | 204:21 | 101:10,17,18 |
| 93:23 94:9 | **resided** 23:9 | **restroom** | 101:19 102:4 |
| 95:1 116:11 | **resolve** 162:2 | 196:16 | 102:15,18,19 |
| 202:4 204:12 | 162:23,25 | **result** 44:17 | 103:11,17,20 |
| 204:14 214:15 | 163:5 165:24 | 51:4 61:4 | 103:24 104:3 |
| | 166:2 191:11 | 85:19 102:13 | 104:14 105:3 |
| | | 107:8 108:7 | 106:14 107:18 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[returns - run]**

107:19,21
**revenue**  48:20
   48:23
**reversed**  93:20
**review**  12:24
   20:14 26:8
   38:24 39:6,15
   60:18 69:17,18
   70:25 71:23
   72:2 91:2
   133:11,16,18
   133:19 134:1
   140:13,17
   141:2,4,15,18
   142:2,11,15
   152:10,21
   166:12,25
   167:12 200:22
   205:24 206:7
   206:11 214:15
   215:8,10,13
   216:2
**reviewed**  20:14
   24:1 26:7
   140:18 141:1
   142:22 152:13
   200:21
**reviewing**
   38:10,11,19
   39:8,17
**revise**  165:16
**rewrite**  200:2
**richman**
   157:10,25
   158:8

**rifkin**  13:22
**right**  9:5 12:15
   12:21 13:5
   14:1,11 15:7
   17:13 18:4,21
   19:1 20:5,23
   21:19,25 22:20
   23:5,17 24:10
   24:14,19 30:5
   31:6 33:3,12
   34:3 35:5
   39:10,20 40:1
   40:6 41:9
   42:19 43:25
   44:25 45:24
   46:2,25 47:2
   47:17 49:12,24
   50:17,24 51:2
   51:5 52:16
   53:8 54:9
   57:10,16 58:6
   62:16,21 63:11
   65:5,8,10
   66:16 67:22
   72:7,16,24
   79:4 80:8
   81:14 84:16
   85:2 91:23
   92:5 99:9
   102:10,16,18
   104:16,21
   106:7,11 107:3
   107:12 109:2
   110:10 117:9
   118:10 120:17

125:20 126:12
126:20 128:3
129:22 130:16
130:20 131:7
131:22 132:18
133:20 138:18
144:5 146:20
147:4,16
149:15 150:13
159:20 162:24
164:12 171:23
172:5 176:5
179:9 180:12
181:16 182:3,6
192:12 193:17
194:16 196:3
197:17 200:9
202:12 206:8
206:15,16,17
208:12 209:4
209:11,12
212:18,22
**risk**  155:22,25
**rlin**  2:20
**role**  31:4,5 67:1
   67:6,11,17,20
   198:8,12
**roles**  29:10
**roll**  29:20 73:3
   77:19
**rolled**  178:23
**rollup**  132:14
**rondeau**  2:24
   8:8

**rough**  212:4,20
**roughly**  16:2
**round**  107:13
   108:11,25
   130:7,8 131:16
   131:20,25
   132:3,8,11,13
   143:1,5,6,7
**round4.sql.**
   130:12
**rounds**  130:22
   130:24 131:1,5
   131:5,8
**row**  171:7
**rpr**  1:21 214:2
   214:22
**rule**  34:6,9,22
   35:2 50:16,19
   50:24 96:23
   97:21 99:15
   102:11 106:6
   107:10 137:21
   137:25 146:16
   146:21 147:12
   160:6,10 166:8
   166:11 174:23
**rules**  60:1 62:2
   107:8,9 108:16
   216:8
**run**  19:18
   54:16,17 102:7
   107:14 108:7
   108:12,25
   126:16 141:6
   143:1 170:8,8

Page 49

**[run - see]**

170:21 171:3
171:12,14,22
173:9 174:11
174:17 176:13
178:21 183:25
185:3 186:4
205:5 207:25
207:25
**running**  40:13
121:19,25
122:5 127:6
171:23 172:14
182:14

**s**

**s**  2:1,18 3:3
127:17 218:3
**sake**  12:6,6
80:24
**salary**  68:11
**sample**  73:2,18
73:22 76:16
77:9,11 78:19
80:14,15 83:24
84:9,11 85:12
86:1 136:14
139:18,23
168:18
**san**  2:15 194:2
194:5,10
**saved**  134:5,8
142:20
**saw**  81:17,25
86:17 92:3
143:17

**saying**  12:9
39:13 49:15
52:25 53:2
73:24 74:25
104:2,4 111:23
150:4 163:12
196:23
**says**  22:18 62:1
73:6 85:11
96:1 168:2
197:24
**scanned**  13:18
**scenario**
207:20
**scenarios**
134:12
**schedule**
215:10
**scheduled**  13:8
13:9
**scientist**  9:8
**scope**  40:10
48:13 49:2,2
161:7
**scratch**  16:8
20:19 21:10
46:15 138:9
182:17
**screen**  14:8
**script**  135:7
172:23
**scripts**  19:25
100:21 127:13
132:2 135:9
142:4,19 173:2

173:4,5,9,14,22
174:4 179:8
**se**  88:8
**sealed**  215:20
**search**  91:3
120:10 121:21
122:7 184:24
185:2,17
189:12 190:18
191:1 192:5
**searches**
185:10
**searching**
166:25
**seattle**  1:14 7:1
7:18 79:15,18
193:18 202:5
**second**  36:15
59:24 72:10
79:8 109:4
116:20 122:6
179:9,17,17
195:9 197:21
197:22 209:11
**secondary**
171:3
**section**  13:19
15:14 22:21
118:3 129:1
170:9,11 175:8
**sections**  12:25
15:5,6,7,17,20
169:22 170:7
171:14

**securities**  24:18
**see**  15:24 34:3
36:10,18 39:1
47:22 59:16
60:5 70:7,24
71:3 73:4,5
84:14 85:22
86:21,25 89:6
89:17,21 92:4
92:14 94:7
104:4 106:9,9
118:4,7 125:25
126:6 129:7,20
130:13 131:4,4
132:22 134:1
139:14,20
140:23 141:12
143:12 148:4,7
148:15 149:18
151:10,24
152:10 154:11
155:8 156:1
159:5,9 160:1
163:6,8,12,15
164:8,12
166:13 168:22
169:23 170:12
176:10 178:2
184:15,25
193:10,24
197:22 198:5
199:1 204:6
205:15 208:8
208:25

Page 50

[seeing - sitting]

seeing  53:3
  105:15
seek  62:14,18
  161:25
seemed  137:4
  178:1
seems  48:8
  137:21,25
  155:12 192:17
seen  50:19
  84:24 85:5
  168:7
sending  25:18
  25:24 122:6
  189:6,7
senior  29:11
  63:16 146:17
  146:21,22
  147:3,7
sense  11:22
  27:17 108:13
  119:21 207:18
sensitive  7:7
sent  80:13
sentence  47:22
  72:6 73:16,19
  73:21,25 74:1
  79:11 140:1
  175:5,11 197:5
  197:23 198:10
separate  32:11
separately
  135:25
september
  28:14 33:13

sequence  193:1
  193:3 195:16
series  128:19
serve  198:8
served  61:20
  63:5
server  128:5
service  32:19
  54:22 66:23
  67:25 184:24
services  24:17
  48:13 49:2,22
  50:2 66:4,9
  139:1 185:15
  185:17
serving  62:24
session  99:1
set  19:5 77:11
  77:13 78:19
  100:20 136:16
  143:2 167:21
  168:10,24
  169:2 170:6
  175:15 203:13
  205:5,6 211:11
settlement  26:7
  33:22 42:22
  43:19 44:13
  45:6 51:10
settlements
  45:4
seven  9:19,19
  92:2
several  37:14
  51:18 56:17

68:16 75:17
shaking  93:6
shape  141:9
share  152:11
  157:6 158:9
shared  80:7
  151:5
shear  140:8
shield  3:15,19
  33:21 45:3,12
  45:22,24,25
  46:3,3,6,16
  47:6,16 48:4
  48:21 49:11
  51:6,10,15
  52:8,19,22
  53:1,3 62:13
  91:10 92:1
  200:14,16
shop  206:13
shortened
  206:23 207:7
shorter  207:23
  208:2
show  146:18
  149:24 168:1
  196:1
shows  76:13
  190:18
side  48:18
  159:21 187:5
sided  84:20
sign  215:16
  216:5

signatory  200:8
signature  14:19
  47:3 199:10
  213:4 214:18
  214:21 215:22
  215:24,24
  216:10
signed  72:22
significant  15:2
  48:19,20
  130:14 179:21
similar  28:25
  29:21 30:3,4
  30:21 31:5,12
  31:14 51:23
  52:3,14 57:3
  85:16 119:8
  127:8 136:18
  164:22 174:12
  174:18,18,20
  177:24 208:16
  210:5
similarly  56:10
  159:21 203:17
simply  19:5,17
  170:7 190:24
single  104:18
  106:3 137:12
  137:18 146:3
  153:11 155:11
  182:24 183:4
  183:20
sitting  91:21
  93:5 105:19
  110:8 151:12

**[sitting - spent]**

151:16 159:12
**situation**  29:20
  43:14 61:23
  115:14,22
  127:11 139:14
  140:24 146:7,7
  148:4 161:5
  163:10 164:9
  166:24 168:20
  168:23 171:19
  176:22 183:22
  203:10
**situational**
  35:11
**situationally**
  27:12,12,13
**situations**
  35:24 87:10
  92:8 134:18
  139:2 152:14
  167:6 171:10
  182:25 208:6
**six**  9:19
**sixth**  1:13 7:18
**size**  10:23 49:3
  49:3,3
**skill**  126:1,8
  211:11
**slight**  146:2
**slightly**  61:17
  76:6 78:14
  164:14
**small**  32:8
  50:20 52:23
  81:18,18,25

89:16,24 133:7
  189:6
**smiley**  52:21
  53:1 86:18
  92:4
**smith**  146:17
  146:17,18
**snyder**  156:8
  157:25 158:8
  158:21
**software**
  127:19 128:3
  167:15,18,20
  167:25 168:6
**solely**  152:4
**solution**  185:18
  186:3,4 197:5
**solutions**  185:4
  185:21,25
  186:21,24
  187:9,15,19,24
  188:13 215:7
**somebody**  43:5
  179:20
**somebody's**
  109:20
**somewhat**
  180:1 182:1
  208:19
**song**  124:14
  125:1
**soon**  212:5
**sorry**  12:16
  18:19 60:13
  78:1 81:24

86:11 97:24
  103:7 104:23
  125:21 129:14
  129:14 130:8
  132:4 149:10
  175:8 204:5
  206:5
**sort**  25:24
  27:13 33:1
  56:2 168:7,18
  178:2 198:15
**sorts**  162:25
**sound**  41:9
  42:19
**soundex**  114:25
  115:4,7,10
  116:1
**sounds**  30:3
  107:18 171:20
  180:12 193:23
**source**  12:20
  33:7 45:19
  121:5 127:24
  127:24 167:25
**sources**  165:9
  165:16,19
**space**  190:25
**speak**  17:16
  22:8 107:2
  118:20 153:3
  205:2
**speaking**
  173:10 191:6
**specialist**  22:14
  22:19 23:3

**specific**  57:9
  61:23 63:15
  113:23 147:20
  195:19
**specifically**
  10:25 21:7
  87:5 137:2
  138:19 152:19
  177:12 178:16
  197:24
**specifics**
  113:22
**specify**  77:24
**spectrum**
  152:14
**speculate**
  202:18,23
  203:9
**speculation**
  188:4 205:9
**speed**  172:8
**spell**  69:9
**spelled**  30:18
  127:17 158:24
  159:6 182:10
  192:14
**spelling**  182:5
**spend**  38:9
  69:22
**spending**  102:9
**spends**  204:17
  204:24
**spent**  56:20
  68:14 104:16
  178:23

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' ONLY

**[spoke - subset]**

| | | | |
|---|---|---|---|
| **spoke**  63:19 | **starting**  59:24 | 133:4 175:2 | 180:21,25 |
| **sponsored**  46:9 | 124:21 | 176:6 177:18 | 181:7,13,17,17 |
| **spools**  192:21 | **starts**  197:4 | 184:24 214:4 | 181:19,19,19 |
| 192:24 195:3 | **state**  8:1,3 9:3 | **static**  151:22 | 182:4,6 |
| **sql**  127:13,16 | 23:6,9 26:5 | **stating**  96:19 | **street1**  89:7 |
| 128:5 173:6,11 | 70:4 72:25 | **statistical**  24:2 | **string**  207:23 |
| **ssms**  128:5 | 74:8 78:4,23 | 58:10 | **stringent**  176:7 |
| **st**  182:6 | 80:19 97:11 | **statistics**  23:19 | **strokes**  68:18 |
| **staff**  123:22 | 112:14,17 | 23:23 24:7 | **stubs**  55:20 |
| 124:10,11 | 125:25 132:19 | 58:13 | **studies**  109:10 |
| **stand**  22:24 | 133:4 145:5 | **stenographic...** | 110:16,21 |
| **standard**  130:4 | 148:6 151:1,22 | 214:10 | **subject**  23:23 |
| 130:5 168:10 | 176:9,24 | **step**  105:2 | 210:14 |
| 168:16,24 | 179:10,11 | 112:23,23 | **subjects**  24:2 |
| 169:1 | 180:10,16,17 | 129:24 171:6 | **submission** |
| **standardization** | 180:19 215:9 | 174:16 | 70:25 |
| 186:8,10,16,25 | 215:12 | **steps**  19:6 | **submissions** |
| 187:11 | **stated**  70:21 | 32:21 120:3 | 85:18 |
| **standardize** | 93:22 139:11 | 135:3 167:9 | **submit**  55:17 |
| 186:12 | 167:21 178:4 | 187:1,11,14 | 55:19 85:18 |
| **standardized** | 201:16 214:8 | **stick**  163:9 | **submitted** |
| 182:15 | 214:14 | 165:11 | 10:11 16:22 |
| **standing** | **statement** | **sticking**  176:5 | 22:11 33:20 |
| 212:12,13,15 | 35:16 54:4 | **stipulation** | 47:6 |
| **stands**  59:22 | 55:25 119:6 | 215:21 | **submitting** |
| **stapled**  79:25 | 140:16 152:5 | **stop**  106:22 | 123:14 167:24 |
| **start**  15:25 | 161:17 169:21 | 108:3 | **subpopulation** |
| 40:6 45:6 | 172:22 173:11 | **stopped**  105:17 | 189:7 |
| 74:14 109:22 | **statements** | 107:23 171:9 | **subsection** |
| 206:5 208:8 | 94:24 | **stopping**  59:3 | 129:8 |
| **started**  16:5 | **states**  1:1 7:15 | **store**  71:18 | **subsequence** |
| 75:22 76:2,8 | 36:4 59:24 | **straying**  207:20 | 114:15 |
| 76:13,14,25 | 84:8 94:8 | **street**  2:9,19 | **subset**  120:12 |
| 77:6 | 95:22 96:14 | 85:16 148:5,6 | 121:19 133:7 |
| | 116:9 117:22 | 151:2 154:23 | 189:1 |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[substance - testified]

substance
   74:17
substantially
   19:7 174:10,11
successful
   126:2 192:10
sufficient
   100:12,16
   126:17
suffix   147:3
suggest   39:2
   79:12 110:17
   110:17,22
   116:15 141:8
suggesting
   111:6,8
suggests   160:20
   162:7,10 164:2
suite   1:13 2:9
   2:14 7:18
summary   68:25
   70:3 74:11
   75:8
supervised
   211:8
supervision
   214:11
supervisor
   210:23
supplemental
   3:10 14:4,12
   94:4
supply   85:15
support   109:10

suppose   44:11
   181:15 182:2
sure   15:14 21:5
   34:20 43:24
   53:23 63:3
   74:24 84:24
   98:3 110:20
   111:5 119:5,20
   122:12 128:1
   144:16 161:13
   166:20 167:22
   172:15,15
   178:17 184:2
   194:15
surprised
   119:3 152:23
surrounding
   122:4
suspect   205:4
swear   8:19
   188:15
sworn   8:23
   214:6,9,9,13
symbol   181:9
sync   212:8
synonyms
   166:22
system   159:19
   187:6
systems   23:7,13
   23:23 24:7
   53:17 203:18

t
t   192:14,15
   218:3,3
tab   14:4 18:17
   33:5 46:23
   72:14 79:22
   84:17 125:21
   199:2
table   190:12,18
   190:20
tables   190:24
take   7:10 11:21
   12:9 30:1 59:6
   104:16 105:1
   128:8,10
   134:14 149:2
   167:9 169:10
   171:3,12
   186:11 190:24
   193:19 194:12
   196:16 203:23
   205:14 208:23
   209:15,17
taken   7:13 16:9
   37:17 68:2
   187:2 199:19
talbott   2:23
   7:20
talk   20:2 83:16
   124:24
talked   91:9
   175:1
talking   12:9
   51:7,8 52:2,9
   52:20 56:9

57:2,7,11
   61:25 62:6,14
   63:7 69:16
   83:3 88:5
   104:14 124:22
   172:2 206:18
target   123:4,7
tasks   203:22
taught   211:3,6
   211:10,12,13
   211:17,17
tbl   130:3
teach   211:10,18
team   126:25
teams   25:2
tell   11:13 21:19
   64:7 177:12
   180:6
template   15:4
ten   133:16
   145:3
tend   205:5
term   43:16
   79:4,5 83:17
   88:7 168:21
   175:22 203:23
terminology
   83:20,21
terms   25:17
   43:15 88:5
   133:17 166:23
   175:7 212:7
testified   8:24
   10:3

**[testify - time]**

| | | | |
|---|---|---|---|
| **testify** 64:12 214:9 | 89:8 103:25 104:4 123:3 167:21 174:13 178:8 199:24 | 205:14 206:13 209:15 212:9 | 152:24 153:2,7 159:4,5,9,14,16 160:1 163:13 192:21 194:25 195:8 |
| **testifying** 10:6 61:20 62:24 63:5 | **think** 9:6,8 14:7 16:25 17:5,25 22:8 27:20 28:7 | **thinking** 91:6 181:6 | |
| **testimony** 9:21 9:25 12:3 185:12 212:24 214:6,10,13 | 31:18 32:1 37:21 39:11 43:13,15 55:25 | **third** 11:6 45:25 54:24 71:23 72:4 85:11 116:21 127:7 185:3 188:4 | **threshold** 207:18 **thresholding** 114:10 |
| **tests** 167:15,18 167:20 168:1,6 168:8 | 67:3 68:25 69:10 74:19,19 75:6 79:11 | **thomas** 2:4 8:12 209:23 215:1 | **tier** 131:12,15 132:7 140:10 140:19 141:5,7 142:12 144:2 144:10 176:6 176:12,13,17 176:18 177:9 177:17,18,23 178:15,19 182:18 183:12 |
| **texas** 149:5 | 88:7 91:5 97:4 99:16 101:13 103:3 104:23 | | |
| **text** 190:21 | 105:8 112:1 113:3 114:24 115:14,22 | **thompson** 1:10 3:11,22 6:19 7:13 8:22 9:4,6 14:13 72:16 199:5 201:12 205:23 209:18 212:25 215:5 217:12 218:2 218:24 | |
| **thank** 8:18 9:9 11:10 72:19 74:4 76:20 88:21 93:9 98:4 103:8 118:5 125:22 128:17,23 129:13 132:8 158:6 169:17 195:7 196:22 205:22 207:11 209:14,17 212:19,23 | 117:5 121:18 122:17,22 123:25 124:12 124:24 128:10 130:19 137:11 137:18 144:1 145:7 161:13 162:5 170:16 174:13 182:1 182:25 188:19 192:20 193:15 195:2,6 197:11 200:12,17 202:12,19 203:2,11 | | **tiers** 110:3,6,9 110:11,13 130:21,23 131:1,4,8,9,10 131:21 140:4 145:6 176:14 177:24 178:19 |
| **theoretically** 168:11 | | **thought** 105:13 119:19 165:23 177:12 178:14 | |
| | | **thousands** 138:25 | **time** 7:9 8:1 32:3 38:4,9 43:3 51:20 55:8 56:18,21 64:17 65:1 66:11,11 69:22 81:2 99:6 100:25 101:7 101:24 102:4,6 |
| **theory** 167:20 | | **three** 13:6 51:19 54:18 79:24 91:16 116:19,23 121:20 132:15 150:13 151:5 151:13,14,17 151:17 152:3 | |
| **thing** 79:7 116:15 144:19 204:7,9 | | | |
| **things** 9:9 32:8 52:24 83:12 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

[time - type]

102:9,12,22,25
103:11,14
104:15,20
105:4,12,25
106:2,16
107:20 114:1
127:5 128:16
133:10 169:16
171:12,21
177:13 178:23
180:11 185:7
189:22 196:21
198:18 201:8
205:21 207:14
211:1,2 214:8
214:14 215:10
215:18,25
216:7
**times** 9:5,14
125:9,11 172:1
183:3 196:2
**timing** 75:7
**title** 24:19
201:6
**titled** 199:5
**today** 9:9 11:25
12:3,5,12 51:8
51:8 52:2,10
52:20 56:9
57:2,8,11,15
62:6,14 63:7
69:16 91:22
93:5 110:8
119:9 151:12
151:16 159:13

201:4 212:5
**today's** 12:16
12:22 212:24
**todd** 2:8 8:16
**together** 100:7
149:4 152:3,12
152:24 153:7
210:21
**tomorrow**
212:6
**took** 51:16
56:14 102:6
120:4 190:4
204:5
**tools** 128:2
145:17,22
**top** 45:18 63:8
63:9,12 89:3
89:19 90:23
130:13,20
132:7 133:1,16
133:25 137:10
142:17 144:1
167:5 176:6,12
176:17 177:9
177:17,22
180:18 189:13
193:14
**topic** 9:20 68:2
164:13
**topics** 12:12
**total** 10:23 48:3
73:7 140:24
189:1 212:25

**touch** 92:24
**transact** 160:23
**transaction**
73:7 74:3
160:23 162:16
**transactions**
93:12,16
162:12 163:19
**transcribed**
214:11
**transcript** 12:6
12:13 80:24
180:6 212:2,3
212:5,6,21
214:7,12,14
215:6,8,10,13
215:13,22
216:2,2
**transient** 134:9
**translate**
171:17
**translating**
87:19
**transported**
194:20
**treated** 143:15
182:8
**trial** 10:3 66:1
66:1
**tried** 99:21
105:22 165:21
**true** 63:10
119:10 178:15
182:16 183:9
183:10 185:8

205:4 214:12
217:3
**trusted** 36:6
**truth** 214:9
**try** 80:24 81:23
82:5 99:11
103:23 127:8
170:23 178:25
191:18
**trying** 22:5,5
39:13 99:10
105:8 112:1
115:14 119:24
161:25 183:2
188:14
**tuesday** 13:3
**turn** 74:5
167:17
**turning** 170:13
**two** 13:12
39:23 83:11
84:19,20
138:23 146:1
147:1 151:14
151:17 154:20
154:23 155:9
155:10,15
157:24 159:7
159:13 164:10
164:16 165:3
166:22 172:4
183:6,18
189:24 208:20
**type** 50:8,11,12
53:4

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[types - updating]**

| | | | |
|---|---|---|---|
| **types** 27:7 143:9 178:21 | **uncommenting** 170:10 171:20 172:18 173:17 173:22 174:4 | **understanding** 48:22 60:17 92:17 101:1 107:12 115:10 115:12,25 | **unicode** 181:9 |
| **typical** 48:17 | **under** 11:24 34:10,24 35:7 35:19 214:11 217:1,2 | 117:18 138:4 163:11,17 166:21 167:23 | **unique** 78:8 79:4,6 81:9,9 81:12,19 82:1 94:2,11 101:22 |
| **typically** 167:25 | **underscore** 81:3 | 168:14 176:1 177:3 180:13 | 116:13 119:16 119:22 120:4,8 |
| **typing** 141:17 | **underscores** 81:1 | 183:8 186:9,13 186:15,17,19 197:17 | 123:5 126:4 137:13,20,23 |
| **typo** 192:15 | **undersigned** 214:2 | **understood** 11:14 15:9 | 151:14,18 152:3 153:11 |
| **typographical** 116:16 | **understand** 11:12,24 14:23 19:19 21:5 | 16:6 22:9 25:5 25:25 28:4,13 29:13 37:24 | 159:14 160:11 163:12 195:23 |
| **u** | 22:1 34:17 36:20 43:24 59:4 60:7 | 41:12,25 44:23 49:10 50:1 53:6 54:6 | **uniqueness** 82:6 |
| **u** 87:4 192:14 192:14 | 64:11 66:18 74:25 77:2 | 56:18 59:22 74:4 75:5,13 | **unit** 7:12 |
| **uh** 108:21,23 | 81:8 82:21 83:1,6,7,21 | 75:16 76:20 81:15,16 82:16 | **united** 1:1 7:15 184:24 |
| **ultimate** 10:23 82:14 182:15 | 85:24 86:4 94:23 101:20 | 82:23 86:8,12 96:6,9 138:7 | **units** 212:25 |
| **ultimately** 33:1 182:13 200:25 | 105:8 106:20 107:24 122:12 | 153:5 159:23 197:12 200:18 | **university** 23:6 |
| **unable** 12:2 | 127:16 153:6 165:12,14 | **undertaken** 39:9,18 | **unlimited** 102:12,12 |
| **unaware** 123:18 162:6,9 163:25 164:1,3 183:5 187:25 | 168:21 169:3 183:19 187:4 190:17 191:14 197:18,20 203:21 | **undertook** 120:2 **unduly** 137:4 | **unquote** 144:5 **unrelated** 83:14 **unreliable** 112:21 |
| **uncertainties** 162:2,23 163:1 | | | **unusual** 182:1 |
| **uncertainty** 163:4,6,9,12,16 | | | **update** 88:9 130:10 135:7,7 |
| **unclear** 126:21 141:25 161:14 161:17 187:17 | | | **updated** 120:14 121:22 |
| **uncomment** 169:22 170:2 | | | **updates** 126:19 **updating** 192:11 |
| **uncommented** 172:1,14 173:2 173:2,13 | | | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

**[upload - variables]**

**upload**  72:9
187:5,6
**uploaded**
186:20 187:1,2
188:1 190:5,14
190:15 191:8
**uploading**
130:6
**usable**  129:5,19
**use**  31:14 42:1
51:24 54:24
56:24 79:4,5
83:17 87:12
88:5,7 109:18
109:19 110:11
111:10,24
112:7 113:13
119:4 127:19
134:3 135:19
145:7 146:22
147:2,6,18,25
147:25 148:2
159:9 161:3
164:2 166:23
186:2 188:7
196:15 207:8
**used**  19:2,11,20
31:13 40:19
42:10 44:2,15
52:1,8 55:4
57:1,3,6,7
58:16 89:2
95:15 100:22
106:23 110:9
110:25 111:17

113:18,18,20
113:22 114:2
120:10 121:6
122:14 127:7
127:23 128:4
134:16,17
140:14 142:3,5
142:15 144:3
144:11,17
148:3 162:15
164:6 167:14
168:5 174:16
175:11,15,17
175:19,21
185:7,8,14,21
186:4 206:20
206:22,23
212:25
**useful**  139:3
**user**  84:11
85:12 114:20
114:23 209:25
**users**  85:15,17
**uses**  70:24
111:9 161:23
**using**  20:10
42:23 55:8,8
93:12,16
110:17,18,22
111:15 112:13
112:15,16
114:6,11
141:23 144:4
144:22 160:9
166:20 189:12

**usps**  186:13
**usually**  11:6
**utilize**  52:11
90:15 119:7
134:19 139:12
**utilized**  60:19
61:3 90:21
111:12 128:1
131:14 138:25
**utilizes**  140:10
**utilizing**  22:15
38:23 100:24

**v**

**v**  154:4,18
157:13
**v2.sql.**  130:3
**vaguely**  85:7,9
**valid**  43:6,7
90:8,12 139:3
141:10 152:6
153:16 208:9
**validate**  56:2
184:1
**validated**  60:18
140:19
**validating**  52:1
56:25
**validation**
140:13,17
141:15,18
142:3,16
168:10,24
169:1,2 177:19
177:22 178:18
178:19 179:2,5

179:7 182:22
183:22 184:13
184:15 187:13
205:24 206:7
**validator**
155:24
**valuable**
113:19
**value**  73:8 74:3
133:5,24
134:19,21
135:3,18,25
136:1 137:6
**values**  81:19
82:1,7 85:18
87:23 89:7,13
91:23 92:7
111:16 133:9
133:12,16,17
134:11 135:8
136:12,13,14
136:16,21
137:8 144:3,11
145:13 146:3
150:15 151:2
154:24 155:2,5
180:9,14,16
**variable**  81:8
82:21 133:9,12
133:20 145:18
146:1 179:15
179:16
**variables**
109:15 135:13
135:16 144:4

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

## [variables - witness]

144:11 147:18 147:20,21 176:16
**varied** 13:12
**varies** 25:10
**variety** 153:3
**various** 29:10 54:15 101:3 119:13 131:11 131:21 181:9 182:12
**vary** 43:13
**vast** 70:10 96:16,20 97:13 97:15,17
**vehicle** 28:11
**vendor** 54:24 55:2,3,4,7 120:17 122:6 185:3,7,9,15
**vendors** 185:9 185:16
**verified** 84:13 85:14
**verify** 55:20 189:11
**veritext** 7:20,22 213:1 215:7,9 215:11,20
**versed** 122:23
**version** 142:24 142:25 207:7
**versus** 39:24 40:6 41:7 52:9 52:19 57:7

88:4 95:12 107:21 113:2 166:4
**viable** 153:16
**video** 1:9 7:9 7:12 212:3,7 212:21
**videographer** 2:23 7:5,21 8:18 64:22,25 97:24 98:5 99:5 128:12,15 129:10 169:12 169:15 196:17 196:20 205:17 205:20 211:24 212:2,8,11,17 212:22
**view** 127:24 183:22 184:13
**virtually** 177:19
**virtue** 130:6
**visibility** 55:14 137:5
**visited** 193:17
**volume** 49:4,4 140:8
**volumes** 137:4
**vp** 41:18

| w |
| --- |

**w** 182:6,11
**wa** 1:22
**wait** 12:7

**waived** 215:24 215:24
**waiving** 215:21
**walk** 135:2
**wallat** 1:21 7:22 214:2,22
**want** 12:18 16:3 74:24 76:18 77:14 91:1 92:11 98:1 111:5 116:8 126:13 128:18 175:10 184:18 195:18 208:13 212:9
**wanted** 173:7
**washington** 1:14 2:9,19 7:1 7:19 23:5,10 214:4,23
**way** 43:15 61:18 74:21 76:6 87:22 88:4 126:11 136:1 141:9 166:5 172:11 192:18 194:8 195:3,24 201:17 202:23 203:18 205:11 214:15
**wayne** 9:4
**ways** 101:23 112:6 181:9,12

**we've** 35:25 55:8 58:23 139:11 169:8 201:3
**weeks** 13:7
**went** 99:9 125:7
**west** 182:3,5,11
**whafh.com** 2:6 215:2
**whispering** 7:8
**white** 89:18
**whoever's** 164:6
**wide** 167:20
**widely** 25:10
**william** 145:13
**winding** 193:16
**withdraw** 17:13 18:2 61:8 124:3 164:11
**withdrawn** 151:8 152:9 199:15 206:16 210:16
**witness** 8:20,23 59:1,7 61:20 63:6 64:19 98:2 115:19,20 115:21 180:4 196:15 214:8 214:18 215:13 215:16 216:2,5

Page 59

**[witnesses - zoom]**

| | | | |
|---|---|---|---|
| **witnesses** 62:25 201:20 202:1 | 90:10,20 104:6 104:9 105:16 | **writing** 16:5 200:10 | 55:9 56:17,17 92:1,2 100:22 |
| **wolf** 2:4 8:12 209:23 | 124:8,18,21,22 124:25 125:3,5 | **written** 103:8 156:11 181:8 | 104:11 118:2 126:5 138:16 |
| **wood** 2:7 3:25 4:3 6:17 8:15 8:15 65:2 | 127:20 139:6,7 139:7 143:11 143:24 175:20 | 181:12 **wrong** 196:11 **wrote** 12:24 | 138:22 176:2 185:13 192:8,9 207:12 208:15 |
| **woodlawn** 156:11 157:12 158:23 | 179:5 180:7 186:6 210:24 | 15:2,15,18 134:4 199:18 | 210:19 **yep** 125:24 136:7 |
| **woodline** 156:10 | **worked** 22:18 23:3 41:18 | **x** | **yesterday** 13:4 13:6 |
| **word** 38:3 39:11 70:24 | 45:8 53:10 118:17,20 | **x** 3:1 **xx** 216:1 | **ygr** 1:5 7:17 **yield** 106:5 |
| 103:4 111:19 193:19 194:12 | 209:24 211:7 **working** 22:16 | **y** | 108:12 **york** 2:5,5 |
| 197:4 **words** 60:10 | 51:12 75:22 76:2,8,13,14 | **yeah** 54:2 55:14 69:18 | **z** |
| 76:18 78:14 101:6 182:20 | 77:6 138:22 139:5 192:22 | 75:4 79:11,12 79:17 85:7 | **zero** 26:24 27:1 96:4,8 104:3 |
| **work** 16:15 17:8 18:1 | **workings** 188:5 **works** 124:17 | 87:6,17 89:16 89:25 91:1,24 | 107:14,21,22 **zip** 181:21 |
| 26:21 29:15,16 29:17 32:16 | **world** 119:9 **worries** 72:7 | 93:9 97:6 99:19 101:15 | **zola** 63:24 **zoom** 2:8,13,18 |
| 34:8,21 50:8 50:11,12 51:3 | **worth** 102:25 103:14 | 102:17,19 105:15 115:18 | 2:25 8:9 17:15 |
| 51:9,15,21 53:24 55:6 | **worthwhile** 105:14 | 132:5 134:4 136:10 172:6,8 | |
| 56:8,13,21 58:19 65:16 | **write** 15:1,10 42:21,25 44:14 | 183:15 188:9 188:21 190:15 | |
| 66:15,15,16,21 68:10,11,12,13 | 45:2,7 51:5 53:9 56:8 88:8 | 197:13 212:11 **year** 16:3 64:1 | |
| 69:16,19 71:22 74:18 75:12,18 | 88:8,13 138:12 139:16 140:9 | 64:16 75:16 **years** 9:19 | |
| 75:20 76:25 | 184:21 197:18 199:16 200:19 | 22:19 23:4 26:8 31:21 42:3 51:18 | |

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.